# EXHIBIT A

Page 1

1                          HARVEY

2                     SUPERIOR COURT

3            JUDICIAL DISTRICT OF HARTFORD

4              (COMPLEX LITIGATION DOCKET)

5            Docket No. X03-HHD-CV-15-6057664-S

6    _____

7    EDWARD McDEVITT,                              )

8                     Plaintiff,                   )

9          v.                                      )

10   BOEHRINGER INGELHEIM PHARMACEUTICALS,         )

11   INC., and BOEHRINGER INGELHEIM               )

12   INTERNATIONAL GmbH,                           )

13                     Defendants.                 )

14   _____    )

15

16

17

18      DEPOSITION OF BRIAN E. HARVEY, MD, PhD

19                  Washington, D.C.

20                  November 30, 2017

21

22

23

24   Reported by:  Mary Ann Payonk

25   Job No. 132828

Page 2

HARVEY

November 30, 2017
8:30 a.m.

Deposition of BRIAN E. HARVEY, MD, PhD, held at the offices of Covington & Burling, 850 Tenth Street, N.W., Washington, DC, pursuant to Notice before Mary Ann Payonk, Nationally Certified Realtime Reporter and notary public of the District of Columbia, Commonwealth of Virginia, and State of New York.

Page 3

HARVEY
APPEARANCES:
ON BEHALF OF PLAINTIFF:
    NEAL MOSKOW, ESQUIRE
    URY & MOSKOW
    883 Black Rock Turnpike
    Fairfield, CT 06825

    ELLEN PRESBY, ESQUIRE
    NEMEROFF LAW FIRM
    Hillcrest Tower
    12720 Hillcrest Road
    Dallas, TX 75230

ON BEHALF OF DEFENDANTS:
    PAUL SCHMIDT, ESQUIRE
    NICHOLAS HAILEY, ESQUIRE
    COVINGTON & BURLING
    850 Tenth Street, N.W.
    Washington, DC 20001

ALSO PRESENT:
    Kim Johnson, videographer

Page 4

HARVEY
THE VIDEOGRAPHER:  Here begins media number 1 in the video recorded deposition of Dr. Brian Harvey, taken in the matter of Edward McDevitt versus Boehringer Ingelheim Pharmaceuticals et al., in the Superior Court, Judicial District of Hartford, Case Number X03-HHD-cv-15-6057664-S.
    Today's date is November 30, 2017. The time is 8:51 a.m.  This deposition is being held at 850 10th Street Northwest, Washington, D.C.
    The court reporter is Mary Ann Payonk, the video camera operator is Kim Johnson, both on behalf of TSG Reporting.
    Will counsel please introduce yourselves and state who you represent.
    (Whereupon, counsel placed their appearances on the video record.)
    THE VIDEOGRAPHER:  The reporter may swear the witness.

Page 5

HARVEY
DR. BRIAN HARVEY,
    called as a witness, having been duly sworn, was examined and testified as follows:
        EXAMINATION
BY MR. SCHMIDT:
    Q.  Dr. Harvey, thank you for joining us today.  We said hi briefly before.  I'm Paul Schmidt, I represent Boehringer in this case, and I understand you're a retained expert for the plaintiff in this case.
    A.  Yes, that's correct.
        MR. SCHMIDT:  We have a lot to cover given the size of your report, so let me jump in.  I put before you what I've marked as Exhibit 1, which I understand to be a copy of your 120-page report.
    (Harvey Exhibit No. 1 was marked for identification.)
BY MR. SCHMIDT:
    Q.  Is that a correct description of it?
    A.  From a look at the beginning and the end, it appears to be my report, yes.

HARVEY

1
2      Q.  I have not slipped stray pages in.
3      A.  Okay.
4      Q.  I'm sure Mr. Moskow would tell me if
5   I had.  This report that we've marked as
6   Exhibit 1 contains all your opinions in this
7   case; correct?
8      A.  That's correct.
9      Q.  You're ready to give those opinions
10  and you've done the work you need to be able to
11  explain them?
12     A.  Yes, I have.
13     Q.  If you were going before a jury now,
14  you'd be ready to testify in front of a jury?
15     A.  I'd be ready.
16     Q.  There's no additional work you've
17  either done or plan to do, is there, in terms
18  of generating new opinions?
19         MR. MOSKOW:  I would just object to
20     the point that we received new
21     documentation on Tuesday night from
22     Mr. Hudson that we've not shared with
23     the witness, and we reserve the right to
24     share and seek further information from
25     him after today's deposition.

HARVEY

1
2         MR. SCHMIDT:  If you do that I'd
3     ask you to let us know and we will ask
4     to take Dr. Harvey's deposition again.
5         MR. MOSKOW:  We can address that if
6     and when.
7         THE WITNESS:  AND I would be happy
8     to make myself available if that was the
9     case.
10        MR. SCHMIDT:  Thank you, Doctor.  I
11    appreciate that.
12     Q.  Is there anything right now that you
13  know of that you need to do in addition to the
14  work you've done preparing your report?
15     A.  Well, based upon my experience at
16  FDA, new data does appear.  You know, there are
17  new publications.  And this is a case where the
18  data has evolved over time.  So if between now
19  and trial there was a release of new data, new
20  publications, then I would certainly be looking
21  at that, and then I would discuss with counsel
22  the best way to make sure that that information
23  got incorporated.
24     Q.  I understand your point on that.
25  There's no new data you know of right now

HARVEY

1
2   that's not reflected in your report that you
3   intend to rely on, is there?
4      A.  Not that I know of.
5      Q.  Okay.
6         MR. MOSKOW:  As supplemented with
7     the additional materials.
8         MR. SCHMIDT:  Yeah.
9      Q.  You mentioned just before we were on
10  the record your experience at the FDA.  And I
11  take it that's something that you would say is
12  part of the reason you can serve as an expert
13  witness in this case.  I want to ask you a
14  couple questions about the FDA.
15         Would you agree with me that the FDA
16  has closely reviewed the safety and efficacy of
17  Pradaxa since before it was launched up through
18  the present date?
19     A.  Well, if you could just clarify on
20  your question, because there -- if one is on
21  the outside, there's no way to know the
22  intensity of any specific review.  So from the
23  outside, yes, they follow the traditional FDA
24  process which led to the NDA approval, but
25  there's no way to know whether any individual

HARVEY

1
2   reviewer analyzed every topic and every concern
3   from the outside.
4      Q.  Doctor, you've not seen the
5   publications by FDA officials on Pradaxa?
6      A.  Yes, I have.
7      Q.  You've not seen the communications
8   back and forth between the FDA and individuals
9   at Boehringer?
10     A.  Yes, I have.
11     Q.  You've not seen the review memos
12  written by individuals at the FDA and comments
13  they've made on labeling and things of that
14  nature?
15     A.  I've seen the review memos.
16     Q.  And you've not seen the public
17  statements that FDA officials have made
18  regarding Pradaxa?
19     A.  Yes, I have.
20     Q.  From those various materials that you
21  have seen, would you agree with me that the FDA
22  has closely looked at the safety and the
23  efficacy of Pradaxa from before it was approved
24  up through the present date?
25     A.  Based upon that information that

Page 10

HARVEY

you've just cited, they've done a review of
Pradaxa.

Q.  Has it been thorough?

A.  Once again, there's a -- I'm having
difficulty with the word "thorough" because
it's not defined in regulatory terms.  And
given the fact that there are some concerns
with the drug, it was not a perfect review.

Q.  Okay.  What were the flaws in the
FDA's review from your perspective?

A.  Well, that's part of my opinions in
my report, which I'm happy to go over.

Q.  What did the FDA get wrong in your
view on Pradaxa?

A.  So as -- going back to the initial
data set with the initial interpretation,
because just to clarify, as you know, based
upon the publications, there was a reanalysis
of the RE-LY data that was published and then
there was another reanalysis later on, and
there was the data before the refuse to file by
FDA, and then there was the data after the
refuse to file.

So based upon that early data, there

Page 11

HARVEY

was always a concern that having a policy of no
monitoring across the board didn't necessarily
fit with the data.  And in the RE-LY trial,
there had been a concern that there may not
have been enough patients that fit into all the
different subcategories where they would -- may
have been at higher risk in order to fully test
the working hypothesis that the sponsor had
that no monitoring was valid across the board.

So a concern of the trial and a
concern of FDA's review is that in many of
their documents and public statements, they
focused on stroke prevention, and yet trying to
minimize risk by minimizing both GI bleeding
and non-GI bleeding appeared to be secondary in
their thinking.  And some of the tools that I
would have thought they would have used and
actually later were in Bob Temple -- so
Dr. Robert Temple, who has several roles at
FDA, has since come out with some slide sets,
and he actually has mentioned certain things --
and I'm sure we will talk about that.

But all of that information or all of
those concepts could have come into play during

Page 12

HARVEY

the initial FDA review.  And based upon the
materials I've seen, they haven't.

Q.  Okay.

A.  So RE-LY was a good first step, but
either there should have been more with RE-LY
or subsequent trials should have addressed the
questions, some of which are still unanswered
as of today.

Q.  So let me see if I can unpack that
very long answer.

Do you fault the FDA for approving
Pradaxa without a monitoring requirement, based
on the data that they had at that time?

A.  If you define monitoring as routine
monitoring as is done traditionally with
Coumadin, I don't believe that routine
monitoring is the answer.  I believe in dose
adjustment.  So of course the answer to that
then would be yes, the way you phrased the
question.

Q.  You do fault the FDA?

A.  No, I don't fault the FDA.

Q.  Okay.  Should the FDA have required
some form of blood testing with Pradaxa in your

Page 13

HARVEY

view?

A.  Given that FDA was looking at
benefit/risk, I think there were several
different paths forward.  If they were not
going to approve the 110 dose, then there would
have been more of an emphasis on monitoring.
If they had a 150 dose and a 110 dose, then
testing would have allowed a dose reduction in
an appropriate systematic manner.

So it's really a combination of
testing individuals, you know, tailoring the
treatment to the individual, because one size
doesn't fit all, but second of all, having then
the option of dose reducing from the 150 to the
110 dose which, you know, did not get approved.
By not having that option, you know, that was
a -- I think a limitation in FDA's review and a
potential blind spot.

Q.  I'm going to get into detail on a lot
of those points.  I just want to ask you some
simple questions just at the outset.

Do you agree or disagree with the
FDA's decision not to approve the 110 dose?  Or
do you not have a position on that?

Page 14

HARVEY

1
2    A.  Well, I can understand why they
3  didn't --
4    Q.  I'll withdraw my question.  I'm just
5  going to ask you a yes or no question.
6    A.  Okay.
7    Q.  We've got a lot to cover and I'm
8  going to get into detail on some of these
9  points and you'll have a chance to talk about
10  them and you've had a chance to talk about them
11  in your report.  But I want to just see if I
12  can just understand the parameters of your
13  opinion.
14    A.  Okay.
15    Q.  So let me, with that said, ask my
16  question.
17    MR. MOSKOW:  Let him ask the
18    question.  And also, if you're not able
19    to answer yes or no, you need to tell
20    him that.
21    THE WITNESS:  Okay.
22    Q.  My question is simply, do you agree,
23  disagree or not have a view on whether the FDA
24  appropriately declined to approve the 110?
25  Agree, disagree or don't have a view?

Page 15

HARVEY

1
2    A.  I believe they should have approved
3  the 110 dose based upon the information I've
4  reviewed.
5    Q.  Do you agree, disagree or don't have
6  an opinion on whether the FDA was correct in
7  approving Pradaxa 150 with no form of blood
8  concentration monitoring requirements at all?
9  Agree, disagree or don't have a view?
10    A.  I agree with the approval.
11    Q.  Under those terms?
12    A.  Not under the label that they
13  approved but I agreed with the product approval
14  at 150.
15    Q.  Do you agree with the product
16  approval of 150 with no blood monitoring
17  requirement?
18    A.  With no blood monitoring requirement,
19  yes, I agree with that.
20    Q.  Okay.  Let's go ahead and mark
21  your --
22    A.  But I do make that distinction
23  between routine monitoring and dose adjustment.
24  I --
25    Q.  Do you agree or disagree with the

Page 16

HARVEY

1
2  FDA's approval of the launch label for Pradaxa?
3    A.  I disagree with the launch label.
4    Q.  And I take it you disagree with FDA
5  on -- from your report you disagree with the
6  FDA on its approval of every version of the
7  Pradaxa label.  True or false?
8    A.  That's true.
9    MR. SCHMIDT:  I'm going to go ahead
10    and mark as Exhibit 2 your CV.  And I'll
11    spend some time asking you some
12    questions about your CV.
13    (Harvey Exhibit No. 2 was marked for
14    identification.)
15  BY MR. SCHMIDT:
16    Q.  Is this the most current version of
17  your CV?
18    A.  This is an up-to-date version of just
19  my basic CV.
20    Q.  Is there a more expansive version?
21    A.  I think I shared -- I have -- there
22  are more expansive versions and -- with just
23  more detail about -- around this skeleton.  And
24  it's also publicly available on my LinkedIn --
25    Q.  The more expansive version is?

Page 17

HARVEY

1
2    A.  I think there's more detail.
3    Q.  Okay.
4    A.  This is the version I routinely give
5  out to people because I believe in clarity and
6  brevity.
7    Q.  Just like the FDA; right?  Correct?
8    MS. PRESBY:  Objection.
9    A.  Is that a real question?
10    Q.  It is a real question.  The FDA has
11  that principle in labeling, don't they?
12    MR. MOSKOW:  Objection to form.
13    Q.  Clarity and brevity in labeling?
14    A.  That's one of their stated goals on
15  the website.
16    Q.  If we look at Exhibit 2, Exhibit 2
17  reflects that you've been medically trained in
18  gastroenterology; correct?
19    A.  That's correct.
20    Q.  But you've never had a full-time
21  gastroenterology practice?
22    A.  That's correct.
23    Q.  As I understand it, you've never had
24  a full-time medical practice of -- at any point
25  in your career?

Page 18

HARVEY

1
2     A.  That's correct.
3     Q.  You did practice while you were at
4  the FDA kind of, I guess, on evenings and
5  weekends; is that right?
6     A.  Right.  20, 25, 30 hours a week as a
7  medical hospitalist.
8     Q.  And that stopped in 2010?
9     A.  Yes.  So after I left FDA in 2007 I
10 went to work for Sanofi.  And just given my
11 duties at Sanofi and the travel, it became very
12 difficult to schedule time.  So eventually I
13 stopped that practice.
14    Q.  So when did your medical practice --
15 when did you last practice medicine?
16    A.  So 2010.
17    Q.  2010?  Are you currently licensed?
18    A.  Yes, I am.
19    Q.  But you're not a practicing physician
20 as we sit here?
21    A.  I do volunteer work internationally,
22 and so I've kept up my medical license,
23 including continuing medical education and all
24 of the different things because I believe in
25 giving back, so I do travel around the world

Page 19

HARVEY

1
2  and I've done some medical work and also some
3  veterinary work with my wife, who's a
4  veterinarian.
5     Q.  How often do you do that?
6     A.  One or two times a year.
7     Q.  Does your wife have a private
8  practice?
9     A.  My wife, who was at FDA as well when
10 I was there, but in devices, works as a medical
11 device consultant, but she does have a
12 part-time -- she works in a practice in
13 Maryland, not as an owner but as an employee,
14 part-time, and she also does work for the SPCA
15 and then World Vets internationally.
16    Q.  Is her device practice focused on
17 veterinarian devices?
18    A.  It's on human devices.
19    Q.  On human devices?
20    A.  Yeah.
21    Q.  Has she done any work that touches on
22 any issues relevant to this case in terms of
23 assays or bedside devices?
24    A.  Her focus are vascular stents, so at
25 FDA she was an expert in coronary stents and

Page 20

HARVEY

1
2  carotid stents.  So her focus has been 510(k),
3  PMA and peripheral vascular stents.  So she's
4  dealt with cardiologists but from a -- in the
5  stenting, interventional community.
6     Q.  Let's go back to your experience.
7  Have you ever diagnosed atrial fibrillation?
8     A.  Yes, I have.
9     Q.  When did you last do that?
10    A.  I actually did that in my father
11 three years ago.
12    Q.  Is your father -- not going to ask
13 you about that.  When was the last time you
14 diagnosed atrial fibrillation as part of your
15 medical practice?
16    A.  2010.
17    Q.  2010?  And have you treated atrial
18 fibrillation?
19    A.  During my work at Anne Arundel
20 Medical Center as a medical hospitalist.
21    Q.  And how have you treated it?
22    A.  Well, it depends on whether it's new
23 or -- I mean, my role as a medical hospitalist
24 is after a patient, let's say, was in the
25 emergency room and got diagnosed and the

Page 21

HARVEY

1
2  decision made to admit them, I would admit them
3  to the hospital.  So -- and then I would
4  develop a treatment plan, and more often than
5  not a cardiologist would be involved as well.
6         And the initial treatment of atrial
7  fibrillation at that time was either
8  intravenous heparin or enoxaparin.  Of course,
9  my job was to admit them and then what was done
10 actually during the hospitalization and
11 discharge was outside of my duty.
12    Q.  Let me just ask, you don't intend to
13 offer any testimony about your father's atrial
14 fibrillation I take it.
15    A.  No, I don't.
16    Q.  In terms of your practice, have you
17 ever prescribed warfarin?
18    A.  During my work as a hospitalist, more
19 often than not -- I can't say I've never
20 prescribed warfarin, but usually when admitting
21 a patient, you start them on heparin and see
22 how they do, and then it's later, you know,
23 it's later on when the warfarin gets
24 prescribed.  During internship and residency in
25 Boston, I would have prescribed warfarin for

Page 22

HARVEY

1  patients during their hospital stay as a -- you
2  know, during that medical training.
3      Q.  Do you have any recollection of
4  prescribing warfarin since your internship and
5  residency?
6      A.  There -- as I think about it, there
7  probably were several cases as a medical
8  hospitalist where I admitted the patient,
9  started the IV heparin and then gave the first
10  dose of Coumadin, and then with the
11  instructions to test, you know, to draw PT/INR
12  in the morning.
13     Q.  Have you ever initiated prescriptions
14  of warfarin?
15     A.  No.
16     Q.  Have you treated patients who
17  suffered from strokes?
18     A.  Yes.
19     Q.  Have you been responsible for the
20  care of patients on warfarin in terms of
21  ongoing monitoring of those patients?
22     A.  No.
23         MS. PRESBY:  Objection, form.
24     Q.  And you've never prescribed Pradaxa

Page 23

HARVEY

1  or any other novel oral anticoagulant?
2      A.  No, I have not.
3      Q.  That's just because of the timing of
4  when they came on the market?
5      A.  Correct.
6      Q.  That was after your medical practice
7  had ended?
8      A.  That's correct.
9      Q.  Did you ever read the Pradaxa label
10  as kind of a practicing doctor?
11         MR. MOSKOW:  Objection, form.
12     A.  I read the Pradaxa label as a
13  regulatory expert keeping up with all the
14  various developments.  Given the newness of
15  this, you know, this class, I've read the
16  label.
17     Q.  When did you first read the label?
18     A.  On the FDA website, so when it became
19  available, so it would have been after approval
20  and when it was posted on the FDA website.
21     Q.  When you were at Sanofi?
22     A.  When I was at Sanofi.
23     Q.  You've never read it as a practicing
24  doctor, the Pradaxa label?

Page 24

HARVEY

1         MR. MOSKOW:  Objection to form.
2      A.  The label would have been available
3  after I stopped practicing, so the answer is
4  no, I never read it as a practicing physician.
5      Q.  You state on page 2 of your report
6  that you've treated patients with
7  anticoagulation therapy who have presented to
8  the hospital with serious bleeds.  Is that
9  correct?
10     A.  I've treated patients with serious
11  bleeds and I've treated patients presenting to
12  the hospital.  I don't quite understand your
13  question.
14     Q.  Have you treated patients who have
15  anticoagulant bleeds?
16     A.  Yes, I have.
17     Q.  And that's all warfarin bleeds;
18  correct?
19     A.  That would have been warfarin bleeds,
20  it may have been some enoxaparin bleeds, and it
21  may have also been sub Q heparin because part
22  of the practice at the time was giving large
23  doses of sub Q heparin.  So heparin, sub Q IV,
24  and enoxaparin.

Page 25

HARVEY

1      Q.  Can you quantify how many times
2  you've treated warfarin bleeds in your career?
3      A.  During my gastroenterology
4  fellowship, much of what we did on an emergency
5  basis were GI bleeds, and many of those
6  patients were on either aspirin or warfarin or
7  some sort of anticoagulant.  I wouldn't be able
8  to quantify the number but, you know, there was
9  a percentage of serious bleeds that were likely
10  associated with warfarin.
11     Q.  So let me see if I have that.  When
12  you were a gastroenterology -- and I always get
13  these terms mixed up -- resident or fellow?
14     A.  Fellow.
15     Q.  Fellow.  When you were a
16  gastroenterology fellow, it was not uncommon to
17  see warfarin GI bleeds.  True?
18     A.  Correct.
19     Q.  And that's because warfarin has a
20  well-known bleed profile generally and
21  gastrointestinal bleed profile specifically?
22         MR. MOSKOW:  Objection to form.
23     A.  Correct.
24     Q.  And you were not specializing in

HARVEY

1
2 warfarin, you were specializing in
3 gastroenterology issues, and part of
4 specializing in gastroenterology issues is
5 you're inevitably going to see a reasonable
6 number of warfarin gastrointestinal bleeds;
7 correct?
8          MR. MOSKOW:  Objection, form.
9      A.  That's correct.
10     Q.  Just comes with the territory when
11 you were practicing?
12     A.  Correct.
13     Q.  And those can be quite, quite serious
14 bleeds; right?
15         MR. MOSKOW:  Objection to form.
16     A.  Yes.
17     Q.  Since you've been a gastroenterology
18 fellow, could you quantify in your medical
19 practice how common it was for you to see
20 warfarin bleeds?
21     A.  It was not very common because I was
22 a hospitalist, not an intensivist.  And so if
23 there was a serious GI bleed, that wouldn't
24 have come to me, it would have gone to the
25 intensivist.  So there's a certain selection

HARVEY

1
2 bias there.
3      Q.  Got it.  Your focus would not be on
4 the serious warfarin GI bleeds; that would have
5 gone to someone else at the hospital?
6      A.  That's correct.
7      Q.  Did you ever administer treatment to
8 patients who had warfarin bleeds?
9      A.  Yes.
10     Q.  Did that include Vitamin K?
11     A.  It included Vitamin K.
12     Q.  You've heard of Vitamin K referred to
13 as a, quote, reversal agent for warfarin;
14 right?
15     A.  Yes.
16     Q.  In your experience how long does it
17 take for Vitamin K to fully reverse a serious
18 warfarin bleed?
19     A.  Well, one of the concerns is there is
20 variability, and it also has to do with how
21 much Vitamin K you give.  And over the years
22 there has been a disagreement on whether to
23 give a little or a lot, because if you give a
24 lot, then it takes a long time to restart the
25 Coumadin.  There's also some question on

HARVEY

1
2 whether or not giving a lot actually speeds up
3 the effect.
4          And then for when I was in practice,
5 we would often give fresh frozen plasma at the
6 same time for a more immediate effect while the
7 Vitamin K kicked in.  So the thought was it
8 would take a number of hours for Vitamin K, but
9 sometimes you actually saw a quicker onset.
10 But there was a lot of variability.
11     Q.  It can take more than a day with
12 Vitamin K; right?
13     A.  It can -- there are -- I can think of
14 examples when it took more than a day.
15     Q.  Even with fresh frozen plasma, it can
16 take hours and hours and hours; right?
17         MR. MOSKOW:  Objection to form.
18     A.  I had pretty good luck with fresh
19 frozen plasma, so --
20     Q.  How long?
21     A.  Pardon?
22     Q.  How long would fresh frozen plasma
23 take?
24     A.  Just an hour or two.
25     Q.  Have you reviewed the data that's

HARVEY

1
2 inconsistent with that on fresh frozen plasma
3 and how long it takes?
4      A.  I'm speaking about what I did back in
5 the 1990s.  There have been a lot of
6 publications since then.  And so my practice
7 now would be -- might be different based upon
8 data.  But that was a snapshot in time.
9      Q.  My question is simply have you
10 reviewed the data from actual studies that
11 exist on how long it takes Vitamin K to work,
12 how long it takes fresh frozen plasma to work?
13     A.  I have -- I have not done a
14 systematic review and nor has that been
15 something that I focused on for my report.  I
16 do know of articles where the time frame is
17 actually longer than what my experience was.
18     Q.  Okay.  And you know that both Vitamin
19 K and fresh frozen plasma carry their own
20 independent risks?
21     A.  Yes.
22     Q.  What are some of the risks of fresh
23 frozen plasma?
24     A.  Well, in the days before HIV testing
25 and hepatitis C testing, there was viral

HARVEY

transmission.  And even today with Sika and some other viruses, if they're not specifically testing, any blood product can then transmit.  And Vitamin K sometimes is an all-or-nothing; it can actually cause clotting.

Q.  Have you ever used a -- Vitamin K can cause the very problem that you're taking warfarin to prevent, like a stroke?

A.  That's correct.

Q.  Have you ever used an anticoagulation test in your career -- in your practice?

A.  Yes.

Q.  And when was the last time you did that?

A.  That would have been in 2010.

Q.  Was that an INR test?

A.  So it was an INR, a PT, PTT, INR.

Q.  And that's what I was going to ask.  Have you used the APTT test?

A.  Yes, I have.

Q.  Have you used the TT and the ECT test?

A.  I have not, once again because they were not routinely available up until 2010.

HARVEY

Q.  You had -- you were at the FDA from '95 to 2007; correct?

A.  That's correct.

Q.  Did you ever work on any atrial fibrillation treatment when you were at the FDA?

A.  I was for a period of time in the cardiovascular devices division, and there were some devices at that time that dealt with atrial fibrillation.  This was around the time of automatic defibrillators and things like that.  So I did have experience -- regulatory experience on the device side with cardiovascular issues during that part of my career.

Q.  What about in terms of anticoagulation?  Did you have any experience with anticoagulation while you were at the FDA?

A.  Yes, I did.

Q.  And what was that experience?

A.  That was when I first became GI division director.  There was -- GI was combined with hematology at that time, and so all of the different hematology products,

HARVEY

including some of the anticoagulants, were there.  Then during the reorganization they split hematology to go to the oncology office, and then GI was where I remained as a -- having trained in gastroenterology.

Q.  So what anticoagulation products did you ever have responsibility for when you were at the FDA?

A.  Well, I would have to look back to make sure that I wasn't giving away any proprietary or confidential information, because those would have been under IND review, and that's confidential information.

Q.  Subject to a FOIA request, though; right?

A.  For redacted, yeah.

Q.  Are there any products on the market that you have worked on while you were at the FDA that are anticoagulation products?

A.  Well, it would have been anything that was under IND back in 2005.

Q.  Okay.  Is there any such thing?

A.  I would have to go back and check.

Q.  You don't know, sitting here today,

HARVEY

of any anticoagulation products you've worked on while you were at the FDA that have ever been approved?

A.  There are a number of products that never got approved, and I would have to look back and see if some of the ones that were subsequently approved were actually there during that time.

Q.  Do you have any recollection of working on an anticoagulant product that was approved?

A.  Like I said, I really am reluctant to give away anything that's -- one of the things we learn at FDA is that you don't talk about products in -- under IND.  You know, companies who own the product can talk about development.  But when I was at the FDA we were told you're not even supposed to reveal the existence of an IND, let alone how it's going.

Q.  That's why I asked the question the way I did.  Are you aware of any approved products that you worked on in terms of anticoagulation while you were at the FDA?

A.  And I would have to think about that.

HARVEY

1
2    Q.  Can you identify any sitting here
3    right now?  Approved products for
4    anticoagulation that you worked on while you
5    were at the FDA?
6    A.  No, I can't think of any right now.
7    Q.  On page 3 of your report, Exhibit 1,
8    you make reference to something that you just
9    referenced now.  "I did get to know" -- I'm in
10   paragraph 13, second-to-last sentence: "I did
11   get to know the medical officers and hematology
12   team leaders during this time period and
13   maintained professional contact over the years,
14   understanding their analytic perspective during
15   the regulatory review process for hematology
16   products."
17        Why is that relevant to your opinions
18   in this case?
19   A.  Well, because many of the
20   anticoagulants are reviewed in both the
21   hematology division as well as the cardiorenal
22   division, and there are a lot of interactions
23   between the two, and even when there are no
24   formal consults, some of the thinking from
25   hematology worked its way into cardiorenal and

HARVEY

1    vice versa.
2
3    Q.  Do you know of any hematology role
4    that has been played with respect to oral
5    anticoagulants?
6        MR. MOSKOW:  Objection to form.
7    A.  Only what would be publicly available
8    on the FDA website, but I -- offhand I don't
9    know of any.
10   Q.  Okay.  You're not here to speak for
11   the FDA; correct?
12   A.  That's correct.
13   Q.  In fact it would be unethical for you
14   to purport to speak to the FDA; correct?
15       MR. MOSKOW:  Objection to form.
16   A.  I'm retired FDA and so I'm speaking
17   on my experience from my time at FDA, but also
18   then in industry.
19   Q.  So come back to my question.  It
20   would be unethical for you to purport to speak
21   for the FDA in this matter; correct?
22       MR. MOSKOW:  Objection to form.
23       MS. PRESBY:  Form.
24   Q.  Do you know?
25   A.  I guess I'm having trouble with the

HARVEY

1
2    ethics.
3    Q.  Okay.
4    A.  Because it would be ill-advised and
5    would be unwise.
6    Q.  Would it be illegal?
7        MR. MOSKOW:  Objection to form,
8    calls for a legal conclusion.
9    A.  I'm -- you know, I don't know -- I
10   know when I left the FDA there were certain
11   guidelines, ethics guidelines, and that wasn't
12   one of them specifically.  But I'm not an
13   employee of the FDA now, and therefore I'm not
14   speaking for the FDA now.
15   Q.  Have you spoken with anyone at the
16   FDA about this matter?
17   A.  No, I have not.
18   Q.  Do you keep in touch with people at
19   the FDA?
20   A.  Yes, I do.
21   Q.  You've raised various concerns about
22   both the FDA's work on Pradaxa and Boehringer's
23   work on Pradaxa in your report; correct?
24   A.  Yes, I have.
25   Q.  Have you raised any of those concerns

HARVEY

1
2    with former colleagues at the FDA or with
3    anyone at the FDA?
4    A.  Not since I've started working on
5    this case.
6    Q.  Have you done it before?
7    A.  I had a ongoing dialogue with Bob
8    Temple who I worked with a number of years ago.
9    Q.  About Pradaxa?
10   A.  Not specifically about Pradaxa, but
11   about anticoagulation and bleeding.  I had
12   always felt that he minimized the severity of
13   GI bleeding, and having trained in GI and
14   having seen patients die from GI bleeds, you
15   know, I would communicate that to him.  And we
16   also have had an ongoing dialogue about
17   aspirin.  He doesn't believe in primary
18   prevention of aspirin, only secondary.  So, you
19   know, he and I have an ongoing dialogue but
20   never have specifically talked about Pradaxa
21   ever and not really had a dialogue since I've
22   started on this case.
23   Q.  Have you had any dialogue ever with
24   anyone at the FDA about any -- I'm going to use
25   the term NOAC, novel oral anticoagulant?  Have

Page 38

HARVEY

1  you ever had any dialogue with anyone at the
2  FDA, Dr. Temple or otherwise, about any novel
3  oral anticoagulant or about novel oral
4  anticoagulants generally?
5      A.  I did comment to Dr. Temple that I
6  liked his slides when he came out with them in
7  2014 and 2015, and I've referenced those slide
8  sets in my report.  But we didn't -- we didn't
9  go into any depth.
10     Q.  When did you make that comment to
11 him?  Around the time that he presented those
12 slides?
13     A.  It would have probably been either
14 late 2015 or maybe after the holidays,
15 January 2016.
16     Q.  Okay.  Now, at that time you were
17 employed at Pfizer; correct?
18     A.  2015, '16 I was an independent
19 consultant.  I left Pfizer in April,
20 March-April of 2015.  So I was independent
21 then.
22     Q.  Do you -- you know what a citizen's
23 petition letter is?
24     A.  Yes, I do.

Page 39

HARVEY

1      Q.  Do you have any -- you've not written
2  a citizen's petition letter about Pradaxa?
3      A.  I've not.
4      Q.  Do you have any intention to do so?
5      A.  No, I do not.
6      Q.  You know that a citizen's petition is
7  a vehicle that you or any other citizen has to
8  write to the FDA and raise concerns including
9  if you think a drug has inappropriate labeling;
10 correct?
11     A.  Yes, I do.
12     Q.  And the FDA will act on citizen's
13 petitions, it will review them and in many
14 instances give a full decision --
15         MR. MOSKOW:  Objection to form.
16     Q.  -- as to whether it agrees or
17 disagrees with the citizen's petition; correct?
18     A.  That's correct.  I had not thought
19 about that until you mentioned that but that
20 actually is a good idea, but.
21     Q.  Do you have an intent to do so now?
22     A.  No, I don't.
23     Q.  If you did would you disclose the
24 fact that you're a paid expert for the

Page 40

HARVEY

1  plaintiff lawyers?
2      A.  Well, it's a theoretical because I
3  really -- I don't plan to submit a citizen
4  petition, and I would need to go back -- the
5  FDA has guidance documents, and I would follow
6  that, and any sort of disclosure that I would
7  need to make I certainly would make.
8      Q.  You would make that disclosure?
9          MS. PRESBY:  Objection, form.
10     A.  If the FDA guidance on submitting
11 citizen's petition recommends that that
12 disclosure is made -- and nowadays disclosures
13 are a big part of publications and
14 everything -- I would certainly be willing to
15 do that, you know, to follow the rules and the
16 guidelines.
17     Q.  You mentioned disclosures are a big
18 part of publications.  You've never published
19 on Pradaxa; correct?
20     A.  That's correct.
21     Q.  You've never published on any stroke
22 prevention treatment; correct?
23     A.  That's correct.
24     Q.  You've never published on strokes at

Page 41

HARVEY

1  all or atrial fibrillation at all; correct?
2          MR. MOSKOW:  Objection to form.
3      A.  That's correct.
4      Q.  If you were to publish on Pradaxa,
5  would you disclose that you're a paid
6  plaintiffs' expert?
7          MS. PRESBY:  Objection.
8          MR. MOSKOW:  Objection to form,
9          calls for speculation.
10     A.  If I were, I would certainly disclose
11 that.
12     Q.  Okay.  If you were to publish?
13     A.  If I were to publish.
14     Q.  Is there a reason that you would not
15 write a citizen's petition letter to the FDA
16 regarding your views in this case?
17         MR. MOSKOW:  Objection to form.
18     A.  Based upon my FDA experience, I don't
19 necessarily think that citizens' petitions are
20 that effective, and a lot of work goes into
21 them, often with very little impact.  And so I
22 wouldn't see that as something that I would
23 need to do.  And it's often in the realm of --
24 many of the law firms do that, and whether or

Page 42

HARVEY

1  not they have utility doesn't seem to matter
2  there.
3      Q.  Do you have any intention -- strike
4  that.
5          MR. SCHMIDT:  Let me say for the
6      record, I don't think simultaneous
7      objections are proper.  I don't want to
8      have a big fight about it but I'm going
9      to ask just one of you guys to object.
10     Q.  Doctor --
11         MR. SCHMIDT:  I'm not saying it's
12     been disruptive; it hasn't.  But I don't
13     think it's proper and I wouldn't want it
14     to be disruptive.
15         MS. PRESBY:  It won't be
16     disruptive.  But I just for the record
17     want to say I disagree based on our
18     protocol.
19     Q.  Doctor, have you expressed the views
20  you've expressed in your report in any context
21  outside of this litigation?
22     A.  I have not.
23     Q.  Has there been any way in which you
24  have expressed your views on Pradaxa or on the

Page 43

HARVEY

1  FDA's regulation of Pradaxa other than in the
2  context of being paid by plaintiffs' lawyers?
3      A.  I have not.
4      Q.  Do you have any intention to do so?
5      A.  I don't.
6      Q.  When you were at the FDA -- I'm going
7  to ask you in a minute about your work at
8  Sanofi and your work at Pfizer.  When you were
9  at the FDA did you work on any Sanofi or Pfizer
10 drugs?
11     A.  Yes, I did.
12     Q.  Which ones?
13     A.  So when I was at FDA in the GI
14 division I worked on Protonix, which was a
15 Wyeth drug which then became a Pfizer drug.
16 That's a proton pump inhibitor.  And there was
17 a Sanofi Synthelabo drug that I'm blanking on
18 the name but it was actually part of the FDA
19 EMA joint review process.  So we were on a
20 videoconference with Sanofi and EMA as part of
21 that development program.
22         And then of course Sanofi Synthelabo
23 merged with Aventis to became Sanofi-Aventis
24 who I work with.  Those are the notable

Page 44

HARVEY

1  interactions.
2      Q.  Did you work on any products that
3  were later withdrawn from the market?
4      A.  Not either for Sanofi or Pfizer.
5      Q.  Okay.  Did you work -- did you, in
6  fact, approve a product called Bextra that
7  Pfizer made?
8      A.  Actually, I did not.
9      Q.  Okay.  Did you sign letters approving
10 it?
11     A.  I signed letter -- so as acting
12 director of the analgesics division, I signed
13 labeling supplements because it was well after
14 the approval, and I was the lead negotiator on
15 the FDA side to impose the black box on Bextra
16 for Stevens-Johnson syndrome.  So my signature
17 would have been on that as well.
18     Q.  And then you were at Pfizer when
19 Bextra was pulled from the market; correct?
20     A.  I was at FDA when Bextra was pulled
21 from the market.
22     Q.  When was Bextra pulled from the
23 market?
24     A.  It would have been in 2005, and I was

Page 45

HARVEY

1  still at FDA then.
2      Q.  Were you at -- did you have any work
3  on Bextra while you were at Pfizer?
4      A.  I'm not aware of any work on Bextra
5  because I was at Pfizer from January 2012 until
6  early 2015.  So I'm not aware of any
7  development work on Bextra at that time.
8      Q.  Okay.  You left the FDA in 2007.
9  What month did you leave?
10     A.  It was in the March-April time frame.
11     Q.  And you went straight to Sanofi?
12     A.  And I left FDA because I was
13 recruited by Sanofi to become their FDA
14 liaison.
15     Q.  Did they talk to you while you were
16 at the FDA, while you were still employed by
17 the FDA?
18     A.  They -- I was contacted by a
19 recruiter in February 2007.  I notified my
20 supervisor of that.  I interviewed.  And then
21 part of the process was I recused myself from
22 anything -- and there were no Sanofi-Aventis
23 products.  So I followed the procedures.  And
24 then I was offered a job and started I think

Page 46

HARVEY

1 late March, early April of 2007.
2 Q. And what made you switch?
3 MR. MOSKOW: Objection to form.
4 A. Well, the honest answer is that I'd
5 been at FDA for 11 years, I was mid career, I
6 was looking for more. It was an amazing
7 opportunity to become the head FDA liaison for
8 a major pharmaceutical company. And, you know,
9 my children were, you know, nearing college age
10 and it was time for a change, and I welcomed
11 the opportunity to work with an international
12 company and spend time in Paris and learn new
13 things.
14 Q. What's the relevance of your kids
15 nearing college age? I think I know the
16 answers having kids of my own nearing college
17 age, but --
18 A. It's very difficult to pay for
19 college on a government salary.
20 Q. Did you value the work you were doing
21 at a pharmaceutical company in terms of
22 bringing new medicines to patients?
23 MS. PRESBY: Objection, form.
24 A. I enjoyed my work at Sanofi because I

Page 47

HARVEY

1 was able to bring new FDA insights to an
2 organization that benefited from my experience.
3 I was able to establish an office of FDA
4 liaison and a process of interacting with FDA
5 that's continued long after I left. And I
6 think I also had an impact on some of the
7 internal decisions of terminating programs
8 where the benefit didn't outweigh the risk, as
9 well as, you know, getting things approved.
10 So I think my expertise benefited
11 Sanofi, and I learned quite a bit about the
12 pharmaceutical industry making that move.
13 Q. Were you -- when you were at the FDA
14 were you ever subject to any kind of public
15 criticism for your work at the FDA?
16 MR. MOSKOW: Objection to form.
17 A. Yes, there was public criticism.
18 Q. And what was that?
19 A. That was during the Vioxx issue. I
20 had been -- I was deputy office director,
21 Office 5. And when Lee Simon, who was the
22 analgesic rheumatology director, left FDA to go
23 back to Harvard, they made me acting director.
24 It's a routine practice at FDA that if you're

Page 48

HARVEY

1 at one level and somebody below you leaves, you
2 have then a higher level person acting until
3 that position could be filled.
4 And while I was in that acting
5 director position, we got the phone call from
6 Merck setting up the in-person meeting where
7 they announced that they were withdrawing
8 Vioxx. So I became the point person with the
9 interactions with Merck. It was my job to
10 interact with Ned Braunstein, who was head of
11 regulatory, U.S. regulatory at Merck. And
12 because of that position and my job of
13 interacting in the withdrawal of Vioxx, as well
14 as the planning of the 2005 February advisory
15 committee meeting, my name came up in one of
16 Senator Grassley's emails and -- and
17 announcements. And because of that he
18 requested an Inspector General investigation.
19 Q. Okay. So what was the specific
20 criticism that was made against you?
21 A. The criticism from Senator
22 Grassley's -- it was actually his staff I found
23 out later -- was I was colluding with Merck.
24 And it was after Vioxx had been withdrawn so it

Page 49

HARVEY

1 was always very confusing to me what I was
2 colluding over. And the Inspector General
3 investigation, which included a sworn
4 deposition, found there was no basis for the,
5 you know, that allegation that Senator
6 Grassley's staff had made.
7 Q. So there was an Inspector General
8 investigation of you?
9 A. Yes.
10 Q. And you gave testimony in that
11 investigation?
12 A. Yes, I did.
13 Q. Do you have -- do you retain that
14 testimony?
15 A. No. I was never given that sworn
16 deposition.
17 Q. And was there a report written by the
18 Inspector General?
19 A. I was never shown a report and I was
20 told that Inspector General investigations
21 are -- results are not made public, unlike GAO.
22 Q. So how were you told the results of
23 it?
24 A. I was told by the investigator that

HARVEY

1
2  there was no basis for the claim and the
3  investigation had concluded and I was cleared.
4      Q.  Okay.
5      A.  And that was prior to Christmas of
6  2006.
7      Q.  There was no document you were given
8  on that or anything?
9      A.  No, I wasn't.
10     Q.  And do you recall that the allegation
11  related to one of your colleagues and an
12  accusation that you were undermining one of
13  your colleagues at the FDA?
14     A.  Oh, the -- and it's still -- if you
15  do a Google search, it's all still there.  The
16  allegation was that I was colluding against
17  David Graham, Dr. Graham, who was a safety
18  officer.
19     Q.  He's a pretty well-known safety
20  officer at the FDA?
21     A.  He's very well known.  He's been
22  critical of many, many drugs over the years.
23     Q.  I was going to say, he's someone
24  who's pretty ready when he sees a safety issue
25  to say this drug should be pulled from the

HARVEY

1  market?
2
3      A.  Yes, he has said that for many drugs.
4      Q.  That's what I was going to say.
5  There's been a number of instances where
6  Dr. Graham has publicly or within the halls of
7  the FDA said this drug's too dangerous, we need
8  to take it off the market?
9          MR. MOSKOW:  Object to the form.
10     A.  That's what he has said.
11     Q.  He's known as a bit of a gadfly
12  within the FDA?
13         MR. MOSKOW:  Objection to form.
14         MS. PRESBY:  Objection.
15     A.  Well, you know, of course I never
16  worked with him directly because I was in new
17  drugs, he was in drug safety.  We were in
18  different silos.  And so neither one of us
19  really crossed paths and neither one of us had
20  any direct oversight of the other.  So I'm
21  certainly aware of what he did and read
22  extensively in the press.
23     Q.  I was being jokey.  Let me ask it a
24  little more seriously.
25         Do you have a good regard for

HARVEY

1
2  Dr. Graham and his safety efforts at the FDA?
3      A.  The honest answer is that there are
4  many drugs that he criticized where he was
5  wrong, that the safety, the benefits did
6  outweigh the risks, and there were a few
7  examples where he is right.  And if all drugs
8  are bad, eventually you're going to be right.
9  And so his tendency is to see the negative, and
10  there have been a few times he's been correct,
11  but there are many drugs that are still being
12  used today with good benefit/risk where he felt
13  they should have been withdrawn and that
14  actually probably would not have been a good
15  thing.
16     Q.  So, but fair to say from what you
17  just said, and I think I'm quoting what you
18  just said, you think Dr. Graham has a tendency
19  to see the negative in drugs?
20     A.  Well, his role at FDA was in drug
21  safety.  My role was in premarket approval.
22  And so he had a role to play and he played that
23  role.
24     Q.  But in that role, I think you said a
25  moment ago his tendency was to see the negative

HARVEY

1
2  in drugs.
3      A.  If you do a Google search, you see
4  that he's criticized many drugs, as you
5  probably did to find my, you know, my
6  experience.
7      Q.  So what I said is correct?
8      A.  His tendency was to be negative,
9  that's correct.
10     Q.  Okay.  When you were at either Sanofi
11  or Pfizer did you recuse yourself from any FDA
12  interactions?
13     A.  Well, under the policy I was given,
14  the ethics policy, I could have no direct
15  interactions with FDA for the first year, when
16  I was at Sanofi.  And if I was directly
17  involved or had approved something -- you know,
18  if I was directly involved, then it was two
19  years, and if I was actually the signatory
20  authority of approval, there was some wording
21  for actually a lifetime ban of interacting.  So
22  I followed those rules to the letter.
23     Q.  What did you -- what made you leave
24  Sanofi and go to Pfizer in 2012?
25     A.  Well, I was contacted by a recruiter

HARVEY

1   for a position of VP U.S. regulatory strategy,
2   which was a step up from -- I was VP U.S.
3   regulatory policy, and so in order -- and the
4   opportunity to be the top regulatory person in
5   the U.S. for Pfizer was an amazing opportunity.
6   And so I interviewed and I got the job and was
7   quite glad I did because the experience I got
8   in working with a high-quality organization
9   like Pfizer, working in the advertising and
10  promotional space, it really broadened my
11  perspective even further.
12       Q.  Did you work on any medicines at
13  either Pfizer or Sanofi that were subject to
14  litigation?
15       A.  Well, it seems like all medicines are
16  subject to some sort of litigation nowadays.
17  Yes, it does.
18       Q.  Yes, it does.
19       A.  So when I was at Pfizer I was
20  involved with the approval of Xeljanz, which is
21  the first JAK inhibitor.  I don't know what
22  current litigation there is but I'm sure
23  there's something.  Duavive, which is an
24  estrogen combination, involved in that
25  approval.  I worked with the vaccine folks on

HARVEY

1   Trumenba, which is a meningococcal B
2   vaccination.  And I also worked with the
3   oncology group for palbociclib, which became
4   Ibrance, which is one of the first breakthrough
5   designation drugs, and that got approved --
6   accelerated approval and then full approval.
7       Q.  Were you ever deposed?
8       A.  I was never deposed at Pfizer.
9       Q.  Or at Sanofi?
10      A.  Or at Sanofi.
11      Q.  Now, at Pfizer I think you say in
12  your report that you were -- in your CV that
13  you were the lead for U.S. regulatory strategy
14  across all Pfizer business units.  Is that
15  correct?
16      A.  Yes.  So I worked in parallel with
17  the regulatory leads of the various business
18  units.
19      Q.  Were you responsible ultimately for
20  every -- I think you say in your report, I was
21  the final signatory on all labels that were
22  sent to the U.S. FDA.  Is that correct?
23      A.  As VP U.S. regulatory strategy at
24  Pfizer, that's correct.
25

HARVEY

1       Q.  And would that include products that
2   you had a co-promote relationship with another
3   company?  Would you still have a role on the
4   labeling?
5       A.  Actually, not.
6       Q.  Okay.
7       A.  Because in the co-promotes, they
8   always had someone who was the U.S. lead, and
9   if Pfizer was the U.S. lead, then I would have.
10  But in many cases, the U.S. lead was the other
11  company, and therefore, their regulatory person
12  would have had the sign-off.
13      Q.  So Eliquis is a Pfizer drug; correct?
14      A.  Eliquis is part of the Pfizer
15  Bristol-Myers Squibb partnership, and
16  Bristol-Myers Squibb holds the U.S. NDA, which
17  means the Bristol-Myers Squibb regulatory
18  person was the signatory authority.
19      Q.  Pfizer profits off of Eliquis sales;
20  correct?
21      MS. PRESBY:  Objection, form.
22      A.  There is a partnership and I'm not
23  aware of what the interaction is.  But since
24  there is a partnership, they have -- they

HARVEY

1   shared in the costs and I'm sure there's, you
2   know, the business -- there's a business
3   arrangement but I don't know the contract.
4       Q.  Does Pfizer have any role in the
5   labeling for Eliquis?
6       A.  I was not involved in that because
7   Bristol-Myers Squibb was the lead on that NDA
8   approval.
9       Q.  So as far as you know did anyone in
10  regulatory at Pfizer have any role regarding
11  Eliquis?
12      A.  I know there were some individuals in
13  advertising and promotion who had an advisory
14  role, and there would have been some in
15  regulatory that maybe had an advisory role, but
16  not being directly involved with it, I don't
17  know who had authority since the ultimate
18  sign-off was Bristol-Myers Squibb.
19      Q.  Eliquis was launched when you were at
20  Pfizer; correct?
21      MR. MOSKOW:  Objection to form.
22      A.  Yes, I was there.
23      Q.  And it was on the market for several
24  years while you were at Pfizer; correct?
25

Page 58

HARVEY

1
2    A.  I didn't follow it that closely but
3  it was approved and then, like I said, I left
4  early on in 2015, so it would have been on
5  for --
6    Q.  Two years?  Correct?
7    A.  I will -- I will take your word for
8  that.
9    Q.  Did you have any role or any
10 discussions regarding Eliquis?
11    A.  Eliquis was discussed in general at
12 some of the meetings, the regulatory meetings
13 as general issues in process.  You know, there
14 always were discussions about how to interact
15 with a partner.  But as far as, you know, the
16 data and the nuts and bolts application, I was
17 not part of those discussions.
18    Q.  So you were responsible ultimately
19 for all Pfizer labels; correct?
20    A.  That's correct.
21    Q.  Did you have the ability, whether it
22 was binding or not -- strike that.
23      Who was your counterpart at BMS who
24 would have had that role as to Eliquis?
25    A.  I'm not sure.

Page 59

HARVEY

1
2    Q.  You don't even know?
3    A.  I know Dr. Hukkelhoven was at BMS.
4  He was the head of regulatory.  But I think he
5  might have -- I think he's a senior VP so he's
6  not -- I was a VP.  So I don't know who exactly
7  under him would have been involved.
8    Q.  Did you have the ability if you
9  wanted to raise concerns -- strike that.
10      You talked about advisory work that
11 people on your team would have done regarding
12 Eliquis, including on promotional issues;
13 correct?
14    MR. MOSKOW:  Objection to form,
15  mischaracterizes the testimony.
16    A.  There were people in Pfizer
17 advertising and promotion who were on some of
18 the various advisory groups for Bristol-Myers
19 Squibb.
20    Q.  And were those people under your
21 supervision?
22    A.  There were some that were under my
23 supervision.
24    Q.  So people on your team were giving
25 advice on the promotion of Eliquis; correct?

Page 60

HARVEY

1
2    MR. MOSKOW:  Objection to form.
3    A.  Yes.
4    Q.  And you understand it's a basic rule
5  when you're promoting a medicine that the
6  promotion has to be consistent with the label.
7    A.  I'm aware of that, yes.
8    Q.  And if the label is defective in some
9  core way, then the promotion will
10 correspondingly be defective; correct?
11    A.  Are we talking in general or --
12    Q.  Yes.
13    A.  In general, that's correct.
14    Q.  Was it important to you that when
15 your team members were working on a product,
16 whether it was Eliquis or something else, that
17 they acted consistent with patient safety?
18    A.  That's important, yes.
19    Q.  Would you expect them to raise issues
20 or concerns they had with you if what was being
21 done was inconsistent with patient safety?
22    MR. MOSKOW:  Objection to form.
23    A.  Well, I would expect them to raise
24 the issues, but I would not have been the
25 appropriate person to raise the issues with,

Page 61

HARVEY

1
2  given that it was a partnership with
3  Bristol-Myers Squibb.  I had a lot on my plate
4  for all the Pfizer products, and so their input
5  or any input they may have given on these
6  advisory committees would have gone to
7  Bristol-Myers Squibb and not to me.
8    Q.  If they had a concern about the
9  disclosures that were being made regarding
10 Eliquis, would you expect them to raise them
11 with you, if they were concerned that the
12 disclosures were jeopardizing patient safety
13 woman.wouldn't.
14    MR. MOSKOW:  Objection to form.
15    MS. PRESBY:  Objection.
16    A.  I wouldn't have expected that they
17 would have raised them with me; I would have
18 expected that they would have raised them with
19 the appropriate individuals on the committee,
20 given that Bristol-Myers Squibb held the NDA.
21    Q.  Did you have a vehicle to raise
22 concerns you might have had about Eliquis with
23 either people at Pfizer or your partner at
24 Bristol-Myers Squibb?
25    MR. MOSKOW:  Objection to form.

HARVEY

A.  It wasn't part of my duties to do that.  And like I said, I had so much to do that was my responsibility that I didn't go looking for additional work.  And I wasn't in that chain of command for Eliquis and I wasn't given the information, so I had -- I would have had no direct information to react to.

Q.  Do you have any current relationship with Pfizer or with Sanofi?

A.  Yes.

Q.  And what are those relationships?

A.  Well, the relationship with Pfizer is, you know, I'm an independent consultant and I am on the list at Pfizer as a vetted consultant contractor.  And so if certain projects arise, I've been hired by Pfizer to advise.

Q.  Okay.  Do you have kind of an ongoing stream of work with them?  I understand it's different projects but does it end up being an ongoing stream of work?

A.  It's -- I've done -- you know, it's when the projects come available.  So I don't know when the next one's going to be.  But it's

HARVEY

an episodic sort of thing.  But I'm still on the contractor list.

Q.  Okay.  So let me see if I have this.  Pfizer has a special list of contractors, approved contractors they use on consulting projects, and you're on that list?

A.  Yes.

Q.  And do you end up working with Pfizer every year?

MR. MOSKOW:  Objection, form.

A.  I worked with them last year and I worked with them this year.

Q.  Okay.  I'll take that as a yes.

A.  Yes.

Q.  Do you have a sense of your earnings from Pfizer every year?

MR. MOSKOW:  Objection to form.

A.  I know I've worked on three projects and I know what I've earned on the three projects and the cumulative amount on those three projects is less than 50,000.

Q.  Do you anticipate working with them on an ongoing basis in the future?

A.  I hope to.

HARVEY

Q.  Do you have any kind of stock or ownership in either Pfizer or Sanofi?

A.  I do have stock with Pfizer because that's part of my retirement program, as well as part of my severance program.

Q.  And you understand that the performance of that stock that you own is influenced by how Pfizer does as a company?

A.  That's correct.

Q.  You understand that Eliquis is one of the Pfizer blockbusters?

MR. MOSKOW:  Objection to form.

A.  I have never seen a good definition of "blockbuster."  I know it's done well in the market, and obviously there's some incremental impact on Pfizer.

Q.  I've heard some of your colleagues across the table refer to a blockbuster as something that makes more than a billion dollars a year.  Does Eliquis fit that definition?

A.  Based upon public information I've seen, yes.

Q.  Are you aware of -- okay.  And

HARVEY

obviously how Eliquis does affects how Pfizer does, in part?

MR. MOSKOW:  Objection to form.

A.  That's correct.

Q.  Does that create in your view -- do you have any other ongoing relationship with Pfizer?

A.  No.

Q.  Do you have any other -- you don't have any pension or anything like that?

A.  There was no pension but I do have Pfizer stock in my retirement account.

Q.  That's what you just talked about; right?

A.  Well, that and the severance.

Q.  Okay.  Are the severance payments ongoing?

A.  The severance payments were completed in 2015, and I -- and then the vested stock that -- you know, so the stock awards that had been vested have come due on a periodic basis.

Q.  Okay.  Did you sign any kind of -- in connection with your severance agreement, did you sign any kind of disparagement agreement

HARVEY

with Pfizer?

A. A nondisparage agreement, yes.

Q. That's a better way to put it. You'd have some legal problems if you signed a disparagement agreement. Would that nondisparagement agreement keep you from serving as an expert witness in an Eliquis case?

MR. MOSKOW: Objection to form.

A. I would -- I would have to -- I mean I would check with Pfizer on that and get a legal opinion before I did that.

Q. You're aware that there's -- just as there's litigation over Pradaxa, there's litigation over the other novel oral anticoagulants, Xarelto and Eliquis?

A. I wasn't aware of the Eliquis. I've heard about Xarelto.

Q. There is -- I'll represent to you there is Eliquis litigation that is ongoing. So I have it, if you were approached by Mr. Moskow or by anyone else about being an expert witness in Eliquis litigation, before you would do that, before you could do that,

HARVEY

you would go back to Pfizer and say is this permissible?

A. Yes, I would. And I would think carefully about it, just having been involved with this case.

Q. What do you mean by that?

A. Well, I would just want to make sure that nothing I did in this case would have any negative impact on any future case.

Q. Okay. You understand that some of the criticisms you make in this case have been made against other oral anticoagulants; correct?

A. Well, that was not the focus of my study. And I'm not -- I'm not aware of that literature because that was not the basis of my report. So I've not heard about the same criticisms for Eliquis that I've heard for Pradaxa.

Q. You haven't seen some of the very same documents you've looked at where they talk about whether there should be monitoring for Pradaxa, they talk about whether there should be monitoring for Xarelto and Eliquis?

HARVEY

A. I've seen those mentioned in the -- those articles, but those have not been the focus of my research.

Q. Do you know of any difference between how Xarelto works and how Eliquis works that would make blood concentration testing appropriate for Pradaxa but not for Xarelto and Eliquis?

MS. PRESBY: Objection to form.

MR. MOSKOW: Objection to form.

A. I'm not here to serve as an expert on Eliquis. There's a different mechanism of action, whether it be a direct thrombin inhibitor versus, you know, a factor 10. So there's a different mechanism of action. Pradaxa's the only direct thrombin inhibitor that I know of, and it's the one that I've studied. So I would actually like to just confine my analysis to that because that was the topic of my report.

Q. Well, you've seen Dr. Temple talk about whether there should be monitoring for Eliquis; right?

A. Only the slides that I referenced, he

HARVEY

was talking about this new generation in general.

Q. Right.

A. So that would have covered all of them. He did specifically show a chart of risk of bleeding going up and benefit, you know, marginal benefit going down, and that was Pradaxa-specific.

Q. Do you know why that was Pradaxa-specific?

A. Because that was from the Reilly paper.

Q. Right.

A. Figure 2.

Q. Do you know that Boehringer undertook the effort in their pivotal trial to gather blood concentration data that neither the manufacturers of Eliquis nor the manufacturers of Xarelto did?

MR. MOSKOW: Objection to form.

A. Like I said, I did not do an in-depth analysis of the other anticoagulants.

Q. Do you know if what he said is true?

A. I do know out of the -- there were,

HARVEY

1  what, 3,300 patients that didn't get tested but
2  some did get tested, so it wasn't all patients
3  in RE-LY who got drug levels.
4       Q.  Can you answer my question, though?
5       Do you know if there was drug level
6  testing in the pivotal studies for Xarelto or
7  for Eliquis?
8       MS. PRESBY:  Objection.
9       A.  I don't know that information.
10      Q.  And do you have any basis sitting
11  here right now to say that Xarelto and Eliquis
12  are different in terms of whether they require
13  some form of blood concentration testing than
14  Pradaxa?
15      MS. PRESBY:  Objection.
16      MR. MOSKOW:  Objection to form.
17      A.  I'm not here to opine on the other
18  products.
19      Q.  I understand your position on that.
20  My question is do you know of any differences
21  between them that makes blood concentration
22  testing appropriate for Pradaxa but not for
23  Xarelto and Eliquis?
24      MS. PRESBY:  Objection.

HARVEY

1       MR. MOSKOW:  Objection to form.
2       A.  I know that there's a different
3  mechanism of action, those being factor 10 and
4  this being a direct thrombin inhibitor.  And so
5  I would have to go through and see how a
6  different mechanism of action might play a role
7  in benefit/risk.  My focus has been on this
8  direct thrombin inhibitor and the need for
9  testing for dose adjustment.
10      Q.  That's why I asked my question the
11  way I did.  You can't tell me that the
12  different mechanism of action makes blood
13  concentration testing appropriate for Pradaxa
14  but not for Xarelto and Eliquis; right?
15      MR. MOSKOW:  Objection, form.
16      A.  I can't tell you that; that's
17  correct.
18      Q.  So my question is is there anything
19  you can tell me that you know that makes
20  Xarelto and Eliquis different from Pradaxa that
21  would make concentration testing appropriate
22  for Pradaxa but not for them?
23      MR. MOSKOW:  Objection to form,
24  asked and answered.

HARVEY

1       A.  The different mechanism of action,
2  you know, the way that you can test for
3  Pradaxa, direct thrombin inhibitor, you know,
4  the TT test, I don't know the performance
5  characteristics of that with the factor 10
6  products because I didn't analyze those, I
7  didn't study those and didn't look through
8  their literature.
9       Q.  Let me try it this way.  You have
10  seen discussion of those products in this
11  broader discussion that has occurred over the
12  past several years about whether blood
13  concentration would be beneficial, such as with
14  Dr. Temple, such as with the CRSC; correct?
15      A.  Yes.
16      Q.  Do you have any basis to rule out
17  that there should be blood concentration for --
18  testing for Xarelto or for Eliquis?
19      A.  I have no basis to rule in and rule
20  out since that wasn't the focus of my report.
21      Q.  And if I were to ask you to look at
22  the data, such as it is, for Eliquis, and try
23  to tell me whether your opinions on Pradaxa
24  apply to Eliquis equally, would you need to

HARVEY

1  talk to Pfizer first before you could go on
2  record and give an opinion on that?
3       MR. MOSKOW:  Objection to form.
4       A.  I think I would talk to Pfizer to
5  make sure I wasn't violating any agreement.
6       Q.  Okay.
7       A.  But in theory, I certainly could
8  analyze any data set I was given.
9       Q.  Okay.  If you were to -- you
10  understand that Eliquis and Pradaxa compete;
11  correct?
12      A.  I understand the U.S. market and that
13  practitioners have various options, and so
14  there is competition amongst those.
15      Q.  To some extent every Pradaxa
16  prescription takes money potentially away from
17  Eliquis; correct?
18      MS. PRESBY:  Objection.
19      MR. MOSKOW:  Objection to form.
20      A.  Well, I'm not here as an economist.
21      Q.  I'm just asking as a regular person
22  who has basic knowledge.
23      A.  Yeah, well, I mean, part of what
24  we -- you know, I have been reading is that

HARVEY

1  there is an underutilization.  There are
2  patients who are not receiving anything now.
3  And if you can provide a safer option, you
4  actually can increase the size of the pie.  So
5  not every prescription of one takes away from
6  the other if you have more patients in a
7  underserved area getting treated.  So a
8  prescription for one doesn't take away from the
9  other if you're increasing utilization in a
10  beneficial way.
11      Q.  You sound like some of our
12  politicians in tax cuts.
13      MS. PRESBY:  Objection.  Seriously.
14      Q.  Do -- are Pradaxa -- are Pradaxa
15  and -- I'll withdraw that.  I was joking.
16      Are Pradaxa and Eliquis prescribed to
17  the same patients?
18      MR. MOSKOW:  Objection to form.
19      Q.  Do they have a very large overlapping
20  patient pool?
21      MR. MOSKOW:  Objection.
22      A.  Based upon the U.S. label, there are
23  some patients who would be appropriate for one
24  who would be appropriate for the other.

HARVEY

1      Q.  Okay.  Do you think it's any form of
2  a potential conflict of interest to give
3  testimony on Pradaxa when you have a financial
4  interest with Pfizer?
5      MR. MOSKOW:  Objection to form.
6      A.  No, I don't.
7      Q.  Okay.  So if you were, for example,
8  to publish an article on Pradaxa that was
9  critical of Pradaxa, consistent with your
10  report, would you make any kind of conflict of
11  interest disclosure regarding your former or
12  current work with Pfizer?
13      MR. MOSKOW:  Objection to form.
14      A.  I don't plan to publish, but if I did
15  I would follow the appropriate disclosure
16  rules, which would be to reveal that.
17      Q.  You would reveal that?
18      A.  I would reveal that.
19      Q.  Okay.  As a potential conflict of
20  interest?
21      MR. MOSKOW:  Objection to form.
22      A.  Yes, for transparency.
23      Q.  When -- when you were at companies, I
24  take it you -- Sanofi and Pfizer, I take it you

HARVEY

1  oversaw submissions that were made to the FDA.
2      A.  That's correct.
3      Q.  Did you have a practice of telling
4  the scientists at your company that as they
5  debated things internally -- let me take a step
6  back.  You understand that at pharmaceutical
7  companies scientists will debate various issues
8  about the safety of their medicines or about
9  how they work; right?
10      A.  Yes.
11      Q.  They'll debate them by email or by
12  memo or by meeting or however the case may be;
13  correct?
14      A.  Yes, I'm aware of that.
15      Q.  And one thing companies will try to
16  do is take that debate and from that debate
17  develop a final position that the company
18  thinks is right?
19      A.  That's standard, yes.
20      Q.  And that position might reflect
21  everyone ultimately coming to agreement, it
22  might reflect some people being kind of
23  dissenting votes, so to speak; correct?
24      A.  That's all within the realm of

HARVEY

1  possibility, yes.
2      Q.  When you were at a pharmaceutical
3  company, did you make a practice of telling
4  your scientists that as they had these debates
5  you needed to be submitting any memos they
6  wrote or emails they wrote as part of this
7  debate to the FDA?
8      MR. MOSKOW:  Objection to form.
9      A.  That -- if you could clarify that,
10  because I'm trying to understand what mechanism
11  would be used to submit that to FDA if it
12  wasn't part of an application or an IND.
13      Q.  Well, for example, were you ever
14  involved with discussing safety issues with the
15  FDA?
16      A.  Yes.
17      Q.  And I take it those discussions of
18  safety issues would reflect a good bit of
19  discussion back at the company among your
20  scientists as they tried to understand the
21  safety issue and analyze it.
22      MR. MOSKOW:  Objection to form.
23      A.  Yes.
24      Q.  Would you submit all the discussions

HARVEY

1  that the scientists would have on that safety
2  issue to the FDA, whether it was emails or
3  memos?  Or would you try to come up with a
4  final company view and submit that to the FDA?
5      A.  Well, I would come up with a company
6  view that would make sure it encompassed the
7  broader discussion.
8      Q.  Okay.
9      A.  Yes.  So I would submit the broader
10 company view.
11     Q.  Would you submit every precursor
12 discussion to that company view?
13     A.  No.
14     Q.  Why not?
15     A.  Given the many emails -- and I know
16 where you're going with this, but given the
17 vast number of emails and communications,
18 that's not something you would submit to FDA
19 because FDA -- you know, when you -- if you
20 truly wish to communicate information to FDA,
21 you want it to be clear and concise.  You don't
22 want to do what is referred to as a data dump
23 because by giving thousands and thousands of
24 patients, they may miss something, and by

HARVEY

1  having a summary that covers the various
2  points, if it's done accurately, then that
3  encompasses the internal discussion and you
4  don't have to submit everything, because by
5  submitting everything, that doesn't necessarily
6  increase the clarity, it just dilutes out those
7  things that are most important.
8      Q.  You would try to submit your best
9  final view, integrating the views of the
10 scientists?
11     A.  That's what I would have done, yes.
12     Q.  And that's what you understand to be
13 appropriate in terms of what the FDA wants?
14     MR. MOSKOW:  Objection to form.
15     A.  That's what they'd expect from a
16 reasonable company.
17     MR. MOSKOW:  Let me ask that --
18 I'll let you finish the line of
19 questioning, but next break.
20     MR. SCHMIDT:  Sure.  I'm almost
21 done with this line.
22     Q.  There would be times I take it where
23 your scientists at your company would run
24 various analyses on issues related to the

HARVEY

1  safety or the efficacy of your medicines;
2  right?
3      A.  Yes.
4      Q.  And some you might not even hear
5  about; right?
6      MS. PRESBY:  Objection.
7      MR. MOSKOW:  Form.
8      A.  Yeah, I can't say I heard everything
9  that went on in the entire 100,000-person
10 company of Pfizer.
11     Q.  I thought that was an easy one.  You
12 didn't have a practice of submitting every
13 analysis that scientists at your company
14 performed to the FDA, did you?
15     A.  I wouldn't have submitted every
16 analysis, but significant analyses that I felt
17 had an impact would get submitted through
18 various mechanisms, either, you know, where
19 appropriate, either under the IND or in annual
20 reports.  You know, there are different ways to
21 submit it.  And then FDA has that information.
22 So if I felt it was significant, it would get
23 submitted.  And so based upon information I was
24 given.

HARVEY

1      Q.  So if you thought an analysis, I
2  think the words you used were significant and
3  had an impact, then you would submit it?
4      A.  Correct.
5      Q.  But not every other analysis?
6      MR. MOSKOW:  Objection to form.
7      Q.  If it was not significant and did not
8  have an impact, you would not necessarily
9  submit it; correct?
10     A.  That would be -- not everything was
11 submitted, so yes, correct.
12     MR. SCHMIDT:  Why don't we take a
13 break?
14     MR. MOSKOW:  Thank you.
15     THE VIDEOGRAPHER:  We're off the
16 record at 10:11.
17     (Recess taken.)
18     THE VIDEOGRAPHER:  Here begins
19 media number 2 in the video recorded
20 deposition of Dr. Brian Harvey.  We're
21 back on the record at 10:27.
22 BY MR. SCHMIDT:
23     Q.  I'm just going to round out some
24 questions about your background with what I

Page 82

HARVEY

1  hope is a speed round.  You're not a
2  cardiologist; correct?
3      A.  I'm not a cardiologist.
4      Q.  You're not a hematologist?
5      A.  I'm not a hematologist.
6      Q.  You're not a nephrologist or an
7  expert in nephrology?
8      A.  That's correct.
9      Q.  You're not a geriatrician or an
10  expert in geriatric treatment?
11      A.  That's correct.
12      Q.  You're not an epidemiologist?
13      A.  I'm not an epidemiologist.
14      Q.  You've no specialized training or
15  education in epidemiology?
16      A.  That's correct.
17      Q.  You're not a pharmacologist?
18      A.  I'm not a pharmacologist.
19      Q.  You're not a pharmacokineticist?
20      A.  I'm not a pharmacokineticist.
21      Q.  Do you have any special training in
22  pharmacokinetics?
23      A.  Yes, I do.  I have had training
24  during my Ph.D. in biochemistry, which I got

Page 83

HARVEY

1  before going to medical school.  I had training
2  as part of medical school and as a fellow at
3  Hopkins, I've availed myself of courses they
4  had there.  And then FDA had a very extensive
5  internal training program and took all of those
6  that I could from some, you know, of the
7  well-known folks who were there and others
8  while at FDA.
9      Q.  Have you ever personally performed
10  any pharmacokinetic or pharmacodynamic
11  modeling?
12      A.  I have not.
13      Q.  Have you ever designed or overseen a
14  clinical trial?
15      A.  I have designed clinical trials.
16  I've not overseen clinical trials.
17      Q.  What's the largest clinical trial you
18  have designed?
19      A.  A 24,000-patient trial.
20      Q.  Which --
21      A.  I helped design the PRECISION trial
22  when I was at FDA, which was Celebrex and
23  Pfizer, to look at cardiovascular risk.
24      Q.  What was the outcome of that trial?

Page 84

HARVEY

1      A.  The outcome of that trial was
2  actually made public about a year or so ago.
3  The initial estimate was that it was going to
4  be 20,000 patients based upon an expected event
5  rate, and the event rate was lower than
6  expected.  So 24,000 patients or so were
7  enrolled, and it came out that there wasn't an
8  elevated cardiovascular risk for Celebrex over
9  what they had previously reported.
10      Q.  Celebrex of course is a Pfizer
11  product?
12      A.  Celebrex is a Pfizer product and is
13  still on the U.S. market.
14      Q.  Did you do any work on Celebrex when
15  you were at Pfizer?
16      A.  I was there when they were discussing
17  the pending results for the PRECISION trial,
18  and I'm trying to remember if the results got
19  released when I was still at Pfizer or soon
20  after.
21      Q.  Did you have any FDA interactions
22  regarding Celebrex when you were at Pfizer?
23      A.  No, I didn't.  Because the trial was
24  ongoing and there was nothing to be done other

Page 85

HARVEY

1  than to wait for the data.
2      Q.  Do you consider yourself an expert in
3  assays?
4      A.  Five years of my time at FDA were in
5  the Center for Devices and part of that time
6  was in the in vitro diagnostic group.  I was
7  involved with the approval of the hepatitis C
8  PCR, RNA test, the Roche tests, and at my time
9  there, I learned about in vitro diagnostic FDA
10  regulation.
11      I'm not sure what makes one an expert
12  but it's something that I've continued to
13  follow and part of my consulting work is with
14  in vitro diagnostic companies and policy.
15      Q.  Have you ever been involved in
16  development efforts for an assay?
17      A.  I've been involved with the
18  regulatory aspects of developing assays.
19      Q.  What about the actual scientific
20  aspects of developing assays?
21      A.  No, I've not.
22      Q.  And you say in your report you're not
23  an expert on pharmaceutical regulation outside
24  the U.S.; correct?

Page 86

HARVEY

1
2     A.  I'm not an expert outside the U.S.
3  but have experience outside.
4     Q.  You're not an attorney or a legal
5  expert?
6     A.  I am not.
7     Q.  And you're not an expert on ethics?
8     A.  That's correct.
9     Q.  And I think you say in your report
10 you're not giving an opinion as to whether
11 Boehringer met state law standards or violated
12 state law standards; correct?
13     MR. MOSKOW:  Objection to form.
14     A.  That's correct.
15     Q.  Are you offering an opinion as to
16 whether Boehringer violated federal law
17 standards?
18     MR. MOSKOW:  Objection to form.
19     A.  Can you just clarify?  Because I'm --
20     Q.  Do you have an opinion that
21 Boehringer violated FDA standards?
22     A.  FDA standards, yes.
23     Q.  What were the violations?
24     A.  Well, specifically the -- you know, a
25 reasonable pharmaceutical company has a duty to

Page 87

HARVEY

1
2  report information that has an impact on
3  benefit/risk.  If I remember correctly, it's
4  21 CFR 314.70, often quoted by people from FDA.
5  And that's where, when there's new information
6  that becomes available, or new analyses of
7  previous data, then the sponsor should be
8  sending that to FDA and that should then be
9  part of the label to help inform prescribers.
10     Q.  Okay.  So you believe there's a
11 violation in terms of Boehringer failing to
12 report information that was required by law to
13 report to the FDA.  Is that right?
14     A.  I'm a regulatory expert so I base it
15 upon the regulations, not upon the law, so I'm
16 always very careful to confine it to a
17 regulatory perspective.
18     Q.  You understand regulations are law;
19 right?
20     A.  Regulations are promulgated by an
21 agency based upon the law.
22     Q.  Okay.  Do you understand them to be
23 legally binding on companies?  Yes or no?
24     A.  I understand -- yes.
25     Q.  Okay.  So do you have an opinion that

Page 88

HARVEY

1
2  Boehringer violated FDA regulations requiring
3  it to report information that it failed to
4  report?
5     A.  Yes.
6     Q.  Do you have any other opinions about
7  whether Boehringer violated FDA regulations or
8  standards?
9     MR. MOSKOW:  Objection to form.
10     A.  Yes, I do.
11     Q.  What are those opinions?
12     A.  So as, you know, information became
13 available, and, you know, and I can go through
14 point by point and it was outlined in my --
15 actually, may I open my report?
16     Q.  Yeah.  Just so my question's precise,
17 I don't want to go through every single issue;
18 I'm just asking you what were the violations in
19 your view.  One is failing to report
20 information.  What other violations, if any, do
21 you believe that Boehringer made, federal
22 regulations or federal standards?
23     A.  So the information that was provided
24 to FDA did not allow for the launch label to
25 adequately inform prescribers, and subsequent

Page 89

HARVEY

1
2  information provided has not generated U.S.
3  labels that adequately inform prescribers.  And
4  FDA has provided a roadmap of what to do in
5  order for the sponsor to provide adequate
6  information to improve the label, and that has
7  not yet been done.
8     Q.  So it's your opinion that they failed
9  to provide adequate information and that that's
10 resulted in a defective label?
11     A.  An inadequate label.
12     Q.  Are there any other violations in
13 your view, other than failing to provide
14 information resulting in what you believe to be
15 an inadequate label?
16     A.  Well, I'm reluctant to call it a
17 violation, but --
18     Q.  I'm just focused on violations.
19     A.  Okay.
20     Q.  I'll ask you about your other --
21     A.  Can you define violation for me then?
22     Q.  Some kind of legal obligation,
23 whether it's in a statute or in a regulation,
24 that you believe Boehringer violated in its
25 interactions with the FDA regarding Pradaxa.

HARVEY

1
2    A.  So I don't believe that they provided
3    adequate information on the various
4    subpopulations that were at higher risk in
5    order to provide adequate benefit/risk for
6    those subpopulations.
7        Q.  I'm going to stop you there because I
8    think you've covered failure to provide
9    information.  I'm asking if there's any other
10   categories of violations.  I'll come back to
11   failure to provide information.
12       A.  Well, you know, there was research
13   done based upon my review of the documents on a
14   reversal agent.  That was well before the
15   submission of the NDA and yet that doesn't
16   appear to be actively pursued.  And given what
17   we know about anticoagulation, the development
18   and approval of a reversal agent would have
19   improved the benefit/risk profile of this
20   product.
21       Q.  Is it your opinion that Boehringer
22   violated a federal law or regulation in the
23   manner in which it developed the reversal
24   agent?
25       A.  That's why I asked for a

HARVEY

1
2    clarification on what you thought was a
3    violation.
4        Q.  Right.  I gave you that
5    clarification.  Tell me in your opinion, did
6    FDA -- I'm sorry, did Boehringer violate any
7    federal regulation or any federal law?  Yes or
8    no.
9        A.  No.
10       Q.  But you do have concerns about how
11   Boehringer acted?
12       A.  I believe that a reasonable
13   pharmaceutical company, if they had the
14   information regarding a reversal agent, would
15   have developed that in parallel with the agent.
16       Q.  Now, in terms of submission of
17   information -- in terms of submission of
18   information, have you identified any specific
19   information, data that Boehringer had that was
20   required by regulation or statute to submit to
21   the FDA but failed to submit to the FDA?
22       A.  I believe that the modeling data was
23   significant information that should have been
24   submitted to FDA and it would have fallen under
25   21 CFR 314.70.

HARVEY

1
2        Q.  So did -- just to be sure I
3    understand your testimony, did that regulation
4    you just cite impose a legal obligation on
5    Boehringer to submit its modeling information?
6        A.  I'm -- I'm a regulatory expert, not a
7    lawyer, so we don't normally think of things in
8    that term.  I think a reasonable company --
9        Q.  Let me rephrase it then.  I'll
10   withdraw it and rephrase it.  Did Boehringer
11   have an obligation -- I'm not asking about
12   reasonable companies, I'm asking about an
13   obligation.  Did Boehringer have an obligation
14   under federal law or federal regulations to
15   submit its modeling data?  Yes or no?
16       MR. MOSKOW:  Objection to form.
17       Q.  Or I don't know.
18       A.  The practice -- the regulatory
19   practice in the U.S. is based upon the
20   regulation but also industry standards.
21       Q.  I'll ask you about industry
22   standards.  I'm just focused now on the
23   regulation.  Did Boehringer have an obligation
24   under any regulation or statute you know of to
25   submit the modeling data to the FDA?

HARVEY

1
2        MS. PRESBY:  Object to form.
3        A.  As a regulatory person it's my
4    understanding that the significance of the
5    modeling data, it should have been submitted to
6    FDA for their review, and it should have been
7    singled out as important information for FDA to
8    see at the time it was first generated.
9        Q.  And failure to do that was a
10   violation of the regulation in your opinion?
11       A.  Like I said, I'm uncomfortable to say
12   it's a violation of specific regulation,
13   because that's not how we operated when we were
14   at FDA.
15       Q.  Did the FDA ever have access to that
16   modeling information?
17       A.  It's my understanding that later,
18   that some of that modeling was used as part of
19   the pediatric development.  But not at the time
20   that it was first generated.
21       Q.  Let me ask you this question.  Is
22   there any information you know of that you
23   believe should have been submitted to the FDA
24   regarding Pradaxa but that as we sit here right
25   now today has not been submitted to the FDA

Page 94

HARVEY

regarding Pradaxa?

MR. MOSKOW:  Objection to form.

A.  Well, I would have to go back and look, because there was some information that was available at the time of NDA submission and some that was available soon after that wasn't submitted, and then at a later date, it was submitted as a larger data dump.  And then there have been publications that have come out, 2014, '15, '17.  But some of that data in even the most recent publications was available back at the time of initial NDA.

So yes, some of the information has been shared with FDA, but in some cases it's up to a five-year or more time delay, which doesn't seem to make sense from a regulatory perspective.

Q.  Come back to my question then, please.  My question is really simple.  As we sit here today, can you point me to any information that should have been submitted but as of today has not been submitted to the FDA?

MR. MOSKOW:  Objection to form, asked and answered.

Page 95

HARVEY

A.  As of today, no, I can't point to anything specifically.

Q.  Can you point me to -- you raised a timing concern about when information was submitted.  Can you point me to any information that you believe -- strike that.  Let me focus my question.

We have been talking about modeling information; correct?

A.  Correct.

Q.  That's data -- it's not data.  It's attempts to take data on plasma concentration and make predictions based on that data; correct?

A.  That's not correct.

Q.  Okay.  Which part of that is not correct?  Strike that.

Is the modeling data based on plasma -- is the modeling based on plasma concentration data?

A.  That's my understanding.

Q.  And is it an attempt to make predictions about outcomes if you try to adjust dose such that you adjust plasma concentration?

Page 96

HARVEY

A.  That's one of the intended outcomes of using modeling.

Q.  The modeling data that you believe was required or should have been submitted, you have seen it submitted; correct?  You are aware that it has been submitted?

A.  Ultimately, it was.

Q.  And can you point me to any action -- and you know it's been publicly discussed; right?

A.  Correct.

Q.  And it's been published on, as you noted; right?

A.  Uh-huh.

Q.  Correct?

A.  That's my understanding.

Q.  And there have been special workshops to talk about it; right?

A.  Yes.

MR. MOSKOW:  Objection.

Q.  There's even been some discussion in the lay media about it; right?

A.  I'm not aware of the lay media but that wasn't really the focus of my report.

Page 97

HARVEY

Q.  Fair point.  Here's my question.  Can you point me to any specific action that the FDA has taken in response to modeling data on Pradaxa as it's learned about that data or that analysis?

MR. MOSKOW:  Objection to form.

A.  Well, once again, the concern is about the delay.  You know, the -- the utility of the modeling data, that would have been good to have during the initial NDA review and the immediate aftermath when there was the reporting of adverse events, including significant bleeds.  Now, a number of years after the fact, when the company was faced with the requirement to do pediatric studies, the modeling then appeared to have utility with helping design those pediatric studies.

And so I don't know what's been submitted to FDA because having a publication or a workshop is not an FDA submission for NDA supplement or labeling change.

Q.  Have you reviewed the NDA to see if the modeling information has been submitted as part of the NDA?

HARVEY

1
2    A. I did not see the modeling
3  information in my review of the initial NDA
4  approval.
5    Q. No, I'm talking the NDA as it exists
6  today.
7    A. I have not -- I have not reviewed
8  every generation of what's been submitted. I
9  mean, the NDA is that initial submission, so
10  let's clarify -- and then supplemental NDAs.
11  I'm not aware that FDA has received that
12  modeling data as a submission of an sNDA in
13  order to get that information in the label.
14  I'm unaware of that.
15    Q. Have you reviewed the regulatory
16  correspondence in full between Boehringer and
17  the FDA to see whether and how Boehringer has
18  submitted modeling information to the FDA?
19    A. I have reviewed the correspondence.
20    Q. So you have seen how FDA -- how
21  Boehringer has submitted modeling information
22  to the FDA?
23    A. I have seen over time that that has
24  been submitted.
25    Q. So come back to my question. My

HARVEY

1
2  question is can you point me to any specific
3  regulatory action that FDA has taken regarding
4  Pradaxa in response to receiving that modeling
5  information?
6    MR. MOSKOW: Objection to form.
7    A. Now, is this independent of the PK
8  information that led to the approval of the
9  75-milligram, or are you including that?
10  Because of course there wasn't a 75-milligram
11  dose study that was done based upon PK
12  modeling.
13    Q. You raise a very good point, Doctor.
14  So let me take a step back. You understand
15  that every piece of plasma concentration data
16  from the RE-LY study was submitted to the FDA
17  pre approval; correct?
18    A. That's my understanding.
19    Q. And it was that data that the FDA
20  carefully analyzed, and not only did they
21  discuss that data in the context of approving
22  the 150-milligram dose, they actually approved
23  a whole new dose based on that data, the
24  75-milligram dose; correct?
25    A. That's what -- yes.

HARVEY

1
2    Q. What you are objecting to is not the
3  withhold -- and the later modeling was all
4  based on that same data, right, from the RE-LY
5  study?
6    A. That, I don't know because I don't
7  know whether it was the original data set, the
8  resubmitted after the refuse to file, and -- or
9  some of these subsequent analysis. I would
10  hope it's all based upon the same data which,
11  of course, is with the first generation
12  product, which is not what's currently now
13  being marketed.
14    Q. Well, that's false, isn't it?
15    A. It was -- the original data set was
16  based upon the first generation product.
17    Q. I didn't ask you about first
18  generation, Doctor. I just asked you about the
19  plasma concentration data.
20    Do you know of any plasma
21  concentration data that has been generated
22  since the time of the RE-LY study?
23    A. There have been publications. You
24  mean generated by the sponsor or --
25    Q. By anyone.

HARVEY

1
2    A. There are publications that have come
3  out where they have looked at levels, at drug
4  levels as part of their practice, and there are
5  publications.
6    Q. Are there any -- has Boehringer
7  obtained any data on plasma concentration
8  outside of the RE-LY study?
9    A. It's my understanding that some of
10  the authors on these papers are BI employees.
11    Q. But those are -- do you understand
12  those papers that you're referring to be
13  analysis of the RE-LY plasma concentration
14  data?
15    A. There was a paper that I reference
16  where they're using -- they're measuring levels
17  as part of their ongoing work.
18    Q. Which paper is that?
19    A. I would have to look through.
20    Q. Was all the RE-LY plasma
21  concentration data submitted to the FDA before
22  approval?
23    A. I know it was all submitted.
24    Q. And you understand that the 2014
25  exposure paper by Dr. Reilly and others was

Page 102

HARVEY

based on that RE-LY plasma concentration data?

A. Yes, yes, I do.

Q. Do you understand --

A. I was thinking of a paper from 2016 or 2017.

Q. You understand that the models you've been discussing were based on the RE-LY plasma concentration data?

A. Yes, I do. There was an article from the group in Canada that was measuring levels and monitoring.

Q. Did you have any interactions with BI while you were at the FDA?

MR. MOSKOW: You can answer. There's a question pending.

A. Okay.

MS. PRESBY: You don't have to wait for him.

A. Not that I remember.

Q. Let me just make sure I rounded out my prior questions. We talked about the modeling information ultimately being submitted to the FDA. And I'm focused on the modeling information that was conducted -- strike that.

Page 103

HARVEY

When you have said that there was modeling information that should have been submitted sooner to the FDA, you're talking about modeling that was done post approval at Boehringer; right?

A. I'm talking about any modeling that might have been done either before, during, or after submission that had significant -- that could have had a significant impact on benefit/risk.

Q. When was it done, Doctor?

A. That's a good question. I mean, I can only go based upon the --

Q. What's your understanding of when it was done?

A. My understanding is that there was some modeling done prior to approval and then there has been subsequent modeling done after approval.

Q. And when that modeling data has ultimately been submitted to the FDA, can you point me to any specific action that the FDA has taken based on that modeling data?

A. No, I can't.

Page 104

HARVEY

MR. MOSKOW: Objection to form.

Q. You know that the FDA has conducted their own modeling; right?

A. Yes, I do.

Q. For example, that was the basis for the 75-milligram approval; right?

A. Yes, I am aware.

Q. The FDA actually did modeling in the opposite direction as well; right? They looked at maybe it would be good to have an even higher dosage of Pradaxa?

A. Yes, that's -- I've read that.

Q. Do you know if as we sit here right now as a factual matter -- strike that.

All that modeling that we were just discussing was done before Pradaxa was ever approved; right?

MR. MOSKOW: Objection, form.

A. I don't know that.

Q. You don't know that the 75-milligram modeling was approved and done before?

A. I do, do know, but -- then can you clarify, when you were saying all that modeling. Yes, the 75 was done prior to, which

Page 105

HARVEY

served as the basis for the 75-milligram approval.

Q. So let me -- you're right. Let me be precise. Prior to approval the FDA did modeling on -- based on Pradaxa blood concentration; correct?

A. That's my understanding.

Q. And that modeling prior to approval led to them approving the 75-milligram dose; right?

A. That's what I understand, yes.

Q. And they also modeled before approval what would be the effect of having an even higher dose; right?

A. There is discussion of that in the memos, yes.

Q. And I take it your point is you don't know if they have done modeling since. They might, they might not have?

A. That's right, I don't know.

Q. So maybe that answers my next question, which is do you even know that the modeling Boehringer has conducted is not entirely redundant to the modeling that the FDA

HARVEY

1  has independently conducted?
2          MR. MOSKOW:  Objection to form.
3      A.  There's no way for me to know that,
4  being outside the agency.
5      Q.  To ask it differently -- and I always
6  am to be mindful of the objection.  Can you
7  point me to any distinct modeling that
8  Boehringer has done that you can tell me that
9  the FDA never looked at this very model or this
10  very study?
11     A.  There was some modeling discussed
12  internally, and I remember some internal emails
13  from BI where, when the results of the modeling
14  was discussed, the response in the email was
15  that's not consistent with our no-monitoring
16  policy.
17     Q.  I'm going to ask you about that.
18     A.  So my question would be then what was
19  the gap in the amount of time between that
20  email and when that modeling was ultimately
21  submitted.
22     Q.  Boehringer doesn't get reports from
23  the FDA on internal modeling the FDA's
24  conducting; correct?

HARVEY

1      A.  There's no mechanism for that.
2      Q.  So Boehringer doesn't know what
3  modeling the FDA is doing, do they?
4      A.  Unless there is a meeting or a
5  communication.
6      Q.  So my question to you is, can you
7  tell me that Boehringer did any modeling on
8  Pradaxa that was not also independently being
9  done by the FDA?
10         MR. MOSKOW:  Objection to form.
11     A.  There's no way for me to know that.
12     Q.  As we sit here today, you know there
13  have been a number of publications on the RE-LY
14  study; correct?
15     A.  Yes.
16     Q.  There have been follow-on
17  publications of the RE-LY study; correct?
18     A.  Yes.
19     Q.  Boehringer has had various other
20  publications that it's either sponsored or
21  participated in regarding Pradaxa; right?
22     A.  Yes.
23     Q.  There have been a volume of
24  independent scientists publishing on Pradaxa?

HARVEY

1      A.  That's correct.
2      Q.  Can you point me to any study data
3  that Boehringer has at the company that has not
4  been disclosed through a publication or through
5  clinicaltrials.gov or something like that?
6      A.  Based upon my review of the
7  documents -- which is not every single document
8  because there were millions of documents -- I
9  can't point out anything specifically that
10  wasn't ultimately shared with FDA.
11     Q.  Or with the public, the medical
12  community.  That's my question.  Is there
13  anything in terms of study data that you saw
14  that's relevant to your opinions that has not
15  been publicly disclosed in some form by a
16  clinical trial, publication or
17  clinicaltrials.gov or something of that nature?
18     A.  I'm not sure --
19     Q.  In terms of studies.
20     A.  Yeah.  Clinicaltrials.gov, which I
21  spend a lot of time on, often doesn't actually
22  have the data; they just have the protocol
23  posted.  But I'm not sure if some of the
24  modeling for the pediatric studies, whether all

HARVEY

1  of that has been published.  I'm not aware of
2  that.
3      Q.  That's why I asked the question the
4  way I did.  Are you aware of any actual study
5  data, safety data that has been generated but
6  not publicly disclosed?
7          MR. MOSKOW:  Objection to form,
8      asked and answered.
9      A.  I guess I'm having trouble with your
10  distinguishing between modeling and data.  And
11  it's interesting because in the current debate
12  over FDA process and industry trying to
13  increase the ability to use real-world data and
14  others, PhRMA, which is an organization which I
15  believe BI is a member of, has been advocating
16  that modeling data is data.  So I don't make
17  that distinction between data and modeling
18  because modeling is another form of data as
19  part of this big data initiative in order to
20  help facilitate using that type of information
21  for approvals and post market.
22     Q.  I will draw that distinction.  Is
23  there any underlying data you can point me to
24  that you looked at that's relevant to your

HARVEY

1
2  opinions that's not been publicly disclosed?
3      A.  I'm not aware that all of the
4  information in the pediatric development
5  program, including that modeling, has been
6  disclosed.
7      Q.  Anything else?
8      A.  No.
9      Q.  And the pediatric program is an
10  ongoing study; right?
11      A.  That's correct.
12      Q.  And it's not customary to disclose
13  study results in all instances before they're
14  final; correct?
15      A.  That's not routine, but of course in
16  this case, it has impact -- some of what's
17  being learned in the pediatric space about dose
18  and corresponding drug levels could actually
19  then impact what's known or what should -- you
20  know, could be done in adults.  So they're not
21  distinct that one -- you know, that some
22  something that happens in one area could inform
23  another.
24      Q.  You've -- just to be clear, what
25  you're referring to as modeling in the

HARVEY

1
2  pediatric study is a dosing algorithm; correct?
3      A.  That's part of what I'm --
4      Q.  Okay.  What modeling from the
5  pediatric study are you referencing beyond a
6  dosing algorithm?
7      A.  As I looked at the pediatric plans,
8  there was a lot of discussion regarding how
9  that was going to be done, and that was in
10  light of some of the earlier adult modeling
11  being called preliminary.  And then it was
12  used -- turned around and that same sort of
13  modeling was then used to help determine a
14  therapeutic range and dosing for the pediatric
15  patients.
16      Q.  Is it your understanding that the
17  pediatric dosing is based on a model as opposed
18  to just cut points in terms of plasma
19  concentration from the RE-LY study?  Is that
20  your understanding?
21      A.  Well, I think once again, you know,
22  you using the term "model" is imprecise.  There
23  was --
24      Q.  It's your term.
25      A.  I mean, it -- the -- there wasn't

HARVEY

1
2  actual dosing in kids to determine the lowest
3  and highest dose.  It was done through a
4  mechanism where there was modeling and PK data.
5      Q.  Wasn't it just done by saying let's
6  make sure that pediatric patients fall, in
7  terms of their blood concentration, within the
8  10 to 90th percentile of RE-LY?
9          MR. MOSKOW:  Objection to form.
10      A.  I don't know if that's an accurate
11  characterization.  Sounds like an
12  oversimplification.
13      Q.  Do you know that it is?
14      A.  I don't -- that doesn't seem to be
15  consistent with what I was reading.
16      Q.  Why don't you articulate on the
17  record under oath for me how you understand the
18  dose was selected for pediatric patients.
19      A.  The question I was answering that you
20  asked was am I aware of data that has not been
21  released.  And I think we've already
22  established that I'm not an expert in modeling.
23      Q.  Can you now answer my question?
24      Do you know how the dose was selected
25  in the pediatric trial?

HARVEY

1
2      A.  I don't know the specifics of how it
3  was done but I know it was based upon -- it was
4  not based upon traditional dose ranging in
5  children.
6      Q.  Can you tell me anything about how it
7  was done?
8      A.  It was based upon some of the
9  modeling data which we have been discussing,
10  and a range, and what would be a safe range for
11  children.  I don't have additional details
12  beyond that.
13      Q.  What was the range?
14      A.  There was a discussion of 50 to 225,
15  which was of course different from Dr. Temple's
16  sweet spot of 50 to 150 or 75 to 150.
17      Q.  Do you know how they got to 50 to
18  225?
19      A.  That was part of the PK and the
20  modeling process.  That was my understanding.
21      Q.  Do you know if there was any model
22  that led to 50 and 225 as opposed to just
23  picking points on the curve of where patients
24  in RE-LY fell on plasma concentration?
25      A.  Not being an expert in that area

HARVEY

1
2  which, we've already established, I don't know
3  the specific details.
4      Q.  And what's that area where you're not
5  an expert?
6      A.  In actually conducting modeling.
7      Q.  Okay.  You've been an expert witness
8  against Boehringer in the past; correct?
9      A.  I have been involved with a patent
10 dispute, and it was in U.S. Patent Court.  And
11 I was retained by the innovator to discuss the
12 FDA approval process for that innovator
13 product.  And there were a number of companies
14 who were biosimilars makers that were on the
15 other side of that patent dispute, and BI was
16 one of those companies.
17     Q.  So is the answer to my question yes,
18 you have been an expert against BI in the past
19 in a patent case?
20     A.  In a patent case.
21     Q.  And how much were you paid in that
22 patent case?
23     A.  I was paid -- well, the two cases
24 were together, and so the work that I did for
25 one had direct bearing on the other.  If I

HARVEY

1
2  remember correctly, there were -- it was about
3  100 or so hours, so that would have been about
4  50, 60,000.
5      Q.  And do you know what the outcome of
6  that case was?
7      A.  The U.S. Patent Court actually
8  decided against AbbVie.
9      Q.  Against the side you were --
10     A.  The side I was referencing.
11     Q.  Have you ever been a party to a
12 lawsuit?
13     A.  As far as -- can you --
14     Q.  Plaintiff or defendant?
15     A.  I have been involved with one
16 malpractice case when I was at Anne Arundel.  I
17 was one of many physicians who treated a
18 patient.  And I was dropped.  After depositions
19 and expert testimony or expert depositions, I
20 was dropped from the case because I was found
21 that I met or actually exceeded the standard of
22 care.
23     Q.  I will represent to you that -- well,
24 I'm not going to quibble with you about that.
25 What was the nature of the injury in that case?

HARVEY

1
2      A.  It was a patient who came to the
3  hospital with a dissection of the aortic
4  aneurysm.
5      Q.  Did you give testimony in that case?
6      A.  No, I did not because I was dropped
7  before that.
8      Q.  You've worked full-time as an
9  independent regulatory consultant from 2015 to
10 the present?
11     A.  That's correct.
12     Q.  Can you tell me the pharmaceutical
13 companies other than Pfizer that you do work
14 for?
15         MR. MOSKOW:  I just want to note
16     for the record to the extent you're not
17     subject to a confidentiality agreement
18     you can answer that question.
19     A.  Well, I'm working with a -- I mean,
20 all of them I have confidentiality agreements,
21 but I work with large pharmaceutical companies,
22 biotech companies.  Most of my work is with
23 companies.  I don't have a contract with BI and
24 have not done work with BI, but most of what I
25 do in my consulting work is working with

HARVEY

1
2  companies and working on the side of companies.
3      Q.  Do you solicit companies in any way?
4  Do you do outreach to companies?
5      A.  No, I don't because people come to
6  me.
7      Q.  And in your work -- well, not
8  everyone comes to you.  You don't represent the
9  industry; right?
10     A.  Well, I only have so many hours in
11 the day and I have all the work I can do.
12     Q.  Boehringer has never come to you.
13     A.  Not that I know of.
14         MR. MOSKOW:  Not yet.
15     Q.  If Boehringer had come to you with a
16 project is there any reason you would have said
17 no, I won't work with you?
18     A.  Not that I know of.  They make some
19 good products.
20     Q.  And if Boehringer had come to you
21 with a project and you were doing work for
22 Boehringer, would that keep you from working
23 for the plaintiff lawyers in this case?
24         MR. MOSKOW:  Objection, form.
25     A.  I would have to check to see.

HARVEY

Q. Check with Boehringer?

A. Yeah.

Q. The reason I ask about your clients -- I understand the concern about confidentiality agreements. So you know, my position will be that if we can't get information on who you represent, you shouldn't be allowed to talk about it in terms of a statement like you just made: I represent a lot of big pharmaceutical companies. So I say that simply to set up my question so you understand where I'm coming from with my question. When you say you represent a number of large pharmaceutical companies, can you tell me who those companies are?

MR. MOSKOW: Objection to form. You can answer if you are able.

A. Okay. I do work for J&J.

Q. What J&J products?

MR. MOSKOW: Again, to the extent that you're bound by confidentiality, you should answer as you see fit.

A. I think that is under confidentiality.

HARVEY

Q. So you'll decline to answer that?

A. Because they're premarket, I don't know if that's been disclosed or not.

Q. Have you worked on any post market J&J products?

A. No.

Q. Who else?

A. And I can say I'm not working on any anticoagulants. I mean, most of my work is in the GI space, so GI and liver, so -- and Pfizer has been a client.

Q. Who else? We've talked about Pfizer.

A. Right. I've done work for Amgen.

Q. You understand that J&J is a manufacturer of Xarelto?

A. I didn't really think about that.

Q. But do you know that?

A. I do know that now.

Q. Who else?

A. Like I said, my work with J&J has been in the liver space, NASH, NASH disease, fatty liver. Amgen.

Q. What proportion of your work is expert testimony work?

HARVEY

A. It's less than 20 percent.

Q. And is it different in terms of proportion of your income?

A. It's less than 20 percent of my time and it's less than 20 percent of my income.

Q. Do you charge differently for consulting work versus expert testifying work?

A. I have a range for consulting work that can be anywhere from 400 to 600 an hour, and my standard legal rate is 500 an hour.

Q. Have you ever done any other case like this where someone is alleging injury from a medicine?

A. Not from a medicine, no.

Q. From a device?

A. From a device.

Q. What was the device?

A. The device was the Olympus endoscope where there was -- I was asked to advise on whether or not they should have submitted a new 510(k). And it was my opinion that the change warranted a submission of a 510(k).

Q. Any other cases where someone's alleging injury from a product?

HARVEY

A. Not that involved any company.

Q. So --

A. So there was a case -- and these are all listed in my report. There was a case in Connecticut where I worked for the plaintiff, for the family, you know, the Radzik case, and it had to do with Remicade. And it had to do with the FDA label for Remicade and the approval of the pediatric indication, which I did as the GI division director, as well as the placement of the black box for hepatic splenic T-cell lymphoma. And that was -- and Remicade is a J&J product but they were not party to the suit, which is why I was able to do that.

Q. If they were party would you not have been able to do that because of your work for them?

A. I would have had to check with them.

MR. SCHMIDT: I marked as Harvey Exhibit 3 your prior testimony which I think you were just referencing.

(Harvey Exhibit No. 3 was marked for identification.)

BY MR. SCHMIDT:

HARVEY
Q.  Is that, in fact, what Exhibit 3 is?
A.  Yes, it is.
Q.  Any other testimony -- strike that.
Am I correct that all your testimony
in cases involving injury from a product has
been on behalf of a plaintiff against a
company?
A.  So the two examples are plaintiff
against a company.
Q.  Have you done any consulting for
Bristol-Myers Squibb?
A.  I have not, but, you know, I -- I
have -- there are emails of them reaching out
to me to do some work, but I haven't -- I
haven't talked with them yet or entered into
any agreement yet.
Q.  Would that relate to Eliquis?
A.  It -- it's in -- with NASH, so fatty
liver disease.
Q.  So not Eliquis?
A.  Not Eliquis.
Q.  Okay.  Have you ever done any work
for Bayer?
A.  I have interacted with Bayer back

HARVEY
when I was at FDA because they were one of the
makers of Naproxen, but I have not consulted
with Bayer since leaving Pfizer.  So as an
independent consultant I'm not currently
working with Bayer.
Q.  And you're affiliated with a group
called NDA Partners?
A.  There are several groups.  One is NDA
Partners, which contain a number of ex-FDA
people, including Carl Peck.  I work with
Kinexum, which is -- many of which are ex-FDA.
I work with Uroncor (phonetic), which are many
ex-FDA people.  Then I work with a group called
xFDA, which are ex-FDA people, and then do
things on my own as well.
Q.  So that's four different groups that
you have an affiliation with?
A.  Yes.
Q.  And do you understand that all four
of those groups hold out their members as
offering professional expert testimony?
A.  I'm familiar that that's the case
with NDA Partners.  I haven't had that
experience yet at Uroncor or Kinexum.

HARVEY
Q.  What is their purpose?
A.  Mostly to help, you know, small
companies navigate the FDA regulatory process.
Q.  Let's talk about your work in this
case.  I'm going to mark your deposition
notice.  Did you ever review your deposition
notice in this case?
A.  Yes, I did.
Q.  Did you look at -- the part I care
about -- it will be Exhibit 4 -- is the
document request that accompanies it?
A.  Yes.
Q.  Did you purport to provide your
lawyers with all the responsive documents to
that document request?
A.  Yes.
(Harvey Exhibit No. 4 was marked for
identification.)
BY MR. SCHMIDT:
Q.  And those have been produced pursuant
to our protocol?
A.  That's my understanding.
MR. SCHMIDT:  I take it you'll make
that representation?

HARVEY
MR. MOSKOW:  Correct.  I just want
to make clear to the extent that a prior
question suggested that a company that
he is with -- affiliated with, like NDA
Partners, if they provide some sort of
advertising material, we didn't think
that was responsive to the specific
request.
MR. SCHMIDT:  Okay.
Q.  When were you contacted by the
plaintiff lawyers in this case?
A.  It was back in 2016.
Q.  Do you remember when in 2016?
A.  It would have been sometime in the
fall, you know, summer, fall.  And I didn't do
my first review work -- I looked back at the
invoices so I could answer this sort of
question.  I think the first time I billed for
review was November 16, 2016.
Q.  And have you worked reasonably
continuously on this matter since
November 2016?
MS. PRESBY:  Object to form.
A.  There are some months that have been

HARVEY

1
2 busier, and obviously writing the report, and
3 then there was a little bit of a lull and then
4 of course now gearing up for the deposition.
5 So -- but it's been pretty much something every
6 month for the last year or so.
7     Q.  Who contacted you?
8     A.  Actually, I think you contacted me.
9 By email.  By email.
10     Q.  Do you mind just saying on the record
11 who you're referencing?
12     MS. PRESBY:  It sounds like Paul.
13     MR. SCHMIDT:  It does sound like
14 me.  It was not me.
15     A.  Neal contacted me.
16     Q.  Mr. Moskow?
17     A.  Yes, through I think -- I think the
18 introduction was made by Alexander, or Zan, Zan
19 Miller from Kinexum.  But he did it as a
20 introduction as opposed to official Kinexum
21 work.
22     Q.  Who is Mr. Miller or Dr. Miller?
23     A.  He's a former FDA person who I'd
24 worked with.  He was in the metabolic endocrine
25 division back when I was at FDA.

HARVEY

1
2     MR. MOSKOW:  Just so we don't go
3 off on a tangent, it's Zan Fleming,
4 Alexander Fleming.
5     A.  Oh, I'm sorry.
6     Q.  Thank you.  And is it Dr. or Mr.?
7     A.  Doctor.
8     Q.  Dr. Fleming put Mr. Moskow in touch
9 with you?
10     A.  Yes, by email.
11     Q.  Okay.  And did you then have a
12 discussion with Mr. Moskow?
13     A.  Yes.
14     Q.  Over the telephone or in person?
15     A.  First over the telephone and then in
16 person.
17     Q.  Did you agree over the telephone to
18 serve as an expert witness?
19     A.  I don't know if I agreed until we
20 actually had the face-to-face meeting,
21 actually.
22     Q.  At some point you did have a
23 face-to-face meeting?
24     A.  Yes.
25     Q.  And was that done here in Washington?

HARVEY

1
2     A.  In Chevy Chase.
3     Q.  Pretty tony neighborhood?
4     MS. PRESBY:  Objection to form.
5     MR. SCHMIDT:  Ms. Presby doesn't
6 have the same "outsider looking in on
7 the D.C. neighborhoods" that some of us
8 do.
9     MS. PRESBY:  I'll object to that
10 too.
11     Q.  So was this meeting in Chevy Chase
12 with Mr. Moskow in November 2016 when you
13 started the work or just before that?
14     A.  It was just before that.
15     Q.  Did you agree at that time to become
16 an expert in this case?
17     A.  Yes.
18     Q.  At that point you knew their
19 allegations against the company generally?
20     A.  Yes.
21     Q.  But you didn't know the specifics in
22 terms of reviewing the documents?
23     A.  That's correct.
24     Q.  And at that point, you began
25 reviewing documents, and I guess ultimately

HARVEY

1
2 writing what became your 120-page report.
3     A.  That's correct.
4     MR. SCHMIDT:  We were provided with
5 a billing statement that I've marked as
6 Exhibit 5.
7 (Harvey Exhibit No. 5 was marked for
8 identification.)
9 BY MR. SCHMIDT:
10     Q.  Does this show all the work you've
11 performed on Pradaxa as an expert witness for
12 plaintiffs?
13     A.  The only thing to add would be what's
14 happened in the last week or so, but it
15 certainly is current as of -- until --
16     Q.  October 28?
17     A.  I would -- yeah, October 29.
18     Q.  That reflects that you performed 202
19 hours, 202.5 hours on Pradaxa?
20     A.  Yes.
21     Q.  And you billed over $100,000 for that
22 work?
23     A.  Right, since my standard legal rate
24 is 500 an hour.
25     Q.  So in the year or so that you've been

HARVEY

1
2 working on Pradaxa, you've made $100,000 from
3 that work?
4     A.  That's correct.
5     Q.  And that includes your document
6 review and that includes writing your report
7 and that includes meeting with these fine
8 lawyers?
9     A.  That's correct.
10     Q.  I would imagine it takes a good bit
11 of time to write a 120-page report.
12         MR. MOSKOW:  Objection to form.
13     A.  It took over 90 hours, yeah.
14     Q.  And that's where I was going.  Are
15 you able to -- I think you just did.  Are you
16 able to articulate how much of the 202 hours
17 you spent was actually spent writing the report
18 versus reviewing documents and conducting
19 research?
20     A.  Right.  Well, so I went back to my
21 invoices and it -- about 92 hours were for
22 writing the report, but part of writing the
23 report is also then referring to the documents.
24 But the time when the report -- when I created
25 the report, that was 92 hours.  And then there

HARVEY

1
2 were many documents to review and then there
3 were other documents which then became
4 available to be reviewed, and so that's how we
5 got to the 202.
6     Q.  As I understand it, you had some help
7 compiling some of the documents and focusing on
8 certain parts of the documents from the
9 lawyers; is that correct?
10     A.  I received, you know, technical help
11 and nuts and bolts, cutting and pasting, and if
12 we had a discussion and I pointed out certain
13 areas that I wanted to focus on, you know,
14 certain excerpts from expert depositions and
15 certain emails, they were the ones that did the
16 cutting and pasting into the document.
17     (Harvey Exhibit No. 6 was marked for
18     identification.)
19 BY MR. SCHMIDT:
20     Q.  I'm passing you what I've marked as
21 Exhibit 6, which is a series of schedules that
22 were attached to your report.  And I believe
23 you said in your report these were prepared
24 under your supervision by lawyers; is that
25 right?

HARVEY

1
2     A.  Yes, that's correct.  I didn't do any
3 of my own photocopying.
4     Q.  Let's take a look at one of these.
5 Schedule 4 is a summary of label changes.  Do
6 you see that?
7     A.  Yes.
8     Q.  This was prepared by the lawyers for
9 you?
10     A.  Yes, it was.
11     Q.  Did you go through looking at the
12 individual labels to quality check this to make
13 sure it was accurate in all regards?
14     A.  Well, I had -- when I do my review of
15 labels, I usually do it online on the FDA
16 website.  And when I went through and looked at
17 this summary, this was consistent with my
18 review of the labels.
19         So did I hold the chart up to the FDA
20 website and do a word-for-word comparison?  No,
21 but there was nothing I read in this that was
22 not consistent with my review of the FDA labels
23 on the -- or the labels on the FDA website.
24     Q.  Okay.  Look with me, if you would, at
25 Schedule 7 and Schedule 11, if you just want to

HARVEY

1
2 pull those out and put them in front of you.
3     A.  7 seems to be missing.  I have 5, 6,
4 and -- oh, there's 7.  There we go.
5     Q.  So look at 7 and 11, please.  Do you
6 mind grabbing 11 as well?  It's at the bottom
7 of the stack.  7 and 11 are summaries of
8 documents and emails.  Number 7 relates to
9 second generation Pradaxa.  Number 11 relates
10 to modeling, specifically modeling by someone
11 named Thorsten Lehr.
12         Do you see that?
13     A.  Yes.
14     Q.  And these summarize documents on
15 those two issues; correct?
16     A.  Yes.
17     Q.  Or contain excerpts from documents on
18 those two issues; correct?
19     A.  Yes.
20     Q.  Who prepared these?
21     A.  So we had some face-to-face meetings.
22 We talked about the various emails.  I
23 highlighted certain emails that I felt were
24 important from a regulatory perspective.  And
25 based upon that direction, this document was

HARVEY

created. And so they -- the counsel's office did the cutting and pasting.

Q. Did you review the full documents that are reflected in these exhibits, these schedules?

A. I read through the information and, you know, there was extensive number of documents, and there may have been times I was skimming for certain information, and other times I read more intently.

Q. Do you know that the documents you reviewed to prepare Schedule 11 and Schedule 7 were the entire set of relevant documents on those issues, Thorsten Lehr's modeling and second generation?

A. Those were the documents I was provided to review.

Q. For example, Schedule 7 does not reference -- regarding second generation does not reference any FDA documents, does it?

A. That's my understanding.

Q. Have you read FDA documents on second generation?

A. I have read the documents that were

HARVEY

provided, which included some of the discussion about the FDA reviewer's review of the data and how it fell outside the 80 to 125 range.

Q. Let's be precise, Doctor. You quote, I think, an email someone wrote getting into a cab after a meeting with an FDA person and some other BI documents talking about the FDA; right --

MR. MOSKOW: Objection to form.

Q. -- in Schedule 11?

A. I don't know about the cab. I know there were documentations of a discussion and, you know, there was a very thorough documentation in 2011 where a BI individual wrote down what the cardiovascular division wanted to see as a path forward, but I don't know where that was written or any of those details. But there were correspondence from FDA, or there were correspondence -- I guess actually a more accurate reflection, there was information from FDA that was in internal documents, their understanding of what FDA said.

Q. Path forward has nothing to do with

HARVEY

second generation, does it?

A. Path forward?

Q. You just talked about a path forward. That discussion that you're referencing has nothing to do with second generation, does it?

A. That had to do with the 110 dose.

Q. Right. Nothing to do with second generation, does it?

A. Well, it does, because I would assume they're not going to have the first generation of the 110 while they're now marketing the second generation of the 150.

Q. Do you know that?

MR. MOSKOW: Objection to form.

A. My understanding is that they went from the first generation to the second generation because the second generation was what they wanted to market.

Q. Were there ever second generation discussions with the FDA about the 110 dose, sir?

MS. PRESBY: Objection, form.

A. No, because the 110 dose was not approved.

HARVEY

Q. So focus on the second generation document that you have in front of you. Does that reference any actual FDA documents --

MR. MOSKOW: Objection to form.

Q. -- reflecting their review of the second generation and whether it was bioequivalent to the first generation?

A. The focus of this document is the company's correspondence and discussions.

Q. So is the answer to my question no, Schedule 11 does not reference any FDA documents regarding second generation or bioequivalence?

A. Yes, that's correct.

Q. Have you reviewed any FDA documents regarding bioequivalence in second generation?

A. Yes, I have.

Q. For example, have you reviewed the FDA's clinical pharmacology review memo that discusses that issue?

A. Yes, I have.

Q. And what was the FDA's conclusion about whether the second generation was bioequivalent to the first generation?

HARVEY

1
2      A.  Well, I would be happy -- if you gave
3  me that document, I'd be happy to point it out,
4  but my memory is that the reviewer found that
5  it did not meet the 80 to 125 -- 125 range.  It
6  came in actually around 126, which is outside
7  the range.  And under standard procedure, that
8  should have led to a request for clinical
9  bridging, clinical data.  And by reading the
10  memo, I'm not quite sure why then the leap was
11  made that it was going to be close enough.
12      Q.  Have you ever performed
13  bioequivalence review for the FDA?
14      A.  I have reviewed -- as a division
15  director, I have to review the work of others.
16      Q.  Have you ever performed yourself
17  bioequivalence review where you're the one
18  responsible for undertaking the review, not
19  reading someone else's work?
20      A.  I have not.
21      Q.  Okay.  Did you see that the FDA
22  reviewer who had that as a job and had that
23  expertise made the conclusion that the first
24  and second generation products are
25  bioequivalent?

HARVEY

1
2      A.  Yes, I do.
3      Q.  Do you know what that means, that
4  they're bioequivalent?
5          MR. MOSKOW:  Objection to form.
6      A.  Well, the fact that it fell outside
7  the range of 80 to 125 means they're not, but
8  the reviewer felt they were.
9      Q.  Move to strike as nonresponsive.  Do
10  you know what it means for drugs to be
11  bioequivalent?
12          MR. MOSKOW:  Objection to form.
13      Q.  For products to be bioequivalent?
14          MR. MOSKOW:  Are you asking
15  regulatory context or in scientific
16  context?
17      Q.  Do you know?
18      A.  In the regulatory context --
19      Q.  Sure.
20      A.  -- or the scientific context?
21      Q.  In the FDA context.
22      A.  In the regulatory context --
23      Q.  Let me take the question back and ask
24  it differently.  You said there were occasions
25  where -- do you have the expertise to conduct a

HARVEY

1
2  bioequivalence review?
3      A.  Actually, based upon my experience at
4  FDA, my Ph.D. in biochemistry and my medical
5  training, yes, I do.
6      Q.  But you never did it?
7      A.  I never did it.
8      Q.  Okay.  When work would come to you
9  from FDA reviewers who who that was their job, to
10  determine if products were bioequivalent, and
11  they would say to you, in their work, I have
12  determined that this product is bioequivalent,
13  what did you understand that to mean?
14      A.  That based upon the data provided to
15  them, they felt that it was in a range of
16  sameness.
17      Q.  Okay.  And that was the conclusion
18  that the FDA reached regarding the second
19  generation, that it was bioequivalent or in a
20  range of sameness to the first generation;
21  correct?
22      A.  That was their finding.
23      Q.  And have you seen any -- you know
24  there's been a substantial volume of real-world
25  data on Pradaxa?

HARVEY

1
2      A.  Yes.
3      Q.  And that real-world data by
4  definition involves the second generation
5  formulation; right?
6      A.  That's correct.
7      Q.  Have you seen any real-world data
8  that suggests that there is a meaningfully
9  different safety profile of the second
10  generation product than there is from the RE-LY
11  study which was first generation?
12      A.  But there's no way to know that
13  because the first generation product was
14  studied in clinical trials where you have a
15  numerator and denominator.  The second
16  generation product is being reported under
17  adverse event reporting, MedWatch and others,
18  where there's no denominator data.  So you know
19  the absolute number of events, so there may --
20  but you don't know the rate.
21      Q.  Sir, have you -- are you telling me
22  that you have reviewed the epidemiological
23  real-world data on Pradaxa, published by some
24  of your former colleagues at the FDA as well as
25  by other independent scientists?

HARVEY

A.  What's the question?  Have I read it or do I know it exists?

Q.  Have you read it?

A.  I've read some of the publications through FDA.

Q.  And you know there's a number of those publications; right?

A.  Yes, I do.

Q.  And those publications do include a denominator.  They compare people who have taken Pradaxa to people who haven't taken Pradaxa in a real-world epidemiological setting; correct?

A.  Yes, I do.

Q.  And have those shown that the rates of bleeding in Pradaxa are any different in a meaningful way than what was seen in the RE-LY trial?

A.  Let me ask for a clarification. Since their denominator is a made-up denominator, and there's a lot of debate within FDA whether it's a -- whether it's valid to take, you know, data, IMS data, prescriptions, use that as a denominator, because that's not a

HARVEY

true ratio.  It's something that's often debated within FDA.  They published it.  It's a working hypothesis.  But it's not a valid comparison between a rate obtained in the post market setting and the rate obtained in a clinical trial.  And this has come up over and over again.

Q.  Move to strike as nonresponsive. Sir, have you seen --

A.  So my experience --

Q.  Let me ask my question, please.  Have you seen any epidemiological real-world data comparing Pradaxa patients using second generation to patients using something else like warfarin, that suggests that the second generation has higher bleeding rates than the first generation?

MR. MOSKOW:  Objection to form.

A.  I know of no valid comparison of the first generation and second generation because it was not studied in a clinical trial.

Q.  Move to strike as nonresponsive.  Try to answer my question now, sir.

A.  I'm trying.

HARVEY

Q.  I'm just asking you about -- you have seen bleed rate data --

A.  Yes.

Q.  -- from real-world epidemiological studies; correct?

A.  Well -- and you can understand my confusion.

Q.  No, I can't.

A.  Moments ago, real-world data and modeling data wasn't data, and now it's data.

Q.  Sir, I'm going to ask you not to argue with me, especially on nonsensical grounds.  I'm trying to ask you simple, simple questions.  I didn't ask you anything about modeling just now.  I don't mean to say nonsensical but I didn't ask anything about modeling.

So here's -- I'm going to try to ask really simple questions and I'm going to ask you not to argue with me.  Just see if you can answer my question.

My first question is, you understand that there have been real-world epidemiological studies that compare bleed rates in patients

HARVEY

taking Pradaxa to bleed rates in patients taking warfarin; correct?

MR. MOSKOW:  Objection to form. You can answer.

A.  Yes, I understand that.

Q.  And you understand that when they look at Pradaxa patients, those are Pradaxa patients who have used the second generation product; right?

A.  That is correct.

Q.  And you understand that those studies have generated rates of bleeding in those second generation Pradaxa patients versus bleeding rates in warfarin patients; right?

A.  Yes.

Q.  Are those bleeding rates, are they occurring differently than what was seen in RE-LY, that compared first generation Pradaxa with warfarin?

A.  In the average patient, which is what they're looking at, there is no difference in -- there are similar rates in the average patients.

Q.  In fact have you seen repeated

HARVEY

1
2  conclusions in those epidemiological studies
3  that these are consistent with what we saw in
4  RE-LY?
5      MR. MOSKOW:  Objection to form.
6      A.  I have seen those conclusions.
7      Q.  Including by your colleagues or your
8  former colleagues at the FDA; right?  Like
9  Dr. Graham who we talked about?
10     A.  Yes, that's correct.
11     Q.  Thank you.
12     Do you disagree with the FDA's
13 conclusion that Pradaxa second generation was
14 bioequivalent to Pradaxa first generation?
15     A.  Yes, I do.
16     Q.  Schedule 9.  Do you have Schedule 9
17 in front of you?  Funny thing, it says 12, and
18 I'm told that the proper reference is Schedule
19 9.
20     MR. MOSKOW:  That's correct.
21     Q.  Do you have it there?
22     A.  Yes, I do.
23     Q.  This is a summary of deposition
24 testimony; is that right?
25     A.  Yes.

HARVEY

1
2      Q.  And tell me what this reflects.
3      A.  This is when I went through the
4  various depositions, these are the areas that I
5  called out as having some meaning to me from a
6  regulatory perspective.
7      Q.  Got it.  Did you review all the
8  depositions?
9      A.  I read through them, and there are
10 times when I might have skimmed through because
11 some parts of the depositions were more
12 informative than others.
13     Q.  Let's look at an example.  If you
14 look at page -- I should have written this
15 down.  It's toward the back.  I'm looking for
16 Paul Reilly.  Help me find Paul Reilly.
17     MR. MOSKOW:  I think he was deposed
18     both first and second, so he's going to
19     appear twice.
20     MR. SCHMIDT:  I think he's just in
21     here once.
22     MR. MOSKOW:  That would be on page
23     62.
24     MR. SCHMIDT:  Yeah.
25     Q.  Look with me at page 62.  Thank you.

HARVEY

1
2  Do you see there's two questions and answers
3  from Dr. Reilly?
4      A.  Yes.
5      Q.  Mr. Moskow just made note of the fact
6  that he was deposed years apart on two separate
7  occasions.  Did you know that?
8      A.  I remember that coming up in
9  conversation at some point.
10     Q.  I think I'm right -- Mr. Moskow will
11 tell me if I'm wrong -- both depositions were
12 multi-day depositions.
13     MR. MOSKOW:  I believe the second
14     was a single day.
15     Q.  He was deposed across multiple days
16 across multiple years.  Did you know that?
17     A.  I wasn't aware of those details, or
18 if I was it didn't -- it didn't strike me as
19 significant.
20     Q.  Here's my question.  Do you know that
21 you read all his testimony?
22     A.  I don't think I read every word but I
23 went through it.
24     Q.  Do you know that you had access to
25 all his testimony?

HARVEY

1
2      A.  I had access to everything.
3      Q.  Just as an example, you've quoted
4  here questions and answers from three pages.
5  Do you have a volume, a sense of the volume of
6  Dr. Reilly's testimony?
7      A.  It was extensive.
8      Q.  It was 1,500 pages.  You can't say
9  you read the full 1,500 pages, can you?
10     A.  I think I just told you that.
11     Q.  That you did not?
12     A.  That I did not.  There were areas I
13 skimmed if I didn't think it was informative.
14     Q.  And that's true for other -- for --
15 generally for the depositions; right?
16     A.  That's correct.
17     Q.  Now, the parts that you picked out,
18 let me just ask you a question about these two
19 excerpts you have.  The first question relates
20 to the timing of the reversal agent; correct?
21     A.  That's correct.
22     Q.  Did you read his full testimony on
23 the timing of the reversal agent or just this
24 question and answer?
25     A.  As I said, I sort of looked through

HARVEY

and I read and I skimmed and then stopped and
focused and then continued.

Q.  But come back to my question.  My
question is do you know that you read his full
testimony on the timing of the development of
the reversal agent, as opposed to the single
question and answer that you've snipped out
here?

A.  I've read his testimony, and this
quote is consistent with what I read.

Q.  Well, do you know if he talked about
different antibodies, for example, that were
explored in terms of developing a reversal
agent, or just the one you reference in this
single question and answer?

A.  There was a lot of general
discussion.  I didn't focus on that and didn't
have it as the basis of my report.  It was the
fact that that took place a number of years
before the NDA was submitted to FDA.  So it was
the timing that was for me important, not
whether it was the first or second cell line
that was used or the way antibodies were made.

Q.  You picked out this single question

HARVEY

and answer from Dr. Reilly on the reversal
agent development.  You didn't study his full
testimony in great detail on the reversal agent
development; fair?

A.  That's correct.

Q.  Let's look at the second question and
answer.  And that's something you actually
quote in your report.  You can put this aside.
And I'm not going to ask you any more about
these schedules because they're kind of bulky.
But go back to your report at page 103,
footnote 97.  You will see there that you quote
the same question and answer from Dr. Reilly
that was the second question and answer in your
Schedule 12/9 in Exhibit 6.

A.  I'm sorry.  Can you repeat the page
number?

Q.  Of course.  Page 103, footnote 97.
(Discussion held off the record.)
BY MR. SCHMIDT:

Q.  Are you with me on page 103?

A.  Yes, I am.

Q.  Do you see that quote from
Dr. Reilly, the second quote in your Exhibit --

HARVEY

Schedule 12/9 from your Exhibit 7?

A.  Yes.

Q.  The quote is:  "When you're doing
this work do you weigh bleeds differently than
you weigh strokes?

"I do not."

Do you see that?

A.  Yes, I do.

Q.  And in the text that accompanies that
quote, you actually state the proposition more
broadly.  You say that Dr. Reilly generally
weighs, quote, strokes and life-threatening
bleeds equally.

Do you see that?

A.  Yes.

Q.  Do you know if that's a true
statement?

A.  It was my understanding based upon
what I had read in his deposition and based
upon the articles of which he is co-author.

Q.  So let me see if I have that.  When
you say he weighs bleeds and strokes equally as
a general matter, what do you mean by that?

A.  That as he was quoted:  "When you do

HARVEY

this work do you weigh bleeds differently than
you weigh strokes?"  And he goes "I do not."

Q.  What is "this work"?

A.  The work he does at BI.

Q.  So --

A.  With anticoagulant.

Q.  So is it your understanding when he
assesses risk and benefit for Pradaxa, as a
general matter he weighs strokes and bleeds
equally?  Is that your understanding?

A.  That's my understanding from his
testimony, his sworn testimony.

Q.  Okay.  And referencing that sworn
testimony, you see that I focused on the first
part of the question, which is "when you're
doing this work."

Do you see that?

A.  Yes.

Q.  You understand "this work" to refer
to his general Pradaxa work as opposed to one
specific analysis?  Or do you know?

A.  I felt it was all related to Pradaxa.

Q.  His general Pradaxa work as opposed
to a specific analysis he conducted?

HARVEY

1
2    A.  I didn't make that distinction.
3    Q.  Okay.  You agree that it's the FDA's
4  mission to protect consumers in the U.S. from
5  dangerous drugs?
6        MR. MOSKOW:  Objection to form.
7    A.  The mission statement since 1998 is
8  to both promote and protect.
9    Q.  Do you agree with me, though, that
10  their mission -- they have a mission of
11  protecting consumers from dangerous drugs?
12        MR. MOSKOW:  Objection to form,
13     asked and answered.
14    A.  It's -- "dangerous drug" doesn't
15  appear in their mission statement.  But it's
16  their job to promote and protect the public
17  health and to make sure that drugs have a
18  favorable benefit/risk, or that the risks -- or
19  the benefits outweigh the risks.
20    Q.  So is it true or false to refer to
21  FDA's mission of protecting consumers from
22  dangerous drugs?
23        MS. PRESBY:  Objection, form.
24        MR. MOSKOW:  Objection, form.
25    A.  Danger -- there's no regulatory

HARVEY

1
2  definition that I know of of dangerousness.  So
3  they have a mission to protect against drugs
4  where the benefits don't -- or the benefits
5  don't outweigh the risks.
6    Q.  Look with me if you would at page 10
7  of your report, Exhibit 1.  And if you look at
8  the end of paragraph 30, do you see where you
9  write, quote, the very language I have been
10  reading that you have been quibbling with:
11  "FDA's mission of protecting consumers from
12  dangerous drugs"?
13        Do you see that?  It's the very last
14  words in paragraph 30.
15    A.  Paragraph 30?  On what page?
16    Q.  10.
17    A.  Oh.  Well, that's --
18    Q.  Do you see that?
19    A.  Yeah.
20    Q.  Is that accurate, that you wrote that
21  the FDA's mission includes protecting consumers
22  from dangerous drugs?
23    A.  I guess I -- I was looking for you
24  for me a definition of -- of what you mean by
25  dangerous.  And of course I cite that here, so

HARVEY

1
2  now I know the context.
3    Q.  Do you agree with that statement --
4    A.  Yes.
5    Q.  -- that it's the FDA's mission to
6  protect consumers from dangerous drugs?
7    A.  Yes.
8    Q.  Do you agree that the FDA has
9  substantial authority over the approval,
10  labeling and promotion of pharmaceutical
11  products?
12        MR. MOSKOW:  Objection to form.
13    A.  Yes.
14    Q.  Do you agree with me that, in fact,
15  under the law as it has existed for close to a
16  decade now, maybe a decade now, the FDA has a
17  legal obligation to order a label change when
18  they believe one should be made?
19        MR. MOSKOW:  Objection to form.
20    A.  The term "legal obligation" -- they
21  have the authority.  In 2007 under the PDUFA
22  legislation at that time that became law, they
23  were granted additional authority where they
24  could unilaterally impose it.
25    Q.  Right.  And in fact, they are charged

HARVEY

1
2  with, if they become aware of new safety
3  information that they believe should be
4  included in the labeling of the drug, they
5  shall promptly notify the company to make the
6  change; right?
7    A.  Yes.
8        MR. MOSKOW:  Objection to form.
9    A.  That's my understanding.
10    Q.  That's a serious obligation that the
11  FDA takes seriously in your experience; right?
12    A.  Yes, they do.
13    Q.  Their obligation that if they learn
14  of a new safety issue that's not reflected in
15  a company's labeling, to notify the company to
16  change the labeling to reflect that safety
17  issue?
18    A.  Yes.
19    Q.  Are you aware of any instances where
20  the FDA has exercised that authority with
21  respect to Pradaxa and safety information
22  regarding Pradaxa?
23    A.  I'm not aware of that.
24    Q.  Are you aware that, I believe it was
25  2014, the FDA ordered that there be a black box

HARVEY

1
2  warning on Pradaxa?
3       A.  I understand that there was class --
4       Q.  Let me --
5       A.  -- class labeling --
6       Q.  Let me pull back my question because
7  I asked it wrong.  I apologize for
8  interrupting.  Are you aware that in 2013 the
9  FDA ordered a black box warning for Pradaxa?
10      A.  I understand that as a broader review
11 of the class there were black box warnings
12 placed on the various labels.
13      Q.  And did you understand that black box
14 warning had nothing to do with bleeding risk?
15      A.  I understand that the initial black
16 box had to do with abruptly stopping Pradaxa or
17 the others, and how that increased your risk of
18 stroke -- no thanks -- and then a subsequent
19 addition to the black box was about epidural,
20 subdural injections.
21      Q.  Nothing about bleeding; right?
22      A.  There's nothing currently in the
23 black box about bleeding as of today.
24      Q.  And the warning that the FDA directed
25 in 2013 on -- in the black box was actually a

HARVEY

1
2  warning about it's dangerous to stop using an
3  anticoagulant like Pradaxa too quickly --
4       A.  Yes.
5       Q.  -- because you could have a stroke?
6       A.  That's just what I said.
7       Q.  Okay.  And that's accurate?
8       A.  Yes.
9       Q.  You're aware, and I'm going to just
10 mark an exhibit.  Hopefully we can go through
11 this very, very quickly.  You're aware that the
12 FDA has approved Pradaxa or new indications for
13 Pradaxa or the labeling for Pradaxa on
14 different occasions since 2010; correct?
15      A.  Yes.
16           MR. MOSKOW:  Objection to form.
17      A.  That's correct.
18      Q.  I trust you haven't taken the time to
19 count up the number of approvals.  Have you?
20           MS. PRESBY:  Objection.
21      A.  As I looked at the FDA website, at
22 drugs, there were well over 10 applications
23 which included labels.
24      Q.  Okay.  Just so we have it for the
25 record, I'm going to put those in front of you,

HARVEY

1
2  the ones that I have been able to compile.  I
3  get to 17 so I'm going to give you the
4  different approval letters and just ask you to
5  count them up.
6       A.  It's well over 10.
7       Q.  You're absolutely right.  I just want
8  to get the exact number for the record.
9           MR. MOSKOW:  After we go through
10      this, can we take a break?
11           MR. SCHMIDT:  Sure.
12      Q.  Let me -- we're going to find those
13 on a break.  Let me ask you one other question
14 while we're on this subject.
15      A.  Schedule 3 has all the Pradaxa
16 labels.
17      Q.  I want to get you the actual letters
18 so we mark them.  You talk in your report about
19 in addition to approving Pradaxa labels, the
20 FDA has also issued various safety
21 communications regarding Pradaxa; correct?
22      A.  Yes.
23      Q.  I think you summarized those safety
24 communications in your report on -- help me
25 out, somebody, anybody.  Mr. Hailey.

HARVEY

1
2  Dr. Harvey.  I believe you summarize them on
3  page 28 of your report.
4       Do you see that?
5           MR. MOSKOW:  Bottom of 27, top of
6      28.
7       A.  That's correct.
8       Q.  By my count of your list, the FDA has
9  on at least 11 occasions issued what you
10 described as communications regarding --
11 different forms of communications regarding
12 Pradaxa to the public.
13      A.  That's correct.
14      Q.  And in every one of those
15 communications, they have reaffirmed that --
16 their belief that the benefits of Pradaxa
17 outweigh the risks of Pradaxa; correct?
18      A.  That's my understanding.
19           MR. SCHMIDT:  I now have the
20      letters.  Let me pass you the letters
21      and then we'll take a break.
22      (Harvey Exhibit No. 7 was marked for
23      identification.)
24 BY MR. SCHMIDT:
25      Q.  We've marked the letters as

HARVEY

Exhibit 7.  And let me give you a moment to look through them.  But as you look through them I will just say for the record that these are various forms of FDA approval letters starting in October -- starting on October 19, 2010 and continuing up through the present date.  This is what we understand to be the set of various forms of approval letters.  Is that accurate?

MR. MOSKOW:  I'm going to object to form.

A.  So 17, I can confirm 17 labels.

Q.  Since the approval of Pradaxa, 17 -- strike that.

Including the approval of Pradaxa and in the time since, there have been at least 17 different approval letters at different points in time from the FDA regarding Pradaxa?

MR. MOSKOW:  Objection to form.

A.  That's correct.

Q.  Every one of those approval letters directs Boehringer to use the labeling word for word as approved by the FDA; correct?

MR. MOSKOW:  Objection to form.

HARVEY

A.  I'm not sure what that means.

Q.  Okay.  Well, let's look at the first label -- at the first letter in the stack.  Do you see on the front page it's got a heading "Content of Labeling"?

A.  Yes.

Q.  And it says that when the company submits its final label for purposes of the FDA, that label has to be identical to the label that the FDA has approved; correct?

A.  Yes.

MR. MOSKOW:  Objection to form.

Q.  And if you look at the next letter, there's similar language in the next letter; correct?

A.  Yes.

Q.  And that's standard language for the FDA when it approves new medicines or when it reapproves a label or approves a new indication for a medicine, it directs the company to use the labeling as approved word for word by the FDA; right?

A.  Yes.

Q.  In fact, every one of these letters

HARVEY

has some variant of that language directing Boehringer to use the language directly as approved by the FDA word for word; right?

A.  Yes, that's the boilerplate language.

Q.  But that's -- you say boilerplate.  That's a serious obligation on the part of the company.  They've got to follow that; right?

A.  They -- based upon this action letter, they need to follow that unless new information becomes available and they either submit an sNDA labeling or, you know, if they initiate a label change, but to be compliant with 21 CFR 314.70.

Q.  Okay.  So let me see if I have that in lay terms.  Then we can break.  The FDA tells companies like Boehringer you need to use your label as we have approved it word for word.  It can be changed later based on new safety information if the company gets advanced approval for the change or, in certain circumstances, the company can do something called changes being effected where it makes a change and then gets later FDA approval; right?

A.  That is correct.

HARVEY

Q.  But ultimately the FDA has to approve the labeling; right?

A.  Yes.

Q.  That mechanism that I referenced where the company can unilaterally change a label subject to subsequent FDA approval, the changes being effected mechanism, are you familiar with that?

A.  Yes, I am.

Q.  Historically has it been widely used by companies?

MS. PRESBY:  Objection to form.

Q.  Where they implement a CBE -- that's the acronym; right?

A.  Yes.

Q.  Historically has it been widely used by companies where they implement a CBE label change without first discussing it with the FDA?

MR. MOSKOW:  Objection to form.

A.  I can't say across every company.  Pfizer used it where appropriate.  Sanofi used it where appropriate.  Discussions at PhRMA, you know, the pharmacological industry

HARVEY

1   organization of which BI is a member,
2   discussions there, it was used.  And the belief
3   was that the individual company who knows the
4   product best, if there is a safety signal that
5   they wanted to communicate, that's the best way
6   to do it, because then you don't delay
7   transmission of that information.
8       Q.  Has Boehringer ever used a CBE for
9   Pradaxa, a CBE label change?
10      A.  I would have to look back at the
11  records.  I would hate to say no, but it didn't
12  jump out at me as significant, but they
13  certainly had the opportunity and they may have
14  used it for something.
15      Q.  You just don't know?
16      A.  I can't remember.
17      MR. SCHMIDT:  Okay.  Let's break
18  there.
19      THE VIDEOGRAPHER:  We're off the
20  record at 11:55.
21  (Recess taken.)
22      THE VIDEOGRAPHER:  Here begins
23  media number 3 in the video recorded
24  deposition of Dr. Brian Harvey.  We're

HARVEY

1   back on the record at 12:10.
2   BY MR. SCHMIDT:
3       Q.  Doctor, I'm going to switch gears a
4   little bit.  You offer yourself in this case as
5   a regulatory expert; right?
6       A.  That's correct.
7       Q.  And I take it you would take the
8   position that you're here motivated by safety
9   concerns and not just because you're being paid
10  for your testimony?
11      A.  That's correct.
12      Q.  On page 25 of your report, Exhibit 1,
13  you say at the beginning of paragraph 77 that
14  "the current label and each Pradaxa label since
15  product launch does not adequately
16  warn/instruct as to the appropriate dabigatran
17  plasma concentration levels."  Did I read that
18  correctly?
19      A.  Yes.
20      Q.  Below that you say:  "The language is
21  inadequate for safe use because it does not
22  mention a dabigatran plasma concentration
23  therapeutic range or concentration cutoff
24  values, a low point and a high point."

HARVEY

1       Do you see that?
2       A.  That's correct.
3       Q.  What is the range that should be
4   included in the label?
5       A.  Well, I think the first step is to
6   have some sort of cutoffs, high or low, and
7   then that can be refined to a range based upon
8   the data.  And part of my thinking was based
9   upon my review of the company's core data
10  sheet.  So the stepwise approach that they used
11  to create that document.  And based upon my
12  time in industry, I know the importance of the
13  core data sheet because, you know, that product
14  is owned by the company and that's their best
15  thinking.  And then the parallels between the
16  core data sheet and the European label.
17      And so my guide for what should be
18  included in the U.S. label is what I saw that I
19  thought was appropriate in the core data sheet
20  as well as what I saw in parts of the European
21  label.
22      Q.  Okay.  Come back to my question.
23  What is the range that should be included in
24  the U.S. label in terms of plasma

HARVEY

1   concentration?
2       MR. MOSKOW:  You're asking for a
3   specific number range?
4       MR. SCHMIDT:  Uh-huh.
5       A.  So I agree with what I saw in
6   Dr. Temple's slides where he talked about 50 to
7   150.  I could certainly understand if you
8   wanted to have a cutoff of 200, I think, or 75
9   to 150 is another range.  I would think you
10  would want to do it based upon data.  And some
11  of the data I hope is available to do that.
12  Some might not be to do it adequately in some
13  of the subpopulations.  So advancing age, there
14  might not be adequate numbers.  Certain
15  patients with certain ranges of renal function,
16  some of the comorbidities, previous GI bleeds,
17  those ranges would need to be based upon data.
18  But I think we certainly have a series of
19  proposals which then need to be studied.
20      Q.  Well, you've looked -- you purport to
21  have looked at the BI documents on this issue;
22  right?
23      A.  Yes.
24      Q.  You purport to have done a complete

HARVEY

1
2  review of the data as it exists; right?
3      A.  Yes.
4      Q.  What should the number be?  What
5  should it say in the label in terms of a range?
6      A.  Well, whether it be 50 to 150 or 75
7  to 150, that certainly is better than what it
8  is now, which is no range.
9      Q.  I'm not asking for what's better; I'm
10  asking what should it be.  And here's why I
11  ask.  Let's do a little exercise.  On page 27
12  of your report you cite a document that gives a
13  range of 50 to 150.
14      A.  Correct.
15      Q.  Right?  And do you know how many
16  Pradaxa patients in the RE-LY study where
17  plasma concentration was measured fell outside
18  that range?
19      A.  I don't have the exact numbers, but
20  there was discussion about a third that might
21  have fallen in the -- outside the range.
22      Q.  Okay.  Another number you cite, going
23  back to 25, page 25, is you talk about the 10th
24  and 90th percentiles --
25      A.  Correct.

HARVEY

1
2      Q.  -- from the RE-LY study.  Do you see
3  that?
4      A.  Uh-huh.
5      Q.  And just so I have it, what that
6  means is if you put everyone on a chart in
7  terms of what their concentration was, you
8  looked at where the 10th percentage of people
9  were and then all the way up to what the 90th
10  percentage of people were; right?
11      A.  Correct.
12      Q.  And do you remember what those
13  numbers are?  What was the 10th percentile in
14  terms of the blood levels and what was the 90th
15  percentile?
16      A.  No, I don't.
17      Q.  Do you know if the 10th was above or
18  below 50?
19      A.  The -- based upon the data I
20  remember, the blood level of 50, below which
21  strokes, you know, increased significantly, and
22  so it would be in that range of 50.
23      Q.  Am I correct in understanding your
24  answer right now that you should not go below
25  50 nanograms per milliliter in terms of stroke

HARVEY

1
2  risk?
3          MR. MOSKOW:  Objection to form.
4      A.  All of the information I've seen,
5  there is general agreement that going below 50
6  increases your stroke risk.
7      Q.  Okay.  So to come back to my
8  question, should you avoid going below 50?
9      A.  Yes.
10      Q.  And if you look at your report where
11  you talk about the fact that 10 percent is a
12  potential cut point for an increased risk of
13  stroke; is that correct?
14          MR. MOSKOW:  Objection to form.
15      A.  Yes.
16      Q.  Do you know what -- if the 10th
17  percentile is above or below 50?
18      A.  As -- if I could look at specific
19  information, but my recollection is that it's
20  in that area.
21      Q.  Am I correct in understanding your
22  report to say you would be okay if the
23  recommendation was to stay within the 10th and
24  90th percentile?
25          MR. MOSKOW:  Objection to form,

HARVEY

1
2  mischaracterizes the document.
3      A.  I think what I'm discussing is, you
4  know, I'm discussing why the one-size-fits-all
5  approach doesn't take certain things into
6  consideration.  I don't think I'm making a
7  specific proposal; I'm just saying why the
8  current paradigm of no monitoring, one size
9  fits all, doesn't take into consideration some
10  of these factors.
11      Q.  But you do say below -- the 10th or
12  below is a subtherapeutic dose where you have
13  increased risk of stroke; correct?
14      A.  The -- I think there is general
15  agreement that a drug level of 50 -- below 50
16  is subtherapeutic, and if that corresponds to
17  the 10th percentile, then that's consistent.
18      Q.  Well, that's what I'm asking you.
19      A.  I've not memorized the numbers.
20      Q.  Is, as your report says, a dose below
21  the 10th percentile subtherapeutic?  Do you
22  stand by that statement in your report?
23      A.  I think as I read the report, I'm
24  saying one size does not fit all.  And that
25  approach ignores the data that 20 percent of

HARVEY

1    the population received either a dose that was
2    too high or too low.
3        Q.  Right.  So is below the 10th too low?
4        A.  That's what I say in my report and I
5    agree with that.
6        Q.  Is above the 90th too high?
7        A.  Yes.
8        Q.  And is between 10 and 90 okay?
9        A.  Well, we're talking about in
10   general --
11       Q.  Yes.
12       A.  -- and so --
13       Q.  In general is between 10 and 90 okay?
14       A.  But that's not what I'm saying.
15       Q.  That's what I'm asking.  In general
16   is between 10 and 90 okay?
17       A.  And we're not talking about specific
18   subpopulations that are at high risk?
19       Q.  Right.
20       A.  If I can clarify, what I was --
21       Q.  Can you just answer my question?  In
22   general is between 10 and 90 okay?
23           MR. MOSKOW:  Objection.  If you are
24       able to answer, you should.  If you need

HARVEY

1    more information, you should ask for it.
2        A.  I need more information because
3    that's an oversimplification.
4        Q.  You understand that the 10th and 90th
5    percentiles are arbitrary points along a data
6    spectrum; right?
7        A.  Yes.
8        Q.  For example, you could just as easily
9    say let's define it according to the 5th to
10   95th percentile or the 15th to 85th percentile;
11   right?
12       A.  That's correct.
13       Q.  And that's true in terms of the data;
14   there's nothing special about either the
15   10th percentile or the 90th percentile in terms
16   of the data, is there?
17       A.  That's correct.
18       Q.  For example, if you go from the 85th
19   to the 90th percentile versus the 90th to the
20   95th percentile, in both increments you see an
21   increased risk of bleeding, but it increases at
22   the same rate; right?
23       A.  Yes.
24       Q.  There's no -- if you were to say

HARVEY

1    above this level in terms of the percentile or
2    in terms of the blood concentration, there's an
3    increased risk of bleed, you could literally
4    say that as to any blood level; right?
5        A.  That's where you lost me.
6        Q.  Okay.  The --
7        A.  Because the --
8        Q.  The --
9        A.  -- current paradigm --
10       Q.  Let me --
11       A.  -- is 0 --
12       Q.  Let me --
13       A.  -- to 90th --
14       Q.  -- try to --
15       A.  -- percentile, or 0 to
16   100th percentile.
17       Q.  Fair enough.  Let me try to ask the
18   question more precisely.
19           You refer to this -- the statements
20   in company documents where they talk about an
21   increased risk of bleeding above 200 nanograms
22   per milliliter; correct?
23       A.  Correct.
24       Q.  And that is a true statement;

HARVEY

1    correct?
2        A.  Yes.
3        Q.  It would be equally true to make that
4    statement about any blood concentration level;
5    correct?
6            MR. MOSKOW:  Objection to form.
7        A.  So there is evidence that above 200
8    increases your risk of bleeding, so I don't
9    follow that --
10       Q.  Okay.
11       A.  Because it's an increased risk for
12   200 and above that has been identified within
13   the company as well as in certain publications.
14   But I don't follow the second part of your
15   question.
16       Q.  Would it be a true statement to say
17   above 50 nanograms there's an increased risk of
18   bleeding?
19       A.  Increased risk over?
20       Q.  Below 50.
21       A.  That would be an odd comparison but
22   that would be a true statement if you were
23   making -- with that -- with that -- if you are
24   using 50 above and below, then that would be a

HARVEY

1
2 true statement.
3     Q.  Okay.  Is it true to say there's an
4 increased risk of bleeding above 100 nanograms
5 per milliliter?
6     A.  Well, there is data to support that
7 in the Reilly paper, figure 2, where with
8 increasing dose there's increasing risk.
9     Q.  Right.  As your plasma concentration
10 increases your bleeding risk increases; right?
11     A.  That's correct.
12     Q.  So you could make that statement, to
13 come back to my first question, there's an
14 increased risk of bleeding above 200 nanograms
15 per milliliter.  You could make that statement
16 about any level because as you go up any level,
17 your bleeding increases; right?
18     A.  And that's on the risk side, that's
19 correct.
20     Q.  Right.  But you also need to consider
21 the stroke benefit side; right?
22     A.  That's correct.
23     Q.  Because you would agree with me that
24 there is no plasma concentration level you can
25 identify where there is not some increased

HARVEY

1
2 stroke benefit above the lower level?
3     MR. MOSKOW:  Objection to form.
4     A.  So the curves are different.  And if
5 you are trying to have benefit/risk, you would
6 want to look at both curves on the same graph,
7 which is what figure 2 is in the Reilly
8 article.  And if the risk of bleeding goes up
9 at a faster rate than any corresponding
10 reduction in stroke, then that's not improving
11 the benefit/risk ratio.
12     Q.  Move to strike as nonresponsive.  Is
13 it true that according to the data you have
14 seen, as you go up each level in terms of blood
15 concentration, there is always some increased
16 stroke protection?
17     MR. MOSKOW:  Objection to form,
18 asked and answered.
19     A.  Stroke protection, I would say no,
20 because there's a part of the curve where it
21 appears to level off.
22     Q.  So is it your testimony that at the
23 high end, the stroke protection completely
24 levels off?  Is that your testimony under oath?
25     MR. MOSKOW:  Objection to form.

HARVEY

1
2     A.  I'm saying as I look at figure 2, it
3 appears to be leveling off, but it's -- I can't
4 say that it's flat.
5     Q.  Does it ever become flat?  Have you
6 tried to quantify that?
7     A.  No, I have not.  I've looked at the
8 graph and it looks relatively flat, but I
9 haven't expanded it and looked at the scale.
10     Q.  For example, do you know who
11 Dr. Baruch is?
12     A.  Yes.
13     Q.  He's one of the plaintiff experts;
14 right?  Correct?
15     A.  Yes.
16     Q.  Unlike you he's a cardiologist;
17 right?
18     A.  Uh-huh.
19     Q.  Yes?
20     A.  That's my understanding.
21     MR. MOSKOW:  He's just saying you
22 need to answer audibly.  So "uh-huh"
23 doesn't work on the record.
24     A.  Yes, that's my understanding.
25     Q.  And unlike you, he actually has

HARVEY

1
2 prescribed Pradaxa in the real world?
3     A.  That's what I understand.
4     Q.  And did you know -- did you review
5 his testimony?
6     A.  Yes, I did.
7     Q.  Did you see that he had actually
8 quantified the stroke benefit that you get at
9 higher levels of the curve?
10     A.  Yeah, he did that analysis, yes.
11     Q.  And did you see from his analysis
12 that whether the curve flattens out, gets
13 flatter or not, there is always an improvement
14 in stroke benefit as you increase
15 concentration?  Did you see --
16     A.  That was his characterization of it.
17     Q.  Do you have any basis to disagree
18 with the factual proposition that as plasma
19 concentration increases, there is always some
20 additional stroke benefit?
21     Do you have any reason factually to
22 disagree with that proposition?
23     MR. MOSKOW:  Objection to form.
24     A.  In a regulatory sense, we never say
25 always.  It's only within the data.  And when I

HARVEY

1 look at figure 2, it looks relatively flat.
2 Q. Okay. Not --
3 A. So what I'm saying is not
4 inconsistent with what you've just outlined.
5 Q. Move to strike as nonresponsive. I'm
6 asserting factually -- Dr. Baruch happens to
7 agree with me -- that as concentration
8 increases on the curve, there is always some
9 additional stroke benefit.
10 Do you disagree with that factual
11 proposition?
12 MR. MOSKOW: Objection to form.
13 A. What I disagree with is the extent of
14 which that data demonstrates that. Since I
15 don't believe -- I would need to see what doses
16 were studied. You know, where is the
17 extrapolation? Where's the interpolation? How
18 many patients were studied?
19 There's a flattening of the curve is
20 what I've observed, which doesn't necessarily
21 mean it goes to a delta of zero.
22 Q. Are you done with your answer, sir?
23 A. Yes, I am.
24 Q. Let me try my question again. I

HARVEY

1 thought it was clear but I'll flag it. It's
2 just a yes or no question, or I don't know.
3 Yes or no or I don't know: Do you agree with
4 the factual proposition that as plasma
5 concentration increases, there is always some
6 additional stroke benefit?
7 MR. MOSKOW: Objection to form.
8 A. I disagree with the word "always."
9 Q. Okay. Do you disagree with me
10 that -- strike that.
11 Do you have any basis to disagree
12 with the factual assertion that as the plasma
13 concentration of Pradaxa increases, the stroke
14 rate continuously decreases --
15 MR. MOSKOW: Objection to form.
16 Q. -- according to the data we have?
17 A. According to the data, there is a
18 diminishing corresponding reduction in stroke
19 rate. I agree with that.
20 Q. The stroke rate continuously
21 decreases. It never stops decreasing as you
22 increase in plasma concentration?
23 MR. MOSKOW: Object.
24 A. "Never" and "always" I can't agree

HARVEY

1 with.
2 Q. Does the stroke benefit ever stop as
3 you increase with plasma concentration?
4 MR. MOSKOW: Objection to form.
5 Q. Yes or no or you don't know?
6 A. I don't know.
7 Q. Have you attempted to quantify in any
8 way how the stroke benefit or the stroke rate
9 changes when you go from, say, 200 nanograms
10 per milliliter to 250 to 300? Have you tried
11 to quantify any of that other than just
12 eyeballing a curve?
13 A. I think it would be ill advised to
14 study that in a real patient, but no, I haven't
15 quantified that.
16 Q. There is data from which you can
17 quantify that, though; right Dr. Baruch has
18 tried to do that.
19 A. I understand that, and that's his
20 area of expertise, and my thinking doesn't
21 contradict that.
22 Q. You agree with Dr. Baruch then on the
23 continuing stroke benefit above 200 nanograms
24 per milliliter?

HARVEY

1 MR. MOSKOW: Objection to form.
2 A. I agree with his opinion. I'm just
3 providing my regulatory perspective that it's
4 going to be based upon the data, and terms like
5 "always" and "never" make me uncomfortable.
6 Q. You agree with Dr. Baruch that the
7 stroke benefit from Pradaxa continues to
8 increase even as you go beyond 200 nanograms
9 per milliliter?
10 A. Yes, I do.
11 Q. And you agree with him that that is
12 clinically significant?
13 MR. MOSKOW: Objection to form,
14 mischaracterizes the testimony.
15 A. I agree with his testimony as I've
16 read it in the transcript.
17 Q. Did you see where he said it's
18 clinically significant, the improvement that
19 you get in stroke rate, even as you go above
20 200?
21 MR. MOSKOW: Objection to form.
22 THE WITNESS: There's been an
23 objection to the characterization of the
24 testimony.

HARVEY

1
2      MR. SCHMIDT:  Okay, then I'm going
3  to put an objection on the record right
4  now.  That's a coaching objection.  The
5  witness has just said on the record he
6  has been coached.  I'm not going to have
7  a fight about it because you're --
8  you're an honest defender and --
9      MR. MOSKOW:  It's not -- it's
10  not --
11      MR. SCHMIDT:  I think it was a a --
12      MR. MOSKOW:  -- what I meant --
13      MR. SCHMIDT:  -- one-time thing,
14  but --
15      MR. MOSKOW:  -- to do, but I --
16      A.  It's not my -- my statement that I've
17  memorized the expert testimony of another
18  expert, and to question whether or not I'm
19  remembering his testimony is outside the scope
20  of my report and my expertise.
21      Q.  Do you know whether there is a
22  clinical, meaningful clinical benefit in stroke
23  protection when you go above 200 nanograms per
24  milliliter?
25      A.  I do not know that.

HARVEY

1
2      Q.  Do you know if there's a meaningful
3  clinical benefit when you go above
4  300 nanograms per milliliter?
5      A.  I do not know that.
6      Q.  All right.  So let's go back to the
7  numbers.  We've now talked -- on page 27 you
8  cited a document referring to 50 to 150.
9      Do you remember that?
10      A.  Yes, I do.
11      Q.  On page 25 you cited a document -- or
12  you discussed the 10th to 90th percentile;
13  correct?
14      A.  Yes, I did.
15      Q.  On page 37 you cite a document
16  talking about 40th -- 40 to 200 nanograms per
17  milliliter?
18      A.  Which page was that?
19      Q.  I'm sorry.  Page 37.  It's the
20  Connolly email down at the bottom.
21      Do you see that?
22      A.  I see there is a very good reason
23  never to go above 200.
24      Q.  Do you see where he says there's a
25  rough plasma concentration range for

HARVEY

1
2  optimization of efficacy and safety in a range
3  of 40 to 200?
4      A.  Yes, I do.
5      Q.  And that disagrees with your number;
6  right?  Is Dr. Connolly wrong in saying you can
7  go down to 40?
8      MR. MOSKOW:  Objection to form,
9  misstates the document.  Objection to
10  form.
11      A.  All of the different ranges that I'm
12  citing are based upon the work of those
13  individuals.  They're all similar in their
14  desire to have some sort of range, which is
15  better than where we are now with the U.S.
16  label, where there's no range at all.
17      Q.  Move to strike as nonresponsive.  Is
18  Dr. Connolly incorrect in your view in saying
19  that your plasma concentration can be as low as
20  40?  Yes or no --
21      MR. MOSKOW:  Objection to form.
22      Q.  -- or you don't know?
23      A.  I don't see 40 versus 50, when he's
24  speculating on potential ranges, as
25  inconsistent or mutually exclusive.

HARVEY

1
2      Q.  Do you view this email as his
3  speculation on potential ranges, to use the
4  word you just used?
5      A.  He's commenting on a draft document.
6      Q.  Move to strike as nonresponsive.
7      A.  I just read it from my report.
8      Q.  Do you remember what my question was?
9      A.  Do you think it was speculation?
10      Q.  Yeah, that's the word you used.  You
11  said I don't see 40 versus 50, when he's
12  speculating on potential ranges.
13      A.  Okay.
14      Q.  Do you understand -- let me finish my
15  question.
16      A.  I'm going to turn the page because I
17  actually answered it in my report.
18      Q.  Do you understand him to be
19  speculating on the potential ranges?  Yes or
20  no.
21      A.  Am I allowed to turn the page and
22  quote the rest of it, saying "of events, but
23  somewhere around 40 to 50 seemed prudent."
24      Q.  Under --
25      A.  He actually said it was 40 to 50 --

HARVEY

1  Q.  Sir --
2  A.  -- so to say 40 versus 50 is a -- a
3  false distinction.
4  Q.  You are not answering my question at
5  all, respectfully, sir.  You're allowed to look
6  at whatever you want to look at.
7  A.  Okay.
8  Q.  But I have to ask you to answer my
9  question.  My question was not about 40 to 50.
10 My question was simply do you understand him --
11 two minutes ago you used the word
12 "speculating."  You said, "I don't see 40
13 versus 50 when he's speculating on potential
14 ranges."  I was just asking you, do you
15 understand this email to be him speculating on
16 ranges?  Yes or no.
17 A.  In the quote, he talks about 40 to
18 200, and then later in the same quote, "but
19 somehow around 40 to 50 seems prudent."  So
20 that's to me is not a definitive
21 recommendation, but he is seeking to find a
22 range, which is then something that needs to be
23 tested.
24 Q.  Can you answer my question now?  Is

HARVEY

1  that word you used two minutes ago,
2  "speculating," accurate for what he's doing in
3  this email?  Yes or no.  Is he speculating?
4  A.  Did you want to give me a definition
5  of "speculation"?
6  Q.  The same one you used two minutes
7  ago.
8  A.  Okay.  It's -- that's how I
9  characterized it.  Since he does mention 40 and
10 then he says 40 to 50.
11 Q.  It's a fair characterization of his
12 email that he's speculating about a range;
13 correct?
14 A.  Yes.
15 Q.  And what was his final opinion on
16 what the range should be?
17 Let me just take a step back.  I'll
18 withdraw that question.  You understand that
19 Dr. Connolly along with Dr. Reilly, to whom
20 this email was sent, did a great deal of hard
21 thinking about what a range might be; right?
22 A.  Yes.
23 Q.  What was Dr. Connolly's -- having
24 done that hard thinking, what was his final

HARVEY

1  view when he was done speculating and came to
2  his final view as to what an appropriate range
3  was, if any?
4  MR. MOSKOW:  Objection to form.
5  A.  I'm reluctant to give you an answer
6  because there's no simple answer because they
7  go on -- we go on to talk about risk factors
8  and age and creatinine clearance.
9  Q.  Let me be sure -- I think you might
10 be answering a different question than I'm
11 asking.  I'm focused on Dr. Connolly
12 specifically.  What was his final view after he
13 had speculated and discussed and thought
14 through the data as to whether there was an
15 optimal plasma concentration range and, if so,
16 what it was?  Do you know?  Do you know what
17 his final opinion on the matter was?
18 A.  I would need to see the paper.
19 Q.  Which paper would you need to see?
20 A.  The paper we're referring to in the
21 final publication version of the above paper.
22 Q.  Okay.  You understand that to be
23 the --
24 A.  The Reilly paper from 2014.

HARVEY

1  Q.  You understand that to reflect
2  Dr. Connolly's final views on this issue?
3  MR. MOSKOW:  Objection to form.
4  A.  I'm asking to see the paper so I can
5  answer that.
6  Q.  Do you know if Dr. Connolly's an
7  author on that paper?
8  A.  I'm waiting for the paper.
9  Q.  We're getting it.  Do you know if
10 he's an author on that paper?
11 MR. MOSKOW:  Objection.
12 A.  I'm waiting for the paper.
13 Q.  Without seeing the paper do you know
14 if Dr. Connolly was an author on that paper?
15 A.  I'm waiting for the paper.
16 Q.  Can you answer my question, sir?  If
17 you are literally refusing right now to answer
18 my questions, we will have to go to the judge
19 on that.
20 MR. MOSKOW:  Objection.
21 Q.  Do you know?
22 MR. MOSKOW:  Just show him the
23 paper.
24 Q.  Do you know if Dr. Connolly is an

HARVEY

1  author on the 2014 Reilly paper?  Are you
2  refusing to answer my question, sir?
3      A.  No, I'm not refusing to answer.  I've
4  asked for the -- a paper, which I think is a
5  legitimate request, and you're refusing to give
6  it to me.
7      Q.  I'm not refusing to give it to you.
8  I'm asking if you know without looking at it.
9          Do you know without looking at it?
10     A.  No, I don't.
11     Q.  Okay.
12     (Harvey Exhibit No. 8 was marked for
13     identification.)
14  BY MR. SCHMIDT:
15     Q.  It's marked as Exhibit 8.  Do you see
16  that this is the paper that you referenced from
17  2014, what's sometimes called the exposure
18  paper?
19     A.  Yes.
20     Q.  If you look, do you see that
21  Dr. Connolly is, in fact, an author on this
22  paper?
23     A.  Yes, I do.
24     Q.  And let's look at the final

HARVEY

1  conclusion of this paper.  Look with me if you
2  would at page 328.  I'm going to read into the
3  record the second-to-last sentence of this
4  article.  Do you see where it says:  "There is
5  no single plasma concentration range that
6  provides optimal risk/benefit for all
7  patients"?
8          Did I read that correctly?
9      A.  Yes, you did.
10     Q.  Do you understand that to be
11  Dr. Connolly's final conclusion, after he's
12  done speculating, after he's done talking about
13  it, after he's done considering the data?
14     MR. MOSKOW:  Objection to form.
15     A.  But the sentence you just read was
16  for all patients.  And in my report, I cite
17  that there are issues with old age, reduced
18  creatinine clearance, low body weight, and that
19  better outcomes might be achieved by adjusting
20  dose.  So yes, it's a true statement for all
21  patients, there's no single range, but it
22  negates his comments on those special
23  populations that are at increased risk.
24     Q.  Move to strike as nonresponsive.  Do

HARVEY

1  you agree with the statement in this paper that
2  there is no single plasma concentration range
3  that provides optimal benefit/risk for all
4  patients?  Is that a true statement as you
5  understand it?
6      MR. MOSKOW:  Objection to form.
7      A.  As written, I agree.
8      Q.  Okay.  Do you understand that to be
9  Dr. Connolly's final view on that issue?
10     MR. MOSKOW:  Objection to form.
11     A.  Given the limitations that I said
12  about all patients, not specific high risk
13  populations.
14     Q.  Yes?  That's his final view --
15     MR. MOSKOW:  Objection to form.
16     Q.  -- subject to those limitations?
17         Let me take a step back and reask the
18  question.  Have you ever seen Dr. Connolly
19  refer to specific plasma concentration ranges
20  for high-risk patients?  Did he do that in the
21  email that you cite on page 37 of your report?
22     A.  There was the discussion that we --
23  we've already had about the 40 to 200.  It's --
24  about not going above 200, and that the 40 and

HARVEY

1  50 seems to be prudent as the lower boundary.
2      Q.  Was that general or related to
3  specific populations?
4      A.  The specific populations came later.
5      Q.  Okay.
6      A.  That was in general then, to answer
7  your question.
8      Q.  And his ultimate conclusion, having
9  speculated about 40 to 200, his ultimate
10  conclusion was there is no single plasma
11  concentration range; correct?
12     MR. MOSKOW:  Objection to form.
13     A.  That's what he states in his article
14  in 2014.
15     Q.  You give various other numbers in
16  your report.  We've talked about 50 to 150,
17  we've talked about 10th to 90th percentile,
18  we've talked about 40 to 200.  If you look at
19  page 41 of your report, you reference the
20  pediatric studies that we've already touched on
21  which are 50 to 250.
22         Do you see that?
23     A.  Yes.
24     Q.  Is that an appropriate range in your

HARVEY

1  view?
2      A.   Based upon what I've read, I would be
3  uncomfortable with going up to 250.  But
4  children are different from adults in how they
5  metabolize things, and I would hope that there
6  would be some adjustment for creatinine
7  clearance.  Although kidney -- you know, renal
8  insufficiency is unusual in children, it's not
9  impossible.
10     Q.   Would you be -- you understand that
11 the 50 to 250 was based on adult data, not
12 child data; right?
13     A.   It's my understanding that it was
14 data that was generated not using children,
15 that's correct.
16     Q.   Would you be comfortable having
17 adults dose 50 to 250?
18          MR. MOSKOW:  Objection to form.
19     A.   Given that experts have been quoted
20 saying there's no good reason to go above 200,
21 and given, you know, the figure 2 from the
22 Reilly paper where you don't see much benefit
23 above 200 on the two curves, I don't -- I
24 wouldn't see the utility of going above 200.

HARVEY

1      Q.   Let's look at figure 2 from the
2  Reilly paper.  It's Exhibit 8.  And this is the
3  curve that you have referenced several times;
4  correct?
5      A.   Yes.
6      Q.   So we have it, there's one curve that
7  shows a dotted line corresponding to bleed.
8          Do you see that?
9      A.   Yes, I do.
10     Q.   And do you see that that tends to
11 flatten out as you get higher plasma
12 concentrations?  It increases less steeply?
13     A.   It -- the rate of slope changes.  I
14 wouldn't say it's flattening out.
15     Q.   And there's a dotted line with gray
16 lines around it.
17          Do you see that?
18     A.   Yes.
19     Q.   What does the dotted line reflect and
20 what do the gray lines reflect?
21     A.   So we're looking at increasing
22 concentration and the event probability.
23     Q.   Yeah.  And what's the difference --
24 what's the dotted line signify and what does

HARVEY

1  the gray line signify, the gray shading area?
2      A.   So you've got the data and then
3  you've got the range, the range.
4      Q.   Is this modeled data or actual data?
5      A.   Well, I object to the term "actual"
6  distinguishing data between modeling, given
7  what we have been talking about.
8      Q.   The way this works, you're a witness,
9  you can't object.  They can object.
10     A.   Okay.
11     Q.   So is this --
12          MS. PRESBY:  I object.
13     A.   I question -- given the --
14     Q.   Let me reask the question --
15     A.   -- our previous discussions --
16     Q.   -- and see if I can meet your
17 concern.  Is this literal patient data or is
18 this modeling from patient data?  Do you know?
19     A.   It's my -- it's based upon actual
20 data, and then the gray area is the 10th to the
21 90th percentile.
22     Q.   You read that on the page.
23     A.   No, because I quoted it in my report.
24     Q.   Is it modeled?  Is there modeling

HARVEY

1  involved in this?
2      A.   There might be some modeling
3  involved.
4      Q.   Do you know?
5      A.   But it's based upon the actual data,
6  to use your term.
7      Q.   Do you know if there's modeling
8  involved?  Yes or no.  Or you don't know.
9      A.   I don't know.
10     Q.   Okay.  And you said that there's a
11 10th to 90th percentile.  So just to take an
12 example -- and what I'm going to ask you to do
13 is if you could look at where it has
14 250 nanograms per milliliter.
15          Do you see that?
16     A.   Uh-huh.
17     Q.   And just because you've got a copy of
18 the exhibit -- I'll do it actually if you want.
19 Do you mind passing me yours?  Do you see how
20 I've drawn a line on the stroke curve above --
21 if you guys need to take a look at that,
22 obviously do -- above the 250 marker?  Through
23 the gray area?
24     A.   Yes, I do.

HARVEY

1
2      Q.  Does that mean that we know that the
3  stroke benefit could be anywhere in that range?
4      MR. MOSKOW:  Objection to form.
5      A.  By definition of a 10th to
6  90th percentile, then yes.
7      Q.  So it could be the very bottom of the
8  range; it could be the high end of the range?
9      A.  Correct.
10     Q.  And do you see where it says
11  "calculated for a 72-year-old male"?
12     A.  Yes.
13     Q.  How does this apply to a 72-year-old
14  female?
15     A.  I don't know.
16     Q.  How does it apply to an 80-year-old?
17     A.  I do not know.
18     Q.  Have you seen curves like this for
19  80-year-olds or for females?
20     A.  No, I don't remember if I have.
21     Q.  And sticking with the stroke, if you
22  look at the left-hand side of the graph it says
23  "event probability."
24     A.  Uh-huh.
25     Q.  This is the percentage chance of

HARVEY

1
2  someone -- this is an attempt to model the
3  percentage chance of someone having a stroke in
4  those groups; correct?
5      MR. MOSKOW:  Objection to form.
6      Q.  At those plasma concentration levels?
7      MR. MOSKOW:  Objection to form.
8      Q.  Correct?
9      A.  Can you repeat the question?
10     Q.  Sure.  What this is attempting to do
11  is it's an attempt to predict the percentage
12  chance that someone at a given plasma
13  concentration level will have a stroke; right?
14     MR. MOSKOW:  Objection to form,
15  mischaracterizes the document.
16     MR. SCHMIDT:  I'm going to ask you
17  not to make that mischaracterization
18  objection, given what the witness has
19  done.
20     MR. MOSKOW:  Well, you're talking
21  about one half of an X-Y chart, so --
22     MR. SCHMIDT:  That's what I'm --
23     MR. MOSKOW:  -- you're
24  mischaracterizing.
25     MR. SCHMIDT:  I referred to both

HARVEY

1
2  the plasma concentration, which is --
3      MR. MOSKOW:  And you talked about
4  one of the -- one risk factor.
5      MR. SCHMIDT:  Yeah, stroke.  That's
6  my question.
7      MR. MOSKOW:  But that's not what
8  the chart reflects.  That's my --
9      MR. SCHMIDT:  You can't coach him
10  on it, and you have coached him already.
11     MR. MOSKOW:  Which is why I said
12  mischaracterization as opposed to saying
13  anything more.
14     MR. SCHMIDT:  "Mischaracterizing"
15  is coaching this witness and he's
16  demonstrated that.  Doctor, let me try
17  to reask the question to avoid the
18  objection.
19  BY MR. SCHMIDT:
20     Q.  Do you see that this reports
21  predicted stroke data?
22     MR. MOSKOW:  Objection to form.
23     Q.  Yes or no.
24     MR. MOSKOW:  You can answer if
25  you're able.

HARVEY

1
2      A.  Can you repeat the question?
3      Q.  Do you see that this reports
4  predictions for stroke data based on different
5  plasma concentrations?
6      MR. MOSKOW:  Objection to form.
7  You can answer if you're able.
8      A.  You're talking about figure 2?
9      Q.  That's what we have been talking
10  about for the past ten minutes, yes, sir.
11     A.  I understand that.  I just wanted to
12  make sure we hadn't changed.  Can we take a
13  break?
14     Q.  Not in the middle of a question.
15     MR. MOSKOW:  You have to answer his
16  questions if you're able.
17     THE WITNESS:  Okay.  Why don't you
18  ask the question one more time?
19     Q.  Okay.  Do you see that figure 2
20  reports predictions for stroke data based on
21  different plasma concentrations?
22     MR. MOSKOW:  Objection to form.
23     A.  So it's ischemic stroke/SEE versus
24  trough plasma concentration --
25     Q.  It report --

HARVEY

1 HARVEY
2 A.  -- of the drug.
3 Q.  It reports a prediction about the
4 percentage chance -- the event probability for
5 strokes and SEE at different plasma
6 concentrations; correct?
7 MR. MOSKOW:  Objection to form.
8 A.  That's -- that appears to be what it
9 does, yes.
10 Q.  And what it shows is that the event
11 probability decreases as the plasma
12 concentration increases; correct?
13 MR. MOSKOW:  Objection to form.
14 A.  Yes.
15 Q.  And within -- at every point in the
16 plasma concentration there's a range of how
17 much it decreases by from the 10th to the
18 90th percentile; right?
19 MR. MOSKOW:  Objection to form.
20 A.  That's correct.
21 Q.  And the rate that it's showing us is
22 the absolute -- when it says "event
23 probability" -- do you see that on the
24 left-hand side?
25 A.  Yes.

1 HARVEY
2 Q.  You understand that to be just how
3 common are the strokes predicted to be;
4 correct?
5 MR. MOSKOW:  Objection to form.
6 A.  That's correct.
7 Q.  So, for example, you see where it
8 says 2, 4, 6, 8?
9 A.  Yes.
10 Q.  That would be predicting a stroke
11 rate of 2, 4, 6, 8 percent; correct?
12 MR. MOSKOW:  Objection to form.
13 A.  That's my understanding.
14 Q.  Now, you understand that different
15 patients have -- if they don't receive
16 anticoagulant treatment, different patients
17 have different stroke rates; right?  Different
18 stroke risks; correct?
19 A.  Yes.
20 Q.  For example, this is a 72-year-old
21 male.  An older patient is more likely to have
22 a higher stroke risk?
23 A.  Yes.
24 Q.  A patient with poor renal function is
25 more likely to have a higher stroke risk?

1 HARVEY
2 A.  Correct.
3 Q.  And both of those patients, older
4 patients and patients with higher renal
5 functions, who have higher stroke risks if they
6 don't take medication, if they do take Pradaxa,
7 they're likely to have higher plasma
8 concentration levels; correct?
9 MR. MOSKOW:  Objection to form.
10 Q.  Generally speaking.
11 A.  Can you repeat that, please?
12 Q.  Sure.  It was a complicated question.
13 Let me break it down.  On average, older
14 patients who take Pradaxa are likely to have
15 higher plasma concentration levels?
16 MS. PRESBY:  Objection.
17 Q.  Let me withdraw the question.
18 Do you know -- if you look at the
19 higher -- let me strike it.  I'll move on.
20 The other numbers that you report
21 in -- let me show you one other set of numbers.
22 We've talked about 50 to 250, we've talked
23 about 40 to 200, we've talked about 50 to 250.
24 Do you remember that?
25 A.  Yes.

1 HARVEY
2 Q.  Can you tell me one of those is the
3 right range for all patients?
4 A.  No, I can't.
5 Q.  Can you tell me one of those is the
6 right range -- you talked about high-risk
7 patients.  Can you tell me one of those is the
8 right range for a defined high-risk patient
9 group?
10 A.  Based upon the information I've
11 reviewed, I think there's evidence to support
12 the choice of 50 to 150 for high-risk patients.
13 Q.  And how do you define high-risk
14 patients?
15 A.  Those of advancing age, those with
16 diminished kidney function, those with a
17 history of previous GI bleed or other bleeding
18 abnormalities, those on certain medications.
19 Q.  What age would qualify for that
20 range?
21 A.  Well, I would have to look at the
22 specific data, and there -- you know, there
23 would actually have to be more data generated,
24 which has not been done.  And whether it be 75
25 or above or 80 or above, but I think there's

HARVEY

evidence of choosing 75, which others have.

Q.  Based on the data that exists that you have seen, can you tell me -- you said generally there's no -- there's no range for all patients.  Based on the data you have seen, can you tell me that there's a specific age group that should have a specific range of 50 to 150?

MR. MOSKOW:  Objection to form. You can answer.

A.  So I also put weight on the company's core data sheet and the information that went into that.

Q.  Move to strike as nonresponsive.

A.  Okay.

Q.  Can you tell me a specific age group that should be subject to a plasma concentration range of 50 to 150 or any other specific range?

A.  I would say as a starting proposal, 75 and above.  And based -- and then you would need to go through the data, and where the data is inadequate, it means there needs to be new data generated.

HARVEY

Q.  Okay.  You say starting proposal; I want your final view.  Should there be a warning that patients 75 and above should be monitored to stay within a range of 75 to 150? Yes or no.

MR. MOSKOW:  Objection to form.

A.  I believe I've seen enough to advocate that position, yes.

Q.  You believe that should be the labeling?  I don't want advocacy; I want your expert opinion.  Should the label tell doctors if your patient is 75 or above --

A.  But that's -- that's not --

Q.  Let me finish the question.

MR. MOSKOW:  Let him finish the question.

Q.  Should the label tell doctors that if a patient is 75 or above they should be monitored to be kept within a specific plasma concentration range?

MR. MOSKOW:  Objection to form.

A.  So that would be one recommendation, yes.

Q.  Okay.  And that plasma concentration

HARVEY

range would be 50 to 150?

A.  That would be what I would advocate.

Q.  Would there be any other age-based labeling recommendations?

A.  Not age-based.  There would be --

Q.  I'm going to go through the other ones.  The next one you mentioned is diminished kidney function.

A.  Correct.

Q.  That's renal function?

A.  Yes.

Q.  Would that be a creatinine clearance measure?

A.  Yes.

Q.  What would be your recommendation there specifically in terms of what would be the cut point and what would be the range?

A.  Well, I agree with what I've read in the European label and the core data sheet.

Q.  Which say nothing about renal function and an optimal plasma concentration based on renal function.

MR. MOSKOW:  Objection to form.

A.  Do I have the core data sheet?

HARVEY

MS. PRESBY:  I don't know that there's a question pending.

Q.  We'll go back to my prior question, which is what would your specific recommendation be for a specific plasma concentration range based on renal function?

A.  I would not make a specific recommendation.  I would recommend that it would be based upon kidney function and then leave the specifics to the renal experts.

Q.  Okay.  There's no number you can give me, is there?

A.  In my review I've seen others propose numbers that look -- look like they certainly would be a good starting point.

Q.  And what are those numbers?  Because I've not seen those.

MS. PRESBY:  Objection, form.

A.  Well, I have found some of the information, but I want to be complete.  There is -- in the company core data sheet there is discussion about renal function in several different contexts, so I guess I'm confused by your statement that you haven't seen it.

HARVEY

1
2    Q.  Let me go back to what I said.  Have
3    you seen it discussed in the context of
4    specific plasma concentrations?
5    A.  Table 13.
6    Q.  Okay.  What else?
7    A.  And then --
8    Q.  Actually, you know, my question is
9    not what is it the core data sheet says.  I
10   started writing on a sheet what I'm trying to
11   understand from you, so I've written down 75
12   years, 50 to 150 nanograms per milliliter.
13   That's what we talked about five minutes ago.
14   A.  Uh-huh.
15   Q.  What I'd like you to tell me is what
16   if any specific plasma concentration would you
17   recommend based on renal function?
18   A.  Well, renal function, if someone has
19   a poor renal function, they can go higher than
20   that 150 range at a lower dose.  So it's not
21   that you would necessarily have to change the
22   range.  It's that with poor renal function
23   you're going to get a higher plasma
24   concentration at a different dose.  You
25   Q.  Let me try it this way.  You

HARVEY

1
2    recognize that the label already recommends
3    testing for renal function and adjusting dose
4    if there's impaired renal function; right?
5    MR. MOSKOW:  Objection to form.
6    A.  I understand that in the U.S. label
7    there's a 150-milligram dose and not a
8    110-milligram dose, so -- that's not the case
9    in Europe.  Why don't you repeat the question
10   and I'll --
11   Q.  I'll move to strike that as
12   nonresponsive.  You recognize that the label
13   already recommends testing for renal function
14   and adjusting dose if there's impaired renal
15   function.  True?
16   MR. MOSKOW:  Objection to form.
17   A.  There is some information in the
18   current label about renal function, that's
19   correct.
20   Q.  Move to strike as nonresponsive.
21   Does the label recommend monitoring renal
22   function?
23   A.  Yes.
24   Q.  Does it recommend adjusting dose if
25   there is impaired renal function?

HARVEY

1
2    A.  Yes.
3    MR. MOSKOW:  Objection to form.
4    Q.  And are you recommending that there
5    be any further dose adjustments based on plasma
6    concentration tests of people who are known to
7    have impaired renal function?
8    A.  Yes.
9    Q.  And so tell me what renal function
10   you would do those tests at and what would be
11   the range you were looking for.
12   A.  And I guess what I'm having trouble
13   is you're asking me to do that in 7 seconds
14   when it hasn't been done in 7 years.
15   Q.  Asking you to do it in 202.5 hours,
16   sir.
17   MR. MOSKOW:  Objection to form.
18   A.  Making specific recommendations on
19   renal ranges is not part of the purview of what
20   I did as a regulatory consultant.
21   Q.  So maybe that answers my question.
22   Do you have a specific renal function level at
23   which you would recommend testing blood
24   concentration levels to hit a target range?
25   A.  No, I don't.

HARVEY

1
2    Q.  Let me go back to the other two and
3    then we'll break.  You mentioned patients who
4    have a prior bleed as being another risk group.
5    Do you remember that?
6    A.  Yes, I do.
7    Q.  Do you have a specific recommendation
8    for patients who have a prior bleed in terms of
9    how to identify such patients to test their
10   blood levels and what their range should be?
11   MR. MOSKOW:  Objection to form.
12   A.  Patients -- I mean, based upon my
13   experience as well as my understanding of the
14   literature is patients who have had a previous
15   GI bleed are at increased risk for another GI
16   bleed, and therefore the current label doesn't
17   adequately address that concern.  Dosing 50 to
18   150 would be a better benefit to risk than it
19   currently is in the U.S.  And given the risk
20   factors of the individual patient if they've
21   had a significant GI bleed, let's say, it may
22   be that Pradaxa may not be right for them under
23   the current no-monitoring paradigm.
24   Q.  Move to strike as nonresponsive.  Do
25   you have a specific recommendation that certain

HARVEY

1
2  groups of patients who have had a prior bleed
3  should have their blood tested before they use
4  Pradaxa or while they're using Pradaxa to
5  ensure that they remain within a specific
6  therapeutic range?
7           MR. MOSKOW:  Objection to form.
8       Q.  Yes or no?
9       A.  Yes.
10      Q.  Okay.  And what is the patient
11  criteria that puts them in this category where
12  they would be tested?
13      A.  If a patient has had a previous GI
14  bleed.
15      Q.  Any GI bleed?
16      A.  Any GI bleed.
17      Q.  Whether it's related to an
18  anticoagulant or not?
19      A.  Doesn't matter if it's related to an
20  anticoagulant.  A lesion in the GI tract that's
21  there has an increased chance of bleeding in
22  the presence of anticoagulants.
23      Q.  So I've written down "prior GI
24  bleed."  What would be the range you would be
25  looking to keep that patient in?

HARVEY

1
2       A.  I would have to look at the data.
3       Q.  Okay.  What's your best answer right
4  now?
5       A.  It would be something less than 50 to
6  150.  It might be 50 to 100, which some have
7  suggested in the literature.
8       Q.  So I just wrote less than 50 to 150,
9  maybe 50 to 100.  Is that a fair summary of
10  what you just told me?
11      A.  No.
12      Q.  Okay.  How is that wrong?
13      A.  It would be -- I didn't say less than
14  50 to 150 because you could imply I'm saying
15  less than 50.
16      Q.  I thought you meant narrower than --
17      A.  Yes, so I --
18      Q.  I'll change that to "narrower."  Is
19  that fair?
20      A.  Yes.
21      Q.  Okay.
22      A.  Which is -- then I gave specifics of
23  50 to 100.
24      Q.  Right.  Maybe 50 to 100 I think is
25  what you said.

HARVEY

1
2       A.  Correct.
3       Q.  So -- let me cover the third
4  category.  You said there's certain medications
5  where people should be tested for optimal
6  range.  What are those medications?
7       A.  Well, the one that's --
8       Q.  Actually, I apologize.  Are there
9  certain medications where you believe --
10  because I'm not sure you did say that.  I think
11  I misstated what you said.  So let me be sure I
12  understand.  Are there certain medications
13  where you believe patients taking those
14  medications while they're using Pradaxa should
15  have their Pradaxa blood levels checked to make
16  sure they fall in a certain range?
17      A.  Yes.
18      Q.  So let me ask, what are those
19  medications?
20      A.  Well, I don't have a comprehensive
21  list.  There's always been a concern about
22  verapamil.
23      Q.  You're going to have to help me spell
24  that.
25      A.  It's in the European label.

HARVEY

1
2       Q.  How do you spell it?
3       A.  V-E-R, verap -- V-E-R-A, verap --
4       Q.  I-M-L?
5       A.  I-M-L.
6       Q.  I-M-I-L?
7       A.  Yeah.
8       Q.  We'll be together in misspelling it
9  if we've misspelled it.  Anything else?
10      A.  I would have to go through and do a
11  specific search in some of the databases.  Now
12  the pharmacies have the drug-drug interactions
13  and contraindications and others.
14      Q.  In your 200 hours of work on this
15  case did you identify any ones other than
16  verapamil where you believe patients taking
17  that in addition to Pradaxa should have their
18  blood checked?
19      A.  I didn't go into the specifics of
20  which drugs.
21      Q.  For verapamil, what would be the
22  target range for those patients?
23      A.  I would defer to others on that.
24      Q.  So here's what I was doing, then we
25  can break for lunch.  I'm going to mark this as

Page 222

HARVEY

an exhibit. I was trying to -- helps me to be
really concrete. I was trying to understand
the instances where you believed something
about the patient justified testing their blood
levels to make sure that they fell within a
certain range. And I've written down the three
instances where you had a specific opinion on
that point, along with what you told me about
their blood ranges. Is that -- the blood
ranges they should be aiming for. Is that
accurate?

  MR. MOSKOW: Objection to form.
You've actually talked about four; there
are only three on the --

  MR. SCHMIDT: He didn't have one
for diminished kidney function. That's
why I didn't put it on there.

  MR. MOSKOW: No, he gave one.

  A. I said based upon what I have been
reading in the core data sheet and in the
literature, but I wasn't going to give
specifics.

  Q. So for the ones where you can give
specifics, have I correctly reported the

Page 223

HARVEY

specific recommendations you're comfortable
making regarding patient characteristics that
would justify testing and specific test ranges?

  MR. MOSKOW: Objection to form.

  A. It's incomplete.

  Q. Okay. What is it missing?

  A. It's missing kidney function.

  Q. Okay. So let's add it.

  MR. SCHMIDT: Why don't we go ahead
and mark this. Is this -- 10 is the
next one? I'm going to mark this as
Exhibit 10.

  (Harvey Exhibit No. 10 was marked for
identification.)

  MR. MOSKOW: I need a copy.

BY MR. SCHMIDT:

  Q. Let me ask you, can you write "kidney
function" on there?

  A. No, I'm not going to do that.

  MR. MOSKOW: You can do that.

  A. This is -- it's really very
concerning because this is not intended to be a
comprehensive review. It could be that with
the second generation product all patients

Page 224

HARVEY

might benefit from some sort of dose
adjustment. And so to carve these out -- these
are special interests, but it doesn't then give
the rest of the population a free pass.

  Q. Doctor, I'm entitled to know your
opinions as best you have them sitting here
right now.

  A. Uh-huh.

  Q. You having told me you're ready to go
before a jury now. And that's all I'm trying
to understand is the instances where you are
comfortable sitting here right now and saying
there's certain patient groups who should be
monitored. And you've added renal function to
the list that we have been talking about. Do
you have a range for renal function or is it
defer to others that you just wrote?

  A. Defer to others.

  Q. Okay. And I think where we got
tripped up on renal function is can you write
down the creatinine clearance level at which
you would start monitoring those patients?

  A. I would defer to others on that.

  Q. So may I ask you to write "defer to

Page 225

HARVEY

others" on level of renal function?

  A. I think I just did.

  Q. You did as to the blood concentration
level, but I'm talking the left side, even as
to what their renal function is. For example,
you gave me a specific age; right? You gave me
75 years of age; right?

  A. Yes.

  Q. You didn't give me a specific renal
function. Are you deferring to others as to
what the specific renal function level would be
before you would monitor?

  MR. MOSKOW: Objection to form.

  A. Yes.

  Q. Okay. So recognizing that you may
do -- that if you were to go do a further
search you might identify additional groups, am
I correct that Exhibit 10 reflects the groups
that at this moment you are comfortable saying,
with the level of specificity reflected on
Exhibit 10, that these are the groups of
patients who should be monitored and this is
the blood level that you should be looking for?

  MR. MOSKOW: Objection to form.

HARVEY

1
2         A.  These are groups that are at
3   increased risk and should be monitored, but
4   there may be others that should also be tested
5   and adjusted, and as information becomes
6   available, it may be all patients might benefit
7   from dose adjustment.
8         Q.  Based on the information you have
9   now, having done your 200-hour review, are
10  there any patient groups other than the four
11  identified on Exhibit 10 that you believe
12  should be monitored?
13        MR. MOSKOW:  Objection to form.
14        Q.  Specific ones.
15        A.  I would have to do a more in-depth
16  dive on the data to see if that 75 years needs
17  to be lowered.
18        Q.  Okay.  But you're not prepared to say
19  it should be lowered now, are you?
20        A.  No.
21        Q.  Okay.  So based on the review you've
22  done, the 200 hours, are there any groups
23  missing from Exhibit 10 who should be monitored
24  to hit a specific blood concentration range
25  when they use Pradaxa --

HARVEY

1
2         MR. MOSKOW:  Objection to form.
3         Q.  -- that you can point me to?
4         A.  Once again, I mean, these are special
5   populations that deserve special consideration
6   but it doesn't then absolve the rest of the
7   patients from not benefiting from some sort of
8   dose adjustment.
9         Q.  Well, you said before not everyone
10  should be monitored, so I'm trying to
11  understand who you think should be monitored.
12        MR. MOSKOW:  Objection to form.
13        Q.  You've identified for me on
14  Exhibit 10 who you think, based on your review
15  to date, should be monitored; correct?
16        A.  No, because I made a distinction
17  between monitoring and dose adjustment.
18  Monitoring is -- I would assume, and you can
19  correct me, that would be like the testing
20  that's in Coumadin.  We're not talking about
21  that.  We're talking about a patient who's put
22  on a specific dose and then you measure a level
23  to see what range they're in.
24        So I had made that distinction
25  earlier on in my testimony, that I

HARVEY

1
2   differentiate between monitoring and dose
3   adjustment testing.
4         Q.  Let me see if I have your testimony.
5   Does Exhibit 10 refer to patients who should be
6   subject to routine monitoring or just an
7   initial blood test with a dose adjustment?
8         A.  These are patients that would benefit
9   from initial dose adjustment, and as they
10  advance in their disease, periodic testing.
11        Q.  Should everybody have an initial dose
12  adjustment who takes Pradaxa?
13        A.  Given the number of bleeds that have
14  been reported, the absolute number, I think
15  that that would further enhance the
16  benefit/risk of this drug.
17        Q.  And so what should be the range that
18  everybody should be dose adjusted to in terms
19  of their plasma concentration?
20        A.  I think there is evidence to support
21  50 to 150.
22        Q.  That's what you would recommend?
23        A.  That's what I would recommend.
24        Q.  Okay.  You would recommend that for
25  every single patient?

HARVEY

1
2         A.  No.  I think we've -- we've said that
3   if you had a previous GI bleed or are higher
4   risk, then 50 to 100 may be more prudent.
5         Q.  Okay.  But every patient should have
6   their blood levels checked once, and if they're
7   in that range of 50 to 150, they're okay.  If
8   not, then they should have their dose adjusted?
9         A.  Yes, but with the caveat that if
10  somebody has renal dysfunction, they could
11  worsen over time, so it makes sense you have to
12  periodically check.  And I don't have specific
13  recommendations on what that should be.  And a
14  patient who's 75, who then becomes 80 or 85,
15  then needs some monitoring -- you know, some
16  testing as well as they progress, since
17  bleeding risk does increase by age.
18        Q.  So how often should patients get
19  tested as they age and how often should they
20  get tested based on renal function?
21        MR. MOSKOW:  Objection to form.
22        A.  I don't have a specific
23  recommendation at this time.  I -- if I was a
24  consultant on this case, I could sit down and
25  produce something, but this is not the best

HARVEY

1
2  environment to -- for me to create a
3  development program.  You know, the companies
4  had years to do this and they haven't.
5      Q.  They've come to their view, haven't
6  they?
7          MR. MOSKOW:  Objection to form.
8      Q.  Correct?
9      A.  Yes.
10      Q.  And you're coming to a different
11  view; right?
12      A.  I'm coming to a different view.
13      Q.  But you can't articulate what that
14  view is in terms of --
15      A.  The specifics.
16      Q.  In terms of how often people should
17  be tested; correct?
18          MR. MOSKOW:  Objection to form.
19      A.  Correct.
20      Q.  And you can't articulate what that
21  view is in terms of what the optimal plasma
22  concentration rate is, can you?
23          MR. MOSKOW:  Objection to form.
24      Q.  Or have you settled on 50 to 150?
25          MR. MOSKOW:  Objection to form.

HARVEY

1
2      A.  There are a lot of questions in
3  there.  Which one should I answer?
4      Q.  You can't articulate your view as to
5  what the optimal plasma concentration range is,
6  can you?
7          MR. MOSKOW:  Objection to form.
8      A.  I have mentioned 50 to 150 as a
9  range, and then as you increase risk, that can
10  be further narrowed.
11      Q.  Okay.  So is that your testimony,
12  that it should be 50 to 150 for all patients,
13  narrowed as you increase risk?  The maximum
14  range is 50 to 150 and it only gets smaller as
15  you have risk factors?
16      A.  I'm not -- I'm not discussing all
17  patients.  Part of my objection is that the
18  company's policy was no testing, no monitoring
19  for all patients.  My position in my paper is
20  that treatment needs to be individualized, and
21  so if a certain physician in evaluating their
22  patient, given the benefit/risk and all the
23  details of the individual patient, believes
24  that there should be a testing of drug levels,
25  then I would certainly support that.  And the

HARVEY

1
2  way that you phrased it, that would negate that
3  opportunity.
4      Q.  Should all patients have their blood
5  levels tested at some point?  Yes or no?
6      A.  Yes.
7      Q.  So you are advocating testing all
8  patients?
9      A.  Yes.
10      Q.  What should be done with that
11  information?
12      A.  That's what we're discussing.
13      Q.  Right.  Should every patient be
14  dose-adjusted so that they fall within 50 to
15  150?
16          MR. MOSKOW:  Form.
17      Q.  At a maximum.
18      A.  As a guideline, yes.  As a rule of
19  thumb.  And then the therapy then should be
20  tailored to the individual based upon the
21  physician or practitioner.
22      Q.  So in your world -- I'm almost done.
23  In your world, if a patient comes in, they
24  should be tested, and if they're at 185, they
25  should be dose adjusted to get within 50 and

HARVEY

1
2  150?
3      A.  Yes.
4      Q.  Has any regulator in the world agreed
5  with that view?
6          MR. MOSKOW:  Objection to form.
7      A.  I don't know what every regulator in
8  the world has said.
9      Q.  Has any regulator required testing
10  that you can point me to?  Blood testing that
11  you're talking about?
12      A.  No.
13      Q.  Has any regulator given a range of 50
14  to 150 that you know of that all patients
15  should aim for?
16      A.  Bob Temple has mentioned that on
17  several occasions in his slide set.
18      Q.  Has any regulator done that?
19      A.  Bob Temple is a regulator.
20      Q.  Has he directed a label change to
21  have a range of 50 to 150?
22          MR. MOSKOW:  As of today.
23      A.  As of today, no.
24      Q.  Is he a pretty senior FDA official?
25      A.  He's a deputy center director.

Page 234

HARVEY

1    Q.  That's pretty senior; right?  He's
2  one of the most senior people at the FDA;
3  right?
4    A.  In Center for Drugs.
5    Q.  And he's very well regarded; right?
6    A.  Yes, he is.
7    Q.  And he has the power, if he really
8  believes something, to effect a label change;
9  right?
10    MR. MOSKOW:  Objection to form.
11    A.  That's not how the process works.
12  The process is that it's the division and the
13  office -- it's the division that initiates
14  these changes.
15    Q.  Does he oversee the division?
16    A.  Actually, he is an acting -- he has
17  an acting title in the office, second to Ellis
18  Unger, who is also one of the authors on the
19  paper.
20    Q.  So is that yes?
21    A.  Can you ask your question again.
22    Q.  Yes.  Does he oversee the division
23  responsible for Pradaxa?
24    A.  He has some oversight responsibility.

Page 235

HARVEY

1    Q.  And do you have any evidence that he
2  has ever even raised the question with his
3  colleagues of whether the Pradaxa label should
4  direct doctors to test and target a range of 50
5  to 150?
6    MR. MOSKOW:  Objection to form.
7    A.  Based upon his slide presentation, he
8  infers that there's discussion ongoing.
9    Q.  Right.  And --
10    A.  But I don't have -- I have no direct
11  knowledge of what the FDA's discussing this
12  minute.
13    Q.  How long ago was the first of those
14  slide presentations you referenced?
15    A.  December 2014.
16    Q.  And can you point me to --
17    A.  The second one was December 2015.
18    Q.  Can you point me to any action the
19  FDA has taken to make modifications to the
20  label along the lines of a plasma concentration
21  recommendation since December 2014?
22    MR. MOSKOW:  Objection to form.
23    MS. PRESBY:  Objection.
24    A.  None as of this morning.

Page 236

HARVEY

1    MR. SCHMIDT:  Why don't we break
2  for lunch.
3    THE VIDEOGRAPHER:  Off the record
4  at 1:20.
5    (Recess taken.)
6    THE VIDEOGRAPHER:  Here begins
7  media number 4 in the video recorded
8  deposition of Dr. Brian Harvey.  We're
9  back on the record at 2:30.
10  BY MR. SCHMIDT:
11    Q.  Doctor, you've been critical of
12  Boehringer for not doing more to evaluate and
13  warn about plasma concentration.  True?
14    A.  Yes.
15    Q.  And your testimony as I understand it
16  is that a reasonable company would do more to
17  evaluate and warn about plasma concentration;
18  correct?
19    A.  Yes.
20    Q.  Now, I think we've talked about this.
21  You know this question has been raised about
22  plasma monitoring, including by Dr. Temple,
23  with respect to all novel oral anticoagulants;
24  correct?

Page 237

HARVEY

1    A.  Yes.
2    Q.  And there are five other companies
3  other than Boehringer involved in making novel
4  oral anticoagulants.  You understand that;
5  right?
6    A.  I know there are others.  I don't
7  know the exact number, but --
8    Q.  There's Pfizer and BMS on Eliquis,
9  there's J&J and Bayer on Xarelto, and there is
10  Daiichi on Savaysa.  Did I get the name wrong?
11    MS. PRESBY:  Is there a question?
12    THE WITNESS:  Is there a question?
13    Q.  Are you aware that --
14    A.  I'm aware of -- that there are many,
15  many folks in the field.
16    Q.  Are you aware of those five companies
17  specifically?
18    A.  I have read about them.  I haven't
19  studied them for my report.
20    Q.  As best you know, are those all
21  reasonable companies?
22    MR. MOSKOW:  Objection to form.
23    A.  My report was confined to BI and what
24  they did.  I didn't -- as part of the scope, I

Page 238

HARVEY

1
2  didn't look at the whole pharmaceutical
3  industry nor the competitive product.
4      Q.  You've worked with some of those
5  companies and at some of those companies;
6  right?
7      A.  Yes.
8      Q.  In your experience are they
9  reasonable pharmaceutical companies?
10     A.  I would say, having worked at Pfizer,
11  Pfizer is a reasonable pharmaceutical company.
12     Q.  Is BMS?
13     A.  I didn't work directly with BMS.
14     Q.  From your experience.
15     A.  I haven't had a direct experience
16  working with them.  I would like to in the
17  future but I have not.
18     Q.  You're currently in negotiations to
19  work with them?
20     A.  That's true.
21     Q.  Is J&J a reasonable company?
22     A.  Yes, it is.
23     Q.  Is Daiichi a reasonable company?
24     A.  I haven't had a lot of direct
25  experience so I wouldn't be able to say.

Page 239

HARVEY

1
2      Q.  You mentioned Bayer.  Is Bayer a
3  reasonable company?
4      A.  I haven't worked directly with them
5  either so --
6      Q.  I thought you said you had in the
7  past?
8      A.  Only when I was at FDA because they
9  were a maker of Naproxen and they were part of
10  the nonsteroidal issue.  So it was very, very
11  indirect.
12     Q.  Have any of these other companies
13  taken any steps regarding plasma concentration,
14  whether it's gathering data, analyzing data,
15  sharing data, that you can point me to?
16         MR. MOSKOW:  Objection to form.
17         MS. PRESBY:  Objection.
18     A.  Yeah, I -- the focus of my report was
19  on BI and what BI did and did not do, not on
20  the competitors.
21     Q.  Let me ask my question again.  Can
22  you point me to any steps that you know of, in
23  your review here or more broadly, that any of
24  these companies have taken to collect plasma
25  concentration data, analyze it, or report it to

Page 240

HARVEY

1
2  the public or the FDA that Boehringer has not
3  taken?
4         MR. MOSKOW:  Objection to form,
5  asked and answered.
6      A.  As I said, and we talked about how my
7  report was 120 pages and it took 200 hours,
8  that was focused on the task at hand, and doing
9  a survey on the entire competitive landscape
10  wasn't in the scope of my report, and I didn't
11  pursue that information.  If I had known that
12  that would have been important to do, I would
13  have done so.  It wasn't part of the scope of
14  my report.
15     Q.  You're talking about what reasonable
16  companies would do; right?
17     A.  Yes.
18     Q.  Here we have reasonable companies
19  working in the very same -- with the very same
20  types of medicines; right?
21         MS. PRESBY:  Objection.
22     A.  Yes.
23     Q.  So can you point me -- I get your
24  qualifier, I get your explanation.  My question
25  is simple:  Can you point me to any steps that

Page 241

HARVEY

1
2  these other companies have taken that BI hasn't
3  taken?
4         MR. MOSKOW:  Objection to form.
5      A.  No, I can't.
6      Q.  Can you point me to any company that
7  has taken the steps that BI has taken in terms
8  of collecting plasma data, analyzing it,
9  sharing it with regulators and publishing on
10  it?
11     A.  I haven't -- I haven't researched
12  that.
13     Q.  Okay.  Can you point me to any
14  company that's done that?
15         MS. PRESBY:  Same objection.
16         MR. MOSKOW:  Objection, asked and
17  answered.
18     A.  It's not -- wasn't in the scope of my
19  research.
20     Q.  I can ask you questions that I think
21  are relevant that you didn't take the time to
22  do, so --
23     A.  And so therefore --
24     Q.  Please let me finish.
25     A.  -- I don't have information --

HARVEY

1
2  Q.  Please let me finish.
3  A.  You just asked me the question and
4  I'm answering it.
5  Q.  Please let me finish.  We're not
6  arguing.  Please let me finish.  I'm allowed to
7  ask you questions about research I think is
8  relevant given the opinions you're offering
9  that you haven't done.
10     So my question is in all of your
11  research have you seen any efforts that any
12  other companies have taken, similar to what BI
13  has done, in terms of gathering plasma data,
14  analyzing plasma data, reporting it to
15  regulators, and publishing on it?
16     MR. MOSKOW:  Objection to form.
17     MS. PRESBY:  Objection.
18  A.  So I have not researched other
19  companies and therefore I can't cite what other
20  companies have done.
21  Q.  Okay.  Would you agree with me that
22  you would not want a dose adjusted in a way
23  that hurts patient safety?
24     MR. MOSKOW:  Objection to form.
25  A.  I agree.

HARVEY

1
2  Q.  Would you agree with me that if you
3  don't -- if you dose-adjust and you're not
4  careful in how you dose-adjust, you could hurt
5  patient safety?
6     MR. MOSKOW:  Objection to form.
7  A.  Yes, I agree.
8  Q.  For example, we have talked about
9  blood testing.  Are you aware that it matters,
10  in terms of getting a reliable blood test, when
11  you test the patient relevant to when they last
12  used the medicine?
13  A.  Can you clarify that?  I don't
14  remember talking about when to test.  So can
15  you rephrase the question or reask the
16  question?
17  Q.  Yeah.  And I didn't ask you about --
18  I didn't say we talked about when to test.  We
19  talked about blood testing.
20  A.  Okay.  We talked about blood testing.
21  Yes, I remember.
22  Q.  Are you aware that if you're doing a
23  blood test you need to be careful to do the
24  test at the right point in time relevant to
25  when the patient last took the medicine?

HARVEY

1
2  A.  Yes, I do.
3  Q.  And what is that point in time?
4  A.  The thought is that you want to make
5  sure that you catch the patient at a steady
6  state, because if you're getting them as the
7  curve is going up or going down, you want to
8  make sure they're at the trough of the steady
9  state because that's a more reproducible time
10  point and more representative of what their
11  concentration is.
12  Q.  So when should you be trying to test
13  patients relevant to when they last took the
14  medicine?
15  A.  Well, it depends.  You know, that
16  would be something that an expert
17  pharmacologist would calculate based upon when
18  steady state was reached, five half-lives.
19  There's a whole paradigm that one would follow
20  and I would defer to a pharmacologist on that.
21  Q.  Do you know when they should be
22  tested relevant to when they last took the
23  medicine?
24     MS. PRESBY:  Objection.
25     MR. MOSKOW:  Objection to form.

HARVEY

1
2  A.  So like I said, as a regulatory
3  person I would say it needs to be determined by
4  the appropriate pharmacology, you know, the PK
5  person.  And my understanding is, you know,
6  you've got to catch it at steady state at the
7  trough.
8  Q.  Okay.  You're not that pharmacologist
9  PK person; right?
10  A.  That's correct.
11  Q.  So you don't have a specific opinion
12  as to what the right time to test is after
13  their last dose?
14     MR. MOSKOW:  Objection to form.
15  Q.  Correct?
16  A.  That's correct.
17  Q.  And -- but you do understand it
18  generally to be at trough, whatever that is?
19  A.  Yes.
20  Q.  And so the numbers we were talking
21  about earlier, the 50 to 250 or a narrower
22  range, those are trough concentrations?
23  A.  The 50 to 150, those are trough --
24  Q.  And then if you test at the wrong
25  time, that can have safety consequences; right?

HARVEY

1
2      A.  Can you rephrase that, because there
3  are -- you may not get an accurate reflection
4  of steady state, but if it is extremely low or
5  extremely high, it's still informative but not
6  as reproducible.
7      Q.  Let me ask you that question then.
8  If you test at the wrong point in time, can you
9  get an inaccurate reading, or misleading
10  reading -- however you want to characterize
11  it -- that leads you to make a dose adjustment
12  that you would not make if you tested at the
13  right point in time?
14      MR. MOSKOW:  Objection to form.
15      A.  Yes.
16      Q.  And could that have safety
17  consequences?
18      A.  Yes, it could.
19      Q.  And it could in either direction;
20  right?  Exposing to too much bleed or exposing
21  to too much stroke?
22      A.  Yes, it could.
23      Q.  Now, are you also aware of whether
24  there is data that even in a controlled
25  setting, when scientists take care to make sure

HARVEY

1
2  that they do test at the right point in time,
3  that initial test results that potentially
4  suggest someone might have an outlier plasma
5  concentration if you retest in a couple of
6  months, that doesn't prove to be the case when
7  you retest?  Are you aware of data showing
8  that?
9      MR. MOSKOW:  Objection to form.
10      A.  Can you rephrase or can you reask the
11  question?
12      Q.  Sure.  Your testimony from before
13  lunch is that you should do a single test,
14  sometime I guess around the time someone starts
15  using the medicine; right?
16      A.  Yes.
17      MS. PRESBY:  Objection.
18      Q.  And are you aware of data showing
19  that a single test does not always prove
20  accurate over time?
21      A.  I -- in some of the articles there is
22  that discussion, yes.
23      Q.  And the concern is that if you
24  dose-adjust based on a single test, that might
25  lead to a dose that actually is not the best

HARVEY

1
2  dose over time; right?
3      MR. MOSKOW:  Objection to form.
4      A.  That's correct.  If you only did a
5  single test, that's correct.
6      MR. SCHMIDT:  And just let me show
7  you one of those studies.  Can I get the
8  Chan study?  Are you familiar with the
9  Chan study from 2015?  Was it cited?  Is
10  it on the reliance list?
11      (Harvey Exhibit No. 11 was marked for
12  identification.)
13  BY MR. SCHMIDT:
14      Q.  I've given you Exhibit 11, a 2015
15  article, the lead author is N.C. Chan.  Have
16  you seen this before, Doctor?
17      A.  I've seen an article that's
18  real-world variability with Eikelboom as an
19  author.  Sometimes when you're looking at it on
20  a screen it looks a little different, but
21  there's a lot in here that looks familiar.
22      Q.  Let me show you a couple things about
23  this.  First of all, if we look at the first
24  page of the article, do you see that there's a
25  summary?

HARVEY

1
2      A.  Uh-huh.
3      Q.  And if you look right before the
4  conclusions in the summary -- let me just ask
5  you.  To be fair to you, why don't you go ahead
6  and read that summary to yourself.
7      A.  Okay.  I've read it.
8      Q.  This is a study, as I understand it,
9  that involved testing the blood levels of
10  patients taking Pradaxa at what they called
11  baseline, which is shortly after they started
12  using the medicine, and then every two months
13  after; right?
14      A.  Uh-huh.
15      Q.  Yes?
16      A.  Yes.
17      Q.  And what they were trying to see is
18  if at that first baseline test they had either
19  a very high or a very low blood concentration,
20  if you did nothing at all, would that persist
21  across the later tests; right?
22      A.  Correct.
23      Q.  And what they found, in the
24  second-to-last sentence of the introduction, is
25  that up to 40 percent of patients whose trough

HARVEY

1
2   levels were in the upper extremes and up to
3   80 percent of patients whose trough levels were
4   in the lower extremes at baseline showed
5   subsequent levels that fell in the middle
6   quartiles.
7           Do you see that?
8       A.  Yes, I do.
9       Q.  So the idea there is they're saying a
10  large number of patients in their review who
11  initially looked like they have high or low
12  levels end up in the middle of the range with
13  later tests; correct?
14          MR. MOSKOW:  Objection to form.
15      A.  That's what they state, yes.
16      Q.  If you look at the conclusion they
17  reached from that -- look with me if you would
18  at 359 -- they say:  "Our data do not support
19  the concept that a single Hemoclot
20  measurement" -- that's a way of testing blood
21  concentration; right?
22      A.  Right.
23      Q.  And one you endorse; right?
24      A.  Yes, one of the ways.
25      Q.  "Our data do not support the concept

HARVEY

1
2   that a single Hemoclot measurement can be used
3   to identify patients with consistently high or
4   low values."
5           Do you see that conclusion?
6       A.  Yes, I do.
7       Q.  Do you agree with that conclusion?
8       A.  Based upon the data they present, I
9   think that's a valid conclusion with the way
10  the study's designed.
11      Q.  Have you seen any contrary data on
12  this point of how predictive is the initial
13  blood test of later blood tests?
14      A.  No, I haven't.
15      Q.  Let me show you one other article.
16  Another -- are you aware of study data looking
17  at whether -- strike that.
18          In the U.S. and around the world
19  there are different doses available for
20  Pradaxa; right?
21      A.  Yes.
22      Q.  In the U.S. there are now three doses
23  available, 75, 110, and 150, and they vary when
24  you're supposed to use those doses; correct?
25          MR. MOSKOW:  Objection to form.

HARVEY

1
2       A.  Yes.
3       Q.  And, for example, for most patients
4   who have atrial fibrillation, the 150 is
5   recommended?
6       A.  Based upon the current U.S. label,
7   yes.
8       Q.  That's been true throughout the life
9   of the medicine in the U.S.?
10      A.  Yes.
11      Q.  For patients who have renal
12  impairment, the 75 is recommended?
13          MR. MOSKOW:  Objection to form.
14      A.  Yes.
15      Q.  And for patients for some new
16  indications other than stroke prevention, the
17  110 has been approved?
18      A.  That is correct.
19      Q.  So doctors have different dosing
20  options and they can vary them even more
21  because every one of those doses is intended to
22  be twice a day; right?
23      A.  Yes.
24      Q.  When a doctor varies from the dosing
25  recommendations, that's referred to as

HARVEY

1
2   off-label dosing; right?
3       A.  Yes.
4       Q.  And, for example, if we're talking
5   about your stroke prevention patient who
6   doesn't have the designated renal impairment in
7   the label, they should be using, according to
8   the label, according to the FDA-approved label,
9   150 milligrams twice a day; right?
10      A.  Can you rephrase that?
11      Q.  Sure.  According to the U.S. label
12  that's been approved by the FDA, the
13  recommended dose for patients who are taking
14  Pradaxa for stroke prevention and do not have
15  the renal impairment designated in the label is
16  150 milligrams twice a day?
17      A.  That's correct.
18          MR. MOSKOW:  Objection to form.
19  Please wait to get the objection on.
20          THE WITNESS:  I'm sorry.
21      Q.  So if a doctor prescribes 110 or 150
22  three times a day, those are off-label doses;
23  right?
24      A.  That's correct.
25      Q.  And a doctor can -- a doctor has the

HARVEY

1      ability to do that under our system; right?
2  They can prescribe off-label whether it's doses
3  or actual uses of the medicine; right?
4      A.  That's correct.
5      Q.  And -- strike that.
6      So an off-label dose of Pradaxa could
7  be either a higher dose or an under-dose;
8  correct?
9      MR. MOSKOW:  Objection to form.
10     A.  Can you ask the question again with
11 the context?
12     Q.  Sure.  If a doctor -- a doctor can
13 prescribe Pradaxa in an off-label dose either
14 by prescribing a higher dose than recommended
15 or a lower dose than recommended; correct?
16     A.  That's true, yes.  Correct.
17     Q.  Are you aware of study data that
18 evaluates safety outcomes when doctors
19 prescribe Pradaxa or other NOACs at an
20 off-label higher dose or an off-label lower
21 dose?
22     A.  I've seen some literature where
23 that's done.
24     Q.  Do you recall what that literature

HARVEY

1  shows?
2      A.  I remember a paper by Graham in the
3  Medicare population where a larger number of
4  patients were prescribed 75 milligrams more
5  than what one would have thought from the U.S.
6  label, and they showed a lower rate of
7  significant bleeds.
8      Q.  Do you know those 75-milligram
9  patients in the Graham study were specifically
10 off-label?
11     A.  Well, the way the article described
12 it is that based upon the U.S. label, they
13 should have received 150 but they received 75.
14 So by your definition, that would be off-label.
15     Q.  Okay.  Are you aware of any other
16 publications looking at that?
17     A.  There have been -- there was a
18 publication coming out of Canada where they
19 looked at 150 and 110, because in Canada, 110
20 would not be off-label, but that would be
21 considered off-label in the U.S.
22     (Harvey Exhibit No. 13 was marked for
23 identification.)
24 BY MR. SCHMIDT:

HARVEY

1      Q.  Let's look at the Graham article that
2  I believe you just referenced.  Is that what
3  I've marked as Exhibit 13?
4      A.  Uh-huh, yes.
5      Q.  Can you point me to that language you
6  were referencing where he suggests to you that
7  there was a lot of 75-milligram off-label use?
8      A.  Well, not using that, the term
9  "off-label," as we discussed.  Let's see.
10     Okay.  So on page 162, the second
11 column, in the top paragraph, the first
12 sentence is just leading in.  The second
13 sentence -- let's see.  Third sentence:
14 "Although we lack the laboratory data on
15 creatinine clearance and are uncertain of the
16 accuracy of kidney disease coding, our results
17 suggest that many patients treated with this
18 lower dose" -- I'm assuming they mean the 75 --
19 "on the basis of the current product label,
20 they should have been treated with a
21 150-milligram dose.  In this setting of
22 moderate, mild or no renal impairment,
23 off-label use of the 75-milligram may result in
24 patients being under-dosed and could explain

HARVEY

1  why we found no difference in the risk of
2  ischemic stroke, major gastrointestinal
3  bleeding, or mortality between warfarin, the
4  lower dose, and" -- let's see.  "On the other
5  hand, if most of the patients treated with the
6  75-milligram dose actually had severe renal
7  impairment, this would suggest that the
8  dabigatran dosing based on pharmacological
9  modeling was suboptimal."
10     So there they discuss variations of
11 prescribing from the U.S. label.
12     Q.  Okay.  So that helps.  I see now what
13 you're referencing.  Let me see if I understand
14 it.  This is this Graham FDA publication we've
15 talked about a couple of times today; right?
16     A.  Yes.
17     MR. MOSKOW:  Objection, form.
18     A.  I believe so.
19     Q.  This is an FDA publication; right?
20     MR. MOSKOW:  Objection, form.
21     A.  Yeah, let me just -- because the
22 authors are from FDA.  Let me just see if they
23 have the disclaimer.
24     Q.  They do have the disclaimer.  This is

HARVEY

1
2  a study authored by FDA employees; correct?
3       A.  Correct.
4       Q.  And funded by the FDA; correct?  If
5  you look at source of funding on 163.
6       A.  Yes.
7       Q.  And in this article, the language you
8  just pointed me to, they make the point that
9  they can't be sure but it looks to them like
10  some of the 75-milligram patients should have
11  been using 150; correct?
12       A.  That's correct.
13       Q.  And they should have been using 150
14  based on the label; right?
15       A.  The U.S. label, yes.
16       Q.  And then they say this raises the
17  question of whether patients treated off-label
18  with a 75-milligram dose would have experienced
19  improved outcomes for ischemic stroke and
20  mortality had they been treated with the 150
21  dose instead.
22          Do you see that?
23       A.  Yes.
24       Q.  So they're raising the question there
25  might be off-label use of the 75-milligram and

HARVEY

1
2  that might be bad in patient outcomes; right?
3  Might lead to more death and more ischemic
4  strokes; correct?
5       A.  In that paragraph.
6       Q.  Yes.
7       A.  Then they go on.
8       Q.  Then in the table below, they give
9  the data supporting what they saw with
10  75-milligram patients and what they saw with
11  150-milligram patients; right?
12       A.  Correct.
13       Q.  And this definitionally is second
14  generation data; right?  This is second
15  generation Pradaxa they're looking at; correct?
16       A.  That is my understanding, yes.
17       Q.  A real-world United States study
18  involving elderly patients; correct?
19       A.  Yes.
20       Q.  And what they find is in table 4 when
21  they compare -- they compare the 75-milligram
22  dose and the 150-milligram dose to warfarin on
23  a number of important measurements; right?
24          MR. MOSKOW:  Objection to form.
25       A.  Which table?

HARVEY

1
2       Q.  Table 4.
3       A.  Yes.
4       Q.  And what they find is that on
5  ischemic stroke, the 75-milligram dose is not
6  statistically different from warfarin, but the
7  150-milligram dose is statistically better than
8  warfarin; correct?
9       A.  Correct.
10          MR. MOSKOW:  Objection to form.
11       Q.  For major gastrointestinal bleeding,
12  they find that the 75-milligram dose is not
13  statistically different from warfarin but that
14  the 150-milligram dose is statistically higher;
15  correct?
16          MR. MOSKOW:  Objection to form.
17       A.  Yes.
18       Q.  For intracranial hemorrhage they find
19  that both the 75 and the 150 are statistically
20  lower than warfarin?
21          MR. MOSKOW:  Objection to form.
22       A.  Yes.
23       Q.  And for mortality -- which is death;
24  right?
25       A.  Yes.

HARVEY

1
2       Q.  They find that mortality is not
3  statistically different between warfarin and
4  the 75-milligram; correct?
5          MR. MOSKOW:  Objection to form.
6       A.  Yes.
7       Q.  But they find that deaths are
8  statistically significantly lower with the 150
9  than they are with warfarin; correct?
10       A.  Yes.
11       Q.  By 24 percent?
12       A.  Yes.
13       Q.  Now, in terms of those end points, in
14  terms of those metrics, ischemic stroke, major
15  gastrointestinal bleed, intracranial
16  hemorrhage, mortality, would you agree with me
17  that on average death is worse than a major
18  gastrointestinal bleed?
19       A.  Are you saying a nonfatal -- since
20  upwards of 10 percent of gastrointestinal
21  bleeds lead to death.
22       Q.  Okay.  10 percent death versus
23  100 percent death, which is worse?
24       A.  100 percent death obviously.
25       Q.  So you would take the mortality

HARVEY

1   finding as a more important safety finding than
2   the major gastrointestinal bleed finding?
3       A.  I would analyze both and put them in
4   context and agree with you that mortality is
5   important to consider, as mortality could
6   include all cause mortality, which means all
7   the various categories.
8       Q.  When you're assessing the safety of a
9   medicine and the efficacy of a medicine, is the
10  mortality rate more important to you than the
11  major GI bleed rate, or do you weigh them
12  equally?
13      A.  I would put the highest priority on
14  mortality, but I wouldn't ignore the other
15  indications, since intracranial bleeds that
16  don't kill patients can still have major
17  debilitating and a major impact on the rest of
18  their lives.
19      Q.  You just got to the one I was going
20  to ask you.  Intracranial bleeds can be
21  incredibly serious; right?
22      A.  Yes.
23      Q.  And they're viewed as of great, great
24  concern to treaters.

HARVEY

1       A.  Yes, very much so.
2       Q.  Would you put more weight on avoiding
3   intracranial hemorrhages than you do on
4   avoiding major gastrointestinal hemorrhages?
5       A.  Can you rephrase that?
6       Q.  Sure.
7       A.  Since it's sort of an
8   oversimplification the way you've asked it.
9       Q.  Every drug involves tradeoffs; right?
10      A.  Correct.
11      Q.  Here on this table we see some of the
12  tradeoffs.  Pradaxa according to this table is
13  better than warfarin on ischemic stroke, better
14  on intracranial hemorrhage, better on death,
15  worse on major GI bleeds; right?
16      A.  Right.
17          MR. MOSKOW:  Objection to form.
18      Q.  So my question is if you have a
19  choice between having a drug that's better on
20  intracranial hemorrhage versus one that's
21  better on major GI bleeds, how do you weight
22  those two?
23      A.  Well, I think -- I don't think that I
24  can give you a good answer, and that has been

HARVEY

1   something that's been debated within FDA on how
2   you compare different types of events.
3           MR. SCHMIDT:  Let me show you an
4   article published by Hart.
5       (Harvey Exhibit No. 14 was marked for
6       identification.)
7   BY MR. SCHMIDT:
8       Q.  Entitled "Intracranial Hemorrhage in
9   Atrial Fibrillation Patients During
10  Anticoagulation with Warfarin or Dabigatran."
11      A.  Published in the Stroke Journal.
12      Q.  A reputable journal; right?
13      A.  Yeah, but not published in the
14  gastrointestinal literature.
15      Q.  I don't want to get into any
16  professional turf wars.
17          MR. MOSKOW:  I think you already
18      got it.
19      Q.  My question is simply do you know if
20  you've seen this article before?
21      A.  Yes, I have.
22      Q.  Look with me if you would at the very
23  first sentence of this article.  I'll read it
24  out loud.  "Intracranial hemorrhage is the most

HARVEY

1   feared complication of warfarin anticoagulation
2   in older patients with atrial fibrillation and
3   is responsible for the bulk of disability and
4   death from anticoagulation-associated
5   bleeding."
6           Did I read that correctly?
7       A.  Yes, you did.
8       Q.  Do you agree with that?
9       A.  I would need to see the data.  More
10  patients used to die from GI bleeds, and now
11  with the advent of proton pump inhibitors, the
12  number of deaths from GI bleeds has gone down,
13  and yet interventions for intracranial
14  hemorrhage have not improved much over that
15  same time period.  So this statement on its
16  face could be true.
17      Q.  You're not sure?
18      A.  I would have to see some of the
19  current data since an elderly person who had a
20  significant GI bleed then could have
21  hypotension, go into renal failure, and have,
22  you know, many debilitating residual effects
23  that parallel what could happen -- you know,
24  not the same but as debilitating but in a

HARVEY

different way than in an intracranial bleed.

Q. I think we can both agree a GI bleed can be quite serious; right?

A. Leading to death in cases.

Q. It could be not serious; right?

A. That's true.

Q. My question is just do you know if this is a true statement that generally speaking intracranial hemorrhage is the most feared complication of warfarin?

A. I think in general, and especially in the stroke community, that's true.

Q. Look with me if you would at page 6 of this article, please. If you look at the first full paragraph, it provides some data supporting that proposition we were looking at. "Intracerebral hemorrhage is the most devastating complication of anticoagulation, with mortality rates exceeding 50 percent in most studies."

Did I read that correctly?

A. Yes, you did.

Q. Do you have that general understanding, that over half of people who

HARVEY

have intracranial hemorrhages die from it?

A. I think that the understanding of the -- of the pathophysiology of the hemorrhage has evolved given our better ability to image it with MRI and advanced CT. And I think with that refined testing we are better able, you as a -- the clinical community is better able to diagnose it. And so the references -- reference 1 is actually from 2007, which was a while ago. Some of the other references are older as well.

I think the point that they're making is that it's a serious complication, and I certainly wouldn't disagree with it. I would only have problems with some of the numbers. But 50 percent mortality is well above the 10 percent mortality we just talked about with GI bleeds.

Q. And that's where I was going next. If you had the choice of making the tradeoff, something that was better on GI bleeds but worse on intracranial hemorrhage, versus something that was worse on intracranial hemorrhage but better -- I guess they're the

HARVEY

same thing twice. Let me start my question again.

MR. MOSKOW: I actually liked that question. Let's just stick with that one.

MR. SCHMIDT: That's why I do the hand thing, to keep myself straight.

Q. Doctor, if you had the choice between a medicine that was better on GI bleeds but worse on intracranial hemorrhage, versus a medicine that was worse on intracranial hemorrhage but better on GI bleeds, how would you choose between those two, all other things being equal?

A. Well, if I was looking at this from a regulatory perspective, then --

Q. You know what? I got to withdraw it. I goofed on my question again. I'm so sorry. Let me try it one more time.

If you something that was better -- if you had a medication that was better on GI bleeds, worse on intracranial hemorrhage, versus one that was worse on GI bleeds, better on intracranial hemorrhages, how

HARVEY

would you pick between those two, all other things being equal?

A. So as a regulator, I would tend to favor those that are better on intracranial hemorrhage. As a clinician, or if I was treating an individual, it would be based upon the characteristics of that individual, their past history, if they had a history of GI bleeding. So I would try to tailor the treatment to the individual and their, you know, desires as well. Different individuals have different risk tolerances and some fear certain things as well, and that's part of the doctor-patient relationship.

Q. Let's go back to Exhibit 13, the Graham article, and let's just close that out. Do you understand from the language we were looking at about the 75-milligram dose that the Graham authors are at least raising the question of -- are raising the suggestion that their data might indicate that under-dosing Pradaxa patients is undesirable in terms of safety outcomes?

A. I don't interpret it that way. I

HARVEY

1 think they have said that they see a decrease
2 in efficacy with a 75-milligram dose, but they
3 also see a corresponding decrease in bleeds
4 with the 75-milligram dose, since in the
5 summary at the very end of the paper the
6 75-milligram dose was associated only with a
7 reduced risk of intracranial hemorrhage.
8     Q.   Versus warfarin?
9     A.   So they were -- they were citing that
10 there was a differential effect.
11     Q.   Let me be specific.
12         Do you remember that language we
13 looked at where they say this raises the
14 question of -- it's on page 162.  "This raises
15 the question of whether patients treated
16 off-label with a 75-milligram dose would have
17 experienced improved outcomes for stroke and
18 mortality had they been treated with
19 150-milligram dose instead"?
20     A.   Yes.
21     Q.   And they're suggesting there that
22 under-dosing might not be a good thing, you
23 might get better results on stroke and better
24 results on mortality with the proper dosing;

HARVEY

1 correct?
2     A.   Yes, that's correct.
3     Q.   And this article -- then we can put
4 it aside -- if we look at page 160 under the
5 discussion.
6         MR. MOSKOW:  160?
7         MR. SCHMIDT:  160, yes.
8     Q.   The second sentence under the
9 discussion says:  "The level of risks were
10 similar in direction and magnitude to those
11 observed in the randomized trial, RE-LY, in
12 which dabigatran 150 twice daily was compared
13 with adjusted dose warfarin therapy."
14         Did I read that correctly?
15     A.   Yes, you did.
16     Q.   That's the idea we talked about
17 earlier in the day that these authors looked at
18 their real-world data results and said these
19 are consistent with what we saw in RE-LY;
20 correct?
21         MR. MOSKOW:  Objection to form.
22     A.   Yes.
23         MR. SCHMIDT:  Let's go back to -- I
24 was asking you about whether you had

HARVEY

1 seen other data on real-world
2 implications of over- or under-dosing.
3 I want to show you an article that I've
4 marked as Exhibit 12.  The lead author
5 is Steinberg.
6     (Harvey Exhibit No. 12 was marked for
7 identification.)
8 BY MR. SCHMIDT:
9     Q.   I will represent to you that this is
10 not on your list of articles.  Does that mean
11 you have not reviewed this article before?
12     A.   I have not reviewed this specific
13 article.
14     Q.   Let's look at what this article did.
15 If you look with me at page -- let's look at
16 the first page.
17         Do you see the objectives?
18     A.   Yes.
19     Q.   "This study assessed the frequency of
20 off-label NOAC doses among atrial fibrillation
21 patients and the associations between off-label
22 dose therapy and clinical outcomes in community
23 practice."
24         Do you see that?

HARVEY

1     A.   Yes, I do.
2     Q.   So what they were doing is they were
3 looking at whether patients who received a dose
4 other than recommended in the label, whether
5 that impacted safety outcomes; correct?
6     A.   Correct.
7     Q.   And if you look, they report their
8 data in various tables and charts, including,
9 for example, table -- the table on page 2602.
10 The easier way to do it is let's look at the
11 results on the first page.
12         Do you see in the results they report
13 that about 9 percent of their patients were
14 under-dosed, 3.4 were overdosed, and 87 percent
15 were dosed according to the label?
16     A.   I'm sorry.  What page again?
17     Q.   Go back to the front page.  If you
18 look at the first sentence under Results, do
19 you see that they report just over 9 percent of
20 their patients were under-dosed, just over
21 3 percent were overdosed, and the rest,
22 87 percent, received the recommended dose?
23     A.   Yes, I see that, yeah.
24     Q.   And they found that patients who

HARVEY

1 were -- received off-label doses were more
2 likely to be older, and that was true both for
3 under-dosing and overdosing.  They were both
4 about 10 years older than the on-label dosed
5 people?
6     A.  Yes, I see that.
7     Q.  Their conclusion is that
8 overdosing -- if you look at the conclusions on
9 the first page, overdosing and under-dosing are
10 associated with increased risk for adverse
11 events.
12         Do you see that?
13     A.  Yes, I do.
14     Q.  And they provide data supporting that
15 proposition; right?
16     A.  Yes, they do.
17     Q.  They make a similar conclusion on the
18 last page of the article, 2604.  They say:
19 "Most patients treated with NOACs for stroke
20 prevention receive doses according to
21 FDA-approved labeling; however, a significant
22 minority did not receive such doses, and
23 off-label doses were associated with increased
24 risk for adverse events."

HARVEY

1     Do you see that?
2     A.  Yes, I do.
3     Q.  "Careful attention to recommended
4 doses and additional studies of these agents in
5 patients underrepresented in clinical trials
6 may improve clinical outcomes." Correct?
7     A.  Yes.
8     Q.  So these authors were purporting to
9 say that if you vary from the recommended
10 dosing, you can have an increase in safety
11 events; correct?
12     A.  Yes.
13         MR. MOSKOW:  Objection to form.
14     Q.  Have you seen any contrary data?
15     A.  Well, actually, I see something
16 within their own paper that's a confounding
17 variable.  They also mention in the results
18 section, where you did not read, was that the
19 off-label -- in addition to the off-label
20 individuals being older, they also were more
21 likely to be female and they were more likely
22 to not be treated by super-specialists, you
23 know, electrophysiologists.  And so you have
24 the variable that the individuals that were

HARVEY

1 off-label were also more likely to be female,
2 and that can increase the risk.  And higher
3 level of care or more specialized care would
4 lead to a lower risk, and they were less
5 likely.
6         So both of those would actually
7 contribute to the results as well, and they
8 don't mention that in their conclusion.
9     Q.  Move to strike as nonresponsive.
10 Have you ever -- have you seen any contrary
11 studies that indicate that off-label dosing of
12 patients does not lead to adverse outcomes?
13     A.  And let me say that data is here in
14 this paper where that part was left out.
15     Q.  Well, you're making a different
16 point.  You're saying that they might have
17 over-extrapolating from their findings because
18 of a confounder; correct?
19     A.  Correct.
20     Q.  My question is different.  My
21 question is -- first of all, have you done any
22 analysis of whether there is, in fact, a
23 confounder in this paper or the effect of the
24 confounder, how much of the effect it might

HARVEY

1 wipe away?
2         MR. MOSKOW:  Objection to form.
3     Q.  Have you done that?
4     A.  I've done it in my head since you
5 highlighted that the difference in age between
6 79 and 70 was significant, and yet, then when
7 you go down below, there's a similar difference
8 on more likely to be female, and so --
9     Q.  So what's the impact of the female
10 difference that you've been able to calculate
11 in your head?
12     A.  I think a portion of the increased
13 risk of the off-label use is due to the
14 imbalance of females.
15     Q.  What portion?
16     A.  Can't say.
17     Q.  Okay.  So let's come back to my
18 question which is have you seen any data
19 contrary to the conclusion these authors reach
20 from their data, i.e., data that is data
21 showing that off-label doses are not associated
22 with higher safety problems?  Have you seen any
23 contrary data?
24     A.  I'm trying to remember the

HARVEY

Canadian -- the Canadian paper.  I can't give specific examples, so no.

Q.  Would you want to be sure, before you implemented a testing and dose adjustment scheme like the one we talked about before lunch, that it would actually lead to safer results and not lead to patient harm?

A.  I would agree that that scheme should be tested by the sponsor, the data generated and that evaluated -- and submitted to the FDA in an sNDA for them to do a formal review, I agree.

Q.  Has such a test been done to validate that kind of testing and dose adjustment regimen?

A.  I don't know of any study done by the sponsor to formally test it, and I don't know of it being submitted to FDA for their review.

Q.  Now, you've talked about -- you talked about this morning how you have been involved in designing studies; right?

A.  That's correct.

Q.  Have you sat down and tried to design what a study like the one you just described

HARVEY

would look like in terms of how it would be conducted and the patient population size you would need?

A.  No, I have not.

Q.  There are limits to what can feasibly be conducted in terms of study size; correct?

MR. MOSKOW:  Objection to form.

A.  I'm not sure what criteria one would use since the study size is really dictated by the treatment effect and the incidence in which events occur.

Q.  Right.  I guess that's where I'm getting.  Have you modeled out, if you were to try to do a study designed to look at whether the testing and dose adjustment regimen you talked about before lunch, whether a study to evaluate the safety of that would require 100 people, 1,000 people, 10,000 people, 20, 30,000 people?

A.  Well, we know the original -- so the answer is no.  And we know the original RE-LY trial was what, 18,000 patients?  So --

Q.  This would be a different study?

A.  This would be a different study.

HARVEY

Q.  So you can't just say because RE-LY was 18,000, that would be enough for this; right?

A.  That's correct.

Q.  Let me show you one more thing.  Have you written down what you think the label should say?  Let me ask more broadly.

A.  I haven't written down --

MR. MOSKOW:  Wait for the question.

A.  Okay.

Q.  Why don't you finish your answer, sir.

A.  I haven't written down --

MS. PRESBY:  There's no question.

A.  -- anything other than what I've written in my report.

Q.  Have you written what you think the Pradaxa label should have said at launch or should have said at any point after?

A.  No.

Q.  Have you tested that label with real-world doctors to see if they understand what you're trying to communicate and if they think it makes sense?

HARVEY

MR. MOSKOW:  Objection to form.  Other than himself.

A.  If I didn't write the label, how could I test it with real-world doctors?

Q.  You haven't?

A.  I'm confused.  So can you rephrase.

Q.  Sure.  Have you consulted with any doctors who prescribe anticoagulants about your concerns about the label to get their reaction to them?

A.  No, I didn't.

Q.  Have you tried out proposed labeling language with them to see if in their view it would be more informative to them than what Boehringer gives them?

MR. MOSKOW:  Objection to form.

A.  No.  And can I ask the question, I didn't think I was supposed to be reaching out to others outside of the process.  So I haven't talked with anybody outside of counsel.

Q.  Have you talked with any -- have you tested your -- have you tested specific warnings with regulators in any way to see if it would be acceptable to regulators or if they

HARVEY

1
2 would agree with your opinion that there are
3 better ways to warn than what they have
4 approved?
5      A.  No.
6         MR. MOSKOW:  Objection to form.
7 Specifically with regard to Pradaxa?
8         MR. SCHMIDT:  Yes.
9      A.  No, I have not.
10         MR. SCHMIDT:  Let me give you what
11 I'm going to mark as Exhibit 15.
12      (Harvey Exhibit No. 15 was marked for
13 identification.)
14 BY MR. SCHMIDT:
15      Q.  You will see this is an exhibit from
16 another deposition from Dr. Baruch.  And let me
17 just ask you, if you'll look at this I will
18 represent to you that this is labeling language
19 he wrote regarding monitoring.  I'll just ask
20 you to read it to yourself, then I'll ask you a
21 question about it.
22      A.  Okay.
23      Q.  Is this -- can you endorse this in
24 your view as an appropriate way of warning
25 doctors about how they should warn patients

HARVEY

1
2 about the need to test blood levels and
3 dose-adjust?
4      A.  Well, there are many elements of this
5 I like, especially the rechecking the level
6 before changing the dose, which addresses some
7 of the concerns that have been raised.  The
8 level greater than 180, I think that can be
9 debated, but it's -- that's close enough -- I
10 mean that's -- I might say 150, but the overall
11 structure I agree with.  And I think there's
12 agreement on the 50.  Once again, rechecking,
13 and then if it's less, then going to warfarin
14 or another product.  And then the drug levels
15 being measured at LabCorp's request or
16 whatever's using mass spec is certainly a good
17 way to measure drug levels and available in the
18 U.S.
19      Q.  Let me break that down a little bit.
20 Have you seen this before today?
21      A.  No, I have not.
22      Q.  When you told me your opinion on how
23 blood levels should be checked, you didn't say
24 anything about rechecking a couple weeks later;
25 correct?

HARVEY

1
2      A.  No, I didn't.
3      Q.  Are you now changing that opinion to
4 say in fact you should recheck a couple weeks
5 later?
6         MR. MOSKOW:  Objection to form.
7 You can answer.
8      A.  Nothing that I said in my general
9 outline negated rechecking.  I was giving a
10 broad overview.  This is a more detailed plan.
11 And I think the idea of rechecking makes a lot
12 of sense.  I hadn't gone into that detail.  And
13 as I said with many of the things, I would have
14 deferred to others who are experts in the
15 specific area about testing and treating since
16 I'm not here as a medical expert.
17      Q.  So how often should there be
18 rechecking?
19      A.  Well, if you can rephrase since we
20 had similar conversations.  The idea is that as
21 a regulatory expert I have a general idea, and
22 then the specifics are, you know, filled in by
23 the experts in those areas.
24      Q.  Well --
25      A.  I would like it to be a data-driven

HARVEY

1
2 process, so I think having the experts in those
3 specific areas looking at the data on what
4 makes sense of how often to check, and I think
5 in my Exhibit 10 we went over some of those
6 issues where I was saying -- it didn't get
7 written down -- that if someone has renal
8 function issues, there needs to be some
9 periodic checking because renal function can
10 change over time.  And if you look at FDA
11 labels, they often are not prescriptive on how
12 often to check things.  They give more
13 generalized guidelines to allow for the
14 practitioner to give the specifics.
15      Q.  I'm asking you about your labeling
16 opinions.  What should doctors be told about
17 whether and how often they should recheck after
18 an initial blood test?
19      A.  And I'm saying I agree with this
20 general framework and I have no specific
21 opinions on how often the testing should be
22 done.
23      Q.  Do you have any specific opinions --
24 you have no specific opinions on how often
25 testing should be done; correct?

HARVEY

1
2    A.  That's correct.
3    Q.  Do you have any opinions on --
4    A.  After the initial test, yes.
5    Q.  Right.  Do you have any opinions on
6  whether there should be a mandatory second test
7  after the initial test?
8    A.  Once again, FDA rarely ever has
9  mandatory testing.  That's not how they
10 regulate.  They give guidelines and suggestions
11 and labeling advice for the practitioner to
12 then consider as they're treating their
13 individual patient.
14   Q.  Do you have any recommendation
15 regarding subsequent testing?
16   A.  My general recommendations are -- is
17 that should there be changes in the patient so
18 if they have been on -- if they're on the
19 Pradaxa for a long period of time as they are
20 advancing in years, it would be prudent to do
21 an additional test then.  If during routine
22 blood work there was a worsening of the
23 patient's serum creatinine, you know, that
24 would warrant some consideration and additional
25 testing.  If the patient changed medications,

HARVEY

1
2  certainly if they had a GI bleed or had GI
3  symptoms and a positive stool hemoccult test,
4  you know, all of these things should be taken
5  into consideration.  It's not a blanket test
6  once and you're done, just like I don't believe
7  in no monitoring, you know, in that paradigm.
8    Q.  Would you recommend subsequent tests
9  as a matter of course, absent some kind of
10 special circumstance like you were just
11 listing?
12       MR. MOSKOW:  Objection to form.
13   A.  It would have to be based upon the
14 data that was developed.  The sponsor needs to
15 generate data and make a proposal to FDA and
16 submit it in an sNDA, and they need to evaluate
17 it to have that inform the label.  In the
18 regulatory sense, having a plan in the absence
19 of data is not -- is not the best way to do it.
20   Q.  You understand that BI has generated
21 data on plasma concentration; correct?
22   A.  Yes, I do.
23   Q.  And they have submitted their opinion
24 on that data to the FDA, which is that it does
25 not require routine monitoring or blood

HARVEY

1
2  checking; correct?
3       MR. MOSKOW:  Objection to form.
4    A.  So my understanding is that --
5    Q.  Is what I said correct?
6    A.  Can you clarify how it was submitted?
7    Q.  Sure.  Do you have an understanding
8  that Boehringer has communicated to the FDA its
9  view that based on its data, blood tests for
10 plasma concentration on any form of routine
11 basis are not required?
12   A.  And my clarification --
13   Q.  Do you understand that?
14   A.  I -- I don't understand your question
15 because I don't know if that was in a phone
16 call or to the IND or to the annual report.
17   Q.  In any way.  Have they communicated
18 in any way?  How about in the label?
19   A.  But that's what I'm saying, is that
20 it should be communicated in an sNDA, so for
21 FDA to evaluate that data and have them decide
22 whether or not monitoring --
23   Q.  Do you understand -- you understand
24 that Boehringer's view is that routine
25 monitoring and routine blood tests are not

HARVEY

1
2  required?
3    A.  I understand that that was their --
4  the paradigm that they followed before they
5  had -- even had the RE-LY data.
6    Q.  That's their view up until this day,
7  having analyzed the data; correct?
8    A.  That's currently their view as well.
9    Q.  And they have communicated that view
10 to the FDA.  They haven't kept that view hidden
11 from the FDA; correct?
12   A.  That's correct.
13   Q.  So they have shared their view.  You
14 disagree with that view; right?
15   A.  Could you clarify?  Because I thought
16 we were talking about them submitting the data
17 to FDA.
18   Q.  Do you disagree with Boehringer's
19 view?
20   A.  I disagree with Boehringer's view.
21   Q.  So what is your view as to what
22 doctors should be told about whether and when
23 they need to do a blood test after the first
24 blood test?
25       MR. MOSKOW:  Objection to form.

HARVEY

1
2  A.  I believe that the sponsor, BI, needs
3  to study this in a systematic way because the
4  Graham article was not a randomized controlled
5  clinical trial.  The methodology was something
6  less than a randomized controlled trial.  So in
7  a randomized controlled trial, these ideas need
8  to be tested, and that information, that data
9  that's generated needs to be submitted to FDA
10  in an sNDA for the labeling change.
11      Q.  Move to --
12      A.  And --
13      Q.  Move to strike as entirely
14  nonresponsive.  Doctor, I understand you think
15  Boehringer should do further studies; correct?
16      A.  Correct.
17      Q.  Okay.  But you haven't specified how
18  those studies should be designed; correct?
19      A.  I have in giving specific suggestions
20  on areas that need to be addressed.
21      Q.  Have you identified a specifically
22  feasible way of doing the study you believe BI
23  should do?
24      A.  I have not taken it to that extreme
25  yet.

HARVEY

1
2      Q.  That extreme being feasibility?
3          MR. MOSKOW:  Objection to form.
4      Q.  Correct?
5      A.  Feasibility is in the eye of the
6  beholder as we saw with pediatric studies and
7  modeling.
8      Q.  So here's my question.  Do you have a
9  further opinion, beyond opining that they
10  should do a study, do you have a further
11  opinion that based on the current data as it
12  exists, doctors should be told to do blood
13  tests on their patients with Pradaxa?
14          MR. MOSKOW:  Objection to form.
15      Q.  Do you have a current opinion based
16  on the current data?  Yes or no?
17      A.  I have an opinion.
18      Q.  And what is the opinion?  Should
19  doctors be told to do blood tests based on the
20  current data set?
21      A.  My opinion, and as I stated in my
22  report, is that there are still unanswered
23  questions and they need to be addressed by
24  clinical data, and that data will then answer
25  or address the questions that I have raised.

HARVEY

1
2      Q.  In the absence of that data, that you
3  believe should exist but does not exist, with
4  the data only as it exists now, should in your
5  opinion Boehringer tell doctors that they
6  should do blood tests for every patient who
7  takes Pradaxa?  Yes or no.
8          MR. MOSKOW:  Objection to form.
9      A.  I would object to the language
10  because "should" -- it should be based on data,
11  and although we've had seven years since
12  approval, and we still don't have the data, but
13  the label could be strengthened based upon what
14  we know now, that consideration should be given
15  for these high-risk subgroups, and that testing
16  can be conducted and, you know, there is a
17  belief that there might be some utility.  But
18  until the sponsor conducts the studies and we
19  have the data, then we will not know for sure.
20  But there's enough -- a signal is something you
21  then further pursue and --
22      Q.  I have your point that there should
23  be a study.
24      A.  Correct.
25      Q.  My point is just on the current data

HARVEY

1
2  set, should there be a recommendation to
3  doctors that every patient should have their
4  blood checked at least once?  Yes or no.  If
5  you want to say no subject --
6      A.  I -- I --
7      Q.  -- that there should be a study or
8  yes, there should be a study --
9      A.  I -- I --
10      Q.  -- that's fine.
11      A.  I object to the word "should" because
12  that's not how --
13          MR. SCHMIDT:  We're going to be
14  going to the judge on this.
15          THE WITNESS:  Huh?
16          MR. MOSKOW:  Why don't we take a
17  break?
18          MR. SCHMIDT:  Okay.
19          THE VIDEOGRAPHER:  We're off the
20  record at 3:31.
21          MR. SCHMIDT:  Before we go off the
22  record, I am just going to say on the
23  record I've never in my career had a
24  witness who repeatedly objects to
25  questions.

HARVEY

1  HARVEY
2      MR. MOSKOW:  That's fine.
3      MR. SCHMIDT:  So I appreciate going
4  off the record.
5      THE REPORTER:  We're off the record
6  now.
7  (Recess taken.)
8      THE VIDEOGRAPHER:  We are back on
9  the record at 3:39.
10     MR. MOSKOW:  Paul, just before we
11  went off the record, you had I think
12  articulated some frustration, and
13  without talking about the import of what
14  you said, I want you to know we did
15  speak with Dr. Harvey off the record.
16  We're -- we believe that there's a
17  disconnect here and Dr. Harvey is trying
18  to be very precise.  What we've
19  suggested to him going forward is that
20  rather than say he objects to a way a
21  question has been worded, to suggest
22  that perhaps it be rephrased so he's in
23  a better position to answer it.  And we
24  will endeavor to do that going forward.
25     MR. SCHMIDT:  I appreciate that.

1  HARVEY
2  And I appreciate that, Dr. Harvey.  Let
3  me try to change my question based on
4  what Mr. Moskow just said in
5  discussions.
6  BY MR. SCHMIDT:
7      Q.  Do you think that the FDA would
8  approve a warning that advised doctors to test
9  blood levels for Pradaxa?
10     A.  Yes.
11     Q.  You do?  Okay.  So what should that
12  warning say from your point of view, based on
13  the current data?  Strike that.  Let me try to
14  ask my question differently.
15     A.  Yeah.
16     Q.  Do you think the FDA would approve a
17  warning that said test all patients shortly
18  after they start using Pradaxa to look at their
19  blood concentration?
20     A.  I guess my -- you know, so the
21  clarification that I need is I'm -- I'm having
22  trouble distinguishing the intent versus the
23  wording.  And FDA often gives general ranges
24  and then says, you know, practitioners should
25  consider this in your practice based upon

1  HARVEY
2  individual patient characteristics.  The trend
3  that's been at FDA for many years now has been
4  not to be prescriptive on how to test, but that
5  this is something that should be done and it
6  should be tailored to the individual.
7      Q.  Okay.
8      A.  So that's more what I'm reacting to.
9  So I believe that FDA would write a warning
10  saying that there could be some utility in
11  testing drug levels, how this testing is done
12  should be tailored, and I would believe that
13  they would highlight those patients who were at
14  increased risk because that's where more
15  intensive testing might have the best utility.
16     Q.  So in terms of what we see in
17  Exhibit 9 where it has a preferred test and it
18  has rechecking in one to two weeks, or two
19  weeks later in specific circumstances, do you
20  think the FDA would ever approve --
21     MR. MOSKOW:  Exhibit 15.
22     MR. SCHMIDT:  Exhibit 15.  I'm
23  sorry.
24     A.  The -- I think the FDA would want to
25  see data on levels greater than 180 because

1  HARVEY
2  they would want to see a justification for that
3  level.  But I think the paradigm of rechecking
4  and titrating certainly would resonate with
5  FDA.  But obviously there would need to be data
6  submitted in that sNDA to support the various
7  cutoffs.
8      Q.  I might be entirely misunderstanding
9  what you said.  I thought you said they didn't
10  tend to endorse specific tests, they didn't
11  intend to endorse specific time frames.  Would
12  they -- isn't that inconsistent with what we
13  see in Exhibit 15 where there's a specific test
14  and a specific time frame for rechecking?
15     A.  Well, I don't -- I guess -- please
16  clarify.  I had thought that the preferred test
17  would be mass spec LabCorp.  That's just sort
18  of an aside that the doctor was giving.  I
19  don't think that FDA would ever say, you know,
20  do LabCorp or Quest or whatever.  But I think
21  that was just sort of helpful information given
22  that, you know, articles over the years had
23  said well, there was no available test, and now
24  that we know there is.
25     So I think if I went through step by

HARVEY

1
2  step, there would need to be a justification of
3  the 180, but the idea of testing, titrating,
4  you know, after rechecking, and then having
5  data to support the lower dose, which would
6  probably be more defensible based upon the data
7  we have gone over, I think that would all be
8  good.  And then with the more traditional FDA
9  language as far as tailoring additional testing
10 based upon the character -- the individual
11 characteristics of the patient.
12     Q.  Apart from the doctor's name at the
13 bottom, in your experience, based on what you
14 understand about the data, would the FDA
15 approve this language for the Pradaxa label as
16 written?  Yes or no.
17     A.  Given the data they have, probably no
18 on the 180.
19        MR. SCHMIDT:  Let's look at what
20 I've marked as Exhibit 16.
21     (Harvey Exhibit No. 16 was marked for
22 identification.)
23 BY MR. SCHMIDT:
24     Q.  This just reminded me of something I
25 wanted to be sure I covered with you.  This is

HARVEY

1
2  a list we got yesterday.  It says "Additional
3  Reliance Materials" and it's dated November 29.
4  Do you see that?
5     A.  Yes.
6     Q.  Do you understand what this list is?
7     A.  Yes.
8     Q.  What is this list?
9     A.  This list is additional information
10 that was reviewed and is being used today.
11     Q.  Additional information since the time
12 of your report?
13     A.  Yes.
14     Q.  So at the time you wrote your report
15 you did not have this information; is that
16 correct?
17        MR. MOSKOW:  Objection to form.
18     A.  Or if I had the information, since
19 some of this is public information, it wasn't
20 specifically spelled out.  And so for clarity
21 and completeness, you know, it was added to
22 this list.
23     Q.  For example, you've got a bunch of
24 websites there.  Had you visited those websites
25 at the time you wrote your report?

HARVEY

1
2     A.  No, I'd not visited those four
3  websites at the time.
4     Q.  Do you have Exhibit 1 in front of
5  you?
6     A.  Yes, I do.
7     Q.  Look with me if you would at page 80.
8  Paragraph 231.  Do you see that at the end of
9  the paragraph you say:  "I understand that the
10 vast majority of the labs in the U.S., e.g.
11 Quest, LabCorp, are capable of performing the
12 DTT test and the ECT test"?  Do you see that?
13     A.  Yes, I do.
14     Q.  Which one is the Hemoclot?
15     A.  Isn't that the -- the DTT?
16     Q.  Okay.  So it's your understanding
17 that most labs in the U.S. can perform
18 Hemoclot?
19        MR. MOSKOW:  Objection to form.
20     A.  Could you just clarify how we got
21 from this to that or --
22        MR. MOSKOW:  It doesn't matter.
23     Q.  Just asking a question.  Is it your
24 understanding that most labs in the U.S. can
25 perform the Hemoclot?

HARVEY

1
2        MR. MOSKOW:  Objection to form.
3     A.  As I remember writing this, this was
4  a more generalized view that testing was
5  available in the U.S.  And as I read it, I can
6  see that there was some confusion that that
7  then meant that all of these were -- could be
8  conducted all over the U.S. since -- go ahead.
9     Q.  Is ECT a valid assay in your view?
10     A.  Yes.
11     Q.  Is it true that the vast majority of
12 labs in the U.S. can perform either the
13 Hemoclot or the ECT in your view?
14     A.  I don't know if I could say the vast
15 majority could perform them, but my
16 understanding was these tests were available.
17     Q.  Is this -- let me just ask you, is
18 this a true statement in your report, that,
19 quote, the vast majority of labs in the U.S.
20 are capable of performing Hemoclot or ECT?  Is
21 that a true statement?
22     A.  Based upon my understanding, yes.
23     Q.  That's where I wanted to go with
24 Exhibit 17.  You had not reviewed the Quest
25 website or the LabCorp website.  Where does

HARVEY

1
2  that understanding come from?
3      A.  Well, I hadn't reviewed these
4  specific websites.  It doesn't mean I hadn't
5  gone on the web to look up to see what they --
6  I could order.
7      Q.  Where did your understanding come
8  from?
9      A.  From the web, and I needed to -- I
10  wanted to document the specifics, and so that's
11  why we added that to the additional material.
12      Q.  So when you surveyed the vast
13  majority of labs, how long did you spend
14  looking at that on the web?
15      A.  Well, I can see I didn't reference
16  it.
17      Q.  Right.
18      A.  So the point of that statement was
19  that this testing is available if one wanted to
20  do it.
21      Q.  Do you know it's true?  Did you do
22  the work to make sure it's true that the vast
23  majority of labs have those tests?  Or were you
24  guessing?
25      A.  I guess my question to you would

HARVEY

1
2  be -- or my clarification would be what is the
3  adequate amount -- if I go to a website and see
4  that I could order it from the U.S., is that
5  enough?  Or do I have to actually order it to
6  see if that's doable?  So in my -- in the
7  context of my report, I wanted to show that
8  there were options available other than what
9  might be under FDA's purview.  There are many
10  tests that are available in these labs that
11  aren't specifically, you know, FDA-approved
12  tests, and there isn't availability, and this
13  was intended just to say that that was the
14  case.
15      Q.  You say the vast majority of the labs
16  in the U.S. have this test; right?
17      A.  That's what I say.
18      Q.  Do you know if that's true?  Did you
19  do the work to determine whether that's true?
20  Yes or no.
21      A.  I did a search on the web and found
22  evidence that the tests were available.
23      Q.  Move to strike as nonresponsive.  Do
24  you know if it's true, have you done the work
25  to determine that it's true that the vast

HARVEY

1
2  majority of labs in the U.S. have these assays?
3  Yes, no or --
4      A.  I thought I had.
5      Q.  Okay.  Do you think you have now,
6  sitting here now?
7      A.  Well, I -- by adding these extra
8  references, that provides the different details
9  where one can see what can be ordered.  And I
10  think -- I think the intent of my statement
11  stands that if someone wanted to test, they
12  could get their samples tested.
13      Q.  Is that a six-line way of saying yes,
14  that you think that's still a true statement
15  sitting here now?
16      A.  I think this is --
17      MR. MOSKOW:  Objection to form.
18      A.  I think this is still a true
19  statement.
20      Q.  Thank you.
21      Do you know what a narrow therapeutic
22  index drug is?
23      A.  Yes, I do.
24      Q.  Is warfarin a narrow therapeutic
25  index drug?

HARVEY

1
2      MR. MOSKOW:  Objection to form.
3      A.  Well --
4      Q.  Yes or no.
5      A.  It doesn't --
6      MR. MOSKOW:  Or can't be answered
7  yes or no.
8      MR. SCHMIDT:  Okay.
9      A.  It doesn't meet --
10      Q.  Can you give one of the three answers
11  that all the lawyers in the room have
12  suggested?  Yes, no, or I can't answer yes or
13  no.
14      A.  So the clarification is --
15      MR. MOSKOW:  Just --
16      A.  No, because "narrow therapeutic
17  index" gets used in the context of
18  functionally, but then there is also a
19  regulatory definition of whether or not it's on
20  the list.  And although Pradaxa is not defined
21  as a narrow therapeutic index, Bob Temple and
22  others at FDA have called it a narrow
23  therapeutic window product, because although
24  it's not on the official list, it acts as if it
25  was a narrow therapeutic drug.

HARVEY

1  
2  So if it's from the list, it's --  
3  it's -- there is a list that's incomplete but  
4  that's in the regulation and it may not meet  
5  that definition, but, you know, Coumadin and  
6  the other anticoagulants all have  
7  characteristics of narrow therapeutic indexes.  
8  MR. SCHMIDT: I'm going to note for  
9  the record that we will be asking either  
10  to strike the witness as a witness or  
11  for more time with the witness. I'm  
12  just looking at the answers. We have  
13  had multiple-paragraph answers to simple  
14  yes-or-no questions. We have literally  
15  had the witness argue with his own  
16  lawyer about the need to answer a  
17  question yes or no. So let me try to  
18  answer my question.  
19  MR. MOSKOW: Let me respond to that  
20  first, because we've taken a number of  
21  depositions, including recently of Herr  
22  Professor Dr. Dr. Barner, who refused to  
23  answer any question about risk without  
24  also talking about benefit. And, you  
25  know, counsel have worked hard together.

HARVEY

1  
2  I don't mind taking a 30-second break to  
3  discuss how to answer a question like  
4  the one just posed with the witness so  
5  that will aid things. But I don't think  
6  there's anything about Dr. Harvey's  
7  presentation here that in any way rises  
8  to any kind of deliberate obstruction of  
9  your ability to get answers.  
10  MR. SCHMIDT: I will note that I  
11  believe we gave you extra time with  
12  Dr. Barner.  
13  MR. MOSKOW: Give me 30 seconds.  
14  MR. SCHMIDT: Let me just see if I  
15  can answer, and if not we'll break.  
16  BY MR. SCHMIDT:  
17  Q. There is a regulatory definition of a  
18  narrow therapeutic index drug; right?  
19  A. Yes.  
20  Q. There's a list of them; right?  
21  A. That's correct.  
22  Q. Is warfarin on that list?  
23  A. I don't remember if warfarin is  
24  officially on the list. I know Pradaxa is not.  
25  Q. What qualifies something to be on the

HARVEY

1  
2  list?  
3  A. The list was created by FDA based  
4  upon some characteristics of the drugs that at  
5  too high or too low a dose, they could have  
6  harm in either direction. And I actually was  
7  at the advisory committee where this was  
8  discussed, and those older FDA individuals  
9  pretty much described how it was an empiric  
10  definition based upon their experience.  
11  Q. Okay. And is any NOAC on the list of  
12  narrow therapeutic index drugs?  
13  A. My understanding is no, because  
14  they're newer drugs and this is an older list.  
15  Q. Am I correct that the list of narrow  
16  therapeutic drugs is -- is relatively short?  
17  A. That's my understanding as well.  
18  Q. For example, well under 1 percent of  
19  all approved drugs in the United States are on  
20  the narrow therapeutic index drug list; right?  
21  A. That's my understanding.  
22  Q. What is an SMPC?  
23  A. Can you provide a context?  
24  Q. Do you know what an SMPC is?  
25  A. Can you provide a context?

HARVEY

1  
2  Q. Do you know without me giving you a  
3  context?  
4  A. Can you provide me a context?  
5  Q. Can you tell me what an SMPC is  
6  without giving you a context? I'm about to  
7  give you a context.  
8  A. Okay.  
9  Q. Can you tell me without it?  
10  A. At this point, I need a little  
11  context for the acronym.  
12  Q. Do you know what a CCDS is?  
13  A. The core data sheet?  
14  Q. Yes.  
15  A. Yes, I know what that is.  
16  Q. Do you know what a summary of product  
17  characteristics is?  
18  A. I know about the summary of safety  
19  and effectiveness, and I know about summaries  
20  of the product. I don't necessarily use that  
21  acronym.  
22  Q. But do you know what a summary of  
23  product characteristics is?  
24  A. Yes, I do.  
25  Q. That's the European version of the

HARVEY

1  label; right?
2
3      A.  That's my understanding, yes.
4      Q.  And you cite both language from --
5  and you've done that today in our deposition --
6  language from both the Pradaxa SMPC and the
7  Pradaxa CCDS; right?
8      A.  Yes, I have.
9      Q.  Did you review the full CCDS and the
10  full SMPC?
11      A.  No, I didn't.
12      Q.  You only looked at parts of them.
13      A.  That's correct.
14      Q.  For example, you quote language from
15  both about references to monitoring.  Do you
16  remember that?
17      A.  That's correct.
18      Q.  Did you look at both the SMPC and the
19  CCDS to see if they contain the company's views
20  as to when monitoring should be done?
21      A.  That wasn't the focus of my review.
22  The focus was the difference between the core
23  data sheet, the European label, and the
24  difference with the U.S. label.  That was the
25  focus of my review.

HARVEY

1
2      Q.  You know that there's different
3  warning standards in Europe versus the U.S.;
4  right?
5      A.  Yes, I do.
6      Q.  For example, I've heard regulatory
7  folks say that the FDA's more data driven than
8  EMA, the European version of the FDA.  Have you
9  heard that?
10      A.  I have heard that --
11          MR. MOSKOW:  Objection to form.
12      A.  I've heard their standards are
13  different.
14      Q.  Do you know how they're different?
15      A.  They operate under a different
16  system.  It's not a centralized system.  They
17  have rapporteurs and co-rapporteurs, and
18  there's variability on the risk tolerance of
19  the various reviewers.
20      Q.  Are you aware of the FDA requiring --
21  being more demanding that there be data to
22  support labeling language than EMA?
23          MR. MOSKOW:  Objection to form.
24      A.  I find that the more experience I've
25  gotten in the regulatory space, the more

HARVEY

1
2  difficult it is to pigeonhole one agency or
3  another as data-driven or not.
4      (Harvey Exhibit No. 17 was marked for
5  identification.)
6  BY MR. SCHMIDT:
7      Q.  Marked as Exhibit 17 is a copy of the
8  Pradaxa SMPC.  Do you see this?
9      A.  Yes.
10      Q.  And actually at page 34 of your
11  report, Exhibit 1, you quote language from the
12  SMPC about how the measurement of
13  dabigatran-related anticoagulation may be
14  helpful to avoid excessive high exposure to
15  dabigatran; correct?
16      A.  Yes.
17      Q.  Did you look in this document to see
18  if the SMPC contains any guidance to see
19  whether the guidance -- the SMPC gives any
20  guidance as to when that monitoring may be
21  useful?
22      A.  And as I say, when I did my review, I
23  was looking for differences and did not go into
24  depth on what -- on what was there in the U.S.
25  Europe versus what was not there in the U.S.

HARVEY

1
2      Q.  Is that a different way of saying no,
3  you didn't look to see if the document contains
4  guidance as to when that coagulation testing
5  should be done?
6          MR. MOSKOW:  Objection to form.
7      A.  Given the length of the document, the
8  focus of my review was to look at differences
9  between this and the U.S. label and
10  similarities to the core data sheet and which
11  was different from the U.S. label.
12      Q.  Let me ask the question very
13  specifically and very focused.
14          Did you look in the SMPC to see if
15  the SMP specifies when anticoagulation testing
16  is recommended?  Yes or no.
17      A.  No, I did not look specifically for
18  that.
19      Q.  Look at page 67, if you would.  If
20  you look at the bottom of the page, the last
21  paragraph, the second sentence of the last
22  paragraph is the one we have been discussing:
23  The measurement of dabigatran-related
24  anticoagulation may be helpful to avoid
25  excessive high exposure.

```
1                 HARVEY
2          Do you see that?
3          A.  No, I don't.  Which paragraph?
4          Q.  The last paragraph on the page.
5          A.  Uh-huh.
6          Q.  The second sentence on the last
7    paragraph.  Do you see that sentence I just
8    read?
9          A.  "However"?  Okay, yes.
10         Q.  That's the sentence you quote in your
11   report; right?
12         A.  Yes.
13         Q.  Read the sentence right before that,
14   please.
15         A.  "Pradaxa does not in general require
16   routine anticoagulant monitoring."
17         Q.  Do you agree with that statement from
18   the SMPC?
19         A.  And as I said before, I have -- I
20   distinguished between monitoring and post, you
21   know, testing for dose adjustment.
22         Q.  Okay.  So with that distinction, do
23   you agree with that sentence?
24         A.  I agree with that sentence.
25         Q.  Okay.  Let me just see if I can round
```

```
1                 HARVEY
2    out those questions I was asking you earlier.
3          Mindful of your point that there
4    should be further study, does the data as it
5    exists now support a labeling recommendation to
6    doctors that every patient who takes Pradaxa
7    should have their blood checked at least once?
8    Yes or no.
9          A.  Not having seen all the data, I think
10   the data warrants being submitted to FDA for
11   them to evaluate that.
12         Q.  Okay.  From the data you have seen in
13   your 200 hours of work, is such a labeling
14   recommendation warranted, that every patient
15   should have their blood levels checked at least
16   once just based on the data as it exists now as
17   you've seen it?
18         MR. MOSKOW:  Objection to form.
19         Q.  Yes or no or you can't say?
20         A.  I think -- I think that it's reached
21   the threshold for that to be included in the
22   label.  But, as I'd said, there's more work
23   that the sponsor needs to do to provide
24   additional data for clarity and refinement of
25   that.
```

```
1                 HARVEY
2          Q.  Just yes or no.  Does the data as it
3    exists now support the specific recommendation
4    that the broadest range patient should be in is
5    50 to 150?  Yes or no.
6          A.  Yes.
7          Q.  Okay.  Look with me, if you would, at
8    page 68 of Exhibit 17.  Do you see there's a
9    heading called Surgery and Interventions?
10         A.  Yes.
11         Q.  Do you see that in the third
12   paragraph, they talk -- they say caution should
13   be exercised when treatment is temporarily
14   discontinued for interventions and
15   anticoagulant monitoring is warranted?
16         Do you see that?
17         A.  Yes, I do.
18         Q.  And so that's one situation where
19   anticoagulant monitoring might be appropriate
20   when someone is discontinuing for surgery;
21   correct?
22         A.  Correct.
23         Q.  Had you seen that before I showed
24   that to you?
25         A.  I've seen similar wording elsewhere,
```

```
1                 HARVEY
2    yes.
3          Q.  Had you seen it in this document
4    before I showed it to you?
5          A.  I hadn't seen it in this specific
6    document, but --
7          Q.  Okay.  Look with me, if you would, at
8    page 80.  There's a heading titled Overdose.
9    Do you see in the second paragraph it talks
10   about in case of an overdose suspicion,
11   coagulation tests can help to determine
12   bleeding.  Do you see that reference to using
13   coagulation tests?
14         A.  Yes.
15         Q.  That's another instance where
16   coagulation tests might be helpful in terms of
17   assessing Pradaxa patients; correct?
18         A.  That's correct.
19         Q.  You had not seen that language in
20   this document before I showed it to you;
21   correct?
22         A.  Actually, I have seen that because
23   the DTT test is available in the U.S. and would
24   have some utility for U.S. prescribers were it
25   in the U.S. label.
```

HARVEY

1   HARVEY
2       Q.  The DTT test is available in the
3   United States?
4       A.  Oh, excuse me.  I was thinking of the
5   APTT.  No, I correct myself.  I'm sorry.
6       Q.  Would the APPT test have some utility
7   in measuring anticoagulation?
8       A.  There is evidence that a extremely
9   high APTT is informative and can be used
10  regardless of what reagent.  If it's off the
11  scale, then that indicates a concern.
12      Q.  Other than when someone is stopping
13  the medicine on an emergency basis for some
14  kind of surgery or when they've had an overdose
15  of the medicine, is there anything you can
16  point me to in the SMPC where the company
17  recommends using anticoagulation tests?
18      A.  I think we established that I didn't
19  study the entire document on Europe.  I looked
20  for differences between the European document
21  and the U.S. FDA document so I would have to
22  answer no.
23      Q.  Move to strike everything other than
24  "no."  Can you point me -- did you see any
25  instances in the company core data sheet where

1   HARVEY
2   specific use of the -- of an anticoagulation
3   test was recommended outside of the context of
4   something like an overdose or emergency
5   surgery?
6       A.  In the -- I think in the context of
7   renal insufficiency, wasn't that the table 13
8   that we talked about before?  I would have to
9   look at the core data sheet.
10      Q.  Let's mark the core data sheet.
11          Okay, while we're doing that, are you
12  aware that both the SMPC and the company core
13  data sheet have been submitted at various
14  points in time to the FDA?
15      A.  I am -- I have heard that.  I don't
16  know whether those were submitted to the IND or
17  as an annual report.
18      Q.  You know that they were submitted at
19  various points in time; correct?
20      A.  That's what I have heard.
21          MR. SCHMIDT:  Okay.  Exhibit 18 is
22  the company core data sheet.  Is it 19
23  or 18?
24          MR. HAILEY:  19.  18.
25          MR. SCHMIDT:  19.  Let's mark the

1   HARVEY
2   company core data sheet.
3       (Harvey Exhibit No. 18 was marked for
4   identification.)
5           THE REPORTER:  What number are we
6   marking for the record?
7           MR. SCHMIDT:  We're marking
8   Exhibit 18, the company core data sheet.
9   BY MR. SCHMIDT:
10      Q.  What section were you referring to,
11  doctor?
12      A.  Can you ask the question again?
13      Q.  Yeah.  I thought you just referenced
14  a table 13 from the company core data sheet
15  that you wanted to look at.  Is that what you
16  referenced a moment ago?
17      A.  Yes.
18      Q.  Does that include plasma
19  concentration data?
20      A.  Can you repeat the question?  I
21  thought you were talking about renal issues.
22      Q.  No.  Does table 13 include plasma
23  concentration data?
24      A.  No, it doesn't.
25      Q.  Is there anything in the company core

1   HARVEY
2   data sheet that speaks to use of
3   anticoagulation testing that you have seen
4   outside of the context of emergency surgery or
5   overdose or something like that?
6       A.  No, it does not.
7       Q.  And, in fact, the company core data
8   sheet contains the same statement that we saw
9   in the SMPC with which I think you said you
10  agree, that Pradaxa treatment does not require
11  anticoagulant monitoring on page 10.
12      A.  Correct.
13      Q.  Have you studied the regulatory
14  record -- you've talked at various points in
15  time about distinctions between the European
16  label and the U.S. label; right?
17      A.  Yes.
18      Q.  Is it your opinion that any time
19  information is included in the European label
20  it must be included in the U.S. label?
21      A.  Can you rephrase "must"?  So are you
22  saying that there must be simultaneous
23  submissions between EMA and FDA?
24      Q.  No, I'm asking something a little
25  different.

HARVEY

1
2       Is a U.S. label automatically
3   automatic -- automatically inadequate simply
4   because it does not include some piece of
5   information included in the European label?
6       A.  I --
7       MR. MOSKOW:  Objection to form.
8       Q.  Or does the substance of the
9   information the basis for the information
10  matter?
11      A.  Nothing is automatic in regulatory.
12      Q.  Okay.
13      A.  And if something is in the European
14  label which helps practitioners use it more
15  safely, then that's something that should be
16  submitted to the U.S. label.
17      Q.  Before you made the determination
18  that information in the European label should
19  also be in the U.S., label would you want to
20  understand the data that supported it and the
21  reason that it was added to the European label?
22      A.  Yes, I would.
23      Q.  Have you made that survey -- you've
24  noted various distinctions between the European
25  label and the U.S. label in this case.

HARVEY

1
2       In all those instances, have you made
3   a point of looking at the underlying data that
4   supported the European labeling and the
5   regulatory interactions that led to the
6   addition of that language to the European
7   labeling?
8       A.  No, I have not.
9       Q.  Have you done that in any instance?
10      A.  Can you clarify?
11      Q.  Sure.  In any instance of language
12  that you believe is in the European label but
13  not the U.S. label, have you made a point of
14  looking at the data that justified the European
15  label and looking at the regulatory
16  interactions that resulted in the European
17  label?
18      A.  No.
19      Q.  Okay.  You understand that a company
20  core data sheet is intended to be a basis for a
21  company's worldwide labeling; right?
22      A.  Correct.
23      MR. MOSKOW:  Objection to form.
24      Q.  And you understand that many
25  companies have procedures that, when material

HARVEY

1
2   appears in the company core data sheet, they
3   have an obligation to request a label change to
4   include that same material in their U.S. label?
5       A.  Correct.
6       Q.  In the instances where you say
7   there's material in the Pradaxa core data sheet
8   that is not in the U.S. label, have you
9   reviewed -- strike that.
10      In fact, are you familiar that some
11  companies have actual formal documentation
12  processes -- sometimes they call it exceptions
13  and things like that -- where they will make
14  note of differences between the U.S. label and
15  the company core data sheet and confirm that
16  they've tried to get those parts of the company
17  core data sheet put in the U.S. label?
18      MR. MOSKOW:  Objection to form.
19  You can answer.
20      A.  I'm familiar with that in some
21  companies.  I can't say with all companies.
22      Q.  Do you know if Boehringer has a
23  process where -- strike that.
24      Do you know if Boehringer has a
25  policy or a practice that if something is in

HARVEY

1
2   the company core deteriorate they will try to
3   get it added to the U.S. label?
4       A.  I don't know of that specific policy.
5       Q.  Do you know for the instances of
6   items you say are in the company core data
7   sheet but not the U.S. label whether Boehringer
8   did, in fact, in every one of those instances
9   try to have those -- that relevant language
10  added to the U.S. label?
11      Have you done the review of the
12  regulatory interactions to confirm or refute
13  that?
14      A.  I have reviewed the interactions
15  between the sponsor and FDA and I did not find
16  instances where -- or at least I did not find
17  evidence that all of those had been submitted
18  in sNDAs.  They may have been submitted to
19  other parts of FDA, but not actually as an sNDA
20  for a labeling change.
21      Q.  Can you tell me any provision, any
22  language that you think is in the core data
23  sheet that should be in the U.S. label that
24  Boehringer did not submit to the FDA and
25  request that it be added to the U.S. label?

HARVEY

1
2    A.  Not off the top of my head.
3    Q.  Do you know if any such language
4  exists?
5        Is there any such language that
6  appears in the company core data sheet
7  does not appear in the U.S. label but that you
8  think should appear in the U.S. label that
9  Boehringer never submitted to the FDA, that you
10  know Boehringer never submitted to the FDA?
11    A.  I would have to refer to my report,
12  so page 25.  I'm not sure how much depth I want
13  to go into because I don't want to be repeating
14  past conversations.
15    Q.  Yeah.
16    A.  One -- the big example, of course, is
17  the 110 dose.
18    Q.  Okay.
19    A.  That was submitted.  It was rejected.
20  FDA gave a path for -- in 2011 on what the
21  sponsor needed to do in order to get the 110
22  dose approved for the A-fib indication, and
23  here we are in 2017 and it still has not been
24  done.
25    Q.  You know that Boehringer wanted the

HARVEY

1
2  110 approved; right?
3    A.  Yes.
4    Q.  And you know they made multiple
5  efforts to get it approved, at least four that
6  you cite in your report; right?
7        MS. PRESBY:  Objection.
8    Q.  Is that true?
9    A.  The issue is whether or not the
10  sponsor provided the data that FDA requested
11  that FDA indicated as the path forward.
12    Q.  Is it true that Boehringer made four
13  separate attempts that you're aware of to get
14  approval of the 110 dose?
15    A.  Yes.
16    Q.  Spanning from 2010 or before 2010 all
17  the way to 2015?
18    A.  Yes.
19    Q.  And you say that a path forward was
20  given.  That would have involved some kind of
21  unspecified study; correct?
22    A.  It would have been -- involved a
23  study, and FDA outlined what should be included
24  in the study.
25    Q.  Have you -- have you come up with a

HARVEY

1
2  design of what that study might look like to
3  determine if it would be feasible in the real
4  world?
5    A.  I -- I agree with how FDA outlined
6  that study moving forward, and it's my
7  understanding that that study has not been done
8  or even attempted.
9    Q.  Move to strike as nonresponsive.
10  Have you attempted, looking at the guidance
11  that the FDA, gave to evaluate what the design
12  of that study would look like and how large it
13  would need to be in order to determine if it
14  were feasible?
15        MR. MOSKOW:  Objection, asked and
16  answered.
17    A.  Yeah, I -- I have not.
18    Q.  Have you seen in the documents where
19  anyone comes up with a feasible design for such
20  a study that could be run in the real world?
21        MR. MOSKOW:  Objection to form.
22    A.  I guess I'm having trouble with
23  "feasibility" because in my experience in FDA,
24  when companies say something's not feasible, it
25  usually means that it's expensive, and yet when

HARVEY

1
2  it's in their best -- best interest, then the
3  studies get done.
4        So feasibility is something that's
5  very difficult to define in the regulatory
6  sense.  The FDA made the proposal, and I think
7  it's a -- it's a valid proposal, that was their
8  recommendation on the path forward.  Submitting
9  data four times that didn't address their
10  concerns, to me, is not a genuine attempt to
11  try to get it approved.
12    Q.  Move to strike as nonresponsive and
13  note that we've got another one-page answer to
14  a question I didn't ask.
15        My question simply is, sir, is have
16  you seen documentation about what this study
17  might look like that lets you say with a
18  reasonable degree of professional certainty in
19  your opinion that it would have been feasible?
20    A.  No, I --
21        MR. MOSKOW:  Objection to form.
22    A.  I -- I've not looked at those
23  details.
24    Q.  Now, would you agree with me that you
25  shouldn't submit speculation to the FDA?

HARVEY

1
2      MS. PRESBY:  Objection, form.
3      A.  Can you define speculation, since
4   that was a problem -- it's a term I should not
5   have used because I used it in a traditional
6   vernacular sense.  Again, as I'm hearing you
7   say it, it sounds like there's a legal context
8   that I didn't consider.  There's not -- I'm
9   using --
10     Q.  In the way you use it, you don't even
11  need to define it because I think I know what
12  you mean.  In the way you used the term
13  "speculation," should companies submit
14  speculation to the FDA?
15     MR. MOSKOW:  Objection to form.
16     A.  Well, and as I think about how I --
17     Q.  Yes or no.
18     A.  They should not submit speculation.
19     Q.  Okay.  Should -- if a company -- you
20  understand that when you create a model of some
21  sort it involves making certain assumptions and
22  trying to make predictions based on data;
23  correct?
24     A.  Correct.
25     Q.  And there's sometimes -- and you can

HARVEY

1
2   test your model to see whether it's validated;
3   right?
4      A.  Correct.
5      Q.  And sometimes when you test your
6   model, it works pretty well and it's validated;
7   right?
8      A.  Correct.
9      Q.  And sometimes you test your model and
10  you come to the conclusion that didn't work,
11  it's not validated?
12     A.  Correct.
13     Q.  And there could be any number of
14  reasons why your model's not valid; correct?
15     A.  Correct.
16     Q.  Could be because you made wrong
17  assumptions; right?
18     A.  Correct.
19     Q.  It could be because your data set
20  wasn't representative; correct?
21     A.  Correct.
22     Q.  Could be there's just something you
23  didn't anticipate; right?
24     A.  Uh-huh, correct.
25     Q.  If a company does a model and is not

HARVEY

1
2   able to validate their model should they submit
3   a nonvalidated model to the FDA?
4      A.  Yes, they -- they may still submit it
5   because the evaluation of the model can have
6   various interpretations, and validation can
7   have -- there could be various levels of
8   validation.
9           So even though it's not reached the
10  highest level of validation in the eyes of the
11  company, there still might be utility.
12     Q.  There might be utility, but are they
13  required to submit it in your view under the
14  regulations?
15     A.  If it's significant, if it has
16  significant impact on how a product could be
17  used, then yes.
18     Q.  By definition does it have
19  significant impact if they can't validate it?
20     A.  It depends.  In -- I think we've
21  established I'm not an expert on modeling.
22     Q.  Okay.
23     A.  But I -- I would like to correct my
24  previous statement, because of course since
25  modeling is based upon data, then it truly

HARVEY

1
2   isn't speculation, it's --
3      Q.  I wasn't --
4      A.  I wouldn't -- I -- that word is --
5   you know, that was inappropriate use of the
6   word.
7      Q.  I don't think you used it with
8   respect to the model, but that's fine.
9           If a company does a model and they're
10  not able to validate it and they come to the
11  view they can't validate it because the model
12  doesn't work, for one reason, for multiple
13  reasons, are they under an obligation to say,
14  hey, we did this model, it didn't work, here
15  you go, FDA?
16     A.  Well, but --
17     Q.  Would this be --
18     A.  -- in any case, they should submit it
19  because part of the model was the basis of the
20  calculation of the doses for the pediatric
21  study.
22     Q.  Is it your testimony under oath, sir,
23  that Boehringer used its dose titration model
24  as the basis for the pediatric dosing?
25          Is that your testimony?

HARVEY

MR. MOSKOW:  Objection to form.

A.  It's my understanding from the documents that I read that some of the information from that modeling exercise that was not submitted then informed the process of the pediatric study.  I've read that in some of the documents.

Q.  I'm asking a general question.

If a company creates a model and decides the model's not valid, that it doesn't work, that it's flawed, do they have an obligation to submit it?

MR. MOSKOW:  Objection to form.

Q.  Yes or no.

A.  If it -- if the model raises issues of safety concern, then there's nothing stopping the company from submitting it to FDA.

Q.  Move to strike as nonresponsive.  How about you answer my question, please, sir?

My question is if a company conducts a model and they conclude that it's not valid, that it doesn't work, do they have a requirement to submit it to the FDA?  Yes or no.

HARVEY

MR. MOSKOW:  Objection to form.

A.  It really would depend on the particulars of what they were finding.  It's hard -- I cannot give a yes or no answer because it's too general of a question.

Q.  Might be yes, it might be no, depending on the facts; correct?

A.  Correct.  In this case, it's --

Q.  I'm not asking you about this case yet.  Do -- do you know, did the FDA do modeling of dose -- of plasma concentrations?

A.  We talked about that this morning.  You said they did.

Q.  Do you know if they did?

A.  I -- all I would know is what I read in the documents.  There were some references to them.

Q.  Do you know if they did?  Yes or no.

A.  I don't know if they did.  There were references that they did.

Q.  Do you know -- as to the modeling that Boehringer did, do you know -- could you replicate Boehringer's models yourself?

A.  Not being an expert in modeling, no,

HARVEY

I couldn't.

Q.  Do you know what variables they controlled for?

A.  No, I don't.

Q.  Do you know if the patient data used in the model was representative of the overall patient data set?

A.  I don't know the specifics.

Q.  Is that an important fact, that the patient data used in the model be representative of the overall patient data set?

A.  Yes.  I would have hoped they would have done that.

MR. SCHMIDT:  Why don't we take a break and change the tape.

THE VIDEOGRAPHER:  We're off the record at 4:25.

(Recess taken.)

THE VIDEOGRAPHER:  Here begins media number 5 in the video-recorded deposition of Dr. Brian Harvey.  We're back on the record at 4:35.

BY MR. SCHMIDT:

Q.  Doctor, have you evaluated the

HARVEY

efforts that Boehringer made to validate their dose titration model that we have been discussing all day?

A.  I -- I've reviewed the documents and in general have looked at that.

Q.  Do you understand that part of what they did was they took their model and said, here's what our model predicts in terms of bleeding versus stroke, here's what we see in the real world, do those track up?

A.  I understand that, yeah.

Q.  What did they see when they did that?

A.  My understanding is, is that they felt that there was no monitoring required because of things holding up, as you say.

Q.  Let me try to ask my question a little more precisely.

When the scientists at Boehringer compared their predicted results from the model to the actual real-world results did they see meaningful differences between them?

A.  I -- I can look back, but I remember that they found that there were -- the results were similar.

HARVEY

MR. SCHMIDT:  Let me show you a document.

(Harvey Exhibit No. 19 was marked for identification.)

BY MR. SCHMIDT:

Q.  I've marked as Exhibit 19 a manuscript form of the exposure paper that we were talking about earlier.

Do you recognize this, just in a different format?

A.  In a different format, yes.

Q.  And the reason I marked it in a different format is because this has certain tables attached to it that I think were published online but that were not, for space reasons, part of the journal article.

A.  Okay.

Q.  I'd like to ask you to look at table 15, please.

Before you do, did you understand the 2014 exposure paper from Dr. Reilly to be Boehringer sharing their -- the results of their modeling with the scientific community?

A.  I had thought that that's how you

HARVEY

presented the paper.

Q.  Is that your understanding of what the paper does?

A.  That's my understanding.

MR. MOSKOW:  Can I just ask you to identify which is table 15?

MR. SCHMIDT:  Oh, I'm sorry.  It might not even be table 15 it's not table 15, it's Exhibit 15 from the Reilly deposition, so let me ask my question differently.

Q.  If you look at the back of Exhibit 19 there are tables attached to it.

A.  Yes.

Q.  And if you go about four pages in, there's a table with some text above it that says "Variables in the final logistic regression model"?  Yeah, right there on your right-hand side.  Do you see that?

A.  "Variables in the final logistic regression model."

Q.  Right.  Have you seen this before?

A.  Like, not in this format, but I don't know if I've seen this specific table or this

HARVEY

analysis.

Q.  Do you know that this is referring to the dose titration modeling you talk about for pages and pages in your report?

A.  Yes.

Q.  And do you know what those variables that they used were in the final logistic regression model?

A.  Are you saying based upon this table or --

Q.  Independent of this table.  Have you independently looked at that?

A.  No, I haven't independently looked at it.

Q.  Bottom half of the page, there's a chart that says at the very bottom Predictive Value Analysis.

Do you see that?

A.  Yes, I do.

Q.  And do you know what that means?

A.  No, I don't.

Q.  Okay.  It has in the key a square for predicted and a star for observed.  Do you see that?

HARVEY

A.  Yes.

Q.  And then it's got a grouping on the left for major bleed and a grouping on the right for stroke SE.

Do you see that?

A.  Yes, I do.

Q.  And if you look at it, there's some instances where the square that says predicted is very close to the star.

Do you see that?

A.  Yes.

Q.  And there's some instances where the star is well outside the -- not just well removed from the square but well outside the confidence interval around the square.  Do you see that?

A.  Yes, uh-huh.

MR. MOSKOW:  Objection to form.

Q.  Do you know what this data represents?

A.  No, I don't.

Q.  Do you know that there were multiple instances where when Boehringer -- strike that.

Do you know that this is, in fact,

HARVEY

1
2  Boehringer's efforts to say here's what we
3  predict from our model.  How does that compare
4  to what we see in the real world?
5       MR. MOSKOW:  Objection.
6       Q.  Do you understand to be what this
7  chart is measuring?
8       MR. MOSKOW:  Objection to form.
9       A.  That's how you've explained it to me.
10      Q.  Do you know that what I've said is
11  true or not true?
12      A.  I don't know.  I don't have a
13  independent validation to confirm or deny what
14  you're saying.
15      Q.  Okay.  And, for example, if you look
16  at the -- if I have described it accurately, if
17  you'd look at the category of Major Bleed, you
18  will see that at the high levels, 9 and 10, the
19  observed rates of major bleed are much higher
20  than what was predicted in the model.  Do you
21  see that?
22      A.  Yes.
23      Q.  And if you look at stroke at the high
24  rates, the rates of stroke are lower than what
25  was predicted in the model; right?

HARVEY

1
2       A.  Yes.
3       Q.  So my question to you, is if I tell
4  you that, in important groups, the model
5  underpredicted actual bleeds and underpredicted
6  stroke benefit, do you know if that's true or
7  not?
8       A.  In general --
9       MR. MOSKOW:  Objection to form.
10      A.  -- no, no, I don't.  But I think
11  there are alternative interpretations.
12      Q.  Do you -- do you -- let me ask you
13  this.  Do you have an opinion about how
14  accurate the model was when the scientists
15  compared what was predicted under the model to
16  what was seen in the real world?  Do you know
17  how accurate it was?
18      A.  I wouldn't be able to tell.
19      Q.  Okay.  Let me show you a few more
20  documents on this point.
21      A.  Clarifying question.  Was the model
22  based upon the first generation product and the
23  observed based on the first or the second?
24      Q.  Do you know?
25      A.  I don't know.

HARVEY

1
2       Q.  You're familiar with some of the
3  discussions that Boehringer had with EMA on
4  questions regarding dose titration and modeling
5  and plasma concentration?
6       A.  I saw references to those.  I did not
7  study those in depth.
8       (Harvey Exhibit No. 20 was marked for
9       identification.)
10  BY MR. SCHMIDT:
11      Q.  Have you seen the document I've
12  marked as Exhibit 20 from the European
13  Medicines Agency, the European FDA?
14      A.  It's my understanding that this
15  document was available to me, but I have not
16  studied it.
17      Q.  Okay.  I'm going to just point you to
18  some of the language in this.  Look with me if
19  you would at page 16.  Actually, look at page
20  15, if you would.  And if you look about
21  halfway down, you'll see some italicized
22  language where they say the MAH is requested to
23  provide more details.
24      Do you see that?
25      A.  Yes, I do.

HARVEY

1
2       Q.  Who's the MAH?  Is that a term you're
3  familiar with?
4       A.  No, I'm not.
5       Q.  I'll represent to you that the MAH
6  stands for Market Authorized Holder, which is
7  Boehringer.
8       With that context, do you understand
9  this to be EMA asking Boehringer to provide
10  more details?
11      A.  Yes.
12      Q.  Then do you see Boehringer's response
13  is printed below?
14      A.  Uh-huh.
15      Q.  And I'd like to carry you over to the
16  next page, to page 16.  There's a paragraph
17  that begins "As a result."  I'll read it, but
18  tell me when you get there.
19      A.  "As a result"?
20      Q.  Yes.  "As a result, BI has concluded
21  that the trial simulations based on the PK
22  response model that were made in 2012 have
23  limitations."
24      Did I read that correctly?
25      A.  Yes.

Page 346

HARVEY

1
2     Q.   So this is talking about the same
3   dose titration model we have been talking
4   about; correct?
5     A.   Correct.
6     Q.   And BI is telling the European
7   Medicine Agency that they believe that the
8   trial simulations based on the model have
9   limitations; correct?
10    A.   Correct.
11    Q.   And they were unable to predict the
12  dose/response difference between 110 milligrams
13  bid and 150 milligrams bid seen in RE-LY.
14         Did I read that correctly?
15    A.   Yes, you did.
16    Q.   Do you know whether that's a true
17  statement, an untrue statement, or do you not
18  have a view?
19         MR. MOSKOW:  Objection to form.
20    A.   I do not have a view.
21         MR. SCHMIDT:  Okay.  Let me show
22  you another document.  And I will
23  represent to you that this is a
24  Boehringer submission to EMA that was
25  made in advance of Exhibit 20.

Page 347

HARVEY

1
2     (Harvey Exhibit No. 21 was marked for
3   identification.)
4   BY MR. SCHMIDT:
5     Q.   I'll ask you to look -- tell me, have
6   you seen this Boehringer submission that I've
7   marked as Exhibit 21?
8     A.   To clarify, submission to EMA?
9     Q.   Yes.
10    A.   Yes.
11    Q.   Have you seen that before?
12    A.   I have not studied this specific
13  document since my focus was U.S. FDA and that's
14  my main area of expertise.
15    Q.   If you look through this, this
16  document is called Simulation Analyses and
17  Validation.  That's the heading.
18         Do you see that up at the top?
19    A.   Yes, I do.
20    Q.   And if you look through it, on page 4
21  it talks about validation of the trial
22  simulation approach.
23         Do you see that?
24    A.   Yes, I do.
25    Q.   This says validation step 1,

Page 348

HARVEY

1
2   validation step 2 on page 5, and validation
3   step 3 on page 7.
4         Do you see that?
5     A.   Yes, I do.
6     Q.   Look with me, if you would, at the
7   paragraph above -- on page 7 above validation
8   step 3.
9         "Altogether, given the totality of
10  evidence that was included in the RE-LY trial,
11  the discrepancies between predicted and
12  observed outcomes were regarded as major."
13         Did I read that correctly?
14    A.   Yes, you did.
15    Q.   "The approaches used in this
16  validation step raised doubt concerning the
17  model conclusions."
18         Do you see that?
19    A.   Yes, I do.
20    Q.   Do you understand that to be a true
21  or a false statement, or you don't know, that
22  when -- that the discrepancies between
23  predicted and observed outcomes using the model
24  we have been discussing were major?
25         MR. MOSKOW:  Objection to form.

Page 349

HARVEY

1
2     Q.   True or false or you don't know?
3     A.   I don't know.
4     Q.   On the next page, they talk about --
5   if you look under the table there you'll see
6   they reference a PK set and a nonPK set.
7         Do you see that?
8     A.   Yes, I do.
9     Q.   And is that consistent with your
10  knowledge?
11         And then in the next paragraph, they
12  say they had a large PK set, about 70 percent,
13  whereas the nonPK set was about 30 percent.
14         Do you see that?
15         MR. MOSKOW:  Objection to form.
16    A.   I --
17    Q.   Is that consistent with your
18  knowledge that in about 70 percent of RE-LY
19  patients, they had plasma concentration data
20  and about 30 percent, they didn't?
21    A.   Yes, that's consistent with what I
22  reviewed in the documents.
23    Q.   They say:  "Although the PK set was
24  large, 70 percent, it was not representative
25  for the outcomes in the total RE-LY

HARVEY

1
2 population."
3     Did I read that correctly?
4     A.  Yes.
5     Q.  Do you know if that's a true or
6 untrue statement?
7     A.  That's the first time I'm hearing
8 that.
9     Q.  Okay.  Do you know if it's true or
10 false or you don't --
11     A.  I don't know if it's true or false.
12 I'm surprised by it, though.
13     Q.  They say:  "Whereas the nonPK set --
14 the -- the PK set represented a somewhat
15 positive selection whereas the nonPK set
16 represented a somewhat negative selection."
17     Do you see that?
18     A.  Yes, I do.
19     Q.  Do you know if that's true?
20     A.  No, I don't.
21     Q.  Okay.  But you understand what
22 they're saying, that they're expressing
23 concerns that the data they have from the PK
24 set is not representative of the data from the
25 overall study; correct?

HARVEY

1
2     MR. MOSKOW:  Objection.
3     A.  Correct.
4     Q.  That's a potential concern; right?
5     A.  Yes.
6     Q.  Then they go on to say:  "In summary,
7 the attempted internal validation of the model
8 predictions and trial simulations by using the
9 RE-LY trial data could not successfully
10 validate the proposed three-dose dabigatran
11 titration scheme with plasma concentration
12 cutoffs where based on optimization for one NCB
13 definition."
14     Do you see that?
15     A.  Yes.
16     Q.  Do you know if that's a true or false
17 statement, that they could not successfully
18 validate the proposed three-dose dabigatran
19 titration scheme?
20     A.  I have no knowledge if that's true or
21 not.
22     Q.  Go back with me, if you would, to
23 Exhibit 20.  This is the EMA document.  We were
24 on page 16.  Look with me if you would at page
25 16.  You remember we were looking at the

HARVEY

1
2 write-up that BI had provided to the EMA?
3     A.  Yes.
4     Q.  Below that is the EMA's assessment.
5 Do you see that?
6     A.  Starting with which -- oh, yes,
7 assessment, yes.
8     Q.  And they've got their own boxed
9 assessment before they ask their next question.
10     Do you see that?
11     A.  Yes, I do.
12     Q.  And I want to focus on the last
13 question:  "The MAH concludes that trough --
14 that through dose recommendations for SPAF
15 according to the current label, an optimization
16 of the efficacy and bleeding profile of
17 dabigatran etexilate is already achieved
18 compared to warfarin and/or dabigatran 150 as
19 the reference dose."
20     Do you see that?
21     A.  Yes, I do.
22     Q.  Here's the part I want to focus your
23 attention on:  "The MAH" -- and that's
24 Boehringer; right?
25     A.  Correct.

HARVEY

1
2     Q.  "Boehringer does not believe that
3 available data such as the PK response model
4 support that routine monitoring of dabigatran
5 anticoagulant activity would result in an
6 enhanced balance between benefits and bleeding
7 risks.  This is endorsed."
8     Did I read that correctly?
9     A.  Yes, you did.
10     Q.  Do you agree with that statement from
11 Boehringer that available data such as the PK
12 response models support that routine monitoring
13 would result in an enhanced balance between
14 benefits and bleeding risks?
15     MR. MOSKOW:  Objection to form.
16     A.  No, I don't agree.
17     Q.  Okay.  You see where the EMA agrees,
18 though, right, where they endorse that
19 proposition?
20     A.  Yes.
21     Q.  So you disagree with EMA on that?
22     A.  I disagree with EMA on that based
23 upon some of the information I saw in the
24 records.
25     Q.  Okay.  Look with me, if you would at

HARVEY

page 66, please.

By the way, do you see this article
at the beginning, this EMA document at the
beginning cites certain allegations made in a
BMJ article, for example, on page 5?

Do you see that?

A.  Yes.

Q.  And you cite that BMJ article in your
report; correct?

A.  Yes, I do.

Q.  Are you aware that that BMJ article
was only published after plaintiff's lawyers
took selected documents from Boehringer and fed
them to the author of that article?

MR. MOSKOW:  Objection to form.

A.  Can you clarify "fed"?  Fed them?

Q.  I don't know how it was passed, if it
was under the table, if it was by email, if it
was in a bar, but gave them selected documents
from Boehringer that they then wrote about.

MR. MOSKOW:  Objection to form.

A.  I heard that there were some
questions about how the cases were determined,
you know, were -- were obtained but not that

HARVEY

the -- that undermined the validity of each
individual case.

Q.  I may be asking a different question.
Are you able to rule out -- did you know that
there were interactions between plaintiff's
lawyers and the BMJ author before the BMJ
author wrote her piece?

A.  That was not something I was aware of
when I originally read the article.

Q.  Were you aware --

A.  I've since heard -- I've since heard
it and seen it on the web that those
allegations were made.

Q.  What have you heard?

A.  I heard -- it was what I read on the
web, that there was an interaction between
lawyers and BMJ.  And I've also read that, you
know, the, you know, the interaction doesn't
negate the validity of any individual case just
like simulation of reports to FDA MedWatch.  If
it's simulated and it's a real report then it's
still a real report.

Q.  What did you read on the web about
the nature of the interactions between the

HARVEY

plaintiff's lawyers and the BMJ article?

A.  I didn't read anything specific.

Q.  No, I --

A.  I just knew that there was an
accusation.  It was a summary article.

Q.  Do you know if the BMJ article was
ghostwritten by plaintiff's lawyers?

MR. MOSKOW:  Objection to form.

A.  I'm not sure what the definition of
ghostwritten means, but I don't know who wrote
the article.

Q.  Okay.  Can you rule out that
plaintiff's lawyers contributed to the writing
of the BMJ article?

A.  I can't --

MR. MOSKOW:  Objection to form.

A.  Can't rule out anything.

Q.  Look with me, if you would, at page
15.

MR. SCHMIDT:  Off the record.

(Discussion held off the record.)

BY MR. SCHMIDT:

Q.  Look with me, if you would, at page
15.  And do you see under 1.5 about five lines

HARVEY

down it says therapeutic drug monitoring, TDM?

A.  I see 1.5.

Q.  If I can just point you to it.  Do
you see right here where it defines TDM as
therapeutic drug monitoring?

A.  Yes.

Q.  Look with me, if you would, at page
66, please.  And you will see that the top half
of this page falls in one of these assessment
sections where it's the EMA writing.

Do you see that?

A.  Yes.

Q.  Let's look at the second paragraph.
EMA writes:  "It is considered that currently,
the benefit/risk profile of Pradaxa is
positive."

Do you see that?

A.  Oh, on page 66?

Q.  Yes, sir.

A.  Okay.

Q.  Second paragraph, first sentence.

A.  Okay, yes.

Q.  Is that a true statement, that the
benefit/risk profile of Pradaxa treatment is

HARVEY

1 positive?
2     A.  Can you clarify what context that is
3 in, based upon the RE-LY data?  I --
4     Q.  On the data we know today.  Do you
5 believe that the benefit/risk profile of
6 Pradaxa is positive?
7     A.  I -- I can't answer that because it's
8 very general and I would need to know the
9 specifics of the question.
10     Q.  Well, you agree with me that a drug
11 should not be on the market unless it has a
12 positive benefit/risk profile; right?
13     A.  Correct.
14     Q.  Are you arguing that Pradaxa should
15 not be on the market?
16     MS. PRESBY:  Objection.
17     A.  No.
18     Q.  Do you agree with me that Pradaxa has
19 a positive benefit/risk profile?
20     A.  In general, yes.
21     Q.  They go on to say:  "The size of the
22 patient populations necessary to enter into
23 studies investigating therapeutic dose
24 monitoring of Pradaxa is regarded as too large

HARVEY

1 compared to the theoretical improvement in the
2 benefit/risk profile to justify such studies."
3     Do you see that?
4     A.  Uh-huh.
5     Q.  Do you agree with that statement?
6     A.  No, I don't.
7     Q.  They go on to say:  "Without such
8 studies, the scientific basis for making
9 routine therapeutic drug monitoring
10 recommendations is too weak."
11     Do you see that?
12     A.  Yes, I do.
13     Q.  Do you agree with the European FDA
14 that without studies, the scientific basis for
15 making routine therapeutic drug monitoring
16 recommendations is too weak?
17     MR. MOSKOW:  Objection to form.
18     MS. PRESBY:  Objection.
19     A.  Yeah, no, I don't agree with that
20 either.
21     Q.  They go on to say:  "It is maintained
22 that coagulation tests," and then they list a
23 bunch, "are useful in situations such as
24 emergency surgery or uncontrolled major

HARVEY

1 bleeding as listed in the current SMPC."
2     Do you see that?
3     A.  Yes, I do.
4     Q.  Do you agree that those are the
5 situations where coagulation tests are helpful:
6 Emergency surgery or uncontrolled major
7 bleeding?
8     MR. MOSKOW:  Objection to form.
9     MS. PRESBY:  Objection.
10     A.  I agree that that's a subset of where
11 testing should be done.
12     Q.  But not all?
13     A.  Not all.  No, I think it's not
14 comprehensive.
15     Q.  And finally, it says, EMA says:  "It
16 is agreed that routine therapeutic drug
17 monitoring of Pradaxa should not be
18 recommended."
19     Did I read that correctly?
20     A.  Yes.
21     Q.  Do you agree with that?
22     A.  And based upon my distinction between
23 routine monitoring and dose adjustment testing,
24 I would -- I would agree with that statement.

HARVEY

1     Q.  Okay.  Look with me, if you would, at
2 page 93 of your report.  We're going to talk
3 now about the reversal agent, if that's okay.
4     On page 93 you talk about the
5 reversal agent; correct?
6     A.  Correct.
7     Q.  And you have some language that I
8 wanted to ask you about.  I got the wrong page.
9 Go with me to 92, please.  There was a period
10 of time between -- let me just strike that.
11     There's now a reversal agent for
12 Pradaxa; correct?
13     A.  Correct.
14     Q.  It's called Praxbind; correct?
15     A.  That's my understanding.
16     Q.  It's an incredible product; correct?
17     MS. PRESBY:  Objection, form.
18     MR. MOSKOW:  Objection to form.
19     A.  Can you help me define incredible?
20     Q.  In whatever sense you would use it,
21 do you think it's an incredible product?
22     MR. MOSKOW:  Objection to form.
23     MS. PRESBY:  Objection.
24     A.  It -- it was approved by FDA under

HARVEY

accelerated -- accelerated review and it was a
novel BLA and so it was a high priority for
FDA's approval.

Q.  Do you think it's a highly valuable
product?

MS. PRESBY:  Objection, form.

A.  Yes, I do.

Q.  Do you think Pardaxa's a highly
valuable product?

MR. MOSKOW:  Objection to form.

A.  I think Pradaxa has a role in
clinical practice, and I think the approval of
the reversal agent enhances the benefit/risk of
that.  And it can be further improved with some
of these labeling changes in specific
populations.

Q.  Before Pradaxa, the only oral
anticoagulant was warfarin; correct?

A.  Correct.

Q.  And warfarin has all kinds of
problems with it; correct?

MR. MOSKOW:  Objection to form.

A.  There are problems, but clinicians
know how to manage that.  And there are

HARVEY

Coumadin clinics where it's a highly, highly
intense monitoring system.

Q.  One of the problems with warfarin is
that it has a lot of food interactions that
NOACs don't have; correct?

A.  That's correct.

Q.  And food interactions are a problem
because if you take one of those foods while
you're using warfarin, it can put you at too
much risk of bleeder stroke?

MR. MOSKOW:  Objection.

A.  That's correct.

Q.  Warfarin has an unusually large
number of other medicine interactions that can
have the same effect in terms of putting you at
too high a risk of bleed or stroke?

MS. PRESBY:  Objection.

MR. MOSKOW:  Object, form.

Q.  Correct?

A.  That's true.

Q.  And warfarin has monitoring
challenges with it; correct?

MR. MOSKOW:  Object --

A.  Correct.

HARVEY

Q.  Routine --

MR. MOSKOW:  -- form.

A.  Routine --

THE REPORTER:  I'm sorry, it's late
in the day.  There's no space between
speakers.  Start your question, make
your objection, and then the answer.
Thank you.

THE WITNESS:  And so can you
repeat?

MR. SCHMIDT:  Sure.

BY MR. SCHMIDT:

Q.  Warfarin has monitoring challenges
associated with --

A.  Yes.

Q.  -- it.

MR. MOSKOW:  Objection, form.

Q.  Okay.

A.  Yes, Coumadin has regular monitoring
so they -- they have monitoring in the truest
sense.

Q.  And you understand that warfarin
monitoring is problematic for some patients who
do not end up using a drug they might not have

HARVEY

been on because of the monitoring requirements;
correct?

MR. MOSKOW:  Objection to form.

A.  Yes, I understand that.

Q.  You also understand that even with
warfarin monitoring, a large number of warfarin
patients still end up outside the therapeutic
range at different points in time?

MR. MOSKOW:  Objection to form.

A.  Yes, I understand.

Q.  For example, do you know here in the
United States what the average percentage of
time spent by warfarin patients inside the
therapeutic range is?

MR. MOSKOW:  Object, form.

A.  No, I don't.

Q.  Would you have any reason to disagree
with it being only 55 percent of patients?

MR. MOSKOW:  Objection to form.

A.  I -- I wouldn't have any information
to judge that, given the focus of my report was
Pradaxa.

Q.  Do you agree with me that it's a
concern for warfarin parents if they're not in

HARVEY

1
2    therapeutic range in terms of either much
3    higher bleed risk or much higher stroke risk?
4        A.  Yes.
5        Q.  And even when warfarin patients are
6    in range, they still have a meaningful bleed
7    risk.
8        MR. MOSKOW:  Objection to form.
9        A.  That's my understanding of the data.
10       Q.  Okay.  And for that reason, for all
11   those reasons, there was a desire in the
12   medical community to have alternatives to
13   warfarin; correct?
14       A.  That's very much true.
15       Q.  And Pradaxa was the first successful
16   alternative to warfarin in 50 years; is that
17   true?
18       A.  So Coumadin was '54?  Pradaxa was
19   2010?  Yeah.
20       Q.  Correct.
21       A.  Yeah.
22       Q.  And Pradaxa was viewed in the medical
23   community as a substantial benefit in terms of
24   a new form of anticoagulant treatment other
25   than just warfarin; correct?

HARVEY

1
2        MR. MOSKOW:  Objection to form.
3        A.  Yes, there was initial excitement.
4        Q.  One of the reasons for that is the
5    data showed that Pradaxa 150 was significantly
6    better than warfarin at preventing strokes in
7    systemic embolisms; correct?
8        MR. MOSKOW:  Objection to form.
9        A.  That's what's reported in the RE-LY
10   publication and in the FDA reviewed sponsors
11   label.
12       Q.  You don't take issue with that being
13   a fact, do you?
14       A.  No, I don't.
15       Q.  One of the reasons for excitement
16   about Pradaxa being approved was that it had
17   lower rates of life-threatening bleeds and
18   lower rates of brain bleeds, intracranial
19   hemorrhage; correct?
20       A.  That's --
21       MR. MOSKOW:  Objection to form.
22       A.  Yes.
23       Q.  Those are all wonderful things;
24   right?
25       MR. MOSKOW:  Objection to form.

HARVEY

1
2        A.  Yes, in the data set, yes.
3        Q.  And you don't take issue with any of
4    those facts, do you?
5        MR. MOSKOW:  Objection to form.
6        A.  No, I don't.
7        Q.  Okay.  So in that regard, do you
8    review -- do you view Pradaxa as a meaningful
9    advancement over warfarin --
10       MR. MOSKOW:  Objection to form.
11       Q.  -- in terms of statistically reducing
12   stroke risk, statistically reducing the risk of
13   life-threatening bleeds, and statistically
14   reducing the rate of intracranial hemorrhage?
15       MR. MOSKOW:  Objection to form.
16       A.  For the average patient, yes.
17       Q.  Now, the reason I -- I -- I went
18   through that is it took Boehringer time to
19   develop Pradaxa; correct?
20       A.  That's my understanding from the
21   documents.
22       Q.  And it took -- and -- and -- and just
23   focusing on Pradaxa, you understand that the
24   data tells us there's a lot of money spent on
25   trying to invent medicines that just don't end

HARVEY

1
2    up working; right?
3        MR. MOSKOW:  Objection to form.
4        A.  I don't have any direct information
5    about that.
6        Q.  Well, you must -- you've quoted me a
7    lot of pharma data.  You must have seen pharma
8    data on the amount of money that's invested and
9    the amount of efforts that don't pan out before
10   you actually discover a medicine that works.
11   Right?
12       A.  That's true.
13       Q.  And I think the data I've seen,
14   it's -- it's -- it's not one to one.  Many more
15   medicines fail than work; right?
16       MR. MOSKOW:  Objection to form.
17       A.  That's correct.
18       Q.  And in this space specifically, did
19   you know that there were other attempts to
20   introduce alternatives to warfarin before
21   Pradaxa that just didn't work?
22       A.  I have read about that.
23       Q.  It was -- I think the period of time,
24   like the 50 years that passed between warfarin
25   being invented and Pradaxa being invented, was

Page 370

HARVEY

1
2 not the scientific world being lazy and not
3 looking at it. It was a hard thing to come up
4 with an alternative; correct?
5      A. I think that's a valid
6 interpretation.
7      Q. And with respect to Pradaxa,
8 Boehringer could not be sure that Pradaxa would
9 be this, you know, one-in-whatever medicine
10 that actually works as opposed to one of the
11 ones that failed until they saw the results of
12 the RE-LY data; correct?
13      MS. PRESBY: Objection, form.
14      A. By definition, a development
15 program's driven by the data.
16      Q. Right.
17      A. So that's true.
18      Q. Do you know when Pradaxa -- when --
19 when -- when the scientists at Boehringer first
20 learned the results of the RE-LY data?
21      A. I don't know the exact date. I know
22 it was sometime before submission of the NDA so
23 it would have been sometime before 2010 but I
24 don't remember exactly when the scientists
25 saw -- because there was topline data, there

Page 371

HARVEY

1
2 were detailed data, so that was over a period
3 of time.
4      Q. Are you aware that it was a year or
5 two before the launch date?
6      A. That was my understanding. I mean,
7 that's based upon what I read.
8      Q. And in the testimony you read, did
9 you capture that sense of how amazed people
10 were by the data, by how good it made Pradaxa
11 look?
12      MR. MOSKOW: Objection to form.
13      A. Well, it's hard reading documents to
14 sense amazement.
15      Q. Okay, fair enough.
16      Are you aware that the RE-LY study
17 was designed only to show that Pradaxa was not
18 inferior to warfarin?
19      A. Well, it was my understanding that
20 there was a initial test for noninferiority but
21 then a secondary test for superiority, which it
22 then accomplished --
23      Q. And the --
24      A. -- for the 150 dose.
25      Q. Did you know that the trial design

Page 372

HARVEY

1
2 was a noninferiority trial?
3      A. Well, that's -- the primary end point
4 was noninferiority, yes.
5      Q. Did you -- did you know everyone was,
6 in fact, surprised that 150 was, in fact,
7 superior?
8      MR. MOSKOW: Objection to form.
9      A. Yeah, I don't know what everybody
10 thought. And there would be no way for me to
11 know level of surprise in the company.
12      Q. Did you know the FDA was pleasantly
13 stunned by the results and communicated that to
14 Boehringer?
15      MR. MOSKOW: Objection to form.
16      A. I had access to the documents, and I
17 think FDA was looking for treatments that went
18 beyond the Coumadin paradigm, and I think they
19 were encouraged.
20      Q. That's one of the reasons they had
21 been such supporters of Pradaxa; right?
22      MR. MOSKOW: Objection to form.
23      A. That's my understanding.
24      Q. And, in fact, did you see the
25 testimony from Dr. Reilly that, when they gave

Page 373

HARVEY

1
2 the results of the RE-LY study to the FDA, the
3 FDA said this changes everything?
4      A. I've seen the quotes.
5      Q. Do you have any reason to take issue
6 with that?
7      A. I would have no independent
8 information to doubt that.
9      Q. From your understanding of what the
10 RE-LY study shows about Pradaxa versus warfarin
11 would you agree with that characterization, it
12 changes everything --
13      MR. MOSKOW: Objection to form.
14      Q. -- in terms of the superiority on
15 bleeds, on strokes, on life-threatening bleeds?
16      MR. MOSKOW: Objection to form.
17      Q. Would you agree with that?
18      A. If it -- meaning -- if -- if you
19 mean -- and please clarify -- it changes
20 everything because now we have a medicine that
21 doesn't need monitoring, I disagree with that.
22      I think it was a incremental
23 advancement. It certainly was superior to
24 Coumadin and certainly was a therapeutic
25 advancement over Coumadin, but I think the goal

HARVEY
1
2  of having no one monitored might have been an
3  overreach.
4          And I think some of what I have been
5  talking about for labeling changes is to make
6  what is a good product and a advance even
7  better from a benefit/risk standpoint.
8          Q.  So let me see if I understand what
9  you just said.
10         You agree with me that from a medical
11 standpoint, Pradaxa, even without monitoring,
12 is a meaningful improvement over warfarin.
13         A.  Yes.
14         Q.  Do you know whether -- let's go to 92
15 in your report.
16         You say BI should have done one of
17 three things regarding the reversal agent down
18 at the bottom of the page in 252.  "I believe
19 BI should have done one, some, or all of the
20 following."
21         Do you see where I'm reading?
22         A.  Yes.
23         Q.  And the first thing you say they
24 should have done is they should have informed
25 the FDA of the proof of reversal agent concept

HARVEY
1
2  immediately.
3          Do you see that?
4          A.  Yes.
5          Q.  What is the proof of reversal agent
6  concept?
7          A.  Well, it was my understanding that
8  the information that that initial work had been
9  done and that there was a belief that creating
10 a reversal agent was feasible, that information
11 wasn't communicated to the FDA.
12         So as part of their NDA review, they
13 did not know that there was the potential for a
14 reversal agent to be developed at that time
15 that they were reviewing the NDA.
16         Q.  What's your understanding of the
17 first time at which BI communicated to the FDA
18 that there was a potential reversal agent?
19         A.  My understanding was that it was
20 after approval, but I don't have specifics.
21         Q.  Do you rule out that they informed
22 the FDA before approval that they were making
23 efforts to develop a reversal agent?
24         A.  I don't -- don't rule it out.
25         Q.  Second thing you say is that they

HARVEY
1
2  should have redoubled efforts in 2009 to bring
3  Praxbind to market as soon as possible.
4          Do you see that?
5          A.  Yes.
6          Q.  Have you studied the efforts that
7  Boehringer made in 2009 on Praxbind?
8          A.  I -- I reviewed the document.
9          Q.  Did Boehringer make efforts to
10 develop Praxbind in 2009?
11         A.  They appeared to make some efforts
12 that then accelerated later on.
13         Q.  You say a little later in here --
14 actually, maybe you say it a little earlier in
15 here -- that -- it's on page 91 at paragraph
16 247, you say in 2014 there was a direction that
17 the reversal agent was the highest priority
18 project for the company.
19         Do you see where I'm reading?
20         A.  Yes, I do.
21         Q.  Are you telling me that that
22 statement was not made before 2014?
23         A.  I'm sorry, can you clarify which
24 statement wasn't made?
25         Q.  The one about the reversal agent

HARVEY
1
2  program being the highest priority project for
3  the company.
4          Do you know if it was the highest
5  priority project for the company at any point
6  before 2014?
7          A.  The only documentation that I saw
8  that it was the highest priority was in
9  August -- was in 2014.  So I didn't see that in
10 anything stated that I read that that was the
11 case in 2008 or 2009.
12         Q.  Okay.  Do you know that -- do you
13 rule that out that that was the case before
14 2014?
15         A.  I can only refer to the documents
16 that I studied and so if there was a document
17 that I didn't see then that -- that is
18 possible.
19         Q.  Go with me, if you would, to the
20 third option you give, which is they should
21 have delayed marketing of Pradaxa until
22 Praxbind -- until it could be marketed with a
23 reversal agent.
24         Do you see that?
25         A.  Yes.

Page 378

HARVEY

Q. Is it honestly your opinion that, given the advancement that Pradaxa represented without a reversal agent over warfarin, they should have kept that advancement off the market until they had a reversal agent?

MR. MOSKOW: Objection to form.

Q. Is that your testimony?

A. I think -- yes, yes, it is, because the addition of a reversal agent has enhanced the benefit/risk. And it's enhanced it now, which means it would have enhanced it then.

Q. Okay. And I get your point, and I'll talk about it in a minute. But it would have been nice if it would be have been faster; right?

You made that point; right?

A. Correct.

Q. My question is this. Given where Pradaxa -- I'm sorry, given where the Praxbind development was in 2010, would it have been ethical for BI to keep Pradaxa off the market for four years and subject patients to only warfarin while it completed development of Praxbind?

Page 379

HARVEY

MR. MOSKOW: Objection to form.

A. Well, we have documented I'm not an ethicist.

Q. Okay. Let me ask the question differently. Would it have been the right thing in your view to do, consistent with patient safety, for Boehringer to say we don't have a reversal agent yet, let's keep this product off the market until we develop one and subject patients to a product that, among other things, cause -- results in more strokes, more major bleeds, more intracranial hemorrhage, more drug interactions, more food interactions, more monitoring?

MR. MOSKOW: Objection to form.

A. Well, I -- I think --

Q. Would that be appropriate?

A. I -- I think that my -- the way I wrote it was that when it was made a top priority in 2014, the amount of time between then and the time it was submitted and approved was a fairly short period of time.

Q. Wait a second.

A. And -- and if that emphasis had been

Page 380

HARVEY

placed back in 2008, it would have been available to be submitted to FDA at the same time as the NDA so there would have been no delay in the NDA because the BLA would have been developed because they were able to do it from 2014 to approval and that sort of intensity, if it had been done earlier, would have led to there not being a delay.

Q. Is it really your testimony that had they just applied that intensity in 2009, they could have gotten it approved within a year?

A. I'm saying that --

Q. Is that your testimony, sir?

A. No, that's not my -- that's not accurate.

Q. I'll ask a different question.

Are you aware that there were substantial efforts undertaken regarding the reversal agent in -- between 2019 [sic] and 2014 that allowed for that quick approval after 2014?

MR. MOSKOW: Objection to form.

A. I -- I -- I read about that in the documents. There -- there were -- the -- the

Page 381

HARVEY

fact that such amazing progress was made once the energy was focused on it, one cannot help but think that if that sort of energy had been placed earlier, it would have led to an earlier approval.

Q. How many -- how many scientists were focusing on the reversal agent in 2009?

A. I don't know.

Q. 2010?

A. Is part of your question is the number of scientists equal to the number of --

Q. Just asking how many scientists were working on the reversal agent in 2010.

A. I don't know.

Q. Do you know the number of scientists who were working on the reversal agent at any point in time?

A. No, I don't.

Q. Do you know the amount of money that Boehringer was spending researching the reversal agent at any specific point in time?

A. No, I don't.

Q. Do you know the amount of patients or animals that were being studied by Boehringer

HARVEY

1
2  at any specific point in time?
3      A.  No, I don't.
4      Q.  How many animal studies were
5  conducted on the reversal agent?
6      A.  I don't know.
7      Q.  When were they conducted?
8      A.  I don't know.
9      Q.  How many human studies were
10  conducted?
11      A.  I don't know.
12      Q.  When were they conducted?
13      A.  I don't know.
14      Q.  Okay.  How much engineering -- you --
15  you -- you talk in your report about there were
16  mouse antibodies.  I'm looking at page 90.
17  There were mouse antibodies identified in 2002.
18      Do you see where I'm reading?
19      A.  Yes.
20      Q.  Is that accurate?
21      A.  Based upon the documents I saw, yes.
22      Q.  Are you sure it was mouse antibodies
23  as opposed to rabbit antibodies?
24      A.  I didn't see -- let's see.  I didn't
25  say what species.

HARVEY

1
2      Q.  First line of 246:  "BI identified
3  mouse antibodies" --
4      A.  A mouse antibody.
5      Q.  -- "in 2002."
6      A.  My intent was to reflect what was in
7  the documents.
8      Q.  That's not my question.
9      Do you know if BI had mouse
10  antibodies to dabigatran that it worked off of
11  in 2002 or rabbit or any other species of
12  animal?
13      A.  I --
14      MR. MOSKOW:  Objection to form.
15      A.  I don't remember the details.
16      Q.  Okay.  In fact, if I tell you you're
17  wrong about referencing mouse antibodies in
18  2002 do you have any reason to disagree with
19  me?
20      MR. MOSKOW:  Objection to form.
21      A.  I -- no, I don't.
22      Q.  Let me ask you some general
23  questions.  And we're late in the day.  I'm
24  going to read to you from a declaration I've
25  seen in the AbbVie case where you worked on a

HARVEY

1
2  biologic issue?  Do you remember being asked
3  about that earlier in the day?
4      A.  Yes.
5      Q.  Do you agree with me that developing
6  an -- strike that.
7      Praxbind is a biologic product;
8  right?
9      A.  Yeah, BLA.
10      Q.  But Praxbind itself is a biologic;
11  right?
12      A.  Yes.
13      Q.  That means it's developed from -- I'm
14  going to say this really poorly -- biological
15  material like cells or something like that as
16  opposed to a chemical; correct?
17      MR. MOSKOW:  Objection to form.
18      A.  Correct.
19      Q.  Do you agree with me that developing
20  an investigational biologic product is neither
21  routine nor predictable?
22      A.  I agree.
23      Q.  Do you agree with me that biologic
24  product development is a lengthy, complex
25  product that remains unpredictable even for

HARVEY

1
2  biologics where there's encouraging safety and
3  efficacy data from Phase II clinical studies?
4      A.  Yes.
5      Q.  Do you agree with me that developing
6  biologics can present unique patient
7  recruitment challenges, ethical considerations
8  such as risk to patients to the extent the
9  regimen selected is unsafe and/or uneffective,
10  limited supply of investigational biologic
11  product, and significant time and resources
12  required to conduct controlled clinical trials,
13  each of which can hinder clinical trials in
14  unexpected ways?
15      A.  Yes.
16      Q.  Do you agree that manufacturing
17  monoclonal antibodies in particular is complex,
18  expensive, and time-consuming?
19      A.  Yes.
20      Q.  Do you agree with me there are
21  countless -- is -- is Praxbind a monoclonal
22  antibody?
23      A.  That was my understanding, but I --
24  I'm not -- I didn't spend a lot of time on the
25  mechanism of action.

HARVEY

1
2      Q.  Do you agree with me that even after
3   a company has conducted preliminary studies of
4   a limited number of dosing regimens in Phase II
5   trials, biologic and nonbiologic product
6   development remains unpredictable and a
7   substantial amount of additional work must be
8   completed in order to determine what, if any,
9   dosing regimen will be safe and effective?
10     MR. MOSKOW:  Objection to form.
11     Q.  Do you agree to that?
12     A.  Yes.
13     Q.  Do you agree that there are countless
14  examples of failures in late-stage clinical
15  trials for biologic and nonbiologic
16  pharmaceutical products?
17     A.  Yes, I -- I -- and how does that
18  relate to what I said --
19     MR. MOSKOW:  There's no question
20  pending.
21     THE WITNESS:  Okay.
22     Q.  This -- this antibody, whether it was
23  a mouse or a rabbit or whatever, that was,
24  quote, on the shelf in 2002 that you -- that
25  you talk about, was the -- whatever species it

HARVEY

1
2   was that was, quote, on the shelf in 2002, was
3   that the species of antibody that was
4   ultimately used in Praxbind?
5      A.  It's my understanding that it was
6   then humanized so it was a humanized antibody
7   used in Praxbind.
8      Q.  Was it humanized from the same
9   species that was on the shelf, or did they have
10  to look at other species?
11     A.  I -- I don't remember those details.
12     Q.  Do you know that, in fact, they
13  looked at multiple species before being able to
14  settle on the right species?
15     A.  That would sound legitimate.
16     Q.  Do you know whether that's true in
17  this instance or not?
18     A.  I do not know.
19     Q.  You suggest in your report that
20  nothing was done before 2008.
21         Do you know if there were other
22  efforts other than use of an antibody to
23  develop a reversal agent?
24     A.  Can you rephrase that first part?
25  Because I -- you know, my statements in my

HARVEY

1
2   report were based upon what I read and the
3   emails so, you know, I was reporting what I
4   had --
5      Q.  Sure.
6      A.  -- seen.
7      Q.  Let me ask you, were there efforts
8   other than through use of the antibody to
9   develop a reversal agent before launch?
10     A.  I don't remember details, but
11  that's -- that sounds right.
12     Q.  Going back into the early 2000s;
13  correct?
14     MR. MOSKOW:  Objection to form.
15     A.  That's -- that certainly is
16  consistent with some of the materials I read.
17     Q.  And this specific effort regarding
18  this -- use of this antibody, did you know what
19  purpose the antibody was created for?
20     A.  You mean as -- as a reversal agent?
21  Is that what you're saying?  Or why it was
22  created originally?
23     Q.  Yeah, back in 2002.
24     A.  No, I don't.
25     Q.  Do you know that it involved a

HARVEY

1
2   substantial scientific insight that a
3   Boehringer scientist had going to a scientific
4   conference to think that you could use an
5   antibody like this as a reversal agent?
6      A.  I remember reading something,
7   something about that.
8      Q.  Okay.  Do you have any reason to take
9   issue with that proposition?
10     A.  No, I don't.
11     Q.  For example, are you aware of any
12  instance in the history of science where a
13  company has used an antibody as a basis for
14  reversing the effects of their medicine in the
15  way Boehringer did with Praxbind?
16     MR. MOSKOW:  Objection to form.
17     A.  There are some -- some -- I know of
18  some examples, and I think they're still
19  proprietary and confidential, from my time at
20  FDA.
21     Q.  Do you know of any public examples
22  where a company has been able to develop a
23  product using an antibody to reverse
24  potentially harmful effects of their medicine
25  other than Boehringer with Praxbind?

HARVEY

1
2   A.  No, I don't.
3   Q.  The ones you mentioned that are
4   proprietary and confidential, I take it those
5   have never been approved.
6       MR. MOSKOW:  Objection to form.
7   A.  That's correct.
8   Q.  And to this day, are you aware -- are
9   you aware of how quickly Praxbind works?
10  A.  I don't have any direct experience on
11  how quickly it works.  I would refer to the
12  sponsor's label.
13  Q.  Are you aware that it works in
14  minutes?
15  A.  That sounds right.
16  Q.  And are you aware of any product that
17  reverses warfarin that fast?
18      MR. MOSKOW:  Objection to form.
19  A.  As we discussed this morning, the
20  literature on Vitamin K and FFP quote longer
21  time frames than that.
22  Q.  So the answer is no, you don't know
23  of any product that --
24  A.  I don't know of any product that does
25  it quicker.

HARVEY

1
2   Q.  Is there any reversal agent at all
3   for the other novel oral anticoagulants?
4   A.  Not that I'm aware of.
5   Q.  Are you aware that there have been
6   efforts to develop reversal agents for those
7   novel oral anticoagulants?
8   A.  I'm not aware of any specific
9   efforts, but --
10  Q.  But whatever efforts there have been
11  have not succeeded to date.
12      MR. MOSKOW:  Objection to form.
13  A.  Yes, those -- that -- those have not
14  led to an FDA approval as of today.
15  Q.  Should those products be kept off the
16  market absent a reversal agent?
17  A.  Well, my -- my report focused on
18  Pradaxa so it would be outside the scope of my
19  report to comment if other products should or
20  should not be kept on the U.S. market.
21  Q.  I'm asking based on your reasoning
22  about Pradaxa and your knowledge about oral
23  anticoagulants, should the other oral
24  anticoagulants be kept off the market until
25  they develop a reversal agent?

HARVEY

1
2       MR. MOSKOW:  Objection to form,
3   asked and answered.
4   A.  When we were going over the various
5   recommendations I had, it was that, you know,
6   an acceleration of the Praxbind development
7   program to correlate with introduction of the
8   Pradaxa NDA, not at the emphasis of delaying
9   it, because nothing I said in my testimony for
10  the patent case contradicts the belief that
11  since things are expensive, then additional
12  resources do accelerate the process.
13      And I think it's quite clear in
14  industry that if you do put additional
15  resources to a project, that often speeds it
16  up.  I mean, that's sort of the mainstay of,
17  you know, industry thinking in the space.  How
18  can we accelerate the development process?  And
19  it's often with dollars and people.
20      And so if there was already maximal
21  effort, then what good would it have done to
22  say that this is now our top priority if it had
23  always been their top priority?  So that was my
24  reasoning process.
25  Q.  Okay, move to strike and note that we

HARVEY

1
2   have had another page-long answer that's --
3       MS. PRESBY:  I'm going to object to
4   that characterization.
5   Q.  -- that's arguing with -- with
6   several lines of questions back.  My question
7   is --
8       MS. PRESBY:  I object to the
9   characterization of the length of the
10  answer, by the way.  No need to
11  exaggerate.
12  Q.  My question was simply, sir, in
13  evaluating whether Boehringer acted reasonably,
14  either in the timing of the reversal agent
15  development or in the fact that there was a
16  period of time when Pradaxa was on the market
17  with no reversal agent, have you done -- have
18  you looked to the actions of other reasonable
19  pharmaceutical companies that have also brought
20  novel oral anticoagulants to market?
21      MR. MOSKOW:  Objection to form.
22  A.  That was not the scope of my report.
23  My focus was on Pradaxa and what BI did or
24  didn't do.
25  Q.  So is the answer to my question no,

HARVEY

you haven't looked at the actions of the other
companies?

A.  I haven't looked at the actions of
those other companies because that has no
bearing on FDA regulation of safety and
efficacy.  It's not comparative.

Q.  Are you offering opinions based on
what a reasonable company would do?

A.  Yes, I am, what this reasonable
company could do.

Q.  You said a moment ago that -- you
said a moment ago that the document you cite,
for the highest priority document you cite on
page 91, that that was the highest priority
project for the company.

Do you see that?

A.  Yes.

Q.  And you reference a document that
ends with the Bates number 404; correct?

A.  Yes.

Q.  And you said just now in your answer,
why would you need to say it was the highest
priority if it already was the highest
priority; right?

HARVEY

A.  If -- yes, that's correct.

Q.  Did you read that full document?

A.  Yes, I did read the document.

Q.  Okay.  Did you know that you left out
really important language in that quote?

A.  Can you clarify?  I -- I feel -- I
feel I included the language of getting the
point across that -- that perhaps prior to
that, 100, you know, maximal effort was not
being used.

Q.  Okay.

A.  And once maximal effort was used, it
led to a -- a successful product that was
approved.

Q.  Do you remember the language you
omitted from your quote?

A.  I don't remember what I omitted.
That was how many months ago?

Q.  Do you -- do -- is it your
understanding that you included the important
language in the quote?

A.  My intent was to include the
important language in the quote.

Q.  I'm going to read you the language

HARVEY

you omitted.

MR. MOSKOW:  What page?

MR. SCHMIDT:  It's page ending in
the Bates label 406.  Do you have that
there, Neal?

MR. MOSKOW:  Uh-huh.

MR. SCHMIDT:  I'm sorry, I don't
have a copy of this so I'm going to read
it and Mr. Moskow can tell me if I've
misread it.

MR. MOSKOW:  Is it all right if I
show it to the witness on the screen?

MR. SCHMIDT:  Sure.

BY MR. SCHMIDT:

Q.  Let's go to the start of this
document.  Do you see where Mr. Moskow has put
in front of you a document that the first Bates
number's the same one you cite, 404?

A.  Yes.

Q.  And this is, in fact, as you say --
well, do you -- do you know -- it says at the
top Final Minutes, IDC2, 2014.

Do you see that?

A.  Yes, I do.

HARVEY

Q.  And if you scroll down to page 406,
the last page of the document, it has decisions
and conclusions.

Do you see that?

A.  Yes.

Q.  One of the decisions and conclusions,
the third one, specifically contains that
language.  What -- what is is -- I can never say
this.  What is idarucizumab?

A.  Are you asking me a question?

Q.  Yes.  Do you know what idarucizumab
is?

A.  Well, that's the -- the monoclonal
antibody.

Q.  Okay.  That's the -- that's Praxbind?

A.  That's Praxbind.  And since it's a
-mab, M-A-B, it's a monoclonal antibody.

Q.  And it has that language you quote
about Praxbind being the highest priority
project for the company.

Do you see that?

A.  Yes, I do.

Q.  Let's look at the language you
omitted.  The language you omitted says the IDC

HARVEY

1
2  confirmed that it was the highest priority
3  project for the company; correct?
4      A.  Yes.
5      Q.  Doesn't that indicate, if you confirm
6  something, that it was already the case?
7      A.  Not if you read the second part of
8  the sentence where it says "to ensure
9  sufficient resources," because that means that
10 it may or may not have had sufficient resources
11 and planned upcoming submission.
12      So, you know, that infers that, yes,
13 they're confirming that now it's the highest
14 priority, but that doesn't mean that it was the
15 highest priority before and they want to ensure
16 that it has sufficient resources.
17     Q.  Do you know one way or the other
18 whether it was before?
19     A.  I -- I would have thought they would
20 have worded it "to continue sufficient
21 resources" if that was the case, so the wording
22 is vague.
23     Q.  Do you know one way or the other
24 whether it was the highest priority before?
25     A.  It was my impression that it was now

HARVEY

1
2  the highest priority as of 2014.
3      Q.  Do you -- do you know?
4      A.  I know -- all I know is what I've
5  read in the documents.
6      Q.  Okay.  Have you seen earlier
7  documents where they talk about it being a high
8  priority or a company priority or the funding
9  they're devoting to it?
10     A.  No, I have not.  This is the first
11 time I saw it was the highest priority, which
12 is why I made note of it and included the
13 quote.
14     THE REPORTER:  Let's take a break
15 soon.
16     MR. SCHMIDT:  We can do that now.
17     THE VIDEOGRAPHER:  We're off the
18 record at 5:35.
19 (Recess taken.)
20     THE VIDEOGRAPHER:  We are back on
21 the record at 5:51.
22     MR. MOSKOW:  I just wanted to say
23 quickly, counsel continue to work
24 together as best we're able to do.
25 We've have agreed to continue the

HARVEY

1
2  deposition beyond the 7 hours under
3  CMO-18 protocol for a reasonable period
4  to allow counsel to complete his
5  questioning but I would just note that
6  Dr. Harvey is recovering from an
7  illness, and the day has been long, and
8  he's indicated he may need more frequent
9  breaks.
10     THE WITNESS:  Thank you.
11     MR. SCHMIDT:  In our view, the
12 extra time is appropriate, but I also am
13 grateful for your professionalism in
14 offering it without -- with great
15 graciousness, as is customary from you.
16     As to how you're doing health-wise,
17 doctor, candidly, I'd forgotten that.
18 Mr. Moskow several weeks ago mentioned
19 to us that you had a health concern and
20 we had to move the deposition.
21 Obviously, we immediately agreed to it.
22 I hadn't thought of it since in terms of
23 if there was any ongoing issue.  If you
24 need a break at any time, let me know
25 immediately, for health reasons.  I will

HARVEY

1
2  squawk if you break for nonhealth
3  reasons, but I think I'm within my
4  rights to do that.  But obviously, if
5  you have a health concern, please let me
6  know.
7      THE WITNESS:  Okay.
8      MR. SCHMIDT:  And we want to be
9  accommodating on that.
10     THE WITNESS:  Okay.
11 BY MR. SCHMIDT:
12     Q.  I don't want to make it sound like
13 one or two, but I have a few more topics to
14 cover that I think will be discrete and
15 individually reasonably quick, and I want to
16 walk through them.
17     On page 24 of your report carrying
18 over to page 25, you state that the current
19 label does not adequately warn or quantify the
20 bleeding risk in specific subpopulations.
21     Do you see that?
22     A.  Yes.
23     Q.  And you identify age greater than 80,
24 mild and moderate renal impairment, weight less
25 than 50 kilograms, and concomitant medications,

HARVEY

1
2  e.g., SSRIs.
3        Do you see that?
4     A.  Yes.
5     Q.  What should the label say about
6  SSRIs?
7     A.  Could you give me a context of what
8  you're -- what you're saying or what you're
9  asking?
10    Q.  You say the label does not adequately
11 warn of specific issues, and one of them is
12 SSRIs.
13       What should the label say about
14 SSRIs?
15    A.  So you had me looking at table 10?
16    Q.  No, no, no.  Look at the paragraph
17 76.
18    A.  Okay.
19    Q.  "As noted below, the current label
20 does not adequately warn of or quantify the
21 bleeding risk in specific populations."  And
22 then it identifies age, renal impairment,
23 weight, concomitant medications.
24       Do you see that?
25    A.  Yes.

HARVEY

1
2     Q.  And the example given of concomitant
3  medications is SSRIs.
4        Do you see that?
5     A.  Yes, I do.
6     Q.  Have you seen any studies that show
7  the effect of SSRI use on Pradaxa patients?
8     A.  I am looking to see where I got that
9  from.  So there has been a concern in elderly
10 patients that certain -- use of certain
11 medications increased their chances of falls.
12 FDA's been concerned about that, more with the
13 atypical antipsychotics, but also with other
14 centrally acting medications.
15       So I think I had used that as an
16 example just that you don't have to have a
17 strict traditional drug/drug interaction, you
18 know, like the verapamil and ketoconazole and
19 quinidine to have a concern about drug/drug
20 interactions.  And that's information I've
21 taken from my days at FDA.
22    Q.  What -- what are --
23    A.  I don't have a citation for that.
24    Q.  What are the -- what's the effect of
25 using an SSRI in a Pradaxa patient?

HARVEY

1
2     A.  I think it was more directly the --
3  it's an SSRI on an elderly patient who may
4  fall.  And then, you know, it would increase
5  their risk of bleeding, not directly to
6  Pradaxa, but to them falling and any sort of
7  anticoagulation.
8        So I didn't intend that to be
9  Pradaxa-specific, and it could have -- could
10 have had some additional description there to
11 illustrate the point.
12    Q.  Do the SSRI labels warn of risk of
13 falls in elderly patients?
14    A.  I have to go back and see what has
15 been put in the various labels.  There's been
16 discussions about that.  I need to follow up on
17 that.
18    Q.  Okay.  Do you know of any SSRI labels
19 that warn about use of SSRIs with
20 anticoagulants?
21    A.  I remember that there's a section
22 there.  I know the labels have been updated
23 over time.
24    Q.  To warn of use of SSRIs with
25 anticoagulants?

HARVEY

1
2     A.  I would have to look at those labels.
3     Q.  Does any other -- I take it the
4  concern you raise would apply, the SSRI concern
5  you raise would apply with all anticoagulants;
6  right?
7     A.  That's my understanding.
8     Q.  Do you know if any anticoagulant
9  warns -- has a warning regarding SSRIs?
10    A.  I didn't do that review.
11    Q.  Okay.  So you don't know?
12    A.  I don't know.
13    Q.  Weight, and mild and moderate renal
14 impairment.  Do you see those categories as
15 categories you identify that should have
16 warnings?
17    A.  Yes, I do.
18    Q.  Does the label currently have any
19 information on how either weight or level of
20 renal impairment impacts major bleeding risk
21 relative to warfarin?
22       MR. MOSKOW:  Objection to form.
23    A.  There is some information in the
24 label, but I -- you know, my statement was that
25 there needed to be more information.

HARVEY

1
2     Q.   And what is the more beyond what
3  exists that should be added?
4     A.   I outline --
5     Q.   With respect to mild and moderate
6  renal impairment and weight less than 50
7  kilograms.
8     A.   Well, we -- we talked about that
9  before, that weight less than 50 kilograms,
10  there's an increased risk of having a dose
11  result in high plasma levels, which increase --
12  and higher risk of -- of bleeding events.
13     Q.   What do you base that on?
14     A.   The articles that we have been
15  talking about all day.
16     Q.   I didn't see any articles that talked
17  about an increased risk of bleeding in
18  patients --
19     A.   Under 50 kilograms?
20     Q.   Yes.
21     A.   Well, it's in the documents.
22        MR. SCHMIDT:   Well, let me show you
23  a document.   Why don't we go ahead and
24  mark the 2015 label as -- exhibit what?
25  22?

HARVEY

1
2     (Harvey Exhibit No. 22 was marked for
3     identification.)
4  BY MR. SCHMIDT:
5     Q.   And look with me, if you would, at
6  figure 1 in the 2015 label, Exhibit 22.
7     A.   I'm sorry, which page?
8     Q.   Figure 1.   It's about six pages in.
9  I'm going to give you a second version.   Do you
10  see on -- do you see figure 1 in the 2015
11  label?
12     A.   Yes, I do.
13     Q.   And do you see that it reports bleed
14  data by different baseline characteristics?
15     A.   Yes.
16     Q.   Comparing Pradaxa to warfarin?
17     A.   Yes.
18     Q.   Specifically, it reports data on the
19  effect of Pradaxa on patients above
20  60 kilograms versus below.
21        Do you see that?
22     A.   Yes.
23     Q.   And there's no difference between
24  those two groups?
25     A.   And we look at the end and there's

HARVEY

1
2  only, what, 43 under 60 kilograms in the
3  Pradaxa group, and only 50 patients in the
4  warfarin group, so it's sort of underpowered.
5     Q.   Am I correct that there's no
6  difference between the two?   They have almost
7  identical point estimates?
8        MR. MOSKOW:   Objection to form.
9     Q.   .96 and .97?
10     A.   And I would say that the -- the N,
11  the numbers are small.
12     Q.   Before you get to the speech, could
13  you tell me if what I said is right, that
14  they're almost identical, over 60 kilograms and
15  under 60 kilograms?
16     A.   The -- in this -- in this
17  representation, they are similar.
18     Q.   Are you aware of any contrary data?
19     A.   I remember seeing some document that
20  discussed that patients under 50 kilograms were
21  at increased risk of bleeding.
22     Q.   Can you point me to those documents?
23     A.   No, I can't.   It's here somewhere.
24     Q.   If you look a little further down, it
25  gives data based on different levels of renal

HARVEY

1
2  function.
3        Do you see that?
4     A.   Yes.
5     Q.   And if you get below 30, there's
6  quite a dramatic difference between Pradaxa 150
7  and warfarin.
8        Do you see that?
9     A.   Yes.
10     Q.   And that's why there's a lower dose
11  recommended for patients below 30; correct?
12     A.   Yes.
13     Q.   Once you're above 30, though, again,
14  the estimates are -- are very similar.
15  1.02, .92, .90 are the different ranges above
16  30; correct?
17     A.   That's what it says.
18     Q.   Have you seen any contrary data?
19     A.   Well, I went to the core data sheet
20  on page 36.   They talk about special
21  populations and renal impairment.
22        And let me note that on figure 1
23  there were only three patients on Pradaxa with
24  a creatinine clearance less than 30.
25        And if you see, the size of the

HARVEY

1 square correlates with the number of patients
2 and so when you see a teeny tiny square, it's
3 because you don't have a very large N.
4 Q. Sir, can you answer my question now?
5 Have you seen any contrary data in terms of
6 bleed rates at patients who have mild or
7 moderate renal impairment?
8 A. In some of the documents that I've --
9 I've read.
10 Q. Can you point me to any specific
11 ones?
12 A. Do you want me to take the time to
13 find them?
14 Q. Can you do it without going through
15 all the documents?
16 A. I guess I'm confused since, you know,
17 there is information in the label about renal
18 impairment. So I understand that figure 1 is
19 figure 1, but I'm trying to reconcile that with
20 all the other information I've seen.
21 Q. Have you seen any data contrary to
22 the data in figure 1 suggesting that there are
23 notably higher bleed rates in patients who have
24 moderate or mild renal impairment versus

HARVEY

1 warfarin, or versus normal renal impairment in
2 Pradaxa patients?
3 A. Yes, I have.
4 Q. But you can't point me to that right
5 now?
6 A. I can't point you to that reference.
7 MR. SCHMIDT: Let me mark another
8 exhibit. Let's mark the launch label.
9 That will be Exhibit 23.
10 (Harvey Exhibit No. 23 was marked for
11 identification.)
12 BY MR. SCHMIDT:
13 Q. This is the label from when Pradaxa
14 first came on the market, correct, Exhibit 23?
15 A. Yes.
16 Q. Correct? This is the label from when
17 Pradaxa first came on the market?
18 A. Yes.
19 Q. And you understand from the time
20 Pradaxa has first come on the market that the
21 label has warned of the risk of bleeding for
22 older patients?
23 A. Yes.
24 Q. For example, under section 6.1 --

HARVEY

1 A. Okay, I'm there.
2 Q. -- under the table 2 there's a
3 reference to the risk of major bleeds being
4 similar, with the exception of age, where there
5 was a trend towards a higher risk of bleeding.
6 Do you see that?
7 A. Yes.
8 Q. And if you continue on the next page
9 in section 8.5, Geriatric Use, it says the risk
10 of stroke and bleeding increases with age.
11 Do you see that?
12 A. Yes.
13 MR. MOSKOW: Objection to form.
14 A. Yes.
15 Q. And then there's a medication guide
16 attached to the Pradaxa label; correct?
17 A. Yes.
18 Q. And the medication guide says you may
19 have a higher risk of bleeding if you take
20 Pradaxa and are over 75 years old; correct?
21 A. Yes.
22 Q. Now, a few questions about this. Do
23 you know why -- you talk in your report on page
24 25 about the risk of bleeding above the age of

HARVEY

1 80.
2 A. Yes.
3 Q. Do you know why the age 75 was used
4 in the Pradaxa label?
5 A. Not specifically. I mean, and that
6 was -- I -- I would assume that it's related to
7 the RE-LY trial data.
8 Q. And specifically, do you know whether
9 the age of 75 was a prespecified end point in
10 the RE-LY study?
11 A. I don't remember that offhand.
12 Q. Do you know whether the age of 80 was
13 a prespecified end point in the RE-LY study?
14 A. Prespecified end point or
15 inclusion/exclusion?
16 Q. Prespecified end point.
17 A. That -- that, I don't remember.
18 Q. Does that have any implications for
19 labeling language?
20 MR. MOSKOW: Objection to form.
21 A. Well, if --
22 MR. MOSKOW: You can answer even
23 when he's not listening.
24 A. You know, if -- if you're conducting

HARVEY

1
2  a clinical trial and you don't have adequate
3  number of patients in those various age groups
4  it's very difficult to make recommendations
5  about those age groups if you haven't
6  adequately studied them.
7      Q.  Do you know if there was adequate
8  data on patients 80 and above to justify a
9  warning about patients 80 above as opposed to
10 75 and above?
11     A.  I don't know the details of that
12 data, but the FDA criteria for warning is not
13 the same as the FDA criteria for an efficacy
14 claim; and therefore, the lack of data doesn't
15 necessarily imply that you can't make a warning
16 of a population.
17     Q.  And so if you come back to my
18 question, do you know if there was enough data
19 to justify a warning for patients 80 and above
20 in the RE-LY study as opposed to the --
21     MR. MOSKOW:  Objection.
22     Q.  -- the warning that was given for
23 patients 75 and above?
24     A.  I don't remember the details of 75
25 versus 80.  I mean, they're both elderly

HARVEY

1
2  population; they're both Medicare population.
3  I -- I don't know why that distinction was
4  drawn.  And practically, you know, the more
5  conservative approach would be to use the 75
6  age cutoff.
7      Q.  Conservative in a good way?
8      A.  Conservative in a good way.
9      Q.  Okay.  So you don't take issue with
10 using a 75 cutoff versus an 80 cutoff?
11     A.  No, I don't.
12     Q.  And you do take issue with one thing
13 that I want to ask you about.  On page 26, you
14 say -- you go over that language you and I just
15 talked about and you say to the extent that the
16 label references a trend toward a higher
17 incidence of major bleeding in patients 75
18 years old and older in section 6.1, this
19 statement is immediately contradicted in label
20 section 8.5, Geriatric Use.
21     Do you see that?
22     A.  Yes, I do.
23     Q.  So let's look at the language again
24 one more time that you're talking about.  Let's
25 look at the 6.1 language in Exhibit 23 under

HARVEY

1
2  table 2.  It says:  "The risk of major bleeds
3  was similar with Pradaxa 150 milligrams than
4  warfarin with the exception of age, where there
5  was a trend towards a higher incidence of major
6  bleeding on Pradaxa for patients 75 years or
7  older."
8      Do you see that?
9      A.  Yes, I do.
10     Q.  As far as you know, is that factually
11 accurate, based on the data as it existed then?
12     A.  Yes, that's my understanding.
13     Q.  We then go to the statement you say
14 is contradictory, section 8.5.  The first
15 sentence gives data on how many patients in
16 RE-LY were in different age groups.
17     Do you see that?
18     A.  Which heading?
19     Q.  Under Geriatric Use, 8.5.
20     A.  Yes.
21     Q.  Where it talks about 82 percent of
22 patients being over 65 and 40 percent being
23 over 75.
24     A.  Correct.
25     Q.  Is that statement accurate as best

HARVEY

1
2  you know?
3      A.  Yes.
4      Q.  It then says:  "The risk of stroke
5  and bleeding increases with age."
6      Is that a true statement?
7      A.  Yes.
8      Q.  "But the risk/benefit profile is
9  favorable in all age groups."
10     Is that a true statement?
11     A.  It depends on how much the stroke and
12 the risk of stroke and bleeding increases with
13 age.  It depends on how much it increases
14 because if it increases to a great degree, then
15 it's no longer a favorable benefit/risk
16 profile.  And the extent of that increase isn't
17 fully characterized.
18     Q.  Let's take an age group 90 and above.
19 If there were data showing that the
20 risk/benefit profile was not favorable for
21 patients 90 and above, should be
22 contraindicated in those patients; right?
23     A.  Or there should be a warning that it
24 should not be used.
25     Q.  Have you seen data that leads you to

HARVEY

believe that the risk/benefit profile is
unfavorable for Pradaxa 150 in any age group?

A.  My concern is that there isn't
adequate data, let's say, for 90 and above in
order to assure that that still has a favorable
benefit/risk profile --

Q.  Okay.

A.  -- given that we know that bleeding
risk increases with age.

Q.  Come back to my question, please.

Have you seen data that indicates to
you that any specific age group, Pradaxa has as
unfavorable benefit/risk profile?

A.  No, I've not seen clinical data that
shows that.

Q.  Look with me at page 40 of your
report.  On page 40 of your report in paragraph
116 you cite a document saying that the net
clinical benefit in subjects over 80 years is
marginally in favor of warfarin.

Do you see that?

A.  Yes.

Q.  Do you know how net clinical benefit
was calculated in that -- as used in that

HARVEY

statement?

A.  No, I don't.

Q.  Do you know generally how net
clinical benefit's calculated?

A.  I don't -- I don't have the details
right here.

Q.  Do you -- do you know that net
clinical benefit calculations of this type
involve assigning a specified weight to strokes
and a specified weight to go bleeds and then
running a formula?

A.  I know that the -- the folks in drug
safety do the number of patients needed to
treat versus the number of patients needed to
harm and come up with it that way.

Q.  Do you understand this to be a drug
safety calculation as opposed to a medicine
calculation?

MR. MOSKOW:  Objection to form.

A.  I don't understand the difference.

Q.  You understand that Boehringer has a
drug safety department; right?

A.  Yes.

Q.  And they're the department that's

HARVEY

responsible for something called
pharmacovigilance; right?

A.  Correct.

Q.  That involves monitoring information
that's generated in the real world from the
drug; right?

MR. MOSKOW:  Objection to form.

A.  Yes.

Q.  Including case report information
where people call up and report events to the
company; is that right?

A.  Correct.

Q.  Are you aware of -- and -- and -- and
companies like Boehringer have an obligation
under FDA rules to submit that data or certain
forms of that data that they get to the FDA;
right?

A.  Correct.

Q.  They have an obligation to submit
certain case reports; correct?

A.  Yes.

Q.  Then they have the obligation to do
periodic filings with the FDA on different
safety issues.

HARVEY

A.  That's right.

Q.  And those filings are called PSURs or
PSURs; right?

A.  Correct.

Q.  And you've seen that Boehringer made
those filings; right?

A.  Correct.

Q.  Both individual case reports and
PSURs or PSURs; correct?

A.  That -- that's not been an issue in
my report that reports were not filed.

Q.  And that's -- that's what I wanted to
ask you.  Did you see any -- any
pharmacovigilance data that Boehringer was
required to submit that it did not submit?

A.  That would -- I did not find that in
my review.

Q.  Okay.  So let's go back to this
example, this net clinical benefit statement.

Do you know the specific formula that
was used to make that net clinical benefit
calculation?

A.  No, I don't.

Q.  Do you know if you agree with the

HARVEY

1  HARVEY
2  formula in terms of the weighting of strokes
3  and bleeds or not?
4        MR. MOSKOW:  Objection to form.
5     A.  Yeah, that's unknown.  I don't know.
6     Q.  Okay.  Let's look -- do you know what
7  else that document that you cite there says
8  about how Pradaxa performs relative to warfarin
9  in patients 80 and above?
10     A.  No, I don't.
11     Q.  Do you know if -- do you know if
12  Boehringer ultimately had the view that Pradaxa
13  was better than warfarin or was not better than
14  warfarin for patients 80 and above?
15        MR. MOSKOW:  Objection to form.
16     A.  Can you --
17     Q.  It was an inartful question.
18        Do you know if Boehringer's ultimate
19  opinion or the -- the ultimate opinion of the
20  scientists working at Boehringer was that
21  Pradaxa was or was not better than warfarin for
22  patients 80 and above?
23        MR. MOSKOW:  Objection to form.
24     A.  I don't know what the ultimate
25  opinion was, I just know what was cited in that

HARVEY

1  HARVEY
2  document, that in that specific case, they felt
3  that it was only marginally -- you know,
4  warfarin was marginally better.
5     Q.  Do you know what the ultimate opinion
6  expressed in that document was as to whether
7  warfarin or Pradaxa was better for patients 80
8  and above?
9     A.  I --
10        MR. MOSKOW:  Objection to form.
11     A.  I'm sure that the documents said that
12  Pradaxa was better.
13     Q.  Do you recall that?  Did you read the
14  full document to see that?
15     A.  I -- I -- I reviewed the document.  I
16  didn't study that in depth.  I looked at the
17  pertinent sections of the document.
18        (Harvey Exhibit No. 24 was marked for
19        identification.)
20  BY MR. SCHMIDT:
21     Q.  I'm going to pass you a document that
22  I've marked as Exhibit 24.  You'll see that
23  this is the document that you cite that we have
24  been discussing in your report.  Is that
25  correct?

HARVEY

1  HARVEY
2     A.  It's --
3        MR. MOSKOW:  It's an excerpt in the
4  document.
5     A.  It's an excerpt, yes.
6     Q.  If you look at the third page of this
7  excerpt, you will see a table 46.13 with a net
8  benefit -- net clinical benefit calculation,
9  and below that is the language that you quote
10  about net clinical benefit.
11        Do you see that?
12     A.  Yes.
13     Q.  Did you read the full page here when
14  you cited this document?
15     A.  Let me look.  Yes, I did read that.
16     Q.  Okay.  So you saw that they went on
17  to conclude that dabigatran has favorable rates
18  of intracranial hemorrhage in subjects 80 and
19  above; correct?
20     A.  Yes.
21     Q.  Less than a quarter of the rates for
22  warfarin; correct?
23        MR. MOSKOW:  Objection to form.
24     A.  That's how it's described here.
25     Q.  As well as favorable rates of stroke;

HARVEY

1  HARVEY
2  correct?
3     A.  The stroke rates, yes.
4     Q.  They are actually 35 percent lower in
5  patients 80 and above; correct?
6        MR. MOSKOW:  Objection to form.
7     A.  Yes.
8     Q.  And they ultimately conclude subjects
9  at least 80 years of age have a high risk of
10  stroke or intracranial hemorrhage.
11        Do you see that?
12     A.  Yes.
13     Q.  Do you agree with that?
14     A.  Well, but then there's a section you
15  left out where the benefit is driven primarily
16  by major bleeding where the excess bleeding
17  with Pradaxa is primarily GI bleeding.
18     Q.  Move to strike as nonresponsive.  Do
19  you agree with the statement that subjects at
20  least 80 years of age have a high risk of
21  stroke or ICH, intracranial hemorrhage?
22        Is that a true statement?
23     A.  Yes, it's a true statement.
24     Q.  They go on to say: "These subjects
25  have a clear benefit with dabigatran compared

HARVEY

1
2  to warfarin in reduction of the risk of stroke
3  and of intracranial hemorrhage."
4      Did I read that correctly?
5      A.  Yes, you did.
6      Q.  Okay.  Do you -- do you agree that
7  that's a true statement based on the data
8  you've seen?
9      A.  Yes, given the context of that
10 sentence, that's a true statement.
11     Q.  And they then reach their conclusion,
12 and that's what I want to ask you if you agree
13 with.
14     "These advantages in stroke, SEE
15 prevention, and rates of intracranial
16 hemorrhage counterbalance the excess
17 extracranial bleeding."
18     Did I read that correctly?
19     A.  Which paragraph was that?  I'm sorry.
20     Q.  It's the last sentence in the
21 paragraph we were just looking at.
22     A.  Oh, okay.  You were reading up there
23 and now we're down here.
24     Q.  No, it's the same paragraph I was
25 reading from.

HARVEY

1
2      A.  Okay, yes, I see that.
3      Q.  Do you agree with that statement,
4  that the advantages that Pradaxa 150 has over
5  warfarin in patients 80 and above in stroke and
6  SEE prevention and rates of brain bleeds
7  counterbalance the excess bleeding outside the
8  brain that you see with Pradaxa 150 in patients
9  80 and above?
10     MR. MOSKOW:  Objection to form.
11     A.  Yeah, I don't agree with that just
12 because that's a value judgment about the
13 seriousness of GI bleeds versus intracranial
14 bleeds.
15     Q.  Okay.  Do you disagree with it or do
16 you just not have a view one way or the other,
17 as a general proposition?
18     A.  I think it's vague enough that I
19 would have to not have a view.
20     Q.  Okay.  You don't agree or disagree?
21     A.  It's open to interpretation, and you
22 could either agree or disagree depending on how
23 you interpret it, so I have no opinion.
24     Q.  Okay.  You talked at various points
25 in your report about assays; correct?

HARVEY

1
2      A.  Yes.
3      Q.  And I want to focus -- we've talked a
4  little bit about that, but I want to focus on
5  one specific statement you make that struck me
6  as quite strong.  And that's on page 26 in your
7  report.  I may have asked you this, and I
8  apologize.
9      Have you ever administered the APT --
10 APT -- have you ever administered the APTT
11 test?
12     MR. MOSKOW:  Objection to form.
13     You can answer.
14     A.  I have ordered, you know, a PT --
15 PTT -- APTT INR many times during internship,
16 residency, fellowship, and my hospitalist work.
17     Q.  There's data that exists regarding
18 how the APTT test performs with Pradaxa.  Are
19 you aware of that?
20     A.  Yes.
21     Q.  Have you made a point of studying
22 that data?
23     A.  I've looked at the various documents
24 and read about, you know, the differences in
25 reagents and different values.

HARVEY

1
2      Q.  And that's what I want to ask you.  I
3  have heard it said that the APTT test is more
4  reliable -- and I think you alluded to this
5  earlier -- is more reliable at certain plasma
6  concentration ranges than at others.
7      Have you heard that?
8      A.  Well, the fact that it's -- if it's
9  off the scale, so when you have a very, very
10 high APTT, it's more than likely going to be
11 off the scale regardless of the reagent and
12 therefore, that is something that's
13 reproducible across the various assays, and
14 that would correlate with a high drug level.
15     Q.  Let me ask you this.  We have been
16 talking throughout the day about different
17 plasma concentrations in terms of nanograms per
18 milliliter; correct?
19     A.  Correct.
20     Q.  And we've talked about anything from
21 0 to 100 to 200 or higher than 200, 300 and
22 above; correct?
23     A.  Right.
24     Q.  Is -- is there a particular part of
25 the range where you believe that the APTT test

HARVEY

1  is reasonably accurate?
2        MR. MOSKOW:  Objection to form.
3        A.  I believe, and it would be inferred,
4  not directly measured, that to get an APTT
5  greater than 200 or off the scale, you would be
6  up at the higher concentrations of drug in --
7  in the serum.
8        Q.  I think you're answering a different
9  question, I think, because my question's vague.
10  Let me take a measure.  You've used the measure
11  of 150 nanograms per milliliter.
12        Do you remember that?
13        A.  Yes.
14        Q.  Okay.  Can the APTT -- the APTT
15  measures it in a different way.  It measures it
16  in seconds; right?
17        A.  Correct.
18        Q.  But you're aware that the Pradaxa
19  label gives data on the APTT measurement that
20  corresponds to the 10th percentile of plasma
21  concentration exposure from RE-LY and the 90th
22  percentile; correct?
23        MR. MOSKOW:  Objection to form.
24        Q.  Are you aware of that?
25

HARVEY

1        A.  Yes.
2        Q.  Here's -- here's my question.  If you
3  have a plasma concentration of 150 or above,
4  can the APTT reliably tell you that fact if
5  you're above 150?
6        MR. MOSKOW:  Objection to form.
7        A.  If the APTT test came back off the
8  scale, you'd know you would have a high level,
9  but I don't know how much higher and it would
10  probably be significantly higher than just 150.
11        Q.  Okay.  Do you know where -- at what
12  level you can reliably tell that, in your
13  opinion, you have too much anticoagulation from
14  the APTT?
15        A.  Well, it's -- it's -- you know, if
16  it's off the scale, then you obviously have too
17  much.
18        Q.  What's off the scale?
19        A.  That's when the reading is -- when
20  they stop giving you seconds, it's just the
21  maximum reading.  And you know that's too much.
22        And then if it's -- you know, I've
23  seen things anywhere from two to three times
24  the upper limit of normal as being too much.
25

HARVEY

1        So it's a relatively crude measure,
2  but if it comes back at a very high level then
3  you know that you've got a very high amount of
4  anticoagulation on board.
5        Q.  From the time of -- of -- of
6  launch -- and if you want to look at the launch
7  label, it's Exhibit 23.  If you look at section
8  12.2, there's a paragraph, the first paragraph
9  under section 12.2, the third sentence -- I'm
10  sorry, the second sentence says in -- I'm
11  sorry, the -- the third sentence says:  "In the
12  RE-LY trial, the median," and then it says
13  "10th to 90th trial, trough APTT in patients
14  receiving the 150-milligram dose, was 52 with
15  the 10th percentile 40 and the 90th percentile
16  76 seconds."
17        Do you see that?
18        A.  Yes.
19        Q.  Do you know if you get a measurement
20  of 76 seconds on the APTT if that's reliable?
21        MR. MOSKOW:  Objection to form.
22        A.  It's my understanding that the APTT
23  test has more utility at that high end to -- to
24  eliminate individuals who are getting too high
25

HARVEY

1  a dose and that the precision closer to that
2  range of 50 to 150 hasn't -- hasn't shown as
3  much utility.
4        Q.  So if I understand what you said just
5  right, the APTT test is good at telling you if
6  you're -- if you have a high coagulation, it's
7  less precise at telling you if you have a low
8  one --
9        A.  In --
10        Q.  -- or the middle of the range?
11        A.  In theory, you should be able to tell
12  when you're too low because you haven't bumped
13  it at all.  And I would need to see the data on
14  that, so -- but a generalization would be, you
15  know, extremely high or extremely low, there's
16  utility.
17        Q.  And then it goes on to report ECT
18  data, the median with the ECT and the 10th and
19  90th percentile.  Do you see that?
20        A.  Yes.
21        Q.  And the ECT is the test you said that
22  you looked on the Internet and you saw was
23  widely available, correct, in the
24  United States?
25

HARVEY

1
2    A.  I think there was some confusion
3    about that based upon our discussion.
4       Q.  Is the ECT widely available in the
5    United States?
6       A.  The ECT is one that's available --
7    now you're getting me all confused here.
8    People do have access to it, but, you know,
9    widely available, there's some question to
10   whether, you know, I had the documentation on
11   the web to state that.
12      Q.  Okay.  Going back to page 26 of your
13   report.
14         MR. MOSKOW:  The report?
15         MR. SCHMIDT:  Yes, the report.
16      Q.  If you look at page 26, which I think
17   you have open there, you reference the fact
18   that -- you -- you talk about the APTT test and
19   you say:  "Finally, because APTT reagents vary
20   in sensitivity, recommending that physicians
21   use APTT to assess a Pradaxa patient's
22   anticoagulation status is reckless without
23   specifying which reagent should be used for
24   that assessment."
25         Did I read that correctly?

HARVEY

1
2    A.  Yes.
3       Q.  And that was the strong language
4    about reckless that I was referring to.  Here's
5    my question.  Which APTT reagents are available
6    in the United States?
7       A.  I don't know the specific reagents.
8    I -- I could look at it and, you know, I know
9    there are -- there are various ways to conduct
10   the test, but I don't remember exactly which --
11   which buffers and which -- what are the
12   specifications.
13         And when a physician orders it, they
14   check the box, they draw the blood, they send
15   it off and they give you a reference range.
16   So, you know, the actual reagents that are used
17   aren't something that's -- that's remembered
18   but you know what the range is for your
19   institution and what that number needs.  The
20   only problem is when you're trying to compare
21   from one institution to another.
22      Q.  Do you know if there's more than one
23   reagent commonly used in the United States?
24      A.  I don't -- I don't know who uses what
25   reagent and whether one's more common or -- or

HARVEY

1
2    not.
3       Q.  For example, if I told you one
4    reagent was used by 95 percent of facilities in
5    the United States, would you have any reason to
6    disagree?
7       A.  No, I --
8          MR. MOSKOW:  Objection to form.
9       A.  No, I wouldn't.
10      Q.  Do you know if there is any
11   difference between the reagent that's most
12   commonly used in the United States and the one
13   that was used in RE-LY and reported in the
14   label?
15         MR. MOSKOW:  Objection to form.
16      A.  No, I don't.
17      Q.  Do you agree with me that APTT
18   provides an approximation of anticoagulation
19   activity in Pradaxa applicant?
20      A.  It provides an approximation when
21   looking at the entire range, and it's better at
22   that high range.
23      Q.  On page 36 you quote an email
24   exchange between Dr. Clemens and Mr. Kannan.
25      A.  Which page?

HARVEY

1
2       Q.  Page 36, paragraph 106.  This is an
3    email chain about a bedside device.
4       A.  Okay.
5       Q.  Do you understand that quote?
6       A.  "Are you asking for a bedside
7    device"?
8       Q.  Yeah.  Do you see the quote, the
9    communication between Dr. Clemens and
10   Mr. Kannan?
11      A.  Starting with which word?
12      Q.  "Are you asking for a bedside
13   device."
14      A.  Yes, I do.
15      Q.  Mr. Kannan is in marketing; correct?
16      A.  That's my understanding.
17      Q.  And he's not a scientist?
18      A.  I don't know if he's a scientist or
19   not but his title is team leader, marketing.
20      Q.  Dr. Clemens is not in marketing.
21   He's in the science area; correct?
22      A.  Yeah, he's in the therapeutic area.
23      Q.  He is, in fact, a scientist; correct?
24      A.  He's a doctor.
25      Q.  Do you know that he's also a

HARVEY

1  scientist?
2       A.  How would you define scientist?
3       Q.  Someone who studies science.
4       A.  Then he is a scientist.
5       Q.  Okay.  And in this email, who is it
6  that refers to the no monitoring idea/claim?
7            MR. MOSKOW:  Objection to form.
8       A.  The team leader.
9       Q.  Dr. Clemens; right?
10      A.  Yeah.
11      Q.  And Dr. Clemens, I take it, you know
12  if you've read any of his emails, is not a
13  native English speaker; correct?
14      A.  I don't know his -- I don't know.
15  It's hard to tell from quotes.
16      Q.  If you've read four or five of his
17  emails it's pretty easy to tell.
18           MR. MOSKOW:  Object to form.
19           MR. SCHMIDT:  Mr. Moskow would
20      probably stipulate to that.
21      Q.  Do you know what he meant when he
22  said the no monitoring idea/claim?
23      A.  It appears that, you know, the
24  paradigm of which they were following is that

HARVEY

1  no monitoring is needed.  And, you know, this
2  doesn't necessarily fall within that vision.
3       Q.  Okay.  Here's I guess what I'm trying
4  to get at, doctor.  You could have a marketing
5  claim that there is no monitoring; right?
6       A.  Yes.
7       Q.  But you could also have a scientific
8  idea that monitoring is not appropriate;
9  correct?  Or required?
10           MR. MOSKOW:  Objection to form.
11      A.  The second, yeah, you could say that.
12  Yes, yes, you could.
13      Q.  And, in fact, you've seen in the
14  documents and you've seen in the testimony many
15  scientists inside Boehringer and outside
16  Boehringer who have advanced the scientific
17  view that monitoring is not required; correct?
18      A.  Yes.
19      Q.  This email reflects a scientist
20  advancing the view that no monitoring is
21  required; correct?
22           MR. MOSKOW:  Objection to form.
23      A.  I mean, this -- the document states
24  who said what and, you know, the concern is --

HARVEY

1  well, can you reask the question?
2       Q.  You see that Dr. Clemens is
3  responding to Mr. Kannan; right?
4       A.  Yes.
5       Q.  And his response indicates that it's
6  Mr. Kannan who's asked about a bedside device;
7  correct?
8       A.  Correct.
9       Q.  It's Dr. Clemens who says this would
10  go against our views on monitoring; correct?
11      A.  Yes.
12      Q.  So at least in the context of this
13  email, the person expressing the views that
14  monitoring is not required is the scientist,
15  not marketing; correct?
16      A.  Yes.  And that -- how's that
17  important?
18      Q.  He actually expresses that in
19  response to a request from the marketing person
20  about a device; correct?
21      A.  That's what appears at -- to say.
22      Q.  So the marketing concern in this
23  email is, is there a device; correct?
24      A.  Yes.

HARVEY

1       Q.  The scientific response is, that goes
2  against our views on monitoring; correct?
3            MR. MOSKOW:  Objection to form.
4       A.  So the person with the title of
5  marketing has one position; the person with the
6  title of scientist has the other.  They both
7  work for the company where the common goal is
8  to advance the company position.
9       Q.  Is one of Boehringer's goals to have
10  safe, scientifically supported medicines?
11           MR. MOSKOW:  Objection to form.
12      A.  One of the goals was to have a
13  product with no monitoring that was determined
14  to be the priority prior to seeing the RE-LY
15  data.
16      Q.  Move to strike as nonresponsive.  Was
17  one of the goals of Boehringer to have safe,
18  scientifically founded products --
19           MR. MOSKOW:  Objection to form.
20      Q.  -- as you read the documents?
21      A.  Can you clarify "safe, scientific"?
22      Q.  You don't know what that means?
23      A.  They -- they -- I know that they
24  wanted -- you know, the goal is to have a

HARVEY

1
2  product that is based upon the data and where
3  the benefits outweigh the risks.
4      Q.  Okay.  I'll take that answer.  All
5  I'm asking is in the context of this email, the
6  person asking about the device is a marketing
7  person; right?
8      A.  Yes.
9      Q.  The person saying such a device is
10 contrary to the views of -- that no monitoring
11 is required is a science person; right?
12         MR. MOSKOW:  Objection to form.
13     Q.  Correct?
14     A.  Yes.  And they all work for the
15 company.
16     Q.  But this not an instance where the
17 scientist is saying we should have a device and
18 the marketing person is saying that goes
19 against a marketing claim; correct?
20     A.  Yes.
21     Q.  You quote an email from Martin
22 Feuring on page 37.
23     A.  I -- I --
24     Q.  Do you see that?
25     A.  I haven't fully answered the question

HARVEY

1
2  because the -- instead of addressing the
3  scientific issue of the need for a bedside
4  monitoring device, the reply was this goes
5  against our no monitoring claim, not that there
6  would be no utility or no improvement in
7  benefit/risk.  So regardless of who said what,
8  the reply to a valid question was the goal of
9  no monitoring.
10     Q.  Move to strike that as nonresponsive.
11     A.  Of course.
12     Q.  Look with me, if you would, at page
13 37, please.
14         Do you see that you quote an email
15 from Dr. Feuring on page 37?
16     A.  What line?
17     Q.  107, the latter part of 107.
18     A.  Yes, I do.
19     Q.  This is him agreeing to the wording
20 that includes the word "over dosage range."
21         Do you see that?
22     A.  Yes, I do.
23     Q.  Is it important for you when you
24 quote little snippets like this or soundbites
25 like this from company documents that you

HARVEY

1
2  understand the full context?
3      A.  I agree that I -- that I do.
4      Q.  Is that important --
5          MR. MOSKOW:  Objection to form.
6      Q.  -- to understand the full context of
7  a discussion like this before quoting those
8  soundbites?
9      A.  Yes, I think it is important to
10 understand the full context.
11     Q.  What was the further discussion about
12 whether that was the appropriate wording?
13     A.  Are you questioning the quote?
14     Q.  I asked you what was the further
15 discussion that day about whether using the
16 phrase "over dosage range" was appropriate.
17         MR. MOSKOW:  Objection to form.
18     Q.  Was there --
19     A.  Would you like to show me that
20 document?  Out of 44,000 patients, you're
21 asking me what occurred just before and just
22 after a quote?
23     Q.  Did -- did you look at it?
24     A.  I did look at it.
25     Q.  So what --

HARVEY

1
2      A.  I read before and after and I chose
3  the part that I felt represented the idea that
4  I wished to represent.
5      Q.  Well, I get that.  That's clear.  I
6  want to talk about the facts, not the idea you
7  wished to represent.
8          Factually, did you look at whether
9  there was an alternate email string that had
10 further discussion about whether this was
11 appropriate wording?
12         MR. MOSKOW:  Objection to form.
13     A.  Yes, I looked at many emails.
14     Q.  Okay.  And what --
15     A.  And yet that wouldn't change what was
16 said in this email.
17     Q.  Sure.  What did the further email say
18 about whether that was the appropriate
19 verbiage, that there was an over dosage range?
20     A.  You would have to show me the email.
21 I can't remember every email that was sent at
22 BI, especially with the ultimate goal of having
23 no monitoring, so --
24     Q.  What did Dr. Feuring testify about
25 whether this was, in fact, his final views on

HARVEY

1
2  whether that was appropriate wording?
3      A.  Can you show me a document?
4      Q.  Did you read Dr. Feuring's testimony?
5      A.  I did look at Dr. Feuring's
6  testimony.
7      Q.  What do you remember him saying about
8  whether he ultimately believed that was the
9  correct verbiage, over dosing range -- over
10 dosage range?
11     A.  What I remember reading of his
12 testimony was consistent with this quote.
13     Q.  Did you see his testimony where he
14 said "I'm not a native English speaker"?
15     A.  Yes.  I'm not sure how that has a
16 bearing on it.
17     Q.  Did you -- well --
18     A.  Yes.
19     Q.  -- you've probably never written in
20 German; right?
21     A.  No, but -- but when information's
22 provided to FDA in English saying that you're
23 not a native English speaker is never the
24 excuse for having information, you know, given
25 that's not accurate.

HARVEY

1
2      Q.  I agree.
3      A.  That's not -- that's not -- whether
4  it be Japanese or whether it be any language.
5      Q.  You don't need to list every language
6  in the world.
7      A.  Okay.
8      Q.  Was this information ever provided to
9  the FDA?  It was not, was it?
10     A.  What's your question?
11     Q.  Was this verbiage about an over
12 dosage range over provided to the FDA?
13     A.  I don't -- I don't -- no, I don't
14 think it was provided in an sNDA for a labeling
15 supplement.
16     Q.  It wasn't provided in any form, was
17 it?
18     A.  Are you -- are you asking me or
19 telling me?
20     Q.  Both.
21         MR. MOSKOW:  Objection to form.
22     Q.  I'm saying it was not.  Do you agree
23 with me that it was not provided to the FDA?
24     A.  I don't know everything that was
25 provided to the FDA because it might have just

HARVEY

1
2  been provided in the IND or slipped in
3  somewhere in the annual report.
4      Q.  And, in fact, do you know that it's
5  correct that different language that was agreed
6  to by everyone who was part of this email chain
7  was, in fact, provided to the FDA?
8         MR. MOSKOW:  Objection to form.
9      Q.  That this language was corrected and
10 the correct language was provided to the FDA?
11         MR. MOSKOW:  Objection to form.
12     Q.  Do you know that?
13     A.  Provided to the FDA in what
14 submission?
15     Q.  In any form, doctor.  I'm not fussing
16 over the form, I'm just asking you.  Do you
17 know that this language that you have cited in
18 your report about an over dosage range was both
19 corrected, agreed to by every participant on
20 the email, and then, once corrected and agreed
21 to by every participant in the email, was
22 provided to the FDA.  Do you know that?
23         MR. MOSKOW:  Objection to form.
24     Q.  Just yes or no.  Do you know what I
25 said is true?

HARVEY

1
2      A.  And I know what the label looked like
3  after the process.
4      Q.  This had nothing to do with the
5  label.  It had to do with the Hemoclot
6  submission.  You know that.  Right, doctor?
7      A.  So I -- I -- I do not know what
8  specifically was submitted to FDA as far as a
9  change in wording from what was in this email.
10     Q.  Am I wrong that this wording was
11 corrected?
12         MR. MOSKOW:  Objection to form.
13     Q.  Let me ask it differently.  Am I
14 correct that this wording was corrected?  Yes
15 or no.
16         MR. MOSKOW:  Objection to form.
17     Q.  Or I don't know.
18     A.  I don't know.
19     Q.  Am I correct that it was agreed to by
20 every participant on the email?  Yes or no or
21 you don't know?
22         MR. MOSKOW:  Object to form.
23     A.  I don't know.  It was difficult to
24 tell from the email chain whether there was
25 agreement or not or people just stopped

HARVEY
1
2  responding.
3       MR. SCHMIDT:  Okay.
4       THE REPORTER:  Let's take a break.
5       THE VIDEOGRAPHER:  Off the record
6  at 6:45.
7       (Recess taken.)
8       THE VIDEOGRAPHER:  Here begins
9  media number 6 in the video recorded
10 deposition of Dr. Brian Harvey.  We're
11 back on the record at 6:52.
12      (Harvey Exhibit No. 25 was marked for
13 identification.)
14 BY MR. SCHMIDT:
15      Q.  I've marked as Exhibit 25 that email
16 chain I was alluding to, and I'll direct your
17 attention, if I may, to page 2 of the email
18 where Sandy -- Sandra White from the company
19 that makes Hemoclot or the company that was
20 helping to seek approval of Hemoclot writes to
21 Martin Feuring, Michelle Kliewer, and Andreas
22 Clemens.
23      Do you see that where she begins
24 "Martin, thank you"?  Do you see that?
25      MR. MOSKOW:  Can you orient us to

HARVEY
1
2  this?  This is a different email than
3  the one that was cited.  Is that
4  correct?
5       MR. ANDERSON:  Yes, it is.
6       MR. SCHMIDT:  It's a different
7  chain with common parts to the chain.
8       A.  "Martin, thank you."
9       Q.  Yes.
10      A.  That would be correct to say.
11      Q.  And so here at the bottom we see the
12 November 22, 2010 email from Sandra White
13 working to secure approval of Hemoclot to
14 Martin Feuring and others, and you quote
15 language from that email in paragraph 26 -- I'm
16 sorry, on page 26 of your report where she asks
17 "Would it be correct to say," and she
18 references an over dosage range; correct?
19      This is that same email, at least
20 Dr. White's portion of it.
21      A.  Yes.
22      Q.  And then, as sometimes happens when
23 you have an email, Dr. Feuring sent one
24 response back.  And what we see here is a
25 different response from Dr. Clemens.  Do you

HARVEY
1
2  see that right above the response, the -- the
3  email from Dr. --
4       MR. MOSKOW:  May I help the
5  witness?
6       MR. SCHMIDT:  Sure.
7       THE WITNESS:  I don't have any --
8       Q.  Do you see above?
9       A.  It's above?
10      Q.  Yes.  Do you see above, Dr. Clemens
11 separately responds to Ms. White in addition to
12 the email from Dr. Feuring that you cited?
13      A.  So where he says "I have wording like
14 in the label of Canada"?
15      Q.  Uh-huh.  Do you see where he
16 separately responds to her --
17      A.  Yes.
18      Q.  -- copying Dr. Feuring, copying
19 Michelle Kliewer, copying Ms. White?
20      A.  Yes.
21      Q.  And he says:  "I would like to have a
22 wording like in the label of Canada," and then
23 he quotes it.
24      Do you see?
25      A.  Yes.

HARVEY
1
2       Q.  "Patients are at a higher risk of
3  bleeding and not overdosing."
4       Do you see that?
5       A.  Yes.
6       Q.  So he doesn't want to use
7  "overdosing."  He wants to use "patients are at
8  a higher risk of bleeding"; correct?
9       A.  Yes.
10      Q.  She says above that:  "Dr. Clemens,
11 thank you, I agree."
12      Do you see that?
13      A.  Yes, I do.
14      Q.  And do you know that Dr. Feuring
15 testified that he also agreed with that
16 language --
17      MR. MOSKOW:  Objection to form.
18      Q.  -- once he saw Dr. Clemens' email
19 after his?
20      A.  Yes.
21      Q.  You did know that?
22      A.  Yeah.  And this is from
23 November 2010?
24      Q.  Yes.
25      A.  And when was the 510(k) cleared?

Page 454

HARVEY

1    Q.  My question --
2    A.  Doesn't, I -- I -- I'm not -- you're
3  not going to talk about that?  Okay.
4    Q.  In fact, I'll move to strike "and
5  this is from November 2010" because that really
6  took us off on a tangent.
7    So does this show to you that
8  Dr. White's or Ms. White's language was
9  corrected by Dr. Clemens and she agreed to the
10  correction and Dr. Feuring agreed to the
11  correction?
12    MR. MOSKOW:  Objection to form.
13    A.  In which email are you referring to?
14    Q.  Exhibit 25 where Dr. Clemens corrects
15  it and she agrees to the correction, and then
16  he agreed in his deposition to the correction.
17    MR. MOSKOW:  Objection to form.
18    A.  And -- and are we on 26 now or 37 of
19  my report?
20    Q.  We are on Exhibit 25.
21    A.  Right, but you're comparing back to
22  my report and you're asking me to look at a
23  different chain of emails regarding -- you
24  know, then what I quoted.

Page 455

HARVEY

1    Q.  Yes, and that's my point.  Did you --
2  had you seen Exhibit 25 before I showed it to
3  you just now?
4    A.  The November 22, 2010 email?
5    Q.  Uh-huh.  Other than her original
6  email had you seen Dr. Clemens' response to her
7  email and her response back saying she agrees
8  with Dr. Clemens?
9    A.  I remember reading about the -- the
10  reluctance to use the word "overdosing."
11    Q.  Did you see this email, sir?
12    A.  Yes, I believe I -- that was one of
13  the ones I saw because I was looking for it at
14  the 510(k) preIDE review.
15    Q.  And so my question is the language
16  you quote in your document in your report on
17  page 27 where she talks about an over dosage
18  range and Dr. Feuring agrees to her wording, do
19  you see that?
20    A.  Yes.
21    Q.  Do you agree with me that Dr. Clemens
22  subsequently corrected her wording to say
23  patients are at a higher risk of bleeding and
24  she agreed to it?

Page 456

HARVEY

1    MR. MOSKOW:  Objection to form,
2  asked and answered.
3    A.  And I think the focus of my quote was
4  not the word "overdose," it was the range.  And
5  so he didn't negate talking about the range, he
6  just objected to the word "overdose" and wanted
7  to substitute "higher risk of bleeding."
8    Q.  Let me try again.  Move to strike as
9  nonresponsive.  Do you agree with me that
10  Dr. Clemens corrected her overdosing wording
11  and she agreed to the correction?
12    MR. MOSKOW:  Objection.  I don't
13  want to coach the witness but you're
14  using a word in that question that I
15  think is -- is improper for purposes of
16  this line.
17    Q.  Sir?
18    MR. SCHMIDT:  For the record, the
19  witness isn't even looking at the
20  document I'm asking him about.
21    A.  No, I -- I'm waiting for you to ask
22  a -- the question again.
23    Q.  I asked the question again.  I'll ask
24  it one more time.

Page 457

HARVEY

1    A.  Okay.
2    Q.  Do you see in Exhibit 26 that when
3  Ms. White proposed language that referred to an
4  over dosage range, Dr. Clemens corrected it by
5  saying it should be "patients are at a higher
6  risk of bleeding," and she agreed to the
7  correction?
8    MR. MOSKOW:  Objection to form,
9  asked and answered.
10    A.  And what he objected to was not the
11  range but the word "overdosing," and he
12  replaced that with "higher risk of bleeding."
13    Q.  Right.  So let me ask you my question
14  again because I think you're saying what I'm
15  saying but just not answering me.
16    Do you see where she proposes
17  language that references an over dosage range,
18  he corrects it to say instead "patients are at
19  a higher risk of bleeding," and she agrees to
20  his correction?
21    MR. MOSKOW:  I'm going to object to
22  the question.  The form is wrong.  It
23  uses the word "corrected."  The witness
24  has answered it three times, and I'm

HARVEY

1
2  going to instruct him not to answer it.
3  You want to go to the judge on this one,
4  go to the judge.  He's not going to
5  answer that again.
6      MR. SCHMIDT:  Move to --
7      MR. MOSKOW:  It's --
8      MR. SCHMIDT:  -- strike all of --
9      MR. MOSKOW:  It's -- it's --
10      MR. SCHMIDT:  -- his opinions on
11  this email.
12      MR. MOSKOW:  It's almost 7 o'clock.
13  We have agreed to extra time, but for
14  you to keep asking a question with the
15  word "corrected" as opposed to "changed"
16  or "it's different" is a qualitative
17  question.  The witness has answered to
18  the best of his ability that the word
19  was changed.
20      MR. SCHMIDT:  He's agreed with me
21  about something else.  He's referred to
22  his report, and -- but I'll move on.
23  You've given your instruction.
24  BY MR. SCHMIDT:
25      Q.  Are you going to follow that

HARVEY

1
2  instruction, doctor, knowing that we will move
3  to strike any testimony based on this document?
4      Are you going to follow that
5  instruction, doctor?
6      A.  I'm going to follow the instruction.
7      Q.  Okay.  You've seen reference in
8  documents where marketing people at Boehringer
9  thought there might actually be a competitive
10  advantage to monitoring and to doing dose
11  titration; correct?
12      A.  I saw some emails that -- that by
13  enhancing the benefit ratio there actually
14  could be a market advantage.
15      Q.  Okay.  Did you ever see anywhere in
16  documents where the scientists said we think
17  monitoring makes sense, and marketing said we
18  don't want to do that from a marketing
19  perspective?
20      A.  I saw emails where the issue of
21  testing was raised and the response was it's
22  not in keeping with our no monitoring policy.
23      Q.  Right.  And I know what you're
24  talking about when you say that.  The examples
25  I've seen the people saying that are the

HARVEY

1
2  scientists.  And so come back to my question,
3  which is very precise.
4      Have you seen instances where the
5  scientists said we think monitoring is
6  appropriate, and the marketing folks said no,
7  we can't do that because of our marketing
8  goals?
9      A.  I can't answer that because I
10  disagree with the premise.  When -- when I was
11  in industry, just because someone had a certain
12  title didn't necessarily mean they'd have a
13  certain point of view.  And there was -- always
14  can be group think within an organization.  And
15  regardless of your role, you can -- you can
16  unite behind a common goal.
17      So which role the person had and what
18  they said, the thing is if they work for the
19  company and that was a belief, and every
20  attempt for testing then didn't come to
21  fruition, to me is what said something.
22      Q.  I didn't ask any of that so let me
23  ask my question.
24      Did you see an instance where
25  scientists at BI said we want to do monitoring,

HARVEY

1
2  we will recommend some form of monitoring or
3  testing, and the marketing people said no, we
4  won't do that because that's inconsistent with
5  our marketing goals?  Did you see such an
6  instance?
7      MR. MOSKOW:  Objection to form.
8      A.  So when I read the emails, I didn't
9  note whether someone was, quote, a scientist
10  or, quote, a marketing person but I did read
11  emails where the response was this is not
12  consistent with no monitoring.
13      Q.  Did you see an instance where anyone
14  expressed the view that monitoring should --
15  you saw instances -- strike that.
16      You saw instances, and we've looked
17  at some of them, where people said their
18  scientific view was that monitoring didn't make
19  sense; right?
20      A.  There were differences of opinion,
21  that's correct.
22      Q.  You saw instances where people said
23  as a scientific matter they didn't think
24  monitoring made sense; correct?
25      A.  Yes, correct.

HARVEY

1
2      Q.  And there's no one you can point me
3  to who their ultimate opinion was we should be
4  doing monitoring, correct, at BI?
5      A.  At the time of submission of the NDA?
6      Q.  Ever.  Is there any --
7      A.  Isn't Paul Reilly a member of --
8  in -- in some of the consensus work?
9      Q.  Is it your understanding from
10 Dr. Reilly's testimony that his current view is
11 that there should be monitoring?
12     A.  Oh, I was -- I was basing it based
13 upon the publications.
14     Q.  And the publications don't say there
15 should be monitoring.  They talk about whether
16 there's a hypothetical sweet spot; correct?
17     A.  Correct.
18     Q.  Okay.  So is there any BI employee
19 you've seen who their ultimate opinion after
20 analyzing the data was monitoring was
21 appropriate?
22     A.  No.
23     Q.  Is there any time you saw a marketing
24 person specifically say we can't talk about
25 monitoring because it goes against a no

HARVEY

1
2  monitoring marketing claim?
3      A.  I didn't see that in an email.
4      Q.  You talk about a prescriber guide and
5  a patient alert card in Europe on page 104 of
6  your report.
7          So before you get there, turn with me
8  to page 73.
9      A.  To?
10     Q.  73, please.  And specifically,
11 footnote 56.  In footnote 56 on page 73 you
12 make reference to a jokey email chain between
13 Allison Blouse at the FDA and Michelle Kliewer
14 at BI.
15         Do you see that?
16     A.  Yes, I do.
17     Q.  I think you've interacted with
18 Ms. Blouse; is that correct?
19     A.  Some interactions over the years,
20 likely when I was at Sanofi or Pfizer.
21     Q.  Both within and without -- both
22 inside and outside of the FDA, or just outside
23 the FDA?
24     A.  I -- I don't remember any direct
25 interactions at FDA.

HARVEY

1
2      Q.  Did you always find her to be
3  professional and appropriate in your
4  interactions with her?
5      A.  I never had any instance to question
6  that.
7      Q.  You cite some regulations and a
8  conflict of interest statement in this
9  footnote?
10     A.  Yes.
11     Q.  Are you offering any opinion that
12 either Ms. Kliewer in this email chain or
13 otherwise or Ms. Blouse did anything
14 inappropriate?
15     A.  No, I'm just providing the
16 references.
17     Q.  You're not suggesting that there's an
18 improper solicitation of employment or anything
19 like that, are you?
20     A.  I think I just wanted to put the
21 email in context.
22     Q.  In fact, I think you say this appears
23 to be innocuous banter; right?
24     A.  Yes.
25     Q.  And you stand by that statement;

HARVEY

1
2  right?
3      A.  I -- I stand by my report, that's
4  correct.
5      Q.  Page 96 -- I'm sorry, page 97, you
6  cite a quote from Dr. Valentine.
7          Do you see that?
8      A.  Which paragraph?
9      Q.  First one, 263.
10     A.  Okay.
11     Q.  Do you see where you quote an email
12 from him in the block quote?
13     A.  There might be.
14     Q.  Yes.
15     A.  Okay.
16     Q.  And you attribute to him the view
17 that there was a need to identify, monitor, and
18 titrate certain patients falling outside the
19 10th to 90th percentiles.
20         Do you see that?
21     A.  Yes.
22     Q.  Do you know that Dr. Valentine
23 actually did not endorse the 10th to 90th
24 percentile?
25         MR. MOSKOW:  Objection to form.

HARVEY

1
2     A.  Endorse in what forum and at what
3 time?
4     Q.  Ever.  Did he ever endorse the 10th
5 to 90th percentile in your -- in your -- to
6 your knowledge?
7     A.  I -- I'm quoting what I read.
8     Q.  And there's nothing in that quote
9 about the 10th to 90th percentile; right?
10    A.  Yes.  And so what's the question?
11    Q.  Have you seen him ever endorse the
12 10th to 90th percentile, as your text suggests?
13         MR. MOSKOW:  Objection to form.
14    A.  In the quote, he's talking about, you
15 know, thrombin time in high-risk patients.
16    Q.  Do you know if he ever endorsed the
17 10th to 90th percentile being the appropriate
18 range?  Yes or no.
19    A.  So your -- the question is not
20 whether or not he felt that there needed to be
21 some sort of testing, it's whether he endorsed
22 the specific recommendation of 10th to 90th?
23    Q.  Correct.
24    A.  Okay.
25    Q.  Do you --

HARVEY

1
2     A.  There -- there's --
3     Q.  -- know if he did?
4     A.  There's no way to tell from that
5 information on the page.
6     Q.  And do you know what Dr. Valentine's
7 ultimate informed view was on whether there was
8 a optimal range?
9     A.  And you mean by -- to clarify,
10 ultimate meaning is -- his affidavit, his --
11 his testimony?
12    Q.  Uh-huh, or his publications or any
13 other source.  Do you know what his ultimate
14 view after he -- I think if we look at the
15 quote you have on page 97, this sounds like
16 that kind of speculation.  "There might even be
17 a reason to tailor the dose based on
18 measurements."  Right?
19    A.  So it -- my --
20    Q.  Do you --
21    A.  My --
22    Q.  -- know --
23    A.  -- thought --
24    Q.  -- what his --
25    A.  -- was -- was that he -- he believed

HARVEY

1
2 that there was some testing that -- some
3 high-risk patients that would benefit from
4 testing.
5     Q.  My question is, do you know if that
6 was his opinion after he had finished
7 considering all the data in reaching his most
8 informed view?
9         MR. MOSKOW:  Objection to form.
10    A.  Yeah, I know that --
11    Q.  Do you know?  Yes or no.
12    A.  No, I don't.
13    Q.  Look with me, if you would, at page
14 104.  You reference something called -- in
15 paragraph 286 something in Europe called the
16 prescriber guide and the patient alert card.
17         Do you see those?
18    A.  Yes.
19    Q.  Can you point me to any specific
20 information that either the prescriber guide or
21 the patient alert card contains that is not
22 reflected in the Pradaxa U.S. label or the
23 Pradaxa U.S. medication guide?
24    A.  Yeah, I would want to look at the
25 card, but from memory, they talk about the 110

HARVEY

1
2 dose and then how to go from -- you know, go
3 from the 150 to 110.  And, of course, there is
4 no 110 dose in the U.S.  That's a glaring
5 example of a difference.
6     Q.  Fair enough.  It would be illegal for
7 the -- for Boehringer to talk about the 110
8 dose, at least in stroke prevention patients in
9 the U.S.; correct?
10    A.  Not without submitting the data that
11 FDA outlined back in 2011, that's correct.
12    Q.  Right.  And so other than information
13 they're legally barred from talking about, is
14 there any information in the prescriber guide
15 in Europe or the patient alert card in Europe
16 that is not in the medication guide or the
17 label in the U.S.?
18    A.  There were some details on that card
19 that I remember being informative that I do not
20 remember from the U.S. label.  I would have to
21 look at the actual guide.  It was a very well
22 thought out presentation and I think would have
23 provided value to the physicians there, and
24 it's unfortunate that our physicians don't have
25 that same -- same benefit.

HARVEY
1
2    Q.  Have you compared the U.S. label and
3    the U.S. medication guide to European warning
4    materials to identify information that's in the
5    U.S. materials but not in the European
6    materials?
7    A.  No, that's not been part of my
8    evaluation.
9    Q.  Okay.
10    MR. MOSKOW:  Just about done?
11    MR. SCHMIDT:  Yeah.
12    Q.  On page 98 of your report you cite a
13    letter that the FDA sent to Boehringer in May
14    of 2013.
15    Do you see that?
16    A.  Yes.
17    MR. SCHMIDT:  And why don't we go
18    ahead and mark that.  You understand
19    that that's something called a change of
20    opinion letter; right?
21    MR. MOSKOW:  Objection to form.
22    THE WITNESS:  I know it was a
23    advertising and promotion letter.
24    (Harvey Exhibit No. 26 was marked for
25    identification.)

HARVEY
1
2    BY MR. SCHMIDT:
3    Q.  Did you know it was a change of
4    opinion letter?
5    MR. MOSKOW:  Objection to form.
6    It's a "yes," "no," or "I don't know".
7    A.  I would need to see the letter.
8    Q.  I've marked as Exhibit 26 a copy of
9    the letter.  Is this, in fact, the letter you
10    cite and quote on page 98 of your report?
11    A.  I mean, it's from the division of
12    advertising and promotion.  Now, the -- their
13    intent is to change their opinion.
14    Q.  Sir, my question was just is this the
15    letter you cite at page 98 of your report?
16    A.  Yes, I -- yes, it is.
17    Q.  Is this a change of opinion letter?
18    A.  Well --
19    MR. MOSKOW:  Objection to form.
20    A.  -- so when -- when I look at letters,
21    they usually say Warning Letter or Untitled
22    Letter, Notice of Violation.  This doesn't say
23    Change of Opinion Letter.  It says it in the
24    body of the letter.
25    Q.  It doesn't say Warning Letter; right?

HARVEY
1
2    A.  It does not say Warning Letter.
3    Q.  It's not a warning letter; right?
4    A.  It's not a warning letter.
5    Q.  It's not an untitled letter; right?
6    A.  It doesn't say Untitled Letter.
7    Q.  It's a letter telling Boehringer that
8    we have thought about a view we previously
9    endorsed and we have changed our mind and we
10    want you to change your materials accordingly;
11    correct?
12    MR. MOSKOW:  Objection to form.
13    A.  That is correct, and that's how I
14    represented it in my report.
15    Q.  It would be false, though, to call
16    this a warning letter; correct?
17    MR. MOSKOW:  Objection to form.
18    A.  Yes.
19    Q.  The FDA issues warning letters up to
20    dozens a year; right?
21    Do you know how many warning letters
22    the FDA issues to companies every year,
23    ballpark?
24    A.  The number has gone down but it still
25    is certainly over a dozen in advertising and

HARVEY
1
2    promotion.
3    Q.  Did you receive warning letters when
4    you were at companies?
5    A.  Yes, I did.
6    Q.  Can you quantify how many you
7    received?
8    A.  I received -- so two when I was VP at
9    Pfizer based upon actions that took place
10    before I took over the duties.  But there were
11    two during my three and a half years and
12    nothing during my time --
13    Q.  At Sanofi?
14    A.  -- at Pfizer.  And I wasn't directly
15    involved with advertising and promotion at
16    Sanofi because that was the U.S. affiliate and
17    I was part of global.
18    Q.  Okay.  Do you take a warning letter
19    from the Food and Drug Administration
20    seriously?
21    A.  Oh, very much so.
22    Q.  Did you see any warning letters that
23    BI received for Pradaxa?
24    A.  No, I did not review any specific
25    warning letters.

HARVEY

1
2     Q.   They didn't receive any, did they?
3          MR. MOSKOW:  Objection to form.
4     A.   No, I -- I didn't see them in my --
5     my review.
6     Q.   They also didn't receive any untitled
7     letters, did they?
8          MR. MOSKOW:  Objection to form.
9     A.   No.
10    Q.   And so the jury understands, an
11    untitled letter is a way of pointing out a
12    concern that the agency has, often about
13    promotional materials; correct?
14    A.   That's correct.
15    Q.   And a warning letter is an even more
16    serious way of pointing out that concern.
17    A.   That's correct.
18    Q.   And as best you know, Boehringer
19    never received an untitled letter for its
20    promotion of Pradaxa or a warning letter for
21    its promotion of Pradaxa; correct?
22    A.   That's correct.
23    Q.   This is something different.  This is
24    saying we previously approved this messaging,
25    now we'd like you to change it, having thought

HARVEY

1
2     further about it.  You can continue giving the
3     same numbers you were giving, but we want you
4     to GI more context; correct?
5     A.   That's correct, with the -- with the
6     goal of having BI change its advertising and
7     promotion material.
8     Q.   And BI did that immediately, didn't
9     it?
10         MR. MOSKOW:  Objection to form.
11    Q.   If they didn't, we'd be looking at
12    the warning letter they received for not doing
13    so; correct?
14         MR. MOSKOW:  Objection to form.
15    A.   That would be correct.
16    Q.   And they didn't -- they changed it
17    immediately as best you know; right?
18    A.   I have no information to say
19    otherwise.
20    Q.   Okay.
21    A.   And -- and I characterized this as
22    such in my report as a a -- FDA-issued a letter.
23    Q.   Last line of questions I'm going to
24    ask you about, page 70 -- 79, you talk about
25    the Hemoclot assay.  And it goes back to some

HARVEY

1
2     of those emails with Ms. White.
3          You understand that Ms. White was not
4     a BI employee; right?
5     A.   I understand that she worked for the
6     company that was developing the assay.
7     Q.   Hemoclot is not a BI product, is it?
8     A.   That's my understanding.
9     Q.   You say on page 79, the last
10    carryover paragraph:  "In my opinion, BI did
11    not adequately support the FDA review process
12    of the Hemoclot assay in the U.S."
13         Do you see that?
14    A.   Yes.
15    Q.   Hemoclot was produced by an entirely
16    independent company; right?
17    A.   It was an -- a separate company,
18    that's correct.
19    Q.   No ownership interest by BI in either
20    Hemoclot or the company?
21    A.   I -- I don't know its -- its lineage
22    of -- as a company, but I take that at face
23    value.
24    Q.   You know Hemoclot is approved in many
25    other countries in the world, including in

HARVEY

1
2     Europe?
3     A.   Yes, that's -- I've read that.
4     Q.   Is there any support that BI provided
5     to get Hemoclot registered in any country
6     outside the U.S. that it failed to provide in
7     the United States?
8          MR. MOSKOW:  Objection to form.
9     A.   Can you rephrase the question?
10    Because --
11    Q.   Sure.
12    A.   -- it's my understanding that it's
13    still not FDA cleared in the U.S., Hemoclot.
14    Q.   Is there any support that BI provided
15    to the company making Hemoclot to help it get
16    approved in other countries that it failed to
17    provide in the United States?
18    A.   I don't know.
19    Q.   Okay.  So when you talk about not
20    adequately supporting the FDA review process,
21    you can't point me to anything BI was willing
22    to do in other countries and not willing to do
23    in the U.S.; correct?
24         MR. MOSKOW:  Objection to form.
25    A.   The medical device approval process

HARVEY

and clearance process is different in the U.S.
than in --
    Q.  Sure.
    A.  -- the rest of the world.  The 510(k)
is submitted on a 90-day clock so you --
normally doesn't take that long to get a
510(k).
    Q.  My question is simply when you fault
BI for not doing enough to help Hemoclot in the
U.S., you can't point to anything it did
elsewhere that it didn't do in the U.S.; right?
        MR. MOSKOW:  Objection to form.
    A.  That is correct.  I just know what
didn't get accomplished in the U.S.
    Q.  Right.  And do you -- do you take
issue with just the FDA didn't see the value of
Hemoclot in the way that other regulatory
agencies did?
        MR. MOSKOW:  Objection to form.
    A.  FDA standard, they need to have data
to support cutoffs, and it's my understanding
that that data was never generated and
supplied.
    Q.  Do you know if any data on plasma

HARVEY

concentration levels was given by the Hemoclot
manufacturer to the FDA?
    A.  I don't know, because that wouldn't
directly impact -- you know, they would be
looking for data generated by the machine.  If
they're looking to clear the machine, they need
data from the machine.
        Now, correlating that with drug
levels would be helpful, but that's only part
of the -- part of the process.
    Q.  Boehringer doesn't control that data
you just talked about; right?
    A.  The machine can be used by -- if --
if it's approved outside the U.S., then any
site where it's a valid machine can be -- you
can use it to test patients who are on Pradaxa.
I mean, there's a way to generate --
    Q.  Let me ask --
    A.  -- the data even if you don't own the
machine.
    Q.  Let me ask you this question.  Is
there data BI should have provided to the FDA
regarding Hemoclot that it did not that you can
point me to?

HARVEY

    A.  The data that FDA felt it needed to
clear the device didn't get supplied to FDA --
    Q.  We know --
    A.  -- to result in a clearance.
    Q.  We know that.  That's a fact.
    A.  Right.
    Q.  My question is, can you point me to
any data that BI had that would have helped
secure approval that BI did not provide to the
FDA or to Aniara, the Hemoclot manufacturer?
    A.  I don't know of data that they had
but didn't supply, it was that they didn't
generate the data.
    Q.  Okay.  On page --
        MR. MOSKOW:  I'm going to --
    Q.  The data was good enough in other
countries; right?
    A.  Okay, it -- there's a different
system for device evaluation --
    Q.  Sure.
    A.  -- in other countries.
    Q.  So it was --
    A.  You can't compare a CE mark and a
510(k) clearance.  They're apples and oranges.

HARVEY

    Q.  Last question on this.  You -- on
page 77 of your report, you recount some of the
back-and-forth between Aniara and the Hemoclot
company and the FDA, and you cite at the bottom
of the page a May 6, 2011 response from the
FDA.
        Do you see that?
    A.  Yes, I do.
    Q.  And the FDA response is:  "Be advised
a common drawback in any direct thrombin
inhibitor testing method is the lack of a
well-defined therapeutic concentration ranges."
        Do you see that?
    A.  Yes, I do.
    Q.  Is that a true statement or a false
statement, in your view?
        MR. MOSKOW:  Objection to form.
    A.  That's a true statement.
        MR. SCHMIDT:  Thank you.  That's
all I have.
        MR. MOSKOW:  Why don't we stay
where we are?  I have only a very few
questions and then we can finish up.

HARVEY

EXAMINATION

BY MR. MOSKOW:

Q.  Doctor, if you would continue to look
into the camera and talk to the jury even
though I'm right beside you, doctor, earlier
today you had a discussion concerning an email
chain between Drs. Connolly and Reilly.

Do you recall that?

A.  Yes, I do.

Q.  And you used the word "speculation."

A.  Yes.

Q.  What did you mean by the use of the
word "speculation" in that context?

A.  I used the word "speculation" in --
in sort of a vernacular sense, in sort of a
common everyday sense where the back-and-forth
between individuals.  And, you know, now as I
think about the exact meaning of speculation,
to be more precise, you know, it really wasn't
speculation because if it's a conversation
based upon data, then it really is a debate
over the interpretation of that data.  And by
calling it speculation, that would be -- you
know, it's not a fair representation of what

HARVEY

they were doing.  There was a -- a debate over
the data in a preliminary setting in order to
come to a consensus for a final conclusion.

Q.  And have you seen data in the
peer-reviewed medical literature that supports
the email communication between Dr. Connelly
and Dr. Reilly that we were just talking about?

A.  Yes, yes, I have.

Q.  And give me an example of somewhere
in the peer-reviewed medical literature where
you've seen that.

A.  Well, in -- in some of the recent
publications there's been a supporting
evidence.  And I can go through those, but it's
a -- it's --

Q.  Let me ask the question differently.

A.  Sure.

Q.  Are you aware of a paper published in
July of 2016 by Reiffel, Reilly, and others
which reflected a consensus opinion of the
Cardiac Safety Research Consortium?

A.  Yes, I do.

Q.  Is that a paper that plays a role in
the formation of your opinions?

HARVEY

A.  Yes, it does.

Q.  Why is that?

A.  Well, because it's -- it's the best
thinking at the time of the experts based upon
their data available.  And there's some
discussion about the utility of drug levels,
but part of that is just based upon at that
time being able to obtain Pradaxa drug levels
wasn't widely available.

Q.  Okay.  And does the Reiffel paper
indicate a therapeutic range for dabigatran
concentration?

A.  Well, there is that discussion.

Q.  And what do you recall that range
being?

A.  I would have to refer to the paper,
but it's certainly consistent to the 50 to 150.

Q.  And -- and if I represented to you
that on page 76 of the Reiffel paper
specifically identifies a sweet spot between 50
and 150, is that consistent or inconsistent
with your recollection?

A.  That is --

MR. SCHMIDT:  I object --

HARVEY

A.  -- consistent.

MR. SCHMIDT:  -- to the --

Q.  And is the?

MR. SCHMIDT:  -- characterization.

THE REPORTER:  I'm sorry, who's
speaking?

MR. SCHMIDT:  I objected to the
characterization.

THE REPORTER:  And now your answer,
sir?

THE WITNESS:  My recollection of
the paper was that they mentioned a
sweet spot of 50 to 150.

BY MR. MOSKOW:

Q.  And finally, doctor, you've been
asked over eight hours of questions by opposing
counsel today.  There's been some
back-and-forth.  You've reviewed 26 exhibits.
You've been asked about other items that
weren't presented to you.  Is there anything
about the proceedings today that impacts the
opinions that you've expressed in your report
that was identified as Exhibit 1 to this
proceeding?

HARVEY

1   A.  Well, I -- I wrote my report to the
2   best of my ability and the understanding that I
3   had of the various documents.  I reviewed the
4   report in preparation for today's deposition
5   and was in agreement with what I was reading.
6   And now after the -- the questioning by
7   opposing counsel, you know, I stand by the body
8   of my report and fully support the conclusions
9   I came to.
10      Q.  And, doctor, in that regard you said
11  you -- you reviewed documents.  This is a
12  120-page report.  True?
13      A.  Correct.  True.
14      Q.  In the schedules that were attached
15  you identify hundreds and hundreds of
16  documents.  Is that fair?
17      A.  Yes.
18      Q.  Are you able to estimate the number
19  of pages that you reviewed both in preparing
20  and drafting your report and in preparing for
21  your deposition today?
22      A.  It -- it would just -- you know,
23  there -- there were so many pages and so much
24  information, and you're -- it -- it's not

HARVEY

1   unexpected that it took 200 hours to review
2   materials and to write the report.
3       Q.  And I appreciate that answer.  It
4   wasn't the specific answer to my question.
5       A.  Oh.
6       Q.  I have some sympathy for some of
7   Mr. Schmidt's points earlier today.  My
8   question was more basic.
9           Are you able to estimate the total
10  number of pages that you reviewed of company
11  documents, medical literature, deposition
12  transcripts?
13      A.  As far as what?  Thousands or --
14      Q.  Yeah, thousands.
15      A.  -- tens of thousands?  It's well into
16  the thousands.
17      Q.  Okay.  My very last question.  You
18  referred to the CCDS, or company core data
19  sheet, a number of times during the course of
20  today's proceeding.  Is that fair?
21      A.  Yes.
22      Q.  Why do you keep bringing up the
23  company core data sheet?
24      A.  Well, I had a lot of experience at

HARVEY

1   Pfizer with their company core data sheet and a
2   lot of thought went into Pfizer's core data
3   sheets and the -- all of the information, all
4   the data that supported that position.  And
5   when there was a position in the company core
6   data sheet, you know, they fought pretty hard
7   to make sure that the labels around the world
8   were consistent.
9       Q.  Did you identify during the course of
10  your preparation of your report and for your
11  testimony how people at Boehringer Ingelheim
12  viewed the company core data sheet?
13          MR. SCHMIDT:  Objection, foundation
14      from this witness, speculation.
15      Q.  For example, did you -- let me
16  rephrase the question.
17          Sir, in preparing your report and in
18  preparing to testify today did you review
19  deposition testimony of Drs. Kreutzer,
20  Drs. Epperla and Dr. Barner (phonetic) as to
21  their views regarding the value of the company
22  core data sheet?
23      A.  Yes.
24      Q.  And how, if at all, did the review of

HARVEY

1   that testimony inform your belief as to the
2   importance of the core company data sheet and
3   the information that should be conveyed to
4   clinicians in the United States?
5       A.  Well, I think it's clear that there's
6   a belief that the core company data sheet is an
7   important document.
8           I guess what I have trouble
9   reconciling is that FDA gave a path forward
10  back in 2011 on how, you know, the
11  110-milligram dose could get approved, and that
12  would be a way to improve the harmony of -- of
13  the core data sheet in the U.S. label, and that
14  avenue wasn't actively pursued.
15          So although there's a -- a -- a
16  verbal belief that it's important, some of
17  their actions in trying to generate the data
18  needed for changes to the U.S. label and that
19  were, you know, then, you know, done in -- in
20  Europe, you know, that hasn't yet happened as
21  of this day.
22          MR. MOSKOW:  No further questions.

HARVEY
EXAMINATION
BY MR. SCHMIDT:
1  
2  
3  
4      Q.  Just a few follow-ups, doctor.  Did
5  you change any of your testimony from your
6  questions and answers with me based on what
7  Mr. Moskow just asked you?
8      A.  I don't think I did.  I think I -- I
9  believe in my report and stand by my
10  conclusions.
11      Q.  And you're not changing any of the
12  testimony you gave with me?
13      A.  I don't think anything I just said
14  did that.
15      Q.  Including what you said about
16  speculation?
17      A.  I don't think I was speculating when
18  I said -- you know, there are some people at BI
19  who believed that the core data sheet's
20  important.
21      Q.  And do you --
22      A.  I don't think that's -- that's --
23  and -- and so I -- I stand by that -- that
24  there are folks at BI who believe that the --
25  that's an important document.

HARVEY
1  
2      Q.  Do you stand by your testimony when
3  you and I were talking about speculation?  Yes
4  or no.
5      MR. MOSKOW:  Objection to form.
6      A.  Which -- what's -- I -- I think I've
7  said that speculation is not speculation when
8  it's based on data and that that was a
9  misrepresentation.  It wasn't -- the word, that
10  wasn't from my report.  I had used that in the
11  characterization of an email.  It probably was
12  not an accurate reflection, given the fact that
13  they were debating data in having a scientific
14  exchange, which is not speculation.
15      Q.  Okay.  So you're changing your
16  testimony on that point in response to
17  Mr. Moskow's questions?
18      A.  Yes.
19      MR. MOSKOW:  Objection to form.
20      A.  So in --
21      Q.  Yes or no?
22      A.  Yes.
23      MR. SCHMIDT:  Okay.  The Reiffel
24  paper, let's mark it so we have it in
25  the record.

HARVEY
1  
2      (Harvey Exhibit No. 27 was marked for
3      identification.)
4  BY MR. SCHMIDT:
5      Q.  We have marked as Exhibit 27 the
6  Reiffel paper you were just asked about.  Do
7  you recall being asked questions about this?
8      A.  Yes.
9      Q.  Did this paper recommend testing
10  blood levels?  Turn to page 82, please.
11      A.  That's the one I'm on.
12      Q.  In the left column right before the
13  paragraph at the bottom that begins "second,"
14  it says:  "Monitoring NOACs is a way to assess
15  drug levels, actions, or to maximize dose
16  flexibility or ultimately to benefit patient
17  care remains unproven."
18      Did I read that correctly?
19      A.  Yes, you did.
20      Q.  That's the conclusion of the article;
21  correct?
22      A.  That's in the conclusion section,
23  yes.
24      Q.  And nowhere in this article do they
25  recommend testing blood levels; correct?

HARVEY
1  
2      MR. MOSKOW:  Objection to form.
3      A.  No, they -- they -- they don't give a
4  recommendation.  They discuss it.
5      Q.  No, they discuss a concentration and
6  a sweet spot; correct?
7      A.  Yes.
8      Q.  And one -- you understand that
9  there's a relationship between plasma
10  concentration and patient characteristics;
11  right?
12      A.  Yes, I do.
13      Q.  And the closest relationship is
14  between plasma concentration and the patient
15  characteristic of renal function; correct?
16      A.  Can you repeat that?
17      Q.  There's a close relationship between
18  renal function and plasma concentration;
19  correct?
20      A.  There is a relationship, yes.
21      Q.  It's a close relationship, isn't it?
22      A.  I would have to have a definition of
23  close, but yes, there is a relationship.
24      Q.  You know that the Pradaxa label
25  recommends monitoring renal function; right?

HARVEY

1
2    A.  Yes, that's correct.
3    Q.  And adjusting dose based on renal
4 function?
5    A.  I agree --
6    Q.  Do you agree with --
7       MR. MOSKOW:  Objection, form.
8    A.  -- with that, yes.
9    Q.  Do you have data that tells you --
10 let's assume this sweet spot discussed in this
11 article of 50 to 150 is correct.  Do you have
12 data telling you how many patients with renal
13 function monitoring and dose adjustment
14 nevertheless fall outside that sweet spot, if
15 any?
16    A.  Are you saying from this article,
17 from this article or the --
18    Q.  I'm saying from anywhere in the
19 world.
20    A.  So are you -- are you -- you
21 questioning the paper by the consensus group
22 here?
23    Q.  No.
24    A.  I mean, I don't have any data.  The
25 only data I have is what I've been reading.

HARVEY

1
2    Q.  Let me ask you this.  Do you know
3 that if you monitor renal function as
4 recommended in the label and adjust dose as
5 recommended in the label that you end up with
6 any patients who fall outside of a range of 50
7 to 150 nanograms per milliliter on a consistent
8 basis?
9    A.  That makes sense.
10    Q.  Do you know if that happens at all in
11 the real world, if you monitor renal function
12 and adjust dose that you end up with any
13 patients outside of -- outside of this range of
14 50 to 150?
15       MR. MOSKOW:  Objection, form.
16    A.  Is the Temple slides and the
17 real-world data publications, is this a -- are
18 you quizzing me from what I remember from those
19 now?
20    Q.  No.  Dr. Temple himself -- and let's
21 look at his slides since you mention them.
22 I'll show you as Exhibit 28 the ones that were
23 given in 2015.
24       Do you see these slides?
25    A.  Yes, I do.

HARVEY

1
2    Q.  And in these slides he talks about
3 plasma concentrations; correct?
4    A.  Correct.
5    Q.  And on slide 14, the very -- the
6 ultimate slide in his deck, he says maybe no
7 blood level.
8       Do you see that?
9    A.  "Maybe no blood level."
10    Q.  And he says it may be possible to
11 adjust dose in accordance with the factor that
12 is most critical to the blood level attained
13 renal function.
14       Did I read that correctly?
15    A.  Yes.
16    Q.  Is Dr. Temple correct when he says
17 that the factor that is most critical to the
18 blood level attained is renal function?
19    A.  Well, that's what he's focusing on.
20 Age is another critical factor.  And then he
21 said if that can be done it would be very hard
22 to see why one would be not do it.
23    Q.  Is renal function the most critical
24 factor to blood level, as Dr. Temple says here?
25       MR. MOSKOW:  Objection to form.

HARVEY

1
2    Q.  Is that a true statement, a false
3 statement, or you don't know?
4    A.  It's not a false statement, but most,
5 most is -- I would have to see how the
6 comparison was done because we all know
7 advancing age is important and we know renal
8 function is important, and they're both
9 independent so it's very hard to say what is
10 most.
11    Q.  So when he says the factor that's
12 most critical to the blood level attained is
13 renal function, do you agree, disagree, or not
14 have a view?
15       MR. MOSKOW:  Objection to form.
16    A.  I agree that renal function's
17 important, as is age.
18    Q.  Do you agree that it's the most
19 critical?
20    A.  I would have to see how he decided
21 to -- to use that, that imprecise regulatory
22 word of "most."
23    Q.  Do you know -- that -- let me go back
24 to my question then.  If you adjust dose based
25 on the most -- this critical factor to blood

HARVEY

level, renal function, if you adjust dose based on renal function do you know that you end up with any patients who are outside of a specific target range?

MR. MOSKOW: Objection to form.

A. That would be the study that BI would need to do because if age is an independent risk factor, that even if you adjust for renal function, you still might have patients with advancing age that are increased risk.

Q. And so that's my question. Do you know if that exists? Have you seen any data that tells you if you dose --

A. I haven't --

Q. Let -- let me finish. Have you seen any data that tells you if you adjust based on renal function that there are patients who remain out of the range you think they should be in?

A. I haven't seen adequate data, and -- and BI should test that.

Q. And so one more question on this issue. What's that?

A. And then -- and then of course, the

HARVEY

last quote --

Q. There's --

A. -- this can be --

Q. -- no --

A. It's hard to --

Q. -- question --

A. -- see why --

Q. -- pending, doctor.

A. -- it would not be done. That got left out.

Q. I don't think it got left out. It got put in the label in 2012.

MR. MOSKOW: Objection to form.

MR. SCHMIDT: But -- but that is objectionable because now we're just arguing so let's strike both of what we said.

BY MR. SCHMIDT:

Q. Doctor, even if you could identify a sweet spot, let's say it's 50 to 150, it still might not be a good idea to try to dose adjust to get to that sweet spot if in the real world just because of interpatient variability and challenges of testing even with the best test

HARVEY

in the real world you couldn't reliably measure levels; correct?

MR. MOSKOW: Objection to form.

A. I think that's a valid concern that needs to be tested with further clinical trials.

Q. You made reference in one of your answers to your work at Pfizer. I think you were talking about the company core data sheet. Do you remember that?

A. Yes, I do.

Q. Have you told either the people you work with at Pfizer now or your former colleagues at Pfizer that you're doing this paid expert work for plaintiff's lawyers in this case?

A. No.

Q. Do you have any objection to us reaching out to them about it?

A. No.

MR. MOSKOW: Objection to form.

A. I looked over my severance agreement. There's nothing preventing me from doing this work on Pradaxa.

HARVEY

Q. You specifically consulted your severance agreement on that point?

A. Well, I -- I have it right there on my desk and I looked at it to make sure.

Q. Why?

A. What?

Q. Why?

A. Why do I have it on my desk?

Q. No, no, no. Why did you look at it in connection with your work here?

MR. MOSKOW: Objection, form.

A. Because I -- I just want to make sure that nothing I do conflicts with anything else I'm doing. I mean, I looked at everything else I'm doing just to make sure that it's not a conflict.

Q. Were -- did you think there was a possibility of a conflict?

MR. MOSKOW: Objection to form.

A. No.

Q. Okay. But you nevertheless consulted the agreement?

A. As -- as part of my routine work as Brian E. Harvey LLC I consult all the various

HARVEY

1  agreements when I start a new project.
2      Q.  What is Brian E. Harvey LLC?
3      A.  That's my individual consulting
4  group.
5          MR. MOSKOW:  Brian.
6          THE WITNESS:  Brian E. Harvey.
7      Q.  You mentioned reviewing thousands of
8  pages of documents.
9      A.  Yes.
10     Q.  Did you select those from a larger
11 set of documents?
12     A.  I had access to all of the documents.
13     Q.  And so how did you pick out those
14 thousands of pages?
15     A.  I went through the Dropbox and opened
16 and looked and read and, you know, developed my
17 report and looked at other documents and -- and
18 tried to work my way through.
19     Q.  And did you -- do you know what the
20 largest set of documents to which you had
21 access to was, like the volume?
22     A.  Was that the 44 -- I mean, there --
23 there were many, many documents.  I mean,
24 everything's listed.

HARVEY

1      Q.  I'll -- I guess that's what I'm
2  wondering.  Did you only have access to the
3  documents listed in your reliance lists, in
4  your supplemental list in your materials
5  reviewed?
6      A.  Only?  That was a lot of documents.
7      Q.  It's a subset of the total production
8  we have been --
9      A.  Okay.
10     Q.  -- asked to make at plaintiff's
11 lawyer's requests.  Did you have access to the
12 full 50 million pages of documents?
13     A.  I know that I would -- had access to
14 the documents that were in the Dropbox.  I
15 don't know what subset that is.
16     Q.  We can agree --
17     A.  -- picture.
18     Q.  That's what you identified on your --
19 I think there were two lists plus a
20 supplemental list.
21         MR. MOSKOW:  Correct.  You should
22         ask him whatever your questions are and
23         then I'll -- I can tell you.
24         MR. SCHMIDT:  Why don't we just

HARVEY

1  mark those two exhibits then.
2          THE REPORTER:  Let's go off the
3  record so I can stand up.  Let's go off,
4  Kim.
5          THE VIDEOGRAPHER:  Off the record
6  at 7:44.
7  (Recess taken.)
8  (Harvey Exhibit No. 29 was marked for
9  identification.)
10 (Harvey Exhibit No. 30 was marked for
11 identification.)
12         THE VIDEOGRAPHER:  Back on the
13 record at 7:44.
14 BY MR. SCHMIDT:
15     Q.  Could you identify for me the exhibit
16 numbers on these two documents I just passed
17 you?
18     A.  Exhibit 29 and 30, and I think one of
19 these was already --
20     Q.  I thought that was the third
21 supplemental list.
22     A.  That may be, that may be.
23     Q.  So are Exhibits 29 and 30 plus the
24 list we were given dated November 29, which I

HARVEY

1  marked as Exhibit 16, are those the universe of
2  documents you had access to?
3      A.  That's -- I believe so.
4      Q.  Did the lawyers point you to any
5  specific documents or specific parts of
6  testimony?
7      A.  No.
8      Q.  And last question.  You talked about
9  the 110-milligram dose.
10         Do you remember that?
11     A.  Yes, I do.
12     Q.  Is it your understanding that the
13 110-milligram dose prevents significantly less
14 strokes than the 150-milligram dose?
15         MR. MOSKOW:  Objection to form.
16     A.  I think -- it's my understanding the
17 utility of the 110-milligram dose is a
18 reduction in bleeds.
19     Q.  Right.
20     A.  And so therefore, in some patients,
21 the benefit/risk ratio was better, not because
22 of increased stroke reduction, but because of
23 decreased bleeds.
24     Q.  So back to my question.

HARVEY

Is it your understanding that the 110-milligram dose prevents significantly less strokes than the 150-milligram dose?

MR. MOSKOW: Objection to form.

A. I -- I can't agree with that the way it's worded.

Q. Did you know that the FDA declined to approve the 110 dose because it concluded that there was no patient group it could find for whom the 110 was better than the 150?

A. I read that as their conclusion; however, in the documents, they said by traditional analysis, they should approve the 110 dose because the benefits do outweigh the risks.

Q. Okay.

A. However -- and then they had the conclusion.

Q. They thought the 150 was better?

A. They thought the 150 was better.

Q. For all patients?

A. That's what they thought at the time.

Q. Have they ever publicly changed that view?

HARVEY

A. Not as of today.

MR. SCHMIDT: Thank you. That's all.

MR. MOSKOW: I have one question.

EXAMINATION

BY MR. MOSKOW:

Q. Doctor, you were just asked about the universe of documents you had access to. What, if any, access did you have to a database of the 44 million plus pages of documents that have been produced in this litigation?

A. Well, when I referred to Dropbox, I was using that in a more general term, which meant on the web.

There was a -- there were many documents that were available and in a form where you had to enter a password and so I just assumed that was all part of the Dropbox. But, you know, that might have been -- you know, it was a different site so it was -- you know, I had access to many documents, some of which needed the -- the password.

MR. MOSKOW: Nothing further.

HARVEY

EXAMINATION

BY MR. SCHMIDT:

Q. Doctor, is it your understanding you had access to the full 44 plus million pages of documents that Mr. Moskow just referenced?

A. That's my understanding.

Q. And did you purport to review those documents in any way?

Did you -- is it your testimony that you did any kind of review of those documents to identify the important ones?

A. I -- I -- I didn't review all 44,000 documents.

MR. MOSKOW: 44 million.

THE WITNESS: 44 million.

MR. SCHMIDT: We'll stop there.

THE VIDEOGRAPHER: This concludes the video recorded deposition of Dr. Brian Harvey. We're off the record at 7:47.

(Deposition adjourned at 7:47 p.m.)

HARVEY

C E R T I F I C A T E

DISTRICT OF COLUMBIA:

I, MARY ANN PAYONK, shorthand reporter, do hereby certify that the witness whose deposition is hereinbefore set forth was duly sworn, and that such deposition is a true, correct, and full record of the testimony given.

I further certify that I am not related to any of the parties to this action by blood or by marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 1st day of December, 2017.

_____

MARY ANN PAYONK, Shorthand Reporter

Page 510

```
 1              HARVEY
 2       - INDEX TO WITNESSES -
 3    WITNESS                    PAGE
 4    DR. BRIAN HARVEY
 5       Examination by Mr. Schmidt    5, 490, 508
 6       Examination by Mr. Moskow        482, 507
 7          - INDEX TO EXHIBITS -
 8    NO.        DESCRIPTION         MARKED
 9    Exhibit No. 1 Harvey report        5
10    Exhibit No. 2 Harvey CV           16
11    Exhibit No. 3 Harvey testimony    121
12    Exhibit No. 4 Notice          124
13    Exhibit No. 5 Harvey billing statement   129
14    Exhibit No. 6 Schedules       131
15    Exhibit No. 7 FDA approval letters     161
16    Exhibit No. 8 Reilly paper        194
17    * Exhibit 9 not marked *
18    Exhibit No. 10 Patient monitoring list   223
19    Exhibit No. 11 Chan 2015 article      248
20    Exhibit No. 12 Steinberg article      272
21    Exhibit No. 13 Graham article       255
22    Exhibit No. 14 Intracranial Hemorrhage  264
23       in Atrial Fibrillation Patients
24       During Anticoagulation with Warfarin
25       or Dabigatran
```

Page 511

```
 1              HARVEY
 2    Index (Cont'd.):
 3    NO.        DESCRIPTION         MARKED
 4    Exhibit No. 15 Baruch deposition      282
 5       exhibit, labeling language
 6    Exhibit No. 16 Add'l reliance materials  98
 7    Exhibit No. 17 Pradaxa SMPC       312
 8    Exhibit No. 18 Core data sheet     320
 9    Exhibit No. 19 Manuscript         338
10    Exhibit No. 21 EMA submission       347
11    Exhibit No. 20 EMA Printout        344
12    Exhibit No. 22 2015 label         407
13    Exhibit No. 23 Launch label        411
14    Exhibit No. 24 Excerpt          423
15    Exhibit No. 25 Email chain        450
16    Exhibit No. 26 Letter           470
17    Exhibit No. 27 Reiffel reference      492
18    Exhibit No. 29 List            504
19    Exhibit No. 30 List            504
20
21
22
23
24
25
```

Page 512

```
 1
 2    Index (Cont'd.):
 3       - INDEX TO CERTIFIED QUESTIONS -
 4    Page/Line     Text of the Question
 5    457  17  Do you see where she proposes
 6          language that references an over
 7          dosage range, he corrects it to say
 8          instead "patients are at a higher
 9          risk of bleeding," and she agrees
10          to his correction?
11
12          <<INDEX END>>
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 513

```
 1
 2    NAME OF CASE:  McDevitt vs. Boehringer
 3    DATE OF DEPOSITION:  November 30, 2017
 4       1. To clarify the record.
       2. To conform to the facts.
 5       3. To correct transcription error.
 6
    Page _____ Line _____ Reason _____
 7    From _____ to _____
 8    Page _____ Line _____ Reason _____
    From _____ to _____
 9
    Page _____ Line _____ Reason _____
10    From _____ to _____
11    Page _____ Line _____ Reason _____
    From _____ to _____
12
    Page _____ Line _____ Reason _____
13    From _____ to _____
14    Page _____ Line _____ Reason _____
    From _____ to _____
15
    Page _____ Line _____ Reason _____
16    From _____ to _____
17    Page _____ Line _____ Reason _____
    From _____ to _____
18
19    _____
20       DR. BRIAN HARVEY
21    SUBSCRIBED AND SWORN TO BEFORE ME
22    THIS _____ DAY OF _____, 2017.
23    _____
24    (Notary Public)
25    My Commission expires: _____
```