IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                              No. 3:15-CV-06424

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

          Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTIONS HEARING

TUESDAY, MAY 15, 2018, 1:25 P.M.

---o0o---

For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                       1932 North Druid Hills Road
                       Suite 100
                       Atlanta, Georgia  30319
                       BY:  C. ANDREW CHILDERS

                       THE BELL LAW FIRM
                       Post Office Box 1723
                       Charleston, West Virginia  25326
                       BY:  HARRY F. BELL, JR.

             (Appearances continued next page...)

Reported by:   KATHY L. SWINHART, CSR
                Official Court Reporter
                (304) 528-2244

```
1                    APPEARANCES (Continued)

2

3      For the Defendant:

4
                       BUTLER SNOW
5                      6075 Poplar Avenue, Suite 500
                       Memphs, Tennessee  38119
6                      BY:  ERIC E. HUDSON

7
                       BUTLER SNOW
8                      1020 Highland Colony Pkwy, Suite 1400
                       Ridgeland, Mississippi  39157
9                      BY:  ORLANDO R. RICHMOND, SR.

10
                       TUCKER ELLIS
11                     925 Euclid Avenue, Suite 1150
                       Cleveland, Ohio  44115
12                     BY:  JOHN Q. LEWIS

13
                       TUCKER ELLIS
14                     950 Main Avenue, Suite 1100
                       Cleveland, Ohio  44113
15                     BY:  MADELINE B. DENNIS

16
                       COVINGTON & BURLING
17                     One City Center
                       850 Tenth Street NW
18                     Washington, D.C.  20001
                       BY:  MICHAEL X. IMBROSCIO
19

20                     JACKSON KELLY
                       Post Office Box 553
21                     Charleston, West Virginia  25322
                       BY:  GRETCHEN M. CALLAS
22

23

24

25
```

1

1        HUNTINGTON, WEST VIRGINIA

2        TUESDAY, MAY 15, 2018, 1:25 P.M.

3            ---o0o---

4        THE COURT:  Good afternoon.

5        MR. CHILDERS:  Good afternoon.

6        MR. BELL:  Good afternoon.

7        MR. HUDSON:  Good afternoon, Your Honor.

8        THE COURT:  All right.  I understand everybody is

9   here.  We're ready to proceed?

10        MR. CHILDERS:  Yes, sir.

11        MR. BELL:  Yes, sir.

12        THE COURT:  Well, I sent out an order late last week

13   that described the sequence in which I thought it made sense

14   to take up these motions.

15        So first I want to take up the defendant's motion for

16   summary judgment.  In the context of that, it seemed to me

17   that a number of the issues raised in some of the motions in

18   limine that the defense had filed were material to it.  So I'm

19   happy to trust that you have figured out how you want to

20   present these things together so that they'll crystallize the

21   arguments.  Likewise with the plaintiff, you've got a cross

22   motion for partial summary judgment, obviously responses to

23   all of the motions in limine that I scheduled for hearing

24   today.

25        So, with that, I'd just like to jump right into the

2

1    argument.

2            MR. HUDSON:  Okay.  Your Honor, given the fact that

3    this case has been pending for a while, but we've never been

4    here in front of Your Honor, would you like us at the podium?

5            How do you like --

6            THE COURT:  Yes, I think it's better if you go to the

7    podium.  The acoustics in this room are not great, and in

8    order for me to hear you and to make sure my Court Reporter

9    can hear you, you really need to use the microphone, and it's

10   probably easiest to use the podium.

11           MR. HUDSON:  Okay.  Thanks, Your Honor.

12           Okay.  Your Honor, in connection --

13           THE COURT:  And, I'm sorry, introduce yourself.  I

14   know you've made appearances for the record, but I don't know

15   everyone.

16           MR. HUDSON:  Thank you, Your Honor.  My name is Eric

17   Hudson.  I'm from Memphis, Tennessee.

18           THE COURT:  All right.

19           MR. HUDSON:  And the way we had planned to structure

20   this was I'm going to focus on summary judgment.  And then in

21   terms of the foreign labeling, the company core data sheet,

22   the reversal agent and then Dr. Ashhab, the motion to exclude

23   Dr. Ashhab, we will have different people speak to those as

24   pertinent to summary judgment.

25           THE COURT:  Okay.  Fine.

3

1          MR. HUDSON:  Okay.  Great.

2          All right.  So, Your Honor, we're here on Boehringer

3     Ingelheim Pharmaceutical Inc.'s -- I'll call them BI -- motion

4     for summary judgment.  Ms. Knight is a woman who took Pradaxa

5     for 18 months before the bleeding event that we're here about

6     today.  It's undisputed that she had her gastrointestinal

7     bleed in the context of after having a bare metal stent placed

8     and going on triple therapy of Plavix, aspirin and Pradaxa.

9     And during that 30-day course of Plavix, she had her bleed and

10    then ultimately went back on Pradaxa.

11         I want to address -- and we are moving for summary

12    judgment on all the plaintiffs' counts.  I'm going to focus my

13    argument on failure to warn, and then I'll hit on design

14    defect.

15         And starting with failure to warn, this argument would

16    apply both to negligent failure to warn as it would to strict

17    liability failure to warn, and both require proximate cause.

18    And we cite these cases in our brief, Your Honor, but in West

19    Virginia to prevail on a failure to warn claim, plaintiffs

20    must show that a different warning would have changed the

21    behavior in a manner which would have avoided the injury.

22    That's the Tracy versus Cottrell case cited in our brief.  And

23    then later, the federal district court in West Virginia relied

24    on that case in Meade versus Parsley to reinforce that

25    standard of failure to warn.

4

1          It's not merely enough to show that an adequate

2     warning would have changed the behavior.  You've got to show

3     that it would have changed the behavior in a manner which

4     would have avoided the injury, which would have avoided

5     Ms. Knight's bleed in the context of her triple therapy, ah,

6     after her stent.

7          And the plaintiffs, in opposition to our motion, they

8     point to Dawn MacFarland, M.D., who was the doctor at the

9     prescribing -- at the office where Ms. Knight first received

10    her prescription.  And they point to some testimony from her

11    to argue that, well, that would have changed the outcome.  But

12    if you look at what Dr. MacFarland testified to, we assert

13    that's not the case.

14         And we're not discounting what Dr. MacFarland said.

15    We're not suggesting that Dr. MacFarland's testimony ought to

16    be construed in any light favorable to the moving party.

17    We're saying that if you take Dr. MacFarland's testimony at

18    its face value, that it's nothing more than speculation to

19    conclude that anything in the record would have changed the

20    outcome here.

21         And that's the standard we cite in -- on page 5 of our

22    memo, Craft versus Boston Scientific Corp. and Thomas

23    [verbatim] versus Potomac Electric Power, where, to avoid

24    summary judgment, conclusory or speculative allegations are

25    not enough.  And that's really what you see when you look at

5

1   Dr. MacFarland's testimony.

2           THE COURT:  Remind me what she said that the --

3           MR. HUDSON:  Okay.

4           THE COURT:  -- plaintiffs quoted in their response.

5           MR. HUDSON:  Sure.

6           On page 8 of their brief, the plaintiffs cite Dr.

7   MacFarland's testimony as follows:

8           Question:  Okay.  If the manufacturer had actually

9   determined that there was a protocol you could use when you

10  start a patient on Pradaxa, when you put them on the

11  medication for a short period of time and then measure their

12  plasma concentration so you can tailor the dose to make sure

13  it's in a therapeutic range, would you use that protocol?

14          And she said yes.

15          If you look at that question, she says a protocol you

16  could use when you start a patient on Pradaxa to tailor the

17  dose.  She was, Ms. Knight was started on Pradaxa 18 months

18  before the bleed.  To take that and leap to the conclusion

19  that had Dr. MacFarland done whatever the plaintiffs suggest

20  with respect to whatever different warning they may offer,

21  it's speculation to suggest that that would have altered the

22  outcome 18 months later.

23          THE COURT:  Well, how is that speculative?  I mean, I

24  agree that the way the question is framed, it says when you

25  start a patient on Pradaxa.  Here we know she was on it for a

6

1   considerable period.  We know that Dr. MacFarland continued

2   that prescription.  Dr. MacFarland continued to follow her.

3   She was treated by other people, in and out of the hospital.

4        So if we agree for purposes of the question that a

5   different warning would have been -- as plaintiff advocated, a

6   stronger warning about all this combination of circumstances

7   that this poor lady had --

8        MR. HUDSON:  Uh-huh.

9        THE COURT:  -- then why would we consider this

10   speculative for Dr. MacFarland to be saying, yes, and if I had

11   known about this warning during the course of treatment where

12   I was continuing to prescribe this, especially when she was on

13   the triple therapy, I would have followed that?

14        What is speculative about that?

15        MR. HUDSON:  Well, one, that's not the question that

16   was asked of her.  But, two, presuming that there had been

17   some warning that she took at the time, there is nothing --

18   there is nothing to suggest in the record that that kind of

19   monitoring, if it was actually done, would have impacted the

20   outcome, meaning Ms. Knight would not have had a bleed.

21        And that does tie in a little bit to Dr. Ashhab has an

22   opinion that he thinks she was over-anticoagulated, and

23   Mr. Richmond will talk a little more about that.  But he

24   refers to his testimony about her blood plasma level

25   concentrations at the time of her bleed as a guesstimate.

1          THE COURT:  Okay.  I'll confess I've spent a lot of

2     time with all of this.

3          MR. HUDSON:  Sure.

4          THE COURT:  But as is often the case for any of us, we

5     get diverted to other things, and sometimes it's hard to --

6          MR. HUDSON:  Understood.

7          THE COURT:  -- put it all back together.

8          So I certainly could be wrong in saying this, but as I

9     read Dr. Ashhab's testimony, and Dr. MacFarland's, it seemed

10    to me that one could reasonably say that either or both of

11    those doctors could testify that if there had been this

12    stronger, clearer warning, more precise warning that plaintiff

13    advocates, that the duty of care for the physician would have

14    been to take that into consideration and tell Mrs. Knight we

15    need to be monitoring your Pradaxa blood concentration.

16         So I guess what I'm sort of wondering is, in order to

17    prove that it would have made a difference, as you

18    characterized it, the proximate cause question, it could

19    either come from testimony where Dr. MacFarland says, yes, it

20    would have made a difference, I would have done this

21    differently, I would have been checking her levels; or a

22    physician could say that a reasonable physician would likely

23    undertake that in order to conform to the standard of care.

24         MR. HUDSON:  Yeah.

25         THE COURT:  It seems to me either one would be enough

1    to at least get that issue to the jury.

2          Am I wrong?

3          MR. HUDSON:  Respectfully, Your Honor, I would

4    disagree, yes --

5          THE COURT:  Okay.

6          MR. HUDSON:  -- and on two grounds.

7          One, with respect to Dr. MacFarland, there is nothing

8    in the record to suggest that that would have actually taken

9    place.  I mean, she just was never asked those types of

10   questions.  So to take that question that she was asked during

11   the deposition -- and I want to go on because there is

12   additional testimony from Dr. MacFarland.  One of the

13   questions was about plasma concentrations and the notion that,

14   you know, well, maybe she didn't even know about this.

15         And she was asked:

16         Okay.  Is that information that anybody from BI --

17   this is page 28 of the -- I'm sorry -- page 8 of the

18   plaintiffs' brief.  They cite to page 150 of Dr. MacFarland's

19   deposition testimony via footnote, footnote 8 in their brief.

20   But they're making an argument about the importance of plasma

21   concentration in the context of failure to warn.

22         And the question is:

23         Okay.  Is that information that anybody from BI has

24   ever told you, that some of your patients may absorb this

25   medication at a higher rate and, therefore, have a higher

1    concentration of it in their blood?

2          And Dr. MacFarland answered:  I don't remember

3    specifically being told that, but you can assume that or

4    figure that out.

5          So you tie that into your question, Your Honor, and it

6    reinforces the notion that Dr. MacFarland understood the

7    notion that there are instances where patients may absorb more

8    Pradaxa.  And the Pradaxa label actually tells doctors you

9    prescribe this based on renal function because your body

10   renally clears the drug.

11         THE COURT:  What about where she goes on, is then

12   asked:  And you don't have any way to measure whether it's her

13   plasma concentration to know what the specific anticoagulant

14   effect that it's having?

15         She says right.

16         And then as she goes on into the next page, there are

17   several questions related to this, whether this information

18   about the two-fold increase, as plaintiff characterized it,

19   whether she had that.  She didn't.  Whether that would be

20   important, she says perhaps.

21         MR. HUDSON:  Uh-huh.

22         THE COURT:  But, you know, perhaps means an equivocal

23   yes.

24         And then knowing that there is this increase, if you

25   have accurate information, which I take it means an accurate

1     warning quantifying this increased risk which is what

2     plaintiff says ought to be the warning, would she take that

3     into consideration in doing the risk benefit analysis?

4            She says yes.

5            If there was a way to measure the anticoagulant effect

6     of Pradaxa, would you use it?

7            Sure.

8            If there was a way to tailor the dose to make sure

9     it's within a therapeutic range, would you use it?

10           Yes.

11           And all those sound to me like the doctor saying, yes,

12    if there had been a more complete warning, as plaintiff

13    advocates --

14           MR. HUDSON:  Uh-huh.

15           THE COURT:  -- I would have taken advantage of that.

16           And if the complete warning is you ought to check

17    levels, you ought to recognize there's a much greater risk,

18    quantifiable risk for this type of patient with these

19    combinations, would you consider that?

20           Yes.

21           So all those things tend to me to suggest that she's

22    saying, yeah, if that warning had been there, as plaintiff

23    advocates, and there had been a way to monitor plasma levels

24    suggested by BI, I would have used it.  I don't see how I can

25    treat that as anything other than creating at least an issue

1  of fact for the jury.

2         MR. HUDSON:  Yeah, and if I could respond to that

3  because it sounds compelling.  Okay.  Well, just do the

4  monitoring, everything is fine.

5         But that is the question.  Is there anything

6  nonspeculative to say that, okay, had there been a monitoring

7  warning, and had Dr. MacFarland or Dr. Gunnalaugsson, anybody,

8  monitored Ms. Knight's blood, would that have prevented the

9  injury?  And that's where it ties into Dr. Ashhab.

10         THE COURT:  I agree.

11         MR. HUDSON:  Okay.  And so then --

12         THE COURT:  I see that, too.

13         MR. HUDSON:  Okay.  And if you see that -- but

14  there's --

15         THE COURT:  Sure.

16         MR. HUDSON:  So you take the warning, and if you say,

17  okay, well, if that's going to create a nonspeculative

18  warning, there's got to be that proximate cause step to get

19  past summary judgment.

20         And I'll let Mr. Richmond talk about Dr. Ashhab in

21  terms of why what he proposes to offer to say that warning

22  would have prevented the injury and --

23         THE COURT:  Well, and I guess to me -- you know, this

24  is one reason I'm asking these questions is to see if I can

25  make sure that I am analyzing this correctly.

1        MR. HUDSON:  Sure.

2        THE COURT:  So what we've kind of established is that

3  Dr. MacFarland may well have testified sufficiently to say had

4  this increased warning, more specific, quantified warning and

5  this way to measure recommendation on how to monitor Pradaxa

6  levels been available to me as the doctor, then I would have

7  used it.

8        And then the question becomes, did the failure of it

9  here contribute -- is there still causation in that plaintiff

10 still needs to establish that she was over-anticoagulated?

11       MR. HUDSON:  There's got to be some -- I didn't mean

12 to interrupt.

13       THE COURT:  No, go ahead.

14       MR. HUDSON:  There's got to be a connection between

15 the purported failure to warn and the injury.

16       THE COURT:  Right.

17       So it is certainly arguable here that even if the jury

18 believed that this more complete warning advocated by

19 plaintiffs, and this way of monitoring plasma levels would

20 have been demonstrated by the manufacturer, and Dr. MacFarland

21 would have used those, that doesn't mean she was

22 over-anticoagulated.  But Dr. Ashhab says she was

23 over-anticoagulated.

24       MR. HUDSON:  Right.

25       THE COURT:  So then I guess to me, then, that's really

13

1    maybe the more difficult question here.

