```
            IN THE UNITED STATES DISTRICT COURT FOR THE

      SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

          BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE


                         ---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
               Plaintiffs,
vs.                                      No. 3:15-CV-06424

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

                 Defendant.
_____/

                         ---o0o---

                REPORTER'S TRANSCRIPT OF PROCEEDINGS

                      PRETRIAL CONFERENCE

                TUESDAY, JUNE 5, 2018, 1:30 P.M.

                         ---o0o---


For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                       1932 North Druid Hills Road
                       Suite 100
                       Atlanta, Georgia  30319
                       BY:  C. ANDREW CHILDERS

                       URY & MOSKOW, LLC
                       883 Black Rock Turnpike
                       Fairfield, Connecticut  06825
                       BY:  NEAL L. MOSKOW

             (Appearances continued next page...)


Reported by:   KATHY L. SWINHART, CSR
               Official Court Reporter
               (304) 528-2244
```

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

1                       APPEARANCES (Continued)

2

3      For the Defendant:

4
                       TUCKER ELLIS
5                      925 Euclid Avenue, Suite 1150
                       Cleveland, Ohio  44115
6                      BY:  JOHN Q. LEWIS

7
                       TUCKER ELLIS
8                      950 Main Avenue, Suite 1100
                       Cleveland, Ohio  44113
9                      BY:  MADELINE B. DENNIS

10
                       COVINGTON & BURLING
11                     One City Center
                       850 Tenth Street NW
12                     Washington, D.C.  20001
                       BY:  MICHAEL X. IMBROSCIO
13

14                     JACKSON KELLY
                       Post Office Box 553
15                     Charleston, West Virginia  25322
                       BY:  GRETCHEN M. CALLAS
16

17

18

19

20

21

22

23

24

25

1

1        HUNTINGTON, WEST VIRGINIA

2        TUESDAY, JUNE 5, 2018, 1:30 P.M.

3                ---o0o---

4        THE COURT:  Good afternoon.

5        MR. CHILDERS:  Good afternoon, Your Honor.

6        MR. IMBROSCIO:  Good afternoon, Your Honor.

7        MR. MOSKOW:  Good afternoon, Your Honor.

8        THE COURT:  Welcome back.

9        MR. MOSKOW:  Thank you.

10        THE COURT:  All right.  We have a number of motions

11   that remain pending that I want to go through here and argue

12   about first.  After we have concluded arguing all of the

13   pending motions, there are a few matters I want to discuss

14   with you, sort of the logistics in anticipation of the future

15   pretrial conference and trial date as altered by the Court.

16        So I think what I'd like to do is start first with the

17   defendant's motions in limine with respect to the general

18   experts of plaintiffs.

19        Have you already noted your appearances?  Do you have

20   them marked?

21        THE COURT REPORTER:  I have them.

22        THE COURT:  All right.  Go ahead.

23        MR. LEWIS:  Good afternoon, Your Honor.  John Lewis

24   for the defendant.  Thank you for the opportunity to be heard

25   on these motions, Your Honor.

1          We essentially, Your Honor, are making a motion

2    related to plaintiff's experts in three what I'll call broad

3    categories, plaintiff's experts related to what I'll call

4    plasma monitoring --

5          THE COURT:  Right.

6          MR. LEWIS:  -- secondly with respect to labeling, and

7    then thirdly with respect to corporate intent, corporate

8    knowledge, corporate behavior if you will.

9          Unless the Court has a particular order --

10         THE COURT:  No, that sounds good.

11         MR. LEWIS:  -- I'm just going to roll into the way our

12   briefing was structured, which is focus first on the plasma

13   monitoring.

14         And the reason we're asking the Court for relief here

15   with respect to plaintiff's experts and their opinions related

16   to plasma monitoring really kind of falls into two big

17   categories.

18         The first is, there's a real fit problem here with

19   respect to these opinions.  And when I say fit, I mean that

20   the opinions are sort of in an abstract way what they are.

21   But when we peel the onion back a little bit closer to the

22   facts of this case, we see that those general opinions related

23   to plasma monitoring don't appear to be connected to the

24   plaintiff's specific case here in a sufficient way to allow

25   them to be admissible.  And we can kind of talk broadly about

1    why that is so.

2         In this particular case, what we lack here on a case

3    specific -- from a case specific perspective is evidence that

4    whatever it is that the plaintiff's experts say we should have

5    done differently with plasma monitoring, that it actually

6    would have led to a different and better result for Ms. Knight

7    in this particular case.

8         Now what we do have -- and I acknowledge Your Honor's

9    summary judgment ruling, which I've spent a lot of time on.

10   We do have somewhat light -- what I'll call lighter testimony

11   from some of the treaters that they would have considered,

12   right, the possibility of monitoring guidance or something

13   along those lines.  But in order for the general opinions to

14   be admissible, we really need a little bit more than that.

15        What we need to have to fit the case is for someone to

16   come in and to say, if this particular plaintiff had been

17   monitored appropriately, pursuant to whatever the plaintiff's

18   experts say we should have done to give them the benefit of

19   the doubt for right now, then it would have led to a different

20   clinical outcome for the plaintiff.  All we have in the record

21   right now is that it would have been considered, not that any

22   physician would have actually made a different choice.

23        And if we really look at the plaintiff's circumstances

24   here -- and I know Your Honor has looked at this because, in

25   the summary judgment opinion, the medical history of the

4

1    plaintiff is laid out in very, very -- in a lot of detail.

2         We know that Ms. Knight, at the time that she had her

3    bleed incident that was the subject injury here, had had

4    stents and was on triple therapy with these other medications.

5    And what we lack is any physician coming in and saying, you

6    know what, if I'd had known better to monitor this particular

7    individual, I would have instead prescribed Warfarin, for

8    instance.  Or I would have taken her completely off Pradaxa

9    and allowed her to just go forward without Pradaxa at all if

10   her levels got to a certain point.  We lack any testimony, ah,

11   to that effect in this case.

12        THE COURT:  Well, what about, though, the evidence

13   that I cited in the summary judgment ruling where we discussed

14   Dr. Ashhab, Dr. MacFarland, the cardiologist?  It's not the

15   strongest, clearest evidence, but nonetheless I found it was

16   sufficient to create an issue of fact.  And each of those

17   doctors testified in a way that if the label or other

18   information had told them of these significantly apparently

19   quantifiable increases in risk given this constellation of

20   medications and symptoms had been conveyed to -- had been then

21   conveyed to us that you ought to be checking plasma levels

22   when somebody goes on this, they all said in one way or

23   another that they would have, or at least they may have.

24        I want to know why that -- it seems to me if it's

25   enough for the ruling on summary judgment, why isn't it enough

5

1    here on getting these opinions in?

2              MR. LEWIS:  Right.

3              Well, Your Honor, I respect the Court's summary

4    judgment opinion, and I have to obviously.  But when we're

5    talking about the admissibility of expert opinion, we're

6    really working under a different paradigm.

7              Instead of a material issue of fact for the jury --

8              THE COURT:  Right.

9              MR. LEWIS:  -- we're now working under the Daubert

10   paradigm.

11             And the Daubert paradigm does require an analysis

12   separate and independent of any summary judgment analysis that

13   the expert's opinions fit the case to the point where the jury

14   can hear these folks testify as scientific experts and be able

15   to rule -- to enter a verdict in the case based on that

16   testimony.

17             That's different than saying, hey, you know what,

18   jury, you're just going to have to figure out whether Dr.

19   Abdelgaber or Dr. MacFarland actually would have done

20   something differently.  That's fine.  Understood.  Respect the

21   Court's opinion on that.  But we are really talking about the

22   admissibility of experts, and that has a different impact on

23   juries when an expert is up there, and the Court has said this

24   is an expert opinion, what have you.  The law does require

25   that there be a connection to the case sufficient that it

1    would have changed the outcome in the case, it would have

2    assisted the jury in helping to evaluate the plaintiff's

3    allegations in this case, and we don't have that here.

4           There is no expert who actually connects the

5    monitoring opinion to a changed clinical outcome.  Even the

6    testimony that the Court cited in the summary judgment

7    motion -- again, respect that the jury is going to be able to

8    consider that -- even that testimony isn't a sufficient basis

9    to have the experts come in and testify about the different

10   ways we should have warned physicians on how to monitor

11   because there is no evidence that monitoring would have led to

12   a different outcome here.  There just isn't.

13          Even in the Court's opinion, even in the Court's

14   opinion, there is no suggestion, there is no evidence cited

15   that this particular plaintiff would have been on a different

16   medication or even had changed -- a changed medical outcome

17   because of that.  That's big problem number one.

18          THE COURT:  Okay.  You've got -- it's the same

19   argument concerning each of the monitoring opinions that you

20   criticized, Dr. --

21          MR. LEWIS:  Absolutely.

22          THE COURT:  Is it Baruch?  Is that how you say his

23   name?

24          MR. LEWIS:  Baruch, I think.

25          THE COURT:  Yeah, Dr. Baruch.  And then the other two

1    as well.

2           MR. LEWIS:  Right, which I think also include, I

3    guess, Laura Plunkett and Dr. Chernow [phonetic] --

4           THE COURT:  Yeah.

5           MR. LEWIS:  -- on the monitoring.

6           The other piece of really our challenge here is -- and

7    I guess I'll tackle these in two different ways.  Let's focus

8    first on Dr. Baruch.

9           Again, peeling the onion back a little bit as we must

10   do when we are talking under the Daubert paradigm, Dr. Baruch

11   really isn't bringing anything to bear here that he's done

12   independently.  In fact, the things that he cites are really

13   just Boehringer documents or FDA documents that -- I mean, his

14   deposition was pretty clear.

15          He didn't even really understand the models that he

16   was citing in his --

17          THE COURT:  But does he have to?  I mean, isn't it

18   enough that the expert testifies that he relied upon the type

19   of data and material that experts in his field typically rely

20   upon, even if it's not otherwise independently admissible and

21   even if he can't really explain it?

22          I mean, that's -- one facet of having expertise is

23   that you know what you can rely upon and use and should take

24   into consideration.  That doesn't mean that you have to be the

25   person that produced that data or that analysis or even

8

1    understand it fully.  If it's what experts of your type use

2    and rely upon, that's enough.

3         MR. LEWIS:  And I would -- Your Honor, perhaps the

4    first part about admissibility, definitely agree with you

5    there, that not all of the evidence has to be admissible, but

6    the expert has to understand it.

7         And the reason why the expert has to understand it is

8    if he doesn't, as Dr. Baruch clearly doesn't here, and I think

9    he kind of admits that --

10        THE COURT:  And, you know, I'm going to confess that

11   it's been hard to keep all of these straight, and I haven't

12   reread this part very recently.  But are there specific BI

13   models or studies or something that in particular you believe

14   Dr. Baruch said I don't know what that -- I can't explain

15   that, but I nonetheless relied upon it?

16        MR. LEWIS:  Yes.

17        So on page 4 of our opening brief, we sort of talk

18   about the -- we cite the areas where he sort of made these

19   admissions that he doesn't have an understanding as to the

20   modeling that he's testified about, which lead him to the

21   conclusion that, oh, you should have offered this monitoring

22   guidance, and here's the specific monitoring guidance you

23   should have offered.  He's not -- he admits that he doesn't

24   understand how this was derived or arrived at.

25        And I guess I would sort of twist it around the other

1   way.  There is -- if Dr. Baruch doesn't understand how he's

2   arriving at his opinion, I don't see how that makes him an

3   expert in any way, shape or form.  And I think that's exactly

4   what Daubert is saying the Court needs to make sure that we

5   don't let someone get on the stand and start overly persuading

6   the jury as an expert when they don't fundamentally understand

7   what they're talking about, and instead they are just serving

8   as a conduit or a mouthpiece for maybe an argument.

9        I'm not saying that the plaintiffs can't make the

10  argument during the trial using the BI documents and the FDA

11  documents to support that.  But when you take it to the next

12  level, which is offer an expert opinion on that that's very

13  persuasive to a jury, that is where the Court comes in and

14  says, look, that person, he or she has to understand what he

15  or she is talking about.  And that's what Dr. Baruch doesn't

16  understand here.

17       When we dive further into Dr. Baruch, we also see that

18  he's -- he has been completely inconsistent on his viewpoints

19  throughout time.  Now, I understand that's probably an issue

20  of -- because a lot of courts -- I've been in these Daubert

21  hearings --

22       THE COURT:  Now you're talking about the different

23  numbers he gave or the different ranges?

24       MR. LEWIS:  The different numbers and even some of his

25  public statements have been inconsistent with statements he's

10

1    now making in this litigation.

2           I know a lot of judges would say -- including Judge

3    Land, the Middle District of Georgia, who ruled on the

4    Chambers case, a lot of judges will say, oh, tackle that on

5    cross-examination, and I get that.  I mean, I understand that

6    some courts have that view.

7           But it seems to me that in this circuit, having read

8    and reviewed -- I know Your Honor is familiar with that Nease

9    case that is recent, that Ford Motor case.  It seems to me

10   that the Fourth Circuit is saying we need to have a little bit

11   more scrutiny of experts than just sort of allowing things to

12   happen on cross-examination in front of the jury.

13          And Dr. Baruch doesn't seem to have a very consistent

14   methodology --

15          THE COURT:  What do you think plaintiff's theory is

16   with respect to this whole question about the plasma

17   concentration levels and the ranges and so forth?

18          As I understand it, the plaintiffs concede they're not

19   trying to prove as part their theory that there is some

20   specific range.  But, rather, their point is there ought to be

21   some guidance from the manufacturer, and then it's the

22   manufacturer who ought to know where the therapeutic range is

23   and what is too high or too low.

24          And so Dr. Baruch is -- I mean, I think some of his

25   inconsistency in reporting different ranges arises from the

1     fact that he was trying to answer questions, essentially being

2     cross-examined in his deposition, and that he wasn't really

3     saying this is my precise opinion I'm going to testify to at

4     trial.  I'm just trying to answer your questions.  You've

5     asked me why I think there ought to be monitoring and what the

6     manufacturer should instruct patients and doctors to do with

7     respect to monitoring and how to monitor.  But I don't really

8     think that he was going so far as to say here's what that

9     monitoring should reveal, and this is the precise therapeutic

10    range that that monitoring ought to target.

11         MR. LEWIS:  In his depo, he did -- he provided some

12    ranges.  Now, again, maybe that was just because he was

13    pressed.  If the Court would rule that he's not allowed to

14    offer those opinions in specific ranges in the trial, I'm

15    going to accept that, that ruling obviously.

16         But --

17         THE COURT:  You can give that up, not cross-examine

18    him about the variations that he used in the ranges?

19         MR. LEWIS:  Well, here's I guess the point and why it

20    ties back to fit and why I'm fussing so much about the fit in

21    the case.

22         Because if the opinion really isn't that there's a

23    specific range, just that the company should have offered some

24    vague guidance to monitor plasma levels, okay.  So how would

25    that have mattered in Ms. Knight's case, vague guidance about

1    monitoring?

2          If the expert opinion is I don't have any ranges

3    wherein the doctor should take action, I just think plasma

4    levels should be monitored, okay, fine.  If that is your

5    theory, fine.  How would that have mattered in Ms. Knight's

6    case?

7          Because the reality is is that we don't have data on

8    her plasma levels just before the bleed.  We have some data,

9    but we don't have data just before the bleed incident.

10          More importantly, we don't -- even if we allow Dr.

11    Ashhab's extrapolation, right, to go back in time and say, oh,

12    well, her levels would have been X, Y or Z at the time of the

13    bleed, which is what essentially his opinion is, to

14    extrapolate --

15          THE COURT:  Right.

16          MR. LEWIS:  -- the opinions of these experts don't

17    indicate that that would have mattered.

18          If her level was 150, if her level was 200, whatever

19    it is, the opinions of the plaintiff's experts that some

20    monitoring should have been done doesn't really affect the

21    outcome of this case.  Because you're not -- the plaintiffs

22    are not suggesting that, oh, the plaintiff would have fallen

23    within this danger zone that would have required action.  And

24    if action were taken, then you would have prevented a bleed

25    incident and would have taken her off Pradaxa or something

1    along those lines.

2           So, again, that's another problem with the fit here --

3           THE COURT:  Okay.

4           MR. LEWIS:  -- is when you start to play out the

5    logical chain of the theory.

6           And so when Your Honor asked me, well, what is the

7    plaintiff's theory on plasma monitoring, I gotta be honest,

8    it's kind of all over the board.  I mean, we have three

9    different experts kind of saying three different things.  It

10   doesn't really match up to what the treaters are saying.  And

11   that's our big problem with this whole plasma monitoring

12   piece.

13          THE COURT:  Okay.  All right.  I'll look forward to

14   hearing their response in explaining that part of their case.

15          Let's shift, then, to the labeling opinion.

16          MR. LEWIS:  Sure.

17          So when we talk about labeling, Your Honor, we're

18   really kind of focused on -- and I'll try to articulate what I

19   think the rule is here --

20          THE COURT:  Okay.

21          MR. LEWIS:  -- in this district.

22          And this is really premised on some decisions from

23   Judge Goodwin and perhaps some other Fourth Circuit law on

24   this particular point.  And I'm just focusing specifically on

25   Judge Goodwin's decisions in the Ethicon, Husky and Bard

1    cases.

2              The rule is essentially this, it is a three-step

3    process.  Step one is related to qualifications.  Do you make

4    clinical judgments yourself?  Do you prescribe this particular

5    product or class of products?  If you don't, then you're not

6    qualified to talk about what should and shouldn't be in the

7    label for some other physician to make a decision about.

8              If you have never even yourself had to make this

9    decision, then you really don't have the qualifications to

10   indicate what some other physician might feel is important or

11   not from a risk benefit perspective.  That seems to be a

12   pretty fundamental proposition.

