# Exhibit C

IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
        Plaintiffs,
vs.                                              No. 3:15-CV-06424

BOEHRINGER INGELHEIM                     Volume 3
PHARMACEUTICALS, INC.,                 Pages 401 through 660

        Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, OCTOBER 5, 2018, 9:00 A.M.

---o0o---

For the Plaintiffs:     CHILDERS, SCHLUETER & SMITH
                         1932 North Druid Hills Road, Ste 100
                         Atlanta, Georgia  30319
                         BY:  C. ANDREW CHILDERS

                         URY & MOSKOW
                         883 Black Rock Turnpike
                         Fairfield, Connecticut 06825
                         BY:  NEAL L. MOSKOW

(Appearances continued next page...)

Reported by:    KATHY L. SWINHART, CSR
                LISA A. COOK, RPR-RMR-CRR-FCRR
                Official Court Reporters
                (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                    APPEARANCES (Continued)

 2

 3     For the Plaintiffs:

 4                    FERRER, POIROT & WANSBROUGH
                      2100 RiverEdge Parkway, Suite 1025
 5                    Atlanta, Georgia   30328
                      BY:  RUSSELL ABNEY
 6                    and  HUNTER VANCE LINVILLE

 7

 8     For the Defendant:

 9                    TUCKER ELLIS
                      925 Euclid Avenue, Suite 1150
10                    Cleveland, Ohio   44115
                      BY:  JOHN Q. LEWIS
11

12                    COVINGTON & BURLING
                      One City Center
13                    850 Tenth Street NW
                      Washington, D.C.   20001
14                    BY:  PHYLLIS ALENE JONES
                      and  NICHOLAS HAILEY
15                    and  JESSICA PEREZ

16
                      JACKSON KELLY
17                    Post Office Box 553
                      Charleston, West Virginia   25322
18                    BY:  GRETCHEN M. CALLAS

