IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                       No. 3:15-CV-06424

BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

          Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

FINAL PRETRIAL CONFERENCE

MONDAY, OCTOBER 1, 2018, 10:00 A.M.

---o0o---

For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                       1932 North Druid Hills Road
                       Suite 100
                       Atlanta, Georgia  30319
                       BY:  C. ANDREW CHILDERS

                       URY & MOSKOW
                       883 Black Rock Turnpike
                       Fairfield, Connecticut 06825
                       BY:  NEAL L. MOSKOW

(Appearances continued next page...)

Reported by:   KATHY L. SWINHART, CSR
              Official Court Reporter
              (304) 528-2244

```
 1                          APPEARANCES (Continued)

 2

 3      For the Defendant:

 4
                          TUCKER ELLIS
 5                        925 Euclid Avenue, Suite 1150
                          Cleveland, Ohio  44115
 6                        BY:  JOHN Q. LEWIS

 7
                          TUCKER ELLIS
 8                        950 Main Avenue, Suite 1100
                          Cleveland, Ohio  44113
 9                        BY:  MADELINE B. DENNIS

10
                          COVINGTON & BURLING
11                        One City Center
                          850 Tenth Street NW
12                        Washington, D.C.  20001
                          BY:  PHYLLIS ALENE JONES
13                        and  NICHOLAS HAILEY
                          and  JESSICA PEREZ
14

15                        JACKSON KELLY
                          Post Office Box 553
16                        Charleston, West Virginia  25322
                          BY:  GRETCHEN M. CALLAS
17

18

19

20

21

22

23

24

25
```

1

```
1              HUNTINGTON, WEST VIRGINIA

2          MONDAY, OCTOBER 1, 2018, 9:51 A.M.

3                    ---o0o---

4         THE COURT:  Good morning.

5         MR. CHILDERS:  Good morning, Your Honor.

6         MS. JONES:  Good morning, Your Honor.

7         THE COURT:  We'll go off the record.  I understand the

8    the parties wanted to bring a matter to the Court's attention.

9      (Off-the-record discussion.)

10        MR. CHILDERS:  Sorry.  The first person would be

11   Melissa Ann Mobley, M-O-B-L-E-Y.  Second is Victoria Lewis

12   Pickavance, P-I-C-K-A-V-A-N-C-E.  And the third is Linda Marie

13   Watts, W-A-T-T-S.

14        Thank you, Your Honor.

15        THE COURT:  Thank you.

16        MR. LEWIS:  Thank you.

17        THE COURT:  All right.  Are we otherwise ready to

18   proceed?

19        MR. CHILDERS:  Yes, sir.

20        THE COURT:  Great.

21        So here's what I'd like to sort of list as the

22   schedule of the agenda.  First I want to hear brief argument

23   and then hopefully rule upon the defendant's motion to

24   preclude certain evidence.  Then I want to turn to the

25   deposition issues, first plaintiffs' objections to the
```

2

1   defendant's deposition designations, then the defendant's

2   objections to plaintiffs'.

3        After that, I want to go through the proposed voir

4   dire and preliminary instructions.  Following that, if there

5   is anything else that needs to be addressed from the joint

6   pretrial order, I want to hear about that.

7        And then the last matter, I have a few relatively

8   minor matters a few minor matters that I want to discuss with

9   you just about logistics, in particular a couple of matters

10  that my court reporter asked that I raise and clarify with the

11  parties.

12       So let's start, then, with the defendant's motion to

13  preclude evidence.  I've read all this, I've got a pretty good

14  understanding, but I want to give the parties a chance for

15  some brief argument.  Go ahead.

16       MR. LEWIS:  Should I do it from here, Your Honor, or

17  do you want me --

18       THE COURT:  You can do it from there if you're

19  comfortable.  Just make sure you use that microphone so my

20  court reporter can hear it well.

21       MR. LEWIS:  Very good.  Thank you, Your Honor, for

22  considering the motion.

23       You know, it's really -- I was trying to think of a

24  good analogy on the defense side to really describe what we

25  are moving for because I think there is some confusion based

3

1    on the papers that I've seen from plaintiffs about what we're

2    really asking for.

3         And so as a defendant, let's assume that the

4    plaintiffs never requested our complaint database at all, just

5    for whatever reason in discovery.  And we did get to the

6    trial, and as defendants, we seek to argue in front of the

7    jury that there are no complaints associated with this

8    product.  Now just because the plaintiffs have not asked for

9    our complaint database doesn't mean I get to argue a fact that

10   isn't true to the jury or that I can't confirm it's true.

11   That's not appropriate.

12        And if there indeed were complaints about a product,

13   or in fact I didn't even know if there were or not, I still

14   can't argue to the jury there are no complaints associated

15   with that product.  I could say, based on what we've

16   collected, or based on the evidence you will hear, there are

17   no complaints associated with that product, but there is a

18   back story there.  And there is a big difference between

19   saying it as a fact and saying that, hey, based on the

20   homework we've done, we don't have that evidence.

21        And that's really what we are seeking here with

22   respect to the plaintiffs' use of the warfarin medication.  We

23   don't have all of the medical records from the entire time

24   frame that Betty Knight was on warfarin, we just don't.

25   Should the plaintiffs have collected those and produced those

4

1    to us?  Maybe, but let's put that aside for a second.  Could

2    we have done it?  Maybe, but let's put that aside.

3           We know for a fact that we can't really represent to

4    the jury that in fact Betty Knight had no bleeds with warfarin

5    during the entire time that she had the medication.  We can

6    say based on the records we've collected, the plaintiffs can

7    argue this, maybe, maybe there isn't any evidence.  We think

8    maybe there is, but we think the jury shouldn't be misled into

9    thinking it's a fact that she did have a bleed while she was

10   taking warfarin.

11          So either we need to preclude the plaintiffs from

12   making that argument and stating that as fact or we need to be

13   able to tell the jury the whole story.  We didn't collect all

14   of the information, so we don't know, we're not sure.

15          THE COURT:  Well, as I understand it, the plaintiffs'

16   evidence is, first, they have medical records which have been

17   shared, and Dr. MacFarland's comes to mind most readily, where

18   Dr. MacFarland purported as part of the history that there was

19   prior GI bleeds on warfarin.

20          But then it seems that when Dr. MacFarland, and other

21   witnesses who made those entries in their notes, were

22   questioned at deposition, they said, well, we don't really

23   know why that is there.  And more or less, if we take the

24   plaintiffs' view of it, they testified that they don't really

25   see a basis for that notation to be there.

5

1          And then you've got Dr. -- and I'm going to forget how

2     to pronounce the name, your expert?

3          MR. CHILDERS:  Ashhab.

4          MR. LEWIS:  Ashhab.

5          THE COURT:  -- Dr. Ashhab saying, you know, I don't

6     see that she ever had a problem on warfarin, so that was

7     clearly still an alternative that she could have been on.

8          It seems that the evidence is that Dr. MacFarland

9     treated her for was it like six years and had her on Pradaxa

10    for the first three or four of that, and that Dr. MacFarland

11    testified she did not have any significant bleeds from

12    warfarin while.  So if they develop that evidence, I don't see

13    how I can keep them from offering that evidence.

14         If you've developed -- so I assume you've

15    cross-examined these people, and there might be some further

16    of discussion that.  But whether or not she had a prior bleed

17    on warfarin seems to me to be a question of fact.  And

18    although medical records from those first two years might be

19    conclusive about it, nobody has got those records.  At this

20    point, I'm not inclined to blame either side for the absence

21    of those records.  And so it seems that the plaintiffs have

22    got testimony essentially explaining what is otherwise in the

23    chart from these two doctors, and I think they're entitled to

24    do that.

25         I think you're certainly entitled in your

1     cross-examination of their experts -- if he says she never had

2     a bleed on warfarin, I think you're entitled to probe that and

3     ask about these histories.  I don't know what all the

4     testimony was by the various doctors.

5             Are they testifying live?  Is MacFarland going to be

6     here live?

7             MR. CHILDERS:  That's not our plan, Your Honor.

8             THE COURT:  All right.  And who was the other -- was

9     it the cardiologist who also --

10            MR. CHILDERS:  Dr. Gunnalaugsson also had it in his

11     records and said he  didn't actually see --

12            THE COURT:  Right.

13            So, I mean, it seems to me that -- I certainly believe

14     you can challenge that, cross-examine him, but I don't believe

15     that it's appropriate for you to blame the plaintiffs for

16     failure of discovery and thereby preclude them from offering

17     their evidence.  Nor do I think it's appropriate that you be

18     permitted to argue to the jury as counsel that, well, there

19     was a failure to produce these records.

20            I think you can ask these doctors, have you seen these

21     records, and they're going to say, I guess, no.  But I think

22     that's really as far as you can go.

23            MR. LEWIS:  Okay.  So if there are -- Your Honor, if

24     there are an absence of -- for instance, Dr. Ashhab hasn't

25     seen all of the providers' records during the entire time she

7

1    was on warfarin.  That's fodder for cross-examination.

2            THE COURT:  It absolutely is.  And I think you can

3    also point out the entries in the charts that purport to be a

4    medical history, which is otherwise admissible anyway, that

5    says she had prior GI bleeds on warfarin --

6            MR. LEWIS:  Right.

7            THE COURT:  -- and see what his explanation is for

8    concluding that that was inaccurate.

9            MR. LEWIS:  Right.

10           THE COURT:  I have to admit, I've looked at -- last

11   week, when I looked at some of this discussion in the

12   depositions of MacFarland and Gunnalaugsson, that it wasn't

13   very clear to me what they purported to have seen or

14   concluded.  I think it's pretty mushy.

15           But I think all that is evidence for the jury, and I

16   don't think it's appropriate for either counsel to raise this

17   as sort of a discovery criticism of either side because these

18   records aren't there.  I think it's fair to ask these

19   witnesses who testify live if they've seen such records.  And

20   if they haven't, they haven't, and that can plant the seed of

21   doubt.

22           But I don't think it's appropriate for either side to

23   be arguing that --

24           MR. LEWIS:  It's their fault.

25           THE COURT:  Yeah, exactly.

1          MR. LEWIS:  Okay.

2          THE COURT:  So in that sense, then I'm going to deny

3     the motion.

4          MR. LEWIS:  That's fair guidance.  Thank you, Your

5     Honor.

6          THE COURT:  All right.  Thank you.

7          All right.  Then let's turn to the deposition

8     designations, and I think I said I would start with

9     plaintiffs.

10         I got the reply -- or response, rather, filed by the

11    defendant.  I read through it yesterday.  I think I've got a

12    pretty fair grasp of the issues, but I do want to give each of

13    you a few minutes to just walk through each of these.

14         So let's start with -- is it Kliewer, is that her

15    name?

16         MR. CHILDERS:  Kliewer.

17         THE COURT:  Kliewer?

18         MR. CHILDERS:  Kliewer actually.

19         THE COURT:  Kliewer.  All right.

20         So, first, I haven't seen this transcript.  I don't

21    know what the document is that was referred to.  I know --

22    I've read her deposition transcript, and I understand she was

23    questioned about it, but I don't think I've seen the document.

24    So it's a little hard for me to be sure what it is that she

25    was testifying about that day.

9

1      MS. JONES:  Your Honor, we have a copy of the document

2   itself if that would be of any help.

3      THE COURT:  I'd like to see it.  I don't know that

4   it --

5      MS. JONES:  May I approach?

6      THE COURT:  Yes, you may.

7      So I understand Ms. Kliewer was sort of the regulatory

8   agent for Boehringer, and she's the one who would have kind of

9   marshaled the documents and studies and so forth, and had been

10   dealing with the FDA to get FDA approval.  She said she was at

11   this advisory committee meeting, which I understand to be

12   about a month before the FDA approval was issued.  And that

13   when presented with a transcript of the discussion that ensued

14   at that meeting, she testified about what at least one doctor

15   who was there said.  And then I think she testified about

16   other matters related to that advisory committee meeting that

17   aren't objected to that seemed to be outside of quoting

18   anything from what somebody said to me.

19      MR. CHILDERS:  That's correct, Your Honor.

20      We objected to her testifying about what another

21   person said, a person who hadn't been deposed in this case.

22   And this was a transcript that was not testimony under oath.

23   This was an advisory committee meeting, which is -- I'm sorry.

24      THE COURT:  No.  Go ahead.

25      MR. CHILDERS:  It's a committee --

10

1          THE COURT:  Well, obviously I interrupted you.  I

2     didn't really want to.

3          Is it Dr. Krudys, K-R-U-D-Y-S?

4          MR. CHILDERS:  Correct.

5          THE COURT:  Is that who she referred to?

6          MR. CHILDERS:  Correct.

7          THE COURT:  So that's who she purported to quote from?

8          MR. CHILDERS:  Correct.  And Dr. Krudys gave a

9     presentation here.

10         There were people from various entities, including the

11    government and Boehringer Ingelheim, who came to the advisory

12    committee meeting.  And the purpose of the meeting is to have

13    them all talk about what they think about whether or not this

14    drug should be approved.  It's not an FDA official

15    proclamation.  It is a group of people that the FDA has asked

16    to come and speak to them about this drug, and they can say

17    whatever they want.

18         This happens to be before the drug was approved, as

19    you noted.  And everything that was discussed at the advisory

20    committee meeting, even the vote that the advisory committee

21    had, is nonbinding on the FDA.

22         So this is not an FDA official government document.

23    This is an unsworn transcript from which the defendant is

24    trying to put in hearsay as to what another person said.

25         THE COURT:  And Dr. Krudys --

1          MR. CHILDERS:  Yes, sir.

2          THE COURT:  -- was the rep -- he was a pharmacometrics

3     reviewer for the FDA?

4          MR. CHILDERS:  That's right.

5          THE COURT:  Okay.  And he was leading, I guess, the

6     Office of Clinical Pharmacology?  That's part of the FDA?

7          MR. CHILDERS:  Correct, and they have lots and lots of

8     offices.

