IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
            Plaintiffs,
vs.                          No. 3:15-CV-06424

BOEHRINGER INGELHEIM         Volume 2
PHARMACEUTICALS, INC.,      Pages 122 through 400

              Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

THURSDAY, OCTOBER 4, 2018, 9:00 A.M.

---o0o---

For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                      1932 North Druid Hills Road, Ste 100
                      Atlanta, Georgia  30319
                      BY:  C. ANDREW CHILDERS

                      URY & MOSKOW
                      883 Black Rock Turnpike
                      Fairfield, Connecticut 06825
                      BY:  NEAL L. MOSKOW

                (Appearances continued next page...)

Reported by:    KATHY L. SWINHART, CSR
                Official Court Reporter
                (304) 528-2244

```
 1                    APPEARANCES (Continued)

 2

 3     For the Plaintiffs:

 4                    FERRER, POIROT & WANSBROUGH
                      2100 RiverEdge Parkway, Suite 1025
 5                    Atlanta, Georgia  30328
                      BY:  RUSSELL ABNEY
 6                    and  HUNTER VANCE LINVILLE

 7

 8     For the Defendant:

 9                    TUCKER ELLIS
                      925 Euclid Avenue, Suite 1150
10                    Cleveland, Ohio  44115
                      BY:  JOHN Q. LEWIS
11

12                    COVINGTON & BURLING
                      One City Center
13                    850 Tenth Street NW
                      Washington, D.C.  20001
14                    BY:  PHYLLIS ALENE JONES
                      and  NICHOLAS HAILEY
15                    and  JESSICA PEREZ

16

17                    JACKSON KELLY
                      Post Office Box 553
18                    Charleston, West Virginia  25322
                      BY:  GRETCHEN M. CALLAS

19

20     Also Present:

21             CLAUDE R. KNIGHT, Plaintiff

22

23

24

25
```

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

1                                   <u>INDEX</u>

2

3      <u>PLAINTIFF'S WITNESSES:</u>                              <u>PAGE:</u>

4
       LAURA PLUNKETT, Ph.D.
5
       DIRECT EXAMINATION BY MR. MOSKOW                     131
6      DIRECT EXAMINATION (Cont'd) BY MR. MOSKOW            252
       CROSS-EXAMINATION BY MS. JONES                       342
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

122

1                    HUNTINGTON, WEST VIRGINIA

2              THURSDAY, OCTOBER 4, 2018, 9:10 A.M.

3                          ---o0o---

4         (Jury not present.)

5              THE COURT:  Good morning.

6              MR. MOSKOW:  Good morning, Your Honor.

7              MS. JONES:  Good morning, Your Honor.

8              THE COURT:  Before we bring the jury in, the defense

9    filed a motion seeking to preclude the plaintiffs from

10   offering a particular set of opinions from Dr. Plunkett

11   concerning the 75-milligram dose label.  I'll give each side

12   just like two minutes to argue.

13             MS. JONES:  Thank you, Your Honor, and I will be

14   very brief.

15             Our motion is a narrow one.  We are not asking to

16   preclude Dr. Plunkett from talking about the 75-milligram at

17   all.  To the extent that she's disclosed comments or

18   opinions about the 75-milligram in her report or her

19   deposition testimony, we don't have an issue with that.

20             We understand --

21             THE COURT:  Was she deposed for this case?

22             MS. JONES:  She was deposed generally for the

23   litigation.  I don't think there was ever a separate

24   litigation for -- or a separate deposition for Knight

25   specifically.

1          THE COURT:  At the time she was deposed, the Knight

2     case was one of the pending cases, though?

3          MR. CHILDERS:  That's correct.  This was either the

4     first or second case that had been filed.

5          THE COURT:  All right.  Is your microphone on?

6          MR. CHILDERS:  I'm sorry.  The answer is yes, Your

7     Honor.

8          THE COURT:  All right.  Go ahead.

9          MS. JONES:  And so we're really only seeking to

10    exclude a specific opinion concerning the labeling that we

11    understand that Dr. Plunkett intends to offer today, which

12    is that the labeling was somehow deficient because it didn't

13    inform patients that the 75-milligram dose had not been

14    tested in patients in a clinical trial setting or that

15    Pradaxa had not been tested in patients who had severe renal

16    impairment.

17          That just doesn't appear in her report.  She never

18    said it at her deposition.  She's been a live witness at

19    three Pradaxa trials all about the 150, but there has never

20    been any mention of that opinion.  And certainly Dr.

21    Plunkett has the ability, as is reflected in her report, to

22    be very direct and very specific about what her opinions

23    are.

24          And the response that was filed by plaintiffs this

25    morning, I think the five pages or so of excerpts from her

1    report really prove our point.  Most of those references

2    include no specificity with regard to a warning about the

3    75-milligram dose and the testing of the 75-milligram dose.

4         We are not proposing that she not be able to say the

5    things that are in her report.  But she has never testified

6    or offered the opinion that the label was inadequate because

7    it didn't say that it was not tested in patients with severe

8    renal impairment.  She has never offered the opinion that

9    the label was inadequate because it didn't say that Pradaxa

10   was never tested in the 75-milligram dose in human patients.

11   Those are new opinions.

12        To the extent that she is permitted to offer them

13   today, we view that as being prejudicial, and so we're

14   objecting to that testimony on that limited basis.

15        THE COURT:  I'll give you a couple of minutes to

16   respond.

17        MR. MOSKOW:  Thank you, Your Honor, very briefly.

18        We believe, first of all, the motion is untimely.

19   That when defendants moved en masse to preclude plaintiffs'

20   experts, they specifically moved to preclude labeling

21   opinions of three of the experts and did not seek to

22   preclude any labeling opinions by Dr. Plunkett.

23        THE COURT:  Of course, in their motion they say that

24   they weren't aware that you were going to elicit these

25   opinions until Mr. Childers' opening statement made it clear

1     that that would be the case.

2              MR. MOSKOW:   I appreciate that, Your Honor.   I

3     think -- with all due respect, I think that is disingenuine.

4              This case has always been about the 75-milligram

5     dose.  Among the only issues that is not contested in this

6     case is that, under West Virginia law, the warning was

7     required to be delivered directly to the patient.

8              While Dr. Plunkett has been disclosed in a number of

9     Pradaxa cases, most of them are the 150, but there are

10    specific references to the 75-milligram dose in this report

11    and the fact that it was untested.  And as reflected in our

12    papers, that's an opinion that she gave as being very

13    unusual.  She was not asked about why that was unusual.  She

14    was not asked at her deposition as to the consequences of it

15    not being tested in people.

16             And finally, Your Honor -- again, I think, you know,

17    we responded as quickly as we could in our papers that were

18    filed this morning, particularly given the timing of this

19    motion, but I want to be clear.

20             If the Court were to go to page 7 of our response,

21    you'll see that on page 8 of the report, bullet point two,

22    she specifically says the discussion in the label is

23    incomplete with respect to the known effects of a variety of

24    patient demographics on the risk of bleeding events in

25    particular.  And they had an opportunity at the deposition

1     to ask her what are those patient demographics that you're

2     most concerned about.  And she would have responded among

3     the things that I am most concerned about is that the

4     product was never tested on patients with creatinine

5     clearance below 30.  The 75-milligram dose was never tested,

6     and it's now being sold to those patients without telling

7     them that that's a fact.

8              THE COURT:  And in your response, you purport to

9     quote from a number of paragraphs of her report.

10             Those are all taken directly from --

11             MR. MOSKOW:  They are, Your Honor.  And I have

12    copies of those for the Court and for counsel if you would

13    like.

14             THE COURT:  I don't need to see them.  Further, I

15    think I've already seen her report anyway.

16             MR. MOSKOW:  You have, Your Honor.

17             THE COURT:  I'm going to deny the motion.

18             First, it's been clear all along that this is a case

19    in which the plaintiffs' allegations focus on the

20    75-milligram dose of Pradaxa.  The criticisms offered by Dr.

21    Plunkett in her report are broad in the sense that they

22    don't particularize the dosage in every instance where she

23    offers an opinion, but those opinions are broad enough that

24    they surely encapsulate opinions about the 75 dose.

25             Then, in particular, paragraph 66, which plaintiffs

1    quote from, includes a statement italicized in what they've

2    submitted -- I suspect it wasn't italicized in the original

3    report, but it says, quote:  It's unusual, however, for such

4    data -- that means the RE-LY data -- to form the basis of an

5    approval decision of an untested dose, 75-milligram Pradaxa.

6         So, you know, I appreciate that in a case like this

7    both sides are using proof and evidence developed for a

8    number of different cases and are then presenting those

9    cases here.  Even so, counsels' obligation is to provide the

10   expert report -- they did so here -- on behalf of Dr.

11   Plunkett.  I don't read that report as in any sense

12   excluding or restricting the opinions.  And it's been known

13   that this is the 75-milligram dose, the prescription that is

14   at issue here, so I think the report clearly was intended to

15   cover the dosage that is uncontested as the fact here.

16        And then when I see statements like the one here

17   that I just quoted from, it seems to me if the defendant

18   questioned whether or not this expert was going to opine

19   that the data was insufficient that there wasn't any testing

20   for the 75-milligram dosage, that they could have pursued

21   this by a supplemental deposition just for this case.

22        So I deny the motion.

23        Are we ready to proceed?

24        MR. MOSKOW:  Thank you, Your Honor.

25        Dr. Plunkett is in the courtroom.  We're good to go.

 1          THE COURT:  All right.  Let's bring the jury in.

 2      (Jury present.)

 3          THE COURT:  As the jury is coming out, I had

 4   forgotten, my clerk mentioned that you have another list of

 5   exhibits that are being introduced.

 6          MR. CHILDERS:  Yes, sir.

 7          THE COURT:  We've been trying to do that without

 8   interrupting the flow of evidence.  So even though the jury

 9   is coming in, do you want to go ahead and complete that as

10   they are being seated?

11          MR. CHILDERS:  Sure, Your Honor.

12          THE COURT:  Good morning.

13          MR. CHILDERS:  I apologize, it's a list of numbers.

14          From the Friedman deposition, plaintiffs move in

15   Trial Exhibit Nos. 93, 1075, 288, 38, 36, 671, 684, 1577,

16   279, 6, 310, 1045, 167, 919, 151, 1046, 543, and 816.

17          THE COURT:  Any objection to the admission of those

18   exhibits into evidence?

19          MS. JONES:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  They're admitted.

21      (PLAINTIFFS' EXHIBITS 6, 36, 38, 93, 151, 167, 279,

22         288, 310, 543, 671, 684, 816, 919, 1045, 1046, 1075,

23         and 1577 ADMITTED INTO EVIDENCE.)

24          THE COURT:  And just to keep it straight in my mind,

25   and maybe for the jury, too.  So these are the exhibits that

129

1    are now admitted into evidence that were referred to in the

2    deposition, but may be under a different number or

3    identification in the deposition?

4            MR. CHILDERS:  That's correct, Your Honor.

5            THE COURT:  All right.

6            MR. CHILDERS:  And that was for Dr. Friedman's

7    deposition, the first one we heard yesterday.

8            THE COURT:  All right.  Very good.

9            Call your next witness.

10           MR. CHILDERS:  I'm sorry.  They have some as well.

11           THE COURT:  I'm sorry.

12           MS. JONES:  We just have two for Dr. Friedman, Your

13   Honor, and I believe we also have exhibits for Ms. Kliewer

14   that we need to read in as well.

15           THE COURT:  Okay.  Let's do all this now.

16           MS. JONES:  So for the defense, we just have two

17   exhibits, Trial Exhibit 5881 and 5980 for Dr. Friedman.

18           THE COURT:  Any objection?

19           MR. CHILDERS:  No objection, Your Honor.

20           THE COURT:  They are admitted.

21        (DEFENDANT'S EXHIBITS 5881 and 5980 ADMITTED

22         INTO EVIDENCE.)

23           MR. CHILDERS:  For Ms. Kliewer's depositions,

24   plaintiffs move into evidence Exhibits 1419, 1673, 387, 72,

25   321, 280, 188, 1145, 141, 144, 494, 482, 80, and 153.

1          THE COURT:  Any objection?

2          MS. JONES:  No objection, Your Honor.

3          THE COURT:  Those are admitted.

4       (PLAINTIFF'S EXHIBITS 72, 80, 141, 144, 153, 188,

5          280, 321, 387, 482, 494, 1145, 1419, and 1673

6          ADMITTED INTO EVIDENCE.)

7          THE COURT:  And then you have corresponding

8    exhibits?

9          MS. JONES:  Yes, Your Honor.  On behalf of the

10   defense, we move in Trial Exhibits 5020, 5021, 5061, 5062,

11   5138, 5151, 5881 and 5884.

12         MR. CHILDERS:  No objection, Your Honor.

13         THE COURT:  They're admitted as well.

14         MS. JONES:  Thank you, Your Honor.

15      (DEFENDANT'S EXHIBITS 5020, 5021, 5061, 5062, 5138,

16         5151, 5881, and 5884 ADMITTED INTO EVIDENCE.)

17         THE COURT:  All right.  Call your next witness.

18         MR. MOSKOW:  Good morning, Your Honor.  Good

19   morning, Ladies and Gentlemen.

20         The plaintiff calls Laura Plunkett.

21         THE COURT:  All right.  Dr. Plunkett, if you will

22   step up here, my clerk will administer the oath, and then

23   you can take the stand.

24         THE CLERK:  Please raise your right hand.

25       LAURA PLUNKETT, Ph.D., PLAINTIFFS' WITNESS, SWORN

Laura Plunket - Direct (Moskow)                    131

1          THE WITNESS:  I do.

2          THE CLERK:  Have a seat.

3          MR. MOSKOW:  Your Honor, I have binders for the

4   Court and for the witness and defense that we will be using

5   today.

6          THE COURT:  Wonderful.

7          MR. MOSKOW:  Thank you.

8          Good morning again, Ladies and Gentlemen.

9                    DIRECT EXAMINATION

10  BY MR. MOSKOW:

11  Q.  Good morning, Dr. Plunkett.

12  A.  Good morning.

13  Q.  Could you introduce yourself to the jury, please?

14  A.  Sure.  My name is Laura Massey Plunkett, and I'm a

15  consultant, and I come from -- I live right now in Houston,

16  Texas.

17  Q.  Okay.  I called you doctor when I introduced you to the

18  jury and the Court.

19      What kind of doctor are you?

20  A.  I'm a -- I have a Ph.D. degree in pharmacology, and I'm

21  board certified in toxicology.

22  Q.  And what does it mean to have a Ph.D. in pharmacology?

23  How many years of college is that?

24  A.  So it's eight years of college, four undergraduate and

25  four in graduate school.

1    Q.   And you said you're board certified in toxicology.

2         What does that mean?

3    A.   That's a process where you take an exam, essentially

4    pass a test that tests your knowledge in the area of

5    toxicology.  And that was done after -- after my degree.  So

6    my degree was granted in 1984 with my Ph.D., and then I was

7    board certified in toxicology in 1993.

8    Q.   We've been talking about pharmaceuticals.  Pharmacology

9    sounds similar.

10        Can you explain to the jury what pharmacology has to do

11   with drugs?

12   A.   Sure.

13        Pharmacologists like myself study the way drugs affect

14   your body, how do they produce the things that you want.

15   So, for example, in this case how does a drug cause your

16   blood to thin.  How does it produce what's called the

17   anticoagulant effect, stops the blood from clotting.  There

18   are all kinds of drugs I've studied in my life, and we are

19   here to talk about that one specific class today.

20   Q.   How is that different from toxicology or the certified

21   toxicologist that you just told us about?

22   A.   So drugs have both desired effects, the things that you

23   want them to produce, and then they also have toxic effects

24   or things you don't want to see.

25        As a toxicologist, when you're using those kinds of

Laura Plunket - Direct (Moskow)                    133

1    tools -- toxicology is a tool or those kinds of things that

2    you learn in school or in books or through your training.

3    You are actually studying what happens when drugs are

4    producing those undesired or those toxicities.  So in this

5    case it would be -- the toxicity would be bleeding, whereas

6    the benefit or the thing that you want the drug to produce

7    would be producing a prevention of stroke.

8        So pharmacologists can study both ends of the spectrum,

9    but the board certification focuses more deeply on just

10   those things about the mechanisms that underlie how you get

11   to these toxic effects, the chemicals in the -- either

12   humans, but also in animals.  And also toxicologists study

13   how things affect the environment as well.

14   Q.  Is there anything unusual about the pharmacology of

15   Pradaxa that also implicates or also makes toxicology

16   particularly important?

17   A.  Yes.

18   Q.  And what is that?

19   A.  So Pradaxa is, as I mentioned, an anticoagulant.  And

20   what is different about these anticoagulants, these drugs

21   like Pradaxa that thin the blood, these drugs are ones that

22   the dose you take that produces the pharmacologic effect,

23   the thing you want to happen, also is a dose that can

24   produce serious and life-threatening toxicity.

25       So most drugs when you take them at the dose that you're

1    given by the doctor, or that you buy over the counter from

2    the pharmacy, for example, you have to take multiples, two

3    pills, three pills, four pills to get to life-threatening

4    toxicities, things that could actually lead to death.  This

5    is different for this drug, for this class of drugs.  This

6    can happen by taking the actual dose that the doctor tells

7    you to take, so the prescribed dose.  It's a very delicate

8    balance for you to move as a person from the drug being safe

9    and the drug producing a life-threatening bleed.

10   Q.  And we'll talk more about that in a moment.  I want to

11   come back to the first thing you said to the jury.  You said

12   that you are a consultant.

13       What does that mean?

14   A.  It means I work with clients -- I work for myself, but I

15   work with clients on a variety of different issues, not just

16   one thing.  So, for example, I used to be -- I used to work

17   in academics.  I used to be a professor, and I would teach,

18   and teaching and working in my lab were how I would describe

19   what I did.

20       Today, as a consultant, I work on issues for my clients.

21   I help them solve problems.  I help them, ah, prepare for

22   meetings.  Or I help them prepare things that are submitted

23   to the Food and Drug Administration as part of a process

24   that they're under, getting either approval or there is a

25   problem with their compound or a problem with their product.

1      So consultants do what I call issue solving, and I do

2  it -- solve those issues applying science because that's

3  what my background is.

4  Q.  And you mentioned that there is some interaction with

5  the FDA, and I'll go into more detail about that in a few

6  moments.

7      But can you just briefly explain to the jury what it is

8  you do with the FDA?

9  A.  So many of the projects or the clients I work with make

10  a product or have been exposed to a product that is

11  regulated or there's an oversight from the FDA.  So that

12  means they are either going to be drugs like Pradaxa.  They

13  could be an over-the-counter drug like Tylenol.  They could

14  be a medical device.  I work on projects with people that

15  work with heart valves, metal implants for hip replacement,

16  those kinds of things.

17      I also work on products that are called dietary

18  supplements.  So if you go to a General Nutrition Store, the

19  GNC, and you buy a vitamin or you buy a product that is an

20  amino -- well, it's a particular product that is not

21  actually one that is sold by a drug company, but sold by a

22  company that manufactures things.  Herbs are considered

23  supplements, so I help with those kinds of projects.

24  Cosmetics is another type of product that I work on because

25  those are also regulated by the FDA.

1          So I work with different clients on a variety of

2     different projects, but the common issue is always something

3     to do with what are the benefits or the things that you want

4     this product to do in the person that's taking it.  Or often

5     I'm working on projects like this, and that has to do with

6     what are the toxicities or what are the harmful or the

7     safety issues associated with use of that product.

8     Q.  When you say a project like this, what do you understand

9     the project you're here to talk about with the jury today?

10    A.  In this case, I was asked to look at the issues related

11    to both the benefits or the things that Pradaxa does that

12    you want to do, such as preventing strokes, and then look at

13    the safety issues, the bleeding issues, and determine

14    whether or not there are things that aren't important to

15    understand in order to see whether or not the dose of

16    Pradaxa that somebody takes is actually safe.  And whether

17    or not the company had information related to that safety

18    that may or may not have been passed on either to the

19    physician or to the patient.

20    Q.  What kinds of things did you look at to come to the

21    opinions that you're going to give to the jury today?

22    A.  So every project I do, I always start with what I call

23    the basic science, so I go to the published literature.  So

24    that's articles, scientific articles that are put out for

25    other scientists and doctors to look at in something called

Laura Plunket - Direct (Moskow)                    137

1    a journal, just a publication every month.  So I start

2    there.  So what is generally known about the drug.

3         And then I also go to the FDA website, and I look at

4    what the Food and Drug Administration has had to say.  You

5    can go there and pull up information that was submitted by

6    the company as part -- a sort of summary that summarizes

7    what the company did in order to get the drug approved.

8         You can also go and find the labels for the drug.  I

9    know we are going to talk a little bit more about that, but

10   the label is essentially the information that the physician

11   is provided with.  There's also a specific part of the

12   labeling that is provided to the patient, and so that can be

13   found on the FDA website.

14        And then in addition to that, I would go and look at

15   documents that were not publicly available but the company

16   made available as part of this litigation process.  It's

17   their internal files.  So it will be e-mails.  It may be --

18   I may -- I'm also reading -- you saw clips of depositions,

19   so I will actually read of some that deposition testimony

20   and see what the company employees had to say about what

21   they knew over time about their product.  And that will

22   often have documents attached to it, so I'll see what they

23   were saying about those documents.

24        So I look across all of that, what the publicly

25   available information is and the scientific literature or

Laura Plunket - Direct (Moskow)                    138

1    the papers I can find when I do my own searches.  I look at

2    what the FDA has in their files that is publicly available.

3    And then I also look at information that I can only get

4    through the kinds of -- well, they call it discovery, the

5    kinds of information provided during a case as I work on the

6    case.

7    Q.  Let me just ask you real briefly about two of the topics

8    you just mentioned.  One is the sworn statements or the

9    depositions of the company employees.

10       Can you estimate how many of those that you've reviewed?

11   A.  I believe there's more than a dozen in this case.  There

12   was a large number of depositions, and some people had their

13   deposition taken more than once.

14   Q.  And, in fact, have you read the depositions of Dr.

15   Friedman and Ms. Kliewer who testified by videotape here

16   yesterday?

17   A.  Yes, I have read both of those.

18   Q.  And you also indicated that there were internal company

19   documents that you had access to.

20       How did you have access to those documents?

21   A.  So those documents are given from the defense to the

22   plaintiffs' attorneys in the case, the people that I'm here

23   working with here today, like Mr. Moskow.  And then I will

24   ask them for information, I'll say, you know, based on what

25   I want to know, and then they will provide me with

1    information related.

2        So I always give them a list of things.  I'm interested

3    in this kind of information, and I need this kind of

4    information.  And I typically do that, give that kind of

5    list because I've worked on similar cases, and I know the

6    kinds of things that I would expect to see that the company

7    would have.  And then sometimes there's information that is

8    attached, like I said, to the depositions, and so that will

9    lead to me asking another question.

10   Q.  Was there any information that you asked for that anyone

11   told you we're not going to look for?

12   A.  No, not at all.

13   Q.  Based on all of the documents that you've looked at, all

14   of the deposition -- you know, sworn testimony, the

15   websites, the medical literature, all of that, have you

16   formed opinions in this case as to the safety of

17   75-milligram dose of Pradaxa?

18   A.  Yes, I have.

19   Q.  Can you give the jury a general summary of what those

20   opinions are?

21   A.  Sure.

22       So the 75-milligram dose of Pradaxa, it's my opinion

23   that it has not actually been shown to be safe and effective

24   based on real data collected in patients as part of the

25   approval process.  The drug was never tested in patients

1    with atrial fibrillation, so I don't believe it's been shown

2    to be safe and effective based on the typical process that

3    it has undergone.

4         As a result of that, it's my opinion that when people

5    were taking the drug, these people with severe renal

6    impairment, because that's what the drug was -- that dose

7    was meant to be used in patients with severe renal

8    impairment.  So people like that, that were then given the

9    drug by their doctors, those people then became guinea pigs

10   because they were the ones who didn't -- the doctors did not

11   actually have knowledge that those people -- that drug had

12   not actually been tested in patients before it was being

13   used for that reason.  The process was different for this

14   drug at that dose.

15   Q.  Let me break that down just a little bit, if you could.

16        You indicated that the drug was not tested in people

17   with severe renal impairment; is that true?

18   A.  Yes, that's correct.

19   Q.  Can you explain to the jury what severe renal impairment

20   is?

21        They saw some video yesterday, but I think we dropped

22   them into the deep end of the pool without explaining some

23   of that terminology.

24   A.  So when your kidneys aren't working properly, there is

25   different levels of it not working properly, and doctors can

1    put that into a category, either severe -- severe renal

2    impairment means the kidneys just aren't working hardly at

3    all, to moderate impairment, to mild impairment, to normal

4    kidney function.  So the patient can be graded based upon

5    where they fall.

6         And if the patient has something called severe renal

7    impairment, where they take a measurement -- I believe I was

8    sitting yesterday during one of the depositions, and

9    somebody mentioned the term creatinine clearance.  So that

10   is a term, a science term or a medical term that is a test

11   that you can do to determine what level of function you have

12   in your kidneys, how well they are working or not.

13        So really low values of creatinine clearance indicate

14   that your kidneys may be severely renally impaired or

15   moderately impaired or mildly impaired, and the doctor needs

16   to look at that.  It's the severe renal impairment that is

17   at issue here because those are the patients that were being

18   prescribed the 75-milligram dose.

19   Q.  Is creatinine clearance ever abbreviated?

20   A.  Yes.

21   Q.  And how is it abbreviated?

22   A.  Typically big C, little R, big C, little L, all one

23   together.

24   Q.  And that's just the amount of what?

25   A.  So you want the details or just generally?

Laura Plunket - Direct (Moskow)                    142

1    Q.   Just generally.

2    A.   So generally it's just telling you whether or not your

3    kidneys are working probably.  Are they -- the kidneys

4    filter things in and out of your body, and they filter drugs

5    out.  They take the drug from your bloodstream, and they

6    move it out of your body.  And so they're either filtering

7    well or removing things well or they're not.

8         When they don't work well, and things don't get removed

9    from your bloodstream, you can get things that build up in

10   your blood that can be harmful.  And that's why patients

11   that have very severe impairment have to undergo a procedure

12   called dialysis where they actually have to help the blood

13   clean itself.  So you'll go in, and there's a procedure done

14   where the blood is actually cleaned by a machine in order to

15   help you get those toxic things out of your blood.

16   Q.   At the level of severe renal impairment, first of all,

17   is there a number that we look at as kind of a line when

18   someone has severe renal impairment?

19   A.   Yes, there's a standard that is applied.

20   Q.   And what is that?

21   A.   That is less than 30, so a creatinine clearance value of

22   less than 30.

23   Q.   And once somebody has a creatinine clearance of less

24   than 30, are their kidneys working well?

25   A.   No, they're not.

1    Q.   Okay.  So we're talking about a drug that is working in

2    people whose kidneys are not working?

3    A.   Yeah.  When you are giving a drug to -- when you are

4    giving Pradaxa at 75 milligrams, you are giving it to a

5    patient whose kidneys are not working very well at all.

6    Q.   Is there anything about Pradaxa in particular that

7    raises concerns about people whose kidneys aren't working

8    well even getting the drug?

9    A.   Yes.

10   Q.   And what is that?

11   A.   That is the fact that Pradaxa is a drug that is mainly

12   removed from your blood by the actions of the kidneys.  So

13   if your kidneys aren't working, you have no way to get it

14   out of your body, and so that's really important.

15        Many drugs are removed multiple ways from your body.

16   The liver can break them down so that they're no longer

17   active in your blood.  But in this case, that doesn't

18   happen.

19        What happens is the drug has to -- if it is absorbed

20   into your blood, it has to be removed through the kidneys.

21   So if your kidneys don't work, more and more Pradaxa builds

22   up in your blood, and that creates an issue of too much

23   Pradaxa in your blood.  And that's dangerous because too

24   much Pradaxa has been shown to be associated with an

25   increased risk of bleeding.

Laura Plunket - Direct (Moskow)                     144

1    Q.  What is your concern about too much Pradaxa?

2    A.  It's dangerous, causes too much bleeding.  Or can

3    increase your risk of bleeding.

4    Q.  Now, Doctor, you also indicated when you were kind of

5    giving that general discussion that the 75-milligram dose

6    had not been tested in people whose kidneys were not working

7    well; is that true?

8    A.  That's correct.

9    Q.  How, if at all, has Boehringer warned individual

10   patients in West Virginia about that?

11   A.  Ah, they haven't.  If you go to the labeling for the

12   drug, which for the patient would be the Medication Guide,

13   it doesn't tell you that the drug was never tested in

14   patients with atrial fibrillation with severe renal failure

15   to show that it was safe and effective.

16   Q.  You also mentioned that you get too much Pradaxa, and

17   that's dangerous.

18       How does Boehringer warn patients in West Virginia about

19   that?

20   A.  It doesn't provide you with that specific information.

21   It just does not.

22   Q.  Can you tell the jury whether Boehringer properly warns

23   both patients and doctors about who is most at risk to

24   bleed?

25   A.  It's my opinion that they don't provide a full -- full

Laura Plunket - Direct (Moskow)                    145

1    list of information for patients that are at the greatest

2    risk.  They provide some pieces of information, but it's

3    never put together in what I would consider an adequate --

4    we will use the word warning because it's a very specific

5    part of the drug label, and I know we're going to talk about

6    that.

7        But it's my opinion that the warning that is given to

8    doctors as well as to patients is not enough in order for

9    the doctor or the patient to understand the real risks or

10   the real dangers of the drug.

11   Q.  Do you have an opinion as to whether Boehringer properly

12   instructs doctors and patients on how to avoid or at least

13   lessen, minimize the bleeding risks with Pradaxa?

14   A.  They don't, and that's really important.

15   Q.  Why is that?

16   A.  Because there is a way that is available that the

17   company is aware of in order to identify those people that

18   would be a greatest risk of experiencing the dangers or the

19   increased risk of bleeding.  And that's a -- a very simple

20   tool of measuring the amount of the drug that is in the

21   blood.

22   Q.  We'll talk more about that today?

23   A.  Yes.

24   Q.  Okay.  Let me ask you kind of this formalistic thing

25   that we need to do in court.

Laura Plunket - Direct (Moskow)                    146

1          Are all of the opinions you've just told the jury held

2     to a reasonable degree of scientific and regulatory

3     certainty?

4     A.   Yes.

5     Q.   What does that mean to you?

6     A.   That means that, in my opinion, it's more likely than

7     not that I feel comfortable, I believe the evidence says

8     that these things are more likely to happen than not.

9     Q.   All right.  Now that we've kind of got that introduction

10    out, I want to go into a little bit more detail on

11    everything you just told the jury.  Okay?

12    A.   Okay.

13    Q.   So let's start with your education.

14         Where did you go to school?

15    A.   So my undergraduate degree is from the University of

16    Georgia, and my doctorate degree is from the College of

17    Pharmacy at the University of Georgia.

18    Q.   Okay.  Let's start with your undergraduate degree.

19         What is that in?

20    A.   So it's in zoology.

21    Q.   What is zoology?

22    A.   It's the study of -- essentially the study of living

23    organisms, and it's looking at the differences among the

24    different organisms such as -- I studied everything from a

25    worm or a fruit fly up to an animal.  You don't -- and even

Laura Plunket - Direct (Moskow)                    147

1    into humans.

2    Q.  And so you got a four-year degree in that?

3    A.  Yes, I did.

4    Q.  Okay.  And then what did you do after you got that

5    four-year degree?

6    A.  I realized after I completed my degree that I was

7    interested in research, interested in working in a

8    laboratory, for example, and I was really interested in

9    going into teaching at a medical school or some other type

10   of college.  So I decided to get a degree that applied, ah,

11   sort of a science to humans.  I was interested in

12   understanding human diseases.

13       I didn't want to go to medical school, so what I did is

14   I applied for the pharmacology program at Georgia.  And I

15   was lucky enough to actually get a full assistantship and a

16   full ride, which is why I stayed there.

17   Q.  When you were at the University of Georgia getting your

18   Ph.D. in pharmacology, was there a particular focus or a

19   concentration that you had?

20   A.  Yes.  So when I joined the department, there were

21   professors that worked in all different areas of

22   pharmacology and essentially all different types of drugs.

23   You could specialize in drugs that are used to treat

24   diseases of the heart, disease of the brain.  A variety of

25   cancer was another area.

1          I was very interested in the heart, in the cardio --

2     what we call it the cardiovascular system.  So I was

3     interested in drugs that are used to treat things like high

4     blood pressure, arrhythmias, atrial fibrillation we're going

5     to talk about today.  So I specialized in an area called

6     cardiovascular pharmacology, which essentially is just the

7     study of drugs that are used to treat diseases that deal

8     with the heart and the blood vessels.

9     Q.  As part of your Ph.D., did you have to write like a

10    scientific paper?

11    A.  Yeah.  Well, I had to write several.

12    Q.  Can you give us some examples, then, of the kinds of

13    papers that you wrote, then?

14    A.  Sure.

15         So the program I was under, everybody had to do original

16    research, so things in the lab that were new.  And you had

17    to write up a thick volume they called a dissertation.  And

18    then from that, my professor required you to take pieces of

19    your work and publish it in these journals or the scientific

20    literature that I talked about looking at.

21         So I published -- I worked on a drug, and within that

22    drug I published several papers that dealt with how the drug

23    was triggering life-threatening arrhythmias, so changes in

24    the heartbeat, and how that could lead to death.

25         So I was looking at the issue of overdosage of this

1    drug.  Too much of this drug could lead to the patient not

2    just being treated -- and the disease was congestive heart

3    failure I was looking at.  And I was looking at how that

4    drug got -- if the concentrations in blood get too high, you

5    can actually trigger an event that can kill you.

6    Essentially it was called ventricular fibrillation.

7        We're talking about atrial fibrillation.  So I know Dr.

8    Friedman -- I heard him say the atrium and ventricle, and he

9    explained the difference.  So I was looking at an arrhythmia

10   that arises in the lower chambers of the heart, not an

11   arrhythmia that is arising in the atrium or the upper

12   chamber.

13   Q.  Now, I hope I'm not embarrassing you.

14       That was approximately 34 years ago that you did that?

15   A.  Actually it doesn't embarrass me.  I'm proud of the fact

16   that I'm still here after all that time.

17   Q.  In addition to the papers that you published as part of

18   your Ph.D., have you published anything since then?

19   A.  Sure.

20   Q.  Can you estimate the number of things that you've

21   published in the medical literature?

22   A.  I have about 35 or 36 papers that have been published in

23   the scientific literature over the years.  Most of my

24   publications occurred when I was still working in the lab.

25   But even today I still try to take the work I do and apply

Laura Plunket - Direct (Moskow)                     150

1    it into a publication.

2    Q.  Have you ever published about Pradaxa?

3    A.  No.

4    Q.  As part of your work on this project, did you ever

5    contemplate publishing about Pradaxa?

6    A.  Ah, I have thought about it.  But there are some things

7    that limit what I could say and do based upon some of the

8    information and where it comes from.

9    Q.  Okay.  Let me go back to kind of the chronology of your

10   career.

11        So you graduated with your Ph.D. in 1984?

12   A.  Yes.

13   Q.  Can you immediately go out and start pharmacology-ing or

14   is there something in between?

15   A.  Well, it depends what you want to do.  So as somebody

16   who wanted to go into teaching at a medical school, it was

17   advised that I do something called post-doctoral training.

18   Q.  What does that mean?

19   A.  So essentially it's additional training, additional

20   experience that you gather in the lab where I work under a

21   more senior scientist.  And I did that.  I applied for a

22   fellowship, which is a competitive program, at the National

23   Institutes of Health.  And I went there for two years and

24   performed research in a laboratory there in Bethesda,

25   Maryland.

Laura Plunket - Direct (Moskow)                151

1    Q.  Is the National Institutes of Health a governmental

2    laboratory?

3    A.  Yes.

4    Q.  So it's a U.S. government laboratory that you worked at

5    in Maryland?

6    A.  Yes.  I applied for -- essentially I had a government

7    paycheck.  Essentially it was coming through them so, yes,

8    that's correct.

9    Q.  How long did you do that?

10   A.  It was a two-year program, so I was there from '84 until

11   1986.

12   Q.  And then what did you do?

13   A.  So then I was -- applied for -- I sometimes call it my

14   first real job, although I worked on these other things as

15   well.  But I applied for a job as faculty member, as a

16   professor at a medical school, and I was lucky enough to be

17   offered a position at the medical school in Little Rock, the

18   University of Arkansas for medical sciences.

19   Q.  And how long were you a professor at the University of

20   Arkansas?

21   A.  A little over three years.

22   Q.  What subjects did you teach?

23   A.  So I taught pharmacology to medical students.  The job

24   of this department was to teach the doctors in training, ah,

25   about how drugs work and how they can be used safely and

Laura Plunket - Direct (Moskow)                    152

1    effectively.

2    Q.  Did you also teach toxicology?

3    A.  Yes, I did.  Because that was -- I also had -- I was

4    lucky enough to get two separate positions.  I had a

5    position appointment to the pharmacology department, and I

6    had a separate position appointment to the department of

7    toxicology.

8        Some schools, that's all one.  But in this school, they

9    had two separate departments, so I had an assistant

10   professorship in each department.

11   Q.  Okay.  With regards to toxicology, you told the jury

12   earlier that you were board certified.

13       How long have you been board certified?

14   A.  Since 1993, so 25 years.

15   Q.  In addition to being a pharmacologist and a toxicologist

16   and a consultant who works with the FDA, do you do anything

17   else?

18   A.  Yes.

19   Q.  What's that?

20   A.  So I was -- in 1997, I moved from one company out.  And

21   I was very interested in taking inventors -- so in a

22   research environment in a medical school, for example,

23   people that work there, the professors may make a discovery

24   that they want to get a patent for.  So a patent is

25   something that you apply for that allows you alone to have

Laura Plunket - Direct (Moskow)                    153

1    the rights to sell it.  Nobody else can make that exact

2    product until your patent expires.

3        So many people within schools seek patents, and many

4    universities seek patents for things that their scientists

5    invent because it has value.  They can actually -- they can

6    actually take that and sell it to a company that will then

7    buy it and commercialize it.  So I work now helping

8    university-based inventors move their ideas from their

9    laboratory bench to the marketplace.

10   Q.  Do you have a particular certification or qualification

11   to do that?

12   A.  Yes.

13   Q.  What is that?

14   A.  So in order to do this, I have to sit for the patent bar

15   exam.  The patent bar is a little different than the regular

16   bar exam.  You don't have to have a law degree, but you have

17   to have the qualifications.  So you have to show that you

18   have some type of specialized degree like in science, which

19   I did.  You have to have shown that you have worked there

20   for a number of years.  And then essentially I had to sit

21   and take this exam, which is the same exam that people in

22   law school take.

23       And if you pass it, you get something called a

24   registration with the U.S. Patent and Trademark Office.  So

25   I have a registration with them, which means that I can

Laura Plunket - Direct (Moskow)                    154

1    officially sign documents for my inventors and put those in

2    for consideration with the U.S. Patent and Trademark Office.

3    Q.  You talked a little bit about the FDA.

4       Can you tell the jury how long you've worked at the FDA?

5    A.  So I've never worked at the FDA.

6    Q.  Has that fact, that you have never worked at the FDA,

7    ever interfered in any way that you could identify as it

8    relates to how you work with the FDA?

9    A.  No.  No.  There are many people like myself that have

10   never worked for the FDA, but we represent our clients, or

11   we work with our clients on problems that are related to

12   some regulatory or FDA process.

13      So certainly people do work for FDA first, and then

14   maybe do what I do.  But some people do what I do, which is

15   just gain that experience through the work they've done over

16   the years.

17      I actually took some courses at one time, and I still do

18   that every once in a while, with an organization that

19   lawyers that specialize in food and drug law teach.  It's

20   called the -- the organization is called FDLI, the Food and

21   Drug Law Institute.  And that's one of the ways that I

22   gained expertise and experience with the FDA regulatory

23   process.

24   Q.  Okay.  We're going to talk more about the FDA regulatory

25   process in a moment, but I want to go back to your work as

Laura Plunket - Direct (Moskow)                155

1     consultant.  Okay?  So don't lose that train of thought.

2         You told the jury that you were a consultant for how

3     many years?

4     A.  Since 1989 is when I did my first consulting.  So almost

5     30 years.

6     Q.  So in that almost 30 years, that's after you left Little

7     Rock?

8     A.  Yes.  I left Little Rock in late 1989.

9     Q.  Okay.  What kinds of companies or individuals have you

10    worked for as a consultant over that 30-year period?

11    A.  A wide variety of types of people.

12        The majority of my work has been on -- has been with

13    people that have a product or an issue that is under the

14    purview or is part of the FDA, part of the Food and Drug

15    Administration's process.  So I've worked with large drug

16    companies before helping them with issues that come up as a

17    part of this regulatory or the FDA interaction.

18        I've worked on drugs, over-the-counter drugs.  I've

19    worked on devices.  I've worked on cosmetics.  I've worked

20    on supplements.  I've worked on diagnostics.  That is

21    another area where you -- it's a type of test that -- a

22    laboratory that you have to get approved by FDA.

23        And those companies that I've worked with have been in

24    the past large companies like a Boehringer.  Today I work

25    mostly with smaller companies because I'm very involved

1    right now really with that initial commercialization with

2    people.  But I do have some larger clients as well that have

3    to -- have an issue with complying with some part of the FDA

4    process.

5    Q.  In the time that you've worked with companies, either

6    big or small, and their interactions with the FDA, have you

7    played any role in, I guess, the material that is supplied

8    to the FDA for approval of a drug?

9    A.  Yes, I have.

10   Q.  Can you explain briefly what you mean by that?

11   A.  So at different points in time over those 30 years, I've

12   worked with clients that are actually taking data or

13   information that they have developed that's going to be used

14   to support -- for example, we're talking about a new drug

15   application here, would be used like that.

16       So we would actually -- I worked on teams typically in

17   the past to do this.  We would write up the scientific

18   information that would then be submitted as part of this new

19   drug application to FDA.  I've done that also for device

20   companies and other types of submissions as well.

21       I've also worked with the companies on other issues

22   after the -- after a product has already gone to market as

23   well.

24   Q.  You said drug new drug application.  Is that commonly

25   abbreviated in the industry?

Laura Plunket - Direct (Moskow)                157

1    A.  Yes.

2    Q.  And what is that abbreviation?

3    A.  It's called an NDA.

4    Q.  Is the NDA an important document?

5    A.  Yes.

6    Q.  Why is that?

7    A.  It is the document that contains all of the information

8    that the company is relying upon to show that their drug is

9    safe and effective for the use it is seeking.

10       So in this case, the NDA was -- that we're going to be

11   talking about -- well, the NDA that is important here is

12   whether or not Pradaxa was safe and effective for use to

13   treat patients with atrial fibrillation.  So this was all of

14   the data collected from all the different sources put

15   together in a very large submission.

16   Q.  Is the proposed label part of the NDA?

17   A.  Yes.

18   Q.  Who is responsible for proposing the label for a new

19   product?

20   A.  The company.  So in this case, Boehringer was

21   responsible for putting together that initial label that was

22   submitted as part of the NDA.

23   Q.  What role, if any, have you played in proposing labeling

24   as part of a new drug application?

25   A.  So for some of the clients that I've worked for, I have

Laura Plunket - Direct (Moskow)                    158

1    helped contribute sections, but I have never drafted a full

2    label.  But I have indeed -- as a pharmacologist and

3    toxicologist, certain sections of the label are relevant to

4    what I do, and so that is the kind of things that I've done

5    in the past.

6    Q.  You said they are relevant to what you do.

7        As an FDA consultant, is there any part of the label

8    that is not relevant to what you do?

9    A.  So in this issue, no, all of it is relevant.  But as far

10   as the kinds of things I was asked to do as far as helping

11   with that issue would tend to be the issues related to data

12   collected in either humans or animals that show that the

13   drug is either working or to show that the drug has a toxic

14   effect.  And that's the kinds of summaries that I helped

15   drafted that were put into some of the labeling.

16   Q.  Okay.  Now in addition to the consulting work that

17   you've talked about and the patent work that you've done,

18   you're here on kind of a different project, right?

19   A.  Yes.

20   Q.  How do you describe what you're doing here today?

21   A.  I call it litigation support, so litigation being a

22   lawsuit.  And so I'm supporting science issues that come up

23   on one side or the other as part of the litigation process.

24   Q.  How long have you been doing litigation support?

25   A.  I think my first case was in 1991.

1    Q.  And have you worked for plaintiffs, defendants, both?

2    Could you explain that a little bit?

3    A.  So I've worked for both, and it depends upon the kind of

4    cases.  I work more for plaintiffs in one area, and I work

5    for a mixture of defense and plaintiffs in other areas.  It

6    just depends.  There's all kind of issues, science issues

7    that I have dealt with in the past.

8    Q.  Over the last 20 years, would you say you have worked

9    more closely with plaintiffs who have issues regarding drug

10   safety or defendants defending those claims?

11   A.  In the area of what I call -- litigation for what I

12   call -- I call it product liabilities.  That is the idea

13   that something has been harmful to an individual.  Since

14   about 2003, almost all of that work has been for plaintiffs.

15   Q.  Okay.  Approximately how much per year do you earn in

16   these kinds of litigation support projects for plaintiffs

17   lawyers and plaintiffs in general?

18   A.  Sure.  So I charge an hourly rate for the work that I

19   do.  And over the years, on average, it's been about 50

20   percent of my income.  Some years 150 to 170, some years

21   more, some years less.

22   Q.  Okay.  And you said it's about 50 percent of your

23   income.

24       How much of your time is spent doing this kind of

25   litigation support?

Laura Plunket - Direct (Moskow)                    160

1    A.  Well, an average would be about 30 percent of my time.

2    Some months like this month it's been a lot more.  It just

3    depends on what kind of the mix -- I have three practice

4    areas that I do, and it depends on the mix at that

5    particular time.  There has been a lot of litigation the

6    last couple of months.

7    Q.  Okay.  How much per hour do you get for testifying?

8    A.  $300 an hour.

9    Q.  And you've indicated to the jury that you've been

10   working on this Pradaxa project, correct?

11   A.  Yes.

12   Q.  Approximately how long have you been working on the

13   Pradaxa project?

14   A.  I think I first started about six years ago.

15   Q.  And can you estimate the total amount that you've earned

16   over that six years working on Pradaxa?

17   A.  The last time I looked, it was about $135,000.

18   Q.  Now, you also said that you've testified -- you called

19   them product liability or drug liability matters?

20   A.  That's what I would call this but, yes, that's correct.

21   Q.  Okay.  And have you testified in courts like this one

22   about those issues?

23   A.  Yes.

24   Q.  Can you estimate how many times you've done that?

25   A.  In a trial or a deposition or both or --

Laura Plunket - Direct (Moskow)                 161

1   Q.  How about just trial, like sitting here with jurors like

2   today?

3   A.  Dozens of times at trial.  I want to say maybe as many

4   as 50.  I don't have an exact number.

5   Q.  Okay.  And have you testified as a fact witness,

6   somebody who was part of the company in doing the work or as

7   an expert like you're here today?

8   A.  My work has been as an expert.  I've never worked for a

9   drug company, for example, so my work has -- with drugs has

10  always been as an expert.

11  Q.  Okay.  And in these, you know, several dozen, maybe as

12  many as 50 times that you've testified as an expert, what

13  kinds of issues generally have you talked about?

14  A.  So kind of what I'm doing today.  Regulatory matters.

15  Understanding what a company -- what is the process that a

16  company is under in order to get a drug approved, for

17  example, the different things they have to do, the kinds of

18  studies.

19      But as a pharmacologist and a toxicologist, I look at

20  that data on the issue often of something called risk

21  assessment.  That is the idea of determining do the risks

22  outweigh the benefits for a product.  What are the benefits

23  and what are the risks, and how do we look at those?

24      I also often, because of my background, am asked to talk

25  about the mechanism of action of a drug.

Laura Plunket - Direct (Moskow)                    162

1    Q.  What does that mean?

2    A.  So sitting here and telling -- explaining what it is the

3    drug is supposed to do and how it does it, if we know.

4    Sometimes we don't know.  But if we do, it gives context for

5    a jury or for the lawyer in understanding the information

6    that will go through this part of the regulatory submission,

7    for example the NDA.

8    Q.  And from time to time as part of that work, are you

9    asked to talk about whether or not a label adequately warns,

10   appropriately warns?

11   A.  Yes.

12   Q.  Without giving us an exhaustive list, can you identify a

13   couple of things that you might have talked about?

14   A.  Sure.  So some of the drugs that people recognize, a

15   drug called Vioxx that was used for arthritis treatment in

16   the past, that caused -- was shown to cause heart attacks

17   and actually was taken off the market.

18       A drug called Risperdal is another one that people have

19   heard of a lot.  It's been in the news.  It's a drug used to

20   treat mental disorders like schizophrenia and bipolar, but

21   it is also used in children to treat attention deficit

22   disorder, hyperactivity.  And that drug has -- I was

23   testifying about the need to add a warning to the drug.  It

24   wasn't adequately warning about some of the side effects.

25   Q.  Now you mentioned Vioxx, and you said it was removed

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunket - Direct (Moskow)                    163

1    from the market.

2    A.  Yes.

3    Q.  When, if ever, had the FDA approved that drug?

4    A.  It had approved that drug.  It was approved -- I don't

5    know the year.  It was in the early 2000s, and it came off

6    the market, I believe, in '06.

7    Q.  And you also indicated with regard to Risperdal, you

8    advocated a change in the warning?

9    A.  Yes.  It was actually two different -- two different

10   types of issues have come up.  But, yes, different

11   information became available over time that doctors needed

12   to know about.  And it was my opinion that this information

13   was something that was known and should have been put into

14   the label.

15   Q.  Okay.  Has it been put into the label now?

16   A.  The information -- yes.  I mean, it wasn't because I

17   caused it to happen obviously, but certainly yes.  Those

18   things that I was testifying about are things that actually

19   have changed in the labeling for that drug.

20   Q.  Was Risperdal approved without the warnings that you

21   identified were necessary?

22   A.  Yes.  Originally it was, yes.

23   Q.  I want to switch gears a little bit and talk about the

24   FDA, if we can.  I think a lot of people hear the words FDA,

25   and you can maybe explain what means.  All right?

Laura Plunket - Direct (Moskow)                    164

1    A.   Sure.

2    Q.   Food and Drug Administration?

3    A.   Yes.

4    Q.   Approximately how many drugs are they dealing with on a

5    daily, weekly, monthly, yearly basis?

6    A.   So just in the area of prescription drugs, it's

7    thousands of drugs that the agency is responsible for

8    oversight.  And oversight meaning from the time the

9    applications are first put in up through the entire time the

10   drug is on the market, the FDA has responsibilities.  So

11   there is thousands of drug products out there on the market

12   that they are responsible for.

13   Q.   And does the FDA have a certain -- I don't want to call

14   it a mission, but kind of a rule or, I don't know, a

15   standard that they apply when they are looking at drugs?

16   A.   Yes.

17   Q.   And what would that be?

18   A.   So the role of the FDA is protecting public health.  So

19   when they are looking at approval of the drug, the issue is

20   the data has to show that the risks of the drug are not

21   out -- don't outweigh the benefits.  In other words, the

22   drug has to be safe and effective, and the effectiveness has

23   to justify the risks that the patient is put under by taking

24   that drug.

25   Q.   So risks don't outweigh benefits.

Laura Plunket - Direct (Moskow)                    165

1        Is it just a scale?  They put the risk on one side, and

2    the benefits on the other, and they say, oh, we're good?

3    A.  Not exactly, no.  But, I mean, there is -- there is --

4    you know, there is a -- you could use that, but that is

5    really not what happens.  It's much more -- it's more

6    complex than just more -- more benefits than there are

7    risks.

8    Q.  Okay.  Are they looking at how the benefits outweigh the

9    risks in individual patients, or are they looking at how the

10   risks and benefits work in an entire population?

11   A.  Their decisions are based on populations.  So they look

12   at data collected in a population, and it's what that data

13   says about the population, and that's how they will justify

14   that decision.

15   Q.  Is that important when you're talking about drug safety

16   whether you are looking at the population as a whole or

17   individual patients?

18   A.  Yes.

19   Q.  Why?

20   A.  It's because for any drug that is studied, and for the

21   data that is developed that FDA looks at, that data may not

22   be representative of the real people that eventually are

23   going to take the drug.  It's understood that that is what

24   happens.  So this is why the FDA process includes a need to

25   monitor or -- or look at the safety of the drugs after

Laura Plunket - Direct (Moskow)                166

1      they're marketed.

2          That's why companies don't just submit the application

3      and walk away and say we're done.  They submit the

4      application, and then they're required to continually

5      monitor or look at whether or not, once it's released into

6      the general public -- and those people may not be exactly

7      like the population that was studied initially -- that the

8      drug still is safe and effective as it's used -- as it is

9      intended to be used.

10         So they look at it in a population of atrial

11     fibrillation patients.  That's how this drug was assessed.

12     Q.  Now you testified a little bit earlier that the

13     75-milligram dose was not tested before it was sold, right?

14     A.  Yes, that's correct.

15     Q.  All right.  So how -- and I may be jumping ahead of us a

16     little bit, but why wasn't the 75-milligram dose tested in

17     people with severe renal impairment or severe kidney

18     problems?

19     A.  Because the company was looking at a different dose

20     rather than 75, not the 75 dose.  So they collected data on

21     two other doses of the drug, but not that one.  And after

22     the process was completed, when they looked at this issue of

23     severe renal impairment, there was an understanding that

24     there was a need to say something about what to do for those

25     type of people.  And so the FDA actually was the one who

1    made the decision that a 75-milligram dose needed to be

2    available.

3    Q.  Okay.  And we're going talk more about that in a moment.

4        I want to go back to why people with severe kidney

5    problems weren't studied.  Do you know?

6    A.  Yes.

7    Q.  Can you explain that to the jury?

8    A.  So it's -- I call it ethics, medical ethics.  It's the

9    idea that we know we have a drug that is mostly eliminated

10   from the body by the kidneys.  So we know that people who

11   have low kidney function are going to be really at risk if

12   they take this drug.  So as a result, in order to make the

13   clinical studies, the studies that are done before the drug

14   is approved as safe as we can for the patients, we excluded

15   those people, and we said you have to have some level of

16   kidney function in order to enter that trial.

17       And so they had a set number of 30 that they wanted

18   people to be above.  And that's why they were excluded

19   intentionally because of this issue of understanding a

20   safety issue that could be there.

21   Q.  Can you tell the jury are you criticizing or complaining

22   in any way that they excluded people with bad kidneys from

23   the study?

24   A.  No, I'm not.  That was totally appropriate.

25   Q.  So what are you saying about that?  What should the

Laura Plunket - Direct (Moskow)                    168

1   company have done?

2   A.  So once -- well, there is a lot of other information

3   that is --

4   Q.  We're going to get there.

5   A.  Yeah.

6      But essentially, based on what was known about the drug

7   at the -- before the studies were even started and

8   additionally afterwards, when you realize that you have this

9   issue of severe renal function impacting the safety, it's my

10  opinion that you would have a responsibility to go ahead and

11  look at at least some people in a study that was controlled

12  to understand what -- how those patients were going to

13  respond for safety and efficacy.  And so that is what was

14  not done.

15     Instead what was done is they used a -- a tool called

16  modeling, so -- and we'll talk a little bit about it

17  possibly.  But essentially they used an indirect way to look

18  at whether the drug would lead to blood levels of a certain

19  level, and that's how they quantified and determined if the

20  drug could be safe.

21  Q.  And you just used the term a tool called modeling.

22     Another way of saying it is that they used a computer

23  program to predict what would happen in people that they

24  didn't test?

25  A.  Yes, that's what they did.

Laura Plunket - Direct (Moskow)                    169

1    Q.   Okay.  So they never used the drug in real people, the

2    75-milligram dose?

3    A.   In a clinical study, that's correct.  Like they did for

4    the other doses, that's correct.

5    Q.   What, if any, opinions do you have as to whether that

6    information should have been communicated to patients here

7    in West Virginia?

8    A.   I think it was important -- I have an opinion that

9    that's what should have happened.

10        If they were going to provide a drug like this with the

11   safety issues without letting them know that, oh, by the

12   way, this has never been shown in a clinical study to be

13   safe and effective in patients with severe renal impairment,

14   then that's an issue that the doctor and the patient can

15   discuss on whether you want to be able to take this drug or

16   not.

17   Q.   Going back to the FDA for a moment, you said that, you

18   know, they have this process where they evaluate whether the

19   risks don't outweigh the benefits, right?

20   A.   Yes.

21   Q.   Is that something that they kind of put together on the

22   fly, or are those rules and regulations that everybody plays

23   by?

24   A.   It's -- it's a rule and a standard that everybody is

25   aware of, and everybody has to meet that type of a standard.

Laura Plunket - Direct (Moskow)                    170

1         And each drug is different.  Some drugs, there's

2    life-threatening risk issues.  Some drugs, the risk issues

3    you're dealing with are not life-threatening.

4    Q.  Are there specific federal regulations that you deal

5    with as an FDA consultant that speak to how the FDA

6    evaluates whether the risks don't outweigh the benefits?

7    A.  Yes.

8    Q.  And what is that?

9    A.  So there is something called the Code of Federal

10   Regulations, the CFR.  The FDA has a specific section, and

11   it has the No. 21.  So the 21 CFR.  It's kind of a book, or

12   you can actually go online and find them.  And it lists in

13   it in certain sections that deal with prescription drugs all

14   of the rules and procedures that are required.  It tells the

15   company exactly what, for example, has to go into an NDA.

16   It tells the company exactly how a label is put together.

17   It tells the company exactly what they have to do, once the

18   drug is approved in order -- after it's marketed, to

19   continue to know that the drug remains safe and effective.

20   Q.  Are those rules that you work with every day?

21   A.  Yes.

22   Q.  And did you use your understanding and experience of

23   working with those rules in reaching your opinion in this

24   case?

25   A.  Yes.

1    Q.  Can you explain to the jury about all of the testing

2    that the FDA does in people before it approves a drug?

3    A.  So it is not involved in clinical testing of drugs that

4    are being commercialized this way.  It doesn't do the

5    testing.  The company does all of the testing.

6    Q.  I want to stop there.

7        So when the FDA approves a drug, what information does

8    it have to approve a drug on?

9    A.  All -- the information based on studies that the

10   company, in this case Boehringer, performed.  So they

11   have -- the regulations set out these are the kinds of

12   studies you need to do, and then the company does those

13   studies.  And then those studies are analyzed and put into

14   this big package, and the FDA then reviews the data that has

15   been collected by the company.

16   Q.  Okay.  So to be fair, when the FDA is reviewing the data

17   that the company came up with, does it take it at face value

18   or does it, you know, put it into a computer and see if the

19   numbers actually add up?

20   A.  It will do some of their own analysis.  They have a

21   group, it's a specialty called statistics, where people --

22   that is what they do.  They take large sets of data like

23   this, and they look to make sure that, ah, they agree

24   essentially with the analysis the company has done.

25       So the company sends in the data, analyzes it, describes

Laura Plunket - Direct (Moskow)                    172

1    it, and then the FDA checks that.

2    Q.  Okay.  You told the jury a little bit earlier that the

3    FDA actually asked for 75-milligram dose, right?

4    A.  Yes.

5    Q.  What, if any, testing did the FDA do with regard to the

6    75-milligram dose?

7    A.  They did no testing.  Again, the only thing that was

8    done, both the company and the FDA did this computer

9    modeling.

10   Q.  And what information did they use to put into the

11   computer to figure out whether the 75-milligram dose would

12   be better in terms of benefits than the risks that were

13   involved in it in people with bad kidneys?

14   A.  So they took data that had been collected as part of the

15   NDA at a higher dose, 150 milligrams.  That's what the FDA

16   did.  Then they took this data from a study that was done

17   early on.  It wasn't done in AFib patients, but it was done

18   in people.  And those people were given the 150-milligram

19   dose one time, and their blood was taken, and they looked

20   for the level of the drug in the blood.

21       And that information was used to put into this computer

22   program because they had people in the study that had all

23   different levels of kidney function.  So I think there were

24   maybe 11 people that had -- in the study that had severe

25   renal impairment.  There were, I think, nine or ten in each

Laura Plunket - Direct (Moskow)                173

1    of the other levels.  They had some normals.

2        So it was a study that was called a Phase 1 study, and

3    that's what FDA did.  They took that data, they looked at

4    the blood levels that were achieved, and they compared that

5    information to the information that was available from the

6    much larger -- I think it was mentioned -- RE-LY trial.  So

7    they looked at blood levels that were -- numbers from the

8    drug in that trial to see how it changed.  How did the

9    people exposed to 150 with severe renal impairment look

10   different on blood levels compared to the people that had

11   normal kidney function.

12   Q.  You gave us a lot of information.  I want to break that

13   down, if we can.

14   A.  Sure.

15   Q.  You said the study that the FDA used to put into the

16   computer to figure out whether the 75-milligram dose would

17   be safe and effective was based on giving 11 people with

18   severe kidney problems one dose?

19   A.  Yes.

20   Q.  Can you tell the jury for people on AFib, do they take

21   one dose?

22   A.  No.

23   Q.  How many doses would you expect somebody on AFib would

24   get?

25   A.  So they usually will take it for the rest of their life.

Laura Plunket - Direct (Moskow)                174

1    So most of the -- for example, the big clinical study done

2    in RE-LY went on for several years.  And so you would

3    typically in development do a study for a drug that was used

4    in AFib for several years, not just for a single dose.

5    Q.  I think what we'll do is we'll start looking at some

6    documents.  Okay?

7    A.  Okay.

8    Q.  Could you turn in your book to Exhibit 143?

9    A.  Is it in the back of the book or do you know?

10        Oh, I see.  I've got it.

11   Q.  Do you recognize Exhibit 143?

12   A.  Yes.

13   Q.  And without giving us too much detail, what is it?

14   A.  It's a letter from the FDA that tells Boehringer their

15   drug has been approved, Pradaxa has been approved.

16        MR. MOSKOW:  Your Honor, I move Exhibit 143 as the

17   full exhibit.

18        THE COURT:  Any objection?

19        MS. JONES:  No objection.

20        THE COURT:  It's admitted, and you may publish it.

21        MR. MOSKOW:  Thank you, Your Honor.

22     (PLAINTIFFS' EXHIBIT 143 ADMITTED INTO EVIDENCE.)

23        MR. MOSKOW:  All right.  So let's set the stage.

24   Q.  We're in October 19 of 2010?

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    175

1    Q.  How long as of October 19, 2010, based on your review of

2    the documents, had the 75-milligram dose been under

3    discussion for use in people with bad kidneys?

4    A.  I want to say only weeks at this point in time.

5    Q.  I'm sorry.  Could you repeat that?

6    A.  Weeks.

7    Q.  And how long had Pradaxa as a whole been under

8    investigation as of this time?

9    A.  Years.

10   Q.  More than a decade?

11   A.  Yes.

12   Q.  We're going to look at this in a little bit more detail,

13   but can you just tell the jury whether it is common or

14   unusual for a dose of a drug to be approved by the FDA after

15   only weeks of discussions?

16   A.  I find -- in my experience, that is highly unusual.

17   Especially for a drug like this, which was a new type of

18   drug within -- within a class and a new mechanism of action.

19   So a different type of drug altogether, so one that the FDA

20   didn't have a lot of experience with.

21   Q.  And at the time, at this time in October 2010, how long

22   had the FDA been reviewing this new drug application, this

23   NDA?

24   A.  So it was something that was under a fast review

25   process, so I believe overall maybe ten months.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunket - Direct (Moskow)                    176

1          But they had received information over time, so --

2    Q.   And you said they'd been reviewing it approximately ten

3    months.

4          Are we talking about, you know, a binder like the one

5    that you and I have in front of us or are we talking about

6    more information than this?

7    A.   A whole lot more information than that.  I mean, that

8    would be expected, absolutely.  You need to have a whole lot

9    more than one binder.

10   Q.   All right.  For those of us who aren't involved in the

11   pharmaceutical industry or the new drug application, are you

12   able to give the jury a sense in terms of paper how much

13   information we're talking about?

14   A.   So when I first started working in this area, people had

15   to submit everything in paper to the FDA.  Now we do it --

16   they can do it electronically, so it's a little easier.  But

17   it used to be a truckload or more of documents, millions and

18   millions of pages of information.  Because it's everything

19   that the company has done over the decade from their studies

20   in cells and tissues, in animals as well as the data that

21   they have collected in humans.

22   Q.   And just to capture something you just said there.

23        When the company is developing a new drug, they will

24   look at the molecule or the material itself like in a test

25   tube?

Laura Plunket - Direct (Moskow)                    177

1     A.   Yes.  They have to understand what is called the

2     chemistry.  So, yeah, they have to understand what it is,

3     they have to understand how to make it, and they have to

4     understand then what it does.

5     Q.   They test it in animals?

6     A.   Yes.  That's what you do because it would be -- would be

7     unethical again to go right to humans.  You start with an

8     animal in order to protect humans.

9     Q.   And then when you start testing in humans, do you go

10    right to sick people?

11    A.   No.  You start out in healthy people or healthier people

12    to start with.  Because, again, it would be unethical to go

13    right to a patient, a fragile patient, somebody who had an

14    underlying medical condition until you knew something about

15    the dose of the drug can be safe in people generally.  And

16    then once you do that, then you move into patients with the

17    disease or the condition that you're trying to treat.

18    Q.   Okay.  And what we're here about today, that would be

19    people with AFib?

20    A.   Yes.

21    Q.   And so what is that called, a Phase 3 or a pivotal

22    trial?

23    A.   So there is -- that's the study -- the Phase 3 study is

24    the ultimate study done in AFib patients that FDA relies

25    upon to provide the kind of the defining data or most

1    important data that it weighs for safety, for risks and

2    benefits.  There are some studies done before that that will

3    be in patients with AFib, but the majority -- the most

4    important data is going to be that what I call Phase 3

5    study.

6    Q.  So when we talk about the RE-LY trial, is it sometimes

7    called a pivotal trial?

8    A.  Yes.

9    Q.  And it's the pivotal trial because why?

10   A.  Because it's the one that is the largest and has the

11   most information relevant to the patients that are going to

12   be getting the drug.  So it's large, and it has those

13   patients specifically.  And it's designed to really look at

14   safety and effectiveness, risks and benefits, in the people

15   that are then going to get the drug once it's approved.

16   Q.  Okay.  And so when did Boehringer specifically study the

17   safety and effectiveness of the 75-milligram dose in people

18   with AFib and bad kidneys?

19   A.  They did not do that before the drug was approved.

20   Q.  What data, what information was there as of October 19,

21   2010, to support the approval of the 75-milligram dose?

22   A.  There was data on other doses.

23   Q.  What about the 75-milligram dose?

24   A.  There was no data collected on the 75-milligram dose.

25   Q.  I think you already told us that's unusual.

1        Why is that unusual?

2     A.  Because -- well, I think it's unusual for a drug like

3     this.  And that's because we know -- I talked about the fact

4     that the dose you give that give you the effect you want,

5     but it also can lead to a very serious life-threatening

6     bleeding event.  So there is not a lot of room for error

7     when you are deciding is that dose safe and effective?

8        And so that's what is unusual to me with a drug like

9     this, where the right dose, choosing the right dose is so

10    important so that you get benefits, but at the same time you

11    don't have too much risk.

12           MR. MOSKOW:  Let's look a little bit more at the

13    letter, if we could.

14           Going down, you'll see that there is a paragraph

15    that says we acknowledge receipt -- I'm sorry.

16           No, could you just do the paragraph before it.

17    Thank you.  That's on me.

18    Q.  Do you see that there's a paragraph -- no, just below

19    that one -- the paragraph that says we acknowledge receipt

20    of lots of information?

21    A.  Yes.

22    Q.  Is that common or uncommon that the new drug application

23    has a lot of supplements?

24    A.  It's common, especially for a drug like this, that I

25    told you had a fast review process.  Because they do do

Laura Plunket - Direct (Moskow)                    180

1    submissions -- they do submissions not always all at once,
2    but over a period of time.
3    Q.  Okay.  Is this process a one-way street?  Is the company
4    just throwing paper at the FDA or is there some sort of
5    interaction?
6    A.  There's interactions.
7    Q.  So are some of these submissions responses to FDA
8    questions or concerns?
9    A.  Yes.
10            MR. MOSKOW:  Next paragraph, please.  Thank you.
11   Q.  So this is the part that the company was waiting for
12   when they got this letter, right?
13   A.  Yes.  This tells them it's approved.
14   Q.  Okay.  And everybody is going to have to bear with me.
15   This is the first time I've used this machine.
16            But that is that line right there?
17   A.  Yes.
18   Q.  Okay.  And what does that mean?  I know we all assume
19   approve means you can just go out and sell it, but what does
20   it mean at the FDA?
21   A.  It means that the FDA has completed its review, and it
22   has found that the drug in their opinion is safe and
23   effective for use as labeled.  So, in other words, there is
24   specific conditions -- it's approved -- it's not just
25   approved for use in anybody, but it's approved for use in

Laura Plunket - Direct (Moskow)                    181

1    specific doses in specific types of patients, and it has to

2    be used according to the label.

3    Q.  And then as part of the approval, they say:  For use as

4    recommended in the enclosed agreed upon labeling text.

5        Do you see that?

6    A.  Yes.

7    Q.  I want to break that down, if we can.

8        For use as recommended, so what was Pradaxa being

9    recommended for?

10   A.  Use in atrial fibrillation patients as an anticoagulant.

11   Q.  Okay.

12   A.  So a blood thinner.

13   Q.  A blood thinner for people with that irregular

14   heartbeat?

15   A.  That's correct.

16   Q.  All right.  And then it says:  Enclosed agreed upon

17   labeling text.

18       Do you see that?

19   A.  Yes.

20   Q.  Try that again.  There we go.

21       And is that important information for the jury in your

22   opinion?

23   A.  Yes.

24   Q.  Why?

25   A.  Because you need to understand what happens when the

Laura Plunket - Direct (Moskow)                182

1    company submits the label, and the process that goes on to

2    arrive at what actually the doctor sees or the patient sees

3    in the Medication Guide.

4    Q.  Okay.  And what is the process that gets to an agreed

5    upon labeling test?

6    A.  I called it a negotiation, and I think actually

7    Ms. Kliewer also called it that.

8        So it's a back and forth.  So the company submits with

9    their NDA their first suggestion, this is the label we would

10   like to use with the product.  And then the FDA comes back

11   with comments.  And then there is a process -- in this case,

12   there was -- where FDA came back.  The company makes another

13   suggestion what I'd like to see or answers a question with

14   new information.  So it goes back and forth.

15       And eventually before the drug can get this approval

16   letter, there has to be an agreement on what that labeling

17   will say between the company and the FDA.

18   Q.  Okay.  And was that done here?

19   A.  Yes.

20   Q.  Okay.  Are there --

21       THE COURT:  Would this be a good point to take a

22   brief break?

23       MR. MOSKOW:  If I could have three minutes, Your

24   Honor?

25       THE COURT:  Go ahead.  I'll let you decide.

1        MR. MOSKOW:  I'll be done with the document then.

2    Q.  And let me ask you just very quickly with regard to that

3    back and forth.

4        Does it end once the drug is approved?

5    A.  No.

6    Q.  Can we turn to the second page of Exhibit 143?

7    A.  Yes.

8    Q.  And do you see there's a section that says Reporting

9    Requirements?

10   A.  Yes.

11   Q.  Can you just briefly explain to the jury what that

12   means?

13   A.  This is -- this is that section of the 21 CFR

14   regulation.  It cites something here, 314.80, 314.81.

15       It just means that the company is required after the

16   drug is approved to do certain things.  And those certain

17   things means that the drug -- that the company has to

18   continue to look at the drug after it is released into the

19   marketplace, track whether or not there is some new safety

20   issue or new risks they need to worry about.  Or whether

21   there is uses that appear to now be not safe, although they

22   appeared to be safe when the drug was first tested.  So

23   those kinds of things have to be monitored or looked at by

24   the company after the drug is released, and they have to

25   report certain information back to the FDA.

Laura Plunket - Direct (Moskow)                184

1    Q.  Okay.

2    A.  And that could lead to actually a change in the label

3    even, and so sometimes there is new labeling negotiations

4    that go on after the drug is approved.

5    Q.  And we'll talk about this more after the break, but my

6    last couple of questions involve the paragraph at the top of

7    the page.

8        Does the obligation that a company has to warn about the

9    safety of the drug stop when it's approved?

10   A.  No.

11   Q.  When does that stop?

12   A.  It never stops as long as the drug is on the market.

13   Q.  Okay.  And as part of that process, do drug companies

14   sometimes communicate directly with doctors and nurses and

15   people who treat patients?

16   A.  Yes.

17   Q.  Can you explain to the jury what we're talking about

18   here with this letters to health care professional that is

19   written at the top?

20   A.  So a company always has the opportunity, if they would

21   like, to convey especially important new safety information

22   to physicians directly, physicians, pharmacists, other

23   health care providers.  It can go to a large health

24   maintenance -- HMO.  It could be distributed to all of the

25   doctors and nurses there as well.

Laura Plunket - Direct (Moskow)                    185

1      But essentially it's -- they can send those letters out

2   directly to the physicians to tell them about this important

3   safety information.

4   Q.  When, if ever, has Boehringer sent out a letter

5   regarding the 75-milligram dose to doctors?

6   A.  I'm not aware of one.

7           MR. MOSKOW:  This is a good place to stop, Your

8   Honor.

9           THE COURT:  All right.  Ladies and Gentlemen, we'll

10  take a 10-minute recess.  You may retire to the jury room.

11          Dr. Plunkett, you may step down.  Don't discuss your

12  testimony with anyone.

13          We'll take a 10-minute recess.

14          MR. MOSKOW:  Thank you, Your Honor.

15      (Recess taken from 10:32 to 10:43 a.m.)

16      (Jury not present.)

17          THE COURT:  All right.  Are we ready to resume?

18          MR. MOSKOW:  We are, Your Honor.

19          THE COURT:  Let's bring the jury in.

20      (Jury present.)

21          THE COURT:  All right.  Be seated.

22          Dr. Plunkett, you can resume your examination.

23          MR. MOSKOW:  Thank you, Your Honor.

24          We don't have to put the document back on the

25  screen, but I want to talk a little bit more about this

Laura Plunket - Direct (Moskow)                    186

1    agreed upon label language.  Okay?

2    Q.  And you told the jury before we broke that there is a

3    negotiation.  In fact, you quoted Ms. Kliewer who testified

4    by video yesterday about that.

5    A.  Yes.

6    Q.  I want to find out, whose responsibility based on your

7    education, training and experience is it to ensure that the

8    label is complete and accurate?

9    A.  It's the responsibility of the company, in this case

10   Boehringer.

11   Q.  Okay.  And is that reflected in any of the documents or

12   rules and regulations that you work with?

13   A.  Yes.

14   Q.  Where is that reflected?

15   A.  Within the regulations themselves.  It talks about the

16   company putting together the label, the process and that,

17   again, after -- the responsibility of the company after the

18   drug is marketed to assure that the labeling remains

19   accurate and is not false and misleading with new

20   information that also becomes available.

21   Q.  Now, you said it's their responsibility to ensure that

22   it remains complete and accurate?

23   A.  Yes.

24   Q.  How is that done?

25   A.  That's this monitoring, what I call post-market

1    oversight by the company.  So even though FDA still has a

2    role in receiving information after the drug is marketed and

3    is a body that is out there, and they play some role in the

4    things they do.  But it's the label, still it's the

5    company's label, and they're responsible at all times for

6    making sure that what is there is accurate and complete

7    information so that the drug can be used safely and

8    effectively in patients that have the condition that the

9    drug is approved for.

10   Q.  And the jury heard Ms. Kliewer and Dr. Friedman talk a

11   little bit about this yesterday, but is there a process for

12   updating the label?

13   A.  Yes.

14   Q.  Can you explain to the jury how that works?

15   A.  So once the drug is on the market, and the label is out

16   there, is in use, if new information -- especially

17   information that deals with patient safety.  So risks,

18   that's really important.

19       If information is identified by the company, they have a

20   responsibility to notify FDA, but they also have a

21   responsibility and they can make that label change before

22   FDA actually approves it.  So there is two ways you can do

23   it.  You can submit to FDA the information about the label

24   change and wait before you make the change.  But there are

25   certain kinds of information that deal with this warning,

Laura Plunket - Direct (Moskow)                    188

1    safety risk information that a company can put into a label

2    at the same time that they're asking for the FDA to approve

3    it.  So they don't have to wait a period of time for FDA to

4    come back.

5         FDA will eventually come back to them, and it may be

6    that there is again a negotiation over what ends up.  But

7    certainly they have the ability to put that information in

8    their label that has to do with these important risks and

9    something that is not already in the label or something new

10   about the way the information is described in the label.

11   Q.  Has BI used this process to update the Pradaxa label

12   over time?

13   A.  Yes.

14   Q.  And once, twice, more than that?

15   A.  I can't give you the exact number, but certainly there

16   is one time that it's important in this issue because it has

17   to do with the issue of patients with renal disease.

18   Q.  Okay.  And we'll come back to that.

19        But it's more than just a couple of times, right?

20   A.  Yes.

21   Q.  Okay.  And with regard to this important time because it

22   has to do with renal disease or people with kidney

23   problems --

24   A.  Yes.

25   Q.  -- what are you talking about?

Laura Plunket - Direct (Moskow)                    189

1    A.   So the company made a change to the label that told

2    doctors they should be looking at renal function of their

3    patients when the patients are already on the drug.  So it's

4    the idea of understanding if kidney disease changes or their

5    renal function changes.

6         Maybe they used to be mildly -- mildly impaired, their

7    kidney function was just a little bit off, and all of a

8    sudden they get sick, and now the patient's kidney function

9    has gone way down.  So they asked doctors to monitor or look

10   at kidney function as the patient continues to be on the

11   drug to see if something needs to be done either to change

12   the dose of the drug or maybe even choose a different drug

13   for a patient.

14   Q.   When has this process been used to update the Medication

15   Guide -- which is the part of the label for the patient?

16   A.   Yes.

17   Q.   When has this process been used to update the Medication

18   Guide to talk about the importance of how much Pradaxa you

19   have in your blood?

20   A.   It's not been done at all for that purpose, that I'm

21   aware of.

22   Q.   Is that important information?

23   A.   Absolutely, yes.

24   Q.   Okay.  Would it help for the jury to understand a little

25   bit more about how Pradaxa works so they would appreciate or

Laura Plunket - Direct (Moskow)                    190

1    understand how important that is?

2    A.  I think so.  Hopefully they will think so, too.

3    Q.  All right.  So you've talked about anticoagulants, and

4    we've heard people talking about they are blood thinners.

5        How would you describe it to somebody you are meeting on

6    the street?

7    A.  So I sometimes talk about it as being a balance.  So

8    think about a teeter-totter in a playground, it goes up and

9    down, up and down.  And one side of the teeter-totter is

10   this issue of preventing a stroke, and the other side is

11   bleeding.  So the drug can prevent a stroke, but it can also

12   cause a bleed.  So you want that teeter-totter to be in

13   balance where there is no real risk of -- no large risk of

14   bleeding, but at the same time you're preventing strokes so

15   the teeter-totter would be in balance.

16       That's the ideal, what you're seeking with

17   anticoagulants.  You want each patient to be in this balance

18   where the strokes are prevented, but they're not at a large

19   increased risk of bleed.

20       MR. MOSKOW:  Could I ask you to step down from the

21   box with the judge's permission?

22       THE COURT:  You may.

23       MR. MOSKOW:  Thank you.

24       Could I ask you to take that microphone.

25   Q.  And if I could ask you to actually draw that

Laura Plunket - Direct (Moskow)                    191

1    teeter-totter that you just described to the jury.

2    A.   Sure.

3            MS. JONES:  May I just sit over here?

4            THE COURT:  Yes, you may reposition wherever you

5    like.

6            MS. JONES:  Thank you, sir.

7            THE WITNESS:  Can you hear me?

8        (Witness drawing.)

9    BY MR. MOSKOW:

10   Q.   Okay.  So what are you drawing for the jury here?

11   A.   So this is the teeter-totter in balance.  You're

12   protecting against stroke, but you haven't put the person at

13   such a large increase that they're expected to have a major

14   issue with bleeding.  So their blood is in a state where

15   they're getting anticoagulation, thinning to a level to

16   prevent strokes, but you're not at a large increased risk of

17   bleed.  And that's what everybody is seeking for their

18   patients.

19   Q.   What happens if you get too much Pradaxa in your blood?

20   A.   So when you get too much Pradaxa in your blood, think

21   about it this way, is this bleeding risk is going to shoot

22   up.  So bleeding goes way up when you get too much Pradaxa.

23   It's known.  There's a relationship between the level of

24   Pradaxa in your blood and an increase in your risk of bleed.

25   Q.   Is that dangerous?

Laura Plunket - Direct (Moskow)                    192

1    A.  Yes, absolutely.

2    Q.  Why?

3    A.  Because this bleeding can kill you.  We know that -- and

4    we know the relationship.

5        The company studied this issue in their clinical trial,

6    the RE-LY trial.  They collected data in patients that

7    actually showed that the level of drug in blood -- as the

8    level of drug in blood increases, the Pradaxa increases, as

9    it goes up, the bleeding risk goes up.

10   Q.  Could I ask you, before you put the pen away, to put

11   your initials and today's date, which I believe is the 4th?

12       Thank you.  And don't go away.  I'm going to ask you a

13   couple of questions while you are here.  I'm going to ask

14   you to draw something else.

15   A.  Sure.

16   Q.  How would a physician and a patient know whether or not

17   the teeter-totter is in balance or somebody is getting

18   thrown off the high end?

19   A.  Based on the data they have, the only way to know would

20   be to actually measure the level of Pradaxa in their blood.

21   That's the data they collected that showed there is a

22   relationship.  So if they measure it, they can have an

23   understanding, the doctor, based on the data where they

24   fall.

25   Q.  Can you tell the jury whether or not there is

Laura Plunket - Direct (Moskow)                 193

1    information in the label telling doctors what you just

2    explained?

3    A.   That's what is missing.  That's one of the big issues I

4    have with the label is they don't tell doctors how to

5    prevent the bleeding.

6         And also, there's also a relationship with this blood

7    level, with too little that is going to lead to not enough

8    effect, not enough prevention.  So there's a range of blood

9    levels that the company identify in their data that would be

10   useful for doctors to understand.  Too much, there's

11   words -- some people call this excessive exposure to

12   Pradaxa, which essentially just means too much drug in their

13   blood increases the risk of bleeding.

14        MR. MOSKOW:  Can I get the slide too much?

15   Q.   I'm going to put -- you just used the phrase excessive.

16   A.   Pradaxa or dabigatran, that's the same thing.

17        Okay.  So dabigatran is the chemical name for the active

18   drug in the body.  Pradaxa is the name of the pill you take

19   before the active drug gets into your body.

20   Q.   All right.  So this excessive dabigatran exposure, this

21   idea of too much Pradaxa, where is that happening on this

22   teeter-totter?

23   A.   It's -- the too much is happening when the blood levels

24   increase.  And so there is a -- there is data that shows

25   when blood levels -- too much Pradaxa in your blood gets

Laura Plunket - Direct (Moskow)                194

1   around about 200, the units they can measure, then that is

2   when this shoots up.

3       So you can measure too much Pradaxa in the blood, you

4   know that level, and that has been -- the data shows that

5   that was associated with two times or two -- two times or a

6   twofold increase in your risk of bleeding.

7   Q.  Is more Pradaxa better for preventing strokes?

8   A.  That is the difference.  That's why this teeter-totter

9   doesn't act like a typical teeter-totter.

10  Q.  Why?

11  A.  Because if this was a typical teeter-totter, and you

12  increase the level of Pradaxa -- notice I have this going

13  down.  You would think this risk is going up, but you're

14  preventing more strokes.  That's not what happens.  What

15  happens instead is like a broken teeter-totter.  The stroke

16  risk, once you get to these levels up here where you have

17  this increased risk, you're getting no more benefit.

18      So there is a really -- there is a good relationship

19  shown in the data that as the level of Pradaxa in your blood

20  gets higher and higher, you increase your risk of bleeding,

21  but at some point you get no more stroke prevention.  So no

22  more benefit, but much more risk, and that's what is

23  important to understand.

24  Q.  While you are here I'm going to ask you to explain to

25  the jury how Pradaxa actually works in the body.

Laura Plunket - Direct (Moskow)                      195

1        Is that all right?

2   A.   Sure.

3   Q.   Have you come up with a way to describe that to the

4   jury?

5   A.   Yes.

6   Q.   And how do you do that?

7   A.   So I'm going -- I'm not an artist, but I'm going to draw

8   a person.

9        I'm going to talk about something called

10  pharmacokinetics, and I'll explain that if you ask me to.

11  And then we're also going to mention, later I think, the

12  other part of the equation, pharmacodynamics.

13  Q.   All right.  So you're going to be drawing something for

14  the jury for pharmacokinetics?

15  A.   Right.  This is what I want to draw now.

16  Q.   Now we have put a slide up on the screen.

17       Why did you create this?

18  A.   So because it's a big word, it can be broken down into

19  two simple concepts, and so I think it's important for

20  people who don't have a background in pharmacology.

21       So pharmacokinetics is what the body does to the drug.

22  It is how, when you take the drug into the body -- and

23  that's what I was going to draw to show you -- what happens

24  to it when it gets in the body.  And the body actually

25  changes the drug in this case.

1          And then the other concept, pharmacodynamics, that's

2     what the drug does to the body.  So in this case, that's how

3     the drug causes anticoagulation or the way the drug prevents

4     clots from forming.  So that is pharmacodynamics.

5     Q.  Why don't you go ahead and -- is pharmacokinetics

6     sometimes abbreviated as PK?

7     A.  Yes.

8     Q.  So why don't you draw for the jury the way you're going

9     to explain PK.

10    A.  Sure.  This will be PK.

11         Again, I'm not an artist, but this is a person.

12         And up there on the screen there is three things written

13    down, absorption, distribution, metabolism and elimination.

14    Those are the three processes that go on in the human body

15    that take this to -- the drug going in, and you get a level

16    of -- you are going to get a level of I'm going to call it

17    dabigatran in blood.

18         So this is the process that is going to take the pill

19    out here -- that's the Pradaxa pill.  It's going to take the

20    pill, and we're going to put it into the mouth.  That's how

21    it is taken, orally.  And I'm going to show you how you get

22    from the pill here and then what happens to getting the drug

23    in the blood, and that's these three -- well, four

24    processes, absorption, distribution, metabolism and

25    elimination.

1           Want me to go ahead?

2       Q.   Please.

3       A.   So we take the drug into the body.  It goes into the

4       mouth, goes down the esophagus, and that's the stomach here.

5       The stomach connects to the intestines.

6           The other organs that are important, we talked about

7       kidneys.  The kidneys are over here; there are two of them

8       in our body.  We'll call this GI.  Gastrointestinal, your

9       intestines, the abbreviation we have seen, GI bleed, that's

10      this here.

11          And then I'm not going to draw all the different blood

12      vessels and things that are out here, but essentially what

13      happens is dabigatran goes into the stomach, and it gets

14      into the intestines, and it gets absorbed.  That's the first

15      thing.  So absorption is movement -- moving -- movement into

16      the blood.

17      Q.   So another way of saying absorption is the pill is in

18      the gut, and it has to get from the gut into the blood?

19      A.   That's right.

20          So pretend these little dots are -- once the capsule

21      goes in, it starts to disintegrate, and molecules of

22      dabigatran are released.  And so you get -- just pretend

23      these little dots -- I should probably do this in a

24      different color.

25          These are the ones -- this is dabigatran that passes

Laura Plunket - Direct (Moskow)                    198

1    through -- into the stomach and in through the intestine,

2    and then some of the dabigatran actually ends up in the

3    blood.  But that is what is different -- another important

4    thing about this drug is the difference between the amount

5    of this drug that gets into the intestine that never ends up

6    in blood.  So absorption for this drug is different than for

7    most drugs we take.

8    Q.  What do you mean?

9    A.  So Pradaxa, the dabigatran, there is something called

10   absorption, and it's only three to six -- let's say six or

11   seven, somewhere in that range.

12        When you take that pill, and these little molecules of

13   Pradaxa are in your stomach and your gut, only 3 to 6

14   percent of it ends up in your blood.  The majority of the

15   drug just goes right out through your intestines.  So 93 to

16   97 percent of the drug never gets absorbed.  It just stays

17   outside in the intestines and is passing through your body.

18        Only 3 to 6 to 7 percent of it -- and we'll just use

19   six, because I'm going to do some math in a minute, just

20   pretend three to six.  That's how much actually -- that's

21   why I put very few dots out here in your body and a lot of

22   dots in your intestines that actually comes out through the

23   body.

24   Q.  Is it common or uncommon for drugs that are marketed in

25   the United States to have only 3 to 6 percent absorbed?

1    A.  In my experience, that is something that could actually

2    stop development of the drug.  It's very, very low.  Most

3    drugs are absorbed -- in fact, most of the other drugs like

4    this drug that are used as anticoagulants are absorbed in

5    much higher amounts.

6         Warfarin is almost all absorbed.  Almost all of the

7    warfarin you take in gets absorbed into your bloodstream.

8    Other competitor drugs have absorption levels that range

9    from 60 percent up to 90 percent, so most of it goes in

10   versus most of it not going in.  So dabigatran is unusual.

11   Q.  What concerns, if any, do you have for the fact that 93

12   to 96 or 97 percent is remaining in the gut?

13   A.  So that's another important thing about this drug.  I

14   want to skip down.  Distribution, by the way, is just moving

15   around the body.

16        The next part is the metabolism part.  That is important

17   for this drug, and that is because this drug is administered

18   as something called a pro-drug.  And I think somebody used

19   the words on the videos.  Instead of just dabigatran, they

20   used dabigatran extelate.  I think it is spelled that way.

21        So the chemical that is actually in the pill here is

22   dabigatran etexilate.  It's the pro-drug.  All that means is

23   in order for this drug to absorb into the body and be active

24   to do what it's supposed to do, it has to be changed, and it

25   has to get rid of this, and you have to have just

1    dabigatran.

2         So dabigatran is the active drug.  Dabigatran etexilate

3    is not active.  So it has no activity on its own, but it has

4    to be there in order to get it in.

5         The company found out that this drug of dabigatran, no

6    absorption.  So in order to get it in so they could give

7    this drug and have it have an effect in somebody -- they

8    didn't want to give it directly into the bloodstream, they

9    wanted it to be oral, so they had to protect the drug so

10   that it could be passed acrost into the blood.  And they did

11   that by doing something called formulation, which just means

12   making it into a molecule that can actually pass from the

13   gut, the stomach into the bloodstream.

14        But once it's into the bloodstream, it gets activated.

15   The metabolism up there that I mentioned from the pro-drug

16   to this, that actually happens once it's in the blood.  But

17   that also happens -- we're going to make that red.  This is

18   going to be the activated drug.

19        Okay.  So dabigatran is red.  Dabigatran etexilate is

20   black.  What happens when it gets in the gut, you

21   actually -- all of these black dots, 80 percent of them

22   become red dots because, in addition to being metabolized in

23   the body to make active drug, you can metabolize the drug in

24   the gut to make active drug.

25        So when you're screening this out through your gut, this

Laura Plunket - Direct (Moskow)                    201

1    stuff that went in, it's not inactive.  Actually a lot of it

2    is active.  So you have active anticoagulant in the gut, and

3    you also have a much, much lower level of active

4    anticoagulant in the blood.

5    Q.  And you also mentioned that there is something called

6    elimination.

7        How does that work here?

8    A.  So elimination for this drug, 80 percent of what gets

9    absorbed goes out through the kidneys.  So to go out through

10   the kidneys, you have to get into the bloodstream.  That's

11   that issue of -- you know, I was mentioning the filtering

12   system of the blood that the kidneys do.  So of the 3 to 6

13   percent that goes in, 80 percent of that goes out through

14   the kidneys, and that's why kidney function is so important

15   for that.

16   Q.  Is that good for now?

17   A.  Yeah.

18   Q.  You can sit down for a second and then -- thank you.

19   A.  You're going to ask me probably.

20   Q.  Thank you.  I'll have you come back in a few moments.

21       All right?

22   A.  Sure.

23   Q.  Now, Doctor, you indicated that only 3 to 6 or 3 to 7

24   percent of this drug actually gets absorbed.

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    202

1    Q.  Is that important information for the jury?

2    A.  Yes, it is.

3    Q.  Given all of the testimony that you've given, where do

4    you rank that in terms of what they need to understand about

5    this drug?

6    A.  That is pretty high up there in importance because it

7    has a big effect on blood levels.  In other words, that

8    issue of so little absorption has a big effect on what

9    happens when you do absorb it.

10   Q.  So you're concerned that 3 to 7 percent --

11            MR. MOSKOW:  All right.  It's over here, sorry.  I

12   apologize.  They usually don't trust me with the equipment,

13   so I'm very excited.

14   Q.  So 3 to 7 percent gets absorbed?

15   A.  Yes.

16   Q.  So that means 93 to 97 percent in the gut?

17   A.  Yes.

18   Q.  You already told the jury that that is unusual for a

19   marketed drug in the United States.

20   A.  Yes.

21   Q.  Okay.  Is there a concern that you have about -- as a

22   pharmacologist and toxicologist about the 3 to 7 percent

23   that is actually absorbed?

24   A.  Yes.

25   Q.  Why is that?

1    A.   So the best way to do it is let's compare a drug that is

2    absorbed -- let's do three to six because I'm going to just

3    do -- I'm doubling the absorption.

4    Q.   Okay.

5    A.   So if you have a drug that goes from 3 to 6 percent

6    absorption, and that is typical, that is an average person,

7    if you're the person that absorbs it at 3 percent, and I'm

8    the person that absorbs it at 6 percent, that means you can

9    double -- I can have twice as much drug in my blood just by

10   the dose you gave.

11        So if you have 100 -- let's say you have 100 units of

12   the drug, and I in my blood -- or you do because you absorb

13   3 percent.  If I absorb 6 percent, I'm going to have 200

14   units in my blood.  So I'm doubling the amount of drug in

15   the blood just by going up 3 percent in that percentage of

16   absorption.

17        Now, most drugs are absorbed let's say 80 percent.  A

18   lot of drugs are absorbed in the range of 80 percent.  So if

19   I go up 3 percent from 80 to 83, I'm going to make a very

20   small change in that amount of drug in my blood.  Instead of

21   going from 100 to 200, I'm going to go from 100 to I want to

22   guess maybe 110 or 115.  So a very small change in blood for

23   the same change in absorption, and that's what is important.

24        People can differ from person to person within this 3 to

25   6 percent range.  But for other drugs, if you differ from 80

1    to 83 from person to person, what I get in my blood is going

2    to be not as effective as it would be for Pradaxa.

3         So big issues with the pharmacokinetics, and it has big

4    effects on blood levels, and blood levels are what drives

5    bleeding risk.  So big effect from person to person on the

6    amount you take into your body -- just normal people.

7    Forget the issue of kidney function right now, just talk

8    about normal people.  And then you're going to end up with

9    people -- one person can have twice as much drug in their

10   blood, and we know that those blood levels are related to

11   risk.

12        So that -- as a pharmacologist and a toxicologist, this

13   drug from day one has important issues that you need to

14   worry about when you're talking about would this drug be

15   risky in a patient.

16   Q.  Okay.  And this change from 3 percent to 6 percent, does

17   that have a technical term in the pharmaceutical world?

18   A.  Yes.  Sometimes you will see it discussed as

19   bioavailability.

20   Q.  So if we use that term or the jury hears

21   bioavailability, is an easy way of thinking about that the

22   amount that is actually available in your body?

23   A.  Yes.  So bioavailability of the drug, if it's 3 percent,

24   that means 3 percent of the drug ends up inside your body so

25   it can be active.

Laura Plunket - Direct (Moskow)                205

1    Q.  Is there a way that we talk about the difference between

2    the people over here who absorb 3 percent and the people

3    over here who absorb 6 percent?

4    A.  Yes.

5    Q.  What's that called?

6    A.  It's called variability with people.  Inter, I-N-T-E-R,

7    variability.  And I think we have a slide, but --

8    Q.  Great.

9        And so that is -- let's start with No. 1, this

10   inter-patient variability is differences between two

11   different people?

12   A.  Yes.

13   Q.  Is that common or uncommon in pharmaceuticals?

14   A.  Very common.  Every drug has some level of differences

15   between people.  And let's just restrict it to blood levels

16   to make it easier.  Yeah, any drug, the blood levels that

17   one person gets, but another person sitting next to them

18   could be different.

19   Q.  Okay.  And then this idea of intra-patient variability,

20   what does that mean?

21   A.  So that is the blood level that I have today versus the

22   blood level that I'm going to have two weeks from now.  So

23   it's the idea that I can take the same drug every day for

24   weeks or months or years.  And if I was to take the level of

25   drug in my blood on day 1 versus day 30, that level could be

1    different.  So that is differences just due to me, and

2    that's due to things that happen to me.

3        So for example, with this drug, if kidney function

4    changes in me day to day, that's going to lead to my

5    variability intra-patient.  If two people each have

6    different kidney function, that's the difference between

7    those two people, not just within that same person.

8    Q.  All right.  And as you're looking at this idea of, you

9    know, my drug levels today may be different than my drug

10   levels tomorrow, how do you know that?

11   A.  You have to measure it.  And in this case, we did that.

12   They did it -- and when I say we, I didn't do it, the

13   company did that.

14       They had a study where they actually -- in that clinical

15   study we are going to talk about, RE-LY, that big Phase 3

16   study, they actually did a good thing.  They actually

17   measured blood levels in their patients, in thousands and

18   thousands of people, and they were able to look at what are

19   the differences in the same person at different times.  But

20   the main focus was looking between people.  They -- even

21   though they took multiple samples in people, the same

22   person, the big issue was looking at what are the

23   differences between individual patients.

24   Q.  Okay.  Now earlier you were talking to the jury about

25   pharmacokinetics or PK, what the body does to the drug.

Laura Plunket - Direct (Moskow)                207

1        And that's our gingerbread man here, right?

2   A.   Yes.

3   Q.   We also talked a little bit about pharmacodynamics, what

4   the drug does to the body, right?

5   A.   Yes.

6   Q.   And I think the jury heard the phrase trough and peak.

7        Are those terms that are used in pharmacodynamics or PD?

8   A.   Yes.  It's how you relate PK to pharmacodynamics.  So

9   the relationship between those two things, what the body

10  does to the drug and what the drug does to the body, you can

11  look at that in terms of the levels at the lowest level in

12  the blood, which is the trough, versus the highest level in

13  the blood, which is the peak.

14  Q.   Okay.  Do you have a way that you can draw for the jury

15  to explain how that works with Pradaxa?

16  A.   Yes.

17       MR. MOSKOW:  With the Court's permission, could you

18  come down and do that?

19       THE COURT:  You may.

20       THE WITNESS:  So as a pharmacologist, one of the

21  things that I mentioned they did in this study is they

22  collected levels of the drug in patients over time.  So this

23  is the -- this would be blood level, and I'm just going to

24  say of a D for dabigatran, and this will be time.

25  BY MR. MOSKOW:

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunket - Direct (Moskow)                208

1    Q.  And just to be clear, every time you talk about

2    dabigatran, is that the same thing as Pradaxa?

3    A.  Yes.  It is the active form of Pradaxa, that's correct.

4    Q.  Okay.

5    A.  So I may use them interchangeably.

6         So pharmacologists want to know how much blood -- how

7    much -- what's the level of drug in blood over time.  So

8    they do these experiments, administer the drug and monitor

9    the patients to look for the level of drug in blood.

10        So let's just say you take one dose of the drug, just

11   one pill here.  Typically if you take one pill, the blood

12   level goes up, and then your blood level goes down over

13   time.  So time is going out here.

14        So you take the pill, you absorb it.  As absorption goes

15   on, you get to what's called a peak level.  That's the most

16   drug that a person is going to get in their blood when they

17   take that pill in, and then they're going to get down here

18   where it is gone.

19        That is one pill, but most -- a pill like this is not

20   taken just once.  It's taken every day for weeks and weeks

21   and months and years.  So the curve looks different when you

22   talk about multiple doses.

23        So now I'm going to draw a curve where I'm going to

24   give -- that's what this arrow mean, I am giving a new dose

25   of the drug.  For this drug, you give it every 12 hours.  So

1    this could be 12, 24 hours, 36 hours.  So one dose, two

2    doses, three doses.  So I'm going to draw that first in

3    black, and I am also going to draw it in two different

4    patients, so I'll do two colors.

5         So you give the drug, it goes up, reaches a peak, and

6    you give another one.  So then instead of dropping way down,

7    it goes up again.  And instead of -- you give another one,

8    and it never has time to go all the way down, and you build

9    up what's call a steady state.  That means the amount of

10   drug in your blood reaches a level that is fairly steady

11   around -- it has lows and highs every day, but it's in a

12   range between doses.

13        So now I talked about peaks here, this is called a

14   trough.  That's the other word.  So peak and trough, peak

15   and trough, peak and trough.  So every time you give the

16   drug, you have a low, and you have a high that is achieved.

17   Q.  Now is this a typical Pradaxa patient that gets to a

18   steady state like that?

19   A.  Yes, and it happens pretty quickly.  Within a couple of

20   days, people get to a steady state.

21   Q.  What happens if you have somebody with bad kidneys like

22   the people the 75-milligram dose is supposed to be used for?

23   A.  So that is important to know the difference, and that's

24   why I'm going to use a different color, the red being people

25   with the kidney function.

Laura Plunket - Direct (Moskow)                  210

1          So now we are going to draw this curve.  So this curve,

2     the people with kidney function, they are going to start

3     here.  And instead of ever really eliminating, because their

4     kidneys aren't working, they end up with much higher peaks

5     and even higher troughs because they can't get rid of the

6     drug.

7          Especially with a drug -- this drug is given every 12

8     hours, but for some patients with this kind of severe kidney

9     disease -- there's another pharmacokinetic term called

10    half-life that we look at.  And we know for the typical

11    patient who takes Pradaxa where their kidneys work fine,

12    half, 50 percent of the drug about, that you actually

13    absorb, will go out in 12 hours.  So the blood level should

14    drop by about half, 50 percent out.  So that's how the blood

15    level drops.

16         However, for a patient with kidney problems, with kidney

17    impairment, the kidney impaired --

18    Q.  Severe --

19    A.  Severe, that's true.  This is severe I'm showing.  That

20    half-life more than doubles.  Now we go from 12 hours to get

21    50 percent out to over 27.  So that means if you are given a

22    new pill at 12 hours, you still have well over half that

23    drug that you gave before in the body.  And that's why these

24    blood levels can be higher in a patient with kidney

25    impairment than a patient that doesn't have kidney

Laura Plunket - Direct (Moskow)                    211

1    impairment.

2    Q.  Thanks.

3        Now, Doctor, you said that the data that you were

4    talking about for absorption and elimination and

5    inter-patient variability and intra-patient variability and

6    all of these things that you were just talking about, that

7    data or that information comes from where?

8    A.  It comes from the company, comes from Boehringer in

9    their Phase 3 clinical trial.

10   Q.  And that's the RE-LY study that we've heard about?

11   A.  Yes.

12   Q.  Maybe just before we look at some of the RE-LY study

13   information, can you just explain to the jury what happened

14   in RE-LY?

15   A.  So how it was designed, is that what you're asking me,

16   or what it was studying?

17   Q.  Yeah, and how many people, who got what.

18   A.  Sure.  So RE-LY was a typical Phase 3 study in that it

19   was very large.  Other studies that are done early may have

20   several dozen people or hundreds of people.  This study, I

21   think was told you they had about eighteen or 19,000 people

22   in it, had a large -- was a very large study.

23       Over 6,000 people were given warfarin.  Over 6,000

24   people were given a lower dose of Pradaxa at 110 milligrams.

25   And then another group of about 6,000 people were given 150

Laura Plunket - Direct (Moskow)                    212

1    milligrams of Pradaxa twice a day.  So 110 twice a day or

2    150.

3         So there is two groups of people that get Pradaxa, one

4    group of people that gets warfarin, and they're comparing

5    the differences in whether or not the people have a stroke

6    or they have a bleed in all three groups.  But in addition

7    to that, in the Pradaxa patients, about 9,000 overall -- so

8    some in both of the dose groups -- they took blood levels.

9    And they have blood level data that they were able to see

10   how that blood level related to whether or not the person

11   experienced a bleed or experienced a stroke.

12        So that is how when I'm saying too much Pradaxa

13   increases your risk of bleeding, that is the data they

14   collected to actually look at that.  And that's really

15   important.  I actually -- it was a -- it was a good design

16   in that they had two doses, and they had both

17   pharmacodynamic data on prevention of stroke and whether or

18   not people bled, but they also related that to blood levels

19   and pharmacokinetics.  And so it gave us a lot of

20   information that is very useful in understanding how this

21   drug can be used safely and effectively in individual people

22   that then take it later.

23   Q.  When was all that information collected?

24   A.  It was collected before the drug was approved.  So I

25   think in 2009, they had finished the RE-LY study, and the

Laura Plunket - Direct (Moskow)                213

1    drug was approved in late 2010.

2    Q.  And had some of that information published in 2009,

3    2010?

4    A.  Yes, that's correct.

5    Q.  And when we say published -- when I say published, what

6    do you understand me to be talking about?

7    A.  So I know in the video they mentioned that they had

8    these investigators at a university in different places that

9    performed the study.  Those scientists, plus scientists from

10   the company, put together a paper, a publication, and they

11   submitted that to a journal, the New England Journal of

12   Medicine, and that paper was put out for other doctors and

13   other scientists to look at.

14       So we call it a peer-reviewed, P-E-E-R, publication.

15   That just means that other scientists have judged the

16   quality of the data before it was actually put out there for

17   other scientists to use and rely upon.

18   Q.  And is the peer-reviewed literature or the peer-reviewed

19   science important?

20   A.  Yes.

21   Q.  Why is that?

22   A.  Because it's what people like me or anybody else, a

23   doctor can go to and feel it's reliable information.  But he

24   can use -- for example, if he's making a decision on what

25   drug to use for his patient.  Or me as a scientist, I can go

Laura Plunket - Direct (Moskow)                    214

1    there and say this is reliable information that helps me

2    understand whether or not the risks outweigh the benefits of

3    the drug or what the drug does, how useful it was.  Those

4    are all questions you can answer by looking at that publicly

5    available peer-reviewed information.

6    Q.  After Pradaxa was on the market, has BI continued to

7    analyze that data that they collected from the RE-LY trial?

8    A.  Yes.

9    Q.  If I could turn you in your book to Exhibit 3247.

10   A.  Back or front?

11   Q.  Way at the back.

12   A.  Way in the back.  Okay.

13   Q.  I hope they are numerically in there so you can find

14   them.  If not, that's my fault.

15   A.  I have it.

16   Q.  Oh, great.

17       And do you recognize this paper?

18   A.  Yes.

19   Q.  What is it?

20   A.  This is a paper published by the author -- the authors

21   are people within Boehringer as well as these scientists who

22   worked on the clinical study.

23       And they took just the data on plasma levels --

24   Q.  Don't give me details, just --

25   A.  I'm sorry.

Laura Plunket - Direct (Moskow)                215

1      So it is a published paper in the peer-reviewed

2   literature by those individuals.

3           MR. MOSKOW:  Your Honor, this is Exhibit 3247.

4   Permission to publish?

5           THE COURT:  Any objection?

6           MS. JONES:  No objection.

7           THE COURT:  You may proceed.

8           MR. MOSKOW:  Thank you, Your Honor.

9   Q.  So you indicated that Exhibit 3247 includes people from

10  Boehringer?

11  A.  The authors are from Boehringer, yes.

12  Q.  Okay.  In fact, the first two authors, Dr. Reilly and

13  Dr. Lehr --

14  A.  Yes.

15  Q.  -- are from Boehringer?

16  A.  That's correct.

17  Q.  And actually so is the third, Sebastian Haertter?

18  A.  Yes.

19  Q.  And is that important for you as both a scientist and a

20  regulatory person that you are evaluating this paper?

21  A.  Yes.

22  Q.  Why?

23  A.  Two things.

24      First off, when you see a paper, whoever is listed

25  first, the first couple authors, those tend to be the ones

Laura Plunket - Direct (Moskow)                    216

1    that were most involved with the analysis and writing of the

2    paper.  They're called the senior authors that usually show

3    up.  Sometimes the last author is also important when you

4    talk about academic people, people at universities.  But

5    usually the first ones are the ones that actually did the

6    work.

7         And then it's also important, the second issue is

8    because they are with the company, you need to understand

9    that this paper was indeed something that was developed --

10   something the company knew about.  They were involved in the

11   analysis.  So this was the company's analysis of the data

12   that they had collected.

13   Q.  And I think you told the jury this already, but the data

14   came from people who are in the RE-LY trial?

15   A.  Yes.

16   Q.  When people are in trials, in clinical trials, is there

17   a process where they're told what the benefits and the risks

18   of the drug in the trial will be?

19   A.  Yes.  That was really important to my opinions about

20   this issue of not testing.  That's a really important

21   distinction.

22   Q.  Why?  Can you explain that to the jury?

23   A.  So if you decide to participate in a clinical trial, you

24   undergo a process called informed consent.  That means

25   before you agree to participate, you are sat down, and

1    you're told here's the things that can happen to you if

2    you're in this trial.  We don't really know yet if this drug

3    is entirely safe and effective.  But if you're willing to

4    work with us on this trial, then you're going to be helping

5    us generate the data to prove it's safe and effective.

6        So informed content by people in the trials is a really

7    important process.  They're told that this drug has not yet

8    been approved, it's not yet known to be safe and effective.

9    But if you're willing to participate, that will help us

10   collect the data to show that.

11   Q.  How did that happen to people who got the 75-milligram

12   dose once it was approved for marketing in the United

13   States?

14   A.  That's what did not happen.  That's why I said I have

15   the opinion that this drug was not properly tested or shown

16   to be safe and effective.  It's really important because --

17   that's why I made the statement about guinea pigs, because

18   people didn't know that this drug that they were taking --

19   whereas these people know.

20       We know we are involved in a test, and the test isn't

21   guaranteed.  Whereas when a drug is approved, it's assumed

22   that those drugs are safe and effective for use.

23   Q.  Going back to this paper, it was published in the

24   Journal of the American College of Cardiology; is that

25   right?

Laura Plunket - Direct (Moskow)                218

1    A.  Yes.

2    Q.  And I guess I'm not telling too many tales out of

3    school.

4        The American College of Cardiology is for heart doctors?

5    A.  Yes.  Cardiologists, those are doctors who treat

6    diseases of the heart.

7    Q.  Okay.  And was this paper aimed at people who treat

8    diseases of the heart?

9    A.  That is how I would -- that's what I see when I see it

10   published there.

11       You tend to -- as a scientist, you try to publish your

12   paper in a journal that will impact the scientists that you

13   want to read it.  So when I have done studies, I published

14   in a pharmacology journal because I'm interested in other

15   people like me seeing my results.

16   Q.  Who typically prescribes Pradaxa?

17   A.  Typically -- well, it's prescribed by cardiologists, but

18   it is also often prescribed by internists, more of a general

19   medicine doctor as well.  It's both kinds.

20   Q.  Now when, if ever, have you prescribed Pradaxa?

21   A.  Never.  So I'm not a physician.  I don't treat and

22   diagnose patients.  Instead what I do is I'm someone who has

23   studied and become familiar with and have actually taught

24   medical students about what drugs do to you, how they have

25   the effects that you're desiring them to have.

1    Q.  Okay.  Would it be fair to say that this article having

2    been written for doctors is kind of scientific?

3    A.  Well, actually this one is even more scientific than

4    some doctors can handle, I would argue.  But, yeah, it is.

5    It has a lot of details that are really dense or can be

6    difficult for somebody who is not a -- I would argue that if

7    you're not a pharmacokinetics person, somebody who

8    understands how drugs, you know, get into the body and what

9    happens, that this paper could be difficult.

10   Q.  Okay.  Can you work with me to help explain some of

11   these concepts to the jury?

12   A.  Sure.

13   Q.  Let's start with the title, it's a mouthful:  The Effect

14   of Dabigatran Plasma Concentrations and Patient

15   Characteristics on the Frequency of Ischemic Stroke and

16   Major Bleeding in Atrial Fibrillation Patients.

17       What's the simplest way you can explain what they were

18   looking at?

19   A.  They're looking at whether -- how the level of drug in

20   the blood relates to the risk of bleeding or the risk of

21   stroke.  So it's finding out what did the level in blood

22   mean for people that either have a stroke or have a bleed.

23   Q.  Okay.  And when they talk about patient characteristics,

24   what are those?

25   A.  Those are things such as kidney function, so looking at

Laura Plunket - Direct (Moskow)                    220

1    how the kidneys work.  They also looked at how the liver

2    works.  They look at age, how old you are.  They look at do

3    you have heart disease, do you have hypertension.  Those are

4    all characteristics.

5        Any person that comes into the study, not everybody is

6    exactly the same, and so they look at what is it about each

7    of the individuals in the study, and can some of those

8    things about you influence the level of drug in your blood?

9    So, for example, kidney function, they look at how that

10   affects drug in the blood.

11        MR. MOSKOW:  Okay.  If we could look at the first

12   line of the conclusions, please, on the abstract, first

13   page.

14        So this conclusion, I just want to read the first

15   line.  It says:  Ischemic stroke and bleeding outcomes were

16   correlated with dabigatran plasma concentrations.

17   Q.  First of all, what does that mean?

18   A.  That means what I tried -- what I think I said.  As the

19   drug -- the level of the drug in the blood goes up, you

20   increase your risk of bleeding.  And on the issue of

21   ischemic stroke, as the level of the drug in blood goes down

22   too far, you no longer are preventing those strokes.

23        So the level of drug in blood is really important to

24   being able to predict will somebody be at risk of bleeding

25   or will somebody be at risk of not having proper stroke

1    prevention.

2    Q.   Is there a term that people in pharmaceuticals,

3    pharmacologists like yourself, use to describe that range

4    where somebody is getting enough for it to be effective, but

5    not so much that it is dangerous?

6    A.   Yes.

7    Q.   What is that called?

8    A.   It's sometimes called the therapeutic range.

9    Q.   Therapeutic range.

10        Do some people call it the safe range?

11   A.   It can be called the safe range if you are wanting to

12   focus especially on the upper end issue.  But on this case,

13   it's not safe to not prevent stroke, so I would agree it's

14   important.

15        Some people call it the optimal range, too.  You'll see

16   that word used, the optimal range of -- the optimal dose

17   that produces a range that you want so the drug is safe and

18   effective.  You see that.

19   Q.   What about target range?

20   A.   Target range is another word that is used.  It's

21   a way -- you know, those blood levels that you want your

22   patient to fall in or you want somebody to have in order

23   to -- to understand that you're at the best balance you can

24   be between preventing strokes and preventing bleeds.

25   Q.   When the jury sees the word correlated in documents that

1    we're going to be looking at, what should they take away

2    from that?  What is important about that word generally used

3    in the scientific context?

4    A.  So correlate means things go together.  So in this case

5    that means if -- that means the blood level is related to

6    the risk of stroke or the risk of bleed.  So it means the

7    two things predict each other.

8         So if you know your blood levels are too high, that's

9    predictive of your risk of bleeding.  If the blood levels

10    are too low, that allows the doctor to have a better

11    understanding or allows the company, actually, to have a

12    better understanding on predicting what their risk of not

13    preventing ischemic stroke was.

14             MR. MOSKOW:  Okay.  If we could go to page 2, Gina.

15             I want to pull out just a couple of things in this

16    paper.  And if there's time we will go through others, but I

17    really want to focus on this language that starts with

18    however.

19             And it says:  However, there is a large variability

20    in the plasma concentrations achieved with any given dose

21    depending on absorption, renal function and other patient

22    factors.

23    Q.  How, if at all, does that language kind of line up with

24    what you've already told the jury?

25    A.  Well, that's a -- that's an issue of inter-individual

1    variability, you know, changes between people.  That's what

2    that variability is talking about.

3        So it lines up -- as I told you, that you could double

4    the amount of drug in your blood if you absorbed twice as

5    much, that is what this is talking about here.  It's that

6    general relationship between how the level of drug in your

7    blood is affected by things like how much is absorbed, how

8    your kidneys work, and then there's also other things they

9    found.

10   Q.  And they actually identified in this paper those other

11   things as well as the kidney function, right?

12   A.  Yes.  They looked at that in their data.

13   Q.  Okay.  So let's move to page 3, please.  And there's a

14   section on the right-hand side of the page called

15   Demographics.

16       Do you see that?

17   A.  Yes.

18       MR. MOSKOW:  It's magic.  And the part I wanted to

19   ask you about is the part that starts about four lines down

20   on the right.

21       It says:  Renal function, and it uses that CrCL that

22   we talked about earlier, was a key determinant of plasma

23   concentrations.  The subjects with moderate renal

24   impairment, between 30 and 50 milliliters per minute

25   creatinine clearance, showed a 2.29 fold higher trough

1    concentration than the subjects with renal function

2    undiminished by age, and then it says CrCL greater than or

3    equal to 80.

4    Q.   Could you put that in English for us?

5    A.   So what they found was that if the kidneys didn't work

6    properly, and people's kidneys were working where they were

7    clearing compounds in the range of 30 to 50 mils per unit --

8    that's just a unit.  That is people who have moderate -- not

9    severe that we talked about earlier.  These are moderately

10   renally impaired.  That if you looked at their blood levels,

11   that the people with that level of kidney impairment were

12   going to have at least twice as much drug in their blood at

13   that low level, the trough.

14        So trough is important, and I think we may be talking

15   about that a little bit later, but essentially just remember

16   concentration of the drug in blood.  So the Pradaxa in the

17   blood was much higher, over two times higher in patients

18   whose renal impairment was at the moderate level.

19   Q.   Now are these the people with the bad kidneys who are

20   getting the 75-milligram dose?

21   A.   No.  These were people getting either 150 or 110.

22   Q.   So what data do we have specifically identifying how

23   much the concentrations changed between people with good

24   kidneys and people with bad kidneys?

25   A.   In these AFib patients, we do not have that.

Laura Plunket - Direct (Moskow)                    225

1          MR. MOSKOW:  All right.  If we could go down to the

2     next paragraph on the page.

3          It reads:  Concentrations of dabigatran increased

4     with age with a 68-percent increase in trough concentrations

5     in patients age greater than or equal to 75 years compared

6     with those with less than 65 years.  Renal function was

7     highly correlated with age.

8          Let me stop there.

9     Q.  What does that mean?

10    A.  So the second sentence means that as you get older, your

11    kidneys don't work as well.  So we know that, we know older

12    people's kidneys don't work as well.

13         They're talking about two specific age ranges, the

14    greater than 75 and then the less than 65, because those

15    were some of the age ranges where the people in this trial

16    were -- were segregated.  They looked for people at

17    different kind of increments, people under 65, people over

18    65, people over 75.

19         They were older patients in the trial generally, and I

20    believe the average age was in the 70s.  But they wanted to

21    see now, okay, we know your kidneys don't work as well as

22    you age, what about looking at the concentrations in the

23    blood?  And they see that, as you age, indeed the

24    concentrations increase.

25         Not as much as you saw related just to kidney function.

Laura Plunket - Direct (Moskow)                226

1   There we had -- if you were to take 2.29 times, that would

2   be 229 percent.  So we get a 68-percent increase, a smaller

3   increase related just to age, but definitely both those

4   things are important.  Renal function is worse, but the age

5   alone was associated with the difference.

6   Q.  And what does that mean for somebody who is in her mid

7   80s, for example?

8   A.  That means if you're in your 80s, you're even more

9   likely to have a higher blood level of Pradaxa just because

10  you're old, regardless of how your kidneys work.

11  Q.  Now the last sentence is up on the screen:

12  Concentrations in female subjects were approximately

13  30-percent higher than those in male subjects.

14  A.  Yes.

15  Q.  Does that just mean that women have more of this drug in

16  their blood than men?

17  A.  Yes.  That means -- and some of it is related to the

18  fact that women -- men may be bigger.  The bigger you are --

19  we all take -- I take a 150-milligram pill.  Somebody else

20  that weighs twice me could take a 150-milligram pill.  So

21  that affects it.

22      But also there is often issues where women and men have

23  different pharmacokinetics.  So we know that females are

24  going to have more drug in their blood with Pradaxa than

25  males were in this study.

Laura Plunket - Direct (Moskow)                227

1       MR. MOSKOW:  I now want to turn you to page 5 of the

2   paper.  And this is a pretty dense paragraph, so I'm going

3   to stop and ask you as I'm reading what something means.

4       Okay?

5       THE WITNESS:  Okay.

6       MR. MOSKOW:  So the median trough and post-dose

7   concentrations were 55 percent and 36 percent higher,

8   respectively, in the subjects with a major bleeding event

9   than those in the subjects without bleeding events.

10  Q.  What does that mean?

11  A.  It just means that regardless of whether you talk about

12  the lowest level in the blood or the highest level in the

13  blood on any given date, these people that -- the people

14  that bled had more in their blood.

15      So, again, it is that relationship.  Too much Pradaxa

16  puts you at an increased risk of bleeding.

17  Q.  I want to skip down a little bit here.

18      At the bottom, you see median?

19  A.  Uh-huh.

20  Q.  It says:  Median plasma concentrations in subjects with

21  an ischemic stroke, or SEE, were not different from those

22  without these events.

23      Do you see that?

24  A.  Yes.

25  Q.  What does that mean?

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunket - Direct (Moskow)                    228

1    A.   That just means -- this is the other end of the curve.

2    So that means that the plasma concentrations, when you

3    looked at these people that did or did not have a stroke,

4    there didn't appear to be as big a difference in what they

5    found.  So there was less relationship on the low end of the

6    curve than there was on this issue with bleeding.

7         So if you're going to take blood levels of this drug,

8    the highest, too much levels were really predictive of

9    bleeding events.  The lower levels, it's a little more

10   difficult to say what is that absolute lowest level.  When

11   you go below that, we see no effect on prevention.

12        MR. MOSKOW:  So I don't know -- can the jury see

13   this from here?  Do I have to move it?  Great.

14   Q.   So we're looking at the teeter-totter?

15   A.   Yes.

16   Q.   So what is that language telling us about this part of

17   the curve?

18   A.   So it's -- that's that -- it's telling us what the red

19   line -- this is actually my broken teeter-totter, this whole

20   paragraph.  It's the idea that on my right side, where it

21   goes up, it is shooting up, the bleeding -- yes -- that's

22   the side where the first sentence is talking about as

23   concentrations go up in the blood, bleeding risk goes up.

24        But then on the other side, which is stroke prevention,

25   it is saying that there didn't appear to be the same type of

```
1    relationship, strong relationship between the level and the

2    likelihood that you would have a stroke.

3              MR. MOSKOW:  All right.  I'm going a little bit more

4    slowly than I meant to, so I'm going to take control, and

5    I'm going to do this here.  Thank you.

6              All right.  Hopefully figure this out.

7    Q.  If we could turn to page 3 again of the paper.  Can you

8    do that with me?

9    A.  Sure.

10   Q.  Do you see that there is a table at the bottom of the

11   paper?

12   A.  Yes.

13   Q.  I'm going to focus in -- I want to focus in on this

14   column here.  Okay?  So under the 150-milligram dose.

15   A.  Yes.

16             MR. MOSKOW:  I don't know if anybody can see these

17   numbers.  Let me try to make this a little bit bigger.

18             No, it's fine.  Thank you.

19             All right.  There we go.

20   Q.  And I just want to walk through quickly with this so we

21   can explain to the jury what this data means.  All right?

22   A.  Okay.

23   Q.  So on the first thing on the left here, do you see this

24   P10?

25   A.  Yes.
```

Laura Plunket - Direct (Moskow)                    230

1    Q.  What does that mean?

2    A.  That is a number that is identifying the level where the

3    lowest -- if you take 100 people and line them up -- or 10

4    people and line them up, this would be the No. 1 patient

5    over here, the one with the lowest levels of Pradaxa in

6    their blood.  And then P90 would be that person on the other

7    end with the highest levels.

8        So we're taking the population of blood levels, and we

9    are ranking them from lowest to highest.  And we have P10,

10   which is the patient with the lowest level in their blood,

11   and the P90 is going to be the patient at the top with the

12   highest level in the blood.

13       Now they had more than 10 patients, so these numbers are

14   going to be an average of those people, 10 percent of the

15   people, the lowest 10 percent, and then the highest 10

16   percent.

17   Q.  So what was the level of Pradaxa in the blood of the

18   lowest 10 percent?

19   A.  So these are going to be those trough levels, so this

20   should be a level that the person had in their blood before

21   they took their next pill.  Okay.

22       So the average was 39.8, about forty -- the units are

23   called nanograms per mil.  Just use the number 40.

24   Q.  And then the highest 10 percent, what number were they

25   at?

Laura Plunket - Direct (Moskow)                    231

1    A.   They were at 215.

2    Q.   Now, were all of the people at P10 at 39.8?

3    A.   No.  So if you look down here where it says min and

4    max --

5    Q.   Here and here?

6    A.   Yeah.

7    Q.   So in this population of people just overall, someone

8    had a level at trough as low as 1.04, essentially 1, and

9    somebody else had a level when they took the samples as high

10   as 809.  So that is how the span of the blood levels before

11   they took their next dose ranged within the population they

12   studied.

13   Q.   So in this study, there was somebody who had as much as

14   809 units in their system?

15   A.   Yes.  And, again, these are all people taking 150

16   milligrams a day, so it's -- and these are patients with

17   AFib.

18   Q.   And there was somebody who only had one?

19   A.   That's correct.

20   Q.   What is that variability called, the difference between

21   one and nearly 800 times that?

22   A.   So there is a number here.  See the CV percent, the

23   second line?

24   Q.   Right here?

25   A.   Yeah.

Laura Plunket - Direct (Moskow)                    232

1    Q.   Okay.

2    A.   So that 81.9 is a way that you can describe the

3    variability in blood levels in these people.  That means

4    that there could be numbers that were -- the difference

5    between the numbers, the variability from number to number

6    varied by 80 percent.  That's a really high level of

7    variability in a controlled clinical study.  Maybe not so

8    high when you talk about the real world.  But in controlled

9    clinical studies for most drugs, those numbers would be more

10   like 30 to 50, not 80, and maybe even as low as 20 for some

11   drugs.

12   Q.   Now, as part of the work that the authors did on this,

13   did they use, like, graphics to try to describe what we were

14   just looking at?

15   A.   Yes.  They tried to take all the data and show it

16   visually.  Because for a doctor that didn't want to delve

17   into necessarily all of the details, they could go to a

18   graph and visually understand what the -- what the results

19   showed.

20   Q.   Okay.  And I put up Figure 2 on page 6.

21        Do you see that?

22   A.   Yes.

23   Q.   Can you just generally describe for the jury what this

24   is showing us?

25   A.   So the red -- the area shaded in red with the red line,

Laura Plunket - Direct (Moskow)                    233

1    that is the calculate -- they predict what was somebody's

2    risk of experiencing a bleeding event based on their blood

3    levels at the lowest level, the trough.  And then the blue

4    area is what is the probability that somebody is going to

5    experience a stroke.

6        So obviously the lowest levels below 50, you'll notice

7    the stroke curve is higher, and the bleed curve is lower.

8    But as the blood levels go up and up and up, the bleed risk

9    shoots up, but you'll notice the stroke area stays fairly

10   constant.  So, again, no more benefit at those higher blood

11   levels.  But at some point, the risk there you see is

12   actually going much higher than the risk of stroke.

13   Q.  Okay.  And that P90 and P10 that we looked a little

14   while ago --

15   A.  Yes.

16   Q.  -- is that reflected at all on here?

17   A.  Yes.  If you take that -- there's a horizontal line at

18   the top that says DE 150 BID.  That just means dabigatran

19   etexilate, Pradaxa, at 150 milligrams given twice a day.

20   Q.  Okay.

21   A.  And then it draws a line, and the top -- the far left of

22   the line, drop it down all the way to the concentration,

23   that should be about your P10.  And over here at the top of

24   the line, drop it down, that should be identifying your P90.

25   Q.  And based on the data in this study and what we're

Laura Plunket - Direct (Moskow)                234

1  looking at here, what do we know about these people in the

2  P10?

3  A.  So the P10 are people that aren't getting enough drug.

4  They're at an increased risk of stroke.  That's why you see

5  that curve rising.

6  Q.  Okay.  And what about the people over here in P90, what

7  do we know about them based on the data that you've

8  reviewed?

9  A.  They're getting too much.  So too much Pradaxa in the

10  P90, too little Pradaxa in the P10.

11  Q.  What do you call this area in the --

12  A.  The area in the middle has been identified -- actually

13  the company, some of the scientists identified it as a

14  therapeutic range.  When I mentioned that, that is the blood

15  levels that if you stay within that zone, between P10 and

16  P90, you have -- you are preventing the strokes, but you

17  haven't increased your risk of bleeding to such an extent

18  that the risks are outweighing the benefits based on this

19  data.

20  Q.  Were you in the courtroom yesterday when the jury heard

21  the questioning of Ms. Kliewer?

22  A.  Yes.

23  Q.  And there was the discussion about a Dr. Temple from the

24  FDA.  Do you recall that?

25  A.  Yes.

1    Q.  And they used a term, sweet spot.

2    A.  Yes.

3    Q.  Do you have an understanding of what that means?

4    A.  Yes.

5    Q.  What is it?

6    A.  So it is -- the sweet spot is that range in the middle

7    here.  You can see where the lines are intersecting where

8    you have -- you are minimizing the risk of bleeding, but you

9    are maximizing the prevention, and so you're targeting

10   there.  You're trying to get your blood values in that range

11   based on their data so that you have less risk of either,

12   less risk of stroke and less risk of bleed.

13   Q.  Now while we're looking at this figure, it looks like

14   the stroke risk continues to go down even as the bleeding

15   risk is going up.

16       That's what it looks like, right?

17   A.  So -- you mean the blue line?

18   Q.  Yes.

19   A.  Yes.

20   Q.  Is there anything in the paper that would suggest that

21   that is not really what is happening?

22   A.  Yes.  There's a statement in the paper where the authors

23   talk about the fact that there is really no significant

24   increase in prevention, so no significant decrease in stroke

25   risk, the opposite of increasing.

Laura Plunket - Direct (Moskow)                    236

1        MR. MOSKOW:  So I'm bringing your attention to page

2    7 and the paragraph on the bottom left.

3        THE WITNESS:  Yes.

4        MR. MOSKOW:  And it says:  Because the risk of

5    ischemic events is relatively constant for patients with

6    higher plasma concentrations, including the daily -- excuse

7    me -- reducing the daily dose to such patients may reduce

8    the risk of bleeding without appreciable loss in efficacy.

9    Q.  Can you put that in English for us, please?

10   A.  That means that what is most -- if you want to talk

11   about risk to the patients, the higher levels are what's

12   important more than looking at the issue of prevention.  So

13   if you give more drug, you're not going to prevent more

14   strokes, but you have a much greater risk of getting a

15   bleed.  So the weighing of risks and benefits is different

16   when you talk about bleeds and strokes.

17       MR. MOSKOW:  And if I bring you back to page 6, the

18   page that had the chart that we're -- the chart we went

19   through or the figure, I want to look just to the right of

20   that.

21       You see there's a statement here that says:

22   Compared with the median trough concentration of 88

23   nanograms per milliliter adjusted for age and CHADS2 score,

24   the rate of major bleeding doubled at concentrations of 210

25   nanograms per milliliter.

1    Q.  What does that mean?

2    A.  So what they're doing here is they're saying if you look

3    at a blood level of 88 nanograms per mil in this work that

4    they've done, and you relate that to certain patient

5    factors, like how old they were -- the CHADS2 score is a

6    clinical assessment.  They look at the patients and whether

7    or not they have hypertension, diabetes.  It's looking at

8    these underlying risk factors for stroke for sure, but other

9    cardiovascular conditions.

10       So when they have people, they look at their age and

11   that kind of underlying risk factor score that they see at

12   88 nanograms per mil and compare it, that when you get from

13   88 to 210, you've doubled the risk, so 200-percent increase

14   in the risk of bleeding in a patient like that, that has

15   certain -- that are adjusted for age and underlying

16   conditions.

17   Q.  This rate of major bleeding doubled.  This doubled it.

18       Is that important to scientists like you when you're

19   evaluating data?

20   A.  Yes.  When you are talking about human -- human data and

21   risk, yes, the twofold increase or the doubling is an

22   important number.

23   Q.  Why is that?

24   A.  So when you analyze a data set, and you see things that

25   are doubling, more than two times of an increase in risk, if

1    you were to go and analyze that data with different kinds of

2    tests you can do, you would find that that relationship

3    between the increase, the doubling of the risk and the blood

4    level are more likely than not a true event, not something

5    that is just due to chance.

6        In science, when I do a study, some of the results I get

7    could just be because it happens, it's chance.  But this

8    means that when you get a doubling, you're less likely to be

9    just something that could just happen, but indeed is more

10   likely to be a true relationship; in other words, that the

11   blood level is actually affecting directly that risk of

12   bleeding.

13   Q.  When you were giving your opinions before, and you used

14   the phrase more likely than not, how if it all does this

15   doubling of the risk here fit into that?

16   A.  Oh, it absolutely is consistent with the more likely

17   than not.  Absolutely.

18   Q.  Finally, before we move on to something else, this P90

19   and P10, each one of those is 10 percent of the people on

20   the drug, right?

21   A.  Yes.

22   Q.  So it's 20 percent altogether or one in five?

23   A.  Yes, that's correct.

24   Q.  How do we know -- if you had five people here on

25   Pradaxa, how do we know who is getting too much and who is

1    getting too little?

2    A.  The only way to know is to measure it in their blood.

3    That's what this data is.

4    Q.  Have there been further studies looking at the data from

5    the RE-LY trial and how it relates to the gastrointestinal

6    tract?

7    A.  Yes.  There was another study.

8    Q.  Okay.  Do you have Exhibit 3124 in your book there?

9    A.  Yes, I do.

10   Q.  And can you, without giving us too much information,

11   tell us who the authors are?

12   A.  The senior author is John Eikelboom, and this is a paper

13   published in 2011, I believe.

14             MR. MOSKOW:  Your Honor --

15             THE WITNESS:  You need the journal or is that good

16   enough?

17             MR. MOSKOW:  Permission to publish?

18             MS. JONES:  No objection.

19             THE COURT:  You may.

20             MR. MOSKOW:  Thank you, Your Honor.

21             And I really want to move quickly through this, if

22   we can.

23   Q.  But just from the title, can you tell the jury what this

24   was looking at?

25   A.  So this is, again, data -- you see down low, the last

1    part of the title, the RE-LY trial.  More data from the

2    RE-LY trial, they are analyzing it.  But in this case

3    they're looking at -- specifically looking at bleeding risk.

4    So they're going to look within this database, and they are

5    going to try to parse out the people that bled and look at

6    very specific kinds of bleeds.

7       So not all bleeding is the same.  We have GI bleeding.

8    We have bleeding in the brain.  I think Dr. Friedman talked

9    a little bit about the different kinds of bleeding there can

10   be.

11              MR. MOSKOW:  Okay.  If we could jump to page 8 of

12   this paper, please.  And I want to -- it is still hard to

13   read from far away.  If we could take out the paragraph on

14   the left, the bottom left.

15              Would it be any bigger if we just started it higher,

16   please, just so the jury can see it better?

17              Okay.  Can you start lower and make it bigger?  See

18   where it says higher bleed?  Right at the beginning of the

19   paragraph.  Great.  That's a little bit bigger.  Thank you.

20              So, Doctor, this is talking about:  Higher blood

21   concentrations of dabigatran with increasing age might have

22   contributed to the higher risk of extracranial bleeding with

23   dabigatran compared with warfarin patients, age 75 years.

24              Let's stop there.

25   Q.  So what is that telling us?

Laura Plunket - Direct (Moskow)                241

1    A.   So it says that the more Pradaxa, dabigatran you have in

2    the blood as patients got older, as their age went up, they

3    were able to look at the risk of bleeding outside the brain,

4    extracranial.  So now they are focusing on these other

5    bleeds, like the GI bleeds, other places in the body, and

6    they see the higher blood level.  Higher blood levels made a

7    higher risk of those types of bleeds.

8    Q.   Okay.  But then they use the phrase might have

9    contributed, so they are trying to figure out whether it did

10   or not, right?

11   A.   That's correct.

12         MR. MOSKOW:  All right.  Then the sentence goes on

13   to say:  But this cannot explain the apparent selectivity of

14   the increase in major gastrointestinal bleeding with

15   dabigatran for the lower gastrointestinal tract.

16         So I need to stop for a minute.

17   Q.   What did the RE-LY trial show about the risk of major

18   gastrointestinal bleeding between Pradaxa and warfarin?

19   A.   So that there was a difference first off just generally

20   overall in GI bleeding.  Pradaxa had more than warfarin.

21   But when you looked at where the bleeds occurred in the

22   gastrointestinal system, high up in the system versus lower

23   in the system, that there was a difference with the way the

24   patients on Pradaxa versus the patients on warfarin were.

25   There were many more lower GI bleeds in people on Pradaxa as

1    compared to people on warfarin.

2        So there seemed to be something different about the

3    pattern of GI bleeds.  Where they occurred appeared to be

4    different, and the risk was higher for lower GI bleeds with

5    Pradaxa as compared to warfarin.

6    Q.  And we're going to come back to that in one moment.

7        Overall was there a percentage increase in major

8    gastrointestinal bleeds on warfarin versus Pradaxa?

9    A.  Yeah, overall a 50-percent increase.

10   Q.  Okay.  And so this is saying to the jury, we can't

11   explain the fact that it's just -- that there's an increase

12   in the GI tract, just age?

13   A.  That's correct.

14   Q.  And then they look for reasons why?

15   A.  That's right.

16        MR. MOSKOW:  Okay.  So dabigatran has a low

17   bioavailability after oral ingestion, and it is possible

18   that metabolism of dabigatran etexilate by asteraceaes leads

19   to progressively higher concentrations of the active drug

20   during transit of the gastrointestinal tract.

21   Q.  First of all, did I read that correctly?

22   A.  You did.

23   Q.  Could you describe it to me like I'm a high school

24   student?

25   A.  Okay.  So going back to that picture we drew.  I talked

1     about the fact that when Pradaxa goes into your mouth, the

2     pill, and it gets into your stomach and your gut, your

3     gastrointestinal system, very little gets absorbed.  Most of

4     it stays in your gut.  Most of it stays in your GI tract.

5         And I mentioned to you that when it's in the GI tract,

6     it can go from the pro-drug to active drug.  So it can go

7     from dabigatran etexilate to dabigatran.  So that is what

8     that is pointing out.  That is talking about because it has

9     a low bioavailability, only 3 to 6 gets in, 93 to 97 goes

10    out directly into the gut.  That, and the fact it can be

11    metabolized in the gut, means you're having a higher

12    concentration of active drug.

13        Whereas for warfarin, which is almost all absorbed and

14    is metabolized in the body to make drug that is not active

15    as an anticoagulant, if that ends up in the gut, that stuff

16    gets excreted in the gut.  It's not active locally like

17    Pradaxa.  That's what they are talking about.  There's a

18    difference between the concentration of the active drug in

19    the gut with Pradaxa versus with warfarin, and that could

20    explain the difference.

21        MR. MOSKOW:  Your Honor, I have about 10 minutes

22    left with this document, and then we can break.

23        Is that all right?

24        THE COURT:  Yes.

25        MR. MOSKOW:  Thank you.

Laura Plunket - Direct (Moskow)                    244

1    Q.  So the fact that we have this unabsorbed Pradaxa in the

2    gastrointestinal tract, in the gut, what is going on with

3    that?  What is happening?

4    A.  Okay.  So that's the concept of understanding that in

5    order for a drug to have an effect in your body, it needs to

6    get somewhere.  So it's called a local effect versus just an

7    effect due to the fact that it circulates throughout your

8    entire body.

9    Q.  And do these authors identify that?

10   A.  Yes.

11        MR. MOSKOW:  Could you go to the next paragraph on

12   the right?  Actually just the very top paragraph on the

13   right.

14        And so what these authors said is:  Thus, local

15   effects of dabigatran on diseased mucosa could account for

16   the relative increase in lower gastrointestinal bleeding

17   seen with dabigatran compared with warfarin in elderly

18   patients in the RE-LY trial.

19   Q.  Again, what is that telling us?

20   A.  So it's telling us -- because remember I told you the

21   drug can be activated in the gut.  If it is activated in the

22   gut, and it is sitting in the gut, it's passing through the

23   gut, it has the ability to lead to an anticoagulant effect

24   or a bleeding event if there is some -- something that has

25   been damaged in the gut.

1      So the other part we didn't read into the record was

2   there is different kinds of problems people have in their GI

3   tract as they age, and they can lead to the tissue being

4   damaged.  So now you have damaged tissue or diseased tissue,

5   and you have a high concentration of this dabigatran that is

6   an anticoagulant, it can act right there.  It doesn't have

7   to get into the bloodstream and be carried there.

8      Because, again, bleeding events with this are going to

9   tend to be occurring either at a site of injury or a site of

10   a problem with the blood vessel.  That is what leads to the

11   bleeding events.

12          MR. MOSKOW:  If we could go back to page 4 in this

13   paper.  That whole right-hand column from Site of Major

14   Gastrointestinal Bleeding down.

15   Q.  So do you see at the very top it says Site of Major

16   Gastrointestinal Bleeding?

17   A.  Yes.

18   Q.  And then it does some numbers as to where they are in

19   the Pradaxa folks and where they are in the warfarin folks?

20   A.  Yes.

21   Q.  Have you worked through that to try to figure out how

22   that plays out in actual differences in bleeding rates?

23   A.  Yes.  I -- you can take this data from this paper, and

24   you can actually just show with numbers how much the risk

25   was increasing.

1         Remember we talked about doubling the risk for bleeding

2    events overall as blood level goes up?  We can find a number

3    that shows how much the bleeding risk in the lower GI tract

4    goes up based on the data that was collected.

5    Q.  Can you walk me through that with the jury?  In the

6    interest of time, I'll do it right here.

7    A.  Sure.

8    Q.  Okay.  So we have --

9    A.  Two columns maybe, one for Pradaxa and one for warfarin?

10   Q.  Oh, sorry.

11   A.  I can't see --

12   Q.  All right.  So Pradaxa and warfarin.

13        Let's say for the sake of argument for doing this, we

14   have 100 bleeds on warfarin.

15   A.  Right.

16   Q.  Based on the data, GI bleeds, right?  These are GI

17   bleeds?

18   A.  Yes.  Let's focus on that.

19   Q.  All right.  That's a G, not a 6.

20        All right.  So based on the data in RE-LY, how many

21   Pradaxa bleeds, GI bleeds would you expect?

22   A.  Since it increased it by 50 percent, if you had 100

23   bleeds on warfarin, you would have 150 bleeds on Pradaxa.

24        So 50 -- so half -- 50 percent of 100 is 50.  So 100

25   plus 50 means you would predict 150 bleeds with Pradaxa

Laura Plunket - Direct (Moskow)                    247

 1    patients.

 2    Q.  All right.  So based on the data in that paper, what

 3    percentage of the bleeds, the GI bleeds on warfarin were in

 4    the upper GI tract?

 5    A.  So to make it easier, it was 53 versus 47.  Let's just

 6    pretend it's 50/50.

 7    Q.  I asked about warfarin.

 8    A.  Oh, I'm sorry.  Yeah.  Yeah.

 9        So it's 50/50 -- for warfarin it's 25 percent in the

10    low -- upper GI tract, and 75 percent in the -- yeah, that's

11    right -- in the lower.  So if you take 25 percent of 100,

12    that's 25.  And if you take 75 percent -- no, that's the

13    opposite actually.

14    Q.  Oh.

15    A.  No, no, no.

16    Q.  I did it backwards.  I'm sorry.

17    A.  Yeah.

18    Q.  It's hard to follow direction, isn't it?  Sorry.

19    A.  Right.

20    Q.  All right.  So this is upper GI and then lower GI.

21    A.  Right.

22    Q.  So upper GI --

23    A.  75 percent for --

24    Q.  -- 75 percent --

25    A.  -- warfarin.

Laura Plunket - Direct (Moskow)                    248

1    Q.  -- equals 75?

2    A.  Right.

3    Q.  And lower is 25 percent?

4    A.  Right, which will be 25 bleeds.

5    Q.  All right.  Now how about on Pradaxa?

6    A.  Pradaxa was about 50/50.  If you want to do the math, we

7    can.  But it was 53 percent versus 47, so let's just say

8    about 50 in the upper and about 50 in the lower.

9    Q.  I'll write 53, but for purposes of this we're going to

10   say 50 percent?

11   A.  Yeah.  I think it's the opposite, there were more in the

12   lower than there were in the upper, but maybe it was that

13   way.  Look at the data.

14   Q.  You have the paper in front of you, Doctor.

15   A.  Hold on.

16   Q.  It's on page 4, site of major bleeding.

17   A.  Yes, you're correct.

18   Q.  Okay.  And so 50 percent of 150 is how much?

19   A.  75.  So half of 150 is 75.

20   Q.  Okay.  And what about the lower GI, how many -- what

21   percentage of those bleeds?

22   A.  It was 47, but we'll pretend it's 50 for the math, the

23   ease of math.  And, again, it would be 75.  So half of the

24   bleeds in the upper and half of the bleeds in the lower.

25   Q.  So what is this calculation telling you about the

1    similarity or difference in bleed rates between Pradaxa and

2    warfarin in the GI tract?

3    A.   So if you look just in the -- you see in the upper GI

4    tract 75/75, there is about the same level of risk seen.

5    But instead what is happening in the lower GI tract, that is

6    driving the difference in the two drugs, and there is three

7    times increased risk -- 25 times 3 is 75.   So three times an

8    increased risk of a lower GI bleed when you take Pradaxa.

9    So this data in RE-LY was able to be looked at that way.

10   Q.   And why is that important to the opinions that you're

11   talking to the jury about today?

12   A.   Because it's entirely consistent with what you might

13   expect to happen based on what we know about this drug.

14   This is a drug that has that low bioavailability.   A lot of

15   the drug can accumulate in the gut.   This idea of a greater

16   risk to the lower GI system is consistent with that biology

17   or the way the drug acts.

18        So as a pharmacologist, I'm always interested in being

19   able to understand whether or not what we know about the

20   drug as far as the high concentration locally fits with what

21   they saw in patients, and it does appear to fit.

22   Q.   Now we didn't do the exact math, so it's not actually

23   three times, right?

24   A.   No, it's a little -- it's going to be a little bit

25   different than three times.

Laura Plunket - Direct (Moskow)                     250

1    Q.  Okay.  But what does it mean to you as a scientist that
2    there is a multiple, it's more than two times increased risk
3    of lower GI with Pradaxa versus warfarin?
4    A.  To me that means this difference I'm seeing is, again,
5    not likely due to chance, but indeed is likely due to
6    something about the drug.  And based on what we know about
7    the drug, in my opinion, that something is this issue of
8    high local concentration.
9        And that's consistent with what Dr. Eikelboom and
10   colleagues are discussing in this paper.  This is the thing
11   that they described.  I think we read that.
12   Q.  Okay.  And when we looked at the first page of this
13   exhibit, you had indicated that it was published back in
14   2011?
15   A.  Yes.
16   Q.  Can you just very briefly, before we go to the lunch,
17   identify for the jury every study that BI has done looking
18   at this issue of why there are almost three times as many
19   lower GI bleeds on Pradaxa than warfarin?
20   A.  I have seen no such study.  I'm not aware of any having
21   been done, so it's an easy question for me to answer.
22   Q.  Have you looked?
23   A.  I did look.  I looked in the literature, and I also
24   looked within the company files.  I find discussions of the
25   need to do a study within the company files, but I don't

Laura Plunket - Direct (Moskow)                    251

1      find any studies that were actually done.

2            MR. MOSKOW:  And we'll look at that when we come

3      back from lunch.

4            THE COURT:  All right.  We're going to take our

5      lunch recess.  Dr. Plunkett, you may step down.  Don't

6      discuss your testimony with anyone.

7            We'll recess -- is about an hour enough time for

8      you?  Is that all right?  We'll see how it goes.  I'd like

9      you back here at 1:15.

10           Again, if you will remain in the jury room while

11     you're in this building.  You can leave things back here,

12     come and go as you like from this room.  Don't discuss the

13     case with anyone.  Don't start deliberating.

14           We'll start back at 1:15 with Dr. Plunkett.

15           THE COURT SECURITY OFFICER:  All rise.  This court

16     stands in recess.

17         (Lunch recess taken at 12:11 p.m.)

18                          ---o0o---

19

20

21

22

23

24

25

Laura Plunket - Direct (Moskow)                    252

```
 1                  HUNTINGTON, WEST VIRGINIA

 2              THURSDAY, OCTOBER 4, 2018, 1:18 P.M.

 3                        ---o0o---

 4        (Jury not present.)

 5             THE COURT:  All right.  Are we ready for the jury?

 6             MR. MOSKOW:  Yes, Your Honor.

 7             THE COURT:  Bring them out, please.

 8        (Jury present.)

 9             THE COURT:  All right.  Be seated.

10             All right.  We're ready to resume your examination

11     of Dr. Plunkett.

12             MR. MOSKOW:  Thank you, Your Honor.

13             Good afternoon, everyone.

14                    DIRECT EXAMINATION (Continued)

15     BY MR. MOSKOW:

16     Q.  Good afternoon, Dr. Plunkett.

17     A.  Good afternoon.

18     Q.  When we broke for lunch, I had just asked you about

19     studies that have been done looking at the way Pradaxa works

20     in the gut.

21        Do you recall that?

22     A.  Yes.

23     Q.  And you, in your answer, mentioned that you were aware

24     of some internal discussions about that issue; is that

25     right?
```

Laura Plunket - Direct (Moskow)                253

1    A.  Yes.

2    Q.  Could you turn you to Exhibit 21 in your book?  It's

3    probably way at the front.

4    A.  Oh, I'm sorry.  I have 21 on one side, and 600 on the

5    other.  I'm sorry.

6    Q.  I recycle tabs, so that's my fault.

7    A.  No, no.  That's okay.  I'm there.

8    Q.  Great.

9         Is this a power point about one of those discussions?

10   A.  Yes.

11            MR. MOSKOW:  Your Honor, I'd move 21 as a full

12   exhibit.

13            MS. JONES:  No objection, Your Honor.

14            THE COURT:  You may proceed.  It's admitted.

15         (PLAINTIFFS' EXHIBIT 21 ADMITTED INTO EVIDENCE.)

16            MR. MOSKOW:  May I publish?

17            THE COURT:  Yes.

18            MR. MOSKOW:  Thank you, Your Honor.

19   Q.  What is it about this particular power point that you

20   thought was interesting?

21   A.  So it's a discussion of a meeting with the company with

22   some -- an advisory board, and they're talking about these

23   issues of GI adverse events.  So they are specifically

24   talking -- one of the objectives was to manage those events,

25   and then they are talking about -- on the second page, they

Laura Plunket - Direct (Moskow)                254

1    are actually talking about some studies they could initiate.

2    Q.   Okay.   Why don't we go to the second page of this

3    document, which is the slide about a GI advisory board

4    meeting, 16 December 2011, in Toronto, Canada.   Right?

5    A.   Yes.

6    Q.   All right.   So, first of all, can you explain to the

7    jury, who is not in the pharmaceutical space like you are,

8    what these advisory boards do?

9    A.   So most companies that are large have these kinds of

10   things.   A company will often seek outside advice from

11   doctors that are specialists in particular areas.   So in

12   this case, they're looking for people who have an interest

13   or experience with gastrointestinal disorders.   So they'll

14   go to those individuals, and they'll talk about maybe drug

15   issues that have been raised.   And I've seen this done with

16   other advisory boards for other issues for other drugs.

17        And they'll talk about the drug, and they'll get

18   recommendations from the board based upon the presentations

19   that they make about what they could or couldn't do, what

20   makes sense to look at, hypotheses that they could or

21   couldn't test, whether or not there's something missing.

22   Sometimes that's the issue, is there something more missing

23   that we need to pay attention to?

24            MR. MOSKOW:   I don't know if you can read it, but

25   could you pull out the very, very bottom where it says

Laura Plunket - Direct (Moskow)                    255

1    confidential, and there's the line?  Great.

2    Q.  When you were reviewing this document, what if anything

3    did you take from the fact that this was being presented at

4    a Pradaxa senior executive committee meeting?

5    A.  It tells me that this is an issue that is of importance

6    to the company about their drug.  And Pradaxa was a very

7    important drug to the company, so it makes sense that any

8    advisory board issue dealing with an issue for that drug

9    would be one that would be raised.

10       And I think there's even deposition testimony that talks

11   about the role of these -- this board, who was generally on

12   it, things like that.

13   Q.  And if I'm going too far into your memory, just tell us,

14   but do you have an understanding as to the types of folks

15   who were on this senior executive committee?

16   A.  I can't give you all of the names, but certainly it was

17   senior people within the medical group.  Dr. Friedman,

18   somebody like that.  But I imagine Dr. *Varner was on there

19   as well, but I don't recall whether he was.

20       But it was essentially the people that make decisions

21   about the drug, that's who this was.

22   Q.  Okay.  And I want to focus on the objectives, those

23   little hash marks.

24       The first objective, the optimal management of GI

25   related adverse events and GI related bleeds, do you see

Laura Plunket - Direct (Moskow)                256

1    that?

2    A.  Yes.

3    Q.  From your review of the internal company documents from

4    literature, from labels, what did you understand or do you

5    understand was going on with regard to management of GI

6    bleeds in the first year after the drug was approved, so

7    between, you know, October 2010 and December 2011?

8    A.  So the information I have seen shows the company was

9    trying -- was looking at this issue, because this was an

10   issue where it was -- it was not as good as warfarin in this

11   one area.

12   Q.  Why wasn't it as good as warfarin in this one area?

13   A.  Based on the results of the RE-LY trial.  So the RE-LY

14   trial had shown that there was -- we did that calculation, a

15   50-percent increase overall --

16   Q.  Okay.

17   A.  -- in those types of bleeds.

18   Q.  At -- in December of 2011, was it possible to treat

19   bleeds related to warfarin differently than bleeds related

20   to Pradaxa?

21   A.  Yes, it was.

22   Q.  Can you explain to the jury why?

23   A.  So the drug Pradaxa in this time period had no I will

24   use the term antidote.  There was no agent to reverse

25   bleeding.  Whereas for warfarin, there was a way that you

1    could take the patients that were bleeding and give them

2    vitamin K, which was a way to hopefully stop the bleeding

3    and reverse the effects of Pradaxa.  I'm sorry, of warfarin.

4        We had no similar agent for Pradaxa, so you had to just

5    wait until the Pradaxa cleared from the system.  There was

6    no drug you could give that would reverse the specific

7    effects of Pradaxa as there was for warfarin.

8    Q.  So what significance was there, if any, for the company

9    to look at ways of preventing those bleeds in the first

10   place?

11   A.  Well, since you can't reverse them, the issue would be

12   what can we prevent so that we don't have that risk.

13   Knowing that our patients are in a greater risk of these

14   type as compared to warfarin, what can we do to prevent?

15   And so the issue was understanding what they can do.

16   Q.  And that next bullet point says essentially that, right,

17   assessment of risk minimization strategies regarding their

18   occurrence?

19   A.  That's correct.

20   Q.  And a simple way of saying that, let's look at ways to

21   stop bleeds?

22   A.  Yeah, look at ways that we can prevent them from

23   occurring.

24        MR. MOSKOW:  Okay.  Let's go down and look at some

25   of the key messages here.  The second bullet point, more

1    data on the GI effects of Pradaxa are required to enable

2    recommendations of clinical practice as the current evidence

3    base is limited to draw fair conclusions.

4    Q.  Based on your review of the literature and the documents

5    as of December 2011, was that a true statement?

6    A.  Well, not really.  I think the RE-LY data had data that

7    gave them an answer about what was going on generally from

8    the clinical picture, but they certainly didn't -- hadn't

9    delved into a lot of the details on why.  Although, the

10   Eikelboom paper gave a discussion of what could be going on.

11   Q.  And the Eikelboom paper was published in or about this

12   time, right?

13   A.  That's correct.

14   Q.  Is the interaction -- well, let me say it differently.

15        Does the Pradaxa in the gut that you talked about, that

16   local effect, is that something that is spoken about in the

17   Medication Guide?

18   A.  No.

19   Q.  I want to go to this next point, specifically

20   information on how to dabigatran interacts with the GI tract

21   is lacking.

22        Was it lacking in 2011?

23   A.  So they had some information, I would argue, that they

24   knew that -- they knew that it was metabolized by

25   esterases, and they knew that you would have active

1    dabigatran.  And they knew at this time that 80 percent of

2    the dabigatran in the GI tract was activated.  They had done

3    a pharmacokinetic study that had looked at that issue.  So

4    they knew that they had lots of active drug in the GI tract,

5    so that they knew.  And they know what the drug does

6    generally.

7        So I don't think it's an issue of not understanding

8    basically what's going on, but certainly they hadn't figured

9    out how to prevent it.  That is true.

10   Q.  Do you take issue with this statement that says

11   specifically information on how dabigatran interacts with

12   the GI tract is lacking?

13   A.  I do.  Based on the data I have, yes.

14       Certainly can we know more?  We can always know more, it

15   is always better.  But they did have some basic information

16   that explained, in my view as a pharmacologist, what was

17   generally going on.

18   Q.  That's a next transition, you can always know more, so

19   let's go to the next slide, please.

20       And the next slide reflects the activities that are

21   proposed or recommended, right?

22   A.  Yes.

23   Q.  Have you participated in advisory boards like this?

24   A.  Not for a large drug company, no.  But I've done similar

25   things for some of my smaller companies, yes.

Laura Plunket - Direct (Moskow)                    260

1   Q.   Okay.  And these activities, proposed, recommended, do

2   some people call them take-aways?

3   A.   You could, yeah, a message to take away.

4   Q.   Okay.  Let's look at the very last bullet point, and

5   we'll move on, initiate research activities to investigate

6   dabigatran effects in the GI tract.

7   A.   Yes.

8   Q.   Okay.  So what is -- what could be initiated to

9   investigate dabigatran effects in the GI tract?

10  A.   There's all kinds of studies they could do.  They could

11  do an animal study.  They could also do some more clinical

12  work to look at more detailed issues on where the drug --

13  how much the drug is ending up in the GI tract repeatedly.

14      There's things they could do.  They could do things at a

15  molecular level to look at taking cells -- they could put

16  cells in a test tube and in a Petri dish, and they could

17  look at the way that dabigatran interacts with cells at that

18  molecular level as well.  Yeah, there is things they could

19  do.

20      And so certainly, again, I would not -- I would not

21  suggest that not doing more research is not good.

22  Absolutely more research would be good, especially on the

23  issue of is there a way that they could prevent this from

24  happening.

25  Q.   Where, if ever, has BI compared the Pradaxa

Laura Plunket - Direct (Moskow)                    261

1    gastrointestinal issue, and particularly lower GI, and

2    warfarin, looking at how the drug specifically interacts

3    with the GI tract?

4    A.  I haven't seen a study.  I am not aware of one that they

5    have.

6    Q.  All right.  Let's move on.  I want to focus now -- I'd

7    like to switch gears, and I want to talk about what

8    Boehringer knew about its drug and about the patients who

9    were taking it.  Okay?

10   A.  Okay.

11   Q.  And in particular I want to start with something called

12   the company core data sheet.

13       Do you know what that is?

14   A.  Yes.

15   Q.  Could you tell the jury what a company core data sheet

16   is?

17   A.  So it's a document that lays out everything that the

18   company knows about their drug, specifically how it works,

19   safety issues, risks, benefits.  And it also includes

20   statements of what they believe to be things that should be

21   done.  So they actually have information in there about

22   warnings that should be given to patients, specific

23   information.  It lays it out in sections sort of like you

24   would build a label.

25   Q.  Okay.  Is that an important document for someone like

Laura Plunket - Direct (Moskow)                    262

1    you in this type of project?

2    A.   Yes.

3    Q.   Why?

4    A.   Because it tells me -- even though I can look at the

5    label and know what they have stated to the FDA and to the

6    physician or in the Medication Guide to the patient, I can

7    compare that with what is in the core company data sheet

8    from the same time.  And that's the issue of what did they

9    know that they weren't conveying to physicians and to

10   patients.  So it allows that comparison.

11   Q.   How does a company construct a company core data sheet?

12   In other words, where does the information come from?

13   A.   It's all their testing, the studies that they've done,

14   and that's why changed over time.

15        So, in this case, you'll see Pradaxa's core company data

16   sheet change from year to year as new studies were

17   performed, new clinical data, new indications for the drug

18   were gained, new adverse -- new experiences from once the

19   drug is on the market, the risks or the toxicities that

20   patients were experiencing.  All of that can come into the

21   data -- that particular document as it builds over time.

22        And, again, it's a -- this drug is sold worldwide, so it

23   is a document that is not just experienced in the U.S. but

24   experienced around the world.

25   Q.   To the extent that the company core data sheet or -- can

1    we call it the CCDS just to make it easier?

2    A.  Sure.

3    Q.  Okay.  To the extent that the CCDS includes information

4    from people outside of the United States, data from people

5    outside of the United States, is it still relevant to people

6    here in West Virginia?

7    A.  Absolutely.  I would consider a lot of it to be very,

8    very relevant.

9    Q.  Okay.  But what is it about human anatomy generally, if

10   you know, that is different from Europe to the United

11   States?

12   A.  There's nothing that should be different on this issue

13   of why people bleed and why -- how you prevent strokes.

14       What -- the thing that can be different -- do you want

15   me to explain?

16   Q.  Sure.

17   A.  The thing that could be different, if you had done a

18   study in a population -- and this happens a lot in Asian

19   populations -- only in people from Japan, and you wanted to

20   say whether or not that information would relate to what you

21   expect to happen in the U.S., which is a much more mixed

22   genetic background, people from all different places, it may

23   be that that study collected just in the Japanese population

24   wouldn't tell you exactly what the risks would be in the

25   U.S. people.  And that's because there are known genetic

Laura Plunket - Direct (Moskow)                    264

1    differences in Asians versus Caucasians or U.S. background

2    people that can affect the risk of some drugs.

3        I don't believe that is true, however, for this drug

4    based on the fact that it's not highly metabolized in the

5    liver.  And that's the main issue for the Asian population,

6    whether or not it's metabolized the same way.

7    Q.  So if I could turn you to Exhibit 351.  It's probably

8    now towards the back of your binder.

9    A.  Yes.

10   Q.  Okay.  Are you able to identify that document?

11   A.  Yes.

12   Q.  And what is it?

13   A.  It's this company core data sheet, CCDS, dated December

14   10th, 2009.

15       MR. MOSKOW:  Your Honor, I move Exhibit 351 as a

16   full exhibit.

17       MS. JONES:  No objection.

18       THE COURT:  It's admitted.  It may be published to

19   the jury.

20       MR. MOSKOW:  Thank you, Your Honor.

21     (PLAINTIFFS' EXHIBIT 351 ADMITTED INTO EVIDENCE.)

22       MR. MOSKOW:  All right.  So do a little bit of

23   teaching here for a moment.

24   Q.  Earlier you wrote dabigatran etexilate on the screen,

25   and you indicated what about that?  Why does it have the

Laura Plunket - Direct (Moskow)                    265

1    etexilate?

2    A.  So that is so it will get absorbed.  So that's what I

3    call the pro-drug.  So this is the form that on its own is

4    not active.  It has to get into the body, and once it's in,

5    the etexilate comes off, and you have dabigatran which is

6    active.

7    Q.  Now, you chose the document dated 10 December 2009.  Why

8    is that time frame important to you?

9    A.  So this is a document after the RE-LY study data has

10   been collected, but it is before the drug was approved.  So

11   this would be what the company knew at the time that they

12   were submitting the NDA to the FDA, because a lot of this

13   data in here is what made up the NDA.

14   Q.  Okay.  So can I summarize that?  This is what the

15   company knew at the time they were applying to sell the

16   drug?

17   A.  Yes.

18          MR. MOSKOW:  Okay.  And we're going to bounce around

19   in this a little bit if that's all right.  Well, more if

20   it's all right for Ms. Veldman.

21          But if we could drop down to the bottom of the page,

22   there is several paragraphs under the word general, and I

23   want to focus on the one in the middle.  Do you see that?

24          There is a close correlation between plasma

25   dabigatran concentrations and degree of anticoagulant

1     effect.

2     Q.  Do you see that?

3     A.  Yes.

4     Q.  Can you tell the jury what that means?

5     A.  That is those curves we were talking about.  The more

6     Pradaxa, the more in your blood, the greater the increased

7     risk of bleeding.  But also enough Pradaxa in your blood is

8     needed in order to prevent strokes.  It's that therapeutic

9     range, issue that blood levels matter.  That you can get

10    information from the blood levels that tell you whether or

11    not the drug is working and whether or not there is an

12    increased risk.

13    Q.  Where is that information that blood levels matter in

14    the Medication Guide that is given to West Virginia

15    patients?

16    A.  It's not there.

17    Q.  Further down in that same area, there is a paragraph

18    that starts with however?

19    A.  Yes.

20    Q.  I really want to focus about halfway down at

21    recommended.  Do you see that?

22    A.  Yes.

23         MR. MOSKOW:  So it says:  At recommended

24    prophylactic doses of dabigatran etexilate, dabigatran may

25    prolong the activated partial thromboplastin time, aPTT, and

Laura Plunket - Direct (Moskow)                    267

1    the INR, but these tests are relatively insensitive to the

2    activity of dabigatran and are unsuitable alone as measures

3    of anticoagulant activity.

4         Stop there.

5    Q.  Can you make that so I can understand it?

6    A.  So this sentence is saying -- prophylactic means the

7    dose to prevent.  So at the dose people take to prevent

8    strokes, that's what they're talking about.  That there are

9    some tests that could be used to try to understand whether

10   or not the drug is producing the blood thinning effect.  And

11   those tests are the aPTT, and there is another one mentioned

12   there, the INR.  And the INR test is one, by the way, that

13   is used for warfarin patients.  It's the one people use.

14       But what they're saying is those two tests don't appear

15   to be suitable in order to tell you whether or not there is

16   adequate anticoagulant activity.  Which means that it's not

17   like the blood levels.  The blood levels correlate, but

18   these tests do not appear to provide that kind of

19   information that allows you to know if you're at the right

20   level of efficacy for the drug.

21       MR. MOSKOW:  Okay.  Moving on, it says:  However, in

22   patients who are bleeding, aPTT test may tell determine an

23   excess of anticoagulant activity.

24   Q.  Do you have see that?

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    268

1    Q.  All right.  So it may not be sensitive, but if somebody
2    has too much, this will tell us?
3    A.  Yes.
4    Q.  Okay.  How do we know how much is too much?
5    A.  How much is too much?
6    Q.  Well, it says an excess of anticoagulant activity.  Is
7    an excess too much?
8    A.  An excess is too much, and we know that from the RE-LY
9    data.  The RE-LY data had data that correlated this blood
10   level data with too much Pradaxa, which would be the
11   increased risk of bleeding.  So too much anticoagulation,
12   too thin of a blood, you increase your risk of bleeding.
13   Q.  This idea of excess, is this the only place that the
14   company talks about excess amounts of the drug?
15   A.  No.  There is a number of -- there are other places
16   within this document, other versions of the document, and
17   also some other documents that are available in other
18   questions that use the words excessive dabigatran exposure,
19   which is another way of saying too much Pradaxa.
20   Q.  Where does that language, any of the ways you've just
21   described it -- either excess dabigatran exposure or too
22   much Pradaxa or excess anticoagulant activity -- where does
23   that kind of language appear in the patient Medication Guide
24   in the Pradaxa information given to West Virginia residents?
25   A.  Unfortunately it is not there.

Laura Plunket - Direct (Moskow)                    269

1    Q.  If we could move to page 10, please, and I want to focus

2    at the bottom of the page, co-medication.

3    A.  Yes.

4    Q.  So there is something here that says co-medication with

5    P-gp inhibitors.  Do you see that?

6    A.  Yes.

7    Q.  And what is a P-gp inhibitor?

8    A.  So I didn't draw that on my graph, my Mr. Bill man or

9    the gingerbread man.  I didn't draw that but essentially a

10   P-gp -- P-gp is a protein that is present in your gut, in

11   the lining of your gut, and it is there to transport drugs

12   in and out of the blood.  So when the drug is absorbed into

13   the blood, this transporter can move it back out to the gut.

14   So it is actually -- if something comes in, it's taking it

15   back out.

16       So if you inhibit the activity of that transporter,

17   which we know Pradaxa by the way interacts with -- we know

18   Pradaxa moves with this transporter back out of the blood

19   back into the gut, if you inhibit it, that's going to

20   prevent the Pradaxa from leaving, and you're going to -- you

21   could increase your blood levels.  And this is true for any

22   drug that interacts with this transporter.

23       Lots of drugs interact with P-gp as a transport

24   mechanism.  But the reason it's really important for Pradaxa

25   is that issue we went into, a very small change in the

1    absorption.  So if you can't get it back out, that 3 percent

2    could be 4, 5, 6 percent now because you inhibited that

3    activity.  So that could lead to, ah, unsafe levels or high

4    levels, too much Pradaxa in the blood.

5    Q.  So does everybody in this room have P-gp things working?

6    A.  We should.  If you're a normal person, you have that in

7    your gut, and it's there, again, to protect your -- protect

8    your system to some extent.

9         Not all drugs interact, so P-gp transport isn't an issue

10   for all drugs.  But it is for Pradaxa as well as a number of

11   other important drugs used to treat cardiovascular diseases.

12   Q.  You beat me to the punch.

13        So are there P-gp inhibitors that people with cardiac

14   issues typically are on?

15   A.  Yes.

16   Q.  Why is that?

17   A.  That is because most people that have atrial

18   fibrillation will have some other condition, too.  So

19   it's -- because, first off, you tend to be elderly.  So you

20   might be a taking blood pressure drug, or you might be

21   taking a drug actually to treat that atrial fibrillation.

22   It's called an antiarrhythmic.  So now we are not trying to

23   prevent clotting, but you are taking the drug to actually

24   make it so your heart doesn't beat so fast, the atrium.

25        So those kinds of drugs are used at the same time as an

1    anticoagulant, so if you have medicines together.  And it's

2    very common for people with atrial fibrillation to have more

3    than one drug on board.

4    Q.  There is a statement here about a drug called verapamil.

5    Do you see that?

6    A.  Yes.

7    Q.  And what is verapamil?

8    A.  Verapamil is -- well, first off, it has the ability to

9    inhibit the P-gp, but it's an antiarrhythmic drug.  So it's

10   one used to treat these irregular heartbeats.  It is used

11   for that purpose.

12   Q.  Are there other drugs that are commonly used in AFib

13   patients that are similar to verapamil?

14   A.  There is others commonly used that might have a little

15   bit different mechanism of how they change the heartbeat,

16   but they're used for the same reason.  So amiodarone is the

17   name of a drug that is also an antiarrhythmic, so changes

18   that -- it is used to treat atrial fibrillation.

19       There is also a drug called carvedilol or Coreg.  It's a

20   drug that is used for blood pressure, but it also slows the

21   heart, so it is also used in patients with atrial

22   fibrillation as well as patients that may be taking it for

23   hypertension.

24   Q.  And one of the things, talking specifically about

25   verapamil, is that it has this line, increase of Cmax by 180

1    percent and AUC by 150 percent.  Those are technical terms.

2         What is Cmax?

3    A.   So Cmax, peak, we had the peaks over there on the curve,

4    that's the maximum concentration in blood.  That's a peak

5    level.  So Cmax and peak, we can use those interchangeably.

6    Q.   So when you wrote peak here, that would be Cmax?

7    A.   Yes.

8    Q.   And then what is this AUC?

9    A.   AUC stands for area under the curve.  So up there if you

10   were to take a pen and shade -- just do the single dose, it

11   will be easier.  If you were to shade all of that

12   information right under that, that would be the AUC.  You

13   can use a mathematical formula to calculate how much area is

14   taken up.

15        Just like in geometry class we can figure out what area

16   of a circle is, here we can use a formula to figure out what

17   the area is covered by that.  And that area under the curve

18   is a measure of all of the -- the amount of drug that your

19   body has been exposed to.

20        So -- because, again, it's all -- the entire time it is

21   in your body, from the time you take it to the time you get

22   it out.  So when you measure the area under the curve,

23   that's a measure of your total exposure to the drug.  Versus

24   the Cmax just tells you what the highest level was.  So you

25   get additional information when you look at how much the

Laura Plunket - Direct (Moskow)                    273

1   total exposure was.

2   Q.  So what is this information telling us about how

3   verapamil affects the amount of Pradaxa in the blood?

4   A.  It's going to increase it.  So, in other words, again,

5   when those two drugs are on board at the same time, if

6   somebody takes Pradaxa and is on verapamil, then they're

7   going to have a higher level of Pradaxa in their blood.  So

8   they could have excess of exposure to Pradaxa.

9   Q.  Now is this something that is already included when

10  somebody has bad kidneys, or is it in addition to that?

11  A.  Oh, this is in addition.  Those are different things.

12      So a P-gp inhibitor, this drug verapamil or, like I

13  said, other drugs, they're increasing the level of Pradaxa

14  in the blood by one mechanism that is not letting it go back

15  out.  So the kidneys is how the blood -- the drug leaves the

16  blood through that organ.

17      Different things, so these are two different -- it would

18  be -- it is essentially saying there's two different ways

19  that we can increase the blood level of Pradaxa.  One is by

20  making it stay in at the start, and the other is by not

21  letting it go out at the end.  So it is like having a plug

22  in the dike at two places.

23  Q.  Is that important information for pharmacologists and

24  toxicologists like you?

25  A.  Absolutely.

Laura Plunket - Direct (Moskow)                    274

1   Q.   Why?

2   A.   Because now we have multiple ways to increase the blood

3   level.  So if you have a patient who has severe renal

4   impairment and is taking a P-gp inhibitor, then their blood

5   levels are going to be even higher than if they were just

6   just severely renally impaired or just on the P-gp

7   inhibitor.

8        In other words, the two things, it's not one plus one

9   equals two on risk, it's one plus one equals five because

10  the two things act together to increase the exposure.  So

11  that person's risk level for bleeding is even higher than

12  the person on just the P-gp alone or the person who just had

13  the renal impairment but wasn't exposed to the drug.

14  Q.   Where is -- that information that you just described,

15  that one plus one equals more than two, where is that

16  information included in the patient Medication Guide for

17  Pradaxa?

18  A.   It's not.  It's also not included that way in the

19  labeling for the physician either.

20       MR. MOSKOW:  Could we go to page 13, please.  I want

21  to focus your attention on the bottom half of the page where

22  it says renal impairment.  Let's just take out that -- okay.

23       Can you all read that from where you are?  Should I

24  make it bigger?

25       So at the top there is a statement:  There are no

1    data to support use in patients with severe renal impairment

2    less than 30 milliliters a minute creatinine clearance.

3    Treatment in this population with Pradaxa is not

4    recommended.

5    Q.  Correct?

6    A.  Yes.

7    Q.  What does it mean to say there's no data to support

8    these?

9    A.  Well, it means what I told you earlier.  In other words,

10   it hasn't been tested.  It hasn't been shown that it could

11   be used safely and effectively in patients with severe renal

12   impairment.

13       And the RE-LY study did not -- it had a few patients

14   that might have had severe impairment, but it did not have

15   enough to draw any conclusions and to make any

16   recommendations to doctors about -- about the issue and how

17   that affected the risk in patients.

18           MR. MOSKOW:  At the bottom of the second bullet

19   point, you'll see there's a paragraph:  Regular assessment

20   of renal status is required in these patients.

21           And then:  A coagulation test, such as aPTT, see

22   warnings and precautions, monitoring and laboratory tests,

23   may help to identify patients with an increased bleeding

24   risk caused by excessive dabigatran exposure.

25   Q.  Do you see that?

Laura Plunket - Direct (Moskow)                    276

1    A.   Yes.

2    Q.   I want break that down.

3         First of all, based on your review of the medical

4    literature, internal company documents, does it make sense

5    to regularly assess kidney function?

6    A.   Yes.  With this drug, absolutely because of the -- how

7    it relies so much on being excreted or being eliminated,

8    getting out of your blood that way.

9    Q.   Okay.  And then it says a coagulation test.  So what's a

10   coagulation test?

11   A.   So that is a test that's going to tell you whether or

12   not your blood is too thick or too thin.  So for warfarin,

13   it's an INR.  Here they're talking about using this aPTT.

14   That's just another test that can be done, a different type,

15   same end points.  Is the blood too thick, too thin.

16   Q.   Is that the same test being done to look at the kidneys?

17   A.   No.  Well, it's a different test, but it can be done

18   with the same blood sample.  So you take a sample of blood,

19   and you could do two things with that blood.  But it's a

20   different test, yes.

21   Q.   Okay.  So if I'm monitoring kidney function, explain to

22   the jury how I can figure out just by monitoring kidney

23   function whether somebody has this excessive dabigatran

24   exposure, too many Pradaxa.

25   A.   So you'd have to take a blood sample from a patient in

1    order to look at their creatinine clearance, which is the

2    way they monitor it.  So if you take that blood sample, you

3    can take part of that blood sample and use it to run one of

4    these tests, like the aPTT.  That's what they're saying.

5    That's the test they're mentioning here.

6         So, yeah, it wouldn't be another stick.  It would be at

7    that time that you're monitoring their kidney function, you

8    could also be looking at whether or not their blood levels

9    of Pradaxa are too high.  Because that test gives you an

10   idea that it's -- that you have too much Pradaxa in your

11   blood even though it doesn't tell you the exact number.

12   Q.  As of 2013, did the patient Medication Guide talk about

13   getting regular assessment of renal function of kidneys?

14   A.  In 2013?

15   Q.  Yeah.

16   A.  It has a statement about kidney function, yes.  It

17   wasn't exactly like this, though.  It didn't put things

18   together.  But certainly it did mention that, yes.

19        MR. MOSKOW:  If we could drop down to the top of

20   page 14, please.  I just want to focus on this formula here.

21        Actually I probably should have started on the other

22   page, but that's okay.  Are you able to pull the bottom of

23   13?  Thank you.

24   Q.  So as part of determining whether somebody has bad

25   kidneys, are there formulas that doctors and scientists use

Laura Plunket - Direct (Moskow)                    278

1    to figure that out?

2    A.   Yes.  That's -- they would take the number from the

3    blood test on the amount of creatinine, and they would use

4    that in a formula, which is in this document.  They give it

5    for men and women separately.

6    Q.   Are there more than one way to calculate somebody's

7    kidney function, the way their kidneys are working?

8    A.   Yes.

9    Q.   Are there differences between them?

10   A.   Well, there's different methods and different formulas.

11   There are, but this one here is one that you see described

12   in the literature a good bit.

13   Q.   If you know, was this particular formula used for the

14   patients in the RE-LY trial?

15   A.   That I don't know.  I haven't done that comparison.

16   Q.   Okay.  But it indicates right here:  Creatinine

17   clearance can be estimated using the Cockroft-Gault formula

18   as follows.  Right?

19   A.   Yes.

20   Q.   And then there's a different calculation for men and for

21   women.  Do you see that?

22   A.   Yes.

23   Q.   Why is that?

24   A.   Because of this issue we already talked about, the issue

25   of men and women having different physiologies to some

Laura Plunket - Direct (Moskow)                 279

1    extent.  They have a different blood volume.  They have a

2    different -- because of their body size and just their basic

3    who they are, there is differences that affect the way your

4    kidneys work and also the way -- how much volume there is in

5    your body for things to circulate within.  So that is why

6    you have to do this correction for -- this formula for

7    females versus males.

8    Q.  Okay.  You indicated to the jury, when you were telling

9    them what a CCDS is, that it changes over time.

10   A.  Yes.

11   Q.  Why is that?

12   A.  Because once -- when you have new information, you put

13   it in.  So, in other words, if you gather new data or have

14   new observational data, you do.  So this company indeed they

15   have later CCDSs where there is additional information added

16   that tell us something more that they've learned about the

17   safety of the drug or the way the drug works or what kinds

18   of risks they've seen in patients.

19   Q.  Okay.  Did that happen with Pradaxa?

20   A.  Yes.

21   Q.  Turn to Exhibit 1, please.

22   A.  That one is the first in the binder.

23   Q.  What is Exhibit 1?

24   A.  It's a company core data sheet with the date of -- for

25   Pradaxa from the date of December 18, 2013.

Laura Plunket - Direct (Moskow)                    280

1           MR. MOSKOW:  Your Honor, I would move Exhibit 1 as a

2      full exhibit.

3           MS. JONES:  No objection, Your Honor.

4           THE COURT:  It's admitted.  It may be published.

5           MR. MOSKOW:  Thank you, Your Honor.

6      (PLAINTIFFS' EXHIBIT 1 ADMITTED INTO EVIDENCE.)

7           MR. MOSKOW:  So you had indicated this is 18

8      December 2013.

9      Q.  Does this document include data going back to all of the

10     clinical trials or is it just what's going on right here in

11     December of 2013?

12     A.  No, it's a -- I would call it a living document.  In

13     other words, they take what they know, and they add to it.

14          Now if they found something was wrong, you know, I

15     imagine they would take that out.  But certainly it has all

16     of the information, so it gets bigger.  You will see more

17     information.  More data, more -- more instructions and

18     things like that will appear as the document grows over

19     time.

20     Q.  Okay.  And one of the things I want to point out to the

21     jury is that there's a color code now.  Do you see that?

22     A.  Yes.

23     Q.  And what's significant about that?

24     A.  So by 2013, in addition to the use of the drug in

25     patients with atrial fibrillation -- and that's that blue

Laura Plunket - Direct (Moskow)                    281

1    bar, SPAF -- they had obtained three additional approvals

2    for uses in other types of conditions.  So they had

3    submitted a separate application that was approved for VTE,

4    which is venous thromboembolism.  It's another disorder

5    where you need to prevent clots.  And the same thing for the

6    pink and the purple, those were other indications where you

7    need an anticoagulant.  So different clinical data was

8    collected, different studies, different populations of

9    patients.

10   Q.  Okay.  At the bottom there is something in white.  Do

11   you see that?

12   A.  Yeah.

13   Q.  And it says all indications.

14   A.  Yes.

15   Q.  So what parts of this company core data sheet should the

16   jury be looking at if they want to know about prevention of

17   stroke in atrial fibrillation patients?

18   A.  So you would go for the white boxes because that applies

19   to every patient population.  And then you would look at the

20   blue boxes for the atrial fibrillation patients.

21   Q.  And with that in mind, could we turn to page 4, please.

22       You see there's a -- sorry.  There's a white box in the

23   middle that says reasonable impairment?

24   A.  Yes.

25   Q.  All right.  So I want to start there.

1      And actually, can you read that first paragraph slowly

2   to the jury, please?

3   A.  Sure.

4      Renal function should be assessed by calculating the

5   creatinine clearance, CrCl, prior to initiation of treatment

6   with Pradaxa to exclude patients for treatment with severe

7   renal impairment.  Then they say, for example, CrCl less

8   than 30 mils per minute.  There are no data to support use

9   in patients with severe renal impairment, in parentheses

10  less than 30 mils per minute CrCl.  Treatment in this

11  population with Pradaxa is not recommended.  See

12  contraindications.

13  Q.  Okay.  Is that information that you wanted to call to

14  the jury's attention?

15  A.  Yes.

16  Q.  Why?

17  A.  Because this is the exact issue in this case.  It's the

18  idea that they're talking about the -- there is -- there is

19  no data to support use in this patient population with

20  severe renal impairment, and that's the patients that are

21  getting the 75-milligram dose in the U.S.

22  Q.  So at this point in 2013, the Pradaxa 75-milligram dose

23  had been sold in the United States for almost three years?

24  A.  Yes.

25  Q.  And what significance, if any, is there to your opinions

Laura Plunket - Direct (Moskow)                    283

1   in this case that the company is still reporting in their

2   core company data sheet that there is no data, no

3   information to support that use?

4   A.   Well, there is at least two things.

5        Number one, the fact that there is no data means they

6   haven't done any additional studies to provide that data.

7   And I would say that based on three-year period having

8   elapsed, I think that that is a problem.  The company wasn't

9   doing the job they should do to provide data for patients.

10       However, what's interesting here is in this document

11  they're actually contraindicating, ah, the use of the drug

12  in those patients, and yet in the U.S., they're selling a

13  dose without data in the same population.

14  Q.   I wanted to ask you about that.

15       So what this said up here is that you want to exclude

16  patients for treatment with severe renal impairment.  But

17  that's not true in the United States.  There's actually a

18  dose for those folks.

19  A.   That's correct.  And that was -- that was mentioned --

20  this document is a worldwide document, so there is

21  different -- different ways that this drug is used in

22  countries outside of the U.S.

23  Q.   What, if any, concerns do you have about a product that

24  is contraindicated for patients with severe renal impairment

25  outside the United States, but for which a 75-milligram dose

Laura Plunket - Direct (Moskow)                    284

1    is being sold without data to support in patients with

2    severe renal impairment?

3    A.   My issue would be if you're going to do -- if you're

4    going to do that in the U.S., you need to let doctors know

5    this exact issue, that there is no data to support -- that

6    has been collected to show that that drug is safe and

7    effective.  And I think they should have been doing studies

8    to prove that safety as well, if they're going to continue

9    to sell it that way.

10   Q.   Now you indicated that there was a contraindication.

11   You specifically called that out in looking at this

12   paragraph, correct?

13   A.   Yes.

14   Q.   All right.  So this comment, see contraindications, your

15   use of these documents, what does that mean?

16   A.   So that is a section within the labeling, not in the

17   Medication Guide.  It won't be spelled out that way for the

18   patient.  But in the physician, the label to PCs, there is

19   an actual section called contraindications.  And that's the

20   information within the label that tells the physician don't

21   use -- the risks outweigh the benefits in these type of

22   people.  That's what contraindication means, don't use it,

23   risks outweigh benefits.  And that's the decision that's

24   made in order to put a contraindication on a label.

25   Q.   And within this company core data sheet, what the

Laura Plunket - Direct (Moskow)                    285

1    company knows and believes its drug, what does it mean when

2    they write see contraindications in this document?

3    A.   In my opinion, it means that they understand that it

4    should be contraindicated.  And I would --

5    Q.   I was being more basic.

6         What am I supposed to do now?

7    A.   Oh, I'm sorry.  You are supposed to go to that section

8    of the label if you would like to see more details.  I'm

9    sorry.

10   Q.   Very good.  So let's go to page 9, contraindications.

11        And here it specifically notes at bullet point two,

12   severe renal impairment, right?

13   A.   Yes.

14   Q.   Based on your work with labels and regulatory documents

15   and company core data sheets like this, what does it mean

16   when you contraindicate something?

17   A.   That was the answer I was giving.  When you

18   contraindicate means you have decided that the risks

19   outweigh the benefits.  So there really is no reason to use

20   the drug in this population because of the risk it poses.

21   So it's an unacceptable or unnecessary risk that you're

22   putting the patients at at this point in time.

23   Q.   On that same page, there is a spot at the bottom that

24   says special warnings and precautions and haemorrhagic risk.

25        Do you see that?

1    A.   Yes.

2    Q.   What is haemorrhagic risk?

3    A.   Bleeding risk.  Hemorrhage is the bleed.

4    Q.   And does Pradaxa have a bleeding risk?

5    A.   Yes, it does.

6    Q.   Okay.  Are you able to kind of summarize in your own

7    head the way it's worded in the patient Medication Guide?

8    A.   It tells -- tells patients that it's a serious risk and

9    may be -- may cause death.  So patients on Pradaxa are at a

10   risk of bleeding, and that bleeding can be fatal and lead to

11   death, I believe it says.

12   Q.   And we're going to talk more about that, but that sounds

13   like it includes everything.  It includes I could bleed or I

14   could die from a bleed.

15   A.   Well, it's a serious warning.  I mean, I'm not saying

16   it's not a serious warning.  But it's not giving everything,

17   all of the information that a patient needs to understand

18   about the drug.

19   Q.   Is there information in this section in the CCDS that

20   makes you think, you know, there could be more in the

21   warning?

22   A.   Yes.

23   Q.   Okay.  Let's keep going, then.

24        MR. MOSKOW:  Turn the page to page 10.  And I want

25   to start in the second white box, the third paragraph where

Laura Plunket - Direct (Moskow)                    287

1    it says factors.

2    Q.  Do you see that?

3    A.  Yes.

4         MR. MOSKOW:  And I'll read this, and then I will

5    have some questions for you.

6         It says:  Factors such as decreased renal function,

7    30 to 50 milliliters creatinine clearance, age greater than

8    or equal to 75 years, or strong P-gp inhibitor

9    co-medications are associated with increased dabigatran

10   plasma levels.  The presence of one or more than one of

11   these factors may increase the risk of bleeding.

12   Q.  Do you see that?

13   A.  Yes.

14   Q.  Is that important information?

15   A.  Yes.

16   Q.  Why?

17   A.  It's that issue I was talking about, one plus one equals

18   two or one plus one can be five.  It's the idea you put more

19   than one factor, like the P-gp inhibitor and the severe

20   renal impairment, and those things together could put people

21   into the issue of having too much Pradaxa in their blood and

22   an increased, unacceptable risk of bleeding.

23   Q.  And how would you know that?  How do you know if you

24   have these things whether or not you have too much Pradaxa?

25   A.  The only way to know is to actually measure your blood

Laura Plunket - Direct (Moskow)                    288

1    levels, and that's the most information.  We haven't talked

2    about it much, but it's really important that patients

3    understand there is a way to know if you're at risk, just

4    the way it is important for doctors to know there's a way to

5    make the drug safer for their patients.

6              MR. MOSKOW:  Let's look at the top box on this page.

7    And there is a paragraph that says tests of anti -- oh,

8    sorry -- tests of anticoagulant activity.

9              Do you see where I am?

10             THE WITNESS:  Yes.

11             MR. MOSKOW:  And it says:  Tests of anticoagulant

12   activity such as thrombin time, TT, ecarin clotting time,

13   ECT, and activated partial thromboplastin time, aPTT, are

14   available to detect excessive dabigatran activity.

15   Q.  Do you see where I'm reading?

16   A.  Yes.

17   Q.  Once again, that phrase excessive dabigatran activity.

18        Can you tell the jury where this document information is

19   in the Medication Guide that is given to patients in West

20   Virginia so they can know whether they're getting too much

21   Pradaxa?

22   A.  It is not there.

23             MR. MOSKOW:  Let's go to page 12, please.

24   Q.  We talked a little bit about P-gp inhibitors before.  Do

25   you recall that?

Laura Plunket - Direct (Moskow)                289

1    A.  Yes.

2    Q.  Halfway down the page here, there is a section that says

3    interactions.

4    A.  Yes.

5    Q.  And we are actually going to go further down, but do you

6    see where it says interactions, and then there is more

7    information right below that?

8    A.  Yes.

9    Q.  And it says P glycoprotein interactions?

10   A.  Yes.

11          MR. MOSKOW:  Can you bring up that second box below

12   that?  Great.  Thank you.

13   Q.  And P glycoprotein inhibitors, are those that P-gp

14   inhibitor that we talked about a little bit before?

15   A.  Yes.

16   Q.  Could you read again slowly the paragraph that's up on

17   the screen regarding P-gp inhibitors?

18   A.  Sure.

19      It says:  Dabigatran etexilate is a substrate for the

20   efflux transporter P-gp.  Concomitant administration of P-gp

21   inhibitors, such as amiodarone, verapamil, quinidine,

22   systemic ketoconazole, dronedarone, ticagrelor and

23   clarithromycin, is expected to result in increased

24   dabigatran plasma concentrations.

25   Q.  Okay.  Going back to the discussion we had about what

1    P-gp inhibitors do, can you explain to all of us what

2    information this is telling us?

3    A.  It's telling you that because dabigatran, the drug

4    Pradaxa, interacts with that transporter, if you give

5    dabigatran with one of these drugs that it is listing, you

6    could end up with too much Pradaxa in your blood.  You are

7    going to increase the levels, and that could lead to too

8    much.

9    Q.  And based on your experience working with labels and

10   company core data sheets and all of these documents that

11   we've been looking at today, when the phrase such as and a

12   list of drugs is given, what does that mean?

13   A.  So the such as is telling you that these behind here are

14   specific examples of P-gp inhibitors.  So each of those

15   drugs in there are ones that have been identified as

16   inhibitors of P-gp.

17   Q.  Okay.  Is this an exhaustive laws of all the P-gp

18   inhibitors?

19   A.  No.  And, in fact, it doesn't list some of the ones that

20   have been classified as strong inhibitors that are drugs

21   used to treat cardiovascular disease.  I mentioned one

22   earlier, carvedilol is an example of one that is not on that

23   list.  But it is also, like verapamil, a strong P-gp

24   inhibitor that could be used in patients that have atrial

25   fibrillation.

1    Q.  Thank you.

2          MR. MOSKOW:  Let me move your attention to page 20.

3          And I just want to pull out one sentence near the

4    bottom of this box that says:  There is a close correlation

5    between plasma dabigatran concentrations and the degree of

6    anticoagulant effect.

7    Q.  We've seen that language before?

8    A.  Yes.

9    Q.  Again, where is that information in the product labeling

10   and Medication Guide in the United States?

11   A.  It's not.

12         MR. MOSKOW:  And if I could turn you to page 33 of

13   this exhibit.  And I really want to focus on the special

14   populations box.

15   Q.  Do you see that, and then underneath that it says renal

16   impairment?

17   A.  Yes.

18   Q.  You told the jury earlier about some small studies that

19   had been done looking at Pradaxa in people with bad kidneys.

20   Do you recall that?

21   A.  Yes.

22         MR. MOSKOW:  I want to focus your attention, then,

23   on the second paragraph here.

24         It says:  In a small number of volunteers with

25   severe renal insufficiency, between 10 and 30 milliliter a

1    minute creatinine clearance, the exposure area under the

2    curve to dabigatran was approximately six times higher and a

3    half-life approximately two times longer than that observed

4    in a population without renal insufficiency.

5    Q.  Is that important information?

6    A.  Yes, it is.

7    Q.  Why is that?

8    A.  So this information is telling you that when you have

9    severe renal insufficiency, your blood levels -- your

10   exposure could be six times higher.  So, in other words, too

11   much Pradaxa would be likely to be found in your blood.

12       The other thing that is important about this data is the

13   size of the data.  And you have to understand that this is

14   the data that was the only data that was available to

15   justify the 75-milligram dose that FDA used in its

16   assessment.  So you have to understand that that's what that

17   data was used for.

18       It was used -- it wasn't in AFib patients.  It wasn't --

19   it was only -- like I said, I think there were 11 people

20   with severe insufficiency as compared to thousands of people

21   that were studied in the safety and efficacy trials.  And

22   this was a population that was modeled to then use to

23   justify that 75 milligrams would be used in patients with

24   severe renal insufficiency.

25   Q.  So did these people get the 75-milligram dose or not?

Laura Plunket - Direct (Moskow)                    293

1    A.   They did not.  They got the 150, and then they looked at

2    their blood levels.  And then they used that with a computer

3    model to say we want to approve the 75.

4    Q.   Let's move on.  I want to turn you to document 3295 in

5    your -- you're going to have to look at it in there first,

6    way in the back.

7    A.   Way in the back.

8    Q.   Do you recognize this document?

9    A.   Yes.

10   Q.   What is it?

11   A.   This is a publication by Wessler and colleagues

12   published in 2013.

13          MR. MOSKOW:   Permission to publish, Your Honor?

14          MS. JONES:   No objection.

15          THE COURT:   It's admitted.  You may do so.

16          MR. MOSKOW:   Thank you, Your Honor.

17      (PLAINTIFFS' EXHIBIT 3295 ADMITTED INTO EVIDENCE.)

18   BY MR. MOSKOW:

19   Q.   And is this a study that you wanted to talk to the jury

20   about?

21   A.   Yes.

22   Q.   Why is that?

23   A.   So when I first started my work on this case, this was a

24   paper I found that talked specifically about this

25   interaction of the P-gp transporter with different

Laura Plunket - Direct (Moskow)                    294

1    cardiovascular drugs.  So it's the issue of what drugs out

2    there would be expected to inhibit the transport of Pradaxa

3    so that it stayed in the blood and built up levels, so these

4    kind of drug interactions.

5        So I looked in here, and it gives you a list of some of

6    the commonly used cardiovascular drugs, and whether they

7    were like verapamil, which is in the label, a strong

8    inhibitor or not.  And so there were other drugs in this

9    list that are strong inhibitors like verapamil that are not

10   specifically listed in the labeling for Pradaxa.

11   Q.  Okay.  And I want to focus on that in just one moment.

12       I wanted to start at the top of the page, the very top

13   of the first page.  It references the Journal of the

14   American College of Cardiology.  Do you see that?

15   A.  Yes.

16   Q.  We talked about that once before, that journal, right?

17   A.  Yes.  That's the same journal of the paper by Dr.

18   Reilly, et al., that talked about blood levels of Pradaxa

19   and the therapeutic range.

20   Q.  Okay.  And if we could then move to page 4 of this

21   document.

22       Do you see at the bottom of the first page, there is an

23   area that says oral anticoagulant?

24   A.  Yes.

25   Q.  And then it talks about dabigatran?

Laura Plunket - Direct (Moskow)                    295

1   A.  Yes.

2   Q.  And then going over to the right-hand column, and then

3   going on to page 5, I want to read something to you and have

4   you work -- help us understand it.  Okay?

5   A.  Yes.

6        MR. MOSKOW:  It says:  P-gp inhibition and impaired

7   renal function are two major independent factors that can

8   increase dabigatran concentrations, with greater effects if

9   both are present.

10  Q.  Does that just mean that if you have both bad kidneys

11  and a P-gp inhibitor, it's worse than having either of one

12  of them alone?

13  A.  Yes.  And that's this issue of independent.  So they

14  have a -- they both contribute separately.  Unlike earlier

15  in the Reilly paper, they talked about how age and kidney

16  function go together, that's not here.  This is kidney

17  function separate from the presence of a drug, and that's

18  that one plus one equals two versus one plus one equals

19  five.

20  Q.  Okay.  And then it says:  Exposure to dabigatran

21  increased with coadministration of the strong P-gp

22  inhibitors, and then it gives several, right?

23  A.  Yes.

24  Q.  And it talks about verapamil as being one of them.

25  A.  Yes, that's correct.

Laura Plunket - Direct (Moskow)                    296

1   Q.  If I could move you actually to the very bottom of page

2   5, the bottom right-hand corner.

3   A.  Okay.

4   Q.  Do you see that there is a -- there's another one that

5   says:  Carvedilol inhibits P-gp activity to a similar degree

6   as verapamil?

7   A.  Yes.

8   Q.  Is that important information for you?

9   A.  Yes.

10  Q.  Why is that?

11  A.  Because it has essentially the same effect biologically

12  as far as its ability to inhibit that transporter.  Yet the

13  verapamil was one that was studied and put into the label,

14  and carvedilol is not in the label.  So physicians and

15  patients wouldn't know, based upon what's in the label, that

16  carvedilol was a drug to be avoided even though verapamil is

17  specifically mentioned.

18  Q.  Okay.  And if we could now go back to page 4.  I know

19  I'm bouncing around a little bit.  I'm sorry.

20      Do you see there's a table -- well, you will in a

21  second -- there's a table on the right-hand side?

22  A.  Yes, I'm familiar with that table.

23  Q.  All right.  And at the top, there are certain keys that

24  tell you what a strong P-gp inhibitor is?

25  A.  Yeah, that had two plus signs under -- there is an

1    inhibitor column all the way over on the right.

2           MR. MOSKOW:  If you could make this bigger by just

3    getting rid of the bottom third of that, Ms. Veldman, that

4    would be great.  Further down.  Thank you.

5    Q.  Do you see about halfway down here, we have carvedilol?

6    A.  Yes.

7    Q.  And then if we go across, it has those two pluses that

8    are up here, strong inhibitor?

9    A.  Yes.

10   Q.  Is that information that you took into account when you

11   were talking to the jury earlier about carvedilol and its

12   interactions with Pradaxa?

13   A.  Yes.

14   Q.  And can you explain why?

15   A.  Because just like the P-gp inhibitors mentioned in the

16   labeling, this drug, which is not, would be expected to have

17   the same interaction.  So as a result, a patient needs to

18   understand if they have severe renal impairment and are

19   taking carvedilol, they would be at risk of blood levels

20   that were too high.

21          MR. MOSKOW:  Can we go to page 7, please.

22          And there are two take-home messages that I wanted

23   to ask you about.  The second one -- well, there were more

24   than two.  I just pulled out two.

25          Cardiovascular drugs with narrow therapeutic

Laura Plunket - Direct (Moskow)                    298

1    indexes, antiarrhythmic agents, anticoagulant agents, can

2    have large increases in concentration when coadministered

3    with potent P-gp inhibitors, thus increasing the risk for

4    drug toxicity.

5    Q.  What does that mean with regard to Pradaxa and a strong

6    P-gp inhibitor like Coreg or carvedilol?

7    A.  So Pradaxa is an anticoagulation agent.  So it's

8    telling -- in this take-home message, it is saying if you

9    have someone who is taking both Pradaxa, an anticoagulant,

10   and taking a strong inhibitor, which we know that carvedilol

11   is, that you're increasing the risk of toxicity.  And we

12   know that toxicity in this case is an increased risk of

13   bleeding, and we know that bleeding is related to too much

14   Pradaxa in the blood.

15   Q.  And then the last thing on this paper I want to ask you

16   about, this dose adjustment or use of alternative agents

17   should be considered when strong P-gp mediated drug-drug

18   interactions are present, what does that mean?

19   A.  That means if you have a drug that you're taking, and

20   you're taking one of these strong inhibitors, that you need

21   to think about changing the dose of the drug or using a

22   different drug altogether, the one that doesn't have this

23   interaction as an issue.

24   Q.  Are there anticoagulants that don't have this P-gp

25   interaction as an issue?

Laura Plunket - Direct (Moskow)                    299

1    A.   There is others that have -- that will interact, but

2    because of the way that they're absorbed to such a greater

3    extent, it's not -- it doesn't drive it the same way.

4         So, no, this is one of those other unique issues with

5    Pradaxa because it has such a low amount absorbed.  Again,

6    big effect with just a small change in the inhibitor.  So

7    that makes, to me, Pradaxa unique among the ones that are

8    already on the market.

9         And one of the things I didn't say about the 2013 CCDS,

10   there were other drugs like Pradaxa on the market then.  So

11   there were other alternatives that could have been used.

12             MR. MOSKOW:  Okay.  Take this down.

13             Let me try to get in one more document before -- I

14   don't know when the Court wants to break.

15             THE COURT:  When you're ready to have a break, we

16   can take one.

17             MR. MOSKOW:  I'm going to need to cut a little bit,

18   so maybe do one document and then figure out when I'm going

19   to cut.

20             THE COURT:  Okay.

21             MR. MOSKOW:  Thank you.

22             THE COURT:  Do you want to break now?

23             MR. MOSKOW:  I'd like to do one more before we

24   break.

25             THE COURT:  Go ahead.

Laura Plunket - Direct (Moskow)                    300

 1    BY MR. MOSKOW:

 2    Q.  Doctor, could you turn to page 80, please, Exhibit 80?

 3    A.  Middle, front?

 4    Q.  It's probably towards the front.

 5    A.  I see it, yeah.  Okay.

 6    Q.  And what is Exhibit 80?

 7    A.  So this is essentially the labeling for Pradaxa in

 8    Europe.

 9    Q.  And specifically is this the labeling related to the

10    75-milligram dose?

11    A.  Oh, yes.  I'm sorry.  Yes, it is.

12            MR. MOSKOW:  Your Honor, I would move Exhibit 80 as

13    a full exhibit.

14            MS. JONES:  No objection.

15            THE COURT:  It's admitted.  It may be published.

16            MR. MOSKOW:  Thank you, Your Honor.

17       (PLAINTIFFS' EXHIBIT 80 ADMITTED INTO EVIDENCE.)

18    Q.  And it says S -- excuse me.

19        It says summary of product characteristics.  Is this

20    commonly abbreviated?

21    A.  S as in Sam PC you'll see sometimes, yes.

22    Q.  SMPC?

23    A.  Yes.

24    Q.  Okay.  If we could turn to sage page 2.

25        Right at the very top, it tells us that this is Pradaxa

Laura Plunket - Direct (Moskow)                301

1    75-milligram hard capsule, right?

2    A.  Yes.

3         MR. MOSKOW:  All right.  And if we go to page 3,

4    what this is telling doctors in the European Union -- in all

5    patients, it is about middle third of the page.  Keep going.

6    Stop there for now.

7         So in all renal patients -- excuse me.

8         In all patients, renal function should be assessed

9    by calculating the creatinine clearance.

10   Q.  Right, we already looked at that in the CCDS?

11   A.  Yes.

12   Q.  So this is -- this is not new information?

13   A.  No.  That's correct.

14   Q.  And in Europe, doctors are specifically told that

15   Pradaxa is contraindicated for patients with severe renal

16   impairment, right?

17   A.  That's correct.

18   Q.  And then there's also talk about continuing to assess

19   renal function when there is a decline suspected during

20   treatment, right?

21   A.  Yes.

22   Q.  And it gives some examples why somebody might have a

23   decline in treatment?

24   A.  That's correct.

25        MR. MOSKOW:  All right.  And then in the interest of

Laura Plunket - Direct (Moskow)                302

1    time, we don't need to pull it up, but if you could get rid

2    of the call-out.  Just -- there you go.  Great.

3    Q.  Do you see that there is the information that we looked

4    at earlier, the formula for calculating creatinine

5    clearance?

6    A.  Yes, that's correct.

7    Q.  Okay.  And it specifically says this method is

8    recommended?

9    A.  Yes, it does.

10   Q.  Okay.  If we could turn to page 5, please.

11       You see the section called haemorrhagic risk?

12   A.  Yes.

13   Q.  There's a section, the second paragraph, and once again

14   it talks about factors that increase the levels of Pradaxa

15   in the blood; is that right?

16   A.  Yes, it is.

17   Q.  And this is information that is communicated to doctors

18   in Europe?

19   A.  Yes, it is.

20   Q.  And is this information important to you?

21   A.  Yes.

22   Q.  Why is that?

23   A.  Because it is -- it is telling doctors in Europe that

24   there is a relationship between these things, renal function

25   changes and whatnot, and blood levels.  And so it's giving

1    them information on what they can do to prevent that high

2    level of exposure.

3    Q.  Now are those instructions on how to prevent high levels

4    of exposure important to you?

5    A.  Yes.

6    Q.  Why?

7    A.  Because that is what is missing here.  It's the idea

8    that if you tell a patient and a physician that you can

9    bleed, bleeding is dangerous, but you don't give them

10   instructions or information on how to avoid that or identify

11   people, it's a problem.

12        An analogy that I've used before is it's like you are

13   driving down the road, and you see a sign blinking at you

14   that says speed kills.  But a little bit further down the

15   road, you see a sign that says there's a speed grade, a

16   curvy road.  Those kinds of things give you more information

17   about why you want to slow down and not just keep going

18   rather than just telling you you can die if you speed.  So

19   those other signs give you a lot more information on how to

20   factor how fast you should go.

21        So it's the same thing here.  Doctors are being given

22   information on what to do to identify those patients at

23   greatest risk and to consider either a different dose, but

24   also potentially alternative therapy.

25   Q.  Based on your work in drugs and regulations regarding

Laura Plunket - Direct (Moskow)                    304

1    drugs, what does this information reflect about Boehringer's

2    knowledge of the risks associated with increasing Pradaxa

3    levels in the blood?

4    A.  It tells me that they understood not only that there was

5    an increased risk, but also that they understood ways to

6    modify that risk by identifying the plasma levels with

7    those -- the presence of those kinds of conditions.

8            MR. MOSKOW:  Great.  Let's go to the last page.

9    Excuse me, the next page.

10   Q.  So do you see there is this chart at the top of page 6?

11   A.  Yes.

12   Q.  Is there important information here from your

13   perspective reflecting what Boehringer knows about bleeding

14   risks associated with this drug?

15   A.  Yes.

16   Q.  What is that?

17   A.  It's putting together all of the factors in one place

18   where you can go and pick them out.  So it is showing you

19   that you can increase plasma levels -- the second one down

20   there.  And it gives you the things that are important,

21   which include renal impairment, co-medication with a P-gp

22   inhibitor.  It also talks about the fact above that, there

23   is a separate factor for age.

24       And then the next one says here's another group of

25   factors that are important to realize when you are talking

Laura Plunket - Direct (Moskow)                    305

1    about using this drug.  And that is you need to look at

2    whether or not there's another drug, and they're listing

3    aspirin -- ASA is aspirin -- that can also interact in

4    another way.

5         So this is where you would be taking two drugs that both

6    thin your blood, so that is a problem you'd have to worry

7    about and consider as a doctor.

8    Q.  I really wanted to ask you about diseases and procedures

9    with special haemorrhagic risks.  Do you see that?

10   A.  Yes.

11   Q.  And then there are a list of five bullet points right

12   across.

13   A.  Yes.

14   Q.  The last one down, esophagitis, gastritis and

15   gastroesophageal reflux, do you see that?

16   A.  Yes.

17   Q.  Where does, if at all, is that information in the

18   patient Medication Guide for Pradaxa?

19   A.  It's not there.

20   Q.  Is that important information?

21   A.  Yes.

22   Q.  Why?

23   A.  Because being what we know about the drug and the risk

24   of bleeding in the GI tract, that puts these kinds of

25   patients in particular at risk knowing what we know about

1    the drug.

2         MR. MOSKOW:  And the last thing I want to do on this

3    document before we break, just below this chart on page 6,

4    there is a -- can you bring up the whole page, and I'll tell

5    you what I want to pull out?  The paragraph that says

6    Pradaxa does not.  Thank you.

7         All right.  So there's a paragraph that says:

8    Pradaxa does not in general require routine anticoagulant

9    monitoring.

10        Let me stop there.

11   Q.  Is that information that you are aware of before today?

12   A.  Yes.

13   Q.  And is that how the drug is marketed and sold in the

14   United States?

15   A.  As not requiring?  Yes, absolutely.

16   Q.  Do you take issue with this idea of routine

17   anticoagulant monitoring?

18   A.  I take issue on what that means versus what they could

19   be doing.  So to me, it's almost a semantic -- it's almost

20   like hiding behind something that would be helpful because

21   you don't want to do routine monitoring.

22   Q.  Okay.  What do you --

23   A.  Do you want me to explain or --

24   Q.  Yeah, please.

25   A.  So warfarin is a drug that people have to go in week --

1    every several weeks or at least monthly and have your --

2    with a finger prick and have your blood tested to see

3    whether you need to adjust the dose.  So that is one of the

4    disadvantages for some patients because it requires them to

5    continually show up either at a doctor's office or at a

6    facility where they can have that checked.

7        And the other issue with warfarin that some people have

8    is they may have a hard time staying within that -- that

9    range.  But at least by checking the range, you're

10   protecting the people from whether or not they have too much

11   or too little of the drug in their blood.  So it is a way to

12   make the drug safer.

13       When this drug was developed, it was developed with the

14   idea -- and documents that I've reviewed show this -- that

15   they did not want to do monitoring.  It's an advantage for

16   Pradaxa, if they market it, to say no monitoring is needed.

17   But the issue that I see with Pradaxa is we can make it

18   safer not so much by doing routine monitoring, but by doing

19   some monitoring.  And that's the issue that I have with the

20   drug, and I think that is the issue that they've actually

21   put out there in some other internal documents, but they

22   don't do it.

23       There is a way to make Pradaxa safer by doing some level

24   of -- I wouldn't call it monitoring, I would call it blood

25   level measurement at different times to make sure that the

Laura Plunket - Direct (Moskow)                    308

1    the patient taking the drug is getting the right dose.

2    Q.  When are those times that you think it should be done?

3    A.  At initiation of therapy.  So you put a new person on

4    the drug, you wait until it -- four or five days or a week

5    until the person has been taking the drug regularly to get

6    to that steady state we talked about.  You take a sample,

7    and you monitor what their blood level is.

8        Based on that, you can compare that to what is known

9    about the range and specifically the issue of what is too

10   high and determine whether or not the patient needs to be on

11   a different dose or a different medicine.

12       And that kind of assessment could be done -- let's say

13   somebody didn't have kidney disease when they first started

14   on Pradaxa.  But two years later, due to their age, they now

15   have severe renal impairment.  It's another reason to

16   consider measuring the drug and seeing whether or not it is

17   still safe for that patient to use.

18            MR. MOSKOW:  I want to read the next line and see if

19   within the European label Boehringer acknowledges what

20   you've just said.

21            However, the measurement of dabigatran related

22   anticoagulation may be helpful to avoid excessive high

23   exposure to dabigatran in the presence of additional risk

24   factors.

25   Q.  Do you see that?

Laura Plunket - Direct (Moskow)                    309

1    A.  Yes.

2    Q.  What does that say to you as a scientist working in this

3    area?

4    A.  It tells me essentially what I just said.

5        In other words, if you were to measure people's Pradaxa

6    exposure, so excessive activities essentially saying how

7    much Pradaxa is working in the blood, it could -- and people

8    have a risk factor, you would be able to know whether or not

9    you need to either change the dose or put somebody on a

10   different drug because they're at risk.

11   Q.  Where does it tell people in West Virginia in the

12   patient Medication Guide that they can do this to avoid

13   excessive exposure, to avoid too much Pradaxa?

14   A.  There is nothing like that in the Medication Guide.

15           MR. MOSKOW:  Your Honor, this is a good place to

16   break.

17           THE COURT:  All right.  We'll take a 10-minute

18   recess.  You may retire to the jury room and sit down.

19   We'll reconvene in about 10 minutes.

20           MR. MOSKOW:  Thank you, Your Honor.

21       (Recess taken from 2:33 to 2:46 p.m.)

22       (Jury not present.)

23           THE COURT:  All right.  Ready to resume?

24           MR. MOSKOW:  Yes, Your Honor.

25           THE COURT:  Let's bring the jury out.

Laura Plunket - Direct (Moskow)                    310

1        (Jury present.)

2             THE COURT:  All right.  Be seated.

3             You may resume your examination.

4             MR. MOSKOW:  Thank you, Your Honor.

5    Q.  When we just broke, Dr. Plunkett, we were looking at

6    Exhibit 80, which is the European label.

7        Do you remember that?

8    A.  Yes.

9    Q.  We had looked at language that talked about detecting

10   excessive dabigatran activity or excessive dabigatran

11   exposure.

12   A.  Yes.

13   Q.  And, again, what does that mean simply?

14   A.  Too much Pradaxa in your blood.

15   Q.  Okay.  And you talked about there were ways to do that

16   with blood tests?

17   A.  Yes.

18   Q.  Did the company look at those ways to do that in the

19   United States?

20   A.  What do you mean by look at?

21   Q.  Yeah, not a good question.

22       As you reviewed the company documents, did you see

23   discussions among employees at Boehringer about whether it

24   would make sense to test patients' blood to see whether they

25   had too much Pradaxa?

Laura Plunket - Direct (Moskow)            311

1    A.  Yes, they had discussions.  I wasn't sure you meant that

2    they did a study or had discussions.  Yes, they did.

3    Q.  And did some of those discussions look about how that

4    testing would affect the sales of Pradaxa?

5    A.  Yes, they did.

6    Q.  Before we look at any more documents, let me ask you,

7    based on your work in this area for more than 30 years, is

8    it appropriate or inappropriate to look at sales when you're

9    talking about patient safety?

10   A.  To me, it's totally inappropriate.  Patient safety

11   should come first.

12   Q.  Why is that?

13   A.  Because that's what these drugs are being sold to do.

14   They're not being sold to harm people.  They're being sold

15   to help people.

16   Q.  If I could turn you to Exhibit 24 in your book.

17       What is Exhibit 24?

18   A.  It's an e-mail string starting on March 16th, 2012,

19   between several Boehringer employees.

20       MR. MOSKOW:  Your Honor, I would move Exhibit 24 as

21   a full exhibit.

22       MS. JONES:  No objection, Your Honor.

23     (PLAINTIFFS' EXHIBIT 24 ADMITTED INTO EVIDENCE.)

24       MS. JONES:  Could we be heard briefly at side bar?

25       THE COURT:  Yes.

Laura Plunket - Direct (Moskow)                 312

1          (Bench conference, reported.)

2          MS. JONES:  I don't have an objection to the

3    document, but I did just -- I have a sense where we're

4    heading next in the examination, which is digging into the

5    company e-mails.  I did want to just flag for the record the

6    guidance that the Court had given in its motion in limine

7    order that there shouldn't be discussion with Dr. Plunkett

8    about company motives or intent, et cetera, et cetera.

9          MR. MOSKOW:  I'm trying to walk the line, Judge, of

10   having her identify documents that fed into her opinions as

11   to whether or not the company could and should do

12   monitoring.  So I am mindful of your order, and I'll do my

13   best to walk the line.

14         THE COURT:  Okay.  I think that's fine.

15         MR. MOSKOW:  Thank you.

16         MS. JONES:  Thank you, Your Honor.

17         (Bench conference, concluded.)

18         THE COURT:  All right.  Go ahead.

19         MR. MOSKOW:  Permission to publish, Your Honor,

20   Exhibit 24?

21         THE COURT:  Yes.

22         MR. MOSKOW:  Thank you.

23   Q.  Now, Dr. Plunkett, did you identify this document as one

24   that you wanted to talk to the jury about?

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    313

1    Q.  Why was that?

2    A.  Because it's addressing the issue of competition and

3    disadvantages with the issue -- surrounding the issue of

4    monitoring.

5         MR. MOSKOW:  Okay.  So let's pull up the bottom half

6    of the document.

7    Q.  And this is an e-mail from William Ragatz to Greg Behar

8    and Christopher Kaplan, right?

9    A.  Yes.

10   Q.  And all of these e-mails reflect the U.S. division of

11   Boehringer Ingelheim Pharmaceuticals?

12   A.  That's correct.

13   Q.  And was this document in the context of a larger

14   discussion about blood tests?

15       In the prior pages in the document, were there other --

16   it is an e-mail, right, so e-mails go in different

17   directions?

18   A.  That's correct.  In fact, there are -- yeah, there were

19   ones that preceded, but they're redacted.

20   Q.  Okay.  We're not talking about those.

21   A.  No.  I'm starting with the one on the bottom.

22   Q.  Okay.  What I really wanted to focus you on is that this

23   was part of a larger discussion.

24   A.  Yes.  And there's other e-mail chains with discussions

25   around this same basic issue.

Laura Plunket - Direct (Moskow)                314

1    Q.  Okay.  The reason I asked that is because the first part

2    of this says if we go down this route.

3        And could you tell the jury what you understood to be

4    this route in the context of this larger discussion?

5    A.  Plasma monitoring.  Measuring levels of Pradaxa in

6    blood.

7    Q.  Okay.  When you say plasma monitoring, are you talking

8    about monitoring like with warfarin or something different?

9    A.  Well, I believe it's something different than the

10   monitoring for warfarin.  It's the idea, though, of

11   measuring blood levels of Pradaxa or anticoagulation

12   activity in patients on Pradaxa and making decisions about

13   whether or not the dose should be different or whether it's

14   the right drug for the patient.

15       MR. MOSKOW:  Okay.  And so these folks at BI are

16   talking about this.

17       And they say:  First, if we go down this route, we

18   will have to advise all patients to get some kind of

19   anticoagulation monitoring, which would put us at a

20   competitive disadvantage versus rivaroxaban or apixaban and

21   force us to change part of our value story around not

22   monitoring.

23   Q.  What are rivaroxaban and apixaban?

24   A.  So at this time in 2012, those were two other drugs that

25   were competitors.  They were also called NOACs, oral

Laura Plunket - Direct (Moskow)                    315

1    anticoagulants.  They were developed like Pradaxa to be as

2    an alternative therapy to warfarin.  And they're used in the

3    exact same populations, generally the exact same

4    populations.  I don't know if they had all the indications

5    for both of them by then, but they certainly were

6    competitors in the atrial fibrillation market.

7    Q.  And what is rivaroxaban?

8    A.  Xarelto is the other name.  People may have seen ads for

9    Xarelto.  And the other one is Eliquis, apixaban, which is

10   another one that is advertised routinely.

11   Q.  Okay.  And do Eliquis and Xarelto have any kind of blood

12   test to determine whether their levels are right?

13   A.  They're not -- it's not required by the labeling, that

14   is true.  So it's -- none -- no three of these have that as

15   a requirement by the labeling.

16   Q.  So from your work in the industry, why would it put BI

17   at a competitive disadvantage if they tested Pradaxa for

18   excessive Pradaxa levels?

19   A.  So unlike the other two drugs, Pradaxa had an advantage.

20   They actually had collected a lot of data that allowed them

21   to look at the relationship between blood levels and risk of

22   bleeding and risk of stroke.  The other two drugs didn't.

23   So this is the drug where they actually had the data where

24   they could make recommendations about plasma levels.

25       To me, that's an advantage, not a competitive

Laura Plunket - Direct (Moskow)                    316

1    disadvantage.  But they didn't want to have to monitor.

2    That's the way the drug was developed.  There's lots of

3    other documents that talk about that was the goal of their

4    development program, was to develop an oral anticoagulant as

5    an alternative to warfarin that did not need monitoring.

6    Q.  Was this something that you saw raised as a concern when

7    that Reilly paper, that plasma concentration paper we looked

8    at earlier, was being developed?

9    A.  Yes.  Before that paper was published, there were

10   drafts, and the company went back and forth on what they

11   should say in that paper and whether they should actually

12   recommend a therapeutic range or not, stated specifically in

13   the paper instead of having to go to that graph and

14   extrapolate it down for yourself.

15   Q.  Without pulling a lot of documents to show the jury,

16   what did you understand the concern was of some of the folks

17   at Boehringer as to whether stating a therapeutic range

18   outright would be useful?

19   A.  Many -- there were people that were involved in the

20   development of Pradaxa, especially around the RE-LY trial,

21   that thought this type of information, telling doctors about

22   the relationship would be useful and actually make the drug

23   safer.  But there was also people within marketing and other

24   parts of the company that did not want that message out.

25   They wanted to maintain the message of no monitoring.

Laura Plunket - Direct (Moskow)                317

1          And if you put in a paper that there's a therapeutic

2     range, that is admitting that there is a -- a range out

3     there that would help doctors and could lead to the need for

4     monitoring.

5     Q.   Once you identify a therapeutic range, what are you

6     telling the people at that P90 level?

7     A.   You're telling them that you have too much, both ends.

8     Essentially with that therapeutic range, if you were to say

9     that's a range with P10 and P90, you're telling people that

10    one in five, 20 percent out of 100, one in five of the

11    people are not at the right level of Pradaxa in their blood,

12    and they have a risk either of not having prevention of

13    stroke or they are at a risk of bleeding.  So it's a pretty

14    big number, one in five people not at the right dose.

15    Q.   Let's go to a different document.

16         Could you look at Exhibit 36 in your group there?

17    A.   Yes.

18    Q.   What is 36?

19    A.   So it is another e-mail stream for people within the

20    company that is around September -- it looks like between

21    September and October, late September, early October of

22    2012.  And they're talking about this issue of plasma blood

23    levels and the RE-LY data.

24         MR. MOSKOW:  Your Honor, I would move Exhibit 36 as

25    the full exhibit.

Laura Plunket - Direct (Moskow)                    318

1          MS. JONES:  No objection, Your Honor.

2          THE COURT:  It's admitted.  It may be published.

3          MR. MOSKOW:  Thank you, Your Honor.

4       (PLAINTIFFS' EXHIBIT 36 ADMITTED INTO EVIDENCE.)

5          MR. MOSKOW:  Am I blocking the screen for anybody?

6          All right.  And I want to start, if I could, at the

7    top half of the first page.  Actually that's all we're going

8    to talk about.

9    Q.  Do you see this is an e-mail from Dr. Clemens or Clemens

10   at Boehringer to Dr. Friedman?

11   A.  Yes.

12   Q.  And you saw -- or you've reviewed the deposition

13   testimony of Dr. Friedman that the jury saw yesterday?

14   A.  Yes.

15   Q.  And this is specifically referring to the concentration

16   response paper, right?

17   A.  Yes.  This is that Reilly paper that eventually got

18   published in 2014.

19   Q.  So this is talking about earlier drafts of that paper?

20   A.  Yes, that's correct.

21          MR. MOSKOW:  And what I want to focus on is this

22   point in the second paragraph.

23          The world is crying for this information, but the

24   tricky part is that we have to tailor the messages smart.

25   Thorsten wants to do that, so I think it would be worth it

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunket - Direct (Moskow)                319

1    if you and I would attend a TelCon for alignment.  This I

2    see as a real opportunity to not have a bad manuscript.

3    Would be the last try to convince and guide Paul into an

4    appropriate BI conform direction.

5    Q.  Do you see that?

6    A.  Yes.

7    Q.  I want to start at the end of that sentence that says,

8    to convince and guide Paul into an appropriate BI conform

9    direction.

10        Based on your work as a scientist publishing

11   peer-reviewed literature, reviewing that literature, does

12   science have a company direction or is science science?

13   A.  Well, science itself is science, and the data is what

14   the data is.  Certainly a company could have a goal, and

15   they can try to achieve it.  But making science fit your

16   goal when it doesn't, that's not good science.

17   Q.  And with regard to the plasma concentration paper, we

18   saw Dr. Friedman tell the jury yesterday that there were

19   earlier drafts that included a therapeutic range.

20   A.  They did.

21   Q.  How, if at all, does the change in that paper, where the

22   therapeutic range was in and now was out when it was

23   published, how, if at all, does that information inform your

24   opinions as to whether Boehringer is fully disclosing the

25   risks of Pradaxa to patients in West Virginia?

Laura Plunket - Direct (Moskow)                320

1    A.   It's very important as part of my opinions.  You want me

2    to tell you how?

3    Q.   Yes, please.

4    A.   So the idea that you have a paper that appears in

5    scientific literature and can use a term that people in the

6    field would understand -- therapeutic range is an idea that

7    a pharmacologist, someone working in clinical medicine would

8    understand what that means.

9        If you understand it exists, and you don't tell

10   physicians about it, but instead -- in fact, if you read

11   that paper, they try to twist that message around in a

12   different way based on what was in the earlier manuscript --

13   to me is wrong.

14       I mean, the idea is the drug can be safer, and this

15   is -- this paper in the early drafts when it used the word

16   therapeutic range had a way to make the drug safer for some

17   people.  And so I think hiding that information by taking it

18   out of the draft is wrong and is not putting the best

19   science forward.

20   Q.   This -- I want to touch on two last things on this.

21       The point that the world is crying for this information,

22   is that a statement you agree with?

23   A.   Yes.

24   Q.   Why?

25   A.   Because up to this time, in other documents that I've

1    seen that relate to this conversation within the company, it

2    was pointed out by some other clinicians who were working on

3    this paper that it would be very helpful for doctors to

4    understand how to pick the right dose and the right drug for

5    their patients.  And that's what this information on

6    therapeutic range would do.  It would tell you, based on

7    having gathered this data, here's a way we can use it, and

8    this is a way you can know that your patient on Pradaxa is

9    not one of those patients that has risk factors based on who

10   they are that put them at excessive risk of bleeding.  So

11   it's the idea of making the drug safer for the patients that

12   you give it to.

13   Q.  This is October of 2012, right?

14   A.  Yes.

15   Q.  I want to take you back very quickly to Exhibit 5, which

16   is about a year and a little bit earlier.

17   A.  Okay.

18   Q.  And are you able to identify Exhibit 5?

19   A.  Yes.

20   Q.  What is that?

21   A.  It's another group of e-mails dated August 1st, 2011,

22   between Dr. Reilly and some other scientists in the company.

23   Q.  Okay.  And does this deal with that same plasma

24   concentration paper?

25   A.  Yes.  It's called the PK outcomes paper, but also called

Laura Plunket - Direct (Moskow)                322

1     in the other e-mail exposure response.  But it's the paper

2     that Dr. Reilly was working on.

3             MR. MOSKOW:  Your Honor, I would move Exhibit 5 as a

4     full exhibit.

5             MS. JONES:  No objection.

6             THE COURT:  It's admitted and may be published.

7             MR. MOSKOW:  Thank you, Your Honor.

8         (PLAINTIFFS' EXHIBIT 5 ADMITTED INTO EVIDENCE.)

9             MR. MOSKOW:  So I want to stay on the first page of

10    this.  We are going to move very quickly.  But the bottom

11    half of the page is an e-mail at 16:46 on Monday, August

12    1st.

13    Q.  Do you see that?

14    A.  Yes.

15    Q.  And there's some German on this document.

16        Do you know if Dr. Brueckmann, Professor Dr. Martina

17    Brueckmann is in the German department of Boehringer

18    Ingelheim?

19    A.  Yes, in medical affairs.

20    Q.  In fact, the DE in her e-mail indicates that she's in

21    Deutschland or Germany, right?

22    A.  And Dr. Reilly, you'll see U.S. with his.

23    Q.  Okay.  And can you read this e-mail to the jury?

24    A.  Dear Martina:  Of course I am aware that the conclusions

25    that appear to emerge from this paper are not the ones

Laura Plunket - Direct (Moskow)                323

1    currently wished for by marketing (that dose adjustment will

2    optimize therapy).  Let's just see where this paper ends up.

3    I actually think that once we have a competitor out there

4    that is as good as we are, we will be looking for ways to

5    make our drug better.  Ultimately, if BI doesn't want to be

6    associated with this message, I recognize that BI authorship

7    may not be possible.

8    Q.  Again, based on your experience, does marketing drive

9    science?

10              MS. JONES:  Excuse me, Dr. Plunkett.

11              Your Honor, I am going to object in light of Your

12   Honor's motion in limine I raised at side bar.

13              THE COURT:  Sustained.

14              MR. MOSKOW:  Let me rephrase the question.

15              THE COURT:  Okay.

16   BY MR. MOSKOW:

17   Q.  Doctor, based on your work in the regulatory and

18   scientific fields, how do you view marketing's role in the

19   progress of science?

20              MS. JONES:  Your Honor, I'm going to make the same

21   objection.

22              THE COURT:  Overruled.

23              THE WITNESS:  Marketing, in my experience, is not

24   supposed to play a role in how the science evolves and

25   develops.  Again, marketing can be involved in an initial

Laura Plunket - Direct (Moskow)                    324

1    goal.  This is a good market to go into.  This is the type

2    of drug that would be useful.  But once you start to gather

3    the science and the data, marketing should not be driving

4    the information that gets to physicians.

5         MR. MOSKOW:  If we could go to the e-mail at the top

6    half of the page, please.

7    Q.  Dr. Brueckmann responds to Dr. Reilly later that same

8    day?

9    A.  Yes.

10   Q.  And she writes:  Fully agree.  A target range is

11   something we always wanted to avoid in the first place to

12   get away from monitoring.

13        Right?

14   A.  Yes.

15   Q.  And based on your review of the documentation, is that a

16   consistent company position?

17   A.  Yes, absolutely.

18   Q.  She goes on to say, the fourth line down:  The time may

19   be a bit too early to introduce a target plasma level range

20   from a marketing point of view.  But if this could clearly

21   demonstrate that additional benefits are obtained, this may

22   be a path forward to differentiate ourselves from

23   competitors.

24        Do you see that?

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    325

1    Q.  Based on your experience working in this field, is

2    patient safety something that waits until you have a

3    competitor, or do you address it immediately?

4    A.  It should be addressed immediately.  And that's really

5    what is meant to happen by the way the process goes about.

6    That is sort of the way the regulations talk about

7    protecting patient safety.  That's what is supposed to

8    happen.

9    Q.  If we could go to Exhibit 38, please, in your book.

10   A.  38.  Okay.

11   Q.  And what is that?

12   A.  It's -- the first -- it is an e-mail stream.  If you

13   want the first one, it's dated June 24th, 2012.

14   Q.  Are you at 38?

15   A.  Oh, I'm sorry.  Wrong one.

16        38, an e-mail stream, but this date is February 4th,

17   2013, and it's talking about the exposure paper again, so

18   Reilly's publication that eventually comes out.

19        MR. MOSKOW:  Your Honor, I move Exhibit 38 as a full

20   exhibit.

21        MS. JONES:  No objection.

22        THE COURT:  It's admitted, and it may be published.

23     (PLAINTIFFS' EXHIBIT 38 ADMITTED INTO EVIDENCE.)

24        MR. MOSKOW:  All right.  So let's take the first

25   half of the page, the first page, please.

1          THE WITNESS:  Sure.

2          MR. MOSKOW:  And this is an e-mail from Dr. Jutta

3    Heinrich Nols.

4    Q.  Do you see that at the top?

5    A.  Yes.

6    Q.  And she's writing to Dr. Friedman, Dr. Brueckmann, and

7    Dr. Clemens.

8    A.  Yes.

9    Q.  Based on your review of documents and information at

10   Boehringer, are these senior or junior people in the

11   development of Pradaxa?

12   A.  These are people -- decision-makers, senior people.

13   Q.  Okay.

14          MR. MOSKOW:  And Dr. Heinrich Nols writes:

15          Dear all, is it really wanted to publish this

16   exposure event paper of RE-LY?  I cannot believe that for a

17   decade a drug was developed with a clearly defined target of

18   no monitoring needs, a prospective trial without plasma

19   level monitoring was performed generating the RE-LY study

20   results that we promote two fixed doses without monitoring,

21   defend continuously to health authorities that individual

22   patient characteristics do not allow a dose titration based

23   on plasma level only, and then finally release a publication

24   where exposure event relationships, which was neither

25   prospectively defined nor adequately conducted, are

1    described to define an effective and safe plasma level

2    range.  This will make any defense of no monitoring to HA

3    extremely difficult, i.e. Health Canada and TGA, and

4    undermine our efforts to compete with other NOACs.

5         Let me stop there.

6    Q.  Can you explain to the jury what this will make any

7    defense of no monitoring to HA extremely difficult means?

8    A.  It means that if health authorities are actually asking

9    questions about the need to monitor, it will be very hard to

10   say we don't need to monitor if they put this paper out,

11   which actually identifies a useful therapeutic range for

12   doing such blood level assessment or measuring levels of

13   Pradaxa in blood and relating it to risk.

14   Q.  Okay.  Earlier when we were looking at another e-mail,

15   you said that it was always appropriate to have a target of

16   no monitoring.

17        Do you disagree with that?

18   A.  No, absolutely not.

19   Q.  So what's the problem with monitoring now?

20   A.  Because you actually know that it could be helpful and

21   would make the drug safer.  I mean, there again,

22   other discussions within e-mails that I have seen and in

23   company documents where they recognize that they could have

24   a safer drug.

25        I mean, that is what they are talking about in the one

Laura Plunket - Direct (Moskow)                328

1    we just did.  Make the drug better?  Making it better means

2    making it safer in this case when you can identify patients

3    at risk.

4        So, again, no problem with them having a goal of no

5    monitoring.  But when they collect the data -- they

6    collected a large amount of data that was extremely useful.

7    To ignore what that data tells you, especially for

8    vulnerable people like the ones with severe kidney

9    impairment on multiple drugs, that's a real problem in my

10   view.  I don't think that that is consistent with protecting

11   patients.

12   Q.  All right.  I want to end my time with you -- I know

13   Attorney Jones will have some questions for you, but I want

14   to end my time with you looking at Exhibit 93.

15   A.  Okay.

16   Q.  What is Exhibit 93?

17   A.  It's the -- sorry -- the labeling that is written for

18   the doctors.  So it's for the prescribers for Pradaxa.  And

19   this looks like it is -- look at the date -- 2013, April of

20   2013.

21   Q.  I don't mean to correct you, but is this the labeling

22   just for doctors or does it include information specifically

23   for patients?

24   A.  Well, the front page is the labeling for doctors.  But

25   you're exactly right, at the back there is a Medication

Laura Plunket - Direct (Moskow)                    329

1   Guide.  So this is the full labeling for the drug.

2        MR. MOSKOW:  I move Exhibit 93 as a full exhibit.

3        MS. JONES:  No objection, Your Honor.

4        THE COURT:  It's admitted and may be published.

5        MR. MOSKOW:  Thank you.

6    (PLAINTIFFS' EXHIBIT 93 ADMITTED INTO EVIDENCE.)

7   BY MR. MOSKOW:

8   Q.  Let me just ask you generally, when you talk about the

9   label, what are you talking about?  Are you talking about

10  the thing that is on the bottle?

11  A.  Well, that is actually part of it, but the labeling is

12  more than that.  For a prescription drug, there's a lot of

13  things that make up the label.  The thing that is on the

14  bottle is regulated as part of the label.  The Medication

15  Guide that is handed out to the patients, that's part of the

16  labeling.  The larger, more detailed instructions that are

17  given -- made available to doctors is labeling.  And even

18  promotional materials, advertisements that you see on the TV

19  and things like that, those are considered part of labeling

20  for the product.

21      And that means that all of that has oversight, and all

22  of that has certain ways that it's supposed to be developed

23  and produced and made available to doctors and then also to

24  patients, in this case with the Medication Guide.

25  Q.  Okay.  So you said in patients in this case with the

Laura Plunket - Direct (Moskow)                    330

1    Medication Guide.

2        Why is there separate information for patients with

3    regard to Pradaxa?

4    A.  So it's understood that the language in the label for

5    the doctors is going to be way too detailed, but also there

6    are a lot of terms and a lot of language that won't be known

7    by the average person.  So rather than requiring you to have

8    a medical degree or a doctorate in order to understand the

9    label or a science degree of some kind, they make a shorter

10   more concise version of important information that is

11   drafted in language so the average person could understand

12   it and read it.  And then it either may lead to opening a

13   dialogue with your doctor, or it may just be with your

14   pharmacist, or it may be that you just have it at home, and

15   you read it and understand it.

16   Q.  Is this done for all drugs?

17   A.  No.

18   Q.  Why not?

19   A.  Because many drugs don't have the kind of serious risk

20   issues or concerns that require there to be specific

21   information given to patients.

22       I see this kind of Medication Guide for all

23   anticoagulant -- all anticoagulants have one.  I see it

24   for -- a drug like Accutane has one because of the risks to

25   being pregnant if you're taking that drug.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

1      So the drugs that have these more serious patient safety

2    concerns or more serious issues of how to take the drug,

3    those are the ones that will have a Medication Guide.

4    Q.  How is it that Pradaxa came to have a Medication Guide?

5    A.  Because of the type of drug it is.

6      I know Mrs. Kliewer mentioned in her depo that it wasn't

7    a regulatory requirement.  That's true, it's not.  But it is

8    one that is often recommended and asked for by the agency.

9    And certainly I think it's appropriate for this kind of a

10   drug being it is one that you need to understand the risks.

11   Q.  Do you have an understanding of whether part of the

12   labeling negotiations for Pradaxa included a need to have a

13   patient Medication Guide?

14   A.  Yes, that was mentioned during the labeling negotiation.

15   Q.  All right.  And then the last thing I wanted to ask you

16   before we actually get into the nitty-gritty here, have you

17   seen any studies anywhere that talk about how drug safety

18   can be improved by the delivery of warnings and instructions

19   directly to patients?

20   A.  Yes.

21   Q.  And generally speaking, what do you understand about

22   that?

23   A.  That very specific targeted information in plain

24   language is able -- when given to patients outside of not

25   being given to patients when they do studies, they see that

1    it improves the safe use of the drug.  That patients have a

2    better understanding, and with a good Medication Guide, that

3    there's actually a lower incidence of certain kinds of

4    adverse events and things like that because people

5    understand it better.

6            MR. MOSKOW:  Let's turn to page 12 of Exhibit 93.

7    And if you could take out the first half of the label --

8    yeah, through the second point.  Thank you.

9    Q.  So this is the very beginning of the Medication Guide,

10   right?

11   A.  Yes.

12   Q.  And patients are told to read this before you take it

13   and to read it each time you get your new medication?

14   A.  Yes.

15   Q.  And that's important because why?

16   A.  Because the information can change.  It is the idea that

17   each time you get a refill, it's possible that the labeling

18   has changed, and so there could be new information that

19   would be useful that you need to understand and that your

20   doctor hopefully will open up a dialogue with you as well.

21   Q.  Then the first section is what is the most important

22   information I should know about Pradaxa, right?

23   A.  Yes.

24   Q.  And in the interest of time, I won't make you read

25   everything.  But this first paragraph is really talking

Laura Plunket - Direct (Moskow)                333

1    about why you take Pradaxa, right?

2    A.  That's exactly right.

3    Q.  And it is important to take an anticoagulant if you have

4    AFib and your doctor prescribes it; is that fair?

5    A.  Yes, absolutely.

6    Q.  Can you tell the jury why?

7    A.  Because indeed, as Dr. Friedman described when I saw his

8    depo, you're at an increased risk of blood clots, and those

9    block clots can lead to various serious strokes.  So if you

10   can prevent those from happening because your heart is not

11   beating properly, then this kind of drug is very useful and

12   has been shown to be effective.

13       So, yes, it's important to realize if you have an

14   ongoing condition of atrial fibrillation that is not being

15   able to be treated properly, then an anticoagulant is

16   definitely important.

17   Q.  Now the only thing bolded in this section is that you

18   should not stop taking Pradaxa without talking to the doctor

19   who prescribes it for you, correct?

20   A.  Yes.

21   Q.  Why?

22   A.  Well, as soon as you stop, you're at an increased risk

23   of a stroke.  They have actually data that shows that the

24   risk is higher if you promptly stop than if you don't.

25   Q.  But then the next section says you may need to stop it

Laura Plunket - Direct (Moskow)                    334

1    if you are going to have surgery.

2    A.  Yes.

3    Q.  Can you explain to the jury that balance of stroke risk

4    versus bleed risk that is being discussed here?

5    A.  Right.  So you take the drug because you want to prevent

6    a stroke.  But if you're going to have surgery, and you're

7    going to bleed because they're cutting into your tissues, if

8    you're on this anticoagulant, you could just not ever clot,

9    and you could actually die from excess bleeding due to the

10   surgery.

11       So, as a result, if you go into your doctor, and he

12   wants to do any kind of procedure like a colonoscopy or even

13   some types of dental procedures, you're required to stop --

14   they tell you to stop taking the drug before you have that

15   done so that you don't have that risk of a life-threatening

16   bleed or even just really excessive blood loss that could

17   require you to be hospitalized in order to replace the

18   blood.

19   Q.  And then the next bullet point is the warning that you

20   talked about before, Pradaxa can cause bleeding which can be

21   serious and sometimes lead to death, right?

22   A.  Yes.

23   Q.  And I think you used an analogy about a sign on the

24   highway that says speed kills?

25   A.  Yes.

Laura Plunket - Direct (Moskow)                    335

1    Q.  Why did you use that analogy to talk about this

2    language?

3    A.  Because this language is telling you that -- something

4    about the fact that bleeding can -- bleeding can kill you,

5    but it is not providing in this Medication Guide information

6    about how to avoid that risk.  How to put those things

7    together to understand -- in other words, the idea that

8    telling a person on a 75-milligram dose that, oh, by the way

9    the drug hasn't been tested or -- for you, shown to be safe

10   and effective.

11        Or if you're bleeding, and you have these risk factors,

12   those things could all combine together to make it so that

13   if you're old, and you have severe renal impairment, and you

14   are on a strong P-gp inhibitor, you are really at an

15   increased risk of bleed.

16        So it's providing context so the patient understands

17   that bleeding is a risk, but there is ways that I can --

18   this drug can be safer for me.  Measuring the blood level is

19   an example of something that could be provided to the

20   patient or mentioned to the patient as well.

21   Q.  What opinion, if any, do you have as to whether simply

22   warning a patient that Pradaxa can cause bleeding which can

23   be serious, and sometimes lead to death, is an adequate

24   warning?

25   A.  It's my opinion that it's not adequate based on a lot of

Laura Plunket - Direct (Moskow)                    336

```
 1   other information that is known that would help them prevent

 2   or avoid that bleeding risk.

 3   Q.  I want to stop for a second while this is on the screen

 4   and just ask you, do you, as part of your consulting

 5   practice, advise clients as to the types of warning

 6   instructions they need to give to doctors and patients?

 7   A.  I have, yes.

 8   Q.  And when you do that, what significance is there, if

 9   any, as to how individual state laws may apply versus FDA

10   rules?

11   A.  So I've worked on projects or cases where the issue is

12   whether or not the information needs to be provided directly

13   to a patient -- like in this case, that's my understanding

14   here in West Virginia -- versus the information only having

15   to be provided to the physician.

16       So in some projects that I work on what is most

17   important is what is being told to the patient, and that's

18   what this Medication Guide is.  So in my view that is what

19   is really important in this particular case, understanding

20   what the patient was being told.

21   Q.  Let's look at the bottom half of this page of the

22   Medication Guide.

23       It says:  You may have a higher risk of bleeding if you

24   take Pradaxa and -- and it lists a bunch of things, right?

25   A.  Yes.
```

Laura Plunket - Direct (Moskow)                    337

1    Q.  Age over 75 years?

2    A.  Yes.

3    Q.  Kidney problems?

4    A.  Yes.

5    Q.  If you're on other medications?

6    A.  Yes.

7    Q.  If you've had stomach or intestine bleeding that is

8    recent, and it keeps coming back?

9    A.  Yes.

10   Q.  I mean, this is a whole bunch of medications here,

11   right?  I mean, we can count them up, but there are a whole

12   bunch of medications that are listed here.

13   A.  Yes.

14   Q.  Do you have an opinion as to whether this is adequate

15   information to patients?

16   A.  I do.

17   Q.  And what is that opinion?

18   A.  That it's not.

19   Q.  Why is that?

20   A.  Well, there's a couple of issues.  One -- on the issue

21   of medications, there are other drugs out there that are

22   strong P-gp inhibitors that are commonly used with this drug

23   that I believe should be discussed or described or at least

24   they should be told to ask questions about with their

25   doctor.

Laura Plunket - Direct (Moskow)                338

1      And then there's this issue of pointing out that -- on

2   this issue of higher risk of bleeding, the idea that

3   multiple risk factors puts you at even greater risk.  It's

4   the idea that you may -- you have to understand, if you have

5   three or four of these things, it's a real problem.  And

6   there is a way to find out if the drug safe for you,

7   however, with those factors.  And that's the issue of

8   plasma -- monitoring the level of Pradaxa in your blood.

9         MR. MOSKOW:  In the interest of time, let me see if

10  I can walk you through the Medication Guide as a whole.

11        Gina, can you just flip through pages 12 to 16 very

12  quickly and just show the four pages or maybe put all four

13  of them up at one time?

14  Q.  Okay.  So this is a four-page document with big print,

15  right?

16  A.  Yes.

17  Q.  And we'll put the first two pages up.

18        Have you had an opportunity to review the entire

19  Medication Guide?

20  A.  Yes.

21  Q.  Okay.  So I'm going to ask you a series of questions,

22  and I'm going to ask you to identify, and then Ms. Veldman

23  can pull up on the screen the area you're talking about.

24        All right?

25  A.  Sure.

Laura Plunket - Direct (Moskow)                    339

1    Q.  Can you direct Ms. Veldman to put up on the screen where

2    in the Medication Guide it says that the 75-milligram dose

3    was never tested on AFib patients?

4    A.  That is not in the Medication Guide.  The patient would

5    have no way to know that.

6    Q.  Okay.  Could you tell us where we're going to find that

7    there is no safety and effectiveness information about the

8    75-milligram dose?

9    A.  That is not in there.

10   Q.  Can you show us where there is information that one in

11   five patients are getting too much or too little drug?

12   A.  That is not in there.

13   Q.  Can you point where in the Medication Guide it talks

14   about excessive dabigatran exposure or too much Pradaxa?

15   A.  That concept is not provided in here.

16   Q.  Can you point to where in this label it tells us that

17   too much Pradaxa increases your risk of bleeding?

18   A.  It doesn't use those words.

19   Q.  Where does it say that increasing plasma -- increasing

20   plasma concentration increases the risk of bleeding?

21   A.  It does not mention that relationship.

22   Q.  Can you show the jury where in this label it says that

23   if you're on Pradaxa, you're more likely to have a GI

24   bleed -- strike that.  Let me start again.

25       Tell the jury where in this Medication Guide it tells a

Laura Plunket - Direct (Moskow)                    340

1    patient that you are more likely to have a GI bleed with

2    Pradaxa than you would with warfarin?

3    A.  It doesn't provide that data.

4    Q.  Where in this Medication Guide does it tell a patient

5    that there is no reversal agent, there is no way to stop an

6    active bleed?

7    A.  It also doesn't provide that information to the patient.

8    Q.  Where in this label -- strike that.

9         Where in this Medication Guide does it identify the

10   strong P-gp inhibitor Coreg or carvedilol should not be used

11   with somebody who has severe renal impairment or significant

12   kidney problems?

13   A.  It does not mention that together.

14   Q.  And I think you already said this, but can you point

15   anywhere in the label where it says -- strike that.

16        Can you point to anywhere in this Medication Guide where

17   it says that if you add risk factors, the risk of bleeding

18   is increased more than just one plus one plus one?

19   A.  It doesn't provide that information.

20   Q.  Have all of the opinions that you've given this jury

21   over the course of the entire day been given to a reasonable

22   degree of scientific and regulatory certainty?

23   A.  Yes, they are.

24   Q.  And just to confirm one more time, what does that mean

25   to you?

1   A.   That is the more likely than not standard.  I believe

2   that the information I reviewed and relied upon shows that

3   it's more likely than not that those opinions I have

4   expressed are true.

5            MR. MOSKOW:  Your Honor, may I have one moment?

6            THE COURT:  You may.

7        (Plaintiffs' counsel conferring.)

8            MR. MOSKOW:  Your Honor, I'm going to tender the

9   witness.

10           THE COURT:  All right.  We'll take a brief recess

11  before cross-examination begins.  You may retire to the jury

12  room.

13           MR. MOSKOW:  Thank you, Dr. Plunkett.

14       (Recess taken from 3:28 to 3:35 p.m.)

15       (Jury not present.)

16           THE COURT:  All right.  Ask the jury if they're

17  ready.  They can come out when they're all ready.

18           THE COURT SECURITY OFFICER:  Yes, sir.

19           MS. JONES:  And, Your Honor, I obviously have more

20  than I'm going to cover this afternoon, so I'll stop at a

21  reasonable breaking point if that makes sense for Your

22  Honor.

23           THE COURT:  Absolutely.

24       (Jury present.)

25           THE COURT:  All right.  Be seated.

Laura Plunket - Cross (Jones)                342

1          MS. JONES:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MS. JONES:

4    Q.  Good afternoon, Dr. Plunkett.

5    A.  Good afternoon.

6    Q.  I don't think we've ever formally met.  I am Phyllis

7    Jones.  I am one of the lawyers for BI.  It's nice to meet

8    you.

9        How are you doing?

10   A.  I'm fine, thank you.  And I don't think we have met.

11   Nice to meet you.

12   Q.  Likewise.

13       So we don't have as much time as I will need to finish

14   your cross-examination, so I may jump around a little bit to

15   try to get into some things that we can finish in an

16   efficient way if that's okay.  All right?

17   A.  That's fine.

18   Q.  All right.  I actually want to start where you ended up

19   with Mr. Moskow in talking about the Medication Guide for

20   Pradaxa.  Okay?

21   A.  Okay.

22   Q.  Do you have Exhibit 93 in front of you?

23   A.  Yes, I do.

24          MS. JONES:  And can we pull that up on the screen,

25   Mr. Reynolds?  And let's just go to start to page 12 of

Laura Plunket - Cross (Jones)                    343

1    Exhibit 93.

2    Q.  And just to remind ourselves, this is a copy of a

3    version of the Pradaxa label from April of 2013; is that

4    correct?

5    A.  Yes.

6    Q.  And what we're looking at towards the back of the

7    document is what you described as the Medication Guide,

8    correct?

9    A.  Yes.

10   Q.  And the Medication Guide is a document that is prepared

11   specifically for patients, correct?

12   A.  Yes.

13   Q.  And by the rules that are established by the FDA, every

14   time that a patient goes to a pharmacy to pick up a

15   prescription for Pradaxa, that patient is supposed to

16   receive a copy of the Medication Guide, correct?

17   A.  Yes, that is correct.

18   Q.  All right.  And just to be clear, following up on what

19   you were covering with Mr. Moskow, the Medication Guide for

20   Pradaxa is not the only resource that is available that

21   contains information about the benefits and the risks of

22   Pradaxa, correct?

23   A.  Are you meaning just to the patient only or are you

24   saying just generally?

25   Q.  I'm saying generally.

Laura Plunket - Cross (Jones)                    344

1    A.   That's true.  Generally there is other information.

2    Q.   Okay.  And in fact, if we look at the very beginning of

3    Exhibit 93, we see what I think you referred to as the

4    physician labeling for Pradaxa, correct?

5    A.   Yes.

6    Q.   Okay.  So let's start back with the Medication Guide,

7    and then we will probably flip back to the beginning of the

8    document at least briefly.

9         At the very top of the Medication Guide for Pradaxa,

10   there is actually just some advice to patients about how to

11   use the Medication Guide, correct?

12   A.   Yes.

13        MS. JONES:  And can we call out that first

14   paragraph, Mr. Reynolds?

15        It says:  Read this Medication Guide before you

16   start taking Pradaxa and each time you get a refill.

17   Q.   Did I read that correctly?

18   A.   You did, yes.

19   Q.   And you don't take issue with that suggestion to

20   patients, correct?

21   A.   No.

22   Q.   That's good advice, right?

23   A.   Yes.

24   Q.   Okay.  And it goes on to say there may be new

25   information.  That's the reason that a patient might want to

Laura Plunket - Cross (Jones)                    345

1    read it each time he or she receives it, correct?

2    A.  Yes.

3    Q.  It goes on to say:  This Medication Guide does not take

4    the place of talking with your doctor about your medical

5    condition or your treatment.

6         Correct?

7    A.  Yes.

8    Q.  So the Medication Guide, I think this was something that

9    you referenced in your direct testimony, also is intended to

10   encourage a conversation with the patient's doctor, correct?

11   A.  Yes.

12   Q.  And that makes sense because Pradaxa is a prescription

13   medicine, correct?

14   A.  That's correct.

15   Q.  You can't get Pradaxa unless a doctor or some health

16   care professional who is authorized to prescribe medicines

17   says you should have this medicine, correct?

18   A.  That's correct.

19   Q.  Okay.  And so you don't take issue, I assume, with this

20   advice in the Medication Guide that says this doesn't take

21   the place of talking with your doctor about the medicine,

22   correct?

23   A.  I have not had issue with that, no.

24   Q.  Okay.  And am I right in understanding that every single

25   word of this Medication Guide for Pradaxa has been approved

Laura Plunket - Cross (Jones)                        346

1     by the Food and Drug Administration?

2     A.  Yes, that's correct.

3     Q.  And if we actually go to the very last page of the

4     Medication Guide, you see there is a reference there -- it's

5     about a fifth of the way down the page, Mr. Reynolds --

6     where it says this Medication Guide has been approved by the

7     U.S. Food and Drug Administration?

8     A.  That's correct.

9     Q.  All right.  And so that just confirms that every piece

10    of content that appears in this Medication Guide for

11    patients, the FDA gave it its seal of approval, correct?

12    A.  That's what is supposed to happen, yes, and I believe it

13    did in this case.

14    Q.  All right.  Then if we go to page 15 of Exhibit 93, just

15    moving further back into the Medication Guide, it also

16    says -- there's a section at the bottom that says General

17    Information About Pradaxa, correct?

18    A.  Yes.

19    Q.  And it says -- I want to go actually to just that middle

20    paragraph.  It says:  This Medication Guide summarizes the

21    most important information about Pradaxa.

22        Correct?

23    A.  Yes.

24    Q.  And you don't take issue with that reference in the

25    document, correct?

Laura Plunket - Cross (Jones)                    347

1     A.  To the reference?  No.

2     Q.  Okay.

3     A.  No.

4     Q.  It goes on to say:  If you would like more information,

5     talk with your doctor.

6         Correct?

7     A.  It does say that, yes.

8     Q.  And that's good advice, correct?

9     A.  Yes.

10    Q.  You don't have any issues with that language in the

11    Medication Guide, correct?

12    A.  No, I have not commented on that.

13    Q.  Okay.  And it goes on to say:  You can ask your

14    pharmacist or doctor for information about Pradaxa that is

15    written for health professionals.

16        Do you see that?

17    A.  Yes.

18    Q.  And do you understand that to be a reference to the

19    physician labeling that is also made available by Boehringer

20    Ingelheim to doctors and health care professionals who

21    actually prescribe Pradaxa?

22    A.  Yes, that's my understanding.

23    Q.  Okay.  And you covered a lot during your direct

24    examination testimony today, but you did not cover at all,

25    if I'm recalling correctly, any of the detail in the

Laura Plunket - Cross (Jones)                    348

1    labeling for physicians for Pradaxa; is that right?

2    A.  We did with -- I don't believe in the U.S. label.  We

3    did go into the European label, which was for physicians.

4    Q.  Got it.  And that's a fair clarification.

5         You talked about the label that doesn't apply in the

6    United States, but you did not talk about the doctor label

7    that would apply in the United States, right?

8    A.  That's correct.  It's my opinion the Medication Guide is

9    what is relevant.

10   Q.  Okay.  But we can agree, because we just looked at it,

11   that the Medication Guide also encourages patients to talk

12   to their doctors who have access to the physician labeling,

13   correct?

14   A.  It does say that, that's true.

15   Q.  Okay.  And do you understand there to be --

16        MS. JONES:  I apologize.  I apologize to everyone.

17   That's a failing of mine.  I will try to do better.

18   Q.  Do you understand there to be something that is the

19   equivalent of the Medication Guide in Europe?

20   A.  Yes.

21   Q.  Have you looked at that?

22   A.  I've seen something that was available online, yes.

23   Q.  Did you evaluate it to determine whether you viewed it

24   as adequate or not?

25   A.  No.  I haven't made an opinion on any specific language,

Laura Plunket - Cross (Jones)                          349

no.

2          MS. JONES:  Could we just go to the first page of
3      Exhibit 93, Mr. Reynolds?
4      Q.  And there is more in this document to cover than we're
5      going to be able to cover this afternoon, but I just wanted
6      to give a little bit of a quick run through of some of the
7      highlights in the document.  Okay?
8      A.  Okay.
9      Q.  So on the first page of Exhibit 93, we are looking at
10     what's known as the highlights section for the prescribing
11     information for doctors and medical professionals who
12     prescribe Pradaxa, correct?
13     A.  Yes, that's correct.
14     Q.  And this is information that is given to health care
15     professionals so that they can provide whatever information
16     they think is appropriate for their patients, correct?
17     A.  Yes.
18     Q.  Okay.  And this is the type of information that the
19     Medication Guide is envisioning when it says talk to your
20     doctor, your doctor can give you the information that is
21     made available for health care professionals, correct?
22     A.  Well, I wouldn't think they were only talking about the
23     highlights, but certainly the information generally I would
24     agree.
25     Q.  And, again, that's a fair clarification.  I was

1    referencing the doctor label in general.

2    A.   Okay.  I'm sorry.  I thought we were just talking about

3    the highlights, but that's fine.

4    Q.   We're on the same page.

5        The doctor label is what the Medication Guide is

6    referring to when it says talk to your doctor, your doctor

7    might be able to give you more information including the

8    labeling for doctors, correct?

9    A.   Yes, that's true.

10   Q.   Okay.  And if we just call out that top section -- thank

11   you, Mr. Reynolds -- this, again, is a section that is

12   regulated and approved by the FDA, correct?

13   A.   Yes, that's correct.  This is part of that labeling

14   negotiation process in the beginning and then also later.

15   Q.   And then the structure of a doctor label for a medicine,

16   that is all regulated by the FDA as well, correct?

17   A.   Yes.  There are a certain part of the regulations that

18   tell you how to -- what sections need to be there and how to

19   put it together, yes.

20   Q.   And so a company like BI couldn't say we want to name

21   the sections differently or we want to somehow switch up the

22   organization of the sections, correct?

23   A.   That is true, no.

24   Q.   Okay.  And if the FDA says we don't want something in

25   the label, the company cannot then say, well, we're going to

1    put it in there anyway, correct?

2    A.  It can push back.  But if the FDA has made a final

3    decision it's not to be there, then they are to -- they're

4    supposed to follow the FDA's advice, that is true.

5    Q.  Okay.  And in the Highlights of Prescribing Information,

6    this is a little bit of a summary of all of the information

7    that is captured for doctors in the labeling for physicians,

8    correct?

9    A.  I wouldn't put it quite that way.

10   Q.  How would you put it?

11   A.  I would say this highlights is the most important

12   information about safety and effectiveness that is in there,

13   because there is not as much information on clinical

14   pharmacology and those other sections here.

15   Q.  I like your definition.  I'm good with that definition.

16       So just to run through some of the areas that are

17   covered here, if we start just by looking at Indications and

18   Usage, that is the section that just talks about what is the

19   medicine used for and how do you use it, correct?

20   A.  Yes.

21   Q.  Okay.  And then there's another section that is entitled

22   Dosage and Administration, correct?

23   A.  Yes.

24   Q.  And it specifically identifies the two dosages of

25   Pradaxa that are available for patients, correct?

Laura Plunket - Cross (Jones)                    352

1    A.  Yes.

2    Q.  And it explains how you decide how to dose Pradaxa based

3    on a patient's kidney function, correct?

4    A.  It mentions it in the third bullet.  If that's what

5    you're asking me, yes.

6    Q.  Actually I was referring to the first and the second

7    bullet.

8    A.  Oh, I'm sorry.  You mean the creatinine clearance

9    levels?  Yes, those are listed.

10   Q.  Okay.  Then in the third bullet -- you were anticipating

11   where I was going next -- it tells doctors:  Assess renal

12   function during therapy as clinically indicated and adjust

13   therapy accordingly.

14       Correct?

15   A.  Yes.

16   Q.  All right.  And you can see behind some of those

17   instructions to doctors that there are numerical references,

18   correct?

19   A.  Yes.

20   Q.  And those are -- those are numbers that actually refer

21   to specific sections in the label, correct?

22   A.  Yes.

23   Q.  And so if a doctor just looked at the highlights of

24   the -- of the label, they would be able to see pretty

25   quickly this is the section I need to look in to find more

Laura Plunket - Cross (Jones)                    353

1    information on this topic.  Is that fair to say?

2    A.  Yes.

3    Q.  Okay.  Moving on to some of the other sections on this

4    same page, there is a section called Contraindications,

5    correct?

6    A.  Yes.

7    Q.  And those are -- those are particular patient

8    characteristics where the company and the FDA determined

9    these folks should not be on the medicine, correct?

10   A.  Yes.

11   Q.  Okay.  And then in the next section, there's something

12   titled Warnings and Precautions, correct?

13   A.  Yes.

14   Q.  And that is the place where you probably find the most

15   serious safety information about the medicine, correct?

16   A.  Yes.

17   Q.  Okay.  And the very first warning and precaution that

18   appears in the highlights section for Pradaxa reads:  Risk

19   of bleeding, Pradaxa can cause serious and sometimes fatal

20   bleeding.  Promptly evaluate signs and symptoms of blood

21   loss.

22       Correct?

23   A.  Yes.

24   Q.  And so a doctor who did nothing more than just reading

25   the first page of the label for Pradaxa would know this is a

```
 1   medicine that can cause serious and sometimes fatal
 2   bleeding, correct?
 3   A.  Yes.
 4   Q.  And if we looked at the labeling for all of the other
 5   oral anticoagulants that are available for patients who have
 6   atrial fibrillation, those labels would have very similar
 7   warnings, correct?
 8   A.  In fact, they do, yes.
 9   Q.  They do have similar.
10       In some cases, they're identical I think for the NOAC
11   medicines; is that right?
12   A.  Yes, that's correct.
13   Q.  Okay.  And so that's not a risk that is unique to
14   Pradaxa, correct?
15   A.  The bleeding risk?
16   Q.  Yes.
17   A.  Yes, that's true.
18   Q.  At the end of that list of items under Warnings and
19   Precautions, you see there is a reference there to P-gp
20   inducers and inhibitors.  Do you see that?
21   A.  Yes.
22   Q.  And then it says:  Effects on dabigatran exposure.  Do
23   you see that?
24   A.  Yes.
25   Q.  And you mentioned earlier that there was nothing in the
```

Laura Plunket - Cross (Jones)                     355

1    patient Medication Guide on the subject of P-gp inhibitors.

2    But you understand that there is information in the package

3    insert for Pradaxa for doctors that talks about P-gp

4    inhibitor medicines, correct?

5    A.   There is some information there, yes.

6    Q.   Okay.  And then the next section in the highlights for

7    the labeling for Pradaxa is entitled Adverse Reactions.  Do

8    you see that?

9    A.   Yes.

10   Q.   And it says:  The most common adverse reactions, and

11   then it just refers to those being greater than 15

12   percent -- are gastritis like symptoms and bleeding.  Do you

13   see that?

14   A.   Yes.

15   Q.   Okay.  And then there's a section for drug interactions.

16   Do you see that?

17   A.   Yes.

18   Q.   And at the end of that list -- actually all of those --

19   all of those bullets refer to either P-gp inhibitors, which

20   are one class of medicines, correct?

21   A.   Yes, they are.

22   Q.   Or there's a reference to something known as P-gp

23   inducers, which are different types of medicines, correct?

24   A.   Yes.  They do different things to the blood levels.

25   Q.   And then at the bottom of that list of drug

Laura Plunket - Cross (Jones)                    356

1    interactions, it reads:  P-gp inhibitors in patients with

2    severe renal impairment, creatinine clearance less than 30

3    millimeters per minute, Pradaxa use not recommended.

4        Do you see that?

5    A.  Yes.

6    Q.  Okay.  And so you understand that the labeling for

7    doctors for Pradaxa actually does provide guidance to

8    doctors on patients who have severe rental impairment and

9    might be on a P-gp inhibitor, correct?

10   A.  They have some information, yes.

11   Q.  Okay.  Well, not just some information.

12       They specifically say we don't recommend it necessarily

13   in these patients, correct?

14   A.  Yes.  Well, I have issues with some of the details when

15   you go back to the label, but -- that part of the label, but

16   I agree there's a general statement here, that is true.

17   Q.  That it is not recommended, correct?

18   A.  That is what -- yes, you read that in correctly.

19   Q.  Okay.  And then the last reference there is to use in

20   specific populations.  Do you see that?

21   A.  Yes.

22   Q.  And then it says:  Geriatric use, colon, risk of

23   bleeding increases with age.

24       Do you see that?

25   A.  Yes.

Laura Plunket - Cross (Jones)                      357

1    Q.  And that's a true statement, correct?

2    A.  Yes.

3    Q.  As folks get older, as we all get older, our risk of

4    having a bleed increases, correct?

5    A.  That's correct.

6    Q.  And then down at the bottom of the first -- that first

7    page of the Pradaxa label, there is a table of contents or

8    index that goes through each of the sections in the

9    labeling, correct?

10   A.  Yes, that's correct.

11   Q.  And so if we just look quickly, there's a section for

12   indications and usage.  Yes?

13   A.  Yes.  This is what those numbers above refer to.

14   Q.  They correspond to what we just went through, right?

15   A.  That's correct.

16   Q.  And there are also references there for clinical

17   pharmacology, which is your area of expertise, correct, as

18   well?

19   A.  Yes.

20   Q.  And there's a section for toxicology, for example,

21   correct?

22   A.  Yes.

23   Q.  A section about clinical studies on the medicine,

24   correct?

25   A.  Yes.

Laura Plunket - Cross (Jones)                    358

1    Q.  And then there's a section on patient counseling, giving

2    doctors advice on how they counsel -- they might counsel

3    their patients who are on Pradaxa, correct?

4    A.  Yes.

5    Q.  Okay.  And we don't have time to go through all of this

6    this afternoon, so I'm not going to try.  But when we go

7    through it tomorrow, some of those things that you saw on

8    that wheely board over there, some of those specific issues

9    are raised in the physician labeling for Pradaxa, correct?

10   A.  If by you mean raised [sic], there is some discussion

11   somewhere in the labels for some of those, that is true.

12   Q.  Well, for example, does the physician labeling for

13   Pradaxa specifically say there is not a reversal agent for

14   Pradaxa?  Yes or no?

15   A.  The physician?  Yes, it does.

16   Q.  All right.  Let me ask you just a little bit about this

17   particular case.

18       Did you know that you were the first live witness we've

19   had come to see us?

20   A.  I was told that, yes.

21   Q.  Okay.  All right.  And you understand that this case is

22   about a specific person who took Pradaxa, correct?

23   A.  Yes.

24   Q.  Do you know the name of that person?

25   A.  I know her name was Mrs. Knight.  I believe Betty may

Laura Plunket - Cross (Jones)                    359

1     have been her first name.

2     Q.  Okay.  Have you reviewed any of the medical records for

3     Mrs. Knight?

4     A.  No, I have not.

5     Q.  Have you reviewed any of the deposition testimony of the

6     doctors who cared for Mrs. Knight?

7     A.  No, I did not.

8     Q.  And do you know what dose of Pradaxa Mrs. Knight

9     actually used?

10    A.  I have information that she was on the 75-milligram

11    dose.  At least that's what was relayed to me from the --

12    the lawyers in the case.

13    Q.  Okay.  Given that you've not reviewed the medical

14    records in the case or reviewed any of the testimony from

15    the case, you don't have a sense of what Mrs. Knight did or

16    didn't understand about the risks of Pradaxa when she took

17    it, do you?

18    A.  No.  I have not had a conversation, and it's my

19    understanding she died, so I couldn't have one now either.

20    Q.  Okay.  And you also have no understanding of what Mrs.

21    Knight's doctors, the doctors who cared for her and

22    prescribed her Pradaxa, you have no understanding of what

23    they did or didn't understand about the risks of Pradaxa,

24    correct?

25    A.  No.  But I believe that some of those treaters are going

Laura Plunket - Cross (Jones)                    360

1    to be testifying or provided deposition testimony, so I --

2    that's not something that I covered in my scope of the work

3    that I did.

4    Q.  And just to follow up on that scope point, some of the

5    criticisms that you've raised about the Medication Guide for

6    Pradaxa, you're not able to tell the jury, for example, that

7    any one of those specific issues would have affected Mrs.

8    Knight's specific care or her treatment or her course on the

9    medicine, correct?

10   A.  I haven't looked to see if those questions have been

11   asked of anyone, but -- so I can't answer that.  I don't

12   know.

13   Q.  Okay.  And you talked a little bit about patients who,

14   in your view, when they're on Pradaxa can either be too high

15   or too low, correct?

16   A.  In blood levels?

17   Q.  Yes.

18   A.  Yes, that's correct.

19   Q.  You don't know one way or the other whether Mrs. Knight

20   would have fallen at either end of that spectrum, correct?

21   A.  Well, I think I can predict, based on what I do know,

22   the little bit that I do know about her.  But I haven't

23   seen -- I don't believe she had her blood level measured, so

24   I can't tell what it was.

25   Q.  And what you know about her is not based on actually

1    reviewing her medical records, correct?

2    A.  No.  I've not reviewed her medical records.  That's what

3    I have seen as sort of the summary of her condition.

4    Q.  Okay.  Something you learned about from the lawyers?

5    A.  Yes, and also some slides from the opening.

6    Q.  Okay.  You are not giving an opinion in this case on

7    topics like what led to Mrs. Knight's GI bleed or what led

8    to her passing, are you?

9    A.  No.  I think you're saying a causation -- a specific

10   cause, and no, I'm not.  A physician will be doing that.

11   That is not my role.

12   Q.  Okay.  I wanted to actually go back to the topic that

13   you started with with Mr. Moskow on the topic of the

14   75-milligram dose of Pradaxa.  And I mostly wanted to just

15   make sure that we were clear on some basic facts about that

16   dose of the medicine.

17       You understand that when Boehringer Ingelheim submitted

18   an application for approval of Pradaxa for patients with

19   atrial fibrillation, the company proposed two doses,

20   correct?

21   A.  Yes.

22   Q.  They proposed a 150-milligram dose and a 110-milligram

23   dose, correct?

24   A.  Yes.  That's what was tested in RE-LY.

25   Q.  And you were anticipating my next question.

1          Those were the doses that had been tested in terms of

2      the patients on Pradaxa in the RE-LY study, correct?

3      A.  Yes.

4      Q.  There were not patients in the RE-LY study who took 75

5      milligrams of Pradaxa, correct?

6      A.  Yes, exactly.

7      Q.  And there were not patients in the RE-LY study who had

8      severe renal impairment, correct?

9      A.  Yes.  There were a couple I think that slipped through.

10     But, you're right, it was not a -- they were trying to

11     exclude patients with severe renal impairment in the study.

12     Q.  And both of those facts, that the RE-LY study did not

13     test the 75-milligram dose and that there were not patients

14     with severe renal impairment in the RE-LY study, those were

15     facts that the FDA were fully aware of, correct?

16     A.  Yes, they were.

17     Q.  Now after the study was done, the FDA agreed to approve

18     a 150-milligram dose of Pradaxa for atrial fibrillation,

19     correct?

20     A.  Yes.

21     Q.  But the agency made the decision not to approve the

22     110-milligram dose.  Do you recall that?

23     A.  Yes, that is correct.

24     Q.  Okay.  And because they weren't going to approve the

25     lower dose of Pradaxa, do you recall seeing in the review

Laura Plunket - Cross (Jones)                    363

1    memos for Pradaxa that the FDA actually specifically said we

2    need to have a lower dose for patients who have severe renal

3    impairment?

4    A.  Yes.  That was talked about in the summary review.

5            MS. JONES:  Okay.

6        (Pause in proceedings.)

7            MS. JONES:  While she's doing that, may I approach

8    and hand the witness the document?

9            Okay.  Dr. Plunkett, I have handed you what's been

10   marked for identification as Defendant's Exhibit 5827.

11   Q.  Do you recognize that document?

12   A.  Yes, I do.

13   Q.  Do you recognize it as the summary review by the FDA for

14   Pradaxa for the atrial fibrillation application?

15   A.  Yes, that's correct.

16   Q.  Okay.

17           MS. JONES:  Your Honor, we would move for the

18   admission of 5827.

19           MR. MOSKOW:  No objection.

20           THE COURT:  It is admitted, and it may be published.

21      (DEFENDANT'S EXHIBIT 5827 ADMITTED INTO EVIDENCE.)

22           MS. JONES:  Dr. Plunkett, let's just look at this

23   document in a couple of places if we could.

24           So if you turn to just the first page of the

25   document, up at the top of the page there is a reference to

Laura Plunket - Cross (Jones)                    364

1   the Center for Drug Evaluation and Research.

2   Q.  Do you see that?

3   A.  Yes.

4   Q.  And that's a part of the FDA that is specifically

5   devoted to, among other things, evaluating new drug

6   applications for prescription medicines, correct?

7   A.  Yes, that is correct.

8   Q.  And the FDA has different centers that focus on

9   different types of products; is that right?

10  A.  That's correct.

11  Q.  Okay.  And if we turn to the second page of Exhibit

12  5827, you see there's a heading there to the deputy office

13  director decisional memo.

14  A.  Yes.

15  Q.  Do you see that?

16      And there's a date of October 19, 2010, correct?

17  A.  Yes.

18  Q.  And then if you look a little further down, you can see

19  that the memo is from someone named Ellis Unger, M.D.,

20  deputy director.  Do you see that?

21  A.  Yes.

22  Q.  Do you have an understanding who Dr. Unger is?

23  A.  Yes.  He was the -- well, at that time he was part of

24  the -- ODE is Office of Drug Evaluation 1.  And within that,

25  there is a division that was looking at cardiovascular renal

Laura Plunket - Cross (Jones)                365

1    drugs, and he was the deputy director of that OED-1, so the

2    senior level within that drug evaluation review group.

3    Q.  And so if you look a little further down, you can see

4    there's a reference to the name Pradaxa, correct?

5    A.  Yes.

6    Q.  And then the approved indication is described there.  Do

7    you see that?

8    A.  Yes.

9    Q.  And it says:  For reducing the risk of stroke and

10   systemic embolism in patients with non-valvular atrial

11   fibrillation.

12       That just means this is a medicine that has been

13   proposed for patients who have AFib and who need stroke

14   protection, correct?

15   A.  Yes, that's correct.

16   Q.  Okay.  And then there is a reference there to action,

17   correct?

18   A.  Yes.

19   Q.  And that's the place where Dr. Unger indicates what the

20   FDA intends to do based on his review of the data that was

21   submitted as part of the application, correct?

22   A.  Yes, that's correct.

23   Q.  And what it says here is what you just finished telling

24   us all, that the FDA approved the 150-milligram strength,

25   correct?

Laura Plunket - Cross (Jones)                    366

1    A.   Yes.

2    Q.   And decided not to approve the 110-milligram strength,

3    correct?

4    A.   That is correct.

5    Q.   And then at the bottom of that page, there is a listing

6    with the heading of Material Reviewed and Consulted.  Do you

7    see that?

8    A.   Yes.

9    Q.   What's that list?

10   A.   That's a list of all of the documents that were provided

11   by different parts of the review division, and it lays out

12   sort of their review of the data.  So like, for example, I

13   can go to the FDA website, and I can find each of these

14   documents.

15       And I did do that to take a look at what was said by

16   different parts of the review group.  I didn't look at the

17   CMC, but I did look at the medical officers, the pharm tox,

18   the clinical pharm, things like that.

19   Q.   And so these are all doctors and scientists and subject

20   matter experts at the FDA who collectively in different

21   teams looked at different parts of the medicine, correct?

22   A.   Yes, that's correct.

23   Q.   And various of these individuals actually prepared memos

24   reflecting their analysis of their subject matter area and

25   explaining their conclusions, correct?

1   A.  Yes.

2   Q.  And by my count, there are about 33, 34 folks who are

3   listed here on this list.  Is that a reasonable estimate

4   just eye-balling it?

5   A.  Yes.

6   Q.  Okay.  And if you look at the different subject matter

7   areas, you mentioned there is pharmacology toxicology, there

8   is a statistical review.  You see that?

9   A.  Yes.

10  Q.  Okay.  And there's clinical pharmacology, correct?

11  A.  Yes.

12  Q.  All right.  And various other areas that looked at the

13  Pradaxa application.

14      Let's turn to page 3 of Exhibit 5827.  And we're not

15  going to go through this entire document, but just to orient

16  ourselves here, there is a section that is entitled Action.

17      Do you see that?

18  A.  Yes.

19  Q.  And it says:  The Division of Cardiovascular and Renal

20  Products is recommending approval of dabigatran etexilate,

21  150-milligram capsules for oral administration, for reducing

22  the risk of stroke and systemic embolism in patients with

23  non-valvular atrial fibrillation.  And then in parenthesis,

24  it just says AF, correct?

25  A.  Yes.

Laura Plunket - Cross (Jones)                      368

1    Q.   And then it goes on to say:   I concur with their

2    recommendation for approval, right?

3    A.   Yes.

4    Q.   And then they say we're not going to approve the

5    110-milligram strength of the medicine, correct?

6    A.   That's the next two sentences, yes.

7    Q.   Then if you turn back to page 16 of the exhibit, there

8    is a paragraph at the bottom that is focused specifically on

9    consideration of renal insufficiency.

10        Do you see that?

11   A.   Yes.

12   Q.   And renal insufficiency is just another way of saying

13   patients who have bad kidneys, correct?

14   A.   Right.   Kidneys aren't working properly.

15   Q.   Right.

16        And that's the category of patients that you have spent

17   some amount of time describing today, correct?

18   A.   Yes.

19   Q.   All right.   And just to situate ourselves here, it

20   starts out by saying:   In not approving the 110-milligram

21   strength, dosing options were limited for patients with

22   severe renal insufficiency.

23        And that just means when the agency decided they weren't

24   going to approve the 110, that meant there weren't -- there

25   wouldn't be an option for patients whose kidneys were bad,

1    correct?

2    A.  Yes, that's correct.

3    Q.  And it goes on to say:  The division concluded that it

4    would be desirable to provide access to dabigatran for this

5    patient population.

6        Do you see that?

7    A.  Yes.

8    Q.  And the reference to dabigatran, that's just another

9    reference to Pradaxa, correct?

10   A.  Yes.

11   Q.  And so do you understand it to be the case that it was

12   the Division of Cardiorenal Medicines that determined that

13   it would be a good idea for patients who have severe renal

14   insufficiency to have access to Pradaxa?

15   A.  They have certainly -- that is what they are laying out

16   in this document, yes.

17   Q.  Okay.  You agree that that's what happened, correct?

18   A.  Yes.  That is what happened, that's true.

19   Q.  It goes on to say:  Based on pharmacokinetic modeling,

20   comparing pharmacokinetic data from RE-LY with data from a

21   small study of subjects with compromised renal function, a

22   dosing regimen of 75 milligrams BID appears appropriate for

23   patients with estimated creatinine clearance of 15 to 30

24   milliliters per minute.

25        Did I read that correctly?

Laura Plunket - Cross (Jones)                    370

1    A.   Yes, you do.  I'm sorry.  Yes, you did.

2    Q.   Thank you.

3         And that reference there to 75 milligrams BID just means

4    twice a day, correct?

5    A.   Yes.

6    Q.   And what that is telling us is that the FDA conducted

7    its own pharmacokinetic modeling, it compared some of the

8    universes of data that it had, and it determined that a

9    75-milligram twice a day dose would be appropriate for

10   patients who had severe renal impairment, correct?

11   A.   That is correct.  And I believe that's what we talked

12   about this morning.

13   Q.   That was not modeling that was done by Boehringer

14   Ingelheim, correct?  The FDA relied on its own modeling,

15   correct?

16   A.   Yes, they did.  And I think I told you even which study

17   it was.  It was a small study, but yes.

18   Q.   It was a Phase I study, correct?

19   A.   That's correct.

20   Q.   Okay.  It goes on to say:  The 75-milligram strength is

21   already manufactured by the applicant and marketed in the EU

22   and can be marketed in the U.S.

23        Did you know that there -- I think I'm back.

24        Did you know that the 75-milligram dose was approved for

25   treatment of patients who had VTE issues in Europe?

Laura Plunket - Cross (Jones)                    371

1   A.  Yes.  It was a different indication, so different length

2   of time.  But, yes, it was approved in that population in

3   Europe.

4   Q.  Okay.  That paragraph concludes by saying:  Patients

5   with creatinine clearance greater than 31 milliliters per

6   minute should receive the 150-milligram BID.

7        Which just means twice a day, correct?

8   A.  Yes.

9   Q.  That is the higher dose of Pradaxa, correct?

10  A.  Yes.

11  Q.  Based on data from one subject who received

12  hemodialysis, dabigatran appears dialzyable, but there are

13  not sufficient data to make any dosing recommendation in the

14  dialysis population.

15       So patients whose kidney functions had become so

16  problematic that they had to have dialysis, they were

17  excluded from treatment with Pradaxa, correct?

18  A.  Based upon the label, yes, that's true.

19  Q.  Okay.  Did you know that when BI submitted the original

20  proposed labeling for Pradaxa to the FDA, that the company

21  actually proposed that patients with severe renal impairment

22  shouldn't receive Pradaxa?

23  A.  Yes.

24  Q.  Okay.  And you've seen those specific documents?

25  A.  Yes.

Laura Plunket - Cross (Jones)                372

1  Q.  And the company submitted a label, and the FDA actually

2  sent something back striking out what the company had

3  written?

4  A.  Yes.

5  Q.  You remember that?

6      So the idea of patients with severe renal impairment

7  getting Pradaxa, that was not Boehringer Ingelheim's idea,

8  correct?

9  A.  If you're asking me the change to the 75-milligram dose,

10  I would agree that was not theirs.  But they actually -- in

11  some of these documents they were pushing for the use of the

12  110 dose.

13  Q.  Well, you understand that the FDA didn't approve the 110

14  dose, correct?

15  A.  Yes, I do.

16  Q.  And you understand I'm asking you about the 75-milligram

17  dose, correct?

18  A.  Yes, I do.

19  Q.  Okay.  And it is sounds like you understand that Mrs.

20  Knight took the 75-milligram dose?

21  A.  I do.

22  Q.  Okay.  I just wanted to get us on the same page.

23      And let me go back to my original question, the idea of

24  patients with severe renal impairment getting Pradaxa, that

25  was the FDA's idea originally, correct?

Laura Plunket - Cross (Jones)                    373

1   A.  Getting any Pradaxa?  I don't know that that was their

2   idea.  Certainly the issue of the 75-milligram dose, yes, I

3   agree with that.  That was the FDA's idea as a way to solve

4   the problem.

5   Q.  Okay.  The FDA also viewed it as a priority that

6   patients who had severe renal impairment would have access

7   to Pradaxa, correct?

8   A.  I don't know about the word priority, but certainly it

9   was something that they were looking for.  So if you read

10  this review memo, that's what they lay out.

11  Q.  When FDA approved the 75-milligram dose of Pradaxa, do

12  you agree that that reflects that the FDA's judgment that

13  the 75-milligram dose of Pradaxa was safe and effective for

14  patients who would take it?

15  A.  Well, I can't get in the mind, I didn't see them state

16  it quite that way.  But I would assume that they did believe

17  it would be -- would be safe and effective to be used that

18  way, yes, based on the fact that they made that decision for

19  the labeling.

20  Q.  And, in fact, if I recall your direct examination

21  testimony, you testified that whenever the FDA approves a

22  medicine for use, that reflects its judgment that the

23  medicine is safe and effective for whatever the patient

24  population is, correct?

25  A.  Yes.  That's why I answered that way.  I'm assuming that

1    is true based upon my understanding of the way the process

2    happens.

3         I guess, in that approval document, they didn't state it

4    quite that way.  But I would agree that that is the standard

5    they use.

6    Q.  And you have no reason to doubt that the FDA believed

7    that, correct?

8    A.  I don't, no.

9    Q.  Let me see if I can just ask you a couple of simple

10   questions now that we have gotten the facts established.

11        Do you believe that the FDA was wrong when it decided

12   that a 75-milligram dose of Pradaxa should be available for

13   patients with severe renal impairment?

14   A.  No, I have not formed that opinion.

15   Q.  Do you take issue with the modeling that the Food and

16   Drug Administration did to support its decision to approve

17   the 75-milligram dose of Pradaxa for patients with atrial

18   fibrillation?

19   A.  So what do you mean by take issue with?  You mean do I

20   agree with everything --

21   Q.  Let me state it more simply.

22   A.  Okay.

23   Q.  Do you think they got it wrong?

24   A.  I don't think -- no, I don't think they got it wrong,

25   but there are issues with it that the company pushed back on

Laura Plunket - Cross (Jones)                          375

1    that I'm aware of.

2    Q.  Well, that -- I'm not sure I understand what the last

3    part of the answer means.

4        Was the answer to my original question, no, I don't

5    think they got it wrong?

6    A.  I haven't formed that opinion, that is true.

7    Q.  Now, you have said if I --

8        MS. JONES:  I'm sorry.  Mr. Reynolds, we can take

9    down this document.

10   Q.  You've said that the fact that the 75-milligram dose was

11   approved for patients with severe renal impairment, that

12   that creates a safety issue in your mind.

13   A.  Yes.

14   Q.  I believe the way you described it was that it meant

15   that patients who were taking the 75-milligram dose in the

16   United States are being treated like guinea pigs.

17       Is that the way you described it?

18   A.  Yes, that's true.

19   Q.  And that's a serious claim to make.  You understand

20   that, right?

21   A.  Absolutely, yes.

22   Q.  Okay.  Have you communicated your view that there is a

23   serious safety issue created by the fact that there are

24   patients taking the 75-milligram dose, have you communicated

25   that view to the Food and Drug Administration?

Laura Plunket - Cross (Jones)                    376

1   A.  No, I have not.

2   Q.  Okay.  You interact with the FDA as part of your

3   consulting work; is that right?

4   A.  Yes, I do.

5   Q.  In any of those interactions, have you ever conveyed to

6   the FDA that you believe that there is a serious safety

7   issue created by the fact that the 75-milligram dose of

8   Pradaxa is available to patients who have severe renal

9   impairment?

10  A.  No.  And I've not worked on Pradaxa with the company

11  with the FDA.

12  Q.  So that's a no, you have never --

13  A.  Yes.  No, I have not.  That's correct.

14  Q.  Now, Dr. Plunkett, you have told us some about your

15  background and what your work is.  But just to be clear, you

16  are not a medical doctor, correct?

17  A.  That's correct, I am not.

18  Q.  And what that means as a practical matter is you don't

19  diagnose or treat patients with any medical condition,

20  correct?

21  A.  That is correct, I do not.

22  Q.  And that means you don't treat patients who have atrial

23  fibrillation, correct?

24  A.  I do not.

25  Q.  You don't treat patients who might have a bleed while

Laura Plunket - Cross (Jones)                    377

1    they're on an anticoagulant, correct?

2    A.  I do not.

3    Q.  All right.  And that means you've never been responsible

4    in the real world for communicating the risks of a medicine

5    to a patient, correct?

6    A.  That's true.  I'm not a physician.

7    Q.  When you leave the courthouse either tomorrow or

8    sometime later in the trial, we'll see how we do on time, it

9    won't be to go back out into the world and actually care for

10   patients who struggle with some of the conditions that the

11   jury will hear about throughout the course of the trial,

12   correct?

13   A.  Not as a treating physician or a nurse.  No, I don't do

14   that.

15   Q.  Well, you won't be caring for patients in any capacity

16   because you're not a medical professional, correct?

17   A.  That's correct.

18   Q.  And, in fact, what you do as a major part of your

19   livelihood is what you've done today, which is to come into

20   court and to testify as a paid expert on behalf of

21   plaintiffs lawyers, correct?

22   A.  Yes.  We talked about that.

23   Q.  Okay.  And I think you said that that was 50 percent of

24   your income; is that right?

25   A.  On an average over the years, yes.

Laura Plunket - Cross (Jones)                    378

1    Q.   Okay.  And if you stopped doing that, that would be a
2    major loss of income.  Is that fair to say?
3    A.   It's possible, yes.
4    Q.   Okay.  You've testified in court or in a deposition over
5    150 times; is that right?
6    A.   Yes, that's correct.
7    Q.   Okay.  And by my count, you've offered testimony as a
8    paid expert for plaintiffs lawyers at trial to more than 30
9    different juries around the country; is that right?
10   A.   Ah, yes.  I think I said maybe 50, but if it's 30, I'll
11   take your word for it.
12   Q.   Okay.  Well, you would know better than I would.
13        And that's all over the country.  You travel around to
14   do that, correct?
15   A.   I've been in different venues, yes, that's correct.
16   Q.   Okay.  And just last year alone, 2017, you went under
17   oath as an expert witness 24 different times.  Does that
18   sound right to you?
19   A.   Yes.  Last year was a very busy year.
20   Q.   Okay.  And collectively through that testimony working
21   for plaintiffs lawyers, you've earned millions of dollars
22   giving that testimony reaching back a decade or so, right?
23   A.   Going back about 15 to 20 years, yes, that's true.
24   Q.   Okay.  Now you talked a little bit about your clients,
25   who some of your clients are.  But when you do what you're

Laura Plunket - Cross (Jones)                    379

1    doing today, you're getting paid by plaintiffs lawyers,

2    correct?

3    A.   In the area of product liability, yes --

4    Q.   Yes.

5    A.   -- that's true.

6    Q.   I mean, the millions of dollars that we were just

7    talking about, that's money you've made working for

8    plaintiffs lawyers, correct?

9    A.   Not all of it, but yes.  A lot of it has been, yes.

10   Q.   Okay.  And by my count, again just since 2007 if we --

11   since 2010, there have been approximately 20 different

12   products that you've testified about on behalf of plaintiffs

13   lawyers.  Does that sound right to you?

14   A.   Yes, that's probably true.

15   Q.   Okay.  Pradaxa is one of those, and you've made $135,000

16   in this litigation alone; is that right?

17   A.   Not just this case, but over six years working in this

18   general area, yes.

19   Q.   Okay.  And you are not just working for plaintiffs

20   lawyers in litigation involving Pradaxa.  You're also

21   working for plaintiffs lawyers in litigation involving

22   Xarelto, one of the other novel oral anticoagulants,

23   correct?

24   A.   Yes.  It has its own unique issues.

25   Q.   Okay.  And, in fact, just last month you were in a

Laura Plunket - Cross (Jones)                    380

1      courtroom, sitting in front of a jury offering paid

2      testimony as a litigation expert, correct?

3      A.   An expert in pharmacology and toxicology, yes.

4      Q.   Okay.  And that medicine is made by different companies,

5      correct?  It's not made by BI, right?

6      A.   That's correct.  It's a competitor to Pradaxa.

7      Q.   All right.  And you said that it's got its own issues.

8      But, in fact, you've made some of the same criticisms there

9      that you've made with respect to Pradaxa, correct?

10     A.   Some of them are the same, some are different.

11     Q.   So, for example, in your report in your deposition in

12     the Xarelto litigation, you gave the opinion that the

13     FDA-approved label for Xarelto was inadequate, correct?

14     A.   Yes.  Generally it has inadequacies.

15     Q.   Just like you've done here, correct?

16     A.   Yes, that's true.

17     Q.   All right.  And you criticized Xarelto in your report

18     for not having blood monitoring, correct?

19     A.   Yes.

20     Q.   Okay.  And you criticized Xarelto in your written report

21     in that litigation for inadequately warning about the risk

22     of bleeding in older patients, correct?

23     A.   Yes.

24     Q.   And you were paid in that litigation, too, just to be

25     clear?

Laura Plunket - Cross (Jones)                    381

1   A.  Yes.  I was working on behalf of injured parties.

2   Q.  Okay.  Did you know that some of the same lawyers that

3   are suing BI in this litigation are also suing the makers of

4   Xarelto?

5   A.  I'm working for different ones, so I don't know.  It's

6   possible, but the ones that I'm working with are a different

7   set.

8   Q.  Okay.  So you've mentioned a couple of medicines where

9   you've been involved in litigation related to them.  One was

10  Vioxx, and the other one was Risperdal.

11      Do you remember that?

12  A.  Yes.

13  Q.  And I think you said Vioxx was taken off the market, and

14  the labeling for Risperdal, that was changed.

15      Do you recall that?

16  A.  It has been changed several times, but yes.

17  Q.  Okay.  And you're not testifying under oath to the jury

18  that your work as a litigation expert was the reason for any

19  of those things, correct?

20  A.  I'm not.  In fact, I pointed that out, I believe, in my

21  testimony.  I said I'm not saying that it was what I did.

22  It is just that what I testified about is consistent with

23  what changed.

24  Q.  Okay.  And in both of those circumstances, again, you

25  were paid by plaintiffs lawyers to offer criticisms of the

Laura Plunket - Cross (Jones)                    382

1    way that the company had conducted itself, correct?

2    A.   Yes.  I was working on behalf of injured parties in

3    those cases as well.

4    Q.   Okay.  And just to be clear, there were plenty of

5    medicines where you've become involved in litigation working

6    with plaintiffs lawyers, and the label does not change,

7    correct?

8    A.   Some of them, that's true, yes.

9    Q.   For example, in the Pradaxa litigation, you've testified

10   about various issues with the Pradaxa label.  There have

11   been no changes required by the FDA to the Pradaxa label,

12   correct?

13   A.   The changes we're discussing here, those have not

14   happened yet, that's true.

15   Q.   There have been no changes to the Pradaxa label as a

16   result of your testimony, correct?

17   A.   Well, none of them would be the result of my testimony.

18   I've said that.  There have been changes that have been

19   consistent with my testimony in some cases.  But I agree, I

20   am not the impetus that is making FDA or the company

21   specifically make a specific change, no.

22   Q.   And the same situation with respect to Xarelto.  Xarelto

23   is another medicine that was approved by the FDA without

24   blood monitoring, correct?

25   A.   That is correct.

Laura Plunket - Cross (Jones)                    383

1    Q.  And you've criticized the makers of Xarelto because

2    you've said they ought to be encouraging blood monitoring,

3    correct?

4    A.  Yes.  They have information and data to indicate the

5    drug would be safer if they were -- and actually it's not so

6    much blood monitoring there.  It's not the same, it's a

7    little different issue.  But essentially it's exposure

8    assessment, yes.

9    Q.  Okay.  And you've used phrases like exposure and

10   exposure assessment in this litigation, too, haven't you?

11   A.  Yes, but it's a different test that I am advocating for

12   in Xarelto versus here.

13   Q.  In that litigation, you are talking about the PT test,

14   right?

15   A.  Yes.

16   Q.  Okay.  And what test is it precisely that you're arguing

17   to be used for Pradaxa patients?

18   A.  It's actually a measurement of the level of Pradaxa in

19   the blood is the one that I've discussed.  Although there

20   are -- in the label, I've talked about the fact that there

21   are other tests available that could be used.  But I've been

22   specifically talking about measuring blood levels.

23   Q.  Right.  But you understand that there has to be some

24   kind of test, there are different tests that are sometimes

25   used for evaluating things that are in the blood.

Laura Plunket - Cross (Jones)                    384

1          Is there a specific test that you're suggesting?

2     A.  I'm suggesting measuring the level of the drug in the

3     blood, and that can be done at laboratories in the U.S.

4     Q.  Well, let me ask you another question.

5          You have shown the jury documents that refer to things

6     like the aPTT and the ECT and the dTT.  Those all sound

7     familiar to you?

8     A.  Yes.  We talked about that in some of the -- in the

9     CCDS, the core company data sheet, yes.

10    Q.  Are you taking the position that any one of those

11    particular tests need to be used with Pradaxa specifically?

12    Or you haven't gotten that far?

13    A.  So I haven't particularly pointed to one specific test

14    because I believe the issue is actually monitoring the

15    levels.  But certainly those tests, as I've talked about in

16    other situations -- not with you, but with others -- there

17    are correlations with some of those tests where you can look

18    at the upper limit.  There's information in the European

19    label that would be useful also to provide to doctors in the

20    U.S.  Some of that information in the European label would

21    be useful for doctors.

22         It talks about the dilute thrombin time.  There is

23    others as well.  Do you want me to -- we didn't discuss that

24    here because we have talking about the Medication Guide,

25    which has no similar discussions in it.

Laura Plunket - Cross (Jones)                    385

1    Q.  My only question was, is there a particular test that

2    you've taken a view in this litigation doctors should be

3    using to measure blood levels for Pradaxa?

4    A.  And I answered that.  I said I believe it should be

5    actually measuring the levels of the drug in the blood.

6    Q.  You understand that there are specific types of tests,

7    that it's not just you take a vial of blood and hold it up

8    to the light, there is more to it that happens?

9    A.  No, absolutely.  I'm not -- I think you and I are

10   crossing paths here.

11        I have a very specific opinion, which I've said, measure

12   the level of Pradaxa in the blood, which can done in

13   laboratories in the U.S.  There are other tests which we

14   talked about, INR, aPTT, ECT, dilute thrombin time, the

15   hemoclot assay.  The hemoclot assay with the dilute thrombin

16   time is one that has been shown to be correlated with the

17   levels of Pradaxa in blood.  The aPTT, I talked about

18   before, has been shown to be on the high end, at least able

19   to identify people with excessive dabigatran exposure.

20        Any of that information passed on to physicians in the

21   U.S. would be extremely important for them to be able to

22   look at their patients.  But am I saying it can only be this

23   or only that?  No, because the company hasn't even said

24   that.  In Europe, they give physicians options.

25   Q.  Is the hemoclot approved in the United States as far as

Laura Plunket - Cross (Jones)                    386

1    you know?

2    A.  No.  Unfortunately they haven't gotten it approved here.

3    Q.  Dr. Plunkett, I want to go back to this topic of the

4    FDA's approval of the 75-milligram dose of Pradaxa, if we

5    could.

6        Are you aware that after the FDA approved the

7    75-milligram dose of Pradaxa, it actually generated a memo,

8    that there were members of the clinical pharmacology team

9    who put together a memo describing their thinking on that

10   dose?

11   A.  I -- I may have seen what you are talking about.  Maybe

12   you could show me the document, and I could tell you if I've

13   seen it or not.  I've seen other discussions within the

14   agency if that's what you mean.

15           MS. JONES:  Okay.  Well, I'm going to ask us to pull

16   up 9328.

17           Oh, actually, let's not put it up on the screen just

18   yet, Mr. Reynolds.  Thank you.

19           May I approach, Your Honor?

20           THE COURT:  Yes, you may.

21           MR. MOSKOW:  I have no objection, to move things

22   along.

23           THE COURT:  All right.  It's admitted and may be

24   published.

25       (DEFENDANT'S EXHIBIT 9328 ADMITTED INTO EVIDENCE.)

1    MS. JONES:  All right.  Could we call that up,

2    please, Mr. Reynolds?

3    Q.  Dr. Plunkett, do you recognize this Exhibit 9328?

4    A.  I'm not sure I have seen it in this form, no.  I have

5    seen some of these graphs before, but I don't know if I have

6    seen the complete memo.  I don't recall.

7    Q.  Okay.  Well, let's walk through it and see if it jogs

8    your memory at all.

9    MS. JONES:  If we could just call out the top part.

10   Thank you, Mr. Reynolds.

11   Q.  Do you see the date there of October 20th, 2010?

12   A.  Yes.

13   Q.  And you recognize that as the date that Pradaxa was

14   approved in the United States for atrial fibrillation?

15   A.  I believe it was the 19th, but this would have been the

16   next day, yes.

17   Q.  Okay.  You're correct on that.

18   Okay.  And you see the reference there to a memo from

19   Abraham Karkowsky, the group leader for the division of

20   cardiovascular and renal products?  Do you see that?

21   A.  Yes.

22   Q.  And then that's a memo written to Dr. Ellis Unger.  He

23   is the deputy director we were talking about earlier today,

24   correct?

25   A.  Yes.

1    Q.  All right.  And Dr. Unger was the individual who wrote

2    the summary review that included that description of why the

3    FDA had decided to approve the 75-milligram dose of Pradaxa,

4    correct?

5    A.  Yes.  There was more in it than that, but that was also

6    discussed.

7    Q.  Correct.

8        And if you look at the subject line of that memo, it

9    said:  Approval of a 75-milligram BID dosing regimen for

10   subjects with severe renal dysfunction, and then in

11   parentheses it just defines that category of patients by

12   their creatinine clearance of 15 to 30 milliliters per

13   minute, correct?

14   A.  Yes.

15   Q.  Okay.  And we won't go through this in tremendous detail

16   because we have touched on some of these points.

17       But you see in that very first paragraph, it says:  The

18   RE-LY study is the basis for the approval recommendation for

19   dabigatran etexilate to decrease the risk of stroke and

20   systemic embolic events in subjects with non-valvular atrial

21   fibrillation.

22       Did I read that correctly?

23   A.  You did.

24   Q.  And then it goes on to say:  In the RE-LY study,

25   subjects with severe renal impairment, i.e. an estimated

1    creatinine clearance, creatinine clearance of 15 to 30

2    milliliters per minute, were routinely excluded from

3    enrolling in the study.

4        And that is just that point we were talking about

5    earlier.  The FDA understood that patients with severe renal

6    impairment weren't included in the RE-LY study, correct?

7    A.  That is correct, Yes.

8    Q.  Have you seen any documentation to suggest that the FDA

9    ever suggested that that information needed to be included

10   in the Medication Guide for Pradaxa?

11   A.  That there were no patients within the study?

12   Q.  No patients with severe renal impairment.

13   A.  I haven't seen FDA suggest that, no.

14   Q.  Okay.  If we move down to the next paragraph, it says:

15   For the RE-LY study, the decision to not include or to

16   discontinue subjects with markedly decreased renal function

17   was probably a rational decision.

18       Do you see that?

19   A.  I see that, yes.

20   Q.  Do you agree with that statement?

21   A.  Yes, I agree that -- excluding them from the study, if

22   that's what you are asking me, I believe that was a rational

23   decision based on what we know about the drug.

24   Q.  So you don't criticize BI for not having patients with

25   severe renal dysfunction in the RE-LY study, correct?

Laura Plunket - Cross (Jones)                    390

1    A.  Oh, no.  I'm not criticizing them for that initial

2    study, no.

3    Q.  Okay.  And then down at the bottom of the paragraph

4    says:  The decision not to enroll or to discontinue patients

5    with severe renal failure in the RE-LY study, however,

6    creates uncertainty about the magnitude of benefit or risk

7    ratio for this population.

8        Did I read that correctly?

9    A.  You did.

10   Q.  Okay.  And then if we flip over to page 3 of Exhibit

11   9328, do you see there is a discussion there of the specific

12   modeling and simulation work that the FDA's clinical

13   pharmacology team did to determine what dose of the medicine

14   would be most appropriate for patients with severe renal

15   impairment?

16   A.  I see the paragraph, yes.

17   Q.  Okay.  And it says at the first -- at the top of that

18   first paragraph:  The clinical pharmacology reviewers

19   performed simulation of various dosing regimens and proposed

20   75 milligrams once a day for subjects with severe renal

21   impairment.

22       And that QD just means once a day, correct?

23   A.  Yes.

24   Q.  And so what that tells us is that when the FDA

25   originally started considering how are we going to make

1    Pradaxa available to patients with severe renal function,
2    their first thought was maybe the right dose is 75
3    milligrams once a day, correct?
4    A.   Yes.
5    Q.   Okay.  And then it goes on to say:  Upon further
6    deliberations, the goal of the simulation exercise was
7    revised to model a dabigatran regimen in severe renal
8    dysfunction patients whose concentrations are reasonably
9    similar to that expected in subjects with moderate renal
10   impairment receiving 150 milligrams BID regimen.
11        Did I read that correctly?
12   A.   You did.
13   Q.   Can you tell us briefly what that means?
14   A.   BID regimen --
15   Q.   No.
16   A.   -- or the whole statement?
17   Q.   The statement, yes.
18   A.   I'm sorry.  Okay.
19        So if you read the first paragraph, and then you read
20   the second paragraph, what they're saying is, is they are
21   trying to match their computer modeling to the results from
22   the RE-LY study because they did have people that had
23   moderate renal impairment.  So they took that small
24   population, that smaller population from the RE-LY study of
25   the 30 to 50, and they tried to match through modeling the

Laura Plunket - Cross (Jones)                           392

1    exposure they were getting.

2    Q.  And do you recall seeing in the documentation on the

3    subject of dosing for severe renally impaired patients that

4    the FDA ultimately had the view that patients who had

5    moderate renal impairment had done well on the outcomes in

6    the RE-LY study, and that's why they were targeting or

7    trying to match with those patients' exposure?

8    A.  I don't know if I'm familiar with what you're referring

9    to.

10   Q.  Okay.

11   A.  But certainly I agree that is what they did.  And

12   there's a publication that followed this in the published

13   literature where some of this is also described.

14   Q.  Yeah, I suspect we'll get to that tomorrow.

15       If you read the next sentence, I think it gets to the

16   point that I was just raising.

17       This target was based on the fact that the 150-milligram

18   BID regimen for those with moderate renal function

19   impairment produces substantial benefit in the RE-LY study.

20       Did I read that correctly?

21   A.  You did.

22   Q.  Okay.  And that's just the FDA saying that for folks who

23   were on the 150 milligram twice a day, those people who had

24   moderate renal function, it seemed to show substantial

25   benefit in those patients, correct?

Laura Plunket - Cross (Jones)                    393

1    A.   I agree that's what they have stated.

2    Q.   Okay.  And do you disagree with that statement by the

3    FDA?

4    A.   I wouldn't agree or disagree with that statement.  I

5    mean, it is what it is.  I don't disagree that what their

6    modeling showed.

7    Q.   If you turn to page 4 of the document, just moving along

8    quickly, do you see here that the FDA actually looked at

9    three different dosing regimens for possible use with

10   patients who had bad kidney function?

11       Do you see that?

12   A.   Yes.

13   Q.   And you see there is a reference to a 150 once a day.

14   You see that?

15   A.   Yes.

16   Q.   And then they considered the possibility of 75

17   milligrams once a day.  You see that?

18   A.   Yes.

19   Q.   And then they went on to say:  The 75 milligram twice a

20   day regimen in subjects with severe renal dysfunction is

21   expected to provide 12-percent higher exposure with low peak

22   to trough ratio compared to 150 milligrams BID in subjects

23   with moderate renal dysfunction.

24       Now that is a discussion of the dose that the FDA

25   ultimately approved for patients who had severe renal

1    impairment, correct?

2    A.  Yes.  This is the modeling they did with that dose.

3    Q.  And what they said specifically was that they expected,

4    based on their analyses, that there would be a 12-percent

5    higher exposure to the medicine with patients who had severe

6    renal impairment, correct?

7    A.  I agree that's what they've stated.

8    Q.  And so that was something that the FDA fully understood

9    when it decided to approve the 75-milligram dose for

10   patients with severe renal impairment, correct?

11   A.  Based on their modeling, yes, that's what they were

12   predicting.

13   Q.  And when we see this word exposure, that is just another

14   way of talking about blood levels, right?

15   A.  They may actually be talking about area under the curve

16   here.  I'd have to look further at what they say.  But

17   certainly it's blood levels achieved over time, and they

18   could be talking about total exposure.  Or they could be

19   talking about troughs versus peaks, and that's a specific

20   blood level.  I think they are talking about total exposure.

21   Q.  Yes.  Okay.

22       It goes on to say in that same paragraph:  This clinical

23   and clinical pharmacology reviewer did not consider the

24   small increase in peak exposures on the 75-milligram BID

25   regimen to be clinically significant.

Laura Plunket - Cross (Jones)                    395

1      Did I read that correctly?

2  A.  You did.

3  Q.  And that means that the FDA recognized the possibility

4  of higher exposure for patients who had severe renal

5  dysfunction if they were on the 75 milligram twice a day,

6  but they didn't think that that was going to be clinically

7  significant, correct?

8  A.  Based on their modeling, that is true.

9  Q.  If you turn to page 5 of that same document, that same

10  FDA memo on the 75-milligram dose, underneath that image

11  that appears there, there's a paragraph that begins the

12  division concluded.

13      Do you see that?

14  A.  Yes.

15  Q.  And after they did all of their analysis, the FDA

16  reported:  The division concluded that the best tact is to

17  assure that the population with severe renal dysfunction,

18  not on dialysis, would have access to dabigatran.

19      Do you see that?

20  A.  Yes.

21  Q.  And that just means that the division, the cardiorenal

22  division at the FDA concluded that the best approach for

23  patients with severe renal impairment would be to make sure

24  that they had access to Pradaxa, correct?

25  A.  I agree that's what they've stated, yes.

Laura Plunket - Cross (Jones)                    396

1    Q.  And do you disagree with the FDA's judgment on that

2    issue?

3    A.  I haven't formed an opinion one way or the other.  I

4    don't tend to try to second-guess what -- a decision FDA

5    themselves has made.  But I would disagree with the

6    assertion that the modeling they did was, ah, predictive of

7    what was actually occurring in patients.

8    Q.  So you do take issue with the FDA's modeling and the

9    ability of that modeling to predict patient experience?

10   A.  Based on their own -- their own analysis and the

11   company's own analysis and criticisms of the FDA modeling,

12   yes.  The company also criticized this modeling and talked

13   about what it was missing.

14       So, yes, I believe there is limitations on what they

15   did.  And the biggest issue is they didn't test it in anyone

16   actually that was AFib with severe renal impairment going

17   forward.  I just -- or letting doctors know that that

18   information had not been -- had not been gathered.

19   Q.  But this notion of testing, is that a criticism that you

20   have of the FDA, that the FDA didn't immediately require

21   testing of the 75-milligram dose?

22   A.  No.  It's the responsibility of the company at all times

23   to do the testing.

24       So I am saying that -- I am saying that the company

25   failed to test based upon knowing that it had no such data

Laura Plunket - Cross (Jones)                    397

1    even after the drug was approved.

2    Q.  If we go further down in this paragraph, it says:  A

3    dosing regimen of 75 milligrams BID for this population

4    provides reasonable matching of exposures to that expected

5    with subjects with moderate renal dysfunction.

6        And that's just that idea that we were talking about

7    earlier, that they were looking at patients with slightly

8    better kidney function to see if they could match the level

9    of medicine that they had gotten when they were in the

10   study, correct?

11   A.  Yes.  Those people had a higher dose, but they were

12   trying to match what they thought might happen, yes.

13   Q.  And it goes on to say:  A dose of 75 milligram BID was

14   included within the label and will shortly be available for

15   marketing.  Since the variability was no greater than the

16   population that was already studied, no monitoring of

17   clotting effect was currently recommended.

18       Did I read that correctly?

19   A.  You did.

20   Q.  And that was the FDA's judgment at that time that it was

21   not necessary that patients on the 75-milligram dose of

22   Pradaxa receive blood monitoring, correct?

23   A.  I agree, that's what it stated.

24   Q.  The last thing I want to touch on as we finish up this

25   document is this reference on page 6 of the memo from the

Laura Plunket - Cross (Jones)                398

1   FDA up at the top.

2       It says:  Since there is no empirical data on this

3   population with regard to bleeding risk, particular

4   attention post-marketing should be paid to bleeding and

5   other safety events in those treated with the 75-milligram

6   BID regimen in patients with severe renal impairment.

7       Did I read that correctly?

8   A.  You did, yes.

9   Q.  And as far as you know, you understand that the company,

10  once it has a medicine approved, has an obligation to

11  capture and report any reports that it receives of bad

12  outcomes with the medicine, regardless of dose, correct?

13  A.  Yes.

14  Q.  Okay.  And that would have been the obligation of the

15  company with respect to the 75-milligram, correct?

16  A.  Yes.

17  Q.  And as far as you know, Boehringer Ingelheim discharged

18  that obligation, correct?

19  A.  If I discharge, do I know that they monitored?  Yes.

20  The adverse events, they did reporting.  Yes, they did.

21  Q.  That's the question.

22      MS. JONES:  I think that's probably an appropriate

23  breaking point, Your Honor.

24      THE COURT:  All right.  Ladies and Gentlemen, we'll

25  adjourn for the day.  I'd like you back here at 9:00 a.m.

399

1    tomorrow.

2           Remember my instructions before.  Don't discuss the

3    case or try to do any investigation or come to any

4    conclusions on your own or together.

5           With that, I'll excuse you.  We will see you back

6    here at 9:00.

7           Dr. Plunkett, you can step down.  Don't discuss your

8    testimony with anyone.  We'll see you back here at 9:00

9    tomorrow morning.

10           THE WITNESS:  Thank you.

11      (Off the record.)

12      (Jury not present.)

13           THE COURT:  All right.  I just spoke with coach.

14    He's got a game tomorrow at 7:30 in Welch, so we're going to

15    adjourn tomorrow at like 4:00 --

16           MR. CHILDERS:  That sounds great.

17           THE COURT:  -- so that he can get to that game.

18           And, of course, some of the jurors asked earlier

19    about Monday.  The courthouse is closed Monday.  It's a

20    federal holiday.  So we will -- as you already know, but

21    I'll confirm it, we'll be closed.

22           I don't have anything else scheduled, so I'm

23    comfortable with you folks, if you're comfortable, leaving

24    anything you'd like here in the courtroom tomorrow at the

25    conclusion.  It will be locked, kept locked until you folks

400

1    show up on Tuesday.  But I'll leave that up to you.

2              Is there anything else we need to address today?

3              If not, see you back here at 9:00 tomorrow.

4              MR. CHILDERS:  Thank you, Your Honor.

5              MR. MOSKOW:  Thank you, Your Honor.

6              THE COURT:  Let me just have a bench conference with

7    your folks up here just for a moment.

8          (Bench conference, not reported.)

9              (Proceedings were adjourned at 4:43 p.m.)

10                        ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1     CERTIFICATION:

2              I, Kathy L. Swinhart, CSR, certify that the

3     foregoing is a correct transcript from the record of

4     proceedings in the above-entitled matter as reported on

5     October 4, 2018.

6

7

8     October 5, 2018_____   _____
      DATE

9

10    /s/ Kathy L. Swinhart   _____
      KATHY L. SWINHART, CSR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25