IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                                             No. 3:15-CV-06424

BOEHRINGER INGELHEIM                            Volume 3
PHARMACEUTICALS, INC.,                          Pages 401 through 660

          Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

FRIDAY, OCTOBER 5, 2018, 9:00 A.M.

---o0o---

For the Plaintiffs:     CHILDERS, SCHLUETER & SMITH
                        1932 North Druid Hills Road, Ste 100
                        Atlanta, Georgia  30319
                        BY:  C. ANDREW CHILDERS

                        URY & MOSKOW
                        883 Black Rock Turnpike
                        Fairfield, Connecticut 06825
                        BY:  NEAL L. MOSKOW

            (Appearances continued next page...)


Reported by:   KATHY L. SWINHART, CSR
               LISA A. COOK, RPR-RMR-CRR-FCRR
               Official Court Reporters
               (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                        APPEARANCES (Continued)

 2

 3     For the Plaintiffs:

 4                     FERRER, POIROT & WANSBROUGH
                       2100 RiverEdge Parkway, Suite 1025
 5                     Atlanta, Georgia  30328
                       BY:  RUSSELL ABNEY
 6                     and  HUNTER VANCE LINVILLE

 7

 8     For the Defendant:

 9                     TUCKER ELLIS
                       925 Euclid Avenue, Suite 1150
10                     Cleveland, Ohio  44115
                       BY:  JOHN Q. LEWIS
11

12                     COVINGTON & BURLING
                       One City Center
13                     850 Tenth Street NW
                       Washington, D.C.  20001
14                     BY:  PHYLLIS ALENE JONES
                       and  NICHOLAS HAILEY
15                     and  JESSICA PEREZ

16

17                     JACKSON KELLY
                       Post Office Box 553
                       Charleston, West Virginia  25322
18                     BY:  GRETCHEN M. CALLAS