2         And that is, does Dr. Ashhab -- and I think he's the

3    only witness plaintiffs have about this -- have enough

4    evidence that she was in fact over-anticoagulated to make all

5    of the rest of this get to the jury?

6         MR. HUDSON:  Right.

7         If you look at it that way -- and, Your Honor, I would

8    assert that if you take -- I mean, it would be reasonable to

9    take Dr. MacFarland's testimony and say based on that alone,

10   even without getting to the additional component of Dr.

11   Ashhab's testimony, it would be speculative to conclude that

12   that would have made a difference.

13        THE COURT:  Right.

14        MR. HUDSON:  But if you take the next step and say,

15   okay, I'm going to give them the benefit of the doubt on that

16   one, then the Dr. Ashhab inquiry is, is what he purports to

17   say, does that satisfy Daubert?

18        So -- and if that's where your inquiry is focused,

19   then I'm going to -- I'll move on and let Mr. Richmond --

20        THE COURT:  That would be fine.

21        MR. HUDSON:  -- come back to that one, if that works.

22        Okay.  I do want to also say, Your Honor, because, you

23   know, there's been a focus on Dr. MacFarland in connection

24   with the failure to warn claim, you know, we've got the added

25   element where this is post-Karl, pre-legislative amendment.

14

1          THE COURT:  Right.

2          MR. HUDSON:  And there I think the record is pretty

3     clear that there is nothing to indicate that Ms. Knight read

4     or would have read these warnings.  But you've got

5     back-stopped against that the language of the medication

6     guide, which is provided along with the medicine.  And we

7     attached that as Exhibit 9 to our opposition to plaintiffs'

8     motion for summary judgment.

9          When you look at what the plaintiffs are saying in the

10     context of all of their warnings, I mean, the medication guide

11     tells patients you have a higher risk of bleeding if you take

12     Pradaxa and are over the age of 75; if you have kidney

13     problems; if you take other medications that increase your

14     risk of bleeding, including Plavix.

15          And then the plaintiffs in their briefing make -- they

16     say a lot about P-gp inhibitors.  The medication guide

17     addresses that, too, in general -- in lay terms.  It says tell

18     your doctor about all of the medications you take, including

19     prescription and nonprescription medications.  Some of your

20     medications may affect the way Pradaxa works, and certain

21     medications may increase your risk of bleeding.

22          So to the extent we're looking at the plaintiff

23     herself, there's nothing in the record to suggest that any

24     additional warning or action to her would have averted the

25     harm.

15

1          THE COURT:  Well, I do think it's clear that what

2     plaintiffs are advocating here is that the warnings that

3     accompanied the medication when she first started taking it

4     were incomplete or inadequate.  And that they've been pretty I

5     think specific saying that BI had knowledge that people with

6     this level of renal impairment have a specifically

7     quantifiable increased risk, three times I think is what they

8     say.  That may be -- I mean, that's what they say, and they've

9     got BI documents and some of the studies to back that up.  I

10    understand you've got defenses on some of that.

11         But basically they say severe renal problems, three

12    times.  Over age 80, two times greater.  The European label

13    saying that if you've got these conditions, not just that it's

14    warning that there could be a bleeding complication, but

15    stronger, clearer warnings that you shouldn't be on this, you

16    shouldn't try this if you've got these other combination of

17    medications and so forth.

18         So, you know, I think probably like the other courts

19    where you folks have already blazed your trail a few times, I

20    think I'm probably going to end up concluding that there's

21    enough there to support the plaintiffs' claim to get to the

22    jury that the warnings were inadequate given all of these

23    circumstances, many of which are kind of unique to Ms. Knight

24    because she had that combination of medical conditions and

25    other medications and other risk factors.

1       MR. HUDSON:  Okay.  Then, Your Honor, I'll finish up

2   on failure to warn given that we've still got to talk about

3   Dr. Ashhab.

4       THE COURT:  Right.

5       MR. HUDSON:  And I'm sure you've caught this in going

6   through this.  This is a 75-milligram dosage.  There is no

7   lower dose of Pradaxa.  And the 75-milligram dose was never

8   approved in the European Union.  It was approved by the FDA

9   based on the FDA's -- excuse me -- own initiative to conduct

10  modeling for people like Ms. Knight, who had renal function

11  below a certain level.

12      So there are a lot of differences in this one, which

13  are going to --

14      THE COURT:  And I think I agree with the other courts

15  that have said plaintiffs' warnings claim cannot include or

16  rely upon the claim that a lower dose should have been

17  available or provided.

18      MR. HUDSON:  Yeah.

19      THE COURT:  I think it's the completeness of the

20  warning given these other relevant conditions and medications

21  that she was on, whether she should have been taking it or

22  not, not that the dosage was -- not that there was inadequate

23  warning relative to the dosage amount.

24      MR. HUDSON:  Understood.  And I'll leave that because

25  we are going to argue the foreign label.

```
1              THE COURT:  Sure.
2              MR. HUDSON:  Okay.  Then I'll move on to design
3    defect, then, if it's okay.  Unless you have any questions I
4    can address on failure to warn.
5              THE COURT:  No.
6              MR. HUDSON:  Okay.  Well, let me back up.
7              One point on failure to warn, particularly -- and I'll
8    come back, I guess, after plaintiffs argue their brief.  But
9    in the briefing on theirs, I think there was some back and
10   forth on use defect.  And, you know, we are arguing use defect
11   is a strict liability failure to warn claim.  That's the
12   premise of our strict liability failure to warn motion.
13             In terms of design defect, Your Honor, I think you
14   have probably seen the Chambers decision and the Boone
15   decision.  The Chambers decision is Exhibit 9 to our summary
16   judgment motion.  The Boone decision is Exhibit 6 to our
17   opposition --
18             THE COURT:  Well, all this is premised upon
19   plaintiffs' claim that there was an alternative, safer way to
20   manufacture Pradaxa by either making Pradaxa reversible by the
21   common, readily available means in hospitals, I guess in
22   theory sort of similar to warfarin where there are substances
23   that can be given to patients that tend to counteract it
24   immediately; or an alternative design for failing to come up
25   with this so-called antidote, the Praxbind, that is here
```

18

1    today.

2         MR. HUDSON:  I think --

3         THE COURT:  And it seems to me that the cases, most of

4    the cases -- and I haven't seen a lot of these, but you've

5    cited I think several which stand for the basic proposition

6    that courts refuse to consider a separate drug like Praxbind

7    or the unavailability of a separate drug like Praxbind as a

8    design defect for Pradaxa.

9         And about the only thing that I can recall plaintiffs

10   cited in opposition to that would be Judge Fallon's rulings in

11   some of the Xarelto cases.  And in his case, as I understand

12   it, he denied summary judgment on this issue and determined

13   that there was evidence from the plaintiffs that the drug

14   manufacturer -- I don't remember who it was now for Xarelto --

15   that there was evidence that the drug manufacturer had, prior

16   to FDA approval of Xarelto, knowledge of how to manufacture

17   this so-called antidote.  And so I'm wondering why that same

18   analysis wouldn't apply here.

19        I realize that here Praxbind was not developed and

20   actually taken to FDA until after she died.  But plaintiffs

21   argue that they have evidence that it was considered,

22   developed to an extent and developable before.  And that once

23   you started marketing Pradaxa, given that there were a large

24   number of major bleeds reported, that that information was

25   available to you and that, therefore, there was an alternative

19

1    design in that you could have developed this antidote prior to

2    Pradaxa being approved by FDA and marketed.

3          MR. HUDSON:  Yeah, and three points on that --

4          THE COURT:  Okay.

5          MR. HUDSON:  -- which we rely on for summary judgement

6    and in response to what the plaintiffs are saying in their

7    motion.

8          The first -- you asked first about if Judge Fallon,

9    you know, said, well, maybe they could have developed it

10   sooner.  If you look at the Chambers opinion, Judge Land, on

11   page 36 of that opinion, took the evidence on that in the

12   summary judgment briefing and said -- and this is a quote from

13   him.

14         There is no evidence that anyone knew that

15   idarucizmab, which is the --

16         THE COURT:  State it again.  I didn't hear you very

17   well.

18         MR. HUDSON:  Sure.

19         He says there is no evidence that anyone knew that

20   idarucizmab, which is the scientific name for Praxbind, that

21   the idarucizmab antibody could reverse Pradaxa's anticoagulant

22   effect until Dr. Van Ryn developed the idea in 2008.

23         THE COURT:  In 2008?

24         MR. HUDSON:  2008.

25         The evidence demonstrates that Boehringer moved

1    expeditiously to get Praxbind approved.  Simply put, no

2    reasonable juror could conclude from the present record that

3    Boehringer developed an antidote in 2003 and kept it in the

4    freezer for 12 years while Pradaxa patients suffered fatal

5    bleeding.

6         So Judge Land squarely addressed that when he said,

7    no, that's just not going to fly.  That is the kind of

8    speculation that is not going to get a plaintiff past summary

9    judgment.

10        THE COURT:  And I take it you're comfortable saying

11   that the evidence that was before Judge Land in the Chambers

12   case is the same as the evidence that the plaintiffs have

13   cited here?

14        MR. HUDSON:  To the best of my knowledge, yes.

15        THE COURT:  All right.

16        MR. HUDSON:  And I haven't done a lot of online

17   comparison, but to the best of my knowledge --

18        THE COURT:  Well, you haven't seen plaintiffs argue

19   that they've got something different here.

20        MR. HUDSON:  No, I haven't.

21        So that's one, and that's -- but then you've got two

22   more.  One you've got, okay, what are the elements for West

23   Virginia strict liability law?  They cite, the plaintiffs cite

24   Mullins versus Ethicon, all derived from Morningstar.  Design

25   is defective in that it renders the product not reasonably

1  safe, and the defect proximately caused the plaintiff's

2  injury.

3  So, again, that's the element. Did the defect cause

4  the injury? No. The absence of a reversal agent could not in

5  any way be construed as causing Ms. Knight's bleeding.

6  THE COURT: And, you know, I will also confess I have

7  some trouble keeping straight what's in the label, what's in

8  the medication guide and when they changed.

9  But with respect to, I guess, the information

10  available at the time she started, did the label say at that

11  point there's no antidote or something to that effect?

12  MR. HUDSON: Yes.

13  THE COURT: All right. So plaintiffs couldn't really

14  claim a warning defect based upon the lack of an available

15  antidote because that's exactly what you warned them.

16  MR. HUDSON: Right.

17  THE COURT: Okay.

18  MR. HUDSON: And that comes in, you know, in a

19  different context, too, in that Dr. Ashhab, the plaintiffs'

20  expert, he acknowledged that the RE-LY clinical trial, which

21  is the trial --

22  THE COURT: Right.

23  MR. HUDSON: -- where Pradaxa was tested, and it led

24  to FDA approval, that was tested without an antidote.

25  And Dr. Ashhab acknowledges that, you know, Pradaxa

1    had a better safety profile with respect to stroke prevention

2    and avoiding the risk of intracranial hemorrhage -- which is

3    warfarin, one of the big side effects of warfarin -- but

4    acknowledged a known risk of gastrointestinal bleeding.

5          And so, you know, this all comes back to the fact this

6    is an anticoagulate preventing strokes, and doctors are

7    prescribing it knowing that there are risks of bleeding.

8          THE COURT:  Right.

9          MR. HUDSON:  And these are doctors that know there is

10   no reversal agent.  They know it was examined against warfarin

11   without a reversal agent, and they know even there they know

12   the outcome data.

13         THE COURT:  And that's even though warfarin apparently

14   does have some versions of antidotes available to them?

15         MR. HUDSON:  And, I mean, to be fair, this isn't in

16   the record, but Vitamin K takes 12 to 24 hours to work.  The

17   half-life of Pradaxa in a person with good renal function is

18   about 12 hours.  So the notion that warfarin has an immediate

19   acting reversal agent at the time of Ms. Knight's bleed is --

20   and plaintiffs aren't arguing that.

21         THE COURT:  Okay.

22         MR. HUDSON:  So that's the second, is did the defect

23   cause the injury?  And the answer is no.  So the plaintiffs

24   come back and say -- on that one they say, well, this is kind

25   of like a continuing injury or crash worthiness type of

 1    analysis.

 2              THE COURT:  Enhanced injury.

 3              MR. HUDSON:  Enhanced injury.

 4              And they cite to the crashworthiness case, and that is

 5    a case where somebody has an automobile accident, and then

 6    something goes wrong with the components of the car, they can

 7    still recover because of product defects in the car.  But we

 8    weren't able to find a single case applying that to the

 9    prescription medicine context.

10              And when you look at the preemption analysis --

11    because this is, I think, where it really comes home in terms

12    of preemption.  Because Bartlett and Mensing, if you look at

13    those, they say if you've got a state law duty that conflicts

14    with the federal law duty, that claim is going to be

15    preempted.  And if a court were to find that, well, there's a

16    continuing injury duty here akin to the crashworthiness

17    doctrine, what that does is that creates a state law duty that

18    says if you've got this medicine with a warned-about risk and

19    that risk happens, and a warned-about fact that there is no

20    reversal agent and you don't have a reversal agent, you can

21    recover for the failure to -- for not having the reversal

22    agent sooner.

23              That's exactly what Buckman -- excuse me -- Bartlett

24    and Mensing address.  I mean, and that really kind of squares

25    away the preemption target.

24

1        I haven't seen courts, for example, in the cases we

2   cited, and even Judge Land's decision or Judge Moll's decision

3   in Connecticut, they don't talk about the details of it.  But

4   when you think about what that means, and what the state law

5   duty would be and whether that conflicts with the federal

6   standard, which is you cannot market a prescription medicine

7   until you have FDA approval, that's square preemption.

8        And so the plaintiffs --

9        THE COURT:  I think I probably agree with you with

10  respect to this issue about the lack of a reversal agent, but

11  I don't think that this carries over to the warnings.

12       It does seem to me, from reading these cases -- and I

13  am not nearly as conversant as you are, for sure.  But it does

14  seem to me that when you talk about a brand name manufacturer,

15  the cases recognize that, first, they've got a fair amount of

16  control and discretion over what to put in the label.  So they

17  could change the warnings without either getting FDA approval

18  or being relatively clear that they're going to get it.  So

19  most courts I think have said you would have to show clear

20  evidence that it wouldn't be approved, some standard like

21  that.

22       So I think that's probably where I come out on this,

23  too, that I don't think preemption is going to extend to the

24  warnings that we discuss today.  But perhaps that's not the

25  case, that maybe there is preemption with respect to this lack

1    of a reversal agent even if I were to consider that somehow a

2    product defect.

3              MR. HUDSON:  Understood.

4              And, you know, Judge Land squarely addressed the

5    product defect component as well on page 39 of the -- 39 and

6    40 of his opinion, and I'll leave the cite at that.  But he

7    said it's not a product defect, it's a different product.

8              THE COURT:  Right.

9              MR. HUDSON:  It did not cause the injury.

10             Let me make two more points if I could, Your Honor,

11   and then -- because I think I understand where your questions

12   lie.

13             In the briefing, you know, the plaintiffs, I think

14   their position evolved a little bit ending with I think their

15   reply brief in opposition to their motion for summary

16   judgment, where they said that, well, you know, Boehringer

17   really should have just developed Praxbind before it even got

18   FDA approval.  And that's not preempted because, you know,

19   we're not saying you couldn't have done it.  We're just saying

20   you should have done it and gotten it all done at once.

21             And there are two cases I want to bring to the Court's

22   attention on that.  One is the Yates case in the Sixth

23   Circuit.

24             THE COURT:  What's the name of it?

25             MR. HUDSON:  Yates, Y-A-T-E-S.

26

1          The cite is 808 F.3d 281, and the Sixth Circuit Court

2     of Appeals squarely addressed that same argument, which is the

3     never start selling rationale.  The notion that, okay, well,

4     it's not going to be preempted if you just wait, and you don't

5     sell it.  And the Sixth Circuit addressed that and said that

6     for the same reason the Supreme Court rejected the stop

7     selling rationale, i.e. if you don't have a reversal agent,

8     you shouldn't have it on the market, the Sixth Circuit said

9     we're not going to buy the don't start selling it until you

10    have it rationale.