13             I have found very few cases even in West Virginia

14   where someone has tried to proffer somebody like, ah,

15   plaintiff's expert Gosselin, who has never even made a

16   decision himself on how to prescribe a particular class of

17   products or this particular medication to a patient -- he is a

18   laboratory person, so in that sense, Dr. Gosselin doesn't even

19   meet these minimal requirements to be qualified to be talking

20   about what should be in and out of the label.  Obviously his

21   opinions may be admissible for other purposes, but not in an

22   effort to criticize the label in the first instance.

23             THE COURT:  Did Dr. Baruch fall in that same category?

24   Or did he testify that he has clinical experience with

25   treating people who are -- either through prescribing these

1   medications or treating people who were on them?

2         MR. LEWIS:  Dr. Baruch would be -- would meet that

3   minimal qualification.

4         Dr. Baruch obviously makes decisions on how to

5   prescribe these types of --

6         THE COURT:  You agree that Dr. Chertow does as well,

7   the nephrologist?

8         MR. LEWIS:  Both of those doctors meet that minimum

9   requirement.  I would say Dr. Gosselin, he is out because he

10  doesn't even make that --

11        THE COURT:  Well, let's focus on him a little bit

12  because, as I understand it, he's essentially what I would

13  characterize generally as a research scientist.

14        MR. LEWIS:  Right.

15        THE COURT:  And so why is it that if he's a research

16  scientist, who admittedly his expertise is in the area of

17  coagulation and anticoagulation and the effects, efficacy and

18  characteristics of these things -- I mean, that seems to me

19  that gives him expertise to know what the risks are or be able

20  to evaluate reports of what the risks are for a given

21  medication and compare that to what is stated in the labeling

22  or patient medication guides and say whether or not the

23  labeling or the guides convey what he determines as a research

24  scientist to be fairly the risks and benefits or whatever of a

25  particular drug therapy.

1          MR. LEWIS:  Right.  So here is why that doesn't work.

2          And I'll just call -- as a lab guy or as a research

3     scientist, he may be qualified to talk about here are the

4     risks, here are the benefits of this particular drug or

5     medicine.  Totally fine.  But when you get into the arena of

6     what ought to be disclosed to physicians in a label for the

7     risk benefit analysis, it takes that information to a

8     different level.

9          Because we know that not all risks, not all benefits

10    work themselves into a label, nor should they.  Nor should the

11    way that they're framed into a label be in a generic way.

12         This needs to be framed in an appropriate way for a

13    physician to take that information --

14         THE COURT:  But didn't he testify -- and perhaps this

15    is laid out also in his CV, his qualifications, but that part

16    of his role at whichever university -- is it a university

17    hospital?

18         Is that where he is or --

19         MR. LEWIS:  I think that's --

20         THE COURT:  Wherever it was, but that he did advise

21    clinicians about these matters?

22         MR. LEWIS:  Well --

23         THE COURT:  So while admittedly he's not writing

24    prescriptions, he's not directing treatment, if he is -- if he

25    is advising clinicians about the risks and efficacy of

1    different blood thinners and all that, it seems to me he's

2    sufficiently familiar with what is conveyed in labels and

3    medication guides to be able to testify about whether they

4    reveal the risks and benefits that he assesses.

5            MR. LEWIS:  I'd urge the Court to take a look at his

6    deposition around pages 118 and 119.  We cite that on page 14.

7            THE COURT:  Okay.

8            MR. LEWIS:  I will say this.  If you compare

9    Mr. Gosselin to Dr. Baruch -- now, Dr. Baruch shouldn't be

10   able to offer these opinions, but it's for a different reason.

11   But for the fundamental qualification issue, you see a vast

12   difference in those two individuals, and you see why

13   Mr. Gosselin really isn't an expert for labeling and really

14   isn't an expert for advising physicians.

15           Sure, he has some cursory conversations with emergency

16   room physicians.  But it is not his job and it is not his

17   primary job to be advising physicians on how to prescribe

18   Pradaxa or to make decisions about how to treat patients who

19   have been prescribed Pradaxa.

20           If you read his deposition, he's almost grasping for

21   straws on coming up with some information, some experience,

22   and certainly not the type of experience that would lend

23   oneself to be an expert able to testify.

24           THE COURT:  Okay.  I'll certainly take a look at

25   those.

1          MR. LEWIS:  Rule number one, do you make clinical

2    judgments yourself and prescribe this?  That's kind of a

3    fundamental base for qualifications.  According to Judge

4    Goodwin, that's just not enough either.  You have to have

5    something extra, and Judge Goodwin has sort of made this --

6    drawn this line.

7          If you are -- you have to fundamentally be a

8    physician, otherwise makes clinical judgments, prescribes

9    yourself, and then you have to have some other kind of

10   experience or training.  Maybe you have helped with labels.

11   Maybe you know a little bit about FDA labeling or you've done

12   your own work on that particular issue.

13         Or like in -- and I'll even say in I think it was the

14   Husky case, a urogynecologist -- because it was a vaginal

15   sling case -- was a pioneer in the industry, went around

16   talking and teaching other physicians about the risks and

17   benefits of the device in addition to making these clinical

18   judgments himself.  Judge Goodwin said, you know, that's the

19   something extra I am looking for in a physician.

20         When we look at Dr. Chernow, while he may have these

21   baseline qualifications, he lacks this second piece, this

22   something extra.  He's really not offering any experience in

23   teaching other physicians.  He's not an FDA labeling expert or

24   worked for the FDA obviously.  And he's really not even

25   familiar with the regulations that the FDA uses with respect

19

1    to labeling.

2           He seemed very unfamiliar, and again on page 15 of our

3    brief, we cite a couple of excerpts from his deposition where

4    he really gave that up.  He really conceded that this isn't

5    really his thing, labeling for physicians.  He's not that kind

6    of guy.  And so Dr. Chernow really misses the mark with

7    respect to this something extra that Judge Goodwin, ah, has

8    required in order to allow labeling opinion testimony in

9    cases.

10          THE COURT:  I made a note here when I was reading

11   through these, and I think that plaintiff responded at least

12   in part by saying with respect to Dr. Chernow -- is it

13   Chertow?

14          MR. MOSKOW:  It is, Your Honor.

15          THE COURT:  That Dr. Chertow is really focused on

16   discussing the labeling with respect to the interaction with

17   the kidney, which he's a nephrologist, and different types of

18   coagulants and coagulation activities.  So, I mean, that seems

19   to me to be right in the ballpark for him, that he's a

20   nephrologist, and he's going to testify that he knows and

21   understands how coagulant activity is affected by kidney

22   function.

23          What more does he need?  He's discussing the labeling

24   because the labeling purports to discuss and explain the

25   relationship between kidney function and coagulation activity.

1    And if that is what he's testifying about, it's not really a

2    matter of whether he has some specialized knowledge in

3    labeling decisions, it's his specialized knowledge in kidney

4    function, in nephrology.

5            MR. LEWIS:  And, Your Honor, I think that's where I

6    would disagree respectfully.

7            THE COURT:  Okay.

8            MR. LEWIS:  There's a difference between having

9    knowledge of a particular subject matter or even a clinical

10   area and then being an expert in relaying knowledge or

11   information or assistance or guidance with respect to clinical

12   decision-making.  There is a distinction between them.

13           Certainly one can have a lot of knowledge about

14   something, but they have to be an expert in relaying that

15   information, teaching, coaching, educating others on how to

16   make those decisions themselves, and that's where Dr. Chernow

17   just does not have it.

18           Certainly he has the knowledge, no question about

19   that.  But as Judge Goodwin said in the Ethicon case with this

20   Dr. Margolis, he was really -- Dr. Margolis in the Ethicon

21   case was really sort of the same or the equivalent of Dr.

22   Chernow.  I mean, he was a gynecologist.  He had lots of

23   information about how these things worked and treated plenty

24   of patients on his own, but he didn't have that extra thing in

25   his background that gave him the expertise to be able to say

21

1    here's how you teach other people how to do this.  Here's how

2    you provide guidance to other people.  Here's how FDA labeling

3    requirements work and the rules associated with that.  That

4    extra thing is what is missing here also with Dr. Chernow.

5    That's the fundamental flaw.

6         I grant you that he does have clinical knowledge and

7    experience.  He just doesn't have the experience of teaching

8    others how to make those judgments themselves.

9         Our argument on Dr. Baruch is a little bit different,

10   and this is where we get to sort of the third level.  If you

11   have these minimum qualifications, and you have that something

12   extra on being able to teach others how to make these

13   judgments, then you look at what your methodology was in this

14   particular case, and did you use an appropriate methodology?

15        We know from the Nease case that's a requirement to

16   assess any expert's methodology, and that's where Dr. Baruch

17   falls short here.  He -- and I'll go to page 11, 12 and really

18   on to 13 where we cite numerous instances of his deposition,

19   of admissions from his deposition where he clearly hasn't done

20   his homework in this particular case.

21        He may be qualified because of his experience and

22   training and some of his background to generally speak as a

23   labeling expert.  But when he's asked about some of the

24   specific details about FDA labeling requirements, or even the

25   facts of this particular labeling history, he falls woefully

1    short.  He's made mistakes in the historical background.  He

2    says he really hasn't spent a lot of time.  He doesn't

3    understand foreign labeling requirements.  He didn't really

4    investigate sort of the history of how the foreign labeling,

5    ah, came into play and what the purpose of that was.

6         And so, yes, he came up with, you know, sort of a

7    label himself.  He doesn't really complete it.  But I think

8    the chief problem with Dr. Baruch is he hasn't done his

9    homework here to really have an understanding as to what the

10   labeling history here is and why the decisions were made, and

11   that's just fundamental methodology.  You gotta do your

12   homework in order to offer opinions in front of a jury and try

13   to persuade them that there was a bad label in this case.  He

14   hasn't done that.

15        So that's the sum and substance.  I mean, otherwise, I

16   guess, three labeling experts, we are sort of a little

17   concerned about the duplicative nature and the cumulative

18   effect of some of these experts as well.  It seems to me they

19   have Laura Plunkett also that is going to be talking about the

20   label, and so the Court ought to consider whether or not three

21   or four experts is really necessary on the label as well.

22        But that's the sum and substance of our labeling

23   arguments, Your Honor.

24             THE COURT:  Okay.

25             MR. LEWIS:  The third bucket that we have here is

23

1    really this corporate intent, corporate knowledge, corporate

2    behavior, and the law is pretty strong on this.  Courts

3    routinely prevent experts from offering or testifying about

4    corporate mindset in product liability cases, medical device,

5    pharmaceutical cases.

6         We cited a laundry list of other cases throughout our

7    briefing that confirms that it is inappropriate to allow an

8    expert to look at a series of documents, look at some

9    documents or even read deposition testimony and say, you know,

10   frankly, BI knew this or clearly voted for profits over safety

11   or anything along those lines.  Corporate intent, that's

12   inappropriate for an expert.  That's for the jury to conclude

13   throughout the trial.

14        THE COURT:  Do you perceive that plaintiffs are

15   offering Plunkett to testify to more or different opinions

16   than those considered by Judge Land in the Chambers case?

17        MR. LEWIS:  I do.

18        It's a little murky as to what Judge Land's opinion is

19   allowing Dr. Plunkett to testify about.  I mean, it seems,

20   when I read Judge Land's Chambers opinion, what he's really

21   saying is that she could testify about warnings; in that way,

22   what the company knew or maybe didn't know or should have

23   known perhaps.  I'm not sure Judge Land goes above and beyond

24   and says, oh, and it can also draw conclusions about the

25   corporate intent.

24

1        So I just -- when I read Judge Land's opinion, it

2   sounds to me like he's really saying that her testimony is

3   sort of relevant to warnings.  At least that's the way I read

4   it, the way he describes it, but it's a little unclear.

5        But, you know --

6        THE COURT:  I think he noted that clearly she has a

7   considerable amount of regulatory experience as to labeling.

8   I know that he mentioned that in discussing the context of her

9   use of these documents.  And as I recall, he says she used the

10  studies that the defendant had submitted to the FDA, and I

11  guess even the ones perhaps done since then.

12       But you think plaintiffs are going further than

13  something like that here?

14       MR. LEWIS:  I really do because I've seen it so many

15  other times.

16       THE COURT:  Uh-huh.

17       MR. LEWIS:  Dr. Plunkett is a well traveled plaintiff

18  expert.  And state of mind, motive, ethics, all of those

19  things, if given the license, that's coming out.  I mean,

20  she's going to give a run at all of that if there's not some

21  restriction put on her testimony, and I anticipate that the

22  same thing will be done here.

23       And so really what we're looking for, Your Honor, is a

24  decision that is sort of more in line with the cases we cite

25  on page 12 of our reply brief, Seroquel, Pfizer.  Even Judge

25

1    Land in that Mentor Obtape Transobturator litigation had an

2    order related to that.  That was my litigation, so I remember

3    it.

4             THE COURT:  And generally what those cases say is that

5    you can certainly introduce documents from the defendant and

6    reports, information about what they had.  You just can't have

7    the expert try to supply that last link to the inference that

8    the plaintiffs are arguing just because they're an expert.

9             MR. LEWIS:  That's exactly right.  And that's what

10   we're looking for here, is something consistent with what that

11   body of law really says you can't do.

12            THE COURT:  Great.

13            MR. LEWIS:  All right.  Thank you, Your Honor.

14            THE COURT:  Thank you.

15            All right.  For plaintiffs?

16            MR. CHILDERS:  Your Honor, this is Neal Moskow on

17   behalf of plaintiffs.  He was not here at the last hearing.

18            THE COURT:  Welcome.

19            MR. MOSKOW:  Thank you, Your Honor.  I appreciate the

20   opportunity to appear before you.

21            Let me start by saying that my response to defendant's

22   arguments is somewhat tempered by your May 31st order.  I

23   think a lot of these issues have already been addressed.  I

24   have a presentation, I'm certainly willing to start anywhere

25   you want, but my gut instinct is to start right at the end of

26

1    Mr. Lewis's argument with regard to Dr. Plunkett.

2         THE COURT:  Go ahead.

3         MR. MOSKOW:  Because I happen to be the attorney who

4    presented her in the first two state trials, in Connecticut in

5    February and then again in March or April.  And I assure you

6    that if we had tried to offer some broad-based motive and

7    intent evidence through Dr. Plunkett, whose ability to testify

8    in Connecticut, because of the timing of how things worked

9    out, was simply a denial of the -- we call it a Porter motion,

10   but essentially it's a Daubert challenge.  The court just

11   denied it without a written opinion, so she had unfettered

12   ability to testify.

13        And I assure you that if I or she had offered the

14   testimony that Mr. Lewis has just suggested, you would have

15   been presented with transcripts that would have shown it, and

16   you haven't been.  And the reason for that is simple, because

17   that's not the plaintiff's intent.

18        What Dr. Plunkett does is she looks at what the

19   company knew and how, if at all, that information is reflected

20   in the warnings or other material provided to physicians.  And

21   what wasn't said in either the defendant's moving papers or

22   here today is that while the FDA approved label is one indicia

23   of whether the company has properly communicated information

24   to physicians, in accordance with Wyeth versus Levine, it's

25   just one indication.  It's the floor of -- FDA regulations are

1     the floor and not the ceiling.

2          State law, in particular a state like West Virginia

3     where the warning goes to the patient and not the physician,

4     is a whole different paradigm from what the FDA regulations

5     are considering.

6          So I think, you know, we heard a lot about fit, and we

7     heard a lot about buckets, but what we really need to focus on

8     are the facts of this case.  And in the facts of this case,

9     what Dr. Plunkett will do with regard to company documents,

10    what Dr. Baruch will do with regard to company documents is

11    say to the jury, this is information that we know the company

12    had because it's in their own hand.  And despite having this

13    information, they didn't communicate it to physicians, and

14    patients were at risk as a result.

15         A perfect example kind of brings us back to the first

16    part of Mr. Lewis's argument regarding plasma concentration

17    monitoring opinions.  And that is that the company, for

18    example, in its currently ongoing Diversity trial, which is

19    using Pradaxa in children six months to 18 years of age, they

20    have based their dosing regimen on a plasma concentration

21    range of between 50 and 250 nanograms per milliliter.  Which,

22    as reflected in our reply papers, they chose because,

23    according to the authors of that study, it was a level that

24    had been proven to be safe and effective in multiple adult

25    populations.

28

1          And in the paper that was just published on this

2     art -- on this study, the footnote that they cite to for

3     support is the RE-LY trial.  That because of the evidence

4     adduced during the RE-LY trial, they know that between 50 and

5     250 nanograms per milliliter is a safe and effective range.

6          And I think what has happened in the course of the

7     various briefing that the defendants have done, Judge, is that

8     they've tried to conflate two really distinct issues.  There

9     is a safe and effective therapeutic range, and there is an

10    optimal range, and the two ranges are different things.

11    That's why one is a therapeutic range, and one is an optimal

12    range.

13         And if I could give you an analogy that I think might

14    help kind of crystallize this for us.  If you were driving on

15    a highway, and you saw a sign that said speed limit 65,

16    minimum speed 45, that is equivalent to a therapeutic range.

17    You want to go at least 45 miles an hour so the 18-wheeler

18    coming behind you doesn't strike you and hurt you.  And you

19    don't want to go over 65 because speed kills, and that's more

20    dangerous.  So we have a therapeutic range between 45 and 65.

21         Now if I'm driving a car pulling a trailer, I'm

22    probably going to want to be closer to the 45.  If I'm in a

23    sports car, I would want to be closer to the 65.  That is the

24    optimal range.  The optimal range is for an individual

25    patient.

29

1          We're not talking about an optimal range should be in

2     the label.  What we're saying, and what our experts have

3     opined, is that there should be a therapeutic range, this

4     broad range that has been proven to be safe and effective in

5     multiple adult populations.

6          Your Honor pointed out both in the summary judgment

7     decision and then during argument just now that our experts

8     have identified differing ranges at different times, as has

9     Boehringer.  In fact, you even cited in your order to the

10    e-mail from Dr. Connolly where he says the range appears to be

11    40 to 200, and there's never a good reason to go above 200.

12    That's one range.  The Diversity study says 50 to 250.  That's

13    another range.