19

20     Also Present:

21            CLAUDE R. KNIGHT, Plaintiff

22

23

24

25
```

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

1   what that information was, but certainly it's possible.
2   Q.  Now, I think the jury has now seen various versions of
3   the Pradaxa label at different points in time.  But just to
4   be clear, the FDA had to give approval on the label for
5   Pradaxa during the entire time that the medicine has been on
6   the market; correct?
7   A.  Yes, even though there's at least one case where the
8   approval came after.  But, yes, that's true.  That is
9   required by the process.
10  Q.  Okay.  And it's not uncommon over time -- it's common
11  practice that labels can evolve over the course of a
12  medicine being on the market; correct?
13  A.  Yes.
14  Q.  All right.  Do you know how many updates there have
15  been to the Pradaxa label in the last eight years since the
16  medicine's been on the market?
17  A.  I would say more than a dozen, but I haven't counted
18  them.
19  Q.  Okay, fair enough.  Each one of those labels had to be
20  approved by the FDA; correct?
21  A.  Yes.
22  Q.  Now, you agree that the FDA has among the many
23  professionals who work there medical doctors who are
24  involved in evaluating the drug labeling that companies
25  propose to the agency; correct?

Laura Plunkett - Cross (Jones)　　　　　　　552

1　paper about Pradaxa?

2　A.　Yes.  It's in --

3　Q.　It starts on page 4.

4　A.　Yes, dabigatran.  I think we also, I think, looked at

5　this.

6　Q.　Yeah, this was right under the table I think that you

7　talked about with Mr. Moskow.

8　A.　Yes.

9　　　　　MS. JONES:  And if we could just grab that section at

10　the bottom.  This is a little bit of a puzzle exercise piecing

11　this together.

12　Q.　But you see that's the section, the beginning of the

13　section on Pradaxa, correct, that reference to dabigatran?

14　A.　Yes.

15　Q.　And then if you carry over to the next page, that

16　discussion of dabigatran and possible interactions with P-gp

17　inhibitors continues, correct?

18　A.　Yes.

19　Q.　There is no mention in that section, yes or no, to an

20　interaction with Coreg, correct?

21　A.　There is no -- specific in this section, you're correct,

22　because that data has not been collected.

23　　　　　MS. JONES:  Okay.  We can take that down.  Thank you,

24　Mr. Reynolds.

25　Q.　Okay.  Dr. Plunkett, I want to turn now to talking a

Laura Plunkett - Cross (Jones)                565

1  relevant to what we've been talking about for the last day and
2  a half or so.
3       You showed the jury the language from the CCDS and the
4  SMPC that says Pradaxa is contraindicated in patients with
5  severe renal impairment.  Do you remember that?
6  A.  Yes.
7  Q.  And contraindicated means don't use it in these patients,
8  right?
9  A.  Yes.  And I think I even described it as the risks would
10 outweigh the benefits.
11 Q.  Okay.  Now do you know that Boehringer Ingelheim actually
12 tried to get that language in the U.S. label for Pradaxa?
13 A.  Yes, and I think we -- that was in another document
14 earlier today.
15          MS. JONES:  Your Honor, may I approach?
16          THE COURT:  Yes.
17          MS. JONES:  Dr. Plunkett, I've handed you what we've
18 marked as Exhibits 5061 and 5062.
19 Q.  Do you recognize those documents?
20 A.  I'm not sure I've seen the e-mail, but I have seen, ah,
21 the label.
22 Q.  Okay.
23          MS. JONES:  And so, Your Honor, we'd move for the
24 admission of 5061 and 5062.
25          MR. MOSKOW:  No objection.

Laura Plunkett - Cross (Jones) 569

1  Q. All right. And so this is the process that I think you
2  described a little bit with the jury yesterday.
3      The company proposes a label. The FDA then has an
4  opportunity to say here are some things we think should be
5  different, correct?
6  A. Yeah. This is that negotiation I talked about.
7  Q. Okay. And then if you turn to Exhibit 5036, do you
8  recognize that -- and this actually does have red lines -- the
9  FDA's red line to the company's proposed labeling?
10     If you go to page 2 --
11 A. Yes.
12 Q. -- do you see that?
13     And if we go to the section we were just looking at
14 entitled Contraindications, do you see that second bullet with
15 that reference to severe renal impairment?
16 A. Yes.
17 Q. And what did the FDA do with that?
18 A. It has been struck.
19 Q. Okay. And then if we go to page 3 of that document in the
20 core discussion section, there is the section entitled 2.5
21 Patients with Severe Renal Impairment.
22     Do you see that? It's about midway down the page.
23 A. Yes, I see that.
24 Q. And what the FDA did was they took out the
25 contraindication, and they proposed instead that the

Laura Plunkett - Cross (Jones) 570

1 recommended dosage of Pradaxa in patients with severe renal
2 impairment is 150 milligrams taken once every other day.
3     Do you see that?
4 A. Yes.
5 Q. And we now know that after some discussion and some
6 analysis, they concluded that it would be the 75-milligram
7 dose taken twice a day, correct?
8 A. Yes.
9 Q. So that language that you showed in the CCDS and the SMPC,
10 that's language that the company proposed and the FDA
11 literally struck from the label for Pradaxa, correct?
12 A. Yes. And they made a different proposal.
13 Q. Dr. Plunkett, we've talked a good bit about the FDA and
14 its structure and the process for a medicine like Pradaxa, so
15 I'm going to skip a lot of that discussion, but I did want to
16 just ask you one question.
17     The company, as part of its development of Pradaxa, did
18 both preclinical and clinical studies, correct?
19 A. Yes.
20 Q. And that means studies that involved humans and some that
21 involved animals, correct?
22 A. Yes.
23 Q. All right. And Boehringer shared every one of those
24 studies with the FDA, both the preclinical and the clinical
25 studies, correct?

Laura Plunkett - Cross (Jones) 571

1  A. That's my understanding, yes.
2  Q. And when BI submitted Pradaxa for approval by the FDA, the
3  FDA got all of the raw data from the RE-LY trial, correct?
4  A. Yes, they were given the raw data.
5  Q. Okay. And BI also submitted all of the PK data for