9          THE COURT:  Sure.

10          MR. CHILDERS:  He happened to be one of the people who

11     made a presentation.  He didn't put out an official FDA paper

12     or proclamation.  He gave a power point and talked about it.

13     That's hearsay.  That doesn't fall under the exceptions under

14     803 for a government record, and so our argument is it

15     shouldn't come in.

16          We didn't object to the other stuff that is not

17     hearsay.  We just objected to her specifically talking about

18     what another witness made with an out-of-court statement

19     because she's clearly offering it for the truth of the matter,

20     Your Honor.

21          THE COURT:  All right.  Thank you.

22          MS. JONES:  Your Honor, with the Court's permission,

23     our colleague, Mr. Hailey, who has been working on the

24     deposition designation issues, will handle this argument.

25          THE COURT:  Just make sure you slide a microphone

12

1      over.

2              MS. JONES:  Thank you, Your Honor.

3              MR. HAILEY:  Good morning, Your Honor.  Nick Hailey.

4          So I just want to address sort of the nature of the

5      advisory committee.  I think what's -- your impression of the

6      nature of this meeting is accurate.

7              This was a meeting that was convened by the FDA for

8      the specific purpose of providing a recommendation in

9      connection with the review and approval of Pradaxa.  It was

10     convened by the FDA pursuant to the Federal Advisory Committee

11     Act.

12         (Off the record.)

13             MR. HAILEY:  So the people that were part of this

14     advisory committee and that attended the meeting, they were

15     representatives from the FDA.  They were independent experts

16     who were special government employees for purposes of the

17     meeting.

18             THE COURT:  Is that what Dr. Krudys was?

19             MR. HAILEY:  Dr. Krudys was a full-time employee of

20     the FDA.  He is a pharmacometrics reviewer.  He not only

21     presented at this meeting in advance of approval, he conducted

22     the FDA's exposure response review as part of the approval

23     process.  And he actually authored one of their review memos

24     that the FDA itself issued when, a month after this meeting,

25     it approved this medicine.

1      So Dr. Krudys at this meeting is very much presenting

2   on his investigation of the data on this medicine, his

3   conclusions, his factual findings.  He's expressing his view

4   on the medicine.  He's presenting on behalf of the FDA at this

5   meeting, and later those views were expressed in the FDA

6   review memo that he issued.

7      THE COURT:  Well, that's one of my questions.

8      So if you've got the FDA approval, then why do you

9   need a witness to testify what one of the reviewers said at a

10  meeting?

11     MR. HAILEY:  Well, we think that this is an

12  important -- there's a question asked at the meeting about

13  whether monitoring should be required, and Dr. Krudys responds

14  directly to that question, and that's the specific portion of

15  the transcript that Ms. Kliewer is asked about.

16     And he very clearly provides his view based on the

17  data of whether monitoring should or should not be required,

18  and that is captured in the advisory committee meeting in a

19  clear way that we, ah, think is -- think is relevant and

20  important here, that it's not captured in that same way in the

21  memo that he later issues.

22     THE COURT:  Well, that's what I was going to ask

23  about.

24     So he doesn't say this in the context of the FDA's

25  approval.  In other words, it's not -- there's no memorandum

14

1    or similar statement from him as part of the FDA approval,

2    formal approval, whatever that consists of?

3              MR. HAILEY:  Again, his -- his memo that he issues at

4    approval is sort of more focused on his exposure response

5    analysis.  It's much more sort of in the weeds.  It's not this

6    simple expression that he's having in this conversation at the

7    FDA advisory committee meeting.

8              THE COURT:  Okay.  Anything else?

9              MR. CHILDERS:  Your Honor, that's exactly the point,

10   it's not part of what the FDA officially found.  It's just him

11   talking at a meeting.

12             If it had been in -- if this was the FDA memo that

13   Ms. Kliewer was testifying about, I wouldn't be standing here.

14   This is hearsay, and it shouldn't be approved.

15             THE COURT:  I'm afraid I agree with the plaintiffs on

16   this.  I really appreciate the supplemental argument you made.

17   It helped me a lot to understand and, to me, did make it a

18   much closer question because I wasn't sure what this advisory

19   council's role was.

20             But it does seem to me that the problem here is that,

21   while the advisory council has a role, this is simply a

22   statement by one of the participants in that council, even if

23   he's got FDA authority in a forum.  And I don't think it has

24   the imprimatur of being government action in the sense that

25   it's approved by the FDA or a statement by the FDA, and I

1    think that's what creates the problem under 803.

2         I think it does not become an official act or official

3    record just because it's a statement made by even a government

4    official at some type of a forum.  I think that would open

5    this rule far more than it is intended.

6         And because it's government, if the jury hears this

7    and they're told, well, this is the official public record,

8    this is an admissible statement because he speaks for the FDA,

9    I think that that is troublesome.  I think that that

10    exaggerates the connection between his statement and his role.

11         So I'm going to sustain the objection.  I won't allow

12    that specific part that you've objected to come in because I

13    do think it's hearsay.

14         All right?

15         MR. CHILDERS:  Thank you, Your Honor.

16         THE COURT:  The next one, this is -- I don't know how

17    you say these names.

18         MR. CHILDERS:  Can I stop you for a second?

19         THE COURT:  Yes.

20         MR. CHILDERS:  You will be happy to hear that's been

21    withdrawn because we have reached an agreement on the

22    testimony from Dr. Klaus Dugi.

23         And I do want to say this, Your Honor, as an aside.

24    Mr. Hailey and I spent four or five days solid on the phone

25    together and worked very cooperatively to limit the objections

1    we had.  And I wanted to just tell the Court how much I

2    appreciate how cooperative that was from the defense, and I

3    think it's really helped us to all come here ready to try this

4    case.

5              THE COURT:  Maybe I ought to send you two back to see

6    if you can't settle this case.  Probably not?

7              Well, so does that resolve all of the objections you

8    raised with Dr. --

9              MR. CHILDERS:  Dugi.  Yes, sir.

10             THE COURT:  Okay.  Great.  So I deny the objection

11   with regard to Dr. Dugi.

12             MR. CHILDERS:  Okay.

13             THE COURT:  Then next is --

14             MR. CHILDERS:  Dr. Abdelgaber.

15             THE COURT:  Abdelgaber.

16             I know what that one is about.  I've got a pretty good

17   understanding of it.  I'll let you make a brief argument if

18   you like.

19             MR. CHILDERS:  Your Honor, the requirement for

20   causation opinion evidence and testimony in the Fourth Circuit

21   is that it must be more probable than not, and that mere

22   possibilities are not relevant.  They're not to go to the jury

23   for the jury to consider, and that is why we've made this

24   objection here.

25             He clearly said this was a possibility.  The prior

1    question and answer we did not object to where they talked

2    about whether or not these other hospitalizations could have

3    affected her health.  But as soon as he said it's a

4    possibility, not a probability, that made it inadmissible in a

5    court of law, and that's why we've objected to that.

6         THE COURT:  Well, I'm going to deny that objection.  I

7    think the argument kind of confuses the difference between

8    what is admissible evidence and what is required in order to

9    get an issue to the jury.  And I think the cases you cited

10   really stand for the proposition that in a causation context,

11   let's say, is this.

12        The proponent has to get evidence sufficient for a

13   jury to find that it's probable, reasonably certain or

14   something like that.  I don't think that it's necessarily the

15   test for admissibility of an opinion.  I think if this were

16   the only opinion, and they had a burden to prove the

17   probability of a fact, it would be insufficient.  But I think

18   they're the opponents here, and I think that they can use

19   possibility evidence as a way of challenging your case.

20        In effect, the doctor says, well, it's possible, but

21   he clearly doesn't think that is what occurred.  But in either

22   regard, it doesn't make the evidence inadmissible.  It might

23   not be enough on its own to get an issue to the jury, but I

24   don't think that that precludes the admissibility.  So I deny

25   the objection.

18

1          MR. CHILDERS:  Thank you, Your Honor.

2          THE COURT:  Then the next one is Dr. MacFarland, and

3    I'm going to say I'm confused about what to me is the

4    essential fact that may or may not be at issue here.

5          I understood from my prior readings on all of this

6    back when we were dealing with all these motions, and then

7    from your objection, that Dr. MacFarland does not purport that

8    she ever discussed the Pradaxa prescription with Ms. Knight or

9    her family.  And yet now I think in the response that they

10   filed, they said, well, she does say that she may have had

11   that conversation or did.

12         So in --

13         MR. CHILDERS:  So she testifies -- the deposition was

14   kind of interesting.  We did not have the entire record.  She

15   found another record while we were in her deposition that sort

16   of clarified what happened.

17         We all believed that Ms. Knight, her son and daughter

18   made an appointment, went in and sat down with Dr. MacFarland

19   to talk about being switched to Pradaxa.

20         THE COURT:  Right.

21         MR. CHILDERS:  When she was questioned, she said, I

22   really -- I don't remember that.  But if that is -- you know,

23   I know we started her on the drug, I just don't remember that.

24         While we were there, she went and found another record

25   that showed that the family actually met with her nurse, Nurse

19

1    Clagg, when they came in to get the prescription.  So any risk

2    benefit information they got would have been from the nurse.

3    After that, Dr. MacFarland continued to fill the prescription,

4    but she didn't have the initial risk benefit discussion with

5    them.

6         And so our objection is very limited.  There's a lot

7    of testimony in here that we did not object to about what she

8    knows about Pradaxa, what she thinks about Pradaxa.  The only

9    things we objected to were hypothetical questions that were

10   asked of her as if they were having that meeting, that initial

11   meeting, and she was asked what would you have told Ms. Knight

12   at that meeting?

13        That didn't happen, and so that's why we've objected

14   to that very limited testimony.

15        THE COURT:  Okay.

16        MR. LEWIS:  Yes, Your Honor.  Thank you.

17        Both of the plaintiffs in this case testified that

18   they actually did meet with Dr. MacFarland, so there is a real

19   issue of fact here, what exactly took place at the time the

20   decision was made to switch from warfarin to Pradaxa.

21        I think the jury has got to make this determination

22   and hear all of the evidence about that.  But with respect to

23   Dr. MacFarland's policies and practices, that's relevant to

24   the issue of whether it's more likely than not that the risks

25   and benefits were disclosed at the time of the switch.

20

1          But more importantly, the time of the switch is not

2     the only relevant time period here.  If Dr. MacFarland

3     otherwise communicated with the plaintiffs at any time about

4     the risks and benefits of Pradaxa, then that would be relevant

5     evidence as well.

6          THE COURT:  Well, let's take these things one at a

7     time.

8          MR. LEWIS:  Sure.

9          THE COURT:  With regard to that latter point, did Dr.

10    MacFarland testify that she had reason to believe that, at a

11    subsequent meeting with Ms. Knight or her family, perhaps to

12    renew a prescription or whatever, that she may have had those

13    conversations?

14         MR. LEWIS:  It's not clear from Dr. MacFarland's

15    testimony that she did.

16         THE COURT:  Okay.

17         MR. LEWIS:  It's somewhat equivocal based on the

18    plaintiffs' testimony as to when they, if ever, talked to Dr.

19    MacFarland.

20         THE COURT:  All right.  So it's really kind of the

21    same answer to both.

22         MR. LEWIS:  Correct.

23         THE COURT:  So whether it was the first meeting or

24    subsequent meetings, the kids testified that they were present

25    when Dr. MacFarland discussed Pradaxa?

1       MR. LEWIS:  Mr. Knight's testimony, and we cited this

2   in our opposition paper, says there was an office visit with

3   Dr. MacFarland where you talked about Pradaxa around this

4   time.

5       And then Ms. Stevens, who is the daughter of Betty

6   Knight, testified about an October 2011 meeting between Dr.

7   MacFarland, Mrs. I think Stevens -- or, no, Mrs. Knight and

8   the plaintiffs to discuss the prescription for Pradaxa.

9       So it's hazy about whether Dr. MacFarland was involved

10  in this or not, but I think that's a jury question.  I think

11  the jury has got to sort out who was really talking to whom

12  and what was disclosed, and they ought to hear all of the

13  evidence about that.

14      Otherwise, if we start taking away evidence, well,

15  then Dr. MacFarland's entire testimony is irrelevant.  I mean,

16  if she's out, then she's got to be out entirely, including

17  about any decisions about whether to monitor, about whether to

18  change -- I mean, we've got to either go one way or the other.

19      I --

20      THE COURT:  I don't know that that follows to me, but

21  let me interrupt you because I think this is critical.

22      MR. LEWIS:  Sure.

23      MR. CHILDERS:  May I --

24      THE COURT:  Is that what the Knights said?

25      MR. CHILDERS:  So what both the children said was we

22

1    went to Dr. MacFarland and got the prescription.  When they

2    were pressed further on page 54, for instance, on Rick

3    Knight's deposition, he was asked:

4          Do you have any independent recollection about this

5    office visit when this office visit took place with Dr.

6    MacFarland?

7          He said, No, I don't.  And he also said, I don't

8    remember her telling me about any risks and benefits.  So did

9    Claudia.  They both said that.

10          It all fits together with the fact that they knew they

11   went to her office and had it prescribed.  None -- they don't

12   remember any conversation --

13          THE COURT:  Are they going to testify?

14          MR. CHILDERS:  Yes, sir.

15          THE COURT:  Okay.

16          MR. CHILDERS:  But they don't remember any

17   conversation actually occurring.  They don't have any

18   recollection of that, and it's because it didn't happen.

19          THE COURT:  Have you all talked to the nurse?  Has the

20   nurse been --

21          MR. CHILDERS:  We tried.  She is out of state.  Dr.

22   MacFarland said she didn't even know how we could get in touch

23   with her.

24          THE COURT:  All right.

25          MR. LEWIS:  But again, from our perspective, this is

1    just a factual issue that the jury has got to figure out.  And

2    the policy and practices of Dr. MacFarland and her office are

3    still relevant for the jury to consider, who is talking to

4    whom and what was communicated and what's more likely than not

5    to have been communicated when memories are hazy and

6    recollections are fuzzy.