19

20     Also Present:

21             CLAUDE R. KNIGHT, Plaintiff

22

23

24

25
```

1                                    <u>INDEX</u>

2

3       <u>PLAINTIFF'S WITNESSES:</u>                              <u>PAGE:</u>

4
        LAURA PLUNKETT, Ph.D.
5
        CROSS-EXAMINATION (Cont'd) BY MS. JONES            403
6       CROSS-EXAMINATION (Cont'd) BY MS. JONES            522
        REDIRECT EXAMINATION BY MR. MOSKOW                 590
7       RECROSS-EXAMINATION BY MS. JONES                   641

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    HUNTINGTON, WEST VIRGINIA

2    FRIDAY, OCTOBER 5, 2018, 9:11 A.M.

3    THE COURT:  All right.  Are we ready to go?

4    MS. JONES:  Your Honor, just one quick thing if I

5  may.  And I raised this with Mr. Moskow this morning.

6    As we discussed at the bench conference yesterday, we

7  understand Your Honor's motion *in limine* ruling on this

8  issue of whether experts can talk about motive or intent of

9  the company, that that would be precluded.

10    My sense of Dr. Plunkett's testimony yesterday was that

11  there were a couple of places where our view is that she

12  probably crossed the line on that.  There were references to

13  the company twisting the science, for example.

14    We're not asking for any relief with respect to that

15  testimony.  But before we start cross-examination, before we

16  have the redirect, I was going to ask if the Court would be

17  willing either to let Mr. Moskow talk to her about the rules

18  of the road or if Your Honor would give her some guidance

19  outside of the presence of the jury, that would be helpful

20  too.

21    THE COURT:  Well, all right.

22    Mr. Moskow, do you want to respond?

23    MR. MOSKOW:  Very briefly, Your Honor.  I didn't

24  hear it that way.  But I am glad to talk to Dr. Plunkett and

25  remind her of her obligation to stay within the lines of

1     your rulings.

2          THE COURT: Well, I think my ruling was that

3     neither Dr. Plunkett nor other plaintiff experts could offer

4     testimony where they purport to draw an inference from

5     evidence and thereby form an opinion about the motivations

6     of the company.

7      I didn't hear anything yesterday that I thought crossed

8     the line. There were a number of times she quoted from the

9     company. And the one instance you're talking about I do

10     recall her testimony about, about that and I don't believe

11     that crossed the line. But I certainly am happy for counsel

12     to make sure that the witness understands.

13          MR. MOSKOW: Give me one moment, Your Honor.

14          THE COURT: Go ahead.

15     (Pause in proceedings)

16          MR. MOSKOW: All set, Your Honor.

17          THE COURT: All right. Let's bring the jury in.

18     (Jury returned into the courtroom at 9:13 a.m.)

19          MS. JONES: Thank you, Your Honor.

20          THE COURT: Good morning, ladies and gentlemen.

21     We're ready to resume.

22      Dr. Plunkett, if you would return to the stand.

23     **LAURA PLUNKETT, PLAINTIFFS' WITNESS, RESUMED THE**

24     **WITNESS STAND**

25          MS. JONES: May I proceed, Your Honor?

Laura Plunkett - Cross (Jones)

1    THE COURT:  Yes.

2  BY MS. JONES:

3  Q.   Good morning, Dr. Plunkett.

4  A.   Good morning.

5  Q.   And good morning, members of the jury.

6    Dr. Plunkett, when we finished our day yesterday, we

7  were talking about the FDA's decision to approve a

8  75-milligram dose of Pradaxa for atrial fibrillation

9  patients who have severe renal impairment.  Do you recall

10 that?

11 A.   Yes.

12 Q.   Okay.  And I think I mentioned that I wanted to spend a

13 little bit more time on that decision today when we have a

14 little bit more of an opportunity to talk.

15   When we were going through that summary review document

16 yesterday, do you recall that there were a listing of

17 scientists and doctors at the FDA who had looked at the

18 entire new drug application for Pradaxa; correct?

19 A.   Yes.

20 Q.   And some of those subject matter experts included

21 people who were on a team known as the clinical pharmacology

22 team.  Do you recall that?

23 A.   Yes.

24 Q.   And do you recall from your review of the documents

25 related to the FDA's consideration of the Pradaxa

Laura Plunkett - Cross (Jones)

1   application that the clinical pharmacology team actually

2   generated a specific memo on the topic of their analysis of

3   the application in that area?

4   A.   Yes, I do.

5          MS. JONES:  Your Honor, may I approach?

6          THE COURT:  You may.

7   BY MS. JONES:

8   Q.   Dr. Plunkett, I have marked -- I have handed you what

9   we have marked for identification as Defense Exhibit 5813.

10  Do you recognize that exhibit as the clinical pharmacology

11  and biopharmaceutics review done by the clinical

12  pharmacology team at the FDA on the Pradaxa application?

13  A.   Yes, that's correct.

14         MS. JONES:  Your Honor, we'd move for the

15  admission of Exhibit 5813.

16         MR. MOSKOW:  No objection.

17         THE COURT:  It's admitted and may be published.

18         MS. JONES:  Okay.  Thank you, Your Honor.

19     (Exhibit 5813 admitted into evidence.)

20  BY MS. JONES:

21  Q.   So just to orient ourselves, Dr. Plunkett, you see up

22  at the top of that document, just like the summary review

23  documents, there's a reference to the Center for Drug

24  Evaluation and Research that analyzes applications for new

25  medicines; correct?

Laura Plunkett - Cross (Jones)

1    A.    Yes, that's correct.

2    Q.    And you can see the title there, "Clinical pharmacology

3    and biopharmaceutics review."  Correct?

4    A.    Yes.

5    Q.    And you are, among other things, a pharmacologist;

6    correct?

7    A.    Yes.

8    Q.    And so this is a memo that you would have paid

9    attention to when you were going through the FDA materials

10   in connection with your work in this case; correct?

11   A.    Yes.  It's often the first place I would go.

12   Q.    We're going to go to the second page of Exhibit 5813.

13   And, again, up at the top you see there's a reference to

14   clinical pharmacology review; correct?

15   A.    Yes.

16   Q.    And then if you look down, there's a reference to the

17   name of the product.  Do you see that, brand name?

18   A.    Yes.

19   Q.    And that's, that's a reference to the medicine Pradaxa;

20   correct?

21   A.    Yes.

22   Q.    And then if you go a little further down, there's a

23   reference to something known as "Indication;" correct?

24   A.    Yes.

25   Q.    And "indication" just means this is what the medicine

Laura Plunkett - Cross (Jones)

1  is being proposed to be used for; right?

2  A.    Yes.

3  Q.    And what they have listed there is prevention of stroke

4  and systemic embolism in patients with atrial fibrillation;

5  correct?

6  A.    Yes.

7  Q.    And what that means is this is a medicine that's being

8  proposed for treatment of patients with atrial fibrillation

9  to prevent them from having a stroke caused by a blood clot

10 traveling to the brain; correct?

11 A.    Yes.

12 Q.    Okay.  And if we move a little further down, there are

13 references to some of the reviewers on the application.  Do

14 you see that further down on the page?

15 A.    I do.

16 Q.    And so there's a listing of primary reviewers; correct?

17 A.    Yes.

18 Q.    And based on their titles there, you can see that there

19 are PhDs and medical doctors who were involved; correct?

20 A.    Yes.

21 Q.    And then if you look a little further down, there are

22 other reviewers who were part of that team.  Do you see

23 that?

24 A.    Yes.

25 Q.    So there's a pharmacometrics reviewer.  There's a

Laura Plunkett - Cross (Jones)

1    genomics reviewer.  And then there's a team leader.  Do you

2    see that?

3    A.    Yes.

4    Q.    And, again, just looking at the folks who evaluated the

5    application with respect to clinical pharmacology, those are

6    medical doctors.  Those are folks who have PhDs like you do.

7    There's someone here who has a PharmD degree; correct?

8    A.    Yes.

9    Q.    These are subject matter experts; correct?

10   A.    Yes.

11   Q.    If we look at the next page of Exhibit 5813, there's a

12   Table of Contents.  Do you see that?

13   A.    I do.

14   Q.    And that generally sets out the various different

15   topics that this review memo covers in terms of reflecting

16   what the clinical pharmacology team analyzed and determined

17   based on their analysis of the Pradaxa application; correct?

18   A.    Yes.

19   Q.    And so at the top you see that there's an executive

20   summary; right?

21   A.    There is.

22   Q.    And that includes recommendations by the clinical

23   pharmacology team about what they thought the FDA should do

24   with respect to Pradaxa; correct?

25   A.    Yes.

Laura Plunkett - Cross (Jones)

1  Q.   There's a section called "post-marketing requirements"

2  where they're saying, "This is what we think the company,

3  BI, should be required to do with respect to the medicine if

4  it's approved."  Correct?

5  A.   After it's marketed, yes.

6  Q.   Right, after it's marketed.  Then there's a section

7  called Phase IV commitments.  And those are studies done

8  after a clinical trial like RE-LY; correct?

9  A.   Yes.

10  Q.   All right.  And then there's a section entitled

11  "Summary of OCPD findings."  And that just summarizes the

12  different findings of the clinical pharmacology team based

13  on its analysis; correct?

14  A.   It is.

15  Q.   Okay.  And you can see just looking there that some of

16  the things that they considered were things like

17  pharmacokinetics, one of the topics you discussed yesterday;

18  right?

19  A.   Yes.

20  Q.   They also considered things like exposure response

21  relationships; correct?

22  A.   They did.

23  Q.   And that just means the relationship between how much

24  of the medicine that you're getting and what types of events

25  you might have in terms of bleeding or stroke; correct?

Laura Plunkett - Cross (Jones)

1    A.    Not quite.  It's how much actually gets into the blood

2    in this case, not just how much your dose is.  It's more

3    than that as well.  But I agree dose is part, but it's

4    also -- they were also looking at the actual concentrations.

5    Q.    And I think, I think we're on the same page.  They were

6    looking at how much of the medicine you're actually getting,

7    not just the number on your dose; correct?

8    A.    That's correct.

9    Q.    Okay.  So in terms of some of those curves that you

10   showed the jury, those are the types of relationships that

11   they were evaluating when they prepared this memo; correct?

12   A.    That is correct, yes.

13   Q.    All right.  And then there's a section on drug-drug

14   interaction information; correct?

15   A.    There is.

16   Q.    So the PhDs and the medical doctors at the FDA and the

17   clinical pharmacology review team, they considered some of

18   the issues that you discussed with respect to whether

19   Pradaxa would interact with other types of drugs; correct?

20   A.    Yes, based on the data they have, yes.

21   Q.    Okay.  And then there's a whole section that's devoted

22   to question-based review.  Do you see that?

23   A.    I do.

24   Q.    And I'm not going to go through all of those topics

25   there.  But basically what you see if you scroll down is

Laura Plunkett - Cross (Jones)

1    that the clinical pharmacology team at the FDA specifically

2    looked at various types of questions that were relevant to

3    their subject matter area related to the medicine; correct?

4    A.   Yes.

5    Q.   Okay.  And then let's turn to the next page of this

6    document if we could, Dr. Plunkett.  There is a section

7    entitled "List of Figures."  Do you see that?

8    A.   Yes.

9    Q.   And so the clinical pharmacology team for Pradaxa at

10   the FDA, they, they generated different figures based on

11   their own independent analysis of the data that the company

12   had submitted; correct?

13   A.   I don't know that all of these are based on their

14   independent analysis, but I agree that's mainly what is

15   here.

16   Q.   Okay.  And then if we turn to the next --

17        Are we on Page 5, Mr. Reynolds?  Down at the bottom.

18   Thank you.

19        There's a section entitled "List of Tables."  Do you

20   see that?

21   A.   Yes.

22   Q.   And, again, that's just a description of some of the

23   tables that are spread out throughout the contents of this

24   memo reflecting some of the analysis by the clinical

25   pharmacology team; correct?

Laura Plunkett - Cross (Jones)

1   A.    Yes.

2   Q.    Okay.  If we turn to Page 7 of Exhibit 5813 there is a

3   listing there of various members of the clinical

4   pharmacology team at the bottom of the page.  Do you see

5   that?

6   A.    Yes.

7   Q.    And, again, those are just the doctors and the

8   scientists, the PhDs, the PharmDs who actually looked at the

9   data with respect to Pradaxa before its approval; correct?

10  A.    Yes.

11  Q.    And then if you turn to Page 8 of that same document,

12  you see there's a section that begins with "CP briefing was

13  held on August the 4th, 2010."  Do you see that?

14  A.    I do.

15  Q.    And then there's a long listing of individuals who

16  attended that briefing by the clinical pharmacology team in

17  August of 2010.  Do you see that?

18  A.    Yes.

19  Q.    And those are folks from various different parts of the

20  FDA review team that actually looked at and worked on the

21  application for Pradaxa; correct?

22  A.    Yes.

23  Q.    And so, for example, if you look at the second line of

24  that list of names, there's a reference to Alison Blaus.  Do

25  you see that?  That was the, the person inside the FDA who

Laura Plunkett - Cross (Jones)

412

1  was coordinating with the company.  Do you recall that from

2  your review of the documents?

3  A.    I do, yes.

4  Q.    Okay.  And then if we look further down towards the

5  bottom of that list, there's a reference to someone named

6  Norman Stockbridge.

7        It's the fourth line up from the bottom, Mr. Reynolds.

8        Do you see that?

9  A.    Yes.

10 Q.    And Dr. Stockbridge is a senior person at the FDA who

11 was involved in reviewing the application for Pradaxa;

12 correct?

13 A.    Yes.  I believe he might have been the director of this

14 division.

15 Q.    Of the cardiorenal division?

16 A.    That's correct.

17 Q.    And so there were various folks in the clinical

18 pharmacology review team who specifically looked at the

19 data; correct?

20 A.    Yes.

21 Q.    And then there were people at the FDA beyond the

22 clinical pharmacology team who were briefed by the clinical

23 pharmacology team on what they found based on the data;

24 correct?

25 A.    That is correct.

Laura Plunkett - Cross (Jones)

1  Q.   There was active discussion at the FDA concerning the

2  application for this medicine; correct?

3  A.   I wasn't there, but I would assume there was, yes.

4  Q.   The documentation suggests that there was interaction

5  at the FDA; correct?

6  A.   That's correct.

7  Q.   All right.  Including with some of the most senior

8  members of the cardiorenal division responsible for the

9  application; correct?

10 A.   Yes.

11 Q.   Okay.  I'm going to ask Mr. Reynolds to take us on the

12 screen to Page 11 of this same clinical pharmacology review

13 memo.

14      And this is a section, just to situate ourselves, if we

15 go back to the prior page, the title is "Intrinsic Factors."

16 Do you see that?

17 A.   I do.

18 Q.   And then there's a listing of different, what are

19 essentially patient characteristics; correct?

20 A.   Yes.

21 Q.   Like body weight and like gender and like age; correct?

22 A.   Yes.

23 Q.   The FDA looked at all those different patient

24 characteristics when they considered the application for

25 Pradaxa; correct?

Laura Plunkett - Cross (Jones)

1   A.   Yes.

2   Q.   And then at the bottom of the page there is a reference

3   to renal impairment.  Do you see that?

4   A.   Yes.

5   Q.   And the first sentence in that bullet says, "Exposure

6   to dabigatran increases with the severity of renal function

7   impairment as demonstrated in the dedicated renal impairment

8   study."

9      Did I read that correctly?

10   A.   You did.

11   Q.   And that's a true statement; correct?

12   A.   That is true.

13   Q.   The FDA was fully aware that exposure to Pradaxa would

14   increase in patients as their kidney function got worse;

15   correct?

16   A.   Yes.

17   Q.   And then if you turn to the next page in that same

18   document, there is a second bullet.  Do you see that,

19   Dr. Plunkett?

20   A.   I do.

21   Q.   It says, "At the mid --" I added "the."  "At mid-cycle

22   meeting the review team expressed the need to propose a

23   dosing regimen in severe renal impaired subjects for the

24   current indicated population."

25      Did I read that correctly?

Laura Plunkett - Cross (Jones)

1   A.   You did.

2   Q.   And that reference to a mid-cycle meeting and the

3   review team, do you understand that to be a meeting that

4   involved folks at the FDA who were responsible for reviewing

5   the application for Pradaxa?

6   A.   Yes.

7   Q.   And just to understand the history here, do you also

8   understand that to reference the fact that during one of

9   those meetings that the folks at the FDA had, there were,

10  there were members of the team who said, "We need to have a

11  dose option for Pradaxa for patients with severe renal

12  impairment"?

13  A.   Again, I wasn't there but certainly, yes, I'm aware of

14  there was discussion about that.

15  Q.   And that's what the document says; correct?

16  A.   That is correct.

17  Q.   All right.  And when it says "for the current indicated

18  population," they're talking about for the atrial

19  fibrillation population; correct?

20  A.   Yes, that's correct.

21  Q.   And the next few sentences cover some of the topics

22  that we've already talked about yesterday in terms of

23  figuring out what the dose would be for those patients.  But

24  I actually wanted to focus on the last sentence in that same

25  bullet point section.  Do you see that sentence that starts

Laura Plunkett - Cross (Jones)

1  with, "It should"?

2  A.   Yes.

3  Q.   It says, "It should be noted that there is no efficacy

4  or safety information available at the proposed dosing

5  regimen of 75 milligrams dabigatran once a day," or QD, "in

6  severe renal impairment."

7       That's what it says; correct?

8  A.   It does, yes.

9  Q.   And just to be clear on one thing, when the discussions

10  regarding having a dose for severe renal impairment patients

11  started, it looks like, based on the documents, that they

12  initially considered a 75-milligram dose of Pradaxa once a

13  day as opposed to twice a day.  Is that right?

14  A.   They did.

15  Q.   That was one of the options they considered; correct?

16  A.   Yes.  I think we looked yesterday at their different

17  modeling for different things.

18  Q.   Exactly, okay.  And this memo reflects that the FDA

19  fully understood there was no data for the 75-milligram dose

20  of Pradaxa that would be available for patients with severe

21  renal impairment; correct?

22  A.   Yes.  The agency certainly understood that.

23  Q.   I'm going to ask you to go back to Page 6 of that same

24  document, Exhibit 5813.  And there's a section entitled

25  "Recommendations."  Do you see that?

Laura Plunkett - Cross (Jones)                    417

1    A.    On Page 6?  Yes.

2    Q.    Page 6, yes.  And just to frame this section, it says,

3    "The office of clinical pharmacology has reviewed the

4    clinical pharmacology and biopharmaceutics information

5    submitted to NDA 22-512."

6          Did I read that correctly?

7    A.    You did, yes.

8    Q.    And that's just a reference -- that number is just a

9    reference to the number that was assigned to the new drug

10   application for Pradaxa and atrial fibrillation; correct?

11   A.    Yes, that's the number.

12   Q.    It goes on to say, "The CPB information provided in NDA

13   22-512 is acceptable following agreement with sponsor

14   regarding specific labeling language and post-marketing

15   requirements.  The office has the following specific

16   recommendation."  Do you see that?

17   A.    I do.

18   Q.    And then there are a series of bullets that reflect the

19   recommendations of the doctors and the scientists within the

20   Office of Clinical Pharmacology who had reviewed the data

21   submitted to the agency; correct?

22   A.    Yes.

23   Q.    And the second recommendation there is, "Patients with

24   severe renal impairment should receive 75 milligrams once a

25   day."  Correct?

Laura Plunkett - Cross (Jones)

1  A.   Yes.

2  Q.   That was their recommendation even in light of their

3  acknowledgment that there hadn't been data collected from

4  the RE-LY study for patients who might have been on a

5  75-milligram dose; correct?

6  A.   Yes, that's correct.

7  Q.   If we go to the next page, which is Page 7 of 5813,

8  there's a section -- I want to actually look at both the

9  sections entitled "Post-marketing requirements and Phase IV

10 commitments."  Do you see that?

11 A.   Yes.

12 Q.   And the clinical pharmacology team at the FDA included

13 as a post-marketing requirement for Boehringer Ingelheim the

14 following:

15      "The sponsor should manufacture a lower strength of

16 75-milligram and demonstrate bioequivalence following the

17 administration of two times 75-milligram versus

18 150 milligrams for BIBR 1048 MS."  Do you see that?

19 A.   Yes.

20 Q.   And without getting into all of the technical language

21 there, that's just informing the folks who were reviewing

22 this memo that the clinical pharmacology team, having

23 reviewed all of that data, determined that BI needed to

24 manufacture what was essentially a half dose of Pradaxa 150

25 for patients who had severe renal impairment; correct?

Laura Plunkett - Cross (Jones)                    419

1   A.   Yes.   That -- well, say that again.   I'm sorry.   Are

2   you saying a half dose of 150 or a lower strength of 75?   I

3   think they're talking about --

4   Q.   Well, should -- I think when they say a lower strength

5   of 75, they're referring to the need for the company to have

6   available a 75-milligram dose of the medicine; correct?

7   A.   Yes, I agree.   That's true.

8   Q.   Okay.   And then it goes on to say, "This strength will

9   allow for the dose adjustment in severe renal impaired

10  patients."   Correct?

11  A.   That's what they state, yes.

12  Q.   Okay.   And then there's another section that's entitled

13  "Phase IV commitments."   Do you see that?

14  A.   Yes.

15  Q.   And that's a place where the agency has the ability to

16  say, "We think in addition to whatever study the company has

17  already done, here are some additional things that they

18  should do in further studies."   Correct?

19  A.   Yes.

20  Q.   Okay.   And this talks generally about the need for

21  doing what are known as in vitro studies involving two

22  medicines, Amiodarone and Dronedarone.   Do you see that?

23  A.   Yes.

24  Q.   Okay.   That was their recommendation in terms of Phase

25  IV commitments; correct?

Laura Plunkett - Cross (Jones)

1   A.   Yes.

2   Q.   Now, after the approval of Pradaxa, some of the members

3   of that same clinical pharmacology team actually published a

4   paper in a journal discussing the FDA's analysis of the

5   75-milligram dose; correct?

6   A.   They did.

7         MS. JONES:  May I approach, Your Honor?

8         THE COURT:  Yes.

9   BY MS. JONES:

10  Q.   Dr. Plunkett, I have handed you what has been marked

11  for identification as Defense Exhibit 6038.  Do you

12  recognize Exhibit 6038?

13  A.   I do.

14  Q.   Okay.  And do you recognize it as an article that was

15  published by two members of the clinical pharmacology team

16  at the FDA on the subject of the FDA's decision to create a

17  75-milligram dose for patients with severe renal impairment?

18  A.   Yes, that's true.

19        MS. JONES:  Your Honor, we'd move for the

20  admission of Exhibit 6038.

21        MR. MOSKOW:  My understanding is it's being used

22  as a demonstrative, not as a full exhibit, and we have no

23  objection to that.

24        MS. JONES:  In connection with our discussion in

25  the conference room.

Laura Plunkett - Cross (Jones)

1      THE COURT:  You may proceed.

2      MS. JONES:  Thank you, Your Honor.

3  BY MS. JONES:

4  Q.   Dr. Plunkett, again just to situate ourselves, up at

5  the top of the page you see there's a title there, "Clinical

6  pharmacology basis of deriving dosing recommendations for

7  dabigatran in patients with severe renal impairment."  Do

8  you see that?

9  A.   I do.

10  Q.   And that's a, that's a way of saying this is how the

11  clinical pharmacology team came up with a dose

12  recommendation for Pradaxa patients who have severe renal

13  impairment; correct?

14  A.   Yes, with the caveat they say in here that this is not

15  the official position of the FDA.  It's the author's

16  position.  But I agree with you this is consistent with what

17  we just saw.

18  Q.   Okay.  But the, the subject matter of this article

19  doesn't deviate or significantly differ from what some of

20  the, some of the things you've already discussed with regard

21  to the review memos; correct?

22  A.   Yes, with the exception of there are opinions expressed

23  by these two gentlemen in here.  And that's why they have --

24  one of them may be a woman.  But this, this is their

25  opinions.  And, so, they have a caveat at the end where they

Laura Plunkett - Cross (Jones)

1   say this is not an official statement by the FDA.

2   Q.   Understood.

3   A.   Yeah.

4   Q.   Let me just ask you this question since you've raised

5   that point.  Is there anything in this article that you've

6   seen, having had a chance to review it, that you think

7   somehow contradicts or diverges from the analysis you've

8   seen by the FDA on this subject in the review memos?

9   A.   No.  There's additional information here that isn't

10  presented in the review memos.  But that's, that's why I'm

11  making that caveat.  It's not like this is -- they took this

12  and published the review memo.  It is, it is a little

13  different than that.

14  Q.   Understood.  There is an identification of the two

15  scientists who were authors on those papers, Dr. Hariharan

16  and Dr. Madabushi.  Do you see that?

17  A.   Yes.

18  Q.   And if you look down in the bottom left-hand corner of

19  the paper, there is a reference to what their affiliation

20  is, where they work.  Do you see that?

21  A.   Yes.

22  Q.   It says, "From the Office of Clinical Pharmacology,

23  Center for Drug Evaluation and Research, U.S. Food and Drug

24  Administration."  Do you see that?

25  A.   I do.

Laura Plunkett - Cross (Jones)                                        423

1   Q.   Okay.  If we just -- I don't -- we don't have to go

2   through every single word of this.  But just to look at the,

3   the incomplete paragraph on the right-hand side, do you see

4   there's a sentence that says, "This report is aimed at" --

5   we're going to call it up on the screen as well.

6        "This report is aimed at providing the clinical

7   pharmacology basis for the recommendation of dabigatran

8   75-milligram in patients with severe renal impairment."

9   Correct?

10  A.   That's what it says, yes.

11  Q.   And that's what we were talking about in terms of just

12  the title for the paper; correct?

13  A.   Yes.

14  Q.   They're, they're explaining their thinking on that.

15       If we go to the next page of that same article, there

16  is a full paragraph there that, that starts with the

17  sentence, "The role of renal function."  Do you see that?

18  We'll call it up again on the screen.

19  A.   Yes.  It helps if you --

20  Q.   Yes, understood.

21  A.   I see it now.

22  Q.   And that sentence reads, "The role of renal function is

23  evident from the results of a dedicated renal impairment

24  study that evaluated the pharmacokinetics of dabigatran

25  150-milligram after a single oral dose in healthy subjects

424

Laura Plunkett - Cross (Jones)

1    and those with renal impairment."

2        And then it goes on to define what those different

3    levels of renal impairment were.

4        And do you understand that to be a reference to I think

5    the Phase I study that you were describing yesterday?

6    A.    Yes.

7    Q.    Okay.  And then about midway through that paragraph

8    there is a sentence that begins with, "Patients with severe

9    renal impairment."  Do you see that?

10   A.    I do.

11   Q.    And it specifically says, "Patients with severe renal

12   impairment are inherently at a higher risk for stroke and

13   bleeds.  They are most often not enrolled in cardiovascular

14   trials, as so in RE-LY."  Do you see that?

15   A.    I do.

16   Q.    And do you agree that that statement is correct that

17   patients with severe renal impairment are inherently at a

18   higher risk for stroke and for bleeds?

19   A.    Yes.  I'm aware of that data.

20   Q.    Okay.  Is it also true, as these two authors from the

21   FDA report, that these patients are most often not enrolled

22   in cardiovascular trials as so in RE-LY?  Is that a true

23   statement?

24   A.    Yes.  I think we discussed that yesterday.  But, yes, I

25   agree with that.

Laura Plunkett - Cross (Jones)

1    Q.    And so it's not an unusual thing necessarily that

2    patients who have severe renal impairment might not be part

3    of one of the large types of clinical trials that you were

4    describing yesterday like the RE-LY study; correct?

5    A.    Yes, that's true.

6    Q.    Towards the bottom of that paragraph it goes on to say,

7    "Therefore, due to a lack of clinical experience, Boehringer

8    Ingelheim Pharmaceuticals, Inc., saw contradiction in

9    patients with severe renal impairment on hemodialysis --"

10   "and on hemodialysis."

11        Did I read that correctly with that correction?

12   A.    You did.

13   Q.    And so that's just a reference to the fact that

14   initially when the company submitted an application for

15   Pradaxa, it said, "We don't think that patients who have

16   severe renal impairment would be receiving Pradaxa because

17   we didn't test those patients in the last study."  Correct?

18   A.    Yes.

19   Q.    It goes on to say that, "Given the lack of treatment

20   options for patients with severe renal impairment, during

21   the review of dabigatran new drug application, NDA 22-512,

22   the FDA explored the possibility of deriving dosing

23   recommendations for this population."  Correct?

24   A.    That's what is stated, yes.

25   Q.    Right.  So that's just that chronology we talked about

Laura Plunkett - Cross (Jones)

1    yesterday.  The company made a proposal with regard to

2    severe renal impairment and the FDA reached a conclusion

3    that given the lack of options for patients with severe

4    renal impairment, there should be a dose of Pradaxa

5    available for patients; correct?

6    A.   Yes, that's true.

7    Q.   Let's go to the next page of this paper.  There's a

8    section entitled "Discussion" on the left-hand side.  We'll

9    pull that up for you.

10        At the very top of that "Discussion" section, it says,

11   "Incidence of AF in patients with CKD is high."  Do you see

12   that?

13   A.   I do.

14   Q.   And just to define those acronyms, AF is a reference to

15   atrial fibrillation; correct?

16   A.   Yes.

17   Q.   And CKD is a reference to chronic kidney disease;

18   correct?

19   A.   Yes.

20   Q.   And "incidence" means what?

21   A.   How often it occurs.

22   Q.   Okay.  And so what that sentence is telling us is that

23   AF occurs often in patients who have chronic kidney disease;

24   correct?

25   A.   Yes.

Laura Plunkett - Cross (Jones)

1  Q.   Later on in that paragraph it says, "Importantly,

2  incidence of stroke, which is a major complication of AF,

3  increases significantly with worsening of renal function."

4  Correct?

5  A.   You read that correctly, yes.

6  Q.   And that's a true statement; correct?

7  A.   Yes.  Based on data I've seen, that would be true.

8  Q.   And that just means that when patients have poor renal

9  function and their renal function continues to decline,

10  their chances of having a stroke increase; correct?

11  A.   Yes.  In other words, those two things go together

12  based on some of the data that's available.

13  Q.   Okay.  In that same paragraph these two FDA scientists

14  write, "Moreover, the two-year mortality rates after

15  occurrence of a stroke or transient ischemic attack also

16  increase dramatically in patients with CKD and hemodialysis

17  as compared to those without CKD."

18       Did I read that correctly?

19  A.   You did.

20  Q.   And just to again define some of the terms here,

21  two-year mortality rate refers to the, the number of people

22  who have passed away after they've had either a stroke or

23  what's sometimes referred to as a mini stroke, a transient

24  ischemic attack; correct?

25  A.   The first part of the sentence, yes, that's what

Laura Plunkett - Cross (Jones)

1  they're talking about.

2  Q.  Okay.  And that rate, according to these FDA authors,

3  actually increases dramatically when patients have chronic

4  kidney disease; correct?

5  A.  That's what they state, yes.  Well, they don't give a

6  number to show how much of those -- well, that's fine.  They

7  give a number for going up.

8  Q.  And they're comparing those patients against patients

9  who don't have chronic kidney disease; correct?

10  A.  That's correct, yes.

11  Q.  Okay.  The next statement that the FDA authors make

12  based on that data that they referenced is that, "AF

13  patients with renal insufficiency are in utmost medical need

14  for an appropriate anticoagulant treatment."

15      Did I read that correctly?

16  A.  You did.

17  Q.  And that means that patients who have atrial

18  fibrillation and also have problems with their kidneys are

19  at a particular need for a good anticoagulant medicine;

20  correct?

21  A.  For an appropriate anticoagulant medicine, that is

22  true.

23  Q.  Okay.  Now, it goes on to say later in that same

24  paragraph starting with "moreover," "Moreover, to decrease

25  the noise and avoid misinterpretation of primary efficacy

Laura Plunkett - Cross (Jones)

1   and safety results, a majority of the cardiovascular trials

2   do not enroll patients with severe renal impairment because

3   of higher background rates for both stroke and bleeds."

4       Did I read that correctly?

5   A.   You did.

6   Q.   And what the FDA scientists are saying there is the

7   point that we talking about earlier; that it's commonly the

8   case that patients with severe renal impairment are not

9   included in trials for medicines addressing cardiovascular

10  issues because those folks have other problems that might

11  complicate the interpretation of the data.  That's that

12  reference there to noise and misinterpretation of primary

13  efficacy and safety results.  Correct?

14  A.   Yes, but it's a little more complex than that.  Do you

15  want me to explain or --

16  Q.   Why don't I, why don't I move on to my next question.

17  A.   Okay.  That's fine.

18  Q.   But we can agree that this is just -- it's an echoing

19  of the point that we talked about earlier; that a majority

20  of clinical trials for medicines that are intended for

21  patients with cardiovascular issues, heart issues don't

22  include patients who have severe renal impairment; correct?

23  A.   That I agree with, yes.  I think there's other reasons,

24  though, that aren't described here.  But I would agree with

25  that.

Laura Plunkett - Cross (Jones)

430

1  Q.  Okay.  Understood.  And, so, just to ask the question,

2  that, that can sometimes create a challenge because patients

3  who have severe renal impairment could also have

4  cardiovascular illness that needs to be treated; correct?

5  A.  Yes.  They can be complex patients.

6  Q.  Okay.  And so what, what we see in some of the

7  documentation relating to Pradaxa in particular is a

8  discussion about identifying a dose with respect to Pradaxa

9  that would be available for patients who have severe renal

10 impairment but also need protection from stroke because they

11 have atrial fibrillation; correct?

12 A.  That's what FDA is discussing.  I would agree.

13 Q.  Okay.  The next sentence on this same point says,

14 "Therefore, any clinical experience to treat this important

15 subgroup of patients is very scarce."  Do you see that?

16 A.  Yes.

17 Q.  And that just means for patients who have severe renal

18 impairment, this important subgroup of patients, it is not

19 unusual that you wouldn't have clinical trial data to be

20 able to support an application for cardiovascular medicine;

21 correct?

22 A.  Yes, because they're not typically included.  That's,

23 that's the main issue.

24 Q.  Okay.  Further down that same page there is a reference

25 in the next column to dose adjustment for special

Laura Plunkett - Cross (Jones)

1   populations.  Do you see that?

2   A.    I do.

3   Q.    And let me just ask you, do you agree with the

4   statement that we read earlier that any clinical experience

5   to treat the important subgroup of patients known as severe

6   renal impairment patients, that is scarce?  Is that a true

7   statement as far as you're concerned?

8   A.    It is, it is definitely generally because of the issue

9   of, of them not being in the trial.  So that's the issue.

10  Q.    Okay.  And then further down in that column it says,

11  "Dose adjustment for special populations can be derived

12  using pharmacokinetic approaches as stated in the guidance

13  for industry pharmacokinetics in patients with impaired

14  renal function, study design, data analysis and impacts on

15  dosing and labeling."  Do you see that?

16  A.    Yes.

17  Q.    And, and all that's referring to is the FDA's view that

18  figuring out doses for special populations like severe renal

19  impairment patients, that can be achieved using

20  pharmacokinetic approaches like modeling; correct?

21  A.    Yes, but the guidance gives specific recommendations

22  for when it's appropriate and when it's not.

23  Q.    Okay.  Do you agree with just that statement in this

24  article by these FDA authors that dose adjustment for

25  special populations can be derived using pharmacokinetic

Laura Plunkett - Cross (Jones)

1   approaches?

2   A.   Certainly you can do it.  The question is in all cases

3   should you do it.  But absolutely it can be done.

4   Q.   Okay.  And just to go back to a discussion that we were

5   having earlier yesterday, do you have a view on whether the

6   FDA was, was wrong or incorrect in deciding with respect to

7   Pradaxa that it would use pharmacokinetic modeling to

8   identify a dose for patients with severe renal impairment?

9   A.   No.  And I think I answered that yesterday.  I have not

10  formed that opinion that they were wrong.

11  Q.   Okay.  We're going to turn to Page 6 of the same

12  document moving toward the conclusion.  There is a

13  discussion that starts on the left-hand side of the article

14  and then carries over to that right-hand side column.

15       And at the very top of that top not complete paragraph

16  there's a sentence that says, "Only the dabigatran

17  75-milligram BID regimen provided a reasonable alternative

18  with respect to matching exposures."  Do you see that?

19  A.   I do.

20  Q.   And I didn't want to walk us back through all the

21  discussion that we had yesterday, but that's essentially the

22  FDA concluding after having gone through the different dose

23  options that it considered that the 75-milligram twice a day

24  dose would be the best option for patients who have severe

25  renal impairment; correct?

Laura Plunkett - Cross (Jones)

1    A.    In the other document I agree that they concluded that.

2    And that is a different paper.  But certainly this is

3    consistent with the document we looked at yesterday, yes.

4    Q.    Okay.  Those two things are not -- they didn't reach a

5    different conclusion in this paper than what we saw in the

6    review memo; correct?

7    A.    That is true.

8    Q.    Okay.  And then at the end of that paragraph it says,

9    "Furthermore, from a practical viewpoint the 75-milligram

10   BID regimen in severe renal impairment provides an option

11   that is easy to implement with reduced potential for

12   prescription errors."  Do you see that?

13   A.    Yes, I do.

14   Q.    Do you agree or disagree with that statement by these

15   two FDA authors?

16   A.    I haven't formed an opinion on this one way or the

17   other.

18   Q.    Okay.  Let's move on to the conclusion.  There's,

19   there's a statement at the very beginning of the concluding

20   paragraph in that paper that says, "Conducting safety and

21   efficacy trials that adequately represent all categories of

22   renal function is a challenge."

23        Did I read that correctly?

24   A.    You did.

25   Q.    Is that a true statement?

Laura Plunkett - Cross (Jones)

1  A.   Yes.

2  Q.   It goes on to say, "Depending on the data from large

3  Phase III trials the deriving dosing recommendation --" let

4  me start that one over again.  "Depending on the data from

5  large Phase III trials for deriving dosing recommendations

6  in special populations is not always practical."

7       Did I read that correctly?

8  A.   Yes.

9  Q.   Okay.  Do you agree with that statement?

10  A.   I think that is dependent on the trial.  But certainly

11  in some trials it may be, yes, depending on how many

12  patients or what the drug is going to be used in, what

13  population.  But I'd say that's possible, yes.

14  Q.   Okay.  It goes on to say, "Quantitative clinical

15  pharmacology approaches can provide a powerful alternative

16  to derive meaningful dosing recommendations for special

17  populations."

18       Did I read that correctly?

19  A.   You did.

20  Q.   Do you agree or disagree with that statement by these

21  two FDA authors?

22  A.   I agree in part and disagree in part.  Would you like

23  me to explain?

24  Q.   Which part do you -- just tell me which part you

25  disagree with first.

Laura Plunkett - Cross (Jones)

1   A.   I agree that it can be an alternative.  But there's

2   particular considerations you have to do when you talk about

3   the study itself.  Do you want  me -- that's what I

4   wanted -- do you want me to explain that?

5   Q.   Well, is there a portion of that statement that you

6   specifically disagree with or are there just nuances you

7   would add to what they've written here?

8   A.   It's not just a nuance.  I think there's an important,

9   there's an important thing you have to understand in order

10  to say, yes, I agree with that or I don't agree with that.

11  I think they're missing a concept.

12  Q.   Okay, fair enough.  Let's move on in this concluding

13  paragraph.  "The analysis presented in this article

14  illustrates the use of a simple pharmacokinetic modeling and

15  simulation approach to derive dosing recommendations for

16  patients with severe renal impairment based on the results

17  of dedicated renal impairment study and the understanding of

18  safety and efficacy across renal function categories from

19  the pivotal registration trial."  Do you see that?

20  A.   Yes.

21  Q.   And what they're essentially saying there is the

22  analysis that they've outlined in this article shows the use

23  of pharmacokinetic modeling based on some of the data that

24  was collected during the Pradaxa study period to come up

25  with a dosing approach for patients who have severe renal

Laura Plunkett - Cross (Jones)

1   impairment.  Correct?

2   A.    That's what they're trying to say, yes.

3   Q.    Okay.  And recognizing that you may not fully agree

4   with the statement, do you have any reason to think that

5   this statement that quantitative clinical pharmacology

6   approaches can provide a powerful alternative to derive

7   meaningful dosing recommendations for special populations,

8   do you have any reason to believe that that's somehow

9   inconsistent with the views of the broader clinical

10  pharmacology team that reviewed the application for Pradaxa?

11  A.    I haven't spoken to them.  But based on general

12  principles of clinical pharmacology, do you want me to speak

13  to it that way?  I haven't spoken to the team, so I -- and

14  that's what I think you're asking me.  But --

15  Q.    You, you've reviewed the memorandum prepared by the

16  clinical pharmacology team related to the Pradaxa

17  application; correct?

18  A.    Yes, I have.

19  Q.    And you've had an opportunity to review various other

20  materials generated by members of the Pradaxa review team at

21  the FDA; correct?

22  A.    Yes, I have.

23  Q.    Have you seen anything in any of those written

24  materials that you view as being inconsistent with this

25  statement that quantitative clinical pharmacology approaches

Laura Plunkett - Cross (Jones)

1    can provide a powerful alternative to derive meaningful

2    dosing recommendations for special populations?

3    A.    Yes.

4    Q.    You have seen something that's inconsistent with that?

5    A.    Yes.

6    Q.    Okay.  In the clinical pharmacology review?

7    A.    In the, in the discussion of the data that they use for

8    the review, yes, and in this paper too if you want me to

9    show you.  But --

10   Q.    Well, I want to finish this paragraph because I want to

11   be efficient with your time and with the jury's time.

12        Just to round out our discussion of the conclusion, it

13   says, "Based on our analysis, dosing recommendations for

14   patients with severe renal impairment were incorporated in

15   the U.S. prescribing information for dabigatran."  Do you

16   see that?