11          And then the other case I want to bring to the Court's

12    attention is another anticoagulant, and these post-warfarin

13    anticoagulants are often referred to as NOACs, new oral

14    anticoagulants.  You've got Pradaxa, you've got Xarelto.

15    You've got another one called Eliquis, and the Southern

16    District of New York has addressed some of the Eliquis

17    litigation.

18          And I just -- the cite to the Eliquis case is UTTS

19    versus Bristol Myers Squibb, 226 F.Supp.3d 166.  And there the

20    district court out of the Southern District of New York

21    addressed the never stop selling rationale as well as in the

22    context of a drug akin to Pradaxa and said, well, you

23    shouldn't have sold it until you had a reversal agent.  And

24    the federal court there did the same thing.

25          THE COURT:  Okay.

27

1          MR. HUDSON:  Any questions, Your Honor?

2          THE COURT:  No.  Thank you.

3          MR. HUDSON:  Okay.

4          THE COURT:  All right.  Did you envision having your

5     colleagues address the motions in limine as part of your

6     summary judgment?

7          MR. HUDSON:  I think we were flexible.

8          Have you got a preference?

9          MR. RICHMOND:  I have no preference, Your Honor.

10         I didn't know whether or not you wanted to hear from

11    plaintiffs regarding their response to the motion for summary

12    judgment or have me --

13         THE COURT:  Well, why don't we go ahead and get all of

14    yours laid out here first, and then we'll get their response.

15         MR. RICHMOND:  Good afternoon, Your Honor.  I'm

16    Orlando Richmond.  I go by Rod, R-O-D.

17         I'm going to talk about Dr. Ashhab.  I noted the

18    questions that Your Honor had about that and realize that

19    you're familiar with a great deal of his testimony, but let me

20    start with just a little bit of pertinent background with

21    respect to Dr. Ashhab's testimony.

22         And that is that after about a year and a half in of

23    Ms. Knight using Pradaxa, she had symptoms of a heart attack

24    and had a heart catheterization.  And at that time this triple

25    therapy that has been discussed was then invoked to include

1    Plavix and a low dose aspirin, 81-milligram aspirin.

2         That becomes later as we talk about Dr. Ashhab's

3    opinions and how he arrived --

4         THE COURT:  Right.

5         MR. RICHMOND:  -- at his discussion of the bleed that

6    occurred in this case.

7         He really has two broad opinions that I want to talk

8    about.  Number one is his opinion that Ms. Knight was

9    over-anticoagulated at the time of her bleed.  That particular

10   opinion encapsulates or involves a number of other important

11   strands or assertions in the case.  There's a lot that is

12   packed in there.  And then, secondly, that the bleed in May of

13   2013 contributed to Ms. Knight's heart attack several months

14   later in September of 2013.  He says some other things as

15   well, Your Honor, but primarily those two points take care of

16   his opinions.

17        With respect to the over-anticoagulation, that opinion

18   is based almost solely on a lab test that was conducted when

19   she went to the hospital for the bleed.  You probably read

20   about the aPTT test, and it measures the amount of time it

21   takes for the blood to clot using a reagent, and it's measured

22   in seconds.  The test indicated 47 seconds, as I recall, or

23   the test that he relies upon indicated 47 seconds.

24        And from that -- and this is where the problem is --

25   he guesstimates, according to his own language, or speculates

1    about what her coagulation status would have been either 24 or

2    36 hours earlier at a relevant time.  And his opinion with

3    respect to over-anticoagulation is tied up almost entirely in

4    that leap of logic, speculation or guess.

5            It's important because he admits that the 47 seconds

6    in and of itself is therapeutic.

7            THE COURT:  Right.

8            MR. RICHMOND:  And so then for him to reach his

9    opinion, he reaches back to what he believes to be a relevant

10   time.  And what's important is that that's not based on any

11   scientific analysis as such or any medical analysis that he

12   describes for us.  It's not based on any literature that he

13   offers for us.  And quite frankly, to his credit, he

14   ultimately admits that it's guesstimation or speculation.

15           THE COURT:  Well, as I recall, in his deposition he

16   was then questioned about the chart that was part of the

17   label.  And he points out and I think he even I guess at the

18   deposition put his little mark at 47 showing that that is what

19   her aPTT level was at that particular moment.

20           And then that's -- he is using this chart by BI.  And

21   he's saying so if she's at 47, which is within the therapeutic

22   range at this time, I know that she had a bleed, a significant

23   bleed.  That she hadn't had Pradaxa for so many hours, I can't

24   remember whether he said 36 or 24 or how he equivocated about

25   that, but he then talked about his knowledge of the half-life

1    of the medication and so forth.

2         And so I have to admit I'm a little bit confused by

3    both sides when it comes to that chart and what it means and

4    doesn't mean.  But I thought he used that chart to show that,

5    according to BI, when you take Pradaxa, and you're one of

6    these different types of patients that result in, as I recall,

7    four different lines on the chart, one of which is based upon

8    your creatinine clearance or your renal testing, that when you

9    take Pradaxa, you start off with an aPPT pretty high and then

10   it goes down.  And he said after 36 hours, according to that

11   chart, your line comes down pretty close to where she

12   purportedly was by this test.

13        MR. RICHMOND:  True.

14        THE COURT:  Okay.  What's wrong with that?

15        MR. RICHMOND:  Well, a couple things, Your Honor.

16        First of all, the aPTT does not measure blood plasma

17   concentration.

18        THE COURT:  Right.

19        MR. RICHMOND:  It measures --

20        THE COURT:  We'll talk about that for a minute,

21   because I understand that I think.

22        But the plaintiffs cite in several places part of the

23   literature and part of the studies perhaps in which basically

24   BI says, well, an aPTT is not really designed to determine

25   your level of Pradaxa.  As they've cited in their documents

31

1    and their arguments, there is in this literature an indication

2    that it can be helpful in guiding you.

3            And I wish I had a better grasp of some of this now.

4    If you had asked me a week ago, I could have pointed this out

5    better.

6            MR. RICHMOND:  Yes.

7            THE COURT:  But you know what I'm talking about?

8            MR. RICHMOND:  I do, Your Honor.

9            THE COURT:  So why is that general discussion about,

10   even though limited, the value of an aPTT in monitoring

11   anticoagulation helpful in determining whether, as a result of

12   being on Pradaxa, you're in a therapeutic range?

13           MR. RICHMOND:  Well, a couple things about that.

14           The expert that will really talk about that, as I

15   understand it, is a Mr. Gosselin.  Mr. Gosselin is a

16   laboratory type, a gentleman who has spent much of his life in

17   labs.  I know that because I just left trial in Connecticut

18   and heard him testify for a couple days.

19           So he's talked about this issue, and one of the things

20   that he says is that the aPTT is not useful for determining

21   where someone is with respect to blood plasma concentration.

22   It can't tell you that someone is super therapeutic or where

23   they are in that.  And that's -- that's the testimony I expect

24   that they'll offer in this case.

25           THE COURT:  Well, let me stop you there.  I mean, I

32

1   agree, and I think that's obviously valuable testimony for

2   your side.

3          But, you know, Dr. Ashhab -- is it Ashhab?  Is that

4   how you pronounce it?

5          MR. RICHMOND:  I pronounce it Ashhab, Your Honor.

6          THE COURT:  Yeah.  He doesn't purport to be relying

7   upon Mr. Gosselin for his determination that there was

8   over-anticoagulation, but instead he refers to the BI

9   documents.

10         So I agree that Gosselin seems to contradict him, but

11  the question is I don't think that --

12         MR. RICHMOND:  Right.  Yes.

13         THE COURT:  -- eliminates Dr. Ashhab's testimony.

14         MR. RICHMOND:  Yes, sir.

15         The difficulty with Dr. Ashhab's testimony is he's

16  done two things.  One, he's talked about what we know based on

17  what the test is and the lines that he drew as you pointed

18  out --

19         THE COURT:  Right.

20         MR. RICHMOND:  -- but he wants to go further.

21         He wants to tell you what he doesn't know, and that

22  is --

23         THE COURT:  Which is what her levels would have been

24  earlier.

25         MR. RICHMOND:  That's correct, Your Honor.

33

1          THE COURT:  But why is that chart discounted as a

2     basis of the doctor saying, if she's at this level 36 hours

3     after her last dose according to the Pradaxa chart, when she

4     takes her first dose and is on it, she's going to be up here

5     at this higher level and, over that same course of time, it

6     comes down into this range that is close to 37?

7          MR. RICHMOND:  Because I don't think that he uses the

8     chart in that way, not precisely in that way.

9          What he says is, if I know that she's at 47 seconds at

10    24 or 36 hours, then I assume that she was 80, 90, maybe even

11    100 at some hours earlier.  And that -- that is the definition

12    of speculation.  80, 90, 100?  And finally he says, you know,

13    I just don't know.

14         THE COURT:  Okay.  I recall that part of his

15    testimony, but I guess honestly I think I probably lean

16    towards saying that -- when he tries to be specific and say

17    she's 80, 90 or 100, you know, 36 hours before, I agree, I

18    think that's speculation.  I think he admitted as much.

19         But I don't think that means that he is being too

20    speculative to say that I know, based upon this level of 47 at

21    the time, recognizing that she'd been off Pradaxa for this

22    long, recognizing that when you start taking Pradaxa according

23    to BI you get a higher aPTT level, and figuring in my clinical

24    judgment that she had a severe or significant bleed in the

25    gastrointestinal area, which he's familiar with, that he is

34

1    using his, I guess, medicine arts judgment to say that she

2    must have been much, much higher when she was on Pradaxa.

3           So why is that not just within the realm of clinical

4    judgment?

5           MR. RICHMOND:  Because that's not what he testified.

6           THE COURT:  Okay.

7           MR. RICHMOND:  What he said is it's my guesstimate.

8    It could have been, it may have been.

9           We don't have --

10          THE COURT:  Well, if we're going to say that, I mean,

11   that's what he says when you tried to pin him down on give me

12   a number.  Is it 80, is it 90, is it 100?  But I think in

13   fairness, as I read his testimony overall, I mean, I think

14   he's providing a level of medical certainty in his opinion

15   that she was excessively over-anticoagulated when she started

16   this bleed, and he can't do more than guesstimate at what her

17   aPTT level would have been at the very time the bleed started.

18          But it didn't seem to me to be a big leap to say --

19   for a doctor with skill in handling patients like this to say

20   she's over-anticoagulated.

21          MR. RICHMOND:  Your Honor, what we know is that he's a

22   gastroenterologist.  He did not offer up any particular

23   expertise that would allow him to apply medical judgment.  He

24   certainly didn't articulate any.  It's based on his

25   extrapolation.

1          THE COURT:  I think he even admitted -- did he admit

2     that he doesn't even prescribe Pradaxa?

3          Is that right or am I --

4          MR. RICHMOND:  I don't recall, but I wouldn't be

5     surprised if he didn't given what he does.

6          THE COURT:  One last little thing here since you've

7     already addressed it.

8          Looking at the guide, the patient guide -- is this the

9     patient guide?  And we think this is what was in effect at

10    this time she started on Pradaxa, where it talks about the 2.4

11    surgery and interventions.  It instructs that there is going

12    to be an invasive or surgical procedure.  That increases the

13    risk of bleeding, so you should delay or stop it.  You

14    should -- your risk of bleeding should be weighed against the

15    urgency of intervention.

16         It says bleeding risk can be assessed by ecarin

17    clotting time, and it says this is a better marker for the

18    anticoagulant activity of Pradaxa than an aPTT and INR and the

19    other.  But if that is not available, the aPTT test provides

20    an approximation of Pradaxa's anticoagulant activity.

21         So --

22         MR. RICHMOND:  Which is --

23         THE COURT:  -- you all said that the doctor could use

24    an aPTT level --

25         MR. RICHMOND:  Which is different from blood plasma

1    concentration.

2            THE COURT:  Of Pradaxa.

3            MR. RICHMOND:  Yes.

4            THE COURT:  Oh, I agree.  Sure, I understand that.  We

5    don't have that.  If we had that, we wouldn't have this

6    debate.  It would either show a level that was above

7    therapeutic or below or within therapeutic.

8            But that is talking about when you don't have -- I

9    think that's an aPTT, which is not Pradaxa level.  It's using

10   the aPTT clotting time as an approximation for Pradaxa's

11   anticoagulation effect.

12           MR. RICHMOND:  That's right, Your Honor.

13           And I think that, again, the best we have is what his

14   testimony is.  And I can appreciate Your Honor saying that he

15   must be applying the medical science to make that

16   determination, except he didn't say that.  What he said was

17   it's a guesstimate.  What he said was I don't know what it

18   was.

19           THE COURT:  Yeah, I do recall that.  I was a bit

20   troubled by this, that he said, well, she must have been

21   over-anticoagulated because she developed a bleed.

22           MR. RICHMOND:  That's the other thing I wanted to

23   address.  Obviously you could have a bleed when you're on an

24   anticoagulant in therapeutic range.

25           THE COURT:  Right.

1          MR. RICHMOND:  And so then just because she has a

2     bleed doesn't mean that she is over-anticoagulated, and that's

3     a fallacy in his analysis as well.

4          The second broad opinion that he offers is that the

5     bleed was contributory to the heart attack that occurs months

6     later.  Again, he is a gastroenterologist.  There is nothing

7     that he described regarding his own practice, his own

8     experience, his own background or methodology that allows him

9     to make that leap.

10          THE COURT:  I'm going to be real curious to see how

11     plaintiffs respond to that.  Because about the only thing I

12     saw anybody say was that after this bleed, she didn't bounce

13     back, she didn't seem to get all the way better.

14          There were general references to her being in and out

15     of hospitals, including a skilled nursing unit, between then

16     and September.  I don't think anybody disputes that she died

17     of a heart attack, plaintiffs argue it is, but through Dr.

18     Ashhab, he's testified that this bleed so weakened her that it

19     contributed to her later heart failure.

20          MR. RICHMOND:  But he doesn't unpack that for us.

21          THE COURT:  Right.

22          MR. RICHMOND:  I mean, there really is no discussion,

23     no analysis whatsoever of that issue other than what Your

24     Honor has pointed out, that she didn't bounce back, she wasn't

25     doing well.  But there is no medical analysis of that issue.

1          THE COURT:  So I just got the pretrial order today.

2          MR. RICHMOND:  Yes, sir.

3          THE COURT:  I at least just looked at it today.  It

4    lists all of the witnesses.

5          With respect to plaintiffs, they've identified the

6    children, Dr. Ashhab, and then two or three of their general

7    experts.  And then it lists as -- those are testifying live.

8    And then it lists as testifying by deposition a long list of

9    doctors, which include I think about everybody who treated her

10   from the time she was hospitalized and got the stent through

11   the bleed through her death.  So that means everybody, you all

12   at least, know exactly what those doctors are going to say

13   because it's going to be reading their depositions.

14         Do any of them provide a clearer statement to connect

15   this bleed episode with her later heart attack?

16         MR. RICHMOND:  Your Honor, I gotta tell you, I don't

17   know whether or not anybody does that.

18         MR. HUDSON:  If I may?

19         THE COURT:  Sure.

20         MR. HUDSON:  I think we'll hear from the plaintiffs

21   that Dr. Abdelgaber --

22         THE COURT:  Right.

23         MR. HUDSON:  -- her primary care after the -- at least

24   after the bleed, maybe some before the bleed, his testimony

25   was something to the effect of she never bounced back.

1     THE COURT:  Okay.  Did he go so far as to say she

2   didn't bounce back, and her heart attack is proximately

3   related to this bleed and the effect it had on her?  Or did he

4   just say she just didn't bounce back, and then she had a heart

5   attack?

6     MR. HUDSON:  It's the latter, Your Honor.

7     THE COURT:  All right.

8     MR. RICHMOND:  And of course, finally, Your Honor,

9   there is no demonstration from Dr. Ashhab that this heart

10  attack would not have occurred otherwise but for her use of

11  Pradaxa, which is an important consideration in this matter.

12    THE COURT:  Okay.  Thank you, Mr. Richmond.

13    MR. RICHMOND:  Thank you, Your Honor.

14    THE COURT:  Who is next?

15    MR. IMBROSCIO:  Good afternoon, Your Honor.  Michael

16  Imbroscio from Washington, D.C., although originally across

17  the river in Ohio.