14         What our experts are saying is it was up to the

15    company to identify the range that was most appropriate, it

16    should be in the label, and then they should provide

17    information as to how to test to see whether or not the

18    particular patient is within that range.  And then it's up to

19    the doctor to decide for that individual patient, is this

20    patient at a higher risk of stroke?  Do I need to run them at

21    the high end of the range?  Is this patient at a high risk of

22    bleed?  Do I need to run them at the low end of the range?

23         That's the deficiency in the label.  That's what each

24    of Dr. Baruch, Dr. Plunkett and Dr. Chertow speak to in their

25    opinions.

1          And if I may, I want to be very clear as it relates to

2     Mr. Gosselin, whom you've identified as a research scientist.

3     You know, he calls himself I think a lab guy.  He does not

4     ever opine or testify that he has ever made a clinical

5     decision as to whether a particular patient should be on one

6     anticoagulant or another.  His expertise is squarely within

7     the area of how one identifies whether a particular patient is

8     appropriately anticoagulated.

9          And to the extent that he's providing any opinions in

10     this case, those opinions go to whether the current label

11     identifies appropriate testing and why or why not; and how, if

12     at all, the label could be made better specifically with

13     regard to that issue of testing.

14          And I think that distinction, again, gets kind of

15     conflated into a bigger picture here.  Well, he's not a

16     doctor.  Well, he isn't a doctor, and he makes no bones about

17     it.  But their Ph.D., Joanne Van Ryn, who is one of the

18     leading scientists at the company -- in fact, she wrote the

19     initial paper on dabigatran before it was on the market that

20     set the tone for what Pradaxa is.  She testified in her

21     deposition that he's one of the top ten experts in the world

22     on anticoagulation.  So that's exactly the type of specialized

23     knowledge that our expert brings to the table that the

24     defendants ignore.

25          And I know I've kind of done a loop here to go from

1    the opinions regarding company documents, but I think it's

2    important to understand in the context of what our experts are

3    saying that each opinion is not only supported by internal

4    company documents -- like the Diversity study or like e-mails

5    between physicians at the company that say, yeah, monitoring

6    might be useful, but it would put us at a competitive

7    disadvantage versus Eliquis and Xarelto.

8            That kind of information supports the opinions, so

9    it's not -- there was an argument a few moments ago that Dr.

10   Baruch didn't understand how a particular test worked or

11   didn't understand how a particular model worked.  It's not

12   required that he understand how it works.  What he has to --

13   what he understands and what he testified to is that, based on

14   the modeling, he was able to identify patients who were at

15   higher risk of bleeding.

16           And you know what --

17           THE COURT:  Well, and he's relying upon the

18   conclusions of the model to do that?

19           MR. MOSKOW:  He is to a certain extent, Judge, but

20   that conclusion is published in the medical literature

21   authored by the defendant's own employees.

22           Dr. Reilly and Dr. Lehr published the dabigatran

23   concentration paper in the Journal of American Cardiology, and

24   that paper specifically states that there is a point at which

25   there is minimal, if any, additional benefit from increasing

1    plasma concentrations while there is significant increase in

2    bleeding risk.  So his opinions are borne out by the medical

3    literature.

4         Whether he knows whether it's a regressive model

5    versus an exponential model is of little consequence when it

6    is used in the grander picture here where he knows that

7    increasing concentration is tied to bleed risk.  That

8    information is not in the label.  And the company's own

9    research demonstrates that there is a sweet spot at which you

10   maintain stroke protection efficacy while minimizing bleed

11   risk.

12        I want to, if I could, go back to this issue of fit

13   that Mr. Lewis started with, Your Honor.

14        Much of the argument that you've heard talked about

15   how these opinions relate directly to Ms. Knight's treatment.

16   I want to make clear that the experts that we're here talking

17   about today, Drs. Plunkett, Baruch and Chertow and

18   Mr. Gosselin are all generic experts.  They're not going to be

19   talking about the specific, ah, interplay between their

20   opinions and Ms. Knight.  In fact, they have not been

21   disclosed to do so.

22        What they will do is they will set the stage for

23   someone like Dr. Huff, who you've already -- Dr. Ashhab, I'm

24   sorry, who you have already indicated can testify to these

25   issues.  So what they'll do is they'll set the stage for the

1    jury.  They'll explain where the science comes from, how it

2    fits in, and then Dr. Ashhab will be in a position to explain

3    how that information, had it been available, would have

4    directly impacted Ms. Knight.

5         That's the fit, and I think that's an important

6    distinction.

7         THE COURT:  Can you answer the question raised by the

8    defense in sort of the opening discussion on the monitoring?

9    And that is, what precisely is plaintiff's theory, and what do

10   you expect to adduce from in particular Dr. Baruch?  You

11   expect him to testify about a particular range and say that's

12   the range that should have been in the label or something or

13   what?

14        MR. MOSKOW:  Thank you, Your Honor.

15        What I would expect Dr. Baruch to testify to is that

16   the company has identified several different ranges.  They

17   have access to all of the data, and they're the ones who have

18   been conducting the analyses over the last eight years, and

19   it's up to them to identify what the appropriate range is.

20        I believe what he testified to at his deposition in a

21   couple of different ways is -- and I actually wrote it down,

22   is that for a particular type of patient, you may want to run

23   them higher or lower.  But there is an overall appropriate

24   range and, you know, whether that is again the Diversity range

25   of 50 to 250, or the Connolly range of 40 to 200 and

1    something, you know, that the parties haven't really had an

2    opportunity to get into a lot of detail with you, Judge.

3         But what the jury will likely hear is that there were

4    a series of drafts of the Reilly Lehr concentration paper

5    between 2011 and 2013, and that early drafts included a

6    therapeutic range that settled at 40 to 200.  And that there

7    was a decision by management at the company that the paper

8    could not be published with that therapeutic range in it, and

9    it had to be removed, and that the focus of the paper had to

10   change from plasma concentration range to patient

11   characteristics, and it did.

12        And a significant portion of the company documents

13   that Dr. Plunkett will talk to the jury about will be that

14   interplay between management and the scientists and the

15   physicians, in which they identify a therapeutic range that

16   would make the drug safer while maintaining its efficacy and

17   yet, for business reasons, have chosen not to do so.  And

18   that's why it's hard to argue -- excuse me -- it's hard to

19   argue any one of these opinions in a vacuum.  They really fit

20   together like a puzzle.

21        And the puzzle pieces here that get put together

22   reflect a company decision before the RE-LY trial even

23   commenced that this would be a drug that would not require

24   monitoring or dose adjustment.  The trial was designed that

25   way.  The drug was approved that way.  And, you know, damn the

35

1    torpedoes if there is any evidence that suggests otherwise,

2    we're going to ignore it.  Or in the case of two of their lead

3    physicians in this case, Dr. Friedman and Dr. Heinrich Nols,

4    they were seeking changes in the manuscript to avoid that

5    issue becoming public.

6          So the point that Dr. Plunkett, Dr. Chertow, Dr.

7    Baruch will all testify to is that there is a therapeutic

8    range.  The company has a duty to identify it.  And then,

9    after it's identified, it has a duty to instruct on what

10   testing should be used in order to appropriately determine

11   whether a patient is within that therapeutic range or not.

12         And contrary to this argument both in the summary

13   judgment papers and in the papers regarding Daubert, that

14   there is no fit here because the 75-milligram dose is the

15   lowest dose, that's ridiculous.  If the patient is outside

16   this therapeutic range, is overly anticoagulated, then the

17   appropriate course would be to switch therapies.

18         And with Ms. Knight, she was on Warfarin before

19   without a bleed and without a stroke, so we know that that's a

20   therapy that could have been appropriate for her.

21         And I think what's significant, Your Honor, is that in

22   the label, in Section 2.2, in the situation in which a patient

23   develops renal failure while on the drug, the company says

24   discontinue Pradaxa in patients who develop acute renal

25   failure while on Pradaxa and consider alternative

1    anticoagulation therapy.

2         So the label that is at issue here recognizes that for

3    some people this is not the appropriate drug.  They just don't

4    want it broadcast that it's more people than have just

5    suffered renal failure.  And how do we know that?  We know

6    that because, as the Court has already found, the 10th to 90th

7    percentile reflected a huge range, and there are people

8    outside that range who are either under-coagulated or

9    over-anticoagulated.  So, again, the opinions coalesce around

10   that issue.

11        And with specific regard to Dr. Chertow, I just want

12   to point out not only is he an endowed professor at Stanford,

13   so talking about he doesn't teach things to people kind of --

14   maybe I misunderstood the argument.  But this is somebody who

15   taught at Harvard, at University of California, San Francisco,

16   and now at Stanford.  He's chief of nephrology and an endowed

17   professor at Stanford.

18        He has published more than 500 peer-reviewed articles

19   regarding kidney and kidney function.  He's the author and

20   editor of the textbook called The Kidney.  He's currently

21   involved in an investigator-sponsored trial concerning the

22   safety of Eliquis, an anticoagulant.

23        And significantly what he has written about in his

24   report, what he testified to at his deposition, what we

25   anticipate he will testify to at trial is that small

1    degradations in kidney function have a significant impact on

2    increase in plasma concentration.  And that a patient who is

3    at 40 or 35 or 30, or let's call it 31, doesn't just suddenly

4    require a different dose when they hit 30.  That there are

5    clinical characteristics, there are clinical findings that

6    together with a reduced kidney function may make it

7    appropriate for a patient to be on a different dose or a

8    different therapy.  And that opinion is confirmed in the

9    European label.

10          In the European label, somebody who has 50 -- a

11   creatinine clearance of 50 and is on a P-gp inhibitor, like

12   Ms. Knight was, the label says consider a lower dose.  Take an

13   anticoagulation test, determine whether or not your person is

14   appropriately anticoagulated, and consider a lower dose.  They

15   don't say that here.

16          Now the argument has been from time to time that the

17   reason they don't say that here is because the FDA didn't

18   approve the 110 dose.  Well, then the label could just as

19   easily say to determine whether or not the 150-milligram dose

20   is too much for this particular patient.  It doesn't have to

21   be -- drop to another dose.  It could say if this dose is too

22   much, there's another therapy.

23          And that's essentially Dr. Chertow's position here,

24   which is that when you have a patient population that is --

25   that skews elderly, they have reduced kidney function, you

1   take a drug like Pradaxa that is predominantly cleared by the

2   kidney, as much as 80 percent, and you have somebody who has

3   even small degradation in kidney function, you can expect this

4   huge increase in plasma concentration.

5          The same is not true with Eliquis or Warfarin.

6   It's -- to a lesser extent, it's not true with Xarelto either.

7   Xarelto is around 50 percent kidney cleared.  So his

8   specialized knowledge goes directly to the issue of whether

9   the information conveyed in the U.S. label is sufficient to

10  advise physicians as to how to appropriately dose their

11  patients.

12         I know I have bounced all over, Your Honor.  I did

13  want to say --

14         THE COURT:  I did want to give you a chance to -- I

15  don't know if you had a chance to look at this during

16  argument, but Mr. Lewis asked me to look at, with respect to

17  Mr. Gosselin, pages 118 and 119 of his deposition testimony

18  where he's discussing his --

19         MR. MOSKOW:  His qualifications.

20         THE COURT:  -- experience.

21         MR. MOSKOW:  Yes, his experience.

22         I don't want to in any way mislead the Court.

23  Mr. Gosselin -- and I spent the last trial calling him Dr.

24  Gosselin, and Judge Morgan kept having to correct me, it's

25  Mr. Gosselin, after she allowed him to testify.

1          But he's not testifying as to whether or not this

2     particular information was necessary to evaluate a particular

3     risk.  What he testifies to is that in order to know whether

4     or not the patient is appropriately anticoagulated, you need

5     to test.  The aPTT test that is reflected in the label is

6     insufficient for that purpose for a variety of reasons,

7     including the lack of identification of the reagent so you

8     know what the appropriate range or effect is.  But he also

9     indicates what are appropriate tests and what information

10    could be in the label that would allow physicians to identify

11    what their patient's particular anticoagulant activity is.

12          So his opinion is really focused on the testing that

13    is in the label and what should be in the label.  I think it's

14    a qualitatively different opinion than what Drs. Baruch and

15    Chertow and Plunkett are opining on.

16          THE COURT:  All right.  Thank you.

17          MR. MOSKOW:  Your Honor, unless you have any further

18    questions, the only point I would make about Dr. Gosselin is

19    that he's been talking and teaching about anticoagulants and

20    how to test for them for 30 years, and he's exactly the type

21    of expert who can provide the jury with information that is

22    not in the common lexicon as to how one identifies whether a

23    patient is properly anticoagulated.

24          And at the end of the day, that is really what Judge

25    Land found for each one of these experts, that to the extent

40

1    that there are any issues with prior testimony or whether they

2    understood how a particular model worked or whether they

3    considered all of the company documents, each one of those

4    things goes to weight and not admissibility.  That their

5    opinions are consistent with scientists in their field,

6    they're reliable to the extent that they rest on company data

7    and peer-reviewed medical journals, and that each one of these

8    experts has particular expertise in the areas in which they're

9    offering testimony.

10            THE COURT:  All right.  Thank you.

11            MR. MOSKOW:  Thank you, Your Honor.

12            THE COURT:  Mr. Lewis, I will give you just a few

13    minutes of rebuttal.

14            MR. LEWIS:  Very briefly, Your Honor.  Thank you.

15            THE COURT:  Hold on just a second.

16            MR. LEWIS:  Sure.

17            THE COURT:  Go ahead.

18            MR. LEWIS:  Thank you, Your Honor, a few quick points,

19    number one just about the reliance on Judge Land's Chambers

20    decision.

21            And I have a lot of respect for Judge Land.  I've been

22    in front of him for ten years in a completely different

23    litigation, so this isn't a criticism of Judge Land in any

24    way.  But with all due respect, I'm not sure that Chambers

25    opinion would stand scrutiny under the Fourth Circuit from the

41

1    Nease decision.  I just think that this idea of putting

2    everything to cross-examination and to weight and not doing a

3    full analysis under Daubert, at least in this circuit, is a

4    dangerous thing for a district court judge to do.  It seems

5    like the Fourth Circuit wants the Court to go a little bit

6    further than Judge Land did.  So that's just kind of a first

7    blush argument.

8         Secondly, I wanted to briefly address Dr. Plunkett and

9    something that is in her report.  We cite to this in our

10   brief.  But one of the conclusions that she reaches in her

11   report, just so the Court has an example of where she'll go,

12   is that Boehringer Ingelheim's decisions, based on a bunch of

13   facts and documents and things, were driven by economic

14   concerns and competitive advantage.  So that's just an example

15   of the type of conclusion that is not permitted and should not

16   be permitted.

17        And that's --

18        THE COURT:  You would have no quarrel, I assume, if

19   Dr. Plunkett was presented with a document -- plaintiffs have

20   cited these two or three times -- where there is some

21   reference in e-mails or other documents where someone from the

22   defendant says, well, we don't want to publish that or that

23   would hurt our competitive advantage.

24        So I assume you understand those are documents that

25   are going to come in.

42

1        MR. LEWIS:  They're coming in.

2        THE COURT:  But you just don't think the expert ought

3    to be able to offer an expert opinion that documents like

4    that, even statements like that form -- are evidence of some

5    corporate intent that the expert's going to identify?

6        MR. LEWIS:  Correct.  Exactly right, Your Honor.

7    Because an e-mail doesn't prove an overall corporate intent.

8    I mean, it just doesn't.

9        I mean --

10        THE COURT:  Well, I think, you know, part of the

11    difficulty with things like this and issues like this before

12    the Court is, you know, I don't have specific testimony or

13    anything.  I don't think I have any difficulty saying that if

14    this case goes to trial, that if Dr. Plunkett or other

15    plaintiff experts attempt to gather a series of defendant

16    statements and say, based upon all these, my opinion is that

17    this defendant was trying to hide the truth about Pradaxa just

18    to make money, we're not going to let that type of evidence

19    come in.  That's not within the realm of expertise of any of

20    these experts.

21        But they certainly can say, and Dr. Plunkett I think

22    is a good example -- she might be sort of a steady regular

23    plaintiff's expert, but be that as it may, she certainly has

24    expertise in the FDA process for her to be able to say these

25    are the documents that the company had, and they either were

43

1    or weren't part of the FDA approval.  She can testify to those

2    things.

3            MR. LEWIS:  I think that's fair land.

4            What we're looking for in this motion practice

5    pretrial is some guidance from the Court so we know how to

6    frame the case, and we're not jumping up in the middle of

7    trial here and there.  I think both parties could use a little

8    guidance --

9            THE COURT:  Okay.

10           MR. LEWIS:  -- from the Court.

11           Let me just address real briefly also this monitoring,

12   this plasma monitoring issue one last time.

13           So I focused a lot on fit in my opening.  In our

14   briefing, we also talk about reliability.  And that is a

15   similar, but a little bit different animal, reliability than

16   fit in a particular case.  And under the Nease decision, it's

17   an analysis that needs to be done.

18           So I heard plaintiff's theory.  It doesn't appear that

19   they're actually going to cite a number, 50 to 200, or 35 --

20   it doesn't appear that they're going to say a range.  They are

21   going to say, hey, the company thought about a whole bunch of

22   ranges, and they should have put in their label that you

23   should do some plasma monitoring.  And maybe they should have

24   given a range or maybe they shouldn't have, who knows.

25           When we talk about reliability, we're talking about,

44

1     okay, that's your theory that a different label would have

2     made a difference, generally speaking.  But there are no

3     studies to suggest -- and you'd think they might have some

4     data on this given that there is a European label that is

5     different from the U.S.  There's no data to suggest that

6     putting monitoring in the label actually changes clinical

7     outcomes for patients.

8              I mean, there's no data to suggest -- in fact, the

9     more recent data that has been published is that monitoring

10    really doesn't matter.  You'd think we would have studies out

11    there that would show that, oh, for this patient population

12    with a label as X, we end up with outcomes of far fewer bleeds

13    or the stroke risk is, you know, the same or what have you.