6  Pradaxa that served as the basis for the RE-LY -- excuse me --
7  the Reilly exposure paper that you talked about yesterday,
8  correct?
9  A. The raw data went in, yes, that is true.
10 Q. And also as part of that process, do you know that the
11 company submitted analyses of its data from RE-LY to the FDA
12 in something called a clinical overview document?
13 A. Yes, I'm aware of that document.
14 Q. And is that a document that you reviewed as part of your
15 work in this case?
16 A. Yes, I have seen that document.
17         MS. JONES: May I approach, Your Honor?
18         THE COURT: Yes.
19 BY MS. JONES:
20 Q. Dr. Plunkett, do you recognize Exhibit 5084?
21 A. Yes, I do.
22 Q. Do you recognize that as the clinical overview document
23 that we were just discussing a minute ago?
24 A. Yes. I think -- I assume this is what you were referring
25 to, yes.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunkett - Redirect (Moskow) 628

1 of who it has to go to.
2 THE COURT: Well, I think if you rephrase it, you can
3 ask it.
4 MR. MOSKOW: Okay. I'll rephrase it.
5 THE COURT: Okay. How do you intend to rephrase it?
6 MS. JONES: No, Neal, he wants to know how you are
7 going to rephrase it.
8 MR. MOSKOW: I will rephrase the question, and it will
9 be something to effect of, now, Doctor, in reaching your
10 opinions in this case, did you have an understanding as to who
11 the warning should go to?
12 THE COURT: I think that's fair enough.
13 MS. JONES: I still think that speaks to a legal
14 issue. I mean --
15 THE COURT: It has an implication for the legal issue,
16 but it's -- I will permit that.
17 MS. JONES: Okay. Thank you, Judge.
18    (Bench conference, concluded.)
19 THE COURT: All right. Rephrase your question.
20 MR. MOSKOW: Yes, Your Honor. Thank you.
21 Q. Dr. Plunkett, in reaching your opinions in this case, did
22 you have an understanding as to who the warning should go to
23 here in West Virginia?
24 A. Yes.
25 Q. And who is that?

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunkett - Redirect (Moskow)                 629

1   A.   To the patient.  So the Medication Guide becomes the most
2   important document.
3   Q.   Even with that statement, I want to ask you a few
4   questions about the doctor's label.  All right?
5   A.   Sure.
6   Q.   And in particular, I want to ask you about this warning
7   and precaution that says risk of bleeding -- and I'm looking
8   at Exhibit 5884 right now.
9   A.   Uh-huh.
10  Q.   Risk of bleeding.  Pradaxa can cause serious and sometimes
11  fatal bleeding.  Promptly evaluate signs and symptoms of blood
12  loss.
13       Do you recall that?
14  A.   Yes.
15  Q.   And you were asked whether it was a strong warning.
16       Do you recall your answer to that?
17  A.   Yes.  I said it was.
18  Q.   Okay.  And you were asked whether it was a serious
19  warning.
20       Do you recall your answer to that?
21  A.   Yes, I do.  I said it was.
22  Q.   I have a question for you.  Is it a complete warning?
23  A.   No, and that's my issue.
24  Q.   Explain that to the jury.
25  A.   So it is well known by scientists and physicians, based on

Laura Plunkett - Redirect (Moskow) 634

1  Q. And do you see that that is the Medication Guide?
2  A. Yes.
3  Q. Can you tell the jury whether there were any changes that
4  the FDA recommended to the Medication Guide?
5  A. There is none.
6  Q. Well, I mean, they did some indenting of bullet points.
7  A. Well, I meant substantive changes.
8  Q. Okay. All right. Let's look at Exhibit 5036. Can you
9  look at pages 22, 23, 24.
10     Are there any changes that the FDA recommended to that
11 Medication Guide?
12 A. No.
13 Q. Have you seen any indication that BI proposed specific
14 language regarding the drug never being tested in people with
15 severe kidney problems, that the 75-milligram dose had never
16 been tested, that people should not take Pradaxa and Coreg,
17 that there was no reversal agent, and that you are more likely
18 to have a GI bleed with Pradaxa than with warfarin?
19     Have you seen any evidence that any of those statements
20 were proposed to be put in the Medication Guide?
21 A. No, I've not seen any indication that that was ever
22 proposed.
23 Q. Doctor, you were shown many, many documents today
24 including -- and yesterday including one of them Exhibit 5827,
25 which was the summary review document.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunkett - Redirect (Moskow)                640

1   summarizes the most important information about Pradaxa.
2        Do you believe that the Medication Guide can summarize the
3   most important information about Pradaxa if it doesn't include
4   information on the important identified risk of increased
5   gastrointestinal bleeding?
6   A.  No, I do not.  I think that's a very important -- was a
7   major outcome from the trial.
8   Q.  Doctor, I started my examination with you and I am going
9   to end my examination today, to the extent that the Medication
10  Guide does not include information about never having been
11  tested in patients with severe kidney problems, that the
12  75-milligram dose was never tested, that people shouldn't take
13  Pradaxa and Coreg, that there is no reversal agent, and that
14  there is no information about the -- or I'm sorry -- and the
15  issue of GI bleeding, have you formed an opinion as to whether
16  the Medication Guide fairly, accurately and completely
17  describes the most important information about Pradaxa to
18  patients here in West Virginia?
19  A.  I have.
20  Q.  And what is that opinion?
21  A.  That it does not.  And these are the areas that I believe
22  are missing, although I would make one small change, never
23  tested in AFib patients with severe renal impairment.
24  Q.  Fair enough.
25       And, Doctor, are all of the opinions that you've given

661

1  CERTIFICATION:

2      We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3  RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4  transcript from the record of proceedings in the

5  above-entitled matter as reported on October 5, 2018.

8  October 6, 2018
   DATE

10 /s/ Kathy L. Swinhart
   KATHY L. SWINHART, CSR

12 /s/ Lisa A. Cook
   LISA A. COOK, RPR-RMR-CRR-FCRR