7            THE COURT:  Well, you know, honestly it seems to me

8    that I probably can't resolve this.  If the predicate for the

9    testimony from Dr. MacFarland that you want in is that the

10   children said we had a conversation with Dr. MacFarland when

11   she prescribed, then I'm going to let you use it.  But if they

12   testify that, no, it wasn't, then I don't think that you've

13   got an independent basis for using this part of Dr.

14   MacFarland's testimony.

15           If --

16           MR. LEWIS:  Well, we would probably have to impeach

17   them with their deposition testimony.

18           THE COURT:  Impeach them?

19           MR. LEWIS:  Probably.

20           THE COURT:  Oh, sure.  I think you can.

21           MR. LEWIS:  Okay.

22           THE COURT:  Yeah, I'm not --

23           MR. LEWIS:  Okay.

24           THE COURT:  I think that is fair game.

25           MR. LEWIS:  Okay.

24

1          THE COURT:  But --

2          MR. LEWIS:  I'm just concerned that Dr. MacFarland is

3     going to be played before the plaintiffs.

4          MR. CHILDERS:  I was going to say that, Your Honor.

5     That is going to happen.  And so to the extent there is some

6     way for us to resolve it -- I don't want to surprise anybody.

7     We're going to play her testimony before the children testify.

8          MR. LEWIS:  But we could play the depo -- we could

9     independently play the deposition testimony of the plaintiffs.

10    Those are party admissions.  I mean, we have the predicate

11    already.  So they can't -- they may be able to embellish upon

12    the facts, but the admissions are the admissions, which we

13    cited in our paper.  So that's enough of a predicate to allow

14    the MacFarland testimony to be played no matter what they say

15    on the stand.

16          I could play that -- I could play those admissions in

17    my case in chief, and that's a sufficient predicate for the

18    evidence of Dr. MacFarland's testimony even if the plaintiffs

19    get on the stand.

20          I guess what I'm suggesting is, it's not about waiting

21    to see what the plaintiffs are going to testify --

22          THE COURT:  I think you may be right.  So they're the

23    plaintiffs.

24          MR. CHILDERS:  Yes, sir.

25          THE COURT:  They are statements by a party.  If they

1   made statements in a deposition that we met with Dr.

2   MacFarland about this prescription, then I think that that is

3   a sufficient basis for them to use this part of Dr.

4   MacFarland's testimony.

5         MR. CHILDERS:  Understood.

6         THE COURT:  So I am going to deny the objection based

7   upon the representations, as you've agreed upon really, that

8   the plaintiffs themselves, the Knight children, made these

9   statements to the effect that they met with Dr. MacFarland

10   about the prescription.

11         MR. CHILDERS:  Understood, Your Honor.

12         THE COURT:  Okay?

13         MR. CHILDERS:  This is a great segue.

14         The last one --

15         THE COURT:  Yes.

16         MR. CHILDERS:  -- Dr. Gunnalaugsson, there is no

17   question, he never prescribed either coumadin or Pradaxa to

18   Ms. Knight.  And defendants are trying to elicit the same kind

19   of testimony from him.  What would you tell patients?  What do

20   you warn patients about when you meet?  That's not relevant to

21   this case because he unequivocally stated I didn't have any

22   decision-making at all with regard to prescribing Pradaxa or

23   warfarin to this particular patient.

24         And so for the same reasons you just denied it, I

25   think you have to grant this objection.

26

1          THE COURT:  All right.

2          MR. LEWIS:  The testimony that -- if I recall

3    correctly, is about specifically communications with the

4    plaintiffs and Mrs. Knight, not policies and practices.  I

5    think Dr. Gunnalaugsson's testimony is specific about

6    communications with the plaintiffs themselves and Mrs. Knight.

7          THE COURT:  Well, I read through this, the excerpts,

8    you know, the part you all identified, and I don't recall

9    seeing that.

10         I thought -- I think there were three matters --

11         MR. CHILDERS:  Right.

12         THE COURT:  -- to which there were objections.

13         And the first was about his testimony about the risks

14   of Pradaxa if he's prescribing it.  I thought there wasn't any

15   indication there that he would have -- he didn't prescribe

16   Pradaxa.  I didn't think there was any indication that he

17   would have had any reason to have that discussion with the

18   Knights.

19         So, as to that, I didn't see how -- am I missing

20   something?

21         MR. LEWIS:  And my -- I think there is two issues

22   about -- there's no question that there was not an actual

23   prescription by this physician.

24         THE COURT:  Okay.

25         MR. LEWIS:  But that doesn't end the inquiry as to

1    whether there was a communication --

2          THE COURT:  Right.

3          MR. LEWIS:  -- between anyone and the plaintiffs.

4          If the plaintiffs were warned by anyone, a home health

5    care provider or a doctor that didn't prescribe Pradaxa, about

6    the risks of Pradaxa --

7          THE COURT:  Sure.

8          MR. LEWIS:  -- that is still relevant to causation.

9          THE COURT:  I agree.

10         But now we're talking about Dr. --

11         MR. CHILDERS:  Gunnalaugsson.

12         THE COURT:  -- Gunnalaugsson, and he was an

13    interventional cardiologist.

14         And where I understood the first of the plaintiffs'

15    objections, I made notes kind of in quotes that he testified

16    about what he perceived the risks of Pradaxa to be when he's

17    prescribing it.  But that he did not purport that he had such

18    conversation with any of the plaintiffs.

19         MR. LEWIS:  Well, the specific testimony is on page

20    111, 1 through 18.

21         THE COURT:  All right.  Let me get up with you here.

22         111 -- oh, okay.  Wait a minute.

23         MR. LEWIS:  So that is at least what I was referring

24    to.  Because what Dr. Gunnalaugsson is saying is that, because

25    Mrs. Knight was having some trouble understanding based on

1  perceived dementia or whatnot, he was having communications

2  with the son and has a recollection of the son having an

3  understanding about the risks of Pradaxa.

4          MR. CHILDERS:  Your Honor, I was kind of going in

5  reverse order.  I think that's why we are a little confused

6  here --

7          THE COURT:  Okay.  All right.

8          MR. CHILDERS:  -- because it segued I thought from the

9  last argument.

10          THE COURT:  All right.  So --

11          MR. CHILDERS:  We had three different objections.

12          THE COURT:  Yes.  Okay.  I am glad you clarified that.

13          MR. CHILDERS:  I apologize.

14          THE WITNESS:  Well, let's take the one that we've

15  addressed first.  So it does seem to me that his discussion on

16  this page, to which you objected, he does purport that he had

17  discussion with the son and her or her.

18          MR. CHILDERS:  He doesn't actually say that, Your

19  Honor.  And this is -- and just so you understand, Dr.

20  Gunnalaugsson answered lots and lots of questions that were

21  never asked of him.  This happened to be one of them.

22          And he says son was aware of it, and he says why -- he

23  was asked why do you say that?  And he says because we talked

24  about it.  But then he changes and says he was aware of it,

25  and she seemed to understand, too.  I don't know how to grade

1    her dementia basically.

2         And then he says they were fully aware that she had

3    chronic GI bleed, and that this would increase her risk, but

4    he doesn't say he actually discussed that with them.

5         THE COURT:  Well, you know, if you're going to use the

6    deposition, I'm going to deny the objection as to this point.

7         I think --

8         MR. CHILDERS:  Okay.

9         THE COURT:  -- it's close enough that the jury should

10   hear and decide for itself what they think about that.

11        MR. CHILDERS:  Understood.

12        THE COURT:  So that part I'll deny.

13        MR. CHILDERS:  The next part, Your Honor, he's asked

14   if he would utilize a particular coagulation test for a

15   bleeding patient.

16        THE COURT:  Right.

17        MR. CHILDERS:  He didn't treat her for her bleed --

18        THE COURT:  Right.

19        MR. CHILDERS:  -- and so we don't believe that is

20   relevant.

21        THE COURT:  So how does the defense believe this is

22   relevant?

23        MR. LEWIS:  It's really more, Your Honor, beyond

24   whether this physician treated for the bleed.  It's whether

25   monitoring is necessary or not even absent a bleed --

30

1          THE COURT:  Well, but now aren't you spilling over

2     into asking him what should be an expert opinion?  I mean, he

3     is an expert, he's got opinions, but that doesn't make him an

4     expert for the defense to introduce his opinion evidence about

5     matters outside of his treatment.

6          MR. LEWIS:  It's actually more about causation.

7          THE COURT:  Okay.

8          MR. LEWIS:  So this physician was her treater during

9     this time frame.  He was her cardiologist.  And if that

10    physician is saying, hey, this isn't going to be helpful to

11    me, this aPTT test, then that's relevant to causation.

12         Because what the plaintiffs are arguing is, hey, you

13    should have been doing aPTT testing all long, and that would

14    have guided treatment of this particular plaintiff and avoided

15    a bleed event.  And this doctor is saying this isn't -- I

16    wouldn't even do this.

17         THE COURT:  I'm going to grant this objection.  I

18    think this is one of those times where the use of his

19    testimony spills outside of the scope of his treatment in that

20    this was not -- he was not testifying about a decision he made

21    in the course of her treatment.  He's offering opinions about

22    how would he would address certain matters, but I think it's

23    outside of the treatment.  And since it's outside of the

24    treatment, I don't think you get to convert him to an expert

25    on causation or anything else.  It goes beyond his treatment.

31

1    So I'm going to grant that part.

2         And then the last, which I guess is where you were to

3    begin with, where --

4         MR. CHILDERS:  Yes.

5         THE COURT:  -- he testified about the fact that he

6    hadn't prescribed warfarin for two or three years.

7         MR. CHILDERS:  Right.  He never prescribed warfarin to

8    this patient at all.  He didn't prescribe any anticoagulation

9    to Ms. Knight.  So whatever his personal practice was is

10   irrelevant for one, for that purpose.

11        And also he's talking about the last two or three

12   years, which is after Ms. Knight has already died.  That can't

13   possibly be relevant to what happened during her lifetime.

14        THE COURT:  Okay.

15        MR. LEWIS:  Well, again, Your Honor, it's very similar

16   to when the Court was ruling on our summary judgment motion.

17   The Court found that, for instance, Dr. MacFarland's testimony

18   that she would have made some different treatment decisions --

19   again, all speculative because we're talking about alternative

20   scenarios here that didn't actually occur -- Dr. MacFarland

21   would have treated the patient differently with certain

22   information, this is the same principle.

23        What the plaintiffs are arguing here is that Mrs.

24   Knight should have been on warfarin instead of Pradaxa.  And

25   if -- and this is her cardiologist.  This is the guy making

32

1    that call for her, and this guy making the call says, I

2    would't have made that call.  And that's very, very critical

3    to the specific warning cause.  It's not an opinion, it's

4    specific warning causation just similarly to what the Court

5    ruled -- or relied on in the summary judgment motion.

6           THE COURT:  Well, I disagree.

7           You know, I guess this gets to be a close question if

8    you have a doctor who testifies that I considered different

9    things, and here's what I decided.  I think when he testifies

10   that he considered things at the time of the treatment -- for

11   instance, if he had testified, you know, when she was my

12   patient, I knew she was on Pradaxa.  I thought about warfarin,

13   but I wouldn't prescribe -- decided not to prescribe it.  I

14   think that is admissible, I think that is part of his

15   treatment.

16          But I think this goes outside of that because this is

17   just asking him to express an opinion that was not formed at

18   the time of and as part of the treatment.  And I guess maybe

19   that is for better or for worse, maybe hopefully a little

20   clearer articulation by me of where I think we draw the line

21   on what a treating doctor can testify about who is not being

22   converted into a party expert beyond the treatment.

23          MR. LEWIS:  And not to ask the Court for -- my

24   understanding, then, from Your Honor is that it's really

25   because of the time frame that he is talking about, which is

1    two to three years, and not back when he was making real-time

2    decisions?

3              THE COURT:  Yes.

4              MR. LEWIS:  Okay.

5              THE COURT:  Yes, that's part of it.

6              MR. LEWIS:  Understood.

7              THE COURT:  I think what he raised about whether this

8    opinion is even an opinion he held during the time of

9    treatment, I think that's a fair issue.  But, yeah, I think

10   this is not a judgment that he made during the course of and

11   part of the treatment, so I'm going to grant that objection.

12             MR. CHILDERS:  That was our final objection.

13             THE COURT:  So here's what I'd like for you to do,

14   then, after we conclude.

15             I want the parties to get together and go back through

16   these depositions and, based upon my rulings, make sure that

17   you know and agree what's in and what's out so that we don't

18   have a problem later on.

19             And how are you going to -- are these video

20   depositions?

21             MR. CHILDERS:  Yes, sir.

22             THE COURT:  So I assume --

23             MR. CHILDERS:  Gina Veldman back here will be taking

24   care of all that for us.

25             THE COURT:  All right.  And then so how do you

34

1   intend -- do you intend to excerpt those portions that I've

2   sustained and just delete them?

3        MR. CHILDERS:  You would be amazed at what she can do

4   with these video transcripts.

5        THE COURT:  Probably make a witness say anything she

6   wanted them to.

7        MR. CHILDERS:  Unfortunately she can't do that, and we

8   wouldn't ask her to do that.

9        But she is very good at what she does, and we are

10  working with them -- I'm sorry.

11       Well, we don't really need to get into the

12  technicalities of it.

13       THE COURT:  I'll trust --

14       MR. CHILDERS:  We've done this a few times now, and

15  we're all pretty comfortable with how it goes.

16       THE COURT:  Okay.  Very good.

17       All right.  Let's go to the defendant's objections to

18  the plaintiffs'.

19       MR. CHILDERS:  Is it okay if I stay here?

20       THE COURT:  Yes, you may.

21       MR. CHILDERS:  Okay.

22       THE COURT:  I'm going to start by turning to your

23  opponent.  Tell me what you think is relevant and admissible

24  out of this launch video.

25       MR. CHILDERS:  Your Honor, the launch video is

1    basically the company getting together all of their sales reps

2    to encourage them to push this drug on doctors and patients

3    around the country.  And the launch video shows that the

4    entire drive that they at least edited -- this is not edited

5    by me or anybody on my team, this is how we got it from BI --

6    is money.