17   A.    I do.

18   Q.    And that just means based upon the analysis of the

19   clinical pharmacology team at the FDA, there was a dose that

20   was recommended for patients who have severe renal

21   impairment; correct?

22   A.    Yes.  That's the ultimate outcome.  That's true.

23   Q.    Now, you're, you're familiar with --

24        We can take that down.  Thank you, Mr. Reynolds.

25        You're familiar with the medicine known as Xarelto;

Laura Plunkett - Cross (Jones)

1   correct?

2   A.   I am, yes.

3   Q.   You're actually involved as a litigation expert in

4   cases against the makers of that medicine as well; correct?

5   A.   I am.

6   Q.   All right.  And are you aware that the, the lower dose

7   for Xarelto for patients with severe renal impairment was

8   approved without any safety or efficacy data from the Phase

9   III trial for the medicine?

10  A.   Yes, I am.

11  Q.   Now, in addition to the modeling that the FDA had done

12  for the Pradaxa 75-milligram dose for severe renal

13  impairment patients, the company, BI, actually conducted and

14  published its own pharmacokinetic modeling regarding the

15  75-milligram dose; correct?

16  A.   They did.

17          MS. JONES:  May I approach, Your Honor?

18          THE COURT:  You may.

19  BY MS. JONES:

20  Q.   Dr. Plunkett, I've handed you what is marked as Exhibit

21  3199.  Do you see that number at the bottom?

22  A.   I do.

23  Q.   Okay.  And do you recognize that as an article that was

24  published by various authors at Boehringer Ingelheim on the

25  subject of modeling related to the 75-milligram dose of

Laura Plunkett - Cross (Jones)

1   Pradaxa?

2   A.   Yes, that's correct.

3   Q.   Okay.  And we've, we've talked about this issue at some

4   length so I'm just going to go through it relatively

5   quickly.  If we turn to --

6        And I apologize, Your Honor.  We would move for the

7   admission of 3199, please.

8            MR. MOSKOW:  As a demonstrative, no objection.

9            THE COURT:  All right.  You may use it in your

10  examination of the witness.

11           MS. JONES:  Thank you, Your Honor.

12  BY MS. JONES:

13  Q.   And again, Doctor, just to situate ourselves, do you

14  see there's a title there "Dabigatran etexilate in atrial

15  fibrillation patients with severe renal impairment?"  Do you

16  see that?

17  A.   Yes.

18  Q.   And that's just a reference to Pradaxa in patients who

19  have atrial fibrillation and also have very severe kidney

20  problems; correct?

21  A.   Yes.

22  Q.   Okay.  And then the subtitle is "Dose identification

23  using pharmacokinetic modeling and simulation."  Correct?

24  A.   Yes.

25  Q.   And that just means finding a dose for these patients

Laura Plunkett - Cross (Jones)

1   who have AFib and also have severe renal impairment using

2   pharmacokinetic modeling; correct?

3   A.   Yes.

4   Q.   All right.  And then the authors on this paper are

5   folks who were employed by Boehringer Ingelheim; correct?

6   A.   Yes, all of these are.

7   Q.   Okay.  And this was a paper that was published in

8   something known as the *Journal of Clinical Pharmacology*.  Is

9   that right?

10  A.   Yes.

11  Q.   All right.  If we turn to the second page of that

12  paper, I just very quickly want to talk about some of the

13  introductory information.  There's a paragraph that begins

14  with, "Atrial fibrillation patients with severe renal

15  impairment."  Do you see that?

16  A.   I do.

17  Q.   It reads, "Atrial fibrillation patients with severe

18  renal impairment are known to be at higher risk of stroke

19  than patients with preserved renal function."  Do you see

20  that?

21  A.   Yes.

22  Q.   And that's that same concept that we were talking about

23  earlier, that patients who have atrial fibrillation and also

24  have severe renal impairment are at a higher risk of stroke

25  than patients who have better renal function; correct?

Laura Plunkett - Cross (Jones)

1  A.   Yes.  I agree it's the same type of statement we saw in

2  the first page.

3  Q.   Okay.  And then at the bottom of that paragraph it

4  describes the purpose of the analysis reflected in this

5  paper.  "The aim of this analysis was to derive such a dose

6  and dose regimen for AF patients with severe renal failure

7  who could potentially benefit from the use of DE."  Do you

8  see that?

9  A.   Yes.

10  Q.   And do you understand that reference there to DE to be

11  a reference to Pradaxa, dabigatran etexilate?

12  A.   Yes.  It's an abbreviation for essentially the same

13  compound.

14  Q.   Okay.  And so what the, what the authors of this paper

15  are explaining is the purpose of the analysis that's

16  described here is to outline how using pharmacokinetic

17  modeling you might come up with a dose for patients who have

18  severe renal impairment; correct?

19  A.   Yes.

20  Q.   And then if you look down under the "method" section

21  there's a reference at the very beginning of that section to

22  simulation purposes.  Do you see that?

23  A.   Yes.

24  Q.   It says, "For simulation purposes the final population

25  PK model based on data from 9,522 patients from the pivotal

Laura Plunkett - Cross (Jones)

1   Phase III study (RE-LY) was applied."  Do you see that?

2   A.    I do.

3   Q.    And then it goes on to talk about how the company

4   developed a different model than the one that the FDA had

5   actually used for its approval decision and how they used

6   that model to try to identify an appropriate dose; correct?

7   A.    Yes.

8   Q.    If we go to Page 5 of that same document, please, there

9   is a section called "Discussion."  Do you see that?

10  A.    I do.

11  Q.    And the second sentence of that section called

12  "Discussion," says, "Since renal clearance is the

13  predominant excretion pathway of dabigatran, the impact of

14  renal function on exposure was investigated during DE

15  development."  Do you see that?

16  A.    Yes.

17  Q.    And that's just another way of saying because the way

18  Pradaxa is excreted through the body is through the kidneys,

19  there was a particular -- there was an interest in looking

20  at the impact of renal function on exposure or blood levels

21  while the medicine was being investigated; correct?

22  A.    Yes.

23  Q.    Okay.  If we look down on the next column there, there

24  is a section entitled "Conclusion."  Do you see that?

25  A.    Yes.

Laura Plunkett - Cross (Jones)

1  Q.   And then the third sentence in that conclusion explains

2  that, "Based on simulated exposure data using a model based

3  on data from the actual RE-LY trial, AF patients with

4  creatinine clearance less than 30 but higher than 15 treated

5  with a dabigatran dose of 75 milligrams twice a day have

6  target plasma level and exposure data largely within the

7  concentration range proven to be safe and effective in AF

8  patients with creatinine clearance that was greater than

9  30 milliliters per minute receiving 150 milligrams of

10 Pradaxa twice a day."  Do you see that?

11 A.   Yes.

12 Q.   And it goes on to say, "Through interaction with the

13 FDA, this dosing algorithm was also confirmed and supported

14 by the FDA clinical pharmacology division using their model

15 based on the data from the dedicated renal impairment study

16 taking into account the safety and efficacy information from

17 RE-LY."  Do you see that?

18 A.   I do.

19 Q.   And so what they're saying there is the FDA developed a

20 model based on data from that Phase I study involving

21 renally impaired patients that you talked about yesterday;

22 correct?

23 A.   Yes.

24 Q.   And that model was the basis of the FDA's decision to

25 actually approve the 75-milligram dose twice a day for

Laura Plunkett - Cross (Jones)

1    patients with severe renal impairment; correct?

2    A.    Yes.

3    Q.    At the same time, the company did its own models that

4    included data from patients in the RE-LY study; correct?

5    A.    Yeah.  It was a different, different modeling exercise,

6    but, yes, they did.

7    Q.    They did a different model; correct?

8    A.    Yes.

9    Q.    And what they say here is at the end of this paragraph,

10   "These results support the use of dabigatran 75 milligrams

11   twice a day in AF patients at risk of stroke and with

12   creatinine clearance values between 15 and 30 milliliters

13   per minute."  Did I read that correctly?

14   A.    You did.

15   Q.    Okay.  And so what happened was the FDA created its own

16   model using that Phase I data that you described yesterday;

17   correct?

18   A.    Yes.

19   Q.    And based on that model, the FDA reached a conclusion

20   that the 75-milligram twice-a-day dose was the appropriate

21   dose for patients with severe renal impairment; correct?

22   A.    That was what they based -- that's what they point to

23   as the basis for their decision, yes.

24   Q.    Okay.  And then the company created a model, used a

25   different approach, but also did a modeling exercise to

Laura Plunkett - Cross (Jones)

1    evaluate the same question of dosing in patients with severe

2    renal impairment; correct?

3    A.    Yes.

4    Q.    And they ultimately concluded that the results of their

5    modeling exercise also supported the use of Pradaxa

6    75 milligrams twice a day in atrial fibrillation patients at

7    risk of stroke and with severe renal impairment; correct?

8    A.    I disagree.

9    Q.    You disagree that the company came to that conclusion?

10   A.    Yes, based on other documents I have seen.

11   Q.    Okay.  Well, I want to just focus on the document we're

12   looking at at the moment.  That sentence that we just read,

13   "These results support the use of dabigatran 75 milligrams

14   twice a day in AF patients at risk of stroke and with

15   creatinine clearance values between 15 and 30 milliliters

16   per minute."

17        That's what that's saying; right?  We did our models

18   and we think the results support the same dose that the FDA

19   recommended; correct?

20   A.    I don't disagree the statement is here.  I disagree

21   that that's the company's position based on other things I

22   have seen.

23   Q.    Okay.  Well, I'm just asking you about the statement

24   we're looking at right now.

25   A.    I agree that statement is here, absolutely.

Laura Plunkett - Cross (Jones)

1  Q.  Okay.  And then the modeling that, that Boehringer

2  Ingelheim did that's described in this paper that we just

3  went through, that, that data was submitted to the FDA;

4  correct?

5  A.  Yes.

6  Q.  Now, are you aware, based on your review of the

7  documents in the case, that after Pradaxa was approved that

8  the company conducted small, additional studies regarding

9  the use of the 75-milligram dose in patients with severe

10  renal impairment?

11  A.  I think I -- well, I need to see what you're referring

12  to.  I'm aware there was some things done, yes.

13  Q.  Okay.

14          MS. JONES:  May I approach, Your Honor?

15          THE COURT:  You may.

16  BY MS. JONES:

17  Q.  Dr. Plunkett, I've handed you what we've marked for

18  identification as Defense Exhibit 9194.  Do you recognize

19  that exhibit?

20  A.  I'm not sure I've seen this exact exhibit, so let me

21  look for a second --

22  Q.  Okay.

23  A.  -- to see what the, the -- I don't know if I've seen it

24  in this form, no, I can't tell you that.  But we can talk

25  about it.  I'm, I'm --

447

Laura Plunkett - Cross (Jones)

1   Q.   You're happy to talk about it?

2   A.   Yeah, because I know what -- I mean, I understand

3   what's in here.

4   Q.   Okay.

5           MS. JONES:  Your Honor, given that, we would move

6   for the admission of Exhibit 9194.

7           MR. MOSKOW:  No objection.

8           THE COURT:  It's admitted and may be published.

9       (Exhibit 9194 admitted into evidence.)

10          MS. JONES:  Thank you, Your Honor.

11  BY MS. JONES:

12  Q.   So, Dr. Plunkett, just to situate ourselves up on the

13  screen, do you recognize this as a clinical trial report for

14  a trial done by BI that had the number 1160.166?

15          MR. MOSKOW:  Excuse me, counsel.  Could I talk to

16  you one second?

17          MS. JONES:  Yes, of course.

18      (Ms. Jones and Mr. Moskow conferred off the record,

19  after which the following occurred:)

20          MR. MOSKOW:  Thank you, Your Honor.

21  BY MS. JONES:

22  Q.   And, Dr. Plunkett, just in the interest of fairness, as

23  Mr. Moskow rightly points out, I just want to note that this

24  is Page 1 of 390.  If you, if you need to see the remaining

25  300 or so pages, we're happy to get those for you.  But I'm

Laura Plunkett - Cross (Jones)

1   probably going to ask you a few questions.  If you need

2   more, just let us know.  All right?

3   A.   All right, sure.

4   Q.   And just moving down in that same section at the top of

5   that clinical trial report, the title reads "An exploratory

6   study to investigate the pharmacokinetics and effects of

7   dabigatran etexilate in patients with stable severe renal

8   disease."  Do you see that?

9   A.   Yes.

10  Q.   And then it says "dabirenal."  Do you see that?

11  A.   Yes.

12  Q.   Are you familiar with, having looked at some of the

13  documents, to something that's known as the dabirenal study

14  that the company did?

15  A.   I -- again, I'm not sure I've seen this quite this way.

16  That's my problem.  And I don't think this is an atrial fib

17  study, but maybe I'm wrong.  I would need to see the report

18  to confirm that.

19  Q.   Okay.  If you look further down on that same page, you

20  see the date of the report is September the 19th, 2014.

21  A.   Yes, that's true.

22  Q.   Do you see that?  And then it actually identifies the

23  dates of the trial as starting in January, 2013 and ending

24  in December of 2013.  Do you see that?

25  A.   I do.

Laura Plunkett - Cross (Jones)

1   Q.   Okay.  And then if we go to Page 3 of that same

2   document, there's various information here just regarding

3   some of the details of the study.  You see there's a

4   reference there to the name of the finished product which is

5   Pradaxa up in the upper left-hand corner.  Do you see that?

6   A.   Yes.

7   Q.   And then if you scroll further down, there is a section

8   that refers to the title of the trial.  Do you see that?

9   A.   Yes.

10  Q.   And that's just the title we looked at earlier;

11  correct?

12  A.   Yes.

13  Q.   And then there's a section entitled "Objectives."  Do

14  you see that?

15  A.   Yes.

16  Q.   And it says, "The objective of this trial was to

17  evaluate the pharmacokinetics and pharmacodynamics of

18  dabigatran etexilate in patients with severe chronic kidney

19  disease, CKD, as defined by creatinine clearance between 15

20  and 30 milliliters per minute over the last three months

21  before study participation."  Do you see that?

22  A.   Yes.

23  Q.   And then it goes on to say -- describes the

24  methodology.  Do you see that?

25  A.   I do.

Laura Plunkett - Cross (Jones)                    450

 1   Q.   And then there's a section that refers to the fact that

 2   there were a certain number of subjects.  Do you see that?

 3   A.   Yes.

 4   Q.   And that -- it was a small study; correct?

 5   A.   Yes.

 6   Q.   If you turn to Page 7 of the document, do you see that

 7   there's a reference to conclusions?  Does your document have

 8   a Page 7?  I'm only asking because mine --

 9   A.   Mine has 5 and 6.  Seven is just --

10   Q.   Okay.  If we highlight it on the screen, would that be

11   okay for everyone?

12   A.   That's fine for me.

13   Q.   Okay.  And I apologize for that.

14           THE COURT:  I'll let you highlight it on the

15   screen.  But since this is an admitted document, you need to

16   supply that --

17           MS. JONES:  Yes.

18           THE COURT:  -- as part of the exhibit.

19           MS. JONES:  Absolutely.  We'll do that.  I think

20   it was just a printing issue.

21   BY MS. JONES:

22   Q.   So you see the conclusions there in the clinical study

23   report.  Do you see that, Doctor?

24   A.   Could I have it blown down low first so I can see

25   what's above it just so I can orient?

Laura Plunkett - Cross (Jones)

1  Q.   Oh, sure.

2  A.   Okay.  That's good.  Thank you.

3  Q.   Okay.

4       Thank you, Mr. Reynolds.

5       Do you see there's a conclusion section and it says,

6  "Exposure data," and there's a reference there to AUC.  Do

7  you see that?

8  A.   Yes.

9  Q.   And that's a reference to area under the curve;

10 correct?

11 A.   That's correct.

12 Q.   "Exposure data of this trial showed that 75-milligram

13 dabigatran etexilate twice daily is an appropriate dosing

14 regimen for patients with severe renal impairment as the

15 results compare favorably with the exposure levels seen for

16 150-milligram dabigatran etexilate twice daily in patients

17 with moderate renal impairment."

18      Did I read that correctly?

19 A.   You did.

20 Q.   And then it goes on to say, "The pharmacokinetics of

21 75-milligram dabigatran etexilate twice daily observed in

22 this trial were in good agreement with published

23 pharmacokinetic models and the effect of dabigatran

24 etexilate on coagulation in this study was in line with

25 previous observations."  Did I read that correctly?

Laura Plunkett - Cross (Jones)

1    A.    You did.

2    Q.    And it goes on to say at the bottom of the page, "In

3    addition, twice daily administration of 75-milligram

4    dabigatran etexilate for 7.5 days was safe and well

5    tolerated by the patients with severe chronic kidney disease

6    as defined by a creatine clearance between 15 and

7    30 milliliters per minute over the last three months before

8    study participation in this trial."

9         Did I read that correctly?

10   A.    You read it correctly.

11   Q.    Okay.  Are you aware that Boehringer Ingelheim actually

12   did another also small study looking at the 75-milligram

13   dose of, of Pradaxa after this study?

14   A.    I'm not aware of a study for efficacy and safety

15   long-term in AFib patients, but I believe that there is

16   another shorter term study, yes.

17   Q.    Okay.

18             MS. JONES:  May I approach, Your Honor?

19             THE COURT:  You may.

20   BY MS. JONES:

21   Q.    Dr. Plunkett, you have in front of you what we have

22   marked as Defense Exhibit 9191.  Have you seen that exhibit

23   before?

24   A.    I don't know if I've seen it in this form, so let me

25   look through it.

Laura Plunkett - Cross (Jones)

1   Q.   Okay.

2        (Pause)

3   A.   I don't know that I've seen this form, but I have

4   seen -- some of the information in the back looks familiar.

5   So maybe I've seen it in memos or something else.

6   Q.   Okay.

7        MS. JONES:  Your Honor, we would move for the

8   admission of Exhibit 9191.

9        THE COURT:  Any objection?

10       MR. MOSKOW:  No objection.

11       THE COURT:  It's admitted into evidence and may be

12   published.

13       (Exhibit 9191 admitted into evidence.)

14       MS. JONES:  Okay.  Thank you, Mr. Reynolds.

15  Q.   So, Dr. Plunkett, again just to situate ourselves, do

16  you recognize this as a clinical trial report for a BI trial

17  that was assigned a number 1160.173?

18  A.   Yes, I see that.

19  Q.   Okay.  And you also see the title of the study, "A

20  prospective open label study to evaluate the

21  pharmacokinetics of dabigatran in NVAF patients with

22  severely impaired renal function on dabigatran etexilate

23  75-milligram twice a day therapy."

24       Did I read that correctly?

25  A.   You did, yes.

Laura Plunkett - Cross (Jones)

454

1   Q.   And down at the bottom of the page you can see the date

2   of the report, May the 24th, 2016; correct?

3   A.   Yes.

4   Q.   And it also shows the dates for the trial from July of

5   2013 until October of 2015; correct?

6   A.   Yes.

7   Q.   If we go to Page 2 of the document there is, much like

8   the last report that we looked at, a section entitled

9   "Objectives."  I'll give you a chance to get to that.

10  A.   I'm on 2, yes.

11  Q.   And the objective is described as, "To assess

12  dabigatran exposure at trough and peak in NVAF patients with

13  severe renal impairment (defined as creatine clearance 15 to

14  30 milliliters per minute) receiving dabigatran etexilate

15  75-milligram BID therapy."  Do you see that?

16  A.   Yes.

17  Q.   And so the purpose of this study was to look at Pradaxa

18  exposure in atrial fibrillation patients who also had severe

19  renal impairment and who were receiving the 75-milligram

20  dose of Pradaxa twice a day; correct?

21  A.   Yes.

22  Q.   And then you can see there again the numbers for the

23  study; correct?

24  A.   Number of people?  Yes.

25  Q.   The number of people.  So, again, this was a smaller

Laura Plunkett - Cross (Jones)

1    trial with 60 folks who were actually treated.  Do you see

2    that?

3    A.    Yes.

4    Q.    Okay.  If you turn to Page 9 of this report, do you see

5    the section entitled "Conclusions"?

6    A.    I do.

7    Q.    And it says, "The observed dabigatran plasma

8    concentrations in patients with severe renal impairment

9    following 75-milligram dabigatran etexilate (Pradaxa) twice

10   daily were generally in agreement with those predicted by

11   models developed from data in previous trials, although with

12   a tendency towards under-prediction of median and higher

13   concentrations."

14        Did I read that correctly?

15   A.    You did, yes.

16   Q.    And then it goes on to say, "The safety profile of

17   Pradaxa, 75 milligrams twice daily in non-valvular atrial

18   fibrillation patients with severe renal impairment in this

19   trial was consistent with the patient population and the

20   known safety profile of the drug with no unexpected safety

21   concerns."  Do you see that?

22   A.    I do.

23   Q.    Did I read that correctly?

24   A.    I see it.  And, yes, I agree you read it correctly.

25   Q.    I threw a lot of questions at you at the same time.  I

Laura Plunkett - Cross (Jones)

1  apologize.  And that's just a way of saying in this small

2  trial that the company had done that the safety profile of

3  the medicine didn't show anything different than what the

4  company already understood; correct?  That's what it means

5  by "no unexpected safety concerns."

6  A.   I would assume that's what they're talking about.  If

7  you want me to confirm, I'd have to look in more detail,

8  but --

9  Q.   Let's finish up the discussion of the conclusions.

10  "These findings suggest that Pradaxa 75-milligram twice

11  daily is an appropriate dosing regimen for patients with

12  severe renal impairment."

13       Correct?  Did I read that correctly?

14  A.   You read that correctly.

15  Q.   Okay.  Now, part of the role of the FDA is after a

16  medicine like Pradaxa is approved, the agency continues to

17  have responsibility for oversight of the medicine; correct?

18  A.   Yes.  The company continues to have a responsibility as

19  well as the agency for oversight, yes.

20  Q.   Absolutely.  The company has a responsibility for

21  keeping track of what's going on with the medicine.  The FDA

22  by virtue of its function as a public health agency

23  responsible for prescription medicines in the United States

24  also keeps track of what's going on with the medicine that

25  it approves; correct?

Laura Plunkett - Cross (Jones)

1  A.   Yes.  Not as well as the company, but they do.

2  Q.   Understood.  Okay.  And as far as you know, based on

3  reviewing the documents for this case, is it your

4  understanding that the FDA has continued to evaluate Pradaxa

5  ever since its approval back in 2010 for atrial fibrillation

6  patients?

7  A.   So I'm -- you'll need to be more specific what you mean

8  by continue to evaluate.  Are you asking me about just

9  within the drug safety group or within the entire group?

10 Q.   Well, let's say drug safety as an example.  Do you

11 understand it to be the case that the FDA has continued to

12 evaluate the safety of Pradaxa over the time that the

13 medicine has been on the market?

14 A.   Yes, there has been some evaluation.

15 Q.   Okay.  And as far as you know, there have been points

16 after the approval of Pradaxa back in 2010 where the FDA has

17 actually issued Drug Safety Communications regarding Pradaxa

18 describing its analysis of some of the reports that the

19 agency receives on adverse events with Pradaxa; correct?

20 A.   Yes, that is true.

21         MS. JONES:  May I approach, Your Honor?

22         THE COURT:  Yes, you may.

23 BY MS. JONES:

24 Q.   Dr. Plunkett, I've handed you a copy of what we've

25 marked as Defense Exhibit 5831.  Do you recognize Exhibit

Laura Plunkett - Cross (Jones)

1  5831?

2  A.   Yes.

3  Q.   Okay.

4       MS. JONES:  Your Honor, we would move for the

5  admission of Exhibit 5831.

6       THE COURT:  Any objection?

7       MR. MOSKOW:  No, Your Honor.

8       THE COURT:  It's admitted.

9       (Exhibit 5831 admitted into evidence.)

10      MS. JONES:  If we could put that up on the screen.

11      Thank you, Mr. Reynolds.

12  BY MS. JONES:

13  Q.   Dr. Plunkett, just to situate ourselves in terms of

14  what this document is, do you recognize this as what's known

15  as an FDA Drug Safety Communication?

16  A.   Yes.

17  Q.   And do you recognize it as a Drug Safety Communication

18  from the FDA concerning safety review by the agency of

19  post-market reports of serious bleeding events with the

20  anticoagulant Pradaxa?

21  A.   Yes.

22  Q.   And just so we're clear, Drug Safety Communications are

23  statements written by the FDA that are intended to provide

24  the public with easy access to important drug safety

25  information.  Do you understand that to be the purpose?

Laura Plunkett - Cross (Jones)

1   A.   I believe that's what is stated on their web page, yes.

2   Q.   Okay.  So you have no reason to disagree with that?

3   A.   No, huh-uh.

4   Q.   Okay.  And this particular Drug Safety Communication

5   was actually released about a year -- a little over a year

6   after Pradaxa was approved in the United States for atrial

7   fibrillation; correct?  Do you see there's a date of

8   December 7th, 2011?

9   A.   Yes, that's true.

10  Q.   Okay.  And that reference at the top of that document

11  to safety review of post-market reports, just to give the

12  jury context for this, the FDA as part of its role receives

13  reports from doctors, from patients, from various sources

14  about adverse events that occur with medicines; correct?

15  A.   Yes.  And a lot of it is also information that they

16  require the company to send in too that they look at as

17  well.

18  Q.   Right.  And companies like Boehringer Ingelheim, for

19  example, have a responsibility under the FDA's rules and

20  regulations to actually submit regular reports letting the

21  FDA know about reports that the company has received of

22  safety issues for this medicine; correct?

23  A.   Yes.

24  Q.   Okay.  And so what the FDA is doing here is talking

25  about its analysis of post-market safety reporting that's

Laura Plunkett - Cross (Jones)

1   come in since the medicine was approved in October of 2010;

2   correct?

3   A.   Yes.

4   Q.   And it says in that very first paragraph if we scroll

5   down a little bit, "The U.S. Food and Drug Administration is

6   evaluating post-marketing reports of serious bleeding events

7   in patients taking Pradaxa."  Do you see that?

8   A.   I do.

9   Q.   And it goes on to say, "Pradaxa is a blood-thinning

10  anticoagulant medication used to reduce the risk of stroke

11  in patients with non-valvular atrial fibrillation, the most

12  common type of heart rhythm abnormality."

13       Did I read that correctly?

14  A.   You did.

15  Q.   And, and just to be clear about the types of reports

16  that the FDA is looking at here, these are reports that are

17  coming from what's sometimes referred to as the real world.

18  This is what happened -- this is what's happeing with the

19  medicine after it's approved outside of a clinical trial

20  setting; correct?

21  A.   Many of them, yes.  There are some that are going to be

22  coming from additional clinical studies that were being done

23  too.  But I would agree that there's -- because some of the

24  things that the company submitted, in fact, were from some

25  additional studies.  But, yes, I would agree that it's meant

Laura Plunkett - Cross (Jones)

1  to be an assessment of what happens once you get a wider

2  exposure to the drug and other kinds of people.

3  Q.   And so, for example, with respect to this Drug Safety

4  Communication, it would be reflecting on reports that might

5  have been received from patients who were on the 150 dose of

6  the medicine or patients who were on the 75-milligram dose

7  of the medicine; correct?

8  A.   Yes.

9  Q.   The Drug Safety Communication goes on to say, based on

10 the FDA's review of these post-market reports of serious

11 bleeding events, "At this time FDA continues to believe that

12 Pradaxa provides an important health benefit when used as

13 directed and recommends that healthcare professionals who

14 prescribe Pradaxa follow the recommendations in the approved

15 drug label."

16      Did I read that correctly?

17 A.   You did.

18 Q.   Okay.  And then a little further down it says --

19 there's a reference there to bleeding.  Do you see that

20 paragraph?  We can call it out for you.

21 A.   Yes.

22 Q.   Do you see that?  It says, "Bleeding that may lead to

23 serious or even fatal outcomes is a well-recognized

24 complication of all anticoagulant therapies."

25      That's true; right?

Laura Plunkett - Cross (Jones)

1    A.    Yes.

2    Q.    It goes on to say, "The Pradaxa drug label contains a

3    warning about significant and sometimes fatal bleeds."

4          That's true; right?

5    A.    Yes.

6    Q.    And over in the, in the box there -- do you see there's

7    a box that's called "Facts about Pradaxa"?

8    A.    Yes.

9    Q.    And it says it's a blood thinner; right?

10   A.    Yes.

11   Q.    And it says that it was approved to reduce the risk of

12   stroke in patients with atrial fibrillation; correct?

13   A.    Yes.

14   Q.    It says that it's available in two doses, the

15   75-milligram and the 150-milligram; correct?

16   A.    Yes.

17   Q.    And then it actually provides information of

18   approximately how many prescriptions of Pradaxa had been

19   dispensed by this point in time when the FDA was looking at

20   post-marketing safety reports.  Do you see that?

21   A.    Yes.

22   Q.    A total of approximately 1.1 million Pradaxa

23   prescriptions were dispensed and approximately 371,000

24   patients received Pradaxa prescriptions.

25         Then if you turn to the third page of that Drug Safety

Laura Plunkett - Cross (Jones)

1   Communication, the FDA concludes by saying at the top, "For

2   patients with severe renal impairment, follow the

3   recommended doses."  Do you see that?

4   A.   Yes.

5   Q.   "For patients with creatinine clearance of 15 to 30 the

6   recommended dose is 75 milligrams orally twice daily."

7   Correct?

8   A.   That's what is stated, yes.  You read it --

9   Q.   And -- I didn't mean to interrupt you.  Sorry.

10  A.   That's okay.  If what you're asking is if you read it

11  correctly, yes, you did.

12  Q.   Yes.  And that's the dose that the FDA approved for

13  patients with severe renal impairment; correct?

14  A.   Yes.

15  Q.   And then it goes on to say there are no dosing

16  recommendations for patients whose creatinine clearance is

17  lower than 15; correct?

18  A.   Yes.

19  Q.   Okay.  The last reference there in that little section

20  is to reporting of adverse events.  Do you see that?

21  A.   Yes, yes, I see it.

22  Q.   And that's just a reference to the type of reporting

23  that we were talking about earlier; that the FDA has a

24  mechanism for people to report adverse events to the agency.

25  Correct?

Laura Plunkett - Cross (Jones)

1   A.   Yes.

2   Q.   Dr. Plunkett, are you aware, based on your review of

3   the documents in this case, that after the FDA issued this

4   Drug Safety Communication in 2011 that it then issued a

5   separate Drug Safety Communication in 2012?

6   A.   Yes.

7         MS. JONES:  May I approach, Your Honor?

8         THE COURT:  Yes, you may.

9   BY MS. JONES:

10  Q.   Dr. Plunkett, I've handed you what we have marked as

11  Defense Exhibit 5105.  Do you recognize that document?

12  A.   I do.

13  Q.   Okay.  And do you recognize it as the Drug Safety

14  Communication that was issued by the FDA in November of

15  2012?

16  A.   Yes.

17  Q.   Okay.

18        MS. JONES:  Your Honor, we'd move for the

19  admission of Defense Exhibit 5105.

20        MR. MOSKOW:  No objection.

21        THE COURT:  It's admitted and may be published.

22     (Exhibit 5105 admitted into evidence.)

23        MS. JONES:  Thank you, Your Honor.

24  BY MS. JONES:

25  Q.   And, again, just to get ourselves situated in the

Laura Plunkett - Cross (Jones)

1  document here, do you see up at the top there's a reference

2  to FDA Drug Safety Communication?  Do you see that?

3  A.   I do.

4  Q.   And it's providing an update on the risk for serious

5  bleeding events with the anticoagulant Pradaxa.  Do you see

6  that?

7  A.   I do.

8  Q.   And so this would have been roughly two years after

9  Pradaxa was approved by the FDA for atrial fibrillation

10  patients; correct?

11  A.   Yes.

12  Q.   And, again, this type of Drug Safety Communication is

13  based on the FDA's review of post-marketing reports of

14  bleeding events in what we referred to earlier as the real

15  world, folks who are using the medicine largely outside of

16  the clinical trial setting; correct?

17  A.   Yes.

18  Q.   If we go a little further down, there is a description

19  of what the agency was doing in this safety announcement

20  starting with the date there of November the 2nd, 2012.  Do

21  you see that?

22  A.   I do.

23  Q.   It says, "The U.S. Food and Drug Administration has

24  evaluated new information about the risk of serious bleeding

25  associated with the use of anticoagulants (blood thinners)

466

Laura Plunkett - Cross (Jones)

1  dabigatran (Pradaxa) and warfarin."  And it refers to some

2  other names for warfarin.

3       "Following the approval of Pradaxa FDA received a large

4  number of post-marketing reports of bleeding among Pradaxa

5  users."

6       Do you see that?

7  A.   Yes.

8  Q.   And that the agency, because it saw a large number of

9  post-marketing reports of bleeding among Pradaxa users, it

10 specifically wanted to evaluate whether there was something

11 going on out in the real world that they might not have been

12 fully sensitive to when the medicine was initially approved

13 in 2010; correct?

14 A.   Yes.

15 Q.   And so this Drug Safety Communication actually

16 describes an assessment that the FDA did to look at that

17 specific question; correct?

18 A.   Yes.

19 Q.   And at the end of that paragraph it says, "FDA is

20 continuing to evaluate multiple sources of data in the

21 on-going safety review of this issue."  Do you see that?

22 A.   I do.

23 Q.   Okay.  And then a little further down in that next

24 paragraph it says, "Pradaxa and warfarin are important

25 medications used to reduce the risk of stroke and blood

Laura Plunkett - Cross (Jones)

1  clots in patients with non-valvular atrial fibrillation, the

2  most common heart rhythm abnormality which causes the heart

3  upper chambers or atria to beat rapidly and irregularly."

4      Did I read that correctly?

5  A.   You did.

6  Q.   And it goes on to say, "Although these drugs reduce the

7  number of strokes in patients with non-valvular AF, they can

8  cause bleeding, potentially leading to serious or even fatal

9  outcomes."  Do you see that?

10  A.   Yes.

11  Q.   And that's a true statement as to both Pradaxa and

12  warfarin; correct?

13  A.   Yes.

14  Q.   And then later in time there were additional medicines

15  that were studied and approved as alternatives to warfarin

16  called Xarelto and Eliquis; correct?

17  A.   Yes.

18  Q.   And those medicines carry the same well-recognized risk

19  of bleeding from anticoagulant treatment; correct?

20  A.   Yes.  All in this class would have that risk.

21  Q.   Okay.  And it goes on to say in the next paragraph,

22  "FDA has not changed its recommendations regarding Pradaxa.

23  Pradaxa provides an important health benefit when used as

24  directed."  Correct?

25  A.   I agree that's there, yes.

Laura Plunkett - Cross (Jones)

1  Q.   Okay.  And, again, this would have been the FDA looking

2  at adverse event reports that could have come from patients

3  on the 150 and from patients with severe renal impairment

4  who were on the 75-milligram dose; correct?

5  A.   Yes.

6  Q.   Okay.  And at no point in this communication do they

7  say two years out from approval of the medicine we think

8  there's something going on with patients with severe renal

9  impairment who are on the 75 that gives us concern.

10 Correct?

11 A.   No.  They have some other statements in a document that

12 came out from this, but that's not -- that statement would

13 not be there.

14 Q.   Okay.  If we turn to Page 2 of the document, you can

15 see there's a section called "Additional information for

16 healthcare professionals."  Do you see that?

17 A.   Yes.

18 Q.   And there are several bullets there, some of which

19 include information about the use of the medicine; correct?

20 A.   Yes.

21 Q.   And, for example, the fourth bullet refers to the fact

22 that Pradaxa is eliminated by the kidneys.  Do you see that?

23 A.   I do.

24 Q.   And it says, "Renal function should be assessed prior

25 to treatment with Pradaxa to determine the appropriate

Laura Plunkett - Cross (Jones)

1    dose."  Correct?

2    A.    Yes.

3    Q.    And we, we saw that in the labeling for Pradaxa

4    yesterday, correct, in the physician's label?

5    A.    Yes, we did.

6    Q.    And then there's another statement that renal function

7    should be reassessed during treatment with Pradaxa if

8    clinically indicated.  Do you see that?

9    A.    Yes.

10   Q.    And the dose should be adjusted following the

11   recommendations in the drug label.

12        And then the FDA goes on to say in the sixth bullet

13   that for patients with severe renal impairment it continues

14   to recommend 75 milligrams twice daily for patients with

15   creatinine clearance of 15 to 30 milliliters per minute;

16   correct?

17   A.    Yes, that is there.

18   Q.    That's the, that's the severely renally impaired

19   patient population; correct?

20   A.    Yes.

21             THE COURT:  We'll need to take a break soon.

22             MS. JONES:  I'm finished with that document so

23   this might be an appropriate time.

24             THE COURT:  All right.  We're going to take a

25   ten-minute recess.  You may retire to the jury room.

Laura Plunkett - Cross (Jones)

1      (Recess taken from 10:37 a.m. until 10:46 a.m.)

2              THE COURT:  Ms. Jones, do you have an idea yet how

3      much longer you're going to be with --

4              MS. JONES:  I might run a little past lunch.

5              THE COURT:  Okay.  Well, I don't mind going a

6      little past noon if you're getting close, so between

7      12:00 and 12:15.  Okay?

8              MS. JONES:  Yes, of course.

9              THE COURT:  All right.  Let's bring the jury in.

10         (Jury returned into the courtroom at 10:48 a.m.)

11             THE COURT:  All right.  Be seated.

12         You may resume your examination.

13             MS. JONES:  Thank you, Your Honor.

14     BY MS. JONES:

15     Q.   Dr. Plunkett, when we took our break we were just

16     finishing up our discussion of the two drug safety

17     communications that the FDA had done.

18             THE COURT:  Is your microphone on?

19             MS. JONES:  It's showing green, Your Honor.

20     It's -- my jacket is sliding a little.

21     BY MS. JONES:

22     Q.   Let me start my question again.  When we took our break

23     we were having a discussion about the two drug safety

24     communications that the FDA had issued in 2011 and 2012

25     related to Pradaxa and warfarin and bleeding rates on those

Laura Plunkett - Cross (Jones)

1   medicines; correct?

2   A.    Yes.

3   Q.    And just to close the loop on that discussion, one of

4   the observations that the FDA made was that when it was

5   looking at those two sets of bleeding between patients who

6   were on warfarin and patients who were on Pradaxa, it had

7   reviewed that just doing a simple comparison between the two

8   would not be entirely accurate because warfarin is a

9   well-known medicine and folks are a little more used to it.

10  And with newer medicines you sometimes see higher reports of

11  bleeding.  Correct?

12  A.    I don't think we read that part in here, but I'm aware

13  that there is such discussion --

14  Q.    Okay.

15  A.    -- generally.

16  Q.    Why don't we look at the document very quickly just so

17  we can pin that point down.  On Page 2 of 5105, do you see

18  that?  There's a section entitled "Data Summary."

19  A.    I do.

20  Q.    And the second paragraph of that section reads, "FDA

21  believes that a simple comparison between Pradaxa and

22  warfarin with respect to the numbers of post-marketing

23  reports of bleeding in the AERS database is misleading

24  because bleeding events associated with warfarin (a

25  well-recognized consequence of warfarin use which has been

Laura Plunkett - Cross (Jones)

1  available for many years) are likely underreported compared

2  to events occurring with the more recently available

3  Pradaxa."  Do you see that?

4  A.    I do.

5  Q.    And the FDA said, "FDA continues to evaluate multiple

6  sources of data in the on-going safety review of this

7  issue."  Correct?

8  A.    Yes.

9  Q.    And that review would have included patients who were

10  on the 150-milligram dose of Pradaxa and patients with

11  severe renal impairment who were being prescribed the

12  75-milligram dose of Pradaxa; correct?

13  A.    Yes.  If they reported a bleed, both would be captured.

14  Q.    Okay.  And in this Drug Safety Communication, based on

15  its evaluation of those, those reports between warfarin

16  patients who had bleeds and Pradaxa patients who had bleeds,

17  the FDA said very clearly it had not changed its

18  recommendations regarding Pradaxa; correct?

19  A.    That's true.

20  Q.    Okay.  And in the eight years since Pradaxa was

21  approved, including at a 75-milligram dose for patients with

22  severe renal impairment, the FDA has never changed its view

23  that that dose is the appropriate dose for patients on

24  Pradaxa with severe renal impairment; correct?

25  A.    I can't tell you they haven't changed their view, but I

Laura Plunkett - Cross (Jones)

1  agree there's been no labeling change required by the FDA.

2  Q.   Okay.  Dr. Plunkett, are you aware that in addition to

3  the FDA looking at Pradaxa over the course of the medicine's

4  time on the market that there have also been studies done by

5  scientists out in the world looking at the use of Pradaxa in

6  patients who are prescribed the medicine?

7  A.   Generally, yes, there have been reports in the

8  literature.

9  Q.   Okay.  And are you aware of studies that have

10  specifically looked at populations of patients that included

11  patients on the 75-milligram dose?

12  A.   Yes, there are some that include that.

13  Q.   Okay.  And do you know that there are actually studies

14  that have specifically looked at Pradaxa 75-milligram versus

15  one of the other anticoagulants, Xarelto?

16  A.   So you'll need to show me.  I'm not sure I know which

17  study you're referring to.

18  Q.   Okay.  I'm going to show you a couple of papers.

19       MS. JONES:  May I approach, Your Honor?

20       THE COURT:  Yes, you may.

21  BY MS. JONES:

22  Q.   Dr. Plunkett, I've handed you what we've marked as

23  Defendant's Exhibit 5747.  Do you recognize that exhibit?

24  A.   Yes, I have seen this.

25  Q.   Okay.  And do you recognize it as a paper that reflects

Laura Plunkett - Cross (Jones)

1   the analysis of doctors both who work at the company,

2   Boehringer Ingelheim, but also external scientists looking

3   at the use of Pradaxa after its approval in 2010?

4   A.   Yes, but I thought we were talking about the Xarelto

5   study.

6   Q.   That's our, that's our next exhibit.

7   A.   Oh, okay.  That's fine.  That's great.

8   Q.   Is that how you understand this, this is a paper that

9   reflects analysis of the use of Pradaxa after its approval?

10  A.   Yes, that is true.

11  Q.   Okay.

12        MS. JONES:  Your Honor, we would move to publish

13  Exhibit 5747 for demonstrative purposes.

14        THE COURT:  All right.  You both are using the

15  reference to demonstrative evidence.  Is this a learned

16  treatise?

17        MS. JONES:  It is, Your Honor.

18        THE COURT:  All right.  You may proceed.

19    Let me just explain that to the jury.  There are

20  sometimes documents, reports, publications that are

21  recognized by the parties as being authoritative in the

22  field of whatever it discusses.

23    And in the examination of expert witnesses, parties are

24  allowed to ask experts about specific statements in these

25  learned treatises.  And those statements become evidence

Laura Plunkett - Cross (Jones)

1   that you can use in evaluating the expert's opinions and

2   testimony.

3        But the full report itself is not evidence in the case

4   and will not be admitted as an exhibit.  It won't be subject

5   to the jury being able to look at it and consult it.  So the

6   important facts are what counsel points out in the

7   examination of the expert and the statements in the report.

8        Go ahead.

9            MS. JONES:  Thank you, Your Honor.

10       Is there any objection to us putting that on the

11  screen?

12           MR. MOSKOW:  There's no objection.  We'll take

13  them case by case.

14           MS. JONES:  Okay.