18    I'm going to talk about the motion in limine on

19  foreign labeling.  I'm going to focus on that.  I was going to

20  cover a little bit the plasma concentration motion.  I feel

21  that that's been covered.  If you have any questions, I'm

22  happy to answer.  And I think what I would like to do in the

23  foreign labeling is begin just with kind of bringing it all

24  together, setting the stage.

25    Pradaxa was a real step forward in medical care, I

1   think we all agree, and there subsequently have been several

2   other additional medicines, Eliquis and Xarelto.  When Pradaxa

3   came to the market for this indication, for SPAF, stroke

4   prevention in atrial fibrillation, it was brought to market

5   both in Europe and in the U.S.

6           THE COURT:  At the same time?

7           MR. IMBROSCIO:  At approximately the same time.

8           The U.S. was first --

9           THE COURT:  What year was that that at least it

10  started here?

11          MR. IMBROSCIO:  In the U.S., October of 2010.  It was

12  approved in October of 2010 -- I'll come back to the details

13  in a moment -- and then the following year, I don't have the

14  exact month, it was approved in Europe.

15          And when the company studied the medicine in the RE-LY

16  trial, they set up the various parameters of the clinical

17  trial.  And one of the parameters was that anyone whose renal

18  function was below 30, creatinine clearance below 30, were

19  excluded from the trial.  They were not able to participate,

20  and if they fell below, they were I think converted to

21  warfarin.

22          So it was the company's position, given that Pradaxa

23  is renally excreted, that if you had renal impairment below

24  30, the medicine should not -- should not be given.

25          And the company tested two doses in the RE-LY trial,

41

1    110 milligrams and 150 milligrams.  So as part of the approval

2    process, the company in the U.S. submitted two doses for

3    approval, the 150-milligram dose and 110-milligram dose.

4         Ultimately the FDA came to the conclusion, based on

5    the RE-LY data, that the 150-milligram dose would be approved,

6    but not the 110.  And their rationale, which is laid out

7    pretty clearly both in the approval documentation, but also

8    quite remarkably in the New England Journal of Medicine, is

9    that even though the 110 had less bleeding than the 150, that

10   on balance, weighing stroke protection more, the 150 was

11   better.

12        And in the FDA's words, they did not want doctors in

13   the U.S. playing it safe by giving the 110.  You can imagine

14   doctors saying I don't want to risk a bleed.  Stroke is --

15   obviously that's God's will, but I don't want to be the one

16   causing someone to bleed.  And that was a very unique public

17   health decision, one that frankly, you know, was so remarkable

18   that they felt they needed to publish in the New England

19   Journal of Medicine.

20        What the FDA did do, though, is they said we

21   understand, Boehringer, you don't think anyone should take

22   this medicine, whether 110 or 150, below a creatinine

23   clearance of 30.  We at the FDA think more people can benefit

24   from this medicine.  It was the FDA's idea that we should

25   maybe do what they call a half-dose, the 75-milligram dose.

42

1    And we can figure out that half-dose based on the plasma

2    information that was gathered during the RE-LY trial, so that

3    a greater population of individuals, of Americans can be on

4    this medicine and benefit from it.

5          That's a uniquely FDA U.S. decision.  In other

6    countries, the 75-milligram was -- is not approved for this

7    indication.

8          It is approved in Europe for an orthopedic indication,

9    a short-term orthopedic indication, but not --

10          THE COURT:  Something other than AFib.

11          MR. IMBROSCIO:  Exactly right.  It is for primary

12    prevention of VTEs, essentially clots.

13          So that, it's fair to say, is a very complicated

14    regulatory history and interaction between really

15    fundamentally different public health decisions made in the

16    U.S. versus in Europe.  Because in Europe, they did approve

17    the 150 and the 110 and, as a function of approving the 110,

18    had to put in place a whole range of criteria for when someone

19    should be on the 150 and when someone should be on the 110.

20          To be clear, those criteria originally emanated from

21    the company when they submitted the approval packages to both

22    the U.S. and to Europe.  In the U.S., when the FDA made the

23    decision not to approve the 110, all of that criteria got

24    stripped out of the U.S. label, all the reference to the 110

25    got stripped out of the U.S. label.

43

1        So, for instance, you know, in the European label, if

2   you're of a certain age, if you're above 80, then you should

3   be on the 110 presumptively.  Obviously in the U.S. there is

4   no 110-milligram, and so that has to come out.  And what has

5   resulted as a function of that is just a very different set of

6   dosing guidelines in the U.S. versus in Europe.

7        And having been a part of the two trials that have

8   occurred so far, I think it's fair to say that the essence, if

9   not the principal argument the plaintiffs have made to the

10  jury is the company doesn't tell U.S. doctors what they tell

11  doctors over in Europe.  Which we think is just fundamentally

12  unfair and probably in many material respects preempted in the

13  sense of how can we be punished for not saying in the U.S.

14  what we can't say.

15       THE COURT:  Well, what specifically do you understand

16  plaintiffs complain is not said here that is said there?

17       MR. IMBROSCIO:  Oh, let me see if I can -- it's a long

18  laundry list.

19       You don't tell U.S. doctors that in Europe above 80

20  you should be using a lower dose.

21       THE COURT:  All right.  And that is in the European

22  label?

23       MR. IMBROSCIO:  That is the definition of when someone

24  should be using the 110-milligram dose.

25       THE COURT:  Okay.

44

1        MR. IMBROSCIO:  That's one.

2        Number two, there are various sets of combinations of

3   creatinine clearance and concomitant medications for which the

4   110-milligram dose is recommended in Europe and not in the

5   U.S.  So I think a creatinine clearance below 50 with certain

6   concomitant medications, including perhaps aspirin.

7        THE COURT:  So I gather, then, what you're saying is

8   that in the European label, these additional, more specific

9   warnings about over 80, severe renal, taken concomitantly with

10  two different categories of drugs, all those things or at

11  least some of these things are aimed at the 110 dosage.

12       MR. IMBROSCIO:  Yeah, that's exactly right.

13       THE COURT:  Okay.  And does this label, does the

14  European label provide some quantification of the increased

15  risk to people over 80, to people with severe renal or et

16  cetera from taking Pradaxa?

17       MR. IMBROSCIO:  Yeah, the one thing that does come to

18  mind is a concomitant use of aspirin.

19       THE COURT:  Right.

20       MR. IMBROSCIO:  There is a statement in the European

21  label that says essentially it doubles the risk.  The U.S. --

22  and that comes from the company's data, one aspect of the

23  data.  The U.S. affiliate of Boehringer submitted that

24  language to the FDA, and the FDA struck it out and said, no,

25  we don't want to say that.

45

1          There are probably a laundry list of items that I can

2     probably submit that relate to this.  We could just probably

3     look at the closing argument of the plaintiffs in the last two

4     trials, and they are spelled out in extraordinary detail.

5          And that is really our concern, Your Honor, is that

6     I've been doing this for a long -- a lot of years, and I get

7     confused on what exactly the situation -- what happens in the

8     U.S. label.  And when we get criticized for not saying, you

9     know, in these terms -- this is probably a slide or probably

10    from many statements from their closing argument -- they're

11    not telling U.S. doctors what they tell European doctors,

12    that, of course, has in its own prejudicial aspect to it

13    whatsoever in addition.  But we think that in this setting,

14    where it all really comes down to this unique public health

15    decision that the FDA made in the U.S., that those arguments

16    about what is said in Europe, what is said in the core data

17    sheet, which essentially tracks the worldwide labeling, it's

18    just unfair to essentially be fighting against that.

19          They can attack the U.S. label, they can say it's

20    inconsistent with the RE-LY data, whatever they want to say.

21    But these arguments that, you know, you should have had

22    essentially a 110 available, which is essentially what they

23    are when you peel away the -- when you peel away the onion, we

24    are being criticized for not having the 110 available.  We

25    don't think that's a viable argument.

46

1      THE COURT:  Well, what does the foreign label say with

2  respect, then, to people with severe renal impairment?

3      MR. IMBROSCIO:  They're not allowed to use the

4  medicine.  Below 30, which is usually the definition of severe

5  renal impairment, they are contraindicated.  They are not

6  allowed to use this medicine under any of those.

7      THE COURT:  But that's not true in the United States.

8      MR. IMBROSCIO:  No, because the FDA said we want the

9  people below 30 to have the benefit of this medicine, so we're

10  going to use a half dose, which is a dose that is not

11  available for SPAF elsewhere, certainly not in Europe.

12      And that's what makes this case even more complicated,

13  because the cases we've done so far are cases where the

14  individual was on the 150-milligram dose.  Here we've got the

15  added wrinkle of Ms. Knight to be on the 75-milligram dose,

16  which is even more sort of confounding as to what the heck to

17  make of it because there is no equivalent even in Europe of

18  the 75-milligram dose.

19      THE COURT:  Okay.

20      MR. IMBROSCIO:  And so -- and I think that also plays

21  into what Mr. Richmond said, which is this notion of

22  anticoagulation.  Whether there is evidence of the plaintiff

23  being anti -- over-anticoagulated, excuse me, is even more

24  speculative because it's literally a half dose.  It would be

25  one argument if the person is on the 150-milligram dose, an

1      argument about being over-anticoagulated.

2              By definition -- as I understand it, Ms. Knight's

3      renal function was right around 30, I think it was maybe 34, a

4      little higher at the time of admission.  There would be no

5      suggestion -- I don't know if you can get any expert to say

6      this, that with a renal function of this amount, you would

7      expect a person to be over-anticoagulated on a half dose, on a

8      75-milligram dose.  I think they need that evidence to get

9      over the next step.

10             And our view is substantively it should not be in.

11     But certainly as a part of the trial in this case, the

12     evidence of the foreign labeling should not come in, and we've

13     cited in our brief the dozens of cases where the courts have

14     reached that decision.  We would ask that in this case as

15     well.

16             THE COURT:  Okay.  Thank you.

17             MR. IMBROSCIO:  Thank you, Your Honor.

18             THE COURT:  All right.  Does that complete the defense

19     presentation?

20             MR. HUDSON:  Yes, Your Honor.

21             You had reversal agent on the list of items, but given

22     the discussions today, we'll leave that --

23             THE COURT:  All right.

24             MR. HUDSON:  -- and rely on the papers.

25             THE COURT:  All right.  Great.

48

1          We're going to take a quick recess and then let

2     plaintiffs respond.

3          THE COURT SECURITY OFFICER:  All rise.  This honorable

4     court will be in recess.

5        (Recess taken.)

6          THE COURT:  All right.  Ready?

7          MR. CHILDERS:  Yes, Your Honor.

8          Good afternoon, Your Honor.  I am Andy Childers on

9     before of the plaintiffs in this case.

10         THE COURT:  Welcome.

11         MR. CHILDERS:  I'm not sure how you would like me to

12    start or --

13         THE COURT:  Well, at the beginning.

14         MR. CHILDERS:  Okay.  Fair enough.  Fair enough.

15         I believe the argument from counsel -- and I'm going

16    to do all of the argument, so I don't have to sit down.  So

17    any questions you have, you just let me know.

18         THE COURT:  And Harry is going to be shouting things

19    to you.

20         MR. CHILDERS:  He may.  He may hand stuff to me.

21         The first issue that was argued was failure to warn,

22    and what was described to the Court was the failure to warn

23    being simply that there was a lack of information in the label

24    that a higher plasma concentration of Pradaxa leads to higher

25    bleeds.  That is a half portion of the failure to warn.

49

1          THE COURT:  Okay.

2          MR. CHILDERS:  There's a second portion to the failure

3     to warn, and that is that at the time Ms. Knight started

4     Pradaxa, the label did not tell her or her physicians that if

5     a patient like her, who had severe renal impairment, was also

6     taking a P-gp inhibitor medication, of which she was taking

7     two at the time, they shouldn't take Pradaxa.

8          After Ms. Knight --

9          THE COURT:  Say that again just to help me make notes

10    to keep it clear.

11         MR. CHILDERS:  Yes, sir.

12         Neither the label nor the medication guide --

13         THE COURT:  At the time it was originally prescribed

14    to her --

15         MR. CHILDERS:  That is correct.

16         THE COURT:  -- failed to tell the patient or the

17    doctor --

18         MR. CHILDERS:  That a patient with severe renal

19    impairment, who is also taking a P-gp inhibitor medication --

20    she was on two of them.  One is called Coreg, which is a heart

21    medication, and the other is called Omeprazole, which is a

22    proton pump inhibitor.

23         After she had been on Pradaxa for a short period of

24    time, the manufacturer changed the label and added that

25    information, but never sent a Dear Doctor letter to her

1    prescriber, never altered the patient medication guide.

2         THE COURT:  When did they change it?

3         MR. CHILDERS:  I believe it was within a month or two

4    of her starting the drug.

5         And the testimony from Dr. Ashhab was that they failed

6    to warn her physician, because when they made this significant

7    change to the label, they did not notify her that that change

8    had been made.  And if that change had been made -- I'm sorry.

9    If she had been made aware of that change, she would have

10   known to stop Pradaxa or switch to a different anticoagulant

11   for a patient who is on P-gp inhibitors.

12        So --

13        THE COURT:  So the plaintiff -- or the defendant,

14   rather, maintained the argument that there is no evidence that

15   the patient -- and in the absence of this intermediary

16   doctrine for this limited time frame in West Virginia, the

17   duty is defined by what the patient should know.  But there's

18   no evidence that the patient did anything.

19        MR. CHILDERS:  That's incorrect.

20        Her son and daughter were asked, I believe at

21   deposition, did she read the information that was provided

22   generally in medications, and they said they thought when she

23   got them, she read them.  Meaning when you go to the pharmacy,

24   and they give you printouts, did she read them?  And they said

25   it was their belief that if she got it, she would have read

51

1    it.

2              THE COURT:  So you contend the inference is that she

3    would have read it at the time.

4              MR. CHILDERS:  Correct.

5              THE COURT:  But then when it changed, it's still in

6    the same package, isn't it, the --

7              MR. CHILDERS:  Well, the patient medication guide to

8    this day doesn't tell patients like her, if you have severe

9    renal impairment, and you're on one of -- this particular type

10   of drug, the P-gp inhibitor, you shouldn't take Pradaxa.  To

11   this day it doesn't say that.

12             What it says is let your doctor know what medicines

13   you're on.  The same doctor prescribed her the Pradaxa as

14   prescribed her the P-gp inhibitors.  That didn't change.

15             THE COURT:  So when you talked about the label -- was

16   it the label that changed --

17             MR. CHILDERS:  Yes, sir.

18             THE COURT:  -- a month later?

19             MR. CHILDERS:  Yes, sir.

20             THE COURT:  So you're saying even when the label

21   changed, it really didn't communicate fully that when you've

22   got this combination, severe renal problems, and you're on

23   these other drugs, you shouldn't be taking Pradaxa?

24             MR. CHILDERS:  Correct.

25             It's not just be careful, you might bleed, it's you

52

1    shouldn't take it.

2              THE COURT:  Right.

3              MR. CHILDERS:  That's a very different warning than

4    you are at an increased risk of bleed.

5              And the testimony at trial from Dr. Ashhab will be

6    clearly if any doctor knew that information, they would stop

7    the patient from taking that drug.  And if that had happened,

8    more likely than not, she wouldn't have had her bleed at all

9    because she wouldn't have been on Pradaxa.

10             And when I asked if she would have just as likely had

11   the bleed had she been on warfarin, the response from -- which

12   is an alternative anticoagulant drug that she had been on

13   previously, the response from Dr. Ashhab, which is consistent

14   with the data from the defendant, is she had 50-percent higher

15   increased risk of bleed on Pradaxa.  So it's more likely than

16   not that she would not have bled at the same time had she been

17   on warfarin because the chance of her bleed was less likely.

18   And that's in the record as well, Your Honor, and in his

19   testimony.