14    We don't have that kind of information.  That's what we mean

15    by reliability.  Are you testing the theory that a different

16    label generally would matter?

17             And then let me talk about fit again one last time.

18             So imagine in this particular case, the plaintiffs

19    have no theory on what the range should have been provided to

20    physicians, just some range should have been provided.  Well,

21    if the plaintiff actually in this case would have fallen

22    within a range that would have required no action by the

23    physician based on whatever we published in the label, then

24    that whole theory doesn't fit this case.  It can't lead to

25    liability in this case.

1    To give you an example in a completely different

2    context, let's just talk about a product case.  It's the

3    difference between saying -- okay.

4    Let's say it's a defective tire case.  Plaintiff comes

5    in, has an accident with a tire and says you should have made

6    your tire differently.  That's it, that's really all they're

7    doing here is saying you should have made your tire

8    differently.  But what the law requires is you gotta do more

9    than that.  You gotta say, well, wait a minute, how should we

10   have made our tire differently, number one?  And if we had

11   made our tire differently, would that have avoided the

12   accident here, number two?

13   Daubert requires that two-step analysis, what should

14   have been different, and would it have mattered in this

15   particular case.  Here the plaintiffs do not have that

16   evidence connected up to say, oh, if you had changed your

17   label to put something in there about monitoring, Ms. Knight

18   would have never suffered this bleed event.

19   THE COURT:  Well, they've got Dr. Ashhab, whose

20   testimony will be that she was over-anticoagulated, and that

21   Pradaxa contributed to that over-anticoagulation, and that's

22   what caused or contributed to her major bleed.  So if he's

23   supplying that causation evidence, why do the plaintiff's

24   general experts have to testify that having monitoring would

25   have made a difference?

1      Dr. Ashhab, and we won't go into the others, but to a

2  lesser degree the others, they're all saying she was

3  over-anticoagulated.  And if we had known as treating

4  physicians how to monitor, and that we should monitor when

5  we've got a patient with these characteristics and this

6  combination of medications, then monitoring would have

7  revealed her over-anticoagulation.

8      MR. LEWIS:  And my question is, Your Honor, then what?

9  Then what would you have actually done differently with this

10  particular plaintiff?  And that differently thing -- that

11  different thing that you would have done, how would that have

12  led to a different clinical outcome?

13      There's the analytical --

14      THE COURT:  Well, their evidence was that given this

15  host of problems, that had she or her doctors been fully aware

16  of all this evidence the plaintiffs now claim and had been

17  fully informed of that through the kind of labeling and

18  patient medication guide that plaintiffs are arguing, they

19  more likely than not would have recognized she was

20  over-anticoagulated.  And if at that point there is no

21  information available to them for any different dosing, they

22  would have just put her back on Warfarin where she hadn't had

23  a bleed, even though she had the challenge of being monitored

24  and all that, which is what she was trying to avoid.

25      But it seems to me that they've got enough evidence

1    that that should be for the jury to determine, and that the

2    plaintiff's general experts don't have to supply all of these

3    elements.  They only have to -- all they're being offered for

4    is that general causation basically, and that it's the

5    specific causation evidence of the local doctors that fills

6    the gap and completes at least the prima facie case.

7            MR. LEWIS:  And, Your Honor, with all due respect, the

8    way that you articulated the specific causation piece of this

9    is not actually what is in the record.  Again, with all due

10   respect, the only testimony that is in the record is that it

11   would have been considered.  And it's that -- and Your Honor

12   put it very well because it actually proves why these folks

13   shouldn't be able to testify.

14           If there was testimony in the record, if Dr.

15   MacFarland came in and testified in her deposition, you know

16   what, having known about this and her range would have been X,

17   I would have definitely put her back on Warfarin -- that's not

18   the testimony.  That is -- no doctor has testified to that.

19   Not even Dr. Ashhab goes that far.

20           Dr. Ashhab does not even say what should have been

21   done differently.  He just draws the conclusion that she

22   was -- and, again, we take issue with this.  We think that's

23   wrong.  But he draws the conclusion that she was

24   over-anticoagulated.  He doesn't say what should have been

25   done differently.

48

1          And, again, if the -- and I respect the Court's

2     decision on summary judgment, the jury can hear that, the

3     Court has allowed that testimony in.  But to allow these

4     generals to come in should not be permitted because it really

5     doesn't satisfy that Daubert threshold to connect it up.

6          THE COURT:  Okay.

7          MR. LEWIS:  Thank you, Your Honor.

8          THE COURT:  Thank you.

9          All right.  Let's turn to the plaintiff's omnibus

10    motion in limine.

11         It looked to me like there were -- I guess you raised

12    three different issues or areas.  Obviously I think the first

13    two can be dealt with fairly quickly.

14         MR. CHILDERS:  Yes.  Andy Childers on behalf of

15    plaintiff.  And I don't intend to spend a lot of time arguing

16    these.  I think they are fairly straightforward and in the

17    record.

18         The first is to prevent defendant from coming in and

19    soliciting information about their good acts or good deeds

20    that they do either in the community or by making other drugs

21    that are different from Pradaxa and what have you.  I think

22    it's fairly straightforward under Federal Rule of Evidence 403

23    that that's not permitted.

24         And if it was, if that information did come in, the

25    company has done some really bad stuff, too.  We don't have

1    any intention of coming in here and pointing out that they

2    hired a convicted Nazi war criminal.  But if they were allowed

3    to talk about the good acts, we think that would open the

4    door.

5           THE COURT:  Well, let me make two observations, and

6    you can react to that, and we'll hear the defense reaction to

7    it.

8           First, I generally agree with the proposition that the

9    company can't come in and just offer the portrayal of its good

10   conduct, good reputation that is not connected to Pradaxa.  I

11   think they're entitled to, as I would summarize it, introduce

12   themselves to the jury.  I have no real difficulty with the

13   defendant describing its corporate makeup.  Apparently it's a

14   privately held family corporation.  I think they can put that

15   in.  I suppose they can testify or offer evidence about the

16   size and location of the corporation, where they do business,

17   where they make things, where they sell things.  So things

18   like that I don't have any trouble with.

19          With respect to its development of Pradaxa, I think

20   they're entitled to introduce evidence about the reason that

21   they thought it was important to develop a drug like this,

22   what they were responding to, the legitimacy of developing a

23   drug that is at least arguably a preferred or a better option

24   than other more traditional blood thinners.

25          I think they can offer evidence about how much they

50

1    spent developing that drug, all of the steps they went

2    through, all of the -- a description of the whole process of

3    approval and the studies and all those sort of things.

4         I think they cannot start to offer evidence of how

5    their aim is always to produce the very safest drug no matter

6    which drug it is they're producing or statements like that as

7    to their purpose or intent outside of their development and

8    marketing and sale of Pradaxa.

9         So if that is the way they're restricted, do you see a

10   reason to challenge it?

11        MR. CHILDERS:  No, Your Honor.

12        THE COURT:  Okay.

13        MR. CHILDERS:  That's all we're trying to do, is sort

14   of keep it inside those boundaries as well.

15        THE COURT:  Okay.

16        MR. CHILDERS:  The second issue we have is a very -- I

17   thought a very concise issue that I think maybe the defendants

18   misunderstood as being more broad.

19        We've had several depositions where defendants refer

20   to the United States label as the FDA label or the FDA's

21   label, and the case law couldn't be more clear from Wyeth

22   versus Levine.  The FDA doesn't draft and is not responsible

23   for drug labels.  This is Boehringer's U.S. label for Pradaxa.

24   And all we are seeking to do is prevent Boehringer from coming

25   in and trying to assert to the jury that the FDA somehow

1    created this label, or this is the FDA's label as opposed to

2    their label.  The case law is clear from the Supreme Court of

3    the United States.  That's not accurate, and that's solely

4    what we're trying to prevent here.

5              THE COURT:  Well, again, at least through Dr. Plunkett

6    but perhaps through other witnesses, too, you're going to be

7    describing what the company knew, what it submitted to the

8    FDA, how the FDA responded, how the whole label evolved into

9    what was ultimately approved by the FDA.  So honestly I think

10   with the way the evidence is going to come in, I certainly

11   don't intend to let the defendant argue that they were

12   prohibited from any other type of label.  Rather, I think the

13   evidence is clear that they submit a label to the FDA for

14   approval, and in that context it's the FDA approved label.

15             MR. CHILDERS:  Right.

16             THE COURT:  And the connotation of that is no more

17   than this is what the company developed and presented and the

18   FDA found adequate at the time and approved.  And so as long

19   as that is the context of this discussion -- and I'm not going

20   to interrupt them every time they refer to the FDA approved

21   label to distinguish it from, you know, some other version or

22   characterization of the label.

23             MR. CHILDERS:  And, Your Honor, I think saying the FDA

24   approved label, I don't have -- I don't have a proper

25   objection to that frankly because they did approve it.

52

1          My concern is sometimes they call it the FDA label,

2    and --

3          THE COURT:  Well, I understand what you're saying.

4    You know, I think that that's -- given what I think the

5    evidence is going to be, I don't think that nuance is going to

6    confuse the jury.  I don't think that is going to allow them

7    to argue or lead the jury to conclude that somehow this label

8    is not the responsibility of the defendant but, rather, this

9    is what the federal government did or something to that

10   effect.

11         MR. CHILDERS:  I think you may be surprised when we go

12   through this trial, Your Honor.

13         THE COURT:  That could be.  But I certainly intend to

14   make sure the jury understands the evidence and is properly

15   instructed to understand the process by which the FDA approves

16   a label and what that means, whatever you want to call it, the

17   FDA approved label or an FDA label or whatever else.

18         MR. CHILDERS:  Fair enough, Your Honor.

19         THE COURT:  Okay.

20         MR. CHILDERS:  The final issue that we had in our

21   omnibus motions in limine is to preclude the defendant from

22   arguing that the FDA has made a conclusion with regard to

23   whether or not titrating or changing the dose of Pradaxa based

24   on a patient's blood level is or is not appropriate.  This --

25   we've had two trials thus far, and in both trials they've

53

1    attempted to argue that to the jury.

2           There is no evidence --

3           THE COURT:  Has that all just been from Dr. Mann?

4           MR. CHILDERS:  No, Dr. Mann hasn't come into trial.

5           THE COURT:  All right.

6           MR. CHILDERS:  It's been -- this was filed before --

7           THE COURT:  Okay.

8           MR. CHILDERS:  -- I believe we got to that point.

9           So what happens is they come in and say that we gave

10   to the FDA information we gave to the EMA, and that the EMA

11   responded, the EMA being the European Medicines Agency,

12   related to the therapeutic dose.  The therapeutic dosing,

13   excuse me, Your Honor.  And when we gave it to the FDA, they

14   decided we didn't need to include that in our label in the

15   U.S.

16          Well, the problem with that, I think as Your Honor

17   understands with the way the drug label is approved and then

18   whose responsibility it is, the company has never submitted to

19   FDA a drug label in which they've asked the FDA to reject or

20   approve the use of adjusting the dose based on blood level of

21   the patient.

22          THE COURT:  You know, I understand it.  How did we get

23   a 110 dose?

24          MR. CHILDERS:  In the United States or in the rest of

25   the world?

54

1          THE COURT:  In the United States.

2          MR. CHILDERS:  Through a different indication --

3     excuse me, Your Honor -- for use in orthopedic --

4          THE COURT:  How did that come about?

5          MR. CHILDERS:  They applied for it for those purposes,

6     ah --

7          THE COURT:  So this wasn't something where the FDA

8     said, all right, we've seen your RE-LY study and all of these

9     things, and you've proposed a 150 dose for a whole bunch of

10    different conditions or situations, and as we look at this, we

11    really think maybe you ought to do a 110 dose for certain

12    patients.

13         And so --

14         MR. CHILDERS:  I may need to back up a bit.

15         THE COURT:  Okay.  Go ahead.

16         MR. CHILDERS:  It was kind of the opposite.

17         THE COURT:  All right.

18         MR. CHILDERS:  They came to the FDA and asked the FDA

19    to approve the 150 and the 110 dose at the same time for

20    atrial fibrillation specifically.  The FDA said, no, we'll

21    only approve the 150, but we will let you make a 75-milligram

22    dose for patients who have severe kidney impairment, different

23    from the rest of the world.

24         THE COURT:  Okay.

25         MR. CHILDERS:  So it's sort of a separate issue.  They

55

1    have -- they have now gotten the 110 dose approved in the

2    United States, but not for atrial fibrillation.  It is

3    approved for other uses outside of that.

4         One of the issues that is not at issue in this case,

5    but was in some of the other cases, is whether or not the

6    evidence of why the 110 dose has never been approved in the

7    United States for atrial fibrillation, why that is.  The

8    company has been told by FDA, there are certain things we want

9    you to do if you want to get it approved, and they haven't

10   done it.  That hasn't come into evidence in any of the first

11   two trials.  It's really not an issue here because the 110

12   dose isn't really at issue anyway.

13        THE COURT:  Yeah.

14        MR. CHILDERS:  The issue that we have is the

15   information that was developed internally by Dr. Lehr, who

16   we're going to talk about a lot in the spoilation motion as

17   well, that a patient could be put on the 150-milligram dose,

18   and if it was too high when they measured it, it could be

19   switched to the 75-milligram dose, didn't have to have a

20   110-milligram dose.  And that in doing that, they would lower

21   the amount of bleeding that would occur, but they would

22   maintain the safe -- the stroke prevention efficacy of the

23   drug.

24        That information has never been proposed by the

25   company to be included in the label, and so FDA has never made

56

1    a decision saying, yes, we do think you should do that or, no,

2    we don't think that's a good idea.  FDA hasn't said one way or

3    the other any official position because the only way they can

4    give an official position is if the company proposes a label

5    change to them.

6         I expect, because I've watched it happen twice, that

7    Boehringer will come to this courtroom and say we gave all

8    this information to FDA, and they made a decision that that

9    should not be included in the label.

10        THE COURT:  We're talking now about the monitoring --

11        MR. CHILDERS:  Yes, sir.  Yes, sir.  About measure the

12   plasma concentration in the individual patient, and if it's

13   too high, lower the dose; if it's too low, raise the dose.

14   That's never been proposed as a part of a label change ever in

15   the United States.

16        And so the implication is that the jury is going to be

17   led to believe that was proposed to FDA when it wasn't.  And

18   what we're simply seeking is that because there's no evidence

19   that ever happened, that we preclude -- that the defendant be

20   precluded from making an argument that it did.

21        That's pretty much it.

22        THE COURT:  Well, and so what I've had trouble

23   grasping is what this means in practical terms when the

24   defense presents its case.

25        So you're going to present evidence in your case of, I

1    assume, RE-LY and some of these other studies and the sort of

2    underlying clinical data that would support determining that

3    the company should have proposed a monitoring system and

4    determine what -- how to monitor and what range to look for.

5        And so the defense is certainly going to be able to

6    offer evidence about what it submitted and have its doctors

7    and its experts explain that these things don't suggest that

8    monitoring --

9        MR. CHILDERS:  Certainly.

10       THE COURT:  -- should be required.

11       So I assume you have no trouble with that.

12       MR. CHILDERS:  No.  And --

13       THE COURT:  You just don't want the argument then that

14   the defendant would make that the FDA, in approving the label,

15   disapproved implicitly at least monitoring and dosing

16   titration.

17       MR. CHILDERS:  That's correct.

18       And I expect them to come in and say there's a good

19   reason why we don't monitor this drug.  We're going to have

20   people say that.

21       THE COURT:  Right.

22       MR. CHILDERS:  What is not proper is for them to say

23   FDA has concluded that as well, because there is no evidence

24   that FDA has been presented that information to be considered

25   and then made any conclusion.  That's the issue, that sole

58

1    issue.

2            Certainly I believe they can come in here and tell the

3    jury here is some literature, here is what our scientists

4    say --

5            THE COURT:  And I won't pretend to have a grasp of the

6    FDA process and certainly not the terminology.  But my

7    recollection I think from reading Dr. Mann's report is that

8    there's a formal step, and perhaps that's the investigational

9    drug proposal or something like that, that there is a formal

10   step that FDA recognizes as being the formal step requesting

11   approval of a drug.

12           MR. CHILDERS:  That's called the new drug application,

13   Your Honor.

14           THE COURT:  The new drug application.

15           And so, in your view then, they would have to produce

16   a new drug application or something akin to that or a modified

17   label and approved usage.

18           MR. CHILDERS:  Yes, Your Honor.

19           Once -- if I could, and I don't want to belabor this,

20   but the new drug application is to get the drug approved with

21   the initial label.

22           THE COURT:  Right.

23           MR. CHILDERS:  After that, they can change the label

24   using what's called a changes being effected, CBE.

25           THE COURT:  Right.

1        MR. CHILDERS:  Or they can ask for supplemental -- or

2    excuse me -- for a prior approval of a change to the

3    particular label.  What we're saying is without submitting a

4    CBE or a prior approval application, the FDA doesn't consider

5    whether or not anything should be added to the label.

6        And that is the only thing we are seeking to have

7    precluded here, is to not allow the company to come in and

8    say, well, because we went to a seminar where there was an FDA

9    person there, and they spoke about it, somehow the FDA has

10   made a decision, a conclusion that what the plaintiffs are

11   saying is just not right.  That's -- it's never happened, and

12   that's all that we're asking the Court to preclude.

13       THE COURT:  All right.  Thank you.

14       MR. CHILDERS:  Thank you, Your Honor.

15       Any other questions?

16       THE COURT:  No, sir.

17       MR. CHILDERS:  Thank you.

18       THE COURT:  Mr. Lewis, are you responding?

19       MR. LEWIS:  Yes, Your Honor.

20       THE COURT:  All right.

21       MR. LEWIS:  Again, thank you for the opportunity,

22   Judge.

23       I really don't have anything to say on the so-called

24   good company argument.

25       THE COURT:  All right.

60

1          MR. LEWIS:  I think Your Honor has tackled that.

2          On the FDA label comment, again not much to say there

3     except, you know, I think in maybe some of the video

4     depositions or whatever, folks have said FDA label, but the

5     jury is not going to be confused.