7        They talk about how much money this is going to make

8    for the company, what a blockbuster drug it's going to be.

9    They asked sales reps, who are agents of the company, what

10   they think.  Everybody who speaks on the video is an agent of

11   the company.  They work for the company.  There's only one

12   person in the entire video who says we're going to help

13   patients.

14       I think that's relevant, Your Honor, because we have

15   to prove by clear and convincing evidence that, in this case,

16   we believe Boehringer put profits over patient safety.  This

17   is clearly evidence of that from the beginning.  This is

18   before the drug was even on the market.

19       They gathered all of their folks together.  They had

20   this big, huge, celebratory meeting.  And when they cut the

21   video to send to us, for whatever reason, these were the most

22   important parts that they left in the video.

23       THE COURT:  Well, since I've bifurcated the punitive

24   claim, why should this be allowed during your liability phase

25   and not --

36

1          MR. CHILDERS:  Well --

2          THE COURT:  -- pushed to the punitive phase if we get

3     to that?

4          MR. CHILDERS:  We have to get there first, and this is

5     evidence of the company putting profits over patient safety.

6     The jury has to check the box first before we get to damages,

7     punitive damages.  This is clear evidence of the company

8     putting profits before patient safety and we believe will

9     allow the jury to see that that box should be checked.

10         When we move on to punitive damages evidence, my

11    understanding, Your Honor, is we're talking about money, just

12    money.  We're not talking about the actual acts.  We have to

13    show the acts to get us there in the first phase of the trial.

14    Otherwise we don't get to phase 2 of the trial, at least that

15    is my understanding of how I've done it in the past.

16         And so this is an admission of the company.  It's

17    their document.  They produced it.  It's all of their people

18    in the video.  And it's made by them.  We believe it's

19    relevant specifically for the issue of whether or not punitive

20    damages should be awarded, and that's why we think it should

21    be admitted.

22         THE COURT:  All right.

23         MR. HAILEY:  So we obviously disagree on the

24    relevance.  We don't believe that this video is remotely

25    relevant to plaintiffs' claims.

37

1          This same video plaintiffs have sought to introduce

2     into evidence in the first two Connecticut Pradaxa trials that

3     have been held to date.  In both of those cases, this video

4     was precluded on a number of grounds, including that it is not

5     relevant.

6               THE COURT:  Is that other trial still going on?

7               MR. CHILDERS:  Yes, sir.

8               THE COURT:  Was it used there?

9               MR. CHILDERS:  No, sir.

10              MR. HAILEY:  And, Your Honor, we've submitted as

11    Exhibit 1 and 2 to our objection brief the Connecticut

12    rulings, but I just want to highlight the language from the

13    first Connecticut court's ruling because I think it really

14    encapsulates our view.  And this is reading from the order.

15         There are no statements made in the video to suggest

16    that any particular act or omission by the defendant that is

17    relevant to this case was driven for financial reasons.  The

18    court finds that the vast majority of the video is irrelevant

19    under Code Section 42, which is the Connecticut equivalent to

20    Federal Rule of Evidence 402.

21              THE COURT:  Well, I've read those decisions.  I'm

22    going to grant the objection.  I don't believe you can use

23    this launch video in your case in chief.  If we get to a

24    punitive stage, I think I would let you use it then.

25              MR. CHILDERS:  Okay.

38

1          THE COURT:  But I think it is largely irrelevant.  And

2     to the extent it has any probative value, it is greatly

3     outweighed by the prejudice.

4          Companies are expected to motivate a sales force to

5     sell their product, and I don't think that the fact that this

6     is -- the focus of this launch video is on the salespeople, I

7     think the jury shouldn't misconstrue, and I think that it is a

8     risk that they might.  So I grant the objection with respect

9     to the launch video.

10          MR. CHILDERS:  Understood, Your Honor.

11          MR. HAILEY:  And, Your Honor, if you wouldn't mind.

12          In terms of punitives, I think BI would maintain its

13     objection that this launch video is not relevant to punitive

14     damages.

15          THE COURT:  If we get to that point, we'll have a

16     chance to take that up again.

17          MR. HAILEY:  Okay.  Thank you.

18          THE COURT:  All right.  Next was Kliewer's testimony

19     about the fact that at the time of her deposition, the company

20     had not submitted any of this putative therapeutic range data,

21     but did so later.

22          Apparently you all worked out some type of a

23     stipulation on this in other cases, is that --

24          MR. CHILDERS:  I did not, Your Honor.  Separate

25     counsel did that.

1          THE COURT:  All right.

2          MR. CHILDERS:  Mr. Moskow was involved in that trial,

3     but he's not the lead counsel either.

4          THE COURT:  Okay.

5          MR. CHILDERS:  That case is still ongoing now.  So --

6     I wasn't involved in that.

7          THE COURT:  Okay.

8          MS. JONES:  And just to confirm that --

9          THE COURT:  Make sure that microphone is on.

10         MS. JONES:  Thank you so much.  And good morning.

11    Phyllis Jones for BI.

12         The history on this, and really the history is part of

13    what motivates our motion on this testimony, is in the first

14    two trials, Ms. Kliewer's testimony was played for the jury,

15    both her testimony from 2014 and then portions of her

16    testimony from 2017.  And what happened in both of those

17    trials in Connecticut is that counsel for plaintiffs then got

18    in front of the jury during closing argument and said BI did

19    not submit this information to the FDA.  Which we know to be

20    incorrect based on, for example, Appendix B to the brief that

21    we submitted to Your Honor.

22         And so we have become concerned not so much about the

23    testimony, but the way that the testimony has been used in the

24    course of the trials to date, to make what is we think

25    admittedly a provocative claim to the jury that the company

40

1    somehow failed to provide important information to the

2    company -- to the FDA regarding the safety of the medicine

3    when we know that not to be supported by the evidence.

4          THE COURT:  Well, can't you remedy this by putting

5    that into evidence in your case?

6          MS. JONES:  Well, certainly we can do that, Your

7    Honor, but we're concerned about arguments like the ones that

8    we've heard in some of the earlier cases that really do not

9    acknowledge that actual fact of the evidence, that the company

10   did in fact submit this information to the FDA.

11         Now, in the third trial in Connecticut, you've rightly

12   picked up on from the briefing that what they did was, right

13   after Ms. Kliewer's testimony was played, the parties had

14   reached a stipulation that was relatively short that

15   essentially laid out the history there.  We think at a

16   minimum, if plaintiffs are permitted to play this testimony,

17   that there needs to be some kind of instruction from the Court

18   consistent with what we submitted as part of our proposed

19   instructions, that makes clear to the jury what the actual

20   history was here.

21         THE COURT:  Well, why don't you submit evidence to the

22   jury in your case about the post-2014 submissions?  And then

23   if they try to make the argument -- I can't stop them from

24   making an argument if it's belied by the evidence.  You can

25   point that out to the jury, and it seems to me that is your

1   remedy here.

2           Your remedy is to submit evidence that shows that

3   while Mrs. Kliewer might have been correct at the time, we did

4   later submit all of these things.

5           MS. JONES:  Well, I guess a couple of responses to

6   that, Your Honor.

7           The first response is that the evidence that would be

8   necessary to address the type of representation that we've

9   heard made in the first two of the Connecticut trials would

10  actually compound the prejudice to the company.  Because the

11  evidence related to the submission of the information brings

12  in a whole set of articles that were published about, again,

13  what we believe was an incorrect claim about the company

14  withholding evidence from the FDA.

15          And so our only remedy to addressing that type of

16  representation is having to bring in evidence that further

17  complicates the prejudice to the company.

18          We certainly think it's within the power of the Court

19  to preclude counsel from making a representation to the jury

20  that we know to be false based on the actual documentary

21  evidence in the case, and that's all we're asking for.

22          MR. CHILDERS:  Your Honor, I disagree.

23          The reason that they're making this motion is because

24  the evidence that they would have to put on shows that they

25  sent the FDA three articles that were published in the British

1    Medical Journal that are scathing about Boehringer Ingelheim.

2    And when they submitted those to the FDA, they submitted them

3    with a press release that says, this is all not true.

4         That is not the same as giving the FDA the information

5    that Ms. Kliewer in 2014, a year after Betty died, said we

6    haven't given that to the FDA.

7         I agree with you.  If they have evidence to show they

8    specifically gave it to the FDA, they should put it on.  We

9    have sworn testimony from their own witness who said I didn't

10   give it to the FDA.

11        THE COURT:  So counsel can argue the evidence.  And if

12   at the end of the day the only evidence by either side about

13   what was submitted is the evidence that they've cited in her

14   2014 deposition, they're entitled to make that argument

15   because that's what the evidence says.

16        If they submit her deposition, which I take it you're

17   going to offer --

18        MR. CHILDERS:  Yes, sir.

19        THE COURT:  -- you've got to respond with evidence.

20   And if that opens other doors that are troublesome or a

21   problem for you, that is the way evidence works out.

22        I don't think I can require them to enter into a

23   stipulation, and I can't preclude them from making arguments

24   based upon the evidence.  If at trial there is evidence from

25   your side of what you submitted, then if he makes the argument

43

1    on behalf of the plaintiffs that there was no submission,

2    you've got evidence, and you can tell the jury he's obviously

3    wrong.  If instead what it sounds like there's a dispute in

4    the evidence and between the parties as to the facts as to the

5    nature of the subsequent disclosure to the FDA, that is for

6    the jury to decide.

7           So I'm going to deny the objection.

8           Next, I guess, are the references to the e-mail that

9    Dr. Connolly sent.  I guess this is the e-mail where he talks

10   about there being perhaps a therapeutic range, 40 to 200 or

11   whatever.  And I take it that there were at least three

12   different witnesses in whose depositions or trial or use at

13   trial that this was discussed.

14          So --

15          MS. JONES:  And, Your Honor, again with the Court's

16   permission, our colleague, Ms. Perez, will argue those issues.

17          THE COURT:  Absolutely.

18          MS. PEREZ:  Good morning, Your Honor.  Jessica Perez

19   for BI.

20          Yes, so this e-mail was written by Dr. Connolly in the

21   context of having received an early draft of the Reilly

22   exposure paper.  And Dr. Connolly responds and appears to at

23   least in this e-mail support the idea that there should be a

24   therapeutic range for Pradaxa.

25          THE COURT:  Now, as I understand it, Connolly was one

44

1    of the people involved in the RE-LY study, but he's not a BI

2    employee or agent at the time that he makes -- sends this

3    e-mail?

4          MS. PEREZ:   That's correct.   He is a professor at

5    McMaster University in Ontario and a practicing cardiologist

6    who was involved in the RE-LY study.

7          And we're objecting to this e-mail and related

8    testimony based on hearsay.   I mean, this e-mail is being

9    presented for the truth of his statement, that there is a

10   therapeutic range for Pradaxa, and that patients should be

11   maintained within that range.   And it should be excluded on

12   that basis.

13         THE COURT:   Okay.

14         MR. CHILDERS:   Your Honor, Dr. Connolly was the

15   principal investigator for the RE-LY trial.   He also is a

16   co-author of the article that this e-mail is talking about.

17   He co-authored it with Dr. Reilly and several other people who

18   work at Boehringer.   His opinion is clearly relevant to the

19   case as to whether or not this should be included in the

20   e-mail.

21         I do believe for purposes of what was happening there,

22   he's an agent of the company.   He is working with them, and he

23   is drafting a paper with the -- with the entire RE-LY group,

24   including the BI employees.   And so I think it's an exception

25   to the -- to hearsay.

1      THE COURT:  From the way you're describing it, I don't

2   think that you have enough for the foundation to attribute

3   this statement by Connolly to be a statement of the party.  So

4   unless you've got something more -- the fact that he was

5   involved in the RE-LY study and that it was in some sense

6   continuing I don't think is enough by itself to make him an

7   agent for BI such that his out-of-court statement would be

8   attributable to them.

9      MR. CHILDERS:  Well, they pay him, Your Honor.  That

10   makes him their agent.  They paid him to do the study and to

11   help write the paper.  That's no different from an employee

12   for this purpose.

13      THE COURT:  Okay.  What about that?

14      MS. PEREZ:  Many, many practicing doctors are involved

15   in clinical trials, some in a major way, and collaborate with

16   employees of pharmaceutical companies on published articles.

17      And so that mere involvement in research activities

18   doesn't make a doctor an agent --

19      THE COURT:  Well, he's going beyond your involvement.

20   He's saying he was paid by BI for the work that included what

21   he discussed in this e-mail.

22      I mean, if that's the case, it seems to me that is --

23      MS. PEREZ:  I don't think that that is in the record,

24   that Dr. Connolly was paid to author the article.

25      THE COURT:  Well, here's what I'll do.  For now, I'll

1    hold this in abeyance.  Find where you have in the record,

2    that is admissible evidence, evidence that converts him from

3    just being a collaborator to being effectively an employed

4    agent for these purposes on behalf of BI.

5         I think the fact that he's in the RE-LY study and all

6    that, that makes him a great expert.  It doesn't convert him

7    to their spokesperson, so to speak.

8         MR. CHILDERS:  Understood, and I will get that for

9    Your Honor.

10        THE COURT:  Okay.  So I'll hold off on that until you

11   can -- obviously whatever you can get to me, show to the

12   defense, and we'll see if we need to have further discussion

13   or not.

14        MR. CHILDERS:  Yes, sir.

15        THE COURT:  Okay?

16        Next, Dr. Eberle.

17        MS. PEREZ:  Yes.

18        The testimony that we're objecting to of Dr. Eberle

19   relates to a 2017 European regulatory document that describes

20   a study that was performed in the European Union to assess the

21   effectiveness of patient and doctor education materials that

22   were distributed in the European Union.

23        THE COURT:  So this study led to some type of alert;

24   is that correct?

25        MS. PEREZ:  The materials were created, and then the

1   study was more of a post-hoc study to determine whether or not

2   those materials helped doctors.