15  BY MS. JONES:

16  Q.   Dr. Plunkett, do you recognize on the screen there

17  Exhibit 5747?

18  A.   Yes, I have seen this before.

19  Q.   Okay.  And that's a paper entitled "A comparison of the

20  safety and effectiveness of dabigatran and warfarin in

21  non-valvular atrial fibrillation patients in a large

22  healthcare system."  Do you see that?

23  A.   Yes.

24  Q.   Okay.  And you see there are a listing of authors that

25  appear immediately below the title of the paper?

Laura Plunkett - Cross (Jones)

1    A.    Yes.

2    Q.    And if you look right under that list of names, some of

3    those individuals are affiliated with external research

4    institutions like the Walter Reed National Military Medical

5    Center for example.  Do you see that?

6    A.    Yes.  Dr. Villines lists that.

7    Q.    And then you can see that one of the authors on the

8    paper is someone who worked at Boehringer Ingelheim, Janet

9    Schnee.  Do you see that?

10   A.    Yes.  And there's one other, Kimberly Siu.

11   Q.    Okay, right.  And then you see that this was a paper

12   that the company participated in providing financial support

13   for.  Do you see that under "Financial Support"?

14   A.    Yes.  It's another down here further.

15   Q.    There's a gray box towards the bottom.

16   A.    Yes, under the -- on the summary down a little further.

17   Q.    On the right-hand side.

18   A.    Yes.

19   Q.    Okay.  And you see this was a paper that was published

20   in 2015?

21   A.    Yes, it was.

22   Q.    And there's a, there's a summary that appears on the

23   first page that actually describes the purpose of the study.

24   Do you see that?

25   A.    Yes.

Laura Plunkett - Cross (Jones)

1  Q.   It says, "This study aimed --" this is about two

2  sentences in from the beginning.

3  A.   Okay.

4  Q.   "This study aimed to compare the safety and

5  effectiveness of dabigatran and warfarin in clinical

6  practice."

7       Did I read that correctly?

8  A.   You did.

9  Q.   And that's just a simple way of saying we were looking

10  at the safety and how well it worked for dabigatran or

11  Pradaxa and warfarin out in the real world in clinical

12  practice; correct?

13  A.   Yes.

14  Q.   Okay.  Then it goes on to say, "We undertook a

15  propensity score matched cohort study with 12,000 or so

16  patients in each group."  Correct?

17  A.   Yes.

18  Q.   So all told about 25,000 patients; correct?

19  A.   I believe that's correct.  If you want the exact --

20  yeah, that's what it says, yes.

21  Q.   Roughly.  And then it goes on to say, "Comparing

22  treatment with dabigatran or warfarin in the U.S. Department

23  of Defense claims database, October, 2009 to July of 2013."

24  Do you see that?

25  A.   Yes.

Laura Plunkett - Cross (Jones)

1    Q.   And so what that refers to is the study is based on

2    data on patient experience that was drawn by a claims

3    database maintained by the Department of Defense; correct?

4    A.   Yes.

5    Q.   And that was like actual patient experience on those

6    medicines; correct?

7    A.   Yes.

8    Q.   Okay.  If we go to Page 6 of Exhibit 5747, do you see

9    that there's a discussion there of how many of the Pradaxa

10   patients were on the 150-milligram dose versus how many were

11   on the 75-milligram dose?  It's in the parentheses.

12        The sentence says, "Within the matched dabigatran group

13   87.6 percent of patients had prescriptions for the

14   150-milligram dose on the index day."

15        And then in the parentheses there it says

16   150-milligram, N equals 11,212.  So that means there were

17   11,000 or so patients on the 150 in the study; correct?

18   A.   Yes.

19   Q.   And then it goes on to say that there were about 1,500

20   patients on the 75-milligram dose who were included in the

21   study; correct?

22   A.   Yes, that's what it stated.

23   Q.   Okay.  Now, it goes on to say right after that sentence

24   we just looked at laying out the numbers of patients on each

25   dose, "The overall size of the 75-milligram subgroup did not

Laura Plunkett - Cross (Jones)

1   meet the pre-specified protocol specified power threshold

2   for a separate subgroup analysis."  Do you see that?

3   A.   Yes.

4   Q.   And what that means -- I'm going to try to put it

5   simply and you can tell me if I've got it right or wrong --

6   is that the number of patients who were on the 75-milligram

7   dose, there weren't enough of them to be able to support

8   from a statistical perspective an analysis for that

9   particular subgroup; correct?

10  A.   Yes, with the issue that the statistics had to be able

11  to show that there was a difference between it -- that dose

12  and 150 as compared to each other on safety and efficacy.

13  Q.   And so what they ended up doing -- and we'll look at

14  some of the data in a separate document -- is they actually

15  combined all the patients who were on Pradaxa.  They

16  combined the 150 and the 75-milligram dose; correct?

17  A.   Yes.

18  Q.   For the patient -- for the Pradaxa side of the

19  analysis; is that right?

20  A.   That's correct.

21  Q.   Okay.  Now, have you been able to look at the

22  supplemental tables that show the outcomes on this study?

23  A.   Yes.  In fact, it helps you understand more details.

24  Q.   Okay.

25          MS. JONES:  May I approach, Your Honor?

Laura Plunkett - Cross (Jones)                    480

1          THE COURT:  You may.

2     BY MS. JONES:

3     Q.    Dr. Plunkett, I've handed you a copy of what we've

4     marked as Defense Exhibit 5991.  Do you see that?

5     A.    Yes.

6     Q.    And do you recognize that as the supplemental material

7     to the Villines study that we were just looking at comparing

8     warfarin and dabigatran in clinical practice?

9     A.    Yes.

10    Q.    And just so it's clear for the jury, sometimes when you

11    have studies that are done, the data might not appear in the

12    primary article sometimes.  The authors will publish it in a

13    separate supplement so you can see all the tables.  Correct?

14    A.    Yes, that's true.

15    Q.    If you turn to Page 14 of Exhibit 5991, I just want to

16    ask you a couple of questions.

17             MR. MOSKOW:  No objection, Your Honor.

18             THE COURT:  All right.  Is this a demonstrative?

19             MS. JONES:  It would be for demonstrative

20    purposes, Your Honor.

21             THE COURT:  All right.

22             MS. JONES:  I was just trying to get her to the

23    page.

24             THE COURT:  Okay.

25             MS. JONES:  And I apologize.  Are we okay to

Laura Plunkett - Cross (Jones)

1  publish that?

2          THE COURT:  Yes.

3          MS. JONES:  Okay.

4  BY MS. JONES:

5  Q.   Dr. Plunkett, do you recognize on Page 14 the

6  information that's reflected showing primary and secondary

7  outcomes for dabigatran or Pradaxa versus warfarin?

8  A.   Yes, I do.

9  Q.   Okay.  You can actually see the title up at the top for

10 the table.  You can see "Supplement Table 5, hazard ratios

11 for primary and secondary outcomes dabigatran versus

12 warfarin with combined 150, 75-milligram population, and

13 150-milligram subgroup."  Do you see that?

14 A.   I do.

15 Q.   And so just, just so we're clear about this, what the

16 authors did because of what we talked about earlier in terms

17 of the size of the 75-milligram group was they did an

18 analysis of Pradaxa 150 versus warfarin and they also did an

19 analysis of Pradaxa 150 and Pradaxa 75 together versus

20 warfarin.  Correct?

21 A.   Yes.

22 Q.   And I just want to look at a couple of the outcomes

23 that are reflected up at the top of this chart if we could

24 just call out the first four lines.

25          And, Doctor, just to situate ourselves in terms of what

Laura Plunkett - Cross (Jones)

482

1  this shows, you see here that there are a listing of

2  outcomes on the left-hand side; correct?

3  A.    Yes.

4  Q.    And one of the outcomes that they looked at were

5  patients who had stroke; correct?

6  A.    Yes.

7  Q.    And then one of the other outcomes were patients who

8  had major bleeding; correct?

9  A.    Yes.

10 Q.    Okay.  And if you look at the numbers that appear here,

11 these reflect what are described as unadjusted HR or hazard

12 ratios; correct?

13 A.    Yes.

14 Q.    And just give us a nutshell definition of what a hazard

15 ratio is.

16 A.    It's a value that quantifies the differences that may

17 exist or not and the risks of the two populations being

18 compared.

19      So a change in the hazard ratio either above one or

20 less than one has an effect on how you interpret the data.

21 If the hazard ratio is exactly one, there would be no

22 difference between those two groups you're comparing on

23 risk.

24 Q.    Okay.  And so for, for the two categories that we have

25 here, we can see what you just described as the hazard ratio

Laura Plunkett - Cross (Jones)

1    for the 150-milligram and 75-milligram Pradaxa population

2    when it was compared to warfarin; correct?

3    A.    Yes.

4    Q.    And if you look at the stroke outcome and the major

5    bleeding outcome, both of those hazard ratios are under one;

6    correct?

7    A.    The average -- yeah, the actual HR value, yes, that's

8    true.

9    Q.    Yes, under one.  And so that means there were fewer of

10   those events on Pradaxa including the 150 and the

11   75-milligram dose than there were on warfarin?

12   A.    There were numerically fewer, yes.

13   Q.    Okay.  And if you look over at just the 150-milligram

14   results, the hazard ratios when you compare just 150 of

15   Pradaxa versus warfarin, the numbers are almost the same;

16   correct?  Those hazard ratios are almost the same; correct?

17   A.    As the ones for the combined, yes.

18   Q.    Yes.

19   A.    Those -- the actual calculated number is very similar.

20   Q.    Okay.  And so the presence of the 75-milligram dose in

21   that first group that we were talking about, that didn't

22   cause any change in the outcome results that were reflected

23   relative to the patients who were evaluated who were just on

24   the 150-milligram dose; correct?

25   A.    Based on just that comparison, those numbers are

Laura Plunkett - Cross (Jones)                    484

1   similar.  I would agree.

2   Q.   Okay.

3        If we could take that down, Mr. Reynolds.

4        Now, Dr. Plunkett, I earlier mentioned -- I had earlier

5   asked you whether you were aware of studies that have looked

6   at the Pradaxa 75-milligram dose versus patients who were

7   taking Xarelto, or lower dose of Xarelto.  Do you remember

8   that question?

9   A.   Yes.

10  Q.   Okay.  And I confess I don't remember whether you said

11  you had seen it or you hadn't seen it.

12  A.   Well, I've seen some studies, but I don't know --

13  there's some observational kind of epidemiological research

14  if that's what you're talking about.  I am aware of some of

15  that.

16  Q.   Okay.

17  A.   I asked you if you'd show me maybe I can confirm.

18  Q.   I will show you, absolutely.

19            MS. JONES:  May I approach, Your Honor?

20            THE COURT:  You may.

21            MR. MOSKOW:  Your Honor, may we have a sidebar,

22  please?

23            THE COURT:  Yes.

24       (Bench conference, reported.)

25            MR. MOSKOW:  I'm not exactly sure where I'm

Laura Plunkett - Cross (Jones)

1    supposed to be.

2         We have concerns about going into comparison to

3    Xarelto.  There's no evidence in the record that they ever

4    considered Xarelto as a potential treatment option.  And the

5    only mention of Xarelto has been raised by counsel during

6    cross-examination.

7         So I think it's inappropriate to now challenge the

8    expert on an area that is not under consideration in this

9    case.

10             MS. JONES:  Two quick responses, Your Honor.

11        The first is there was a very stark claim made

12   yesterday that the 75 has never been studied, that no one's

13   ever looked at it.  We have no data on patients who were on

14   the 75.  This paper demonstrates that in the real world

15   there have been scientists and doctors who have looked at

16   the 75.

17             THE COURT:  For Pradaxa?

18             MS. JONES:  For Pradaxa, yes.  And they've looked

19   at it in connection with comparing it to patients who were

20   on the lower dose of Xarelto.  So that's the first point.

21        The second point is that Dr. Plunkett made a point

22   yesterday of saying, well, at a certain point in time there

23   were other options for patients beyond, beyond Pradaxa.

24        And I think there will be a suggestion for Mrs. Knight

25   in particular that at a certain point in her treatment on

Laura Plunkett - Cross (Jones)                    486

1   Pradaxa that maybe her doctors could have considered

2   something else.

3       And I do think we're going to be left in a situation

4   where discussion of whether she could have been moved to

5   Xarelto or Eliquis will come up in the case.

6           MR. MOSKOW:  Your Honor, the only evidence in this

7   case is that she was on warfarin and her family saw an ad

8   and asked her to be switched to Pradaxa.  There's no

9   consideration --

10          THE COURT:  I'm going to take these things as they

11  arise.  Here the exhibit that you're about to discuss with

12  the witness purports to show a comparison between Pradaxa

13  and Xarelto.

14          MS. JONES:  Uh-huh.

15          THE COURT:  I'll allow it.

16          (Bench conference concluded)

17          MS. JONES:  May I proceed, Your Honor?

18          THE COURT:  You may.

19  BY MS. JONES:

20  Q.   Dr. Plunkett, I think I handed you Exhibit 5526.  Do

21  you have that?

22  A.   I do.

23  Q.   And do you recognize Exhibit 5526?

24  A.   Yes, I've seen this before.

25  Q.   Okay.  And before we put it up on the screen, do you

Laura Plunkett - Cross (Jones)

1  recognize it as an analysis done by, among others, doctors

2  and scientists at the Food and Drug Administration looking

3  specifically at patients who were on the lower dose of

4  Pradaxa versus patients who were on Xarelto?

5  A.   I see 150 milligrams of dabigatran versus 20 milligrams

6  of Xarelto.

7  Q.   Okay.

8  A.   Is that what you're talking about?  That would be the

9  75 specifically.

10 Q.   Well, do you understand that this, this paper actually

11 specifically analyzed outcomes for patients on the lower

12 dose of Pradaxa versus patients on the lower dose of

13 Xarelto?

14 A.   There's some data, but their conclusions are based on

15 the 150 versus Xarelto.

16 Q.   Okay.

17      MS. JONES:  Well, Your Honor, we'd move for the

18 ability to, to display to the jury Exhibit 5526 under the

19 framework we talked about before.

20      THE COURT:  You may proceed.

21      MS. JONES:  Okay.

22 BY MS. JONES:

23 Q.   Okay, Dr. Plunkett, just again to get ourselves

24 situated, up at the top here you see the title of the paper

25 is "Stroke, bleeding, and mortality risks in elderly

Laura Plunkett - Cross (Jones)

1   Medicare beneficiaries treated with dabigatran or

2   Rivaroxaban for non-valvular atrial fibrillation."  Do you

3   see that?

4   A.   I do.

5   Q.   And just to be clear, those references to dabigatran or

6   Rivaroxaban, those are just names for Pradaxa and Xarelto;

7   correct?

8   A.   Yes.

9   Q.   Okay.  And if you look right under the title of the

10  paper, there is a reference there to individuals who, among

11  others, worked at the FDA; correct?

12  A.   Yes.

13  Q.   Including Dr. David Graham who is a senior member of

14  the FDA team; correct?

15  A.   In the drug safety group, yes.

16  Q.   Okay.  And if we look down at the bottom of Page 1 of

17  Exhibit 5526, we can actually see there's a reference to

18  "Author Affiliations" are listed at the end of this article.

19  Do you see that there?

20  A.   Yes.

21  Q.   And if we go to the end of the article on Page 9 of

22  5526 -- are you there, Doctor?

23  A.   Yes, I am.

24  Q.   -- there is a section entitled "Author Affiliations."

25  Do you see that?

Laura Plunkett - Cross (Jones)

1   A.   Yes.

2   Q.   And if you look through the list there, there are folks

3   who are affiliated with the FDA.  For example, the first

4   reference is to the Office of Surveillance and Epidemiology

5   Center for Drug Evaluation and Research.  Do you see that?

6   A.   Yes.

7   Q.   And then it lists the names in parentheses of the names

8   of the folks who worked there; correct?

9   A.   Yes.

10  Q.   And then there are people who work at other

11  institutions.  So, for example, there's a reference to

12  someone who worked at the Department of Economics at

13  Stanford University.  Do you see that at the bottom?

14  A.   Yes.

15  Q.   Okay.  If we go back to the first page of Exhibit 5526,

16  do you see there is a section that's entitled "Objectives"?

17  A.   Yes.

18  Q.   It says, "To compare risks of thromboembolic stroke,

19  intracranial hemorrhage, also known as ICH, major

20  extracranial bleeding including major gastrointestinal

21  bleeding and mortality in patients with non-valvular atrial

22  fibrillation who initiated dabigatran or Rivaroxaban

23  treatment for stroke prevention."  Did I read that

24  correctly?

25  A.   You did.

Laura Plunkett - Cross (Jones)

1    Q.    Okay.  And just to break that down, the authors here

2    were looking to compare patients on Pradaxa versus patients

3    on Xarelto in terms of their risk of stroke, brain bleeds,

4    or what is described here as major extracranial bleeding, so

5    bleeding outside of the brain.  Correct?

6    A.    Yes.

7    Q.    And they're also looking at mortalities; correct?

8    A.    Yes.

9    Q.    If you go to Page 16 of your exhibit, do you see that

10   there's actually a table there that refers to analysis that

11   was done of outcome event counts and adjusted hazard ratios

12   with 95 percent confidence intervals comparing inverse

13   probability of treatment weighted new user cohorts treated

14   with lower renal doses of dabigatran 75-milligram twice

15   daily and Rivaroxaban, 15 milligrams once daily for

16   non-valvular atrial fibrillation.  Did I read that

17   correctly?

18   A.    You did.

19   Q.    It's a mouthful.  Is that saying very generally that

20   they looked at patient outcomes for certain events and they

21   compared specifically patients who were on the lower dose of

22   dabigatran or Pradaxa, 75 milligrams twice daily, and they

23   looked at patients who were on the lower dose of Xarelto?

24   Is that a fair way to describe that?

25   A.    Yes.

Laura Plunkett - Cross (Jones)

1    Q.    Okay.  And if we look at the actual table below,

2    there's a column on the left that lists the specific events

3    that they were considering; right?

4    A.    Yes.

5    Q.    And thromboembolic stroke is the first thing that they

6    identified; correct?

7    A.    They did.

8    Q.    Okay.  And what they said there was -- and then the

9    next thing on the list, I'm sorry, the next thing on the

10   list is intracranial hemorrhage; correct?

11   A.    Yes.

12   Q.    That's another way of referring to brain bleeds;

13   correct?

14   A.    Yes.

15   Q.    And then there's a reference below that to major

16   extracranial bleeding; correct?

17   A.    Yes.

18   Q.    And major extracranial bleeding is major bleeding that

19   occurs outside of the brain; correct?

20   A.    Yes.

21   Q.    And then underneath that they broke out the numbers for

22   major gastrointestinal bleeding; correct?

23   A.    Yes.

24   Q.    And then they broke out the numbers for death.  Do you

25   see that?

492

Laura Plunkett - Cross (Jones)

1    A.    Yes.

2    Q.    Now, when the, when the authors who conducted this

3    study were doing so, they were using data from a Medicare

4    database; correct?

5    A.    Yes.

6    Q.    And so, again, we're talking about patients using

7    Pradaxa, using the 75-milligram dose of Pradaxa in the real

8    world; correct?

9    A.    Yes, that's what is indicated.

10   Q.    Okay.  And what the results of this analysis show if

11   you just look at the numbers on the right-hand side in terms

12   of what you described as the hazard ratios earlier is that

13   the numbers are roughly the same -- they show roughly the

14   same results for dabigatran 75 versus the Xarelto lower

15   dose; correct?

16   A.    Yes.

17   Q.    And if we go back to the first page of this paper, this

18   was a paper published in a journal that's a part -- under

19   the umbrella of the American Medical Association; is that

20   correct?

21   A.    Yes.

22   Q.    If you look down at the bottom of the page there's a

23   copyright for the American Medical Association; correct?

24   A.    Yes.

25   Q.    And this was in 2016?

Laura Plunkett - Cross (Jones)                    493

1  A.   It was published then, yes.

2  Q.   Doctor, I want to show you one other paper and then

3  I'll move to another topic.

4           MS. JONES:  May I approach, Your Honor?

5           THE COURT:  You may.

6  BY MS. JONES:

7  Q.   Dr. Plunkett, I've handed you what we have marked as

8  Exhibit 9327.  Do you recognize Exhibit 9327?

9  A.   Yes, I have seen this before as well.

10 Q.   Okay.  And do you recognize it as a paper that compared

11 stroke and bleeding risks for patients on Pradaxa and

12 Xarelto and patients specifically who were on the lower

13 doses of those medicines?

14 A.   It wasn't just the lower doses, but there is a group of

15 people on lower doses.

16 Q.   Okay.

17 A.   They're looking across the, the data which has much

18 more for the higher dose.  But certainly there are some

19 patients in here in that group, yes.

20          MS. JONES:  Your Honor, we would move for

21 permission to publish that to the jury.

22          MR. MOSKOW:  Based on the same explanation as to

23 how it will be used.

24          THE COURT:  All right.  You may use it in your

25 examination of the witness.

Laura Plunkett - Cross (Jones)

1     MS. JONES:  Thank you, Your Honor.

2  BY MS. JONES:

3  Q.   Dr. Plunkett, you can see up at the top of this journal

4  article there's a description of the title "Comparing stroke

5  and bleeding risk with Rivaroxaban and dabigatran in atrial

6  fibrillation, analysis of the U.S. Medicare Part D data."

7  Did I read that correctly?

8  A.   Yes.

9  Q.   And then it names two articles who were at the

10  University of Pittsburgh.  Do you see that?

11  A.   I think you're right, yes.

12  Q.   If we can scroll down to the bottom, Mr. Reynolds, very

13  quickly.

14     Do you see there are footnotes there that show their

15  affiliation with the University of Pittsburgh?

16  A.   Yes, that's true.

17  Q.   Okay.  And then if we go back up to the left-hand

18  column, there is a description of the objectives for the

19  paper.  Do you see that?

20  A.   Yes, I see it.

21  Q.   It says, "Our objective was to compare effectiveness

22  and safety between Rivaroxaban 20-milligram versus

23  dabigatran 150-milligram and Rivaroxaban 15-milligram versus

24  dabigatran 75-milligram among patients with atrial

25  fibrillation."  Do you see that?

495

Laura Plunkett - Cross (Jones)

1  A.    Yes.

2  Q.    And, again, in short, and I think this is the point

3  that you were making, there's data here comparing the higher

4  doses of Pradaxa and Xarelto; correct?

5  A.    Yes.

6  Q.    And then there's data also captured in this study

7  comparing real world experience of patients who were on the

8  Pradaxa 75-milligram dose versus patients who were on the

9  Xarelto 15-milligram dose; correct?

10  A.    Yes, that's what they're attempting to do.

11  Q.    Okay.  And so in that, in that second group of patients

12  who have the lower doses of those medicines, those are

13  patients who have kidney problems; correct?

14  A.    Well, that's the data.  I can't confirm that they're

15  all getting it for the right reason.  That's a problem with

16  all these papers.  They don't -- when you look at it.  But I

17  would agree that by the label if they were being used that

18  way, that's how it should be.

19  Q.    Okay.  If you look a little further down in that same

20  column, there's a section entitled "Methods."  Do you see

21  that?

22  A.    Yes.

23  Q.    Okay.  And I want to direct your attention to what

24  appears to be the second sentence there.  It refers to the

25  sample size that was used.  Do you see that?

Laura Plunkett - Cross (Jones)                    496

1   A.    Yes, I see that.

2   Q.    It says, "Our sample included 7,322 patients receiving

3   dabigatran 150 milligrams."  That's the higher dose of

4   Pradaxa; correct?

5   A.    Yes.

6   Q.    The study also included 5,799 patients receiving

7   Rivaroxaban 20 milligrams; correct?

8   A.    Yes.

9   Q.    The study also included 1,818 patients who received a

10  lower dose of Pradaxa, the 75-milligram; correct?

11  A.    Yes.

12  Q.    And then they also included patients who had received

13  the lower dose of Xarelto.  That's 2,568 patients.  Correct?

14  A.    That's correct.

15  Q.    And if we go to Page 8 of the study, they actually talk

16  about what they saw when they compared patients on Pradaxa

17  and patients on Xarelto, including specifically patients on

18  the lower doses of those medicines; correct?

19  A.    Yes, they do report separate data.

20  Q.    Okay.  And on the left-hand side of the page there's a

21  column that includes a -- I want to just read the tail end

22  of the sentence here.  It says, "There was no difference in

23  the risk of ischemic stroke and intracranial bleeding

24  between Rivaroxaban 15 milligrams and dabigatran

25  75 milligrams."  Correct?

Laura Plunkett - Cross (Jones)

1    A.    Yes.

2    Q.    All right.  And so what that means is there was no

3    difference in the rates of stroke or brain bleeding between

4    Xarelto, the lower dose, and Pradaxa, the lower dose;

5    correct?

6    A.    That is correct.

7    Q.    Okay.  But it goes on to say that the risk of other

8    thromboembolic events all cause mortality, major bleeding,

9    any bleeding event, and gastrointestinal bleeding was higher

10   with Rivaroxaban 15 milligrams than with Pradaxa

11   75-milligram; correct?

12   A.    That is what is stated, yes.

13   Q.    And so just to make sure we understand what all those

14   references are, a thromboembolic event is a clot that is,

15   that occurs that is not an ischemic stroke basically.

16   A.    Yes.

17   Q.    It's everything else that involves that kind of event.

18   "All cause mortality" refers to patients who died or passed

19   away; correct?

20   A.    Yes.

21   Q.    Major bleeding refers to serious bleeding events;

22   correct?

23   A.    Yes.  And they, they have a specific definition in

24   here, yes.

25   Q.    And then there's a reference to any bleeding event and

Laura Plunkett - Cross (Jones)

1  gastrointestinal bleeding; correct?

2  A.   Yes.

3  Q.   All right.  And on those last set of factors, Pradaxa

4  75-milligram actually appeared to be better than Xarelto

5  15-milligram; correct?

6  A.   As far as the hazard ratios, that's true.

7  Q.   If we go back to the first page, this was another study

8  that was done -- that was published in 2016; correct?

9  A.   Yes.

10  Q.   And this is a study that was published in a journal

11  known as the *American Journal of Cardiovascular Drugs*.  You

12  can see that in the upper left-hand corner; correct?

13  A.   Yes.

14  Q.   And this is another example, like the one that we just

15  looked at, the Graham paper, that reflects a study by

16  scientists into the use of the 75-milligram dose of Pradaxa

17  in the real world; correct?

18  A.   That was the attempt, yes.

19  Q.   Dr. Plunkett, I want to turn to a different topic and

20  it's one that we started talking about a little bit

21  yesterday which is the labeling for Pradaxa.  Okay?

22  A.   Okay.

23  Q.   And I want to start with what I think you spent a fair

24  bit of your time talking about yesterday, which is the

25  Medication Guide for Pradaxa.  Okay?

                    Laura Plunkett - Cross (Jones)                    499

1   A.    Okay.

2              MS. JONES:  May I approach, Your Honor?

3              THE COURT:  You may.

4   BY MS. JONES:

5   Q.    Dr. Plunkett, I've handed you what we've marked as

6   Exhibit 5884.

7              MS. JONES:  And I'm told that that exhibit has

8   already been admitted into evidence.  So may we publish it,

9   Your Honor?

10             THE COURT:  You may.  Do you recall what the

11  number is of the corresponding -- the plaintiffs' exhibit?

12             MS. JONES:  It's 5884.  It came in during our play

13  of Michelle Kliewer's deposition.

14             THE COURT:  All right, very good.

15  BY MS. JONES:

16  Q.    Okay.  Dr. Plunkett, do you recognize on your screen

17  there and in the hard copy version as well a copy of the

18  labeling for the medicine Pradaxa?

19  A.    Yes.

20  Q.    Okay.  And if we just look at the bottom right-hand

21  corner of this section that we have called out here, you see

22  that that's a version of the label dated January of 2012;

23  correct?

24  A.    Yes.

25  Q.    And yesterday during our discussions we talked about

Laura Plunkett - Cross (Jones)

1   the fact that the label includes both a label for doctors at

2   the front; correct?

3   A.   Yes.

4   Q.   And then at the back of the document there is a label

5   that is prepared for patients, correct, on Page 11?

6   A.   That's correct, Yes.

7   Q.   Okay.  And we're going to start with Page 11 in talking

8   a little bit about the Medication Guide for Pradaxa.

9        Is it fair to say that, that the Medication Guide and

10  the labeling for doctors that are made available by the

11  company, those are both important pieces of information

12  about the medicine?

13  A.   Yes.  And one is directed to the patient and one to the

14  physician.

15  Q.   Right.  And both are approved by the Food and Drug

16  Administration; correct?

17  A.   Yes.

18  Q.   Now, yesterday we talked about this first piece of

19  information about the Medication Guide which it tells

20  patients, "You should read this every time you pick it up."

21  Correct?

22  A.   Yes.

23  Q.   And I think you said that was perfectly sensible advice

24  to give patients; correct?

25  A.   Yes.

Laura Plunkett - Cross (Jones)

1   Q.   And then it goes on to say in this version of the

2   Medication Guide, "What is the most important information I

3   should know about Pradaxa?"  Correct?

4   A.   Yes.

5   Q.   And in this version of the Medication Guide that first

6   piece of information, the most important information is that

7   Pradaxa can cause bleeding which can be serious and

8   sometimes lead to death; correct?

9   A.   Yes.

10  Q.   Now, that's a true statement; correct?

11  A.   Yes.

12  Q.   And, and the statement actually goes on to explain why

13  it is that Pradaxa can cause a bleed; correct?

14  A.   Yes.

15  Q.   It says this is because Pradaxa is a blood thinner

16  medicine that lowers the chance of blood clots forming in

17  your body; correct?

18  A.   Yes.

19  Q.   And that's a true statement; correct?

20  A.   Yes.

21  Q.   Okay.  Now, that warning that I just read, that warning

22  would apply to any oral anticoagulant; correct?

23  A.   Yes.

24  Q.   If we switched out the word "Pradaxa" for the word

25  "warfarin," it would still be true; right?

Laura Plunkett - Cross (Jones)

1    A.    Yes, that's correct.

2    Q.    Okay.  And that warning also is a warning that applies

3    to every patient; correct?

4    A.    Yes.

5    Q.    It doesn't carve out certain groups of patients and

6    say, "Well, this is not something you need to worry about."

7    Right?

8    A.    That's correct.

9    Q.    And you agree that that's a strong warning; correct?

10   A.    Yes.

11   Q.    You agree that that's a serious warning; correct?

12   A.    Yes.

13   Q.    Okay.  Now, the Medication Guide actually goes beyond

14   just that general warning about the risk of potentially

15   fatal bleeding.  It talks about specific patient

16   characteristics that might increase a patient's risk of

17   bleeding; correct?

18   A.    It has some of them here, yes.

19   Q.    Okay.  And it says, for example, you may have a higher

20   risk of bleeding if you take Pradaxa.  And then it lists

21   various bullet points; correct?

22   A.    Yes.

23   Q.    The first one is if you're over 75 years old; correct?

24   A.    Yes.

25   Q.    And that's a true statement.  If you are over 75 years

Laura Plunkett - Cross (Jones)

1  of age and you take Pradaxa, your risk of bleeding

2  increases; correct?

3  A.   Yes.

4  Q.   The next bullet point there is if you have kidney

5  problems and you take Pradaxa, that might increase your risk

6  of bleeding; correct?

7  A.   Yes.

8  Q.   The next item is if you have stomach or intestine

9  bleeding that is recent or keeps coming back or you have a

10  stomach ulcer, that could increase your risk of bleeding if

11  you're on Pradaxa; correct?

12  A.   Yes, that's stated.

13  Q.   And then it goes on to say if you take other medicines

14  that increase your risk of bleeding and you're also taking

15  Pradaxa, that could, that could cause you to have a higher

16  risk of bleeding; correct?

17  A.   Yes.

18  Q.   And it then goes on to list some of the medicines that

19  might increase the risk of bleeding in a patient who's on

20  Pradaxa; correct?

21  A.   Yes.

22  Q.   For example, it mentions aspirin or aspirin-containing

23  products; correct?

24  A.   It does.

25  Q.   It also mentions a medicine known as Plavix towards the

Laura Plunkett - Cross (Jones)                    504

1   end of that list.  Do you see that?

2   A.   Yes, it does.

3   Q.   And, and part of the reason that those medicines can

4   increase your risk of bleeding if you're taking Pradaxa is

5   because both of those medicines have their own risk of

6   bleeding; correct?

7   A.   Yes, different mechanization of action but, yes.

8   Q.   And then on this issue of medicines and how they can

9   increase your risk of bleeding, the Medication Guide

10  actually tells patients be sure that you talk to your doctor

11  about what medicines that you're taking; right?

12  A.   Later on I think it does, yes.

13  Q.   If you go past that last bullet, it says, "Tell your

14  doctor if you take any of these medicines.  Ask your doctor

15  or pharmacist if you are not sure if your medicine is one

16  listed above."  Do you see that?

17  A.   Yes.  I'm sorry.  I was thinking there's another

18  statement further on --

19  Q.   There is --

20  A.   But I agree that is there.

21  Q.   I didn't mean to interrupt you.  I apologize.  There is

22  another statement and we're going to look at that one too.

23  But that's there.  And I assume you don't take issue with

24  that advice to patients.  That's a sensible thing to advise

25  patients to do, talk to your doctor if you're on any of

Laura Plunkett - Cross (Jones)

1    these medicines; correct?

2    A.    Yes.   Hopefully you would tell your doctor about all

3    the medicines you're on.

4    Q.    And, in fact, if we look back in the Medication Guide

5    just to go to the point that you were making just a moment

6    ago, on Page 12 of 5884 there's actually a section on what

7    patients should do with respect to the medicines that

8    they're taking towards the bottom of the page.

9          There is in bold print a statement that encourages

10   patients, "Tell your doctor about all the medicines you take

11   including prescription and nonprescription medicines,

12   vitamins, and herbal supplements."

13         Did I read that correctly?

14   A.    You did.

15   Q.    And, again, that's a perfectly reasonable piece of

16   advice to give to a patient in terms of safely using

17   Pradaxa; correct?

18   A.    Yes.

19   Q.    And it goes on to say, "Some of your other medicines

20   may affect the way Pradaxa works.  Certain medicines may

21   increase your risk of bleeding."  Correct?

22   A.    Yes.

23   Q.    And then it refers back to that section we were just

24   looking at entitled, "What is the most important information

25   I should know about Pradaxa?"  Correct?

Laura Plunkett - Cross (Jones)

1  A.    It does refer back, yes.

2  Q.    Going back to Page 11 of the Medication Guide, after

3  telling patients this medicine could cause serious bleeding

4  that could lead to death and after identifying patient

5  characteristics that can increase that risk of bleeding, the

6  Medication Guide goes on to explain in more detail how

7  Pradaxa works and some other things that might happen while

8  you're taking the medicine; correct?

9  A.    Yes.

10 Q.    So, for example, there's a bullet there that says,

11 "Pradaxa can increase your risk of bleeding because it

12 lessens the ability of your blood to clot."  Do you see

13 that?

14 A.    Yes.

15 Q.    And that's a true statement; correct?

16 A.    Yes.  And that's similar to what was above.

17 Q.    Okay.  It says, "While you take Pradaxa you may bruise

18 more easily.  It may take longer for any bleeding to stop."

19 Correct?

20 A.    Yes.

21 Q.    And those are true statements; correct?

22 A.    Yes.

23 Q.    And, again, if we replace the word "Pradaxa" with

24 "warfarin" or with the names of any of the other oral

25 anticoagulants, those would still be true statements;

1    correct?

2    A.    Yes.

3    Q.    And then a little further down the Medication Guide

4    tells patients, "Here are some things you should be looking

5    out for and let your doctor know about while you're on the

6    medicine."  Correct?

7    A.    Yes, the next section, yes.

8    Q.    Yes.  And it starts in bold text, "Call your doctor or

9    get medical help right away if you have any of these signs

10   or symptoms of bleeding."  Do you see that?

11   A.    I do.

12   Q.    And then it specifically describes various signs or

13   symptoms of bleeding including unexpected bleeding or

14   bleeding that lasts a long time.  Do you see that?

15   A.    Yes.

16   Q.    Bleeding that is severe or you cannot control.  Do you

17   see that?

18   A.    Yes.

19   Q.    And then it mentions a couple of things that may or may

20   not mean that you're having a bleed but might suggest

21   there's something going on that your doctor needs to check

22   on like pink or brown urine or red or black stools.

23   Correct?

24   A.    Those are listed, yes.

25   Q.    And those could potentially indicate that there is

Laura Plunkett - Cross (Jones)

1  somekind of internal bleeding event; correct?

2  A.   Yes.

3  Q.   And your doctor needs to check on you; right?

4  A.   Yes.

5  Q.   And then the rest of that list goes through some other

6  things that patients just need to be looking out for while

7  they're taking the medicine; correct?

8  A.   Yes.  Some of these are similar to the kinds of things

9  that you would see if you're bleeding, but, yes.

10  Q.   Okay.  And, again, you don't have a criticism or take

11  issue with this portion of the Medication Guide.  This is

12  reasonable advice to give to patients about how to safely

13  use the medicine.  Correct?

14  A.   I don't know that I would put it quite that way, but I

15  don't disagree that it's good that they understand what

16  symptoms are there if they're bleeding --

17  Q.   Okay.

18  A.   -- that they would need to get attention for.

19  Q.   Okay.  If you turn to Page 12, there's a section

20  entitled, "What is Pradaxa?"  Do you see that?

21  A.   I do.

22  Q.   And that section tells patients Pradaxa is a

23  prescription medicine used to reduce the risk of stroke and

24  blood clots in people who have a medical condition called

25  atrial fibrillation.  Do you see that?

Laura Plunkett - Cross (Jones)

1   A.   Yes.

2   Q.   And that's a true statement; correct?

3   A.   Yes.

4   Q.   "With atrial fibrillation part of the heart does not

5   beat the way it should.  This can lead to blood clots

6   forming and increase your risk of a stroke.  Pradaxa is a

7   blood thinner medicine that lowers the chance of blood clots

8   forming in your body."  Did I read that correctly?

9   A.   You did.

10  Q.   And those are all true statements; correct?

11  A.   Yes.

12  Q.   The Medication Guide goes on to tell patients, "What

13  should I tell my doctor before I take Pradaxa?"  Do you see

14  that section?

15  A.   Yes.

16  Q.   It says, "Before you take Pradaxa tell your doctor if

17  you, for example, have kidney problems."  Do you see that?

18  A.   Yes.

19  Q.   Or if you've ever had bleeding problems; correct?

20  A.   Yes.

21  Q.   And then it lists some other things that patients

22  should just be mindful of when they're talking to their

23  doctors about the possibility of using Pradaxa; correct?

24  A.   Yes, general things, yes.

25  Q.   Then the other thing that the Medication Guide tells

Laura Plunkett - Cross (Jones)

1    patients is, "Tell all your doctors and your dentist that

2    you're taking Pradaxa."  Do you see that?

3    A.    Yes.

4    Q.    And that's because it's important that other doctors

5    who might not be the ones who are prescribing your Pradaxa

6    be aware of it so they know it when they're prescribing

7    medicines or when they're performing procedures on you;

8    correct?

9    A.    Yes.  It's mainly on the issue of -- this is mainly

10   directed to the issue of surgeries and procedures.  That's

11   exactly right.

12   Q.    And that's why they mention dentists for example.  They

13   want to make sure that when people go to the dentist to have

14   somekind of procedure done that the dentist is aware that is

15   a patient who's on a blood thinner that might cause bleeding

16   to be more significant than it might be ordinarily; correct?

17   A.    Yes, that's correct.

18   Q.    And, again, you don't, you don't take issue with that

19   advice when given to patients; correct?

20   A.    No.

21   Q.    And then at the bottom of the page, just to round out

22   our discussion on the medicine issue, the very bottom of the

23   page says, "Know the medicines you take.  Keep a list of

24   them and show it to your doctor and pharmacist when you get

25   a new medicine."  Do you see that?

Laura Plunkett - Cross (Jones)

1  A.    Yes.

2  Q.    And, again, that's reasonable advice to give to

3  patients; correct?

4  A.    Yes.

5  Q.    And then on Page 13, we don't have to go through all of

6  these, but it basically gives patients some guidance on how

7  to take the medicine.  You can take it with or without food.

8  You shouldn't break it out.  You should always swallow it as

9  one capsule, those types of things.  Right?

10 A.    Yes.

11 Q.    And then it talks about possible side effects and

12 refers to things beyond the bleeding that we've already

13 talked about; right?

14 A.    Yes.

15 Q.    Down at the bottom of the page.

16 A.    Yes, I agree.

17 Q.    Okay.  And then on the, on the final page of the

18 Medication Guide at the very top of the page it tells

19 patients, "These are not all of the possible side effects of

20 Pradaxa."  Did I read that correctly?

21 A.    You did.

22 Q.    Okay.  And it says, "For more information, ask your

23 doctor or pharmacist."  Correct?

24 A.    Yes.

25 Q.    And it goes on to say, "Call your doctor for medical

Laura Plunkett - Cross (Jones)                                    512

1   advice about side effects."  And then it gives patients

2   information on how they can report side effects to the FDA.

3   Correct?

4   A.   Yes.

5   Q.   And I think we talked about yesterday the fact that

6   it's, it's reasonable to give that kind of advice to

7   patients because Pradaxa is a prescription medicine that you

8   can only get if a doctor or a healthcare professional with

9   prescribing authority says, "This is the right medicine for

10  you."  Right?

11  A.   Well, I would agree with these statements.  I don't

12  know if they have quite that discussion, but absolutely,

13  yes, I agree it's reasonable to tell a patient to report

14  their side effects, yes.

15  Q.   And not just to report side effects, but to talk about

16  possible side effects of Pradaxa, including side effects

17  that might not be featured in the Medication Guide.  That's

18  what that recommendation is at the top of the page; correct?

19  A.   Yes.  It's recommending about ones that are not listed

20  here.  That's exactly right.

21  Q.   Okay.  If you look further down at the section called

22  general information about Pradaxa you see there's a

23  paragraph that says, "This Medication Guide summarizes the

24  most important information about Pradaxa."  Do you see that?

25  A.   Yes.

Laura Plunkett - Cross (Jones)

1   Q.   And it says, "If you would like more information, talk

2   with your doctor.  You can ask your pharmacist or doctor for

3   more information about Pradaxa that is written for health

4   professionals."  Correct?

5   A.   Yes.

6   Q.   And, again, that language is encouraging patients to

7   talk to their doctors about their use of the medicine;

8   correct?

9   A.   Yes.

10   Q.   And it also references the fact that there is

11   additional information given by the company to doctors and

12   healthcare professionals who prescribe medicine; correct?

13   A.   Yes.

14   Q.   And at the very bottom of the page there -- not the

15   very bottom -- it says, "This Medication Guide has been

16   approved by the U.S. Food and Drug Administration."

17   Correct?

18   A.   It does.

19   Q.   The formatting of the Medication Guide, the font size,

20   that's all regulated by the FDA; correct?

21   A.   Yes, the general outline is, that is true.

22   Q.   Okay.  Now, doctors are separately given even more

23   detailed information about the medicine in something that's

24   sometimes referred to as the package insert or the

25   physician's label; correct?

Laura Plunkett - Cross (Jones)

1  A.   Yes.

2  Q.   Okay.  And that's the ten or so pages that appear at

3  the front of Exhibit 5884; correct?

4  A.   That is correct.

5  Q.   All right.  And, and yesterday when we were talking, we