20             THE COURT:  Okay.

21             MR. CHILDERS:  So there are two issues with the

22   failure to warn, not just one.  I wanted to make sure that was

23   clear.

24             I think Your Honor touched -- picked up on right away

25   that the patient medication guide that is given to the patient

53

1    doesn't quantify any risk whatsoever.  It doesn't tell a

2    patient any specific type of medication they might be on that

3    may increase the risk other than saying, if you're on aspirin

4    or on Plavix or on chronic use of an NSAID drug, a

5    non-steroidal anti-inflammatory drug, that could increase your

6    risk.

7         Again, it doesn't quantify it, though.  It doesn't

8    tell the patient the information that the company knows about

9    how much that will increase the risk.

10         THE COURT:  And what do you contend is the information

11    the company knew that they should have put in this patient

12    medication guide?

13         MR. CHILDERS:  It's the information that is

14    contained -- I'm glad you asked that because the last argument

15    we had was foreign labeling and the company core data sheet,

16    the company asking you not to let us show that to the jury.

17         That very information is contained in both of those

18    documents.  In the --

19         THE COURT:  And what is that specific information?

20         MR. CHILDERS:  The specific information is if you're

21    on aspirin -- there are two doses of aspirin that patients

22    take for maintenance of heart issues, 81 milligrams and 325

23    milligrams.  If you're on the 81-milligram dose, the risk of

24    bleed goes up by 50 percent.  If you're on the 325-milligram

25    dose, it doubles.

54

1              If you are taking Plavix, your risk of bleed doubles.

2    If you are taking a chronic NSAID -- or excuse me -- taking an

3    NSAID chronically, meaning you don't just take it every now

4    and then for a headache, if you take it every day, your risk

5    of bleed is increased by 50 percent.

6              THE COURT:  So you're saying that quantification is

7    adopted by BI in the company core safety sheet, and then did

8    you also say in the European label?

9              MR. CHILDERS:  That is correct, Your Honor.

10             THE COURT:  Okay.

11             MR. CHILDERS:  That information is contained in --

12             THE COURT:  So you think that those two documents

13   should each come in as proof of knowledge and notice to the

14   defendant of those facts, those facts being the specifically

15   quantifiable increased risk under certain co-medications.

16             MR. CHILDERS:  I do.  And I believe they should come

17   in for other reasons I'm happy to tell you about right now if

18   you'd like.

19             THE COURT:  Okay.

20             MR. CHILDERS:  One of the things that plaintiffs have

21   to prove for strict liability here is alternative feasible --

22   feasible alternative design.

23             THE COURT:  Okay.

24             MR. CHILDERS:  What better evidence is there of an

25   alternative feasible design than the label that this company

1    actually gives to doctors in the rest of the world?

2            THE COURT:  And you're talking about a feasible

3    alternative design in the label?

4            MR. CHILDERS:  Yes, sir.

5            THE COURT:  Not the product.

6            MR. CHILDERS:  Correct, correct, the warning.

7            And in addition to that, the foreign label also

8    contains specific information telling physicians how to

9    measure Pradaxa levels.

10           As you've heard, we don't know Ms. Knight's Pradaxa

11   level.  The reason for that is physicians in the United States

12   are not told how to directly measure the Pradaxa level.

13   Physicians in the foreign label are told how to do that, what

14   tests to use.  And not only that, they are told what levels of

15   Pradaxa in a patient's blood mean that patients have an

16   increased risk of bleed.

17           So those are two additional pieces of information that

18   are not included in the U.S. label, that have never been --

19           THE COURT:  And at what point were they included in

20   either the company core data sheet or the European label?

21           MR. CHILDERS:  I don't believe the coagulation test

22   information about the actual Pradaxa blood level is in the

23   company core data sheet, but it has been in the foreign label

24   since the beginning of that label being in existence to my

25   knowledge, at least prior to the time that Ms. Knight took the

1    drug.

2         I don't --

3         THE COURT:  Prior to her prescription?

4         MR. CHILDERS:  Absolutely.

5         As well as telling physicians specifically to use a

6    test, and the test you'll hear is called dTT or diluted

7    thrombin time.  That's a test that can be performed by labs in

8    the United States.  Quest and LabCorp, which I'm sure you've

9    heard of -- if you go to physicians' offices, you see their

10   boxes -- they can perform that test.  Physicians in the U.S.

11   to this day are still not told that that test to measure the

12   Pradaxa level can be performed by those labs.

13        So that information, again, is in the foreign labels,

14   and plaintiffs would use that to show knowledge on the

15   company's behalf that there's a way to measure this Pradaxa

16   level, and there's a way to know if it's too high, and that

17   physicians and patients in West Virginia should be told that.

18        THE COURT:  How do you decide if it's too high?

19        MR. CHILDERS:  It's a specific finding, over 200 --

20        THE COURT:  Okay.

21        MR. CHILDERS:  -- nanograms per milliliter, Your

22   Honor.

23        THE COURT:  All right.  So BI says in their own

24   documents --

25        MR. CHILDERS:  Correct.

57

1    THE COURT:  -- that if you measure a Pradaxa

2    concentration level that exceeds 200 units, you've got too

3    much.

4    MR. CHILDERS:  They don't say it's too high.  What

5    they say to the physician is that that means the patient is at

6    an increased risk of bleed, and then it is up to the physician

7    to decide how to deal with that.

8    THE COURT:  Okay.

9    MR. CHILDERS:  So what they are giving is here's the

10   information.  Physician, you use your clinical judgment.  That

11   information is not given to physicians here, it wasn't given

12   to Ms. Knight's physicians, and it certainly wasn't given to

13   Ms. Knight herself.

14   THE COURT:  Okay.

15   MR. CHILDERS:  So I believe for those reasons alone,

16   the alternative feasible design and also the information going

17   to knowledge should show that the foreign labels should come

18   in.

19   The fact that there is no one --

20   THE COURT:  And I gather that you agree that it would

21   be unhelpful and confusing if you were to try to discuss or

22   provide evidence in more detail about the European labeling

23   regime, how things are done over there, requirements?

24   MR. CHILDERS:  We have no intent of getting into any

25   of that.

1    And the fact that there's a 110-milligram dose, that's

2  a higher dose than Ms. Knight was on.  There is no reason we

3  would argue she should have been on a higher dose.  Obviously

4  we believe the 75-milligram dose was too high for her during

5  the time she was on it, and that was why she had this bleed.

6  So any argument that the 150 and the 110 dose in Europe are

7  somehow going to have interplay here is not the case.  She was

8  not on a dose that should have -- she couldn't have gotten a

9  lower dose.

10    What we're saying is, if her physician had been told

11  you can measure the level, you can see that it's too high,

12  then the physician would have known this wasn't the right drug

13  for her.  And her physician had three or four other choices to

14  put her on besides Pradaxa at that point.

15    THE COURT:  Well, as I understand the defendant's

16  argument, at least part of it, it's that the European label is

17  dictated by the fact that they allowed a 110 and a 150 dose.

18  And that if it's a 110 dose, then there are these certain

19  risks.  But are they -- I'm trying to think how I can phrase

20  this and make sense out of it.

21    So when the European label warns of these increased

22  risks, is it based upon the fact that it's a 110 dose?

23    MR. CHILDERS:  No.  It's in the information for the

24  150- and the 110- and the 75-milligram dose in Europe.  There

25  is a 75-milligram dose there, just not for AFib.

1          What they tell physicians is the same information.

2     Some patients are going to potentially have higher levels of

3     Pradaxa, these are some of the reasons why they may have it,

4     and here's how you can test for it, and here's how you can

5     know if it's too high.

6          THE COURT:  So it's not statements that are based on

7     the assumption that you're taking at least 110?

8          MR. CHILDERS:  No, sir.  It's based on plasma

9     concentration in the blood regardless of what dose you take.

10         THE COURT:  Okay.

11         MR. CHILDERS:  And the information given that I

12    believe Mr. Imbroscio was talking about was, if you're on the

13    150 -- or if you are over 80, you just shouldn't take the 150.

14    That's too much for you anywhere else in the world except for

15    the United States.  That's not really at issue here because

16    Ms. Knight was never on the 150-milligram dose.

17         THE COURT:  I think I've got it.

18         MR. CHILDERS:  Okay.  On the issue of proximate cause,

19    in our response, Your Honor, to the defendant's motion for

20    summary judgment on page 5, we have cited the information that

21    Dr. Ashhab relied on for his opinion that Ms. Knight was

22    over-anticoagulated at the time of her bleed, which included

23    the aPTT level, which was 36 hours after her last dose.  And

24    he explains that's three half-lives of the drug, meaning it's

25    half gone, half gone again, and half gone again at that point.

60

1      And, yes, he's using aPTT, but that's the information

2  the drug company label tells him to use to estimate that.

3      THE COURT:  Now we're talking back to this chart?

4      MR. CHILDERS:  Well, the chart -- I can get to that

5  chart if you'd like, Your Honor.

6      THE COURT:  Okay.

7      MR. CHILDERS:  He didn't rely on that chart for his

8  opinions.  He was shown that chart at his deposition and said

9  I can look at it, and I can see this is where she would have

10 been.  And I can also tell you three half-lifes have gone away

11 from the drug at this point, so that makes me believe that she

12 was over-anticoagulated.

13     And, yeah, I can't give you a specific number.  You're

14 right, he would have to guess.  Anyone would have to guess to

15 extrapolate a specific number for a patient.  But he knew it

16 was at least three half-lifes higher than it had been at the

17 time it was measured.  And at the time it was measured, it was

18 over the normal range for aPTT.

19     THE COURT:  47 is over?

20     MR. CHILDERS:  47 is outside the normal range for

21 aPTT.  Doesn't mean at 47 a patient is over-anticoagulated,

22 but at that point in time she hadn't taken the drug for 36

23 hours.

24     Now interestingly enough, Your Honor -- and this is

25 included in our response to -- in fact, I think it's our

1   response to defendant's motion in limine No. 6 about plasma

2   concentrations.

3        THE COURT:  Yeah.

4        MR. CHILDERS:  Just two weeks ago, the defendant's own

5   scientists published a new paper.  And in that paper, there's

6   a chart on page 12 of our response, it's document 81, where

7   they actually finally looked at patients like Ms. Knight who

8   had severe renal impairment, who were taking the 75-milligram

9   dose, and they looked at what the aPTT spread is for those

10  patients.

11       And if you look at it, they are all around 50 going up

12  to plasma concentrations as high as 700 nanograms per

13  milliliter, which is clearly way higher than 200 nanograms per

14  milliliter.  Had this information been available at the time

15  Dr. Ashhab was formulating his opinions, I'm certain he would

16  have relied on it, and it supports exactly what he testified,

17  that that level in a patient like Ms. Knight shows that she

18  was over-anticoagulated at the time of her bleed.

19       So, again, additional support for the opinions that

20  Dr. Ashhab opined on and, again, comes from the defendant's

21  own documents, their own studies, their own scientists.

22       THE COURT:  What else does he rely upon, then, does

23  Dr. Ashhab rely on?

24       MR. CHILDERS:  He -- sorry, Your Honor.

25       He basically relies on that measurement being three

1    half-lifes after she came in the hospital with the bleed and

2    extrapolates that it was three half-lifes higher than that

3    when she came in.

4         The fact that he's a gastroenterologist, let me

5    address that if I could, Your Honor.  He's also a

6    board-certified internist.  And as a gastroenterologist and an

7    internist, he treats patients who have gastrointestinal bleeds

8    that are caused by anticoagulants.  He knows how to assess the

9    level of anticoagulation in these patients because that's the

10   patient he treats.

11        To discount his ability to utilize a coagulation test

12   in a bleeding patient because he doesn't prescribe Pradaxa I

13   think would be improper.  He treats the patients for whom

14   these bleeds happen because of the anticoagulation.  So I

15   think he's absolutely the doctor who has to be the one on the

16   front line interpreting these tests when they matter most to

17   patients in the U.S.

18        THE COURT:  Well, can you explain any more about what

19   sort of clinical judgment he's exercising?  Or is it simply

20   that he would take an aPTT at a given moment and then

21   determine when Pradaxa was last given?

22        MR. CHILDERS:  Correct.

23        THE COURT:  And then from that, he would say if they

24   had a bleed before, it must have been that they were

25   over-anticoagulated?

1          MR. CHILDERS:  I don't think that -- honestly I don't

2     think he said because she had the bleed, she was

3     over-anticoagulated.  I think he said that is evidence of her

4     anticoagulation, and that's why she did have the bleed is

5     because he believes she was over-anticoagulated.  But that

6     certainly goes into his assessment.

7          He's a doctor who treats patients for the very type of

8     bleed that Ms. Knight had on a daily basis, and that is how he

9     would evaluate his own patient to decide -- if a patient like

10    this came in on warfarin, he would have been able to test

11    specifically and reverse it if he needed to.  He testified he

12    can't do that for patients on Pradaxa, so he has to use the

13    tools he is given, one of which is to look at aPTT and try to

14    figure out how long it's been since their last dose and figure

15    out if they're over-anticoagulated.

16         THE COURT:  Okay.

17         MR. CHILDERS:  So let me see.

18         Design defect, I believe -- do you have any other

19    questions, Your Honor, about the failure to warn?

20         THE COURT:  Well, we'll get to this later, but let's

21    talk at least briefly about the other proximate cause issue

22    they raise, which is that Dr. Ashhab apparently can only say

23    that from the medical records it seems that the doctor is

24    treating her after this bleed was repaired, and admittedly it

25    was repaired satisfactorily.  I don't think anybody questions

64

1    that.  She didn't have another one.

2           But that somehow she didn't bounce back, that it took

3    some unstated or unspecified toll on her, and that over the

4    course of the next several months in and out of the hospital,

5    she died of a heart attack.

6           But I've got to tell you, that doesn't -- given this

7    woman's overall condition, that is pretty weak.

8           MR. CHILDERS:  Your Honor, on that point, he relied on

9    the fact that she wasn't just hospitalized for a few days and

10   went home.  She had to be put into a long-term treatment

11   facility there at the same hospital because of the de-bility

12   that was caused by the bleed.  She stayed hospitalized or in

13   that unit for three weeks.

14          She then had to have home health care, who -- for

15   another several weeks -- testified that it took that long for

16   her to get basically to where they just couldn't make her any

17   better.  It's not that she was better, but they couldn't do

18   anything else for her.

19          And he relied on the testimony of Dr. Abdelgaber, who

20   said she kept coming back in each time complaining she had not

21   gotten better from the time of the bleed.  And he agreed that

22   each time she came into the hospital or came to see him, that

23   was the same complaint, that she wasn't getting any better,

24   and that he observed she wasn't getting any better, and that

25   that eventually led to her death.  I believe you can rely on

65

1    that testimony.

2         And then the issue as to -- I believe that what

3    Mr. Richmond said was, well, Dr. Ashhab just didn't unpack

4    that opinion well enough for us.  If you look at the

5    deposition transcript, which is attached in its entirety, he

6    wasn't asked that question until the very end by the

7    defendant.  And once he gave his bases for his opinion, they

8    said no more questions.  They didn't ask him to unpack it

9    because they didn't want him to unpack it.

10        It's not up to him to answer questions that aren't

11   asked.  He has to be asked questions at a deposition in order

12   to answer them.  That literally was the last line of

13   questioning, and then the deposition stopped without asking

14   him to explain any further what he had said.

15        So I do believe not only is his opinion based on the

16   records he looked at, but it is also based on the testimony of

17   Dr. Abdelgaber, who was the primary care physician, who

18   treated her throughout the course and up to the time of her

19   death in the beginning of September.

20        So I believe there certainly is adequate evidence for

21   failure to warn on those two issues we talked about and also

22   the proximate cause from not only Dr. Ashhab, but she wouldn't

23   have even been on Pradaxa had she been warned don't take this

24   if you're taking these other medications, or had her doctor

25   been warned of that at the time she started the medication.