6          It's --

7          THE COURT:  I'm not troubled about that.  I would only

8     be concerned if through a witness or through arguments or

9     statements by counsel that it might -- if I heard something

10    that I think might be misinterpreted by the jury to contradict

11    what we've described as being the process, only then would I

12    believe it necessary to --

13         MR. LEWIS:  Fix it or --

14         THE COURT:  Yeah.

15         MR. LEWIS:  Okay.  On this third issue, just a few

16    points.

17         Your Honor, what we've done in the prior trials and

18    what we intend to do in this trial is just talk about the

19    facts.  The facts are that the FDA has to approve our

20    labeling.  And the facts are that we submitted a whole bunch

21    of evidence to the FDA related to plasma monitoring, and the

22    facts are that the FDA has never said to us you need to put

23    that in your label.

24         THE COURT:  Well, but you've never proposed to the FDA

25    that that be the case.

1        MR. LEWIS:  There has never been a label proposal to

2   the FDA, and we're not going to argue that we have.

3        THE COURT:  I think I would have a lot of trouble with

4   the defendant arguing at trial that we gave all this

5   information to the FDA, and included in that information is

6   all of the underlying data and the studies, and also included

7   are all these discussions by clinicians or doctors or even

8   some of the medical literature that discusses plasma

9   concentration and monitoring and, you know, how you could do

10  it or how you don't need to do it or whatever.

11       If you didn't ask the FDA to approve a label or the

12  drug itself originally with monitoring, I don't think I'm

13  going to let you imply to the jury that the FDA has somehow

14  disallowed monitoring.

15       MR. LEWIS:  We're not going to say the FDA disallowed

16  monitoring.  We're not intending to say that it rejected a

17  label change.

18       THE COURT:  Okay.

19       MR. LEWIS:  But we want to talk about the facts of

20  what was submitted to the FDA and what actually occurred.

21       I mean, we have -- we cited --

22       THE COURT:  Well, I don't have realtime up here, but

23  what was it you first said when you started your argument just

24  now?  You said something to the effect that you want to be

25  able to show and argue that the FDA did not approve a

1   monitoring requirement or label.

2       MR. LEWIS:  The FDA, with knowledge of the information

3   that we submitted to the FDA, did not require us, did not

4   require us to include that information in the label.  That's a

5   fact.

6       THE COURT:  Boy, I don't -- I think that is -- I want

7   to think about it, but I think that's a mischaracterization

8   then of what the FDA did and wrongfully implies that the FDA

9   considered and made an affirmative decision to not require

10  monitoring.  I don't think that you can say that if it's not

11  part of your proposal, that the FDA decided it.

12      MR. LEWIS:  Let me just point out two things, Your

13  Honor.

14      On page 10 of our reply brief, we cite Cardiac Safety

15  Research Consortium, a paper that was published in 2018.  The

16  authors are four FDA folks on that paper.

17      THE COURT:  Right.

18      MR. LEWIS:  And that paper concluded that routine

19  PK-PD measurements to guide the dosing cannot currently be

20  recommended due to the lack of reliable tests, lack of

21  clinical evidence of benefit and data to guide the appropriate

22  dosing.

23      THE COURT:  That should come in.

24      MR. LEWIS:  Right.

25      THE COURT:  I think that's different, admitting that

63

1    as evidence is different from saying that the FDA did not

2    require you to include monitoring in the label and using that

3    to imply that somehow the FDA actually did consider and

4    determine that you shouldn't include that in the label.

5           MR. LEWIS:  And let me explain why it's a distinction

6    without a difference, but it's an important --

7           THE COURT:  Okay.

8           MR. LEWIS:  -- it's an important argument for us in

9    this case.

10          Because we have the specter of punitive damages in

11   this case, right?  So the plaintiffs are arguing that because

12   of our conduct in not including plasma monitoring on our

13   label, among other things, but because of our conduct in doing

14   so, we acted maliciously.  Punitive damages should be awarded

15   against us for that.  And we want to be able to argue, first

16   of all, look at all the facts, and we'll just speak of the

17   facts as the facts.  This is a paper that was published.  It

18   had an impact on us.

19          The information that we supplied to the FDA over time

20   about plasma monitoring, and the fact that the FDA didn't

21   say -- didn't call us up and say, hey, you actually -- we've

22   seen your information, you need to change this, you need to

23   put this in your label; or, hey, we know that Europe is

24   requiring certain things in the label, we want you to do the

25   same thing as Europe; that is impact -- that is important for

64

1    us to be able to tell the jury --

2              THE COURT:  I don't think this -- I don't think my

3    sense of where to draw the line keeps you from offering

4    evidence of those facts.

5              MR. LEWIS:  Okay.  All right.  Then I don't think

6    there's a big difference.

7              THE COURT:  Okay.  Maybe there's not.  You know, this

8    is one of those where we'll just have to wait and see how this

9    sort of comes out of trial.

10             MR. LEWIS:  Well --

11             THE COURT:  You know, like the --

12             MR. LEWIS:  And honestly, Your Honor, I think that's

13   the better course, is to -- whatever guidance the Court

14   provides to give us a shot to -- as the trial develops, to

15   talk to you more about it if we can.

16             THE COURT:  Right.

17             MR. LEWIS:  Okay.  Thank you, Your Honor.

18             MR. IMBROSCIO:  If I may, Your Honor.

19             There is just one legal -- good afternoon, Michael

20   Imbroscio.

21             One legal difference actually that follows, I believe,

22   is in 2007 Congress passed what's called the FDAAA, FDA and

23   two extra As.  In that, they codified what is now Section

24   35504, which is a new provision that post-dated the facts in

25   Wyeth versus Levine.  What that provision says, it puts an

65

1    obligation on the FDA that if they are aware of a safety issue

2    that should be in the label, then they have an affirmative

3    statutory obligation to raise it with the sponsor, with the

4    drug manufacturer, and to come up with labeling.  And if the

5    sponsor does not agree, the FDA has the right to impose that

6    labeling.

7         That's a different regime than what existed in Wyeth

8    versus Levine.  There's a footnote in Wyeth versus Levine that

9    says this case pre-dates this provision, it doesn't address

10   it.  And I think that in many ways changes the calculus at

11   least enough to what Your Honor is getting at.  The fact that

12   the FDA had all of this information.  The fact that in 2010

13   the FDA scientist testified publicly around the approval of

14   the medicine that we looked at the issue of monitoring and we

15   don't think it's appropriate.  That's from his public

16   testimony at the approval hearings.  There are subsequent

17   interactions with FDA folks, including in the two meetings

18   involving a CSRC ultimately published with FDA authors, that

19   concludes there is not enough to recommend monitoring.

20        And so we're certainly not going to say the FDA

21   rejected a monitoring proposal, but we think those facts as

22   facts should come in, and it's not an answer to say that the

23   FDA did not have any obligations to suggest or impose a

24   monitoring regime if the FDA thought that was the appropriate

25   step.  That's what 35504 says.

66

1          THE COURT:  Okay.  I'll think about that.

2          MR. IMBROSCIO:  Sure, Your Honor.  Thank you.

3          THE COURT:  Do you want to respond to that?

4          MR. CHILDERS:  Just to that one issue, if I could.

5          The change in the CFR that gives the FDA certain

6    powers doesn't have anything to do with whether or not the FDA

7    has actually made a conclusion in this case about whether or

8    not plasma monitoring is or is not appropriate.  The FDA would

9    have to actually opine that.  And the whole issue we have here

10   is there is no opinion from the FDA because there has never

11   been a vehicle for the FDA to do that.

12         There is -- to say the FDA has made a decision about

13   that, they base that on two things.  One is the CSRC paper

14   which, I agree, that paper is going to come into evidence.

15   The fact that some of the authors work at FDA does not make

16   that an FDA proclamation or conclusion.  Some of the other

17   authors are employees of Boehringer Ingelheim and doctors from

18   other parts of the country and the world.

19         And that paper also says very specifically Pradaxa,

20   unlike the other NOACs, the other drugs on the market, has a

21   sweet spot between 50 and 150 nanograms per milliliter where

22   the safety and efficacy seem to be greatest, but the company

23   hasn't done enough testing on it for us to recommend it.

24   That's what it says.  So why has that not been recommended?

25   Because they haven't done the testing.

67

1          The other issue that he brought up was the 2010

2     testimony at an advisory committee hearing from one employee

3     from the FDA.  Again, that's not a decision by the FDA.

4     That's not even where the drug was approved.  The drug was

5     approved a month later by a different panel of people.

6          So what they try to do -- and I can tell you this

7     because I've watched it happen twice.  They will take those

8     two things, and they will present it to the jury as saying

9     this is what the FDA has decided, and that is something the

10    jury will believe even though it's not true.

11         THE COURT:  Well, I thought you told me before that

12    the jury had found the product defective in both those cases.

13         MR. CHILDERS:  They found -- they found in the first

14    case that there was failure to warn and in the second case

15    failure to test.

16         I can't tell you because I wasn't in the jury room,

17    but I can tell you it's very powerful for a company to stand

18    up, a drug company especially -- because the jury has no idea

19    how involved the FDA is.  And believe me, in a two- or

20    three-week period of time, we can't explain to them everything

21    we know about how limited the FDA's powers really are.  They

22    think if the FDA has approved a drug, if the FDA has made a

23    decision, well, it's probably absolutely right, and then the

24    plaintiff has a huge uphill battle to get past it.

25         So the only issue that I would -- or I would just urge

68

1    Your Honor, when considering this issue, to look at what

2    they're trying to rely on for evidence of FDA making a

3    decision.  Because the FDA has never made such a decision, and

4    to allow them to say that would just be improper.

5              Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Let's turn to the spoilation, and you have filed cross

8    motions about this.  It's the plaintiffs who seeks to offer

9    this evidence at trial, so I'd like to have the argument

10   presented by plaintiffs and then responded to by defendants.

11             MR. CHILDERS:  Thank you, Your Honor.

12             Can we just argue these together?  Is that how you

13   want us to do it?

14             THE COURT:  Yes.

15             MR. CHILDERS:  Okay.  Super.

16             THE COURT:  And the simplest way would be to try to

17   tell me, succinctly if possible, what specific evidence of

18   spoilation you're relying upon --

19             MR. CHILDERS:  Understood.

20             THE COURT:  -- and what -- yeah.

21             MR. CHILDERS:  Understood.

22             I could boil it down into two custodians in

23   particular, the first being Dr. Lehr.  Sometimes he is called

24   Professor Lehr.

25             THE COURT:  Right.

69

1          MR. CHILDERS:  And I think he is now called Professor

2     Dr. Lehr.  That is a title in Germany when you reach a certain

3     level.

4          Dr. Lehr was a research scientist at Boehringer, he

5     was intimately involved in Pradaxa, and he was the person who

6     did the modeling that made the determination as to whether or

7     not you could use plasma concentration to improve the safety

8     of the drug.

9          THE COURT:  Was that modeling then used for the RE-LY

10    study?

11         MR. CHILDERS:  No, sir.  That was the modeling based

12    upon the data from the RE-LY study.

13         THE COURT:  Okay.  So he took the RE-LY study, and he

14    analyzed the data, and apparently he had different iterations

15    of something you all have referred to as the manuscript.

16         MR. CHILDERS:  Correct.

17         THE COURT:  Then at some point he retired.  Dr. Reilly

18    kind of took over that -- I don't remember if it was because

19    of retirement or whatever, but Dr. Reilly then apparently took

20    the last iteration of Dr. Lehr's manuscript and altered it in

21    some fashion more or less, and then that's what ultimately got

22    issued.

23         MR. CHILDERS:  So I don't believe Dr. Lehr retired

24    before Dr. Reilly got involved, but the evidence that we have

25    from Dr. Clemens, who is supervisor to these fellows, was that

1    Lehr wrote the manuscript, and then -- and he calls him the

2    father of the manuscript.

3         And you see that also from --

4         THE COURT:  Did he have a more precise explanation for

5    what this manuscript was, what it was done for?

6         MR. CHILDERS:  It was done to -- as the basis for what

7    became the exposure paper that was eventually published in the

8    Journal of the American College of Cardiology.

9         And so he --

10        THE COURT:  The RE-LY study paper.

11        MR. CHILDERS:  It's an analysis of the data from the

12   RE-LY study, and what they were looking for was how does the

13   plasma concentration affect bleed rate and stroke rate.  And

14   so that wasn't done initially in RE-LY.  They did a separate

15   analysis to try to figure that out.

16        THE COURT:  Okay.

17        MR. CHILDERS:  So when he did that analysis, at least

18   according to the e-mail from Dr. Clemens, that then Dr. Lehr

19   wrote a manuscript, and he called him the father of the

20   manuscript in that e-mail and said that then the manuscript

21   went to Dr. Reilly, and that Dr. Reilly changed it

22   substantially.  And then there was sort of a series, two or

23   three years of back and forth between people in the company

24   before the article was finally published.

25        THE COURT:  And was Lehr out of the picture during

1    most of that?

2         MR. CHILDERS:  Lehr left in 2012, and the paper was

3    published 2013, 2014.

4         THE COURT:  Well, I'm really puzzled about several

5    things.

6         MR. CHILDERS:  Yes.

7         THE COURT:  One is when I read the MDL order 50 and

8    looked at Judge Herndon's opinion on that, it appeared that

9    relatively immediately before he had issued that opinion, you

10   all in the MDL discovered that there was this Dr. Lehr, and he

11   played this role, and now he can't -- the company couldn't

12   seem to find various things, many of them his personal things,

13   like his own e-mails, his cell phone and then this manuscript.

14        And so as I understand it, immediately after Judge

15   Herndon entered his sanction order, there was an appeal taken,

16   an interlocutory appeal, which raised only really the

17   requirement that the foreign doctors and personnel come to the

18   United States to be deposed.  And, of course, the panel and

19   the circuit found that that was an abuse of discretion and

20   sent it back.  There isn't a whole lot of clarity to what, if

21   anything, they intended to do about anything else in that

22   order, but it does seem pretty clear that all they really had

23   before them was the deposition aspect of it.  And then not

24   long after that, the MDL settled.

25        MR. CHILDERS:  Correct.

1          THE COURT:  So has anybody ever taken Dr. Lehr's

2     deposition?

3          MR. CHILDERS:  No.  Dr. Lehr is a German citizen, does

4     not work for the company.  We have asked, in fact Mr. Moskow

5     asked if we could take his deposition, and they said they

6     could not make him come for a deposition.

7          THE COURT:  Is that the only way to do it is to get

8     them to do it?

9          MR. CHILDERS:  There's no vehicle to take -- believe

10    it or not, you can't take a deposition in Germany.  And so

11    when we have done employee depositions, they have either taken

12    place in Amsterdam or in London.  They have to come outside of

13    the country and be deposed in another place.

14         THE COURT:  Well, what about Dr. Reilly?

15         MR. CHILDERS:  Dr. Reilly has been deposed.  He is a

16    U.S. resident.

17         But I will say this.  Dr. Lehr is still a consultant

18    for the company, and through that particular vehicle is how we

19    asked that they make him available for deposition, because we

20    don't have any sort of ability to do that.

21         THE COURT:  Have they refused or --

22         MR. CHILDERS:  They told us they could not make him

23    available.

24         THE COURT:  And you didn't pursue it beyond that?

25         MR. CHILDERS:  No.  Other than seeking it through

1    them, no, Your Honor.  We didn't know of another vehicle.

2            THE COURT:  With respect to Dr. Reilly, was he asked

3    about the Lehr manuscript?

4            MR. CHILDERS:  He was.  He testifies that Dr. Clemens

5    was just wrong about that, and that he wrote the first draft.

6    That is contrary to what the evidence is from Dr. Clemens.

7    It's contrary to an e-mail from Dr. Lehr that is included in

8    CMO 50 where he says that is the last time that I will let

9    somebody else put their name on a paper that I drafted.

10           And so what we have is a conflict in the evidence that

11   could potentially be resolved if we had the original

12   information of the manuscript that had been drafted apparently

13   by Dr. Lehr, but we don't have that.

14           THE COURT:  Well, why should I apply Judge Herndon's

15   rulings in this case?

16           MR. CHILDERS:  I'm glad you asked that, Your Honor.

17           THE COURT:  This is not a discovery issue that arose

18   in this case.

19           MR. CHILDERS:  That's where I would disagree.

20           At the outset of this case, the defendant asked the

21   plaintiff to adopt and utilize all discovery that had occurred

22   in MDL 2385, not to serve any additional discovery, but to

23   rely on that.  And then to also coordinate with the

24   Connecticut -- I point to Mr. Moskow because he is the leader

25   of the Connecticut litigation.  He's the head of the

74

1    plaintiff's executive committee.

2         And we agreed to do that.  We agreed that we wouldn't

3    serve affirmative discovery here, but we would take all of the

4    MDL discovery, and we would coordinate with Connecticut to do

5    additional discovery.

6         THE COURT:  Was there any discussion of Judge

7    Herndon's MDL order and whether that was going to be somehow

8    adopted or used in this case?

9         MR. CHILDERS:  I certainly would say, Your Honor,

10   there was no carve-out.  There was no request by the defendant

11   that although we utilize all the discovery, we not utilize any

12   of the sanctions or information that had been ordered by Judge

13   Herndon.  So it was our understanding we were taking it as is,

14   and it came to us with CMO 50 as part of it.

15        This issue has been litigated in Connecticut under the

16   same sort of --

17        THE COURT:  Well, the defendant argued -- and I'll

18   confess that I don't fully understand the relationship between

19   the Connecticut action and the MDL, but they've argued that

20   there is a connection.  There was an inter-relationship

21   between those two sets of mass litigation, but that that's not

22   present at all in this case.

23        And so why should you attribute the conduct of the

24   defendant in the other case to this case?