3           THE COURT:  Okay

4           MS. PEREZ:  And we're objecting to this just based on

5   relevance.  This is a European regulatory document.  It

6   studies materials that were only distributed in Europe, which

7   dealt only with the 110- and 150-milligram doses.

8           And perhaps more importantly, these materials weren't

9   even created or studied until after the death of Ms. Knight.

10          MR. CHILDERS:  Your Honor, Mr. Moskow is going to

11   handle this one.

12          THE COURT:  All right.

13          MR. MOSKOW:  Good morning, Your Honor.  Good to see

14   you again.  Neal Moskow for the plaintiffs.

15          Your Honor, let me start by saying that the

16   information in question looks at whether providing specific

17   risk information to both physicians and directly to patients

18   increases the safety of the drug.  And they not only concluded

19   that it did, but before the results were finalized, there was

20   a plan to roll this out in the rest of Europe.

21          The planning for this, as Dr. Eberle testified to in

22   his deposition, started more than five years before his

23   deposition.  So his deposition was taken in 2017.  That puts

24   us at 2012.  So the ideas behind this study predate the bleed.

25          And that's particularly relevant here because in West

48

1    Virginia, the law at the time of this bleed, BI had the duty

2    to warn Ms. Knight directly.

3        THE COURT:  So remind me who Dr. Eberle was.

4        MR. CHILDERS:  Dr. Eberle is a pharmacovigilance

5    safety officer.  In the vernacular of the pharmaceutical

6    industry, it's his responsibility to ensure that the product

7    is safe once it is out in the marketplace.  So he headed up a

8    team of scientists, including physicians, that would survey

9    the literature, review adverse event reports and determine

10   whether or not there were safety issues with the drug that

11   needed further evaluation.

12       THE COURT:  On behalf of BI.

13       MR. CHILDERS:  On behalf of BI.

14       So based on his deposition testimony -- I can provide

15   it to the Court at page 99 -- he indicates that, you know,

16   five years before his deposition, that they had identified

17   these issues, and they were planning the study.

18       And, again, because of the peculiarities of West

19   Virginia law at the time of this bleed, BI had the duty to

20   warn Mrs. Knight directly.  And the issue that this paper or

21   this study demonstrates is, first of all, knowledge of the

22   company that this was an issue; second, feasibility, that they

23   had a way to communicate directly with patients that would

24   improve safety; and, third, that once they got around to doing

25   the work, it proved up that that was a fact.

1         So it goes to the failure to do this, you know, basic

2   investigation in time to save Mrs. Knight.

3         THE COURT:  Okay.

4         MS. PEREZ:  It's just -- it appears that plaintiffs'

5   argument, I guess, boils down to the fact that because the

6   practices in Europe were different from the practices in the

7   U.S., that that somehow makes BI's label inadequate.

8         I mean, the central question in this case is whether

9   the information provided to Ms. Knight provided an adequate

10   warning of the bleed risk.

11         THE COURT:  And to me, I think I agree with plaintiff.

12   This is evidence as to the state of their knowledge at and

13   prior to the time of her event.  So if BI had knowledge,

14   because Dr. Eberle was involved in this process, then it seems

15   to me that is relevant.

16         MS. PEREZ:  The study -- Attorney Moskow described the

17   planning for the study began before her death, but the

18   materials that were developed and tested in Europe were not

19   distributed or studied until after her death.

20         THE COURT:  Well --

21         MS. PEREZ:  And so the knowledge -- it does not seem

22   to prove that BI knew anything at the time that is relevant

23   for this lawsuit.

24         MR. MOSKOW:  I think that the basic statement there,

25   Judge, is that they understood that if they gave more

50

1    knowledge to patients, it would improve the safety of the

2    drug.  And they knew that, that's why they designed the study,

3    and it was so successful that they have rolled it out in the

4    rest of Europe.

5           THE COURT:  Well, if it's relevant to BI's knowledge

6    and feasibility of further warnings at or prior to her death,

7    why not stop there with the evidence and not have further

8    testimony about the ultimate results of a study that didn't

9    take place or at least didn't get completed until well after

10   her death?

11          MR. MOSKOW:  Because, Your Honor, the data showing

12   that warnings matter is part of the plaintiffs' burden here.

13   We have to -- as the Court has identified in the pre-charge or

14   the preliminary charge, that plaintiffs' burden is to show

15   that a better warning would have made a difference.  And so

16   the jury is entitled to hear that when Boehringer gives a

17   better warning, it does make a difference.

18          MS. PEREZ:  This, again, seems to boil down to an

19   argument that because information was provided in the European

20   label that was not provided in the U.S. label, that that

21   somehow makes BI's label inadequate.  And the Court has said,

22   when it denied Boehringer's motion to exclude foreign

23   regulatory evidence, that that was not an appropriate argument

24   for the plaintiffs to make.

25          And in addition, the feasibility of providing warnings

1   is not an issue in this case.  BI does in fact provide

2   warnings to patients, both in the form of the prescribing

3   information for the doctor and the Medication Guide that is

4   included, which goes directly to patients.  But those warnings

5   abide by the regulations here in the U.S. as opposed to the

6   regulations in Europe.

7          THE COURT:  Well, I think what this speaks to in terms

8   of feasibility is the content of the warning, not just

9   whether -- not some warnings would be effective.

10          I'm going to deny the objection.  I would certainly

11  entertain a limiting instruction, if you want to offer one at

12  the time.  I do think this is evidence which is admissible as

13  going to BI's knowledge at and prior to the time of her death

14  and to feasibility of the content of the warning.

15          I think if you believe that the jury might somehow

16  misconstrue this, I would certainly give a limiting

17  instruction.

18          Since you've mentioned it, I'll reaffirm my ruling

19  that I do not believe that plaintiffs can use the foreign

20  regulatory approval or process as evidence here, and I think

21  this is outside of that.  So I deny that objection.

22          Then last is Dr. Corsico.  Explain this one to me.

23          MS. PEREZ:  Yes.

24          Your Honor, the testimony that plaintiffs have

25  designated from Dr. Corsico is just a few lines that is pulled

52

1    out of a larger series of questions dealing with a different

2    plaintiff who was the subject of a different lawsuit.

3         THE COURT:  And who is Dr. Corsico?  Remind me.

4         MR. CHILDERS:  He is a BI employee.  He was a

5    cardiologist who worked on the drug.

6         THE COURT:  Right.

7         MS. PEREZ:  The portion of the deposition involved the

8    questioner asking Dr. Corsico to assume facts about a patient

9    whose records he had not previously seen and to answer

10   questions based on those assumed facts.

11        THE COURT:  And this was some male patient who had, I

12   guess it was described as a similar cascade of events that --

13        MS. PEREZ:  Yes.

14        THE COURT:  I don't know who came up with that phrase,

15   but basically testimony from Dr. Corsico that a different

16   patient had sort of a course similar to the course that

17   plaintiff believes occurred with respect to Ms. Knight

18   generally.

19        MS. PEREZ:  Generally, but there are some key

20   differences.

21        THE COURT:  Okay.

22        MS. PEREZ:  So the way this question proceeded, the

23   questioner asked Dr. Corsico if he could agree that this

24   person died from this series of events, and he explained that

25   he could not give a specific medical opinion on the patient

1      not having seen the records.

2              And in that context, the questioner asked whether it

3      was possible for a series of or cascade of events precipitated

4      by a GI bleed to lead to someone's death, and Dr. Corsico

5      agreed to that.

6              But the context in which he answered that question is

7      very different from the context we're dealing with in this

8      case.  The facts that were described to Dr. Corsico involved a

9      patient who had undergone major surgery to have part of his

10     colon removed to treat his GI bleed, who was never discharged

11     home, and who died, you know, within a month.  That's very

12     different.

13             The meaning of the words cascade or series of events

14     are very different than this case, in which we are dealing

15     with a patient who never underwent major surgery for her GI

16     bleed, was discharged home, and died more than three months

17     after the cessation.

18             THE COURT:  Okay.

19             MR. CHILDERS:  Your Honor, I would agree with Ms.

20     Perez if the question asked do you believe that the series or

21     cascade of events could have caused Mr. Higgins' death.

22     That's not what he was asked.  He was asked a very general

23     question generally, and I'll read the entire question to you.

24             Okay.  Well, do you understand that there can be a

25     series or a cascade of events that can ultimately lead to

54

1    one's demise that may be precipitated by a gastrointestinal

2    bleed, right?

3              And he answers:  Yes, sir.

4              THE COURT:  All right.  I'm going to sustain the

5    objection.  I think in this instance, it is much too vague and

6    presents what I think might be a very confusing scenario to

7    the jury.

8              I don't think there is enough in this question to make

9    this sufficiently similar to the pattern that you've claimed

10   with regard to Ms. Knight to make this relevant evidence.  And

11   if it's even close, I think it's much more likely to result in

12   confusion.  So I'm going to sustain or grant that objection.

13             All right.  Does that take care of -- that's all I had

14   on my list for these objections to depositions.

15             MS. JONES:  I think that's all we had, Your Honor.

16             THE COURT:  Okay.  Are there any other contested

17   issues that the parties are aware of before we -- motions or

18   evidence, matters or things like that, exhibits?

19             MS. JONES:  I don't think so, Your Honor.

20             THE COURT:  Okay.  Have you had a chance to look at

21   the proposed voir dire and preliminary instructions?

22             MS. JONES:  We have.

23             MR. MOSKOW:  Yes.

24             THE COURT:  Before we get into it, do you have much to

25   discuss with regard to either of these?

55

1          MR. MOSKOW:  Your Honor, on the plaintiffs' side, we

2    have two issues with the proposed charge and three with voir

3    dire or visa versa.

4          THE COURT:  Okay.  And what about you folks?

5          MS. JONES:  We have some issues, Your Honor.

6          THE COURT:  All right.  Then we're going to take a

7    brief recess.  I've got to get my copies of these documents

8    anyway.

9          MS. JONES:  Thank you.

10          THE COURT:  We'll take a 10-minute recess.

11      (Recess taken from 11:03 to 11:15 a.m.)

12          THE COURT:  All right.  Let's start with the voir

13    dire, and I'll listen to the plaintiffs first.

14          MR. MOSKOW:  Thank you, Your Honor.  Neal Moskow for

15    the plaintiffs.

16          Your Honor, with regard to voir dire -- and I can

17    submit these in writing.  I just wasn't sure what Your Honor's

18    preference was.

19          But specifically with regard to the voir dire, Section

20    B1a, which identifies the lawyers --

21          THE COURT:  Okay.

22          MR. MOSKOW:  -- we would propose, based on the

23    conversation we had off the record, to excise --

24          THE COURT:  Yeah, we'll take Harry's name out of it.

25          MR. MOSKOW:  Thank you, Your Honor.

56

1          We would also seek to excise the two attorneys from

2     the Salim Beasley office who are no longer actively involved

3     in the case.  So that would be Lisa Causey and Robert Salim.

4          THE COURT:  Okay.

5          MR. MOSKOW:  Your Honor, the only other issue that

6     we'd like to raise with regard to the voir dire has to do with

7     Section E8.  And the question reads:  Are you willing to judge

8     witnesses who work for a pharmaceutical company in the same

9     way that you would judge any other witness?

10         Our position is, Your Honor, that singles out a

11    specific witness and should not be asked.  If the Court is

12    inclined to ask such a question, we would ask for a mirror

13    image charge or question to the effect of, are you willing to

14    judge the witnesses who have sued a pharmaceutical company in

15    the same way you would judge any other witnesses?

16         THE COURT:  Okay.  What's the defense say on those two

17    possibilities?

18         MS. JONES:  We discussed this over the weekend.  I

19    apologize.

20         We've discussed this over the weekend.  We have no

21    objection to that addition if the Court is okay with it.

22         THE COURT:  All right.  So your position would be to

23    give the corresponding question?

24         MS. JONES:  Yes, Your Honor.

25         THE COURT:  And that satisfies you?

57

```
 1            MR. MOSKOW:  It does, Your Honor.

 2            THE COURT:  All right.  We will add that question,

 3     then, as No. 9 and then renumber the remaining --

 4            MR. MOSKOW:  Those are all the issues the plaintiffs

 5     have, Your Honor.  Thank you.

 6            THE COURT:  All right.  Let's hear from the defendant.

 7            MS. JONES:  Your Honor, also fairly limited

 8     suggestions on the voir dire.

 9            As to the listing of defense counsel in section Bc, we

10     wanted to just cut some of the folks from the list.

11            And, of course, we can submit this --

12            THE COURT:  Yeah, why don't you do that.

13            MS. JONES:  -- if that would be helpful.

14            THE COURT:  Give them to Blake, and he'll take care of

15     it.

16            MS. JONES:  Okay.  We'll do that.  Should I go through

17     the list now?

18            THE COURT:  Do you have a corporate representative

19     that you have decided upon?

20            MS. JONES:  We don't -- we will not have anyone

21     sitting at counsel table.

22            THE COURT:  Okay.

23            MS. JONES:  Ms. Danielle *Devine will be in the

24     audience, and I will probably introduce her, but she won't be

25     sitting at counsel table.
```

58

1          THE COURT:  All right.

2          MS. JONES:  So I suspect that could probably come out.

3          THE COURT:  We will just take that out, then, if

4    you're not going to have anybody at the table.

5          Okay.

6          MS. JONES:  Your Honor, did you want me to read

7    through the lawyers who should come out of the list or just --

8          THE COURT:  Just give that to Blake when we are

9    finished.

10         MS. JONES:  Okay.  The only addition that we would

11   suggest to the substantive questions would be in Section D.

12   We had proposed to plaintiffs adding a question about Plavix:

13         Have you, a family member or a close personal friend

14   ever been treated with the drug Plavix?  If so, who?  What was

15   the reason for the prescription?  Please describe the person's

16   experience with the medication and current health condition.

17         THE COURT:  And why do we need to add --

18         MS. JONES:  Because Plavix was also a medicine that

19   Mrs. Knight was on at a certain point during her life and is a

20   medicine that carries a risk of bleeding as well.