6  spent some time looking at the first page of this document.

7  But I, I want to spend some time talking about it in more

8  detail today.

9       But let me ask you a question just to start.  Would you

10  agree that unlike the Medication Guide, the label is written

11  for doctors and other healthcare professionals who prescribe

12  Pradaxa?

13  A.   Yes, I agree that's true.

14  Q.   Okay.  Would you agree that it wouldn't be unusual to

15  find more detailed, more technical information and language

16  in the physician's label than what you might find in the

17  Medication Guide?

18  A.   I agree more detailed and technical details.  Yes, I

19  would expect to see that.

20  Q.   Okay.  And would you also agree that there is certain

21  information that might be included in a label for a doctor

22  that wouldn't be appropriate to be included in a Medication

23  Guide that's intended to be written for patients?

24  A.   I would agree it's possible, but I think it would be

25  highly dependent -- my opinion would be highly dependent on

Laura Plunkett - Cross (Jones)

1  what that information was, but certainly it's possible.

2  Q.   Now, I think the jury has now seen various versions of

3  the Pradaxa label at different points in time.  But just to

4  be clear, the FDA had to give approval on the label for

5  Pradaxa during the entire time that the medicine has been on

6  the market; correct?

7  A.   Yes, even though there's at least one case where the

8  approval came after.  But, yes, that's true.  That is

9  required by the process.

10 Q.   Okay.  And it's not uncommon over time -- it's common

11 practice that labels can evolve over the course of a

12 medicine being on the market; correct?

13 A.   Yes.

14 Q.   All right.  Do you know how many updates there have

15 been to the Pradaxa label in the last eight years since the

16 medicine's been on the market?

17 A.   I would say more than a dozen, but I haven't counted

18 them.

19 Q.   Okay, fair enough.  Each one of those labels had to be

20 approved by the FDA; correct?

21 A.   Yes.

22 Q.   Now, you agree that the FDA has among the many

23 professionals who work there medical doctors who are

24 involved in evaluating the drug labeling that companies

25 propose to the agency; correct?

Laura Plunkett - Cross (Jones)

1   A.   In general terms -- if you're asking me generally, that

2   is true.  That occurs.

3   Q.   Just generally.  And just to be very clear, in terms of

4   the work that you're doing in this case, you have been

5   testifying as an expert for plaintiffs' counsel in

6   pharmaceutical product liability cases since 2003; is that

7   right?

8   A.   Yes.  My first case was in 2003.

9   Q.   Okay.  So that's approximately 15 years; is that right?

10  A.   Yes.

11  Q.   Okay.  You've never -- during that 15-year period

12  you've never testified for a manufacturer or a company in a

13  products liability case; right?

14  A.   Not in product liability, that is true.

15  Q.   Okay.  And you have never testified in a product

16  liability case that a manufacturer of a medicine like

17  Boehringer Ingelheim acted reasonably; correct?  You've

18  never testified to that in 15 years?

19  A.   Probably true, but not all my cases have to do with

20  that issue.  But the ones where it has, yes, that would be

21  true.

22  Q.   To the extent that you've been asked to evaluate that

23  issue over the course of 15 years, you've never concluded

24  that a company acted reasonably; correct?

25  A.   Based on the facts I have seen, that is true.

Laura Plunkett - Cross (Jones)

1  Q.   Okay.  And to go back to this issue of, of labeling and

2  warnings, in those 15 years you've never testified at a

3  deposition or in court that the warnings that a company gave

4  were appropriate; right?

5  A.   Again, with the same limitation that's not always what

6  I'm doing.  Sometimes it's limited.  But in the cases where

7  that's an issue, yes, absolutely, that's the things I would

8  be talking about.

9  Q.   Okay.  But -- now, that's been your work as a

10  litigation expert.  But out in the real world you've never

11  been asked by the FDA, the Food & Drug Administration, to

12  give opinions about a label for a medicine, have you?

13  A.   No.  And they typically would not do that.

14  Q.   Okay.  You've never drafted an entire label for a

15  medicine?

16  A.   No, I have not.

17  Q.   Okay.  And even though you're here as a regulatory

18  expert in this case, you didn't look at the full regulatory

19  record for Pradaxa, did you?

20  A.   No, because I didn't believe it was all relevant to the

21  work I was doing.

22  Q.   Okay.  And you didn't review all of the correspondence

23  between Boehringer Ingelheim and the FDA as it relates to

24  Pradaxa, did you?

25  A.   Not for the entire history of the drug, although I did

Laura Plunkett - Cross (Jones)

1   ask for the entire correspondence at certain periods of time

2   based on the work I was doing.

3   Q.   Okay, all right.  Let's talk -- you didn't go through

4   the detail in a physician labeling for Pradaxa, but I want

5   to spend some time talking about that with you in the time

6   we have before lunch and probably carrying over after.

7        We've talked about the first page and I just want to

8   touch on one point there and then we'll get into some more

9   of the details.

10       There is a section on the first page in the highlighted

11  section of the label entitled "Warnings and Precautions."

12  Correct?

13  A.   Yes.

14  Q.   And that first warning is, "Pradaxa can cause serious

15  and sometimes fatal bleeding.  Promptly evaluate signs and

16  symptoms of blood loss."  Correct?

17  A.   Yes.

18  Q.   And, again, just like the Medication Guide, that's a

19  warning that applies to every patient who takes Pradaxa;

20  correct?

21  A.   Yes.

22  Q.   And you would agree, just as you agreed with respect to

23  the Medication Guide, that that warning is a strong warning;

24  correct?

25  A.   Yes.

Laura Plunkett - Cross (Jones)

1    Q.    It's a serious warning; correct?

2    A.    Yes.

3    Q.    And we talked yesterday about these little numbers that

4    are in the parentheses at the end of some of these

5    references.  Those are references to different sections in

6    the label; correct?

7    A.    That's correct.

8    Q.    Okay.  Now, is it true that that warning, Pradaxa can

9    cause serious and sometimes fatal bleeding, that warning has

10   been given to doctors by Boehringer Ingelheim for every day

11   that the medicine has been on the market?

12   A.    Yes.  It was in the launch label doctors are referring

13   to.

14   Q.    Okay.  And that's, that's a true statement; right?

15   A.    Yes, as far as I'm aware, that's true.

16   Q.    Okay.  That same bullet point says, "Promptly evaluate

17   signs and symptoms of blood loss."  Do you see that?

18   A.    I do.

19   Q.    And that's a reasonable piece of advice to give to a

20   doctor; correct?

21   A.    Yes.

22   Q.    Now, because we've been talking about kidney function,

23   I actually want to turn to the section of the labeling --

24   the sections on the labeling for Pradaxa that talk about

25   kidney function issues.  Okay?

Laura Plunkett - Cross (Jones)

1    A.    Okay.

2    Q.    All right.  And before we get into that, there is a

3    section on Page 2 of the label that talks about this dosing

4    regimen for Pradaxa that the FDA approved; correct?

5    A.    Yes.

6    Q.    If you look up in Section 2.1 called "Recommended

7    Dose," it says, "For patients with creatine clearance

8    greater than 30 milliliters per minute the recommended dose

9    of Pradaxa is 150 milligrams taken orally twice daily with

10   or without food."  Correct?

11   A.    Yes, you read that correctly.

12   Q.    And then the next sentence there refers to the patient

13   population we've been discussing so much.  "For patients

14   with severe renal impairment creatinine clearance 15 to

15   30 milliliters per minute the recommended dose of Pradaxa is

16   75 milligrams twice daily."  Correct?

17   A.    Yes, that is stated.

18   Q.    That was the recommended dose that the FDA came up with

19   based on its modeling analysis; correct?

20   A.    Yes.

21   Q.    There's further down the page a section entitled

22   "Dosing Adjustments."  Do you see that?

23   A.    I do.

24   Q.    Okay.  And do you see on the left-hand side there --

25   it's a little hard to see, but there's actually a line on

1  the left-hand side there.  Do you see that?

2  A.   Yes.

3  Q.   And that's, that signals a change that's been made in

4  the contents of a physician labeling; correct?

5  A.   Yes.  That links back to what you can find on the

6  highlights as well.  They tell you recent revisions and you

7  can go there to see that.

8  Q.   Okay.  So that's a way to see how things have changed.

9  And that section is entitled "Dosing Adjustments."  Correct?

10 A.   That's correct.

11 Q.   All right.  And just to talk about what doctors are

12 told about patients and their kidney function, they're first

13 told, "Assess renal function prior to initiation of

14 treatment with Pradaxa."  Correct?

15 A.   Yes.

16 Q.   And that's a reasonable warning; correct?

17 A.   Well, this is not a warning.  This is a, this is a

18 different section.  From a regulatory standpoint, "warning"

19 has a very specific meaning.

20 Q.   Fair enough.  That's a reasonable piece of guidance to

21 give to doctors; correct?

22 A.   Yes, I would agree with that.

23 Q.   And the reason that you want doctors to assess renal

24 function is because they need to do that to determine which

25 of those two doses of Pradaxa a patient should receive;

Laura Plunkett - Cross (Jones)

1    correct?

2    A.    That should be what they're doing, yes, --

3    Q.    Okay.

4    A.    -- if they're doing this.

5    Q.    And then the next piece of guidance given to doctors

6    is, "Periodically assess renal function as clinically

7    indicated, i.e. more frequently in clinical situations that

8    may be associated with a decline in renal function and

9    adjust therapy accordingly."  Did I read that correctly?

10   A.    You did.

11   Q.    Okay.  And when it says periodically assess renal

12   function, that means check kidney function every once in a

13   while as clinically indicated; in other words, as the

14   circumstances of the patient dictate.  Correct?

15   A.    That's how I would define that, yes.

16   Q.    Okay.  That's a fair definition.  And then in the

17   parenthetical it actually says, "I.e.," or that is, "more

18   frequently in clinical situations that may be associated

19   with a decline in renal function and adjust therapy

20   accordingly."  Do you see that?

21   A.    Yes.

22   Q.    And so what the label tells doctors is after you've

23   assessed renal function, you need to continue checking your

24   patient's renal function; correct?

25   A.    As needed.

Laura Plunkett - Cross (Jones)

1   Q.   As needed?

2   A.   Yes.

3   Q.   Right?  And then it goes on to say you should adjust

4   therapy accordingly based on what you find when you check

5   renal function; correct?

6   A.   Yes.

7   Q.   All right.  And then the third piece of -- and do you

8   agree that that's a reasonable piece of guidance to give to

9   doctors?

10  A.   Yes.

11  Q.   Okay.  The third piece of advice that the label gives

12  to doctors in terms of how to treat their patients on

13  Pradaxa is, "Discontinue Pradaxa in patients who develop

14  acute renal failure while on Pradaxa and consider

15  alternative anticoagulant therapy."

16       Did I read that correctly?

17  A.   You did.

18  Q.   And what that means is you might have to stop Pradaxa

19  and put a patient on a different medicine if something

20  happens with the patient's kidney function that makes

21  Pradaxa inappropriate; correct?

22  A.   It doesn't say it quite that way, but certainly that's

23  what it's advising physicians to do.

24  Q.   Is that a fair interpretation of what it says?

25  A.   It could be.

Laura Plunkett - Cross (Jones)

1   Q.   Okay.  And would you agree with me that that is a
2   reasonable -- that language that appears there that we've
3   just talked through, that is a reasonable piece of guidance
4   to give doctors about treating patients who are on Pradaxa?
5   A.   Yes.
6   Q.   Okay.  Do you agree that in the circumstances -- in a
7   circumstance like what's described there, the possible need
8   to adjust the, the dosing of therapy, would you agree that
9   reducing the dose of Pradaxa to 75-milligram in patients
10  with serious kidney problems, that's a possible way to
11  reduce exposure to Pradaxa in those patients?
12  A.   It's possible, but without measuring, you don't know.
13  Q.   Do you agree that reducing the dose of Pradaxa, going
14  to a 75-milligram dose of the medicine in a patient who has
15  severe kidney problems is a way to reduce the risk of bleed
16  in a specific situation?
17  A.   Could you state the first part of your sentence again?
18  Q.   Sure.  Reducing the dose of Pradaxa, that is, going to
19  the 75 in a patient who has severe kidney problems, is a way
20  to reduce the risk of bleed in a specific situation?
21  A.   So that's what I believe we don't have data on.  So I
22  can't really answer that "yes" or "no."
23          MS. JONES:  Your Honor, may I approach?
24          THE COURT:  You may.
25  BY MS. JONES:

Laura Plunkett - Cross (Jones)

1  Q.   Dr. Plunkett, do you recall giving sworn testimony in

2  this matter in March of 2018?

3  A.   Not this case, but a different case, yes, I did.

4  Q.   Do you recall giving testimony --

5  A.   Yes, I did.

6  Q.   -- in a Pradaxa litigation?  And I've handed you -- did

7  I hand you a binder?

8  A.   No, you didn't.

9  Q.   I'm so sorry.  I apologize.

10  A.   That's okay.

11  Q.   Dr. Plunkett, I have handed you a copy of your sworn

12  testimony from March of this year.  And I'm going to ask you

13  to turn to the tab that reads March 1st, 2018, a.m.

14  A.   I'm there, yes.

15  Q.   Okay.  And I'm going to ask you to go to Page 31, lines

16  4 to 8.  Are you there, Doctor?

17  A.   Yes.

18  Q.   Okay.  And do you recall that this was testimony that

19  you gave under oath?

20  A.   Yes, it is.

21  Q.   Okay.  And do you recall being asked at line 4, Page

22  31, "Reducing the dose of Pradaxa, going to the 75 in a

23  patient who has severe kidney problems is a way to reduce

24  the risk of bleed in a specific situation?"

25       Do you see that question?

Laura Plunkett - Cross (Jones)

1   A.   I do.

2   Q.   And do you see your answer where it says, "In this

3   label specific for the issue of kidney function change, yes,

4   that is true."

5        Was that your testimony?

6   A.   It was.

7   Q.   Okay.  Dr. Plunkett, just continuing on this topic of

8   kidney function and exposure, would you agree that the

9   reason that doctors are told to test kidney function in

10  patients on Pradaxa is because Pradaxa is cleared through

11  the kidneys?

12  A.   Yes.

13  Q.   Okay.  And that's sometimes referred to, you might see

14  in the documents, renal clearance?

15  A.   Yes.  In my previous answer I said "yes" but the

16  question you asked, it has to do with the extent of renal

17  clearance.  So you wouldn't necessarily have to do it if it

18  wasn't totally clear, but that's the issue.  It's almost all

19  cleared that way.

20  Q.   Okay.  I understand your point.  Because Pradaxa is a

21  medicine that is significantly cleared through the kidneys,

22  doctors are told that they need to evaluate a patient's

23  kidney function; correct?

24  A.   Yes, that's correct.

25  Q.   And that's because in that circumstance given the

Laura Plunkett - Cross (Jones)

1   extent to which Pradaxa is cleared through the kidneys,

2   there is a relationship between kidney function and

3   exposure; correct?

4   A.   Right.  And it's really the only way it's cleared from

5   the blood is through the kidneys.

6   Q.   Okay.  Do you agree with the statement that renal

7   function is the main determinate of exposure in patients on

8   Pradaxa?

9   A.   The main determinate?

10  Q.   Yes.

11  A.   I have seen that statement by scientists, yes.

12  Q.   Scientists at the FDA; correct?

13  A.   Yes, I have seen that.

14  Q.   Okay.  Do you agree with that statement?

15  A.   I think it's a significant contributor, but there are

16  others that can be just as important.  But certainly if

17  you -- if everything else is equal, in other words, you

18  don't have other drugs on board, things like that, yes, I

19  absolutely think just someone with Pradaxa with or without

20  kidney failure, yes, it's a main determinate.

21  Q.   Okay.  And do you specifically recall that statement

22  appearing in the summary review for Pradaxa that was

23  prepared by Dr. Unger?

24  A.   Yeah.  In fact, we may have read that yesterday.

25  Q.   Yeah.  And, actually, if you still have it, it's

Laura Plunkett - Cross (Jones)

1   Exhibit 5827.  I can put it on the screen if it's going to

2   require you to dig through your pile.

3   A.   No.  It's right here.

4   Q.   Okay.  Please put up 5827.  I believe it's already

5   admitted into evidence.  And we're going to -- let's start

6   with Page 1 just to refresh.

7       So again, Dr. Plunkett, this is a copy of the summary

8   review by the FDA on Pradaxa in 2010 when it was considering

9   the application for the medicine for atrial fibrillation;

10  correct?

11  A.   Yes.

12  Q.   And then if you turn to Page 5 of the FDA summary

13  review, you see that there is -- I'm looking for it on the

14  page here.  Down towards the bottom there's a section --

15      Actually, could we just call out the bottom half,

16  Mr. Reynolds, just to see what it is?

17      So this is a section entitled "Pharmacokinetics."

18  Correct?

19  A.   Correct.

20  Q.   And that's one of the topics you were talking with the

21  jury yesterday; correct?

22  A.   Yes.

23  Q.   And if we go down to the third paragraph it says,

24  "Dabigatran is mainly eliminated in the unchanged form via

25  glomerular filtration, thus renal function is the main

Laura Plunkett - Cross (Jones)

1    determinate of exposure."  Do you see that?

2    A.    Yes.

3    Q.    And it says mainly 80 to 85 percent eliminated through

4    the kidneys; correct?

5    A.    Yes.

6    Q.    And that was the point that you made with Mr. Moskow

7    yesterday; correct?

8    A.    Yes, I believe we did.

9    Q.    And they go on to say, "For that reason, renal function

10   is the main determinate of exposure."  Correct?

11   A.    Yes, and my clarification which is all things being

12   equal.  But I would agree with the statement as they've

13   written it.

14   Q.    Okay.  And you understand that Boehringer --

15         We can take that down.  Thank you, Mr. Reynolds.

16         You understand that Boehringer warns in the labeling

17   for Pradaxa that problems with kidney function, reduced

18   kidney function could lead to increased anticoagulant

19   activity; correct?

20   A.    Yes, that's true.

21   Q.    Okay.

22   A.    If what you mean is by reducing exposure, yes.

23   Q.    Yes.  And by what I mean is if your kidney functions

24   are getting, is getting worse, your exposure might be

25   getting higher; right?

Laura Plunkett - Cross (Jones)

1  A.   Right.  So I would take it as increased anticoagulant

2  activity if your exposure is getting higher.  Maybe I just

3  misheard you.

4  Q.   No, I think we're using different terms for the same

5  concept.  Increased anticoagulant activity, I mean to say

6  you have more of the medicine that you're being exposed to;

7  correct?

8  A.   That's correct.

9  Q.   Okay.

10      MS. JONES:  Your Honor, it's noon.  This is

11  probably a sensible breaking point.

12      THE COURT:  All right.  We'll take our lunch break

13  now.  Can you be back by 1:00?  That's just a little short

14  of an hour.  Is that all right?  I'm going to also advise

15  you today we have to end at 4:00 today.

16      So with that, Dr. Plunkett, you can step down.  Don't

17  discuss your testimony.

18      Ladies and gentlemen, make sure you have your stickers

19  and follow my other instructions on breaks.  We'll see you

20  back here at 1:00.

21      (Jury retired from the courtroom at 12:05 p.m.)

22      (Recess taken at 12:06 p.m.)

23

24

25

531

1              HUNTINGTON, WEST VIRGINIA

2          FRIDAY, OCTOBER 5, 2018, 1:01 P.M.

3                  ---o0o---

4        (Jury not present.)

5            THE COURT:  All right.  Before we proceed, I would

6    like to request of counsel that whenever you use a learned

7    treatise, like the ones that you used today -- are you

8    tendering those to the clerk?

9            MR. MOSKOW:  I don't think it was our --

10           THE COURT:  You don't need to.  Okay.

11           THE CLERK:  Well, they are on the exhibit lists.

12           THE COURT:  Terry says some of them are listed on the

13   exhibit lists, so --

14           MS. JONES:  Well, we have marked them for

15   identification purposes so that we can just keep track of what

16   we used in that regard, but I don't think there was ever any

17   intention they would be going back to the jury.

18           THE COURT:  Okay.  And our concern is to make sure

19   that we don't get confused.  So I guess if you're not

20   physically tendering it to the clerk, we don't need to worry

21   about it.

22           MR. MOSKOW:  Your Honor, maybe I could suggest

23   something that might be helpful to the clerk as well, which is

24   that the parties have used specific codes to identify

25   literature.  So, for example, for the plaintiffs, anything

Laura Plunkett - Cross (Jones)                    532

1   that begins from 3000 forward is a learned treatise and would

2   not be a full exhibit, and I believe theirs is 5000.

3          MS. JONES:  I think that's right.

4          THE COURT:  Okay.  Well, that may be helpful, but --

5          THE CLERK:  But all of your exhibits are 5000 and

6   above.

7          MR. MOSKOW:  So if it starts with 3000, if it is in

8   between 3000 and 3999, it's a plaintiffs' learned treatise.

9   If it is between 5000 and 5999, it's a defendant's learned

10  treatise.

11         THE COURT:  Okay.  Well, I'm fine as long as you're

12  not confusing it with actual exhibits so we don't have to

13  worry about keeping track physically up here.

14         Let's bring the jury back.

15     (Jury present.)

16         THE COURT:  All right.  We're ready to resume.

17   LAURA PLUNKET, Ph.D., PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

18         MS. JONES:  Good afternoon, Dr. Plunkett.  And good

19  afternoon, members of the jury.

20                 CROSS-EXAMINATION (Continued)

21  BY MS. JONES:

22  Q.  Dr. Plunkett, I wanted to turn back to Exhibit 5884, which

23  is that version of the Pradaxa label from January 2012, if we

24  could.

25      And I wanted to just have us wrap up our discussion of the

Laura Plunkett - Cross (Jones)                    533

1    subject of renal function, and what the label says about renal

2    function and its relationship to anticoagulant activity and

3    exposure in Pradaxa.

4        Okay?

5    A.  Okay.

6    Q.  That long introduction.

7        You understand -- actually, let me ask you to just turn to

8    page 2 of Exhibit 5884 in the label.

9        Do you see down at the bottom of the page, there is a

10   section that is entitled Warnings and Precautions?

11   A.  Yes.

12   Q.  Okay.  And the Warnings and Precautions section includes

13   the key safety information about the medicine, correct?

14   A.  Yes.

15   Q.  All right.  And the first section of Warnings and

16   Precautions reads:  Risk of bleeding.  Pradaxa increases the

17   risk of bleeding and can cause significant and sometimes fatal

18   bleeding, correct?

19   A.  Yes.

20   Q.  And that's that same warning we saw in the highlight

21   section, correct?

22   A.  Yes.

23   Q.  What I wanted to ask you about is actually on the next

24   page, page 3 in that first warning section in the label for

25   Pradaxa.

1    There is a section of the very top that reads:  Risk

2    factors for bleeding include the use of other drugs that

3    increase the risk of bleeding, for example, antiplatelet

4    agents, heparin, fibrinolytic therapy and chronic use of

5    NSAIDs.

6        Did I read that correctly?

7    A.  Yes.

8    Q.  And that's just a reference to the idea that we were

9    talking about earlier with the Med Guide, that if you are on

10   Pradaxa and take certain medicines that increase the risk of

11   bleeding, your risk of bleeding can go up even further,

12   correct?

13   A.  Yes.

14   Q.  All right.  And then the next point related to kidney

15   function is in the further sentence that appears there.

16       Pradaxa's anticoagulant activity and half-life are

17   increased in patients with renal impairment, correct?

18   A.  Yes.

19   Q.  And I think that's what we were talking about right before

20   the lunch break, this idea that if patients have kidney

21   problems, the anticoagulant activity of Pradaxa is higher,

22   correct?

23   A.  Yes.

24   Q.  And on the other side of the coin, the half-life is

25   increased.  In other words, it takes longer for the body to

Laura Plunkett - Cross (Jones)                    535

1    get rid of the medicine, correct?

2    A.  Yes.

3    Q.  And the label for Pradaxa specifically tells doctors about

4    that, correct?

5    A.  It is in this sentence, yes.

6    Q.  Okay.  And then the one other thing I wanted to hit on

7    while we're in this section is actually in the next paragraph,

8    so we don't have to flip back and forth too much.

9         Do you see the first sentence of the next paragraph in

10   that warning?

11   A.  Yes.

12   Q.  What does it say?

13   A.  A specific reversal agent for dabigatran is not available.

14   Q.  So that warning about the absence of a reversal agent for

15   Pradaxa is in the physician labeling for the medicine,

16   correct?

17   A.  Yes, but not in the Medication Guide.

18   Q.  Okay.  If we look further down to Section 5.3, there is an

19   additional discussion of this idea of Pradaxa exposure.

20        Do you see that?

21   A.  Yes.

22   Q.  And it says in the second paragraph of that section:  P-gp

23   inhibition and impaired renal function are the major

24   independent factors that relate in increased exposure to

25   dabigatran.

Laura Plunkett - Cross (Jones)                    536

1    Did I read that correctly?

2    A.  You did.

3    Q.  So what that means is, taking medicines that are P-gp

4    inhibitors can increase your exposure to Pradaxa potentially,

5    correct?

6    A.  Yes.

7    Q.  And, also, impaired renal function can increase your

8    exposure to Pradaxa, correct?

9    A.  Yes.

10   Q.  That's in the labeling for the product, correct?

11   A.  In the physician labeling here, yes.

12   Q.  Okay.  And then the next sentence says:  Concomitant use

13   of P-gp inhibitors in patients with renal impairment is

14   expected to produce increased exposure of dabigatran compared

15   to that seen with either factor alone.

16   Did I read that correctly?

17   A.  You did.

18   Q.  And that tells doctors that if you have a patient on

19   Pradaxa, who is also on a P-gp inhibitor and also has kidney

20   problems, you can expect that patient's exposure to the

21   medicine to increase even higher than it would if the patient

22   just had one of those two conditions, right?

23   A.  Yes.  The physicians are being told this, yes.

24   Q.  Okay.  And then I just want to touch briefly again while

25   we're in this section on the last paragraph of that second

1    warnings section in the Pradaxa label.

2         It says:  Consider reducing the dose of Pradaxa to 75

3    milligrams twice daily when patients are on certain medicines

4    and on Pradaxa, and they have moderate renal impairment.

5         You see that?

6    A.   Yes.

7    Q.   And then the last sentence says:  Avoid use of Pradaxa and

8    P-gp inhibitors in patients with severe renal impairment.

9         And that's the group of patients we've been talking about

10   for now not quite a day, correct?

11   A.   Well, we've been putting those -- I was talking about

12   putting those two things together, yes.

13   Q.   Okay.  And so the physician labeling for Pradaxa tells

14   doctors you might want to avoid using Pradaxa in patients who

15   are on -- who are on a P-gp inhibitor and also have severe

16   renal impairment, correct?

17   A.   Yes, the physician labeling states that.

18   Q.   And just to go back to this idea of anticoagulant

19   activity.  It's just basic pharmacology that the more of an

20   anticoagulant that you have, the higher the risk of bleeding

21   you have, correct?

22   A.   I would argue that in this case it's not so much the

23   increase in dose, but certainly with the issue of increase of

24   exposure internally, yes, that's true.

25   Q.   Okay.  And I think, again, we're using slightly different

Laura Plunkett - Cross (Jones)                    538

1    words to say basically the same thing.

2         This idea of exposure, not so much the number that is

3    attached to the dose, correct?

4    A.  That's correct.

5    Q.  Okay.  And you understand that Boehringer Ingelheim warns

6    doctors that problems with kidney function could lead to

7    increased exposure, correct?

8    A.  In the physician labeling?

9    Q.  Yes.

10   A.  There is some discussion, yes.

11   Q.  Okay.  And increased exposure is just increased blood

12   levels of the medicine, correct?

13   A.  That's what I mean when I say it, yes.

14   Q.  Okay.  Understood.

15        I'm going to ask you to turn to page 6 of that same label,

16   and there is a section entitled Pharmacokinetics.

17        Do you see that?

18   A.  Yes.

19   Q.  Okay.  And about midway down the page, there is a section

20   that specifically refers to renal impairment.

21        Do you see that?

22   A.  I do.

23   Q.  And those couple of -- those three sentences talk about,

24   in the first sentence, that Phase 1 study that you were

25   discussing yesterday, correct, that open parallel-group single

Laura Plunkett - Cross (Jones)                    539

1   center study?

2   A.  Yes.

3   Q.  And then the second sentence says to doctors who are

4   prescribing Pradaxa:  Exposure to dabigatran increases with

5   severity of renal function impairment, correct?

6   A.  Yes.

7   Q.  That means if you have problems with your kidneys, your

8   exposure to the medicine will increase, correct?

9   A.  Yes.

10  Q.  Now, after that reference, there is a parenthetical to

11  Table 3 in the label.  Do you see that?

12  A.  I do.

13  Q.  And there's actually a table that appears immediately

14  below that section on that heading for renal impairment.

15  A.  Yes.  Table 3, yes, I see it.

16          MS. JONES:  Okay.  I was just waiting on

17  Mr. Reynolds --

18          THE WITNESS:  Sorry.

19          MS. JONES:  -- before I started talking about it.

20          Thank you, Mr. Reynolds.

21  Q.  So Table 3 looks at -- let me describe it generally, and

22  you can tell me if you think there are any tweaks you need to

23  make to the description.

24      It generally describes exposure to Pradaxa for patients

25  who have different degrees of renal impairment, correct?  Or

1    renal function is probably a more precise way to say it

2    because normal patients are there, too.

3    A.  That is correct.

4    Q.  Okay.  And so they have at the top of the -- actually, if

5    we look at the left-hand column, you see the heading for renal

6    function, right?

7    A.  Yes.

8    Q.  And then you see there is a category for normal renal

9    function, right?

10   A.  Yes.

11   Q.  There's a category for mild renal -- mild renal

12   impairment, correct?

13   A.  That's correct.

14   Q.  There is a category for moderate renal impairment,

15   correct?

16   A.  Yes.

17   Q.  And then there is a category for severe renal impairment,

18   correct?

19   A.  Yes.

20   Q.  And that's the patient population that we've been talking

21   about that is prescribed -- that is recommended the

22   75-milligram dose of Pradaxa in the labeling, correct?

23   A.  Yes.

24   Q.  All right.  And next to the word severe, there is a little

25   symbol of some kind.  Do you see that?

1    A.  Yes.

2    Q.  And then there's a reference immediately under that table

3    that tracks with that symbol.  Do you see that?

4    A.  I do.

5    Q.  It says:  Patients with severe renal impairment were not

6    studied in RE-LY.

7         Did I read that correctly?

8    A.  You did.

9    Q.  That information is included in the doctor labeling for

10   Pradaxa, correct?

11   A.  In this section it is, yes.

12   Q.  Okay.  And it goes on to say:  Dosing recommendations in

13   subjects with severe renal impairment are based on

14   pharmacokinetic modeling, correct?

15   A.  It is stated, yes.

16   Q.  And that first sentence is true, correct?

17   A.  That is true.

18   Q.  And the second sentence is also true, correct?

19   A.  Yes, it is.

20   Q.  All right.  And if we look back up at that Table 3, the

21   heading indicates that this table shows us the impact of

22   problems with your kidneys on what is described here as

23   dabigatran pharmacokinetics, correct?

24   A.  Well, it -- yes.  This is based on that Phase 1 data.

25   Q.  Okay.  And if you look down at the line for severe renally

Laura Plunkett - Cross (Jones)                    542

1    impaired patients, you see that it reflects an increase of six

2    times in the exposure or what's referred to there as the area

3    under the curve, correct?

4    A.  That's correct.

5    Q.  And it also describes an increase in the half-life, the

6    last column on the right, right?

7    A.  Yes.

8    Q.  And so what that tells doctors is, if your patient has

9    severe renal impairment, that patient's exposure could be

10   increased by six times.

11        That's reflected here, correct?

12   A.  Yes.  The AUC level, yes.

13   Q.  It also tells doctors that it might take longer for the

14   medicine to leave the patient's body, correct?

15   A.  Yes.

16   Q.  Okay.  The other topic that you discussed a little with

17   Mr. Moskow yesterday was the issue of gastrointestinal

18   bleeding.

19        Do you remember that?

20   A.  Yes, we talked about that.

21        MS. JONES:  Can you take down that document,

22   Mr. Reynolds?

23        I'm going to ask you to go to page 3 of the Pradaxa

24   label that we've been looking at.

25   Q.  And you understand that in this label there is specific

Laura Plunkett - Cross (Jones)                    543

1    information provided to doctors about various types of

2    bleeding events and how those bleeding events appeared in the

3    RE-LY trial, in terms of how RE-LY -- how Pradaxa did versus

4    warfarin.

5        Is that a fair description?

6    A.  Yes, that's correct.

7    Q.  Okay.  And if we look at the heading of this section, you

8    see that it's Section 6, Adverse Reactions.

9        Do you see that?

10   A.  Yes.

11   Q.  And then the balance of that page, the rest of that page

12   really describes the experience with the medicine in the RE-LY

13   study, correct?

14   A.  That's correct.

15   Q.  And then if you turn the page to page 4, you see that

16   there is a reference there to the higher rate of

17   gastrointestinal bleeding on Pradaxa versus patients on

18   warfarin, correct?

19   A.  Yes.

20   Q.  And that second paragraph at the top of the page, it

21   reads:  There was a higher rate of major gastrointestinal

22   bleeds in patients receiving Pradaxa 150 than in patients

23   receiving warfarin.  And then there's -- the statistics on

24   that are included in the parentheses.

25       And then it goes on to say that there was also a higher

1    rate of any gastrointestinal bleeds, correct?

2    A.  Yes.

3    Q.  That information, some of which I think you talked about

4    with Mr. Moskow yesterday, that 50-percent increased risk in

5    GI bleeding, that is included in the physician labeling for

6    Pradaxa, correct?

7    A.  The issue of the 50-percent increase is here, yes.

8    Q.  And that is a true statement, correct?

9    A.  Yes.  Based on the RE-LY data that I have seen, it is.

10   Q.  Now, Dr. Plunkett, the label also includes information, as

11   we've seen, about a class of medications known as P-gp

12   inhibitors, correct?

13   A.  Yes, another section in the label.

14   Q.  Okay.  One of the P-gp inhibitors that you described for

15   the jury yesterday was something called Coreg or carvedilol,

16   correct?

17   A.  Yes.

18   Q.  And as we saw earlier in the warnings -- we don't have to

19   go back to them, but the warning section for Pradaxa

20   specifically advises doctors that patients' exposure to

21   Pradaxa might increase if they are also on a P-gp inhibitor,

22   correct?

23   A.  Yes.  They're given, doctors are given that general

24   information.

25   Q.  And the labeling also warns, as we've already discussed,

1  or recommends that doctors might want to consider not

2  prescribing Pradaxa to patients who have severe renal

3  impairment and are also on a P-gp inhibitor, correct?

4  A.  Yes.  As a general statement, yes.

5  Q.  And that statement in the labeling concerning P-gp

6  inhibitors being a factor in increasing exposure to Pradaxa,

7  that's a true statement, correct?

8  A.  Yes.

9  Q.  Now P-gp inhibitors, that's a class of medicines, correct?

10 A.  It's a class descriptor, but it's not like when -- when

11 you use the word class, as a pharmacologist, I think about

12 drugs that are all within the same mechanism or use.  So P-gp

13 inhibitors include many different classes of drugs.  But if

14 you want to describe and talk about that characteristic, many

15 classes of drugs have within them members that are P-gp

16 inhibitors.

17 Q.  And that's a helpful clarification.

18     So it's actually broader than a class of medicines that

19 might be targeted towards treating a specific condition.  P-gp

20 inhibitors, as an umbrella term, can include lots of different

21 groupings of types of medicines, correct?

22 A.  Right.  So it's important to know which type would go with

23 the types of co-medication you might be using for the drug

24 where you put it in the label.

25 Q.  Okay.  And so when you consider all those different

Laura Plunkett - Cross (Jones)                                    546

1   categories of types of medicines that fall under the P-gp

2   inhibitor umbrella, there could be hundreds of those

3   medicines, correct?

4   A.   Not that are strong inhibitors --

5   Q.   Okay.

6   A.   -- which is the concern here.

7        But certainly, yes, there are -- I don't know that there's

8   hundreds, but there are certainly dozens that --

9   Q.   Dozens.

10  A.   -- have some type of activity.

11  Q.   Okay.  And would you agree with the idea that not every

12  P-gp inhibitor medicine affects Pradaxa exposure in the same

13  way?

14       Let me ask a better question.

15       Would you agree that not every P-gp inhibitor medicine

16  increases exposure to Pradaxa at the same level or to the same

17  degree?

18  A.   Can't answer that yes or no because it depends on some

19  other qualifiers you'd have to put in that question.

20  Q.   Okay.

21  A.   For some -- for some of the drugs, I would be okay with

22  that statement.  For others, I think it depends -- there's

23  dependence on how often it's given, ah, as compared to the

24  timing of Pradaxa.  There is a number of things that go into

25  that.

1    Q.  Understood.

2        So just to clarify on this point, if you turn to page 6 of

3    Exhibit 5884 -- this is also in the pharmacokinetic section --

4    do you see at the bottom of the page there's a reference to

5    drug interactions?

6    A.  Yes.

7    Q.  And do you see that P-gp inhibitors actually have their

8    own -- their own section in that drug interaction section?

9        You see that?

10   A.  I do here.  In this label, they do.

11   Q.  And they identify different P-gp inhibitor medicines in

12   that section, correct?

13   A.  Yes.

14   Q.  And so, for example, if you look at the first medicine

15   identified, dronedarone --

16   A.  Well, there's -- the first sentence above has others.  But

17   I would agree the one set off by itself --

18   Q.  Oh, thank you.  Yes.  I apologize, the italicized

19   reference there.

20       It says:  Exposure to dabigatran is 73- to 99-percent

21   higher when it is administered with dronedarone than when it

22   is administered alone.

23       Have I read that correctly?

24   A.  You did.

25   Q.  And then if you go to the next medicine, ketoconazole, the

1  systemic ketoconazole increased dabigatran area under the

2  curve and Cmax values by 138 percent and 135 percent

3  respectively, correct?

4  A.  Yes.

5  Q.  So you can see different data if you're trying to assess

6  to what extent exposure might be increased by a P-gp

7  inhibitor, correct?

8  A.  I wouldn't say it quite that way.

9     I would say that it -- certainly if you don't monitor the

10  same end points, you can get different numbers.  That's part

11  of what they're reporting here.

12     It's not clear that in dronedarone they are talking about

13  AUC and Cmax separately.  But I would agree if you're going to

14  talk about them and compare them, it's always helpful to have

15  the same end point you are looking at.  But absolutely each

16  drug could have some difference in the absolute number that

17  you would calculate.

18  Q.  Okay.  And that was my question.  I appreciate that.

19     And then if you turn to page 7 of Exhibit 5884 under that

20  heading of P-gp inhibitors, there is a reference to

21  clarithromycin.  Do you see that?

22  A.  Yes.

23  Q.  And it says:  Coadministered clarithromycin had no impact

24  on the exposure to dabigatran, correct?

25  A.  Yes, that's what it stated.

Laura Plunkett - Cross (Jones)                           549

1   Q.  Okay.  Now, you discussed with the jury yesterday an

2   article by the lead author named Wessler; is that right?

3   A.  Yes, the P-gp paper.

4   Q.  Yes.  And I think it's in your binder at 3295 if you

5   wouldn't mind getting to that one for me.

6   A.  I'm there.

7   Q.  Okay.  I'm going to get to mine as well.

8        MS. JONES:  I believe this has been admitted, so --

9   thank you, Mr. Reynolds.

10  Q.  Again, Dr. Plunkett, this is a paper that was published on

11  the P glycoprotein transport system and cardiovascular drugs,

12  correct?

13  A.  Yes.

14  Q.  And in general, just generally speaking, what it does is

15  it talks about the interactions between P-gp inhibitors,

16  certain P-gp inhibitors and certain types of cardiovascular

17  medicines, correct?

18  A.  Yes.

19  Q.  Okay.  So the section of the article that you showed

20  yesterday is on page 5.

21  A.  Yes.  Well, we actually went to page 4 on the table, but

22  then also to page 5.

23  Q.  Okay.  Let's start with page 5 if we could, please.

24  A.  Sure.

25  Q.  Okay.  And at the bottom of the page, you were talking

Laura Plunkett - Cross (Jones)                    550

1  with Mr. Moskow about this sentence that begins on page 5 and

2  carries over to page 6:  Carvedilol inhibits P-gp activity to

3  a similar degree as verapamil.

4      Do you see that?

5  A.  Yes.

6  Q.  And you were talking about that in the context of whether

7  or not Coreg might increase exposure levels for patients who

8  were on Pradaxa because Pradaxa had an interaction with

9  verapamil, correct?

10  A.  Yes.

11  Q.  All right.  But this -- this section of this paper is not

12  actually talking about Pradaxa, correct?

13  A.  This -- this paragraph?

14  Q.  Yes.

15  A.  No.  It's talking about the beta blockers.

16  Q.  Okay.

17      MS. JONES:  So if we could call out that section on

18  page 5, Mr. Reynolds, that includes that portion of the

19  sentence.  And if we could grab the last part, that is great.

20  Q.  So this discussion that you showed to the jury yesterday,

21  this is not talking about carvedilol inhibiting P-gp activity

22  to a similar degree as verapamil in Pradaxa patients, correct?

23  That's not what that says.

24  A.  No.  It's talking about carvedilol as its ability to

25  inhibit P-gp like other beta blockers.  And then the table on

Laura Plunkett - Cross (Jones)                551

1    the other page is where you get the comparison to verapamil.

2    Q.  Well, if you read actually this whole sentence, it says:

3    Carvedilol or Coreg inhibits P-gp activity to a similar degree

4    as verapamil increasing serum digoxin levels up to 32 percent.

5        Do you see that?

6    A.  Yes.

7    Q.  So that's not -- that's not a discussion of how Coreg

8    interacts with Pradaxa, correct?

9    A.  Certainly they have not measured -- this sentence, this

10   sentence or this paragraph doesn't have a study that it's

11   pointing to with carvedilol and Pradaxa in the same sentence.

12   Is that what you're asking me?

13       I would agree they're not reporting data on that specific

14   interaction in this paragraph.

15   Q.  And that is what I'm asking.

16       And I just wanted to clarify you weren't suggesting that

17   that sentence would also apply equally to Pradaxa.  You've not

18   seen data to support that point with respect to Pradaxa, have

19   you?

20   A.  I disagree.  With -- this information with the table on

21   the page before, I am suggesting that carvedilol should pose

22   the same, ah, potential interaction as verapamil does to

23   Pradaxa.  Unfortunately, the company has not studied those

24   two, and that's why it's not in the label.

25   Q.  Well, have you actually looked at the section in this

Laura Plunkett - Cross (Jones)                    552

1   paper about Pradaxa?

2   A.  Yes.  It's in --

3   Q.  It starts on page 4.

4   A.  Yes, dabigatran.  I think we also, I think, looked at

5   this.

6   Q.  Yeah, this was right under the table I think that you