1        May I move to design defect?

2        THE COURT:  Yes.

3        MR. CHILDERS:  Again, Your Honor, on design defect,

4   plaintiffs have to show an alternative, safer way to provide

5   Pradaxa to patients in this state, in West Virginia.  Again,

6   we believe that the foreign labels should be allowed for that

7   because they show exactly -- again, these aren't theoretical

8   issues that we have hired some expert to come up with and say

9   this is how the label should read.  These are the labels that

10  Boehringer is actually giving to physicians in the rest of the

11  world.  And the argument here is they know how to do this,

12  they know how to make this drug safer for patients like Betty

13  Knight, and all they have to do is use that same information

14  here in the United States.

15        The issue about the antidote, Praxbind, you asked some

16  questions about that.  In plaintiffs' response, I believe it's

17  pages 10 through 11 of the response to the motion for summary

18  judgment, there is a timeline of the development of this

19  reversal agent.  And the antibody that eventually became

20  Praxbind, the reversal agent, was made by Boehringer, not by

21  an outside company, in 2002.  And the testimony, again by

22  Boehringer's own people, was that it was put in the freezer,

23  and nobody touched it again until 2008.

24        And then the question then moved to -- or the

25  presentation then moved to Judge Land's order from the

1    Chambers case, who I assume is not related to Your Honor.

2         THE COURT:  I don't think so.

3         MR. CHILDERS:  And if you look in Judge Land's

4    opinion, there is two -- there is at least -- there are

5    several distinctions here.

6         First of all, there was no failure to warn claim that

7    was premised on the lack of a reversal agent in that case.

8    It's a different case, and for different reasons, plaintiff

9    didn't pursue failure to warn based on lack of information

10   about adequate reversal of Pradaxa.  So that's one very clear

11   distinction that we have in the present case.

12        In the present case we have shown, Your Honor, in our

13   brief on page 10 at footnote 36, Boehringer's own scientist,

14   Dr. Paul Reilly, wrote an e-mail back in 2012 where he said

15   the information that we provide to physicians in our label,

16   where it says we don't have a reversal agent, but here are

17   some ways you can fix it, is inadequate.

18        That's not my language.  He actually wrote that, I

19   believe this is inadequate.  Clearly that is evidence of the

20   potential inadequacy in the information that is provided to

21   physicians as it relates to the reversibility.

22        But getting back to the reversal agent, as Your Honor

23   asked the questions, I think it became clear, Pradaxa was

24   approved in October of 2010 for sale in the United States.  By

25   2008, two years -- actually more than two years before because

68

1    it was the beginning of 2008, Boehringer had already proved

2    internally they could reverse Pradaxa with Praxbind.  They

3    knew this more than two years before they got Pradaxa

4    approved.  They did not approach the FDA to start getting the

5    approval process for Praxbind until 2011, after Pradaxa had

6    already come on the market.

7         Had that information been given to FDA, I can't say

8    what they would or would not have done, but at least they

9    would have known there is a way to reverse this particular

10   product which we know is going to cause bleeds in patients.

11   And that information I think is more similar to what you

12   alluded to from Judge Fallon in the Xarelto claims, where he

13   noted the company knew how to do this.  They knew how to

14   reverse the Xarelto drug before the time they put it on the

15   market, but they didn't do what they should have done to have

16   a reversal at the time.  Same exact issue here.  It's the same

17   exact issue because the timing is more than two years before

18   approval.

19        THE COURT:  Isn't that, though, exactly what Judge

20   Land looked at, too?

21        MR. CHILDERS:  He did, and respectfully, as much as I

22   respect Judge Land, I believe he got that wrong on that

23   particular issue.  But, again, he also was looking at it in

24   terms of not having a failure to warn claim that was based at

25   all on that issue.

1          And what we've argued here, and I think this is

2     accurate, Your Honor, is just making a reversal agent wasn't

3     the only way to deal with the issue about how to treat a

4     patient who was bleeding on Pradaxa, how to get the Pradaxa

5     out of their system, how to make it so that Pradaxa is not

6     contributing and making that bleed worse.

7          THE COURT:  Yeah, it's not clear to me what your

8     evidence is, if you were permitted to develop this at trial,

9     that there was a feasible, safer alternative at the time of

10    FDA approval here that would have made Praxbind unnecessary.

11    There was some feasible alternative drug or treatment that

12    could provide this sort of reversal antidote.

13          If it's not Praxbind --

14          MR. CHILDERS:  Sure, and that's a tough spot, and I'll

15    agree with Your Honor on that.

16          But we base that on the fact that there is specific

17    information that is put in the label about what to do if a

18    patient comes in and they're bleeding, which the company

19    agrees they actually haven't tested it to see if any of it

20    works, and then their own scientist says I think it's actually

21    inadequate to tell physicians this.

22          So I believe that is a design defect in the drug

23    itself.  Giving bad information to physicians about how to

24    treat it is just as bad as not telling them the right way to

25    treat it.  Especially with someone like Ms. Knight, who is

70

1    having a bleed, and there is not something that can be done to

2    slow it down in a way that could be done if they were given

3    the proper information.

4            In addition to that --

5            THE COURT:  Well, let me ask you about this.

6            MR. CHILDERS:  Yes, sir.

7            THE COURT:  Frankly this kind of just occurred to me

8    because of perhaps the way you just said that.

9            So I know that she came in with gastrointestinal

10   discomfort, and I guess she was starting to see blood in her

11   stool, maybe it was getting worse.

12           MR. CHILDERS:  Yes, Your Honor.

13           THE COURT:  How long was she in the hospital before

14   they surgically repaired the wound; do you remember?

15           MR. CHILDERS:  It was one or two days.  I can't

16   remember specifically standing here, but I know it wasn't more

17   than one or two days before the surgery was done.

18           She stayed in the hospital five days total before they

19   moved her to the --

20           THE COURT:  Well, I'm just wondering, then.  So

21   assuming that there was a reversal agent available then,

22   what's your evidence that a reversal agent would have made the

23   difference?

24           MR. CHILDERS:  She may not have had to have surgery at

25   all had she stopped bleeding because of the reversal agent,

1    Your Honor.

2            THE COURT:  Well, it does seem to me that's perhaps a

3    possibility, but fairly speculative.  I mean, Dr. Ashhab

4    described this type of GI bleed and said it's kind of common.

5    I don't know that he discussed it any more really than that

6    and the fact that it was repaired.

7            So it occurs to me that it's not clear what the

8    evidence is that had there been a reversal agent available, it

9    would have --

10           MR. CHILDERS:  Sure.  So -- if I may.

11           THE COURT:  Yeah.

12           MR. CHILDERS:  I think we attached the articles that

13   were written by the company about the reversal agent.  And

14   it's pronounced idarucizumab, and I know that because I asked

15   Dr. Reilly at his deposition.  That is Praxbind.

16           And what it says is that it reverses the anticoagulant

17   effect of Pradaxa within minutes.  So it's not a matter of it

18   takes several hours or it takes a couple days.  It literally

19   happens in minutes, and that's the evidence that Dr. Ashhab

20   relies on to say that would have either lessened the bleed or

21   made it last a less amount of time.

22           THE COURT:  Okay.

23           MR. CHILDERS:  Back to the warning issue, design

24   defect, there is not one word in the patient medication guide

25   that was given to Ms. Knight that tells her there's no way to

1    reverse Pradaxa.  That's not included, still to this day is

2    not included, and so I believe that is clearly a claim that

3    should go to the jury.

4              THE COURT:  Where is it that the defendant points to?

5              MR. CHILDERS:  It's in the -- I'm sorry, Your Honor?

6              THE COURT:  Where is it that the defendant points to

7    in the --

8              MR. CHILDERS:  In the label, the physician label, but

9    not in the patient medication guide that would have gone to

10   Ms. Knight or any patient.

11             And then as far as proximate cause, again, Your Honor,

12   Dr. Ashhab testified that not having a way to reverse the drug

13   did cause her bleed to last longer than it would have

14   otherwise lasted.

15             Did you have any questions for me?

16             In regard to Dr. Ashhab, I think this is fairly well

17   covered, the only guesstimates he made were trying to give an

18   exact number.  He can't do that, nobody can do that.  But he

19   gave an opinion that was based in medicine, based on his care

20   and treatment of patients, and based on his review of what the

21   company tells him as to how to measure the anticoagulant

22   effect of Pradaxa.

23             THE COURT:  Which includes a reference to relying upon

24   the aPTT if there isn't something better.

25             MR. CHILDERS:  So -- and if I could, Your Honor.

1            It says ECT is better, ecarin clotting time.  No

2    doctor that we have talked to, whether it be expert or

3    otherwise, has ever used the ecarin clotting time.  In fact,

4    ecarin is taken from a snake.  It's called a Russell's viper.

5    They milk the venom out of this snake to get the reagent that

6    is used in order to perform an ecarin clotting time test.

7            Having that in the label is -- I don't know why it's

8    in the label because nobody ever uses it.  aPTT is routinely

9    used.  If you or I were to go into the hospital, and we were

10   bleeding, they would run that test on us whether we are on an

11   anticoagulant or not.  The problem is it's just not exact.  An

12   aPTT can give you an estimate, which is what the label says,

13   but it can't give you an exact number.

14           And that comes back again to failure to warn because

15   there is a test that will give a precise number to a doctor,

16   the dTT, diluted thrombin time.  And that, again, is not

17   contained in the label.  It's not contained in the patient

18   medication guide.  It's not contained in any information given

19   to physicians in the United States, but it is contained in the

20   information given to all doctors in the rest of the world.

21           THE COURT:  So that's BI's recommended way of

22   determining your Pradaxa blood concentration?

23           MR. CHILDERS:  Yes.  In fact, that's what they tell

24   doctors is the preferred way to measure it when you look at

25   the labels in those other countries.

1          And they tell them the same thing there about aPTT as

2     they say here, which is it's an approximation, but dTT gives

3     you an accurate assessment of the actual anticoagulant

4     activity of Pradaxa in that patient or the blood level in that

5     patient.

6          I believe that I've covered most of what I wanted to

7     cover for Dr. Ashhab.  I think we've provided enough

8     information.

9          The only other thing I wanted to cover, if I could, on

10    the foreign labeling, Your Honor, Mr. Imbroscio said that

11    because Ms. Knight was on a half dose, she -- I wasn't quite

12    sure I understood, but that she shouldn't have been

13    over-anticoagulated because it's a half dose.  But he also

14    told Your Honor that the reason she is on a half dose is

15    because that was the information that was modeled from the 150

16    dose to say that a patient like her, with severe renal

17    impairment, is going to have the same amount of Pradaxa in her

18    system.

19         So just as you can be over-anticoagulated on the

20    150-milligram dose if you have normal kidney function, you can

21    be over-anticoagulated on the 75-milligram dose when you have

22    severe renal impairment.  The missing information here, the

23    key is tell doctors how to figure that out.  And that is,

24    again, where we differ on what is at issue in this case.

25         We don't have any intent to come in here and say that

75

1    different doses were approved in other countries and,

2    therefore, Boehringer did something wrong.  Our intent here is

3    to show there is information that can be provided to doctors

4    that will help them to better treat their patients to make

5    sure that, as best they can, they can avoid a bleed, but that

6    the company doesn't share that here in the U.S. even though it

7    does in the rest of the world.

8            If you have any other questions, I'm happy --

9            THE COURT:  No.  Thank you.

10           MR. CHILDERS:  Thank you, Your Honor.

11           THE COURT:  All right.  Replies?

12           MR. HUDSON:  If I may, Your Honor.

13           Your Honor, if -- can we come back to Dr. Ashhab and

14   the chart?

15           THE COURT:  Sure.

16           MR. HUDSON:  Okay.  And so we've pasted into BI's

17   motion to exclude Dr. Ashhab the chart with the handwriting on

18   it.

19           THE COURT:  Right.

20           MR. HUDSON:  If that is unclear at all, I think maybe

21   a better copy is attached as Exhibit 10 to --

22           THE COURT:  Where it is part of the label?

23           MR. HUDSON:  Yes.

24           THE COURT:  All right.

25           MR. HUDSON:  -- the opposition to the plaintiffs'

1   motion for summary judgment, so it's got the full label there.

2          But Dr. Ashhab was asked about that graph because he

3   said, okay, well, I see 47 aPTT.  So I take that to mean then

4   when she took Pradaxa 36 hours earlier, or roughly

5   thereabouts, her blood plasma concentrations must have been

6   higher, and ergo she must have been over-anticoagulated.

7          But if you look at Figure 4, which is from the label,

8   that chart is average aPTT time courses for people with

9   different levels of renal function over time, and his little

10  dot is actually on -- for people with good renal function.

11  The graph for people with impaired renal function is two lines

12  higher, and those would be the aPTT average time courses that

13  you would expect to see in a patient with renal impairment, 15

14  to 30 milliliters per minute for creatinine clearance.

15         So that's not -- and the aPTT, I think it's become

16  clear, it's subjective.  It's quantitative.  Excuse me.  It's

17  qualitative, it's not quantitative.  It will tell you is this

18  person anticoagulated?

19         So -- but what that label says is, okay, here's the

20  data from the RE-LY trial, people taking Pradaxa.  Here's the

21  average aPTT time course.  He picked a number, the 47, 36

22  hours later, which if you look at Ms. Knight, that doesn't say

23  anything that would suggest she was over-anticoagulated.

24         I mean, the graph is self-explanatory.  So if you can

25  look at the graph, that really undercuts the notion that that

1    47 aPTT suggests anything about her being over-anticoagulated.

2         Was she anticoagulated still?  Maybe, but that gets

3    into the half-life.  Because Dr. Ashhab thought, and I think

4    counsel was discussing Dr. Ashhab's statements where he said,

5    well, that's like three half-lifes later, 12-hour half-lifes.

6    But Dr. Ashhab didn't look at the label.

7         Exhibit 10 to the opposition motion, Table 3 under

8    Section 12.3, pharmacokinetics, sets forth the half-life of

9    the medicine in people based on their renal function.  In

10   people with severe renal impairment, which is creatinine

11   clearance from 15 to 30 milliliters per minute, the half-life

12   that is in the chart is T one-half slash hour, 27 hours.

13        THE COURT:  So explain that to me, then.

14        MR. HUDSON:  It means the label is telling doctors

15   that in a person -- in a person with impaired renal function,

16   so much that their kidneys are processing things such that

17   their creatinine clearance rate is --

18        THE COURT:  Much slower.

19        MR. HUDSON:  -- less than 30 -- yeah, it's slower,

20   you're getting stuff out slower -- the half-life to get the

21   drug out is 27 hours.

22        And so --

23        THE COURT:  Instead of 12.

24        MR. HUDSON:  Ergo, that's why you take a lower dose.

25   Dr. Ashhab, he testified, well, that's three 12-hour

78

1    half-lifes later.  Surely her aPTT should have been lower.

2          And so when you take his guesstimates, well, you know,

3    maybe 80, maybe 90, 100, and you say, well, okay, you can't

4    quantify any level of over-anticoagulation because you don't

5    have that measurement, so I'm not going to hold that against

6    you, you gotta look at, well, what is he basing his

7    over-anticoagulation opinion on to begin with?  And if you

8    just look at the label, he's just wrong.

9          THE COURT:  Okay.

10         MR. HUDSON:  All right.  I'm going to circle back now.

11         Plaintiffs' counsel started talking about P-gp

12   inhibitors as the other aspect of their failure to warn claim.

13   And, again, I'll come back to what I mentioned earlier where

14   there's got to be evidence to show that a different warning

15   would have made a difference.  And there's no testimony from

16   any physician that was associated with Ms. Knight in any way

17   that, one, they weren't aware of that after the label was

18   changed; or, two, that they would have done anything different

19   with respect to Ms. Knight.

20         THE COURT:  You're talking about just for those

21   inhibitors?

22         MR. HUDSON:  Correct.

23         THE COURT:  All right.

24         MR. HUDSON:  Correct.

25         So in terms of the record, they've got an expert

1   saying, well, BI should have done this.  But in terms of the

2   testimony and the record before this court, and looking at,

3   well, had BI done what Dr. Ashhab should have done, would that

4   have made a difference, there is nothing in the record to

5   support that.  There is no testimony on it.

6        In terms of the children's testimony about Ms. Knight

7   and the labels, I think it's pretty clear there is no evidence

8   that she read the Pradaxa labels, the Pradaxa medication

9   guide.  That's tabs 10 and 11 to our motion.  It speaks for

10  itself, so I won't speak more to that.