25        MR. CHILDERS:  I would say because, at their request,

75

1    we adopted all of that discovery and conduct so that we

2    wouldn't repeat the discovery here.  That was something

3    that -- again, I can't it stress enough, they asked us to do

4    that, and we agreed to it.

5            We've done the same thing in the Chambers case in

6    front of Judge Land.  We didn't send additional requests for

7    what had already been produced.

8            THE COURT:  Has this come up in the Chambers case yet?

9            MR. CHILDERS:  Not yet, Your Honor.  Not yet.

10           And so I would say that why it applies here is because

11   the defendant asked for it to apply here.  And what they

12   produced in the MDL is what they produced in the MDL, and it

13   is also what they have produced here because that is what they

14   asked us to agree to at the outset of the case.

15           THE COURT:  To be blunt about it, I wouldn't generally

16   contemplate that agreeing to use the discovery from another

17   case implicitly or explicitly allowed things like discovery

18   disputes to be used in the other case.

19           Typically, you know, whatever -- I understand in this

20   case there hasn't actually been any discovery disputes raised

21   here.

22           MR. CHILDERS:  Correct.

23           THE COURT:  But typically when that happens, of course

24   the magistrate judge rules on it, and it doesn't become

25   evidence at trial.  Obviously whether evidence is produced or

76

1    not is a result of discovery, but the steps the parties have

2    to take to file motions to compel or something like that

3    aren't typically admissible.

4           MR. CHILDERS:  And I'm not asking that that be

5    admissible.

6           What we've asked for is an adverse inference charge to

7    be given to the jury that certain --

8           THE COURT:  Right.

9           MR. CHILDERS:  -- evidence was destroyed or lost along

10   the lines of what had been ordered in the Connecticut cases.

11          And in this particular case, even if you were to throw

12   away the discovery dispute that happened in MDL 2385, Dr.

13   Lehr's documents still weren't preserved properly at a time

14   when the company was on notice that they needed to preserve

15   them.

16          The findings are the same.  We can't go back in time

17   and undo the fact that they destroyed his laptop, his cell

18   phone, his personal computer.  We're still stuck with the fact

19   that they destroyed that evidence, and we have the same burden

20   proving the same issues now that were going to be proved in

21   the MDL.

22          THE COURT:  Obviously I'm troubled by all of this.  I

23   know that the MDL has settled, so Judge Herndon's order 50

24   wasn't really reviewed by an appeals court.

25          MR. CHILDERS:  Sure.

1      THE COURT:  And then secondly, he didn't even decide

2   at the time that an adverse inference instruction or loss of a

3   claim or denial of defense or something like that was an

4   appropriate relief.  He kind of put all that off, and it

5   troubles me now to be a judge who is not at all involved with

6   the proceedings that were before him that resulted in his

7   order to then sort of pick that up wholesale and say it's

8   binding here because you agreed that we're going to use

9   discovery from an MDL case when there's no explicit discussion

10  between the parties about what's the effect of order 50 and

11  the unavailability of Dr. Lehr.

12      MR. CHILDERS:  Well, if I could point out to Your

13  Honor sort of the things that are missing, why these documents

14  would have been important to this particular case.

15      Obviously you have heard a lot about therapeutic range

16  and plasma concentrations.  That's the information that --

17  that was Dr. Lehr's wheelhouse.  Those were the issues that he

18  worked on.  Those were the issues that he apparently provided

19  for that initial manuscript of the Reilly Lehr paper that we

20  to this day don't have.  We will never have that paper.

21      THE COURT:  Well, but what you do have is what Dr.

22  Reilly did, which is really the final product.

23      MR. CHILDERS:  Right.

24      THE COURT:  And I understand that Dr. Lehr was perhaps

25  the originating author.  And I recognize, you know, that you

78

1    probably hoped that you could get ahold of one of his

2    so-called manuscripts and find something that greatly and

3    directly contradicts Dr. Reilly's ultimate conclusions and the

4    position that the defense takes here.

5         But the fact is, you've got the report that was

6    issued, which was what he played the role in, and you've got

7    the final product, and I guess I don't know why that isn't

8    enough given the posture of this case here now.

9         MR. CHILDERS:  Well, I can tell you, if we look to

10   case law here in this same court, from Judge Eifert in the

11   Ethicon case, she looked at what duties does a company -- in

12   that case, it was Ethicon -- have as far as maintaining

13   custodian files.  And she made it clear that key players have

14   to be identified, and their files have to be maintained and

15   preserved.

16        There's no question here, for one, Dr. Lehr was a key

17   player.  He analyzed the very issue that this case is centered

18   on, which is plasma concentration of Pradaxa and how that

19   affects safety and efficacy.  And there's no question the

20   defendants did not maintain his custodial file at a time when

21   they were on notice of litigation and should have.

22        So, for one, the case law here in this same court

23   tells us that is an appropriate --

24        THE COURT:  Okay.

25        MR. CHILDERS:  -- that an adverse inference may be an

1    appropriate remedy for that particular situation.

2           If you look to some of the findings in CMO 50 -- and I

3    understand Your Honor is hesitant to adopt them wholesale, but

4    this was very extensively litigated before Judge Herndon, who

5    had all of the facts in front of him.

6           And if you look at certain things such as on page 25

7    of his order, CMO 50, Judge Herndon noted that the MDL court

8    is stunned that Lehr was not identified by Boehringer as a

9    custodian with potential knowledge about Pradaxa.  This is

10   after he's detailed in great detail the roles that Dr. Lehr

11   played.

12          And then on page 26, Judge Herndon went on to say that

13   there is no question that Dr. Lehr's documents should have

14   been the object of a litigation hold.  Again, the same issue

15   here.  It's the same litigation.  We're using the same

16   documents.  We're using all the same evidence.

17          In fact, the only reason we're not in front of Judge

18   Herndon is because he just stopped taking cases.  The MDL shut

19   down, and that's why this case is here.  I'm kind of surprised

20   it didn't make it to the MDL frankly before the MDL shut down

21   based on when it was filed, but it just didn't.

22          Then in that same order -- and this is important, Your

23   Honor -- on page 27, Judge Herndon noted, similar to what I

24   think Judge Eifert found in the Ethicon case, Boehringer does

25   not get to pick and choose which evidence they want to produce

1    from which sources.  They have to produce to us evidence that

2    is responsive and related to our claims.  And when they don't,

3    it says plaintiffs are entitled -- I'm sorry.

4         He also pointed out that the issues that are not known

5    that we don't know because we don't have those documents on

6    page 28, were what annotations were contained in the personal

7    versions of Dr. Lehr's documents relating to the exposure

8    response paper, what statements he made to other people in the

9    company.  They went back and forth extensively on this in his

10   share room, which is a particular -- sort of a cloud kind of

11   thing that is used by the company to communicate back and

12   forth.

13        THE COURT:  I assume that to the extent that he

14   communicated by e-mail or something like that, there was

15   somebody else in the company who was identified, and there was

16   a litigation hold on them.

17        Have you seen things that Dr. Lehr exchanged with

18   them?

19        MR. CHILDERS:  Some.  But what we don't have is what

20   he would have done in the share room, what he would have

21   annotate -- there are a lot of documents that have -- like, if

22   you track changes on a Word document, you can see, if you are

23   passing them around with multiple people, their initials.  It

24   has the time they put it in, the entry.  It says what they

25   have to say.  We don't have that with Dr. Lehr's initial draft

81

1    because we don't have the draft at all in particular.

2            THE COURT:  So are you really then just focused on the

3    so-called manuscript and the failure of the defendant to

4    preserve and disclose it?

5            MR. CHILDERS:  That's the only thing that we know that

6    existed that we don't have.  What we don't know is what we

7    don't know, Your Honor.

8            But we know from at least Dr. Clemens' e-mail, and

9    then Dr. Lehr's own e-mail, there was a draft that he produced

10   that we don't have.

11           THE COURT:  I think you pointed out that in one of the

12   Connecticut orders, in one of those two cases, that the judge

13   agreed to allow an adverse inference instruction but fairly

14   narrowly and wasn't going to allow evidence?

15           Do you know what I'm talking about?

16           MR. CHILDERS:  I do, Your Honor.

17           So it was plaintiff's position that a jury instruction

18   can be properly argued to the jury during closing argument.

19   The judge in Connecticut did not agree with that, and so

20   plaintiffs were not allowed to sort of set it up for the jury

21   in closing argument as to why it was important who it related

22   to.  But then she read the instruction to the jury at the end.

23           While we were pleased that the instruction was read,

24   we felt it was somewhat hollow in that --

25           THE COURT:  I don't have it in front of me, but did it

82

1    refer explicitly to Dr. Lehr?

2         MR. CHILDERS:  It did.  And it said that the company

3    just -- that the -- whatever they did to his files was not

4    inadvertent, meaning they did it on purpose.

5         It didn't -- and then in the second trial, I believe

6    they even said destroyed.  Judge Morgan told the jury they had

7    destroyed it not inadvertently and then allowed the jury --

8    explained -- and that it had the sort of adverse inference and

9    said that the jury could or could not --

10        THE COURT:  Right.

11        MR. CHILDERS:  -- choose to take that as being adverse

12   evidence to the party who destroyed it.

13        So what we have here is -- and I understand Your

14   Honor's issue with use of what happened in the MDL here.  I

15   don't see this as any different.

16        If this case had gone to the MDL, and it didn't

17   settle, it would come right back here to you for trial because

18   it would have to be sent back to the transferor court.  It

19   wouldn't have been tried there unless Lexecon had been waived,

20   and I can tell you that wouldn't have happened, and we'd be in

21   the same boat.

22        The only difference we have here is we have utilized

23   all of the same stuff.  We just didn't go to the MDL to begin

24   with and then come back to you.  And so I do believe that what

25   happened in the MDL in its entirety applies here.

83

1          THE COURT:  Okay.  I don't want to run out of time.

2          MR. CHILDERS:  Yes, sir.

3          THE COURT:  All right.  Tell me about the other

4    doctor.  Is it Dr. Brueckmann?

5          MR. CHILDERS:  Dr. Brueckmann, also a key player, no

6    question about that.  She is in charge of the pediatric

7    clinical trials and has been for a number of years.  Prior to

8    that, she worked on Pradaxa.  She's been a player in Pradaxa

9    since before it was approved for sale.

10         In her particular case, there was about a two-year gap

11   in which her e-mails weren't preserved.  And what the

12   defendants have said is, well, we tried to go capture any

13   internal e-mails that she sent to folks, and we gave you

14   those --

15         THE COURT:  As I understand it, their explanation is

16   that they changed their software or something by which they do

17   their litigation hold.

18         MR. CHILDERS:  I understand.  But there were only

19   three people that that seemingly affected, and there are a

20   whole lot more people that they gave us documents for.  I

21   can't -- I don't know the explanation for that.  I don't know

22   why it would only affect those few.

23         But Dr. Brueckmann is one of the most key people

24   because, in fact, she is the one who is in charge of sort of

25   putting together what is called the Diversity clinical trial,

84

1    which is where Mr. Moskow was explaining to Your Honor they're

2    actually utilizing, the company is actually utilizing plasma

3    monitoring to dose Pradaxa in children based on the

4    information they got from the adult clinical trials, including

5    RE-LY, as to what is the most safe and effective level of

6    Pradaxa for a patient.

7            She still works for BI.  It's not as if she left the

8    company, and we forgot about her.  Or there was some gap in

9    litigation and, therefore, we stopped the litigation hold and

10   then picked it back up.  There's never been a stop in

11   litigation.  There's been a Pradaxa case pending since 2010,

12   '11, '12, somewhere in there, I'm not sure.  But there's never

13   been a time where there just was no litigation happening.

14           And so while I understand their argument is, well, we

15   just had a glitch in our software, it didn't affect some of

16   these other folks who didn't in particular have the duties

17   that Dr. Brueckmann has.  And as you'll see in the trial, that

18   Diversity clinical trial and the fact of utilizing that

19   particular dosing algorithm would be central to our case, and

20   what we don't have is any communication she had with anyone

21   outside the company.

22           And, again, you gotta consider this is a clinical

23   trial, meaning they've got people out in the field who are

24   running this clinical trial.  And she testified when

25   Mr. Moskow asked her -- we did ask her about this at her

85

1    deposition -- yeah, I do communicate with people outside the

2    company, and I don't know how many times I've done that.

3         And I wouldn't have had e-mails saved into --

4         THE COURT:  What do you make of the defendant's

5    argument that they were able to go to other sources and obtain

6    copies of much of this requested information and thereby

7    significantly narrowing the window of time for which they

8    can't produce her e-mails?

9         MR. CHILDERS:  I don't think they can -- I don't think

10   they can narrow the window of time.  They can only capture

11   what Dr. Brueckmann sent internally in the company.  I don't

12   think they argued to Your Honor or to the Court that they were

13   able to go out and capture e-mails that she sent to third

14   parties.

15        THE COURT:  Right.

16        MR. CHILDERS:  And so what we've seen in several of

17   the other documents that have been produced from other

18   witnesses, the communications going back and forth with some

19   of these third parties you're going to see again are key here.

20   People are asking for information outside the company, and

21   then it's not getting to them.  The stuff that is known inside

22   the company is either not told to them or they're told

23   something different, and that's the kind of information we

24   don't have.

25        If Dr. Brueckmann was asked a particular question by

1    someone outside the company about, in particular, use of this

2    algorithm to dose these children, we don't know what she told

3    them back.  She may have said we should be doing this with all

4    of our patients.  She may have said we've considered doing

5    this, but until this litigation is over, we better stay away

6    from it.  Who knows.

7        But we do know we don't have those e-mails, and she's

8    the person who is in charge of that particular aspect of the

9    clinical trial.

10       THE COURT:  The way the new rule reads with regard to

11   ESI, it suggests to me that trial courts are to consider an

12   adverse inference instruction as one of the more severe,

13   perhaps the most severe sanctions, right up there with

14   precluding a defense or granting summary judgment or default

15   judgment on a claim.  And that to get to that point, I'd have

16   to determine that the defendant acted with intent to deprive.

17       MR. CHILDERS:  Your Honor, if this was -- if there

18   wasn't CMO 50, if there wasn't a long history of this

19   happening, I don't think I'd be standing here right now.  But

20   what we have is this is yet again another example of the

21   defendant knowing that a litigation hold should have been

22   placed and should have been maintained with this -- with

23   regard to this particular person, a key player with Pradaxa.

24       If it was one month, maybe that's okay.

25       THE COURT:  Has anyone --

1          MR. CHILDERS:  It was two years, Your Honor.

2          THE COURT:  Has any other court looked at --

3          MR. CHILDERS:  The Connecticut courts did, Your Honor,

4   and they chose not to include this in the adverse inference

5   charge.  They stuck just with the Dr. Lehr issue.

6          THE COURT:  So how could I, then?  I mean, I'm not

7   even hearing the evidence of the defendant's conduct.  So how

8   could I make a ruling under Rule 37 that the defendant acted

9   with intent to deprive the plaintiffs of the use of the

10   information?

11          MR. CHILDERS:  I think, Your Honor --

12          THE COURT:  It's just a prerequisite as I read it

13   to --

14          MR. CHILDERS:  I think, Your Honor, if you were to

15   look at it in conjunction with what occurred prior to that

16   particular litigation hold fail, and look at the extent of

17   time, clearly nobody took any steps in two years to realize,

18   oh, wait, we're not keeping her e-mails.  Again, it's not a

19   situation where whoever is in charge of the litigation hold at

20   one of these -- at the company or one of their law firms

21   missed it one month.  It was two years.  And during that

22   two-year time is when the Diversity trial was being prepared

23   to be rolled out.  It's still ongoing right now.

24          And so --

25          THE COURT:  In these other actions, like in the

88

1   Connecticut case, have you tried to chase down any of these

2   people with whom Dr. Brueckmann would have corresponded to

3   see --

4           MR. CHILDERS:  We don't have any of the e-mails that

5   she sent outside of the company.  That's why we can't --

6           THE COURT:  But I'm asking if you've been able to

7   identify by questioning her in deposition or through other

8   discovery means who it is that she would have communicated

9   with.

10          MR. CHILDERS:  We did ask her, and I think she

11  identified some of the companies who they were working with on

12  diagnostic tools, like handheld devices to be used to monitor

13  blood levels.  But I don't -- I don't recall beyond that, Your

14  Honor.

15          THE COURT:  Okay.

16          MR. CHILDERS:  I think the only other issue I wanted

17  to address is timeliness.  They raise the issue it's not

18  timely, and they relied on Judge Goodwin's order in the

19  Travelers versus Mountaineer Gas case.  In that order, Judge

20  Goodwin specifically found there's no particular time under

21  Rule 37 when you have to file a motion for spoilation.

22          The issue in that case -- and he seemed to believe

23  that asking for a case to be dismissed was much more

24  significant than an adverse inference charge because he said

25  they're seeking the ultimate sanction.

89

1        THE COURT:  Sure, I would agree with that.

2        MR. CHILDERS:  And because of that, I want to look at

3   this timeliness, why this is just coming up now.  And what he

4   noted was the parties weren't even -- the plaintiff had no

5   idea that this was going to be raised, that this was even an

6   issue in the case.

7        That's not what happened here.  Spoilation has been at

8   issue in this case since the MDL was still in play and has

9   been litigated twice in Connecticut, so it's all the same

10  stuff.  It's not a surprise.  It's not something that was not

11  on their radar.  And in looking at Judge Goodwin's order,

12  which is the only case the defendant relies on, I don't think

13  that would apply at all in this situation, Your Honor.

14        THE COURT:  Okay.  Thank you.

15        MR. CHILDERS:  Thank you, Your Honor.

16        MR. IMBROSCIO:  If I may, Your Honor.  I had put

17  together a presentation.  I'm going to skip through it pretty

18  quickly and try to respond to some of the Court's questions.

19        THE COURT:  Okay.

20        MR. IMBROSCIO:  But before I get into it, let me just

21  try to correct some of the facts because I think the Court has

22  a misimpression on some of the facts that I just want to lay

23  out.