21         THE COURT:  Okay.  What's plaintiffs say to that?

22         MR. MOSKOW:  We have no objection to adding that, Your

23   Honor.

24         THE COURT:  All right.  We'll add, then, the

25   corresponding question about Plavix.

1          MS. JONES:  Okay.  And we can send that as well, Your

2     Honor.

3          THE COURT:  All right.

4          MS. JONES:  Those were the only issues that we had on

5     the voir dire.

6          THE COURT:  Okay.  Then we'll make those changes.

7          Let me comment.  You've got the questionnaire, the

8     supplemental questionnaire that the Court sent out.  What I

9     propose we probably have to do, as I've included those

10    questions on the voir dire, is to ask those questions again

11    orally here in the courtroom.

12         We know a number of people have responses.  Hopefully

13    they'll indicate that, you know, if somebody has -- I don't

14    have the list of all of these jurors, and I haven't gone

15    through them like I suppose you have, so I suspect I'll ask

16    the question to the panel.  Anybody who says yes, I'm going to

17    ask is it on your supplemental questionnaire?  If it is, I'll

18    have them sit down at that point.  Those who haven't indicated

19    it on the questionnaire, I'll ask just enough to get specific.

20         But then with respect to these questions, do you feel

21    that we need to conduct individual voir dire on some of these

22    people or --

23         MR. MOSKOW:  It may --

24         THE COURT:  -- all of them or --

25         MR. MOSKOW:  Your Honor, I believe it may be

60

1    appropriate.  We believe it may be appropriate on individual

2    cases to inquire perhaps either at side bar or outside the

3    presence of the other jurors.

4              MS. JONES:  We agree with that, Your Honor.

5              THE COURT:  So here's what we'll do.

6              As I've indicated, we have the questionnaires.  So

7    whether it's somebody with new information or somebody with a

8    questionnaire response, we'll just know who they are.  And

9    then, once I've gone through all of the questions, we'll start

10   with Juror No. 1 -- I think I may have told you this has been

11   my practice for the last few years.

12             We will just start with Juror No. 1 in the conference

13   room, and I'll find out what inquiry you want to make of that

14   juror, and we'll bring them in and do it.  Then we will go to

15   No. 2, 3, 4, 5, just down the line, and that will include

16   follow-up questions about any of the matters identified in the

17   jury questionnaire.

18             Okay?

19             MR. MOSKOW:  Thank you, Your Honor.

20             THE COURT:  All right.  Then the preliminary

21   instructions, start with plaintiffs.

22             MR. MOSKOW:  Thank you, Your Honor.

23             I think we have three -- no, it looks like we have two

24   on this issue as well -- or, no, three on this issue.  So let

25   me start with paragraph A5a.

61

1          We would just ask for two changes in this paragraph.

2     First, plaintiffs make, not makes.

3          THE COURT:  Okay.

4          MR. MOSKOW:  And in the second sentence, we would seek

5     to substitute the word need for must.  So it will read, you

6     need not automatically reach, as opposed to you must not.

7          THE COURT:  All right.  I'll do that.

8          MR. MOSKOW:  Thank you, Your Honor.

9          With regard to the section on compliance with safety

10    standards, that is I believe on page 6 of your --

11         THE COURT:  Okay.

12         MR. MOSKOW:  Let me just -- just give me one second,

13    Your Honor.  I'm sorry.

14         THE COURT:  Page 8 of mine, the section compliance

15    with safety standards?

16         MR. MOSKOW:  Yes, Your Honor.

17         THE COURT:  All right.

18         MR. MOSKOW:  So the plaintiffs' concern is essentially

19    with the last sentence, which repeats and restates what is

20    part of the pattern charge, but does so in a way that we think

21    is a statement beyond that which the law provides.

22         So we would either seek a striking of the last

23    sentence, or it be edited to read as follows:  While

24    compliance with appropriate regulations is competent evidence

25    that BI exercised due care in the development and marketing of

62

1   Pradaxa, it is not conclusive on that issue, and you should

2   consider all of the evidence before reaching your conclusion.

3           MS. JONES:  Your Honor, we are satisfied with the

4   Court's instruction as written on compliance with safety

5   standards.  That final sentence is drawn verbatim from the

6   J.C. by and through Michelle C. versus Pfizer case, which is

7   240 West Virginia 571.

8           Item 3 in the syllabus by the court reads:  Compliance

9   with the appropriate regulations is competent evidence of due

10  care.  That is line for line what the law actually provides

11  for, so we don't think a qualification or adjustment is

12  necessary.

13          THE COURT:  All right.  I'm going to leave it as it is

14  for now.  We'll make note of that.  I might and probably will

15  revisit that when we get to final instructions.

16          MR. MOSKOW:  Thank you, Your Honor.

17          THE COURT:  All right.  Is that it?

18          MR. MOSKOW:  No, we have one last change, Your

19  Honor --

20          THE COURT:  Okay.

21          MR. MOSKOW:  -- or request, I should say.

22          This regards to conduct as jurors, No. 6 on page 9.

23          THE COURT:  Okay.

24          MR. MOSKOW:  At the risk of incurring the Court's

25  wrath, because it's clear that you have a desire that the jury

63

1   not take notes, the plaintiffs believe, given the substance

2   matter that is going to be discussed and the length of the

3   trial, it would be appropriate for the jurors to be able to

4   take notes, at least during the evidence portion of the case

5   if not during opening and closing.

6           THE COURT:  All right.  What do you say to that?

7           MS. JONES:  We agree with that, Your Honor.

8           THE COURT:  All right.  This is just the standard

9   language.

10          I'll tell you that I generally don't like to have the

11  jurors try to take notes, but I think this trial falls within

12  the exception because of the length and nature of it.  So what

13  I will do is rewrite this and make perhaps at least two or

14  three points.

15          One will be that I will allow any juror who wants to

16  take notes to do so.  I will say don't feel obligated to take

17  notes.  It's a question of whether it is your preference and

18  makes it easier for you to follow everything.  And then some

19  form of warning to the effect that your notes should be just

20  for you, and other jurors shouldn't rely upon your notes,

21  something to that effect.

22          So we'll change the language a little bit.  I'll try

23  to make sure you see that -- I will make sure you see that

24  before we do it in the morning.  But with that, we'll let

25  jurors take notes if they so desire.

64

1      And the simplest way for us to do that is we will just

2 get a bunch of legal pads and pens and make them available to

3 the jurors, and we'll see what the jurors do with them.

4      I can't remember if you all talked about doing -- you

5 talked about doing final exhibit notebooks at the conclusion,

6 but you don't intend to do notebooks during the trial; is that

7 right?

8      MR. MOSKOW:  Your Honor, what we'll do is we'll

9 publish exhibits as they're entered into evidence.  I can

10 speak for the live witnesses that the plaintiffs will put on.

11 We will actually have notebooks for the witness, the Court and

12 opposing counsel so that there isn't a lot of running around

13 the courtroom with paper exhibits, but they will not go to the

14 jury.

15      And what has seemed to work for the parties so far is

16 that, you know, before closing argument, those agreed upon,

17 the final list of exhibits, those are put numerically in order

18 into binders, and those are available for the Court and the

19 jury.

20      THE COURT:  All right.  Very good.

21      All right.  That's all of the objections, then --

22      MR. MOSKOW:  It is, Your Honor.  Thank you for your

23 consideration.

24      THE COURT:  All right.  Let's start with your

25 objections.

1          MS. JONES:  Thank you, Your Honor.  I guess we -- and

2     we did raise this with plaintiffs' counsel over the course of

3     the weekend.

4          We had a concern, and I suppose a more direct way of

5     saying it would be we have an objection to the level of detail

6     that is currently included in the instructions in terms of

7     laying out all of the elements of the claims for each of the

8     claims that exist.  And I understand that this may well be the

9     Court's practice, but if I may, I'll just kind of explain what

10    our concerns are in this particular case with that approach.

11         The first is we expect that we will be making a motion

12    at the close of the plaintiffs' case for a directed verdict,

13    and we have some concerns about having a preliminary

14    instruction to the jury that goes through in a fair amount of

15    detail the elements for each of the claims when there is a

16    possibility -- and obviously we can't predict this, but -- a

17    possibility that all of those claims will not survive a motion

18    at the close of plaintiffs' case.  That's one.

19         The second concern is really that some of the elements

20    that are laid out we think probably would be better explained

21    to the jury once the evidence has actually come in.  And the

22    best example that I can point to is in the warranty claims,

23    there are certain instructions related to what the warranty or

24    the representation was that was made.  I don't know that we

25    have a clear sense at the front end of exactly what the

1    evidence will be on that.  I think as the instructions are

2    currently written, it suggests that the company made a

3    representation about the medicine being safe, which in a

4    prescription medicine case, it's a little bit in a posit just

5    because of the nature of prescription medicines.

6         So that's just a threshold, more of a global concern

7    that we have about the instructions as they're written.

8         What we had suggested to plaintiffs' counsel over the

9    weekend was a possible general statement of the case.  We

10   certainly recognize the need to give the jury some sense of

11   what the facts will be.  We certainly have no objection even

12   to laying out in a general way what the claims are that exist

13   at this point in the case, but we have some concerns about the

14   level of detail at which they are outlined in the

15   instructions.

16        To the extent that the Court is inclined to proceed on

17   this basis, then we have some more granular issues that we

18   wanted to raise, but I wanted to put that issue in front of

19   the Court.

20        THE COURT:  Well, a fair matter for discussion.  What

21   is plaintiffs' response to that?

22        MR. MOSKOW:  So, Your Honor, I think the way you

23   stated that was absolutely correct, it was a fair matter for

24   discussion.  And we said, when they brought it up, why don't

25   you put in writing what you're thinking.  We looked at it, and

1    we looked at what you had done, and I think maybe we came to

2    the same conclusion that the Court has.

3         That given the nature of this trial, given the amount

4    of information that is going to be provided to the jury, that

5    giving them a road map as to why this information is relevant

6    or why they should be paying attention to particular things

7    will be helpful.  And I think that's particularly true given

8    the number of claims here, that they have some understanding

9    of exactly what they're here for.

10        THE COURT:  Well, I struggled with this.

11        I always tell lawyers that I prefer that the

12   preliminary instruction be brief and just provide the basic

13   context of everything for the jury.  But when you start

14   looking at a case like this, the nature and number of the

15   claims, unless plaintiff is willing to agree to either delete

16   the references to each of the different claims or summarize

17   them in some different way, I think I have to state --

18   identify each claim and the elements of that claim.  And if

19   there are things we can take out, excise to reduce this, that

20   would be great.

21        I'm really worried that this is just going to go right

22   over top of the jury, but I don't know that there is any

23   alternative at this point unless the parties come to some type

24   of agreement.

25        MR. MOSKOW:  Your Honor, and maybe this would have

68

1   been helpful for me to say when I was standing up originally.

2   If I had turned the microphone on, that might have been

3   helpful as well.

4        But we anticipate that the first several witnesses

5   will be by videotape, so it will be, we think, particularly

6   helpful in that context for the jury to hear what is going to

7   come and then see the video.

8        THE COURT:  Yeah.

9        Well, in any event, I think I'm going to have to deny

10  your general objection.  I think that the Court has to

11  instruct, even in preliminary instructions, as to each of the

12  claims, and so I don't see any shortcut to that other than if

13  somehow the parties agree.  So I guess we're going to have to

14  get into the detail somewhat.

15       MS. JONES:  Okay.  Understood, Your Honor.

16       We just wanted to make sure we noted that --

17       THE COURT:  Sure.

18       MS. JONES:  -- for purposes of the record.

19       How would you like us to proceed?  Because we've sent

20  some red-line changes to plaintiffs' counsel.  I'm happy to

21  walk through those.  They're not incredibly detailed, but

22  there are several.

23       Would you like me to just go through these or submit

24  them --

25       THE COURT:  I guess, first --

69

1          MS. JONES:  -- for the docket?

2          THE COURT:  -- I'd like to see the extent to which

3    there is agreement.

4          If the plaintiffs disagree with your recommended

5    changes, then we'll just have to go through them page by page

6    or section by section, which is fine with me.

7          MS. JONES:  Do you all have a copy of what we sent

8    yesterday?

9          MR. MOSKOW:  I have it, Your Honor.

10          Your Honor, plaintiffs have a general objection to the

11   changes.  We might be able to wordsmith them as we go through

12   them with the Court, but --

13          THE COURT:  All right.

14          MR. MOSKOW:  -- there are a number of things that we

15   just don't think --

16          THE COURT:  Then we'll just have to go through them.

17   And as far as I'm concerned, you know, just start with the

18   first page, and we'll --

19          MS. JONES:  Okay.

20          THE COURT:  -- see where that leads us.

21          MS. JONES:  That sounds good.

22          Okay.  The first section, A, General Instructions, we

23   have no issues there.

24          Section B, obviously subject to our objection earlier,

25   we have no issue with that brief little introduction.

70

1          As to the section on plaintiffs' causes of action --

2          MR. MOSKOW:  Excuse me.

3          MS. JONES:  Yes?

4          MR. MOSKOW:  Would it be helpful to give the Court a

5    copy of it, and then -- we're okay if you want to provide --

6          THE COURT:  If you've got a copy --

7          MS. JONES:  I have a copy of the red line, if that

8    would be helpful to Your Honor.

9          THE COURT:  Do you actually have two copies?

10          MS. JONES:  Yes, I do.

11          THE COURT:  Give one to Blake.

12          MS. JONES:  May I approach, Your Honor?

13          THE COURT:  Yes, you may.

14          THE CLERK:  Thanks.

15       (Counsel conferring.)

16          MS. JONES:  So I think we're on page 3, Your Honor,

17    where we didn't have any changes as you can see.

18          THE COURT:  Okay.

19          MS. JONES:  On page 4, the first substantive change is

20    in the third element regarding proximate cause, where it reads

21    that Pradaxa's defective warnings were a proximate cause of

22    Betty Knight's injury.

23          We have proposed that it also include the clause,

24    including her death.  Given the claims in the case, that would

25    be consistent with what appears on page 6.