7   talked about with Mr. Moskow.

8   A.  Yes.

9        MS. JONES:  And if we could just grab that section at

10  the bottom.  This is a little bit of a puzzle exercise piecing

11  this together.

12  Q.  But you see that's the section, the beginning of the

13  section on Pradaxa, correct, that reference to dabigatran?

14  A.  Yes.

15  Q.  And then if you carry over to the next page, that

16  discussion of dabigatran and possible interactions with P-gp

17  inhibitors continues, correct?

18  A.  Yes.

19  Q.  There is no mention in that section, yes or no, to an

20  interaction with Coreg, correct?

21  A.  There is no -- specific in this section, you're correct,

22  because that data has not been collected.

23        MS. JONES:  Okay.  We can take that down.  Thank you,

24  Mr. Reynolds.

25  Q.  Okay.  Dr. Plunkett, I want to turn now to talking a

Laura Plunkett - Cross (Jones)                    553

1   little bit about some of what you showed the jury in terms of

2   labeling and company information outside of the United States.

3        Okay?

4   A.   Sure.

5   Q.   You talked yesterday about the company core data sheet,

6   and you talked about the European label also known as the

7   SMPC, correct?

8   A.   Yes.

9   Q.   And the SMPC in Europe is the doctor labeling in Europe,

10  correct?

11  A.   Yes.

12  Q.   And if I understand your testimony correctly, you didn't

13  do a comparison of the U.S. Medication Guide to the labeling

14  for patients in Europe, correct?

15  A.   That's correct.  I did not go to find the -- the

16  equivalent of the one in Europe for patients, that's true.

17  Q.   Okay.  So you were comparing what the company says about

18  Pradaxa in the doctor labeling in Europe to the patient

19  labeling in the United States, correct?

20  A.   Yes.

21  Q.   Now, there are differences -- without going into all the

22  details of this, there are differences in the regulations for

23  prescription medicines in Europe and the United States,

24  correct?

25  A.   There are.

Laura Plunkett - Cross (Jones)                    554

1   Q.  All right.  And each of the regulatory agencies that are

2   responsible for overseeing prescription medicines in those

3   places, they can make their own decisions about medications,

4   correct?

5   A.  They can.

6   Q.  Okay.  And sometimes agents -- the FDA and its counterpart

7   in Europe make different decisions, correct?

8   A.  They can.

9   Q.  And, for example, the 75-milligram dose of Pradaxa is not

10  approved for stroke prevention in atrial fibrillation in

11  Europe, correct?

12  A.  That is true.

13  Q.  All right.  It's actually approved for the prevention of

14  venous thromboembolic events in patients who have had certain

15  types of surgery, correct?

16  A.  That's correct.

17  Q.  Now the FDA made a different decision and specifically

18  approved that lower 75-milligram dose for atrial fibrillation

19  patients with severe renal impairment in the U.S., correct?

20  A.  They did.

21  Q.  Okay.  You understand that both the company core data

22  sheet and the SMPC that you talked about with the jury

23  yesterday, that those were submitted by the company to the

24  Food and Drug Administration here in the United States.

25      You know that, right?

Laura Plunkett - Cross (Jones)                    555

1   A.  Yes, as part of their PSUR process.

2   Q.  Okay.  And you were anticipating my next question, which

3   was they did that through a periodic reporting process that

4   medicine companies have to participate in when they have

5   prescription medicines that are regulated by the FDA, correct?

6   A.  That's correct.

7   Q.  All right.  Did you look at all of the PSUR for Pradaxa

8   over time to see what the company was giving to the FDA or

9   wasn't giving to the FDA over time?

10  A.  No, I didn't do a complete assessment.  I've seen some,

11  but I haven't done an assessment of every one.

12  Q.  And you're aware that the PSURs that were submitted, for

13  example, the company core data sheet to the FDA, those have

14  also included descriptions of the company core data sheet and

15  summaries of changes to the company core data sheet.

16      You know that, right?

17  A.  Yes.

18  Q.  All right.  And so, for example, I'm going to ask you to

19  look at a document we've marked as 9199.

20      (Counsel conferring.)

21          MS. JONES:  May I approach, Your Honor?

22          THE COURT:  You may.

23          MS. JONES:  Dr. Plunkett, I've handed you what we've

24  marked for identification as Defense Exhibit 9199.

25  Q.  Have you ever seen this document before?

Laura Plunkett - Cross (Jones)                      556

1    A.  Yes.  This is not the complete document, but certainly I

2    have seen this complete document as well before.

3    Q.  Well, you anticipated again my next question to you.

4        If you turn back to the second page of Exhibit 9199,

5    you'll see that it's actually a document that is about 1,100

6    pages long.

7        Do you see that?

8    A.  Yes, that's correct.

9    Q.  In the interest of good order, we have not printed out all

10   1,100 pages.  If there is something in my questions that

11   necessitates seeing some other part, just let me know.

12       Okay?

13   A.  Sure.

14   Q.  All right.

15           MS. JONES:  So, Your Honor, with your permission, we

16   would move for the admission of Exhibit 9199.

17           MR. MOSKOW:  Your Honor, as long as the record is

18   clear that this is an excerpt from that exhibit, we have no

19   objection.

20           THE COURT:  It is now.  It's admitted and may be

21   published.

22           MS. JONES:  Thank you, Your Honor.

23           MR. MOSKOW:  Thank you, Your Honor.

24       (DEFENDANT'S EXHIBIT 9199 ADMITTED INTO EVIDENCE.)

25           MS. JONES:  Thank you, Mr. Reynolds.

Laura Plunkett - Cross (Jones)                    557

1        So, Dr. Plunkett, just to situate ourselves, you see

2   up at the top the name of the document, a periodic safety

3   update report.

4   Q.  That's the type of reporting you were describing earlier,

5   correct?

6   A.  Yes.

7   Q.  And then it describes the name of the product, which is

8   Pradaxa, right?

9   A.  Yes.

10  Q.  And then it shows the PSUR period, and the date here is

11  from September of 2009 to March of 2010.

12       Do you see that?

13  A.  Yes.

14  Q.  And so this was a period that was in the lead up to the

15  approval of Pradaxa in the United States, correct?

16  A.  Yes.

17  Q.  All right.  We're going to go to page 20 of this document.

18       Do you see there's a section there entitled Changes to the

19  Reference Safety Information?

20  A.  Yes.

21  Q.  And do you understand that to be a reference to the

22  company core data sheet?

23  A.  Yes.  It says that in this paragraph below.

24  Q.  And as you rightly point out, it says:  The reference

25  safety information for this PSUR valid at data lock point DLP

Laura Plunkett - Cross (Jones)                    558

1    of this PUR is the company core data sheet, and then it

2    mentions the version there.

3         Do you see that?

4    A.   Yes.

5    Q.   And that's the company core data sheet version that you

6    showed to the jury yesterday, correct, from December of 2009?

7    A.   Yes.  The December 10th version, yes.

8    Q.   Okay.  And if we just scroll down in this document, you

9    can see here that there's a reference to the document being

10   provided in Annex 1.  Do you see that?

11        It's actually the next sentence right after what we just

12   looked at, I apologize.

13   A.   That's okay.  I see it, yes.

14   Q.   I may have led you astray.

15        And one of the things that the company mentions in the

16   submission is a little further down:  The following

17   safety-related changes were made to the CCDS.

18        Do you see that?

19   A.   I do.

20   Q.   And one of the things that they flag is that there was an

21   addition of new 150 milligram strength for the new indication

22   prevention of stroke and systemic embolism in patients with

23   atrial fibrillation, correct?

24   A.   That's what it stated, yes.

25   Q.   Okay.  And so the annexes to the PSUR now are -- they are

Laura Plunkett - Cross (Jones)                    559

1  hyperlinked, correct?

2  A.  Yes, they are.

3  Q.  So if someone wanted to find it easily, they could just

4  click on a link in the electronic version, and it would take

5  them to Annex 1, correct?

6  A.  That's correct.

7  Q.  Let's go to page 88 of this same document.

8      And on page 88, you can actually see that December 2009

9  company core data sheet that you were talking to the jury

10  about yesterday, correct?

11  A.  Yes.

12  Q.  That was submitted to the FDA, correct?

13  A.  Yes.

14  Q.  Okay.  And one of the things that I wanted to just ask you

15  about is, the language in this version of the company core

16  data sheet that you talked to the jury about, that information

17  was submitted to the FDA even before Pradaxa was approved for

18  the first time in the United States for atrial fibrillation,

19  correct?

20  A.  As part of this process, yes.

21  Q.  Okay.  And there were certainly discussions about the

22  labeling for Pradaxa in that period leading up to the

23  medicine's approval in October of 2010, correct, discussions

24  with the FDA?

25  A.  There were.

Laura Plunkett - Cross (Jones)                              560

1    Q.   Okay.  And the FDA never told the company, based on your

2    submission of the company core data sheet, we think you need

3    to have some of this language in your label here in the United

4    States.

5        Did you have ever see that in any of the documents you

6    reviewed?

7    A.   Ah, no.  There -- what I saw was a response to the

8    proposed labeling from the company, not this document.

9    Q.   Okay.  But my point is when the company submitted the

10   company core data sheet, you've not seen anything to suggest

11   that the FDA then said, well, we think you should take some of

12   this language about, for example, excess of anticoagulant

13   activity and put that in the U.S. label.

14       You've not seen any suggestion by the FDA on that, have

15   you?

16   A.   No, and I would be surprised if that process would happen.

17   Q.   Now you also talked yesterday about the SMPC, the European

18   label for Pradaxa, correct?

19   A.   Yes.

20   Q.   All right.  And that was also something that was shared

21   with the FDA, correct?

22   A.   It was.

23   Q.   Okay.

24   A.   In this same process.

25   Q.   Okay.  Are you aware that there were also circumstances

Laura Plunkett - Cross (Jones)                561

1   where Michelle Kliewer, one of the regulatory leads at

2   Boehringer Ingelheim on Pradaxa, shared a copy of the European

3   label with Alison Blaus of the FDA?

4   A.  I don't recall whether that was discussed in her

5   deposition, so I'd have to review.  I don't recall that.

6   Q.  Okay.

7           MS. JONES:  May I approach, Your Honor?

8           THE COURT:  You may.

9           MS. JONES:  Dr. Plunkett, I've handed you what we've

10  marked as Defense Exhibit 5914 and Defense Exhibit 5915.

11  Q.  Do you see that?

12  A.  Yes, I do.

13  Q.  Okay.  And you've already told us that as part of its

14  regular periodic reporting process with the FDA, that the

15  company would have been submitting its SMPC to the FDA,

16  correct?

17  A.  Yes, and I've seen that done.

18  Q.  Okay.  And have you ever seen what we've marked as 5914

19  and 5915?

20  A.  I've seen 5915 absolutely.  That's the actual annex.  I

21  don't know about -- I don't recall this being discussed in her

22  deposition, so I don't know.

23  Q.  Okay.

24          MS. JONES:  Your Honor, we would move for the

25  admission of 5914 and 5915.

Laura Plunkett - Cross (Jones)                    562

1          MR. MOSKOW:  No objection.

2          THE COURT:  It's admitted.  You may publish.

3      (DEFENDANT'S EXHIBITS 5914 and 5915 ADMITTED

4      INTO EVIDENCE.)

5          MS. JONES:  Could we put up 5914 to start,

6  Mr. Reynolds?

7  Q.  Okay.  And do you see here, Dr. Plunkett, that there is

8  first an e-mail at the bottom from Lisa Matzen at BI to

9  Michelle Kliewer at BI in September of 2012?

10 A.  Yes.

11 Q.  Do you see that?

12     Do you know who Lisa Matzen is at the company?

13 A.  I don't know her personally, but I've seen her mentioned

14 in e-mails before.

15 Q.  You know she is one of the regulatory professionals for

16 the company in Europe?

17 A.  Yeah.  She's a European person, yes.

18 Q.  Okay.  And then if we scroll -- what she says in her

19 e-mail to Ms. Kliewer is:  Dear, Michelle.  As requested, the

20 approved set of annexes covers all CCDS updates up to and

21 including CCDS 07.  A label change pertaining to CCDS 08 is

22 under review.

23     Did I read that correctly?

24 A.  You did.

25 Q.  Then if we scroll up to the top of the e-mail, you can see

Laura Plunkett - Cross (Jones)                          563

1    that Ms. Kliewer actually forwarded whatever Dr. Matzen sent

2    to her to Alison Blaus at the FDA.

3         Do you see that?

4    A.  I do.

5    Q.  And the subject line is Pradaxa, current set of annexes?

6         Do you see that?

7    A.  Yes.

8    Q.  And do you see -- and this is something you can tell just

9    by looking at those Bates numbers in the bottom right-hand

10   corner.

11        Do you see that the attachment to that e-mail is 5915,

12   that annex referred to in the e-mail exchange?

13             MS. JONES:  Can we put up 5915, Mr. Reynolds?

14             THE WITNESS:  If what you're asking me is that the

15   Bateses run consecutively, yes.  The bottom of 5914 ends in

16   153, and then 5915 ends in 154.

17             MS. JONES:  Okay.

18   Q.  And if we put up Exhibit 5915, we see that's a copy of

19   what is referred to as annex, one of the annexes in the e-mail

20   that we were just looking at?

21   A.  Yes, that's correct.

22   Q.  Okay.  And that's a copy of the European label, the SMPC,

23   correct?

24   A.  That is correct, yes.

25             MS. JONES:  We can take that down.  Thank you,

Laura Plunkett - Cross (Jones)                    564

1   Mr. Reynolds.

2   Q.   Now, the SMPC is that document you showed that showed the

3   table with the different risk factors for bleeding that were

4   organized I think in two columns.

5        Do you remember that?

6   A.   Yes.  That's one of the things we showed.

7   Q.   And then there was also that table that had the listing of

8   the different coagulation assays, and then there was a

9   reference to the dTT.

10       Do you remember that?

11  A.   Yes.  I believe we -- I believe we showed that, I don't

12  recall.  But I know it's in there, yes.

13  Q.   Okay.  Did you see, in reviewing any of the materials

14  relating to the regulatory history of Pradaxa, that the FDA

15  ever said, you know, we've looked at your European label, and

16  we think you need to have some of that information in the

17  label that you have here in the United States?

18  A.   I have not seen that, no.

19  Q.   And is it your understanding that actually some of the

20  language that you have referenced in going through the SMPC

21  and the CCDS, that some of that very language was proposed to

22  the FDA, and the FDA rejected it for the U.S. label?

23  A.   Yes.  I think that was -- the jury should have seen some

24  of that in the deposition, I believe, of Ms. Kliewer.

25  Q.   Let me just talk about one example of that that is

1   relevant to what we've been talking about for the last day and

2   a half or so.

3        You showed the jury the language from the CCDS and the

4   SMPC that says Pradaxa is contraindicated in patients with

5   severe renal impairment.  Do you remember that?

6   A.  Yes.

7   Q.  And contraindicated means don't use it in these patients,

8   right?

9   A.  Yes.  And I think I even described it as the risks would

10  outweigh the benefits.

11  Q.  Okay.  Now do you know that Boehringer Ingelheim actually

12  tried to get that language in the U.S. label for Pradaxa?

13  A.  Yes, and I think we -- that was in another document

14  earlier today.

15           MS. JONES:  Your Honor, may I approach?

16           THE COURT:  Yes.

17           MS. JONES:  Dr. Plunkett, I've handed you what we've

18  marked as Exhibits 5061 and 5062.

19  Q.  Do you recognize those documents?

20  A.  I'm not sure I've seen the e-mail, but I have seen, ah,

21  the label.

22  Q.  Okay.

23           MS. JONES:  And so, Your Honor, we'd move for the

24  admission of 5061 and 5062.

25           MR. MOSKOW:  No objection.

Laura Plunkett - Cross (Jones)                    566

1        THE COURT:  They are each admitted.

2        (DEFENDANT'S EXHIBITS 5061 and 5062 ADMITTED

3        INTO EVIDENCE.)

4        MS. JONES:  Okay.  Could you call up 5061 to situate

5   ourselves, Mr. Reynolds?  Thank you.

6   Q.  So, Dr. Plunkett, you recognize that this appears to be an

7   e-mail from Michelle Kliewer at BI in July of 2010, and she's

8   sharing with some of her colleagues at the company a copy of

9   what she refers to as the current USPI proposed to the FDA.

10       Do you see that?

11  A.  Yes.

12  Q.  Okay.  And then if we can go to 5062, which is the

13  attachment to that e-mail.

14       If you flip to the first page, you see that this is a red

15  line document reflecting one of the earlier proposed labels by

16  the company to the FDA, correct?

17  A.  I am looking to see if there's red lines in here, but --

18  Q.  Well, maybe they're blue lines.  To be fair, they're

19  probably -- I used red line as a general term, I apologize.

20  A.  Okay.

21  Q.  You see that there are just changes reflected in the

22  document?

23  A.  There are some, yes.

24  Q.  Okay.  I actually just want to focus your attention on

25  page 2, and there is that section entitled Contraindications.

Laura Plunkett - Cross (Jones)                    567

1      Do you see that?

2   A.  Yes.

3   Q.  Okay.  And they are a list of different things where the

4   company is proposing to say in the label this medicine

5   shouldn't be used with this particular patient group.

6      Do you see that?

7   A.  Yes.

8      MS. JONES:  Could we go back to page 2, please?  I

9   think you had it initially.  Yeah, that's perfect.

10  Q.  And do you see that the second bullet listed there is

11  severe renal impairment?

12  A.  Yes, I see that.

13  Q.  Okay.  That was the company's proposal in terms of

14  patients with severe renal impairment and Pradaxa, correct?

15  A.  Yes, in this version of the label.

16  Q.  Then if you go to page 4 of the label, there is a section

17  at the top entitled Severe Renal Impairment, where it includes

18  language very similar to the language that you pointed to in

19  the CCDS and the SMPC, correct, on page 4?

20  A.  Yes.

21      MS. JONES:  Your Honor, may I approach?

22      THE COURT:  Yes.

23      MS. JONES:  Dr. Plunkett, I've handed you what we've

24  marked as Defense Exhibits 5035 and 5036.

25  Q.  Do you see those?

Laura Plunkett - Cross (Jones)                    568

1   A.  Yes.

2   Q.  Do you recognize Exhibits 5035 and 5036?

3   A.  Yes, I have seen both the e-mail and the label.

4   Q.  Okay.

5           MS. JONES:  Your Honor, we would move for the

6   admission of 5035 and 5036.

7           MR. MOSKOW:  No objection.

8           THE COURT:  They are each admitted.

9       (DEFENDANT'S EXHIBITS 5035 and 5036 ADMITTED

10      INTO EVIDENCE.)

11          MS. JONES:  Okay.  Let's start with 5035, if we could,

12  and just look at how the FDA responded to the company's

13  proposed labeling.

14  Q.  You see this is an e-mail from Alison Blaus at the FDA to

15  Michelle Kliewer at the company dated October 8th, 2010?

16  A.  Yes.

17  Q.  And in the e-mail she writes:  Hi, Michelle.  Please find

18  the division's revisions to the dabigatran label.  There have

19  been a number of changes to every section.  Some of the

20  changes reflected are changes we made to our own language.

21  Please accept all changes prior to making any of your own.

22      And then she says:  I've inserted some comments for

23  changes that we are requesting.

24      Do you see that?

25  A.  I do.

Laura Plunkett - Cross (Jones)                        569

1    Q.  All right.  And so this is the process that I think you

2    described a little bit with the jury yesterday.

3        The company proposes a label.  The FDA then has an

4    opportunity to say here are some things we think should be

5    different, correct?

6    A.  Yeah.  This is that negotiation I talked about.

7    Q.  Okay.  And then if you turn to Exhibit 5036, do you

8    recognize that -- and this actually does have red lines -- the

9    FDA's red line to the company's proposed labeling?

10       If you go to page 2 --

11   A.  Yes.

12   Q.  -- do you see that?

13       And if we go to the section we were just looking at

14   entitled Contraindications, do you see that second bullet with

15   that reference to severe renal impairment?

16   A.  Yes.

17   Q.  And what did the FDA do with that?

18   A.  It has been struck.

19   Q.  Okay.  And then if we go to page 3 of that document in the

20   core discussion section, there is the section entitled 2.5

21   Patients with Severe Renal Impairment.

22       Do you see that?  It's about midway down the page.

23   A.  Yes, I see that.

24   Q.  And what the FDA did was they took out the

25   contraindication, and they proposed instead that the

1   recommended dosage of Pradaxa in patients with severe renal

2   impairment is 150 milligrams taken once every other day.

3       Do you see that?

4   A.  Yes.

5   Q.  And we now know that after some discussion and some

6   analysis, they concluded that it would be the 75-milligram

7   dose taken twice a day, correct?

8   A.  Yes.

9   Q.  So that language that you showed in the CCDS and the SMPC,

10  that's language that the company proposed and the FDA

11  literally struck from the label for Pradaxa, correct?

12  A.  Yes.  And they made a different proposal.

13  Q.  Dr. Plunkett, we've talked a good bit about the FDA and

14  its structure and the process for a medicine like Pradaxa, so

15  I'm going to skip a lot of that discussion, but I did want to

16  just ask you one question.

17      The company, as part of its development of Pradaxa, did

18  both preclinical and clinical studies, correct?

19  A.  Yes.

20  Q.  And that means studies that involved humans and some that

21  involved animals, correct?

22  A.  Yes.

23  Q.  All right.  And Boehringer shared every one of those

24  studies with the FDA, both the preclinical and the clinical

25  studies, correct?

Laura Plunkett - Cross (Jones)                    571

1   A.   That's my understanding, yes.

2   Q.   And when BI submitted Pradaxa for approval by the FDA, the

3   FDA got all of the raw data from the RE-LY trial, correct?

4   A.   Yes, they were given the raw data.

5   Q.   Okay.  And BI also submitted all of the PK data for

6   Pradaxa that served as the basis for the RE-LY -- excuse me --

7   the Reilly exposure paper that you talked about yesterday,

8   correct?

9   A.   The raw data went in, yes, that is true.

10  Q.   And also as part of that process, do you know that the

11  company submitted analyses of its data from RE-LY to the FDA

12  in something called a clinical overview document?

13  A.   Yes, I'm aware of that document.

14  Q.   And is that a document that you reviewed as part of your

15  work in this case?

16  A.   Yes, I have seen that document.

17        MS. JONES:   May I approach, Your Honor?

18        THE COURT:   Yes.

19  BY MS. JONES:

20  Q.   Dr. Plunkett, do you recognize Exhibit 5084?

21  A.   Yes, I do.

22  Q.   Do you recognize that as the clinical overview document

23  that we were just discussing a minute ago?

24  A.   Yes.  I think -- I assume this is what you were referring

25  to, yes.

Laura Plunkett - Cross (Jones)                    572

1    Q.  Okay.  And as far as you know, this was a document that

2    the company would have submitted to the FDA as part of its new

3    drug application for Pradaxa, correct?

4    A.  Yes.

5    Q.  Okay.  And in the interest of time, we're not going to go

6    through all of this document, but I did just want to ask you,

7    can we agree that in the contents of this document, that the

8    company provided the FDA with information on various patient

9    characteristics that might affect exposure and a patient's

10   risk of having a stroke or having a bleed while they were on

11   Pradaxa?

12   A.  Yes, that is true.  That would be in here.

13        MS. JONES:  Your Honor, we would move for the

14   admission of 5081 -- I'm sorry.

15        MR. MOSKOW:  No objection.

16        MS. JONES:  I apologize, 5084.  Thank you, Mr. Moskow.

17        THE COURT:  It's admitted.

18     (DEFENDANT'S EXHIBIT 5084 ADMITTED INTO EVIDENCE.)

19        MS. JONES:  And could we just publish that briefly for

20   the jury?

21        THE COURT:  Yes, you may.

22   BY MS. JONES:

23   Q.  Dr. Plunkett, you see up at the top of that document, the

24   reference to clinical overview?

25   A.  Yes.

Laura Plunkett - Cross (Jones)                    573

1    Q.  And also the fact that this is a clinical overview about

2    the drug substance dabigatran etexilate, also known as

3    Pradaxa, correct?

4    A.  Yes.

5    Q.  And then if you look a little further down for the

6    document title, it says:  MAA NDA for the Prevention of

7    Stroke, Non-CMS Systemic Embolism and Reduction of Vascular

8    Mortality in Subjects with Non-valvular Atrial Fibrillation.

9        Do you see that?

10   A.  I do.

11   Q.  And that's just a long way of saying this is a medicine

12   that is being proposed for patients who have atrial

13   fibrillation and are at risk of stroke, correct?

14   A.  Yes.

15   Q.  Okay.  And you see the date there of November 10th, 2009?

16   A.  Yes.

17   Q.  And then there it refers to there being about a hundred

18   pages of information here.  Do you see that?

19   A.  Yes.

20   Q.  And then if we just click into the second and the third

21   pages of that document, you see that there are various

22   categories of information on different topic that were

23   provided to the FDA.

24       Do you see that?

25   A.  I do.

1    Q.  So there's an overview of clinical pharmacology, for

2    example.  Do you see that?

3    A.  Yes.

4    Q.  And there is a reference to the effect of renal

5    insufficiency.  Do you see that?

6    A.  I do.

7    Q.  There's a reference to the effect of gender, age and

8    weight.  Do you see that?

9    A.  Yes.

10   Q.  There's a reference to P glycoprotein inhibitors, those

11   P-gp inhibitors we talked about earlier.  Do you see that?

12   A.  Yes.  That's further down, yes.

13   Q.  There's a reference slightly further down to exposure

14   response in AF patients.  Do you see that?

15   A.  Yes.

16   Q.  And that's that discussion we've been having about the

17   relationship between exposure and stroke risk or bleeding

18   risk, correct?

19   A.  Yes.  It's the pharmacokinetic data from the RE-LY trial.

20   Q.  Okay.  And the balance of this table of contents lists

21   various tables and figures that appear in this document,

22   correct?

23   A.  Yes.

24   Q.  Okay.  Dr. Plunkett, I wanted to ask you one other

25   question about the FDA's review of the Pradaxa application,

1   and then I'll move into my last, what will be my last topic

2   with you.

3       Do you recall that when the FDA was reviewing the

4   application for Pradaxa, that it expressed the view that in

5   patients with atrial fibrillation, warfarin had been severely

6   under-utilized?

7   A.  I've seen that said by FDA.  I don't know which document

8   it was in, but I've seen that, that discussed.

9   Q.  That was a view that the agency expressed, correct?

10  A.  In some document.  I don't remember where it is, but I

11  have seen that, yes.

12  Q.  Okay.  And do you also recall the FDA saying that the

13  reason for that was fear of bleeding, fluctuations in INR, the

14  importance of diet and the need for monitoring?

15  A.  I can't tell you that all four of those were stated, but I

16  know that those are all four things that were discussed

17  generally for that drug, so I would assume that those would be

18  there.

19  Q.  Okay.  And do you also recall the FDA recognizing that

20  patients' occasional reluctance to use warfarin meant that

21  there might be more strokes and more disability resulting from

22  strokes because those patients didn't want to take warfarin?

23  A.  So I don't recall that exact language, no.

24  Q.  Okay.

25  A.  But I'm certainly -- if they're discussing these issues,

Laura Plunkett - Cross (Jones)                    576

1    they may have talked about the importance of patients being

2    treated with anticoagulants when they have AFib.

3    Q.  Well, do you still have 5827 in your pile there?  It's the

4    summary review document by Dr. Unger.

5    A.  Yes, I do.

6          MS. JONES:  And this has been admitted already.  May

7    we publish it, Your Honor?

8          THE COURT:  You may.

9          MS. JONES:  We're just going to go quickly to page 15

10   of the summary review, Dr. Plunkett.  And I just want to focus

11   on a paragraph, the third paragraph of -- the third paragraph

12   on the bottom of that page 15.

13   Q.  Do you see that?

14   A.  Yes.

15   Q.  It says:  We know that warfarin is severely under-utilized

16   in the AF patient population at a cost of increased strokes

17   and disability.

18          Do you see that?

19   A.  I do.

20   Q.  And so that's the FDA saying we know some patients aren't

21   using warfarin, and the result is that there are more strokes

22   and more resulting disability as a result, correct?

23   A.  That is what he is stating --

24   Q.  And then --

25   A.  -- I agree.

1   Q.   I apologize.  I didn't mean to talk over you.

2        And then it goes on to say:  Some part of the resistance

3   is fear of bleeding.  The other part is related to

4   fluctuations in INR, importance of diet and the need for

5   monitoring.

6        Did I read that correctly?

7   A.   You did.

8   Q.   That was a view held by the FDA expressed during its

9   approval process for Pradaxa, correct?

10  A.   I would agree this is in this memo, yes.

11  Q.   Okay.

12       MS. JONES:  We can take that down.  Thank you,

13  Mr. Reynolds.

14       Dr. Plunkett, the last topic I wanted to cover with

15  you relates to this notion of blood monitoring and your

16  opinion that patients on Pradaxa require blood monitoring.

17  Q.   Now, just to be clear, are you offering the opinion that

18  patients on Pradaxa require regular routine monitoring like

19  patients on warfarin receive?

20  A.   No, and hopefully that was very clear when I gave my

21  opinions yesterday.

22  Q.   Okay.

23  A.   That is not what I'm talking about.

24  Q.   Okay.  Now, you understand that the RE-LY results were

25  achieved without adjusting the Pradaxa dose based on the

1    results of blood monitoring, correct?

2    A.  Yes, I am.

3    Q.  Okay.  And the FDA specifically determined at the time of

4    approval that it did not believe that monitoring would

5    necessary for either of the doses of Pradaxa, correct?

6    A.  Are you asking me was that the FDA's decision?  Yes, that

7    was their decision at the end.

8    Q.  Okay.  Now, despite that decision the company, Boehringer

9    Ingelheim, during the RE-LY study had gathered data on blood

10   concentration levels during the course of the trial, correct?

11   A.  Yes.

12   Q.  They did that for roughly 10,000 patients?

13   A.  Yes.

14   Q.  All that data got submitted to the FDA, correct?

15   A.  It did.

16   Q.  And the FDA performed its own detailed analysis of that

17   blood concentration data, correct?

18   A.  They did their own analysis, yes.

19   Q.  After the FDA approved Pradaxa without the need for blood

20   monitoring, the company continued to address this question of

21   whether Pradaxa should be prescribed to patients and whether

22   there should be a requirement for blood monitoring, correct?

23   A.  I don't think that's quite what they were studying.  But

24   certainly that you could answer that question based on what

25   they were studying.

Laura Plunkett - Cross (Jones)                    579

1   Q.  Okay.  But they were looking at whether or not there was

2   some range that patients should be maintained within through

3   some kind of monitoring, blood monitoring regimen.

4        Is that a fair way of describing it?

5   A.  Yes.  That's how the Reilly paper started out, that's

6   correct.

7   Q.  Okay.  So the company looked at that specifically after

8   the medicine was approved, correct?

9   A.  Well, it wasn't a new study.  But it analyzed the data it

10  had, and that was where the -- the paper started, yes.

11  Q.  Okay.  And in doing that, the doctors and the scientists

12  at Boehringer Ingelheim, they were asking themselves whether

13  they could make the medicine even safer even though it had

14  already been approved by the FDA without blood monitoring,

15  correct?

16  A.  I would agree that was the discussion within e-mails,

17  absolutely, about making the drug safer, yes.

18  Q.  Okay.  And you showed the jury a handful of e-mails that

19  were created during these discussions that were going on at

20  the company.

21       You remember that from yesterday, I assume?

22  A.  Yes.

23  Q.  And those e-mails reflect back and forth among various

24  people at the company about this issue of whether there was a

25  therapeutic range and whether blood monitoring would make the

Laura Plunkett - Cross (Jones)                    580

1    medicine safer, correct?

2    A.  It was more on the issue of therapeutic range.  But, yes,

3    that certainly was the discussion, yes.

4    Q.  Okay.  And specifically with respect to the Reilly

5    exposure response paper that you showed to the jury yesterday,

6    they were -- there were a number of scientists at the company

7    who did not think that the science supported a therapeutic

8    range like the one that folks were discussing within

9    Boehringer Ingelheim.

10   A.  I don't think that I would state that as a yes or a no.

11   It's a little more complex than that.

12       I would -- I agree there was a discussion about that

13   general issue, yes.

14   Q.  Okay.  One of those people was Dr. Martina Brueckmann.

15       I think you showed an e-mail from her, correct?

16   A.  Yes, we did.

17   Q.  Okay.  And you showed the jury an e-mail that she sent

18   discussing a draft of the Reilly paper; is that right?

19   A.  Yes.

20   Q.  Okay.  Now Dr. Brueckmann, she's a medical doctor,

21   correct?

22   A.  Yes.

23   Q.  Who worked at the company?

24   A.  Yes.  In Germany, I believe, yes.

25   Q.  She's not a marketing person, correct?

Laura Plunkett - Cross (Jones)                    581

1   A.  No.  She doesn't work in the marketing department that I

2   know of, but yes.

3   Q.  Okay.  And that's a better way of putting it than I put

4   it.

5       Another e-mail you showed the jury was from someone named

6   Jutta Heinrich Nols.

7       Do you remember that e-mail?

8   A.  Yes.

9   Q.  Okay.  And you showed the jury an e-mail from Dr. Heinrich

10  Nols where she talks about whether or not the company should

11  want to publish Dr. Reilly's exposure response paper.

12      Do you remember that?

13  A.  Yes, I do.

14  Q.  Okay.  And Dr. Heinrich Nols, she's also a medical doctor,

15  correct?

16  A.  Yes.

17  Q.  She doesn't work in the marketing department, correct?

18  A.  No, not that I know of.

19  Q.  Okay.  And she specifically mentioned in that e-mail that

20  you showed the jury that she was not empowered to release or

21  stop the publication of the paper.

22      You remember that.  Yes?

23  A.  Yes.

24  Q.  Okay.  Now, the person who had that power was Dr. Jeffrey

25  Friedman.

Laura Plunkett - Cross (Jones)                    582

1    You saw his testimony I guess the day before yesterday,

2    correct?

3    A.  Yes.

4    I think there were others that had that power, but

5    certainly that was -- that was discussed in the back and forth

6    with him to her.  That is true.

7    Q.  Okay.  And did you read doctor -- you were here during the

8    play of Dr. Friedman's testimony, correct?

9    A.  Yes, I was.

10   Q.  And do you recall what he said about what he did when he

11   received that e-mail from Dr. Heinrich Nols about whether or

12   not the company should publish Dr. Reilly's paper?

13   A.  Yes, I have seen the testimony.

14   Q.  Okay.  And do you recall him saying that he picked up the

15   phone, and he called her, and he told her that he thought that

16   e-mail was inappropriate?

17   A.  Yes.

18   Q.  Do you remember that?

19   A.  I have seen that part of his testimony, yes.

20   Q.  Okay.  And you understand that the Reilly paper was

21   ultimately published, correct?

22   A.  It was.

23   Q.  Okay.  And the findings of the company's work were

24   reflected in the contents of that paper, correct?

25   A.  Not all of the findings from the earlier versions, but

Laura Plunkett - Cross (Jones)                    583

1   certainly they made -- they produced a final version that was

2   put into the literature.

3   Q.  Okay.  And the conclusions of that paper were that there

4   was no optimal therapeutic range that would apply for every

5   patient, correct?

6   A.  That was a sentence in their conclusions, yes.

7   Q.  Okay.  And the other conclusion in the paper was that

8   renal function was a factor that was probably most strongly

9   predictive of exposure.

10      Do you remember that?

11  A.  I believe that was in there as well.

12  Q.  Okay.  And that's consistent actually with Dr. Unger, with

13  what Dr. Unger said in the summary review memo for Pradaxa

14  back in 2010, correct?

15  A.  The issue of the renal function?

16  Q.  Renal function being one of the main determinants of

17  exposure.

18  A.  Yes, he did discuss that.

19  Q.  As part of your work in this case, you've not identified

20  one number or one therapeutic range that applies for every

21  Pradaxa patient.

22      I don't think I heard you testify to that yesterday; is

23  that right?

24  A.  I don't think yesterday I was asked that question about --

25  the way you've just asked it, no, I was not.  So we did not

1   talk about that.

2   Q.   Well, I'll ask you the question.

3        As part of your work in this case, have you identified a

4   single number or a single therapeutic range that you believe

5   applies to every patient who takes Pradaxa?

6   A.   I think what I've testified -- I haven't said it quite

7   that way.  What I have said instead was that the Reilly paper

8   identifies a therapeutic range that the data supports could be

9   used and applied to patients taking Pradaxa.

10       And then there's discussions in the documents and the

11  information I've seen that -- whether the top of the range

12  should be 215 or 150 or 250.  But certainly all of those

13  discussions identify the fact that when your blood levels are

14  getting above the 150 to 200 range, there is a significantly

15  increased risk.

16       And I think that's consistent, I hope, with what I've said

17  before.

18  Q.   And the -- I'm sorry.  Go ahead.

19  A.   So anyways, I'm trying to be consistent with what I

20  believe I have testified to.

21  Q.   Okay.  I appreciate that.

22       The folks at Boehringer Ingelheim, they've not been able

23  to come up with one number for everyone, right?

24  A.   I disagree with that.  Based upon the initial drafts of

25  the Reilly paper, they certainly had a range that they

1    identified as a therapeutic range.  But certainly I would say

2    to you, yes, there were different numbers described within

3    different documents, yes.

4    Q.  Do you still have a copy of your March 2018 testimony,

5    that black binder?

6    A.  Yes, I do.  The Boone?  Yes.

7    Q.  This time I'm going to ask you to turn to the tab that

8    ends with PM as opposed to AM.

9    A.  On the 1st?

10   Q.  Yes.

11   A.  Okay.

12   Q.  Are you there, Doctor?

13   A.  I need to know what page.  I'm sorry.

14   Q.  Oh, I'm so sorry.  I didn't give you a page.

15       Page 19.

16   A.  Okay.  I'm there, yes.

17   Q.  Okay.  And I guess just to give you some context, do you

18   see, just kind of scanning pages 18 to 19, you're being asked

19   about this idea of a therapeutic range and whether the FDA or

20   folks at BI have identified a specific range?

21   A.  I think I'm talking here about the sweet spot issue, but

22   yes.

23   Q.  Okay.  So do you see on page 19 where you were

24   specifically asked -- well, just to provide some context,

25   there is a reference there to folks at the FDA talking about

Laura Plunkett - Cross (Jones)                    586

1   the issue of therapeutic range?

2          MR. MOSKOW:  I think we are looking at something

3   different, counsel.

4          THE WITNESS:  I'm sorry?

5          MR. MOSKOW:  We may be looking at something different.

6          MS. JONES:  They may be looking at something

7   different.

8          MR. MOSKOW:  3/1 p.m.?

9          MS. JONES:  Yes, 3/1 p.m.

10         MR. MOSKOW:  Page 19?

11         THE WITNESS:  I was looking at line 9.

12         MS. JONES:  Oh, I see.  Yes.  Okay.  I'm asking you to

13   look at page 19, line 5.  Do you see that?

14         And you were asked a question -- it's a little hard

15   because the question is broken up a little bit.

16         You said:  They have asked that question and tried to

17   answer it.

18         And then you were asked:  And had not been able to

19   come up with one number for everyone, right?

20   Q.  Do you see that question?

21   A.  I do.

22   Q.  And then the answer was -- this was your sworn testimony:

23   They have not -- they have not put that in the label, that is

24   true.

25         That was your answer, correct?

Laura Plunkett - Cross (Jones)                          587

1    A.  Yes, it's not been put in the label, that is true.

2    Q.  Dr. Plunkett, in connection with that conclusion in the

3    Reilly paper that there is no single plasma concentration

4    range that provides optimal benefit risk for all patients, the

5    authors of that paper included both folks who worked at

6    Boehringer Ingelheim and also doctors and scientists who

7    didn't work at the company, correct?

8    A.  They were not employees of the company, but they were

9    working for the company on behalf -- as clinical

10   investigators.

11   Q.  They were working as scientists on issues related to

12   Pradaxa, correct?

13   A.  Yes, they were clinical investigators in the RE-LY trial.

14   Q.  Okay.  Every one of the authors of that paper signed off

15   on the ultimate conclusion that there is no single plasma

16   concentration range that proves -- provides optimal benefit

17   risk for all patients, correct?

18   A.  And I don't know that I can say yes or no to that because

19   I haven't seen documentation everyone actually signed.  But

20   certainly I would agree that the paper -- they were all

21   authors on the final version that was published, so I would

22   hope that they had agreed, yes.

23   Q.  You've not seen anyone come forward among that group of

24   authors on that paper and say this doesn't reflect my opinion,

25   have you?

Laura Plunkett - Cross (Jones)                          588

1   A.   That's correct.  Other than -- other than there are some

2   e-mails that go back and forth about issues related to drafts

3   of the paper.  But I would agree, I have not seen anything

4   since the paper was published that indicates somebody has come

5   forward and said, no, change this.

6   Q.   And you understand that the company made a point of

7   sharing the Reilly paper with the Food and Drug

8   Administration, correct?

9   A.   Yes.

10  Q.   Did you see anywhere in documents that you reviewed that

11  the -- that the FDA ever said we think that this paper, this

12  paper by Dr. Reilly and others, justifies changing the

13  labeling for Pradaxa?

14  A.   I've not seen those words, no.

15  Q.   And you understand that the FDA has a process where if

16  they think a company should have given them information under

17  their rules and regulations, they can tell a company that,

18  correct?

19  A.   If you're asking about can they send a -- send a letter,

20  an untitled letter to the company asking for information, yes.

21  Q.   Something like that.

22  A.   They can do that, yes.

23  Q.   And you're also aware that the FDA can require and, if

24  necessary, order labeling changes if the FDA becomes aware of

25  any safety information that it believes should be included in

Laura Plunkett - Cross (Jones)                    589

1    the labeling of a drug?

2    A.   Certainly that is now possible, yes, they can require.

3    Q.   And in fact, you said now, but the FDA has had that

4    authority the whole time Pradaxa has been on the market,

5    correct?

6    A.   Yes, that is true.

7    Q.   Okay.  And the FDA has never done that with respect to

8    blood monitoring for Pradaxa that you're aware of, correct?

9    A.   I have not seen a document that shows that.

10   Q.   Okay.

11          MS. JONES:  Your Honor, if I could just have a moment.

12   I think I'm --

13          THE COURT:  All right.

14          MS. JONES:  Let me just confer with counsel.

15       (Counsel conferring.)

16          MS. JONES:  Dr. Plunkett, I thank you for your time.

17          Your Honor, I could just have a chance to move all of

18   my stuff.

19          THE COURT:  Yes.  We're going to take a pretty quick

20   recess, about five minutes, before there's any redirect.

21       (Recess taken from 2:14 to 2:20 p.m.)

22       (Jury present.)

23          THE COURT:  All right.  We're ready.  Now plaintiffs'

24   counsel may conduct redirect examination of the witness.

25

Laura Plunkett - Redirect (Moskow)                590

1        MR. MOSKOW:  Thank you, Your Honor.

2        Good afternoon, everyone.