11       Plaintiffs' counsel mentioned a couple of times the

12  importance of the EU labeling with respect to alternative

13  feasible design.  And I want to hit that a little bit because

14  the plaintiffs don't have to have -- they don't have to bring

15  in the EU labeling or the company core data sheet or anything

16  that talks about how the company warns in different countries

17  to propose to a jury what a different warning should have

18  been.

19       They have the RE-LY data.  They've got the studies.

20  But, you know, the notion of them wanting to have an

21  alternative feasible design for a warning, that is -- that is

22  a creative argument to kind of back-door in this foreign

23  labeling as, well, this is what you could have done.

24       THE COURT:  Well, I don't follow you.  Why is

25  that somehow inappropriate?

80

1        I mean, you've said you agree that they could rely

2    upon other medical studies to say that the warning label

3    should have quantified the increased risk.  But in addition to

4    that, if they've got evidence that BI essentially said in some

5    forum that here's the way we quantify this increased risk, why

6    is that not also admissible?

7        MR. HUDSON:  For all of the reasons that Mr. Imbroscio

8    said.  I just wanted to point out that this notion of

9    alternative feasible design in a failure to warn context is

10   creative in terms of an effort to get in a warning from

11   somewhere else and saying, see, they could have done this.

12       I think the Nease case and Judge Goodwin's case, you

13   know, talk about alternative feasible design in the design

14   defect context --

15       THE COURT:  Right.

16       MR. HUDSON:  -- not in failure to warn.

17       Failure to warn is when you have your experts come in

18   and say this is what the plaintiff -- this is what the company

19   should have warned about, and this is why.

20       THE COURT:  Why is this any different than to say your

21   failure to warn is that we can show you had knowledge of the

22   quantification of these risks and actually provided warnings

23   to that effect to somebody else?

24       MR. HUDSON:  And that's all what Mr. Imbroscio covered

25   already in terms of the foreign labeling.  But they don't have

1    that -- the notion that, well, we have to do it because it's

2    an alternative feasible design, that's not an element of a

3    failure to warn claim.  So the notion that they have to do

4    that to meet some element is not present.

5          The notion that -- I just gotta say it -- they put the

6    antibodies in the freezer, the fact that you keep lab

7    materials in a freezer being used against us is -- I think

8    that kind of underscores Judge Land's conclusion that no

9    reasonable juror could conclude that, you know, you just put

10   something that you knew worked in the freezer.

11         THE COURT:  Well, I agree that's a bit of a pejorative

12   way of characterizing it.  But what about the other evidence

13   that plaintiffs pointed to about the timing of some of the

14   studies that you all were doing?  And I don't recall the

15   precise study or date, I'm sure you saw it referred to, but it

16   was pretty close to the time that Pradaxa came out.

17         So what about that?

18         MR. HUDSON:  It doesn't impact anything I've talked

19   about earlier in terms of Judge Land's addressing the same

20   information, saying no reasonable juror could reach that

21   conclusion.  The company acted expeditiously to get this

22   approved.  And then you've got the preemption layer on it as

23   well, and then you've got the design defect element as well in

24   terms of causation.

25         The plaintiffs said that their -- you know, part of

1    their failure to warn claim is not only the absence of a

2    reversal agent, but the absence of effective ways to reverse

3    the medicine, reversal agent aside.  Dr. Ashhab, he doesn't

4    offer any opinion on that, and his report is attached to our

5    pleadings.

6         And he offers no opinion that had Praxbind been

7    available, her bleed may -- he opines that her bleed would not

8    have been as bad, but he offers no opinion that her bleed

9    would not have been as bad had better, other reversal agents

10   been available.

11        So these are -- you know, I am hearing --

12        THE COURT:  I guess as maybe counsel perhaps even

13   conceded, they really don't have evidence that there was a

14   feasible alternative design in the form of some other

15   treatment to reverse Praxbind -- or Pradaxa.

16        MR. HUDSON:  Correct.  There is nothing -- again, it

17   comes back to, okay, where is the proximate cause problem for

18   Ms. Knight?  There are no expert opinions on that.

19        And Dr. Ashhab's report is in the record now, and

20   there were some questions asked about what Dr. Ashhab

21   explained in terms of his -- the nexus between the bleed and

22   the death in the late summer or fall.  I mean, Dr. Ashhab's

23   report doesn't tie it together.

24        THE COURT:  Well, what about what -- he quoted the

25   treating doctor, and I forget which one he was --

83

```
 1          MR. HUDSON:  Uh-huh.

 2          THE COURT:  -- the treating doctor who apparently said

 3     he treated her, followed her up in the hospital afterward, and

 4     she was -- that once they repaired the bleed, she remained in

 5     the hospital, went to I guess a transitional care unit perhaps

 6     or something there, skilled nursing at the hospital for three

 7     weeks.  And that I guess perhaps -- I don't think I'm

 8     overstating it, but that that doctor said, yes, this bleed

 9     caused her to have such a setback, and failure to recover from

10     this bleed contributed to her having a heart attack.

11          I mean, that's pretty much what he said with or

12     without Ashhab --

13          MR. HUDSON:  I think Dr. Abdelgaber's testimony is not

14     quite so strong.

15          THE COURT:  Okay.

16          MR. HUDSON:  But I'm not -- as attorney Childers said,

17     that's in the record, so I'm not going to try to characterize

18     that one because it says what it says.

19          THE COURT:  Okay.

20          MR. HUDSON:  But I'd ask the Court to take a look at

21     that.  Because earlier you asked me is it more of she's just

22     not bouncing back, and I said it was.  And as I've read that

23     transcript -- and I took that deposition, although it's been a

24     couple of years.

25          THE COURT:  Okay.
```

84

1      MR. HUDSON:  My recollection is he does not offer that

2  sort of causation opinion.

3      THE COURT:  Okay.

4      MR. HUDSON:  And then just briefly on ecarin clotting

5  time and direct thrombin time.  We're being criticized for

6  ecarin clotting time.  We're being admonished for not having

7  direct thrombin time available.  But, again, where does this

8  tie into Ms. Knight?  Dr. Ashhab doesn't offer any opinions

9  that this would have had any impact on her care or her outcome

10 whatsoever.

11     THE COURT:  Didn't Dr. MacFarland testify that if

12 there had been an identified method for testing to determine

13 Pradaxa blood concentration, she would have used it?

14     MR. HUDSON:  She said sure.

15     THE COURT:  And plaintiff has evidence that you all

16 know of a way to do that and told European doctors how to do

17 it.  So why isn't that enough at least to get that issue to

18 the jury?

19     MR. HUDSON:  Well, I guess because it comes back to

20 Dr. Ashhab and him saying she's over-anticoagulated based on

21 what he looked at in the label.  And I would ask the Court's

22 indulgence in taking a hard look at that label --

23     THE COURT:  I will do it.

24     MR. HUDSON:  -- and what he relied on.

25     THE COURT:  The last thing I'll ask you about is this

85

1    more recent chart that plaintiffs included in their reply --

2    or response, rather, I guess, on the blood concentration

3    levels, the chart that shows aPTT scores compared to Pradaxa

4    concentration.

5              As I understand it, they contend that BI admits that

6    if you have a Pradaxa concentration level exceeding 200, that

7    you're at significantly increased risk of bleeding.  And that

8    the aPTT scores depicted on this chart from that study reflect

9    that many are around that 50 level, which is close to the 47

10   that was measured here.

11             MR. HUDSON:  And forgive me, but could you repeat --

12   where is that at in your file?

13             THE COURT:  Max will tell us.  It's in plaintiffs'

14   response to your motion No. 6.

15             THE LAW CLERK:  Exhibit 5.

16             THE COURT:  And it's on page 12 of their response.

17             Let's see.  It's Exhibit 5?

18             MR. HUDSON:  And is this the motion for summary

19   judgment?

20             THE COURT:  No, this is the plaintiffs' response to

21   your motion No. 6 to exclude evidence regarding plasma

22   concentration levels.

23             THE LAW CLERK:  And it's Exhibit 17, not 5.  Sorry.

24             THE COURT:  It's on page 12 of the response.

25             MR. HUDSON:  If it's okay with Your Honor, I'll let

86

1    Mr. --

2          THE COURT:  Take a look at it.  I'll give you a chance

3    to come back to that or now if you --

4          MR. IMBROSCIO:  I'll give it a shot.

5          THE COURT:  Okay.

6          MR. IMBROSCIO:  And your question again, Your Honor?

7    I want to make sure I understand it.

8          THE COURT:  All right.  So according to this chart,

9    which they attribute to your client, it shows that with aPTT

10   times of around 50 seconds, they could have -- as it refers to

11   patients like Betty Knight, they have observed Pradaxa levels

12   that are very high and that exceed 200 and even go up and

13   exceed as high as 400.

14         So I guess what that seems to say is that with an aPTT

15   in the vicinity of 50, which she had 47, you may still have

16   very high Pradaxa concentration levels, and very high at

17   points 200 or more or even up to 400 that are consistent with

18   what you all have identified as being a significantly

19   increased risk of bleed.

20         MR. IMBROSCIO:  Yeah, I think it shows two points.

21         One is, to Mr. Hudson's point earlier, aPTT is at best

22   an approximation, which we've said from the very beginning.  I

23   think what it probably means is that for the renally impaired,

24   it's probably less of a good indication.  Because when you

25   look, there is actually a lot more dots in that chart that

1    would suggest relatively lower concentrations than the higher

2    ones you just mentioned.

3         And so I think it goes to the level of the

4    approximation, which again goes, I would suggest, back to the

5    speculation point.  That there is -- there is some evidence,

6    but there's no reason that I've seen to think that Mrs. Knight

7    is one of these dots on the right-hand side versus a dot on

8    the left-hand side of that column.

9         THE COURT:  Okay.  I guess I sort of understand your

10   point, and I agree.

11        MR. IMBROSCIO:  Yeah.

12        THE COURT:  But to me, it's something that the experts

13   could rely upon even though they may have different

14   interpretations or applications of the chart.

15        As I understand it, this just came out, and so Dr.

16   Ashhab did not have this available and, therefore, did not

17   rely upon it in his own --

18        MR. IMBROSCIO:  He certainly didn't rely on it.  What

19   I'm not sure is whether this data was in the many, many

20   internal documents and reports that were -- it just got

21   published recently, but I suspect this probably comes out of

22   data that was in their control.

23        THE COURT:  I gotcha.

24        MR. IMBROSCIO:  If I may, just on one factual issue on

25   the reversal agent.

88

1          There was a suggestion that Praxbind was discovered

2     and put on the shelf in 2002.  Setting aside the put on the

3     shelf parameter, that is just not correct.  What was developed

4     in 2002 as part of the normal drug development process were

5     what are called polyclonal antibodies.  You would never give a

6     polyclonal antibody to a human being.

7          When this idea arose in late '08, the first quarter of

8     '09 for potential -- using the antibody as an antidote, which

9     was really a relatively unique idea, they pulled the old

10    polyclonal antibodies from the freezer that they had developed

11    as part of the process to test whether this would even work,

12    and they were able to test a bunch of them, and at least for

13    some of them it looked like it might work.

14         That's when they went off into the process of creating

15    a monoclonal humanized antibody, which is a fairly difficult

16    process.  That took place in '09, into late '09 I believe, and

17    that's what kicked off the development process.  And so that

18    really began in the late part of '09, ultimately was tested

19    through the, you know, 2010, 2013 period, 2014, and then it

20    was approved in 2015.  Just so the record is clear.

21         THE COURT:  Okay.  Thank you.

22         MR. IMBROSCIO:  Thank you, Your Honor.

23         THE COURT:  All right.  Mr. Childers, let me ask you

24    to respond to one thing that Mr. Hudson brought up very

25    specifically in his reply, and that is with respect to Dr.

1    Ashhab and his use of the 12-hour half-life.

2         MR. CHILDERS:  Yes.

3         THE COURT:  I think I didn't understand before that

4    the label says that if you've got the type of conditions that

5    she had, severe renal impairment, perhaps other things, that

6    the half-life is not 12 hours as Dr. Ashhab assumed or

7    believed, but rather a much longer period.

8         MR. CHILDERS:  I can't quote to you the half-life, so

9    I'm not sure -- I know that what we measure is by trough level

10   and peak level.

11        THE COURT:  I don't know what that means, but I --

12        MR. CHILDERS:  So the trough level, which is usually

13   what is measured to try to determine how high is the level,

14   when you're looking for whether or not they are over 200

15   nanograms per milliliter, that is trough level, which means

16   right before you take your next dose.

17        So that is a 12-hour --

18        THE COURT:  So when you say trough, you're talking

19   about the lowest point, which is presumably what you reach the

20   latest you can be from taking the medication before you take

21   the next dose?

22        MR. CHILDERS:  Correct.

23        And the reason it's measured that way, as I understand

24   it, is people's peak time just varies, but the trough time is

25   always right before you take your next dose.

1          THE COURT:  Okay.

2          MR. CHILDERS:  If I could address this issue, though,

3     about --

4          THE COURT:  Well, now say this again, though, about

5     your response now that I -- I was focused on this explanation

6     of what trough level meant.

7          So are you aware of the provision in the label that

8     the defendant cited where Mr. Hudson says essentially it tells

9     you, the doctor, on the label that if you are a person with

10    severe renal impairment, your half-life time is much longer

11    than 12 hours; in fact, 27 hours?

12         And as I recall, Dr. Ashhab was pretty clear in

13    repeating himself that 12-hour half-life, coming down three

14    times in the process of 36 to the point of the 47 aPTT score.

15         MR. CHILDERS:  I can't quote to you -- I know that as

16    your kidney function decreases, half-life time does increase.

17    I don't think it's extraordinarily increased, and that's the

18    argument that they always make as to why they don't need a

19    reversal agent because they claim Pradaxa just gets out of

20    your system so fast.

21         But if I could -- I did want to point out that chart.

22    Dr. Ashhab didn't rely on this chart in coming to his opinion.

23    And if you look at the chart, it tells you -- these are

24    simulations.  These aren't from real patients, and there's a

25    very good reason for that.  There weren't any patients in the

1    RE-LY trial who had creatinine clearance as low as Ms. Knight.

2          THE COURT:  They were excluded from the trial?

3          MR. CHILDERS:  That's right.  So they can't come in

4    and say, well, this is what a patient would have.  That's a

5    guesstimate.  That's a model.

6          What we have now is they actually finally looked at

7    patients like Ms. Knight, and what we see is the chart that

8    they just published, which is it's bunched up around 50 and

9    goes up to not 400, but 700.

10         So, you know, they showed him that chart.  He said,

11   yeah, I can see what it says, but he didn't rely on that for

12   his opinion.  He relied on the aPTT measurement that he got

13   and how he would treat a patient in that same situation if

14   they came in bleeding and needed treatment.

15         THE COURT:  Okay.

16         MR. CHILDERS:  But I would say to you that, again,

17   these aren't real patients.  These are just models that they

18   made internally trying to guess what a 75-milligram dose would

19   look like in a patient, because they never actually tested it

20   in those patients before they put it in the label.

21         THE COURT:  Okay.  Very good.  Thank you.

22         MR. CHILDERS:  Thank you, Your Honor.

23       (Off-the-record discussion with Law Clerk.)

24         THE COURT:  All right.  I wanted finally to also take

25   up the matter of the trial date, trial preparation and so

1   forth.  So we'll jump to the recent motion filed by the

2   plaintiffs, and I've seen the defendant's response.

3          Mr. Childers, I assume by your reply that this e-mail

4   communication that was actually generated a few days ago, but

5   only completed recently, is the only contact you've had with

6   Dr. Ashhab?

7          MR. CHILDERS:  No, Your Honor.  I got contact that he

8   was out of the country, and then we immediately -- may I?

9          THE COURT:  Yes.

10          MR. CHILDERS:  That was why we approached and sent the

11   e-mail to Max --

12          THE COURT:  Right.

13          MR. CHILDERS:  -- and then filed the motion.

14          Once that motion was denied, I sent those specific

15   questions to Dr. Ashhab because I understood Your Honor wanted

16   to know that information.