24        THE COURT:  Okay.

25        MR. IMBROSCIO:  First, the RE-LY study was begun back

1    in '04, '05, and Dr. Reilly was the head of the RE-LY study.

2    And one of the things they decided at the outset to decide --

3    to look into is this issue of plasma levels.  And so part of

4    the protocol was to take these plasma levels and see what can

5    be made of them.

6         Notably none of the other -- well, certainly not

7    Eliquis or Xarelto did any of this, so BI did this sort of

8    testing.

9         So they get the data, and one of the preordained, ah,

10   analyses that was going to happen was let's see what the

11   exposure response relationships were, what ultimately became

12   the exposure response paper.  Dr. Reilly was the original

13   author of that.  He did the first draft.  And I'll run

14   through -- you'll see it, but there's no dispute that he was

15   the primary author and wrote the first draft.

16        Two, there is -- well, let me actually run through

17   because I have to get the data on it.  And Your Honor has a

18   copy of this, but I run through the legal aspects.  Your Honor

19   has a firm grasp of the need to establish intent to deceive,

20   which I don't think they even make an effort to do that.  But

21   this is just some background facts on some of the questions

22   Your Honor was asking on slide 7.

23        BI has preserved and produced documents from more than

24   150 different custodians and 45 different central sources,

25   shared drives, other things of that sort, ultimately resulting

1    in, you know, almost 50 million pages of documents and

2    produced I think now upwards of I want to say 60 depositions.

3    So that's point number one.

4           As it relates to -- well, actually I should mention

5    this.

6           So the manual mentions the importance of sharing

7    discovery.  And as Your Honor mentioned, of course, you know,

8    it makes good sense to share discovery that has occurred.  The

9    notion that we would have shared this discovery taking on an

10   order that we vehemently to our core disagreed with, that

11   doesn't make any sense.  We would never have done that, and

12   that was never the implicit or explicit aspect of sharing the

13   discovery.  It was the right thing to do to share this data.

14   And they have also taken a whole bunch of additional discovery

15   since the conclusion of the MDL.

16          Here's something -- I mean, to be clear, Dr. Lehr's

17   e-mails, there's no dispute, they exist.  They were preserved.

18   Let me say that again.  His e-mails were preserved, there is

19   no dispute.  They were not recycled, and so there's no dispute

20   that they have all of these e-mails.  I think it's roughly

21   4,000 e-mails.

22          And there's no dispute that all of the documents that

23   were on the central server, that were on the company documents

24   were preserved.  Put it all together, it's about 20,000

25   documents and families that they have from Dr. Lehr.

1      THE COURT:  And none of these included Dr. Lehr's

2  so-called manuscript?

3      MR. IMBROSCIO:  There's a reason for that.  There was

4  no Dr. Lehr manuscript.

5      To accept -- there is a string e-mail that they have

6  cited to now from Dr. Clemens that says Thorsten was the

7  father of the manuscript, Paul took it over and changed it

8  significantly.  That's just wrong.  The sworn testimony from

9  Dr. Reilly is that he wrote the first draft.  He shared the

10  first draft with the co-authors.

11      Because we had --

12      THE COURT:  Was Lehr a co-author?

13      MR. IMBROSCIO:  Yes, he was, absolutely.

14      And the second piece of evidence they relied on today

15  is an e-mail from Dr. Lehr saying -- and I wrote this down

16  because it's just wrong -- saying never again am I going to

17  have someone take over a draft -- a paper, quote, that I

18  drafted.  That's just wrong.  The e-mail actually says where I

19  did the primary analysis.

20      There is no dispute that Dr. Lehr was the computer guy

21  doing all of the computer models and all the output and all

22  the simulation.  The record -- there are probably hundreds,

23  maybe thousands of versions of those simulations that have

24  been in the discovery record.  There is no dispute that the

25  plaintiffs have all of that.

1    And to accept the plaintiff's missing first draft

2    theory, you've got to assume that Dr. Lehr wrote this draft

3    but did not store it on the central drive, did not e-mail it

4    to anyone, because all of his e-mails were preserved.  That's

5    just fanciful.

6    I think what happened is Dr. Clemens just got that

7    issue wrong.  And it's important, it's relevant that they only

8    have the single e-mail that suggested that there was some

9    first draft.  There is no mystery first draft, and the record

10   I think is very clear on that.

11   This is what happened, and there's no dispute with

12   what happened, Your Honor.  When Dr. Lehr -- he didn't retire.

13   He is a young guy.  He is probably in his early thirties.  He

14   just went to a university professorship.

15   When he did that in the late summer of 2012, he was

16   not on hold.  That was a mistake, no doubt about that.  We

17   know in retrospect, no, that was a mistake.  What happened was

18   his laptop and desktop and his blackberry were recycled in the

19   normal course.  That happened.  That was a mistake, it

20   shouldn't have happened.  It doesn't change the fact that all

21   of his e-mails were preserved and that all of the material on

22   the company server was preserved.

23   The reason why that is important is in his own

24   affidavit, which was obtained in connection with the Judge

25   Herndon proceeding, which Judge Herndon cites, he made very

1    clear that he stored his documents on the central server.  He

2    would put things on his laptop when he was traveling, but he

3    would be good about uploading things back up to the central

4    server which, again, the plaintiffs have.

5         He also said -- that's paragraph 6 of the Lehr

6    affidavit.

7         He also said it was not his practice to make notes on

8    these materials.  He can't rule it out.  But the notion that

9    there was some cache of documents that were missing, there's

10   no evidence of that.  That's just not the case.

11        And certainly, back to the legal standard under Rule

12   37, there's no suggestion of an intent to deprive, which is

13   essential here.  If there were an intent to deprive, his

14   e-mails would not have been preserved.  You know, something

15   would have happened to wipe out things on the central server.

16   What happened here was a mistake, the kind of mistake that the

17   new Rule 37 says cannot, under any circumstances, lead to the

18   kind of adverse inference that the plaintiffs want here.

19        We have in the record an affidavit from Jonathan

20   Redgrave, who is a world recognized expert.  And he

21   essentially offers the opinion, to the extent Your Honor wants

22   to look at it, that there was nothing here suggesting in his

23   expert view any intent to deprive when it comes to Dr. Lehr.

24   And he points out the fact, you know, really that the

25   committee notes especially, you know, talk about needing to

95

1    take reasonable steps and not perfection.

2         Obviously preserving Dr. Lehr's documents, his laptop,

3    not recycling his laptop and desktop would have been closer to

4    perfection.  But the company still took far beyond what we

5    believe to be, ah, reasonable steps.  Again, I mentioned at

6    the outset, we think the plaintiffs have not really even

7    embraced the correct legal standard, and they essentially just

8    rely on Judge Herndon's ruling.

9         Let me just run through now -- let me go to slide 24.

10   As Your Honor said, Judge Herndon himself did not make the

11   ultimate decision here about whether there was any prejudice.

12   He reserved that and ultimately never ruled on that.  So this

13   notion that there would somehow be -- I think what they are

14   arguing essentially as collateral estoppel we think has no --

15   not just no practical place here, but certainly no legal place

16   either.

17        In Connecticut, the judge there -- first Judge Moll,

18   and then Judge Morgan adopted her initial rulings -- basically

19   said I think it's one and the same proceeding because the

20   Connecticut proceeding was open alongside of the MDL

21   proceeding and ultimately sort of struck a balance.

22        The court said I get it that this could be very, very

23   prejudicial.  I'm not going to let evidence of it in.  But the

24   court sort of felt bound sort of through some notion of law of

25   the case or collateral estoppel that needed to adopt -- needed

1    to accept Judge Herndon's ultimate conclusion.

2         Again, we disagree with that, and we will be

3    addressing that issue, you know, at the appropriate time with

4    an appellate court.  But it's very different from the

5    situation here because implicit in that ruling was the notion

6    it was all one big case and, therefore, that ruling in that

7    case was the same as the ruling in this case.

8         We disagree with that, but I think what is instructive

9    is the court's acknowledgement, in granting our motion in

10   limine on keeping out evidence and argument about it, that

11   this stuff is really really prejudicial.  That's why the

12   rules, you know, put adverse inference up there with default

13   judgment and some of the other more extreme circumstances,

14   which we don't think the record here provides.

15        This is the father of the manuscript e-mail, slide 29,

16   from Dr. Clemens, but let me just show you what else is in the

17   record.

18        Dr. Reilly's distribution of what became the Reilly

19   paper, the exposure response paper, in January of 2011 he

20   circulates the first draft of that paper.  So Your Honor was

21   under the impression that Dr. Lehr did a first draft, and then

22   Reilly took it over.  That's actually not the case.  The

23   record is undisputed that Dr. Reilly wrote the first draft.

24        This is him circulating that first draft.  This is him

25   circulating six months later the second draft to the

1    individuals, the outside doctors who were involved in that

2    particular paper.

3           Moreover, Dr. Reilly testified unambiguously that he

4    was the first named author, he wrote the first draft.  He said

5    that in his deposition of January of '17, and he also

6    testified to that in the -- I think that's the Boone trial.

7           Here is the -- just to take a step back for a second,

8    Your Honor.  The implicit argument they have here is that

9    there was some secret about a draft therapeutic range, and

10   that it somehow got excised before any documents came into

11   possession.  That is just factually wrong.  They have all of

12   the drafts, dozens of drafts of this article with the range in

13   it and when the range was taken out with a very clear

14   documentary record of why it was taken out.

15          So this notion that there is something missing

16   substantively, there's just no support for that either, Your

17   Honor.  That is all in the record.  That is a big part of the

18   evidence they put on at trial.  And so this notion that there

19   is something that they are deprived of that they're missing,

20   there is no factual basis for that in our view.

21          And this is an early draft of the exposure paper back

22   from December of 2011 with the range in it.  The range then

23   came out.  That record is all very clear, and they have all of

24   that.

25          It might be a different story if there were

1     suggestions that there were an early draft with a range in it

2     that there is no existence of.  That's not the case.  They've

3     got the earlier drafts.  I think one of the earlier drafts

4     said 30 to 300.  Ultimately it was I think 40 to 215.  I think

5     Mr. Moskow earlier referenced they ultimately settled on 40 to

6     215.  That's because there were lots of theoretical drafts.

7     That's the way the article developed, and ultimately the

8     company picking evolved past that.

9             There was a reference to management sort of making

10    this decision.  The management they're referring to was a

11    doctor by the name of Jeff Friedman, who was essentially the

12    head physician in charge of cardiovascular safety.  His view

13    was, from a medical point of view, it's not appropriate to

14    list a therapeutic range because the relationships between

15    bleeding and stroke and plasma concentrations are far too

16    complex, and you could end up doing harm.  That's -- that's

17    very clear in the record as well.

18            This is one of the e-mails.  And what's important here

19    in this e-mail on slide 37 is Dr. Lehr himself writing to Paul

20    Reilly, around the time of this discussion when it comes out,

21    Dr. Lehr himself says, yeah, I don't think we really need the

22    range.  It really doesn't -- it's not really an important part

23    of the article.  In his words, the manuscript doesn't lose

24    anything if you were to take out this range.

25            So this notion that Thorsten Lehr was fighting, you

1    know, to his death to keep a therapeutic range in the draft,

2    that's just -- that's a figment of the plaintiff's

3    imagination.  That's their spin on this.  Factually it's not

4    true.

5         Let me skip quickly to the Dr. Brueckmann issue.  I

6    think that's a really simple one, as Your Honor said.

7         As Mr. Childers said, the Connecticut court looked at

8    this issue and concluded there is no -- not intent to deprive,

9    that's the federal standard, but no suggestion anything

10   happened here other than an error.  And the efforts that were

11   taken to remedy it more than adequately addressed these

12   issues.  Again, we don't think there's any intent to deprive.

13   There's no evidence that really anything is missing.

14        Dr. Brueckmann communicated with people in the outside

15   world, but I think she was clear that in those communications,

16   it was often the case -- you look at the e-mails in this

17   record, and it is the rare case where there is one person

18   communicating with one other person.  The average number of

19   people in these e-mails is probably 15.

20        And so what would happen is you would need an e-mail

21   only from Dr. Brueckmann to some outside person or to one of

22   the two other custodians during a very limited range.  And can

23   we rule that out?  No, we can't.  But the larger record

24   demonstrates that there is a tremendous amount of information

25   available from Dr. Brueckmann specifically, and we have the

1    stats on slide 39.  Really it's a remarkable number of

2    materials that have been produced from her.  So the suggestion

3    that anything substantive is missing we think is not

4    appropriate.

5            I'm happy to answer any questions.

6            THE COURT:  All right.  Thank you.

7            Mr. Childers, you want to briefly reply?

8            MR. CHILDERS:  If I could, just in regards to some of

9    these slides, Your Honor.

10           I don't know if he gave you a copy of it or if it was

11   just on the screen, but --

12           THE COURT:  Yes I have it.

13           MR. CHILDERS:  Slide 9, one of the things it notes, it

14   says MDL rulings do not justify relief plaintiffs seek.  The

15   MDL court found bad faith.  That's as strong a finding as you

16   can -- a court could make in this situation.  So to say that

17   doesn't justify the relief we seek I think is just -- is just

18   inaccurate.

19           In regard to -- and I'll just skip around to a few of

20   these, Your Honor.  I was trying to make notes.

21           Dr. Lehr's declaration I think that was put on the

22   screen, Judge Herndon considered that.  In fact, in CMO 50, he

23   said I have gotten this declaration from Dr. Lehr, and I

24   understand we have all his e-mails.  That just even more shows

25   me that they should have held the rest of his files.  They

1    kept his e-mails, but destroyed everything else.  And so he

2    made a specific note of that after referring to the Lehr

3    affidavit, Your Honor.

4           On slide 16, I think it's titled No Intent to Deprive,

5    that's not what Judge Herndon found.  In CMO 50 on page 37, he

6    specifically found that -- he called them maneuvers by

7    Boehringer in discovery were by design, that they did them on

8    purpose, and that was one of the reasons why he then went in

9    to find they were done in bad faith.

10          And we quoted in particular in our motion the very

11   specific findings about this was in bad faith, this was in bad

12   faith.  It was on, I believe, pages 44 to 45 of CMO 50 where

13   Judge Herndon very specifically went through what was in bad

14   faith, which clearly would fit into the intent to deprive.

15          I thought it was a bit ironic after arguing that

16   plaintiff's experts should not be able to opine on intent,

17   they give you an affidavit from a litigation -- a discovery

18   expert telling you about their intent and what they were

19   supposedly doing when they destroyed these documents.  I don't

20   know how on one hand they can say our experts can't do that,

21   but you should rely on this gentleman from Redgrave LLP to

22   tell you -- for him to come in and tell you what the company's

23   intent was.  I don't think it's proper for that, so I

24   certainly don't think Your Honor should be considering that.

25          Our arguments are not a hundred percent relying on the

1    MDL court's finding.  We are also looking at what the

2    Connecticut courts found.  In two different situations -- or

3    excuse me.  In two different cases involving the same issues,

4    both of those courts have also found that the burden had been

5    met, that the evidence was intentionally destroyed, and that

6    an adverse inference charge was appropriate.

7         In this case, we have presented Your Honor with the

8    nexus between what is missing and what plaintiff would be --

9    would have presented and will not be able to present to the

10   jury as a result.

11        The fact -- I think it was around -- on page 29, there

12   is the e-mail from Dr. Clemens that I had mentioned to Your

13   Honor where he calls Dr. Lehr the father of the manuscript.

14   Right after showing you that, Mr. Imbroscio said it's

15   undisputed that he wasn't the drafter of the manuscript.  This

16   e-mail in and of itself creates a dispute.

17        I didn't draft this e-mail.  None of us drafted this

18   e-mail.  This was drafted by an employee of Boehringer

19   Ingelheim who said Thorsten Lehr was the father of the

20   manuscript, and then Dr. Reilly changed it.  Whether or not

21   Dr. Reilly disputes that is a dispute at its very essence.

22        THE COURT:  What about all of the other versions of

23   this that defense counsel noted that have been produced and

24   the e-mail discussions and otherwise where they talk about

25   therapeutic range, what it could be, whether it's in or out?

1     MR. CHILDERS:  We've seen quite a bit of those.  One

2  thing that we see every time we actually have a draft of the

3  papers are those internal changes, notes, cross-throughs that

4  are made that we don't have from the initial paper that, at

5  least according to Dr. Clemens, was drafted by Dr. Lehr.  We

6  don't see any of those comments because we don't see the paper

7  itself.

8     And those are comments that are not reflected in the

9  e-mails.  They're just in the body of the actual document when

10  the person who is reviewing it makes their comments directly

11  on the document itself.  And so while we do have some e-mails

12  relating to Dr. Reilly's draft, we don't have any that relate

13  to Dr. Lehr's drafts, and we don't have the actual draft

14  itself.

15     Sorry, Your Honor, if I could just make sure I haven't

16  left anything out.

17     In the Boone -- in the Boone and Gallam cases in

18  regard to Dr. Brueckmann and whether or not the litigation

19  hold in relation to her e-mails should be something that was

20  subject to an adverse inference charge, the court didn't

21  actually hold an evidentiary hearing on that issue that I

22  recall, and I don't know what in particular was relied on

23  other than the actual papers.  But I guess what I would stress

24  to Your Honor again is just switching software and having a

25  glitch does not comport with losing two years -- spending two

104

1    years not collecting this particular key player's e-mails.

2          That doesn't make sense.  It doesn't take two years to

3    switch your litigation hold software.  It takes days at most.

4    So why is there two years worth missing?  I can't tell you,

5    but I know that's not just a glitch.  There's no way that's

6    just a glitch.

7          THE COURT:  The problem I've got with all this is how

8    do I make a finding consistent with Rule 37 when none of this

9    is before me?

10         MR. CHILDERS:  Well, I understand, Your Honor.  And

11   it's an awkward position I guess because we had agreed to do

12   all these things so we wouldn't duplicate efforts.  And it's

13   always been plaintiff's belief that that meant that whatever

14   happened in one court would be considered what happened in all

15   of those courts.  And if we made that mistake, that's our

16   mistake.