1      THE COURT:  It makes sense to me, where it's a

2  wrongful death claim as well as an injury claim.

3      MR. MOSKOW:  Our concern, Your Honor, is that it

4  appears in this case to be all inclusive as opposed to an

5  either/or, which is consistent with the rest of -- that's

6  where I was saying this is the type of thing we could

7  wordsmith --

8      THE COURT:  Well, I mean, it says the warnings were a

9  proximate cause of injury, including death, so I'm going to

10  add the language that they are requesting.

11      MR. MOSKOW:  That's fine, Your Honor.

12      THE COURT:  Okay.

13      MS. JONES:  Your Honor, that would address our next

14  edit, which is at the bottom --

15      THE COURT:  I think it's the same, then.

16      MS. JONES:  Yes.

17      On page 5, you'll see in our red line that we

18  essentially outlined in a little more detail some of the

19  elements that we believe are required to be proved in a

20  failure to warn case under the causation prong.

21      I'm not sure if plaintiffs have specific objections to

22  these that we should talk about or -- or if the Court has a

23  reaction.

24      THE COURT:  Well, what does plaintiffs say about this?

25      MR. MOSKOW:  A couple of things.

1          First of all, Your Honor, this goes down that slippery

2     slope that we just started.  So it takes out the word injury

3     altogether, and now it's just talking about her death, so we

4     have a concern about that.

5          Second of all, and maybe I'm overstating this, but I

6     think part of what the Court was trying to do here was to

7     restate complicated legal principles in plain language to

8     people who are literally learning about this for the first

9     time.  And I think the use of the language, you know, the

10    warning would have made a difference is essentially what we

11    need to prove in terms of causation here.

12         It may be appropriate at the end of the case to

13    provide more detail as to that issue, but what we're trying to

14    do here is get the jury in place.

15         THE COURT:  I agree with the plaintiffs.  I'm going to

16    deny your request with regard to these sections.

17         I guess the way you've divided these up, you've got a

18    vertical line on the side that kind of separates --

19         MS. JONES:  Yeah.

20         THE COURT:  -- the objections.

21         MS. JONES:  The vertical line on the side I think just

22    indicates where there's a change.

23         THE COURT:  Well, in any event, I do think that the

24    Court's original language is sufficient for preliminary

25    instruction.

1          And then just as an incidental note, in that last

2    sentence, it would be redundant to include the including her

3    death addition there.  Because if I did your language, it

4    would say if Pradaxa didn't cause death, or if a warning would

5    have prevented injuries, including her death -- well, maybe

6    it's not the same.

7          But, in either event --

8          MS. JONES:  So just a question, Your Honor?

9          THE COURT:  All right.  Here's what I'll do just to

10   make it simple.

11         MS. JONES:  Okay.

12         THE COURT:  I will add the including her death

13   language --

14         MS. JONES:  Your original instruction --

15         THE COURT:  -- to be consistent with the evidence, but

16   deny the balance.

17         MS. JONES:  And just so I say it to be clear, Your

18   Honor, we have sufficiently preserved our objections for

19   purposes of arguing instructions at the close of the evidence,

20   I assume?

21         THE COURT:  Absolutely.

22         MS. JONES:  Okay.  Thank you, Your Honor.

23         THE COURT:  Okay.

24         MS. JONES:  I think that takes us to page 6 and the

25   warranty instruction, and this was the point that I mentioned

74

1    earlier.

2          You can see we have proposed to eliminate the phrase

3    represented that Betty Knight could safely use Pradaxa, and

4    proposed to replace that with made a statement of fact about

5    Pradaxa.  Excuse that extra A in the word Pradaxa there.

6          And we made a corresponding change in the second

7    element of that claim as well as including the including her

8    death clause at the end of the fifth element, which carries

9    over to page 7.

10          MR. MOSKOW:  Your Honor, we like the way it was

11    written.  We don't have a huge objection to these changes, but

12    we think as written it was appropriate.

13          MS. JONES:  And our only view, Your Honor, was that it

14    would probably be better to state that more generically at

15    this stage in terms of what the alleged representation was.

16    And when we get to the closing instructions, then maybe it

17    would be an appropriate time to give further detail on that

18    point.

19          THE COURT:  Well, I do think these are all subject to

20    being revisited.  And as long as they're accurate, even though

21    more general, then the final instructions are likely to be --

22    I'm satisfied with them.

23          So I'm going to deny the first request -- or first

24    objection you have under the express warranty matters.  But

25    then I'll add the including her death language on the next

1    page to be consistent.  And likewise in the implied warranty,

2    No. 5.

3              MS. JONES:  Thank you, Your Honor.

4              MR. MOSKOW:  Thank you, Your Honor.

5              MS. JONES:  The only other issue we had on implied

6    warranty was with respect to the third element that is

7    described here concerning promises or affirmations of fact.

8    And I think the original phrasing was made on the container

9    label or the Medication Guide.

10             We weren't clear on what exactly container was a

11   reference to, and I'm not sure, as a legal matter, that BI is

12   responsible for --

13             MR. MOSKOW:  We have no issue with that, and we'll

14   note our objection for the record, but understand that

15   including death will be included in paragraph 5.

16             THE COURT:  All right.  I'll adopt the change proposed

17   by the defendant.

18             MS. JONES:  Okay.  Thank you, Your Honor.

19             Your Honor, subject to obviously our earlier objection

20   on the detail point, those are all the issues that we have

21   with respect to the preliminary instructions.

22             THE COURT:  All right.

23             MS. JONES:  Thank you for hearing us on that.

24             THE COURT:  And then on the -- and we'll alter the

25   discussion about note-taking.

1          MS. JONES:  Yes, Your Honor.

2          THE COURT:  All right.  So does that resolve all of

3    either side's objections to voir dire or preliminary

4    instructions?

5          MR. MOSKOW:  For the plaintiff, it does, Your Honor.

6    Thank you.

7          MS. JONES:  Also for the defense.  Thank you, Your

8    Honor.

9          THE COURT:  All right.  The next note I had on my list

10   was any other matters under the joint proposed amended

11   integrated pretrial order.  Is there anything else that we

12   need TO take up from that?

13         MS. JONES:  I don't think so, Your Honor.  I think we

14   have agreement that we will have an hour per side for

15   openings.  I recall you saying you wanted us to try to achieve

16   agreement on that, and I believe that we have.

17         THE COURT:  All right.  And then I assume each of you

18   are going to use some type of presentation.  So have you been

19   able to vet your opponent's presentations, whatever you're

20   going to use, whether it's a power point or actual exhibits or

21   whatever?

22         MS. JONES:  We have a schedule in place as part of the

23   PTO where we will exchange slide very early in the morning,

24   and we'll obviously talk about any issues that we have.  If

25   there is anything that needs the Court's attention, we'll

77

1    bring that to your attention.

2          THE COURT:  All right.  So at this point, there are no

3    other issues that the parties have identified that the Court

4    need address today?

5          MR. MOSKOW:  May I have one moment, Your Honor?

6          THE COURT:  Yes.

7          MR. CHILDERS:  Your Honor, per your instruction, I

8    went and found some information about Dr. Connolly that I'm

9    happy to share with Your Honor.

10         THE COURT:  Great.

11         MR. CHILDERS:  First is the paper itself, once it was

12   published, that we -- may I approach, Your Honor?

13         THE COURT:  You may.

14         MR. CHILDERS:  Your Honor, this is the paper itself.

15         It shows that Dr. Connolly received -- is a

16   consultant -- received consulting fees and other honoraria

17   from Boehringer.

18         There is additional information in the deposition of

19   Jeffrey Friedman where he was asked specifically how much did

20   Dr. Connolly and the rest of his group, which is the PHRI, is

21   what they call them, get paid to do the work that they did.

22   And it was -- the answer was, it's probably, I would guess, in

23   excess of 50 million dollars.

24         So I think we've clearly established he got paid a lot

25   of money to do what he was doing by this company and,

1    therefore, I think he is an agent of the company for purposes

2    of what we seek to do.

3            MS. JONES:  Your Honor, may I respond to that briefly?

4            THE COURT:  Yes.

5            MS. JONES:  So this paper is the exposure response

6    paper that you've obviously heard quite a lot about.  And it

7    is an entirely mundane thing that doctors, like Dr. Connolly,

8    disclose when they are authors to this type of paper, I have a

9    relationship with the company, I've been paid by the company

10   at certain points.  This is an entirely routine, entirely

11   proper disclosure.

12           If every time an outside scientist made a disclosure

13   like that, that person became an agent of the company for

14   purposes of the hearsay rules, it would blow open the

15   exception to the rule for party admissions.

16           The fact that Dr. Connolly may have received grants

17   from the company and may have disclosed that in the

18   appropriate course, as he was required to do by the journal,

19   certainly does not turn him into an agent.  And the fact he

20   works for an institution that was part of a large clinical

21   trial, which happens all the time, does not turn him into an

22   agent of the company.  What they're proposing would completely

23   eliminate the boundaries on the party admission rules.

24           THE COURT:  Okay.  You want to reply?

25           MR. CHILDERS:  Your Honor, he got paid fifty -- his

1  group, including him, got paid 50 million dollars to run this

2  study for the company.  He became an agent of theirs and then

3  wrote this paper along with them, with their employees and the

4  other folks at his institute.  They got the 50 million

5  dollars.  I think that satisfies the issue of whether or not

6  he was an agent for this purpose.

7         THE COURT:  Well, I have to say looking at this, to me

8  it's a little more ambiguous about whether he was being paid

9  by BI for this work, and I'm not sure that the part that

10 you've highlighted convinces me that that is the case.

11        It certainly would be appropriate for any author in a

12 peer-reviewed article to identify any past as well as current

13 connection with someone whose product is under the analysis.

14        What I'm interested in, and I don't know if you can

15 answer this, but that bottom footnote, if that's what it is,

16 starts off with the sentence from departments of clinical

17 development, and then there is an asterisk.

18        And so does that asterisk refer to --

19        MS. JONES:  It reflects --

20        THE COURT:  -- connect the authors listed above to

21 that asterisk?

22        MS. JONES:  Yeah, so all these little figures here

23 match up with the ones at the bottom.  So that asterisk at the

24 bottom matches up with Paul Reilly's name as well as Susan

25 Wong's name.  You'll see that later in the list of authors.

1          And then if you look at Dr. Connolly, he has a

2     different indicator for his affiliation with Population Health

3     Research Institute, McMaster University.

4          So those little symbols just indicate the affiliations

5     of the authors.

6          THE COURT:  Yeah, I don't think this is enough to

7     convince me that Dr. Connolly was an agent of BI at the time

8     he made these statements sufficiently that the statements

9     could be attributed to BI.

10          So I've forgotten what the context was.

11          MS. JONES:  I think that was our motion, Your Honor.

12          THE COURT:  I think I was granting the defendant's

13     objection.

14          Do you want to put this in the record as part of

15     this --

16          MR. CHILDERS:  Sure, Your Honor.  And I would also

17     just point out -- we've been trying to pull these up, and we

18     haven't gotten them all.

19          Dr. Connolly also has specific service agreement

20     contracts with BI during this entire time period, and I'm

21     happy to provide those to Your Honor tomorrow.  I just can't

22     print them out here in the courthouse.

23          This guy is working for the company.  Whether he's at

24     another institute doing it or not, he's working for the

25     company.

1      THE COURT:  Well, if you've got something that you

2  think materially changes the application of my analysis, I'm

3  happy to look at it and consider it.  I'm skeptical, but I'll

4  let you present whatever you come across.

5      So Plaintiffs' Exhibit 3247 -- boy, that's alarming.

6  We haven't even started trial, and we are already on Exhibit

7  3247.  In any event, it's made a part of the record of this

8  pretrial or final settlement conference.

9      All right.  Then is there anything else that you all

10  have that you want to discuss before I get to some of these

11  mundane matters?

12      MS. JONES:  This may be a mundane matter, Your Honor.

13      Just for purposes of opening, is it acceptable to the

14  Court if counsel -- obviously we are not going to be running

15  around the well, but -- step away slightly from the podium to

16  use a board?  Is that okay?

17      THE COURT:  Yes.  And if you'd like, and I would

18  suggest if you are going to be up there for an hour, we can

19  rotate that podium.

20      MS. JONES:  Okay.  Terrific.

21      THE COURT:  So just remind us in the morning.  It

22  takes a couple of people to turn it kind of carefully.  There

23  are plug-ins underneath it, so you have just got to be careful

24  that we don't accidentally unplug something or put counsel in

25  a position where they're going to be standing next to a plug

82

1    they might accidentally hit or kick or something.

2         MS. JONES:  Thank you, Your Honor.

3         THE COURT:  Yes.  You can use that.

4         I will remind you that because the acoustics are not

5    very good in here, my court reporter has to depend upon the

6    microphone system.  So when you step away, make sure that you

7    speak loud.  I think you all are experienced trial lawyers, so

8    that is probably a natural for you.

9         Unfortunately, whether it's lack of experience or

10   whatever, many lawyers get here in the courtroom and talk so

11   quietly even with the jury that it is hard for us to hear, and

12   there is just no way my court reporter can hear that when

13   she's trying to listen through the system.

14        So that reminds me of a couple of points.

15        One, we'll probably have numerous bench conferences.

16   When we do that, I like the plaintiffs to come on this side,

17   the defense to come on the other side, so my court reporter

18   can get here in the middle if she wants to.

19        She's got now a recording device, which is keyed to

20   this bench microphone, and this bench microphone doesn't

21   broadcast over the system, so she just hears that.  So if this

22   works, she may not have to relocate, which will be great.

23   Because if she has to move in the middle to hear you folks, it

24   becomes really difficult.

25        And so we're going to try to use the recorder, but it

1    will be difficult for her to keep up with it on a real-time

2    basis if she has to depend upon listening to the recorder.  So

3    we'll just see how it goes.  We are going to play with this

4    thing later today, and hopefully I can tell you tomorrow that

5    when we have bench conferences, she won't have to relocate and

6    move to the middle, and you can crowd up here with me.  And

7    I've got the courtroom microphone here, which I'll just turn

8    off.