3        Good afternoon, Dr. Plunkett, Your Honor.

4        Your Honor, before I start, I'm going to be using the

5   Elmo with documents that are already in evidence.  Can I have

6   permission to publish those documents that have already been

7   entered?

8        THE COURT:  Yes.  If they're already admitted, feel

9   free.

10       MR. MOSKOW:  Thank you, Your Honor.

11                    REDIRECT EXAMINATION

12  BY MR. MOSKOW:

13  Q.  You covered a lot of information with Attorney Jones over

14  the last day and a half or so.  Let me apologize in advance

15  for the fact that I'm going to be jumping around to try to

16  just touch on a few points.  And what I thought I would do is

17  put them into five categories so that you know where I'm

18  going, Dr. Plunkett, and the jury can follow along as well.

19       So we're going to talk a little bit about the FDA.  We're

20  going to talk about the SMPC, the foreign label.  We're going

21  to look at some of the studies and the company documents that

22  Ms. Jones showed you.  We're going to look at the doctors'

23  label.  And then we're going to finish today by talking about

24  the patient Medication Guide.

25       Okay?

Laura Plunkett - Redirect (Moskow)                591

1    A.   Okay.

2    Q.   All right.  As we start talking about the FDA, can you

3    tell the jury why it is that Boehringer paid the FDA

4    $1,405,000 in 2010 at the time it was reviewing its

5    application?

6    A.   So there's a program called user fee program.  And

7    essentially people that are submitting applications for new

8    prescription drugs in the U.S. pay a fee, and that essentially

9    helps the FDA hire enough people in order to be able to review

10   applications quickly.

11        The program was put into place because there was a problem

12   identified that it was taking very long to get new drugs

13   through the pipeline, so it needed more staff.  So that is

14   what this program does.  Anyone who submits an application,

15   large companies pay a large fee, smaller companies may pay

16   something smaller, essentially depending on how complex the

17   application is.  But, yes, that's what that is.

18        So essentially there is people that are hired within the

19   drug review program, ODE, Office of Drug Evaluation.  Their

20   salaries are being paid by the user fee program.

21   Q.   So when Attorney Jones put those lists in front of you of

22   all the people who were involved in reviewing the documents,

23   how if at all were these individuals paid by BI?

24   A.   So it wasn't a direct paycheck to them, but certainly

25   Boehringer is paying fees into the FDA, and those -- many of

Laura Plunkett - Redirect (Moskow)                    592

1    those people that are listed there are ones whose positions

2    are supported by these user fees.

3    Q.   Now lots of the questions you were asked yesterday and

4    today had to do with what the FDA knew and what they did with

5    that information.

6         Is that fair?

7    A.   Yes.

8    Q.   I want to ask you whether your opinions in this case about

9    what Boehringer didn't do are based on what -- the FDA's

10   knowledge or on Boehringer's knowledge.

11   A.   My opinions are based on what the company knew and, based

12   on the regulations, what the company's duty is based upon

13   those regulations with that information.

14   Q.   Can you please tell the jury whose obligation it is to

15   ensure and to craft actually a label that is adequate and to

16   ensure that it is accurate for the entire time the drug is on

17   the market?

18   A.   So that is -- the label is the property and is owned by

19   the company.  It's the company's job to make sure that all of

20   the information that they're aware that impacts patient safety

21   and -- and also efficacy of the drug, the way patients use the

22   drug, that information is -- it's the duty of the company and

23   the responsibility of the company to make sure that that

24   information gets put in the labeling and passed on so that

25   physicians understand the risks of the drug -- for example, in

Laura Plunkett - Redirect (Moskow)                    593

1   this case that's what we're talking about, risk -- and then

2   also making sure that patients are also aware of not only what

3   the drug is used for, but also the risks that they are going

4   to encounter when they use that drug.

5   Q.  On cross-examination, you were shown this document, which

6   is Exhibit 9199.

7       Do you see that?

8   A.  Yes.

9   Q.  Okay.  And this was something called a periodic safety

10  update report; is that right?

11  A.  Yes.

12  Q.  And you pointed out and Attorney Jones noted that it's

13  actually -- if the entire document were here, it's 1,159

14  pages.

15  A.  Yes.

16  Q.  Based on your experience in working with the FDA, is it a

17  constructive way to get information into the label to dump

18  1,159 pages of information on the FDA?

19  A.  No.  That's not -- not my experience how a company does it

20  when they have information that, ah, they believe needs to go

21  into the label.

22  Q.  Can you talk to the jury a little bit about that?

23      What is your experience on how companies who have

24  information that they want to get into the label actually go

25  about doing that?

Laura Plunkett - Redirect (Moskow)                594

1    A.  Well, it was done in one aspect -- I think we talked about

2    that.  One of the ways to do that is they can file -- actually

3    go to the FDA and request a change.  And so there was a -- I

4    think there was a document we talked about called a CBE,

5    changes being effective.  And I believe even in Ms. Kliewer's

6    deposition it discussed a change to the label that was put in

7    about this issue of monitoring renal function.

8         So that's an example.  The company sees it as an issue,

9    they have data that identifies it as an issue, and the company

10   went and asked that that information be put into the label,

11   and they actually made the label change.  So that's an example

12   of what needs to be done and should be done when that kind of

13   information is available.

14   Q.  In fact, as part of the periodic safety update report, are

15   there places where you could actually inform the FDA of

16   important issues that you think need to be addressed?

17   A.  Yes.

18   Q.  And I'm on page 3 of this document, and let's see if --

19   there's a paragraph that specifically talks about particular

20   safety issues and concerns being investigated?

21   A.  That's correct.  That's a way to highlight there.

22   Q.  And can you just read what the overall findings of this

23   document are?

24   A.  There are no new findings concerning the safety of Pradaxa

25   in this PSUR.

Laura Plunkett - Redirect (Moskow)                595

1   Q.  Based on your experience in working with the FDA, would

2   you expect there to be a careful review of 1,159 pages looking

3   for information that should be added to the label when the

4   company indicates that there is nothing new here?

5   A.  It -- I would say that they probably would not unless

6   there was already something going on in the agency that the

7   company wasn't aware of.  Otherwise, no.

8   Q.  You were asked some questions yesterday afternoon about --

9   about testing.  Do you recall that?

10  A.  Yes.

11  Q.  And you were asked specifically whether you were

12  identifying a specific test that could be done, right?

13  A.  Yes.

14  Q.  And do you recall what your answer was?

15  A.  Yes.

16  Q.  What was that?

17  A.  That you should measure the level of Pradaxa or actually

18  dabigatran in the blood.

19  Q.  Are you aware of whether that is possible in the United

20  States?

21  A.  Yes, and I tried to allude to that, you can do that.

22  There are laboratories, Quest and LabCorp are two big

23  nationwide labs that can actually do that.

24  Q.  Okay.  And there is something called hemoclot.  Do you

25  know what that is?

Laura Plunkett - Redirect (Moskow)                    596

1   A.  Yes.

2   Q.  What is that?

3   A.  That is a test that has been developed and is actually

4   being used in Europe.  So it is a diagnostic test that allows

5   you to be able to measure the activity of dabigatran in the

6   blood because you can calibrate it to the concentration of the

7   drug.

8       So it's an indirect measure.  You are not actually

9   measuring in the way that I am talking about measuring the

10  level.  There is methods of analysis to actually detect the

11  drug itself.  This is instead detecting the anticoagulant

12  effect.  It is more like the INR type of test in that way.

13  It's more direct.

14      But when you calibrate that test to the concentration of

15  dabigatran, in Europe, that can be used to actually come up

16  with an understanding of what the blood level of the drug is.

17  Q.  Are you aware of whether or not that's an approved, an

18  FDA-approved test in the United States?

19  A.  It is not.

20  Q.  Is it still available in certain laboratories in the

21  United States?

22  A.  Yes.  That's another issue.

23  Q.  Why is that?

24  A.  Just because it's not approved by the FDA, it doesn't mean

25  that there aren't laboratories that use that test.  It can be

Laura Plunkett - Redirect (Moskow)                    597

 1    used.

 2         The difference is, if you don't have it as an FDA-approved

 3    test, then in their labeling, they would not be able to

 4    mention that that's the recommended test.

 5    Q.  Are you aware of whether academic institutions like Emery

 6    or Stanford or other university centers in the United States,

 7    whether they actually use the hemoclot test?

 8    A.  Yes, there are a number of places.  In fact, you even see

 9    it discussed sometimes in the literature about it being used.

10    Q.  Now, with regard to Pradaxa in the United States, has

11    Boehringer ever recommended that a non-FDA-approved test

12    actually be used to look at patients?

13    A.  So there is a -- yes.  I believe the ECT test is not FDA

14    approved, but it occurs.

15    Q.  So let me show you page 2 of Exhibit 5884 that Attorney

16    Jones was showing you a little while ago.

17         And specifically in -- this may be a little bit hard to

18    read, but in Section 2.2, there is language that reads:

19    Generally the extent of anticoagulation does not need to be

20    assessed.  When necessary, use aPTT or ECT.

21         Do you see that?

22    A.  Yes.

23    Q.  So what does that mean to you as a scientist, that there's

24    a test that is not FDA approved, but it's in the label?

25    A.  It just means this is a test that can be used.  It

Laura Plunkett - Redirect (Moskow)                    598

1   doesn't -- to me when you see this in the label, they're not

2   saying it is FDA approved.  It just means it's useful.

3   Q.  Do you remember just a few moments ago you were shown

4   Exhibit 5014, which is a clinical trial overview from 2009,

5   November 2009?

6   A.  Yes.

7   Q.  And do you recall that you just talked about it generally,

8   that it includes risk information about different patient

9   characteristics or different things that people might have

10  that would affect their risk of bleeding?

11  A.  Yes.

12  Q.  Okay.  And does this clinical overview make any kind of

13  summaries?

14  A.  It has a summary, yes.

15  Q.  If we could turn to page 94, please.

16      Are you there?

17  A.  I am.

18  Q.  Do you see this paragraph on 94:  There may be subjects

19  who have multiple risk factors for increased bleeding risk

20  that together may substantially increase risk.  Concomitant

21  antiplatelet use, concomitant P-gp inhibitor use, age greater

22  than 75 years, moderate renal dysfunction, previous GI

23  bleeding, high CHADS2 scores greater than or equal to three,

24  are all factors that may increase bleeding risk.  While there

25  may also be increased benefit in such subjects, the risk of

Laura Plunkett - Redirect (Moskow)                    599

1   bleeding may potentially outweigh the risk of stroke.

2        Do you see that information?

3   A.  I do.

4   Q.  Is that information you agree with or disagree with?

5   A.  I agree.

6   Q.  Now I'm going to give you a hypothetical.

7        Based on information in Boehringer's own documents, if you

8   have a female woman who was 84 years of age, who was on

9   Plavix, who was taking Coreg, who had severe renal

10  dysfunction, had a history of gastrointestinal -- or I'm

11  sorry -- gastroesophageal reflux disease, is that information

12  that might indicate that this is a person at an excessive risk

13  of bleeding?

14  A.  Yes.  Based on all of the data and the information I've

15  seen, I would agree.

16  Q.  I'm trying to stay in the order that I set for myself, so

17  let me -- I want to ask you very quickly about the SMPC.

18       All right?

19  A.  Sure.

20  Q.  And I apologize.  If I'm moving quickly, please slow me

21  down.  All right?

22  A.  I'm fine so far.

23  Q.  On Exhibit 80, I want to show you information on page 6,

24  if that's all right.

25  A.  Okay.

Laura Plunkett - Redirect (Moskow)                600

1   Q.  Those patient factors that were reflected in the clinical

2   overview that we just looked at --

3   A.  Yes.

4   Q.  -- are more or less reflected in the European label,

5   right?

6   A.  That's correct.

7   Q.  And these are all factors that do what?

8   A.  These are all factors that put the patient at increased

9   risk of bleeding.

10  Q.  And in the European label, in the SMPC, doctors were told

11  that when they have all these issues, what should they do?

12  A.  Well, they need to consider changing the dose or another

13  drug altogether.

14  Q.  But how would they know whether somebody needs to change

15  the dose or be on another drug altogether?

16  A.  Oh, I'm sorry.  Yes.  They are told to actually look at

17  the exposure or look at the chance that the patient has

18  excessive activity of dabigatran in their blood.

19  Q.  Now we're going to talk a lot about the patient Medication

20  Guide, but let me just ask you simply, does BI ever tell U.S.

21  doctors to do this?

22  A.  No, they don't, and that's one of the things I've talked

23  about that's important.

24  Q.  And when you were showing the jury the information that

25  you had identified in the European label, were you comparing

Laura Plunkett - Redirect (Moskow)                601

1    the European label to the Medication Guide?

2    A.  Yes.

3    Q.  And why is that?  What is it about what the European

4    label -- the information that is in the European label that

5    speaks to BI's obligation to communicate things, to tell

6    patients what is going on?

7    A.  To me, the information that we went over in the European

8    label, and also some of the CCDSs we went over, those issues

9    are ones that tell you how to identify yourself as whether or

10   not you're somebody who is going to be somebody that would be

11   likely to experience this serious risk of bleeding.

12       Especially for patients that have, ah, experience with

13   anticoagulants, maybe on warfarin before, understand bleeding

14   is a risk.  But there's a specific way to look at this

15   particular drug differently based on some of the issues it

16   has -- like I talked about bioavailability, interference with

17   certain things -- that you can actually maybe prevent a bleed

18   by understanding that these things apply to you.

19   Q.  How, if at all, does the information that is in the

20   European label tell you whether BI knows that these are issues

21   that can be communicated to folks?

22   A.  Because they're there.  I mean, the things that are

23   described there are ones that are indeed, ah, somewhat

24   described in the physician label, but then it doesn't make it

25   to the patient.

Laura Plunkett - Redirect (Moskow)                602

1    And to me the most important concepts are the issue that
2    you could have too much exposure.  There is a relationship
3    between your exposure and your risk, that you are one out of
4    five per chance that you could be the person that, oh, by the
5    way has that risk.  And so there is a reason to think you
6    could prevent or reduce your risk by -- with this drug by
7    understanding your risk factors.
8    Q.  Why is it that you're so concerned about language
9    concerning the level of Pradaxa in the blood be communicated
10   to patients here in West Virginia?
11   A.  Because they need to understand that there is -- there
12   is -- there is information out there that will allow you to
13   get that information, that test, and make that choice so the
14   drug can be used more safely.  It's a safer drug when you are
15   able to identify people and identify whether or not they're
16   people where they're outside the safe range of exposure.  And
17   so I just don't understand why it wouldn't be a good idea to
18   make this a safer drug.
19       And being that here, the patient -- it's important that
20   the patient be provided that information, it needs to be
21   there, then.  Too much Pradaxa equals risk, and there's a way
22   to figure out if you have too much Pradaxa.
23   Q.  We were just looking at the European label, and it had
24   that specific language, excess dabigatran exposure and how to
25   test for it.

Laura Plunkett - Redirect (Moskow)                      603

1      Maybe I'm repeating myself, but how would you do that?

2   A.   How would you test for it?

3   Q.   Yeah.

4   A.   You would take your blood sample, and you would test it

5   for the concentration.  If you're already being tested for

6   kidney function, we talked about that, you could take that

7   sample that you've already drawn and use part of that, and the

8   doctor could send it off.  But you could also prick your

9   finger, get a blood sample, and that could be used as well.

10  Q.   Gotcha.

11      All right.  So we've talked a little bit about the FDA.

12  We talked a little bit about the SMPC.  If I had more

13  initials, I'd use them.  But I want to now look at a couple of

14  documents and the studies that we talked about this morning.

15      All right?

16  A.   Okay.

17  Q.   Attorney Jones just asked you whether you had reviewed

18  e-mails of company employees talking about the idea of a

19  therapeutic range.

20      Do you recall that?

21  A.   Yes.

22  Q.   And, in fact, you showed the jury some of those yesterday?

23  A.   Yes.

24  Q.   And one of the documents you showed was Exhibit 5.  It was

25  an e-mail conversation between Dr. Reilly and Dr. Brueckmann.

1          Do you recall that?

2     A.  Yes.

3     Q.  And when Attorney Jones was asking you questions, she

4     asked you whether you would agree that they were discussing,

5     you know, science and different interpretations of the

6     science, and you said you couldn't quite answer that question

7     yes or no.

8          Is that fair?

9     A.  Yes.

10    Q.  Can you explain to the jury why that is?

11    A.  Well, because if you -- if you read these e-mails, it's

12    more than science that's being discussed.  It's talking about

13    the issue of, ah, the goal of the drug and the fact that

14    marketing -- the marketing goal was to have a drug with no

15    monitoring.  So, as a result, that's the message that

16    they're -- that they understand needs to be complied with.

17    Q.  And is Exhibit 5, and particularly the e-mail at the

18    bottom of the page from Dr. Reilly to Dr. Brueckmann,

19    representative of that discussion?

20    A.  Yes.

21    Q.  And what is it about this particular e-mail that you want

22    to point out to the jury as representative?

23    A.  It's the idea that they understand that -- if you read it

24    down here, they understand in the parentheses that dose

25    adjustment will optimize therapy.  But yet above that, you can

Laura Plunkett - Redirect (Moskow)                605

1    see that the issue is the conclusions are not the ones that

2    are wished for by marketing.

3        So it's the idea of these scientists being well aware of

4    the influence of that -- that component of the company at

5    least here.  And I'm not saying -- I'm not saying anything

6    about motives.  I'm just saying generally that this tells me

7    as a scientist that there is more going into their decision

8    process and their discussion than just whether or not there is

9    good science.

10   Q.  And, you know, you were asked also, you know, what it is

11   that you were recommending in terms of testing blood levels

12   for Pradaxa.

13       And this is an e-mail dated August 1, 2011.  So it's more

14   than seven years ago; is that right?

15   A.  Yes.

16   Q.  And could you read the second sentence of Dr. Brueckmann's

17   e-mail?

18   A.  Maybe one has to clearly differentiate between initial

19   dose adjustment with the help of a target range and regular

20   measurements, which are certainly not needed.

21   Q.  How, if at all, is that point consistent or inconsistent

22   with what you've been telling the jury yesterday and today?

23   A.  It's consistent.  I'm saying -- I'm not saying do like

24   warfarin routine monitoring, and I believe Attorney Jones

25   asked me that question.  That's not my opinion.

1    My opinion is this is useful information about the

2    target -- about this therapeutic range that can be used to

3    know whether, when a patient starts on the drug, it's the

4    right dose or even the right drug for that patient.  And that

5    decision can be made early on.

6    Q.  But isn't she actually suggesting the same thing that you

7    said to the jury?

8    A.  Yes, she is.  In fact, there's other e-mails where you can

9    see that they're -- that the scientists here discussing these

10   issues understand -- there was another one we read about when

11   we have a competitive -- a competitor out there, this will be

12   something that makes us better.

13   Q.  Well --

14   A.  So it's that process of understanding that this idea of

15   the really good data set they actually have could be used by

16   them to make this drug safer and better, and yet they're

17   choosing not to do that.

18   Q.  In fact, that e-mail that you are referring to is the one

19   at the bottom?

20   A.  Yes.

21   Q.  Dr. Reilly said, I actually think that once we have a

22   competitor out there that is as good as we are, we'll be

23   looking for ways to make our drug even better?

24   A.  That is exactly right.

25   Q.  I want to just -- last thing on this e-mail, you indicated

Laura Plunkett - Redirect (Moskow)                607

1   that marketing was playing a role.

2       Can you read the sentence that begins on the fourth line

3   to the end?

4   A.  The time may be a bit too early to introduce a target

5   plasma level range from a marketing point of view.  But if

6   this could clearly demonstrate that additional benefits are

7   obtained, this may be a path forward to differentiate

8   ourselves from competitors.

9   Q.  How, if at all, does that fit into your opinions that

10  Boehringer knew there was a way to make the drug safer, but

11  hasn't communicated that to patients here in West Virginia?

12  A.  I think it's exactly on point with what I've been saying.

13  The company obviously understands they have a way to make the

14  drug safer.  There's information and data their scientists are

15  discussing.  But instead of doing that, they're making no

16  change, and that information isn't getting to the patients who

17  I believe would like to have that.  I would.

18  Q.  I'm not sure this fits into any of those categories, but

19  somebody left a note on my stack, so now I have to ask another

20  question, which is, has any plaintiff or plaintiffs lawyer

21  asked you to work on a project that you turned down?

22  A.  Yes.

23  Q.  Why?

24  A.  Because -- so when I do this work, I do it because I

25  believe in what I'm doing.  Before I even agree to take a

Laura Plunkett - Redirect (Moskow)                608

1    case, I spend a couple of hours of my own time, not charged to

2    the attorney, where I look at the issues, the science, and I

3    see whether or not what they have told me they're trying to do

4    is going to be something that I could support.

5        So there are cases that I turn down because I don't think

6    the science supports it or just, in general, I just think

7    there is something wrong with the approach that is being taken

8    as far as trying to link it with cause and effect.  Sometimes

9    I don't believe there's a causal link there that could be

10   identified.  So depending on what I'm doing, I do turn down

11   cases.

12   Q.  So when you're asked have you ever testified in a product

13   liability case whether the drug company was adequate, would

14   there ever be a way you could do that?

15   A.  Probably not unless I was approached by a defendant for

16   one of these cases, and unfortunately I have not.

17   Q.  If somebody did approach you, and you agreed with their

18   position?

19   A.  Yes, absolutely.

20       When I was at ENVIRON in the old days, when I worked for

21   another consulting company, I worked on defense litigation,

22   and they were cases that I believed had scientific support

23   based on the information I had.

24   Q.  All right.  I want to now look at some studies very

25   quickly if we can.  The first one I wanted to ask you about is

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Laura Plunkett - Redirect (Moskow)                    609

1   Exhibit 6038, which is the Hariharan paper that you were asked

2   about today.

3   A.  Yes.

4   Q.  And I hope you can remember your train of thought, but you

5   were asked a question about this paragraph on the bottom of

6   page 3.  And you said you wanted to explain the idea of what

7   the FDA's guidance -- the role that it plays in this area.

8       Are you able to remember what you were thinking?

9   A.  I think so, yes.

10  Q.  And what is that?

11  A.  So if you actually read the guidance document, it talks

12  about the fact that there are times when you can't ethically

13  collect, for example, or just based on the way the study is

14  designed, you can't collect data in all populations.  And

15  specifically in renal impairment, sometimes that is difficult.

16  So what the guidance document says is here's the things that

17  you need to consider if you're going to use this modeling in

18  order to go forward with choosing a dose.

19      And if you actually read that document, when I read it,

20  there is some information there that indicates that additional

21  data still needs to be collected, and that's the issue.

22  That's my -- when I talk about not being tested, the issue is

23  testing the drug afterwards for more pharmacokinetic

24  measurements is not saying it is testing the drug to see --

25  when you know pharmacokinetics or the blood levels or that

1   exposure predicts outcome, we know that there's a relationship

2   between too much Pradaxa and risk of bleeding, that is the

3   data that hasn't been collected in a controlled manner.

4       There has been observational -- she brought up some -- I

5   mentioned that was an epidemiological study.  I think I threw

6   that out once, which I don't think we then explained.

7       But essentially there is different kinds of studies, the

8   studies that are used for drug approval purposes by the FDA,

9   and companies have controls built around them so that we know

10  exactly who we're studying and what outcomes we're going to

11  look for, so you know what people are exposed to, when they

12  got the drug.

13      The problem with the observational work is you don't even

14  know -- you can't control exactly when the people took their

15  drug, what they took, how it was done.  So as a result, there

16  is limitations on that data, to me, as far as saying that that

17  shows that this drug is safe and effective, that data doesn't

18  show the drug is safe and effective.  It adds to a weight of

19  the evidence that you can collect, and all of those studies

20  together may let you determine that it appears to be safe.

21  But it's not the same as doing a study to show that 75

22  milligrams and severe renal impairment prospectively is indeed

23  going to -- going to -- going to be as safe as it was shown --

24  as the 150 dose was shown to be in RE-LY.

25  Q.  So the RE-LY trial is something called a controlled

Laura Plunkett - Redirect (Moskow)                611

1   clinical trial?

2   A.  Yes.

3   Q.  And that's the best thing that you can do in order to see

4   whether a drug is safe and effective?

5   A.  Well, that's part of drug approval, yes.  It is the --

6   it's the type of study that has the most controls that FDA and

7   the regulatory agencies define as the type of study you need

8   to do to prove safety and efficacy.  Less chance, less

9   likelihood that what you get at the end is not really true.

10  Q.  So if we are looking at papers that are based on insurance

11  databases or Medicare, Medicaid databases, can you explain to

12  the jury how that is different than an actual trial?

13  A.  It's because of the fact that the people that are in them,

14  that you didn't select them necessarily to be in a study for a

15  particular purpose.  Instead you gather the database, and you

16  find the people that were on a drug, and then you look at when

17  they started it and when they stopped it or are they still on

18  it and determine did they report an event.  So it just doesn't

19  have the same level of control and understanding of the

20  patient population.

21      Given that this is a patient population that we expect,

22  first off, to be very variable -- severe renal people, when

23  you looked at their data, blood levels were really all over

24  the map -- being that we know that these severely renally

25  impaired patients are on different drugs at the same time, all

Laura Plunkett - Redirect (Moskow)                    612

1  of that isn't accounted for in those observational studies.

2       So we really don't know exactly were they really truly

3  severely renally impaired?  In fact, one of the studies

4  indicates 93 percent of the people they studied, they didn't

5  know if they were.

6  Q.  We're going to talk about that in a moment.

7  A.  So --

8  Q.  Thank you.

9       Let me move you to Exhibit 9328.  This was shown to you

10  earlier today.  Or it might have even been yesterday, I've

11  lost track.

12      But this was part of the approval of the 75-milligram

13  dose.  Do you recall that?

14  A.  Yes.

15  Q.  Well, let me -- as long as we're here.

16      There was a statement that said:  For the RE-LY study, the

17  decision to not include or discontinue subjects with markedly

18  decreased renal function was probably a rational decision.

19  Dabigatran and its metabolites are renally excreted.  Allowing

20  patients with marginal renal function to enroll or continue in

21  the study would risk the problem of generating excessive

22  concentrations in these patients and risking additional

23  bleeding.

24      Do you agree with that statement?

25  A.  Yes.

Laura Plunkett - Redirect (Moskow)                613

1  Q.  Why?

2  A.  Because that's just the point.  If you -- if you don't

3  really know what their exposure is, we know that they're at

4  risk, and that's the issue.

5      So, yeah, in these studies -- in a study like that or any

6  study you design, you would need to be measuring blood levels

7  as well as looking at outcomes, because that is the only way

8  you know that people are also being protected when they are in

9  the study.

10 Q.  Okay.  I want to turn your attention to the last page of

11 Exhibit 9328, page 6, and I want to show you something that

12 counsel didn't show you yesterday when she showed you this

13 document.

14     And it reads:  Since there is no empirical data on this

15 population with regard to bleeding risk, particular attention

16 post-marketing should be paid to bleeding and other safety

17 events in those treated with the 75-milligram BID regimen and

18 patients with severe renal impairment.

19     Can you explain to the jury why that is important

20 information?

21 A.  It's important -- I mean, I think that's a little more

22 complex.  You wouldn't want to put that on the Medication

23 Guide just like that, but essentially this is the issue that I

24 was talking about.

25     It's important to understand that all -- that what was

1  done to make a decision for this dose was computer modeling.

2  They didn't actually have data to show that these people with

3  certain levels of exposure had a decreased or an increased

4  risk of bleeding.  They weren't monitoring that.  So they

5  can't say that the drug, ah, has the same bleeding risk really

6  with data as it does with the 150.  They're assuming it does

7  based on the modeling, but they didn't actually collect the

8  data.

9      So I understand that in the physician labeling in one

10  section there's a statement for the physician, but that's not

11  the same as telling very directly that -- to the patient that

12  this drug has not been tested in people like you, and we don't

13  really know exactly what your risks are as far as when you

14  reach an increased risk of bleeding.

15      I would argue if they said but we could monitor your

16  exposure and mitigate that risk, that would be something that

17  would be useful to the patient.

18  Q.  Okay.  I just want to touch on that last part you said.

19  A.  Okay.

20  Q.  If we could monitor exposure and mitigate that risk, that

21  would be useful information, tell the jury what exactly you're

22  proposing.

23  A.  I'm proposing to tell the patient that if you are one of

24  these people that are at severe renal impairment where we

25  don't actually have the data, that monitoring the level of

Laura Plunkett - Redirect (Moskow)                    615

1  Pradaxa in your blood when you start therapy will tell us

2  whether or not you are one of those people that we should

3  really be concerned about as far as being at an increased

4  risk.

5  Q.  One of the papers you were shown this morning, Exhibit

6  5747, was one of these prospective studies that you talked

7  about?

8  A.  Yes.

9  Q.  Okay.  And I think this one talks about the fact that

10  it -- well, let me take a step back.

11      This paper was published in 2015.  Do you see that on the

12  bottom of the first page?

13  A.  Yes.

14  Q.  You would agree with me that 2015 is after September of

15  2013?

16  A.  Yes.  It's well after, yes.

17  Q.  All right.  And in this particular group, do you recall

18  that there weren't a sufficient number of people on the

19  150-milligram dose -- I mean, excuse me -- on the 75-milligram

20  dose for the company to actually make any conclusions about

21  the 75-milligram dose?

22  A.  That's correct.  This was not a study directed at 75.

23  They tried to see how many were there, but there weren't

24  enough in order for them to draw any conclusions separately

25  about whether the 75 was safe and effective.

Laura Plunkett - Redirect (Moskow)                616

1   Q.  As a scientist talking to the jury about the 75-milligram

2   dose, can you explain to them why this paper is helpful at all

3   to their deliberation as to whether BI breached its duties to

4   the Knight family?

5   A.  Well, I don't think the paper is helpful at all if you're

6   trying to determine whether or not the company had

7   appropriately tested 75 or had given any information to the

8   doctor even in the label about that issue.  This is -- this

9   data does not help in that regard.

10  Q.  Do you recall being shown Exhibit 9327?  This is a paper

11  entitled Comparing Stroke and Bleeding Risk with Rivaroxaban

12  and Dabigatran in Atrial Fibrillation, Analysis of the U.S.

13  Medicare Part D Data.

14  A.  Yes.

15  Q.  Okay.  Is this one of those observational studies that you

16  were talking about?

17  A.  Yes.

18  Q.  And was this one -- you used the word controlled.  Let me

19  see if I can say it differently.

20      Did this one make sure that the people who were in the

21  study and on the 75-milligram dose were the people who were

22  supposed to be on that dose?

23  A.  Yes.

24  Q.  Could I turn you to page 7 of this paper.

25      Do you see there's a paragraph that reads:  Although low

Laura Plunkett - Redirect (Moskow)                617

1    dose dabigatran and rivaroxaban are only indicated in patients

2    with AF with reduced kidney function, only 52.6 percent of the

3    patients receiving dabigatran 75 milligram had a diagnosis of

4    chronic kidney disease?

5    A.   That's correct.  That was the point I was making.  I think

6    the other paper had 93 where they didn't even have data to

7    tell them that, but that's the issue.

8        In many of these observational studies, that's the problem

9    they have.  If they did collect data on 75, they don't know

10   that those were the -- those people were even supposed to be

11   on 75 from the start.

12   Q.   Do you recall -- this is the Hernandez paper.

13       Do you recall whether the authors in the Hernandez paper

14   speculated as to why they had so many people on the

15   75-milligram dose as opposed to the 150-milligram dose?

16   A.   Yeah, there is something later on in the paper, I believe.

17   Q.   Let's take a quick look at that.

18       Do you see it says here:  Although our study did not

19   specifically examine the off-label use of the low dose

20   dabigatran and rivaroxaban, we hypothesize that these low

21   doses of anticoagulants were prescribed off-labelly in 2011 to

22   2013 for patients with normal kidney function who did have

23   other risk factors for bleeding, such as hypertension or a

24   history of stroke or bleeding.

25       Do you see that?

Laura Plunkett - Redirect (Moskow)                618

1    A.  Yes.

2    Q.  What does that mean?

3    A.  Okay.  So off-label means in the -- means it's not

4    something that the drug was approved -- was actually approved

5    for.

6        So the label use is use in patients with AFib, and the

7    label use of the 75 would be in patients with severe renal

8    impairment, where their kidneys just aren't working hardly at

9    all.  Off-label would be using 75 in somebody who didn't fit

10   creatinine clearance less than 30, but they had better kidney

11   function.

12       So that is what we're talking about, use in patients that

13   the 75 dose wasn't even modeled to really fit.  It was modeled

14   to fit severe renal impairment.  It wasn't modeled for these

15   other issues.  So we really have no information.

16   Q.  How, if at all, does this paper help the jury evaluate

17   whether BI breached its duties to the Knight family with

18   regard to the 75-milligram dose?

19   A.  I don't think it helps you at all make a decision on

20   whether they did or they didn't.

21   Q.  Are you aware of any real world studies where they

22   controlled for issues of severe renal impairment to make sure

23   that the people who were on the 75-milligram dose were --

24   actually had severe renal problems, severe kidney problems?

25   A.  Maybe one.

Laura Plunkett - Redirect (Moskow)                619

1   Q.  What --

2   A.  Only one, though, but it's not -- it's not a real study.

3   There's an observational study only.

4   Q.  And are you aware of any, quote/unquote, real world

5   studies of dabigatran that occurred prior to November of 2011?

6   A.  No, not.

7   Q.  I want to show you another one of the papers you were

8   shown.  It's Exhibit 5526, and it's entitled Stroke, Bleeding

9   and Mortality Risks in Elderly Medicare Beneficiaries Treated

10  with Dabigatran or Rivaroxaban for Non-valvular Atrial

11  Fibrillation.

12      Do you remember this one?

13  A.  Yes, I do.

14  Q.  And we haven't really talked about this, but on the front

15  page of most of these articles there's like a little summary

16  section that has important information, right?

17      Every one of the papers we have looked at, they have

18  something -- what's that called?

19  A.  The abstract.

20  Q.  The abstract.

21      And what's the purpose of the abstract?

22  A.  It's to summarize right up front the most important

23  findings and also the design of the study.

24      So a scientist will read the abstract first, and then they

25  will decide whether or not the study has anything that might

Laura Plunkett - Redirect (Moskow)                620

1    be useful to them, and they will delve in further.  So the

2    conclusions and the ultimate design are usually put up front.

3    Q.  Can you tell the jury what drug was actually studied in

4    this -- in this paper?

5    A.  Well, I guess you mean the dose.

6    Q.  Yeah.

7    A.  It's 150 milligrams of dabigatran is what they drew

8    conclusions on.

9    Q.  Is this paper either designed or representing to the

10   public that it has providing valuable information about the

11   75-milligram dose?

12   A.  No.  And like the other ones we've discussed, this paper

13   suffers from those limitations of not knowing if people that

14   were on 75 were the people that were supposed to be on 75.

15   Q.  What help do you believe this paper is to the jury in

16   determining whether or not Boehringer breached its duties to

17   the Knight family?

18   A.  Again, I don't think these papers provide that evidence

19   for the kinds of things that I've been talking about.  In

20   other words, they don't provide that anything was actually

21   studied -- studied in a way that would be able to show that

22   the drug was actually safe and effective as used in patients

23   with severe renal impairment.

24   Q.  Okay.  One of the documents that you were shown today is

25   Exhibit 9194.  It was a clinical trial report from 2014.

Laura Plunkett - Redirect (Moskow)                    621

1      Do you recall that?

2  A.  Yes.

3  Q.  All right.  So 2014 is after September of 2013?

4  A.  That's correct.

5  Q.  Okay.  And with regard to this particular study, you had

6  indicated that you had concerns when you were being asked

7  questions about it, and they specifically had to do types of

8  patients that were enrolled.

9      Do you recall that?

10  A.  Yes.

11  Q.  Can you explain to the jury what your concerns were about

12  that?

13  A.  So this paper was a paper that wasn't being -- people

14  didn't have AFib, so even -- and it was also short term, only

15  for seven days.  So different patients, short term isn't going

16  to tell us what we need to know about the chronic use in AFib

17  patients of 75 milligrams in patients with severe renal

18  impairment.

19  Q.  Is that important?

20  A.  Yes.  Because that's the type of data that you would

21  typically collect if you were going to actually prove that

22  this -- this drug had those benefits.

23  Q.  Does this paper or clinical trial overview, to the extent

24  that you reviewed it, reflect outcome data?

25  A.  No.

Laura Plunkett - Redirect (Moskow)                    622

1   Q.  What is outcome data?

2   A.  So outcome data in RE-LY, for example in RE-LY, is did

3   somebody have a bleed?  Did somebody have a stroke?  That's

4   the outcome of taking the drug.  Did we prevent a stroke?  Did

5   somebody bleed?  This is a pharmacokinetic study, so it is

6   looking at this issue of how much Pradaxa did they measure in

7   their blood.

8   Q.  How long was this study?

9   A.  Seven days.

10  Q.  Seven days in 16 people?

11  A.  Yes.  Small study and for a short period of time.

12  Q.  Is this a comparison of the 75-milligram dose to people on

13  warfarin?

14  A.  No.

15  Q.  You were also shown Exhibit 9191.  Do you recall that?

16      It was a clinical trial report with regard to another

17  study that was done in two thousand -- well, it was actually

18  published in May 2016.

19      Do you see that?

20  A.  Yes.

21  Q.  When I say published, have you ever seen this paper in the

22  medical literature?

23  A.  No, I've not seen this one.  But the study report was --

24  was made available in 2016.

25  Q.  Okay.  This one -- and certainly May of 2016 is after

Laura Plunkett - Redirect (Moskow)                    623

1    September of 2013?

2    A.  Yes.

3    Q.  I don't want to spend a lot of time on this paper, but I

4    want to go to conclusions at the front here.

5        And I drew on mine while Attorney Jones was talking to you

6    about it, so I apologize if it's hard to read.

7        Can you read the first paragraph of the conclusion?

8    A.  Sure.

9        The observed dabigatran plasma concentrations in patients

10   with severe renal impairment following 75 milligrams

11   dabigatran etexilate, in parentheses Pradaxa, twice daily,

12   were generally in agreement with those predicted by models

13   developed from data in previous trials, although with a

14   tendency towards under prediction of median and higher

15   concentrations.

16   Q.  Can you tell the jury as a scientist how something can be

17   consistent with a model when the finding is that it under

18   predicted the median and high concentrations?

19   A.  Well, you can say it's consistent depending on what you

20   compare.  But I would say this is telling me it's not entirely

21   consistent, that there are issues with -- with the model.

22   Q.  So in their internal document talking about the study,

23   they make a finding that it under predicts median and higher

24   concentration.

25       What does that mean for people with really bad kidneys?

Laura Plunkett - Redirect (Moskow)                    624

1    A.  So that's what you're worried about, is those higher

2    concentrations, because they are not going to let the drug

3    out.  So if you're under predicting with that model, then

4    you're not getting an understanding of what actually people

5    have in their blood is what they're saying.

6            MR. MOSKOW:  All right.  I'm going to try to move on

7    here and try to talk about the doctors' label very quickly.

8            Permission to approach, Your Honor?