17          THE COURT:  Yes.

18          MR. CHILDERS:  I didn't get a response until after the

19   response had been filed.

20          THE COURT:  Okay.  And so that response, e-mail

21   response you got from the doctor, that came through when?

22          MR. CHILDERS:  Yesterday afternoon at 1:37, I believe.

23          THE COURT:  Well, his answers to your questions --

24   your questions were right on track.  Some of his answers left

25   me guessing a little bit.

1        So, first, do you have a more direct and speedy way of

2    communicating with him?

3        MR. CHILDERS:  If I did, I promise you I would use it.

4        I didn't know -- just so I can give you some

5    background, Your Honor.  I was in trial with Mr. Richmond, and

6    in fact I was in trial before Mr. Richmond starting in

7    February.  And shame on me, I assumed he would be the easiest

8    of my experts to get here since he is from Charleston.

9        THE COURT:  Right.

10       MR. CHILDERS:  As soon as I got back from that trial,

11   trying to figure out where he was was the first time I learned

12   he was out of the country, and that's why we brought it to

13   your attention, Your Honor.

14       THE COURT:  Okay.  Well, I guess I accept all that.  I

15   guess now my remaining question is whether, or if not, why

16   not, he couldn't arrange just to come here for a few days to

17   testify in this trial and go back.

18       I appreciate that you've laid out some of the

19   logistical challenges he has.  I don't minimize the difficulty

20   it might be for him to leave where he is, travel to Jordan,

21   get planes to here, get here, testify or whatever is necessary

22   in this trial and then get back.  But what wasn't clear to me

23   was whether, in addition to that just being difficult, there

24   was some other reason for him to be unavailable.

25       And I guess specifically I'm wondering if you can

94

1   communicate with him and find out if, as a result of the

2   combination of his father's death and these religious

3   holidays, this period of fasting, if that is something that,

4   in order to observe, he has to remain there.  I'd like him to

5   tell us that, and I don't want to just assume it.

6        MR. CHILDERS:  I'd be happy to ask that question.

7        THE COURT:  Well, I think I'd like you to.  I think

8   I'd like you to ask him specifically why you couldn't make

9   arrangements with him to take several days, if that's what it

10  takes, to get him here.

11       You know, he's an expert witness.  And I've always

12  kind of taken the approach when I was a lawyer myself that,

13  you know, when you hire an expert, they agree to be there for

14  you in the case, and it takes a pretty unusual circumstance to

15  justify their unavailability.

16       He may have it.  I respect that, you know, his father

17  is from another country, and he left to go tend to his father,

18  and his father died a couple of months ago.  He may have these

19  responsibilities, which coupled with religious observance may

20  be a reasonable basis to find that his unavailability is

21  excusable.  But I'd really like to pin that down and have you

22  do that as quickly as possible.

23       Secondly, as part of this, you've represented that you

24  folks have, I guess -- is it the Chambers case --

25       MR. CHILDERS:  In August.

95

1         THE COURT:  -- in August?

2         MR. CHILDERS:  Yes, sir.

3         THE COURT:  And is he a witness there?

4         MR. CHILDERS:  No, sir.  He's only an expert in this

5    one case.

6         THE COURT:  Oh, okay.  I misunderstood.  You've got

7    that case.

8         MR. CHILDERS:  I am lead counsel in that case, and

9    so --

10         THE COURT:  Well, I guess then in any event the other

11    question would be, if he believes that he should be excused

12    from being here for this trial, when he expects or can commit

13    to either returning or making himself available by returning

14    for a short period in order to testify at a trial or at an

15    evidentiary deposition.

16         MR. CHILDERS:  And my understanding from that e-mail

17    exchange that I've attached, Your Honor, was that --

18         THE COURT:  Yeah.

19         MR. CHILDERS:  -- he was available beginning in

20    August, that he would be finished with whatever he had to do

21    there.

22         THE COURT:  Okay.

23         MR. CHILDERS:  Unfortunately that didn't work because

24    I have to be in Georgia that month.

25         THE COURT:  All right.  Well, so I'm going to direct

96

1    that you make --

2         MR. CHILDERS:  Yes, sir.

3         THE COURT:  -- an effort for this communication to

4    take place as quickly as possible.

5         I don't know if you can get a phone number or

6    something for him.  I would ask that if you have tried that,

7    that you try again and see if there is some way of

8    communicating to him that, in addition to answering these

9    questions as quickly as possible, even if it's by e-mail, that

10   the Court would appreciate a more direct means of

11   communication so that we can resolve this one way or another.

12        And if I'm going to continue this case as a result of

13   his unavailability, then I would expect you to make clear to

14   him that whatever new trial date we pick, he either better be

15   here or you're going to have to take his evidentiary

16   deposition before or he's going to cost you your case.

17        MR. CHILDERS:  I understand and completely agree with

18   that.

19        THE COURT:  So let me ask this.  You all indicated in

20   the -- well, first, you've tried two of these cases recently.

21        MR. CHILDERS:  Yes, sir.

22        THE COURT:  I know these are different trials.  There

23   are no doubt some material differences.

24        My understanding from the defense is they were both

25   defense verdicts?

97

1          MR. CHILDERS:  They were, Your Honor.  The juries

2     found liability, but not causation in both cases.

3          THE COURT:  Okay.  Found liability on failure to warn?

4          MR. CHILDERS:  Failure to warn in the first case.  And

5     in Connecticut, there was a claim for failure to test, and

6     they found liability on that in the second case.

7          THE COURT:  Okay.  And so the causation was -- were

8     these death cases?

9          MR. CHILDERS:  The first one was, Your Honor.  The

10    second one was a hospitalization case.

11         THE COURT:  All right.  So with respect to the

12    wrongful death product liability case, the jury did not find

13    that you had proven causation, that the --

14         MR. CHILDERS:  That is what the verdict form said,

15    Your Honor.

16         THE COURT:  Okay.  And then the other one you say was

17    just personal injury, hospitalization --

18         MR. CHILDERS:  Correct.

19         THE COURT:  -- the bills and so forth?

20         MR. CHILDERS:  That's correct.

21         THE COURT:  Okay.  How long did it take to try those

22    cases?

23         MR. CHILDERS:  The first case, excluding jury

24    selection -- because I won't bore you with how long it takes

25    in Connecticut to pick a jury -- four weeks of time in trial.

98

1    And the second one was three weeks of time in trial.

2              THE COURT:  How long did it take you to put on your

3    case in Connecticut?

4              MR. CHILDERS:  I believe it was -- it was over two

5    weeks in the first case.  It was --

6              THE COURT:  So ten workdays?

7              MR. CHILDERS:  It may have been more than that in the

8    first case, I'm trying to remember.  It was, I believe, nine

9    days in the second case, and then we gave -- maybe nine and a

10   half in the second case.

11             THE COURT:  So here when I got the pretrial order

12   today, I noticed that first you've only got four live

13   witnesses, four or five, and then you've listed deposition

14   excerpts.

15             Do you think that your two recent cases are

16   representative or indicative of what this case will require

17   for you to put on your case fully?

18             MR. CHILDERS:  I do believe it will, and we didn't

19   actually have any dispute on that with the defendants.

20             One of the issues with the videotaped depositions is

21   several of them are witnesses who were in German, and an issue

22   that we had was that the defendants wanted them to have the

23   German answer and then the translation played, and that just

24   increases the amount of time that those depositions have to

25   play in court.

99

1          THE COURT:  And that will be true in this case?

2          MR. CHILDERS:  I assume so, but I haven't -- I've just

3     assumed that because that's what they insisted on in the first

4     two cases.

5          THE COURT:  All right.

6          MR. IMBROSCIO:  If I may respond on a couple points,

7     Your Honor.

8          THE COURT:  Yes.

9          MR. IMBROSCIO:  I was at both trials as well.

10          The first trial, there was no -- just to take them in

11     reverse order, there was no testimony of German witnesses on

12     videotape.  The plaintiffs chose to read them in.  In the

13     second trial, I think it was a grand total of two witnesses

14     where there would have been some German testimony.  That was

15     not a driving force here in the length of the trial.

16          I think it was eight days or eight and a half days for

17     the second trial --

18          THE COURT:  I'm sorry.  Say that again.

19          MR. IMBROSCIO:  I'm sorry.

20          I think eight and a half days for the plaintiffs' case

21     in the second trial.  I think it was from a Tuesday to a

22     following Friday.  We had some snow days, I think we had three

23     or four snow days in the first trial.

24          But the larger point is there's actually very little

25     testimony in the company depositions on the 75-milligram dose,

1    so there is arguably a case that there will be less testimony

2    that would be relevant for this particular --

3         THE COURT:  How long did it take you to put on your

4    defense case in the other two?

5         MR. IMBROSCIO:  I think we did it in three days,

6    maybe -- was it three days?  I think three days, maybe carried

7    over to the fourth day some videotape.

8         THE COURT:  All right.  Do you have any reason to

9    believe that it would be much different in this case?

10        MR. IMBROSCIO:  I think we can do it -- we have three

11   experts.  I think we can do it even more expeditious -- we're

12   getting better at this, and we can do it I think more quickly.

13   I think that should be the same for both sides.

14        THE COURT:  Okay.  Well, then I'll be candid about

15   part of this at least.

16        While I'm still anxious to find out what Dr. Ashhab

17   has to say about when he can be available, I had no idea until

18   Mr. Bell talked with my clerk Max, I guess in an e-mail first,

19   about the problem with Dr. Ashhab, and I think in that maybe

20   he indicated to Max that these cases have been taking four to

21   five weeks when they've been tried, and they've been tried

22   recently.  And that presents two big problems for me.

23        You're scheduled to start June 4th or 5th, something

24   like that.  I have scheduled an overseas vacation with my

25   whole family to start on Monday, June 25th, and I have great

1   reluctance in starting a trial on the 4th or 5th that may

2   carry us into that period.

3          Secondly, that is also a very long time for a jury

4   here.  And I can tell you that when I reviewed the jury panel

5   for -- I guess the current period probably started at the end

6   of March, I get an awful lot of folks who are working or have

7   other responsibilities who indicate that, you know, if they're

8   involved in a lengthy trial, they're going to have a huge

9   problem, and they all want to be excused.

10         And so there are a number who frankly I refuse to

11  excuse them and simply say, if I've got a short trial, you

12  know, maybe a day or two, which is kind of common especially

13  for criminal cases, I would expect you to serve.  If it is

14  anything much longer than that, I'm not going to do that

15  because, quite honestly, many of these people cannot

16  financially afford to spend two or three weeks in a trial here

17  where they're not being covered by their employers, and we

18  only pay them a fairly nominal amount.

19         So if I'm going to have a trial of this length, I

20  would expect to have more forewarning about it than I had on

21  this one.  I'm not going to fault you all.  But if I had known

22  in advance that this was possibly going to be a three-, four-

23  or five-week trial, I probably could have taken steps to avoid

24  both of these difficulties, both my own schedule as well as

25  the problem with jurors.

1          I've had this come up before.  And when we've had

2     trials that were expected to be this type or this length, I've

3     often sent out jury questionnaires very early explaining to

4     people, without any identifying information, that they are on

5     the list for a possible trial that could last for a period of

6     weeks.  And I explain to them, clear your schedule, start

7     making arrangements to move anything that you can move,

8     because I'm not going to be able to excuse everybody just

9     because it's inconvenient or in some measure even a hardship

10    to be a juror for that length of time.  That would be

11    impossible to do now for a trial set to start in about two and

12    a half weeks.

13         So I tell you that only because that's going to be a

14    factor in my evaluation of this.  If I find Dr. Ashhab's

15    excuse or his unavailability is reasonable, then I'm going to

16    move this trial.  Even if I don't find that excusable, and

17    that there is some other arrangement that can be made, I'm

18    just going to have to think about how we handle bringing in a

19    jury when it sounds like there is a reasonable possibility, if

20    not probability, that this trial is going to go past that

21    point of difficulty for me.

22         So I don't know that I can tell you anything else yet.

23    If you want any clarification or have a question about it,

24    feel free to raise it right now.  That's the best I can tell

25    you.

1           What I would expect to do is to have Mr. Childers get

2      back with us I would hope in a day or two.  I mean, I don't

3      know --

4           MR. CHILDERS:  You may have seen, Your Honor, I also

5      asked in that e-mail for him get back to me as soon as

6      possible.  And, again, I don't know what he's going through

7      over there other than just what I've gotten from the e-mail.

8           THE COURT:  I understand that.

9           MR. CHILDERS:  So I am trying to respect --

10          THE COURT:  I agree.

11          MR. CHILDERS:  -- that as well for his family.

12          THE COURT:  I mean, I have every reason to believe

13     that you'll use your best efforts --

14          MR. CHILDERS:  Yes, sir.

15          THE COURT:  -- and just as soon as you can, let me

16     know.

17          Mr. Hudson?

18          MR. HUDSON:  Your Honor, I guess just two quick

19     points.

20          One, given the travel difficulties, I mean, if it

21     permitted us to keep the bracket we've got -- I mean, we told

22     you in our opposition motion we've got the Chambers case in

23     August, we've got another one in September.  There's -- I know

24     it's an inconvenience for Dr. Ashhab with what he's got going

25     on, but it's an inconvenience for a tremendous number of

104

1   people to move this now here.

2          THE COURT:  Sure.

3          MR. HUDSON:  So we can go to London, we can go

4   somewhere in Europe if he can get there.  We can do a before

5   trial deposition.  You know, there are other options that

6   we're willing to do, and I think we mentioned that in our

7   brief, but I would reiterate them here to try to keep on

8   track.

9          And then I guess in terms of the timing, you know, we

10  can digest what the Court has talked about, and I know we'll

11  be before you again on Monday for the pretrial and look at

12  that.

13         THE COURT:  Okay.  That's the best we can do for now,

14  then.

15         Have you all tried to settle this case?  Have there

16  been any meaningful discussions?

17         MR. HUDSON:  We mediated it before --

18         MR. BELL:  John Curry.

19         MR. HUDSON:  -- John Curry.

20         THE COURT:  How long ago was that?

21         MR. BELL:  A couple weeks --

22         THE COURT:  Oh, just a couple of weeks ago?

23         MR. BELL:  Two or three weeks ago.  And Mr. Childers

24  was in trial, I believe, and tied up.  I was there with

25  another one of his partners, and we made true best efforts,

105

1    but it was really jammed up relatively quickly.

2         THE COURT:  Pretty far apart?

3         MR. BELL:  Apparently so.  The last thing the

4    plaintiffs came back with was bracket an attempt to shake

5    things loose at the mediator's suggestion.  And I understand

6    the defendants weren't interested in that bracket, and it

7    concluded I think right about lunchtime or so.

8         THE COURT:  Well, all right.  At this point I don't

9    know that I can expect you to do anything else.

10        So I'll expect Mr. Childers to provide us with some

11   response as quickly as possible.  And then if that doesn't

12   happen or it doesn't clarify things, then I'll see you back

13   here on Monday.

14        MR. BELL:  Your Honor, if I may?

15        THE COURT:  Yes.

16        MR. BELL:  I just want to thank you.  I know when I

17   originally took on the assignment as local counsel for

18   Mr. Childers and his firm, I was fully engaged in the practice

19   of law.  And now that I'm semi-retired, my schedule is very

20   limited, and I appreciate defense counsel and the Court's

21   accommodation and understanding in that regard.

22        THE COURT:  Certainly.

23        All right.  Is there anything else that we need to

24   take up while you're here?

25        MR. RICHMOND:  No, Your Honor.

1          THE COURT:  If not, thank you all for your

2     presentations.  We'll stand adjourned.

3          THE COURT SECURITY OFFICER:  All rise.  This honorable

4     court will now stand in recess.

5               (Proceedings were concluded at 3:53 p.m.)

6                         ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2          I, Kathy L. Swinhart, CSR, certify that the foregoing

3    is a correct transcript from the record of proceedings in the

4    above-entitled matter as reported on May 15, 2018.

5

6

7    June 26, 2018_____
     DATE

8

9    /s/ Kathy L. Swinhart_____
     KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KATHY L. SWINHART, Official Court Reporter (304) 528-2244