17         Finally, the last slide was slide 41 where the judge

18   in the Gallam and Boone cases -- judges, excuse me, there were

19   two different judges -- where they didn't allow the evidence

20   to be argued to the jury.  That's under a whole different

21   system of evidence.  That's the Connecticut Rules of Evidence.

22   That's not the Federal Rules of Evidence.  So to the extent

23   that Your Honor is inclined to give an adverse inference

24   charge, plaintiffs would and do believe that any charge to the

25   jury is something that should be properly able to be argued in

1    a closing argument, Your Honor.

2            THE COURT:  All right.

3            MR. CHILDERS:  Thank you, Your Honor.

4            THE COURT:  Well, thank you for your arguments.

5    Before we adjourn, there are a few matters that I want to take

6    up in anticipation of the proceedings.

7            So we reset the trial to October 1st.  I've set aside

8    14 business days.  I guess there's a holiday in there.  I've

9    set a pretrial conference for September 17th.  But I note that

10   there are a number of other things that you all indicated you

11   were going to discuss, or maybe I gave you some direction to

12   in my order on pretrial activity, so I thought I would bring

13   those up.

14           So, first, have the parties decided when and how

15   you're going to exchange deposition designations?  You've each

16   cited a whole lot of people who were going to testify by

17   deposition.  Have you had any discussion about when you will

18   exchange your designations?

19           MR. CHILDERS:  We haven't, Your Honor.

20           And I can tell you we're actively having that

21   conversation about the Chambers case, and we can --

22           THE COURT:  Okay.

23           MR. CHILDERS:  I don't know if the same person from

24   their side is going to be handling that, but it's an ongoing

25   discussion that I think can be had in both cases.

106

1          THE COURT:  What's your deadline in the Chambers case

2     for that; do you know?

3          MR. CHILDERS:  July 5th, I believe, is when we are

4     submitting.  Obviously --

5          THE COURT:  When is the trial scheduled to start?

6          MR. CHILDERS:  August 13th, Your Honor.

7          THE COURT:  August 13th.  Okay.  So you expect then to

8     exchange designations in early July for that case.

9          MR. CHILDERS:  Yes, Your Honor.

10          MR. IMBROSCIO:  One thing I would say, Your Honor, is

11     we have now gone through this exercise twice in Connecticut.

12     I think the circle starts to get smaller and smaller, and it's

13     an easier exercise, but we do need to go through it.

14          THE COURT:  Okay.

15          MR. CHILDERS:  I agree, Your Honor.

16          THE COURT:  Well, I won't yet impose a deadline, but

17     what I would expect is that either before -- hopefully before

18     you start the Chambers trial, because I know you'll be really

19     busy once that goes, that you can advise the Court as to your

20     agreement.  Whether it's the same designations or something

21     different obviously you all have to address.  But I would hope

22     and expect that before you get into the Chambers trial, you'll

23     be able to communicate to this court that you have a definite

24     deadline and plan, if not already an agreement, on what you're

25     designating.

107

1        MR. IMBROSCIO:  If I may on that, Your Honor.

2        THE COURT:  Yes.

3        MR. IMBROSCIO:  As a very -- having been the chief

4   person responsible for this from the defense side in the last

5   two trials, one of the challenges is, I think given the number

6   of witnesses that were deposed, there starts out being a

7   pretty wide range of potential people, and then as the trial

8   progresses it's a smaller number.  What we look for is to try

9   to get to that smaller number earlier, and that seems

10  consistent with what you're saying as well.

11       THE COURT:  Okay.  Good.

12       I will want to set a new deadline -- I don't know if

13  we may have put this in some sort of standard language in the

14  scheduling order, but I wanted to discuss when you would

15  expect to submit proposed instructions and proposed voir dire.

16  You know, our typical order just has people do that as part of

17  the pretrial order.  I don't know whether you have those

18  things -- at least the voir dire is usually included in the

19  integrated pretrial order.

20       Was that the case here?  Did you all do that already

21  or do you know?

22       MR. IMBROSCIO:  I know we were on the precipice of

23  exchanging them or submitting them, and it just didn't --

24  because of the trial delay --

25       THE COURT:  And I know a couple days ago, I guess, Max

1   talked with one of you about instructions because I guess we

2   had sort of left standing the deadline for instructions.  And

3   I sure didn't want them filed at that point, we had just ruled

4   on summary judgment, and we had all of those other things.

5          So do you want to discuss and then reach an agreement

6   to provide instructions, proposed instructions and proposed

7   voir dire to me?  And I'll just leave it to you to get back

8   with us soon and tell us what deadline you've agreed upon?

9          MR. CHILDERS:  That's fine with us, Your Honor.

10          MR. IMBROSCIO:  Yes, Your Honor.

11          THE COURT:  That's the way I would prefer to do it.

12          And then, likewise, I would expect you to reach

13   agreement on how you're handling trial exhibits.  I know you,

14   I guess, talked about putting each other on notice about

15   witnesses and maybe even on notice about when you expect to

16   introduce exhibits.

17          MR. IMBROSCIO:  Uh-huh.

18          THE COURT:  When do you intend to have -- are you all

19   doing notebooks for most of these trials, jury notebooks or

20   not?

21          MR. IMBROSCIO:  We did not do jury notebooks.  We do

22   have an arrangement in place that seemed to work well, at

23   least from our perspective, on notice on the exhibits that

24   were going to be used with a witness.  We would be fine with

25   that proposal.

109

1       THE COURT:  Well, let me do this.  What I think I'll

2   do is direct that the parties communicate about all these

3   things and see if you can reach agreement or stipulation as to

4   the matters we just discussed and report back to the Court

5   sometime -- I'll give you a deadline sometime in that first

6   week of August, sometimes toward the end of whatever that

7   first week is.  And that will be your reminder and my reminder

8   that you're to have these discussions and resolve these

9   things, and then you can tell me before you get bogged down in

10  the Chambers case if there is some expectation or you believe

11  that there is some change in circumstances that's going to

12  make it more difficult to be able to give me these things.

13      I really want and expect to have these things before

14  the pretrial conference on September 17th because I want to be

15  able to address any problems at that point.  I don't expect

16  you to be prepared to fully argue instructions, of course, but

17  at least -- you know, you have tried these cases before, and

18  by that point you should have a pretty good idea of what each

19  is going to offer and what is appropriate or not appropriate.

20  So I would hope we could have a pretty good discussion at the

21  pretrial conference on what each side believes will be

22  entailed in coming up with final instructions.

23      I also intend to do some type of a very limited jury

24  questionnaire, and I expect to do that probably by the first

25  part of September.  And I'm really going to just ask

1    essentially two things.  One, I expect to ask jurors to advise

2    the Court if they have some sort of unusual circumstance that

3    would justify excusing them from the jury pool for the period

4    in October and putting them on notice that this jury pool will

5    be used to pick a jury to try a case that is expected to last

6    through two or three full weeks.

7         As I told you before, in this district that's very

8    unusual, so it's difficult for people to set aside that much

9    time.  And I don't want to find out, you know, the day we

10   start a trial that we've got a bunch of jurors in here that

11   have very legitimate requirements such that it would be very

12   difficult for them to serve.  So I'll ask them to identify

13   anything like that well before we -- hopefully before we have

14   the pretrial.

15        Then also I would expect, with your all's input, to

16   ask some very general, nonspecific questions about the extent

17   to which jurors or their immediate family are or have been on

18   blood thinners or something like that.  I don't want to name

19   the product.  I don't want to invite jurors to start looking

20   for the news.  But I do think it would be important to find

21   out if people are on blood thinners of any kind or have some

22   significant medical history involving them or have the

23   condition of AFib where you certainly want to explore the

24   extent to which they may have discussed some type of blood

25   thinner treatment or something.

1       So keep that in mind.  As I said, I would expect to

2  get a questionnaire of some type out in very early September,

3  probably right after Labor Day, and expect jurors to respond

4  pretty quickly and be prepared to talk about it further at or

5  before the pretrial conference.  So that's my general plan.

6            MR. CHILDERS:  Your Honor?

7            THE COURT:  Yes.

8            MR. CHILDERS:  In the Connecticut trials, we had an

9  agreed upon -- jury selection was a little different there,

10  but we had an agreed upon set of eight or ten questions, ten

11  questions.  They were more specific.  But would it be okay if

12  we got together to try to see if we could -- it helped us

13  greatly to limit the jury pool.

14            THE COURT:  Absolutely.  Sure.

15            MR. CHILDERS:  Is that all right with you?

16            MR. IMBROSCIO:  Yeah.

17            MR. CHILDERS:  Just to see if there is anything that

18  may be appropriate for --

19            THE COURT:  All right.  So I will include then, when

20  we do this order, requiring you to get back with the Court

21  early in August, that you include the prospect of an agreed

22  jury questionnaire of some type --

23            MR. CHILDERS:  Yes, Your Honor.

24            THE COURT:  -- and see where you folks get with that.

25            So I'm not going to try to lay all this stuff out in

112

1    the order.  I'm going to probably just say that by a certain

2    date in the first part of August, the parties are to report

3    back about the matters discussed today and tell the Court the

4    extent to which you agree or you have disagreements that need

5    to be resolved by the Court, and then you can tell me in some

6    fashion your plan.

7         If you work these things out, we can either do this by

8    phone or even I would expect you to file some type of report

9    maybe in advance of some sort of a status conference the next

10   week and see where we stand.  But we'll try to do all that

11   before you actually get started in the Chambers case.

12   (Off-the-record discussion with Law Clerk.)

13        THE COURT:  Max reminded me that I wanted to clarify

14   something else just to make sure I don't make a mistake when I

15   resolve this spoilation question.

16        Do you folks agree or disagree as to whether or not

17   Dr. Lehr's so-called manuscript and notes -- are those ESI?

18   Are those electronically stored information or are they

19   something else?

20        MR. IMBROSCIO:  I think everything that is suggested

21   to be missing is ESI with the exception of there is reference

22   in his affidavit about having some binders in his office.

23   Those were hard copy.  But everything else was ESI.

24        THE COURT:  What did he say about the binders, that he

25   no longer has those?

1          MR. IMBROSCIO:  He says he no longer has those, yes.

2     But I think he says that they were copies of things that were

3     electronically stored.  I think that's straight out of his

4     affidavit, Your Honor.

5          THE COURT:  What do you all say?

6          MR. CHILDERS:  I assume that -- I don't assume

7     anything, Your Honor.

8          They may have had handwritten notes, we don't know.

9     But I think most of what is at issue would be ESI.

10         THE COURT:  All right.  Then is there anything else

11    the parties -- so you've got the Chambers case, and then was

12    there another one scheduled after that before --

13         MR. MOSKOW:  There's a case scheduled in Connecticut,

14    Your Honor, Bedsole, which is scheduled for September 12th.

15    Jury selection is starting -- jury selection is likely to take

16    two to three weeks under the Connecticut rules.

17         MR. CHILDERS:  It's crazy.

18         THE COURT:  All right.

19         MR. LEWIS:  We had just two housekeeping matters, Your

20    Honor, if I may.

21         THE COURT:  Sure.

22         MR. LEWIS:  Number one relates to the Court's factual

23    findings in the motion for summary judgment.  There was some

24    concern on our side that the way they're phrased in the

25    Court's order could be used by perhaps other folks in other

114

1    litigation to say that the Court made findings of fact as

2    articulated in that motion for summary judgment.  I don't

3    particularly read it that way.  I read it as the Court saying

4    these are disputed issues of fact, but I just wanted to make

5    sure.

6           Is my reading on that correct, that these are disputed

7    issues of fact?

8           THE COURT:  Yes.  I wouldn't purport to be finding and

9    concluding facts.  What I tried to do was to recite the

10   evidence.  And when I stated something as a fact, I thought it

11   was pretty obvious that I'm saying that there is evidence from

12   the plaintiff's side to support that if the jury would so

13   determine, that it was a genuine issue of material fact, and

14   that's all.

15          MR. LEWIS:  Understood.  Okay.  Thank you for that

16   clarification, Your Honor.

17          Then secondly, also on the Court's order for motions

18   to be discussed today was motion in limine No. 2.

19          It related to some --

20          THE COURT:  I forgot all about that.

21          MR. LEWIS:  -- financial information.

22          THE COURT:  Yes.

23          MR. LEWIS:  I didn't know --

24          THE COURT:  I'm glad you brought that up.  Yeah, I

25   meant to take that up.

1          MR. LEWIS:  Yeah, I wasn't sure.  It really only

2     requires brief discussion just on our side.

3          I think it's --

4          MR. CHILDERS:  I don't think it would take long, Your

5     Honor, if you want to hear it.  In fact, I think it could be

6     decided on the papers.  But if they want to argue it, I'm

7     happy to respond.

8          THE COURT:  Well, briefly why don't you tell me

9     what -- well, what evidence do you expect you would want to

10    adduce that might fall within the motion?

11         MR. CHILDERS:  The way I understand this, Your Honor,

12    to be laid out, it would attempt to preclude plaintiffs from

13    showing that there was any financial incentive for Boehringer

14    to not include a therapeutic range or a cutoff value or

15    information relating to blood plasma monitoring because that

16    would create a competitive disadvantage, which I think you've

17    seen in documents that we intend to show the jury.

18         We do think that that is proper evidence that goes to

19    the motivation behind why this information was not put into

20    the label, and it relates to competition, sales and money that

21    would or would not be made by the company.  So that would be I

22    think appropriate for motive.  It also goes to -- and intent.

23         It also goes to whether or not the jury would find

24    that punitive damages may be appropriate.  I think we have to

25    be able to show the jury why it is a company may do these

1   things.  And in this particular situation, we think the

2   evidence shows that it was financially related.  And then in

3   that Your Honor has denied the summary judgment motion as it

4   relates to punitive damages, obviously that type of evidence

5   has to come before the jury if they do decide that punitives

6   are appropriate.

7           THE COURT:  There I would expect what you would offer

8   testimony about the worth of the company.

9           MR. CHILDERS:  In the punitive phase, Your Honor.

10          THE COURT:  Yes.

11          MR. CHILDERS:  What we have, though, in the initial

12  phase of the trial is the company predicting --

13          THE COURT:  Right.

14          MR. CHILDERS:  -- we're going to make an X amount of

15  money on this drug if it's not got monitoring, if it's the way

16  we want it to be.

17          THE COURT:  I don't recall that I addressed the

18  bifurcation of punitives.  Are you suggesting that that's what

19  the Court ought to do?

20          I mean, that's typically what I do.  And I'm only

21  telling you that now because I haven't really thought about

22  this other than just knowing of this motion and then

23  forgetting that this was a motion we had.

24          Typically what I would say is that what you've

25  described would be admissible evidence in your case in chief.

1   But once you get to the net worth, profitability and those

2   factors in evidence about those matters, that that would be

3   the subject of a bifurcated proceeding.  And I would typically

4   require first that the jury return a verdict and determine

5   that you've proven the conduct that would merit consideration

6   of punitive damages.  And then if that's the case, we'd have

7   hopefully what would be a relatively brief continuation of the

8   proceedings while evidence of that came in, and then the jury

9   would decide an amount.

10          MR. CHILDERS:  That is certainly how I've seen it

11  happen, and I think -- I don't know how you could do that and

12  otherwise it not create a problem for all of us.

13          THE COURT:  I agree.

14          So if it's limited the way we just described, does

15  that alleviate the defendant's concern?

16          MR. LEWIS:  It doesn't really, Your Honor.

17          THE COURT:  Okay.

18          MR. LEWIS:  And I think we'd like to have an

19  opportunity to be heard on whether or not to bifurcate.

20          I'm not taking a position --

21          THE COURT:  We will.

22          MR. LEWIS:  Yeah, so I think we're not sure we'd want

23  bifurcation --

24          THE COURT:  Okay.

25          MR. LEWIS:  -- with all due respect.

1        But that aside for a second, our main concern is that

2   some of the financial matters are unfairly prejudicial, even

3   if they're perhaps marginally relevant to some of the things

4   that the plaintiffs want to use them for.  And so what we're

5   looking for is something consistent with what the court did in

6   the Liu case, and we attached that order.  Which is to say,

7   look, don't get into financial matters in opening statements

8   because the Court really can't control that at that point in

9   time, and then give us a heads up on what particular things

10  you want to get into, and we'll deal with those, you know,

11  generally on a case-by-case basis.

12       For instance, there's a marketing video that they

13  reference.  I'd like the Court to have an opportunity to look

14  at that and see -- you know, other courts have ruled and said

15  that's not admissible.

16       So we just sort of don't want the cat out of the bag

17  before we have a chance --

18       THE COURT:  Okay.  Well, I'll take a closer look at

19  the motion and then may defer until we get back here for a

20  pretrial at least as to some of the specifics.

21       MR. LEWIS:  Fair enough.  Thank you, Your Honor.

22       THE COURT:  All right.  Is there anything else that we

23  need to take up on the record?

24       MR. CHILDERS:  Nothing from the plaintiff, Your Honor.

25       MR. IMBROSCIO:  Nothing, Your Honor.

1      THE COURT:  If not, is anything changing about the

2  settlement posture of the cases?  I know this is only one of a

3  handful or more.

4      How many cases do you folks have?

5      MR. MOSKOW:  There are about 2,430 pending in

6  Connecticut right now, Your Honor.  There are approximately a

7  dozen in St. Louis and approximately a hundred or so in

8  California.

9      THE COURT:  This can be off the record.

10     (Off the record.)

11     THE COURT:  Thank you all for being here.

12     THE COURT SECURITY OFFICER:  All rise.  This honorable

13  court is adjourned.

14          (Proceedings were concluded at 4:27 p.m.)

15              ---o0o---

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2         I, Kathy L. Swinhart, CSR, certify that the foregoing

3    is a correct transcript from the record of proceedings in the

4    above-entitled matter as reported on June 5, 2018.

5

6

7    June 21, 2018
     DATE

8

9    /s/ Kathy L. Swinhart
     KATHY L. SWINHART, CSR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25