9           Also, we do have the white noise feature, and we'll

10   use that probably every time if I can remember to direct

11   somebody to turn it on.

12          Also, you all have asked for daily transcripts or at

13   least one side has, I guess.

14          Are both sides doing that?

15          MR. MOSKOW:  I believe the defense has, Your Honor.

16   The plaintiff hasn't.

17          THE COURT:  So we've got one of our colleagues in the

18   Charleston division who is going to be here.  She and our

19   court reporter have worked out a schedule.  They're each going

20   to do quarters each day and alternate so we can work on this.

21          I think I can speak for both the court reporters,

22   they're very nervous about being asked to do a read back of a

23   question or an answer if we get into that situation with a

24   witness where, because of an objection or something or for any

25   other reason, counsel says can you read that back to me.  So

84

1    try to minimize that.  We'll depend upon you to try to restate

2    those things, and don't expect that if you've lost your train

3    of thought that we're going to be able to necessarily come to

4    your rescue with a read back.

5         I've got the realtime.  I don't mind summarizing

6    things.  But, you know, I just want to make clear that we're

7    probably going to ask that you not ask the court reporters to

8    literally read back a question or an answer.

9         And then with regard to the daily transcripts, I don't

10   know that I've actually had a trial where one side has asked

11   for that.  I don't remember offhand.  I don't know what you

12   expect to do with that daily transcript, if anything, other

13   than for your own purposes.

14        Do you purport that that becomes an official

15   transcript, and that you could use that -- obviously not for

16   the jury, I guess, but be quoting from that as an official

17   transcript during questioning of other witnesses or argument

18   with the Court?  I don't know what you plan to do with it.

19        MS. JONES:  I can tell Your Honor, just based on our

20   experience in the earlier trials, that usually part of it is

21   just for our internal purposes for preparing for other

22   witnesses, preparing for closing.

23        THE COURT:  Right.

24        MS. JONES:  To some extent, we probably have relied on

25   daily transcripts for purposes of arguments that have come up

1  during the course of the trial.  I don't think we've done that

2  extensively or excessively, but I think that has been the case

3  to some extent.

4      I'm not sure that there have been many, if any,

5  examples of places where we've used a daily trial transcript

6  with a witness on the stand, and I'm not readily coming up

7  with something where I would expect that to happen.  But those

8  are the general buckets of how we've used them in the past.

9      THE COURT:  Well, I'm going to talk with my court

10  reporters this afternoon and see how they view these daily

11  transcripts.  I have always presumed that because it is such a

12  quick turnaround, that they are not considered official

13  transcripts.  They're not filed and docketed by the Court as

14  the official transcript.  And if that's the case, then I'm

15  probably going to be very hesitant to let you read from a

16  daily transcript in questioning a witness.

17      I guess, you know, if it's argument of motions and

18  things like that or issues with the Court, I guess I don't see

19  the official -- or the unofficial transcript that you have as

20  being much different from somebody's notes or best memory, and

21  so I don't know that I have a problem with that.

22      Mostly I'm hesitant to make the jury aware of these

23  daily transcripts because, as a matter of routine, I instruct

24  jurors that they should not expect to have a transcript of any

25  of the witness testimony for the purposes of their

1   deliberation.  Because obviously in the vast majority of

2   cases, we don't have any kind of transcript, and certainly not

3   an official transcript, and so I don't know that there's any

4   reason to believe that this would be any different.

5          But if you think that there is a different or more

6   complete use of the daily transcript, let the plaintiffs and

7   the Court and the court reporter know that before we get into

8   an issue.  Okay?

9          MS. JONES:  We're happy to be guided by whatever Your

10  Honor prefers.

11         The one example that did come to mind for me in terms

12  of witnesses that we sometimes have given the daily transcript

13  to is an expert who we are calling later, and we might ask the

14  person, when we present that witness, did you have a chance to

15  review the testimony of so and so?  Beyond that, we don't use

16  the transcripts for any purpose during examination.  But in

17  the interest of just giving Your Honor a sense of how it might

18  have come up in the past, that is one example.

19         THE COURT:  Well, in the instance you've identified

20  with an expert, then, you would purport to consider giving an

21  expert a daily transcript of a prior witness's testimony when

22  they were not present to hear that testimony?

23         MS. JONES:  Correct.  For example, with experts who

24  just aren't able to be here every day of the trial who

25  obviously would be entitled to be in the courtroom while other

1    folks are testifying.  I think it's mostly come up with

2    physician experts.

3         THE COURT:  You all have a concern about that?

4         MR. CHILDERS:  The only concern I would have, Your

5    Honor, is if they're quoting it or something along those

6    lines.  The jury will remember whatever they remember from the

7    testimony, but I don't mind them looking at it.

8         THE COURT:  All right.  Well, we'll see if we

9    encounter that.  Obviously I don't want the jury to be misled

10   by the availability of a daily transcript, and it might be a

11   little bit problematic if I let you use those openly and quote

12   from them or have a witness quote from them and then at the

13   end of the evidence tell the jury they can't see these

14   transcripts.  So that would be a concern.

15        All right.  Is there anything else that you all have

16   identified that we need to take up?

17        MR. CHILDERS:  Your Honor, may I just ask one question

18   about procedure?

19        In terms of moving the transcripts from the video

20   plays and the exhibits that are referenced in them, those will

21   be done by agreement of the parties.  Is it your preference to

22   do that in front of the jury or outside the presence of the

23   jury?  Because they are transcripts, and you don't want to

24   talk about transcripts.

25        THE COURT:  My preference would be to do that outside

88

1    the presence of the jury.  The jury doesn't need to hear that

2    or be delayed with whatever they're doing.

3            MR. MOSKOW:  Thank you, Your Honor.

4            THE COURT:  All right.

5            MR. CHILDERS:  Just so I'm prepared for tomorrow, how

6    are we going to sort of logistically do this with the jury?

7    Are they coming in the back here?

8            THE COURT:  Here's how we do it.

9            So I think --

10       (Off-the-record discussion with courtroom deputy.)

11           THE COURT:  So we have between 30 and 35 people.  They

12   will show up downstairs.  When they come in downstairs, they

13   will be checked off by the clerk's office.  The clerk

14   downstairs will randomly by computer assign a number to each

15   juror, 1 through -- I guess we will have 32 since we're

16   excusing those three.  I think that's the right number.

17           What we tell the clerk's office is how many we want to

18   show up, so usually they'll ask -- they'll have a few more

19   than that because almost invariably we have somebody who

20   either is really late and we don't want to wait or, for

21   whatever reason, just didn't get the word.  That does happen

22   legitimately unfortunately sometimes.

23           In any event, they'll show up.  They'll each be given

24   a number.  They will have a sticker with that number that will

25   be marked.  And then when they're all assembled and ready to

1   go, the clerk's office will notify us.  We'll be waiting for

2   them.  They're usually pretty efficient.  So pretty close to

3   9:00 or maybe 9:10, we should have them all down in the

4   clerk's office.

5       The clerk will then bring us, first, that numerical

6   list that will have the juror's name, address, and I think

7   maybe it lists their occupation.  And then on the right side

8   is a column where our form has a blank space for different

9   objections, for cause, plaintiffs' peremptory, defendant's

10  peremptory, and you'll be able to use it for that.  So that

11  list will accompany the jury up here.

12      So when we're told they are coming up, I will let you

13  know and expect you to realize that we've got jurors filtering

14  into the courtroom.  It takes them a few minutes to get up

15  here.  Some people will take the steps and be here quickly.

16  Some people will take the elevator.  You know, it seems like

17  they trickle in.

18      When they come in, we'll have them seated in that

19  numerical order in the jury box and in the bench seats out

20  there.  You'll have that list that shows their name, their new

21  number, and have a space for you to mark any excused or

22  removal of that juror from the list, and then we'll get

23  started.

24      As I told you, I think we'll end up probably spending

25  a good part of the morning in the conference room doing this

90

1    individually, and then we'll see where we go.  It's six to

2    twelve people.  I think we will probably have a jury of eight

3    or nine.  And honestly whether it's even an number or an odd

4    number depends upon how many we have left when we start

5    peremptory challenges.  We will just divide those up evenly

6    and let the parties go to it.

7            Usually when I do these peremptory challenges, because

8    you will get more than one or two, I'll see how many we have.

9    If each side is going to have -- each side could have as many

10   as eight or ten peremptory challenges.  Whatever that number

11   is, if it is a number like that, I'll tell you at the time

12   we're going to do this in two or three -- well, in three

13   rounds.  So if you've got eight challenges, you might have to

14   do three, three and two; you might have to do three, three and

15   two.  It will be same, whatever it is.  But we will do that in

16   two or three rounds, probably three rounds instead of one at a

17   time.  It just goes faster.

18           MR. LEWIS:  Is that done in open court, Your Honor?

19           THE COURT:  Yes.

20           MR. LEWIS:  Okay.

21           THE COURT:  Once we finish all of the voir dire -- I

22   assume we'll be in there when we finish -- we will come out

23   here.  We will formally convene.  I'll tell the jurors that we

24   have completed the voir dire.  Now the parties are going to do

25   their peremptory challenges.

1        At that point, I will tell the jurors that I'm going

2   to excuse the parties and let you leave, go to a conference

3   room or somewhere else to huddle up separately and talk about

4   what your strategy is.  I will give you maybe five or ten

5   minutes to do that, and then bring you back in here, and we'll

6   start those peremptory challenges and exchanges.

7        I tell the jurors generally that when they are

8   waiting, that while we're technically still formally in court,

9   that they can stand up, move around a little bit.  They can

10  talk to each other as long as they are not talking about

11  anything about the case or the process, go to the restrooms,

12  which are in here, if they need to.  But I generally try to

13  keep them at or around their chair, partly so you can put a

14  face with a name.  We'll give you a few minutes between the

15  close of all that voir dire and the start of the exchange of

16  peremptory challenges.

17        MR. CHILDERS:  Your Honor, the challenges, will they

18  be, Juror No. 1, does either side have a challenge or --

19        THE COURT:  No.

20        MR. CHILDERS:  We can pick any --

21        THE COURT:  You can pick anyone.

22        We'll have up to 32 people.  And if nobody is released

23  for cause, then we'll probably have an eight-person jury, and

24  that's 24 that will have to be struck.  I'll give each side

25  12, and you'll take turns marking your challenges off of that

1     whole list of 32 people.

2              MR. CHILDERS:  Sorry.  I misunderstood.

3              I thought there were three different groups --

4              THE COURT:  Well, not three different groups.

5              You're going to get to do three series of challenges.

6     So if you've got 12 strikes, I'm going to tell you do four in

7     your first round, and then they do their four, do four in your

8     next, like that.  That's all I meant by that.

9              MR. CHILDERS:  Understood.

10             THE COURT:  But it can be anybody on that list.

11             MR. CHILDERS:  Okay.  Thank you, Your Honor.

12             MR. MOSKOW:  May I just ask, will for cause challenges

13    be done on the record or --

14             THE COURT:  Yes.

15             MR. MOSKOW:  Thank you.

16             THE COURT:  What I prefer to do is when we're doing

17    this individual voir dire, and I'm sure we'll do individual

18    voir dire of probably anybody that either side is going to

19    want to strike for cause, as soon as they walk out of the room

20    is your time to -- and I'll point that out.  That's when

21    either side or both can speak up about a challenge for cause.

22             I don't tell the jurors they're excused until we deal

23    with all of them.

24             MR. MOSKOW:  That's fair.

25             THE COURT:  I don't want there to be a mad rush to the

93

1    doors.  So I just tell even jurors that -- I might say -- if

2    somebody has got some obvious logistical problem that is going

3    to require me to excuse them, and you all agree, and you've

4    discussed that, I'll tell them, well, you're going to stay

5    seated until we excuse everybody together just so we don't

6    start having people dribble out one at a time.

7            And the only reason I do that is I've found in the

8    past, if somebody gets excused like that, then other people

9    start saying I've got something, too.  So, anyway, that is

10   generally how we handle it.

11           I guess you have already figured out where you can --

12   the room you can use for staging for when it's your case.

13           Any different estimate about how long it's going to

14   take for you to put on your evidence?

15           MR. CHILDERS:  I still think we'll be done before

16   three weeks, Your Honor, with the whole trial, like I told

17   Your Honor the last time we were here.

18           THE COURT:  Right.

19           MR. CHILDERS:  Whether it's two weeks or two weeks and

20   change, I couldn't --

21           THE COURT:  Okay.  Same for you folks?

22           MS. JONES:  Same for us, Your Honor.

23           THE COURT:  All right.  How many of you are going to

24   be here?  How many lawyers are you going to have here at

25   counsel table?  Everybody, everybody who is here now?

94

1        MS. JONES:  No, the whole gang will not be here every

2   day.  It will be Mr. Lewis and Ms. Callas and myself at

3   counsel table.

4        THE COURT:  Okay.

5        MR. CHILDERS:  Two of us, Your Honor.  And Mr. Knight

6   will be here most days, and Ms. Stevens will also be here.

7        THE COURT:  Okay.

8        MR. CHILDERS:  Then Mr. Abney may -- if he is going to

9   handle a witness, we'll swap out.

10       THE COURT:  All right.  Is there anything else?

11       If not, be back here at 8:30 in the morning, and we

12   should be good to go.

13       MS. JONES:  Okay.

14       THE COURT:  See you in the morning.

15       MR. CHILDERS:  Thank you, Your Honor.

16       MR. MOSKOW:  Thank you, Your Honor.

17       MS. JONES:  Thank you, Your Honor.

18       MR. LEWIS:  Thank you, Your Honor.

19          (Proceedings were adjourned at 12:06 p.m.)

20                    ---o0o---

21

22

23

24

25

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

1    CERTIFICATION:

2         I, Kathy L. Swinhart, CSR, certify that the

3    foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter as reported on

5    October 1, 2018.

6

7

8    October 10, 2018 _____
     DATE

9

10   /s/ Kathy L. Swinhart _____
     KATHY L. SWINHART, CSR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25