9            THE COURT:  Yes.

10           MR. MOSKOW:  Doctor, I've handed you what's been

11   marked as Exhibit 86 for identification.

12   Q.  Are you able to identify what this is?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is the launch label, the first label for Pradaxa

16   that -- when it was approved.

17   Q.  Is it the launch label or do you see the revised date?

18   A.  Oh, I'm sorry.  I saw up here.  You're right, revised in

19   2011.

20   Q.  Okay.

21           MR. MOSKOW:  Your Honor, I'd offer 86 as a full

22   exhibit.

23           MS. JONES:  No objection.

24           THE COURT:  It's admitted and may be published.

25           MR. MOSKOW:  Thank you, Your Honor.

Laura Plunkett - Redirect (Moskow)                625

1      (PLAINTIFFS' EXHIBIT 86 ADMITTED INTO EVIDENCE.)

2          MR. MOSKOW:  In particular, I don't want to spend a

3      lot of time on this, but you were shown language from a

4      different label on direct examination that -- excuse me -- on

5      cross-examination where Boehringer was telling physicians

6      about severe renal impairment.

7      Q.  Do you recall that?

8      A.  Yes.

9      Q.  In fact, the exhibit you were shown was Exhibit 5884.  And

10     the part of the -- and, again, I apologize for my messy

11     highlighting.

12         The part of the label that you were shown with regard to

13     this was on page 6, and it had to do with Table 3 and language

14     underneath that that said -- well, first of all, the table

15     identified severe renal impairment, right?

16     A.  Yes.

17     Q.  So really bad kidney problems.

18         And then underneath it, it said:  Patients with severe

19     renal impairment were not studied in RE-LY.  Dosing

20     recommendations in subjects with severe renal impairment are

21     based on pharmacodynamic modeling.

22         Do you see that?

23     A.  Yes.

24     Q.  And that was information that you said that you were aware

25     of?

Laura Plunkett - Redirect (Moskow)                 626

1   A.  Yes.

2   Q.  Okay.  I want to go to back to Exhibit 86, and I want to

3   look at page 5.  I'm going to try to do these side by side,

4   but I probably won't do it very well.  So let me -- I guess

5   that's close enough.

6       Are you able to see Exhibit 86?

7   A.  I have both in front of me, so I'm good.

8   Q.  Can you tell the jury where in Table 3 in Exhibit 86 it

9   reflects severe renal impairment?

10  A.  It doesn't.  This part of the label is different in

11  this -- in the 2011 label versus the label we looked at.

12  Q.  Okay.  Now, I know you're not familiar with the facts of

13  Mrs. Knight's Pradaxa use, but let me ask you this.

14      If you had a patient who started on Pradaxa when Exhibit

15  86 was the operative label, what information would be

16  available to the doctor?

17  A.  There would -- nothing in this section on severe renal

18  impairment and certainly wouldn't have the other statement

19  which you pointed to.  They wouldn't know about that, about

20  the fact that patients were not studied.

21  Q.  Can you tell the jury if Boehringer Ingelheim sent a dear

22  doctor letter that we talked about yesterday, did they send

23  any kind of communications to doctors in the United States

24  telling them that they had added information into the label

25  about severe renal impairment?

Laura Plunkett - Redirect (Moskow)                627

1   A.  I actually asked if that had happened, and I was -- I'm

2   not aware that they actually sent such a letter.  I haven't

3   seen one.

4   Q.  And were you aware of whether they ever sent any kind of

5   letter to doctors or anyone indicating they had added a

6   statement that the data had never been tested in real people?

7   A.  The same answer, I'm not aware of that having happened.

8   Q.  You were asked a lot of questions about the doctor's label

9   yesterday and today.

10      Do you recall that?

11  A.  Yes.

12  Q.  And I want you to tell the jury -- well, let me take a

13  step back.

14      Based on your work as a consultant working with

15  pharmaceutical companies over the last 30 years or so, what is

16  your understanding of whether in West Virginia a company

17  should warn the patient or warn the doctor?

18          MS. JONES:  Your Honor, may we approach briefly on

19  this?

20          THE COURT:  You may.

21      (Bench conference, reported.)

22          MS. JONES:  I object to this.  The jury will be

23  instructed on West Virginia law.  Dr. Plunkett is not a West

24  Virginia legal expert.  I think the question is inappropriate.

25          MR. MOSKOW:  Her opinions are informed by the opinion

Laura Plunkett - Redirect (Moskow)                 628

1   of who it has to go to.

2          THE COURT:  Well, I think if you rephrase it, you can

3   ask it.

4          MR. MOSKOW:  Okay.  I'll rephrase it.

5          THE COURT:  Okay.  How do you intend to rephrase it?

6          MS. JONES:  No, Neal, he wants to know how you are

7   going to rephrase it.

8          MR. MOSKOW:  I will rephrase the question, and it will

9   be something to effect of, now, Doctor, in reaching your

10  opinions in this case, did you have an understanding as to who

11  the warning should go to?

12         THE COURT:  I think that's fair enough.

13         MS. JONES:  I still think that speaks to a legal

14  issue.  I mean --

15         THE COURT:  It has an implication for the legal issue,

16  but it's -- I will permit that.

17         MS. JONES:  Okay.  Thank you, Judge.

18      (Bench conference, concluded.)

19         THE COURT:  All right.  Rephrase your question.

20         MR. MOSKOW:  Yes, Your Honor.  Thank you.

21  Q.  Dr. Plunkett, in reaching your opinions in this case, did

22  you have an understanding as to who the warning should go to

23  here in West Virginia?

24  A.  Yes.

25  Q.  And who is that?

Laura Plunkett - Redirect (Moskow)                629

1   A.  To the patient.  So the Medication Guide becomes the most

2   important document.

3   Q.  Even with that statement, I want to ask you a few

4   questions about the doctor's label.  All right?

5   A.  Sure.

6   Q.  And in particular, I want to ask you about this warning

7   and precaution that says risk of bleeding -- and I'm looking

8   at Exhibit 5884 right now.

9   A.  Uh-huh.

10  Q.  Risk of bleeding.  Pradaxa can cause serious and sometimes

11  fatal bleeding.  Promptly evaluate signs and symptoms of blood

12  loss.

13      Do you recall that?

14  A.  Yes.

15  Q.  And you were asked whether it was a strong warning.

16      Do you recall your answer to that?

17  A.  Yes.  I said it was.

18  Q.  Okay.  And you were asked whether it was a serious

19  warning.

20      Do you recall your answer to that?

21  A.  Yes, I do.  I said it was.

22  Q.  I have a question for you.  Is it a complete warning?

23  A.  No, and that's my issue.

24  Q.  Explain that to the jury.

25  A.  So it is well known by scientists and physicians, based on

Laura Plunkett - Redirect (Moskow)                     630

1    what I have seen in the medical literature for sure, that

2    everyone knows that anticoagulants cause bleeding, can cause

3    serious bleeding.  And I think Attorney Jones even pointed

4    that out.

5        So the issue is, when you're telling doctors something in

6    a warning about the risk of bleeding can be serious and

7    sometimes fatal or life-threatening, but you know how to

8    prevent it, you know that there's information that allows you

9    to identify people who may not be at such -- or may be at a

10   great risk and you could actually prevent or minimize that

11   risk, that is what is incomplete.

12       You're not telling the physician, oh, by the way, it's

13   serious.  But identifying your patient -- whether or not your

14   patient has excessive exposure or too much dabigatran or

15   whatever word you use, in other words, taking a blood sample

16   to understand where they fit with their risk factors, that is

17   the warning -- part of the warning that I think is missing.

18   Q.  And that's even in the doctor's label?

19   A.  That's correct.

20   Q.  We're not even talking about the patient Medication Guide.

21   A.  That's correct.

22   Q.  Now, you testified that there were changes to the label

23   over time; is that right?

24   A.  Yes.

25   Q.  I want to go back to Exhibit 86, if we could quickly.  And

Laura Plunkett - Redirect (Moskow)                631

1   I want to look at Section 5.1 which has to do with the risk of

2   bleeding.

3   A.  Okay.

4        MR. MOSKOW:  And hopefully everybody can see this, but

5   we'll read along just so it's clear.

6   Q.  This section on risk of bleeding doesn't specifically

7   mention anything to do with renal concerns, does it?

8   A.  No, not in this section.

9   Q.  And if we go to the later label, Exhibit 5884, that

10  January 2002 [sic] label, in Section 5.1 there on page 3,

11  there is specific language about Pradaxa's anticoagulant

12  activity and half-life are increased in patients with renal

13  impairment.

14       Do you see that?

15  A.  Yes.

16  Q.  Can you tell the jury when Boehringer sent a dear doctor

17  or dear health care professional letter out to U.S. doctors

18  telling them that that change had been made in the warning

19  section of the Pradaxa label?

20  A.  I have not identified a letter where they did that.

21  Q.  So is the simplest way you haven't seen a letter that went

22  to doctors?

23  A.  I have not seen a letter that went to doctors to tell

24  them, and this is important information.

25  Q.  With regard to adverse reactions and drug interactions --

Laura Plunkett - Redirect (Moskow)                    632

1   I'm looking at Exhibit 86 on the highlights.

2   A.  Okay.

3   Q.  Is there any information there about dangerous drug

4   interactions that a physician needs to be aware of?

5   A.  Not in this highlights section, no.

6   Q.  If we look at 5884, the January 2002 [sic] label, has

7   there been information added about dangerous drug

8   interactions?

9   A.  No, not in that section.  Although, to be fair, there is

10  something in warnings and precautions up above, but not under

11  adverse reactions.

12  Q.  How about in drug interactions?

13  A.  Oh, no.  I'm sorry.  Yes, that's correct, there is.  Yes.

14          MR. MOSKOW:  I know it's been a long day --

15          THE WITNESS:  I'm sorry.

16          MR. MOSKOW:  -- and I'm bouncing around.

17          And to be fair, you and I haven't been able to speak

18  in 12 hours, so we haven't had a chance to talk about this.

19          THE WITNESS:  Yeah, I thought you were looking up

20  there under adverse reactions.  I apologize.

21  BY MR. MOSKOW:

22  Q.  But there is a specific warning now saying P-gp inducers,

23  right?

24  A.  Yes.

25  Q.  And a specific warning saying P-gp inhibitors?

Laura Plunkett - Redirect (Moskow)                    633

1    A.  Yes, there is.

2    Q.  And now there's a third warning that says P-gp inhibitors

3    in patients with severe renal impairment, Pradaxa use is not

4    recommended.

5    A.  Yes.

6    Q.  Is that important information?

7    A.  Absolutely.

8    Q.  Why is that important information?

9    A.  Because that's the discussion I had about the fact that

10   you put together severe renal impairment and put together P-gp

11   inhibitors, and you don't know what level of drug is in the

12   blood, those people are at much greater risk.

13   Q.  Can you tell the jury when Boehringer sent a letter to

14   doctors in the United States telling them that they had added

15   this important information about significant drug interactions

16   for people with really bad kidneys?

17   A.  I have not seen a letter.  I'm not aware of them having

18   done that.

19   Q.  Do you remember, Doctor, that you were shown a few moments

20   ago Exhibits 5062 and 5036, which were marked-up labels during

21   the negotiation between the FDA and Boehringer?

22   A.  Yes.

23   Q.  With regard to 5062, could I turn you to page 17 of the

24   document?

25   A.  Okay.

Laura Plunkett - Redirect (Moskow)                    634

1    Q.  And do you see that that is the Medication Guide?

2    A.  Yes.

3    Q.  Can you tell the jury whether there were any changes that

4    the FDA recommended to the Medication Guide?

5    A.  There is none.

6    Q.  Well, I mean, they did some indenting of bullet points.

7    A.  Well, I meant substantive changes.

8    Q.  Okay.  All right.  Let's look at Exhibit 5036.  Can you

9    look at pages 22, 23, 24.

10       Are there any changes that the FDA recommended to that

11   Medication Guide?

12   A.  No.

13   Q.  Have you seen any indication that BI proposed specific

14   language regarding the drug never being tested in people with

15   severe kidney problems, that the 75-milligram dose had never

16   been tested, that people should not take Pradaxa and Coreg,

17   that there was no reversal agent, and that you are more likely

18   to have a GI bleed with Pradaxa than with warfarin?

19       Have you seen any evidence that any of those statements

20   were proposed to be put in the Medication Guide?

21   A.  No, I've not seen any indication that that was ever

22   proposed.

23   Q.  Doctor, you were shown many, many documents today

24   including -- and yesterday including one of them Exhibit 5827,

25   which was the summary review document.

1     Do you recall that?

2  A.  Yes.

3  Q.  And you were shown a lot of pages in here.  You were

4  shown, you know, who actually reviewed the document, and there

5  was specific language that was called to your attention.

6     But in all the language you were shown, you weren't shown

7  this part at the end, Risk Evaluation and Mitigation Strategy

8  or REMS.

9     Do you see that?

10  A.  Yes.

11  Q.  And I specifically want to bring this paragraph to the

12  jury's attention.

13     Could you read that slowly into the record, please, the

14  one that I have highlighted on the screen?

15  A.  Sure.

16     The review team has opined that a Medication Guide is

17  required for dabigatran because dabigatran poses a serious and

18  significant public health concern.  The Medication Guide is

19  necessary because, No. 1, patient labeling could help prevent

20  serious adverse events; and, 2, there are serious risks that

21  patients should be made aware of because information

22  concerning the risks could affect patients' decisions to use

23  or continue to use dabigatran.

24  Q.  Do you agree with that statement?

25  A.  Yes.

Laura Plunkett - Redirect (Moskow)                    636

1  Q.  Was that a statement that you had in your mind when you

2  were reaching your opinions as to whether the Medication Guide

3  was sufficient, was adequate for people to make an informed

4  decision about whether to take Pradaxa?

5  A.  Yes.  The standard I was using when I reviewed it was

6  looking at what FDA had said about the fact that the issue of

7  preventing adverse events, that's an important one, prevent

8  them before they occur.  And then the other one about the fact

9  that patients need to be aware so they can make an informed

10 choice.

11 Q.  Now, even though we've been talking about various labels,

12 would you agree that if Boehringer wants to make that change

13 in a label, there is a process that it can do that?

14 A.  Yes.

15 Q.  Okay.  So, for example, we were looking at the January

16 2012 label that is Exhibit 5884.

17     Do you recall that?

18 A.  Yes.

19 Q.  And when we look at the Medication Guide there, and what

20 you went over today with Attorney Jones, it looks like this,

21 right?

22 A.  Yes.

23 Q.  All right.  And when you and I were looking at the

24 document yesterday, we looked at Exhibit 93, which was the

25 April 2013 label.

1      Do you recall that?

2   A.  Yes.

3   Q.  And that label looked like this.

4      Do you see that?

5   A.  Yes.  The front part is a bit different.

6        MR. MOSKOW:  I want to -- and usually I would do this

7   on the screen with Gina helping me, but in the interest of

8   time, I just want to see if we can do this kind of side by

9   side here.

10  Q.  Do you see in the 2012 label, the very first thing under

11  what's the most important information I should know about is

12  that Pradaxa can cause bleeding which can be serious and

13  sometimes lead to death?

14  A.  Yes.

15  Q.  Can you tell the jury what the very first thing in the

16  2013 label is under what is the most important information I

17  should know about Pradaxa?

18  A.  It's actually telling you about how it works, not about

19  the bleeding risk.

20  Q.  Okay.  And so Boehringer decided over time to change its

21  Medication Guide and actually move down the importance of

22  Pradaxa can cause bleeding which can be serious and sometimes

23  lead to death?

24  A.  That's correct.

25  Q.  And is that consistent with the company's ability to make

Laura Plunkett - Redirect (Moskow)                    638

1   changes to its labeling if it wants to?

2   A.  Yes.

3   Q.  Let's stick with the 2013 label, if we could.

4       Now one of the criticisms that you've told the jury about

5   is that there is no information in the Medication Guide that

6   indicates that the drug was not tested in AFib patients,

7   right?

8   A.  Yes.

9   Q.  If you could turn to Exhibit 93, page 14.

10      Do you see at the very top of the page, there is

11  information that says:  It is not known if Pradaxa will harm

12  your unborn baby?

13  A.  Yes, I do.

14  Q.  It says:  It is not known if Pradaxa passes into your

15  breast milk?

16  A.  Yes.

17  Q.  Do you know why that is?

18  A.  It hasn't been tested.

19  Q.  So if they want to put information in the label regarding

20  the fact that it hadn't been tested, is there evidence that

21  you've found that would show they're capable of doing that?

22  A.  Yes, I believe they can.

23  Q.  Finally, Doctor, I want to ask you about whether there is

24  information in the label -- in the Medication Guide that you

25  believe -- strike that.

Laura Plunkett - Redirect (Moskow)                    639

1      Let me ask you whether there is information that you

2   believe should be in the Medication Guide that is not.

3   A.  Yes.

4   Q.  And I want to start by showing the jury something they've

5   seen before, which is something talking about the risks and

6   benefits of Pradaxa.

7      Do you see that?

8   A.  Yes.

9   Q.  I don't know whether you've seen this before, but the jury

10  has.  And one of the things that this shows is that there are

11  benefits to Pradaxa, right?  The stroke risk, the

12  life-threatening bleeds, and the haemorrhagic stroke is

13  lowered?

14  A.  Yes.

15  Q.  But there is a risk in gastrointestinal bleeds, correct?

16  A.  Yes.  Higher, yes.

17  Q.  Is that among the most important information that should

18  be included in a Medication Guide?

19  A.  I believe so because this was the ultimate conclusions of

20  the outcomes of RE-LY.  So, yeah, this is the study that was

21  done, the most controlled and the largest study that they did.

22  So yes, I do.

23  Q.  Okay.  And, in fact, if we just look really quickly at

24  Exhibit 5884, on I believe the next to last page of the

25  exhibit, page 14, Boehringer says that the Medication Guide

1   summarizes the most important information about Pradaxa.

2       Do you believe that the Medication Guide can summarize the

3   most important information about Pradaxa if it doesn't include

4   information on the important identified risk of increased

5   gastrointestinal bleeding?

6   A.  No, I do not.  I think that's a very important -- was a

7   major outcome from the trial.

8   Q.  Doctor, I started my examination with you and I am going

9   to end my examination today, to the extent that the Medication

10  Guide does not include information about never having been

11  tested in patients with severe kidney problems, that the

12  75-milligram dose was never tested, that people shouldn't take

13  Pradaxa and Coreg, that there is no reversal agent, and that

14  there is no information about the -- or I'm sorry -- and the

15  issue of GI bleeding, have you formed an opinion as to whether

16  the Medication Guide fairly, accurately and completely

17  describes the most important information about Pradaxa to

18  patients here in West Virginia?

19  A.  I have.

20  Q.  And what is that opinion?

21  A.  That it does not.  And these are the areas that I believe

22  are missing, although I would make one small change, never

23  tested in AFib patients with severe renal impairment.

24  Q.  Fair enough.

25      And, Doctor, are all of the opinions that you've given

Laura Plunkett - Recross (Jones)                    641

1  this afternoon, as well as everything that has happened during

2  your examination, been to a reasonable degree of scientific

3  and regulatory certainty?

4  A.  Yes, they have been.

5  Q.  And what does that mean to you?

6  A.  That means it's more likely than not that my opinions are

7  true.

8       MR. MOSKOW:  Thank you very much, Doctor.  That's all

9  the questions I have for you.

10      THE COURT:  Recross?

11      MS. JONES:  Very limited, Your Honor.

12                       RECROSS-EXAMINATION

13  BY MS. JONES:

14  Q.  Dr. Plunkett, good afternoon again.

15      I have not brought my giant pile of paper with me, so I'm

16  going to ask Mr. Reynolds to kind of help us see things on the

17  screen.  But if you need anything in hard copy that you don't

18  have up there, let me know.

19      Okay?

20  A.  Okay.  Sure.

21  Q.  I will be relatively brief.

22      You ended your discussion with Mr. Moskow by talking about

23  the Medication Guide and what you think isn't in the

24  Medication Guide and why it's inadequate, correct?

25  A.  Yes.  And why it's important as well to put those things

Laura Plunkett - Recross (Jones)                    642

1    in, yes.

2    Q.  Understood.

3        Would you agree with me that the Food and Drug

4    Administration, over the course of time that Pradaxa has been

5    on the market in the United States for atrial fibrillation

6    patients, has approved that Medication Guide somewhere around

7    18 times?

8    A.  I said I'm aware of at least a dozen, but I wouldn't argue

9    with your number that they have done labeling changes, at

10   least that many.

11   Q.  Okay.  Let me ask you a question about Exhibit 93

12   specifically.

13       Do you have that in front of you, Doctor?

14   A.  I can, yes.

15   Q.  Okay.

16   A.  Yes, I'm there.

17           MS. JONES:  Are we able to flip back to the third to

18   last page or so, Mr. Reynolds, of the Medication Guide.  I

19   think it's page 11, page 10 or 11.

20           THE WITNESS:  Page 12?

21           MS. JONES:  Page 12, I was close.  Okay.

22   Q.  Now, again, this is the Medication Guide that was part of

23   the labeling for Pradaxa from April of 2013, correct?

24   A.  Yes.

25   Q.  Okay.  And one of the things that you just talked about

Laura Plunkett - Recross (Jones)                    643

1   with Mr. Moskow was the fact that there is now additional

2   information in that first section of the Medication Guide that

3   is entitled What is the Most Important Information I Should

4   Know About Pradaxa, correct?

5   A.  Yes.  And, actually, it's not so much additional.  It's

6   moved up.  There was similar information before lower down.

7   Q.  Okay.  Do you understand that the way that is structured

8   and that language was actually required by the FDA as part of

9   a class labeling approach, and that you find that exact same

10  language in the Medication Guide for Xarelto and for Eliquis,

11  and it appears right at the top of that section?

12      Did you know that?

13  A.  I am aware that there is similar language in the Xarelto.

14  I haven't seen the Eliquis label, so I can't answer that.

15  Q.  Okay.  And did you know that that adjustment that you

16  described in terms of the sequencing of things there and the

17  information that appears there, that that was part of class

18  labeling required by the FDA?

19  A.  I haven't seen a document to confirm that, no.

20  Q.  And you wouldn't -- you can't disagree with me because

21  you've not looked into that specific question; is that right?

22  A.  Yes.  I've not seen documents to show that that is true,

23  so --

24  Q.  Okay.  You talked some --

25          MS. JONES:  We can take that down.  Thank you,

Laura Plunkett - Recross (Jones)                644

Mr. Reynolds.

Q.  You talked some about how someone might go about testing

blood levels, correct?

You said, well, someone might get their kidney function

checked, and you could just take some of that blood and use

that blood to test blood levels, correct?

A.  That's one of the ways you could do it, yes.

Q.  That's what you said.

But you told us yesterday that you are not a medical

doctor, correct?

A.  I am not.

Q.  You have no clinical experience, correct?

A.  Not in treating patients, that is true.  I've dealt with

clinical samples before in the lab, but --

Q.  You understand when I say treating -- when I say clinical

experience, I meant in the context of talking about you not

being a medical doctor.

What I mean is, you have not cared for patients during any

part of your career, correct?

A.  That is absolutely correct.

Q.  And so some of the opinions that you've offered up about

how someone might go about testing blood levels, those aren't

based on any actual clinical experience that you've had caring

for patients, correct?

A.  No.  It's based on knowledge, but not on my actual

Laura Plunkett - Recross (Jones)                    645

1   clinical experience.

2   Q.  You started your redirect examination with Mr. Moskow

3   talking about what are known as PDUFA fees.

4       Do you remember that?

5   A.  Yes.

6   Q.  And that's something that not just Boehringer Ingelheim,

7   but all medicine companies, pay as part of the review process,

8   correct?

9   A.  That is correct.

10  Q.  And you're aware that those fees are paid to the FDA

11  whether the medicine that is proposed is approved or whether

12  it is not approved, correct?

13  A.  That's true.

14  Q.  And I was listening very carefully to both the questions

15  and the answers that you gave.

16      You are not suggesting somehow that the company bought and

17  paid for all of those doctors and scientists and professionals

18  at the FDA who looked closely at the Pradaxa application, are

19  you?

20  A.  No, and I think I said that.  There is not paychecks being

21  written to the employees, which is I think what you're

22  suggesting.

23  Q.  And you're not suggesting that the company somehow bought

24  the decisions or the analysis or the findings of the men and

25  the women at the FDA who looked at the data submitted on

1    Pradaxa, are you?

2    A.   No.  I wasn't suggesting any -- anything untoward, which

3    is I think what you're suggesting.  I'm just stating that this

4    is how the system works.

5    Q.   Okay.  I just wanted to clarify that.

6         And you understand that as part of the review process for

7    Pradaxa, there was actually a panel of external doctors and

8    scientists who looked at the application, something known as

9    an advisory committee, correct?

10   A.   Yes.  I think you and I went over that the first day.

11   Q.   I'm not sure that we did, but we're going to go over it

12   now due to some of your testimony on redirect examination.

13        An advisory committee is a panel of experts convened by

14   the FDA to provide independent advice, correct?

15   A.   That is the goal, yes.

16   Q.   And it's not -- it doesn't give binding advice to the FDA,

17   but it votes on specific questions related to applications for

18   prescription medicines, correct?

19   A.   Yes, and your binding is correct.  Sometimes they follow

20   that advice, FDA, and sometimes they don't.

21   Q.   In the case of Pradaxa, the question posed to the advisory

22   committee generally was should this medicine be approved for

23   patients who have atrial fibrillation, correct?

24   A.   Yes, that's correct.

25   Q.   And do you recall that the doctors and the scientists on

Laura Plunkett - Recross (Jones)                647

1    that advisory committee actually determined that the answer to

2    that question should be yes?

3           MR. MOSKOW:  Your Honor, could we go to side bar,

4    please?

5           THE COURT:  Yes.

6        (Bench conference, reported.)

7           MR. MOSKOW:  Your Honor, I did not talk about the

8    advisory committee.  This is beyond the scope.

9           MS. JONES:  Your Honor, the first questions he asked

10   essentially suggested that the company had somehow bought off

11   the decisions of the FDA.  That's the only reason.

12          To ask did you know that the company had paid the FDA

13   a million dollars for the review, he suggested that the --

14          THE COURT:  So what is it you're trying to establish?

15          MS. JONES:  That in addition to the FDA's review,

16   there were external scientists who participated in the

17   discussions surrounding the evaluation.

18          I'm not --

19          THE COURT:  I will allow you one or two questions

20   about that to establish there were others like these people --

21          MS. JONES:  That's all I intend --

22          THE COURT:  -- but to not get into the details or the

23   substance of the report.  I think that is beyond the scope.

24          MS. JONES:  I don't intend to go much further on this.

25          THE COURT:  All right.

Laura Plunkett - Recross (Jones)                    648

1      (Bench conference, concluded.)

2          MR. MOSKOW:  Your Honor, with the understanding of how

3      the information is to be used, I withdraw the objection.

4          THE COURT:  Okay.  Why don't you restate your question

5      or state a new one.

6          MS. JONES:  I will do that, Your Honor.

7      Q.  Dr. Plunkett, I think the last question I asked you before

8      we went up to the bench was, is it your understanding based on

9      your review of the materials that those independent doctors

10     and scientists who looked at the Pradaxa application all voted

11     unanimously that the medicine should be approved?

12     A.  The medicine generally, yes.

13     Q.  One of the things that you discussed with Mr. Moskow was

14     this idea that there had been changes in the labeling for

15     Pradaxa over the years.

16         You remember that?

17     A.  Yes.

18     Q.  And the doctor label, in particular, there were things

19     that were added to the label over the life of the medicine.

20         Do you recall that?

21     A.  Yeah.  I don't think we did the whole life.  We were in

22     that period up to around 2013, yes.

23     Q.  Right.

24         And just to be clear, that is not an uncommon thing that

25     over time the label for a medication has changes to it,

1    correct?

2    A.   No.   Because often it's new indications that are sought,

3    additional information.

4    Q.   Okay.   And in January -- by January of 2012, some of the

5    information that we've been talking about, including that

6    table that included information on patients with severe renal

7    function and the fact that the RE-LY study hadn't tested a

8    dose of the medicine in those patients, that was in the

9    labeling for Pradaxa by January of 2012; is that right?

10   A.   I can't confirm that it was January of 2012.   I do know

11   that it was -- that it was before 2013, but I can't tell you

12   the exact month.

13   Q.   Do you still have 5884 in front of you?

14   A.   I can find it.

15   Q.   Well, we can pull it up.

16   A.   No, I've got it right here.

17   Q.   And, again, just to situate ourselves, this is the first

18   page of the labeling for Pradaxa.

19        And if you look down at the bottom part of the highlights

20   section, you see that there is a reference to revised January

21   of 2012?

22   A.   Yes.   Okay.   So that is the January 2012, yes.

23   Q.   Okay.   And just to be clear because you were asked some

24   questions, hypothetical questions about some of the issues in

25   this case, you don't know one way or the other what Mrs.

Laura Plunkett - Recross (Jones)                    650

1   Knight's doctors understood based on the labeling for Pradaxa,

2   correct?

3   A.  I have not had a conversation so, no, I can't speak to

4   them specifically.

5   Q.  Dr. Plunkett --

6         MS. JONES:  We can take that down.  Thank you,

7   Mr. Reynolds.

8   Q.  Dr. Plunkett, the last thing I wanted to ask you about was

9   the questions that you covered on the clinical trial overview.

10        Do you have 5084 in front of you?

11  A.  I can get it.  Yes, I do.

12        MR. MOSKOW:  What exhibit number, counsel?

13        MS. JONES:  5084.

14  Q.  Do you have that, Doctor?

15  A.  Yes, I do.

16  Q.  Okay.  And I believe you were shown language on page 94 of

17  5084.

18  A.  Yes, we looked at this.

19  Q.  Okay.

20        MS. JONES:  And if we can just call out that second

21  paragraph, Mr. Reynolds, there may be subjects.

22        There may be subjects who have multiple risk factors

23  for increased bleeding risk that together may substantially

24  increase risk.  And then it goes on to describe some of those,

25  like concomitant antiplatelet use, concomitant P-gp inhibitor

Laura Plunkett - Recross (Jones)                651

1  use, age greater than 75, moderate renal dysfunction, previous

2  bleeding, high CHADS scores, those factors that may increase

3  bleeding risk.

4          THE WITNESS:  Yes.

5  BY MS. JONES:

6  Q.  Do you remember talking about that?

7  A.  That's correct.

8  Q.  Do you have an understanding that Boehringer Ingelheim

9  actually tried to propose language very much like that for the

10  U.S. labeling for doctors for Pradaxa, and the FDA rejected

11  that language?

12  A.  It's possible they did with the 110-dose issue, but I'm

13  not -- but I'm not aware of it for the 75, the prescription of

14  the 75.

15  Q.  Well, you've raised a good point.

16      Because if we actually read down to the bottom of that

17  paragraph, it says:  While there may also be increased benefit

18  in such subjects, the risk of bleeding may potentially

19  outweigh the risk of stroke, and a dose of 110 milligram BID

20  may be considered.

21      Did I read that correctly?

22  A.  You did.

23  Q.  And so that language was actually generated in the context

24  of the discussion around whether or not there would be a

25  110-milligram dose of Pradaxa, correct?

Laura Plunkett - Recross (Jones)                    652

1    A.  Yes.

2    Q.  Okay.

3         MS. JONES:  Your Honor, may I approach, please?

4         THE COURT:  Yes, you may.

5         MS. JONES:  Dr. Plunkett, I've handed you what we've

6    marked as 5054 and 5056.

7    Q.  Have you seen those documents before?

8    A.  I am not sure about the e-mail --

9    Q.  Okay.

10   A.  -- because I have a hard time with that sometimes.  I

11   don't usually see them attached.

12   Q.  Okay.

13   A.  I believe -- I believe I may have seen this presented to

14   me before.

15        MS. JONES:  Let me just ask my colleague one question.

16      (Defense counsel conferring.)

17        MS. JONES:  Your Honor, we would move for the

18   admission of 5054 and 5056.

19        MR. MOSKOW:  No objection.

20        THE COURT:  Each are admitted and may be published.

21      (DEFENDANT'S EXHIBITS 5054 and 5056 ADMITTED

22      INTO EVIDENCE.)

23        MS. JONES:  Dr. Plunkett, let's start with Exhibit

24   5054, if we could please.

25        And you can see just generally that this is an e-mail

1  exchange between Alison Blaus at the FDA and Michelle Kliewer

2  at Boehringer Ingelheim concerning the application for Pradaxa

3  in 2010.

4  Q.  Do you see that?

5  A.  Yes.

6  Q.  Okay.  And down at the bottom, you can see that there is

7  an e-mail from Ms. Blaus where she has sent to Ms. Kliewer a

8  copy of the non-clinical proposed labeling.

9      Do you see that?

10  A.  Yes.

11  Q.  Okay.  And then if we move up towards the top, there is

12  Ms. Kliewer's response saying:  Hope you enjoyed the weekend.

13  Please find attached our response to your proposed

14  non-clinical label.  We accepted the changes in Section 13.

15  We have proposals for 8.1 and 8.2.  I have attached the full

16  proposed USPI that accepts some of the proposed changes and

17  provides the CMC changes with a few format changes.

18      Did I read that correctly?

19  A.  You did.

20  Q.  Okay.  And if we could, Doctor, let's go to 5056.

21  A.  Okay.

22  Q.  And we're going to go to page 9 of that document.

23      And just to orient ourselves, this is the -- 5056 is just

24  the attachment that Ms. Kliewer provided in connection with

25  her e-mail on September 27th, 2010, sending the proposed

Laura Plunkett - Recross (Jones)                    654

1    non-clinical label.

2        On page 9, you see there's a section that refers to 8.7,

3    High Risk Bleeding Patients?

4    A.  Yes, I see that.

5    Q.  Okay.  And if we just pull -- thank you, Mr. Reynolds.

6        If we pull that language up, it says:  For those patients

7    with a potentially higher risk of bleeding, e.g. or for

8    example, age over 75 years, CHADS2 score greater than three,

9    moderate renal impairment, 30 to 50 milliliters creatinine

10   clearance per minute, concomitant treatment with P-gp

11   inhibitors or previous gastrointestinal bleed, a reduced dose

12   of 110 milligram twice daily may be considered.

13       Do you see that?

14   A.  I do.

15   Q.  Okay.  And do you understand that the FDA actually

16   required the company to take that language out of the label in

17   connection with its decision not to approve the 110-milligram

18   dose of Pradaxa?

19   A.  Yes.  That was what the removal was linked to, the fact

20   that it was linked to 110.

21       MS. JONES:  We can take that down.  Thank you,

22   Mr. Reynolds.

23       Dr. Plunkett, I think I'm talking myself out of my

24   voice, so I am going to stop, and thank you for your time.

25       THE COURT:  All right.  Anything else?

655

1          MR. MOSKOW:  No, Your Honor.

2          THE COURT:  All right.

3          MR. MOSKOW:  We've had enough.

4          THE COURT:  All right.  Dr. Plunkett, thank you for

5   your testimony.  You can step down.  We'll collect those

6   later.

7          Ladies and Gentlemen, we already had a requirement

8   that we adjourn for the day at 4:00, so there's no point in

9   starting with any additional evidence.  Obviously there's a

10  lot more evidence for you to hear, so please keep these things

11  in mind.

12         First, we will adjourn until Tuesday morning at 9:00.

13  Monday is a federal holiday, and the courthouse is closed, so

14  we will not have the opportunity to proceed Monday.  So you're

15  off.  So we'll reconvene at 9:00 a.m. on Tuesday morning.

16  We'll follow the same pattern next week as we have this week.

17         Please remember that the parties have put forth a huge

18  amount of effort in this case, so don't violate my request or

19  direction, rather, that you not investigate the case.  Don't

20  try to look anything up on your own.  Don't try to talk to

21  anybody about the case or let anyone discuss it with you.

22         I'm not going to tell you not to think about this case

23  because that would be impossible, I'm sure.  But please

24  observe by letter and spirit the requirement that I've imposed

25  upon you to keep an open mind.

1          With that, we'll see you back here on Tuesday morning.

2          Yes, sir.

3          JUROR NO. 15:  Your Honor, with respect to us jurors

4     who worked the day before and a half, do we get paid money?

5          THE COURT:  No, afraid not.

6          JUROR NO. 15:  Okay.

7          THE COURT:  I invite you to write your congressman.

8          JUROR NO. 15:  I asked all of the ladies that.

9          THE COURT:  Ms. Justice is going to give you her phone

10    number.  Do all of you have your pads handy?  Oh, she's

11    already typed it up.

12         So I'm going to give you her phone number.  If

13    something happens, please let us know as soon as it happens if

14    it's going to present any type of difficulty with you being

15    back here on time on Tuesday morning.  It's unusual that we go

16    through a long weekend like this, so I want to make sure --

17    since it's three days, some things can change sometimes with

18    people.  If it does, please let her know immediately.  She'll

19    contact me, the parties and everyone.

20         So, with that, I'm going to ask everyone else to

21    remain in the courtroom until all of the jurors have left.  Go

22    enjoy your weekend.

23       (Jury not present.)

24         THE COURT:  You can be seated.  I just want to take up

25    a couple routine matters with you after the jury has left.

1          All right.  First, I would point out it seems to me

2     we're going pretty slow.  I understand that that just may be

3     necessary.  But I want to remind everyone that I've given you

4     the three-week period here to conduct this trial, and we're

5     going to stick to that.

6          Generally I'm keeping somewhat track of how much time

7     each side uses.  I don't mean to single you out by any means,

8     Ms. Jones.  This is the first live witness we have had, so

9     it's easy for me to bring this point to discussion based on

10    that, but your examination on cross was as long or longer than

11    the direct, which is fine.  I will simply point out that I'm

12    going to try to keep track and give the parties equal time.

13         So during this three-week period that we've got set

14    aside, the plaintiffs will get no more than half of that time

15    to present their case, and the defendant will receive no more

16    than half of that time to present its defense.

17         MS. JONES:  And, Your Honor, I will tell you, our

18    experience is that Dr. Plunkett is always by far the longest

19    witness.  I frankly was moving at light speed with her

20    compared to how things have gone in Connecticut.  So I don't

21    expect that we will have any witnesses who will run nearly as

22    long as Dr. Plunkett.

23         THE COURT:  Well, I appreciate that.  I just wanted to

24    make you aware that that is going to be my approach to it.

25         Also, I don't see any need for us yet to get into

658

1    final instructions, and I probably will wait until we're close

2    to the end of the plaintiffs' case before I even start --

3    we've obviously got some drafting from the preliminary

4    instructions, but I'm not going to even start to deal with

5    that until we get pretty close to the end of the plaintiffs'

6    case.  But once we do, pretty soon after that, I'm likely to

7    have the parties start communicating with each other and with

8    the Court about final instructions.

9         And we'll discuss the different approaches that are

10   options for how we get into that and have a fair, open

11   discussion and preserve the record adequately for everyone,

12   but I don't intend to get into that until we see the end in

13   sight for the plaintiffs' case.

14        Is there anything else that you all know we need to

15   address?

16        MR. CHILDERS:  Not that I'm aware of, Your Honor.

17        MR. LEWIS:  We've got one minor issue that I just

18   wanted the Court's guidance on, if I could, Your Honor.

19        THE COURT:  Okay.

20        MR. LEWIS:  Based on the testimony of Dr. Plunkett,

21   we're anticipating on our side a pretty significant legal

22   issue at the directed verdict stage on warning preemption

23   under federal law.  And we're -- it's not the kind of motion

24   that you make just on your feet in real time like a lot of

25   directed verdict motions are.  So we thought we would get the

659

1    Court's guidance on should we be throwing some papers in maybe

2    a little bit early on the scope of the law and things along

3    those lines for Your Honor's benefit.

4         THE COURT:  Well, the easy answer to that is, yes, the

5    sooner the better.

6         If you believe, given your understanding of the

7    balance of the plaintiffs' case in chief, that the testimony

8    of Dr. Plunkett and the other testimony that is heard will set

9    the stage for the Court's practical consideration, then the

10   sooner the better is all I can say.

11        MR. LEWIS:  Fair enough.  Thank you, Your Honor.

12   Appreciate that.

13        THE COURT:  Okay.  The last thing I'll note again -- I

14   know you folks are staging from different places here.

15        The courtroom will be locked and secured through the

16   weekend.  So if you feel like it's easier to leave things

17   here, feel free to do that.  I think it will be safe.  We've

18   never had any problems.  So if that helps, makes it a little

19   easier than moving all of this stuff out and then having to

20   come back here early on Tuesday morning to reassemble it, that

21   is certainly your option.

22        We'll have the courtroom reopened by 8:30 on Tuesday.

23   So until then, it will be locked when we end today.  We won't

24   lock up until we know you all are ready this evening or this

25   afternoon.

660

1          All right.  Is there anything else?  If not, see you

2     back here Tuesday.  Have a good weekend.

3          MR. MOSKOW:  Have a good weekend, Your Honor.

4          MR. LEWIS:  Thank you, Your Honor.

5          MR. CHILDERS:  Thank you, Your Honor.

6          THE COURT SECURITY OFFICER:  All rise.  This honorable

7     court will be in recess.

8              (Proceedings were adjourned at 3:56 p.m.)

9                       ---o0o---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2         We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3    RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter as reported on October 5, 2018.

6

7

8    October 6, 2018          _____ __
     DATE

9

10   /s/ Kathy L. Swinhart  _____ __
     KATHY L. SWINHART, CSR

11

12   /s/ Lisa A. Cook_____  _____ __
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25