IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                                      No. 3:15-CV-06424

BOEHRINGER INGELHEIM                     Volume 4
PHARMACEUTICALS, INC.,                   Pages 661 through 845

          Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TUESDAY, OCTOBER 9, 2018, 9:00 A.M.

---o0o---


For the Plaintiffs:      CHILDERS, SCHLUETER & SMITH
                         1932 North Druid Hills Road, Ste 100
                         Atlanta, Georgia  30319
                         BY:  C. ANDREW CHILDERS

                         URY & MOSKOW
                         883 Black Rock Turnpike
                         Fairfield, Connecticut 06825
                         BY:  NEAL L. MOSKOW

                    (Appearances continued next page...)


Reported by:   KATHY L. SWINHART, CSR
               LISA A. COOK, RPR-RMR-CRR-FCRR
               Official Court Reporters
               (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                    APPEARANCES (Continued)

 2

 3     For the Plaintiffs:

 4                    FERRER, POIROT & WANSBROUGH
                      2100 RiverEdge Parkway, Suite 1025
 5                    Atlanta, Georgia  30328
                      BY:  RUSSELL ABNEY
 6                    and  HUNTER VANCE LINVILLE

 7

 8     For the Defendant:

 9                    TUCKER ELLIS
                      925 Euclid Avenue, Suite 1150
10                    Cleveland, Ohio  44115
                      BY:  JOHN Q. LEWIS
11

12                    COVINGTON & BURLING
                      One City Center
13                    850 Tenth Street NW
                      Washington, D.C.  20001
14                    BY:  PHYLLIS ALENE JONES
                      and  NICHOLAS HAILEY
15                    and  JESSICA PEREZ

16

                      JACKSON KELLY
17                    Post Office Box 553
                      Charleston, West Virginia  25322
18                    BY:  GRETCHEN M. CALLAS

19

20     Also Present:

21             CLAUDE R. KNIGHT, Plaintiff

22

23

24

25
```

INDEX

PLAINTIFF'S WITNESSES:                                          PAGE:


DAWN MAC FARLAND, M.D.

VIDEOTAPED DEPOSITION PLAYED                                    662


AHMED ABDELGABER, M.D.

VIDEOTAPED DEPOSITION PLAYED                                    666


JOANNE VAN RYN

VIDEOTAPED DEPOSITION PLAYED                                    672


HAZEM ASHHAB, M.D.

DIRECT EXAMINATION BY MR. CHILDERS                              674
CROSS-EXAMINATION BY MR. LEWIS                                  730
REDIRECT EXAMINATION BY MR. CHILDERS                           808
RECROSS-EXAMINATION BY MR. LEWIS                               830

```
1                   HUNTINGTON, WEST VIRGINIA

2              TUESDAY, OCTOBER 9, 2018, 9:06 A.M.

3              THE COURT:  Good morning.

4         Before we bring the jury in, I note that the defense

5    filed a motion with respect to Dr. Ashhab's opinions.  When

6    do you expect to call him as a witness?

7              MR. CHILDERS:  Right after lunch, Your Honor.

8              THE COURT:  All right.  Have you seen the motion?

9              MR. CHILDERS:  I have.

10             THE COURT:  Will you be prepared to at least argue

11   it a little bit later this morning?

12             MR. CHILDERS:  Then or now, whatever you prefer.

13             THE COURT:  Well --

14             MR. CHILDERS:  At any point today we can argue it.

15             THE COURT:  All right.  I'd rather bring the jury

16   out.  All right.  Are we ready for the jury?

17             MR. CHILDERS:  Yes, Your Honor.

18        (Jury returned into the courtroom at 9:08 a.m.)

19             THE COURT:  Good morning.  Welcome back.  We're

20   ready to have the plaintiff call their next witness.

21             MR. CHILDERS:  Thank you, Your Honor.

22        Ladies and gentlemen, this is going to be another

23   video.  Plaintiffs are going to play the video of Dr. Dawn

24   MacFarland.  It's about an 18-minute video.  And then the

25   defendants will play their examination.
```

1      **VIDEOTAPED DEPOSITION OF DAWN MACFARLAND, PLAINTIFFS'**

2  **WITNESS, PLAYED.**

3      (Videotaped deposition paused.)

4      MS. JONES:  Your Honor, you had asked us to give

5  folks a stretch break during some of the videos.  We have a

6  little bit left but we thought this might be an appropriate

7  time.

8      THE COURT:  All right.  Take a minute.  If you'd

9  like to stretch, use the restroom, get a drink, feel free

10 to.

11     (Pause in proceedings from 10:20 a.m. until 10:29 a.m.)

12     (Jury not present)

13     THE COURT:  All right.  So since the jury

14 obviously wanted to take a little more than just a minute or

15 two break and none of them are present in the courtroom, I'd

16 like to take up the defense motion at least to hear the

17 plaintiffs' response.

18     Are you ready to do that, Mr. Childers?

19     MR. CHILDERS:  Yes, Your Honor.

20     THE COURT:  Go ahead.

21     MR. CHILDERS:  We did read this last night when it

22 came in.  I'm not going to comment on the timing of it, but

23 I would just say that we don't intend to elicit opinions

24 from Dr. Ashhab relating to these two issues.  But these are

25 facts that things are or are not in the label.  And I do

1   expect him to testify, yes, they are, or, no, they're not in

2   the label, but he's not going to offer an opinion as to

3   whether or not it should have been in the label.

4         MR. LEWIS:  I guess, Your Honor, that's what,

5   that's what the concern is.  Dr. Ashhab did not mention

6   either in his report or in his deposition that there's any

7   criticism of the label whatsoever for those purposes.  I

8   don't think that he ought to be able to just float in the

9   suggestion or imply to the jury that there's a deficiency

10  because of that.

11        THE COURT:  How would those facts be relevant to

12  his opinions if they weren't facts he relied upon in

13  reaching his opinion?

14        MR. CHILDERS:  Well, he relied on the entirety of

15  the label, both -- all of the labels.  And we disclosed

16  that, that he looked at all of them.

17        THE COURT:  And that's fine.  He can testify --

18        MR. CHILDERS:  Right.

19        THE COURT:  -- that the label doesn't say that

20  this was tested on severe, severely compromised renal

21  patients or that the 75-milligram dose was tested.

22        MR. CHILDERS:  Correct.

23        THE COURT:  So I think he can do that.

24        MR. LEWIS:  Okay.  I guess, Your Honor, I just, if

25  I may, I think it's very misleading to the jury based on the

1    way that they've presented the case thus far for Dr. Ashhab

2    to mention those facts in the same context where he's

3    criticizing the label in a general way, particularly when it

4    was never -- and they could have disclosed this to us.  That

5    could have been a criticism of Dr. Ashhab.  He could have

6    mentioned that fact during his deposition or in his report.

7    It's nowhere to be found in anything that he said to date.

8         And it will be very misleading to this jury to, to

9    shoehorn in those facts into a general criticism of our

10   label.  I don't think it's relevant to his opinion.  They're

11   not facts that he relied upon or ever mentioned.  And I

12   don't think he should be permitted to even mention it.

13             MR. CHILDERS:  Facts are facts, Judge.  I'm not

14   really sure how he can talk about the label and not, and not

15   be allowed to talk about particular parts.

16        Again, I'm not going to elicit any opinion from him it

17   should have been in there, it shouldn't have been in there.

18   This is the information that Dr. MacFarland had when she

19   made the decision to prescribe it.  This is the information

20   that the patients -- well, actually, he's not even going to

21   talk about the Medication Guide on that issue.  It just --

22   that's the information she had when she made the decision.

23   That's, that's the limit of where we're going to go with

24   that.

25             THE COURT:  Well, I want to think about it.  I may

1   have some more inquiry before we get to it.  When do you

2   expect to get to him?

3              MR. CHILDERS:  We're going to play Dr.

4   Abdelgaber's deposition after this.  And then he would be

5   the next witness I assume right after we take our lunch

6   break, Your Honor.

7              THE COURT:  How long is Dr. Abdelgaber's

8   deposition?

9              MR. CHILDERS:  Our portion, Your Honor, is 47

10  minutes and the defense is 30 minutes.

11             THE COURT:  Okay, all right.  Well, I want to

12  think about it.  We may have some more argument when we take

13  the break.

14             MR. CHILDERS:  Yes, sir.

15             THE COURT:  Let's see if the jury is ready.

16       (Jury returned into the courtroom at 10:33 a.m.)

17             THE COURT:  All right.  We're ready to resume.

18       (Videotaped deposition resumed.)

19       (Videotaped deposition paused.)

20             MS. JONES:  That's the conclusion of the defense

21  examination.

22             THE COURT:  All right.

23             MR. CHILDERS:  We have an extremely short

24  redirect.  Don't blink.  It's only 25 seconds long.

25             THE COURT:  Go ahead.

1          (Videotaped deposition resumed.)

2               THE COURT:  All right.

3               MR. CHILDERS:  That it.

4               THE COURT:  All right.  Call your next witness.

5               MR. CHILDERS:  Again, I apologize.  We have

6    another video.  This will be Dr. Abdelgaber.  And our play

7    of this, Your Honor, is about 45 minutes long.

8               THE COURT:  Okay.

9        **VIDEOTAPED DEPOSITION OF AHMED ABDELGABER, PLAINTIFFS'**

10   **WITNESS, PLAYED.**

11       (Videotaped deposition paused.)

12              MR. CHILDERS:  This might be a good time for a

13   stretch.

14              THE COURT:  All right.  If you want to stand up

15   and stretch where you're seated, that would be fine.

16       (Pause in proceedings)

17              THE COURT:  How many more minutes on the direct

18   side of this?

19              MR. CHILDERS:  I think about 15 more minutes.

20              THE COURT:  Okay.  All right, let's get started.

21       (Videotaped deposition resumed.)

22       (Videotaped deposition paused.)

23              MR. CHILDERS:  That's the end of the plaintiffs'

24   direct, Your Honor.

25              THE COURT:  All right.

```
 1              MR. LEWIS:  Your Honor, we'll do the defense play
 2    at this time.
 3              THE COURT:  You may proceed.
 4         (Videotaped deposition resumed.)
 5         (Videotaped deposition paused.)
 6              MR. LEWIS:  Your Honor, that concludes the defense
 7    portion.
 8              THE COURT:  All right.
 9              MR. CHILDERS:  We have again another very short
10    redirect, one minute long.
11              THE COURT:  Go ahead.
12         (Videotaped deposition resumed.)
13              THE COURT:  All right.  That concludes Dr.
14    Abdelgaber's testimony?
15              MR. CHILDERS:  Yes, sir.
16              THE COURT:  All right.  This is a good time for us
17    to take a break, ladies and gentlemen.  We're going to take
18    a lunch recess for one hour.  I'd like you back here at
19    1:00.
20         Remember my instructions from last week.  Don't discuss
21    the case with anyone or allow anyone to discuss it with you.
22    Make sure you have your stickers as you go and as you depart
23    the courthouse, and then return and please go to the jury
24    room.
25         All right.  If there's nothing else, I'm going to let
```

1    the jury go first.  I have a matter to take up with counsel

2    as soon as the jury leaves.

3         (Jury retired from the courtroom at 12:03 p.m.)

4              THE COURT:  All right.  You may be seated.

5        Is there anything else counsel wants to bring to my

6    attention about the pending motion regarding Dr. Ashhab's

7    testimony?

8              MR. CHILDERS:  No, Your Honor.

9              MR. LEWIS:  No, Your Honor.

10             THE COURT:  Well, as I understand it, first, the

11   defendant's written motion sought to prohibit Dr. Ashhab

12   from being asked or giving opinions related to, first,

13   whether the label was inadequate because it did not reveal

14   that Pradaxa had not been tested on patients who had severe

15   renal impairment; secondly, that the label was -- in the

16   opinion that the label was defective because the label did

17   not reflect whether or not testing had been done at the

18   75-milligram dose.

19        In response, plaintiffs indicate they don't intend to

20   ask Dr. Ashhab for opinions that would be critical of the

21   label for the absence of that information but, instead,

22   merely intended to ask him whether as a fact he was aware

23   that the label did not address testing for -- on patients

24   with renal, severe renal impairment or testing at the 75

25   dose.

669

1    In response, defendants argue that that would be

2    misleading or confusing to the jury because there would be

3    no reason for Dr. Ashhab to mention those two facts unless

4    he was offering an opinion or an inference critical of the

5    company's labeling.

6    I agree with the defendant. The Court has reviewed not

7    only the motion but the entire deposition of Dr. Ashhab, as

8    well as his report.

9    First, I would find -- I accept plaintiffs'

10   representation that they didn't ask -- intend to ask him

11   specific opinions critical of the label. And that certainly

12   wasn't part of his report or even noted in his deposition.

13   Beyond that, I would find that I agree with the

14   defendants that it would either be cumulative and/or

15   confusing or misleading to the jury for Dr. Ashhab to

16   testify as to the fact about the labels not having this

17   information with the testing.

18   First, obviously, he didn't even explain in his report

19   or his deposition that he was familiar at that level with

20   the testing. There's other evidence from Dr. Plunkett, as

21   well as the label itself, that establishes what the label

22   had and whether it should have had more information about

23   the underlying testing.

24   So I think it would be cumulative for Dr. Ashhab to

25   merely note what's already established by the evidence, and

1   that is that the label does not specifically note that there

2   was no testing of severely impaired renal patients nor

3   testing specifically of the 75 dose.

4        So I think it would be cumulative and misleading

5   because he's an expert and he's going to be critical of the

6   defendant's product for a variety of reasons which he

7   explains in his report and his deposition.

8        And I believe it would be difficult for the jury to not

9   also find that Dr. Ashhab is at least implicitly critical of

10  the label in these two respects.  And for the reasons I've

11  stated, I think that's beyond the scope of his opinion.

12       So I would restrict plaintiffs on those areas and

13  expect you to inform him before he testifies.

14            MR. CHILDERS:  Understood, Your Honor.  Thank you.

15            THE COURT:  All right.  Is he going to be next up?

16            MR. CHILDERS:  Yes, sir.  I believe he's in route

17  right now from Charleston, so as long as the traffic is --

18            THE COURT:  Okay.  Well, good luck.  And then

19  after him, what do you -- any idea how long your direct will

20  take?

21            MR. CHILDERS:  I'm hoping that my direct takes

22  about an hour, hour and a half.

23            THE COURT:  Okay.  Who is going to cross him?

24            MR. LEWIS:  I will, Your Honor.

25            THE COURT:  Any idea?

1          MR. LEWIS:  About the same.  I definitely don't

2   want to go longer than they do on direct.

3          THE COURT:  All right.  Then after him --

4          MR. CHILDERS:  If, if we finish and have time

5   today we have another video to play of a Boehringer

6   employee, Dr. Van Ryn.

7          THE COURT:  All right.  I'll see you back here at

8   1:00.

9       (Recess taken from 12:08 p.m. until 1:03 p.m.)

10      (Jury not present.)

11         THE COURT:  Is he out checking on his witness?

12         MR. MOSKOW:  Sorry, Your Honor.

13         THE COURT:  So I'm going to move the sentencing

14  that I had scheduled for later today, so it's no longer a

15  factor.  If, if he's not close or ready, if you want to do

16  the video first, you may do so.

17         MR. CHILDERS:  It looks like he's about 10 minutes

18  away.

19         THE COURT:  That's like 10 minutes to get here?

20         MR. CHILDERS:  Yes, sir.

21         THE COURT:  Well, by the time he parks and does

22  things, so let's go ahead and do the video.  And then if we

23  have to stay a little bit later, I no longer have the

24  sentencing.  So --

25         MR. LEWIS:  We think it makes sense to play the

1  video all the way through.

2          THE COURT:  Yeah, we will, right.

3          MR. LEWIS:  Thank you, Your Honor.

4          THE COURT:  It's how long?

5          MR. MOSKOW:  Forty minutes total.

6          THE COURT:  Okay, great.  Bring the jury in.

7      (Jury returned into the courtroom at 1:05 p.m.)

8          THE COURT:  All right, ladies and gentlemen, we're

9  ready to resume.  The plaintiffs have literally in route one

10  of their expert witnesses, Dr. Ashhab, but he's not quite

11  here yet.

12      So plaintiffs' counsel has suggested, and I agree, that

13  they proceed with a video deposition that they were going to

14  introduce into evidence anyway.  And so that we don't have

15  you all sitting back there waiting 15 or 20 minutes, we'll

16  just proceed with the video.

17          MR. CHILDERS:  Thank you, Your Honor.  This will

18  be the deposition of Joanne Van Ryn, a Boehringer employee.

19  And I think our play is around 18 minutes long.

20          **VIDEOTAPED DEPOSITION OF JOANNE VAN RYN, PLAINTIFFS'**

21  **WITNESS, PLAYED.**

22      (Videotaped deposition paused.)

23          MR. MOSKOW:  Your Honor, that concludes the

24  plaintiffs' play of Dr. Van Ryn.

25          THE COURT:  All right.

Hazem Ashhab - Direct (Childers)                    673

1          MR. LEWIS:  Your Honor, we'll do the defense play

2     at this time.

3          THE COURT:  Go ahead.

4     (Videotaped deposition resumed.)

5     (Videotaped deposition paused.)

6          MR. LEWIS:  That concludes the defense play, Your

7     Honor.

8          THE COURT:  All right.  Are we finished with that?

9          MR. CHILDERS:  Yes, Your Honor.  We don't have

10    anymore.

11         THE COURT:  All right.  Why don't we go ahead and

12    take a brief recess.  The next witness is Dr. Ashhab, a live

13    witness?

14         MR. CHILDERS:  That's correct, Your Honor.

15         THE COURT:  And so as to avoid an interruption to

16    that, let's take about a five-minute recess, be pretty

17    quick.

18    (Recess taken from 1:48 p.m. until 1:53 p.m.)

19         THE COURT:  All right.  Are we ready to proceed?

20         MR. CHILDERS:  Yes, Your Honor.

21         THE COURT:  Let's bring the jury out.

22    (Jury returned into the courtroom at 1:53 p.m.)

23         THE COURT:  All right, plaintiffs may call their

24    next witness.

25         MR. CHILDERS:  Your Honor, plaintiffs call

Hazem Ashhab - Direct (Childers)

1    Dr. Ashhab.

2              THE COURT:  All right.

3        Dr. Ashhab, if you'll step up here, my clerk will

4    administer the oath.

5         **HAZEM ASHHAB, PLAINTIFFS' WITNESS, SWORN**

6                         DIRECT EXAMINATION

7    BY MR. CHILDERS:

8    Q.   Doctor, just so you know, the acoustics in here are not

9    great, so you have to speak into the microphone.  Okay?

10   A.   Okay.

11   Q.   Would you please introduce yourself to the jury?

12   A.   My name is Dr. Ashhab.  I'm a gastroenterologist

13   specializing in internal medicine and gastroenterology and

14   liver disease.

15        I'm Board Certified and recertified in

16   gastroenterology.  I'm part of a private practice affiliated

17   with the University, WVU, and with Charleston Area Medical

18   Center in Charleston, West Virginia.  We are partners of

19   six.

20   Q.   Let me stop you there and sort of break that up a

21   little bit if I could.  Do you practice -- you practice here

22   in West Virginia?

23   A.   Yes.

24   Q.   And where is your practice?

25   A.   In Charleston, West Virginia.

Hazem Ashhab - Direct (Childers)

1  Q.   And what kind of a practice is it?

2  A.   It's a single specialty practice where all six of us

3  are gastroenterologists or Board Certified in

4  gastroenterology.

5  Q.   Could you explain to the jury what gastroenterology

6  means?

7  A.   So --

8  Q.   We're not doctors, so if you could explain to us.

9  A.   So gastroenterology is the specialty in internal

10 medicine where you deal with patients with digestive disease

11 disorders including the stomach, the bowels, the colon, the

12 liver, the pancreas.

13      We deal with patients with symptoms related to these

14 organs including problems with swallowing, problems with the

15 liver, and bleeding as well.

16 Q.   That was my next question.  Do you treat patients who

17 have GI bleeds or gastrointestinal bleeds?

18 A.   Very frequently.

19 Q.   How often would you estimate you do that?

20 A.   Almost on a daily basis, at least twice a week.

21 Q.   So let me ask you another question.  In addition to

22 your medical practice, do you treat patients at hospitals?

23 A.   Yes.  We, we are the only group that covers Charleston

24 Area Medical Center, CAMC, including Memorial and General

25 divisions and Women and Children for anybody in relation to

Hazem Ashhab - Direct (Childers)

1   bleeding or gastrointestinal disorders.  I do also have

2   privileges and do out-patient procedures at Charleston

3   Surgical Hospital.

4   Q.    Okay.  How long have you lived and practiced medicine

5   here in West Virginia?

6   A.    Seventeen years.

7   Q.    You mentioned you were Board Certified; --

8   A.    Yes.

9   Q.    -- is that right?  And you have Board Certifications in

10  two different areas of medicine?

11  A.    Gastroenterology is a subspecialty of medicine.  So you

12  have to do training and complete your training, get Board

13  Certified in internal medicine, and then you go into

14  gastroenterology as a subspecialty.

15  Q.    What do you have to do to be Board Certified?  What

16  does that mean?

17  A.    So you have to go into a training program that is

18  approved and accredited by the American Board of Internal

19  Medicine.  And you go through testing and training for a

20  minimum of three years in internal medicine.

21       And after you pass your exams and evaluations you get a

22  certificate that you are Board eligible.  So at this point,

23  you have a certificate that you specialize in internal

24  medicine, and then you go to sit before the Board.

25       And the American Board is a national exam.  Same

Hazem Ashhab - Direct (Childers)

1  questions, same standards are applied to all physicians from

2  coast to coast.

3  Q.   So you have to become Board eligible by education and

4  training and then you take a test to become Board Certified?

5  A.   Correct.

6  Q.   And when did you become Board Certified in internal

7  medicine?

8  A.   In 1994.

9  Q.   And when did you become Board Certified in

10 gastroenterology?

11 A.   In 1998.

12 Q.   And did you have to renew that again?

13 A.   Yes.  In 2009 I renewed it and the certificate was

14 issued in 2010.  So it is valid for 10 more years.  We

15 recertify every 10 years.

16 Q.   Okay.  And when you recertify, what do you have to do?

17 A.   You do things all over again.  You basically have to,

18 to study.  And sometimes you go through courses.  Sometimes

19 you do it on-line.  And then you go sit for the exam.

20 Q.   Okay.  Did you treat patients, gastroenterology

21 patients in Charleston last week?

22 A.   Yes.

23 Q.   How about this week?  Did you treat patients today?

24 A.   Yes.

25 Q.   Okay.  And I understood --

Hazem Ashhab - Direct (Childers)

678

1    A.    Before coming to court.

2    Q.    And I understood you had a couple maybe that came in

3    unexpectedly and you were there longer than you expected to

4    be this morning?

5    A.    Yes.  A gentleman came with bleeding actually last

6    night, so I had to take care of him today.

7    Q.    And then when you leave here after you testify, are you

8    going to go back and treat patients there tomorrow?

9    A.    Maybe even tonight.

10   Q.    Okay.  Depending on what time we let you go?

11   A.    Because I'm on call, yeah.  I told them 6:00, so I hope

12   I get there before 6:00 but --

13   Q.    Have you ever treated a patient who had a GI bleed who

14   you believed it was caused by Pradaxa?

15   A.    Yes, more than one time.

16   Q.    And you understand that's why we're here today to talk

17   about a patient who had a GI bleed while she was on Pradaxa;

18   right?

19   A.    Yes.

20   Q.    And did you review Betty Knight's medical records in

21   forming your opinions?

22   A.    Yes.

23   Q.    Did you review the depositions of her doctors that were

24   taken in the case before you formed your opinions?

25   A.    Yes.

Hazem Ashhab - Direct (Childers)

1    Q.   Okay.  I want to walk through a couple of those records

2    with you right now.  You have in front of you a binder.  If

3    you could go to the tab that's 2000-A, do you see that?

4    A.   Yes.

5    Q.   If you would turn to Page 26 at the top, on the top

6    right corner.

7    A.   Yes.

8    Q.   Okay.

9             MR. CHILDERS:  And, Your Honor, I probably should

10   have done this previously.  We have agreed on a

11   comprehensive medical examination exhibit, Exhibit Number

12   2000.  These are taken from that.  We'd move 2000 into

13   evidence at this point.

14             THE COURT:  Any objection?

15             MR. LEWIS:  No objection, Your Honor.

16             THE COURT:  It's admitted and it may be published.

17             MR. CHILDERS:  Thank you, Your Honor.

18        (Plaintiffs' Exhibit Number 2000 admitted into

19   evidence.)

20   BY MR. CHILDERS:

21   Q.   Do you see, Doctor, this is the History and Physical

22   from May 20th, 2013, for Ms. Knight?

23   A.   Yes.

24   Q.   Can you explain to the jury what a History and Physical

25   is?

Hazem Ashhab - Direct (Childers)

1   A.   When a patient comes to the hospital, whether to the

2   emergency room or otherwise, usually a house officer or a

3   specialist or a hospitalist will interview them for the

4   first time.

5        They will obtain detailed medical history of the

6   patient on why they are coming this time, what pre-existing

7   conditions or medical history they had in the past, review

8   their medications, and then perform a thorough physical

9   examination.

10       Based on that, they will order some lab testing or

11   imaging test to help them in reaching the diagnosis.  And

12   then they put a set of orders regarding management.

13       And from that point on, the care is directed according

14   to that assessment, whether the patient goes to the floor or

15   to the intensive care unit and so on and so forth.

16   Q.   This particular record is dictated by Dr. Abdelgaber.

17   Do you see that?

18   A.   Yes.

19   Q.   And the jury this morning heard his and watched his

20   deposition.  He talked about this record, so I don't need to

21   go in great detail with you.  But if you could, tell us what

22   was the reason why Ms. Knight was going to the hospital that

23   day?

24   A.   Because she experienced GI bleeding.  She had blood

25   mixed with her stool and that made her feel weak, went to

681

Hazem Ashhab - Direct (Childers)

1   her doctor.  She had blood and lots of blood clots.

2   Q.   Okay.  And in your experience, is that the kind of GI

3   bleed that you would treat?

4   A.   Yes.

5   Q.   And as you reviewed the records, did you also see

6   that -- how long she stayed in the hospital for that

7   particular visit?

8   A.   I believe over two weeks.

9   Q.   Okay.  And if we could, I want to take you to Page 32

10  in that same exhibit.  Do you see this is a Discharge

11  Summary from that hospitalization?

12  A.   Yes.

13  Q.   Okay.  And tell the jury, if you would, what's the

14  purpose of a Discharge Summary?

15  A.   It summarizes the, the hospital stay of the patient

16  including when did they come in, how did they progress

17  during the hospital stay, and what is their final plan of

18  disposal.

19       And it should reflect whether the patient had

20  medications, blood transfusions, surgeries or procedures.

21  It should reflect the outcome, whether the patient gets

22  better or worse.

23  Q.   Okay.  And if you could, if we could look at the

24  Discharge Diagnoses.

25       Could you call up the first three?

Hazem Ashhab - Direct (Childers)

1    What were the, the diagnoses, the first three diagnoses

2    on this Discharge Summary?

3    A.    Severe gastrointestinal blood loss anemia, was

4    symptomatic initially; lower gastrointestinal blood loss,

5    likely colonic AVM bleeding, status-post colonoscopy and

6    clipping.  Number three is atrial fibrillation on Pradaxa.

7    Q.    Okay.  Do you see anything in this Discharge Diagnoses

8    that mentions Plavix?

9    A.    No.

10   Q.    Okay.  And then I want to sort of get a general -- ask

11   you a general question and then we can sort of walk through

12   the records to get more information.

13       Based on what you have reviewed in all of the records,

14   Doctor, and the depositions that you read and your training

15   and experience as a gastroenterologist, have you formed any

16   opinions on what was the most significant cause of Betty

17   Knight's gastrointestinal bleed in May of 2013?

18   A.    Most likely, the severity of her bleeding was related

19   to the intake of Pradaxa.

20   Q.    And have you -- and based on the records you've looked

21   at, and we'll break it down after we talk about it more

22   generally, did you form any opinion on whether or not she

23   was over-anticoagulated or had too much Pradaxa in her

24   blood?

25   A.    I believe she did.

Hazem Ashhab - Direct (Childers)

1  Q.  Okay.  Well, let's start with Betty herself as a

2  patient.  What is it about Betty Knight that would lead you

3  to believe that she's a patient who would likely be

4  over-anticoagulated on Pradaxa?

5  A.  Well, she has the risk factors for having too much of

6  the drug in her system, including her age, above 65, -- in

7  her case she's above 80 -- a female, has compromised kidney

8  function test.

9     Also in this particular incidence one of the

10  medications she was taking, namely Coreg, would have

11  affected the level of her blood thinner, the Pradaxa, by

12  making more of the blood -- of the medication stay in her

13  system being a P-gp inhibitor.

14  Q.  The jury has heard that term and I actually put the

15  board back up for them just in case while we're doing this

16  examination.  Could you explain, as best you can, what does

17  that mean if a drug is a P-gp inhibitor?

18  A.  Well, P-gp stands for permeability glycoprotein.  So

19  this is like a vehicle that transports certain medications

20  across membranes between cells in the plasma.

21     So if that vehicle is interrupted, it's not going to

22  carry the medication where it's supposed to go.  So if you

23  have -- the studies have found that certain medications that

24  inhibit that vehicle or make it not work will result in some

25  of these medications being too high in the system or too

Hazem Ashhab - Direct (Childers)

1    high in the blood, so they are not eliminated properly.

2    That may lead to a high level in the blood.

3         It has also been associated with other conditions that

4    may not be relevant to this, but it can also affect your

5    body response to certain antibiotics.  So some people will

6    not respond to certain antibiotics because of problems with

7    that transporter.  So it's an important vehicle in the, in

8    the human body.

9    Q.   Okay.  And so if I understood you correctly, the, the

10   things about Betty that make you think that she's likely to

11   be over-anticoagulated were that she's over 80; she's a

12   female; she had severe kidney impairment; and she was taking

13   Coreg, which is a P-gp inhibitor drug.  Is that right?

14   A.   That's correct.

15   Q.   What -- do you how what Coreg is used to treat?

16   A.   It's a beta blocker.  It's used for blood pressure and

17   rapid heart rate in people with heart disease.

18   Q.   Is that common medication that you would see in an

19   atrial fibrillation patient?

20   A.   Yes.

21   Q.   Beyond Betty herself, did you see any test results or

22   anything in the medical records that indicated to you that

23   Betty had too much Pradaxa in her system when she had this

24   bleed in May of 2013?

25   A.   Well, unfortunately, there wasn't any precise test

Hazem Ashhab - Direct (Childers)

1   given to measure Pradaxa.  However, the closest or the rough

2   blood test that was available and mentioned in her records

3   is called the aPTT which seemed to be significantly

4   elevated, although the record reflects that she had stopped

5   taking the medication more than 24 hours prior to the test

6   and she had received a blood transfusion which should have

7   helped in correcting that abnormality but instead was

8   elevated.  So I would say it must have been overly

9   anticoagulated.

10  Q.   Okay.  And so if we could just sort of break that down

11  a little for the jury, she had an aPTT test which we've got

12  that on the board too.  That's one of these coagulation

13  tests you can give a patient; is that right?

14  A.   That's correct.

15  Q.   And that test wasn't given right when she came in the

16  hospital; is that correct?

17  A.   It seems that it was done more than 24 hours after

18  that.

19  Q.   Okay.  It was the second day she was in the hospital?

20  A.   After she received blood transfusion.

21  Q.   Why is that important as far as testing the level of

22  coagulation in her blood that it was more than 24 hours

23  after her last Pradaxa dose?

24  A.   Well, because you, you would, you would think, I

25  mean -- well, not you would think.  You know that if you

Hazem Ashhab - Direct (Childers)

1  have not taken the medication for so long, the medication

2  level should have been down significantly or eliminated most

3  of it depending on the half-life.

4      So if you go back 24 hours prior or you do the test

5  when she actually took the medication, then it will be much

6  higher than what you measure 24 hours later.

7  Q.   Okay.  And in this case, they just happened to not

8  measure it the day she came in; is that right?

9  A.   That's what we have in the record.

10 Q.   Okay.  What about the amount of bleeding she had?  Was

11 there anything about that that factored into your opinion on

12 whether she was over-anticoagulated?

13 A.   Well, it was a life-threatening bleed.  She had lost

14 almost -- more than five grams of hemoglobin.  It went down

15 to a hemoglobin of 6.  That's life-threatening.  She had

16 acquired a total of four units of blood transfusion.  I

17 would say, you know, that's life-threatening.

18     If you put these two factors in somebody who's not 40

19 or 50, who's 83 and has heart disease and has diabetes and

20 has had a stroke, you better believe it's life-threatening.

21 Q.   Okay.  You mentioned that we didn't have a precise

22 measurement of Betty's Pradaxa level.  Do you recall that?

23 A.   That's correct.

24 Q.   And as a doctor who treats patients with GI bleeds,

25 does Boehringer provide you with any information as to how

Hazem Ashhab - Direct (Childers)

1   you -- in the label, in the Pradaxa label as to how you can

2   measure precisely the amount of Pradaxa that a bleeding

3   patient has when they come in?

4   A.   No.

5   Q.   Without Boehringer providing that information to you,

6   is there any way for us to know exactly how much Pradaxa

7   Betty had in her blood when she had this GI bleed?

8   A.   No.

9   Q.   Were you aware that Boehringer tells doctors like you

10  in Europe exactly how to measure Pradaxa blood levels?

11  A.   I believe they have more information in Europe than

12  they do in the United States.

13  Q.   Is that the kind of information that you would believe

14  would be helpful to you in treating patients here in West

15  Virginia?

16  A.   Definitely.

17  Q.   And how would that help you?

18  A.   Well, it would help me identify who is at higher risk

19  of bleeding, whose level is too high because of these risk

20  factors.  So I may tell them to reduce the dose or not take

21  the medicine or find another drug to use.

22  Q.   Some drugs aren't right for everybody.  Is that fair to

23  say?

24  A.   That's correct.

25  Q.   You mentioned that, that Betty had what you call a

Hazem Ashhab - Direct (Childers)

1    life-threatening GI bleed; is that right?

2    A.   That's right.

3    Q.   Are there different ways you categorize them as a

4    doctor who treats GI bleeds as far as how bad they are?

5    A.   Yeah.  Well, you get the patient who comes in walking

6    and talking to the office and has passed some blood through

7    the rectum.  They have normal vital signs and normal

8    hemoglobin.  So that's minor.

9        A major GI bleed would be when they bleed probably a

10   couple units of blood.  They may have rapid heart rate so

11   they are a little bit hypertensive, but they do not

12   necessarily need a blood transfusion.  They may or may not.

13   But usually it is less than four units, maybe one or two

14   units.

15       We call that a major GI bleed because we see a drop in

16   hemoglobin, typically one to two grams, maybe with a little

17   bit of low blood pressure.  So these are some of the

18   criteria.

19       And then the life-threatening one is the one we talked

20   about when you need four units of blood or more.  Usually

21   you have low blood pressure.  You may have changes in mental

22   status.  An elderly person may be confused.

23       And in addition, you know, a hemoglobin drop of more

24   than five grams, that's life-threatening.

25   Q.   Okay.  You reviewed the Pradaxa labels, right, the

Hazem Ashhab - Direct (Childers)

1  physician label in this case?

2  A.    Yes.

3  Q.    And, in fact, more than one as they changed over time?

4  A.    Yes.

5  Q.    If you could look in the binder you have in front of

6  you, the first exhibit, which is Number 86.

7        If you could call up the third page of Exhibit 86.

8           MR. CHILDERS:  Your Honor, I believe this is

9  already admitted.

10          THE COURT:  I'm sorry?

11          MR. CHILDERS:  This is an already admitted

12  exhibit.  I apologize, Your Honor.

13          THE COURT:  Right.

14          MR. CHILDERS:  Okay.

15 BY MR. CHILDERS:

16 Q.    Do you see on Page 3, Section 6.1 that talks about

17 clinical trial experience?

18      Would you call up that middle paragraph just above

19 Table 2.  It's just called the "bleeding" paragraph.  Okay.

20      Do you see it here that -- I'm going to ask you

21 questions while she gets that ready.

22      Do you see in here that this is talking about the RE-LY

23 study that was the pivotal clinical trial for getting

24 Pradaxa approved for atrial fibrillation patients?

25 A.    Yes.

Hazem Ashhab - Direct (Childers)

1  Q.   Do you see that?  And in here do you see that they say,

2  "This is how we define in the RE-LY study if someone had a

3  major bleed or a life-threatening bleed."  Do you see that?

4  A.   Yes.

5  Q.   And there about midway through the paragraph do you see

6  where it says, "A life-threatening bleed met one or more of

7  the following criteria"?

8  A.   Yes.

9  Q.   Do you see that?

10 A.   Yes.

11 Q.   And the third item in there is reduction in hemoglobin

12 of at least five grams per deciliter.  Do you see that?

13 A.   Yes.

14 Q.   Did Betty have that?

15 A.   Yes.

16 Q.   Okay.  And the second one is transfusion of at least

17 four units of blood.  Do you see that?

18 A.   Yes.

19 Q.   And did Betty have at least four units of blood

20 transfused?

21 A.   Yes.

22 Q.   So she met two of the criteria, not just one, for a

23 life-threatening bleed if she had been in the RE-LY trial;

24 right?

25 A.   And I would argue on a third one too.

Hazem Ashhab - Direct (Childers)

1   Q.   Okay.

2   A.   It depends on how you look at it.  Necessitating

3   surgical intervention, which she had colonoscopy and

4   clipping.

5   Q.   Okay.

6   A.   Before the area of colonoscopy and clipping, she would

7   go to surgery to have that part of the colon removed.  So it

8   depends on how you look at it, but that's another fact.

9   Q.   All right.  And so not only in your experience it's a

10  life-threatening bleed, the company actually says that as

11  well as how they define it in the RE-LY trial?

12  A.   That's true.

13  Q.   Okay.  All right.  I want to talk to you about -- go

14  back to the actual hospitalization in May of 2013.  And if

15  we could look again on Page 32 which was the Discharge

16  Summary we were looking at just a few minutes ago.  Okay?

17  A.   Okay.

18  Q.   Do you see there it says at the bottom, "Patient was

19  admitted and given two units of blood for a hemoglobin of

20  6"?

21  A.   Yes.

22  Q.   Okay.  Can you, can you tell the jury, what is a

23  hemoglobin of 6?  What does that mean to you?

24  A.   Well, that's a very low hemoglobin.  The hemoglobin is

25  the major protein in your blood that carries the oxygen to

Hazem Ashhab - Direct (Childers)

1    the vital organs.  So if you want your lungs to have oxygen,

2    your brain to have oxygen, your heart, your kidneys, you

3    need normal hemoglobin or a hemoglobin within one to

4    two grams of the normal.

5        Once you get to very low levels of hemoglobin, then you

6    don't have the vehicle to deliver oxygen to your tissues,

7    mainly the vital organs.  And the brain is one of the most

8    important organs and the kidneys as well.  They are very

9    sensitive to hypoxemia, meaning low oxygen in the blood.

10   Q.   Okay.  And what's a normal hemoglobin in a patient?

11   A.   It can vary a little bit in the population in the test,

12   the lab that does it, but females usually 12 to 14 and males

13   14 to 16.  So --

14   Q.   So this is half of what you would expect it to be?

15   A.   I would say so.

16   Q.   And, and what does that mean to you when you see that?

17   A.   So you have somebody who's really in a life-threatening

18   situation where they don't have enough means to deliver

19   oxygen to the vital organs.  So these people would be at

20   high risk for, you know, ischemic stroke, an insult to the

21   heart, insult to the kidneys with this level of hemoglobin.

22   Q.   Okay.  And then we go on and see here it says she was

23   evaluated by GI who took her for upper and lower

24   endoscopies.  An AVM of the colon was actively bleeding

25   which was clipped.  Do you see that?

Hazem Ashhab - Direct (Childers)

1  A.   Yes.

2  Q.   Are those the procedures that you perform as well in

3  your practice?

4  A.   Yes.

5  Q.   Okay.  Could you tell the jury what, what is an AVM?

6  A.   It stands for arteriovenous malformation which is

7  basically an abnormal tiny vessel in the wall of the colon

8  or the intestine that can easily bleed upon the blood being

9  too thin or on friction or trauma.

10      So instead of having the normal vessels that taper down

11 into the capillaries and meet together to transport from

12 artery to vein, they actually make a little pooling of these

13 capillaries.  And that pooling of these little tiny vessels,

14 because it's very thin and abnormal, is high risk for

15 bleeding.

16 Q.   Have you treated patients who have AVMs that don't

17 bleed?

18 A.   Yes.

19 Q.   Do most AVMs bleed or not bleed?

20 A.   No, most of them do not bleed.

21 Q.   Okay.  When is it that you most often see a bleeding

22 AVM?

23 A.   When people are taking what we call a blood thinner.

24 Usually it's an anticoagulation medication that makes the

25 blood too thin.

Hazem Ashhab - Direct (Childers)

1  Q.   Okay.  If we could go on in this report, again do you

2  see it says, "Her hemoglobin improved with two units of

3  blood.  She was given another two units for a total of four

4  units."  Do you see that?

5  A.   Yes.

6  Q.   Okay.  And is that an unusual amount of blood to have

7  to transfuse for a patient, four units?

8  A.   It's a lot, but for somebody with a hemoglobin of 6,

9  that's what you need.

10  Q.   Okay.  And then it says her hemoglobin went up to 10.8.

11  Is there anything about Betty's physical condition that

12  would make you think that that is probably a normal range

13  for her to have a hemoglobin?

14  A.   I would say, you know, 10 to 11 is okay for her because

15  she has chronic kidney disease.  So people with chronic

16  renal failure usually tend to have a little bit lower

17  hemoglobin and their body adjusts to that.

18  Q.   And that baseline becomes just a little bit lower?

19  A.   Yes.

20  Q.   Okay.  Betty was taking some other medications at the

21  same time she had this bleed besides Pradaxa; correct?

22  A.   Correct.

23  Q.   Do you believe any of the other medications that she

24  was taking played any part in the bleed?

25  A.   She's on -- she was on two anti-platelet agents.  I

Hazem Ashhab - Direct (Childers)

1   recall aspirin and Plavix.

2   Q.   What's the difference between an anti-platelet agent

3   and an anticoagulant drug?

4   A.   Okay.  So the anti-platelet will inhibit the platelets

5   that are usually running in your system from making an

6   aggregate or a clot that will block an artery while the

7   anticoagulants make your blood in general very thin.

8   Q.   And how does that affect -- if someone is having a

9   bleed or has damaged tissue, how do those two work together?

10  A.   So the, the aspirin and Plavix will, will make you more

11  likely maybe to ooze a little bit of blood.  It's kind of

12  like a faucet dripping water.

13       But the blood thinners may make you just having an open

14  hose.  Because the blood is too thin when it bleeds, it

15  doesn't stop.

16       So you get one trickling faucet and one that's got an

17  open faucet.  The anticoagulants is the open faucet where

18  the blood is too thin, and when it bleeds it doesn't stop.

19  And the aspirin and Plavix is like the trickle.

20  Q.   Okay.  What role do you believe the Plavix and aspirin,

21  if any, played in the bleed that Betty had?

22  A.   Well, they're probably a contributing factor.

23  Q.   Okay.  You, you mentioned earlier you thought Pradaxa

24  was the most substantial factor.  How would you rate the

25  Plavix and aspirin as opposed to Plavix as being likely

Hazem Ashhab - Direct (Childers)

1  causes of the bleed?

2  A.   Well, in our experience in gastroenterology, two things

3  we, we notice in our practice; number one, the location of

4  the bleeding and, number two, the amount of bleeding.

5       So with aspirin and Plavix you are more likely to see

6  bleeding from upper gastro-intestine, let's say the stomach

7  and maybe the duodenum, while with anticoagulants,

8  especially Pradaxa, you are more likely to see the bleeding

9  coming from the lower GI tract, mainly the colon.

10  Q.   And where was Betty's bleed?

11  A.   It was in the colon.

12  Q.   Okay.  The lower GI?

13  A.   Lower GI.  And then the second point is usually with

14  aspirin and Plavix, you may bleed as an ooze, a little bit

15  at a time, and it takes you a long time before your

16  hemoglobin drops, while when you bleed -- if you have a

17  lesion and it bleeds with anticoagulants, and Pradaxa is one

18  of the higher risks for that, the bleeding is massive.  They

19  come in passing clots, a lot of blood.

20       So the amount of bleeding is more with anticoagulants

21  and the location is lower GI and colon.

22  Q.   If you had a patient who's at high risk of bleed, they

23  come to you and, you know, you say this patient is at high

24  risk of bleed and they're on all three of those medications

25  and you want to take them off just one of them because

Hazem Ashhab - Direct (Childers)

1  you're worried about the bleed, which one are you going to

2  take them off of - Pradaxa, Plavix or aspirin?

3  A.    Now, from the gastrointestinal point of view, I

4  probably would have them stop the Pradaxa or look for an

5  alternative.  Now, that's from my department, my part.

6       Now, there are other reasons for the other medications

7  and their cardiologist usually is to make the call.

8  Q.    Well, let's, let's look, if we could, if you look on

9  Page 37 of the binder in front of you.

10      And if you could call that up.

11      This is a consult with Dr. Linsenmeyer.  Do you see

12  that?

13  A.    Yes.

14  Q.    And it was after Betty had had her bleed.  It was about

15  a month after she got out of the hospital.  Do you see that?

16  A.    Uh-huh.

17  Q.    Okay.  And he mentions here in the first paragraph

18  that -- toward the bottom --

19      If you could call that up.

20      Do you see that he mentions that she had been in the

21  hospital with new onset GI bleeding?  Do you see that in the

22  first paragraph of the history of present illness?

23  A.    Yes.

24  Q.    Okay.  And it goes on to say that she had this AV

25  malformation, had to stay in the hospital until June 8th,

Hazem Ashhab - Direct (Childers)

1    and then went home.  Do you see that?

2    A.    Yes.

3    Q.    Okay.  If we could turn to the -- three pages in.  It's

4    Page 3 of three, 39 at the top.  And I want to direct you

5    down to the "Plan" section.  Do you see that?

6    A.    The "Plan," yes.

7    Q.    Yes, sir.  And this is -- Dr. Linsenmeyer is a

8    cardiologist.  Are you aware of that?

9    A.    Yes.

10   Q.    And do you see he says he would not anticoagulate her

11   with recent gastrointestinal bleed.  Do you see that?

12   A.    Yes.

13   Q.    And then he goes on a little bit farther down the

14   last -- the second to last sentence he says, "We will resume

15   Plavix in the event she needs cardiac catheterization and

16   hold Pradaxa."  Do you see that?

17   A.    Yes.

18   Q.    Is that consistent with what you just told us about

19   which of these drugs you would be most afraid of causing a

20   bleed for this patient?

21   A.    Yes.  In her case I would stop the Pradaxa as the --

22   Q.    And that looks like what Dr. Linsenmeyer was saying as

23   well; right?

24   A.    Yes.

25   Q.    Okay.  Have you treated patients who are on warfarin,

Hazem Ashhab - Direct (Childers)

1   Coumadin --

2   A.   Yes.

3   Q.   -- who have GI bleeds?

4   A.   Yes.

5   Q.   Okay.  In your experience when those patients have a GI

6   bleed, what do you normally find as far as their INR number?

7   Is it normal?  Is it elevated?

8   A.   Usually very high.

9   Q.   Okay.  And when you say very high, what do you mean?

10  A.   Probably about -- above 10.

11  Q.   Okay.  How often do you see GI bleeding in a warfarin

12  patient who has -- who's in therapeutic range, who's in

13  between that two and three number?

14  A.   It's not common as a known agent.

15  Q.   It's possible; right?

16  A.   Yes, but it's not common.

17  Q.   Okay.  Do you believe that Betty would have had a

18  severe GI bleed in May of 2013 if she had still been on

19  warfarin or Coumadin instead of Pradaxa?

20  A.   I would think not, not a life-threatening bleed because

21  she's been on Coumadin before and it was therapeutic and

22  supratherapeutic, but she never had the life-threatening

23  bleed before on Coumadin.

24  Q.   Is there anything about Pradaxa -- is it -- do you know

25  whether or not Pradaxa is more likely to cause a GI bleed

Hazem Ashhab - Direct (Childers)

1   than Coumadin?

2   A.   We do.

3   Q.   What, what do you know about that?

4   A.   Well, from our experience, it's more than double.  I

5   mean, it's significantly higher than warfarin to cause GI

6   bleeding, Pradaxa is.

7   Q.   Okay.  You mentioned that Betty did not have a

8   life-threatening bleed while she was on Coumadin.

9   A.   She didn't.

10  Q.   All right.  I want to talk about that because the

11  jury's sort of heard mixed signals on that.  I want to clear

12  that up.  Okay?

13  A.   Okay.

14  Q.   First of all, Betty had -- we already talked about

15  this.  She had chronic kidney disease; right?

16  A.   Correct.

17  Q.   And you told us that affects her hemoglobin and you

18  would expect it to be a little lower than normal anyway?

19  A.   Correct.

20  Q.   What the jury has heard is that Betty -- Betty had to

21  be taken off Coumadin at some point and it was potentially

22  because of a GI bleed.  Okay?

23       I want to show you records from November of 2008 where

24  Betty was actually taken off the warfarin.  Okay?

25       If you look in your binder at the very beginning of

Hazem Ashhab - Direct (Childers)

1   this same Section 2000-A, do you see that?  Go to the first

2   page.  It's got the sticker on it.  Do you see this is

3   another History and Physical?  This one is from November

4   13th, 2008.

5   A.   Correct.

6   Q.   Okay.  I want you to look at this H & P, the history of

7   present illness, and tell me is there any mention of a bleed

8   in there?

9   A.   I don't see any.

10  Q.   Okay.  Why don't we turn the page, if you would, with

11  me.  And there is a section called "Review of Symptoms."

12  A.   Yes.

13  Q.   Okay.  And what's a Review of Symptoms?  Could you tell

14  the jury what that section means?

15  A.   That after you complete the main reason the patient

16  came to the hospital and you get the detailed story of that,

17  then particularly in elderly people with multiple medical

18  problems, you go on a system by system asking them about

19  their neurological function, their breathing, their heart,

20  their intestines, their genitourinary tract, and their

21  musculoskeletal.

22       So you're reviewing each and every system to make sure

23  that you covered everything and you did not miss anything

24  in, in what the patient told you.  So it's basically a

25  review of each and every system in your body.

Hazem Ashhab - Direct (Childers)

1   Q.   Do you see here that the GI is listed as a separate

2   system?

3   A.   Yes.

4   Q.   What does it say next to GI?

5   A.   "No melena, hematochezia, nausea, vomiting, or

6   diarrhea."

7   Q.   Can you tell the jury --

8   A.   "She has chronic constipation and reflux."

9   Q.   Sorry.  I didn't mean to interrupt you.  Can you tell

10  the jury, what is melena?

11  A.   Melena is transported blood that usually appears dark

12  in color, almost black, because it's blood that has, that

13  has passed through your gastrointestinal tract.  So it gets

14  partially digested by certain enzymes.  So the blood changes

15  color from bright red to dark.  We call it melena.  It's a

16  reflection of GI blood loss basically.

17  Q.   So when it says no melena, what does that mean to you?

18  A.   That she did not have symptoms of passing blood at

19  rectum or passing blood that she could see.

20  Q.   And the next one is that she didn't have hematochezia;

21  is that right?

22  A.   Hematochezia is when you pass blood through the rectum.

23  Q.   So if it says no hematochezia, what does that tell you?

24  A.   There was no bleeding that she could see.

25  Q.   Okay.  And then if we could turn two more pages, you

Hazem Ashhab - Direct (Childers)

1  see -- and this would be Page 4 at the top.  Do you see that

2  this is a consult a couple of days later by Dr. Haberman?

3  A.    Yes.

4  Q.    And you understand him to be a cardiologist as well?

5  A.    Yes.

6  Q.    Okay.  And do you see -- in this history of present

7  illness do you see anything that says she's having a bleed?

8  A.    I, I don't see.

9  Q.    Okay.

10  A.    If you can point it out to me, but I don't see any.

11  Q.    Okay.  And then if we look on the next page, there's a

12  section called "Impression."  Do you see that down toward

13  the bottom?

14  A.    Yes.

15  Q.    Okay.  And, actually, can you pull up the paragraph

16  above it as well?

17       Just above "Impression" do you see the very last

18  sentence in the diagnostic data it says the INR is

19  therapeutic at 3.3?  Do you see that just above the

20  Impression, the word "Impression"?

21  A.    Yes.

22  Q.    What does that mean that the INR is therapeutic?

23  A.    The INR is a lab test we use to monitor the degree of

24  anticoagulation when a patient is on Coumadin.  And we look

25  at studies that tell you where your INR level should be.

Hazem Ashhab - Direct (Childers)

1    So, for example, if somebody has atrial fibrillation

2  like Mrs. Knight and you want to prevent a stroke, typically

3  you like it to be between 2.5 to 3 or 2.5 to 3.5, in that

4  range.

5    And if somebody has a heart valve, the numbers may be a

6  little bit different.  But we use that blood test to tell us

7  how thin the person's blood is and to adjust their Coumadin

8  dose.

9  Q.   When you see in a medical record it says that the INR

10  was therapeutic, what does that tell you as a doctor?

11  A.   I'm assured that the patient is taking the proper dose

12  of the medication.

13  Q.   Okay.  She's not over-anticoagulated?  Is that fair to

14  say?

15  A.   No.  It's therapeutic, so it's where she should be.

16  Q.   Okay.  And then if we look under "Impression," do you

17  see Number 3 says anemia which might be secondary to the

18  recent initiation of Coumadin.  Do you see that?

19  A.   Yes.

20  Q.   Does it say anything in this Impression about a bleed,

21  a GI bleed?

22  A.   It does not.

23  Q.   And then under "Recommendations," the first thing is

24  they're going to stop the Coumadin.  Do you see that?

25  A.   Yes.

Hazem Ashhab - Direct (Childers)

1    Q.    If we could just go to the next page, yes, the

2    following Page 6, there's the, the fifth recommendation.

3          Do you see that it says, "I'm hopeful that the

4    transfusion will help with the heart rate which may be a

5    response to anemia"?

6          Do you see that?

7    A.    Yes.

8    Q.    What does that mean to you?

9    A.    That she was having tachycardia and he thought that the

10   tachycardia, the rapid heart rate was because she had low

11   hemoglobin, did not have enough blood.  So he said if we

12   give her blood, maybe that will help heart rate slow down a

13   little bit and be close to normal.

14   Q.    Okay, all right.  I want to move on to the next page

15   which is the following, the following day.  Do you see that

16   this is a consultation from Dr. Rohrbach?

17   A.    Yes.

18              THE COURT:  Excuse me.

19         Doctor, could you pull the microphone down just a

20   little?  When you look down at the medical record, it's not

21   picking you up.  Thank you.

22   BY MR. CHILDERS:

23   Q.    Do you see this is a consultation from Dr. Rohrbach?

24   A.    Yes.

25   Q.    And if we go to the Impression on the next page, he

Hazem Ashhab - Direct (Childers)

1    says, "Anemia.  This certainly does need to be evaluated

2    given her long-term need for anticoagulation.  We'll start

3    her workup with an upper endoscopy.  And if this is

4    unremarkable, at some point she probably will require a

5    colonoscopy as well."

6         Do you see that?

7    A.   Yes.

8    Q.   And could you tell the jury what an endoscopy is?

9    A.   Endoscopy is the test by which we take a flexible tube

10   with a camera at the end and go in the mouth down the food

11   tube, the esophagus into the stomach.

12        We pass the stomach into the first part of the small

13   intestine called the duodenum looking for abnormal lesions

14   like a bleeding source, ulcer, or cancer or a stricture.

15        Colonoscopy is when you take a different tube, longer

16   usually, with a camera at the tip and you go through the

17   rectum into the entire large intestine, and then where the

18   junction between the small intestine and the colon is.

19        Again, the colonoscopy is designed to look for abnormal

20   lesions in the colon like colon polyps and colon cancer, AV

21   malformations, bleeding source, inflammation,

22   diverticulosis, all that.

23        Both tests have, have abilities for diagnosis as well

24   as a therapeutic option; for example, to remove polyps to

25   prevent cancer or to clip a lesion and stop bleeding.  So

Hazem Ashhab - Direct (Childers)

1   they are used as diagnostic and therapeutic tools.

2   Q.   Okay.  And if we turn three pages in this record to

3   Page 11, do you see where that upper endoscopy was actually

4   performed two days later?

5   A.   Yes.

6   Q.   And what was the -- did they find any blood, first of

7   all?  Do you see the part right in the middle that says "no

8   blood was noted"?

9   A.   Yeah.  It says "normal upper endoscopy."

10  Q.   What does that mean if it's a normal endoscopy?

11  A.   That they found no lesions to report.

12  Q.   Okay.

13  A.   No bleeding, no ulcers, nothing to report.

14  Q.   And then I want you to flip back two pages.  And do you

15  see that there was a cardiac catheterization that was

16  performed the day before that?

17  A.   Yes.

18  Q.   Is that an invasive procedure?

19  A.   Cardiac catheterization, yes.

20  Q.   Is that a procedure where you would have a patient stop

21  taking their anticoagulant before you performed it?

22  A.   Yes.

23  Q.   Okay.  And so in this particular case, she's off

24  Coumadin and they perform a catheterization and put in

25  stents; correct?

Hazem Ashhab - Direct (Childers)

1  A.   Yes.

2  Q.   Okay.  And then I want you to look at "Plan" on the

3  very, the next page, Page 10, the very last one, Number 6 in

4  "Plan."  Can you see it says, "The decision of whether to

5  restart the Coumadin will be left to Dr. Haberman."

6       Do you see that?

7  A.   Yes.

8  Q.   So you have to stop Coumadin before you have a cardiac

9  catheterization like she had; correct?

10  A.   Yes.

11  Q.   And then this doctor, in particular Dr. Gunnalaugsson,

12  is saying, "I'm going to leave that up to another doctor to

13  decide whether or not to put her back on the Coumadin."

14  Right?

15  A.   Yes.

16  Q.   Then I want you to turn to Page 12 in this record which

17  is the Discharge Summary.  Do you see that?

18  A.   Yes.

19  Q.   You told us what a Discharge Summary is.  So I want, I

20  want to ask you, do you see anything -- and there are 24

21  items listed on her Discharge Diagnosis; correct?

22  A.   Yes.

23  Q.   Is any one of those GI bleed?

24  A.   No.

25  Q.   Okay.  The jury also heard that -- has heard that Betty

Hazem Ashhab - Direct (Childers)

1   got a clot in her arm after she stopped the Coumadin in

2   November of 2008, that she got a clot in her arm in February

3   of 2009.  Do you recall from the medical records seeing that

4   that occurred?

5   A.   Yes.

6   Q.   All right.  I want to direct you to another record,

7   Page 52 of this particular set we're looking at now.  Let me

8   know when you're there.

9   A.   52?

10  Q.   Yes, sir.

11  A.   Yes.

12  Q.   Do you see this is a consultation from a Dr. Baryun on

13  February 10, 2009?

14  A.   Yes.

15  Q.   So just a few months after the record we just saw;

16  correct?

17  A.   Yes.

18  Q.   And the reason for the consultation is bradycardia;

19  right?

20  A.   Yes.

21  Q.   And then if we look under "History of Present Illness"

22  about midway down, do you see it says, "Patient has been on

23  Coumadin in the past.  However, it was held because of the

24  percutaneous coronary intervention and was not restarted."

25  Do you see that?

Hazem Ashhab - Direct (Childers)

1   A.   Yes.

2   Q.   Is that percutaneous coronary intervention the cardiac

3   catheterization we just looked at?

4   A.   Yes.

5   Q.   Does it say anything in this record about her having a

6   bleed, whether it was acute or chronic, and that's the

7   reason why Coumadin was stopped?

8   A.   It does not.  It says it was stopped because of the

9   PTC, the percutaneous intervention with the catheterization.

10  Q.   I want you to turn now to -- sorry.  I'm making you

11  skip around here.  If you go to Page 23 of this same set of

12  records, you should find another consultation that was three

13  days after that, February 13th, 2009.  Do you see that?

14  A.   Yes.

15  Q.   And at this point, Betty's not on Coumadin; right?

16  A.   Correct.

17  Q.   She had been taken off of it.  And do you see what it

18  says under his "History of Present Illness," the first

19  sentence?  Do you see it says, "The patient is a 79-year-old

20  white female seen in consultation at the request of Dr. Dawn

21  MacFarland for evaluation of anemia."  Right?

22  A.   Yes.

23  Q.   Anemia, you told us, is where the hemoglobin is a

24  little low and you want to find -- try to find out why;

25  correct?

Hazem Ashhab - Direct (Childers)

1   A.   Yes.

2   Q.   At least that's what they're doing here.  And at this

3   point if you look under "Medications," there are 15 things

4   listed, not one of which is Coumadin or warfarin.

5   A.   Yes.

6   Q.   Okay.  And then if we turn to the next page, do you see

7   a section that's called "Diagnostic Data"?

8   A.   Yes.

9   Q.   And under that do you see that she had labs checked and

10  that her hemoglobin had dropped to 9.1?  Do you see that?

11  A.   Yes.

12  Q.   That's pretty -- almost exactly what it was in November

13  of 2008 when they took her off Coumadin; correct?

14  A.   Yes.

15  Q.   Okay.  But at this point, she's not on Coumadin; right?

16  A.   Right.

17  Q.   And she's diagnosed with anemia; right?

18  A.   Yes.

19  Q.   Okay, all right.  I want to get into now, if we could,

20  the Pradaxa label that was in effect when Betty Knight was

21  started on Pradaxa.  Did you review that label?

22  A.   Yes.

23  Q.   Okay.  And the jury saw this morning that the label

24  that Dr. MacFarland had available to her was Exhibit Number

25  86 in your binder, the label that was revised in March of

Hazem Ashhab - Direct (Childers)

1  2011, if you would turn to that with me.

2      Do you see on the front page, the very first page

3  what's called the "Highlights of Prescribing Information"?

4  A.  Yes.

5  Q.  And at the -- and in the very right column, the top

6  half, is there a section there called "Drug Interactions"?

7  Do you see a section called that?

8  A.  No.

9  Q.  Do you see anything in this "Highlights of Prescribing

10  Information" that tells a physician that a patient who has

11  severe renal impairment and is taking a P-gp inhibitor

12  should not get Pradaxa?

13  A.  No.

14  Q.  Okay.  I want you to turn to the third page.  And at

15  the bottom there's a section called "Drug Interactions."  Do

16  you see that?

17  A.  Yes.

18  Q.  And when you look at that section, is there anything

19  there that tells a physician that a patient with severe

20  renal impairment who's taking a P-gp inhibitor should not

21  take Pradaxa?

22  A.  No.

23  Q.  Okay.  You told us earlier Coreg is a P-gp inhibitor;

24  right?

25  A.  Yes.

Hazem Ashhab - Direct (Childers)

1  Q.   And it's a drug that is commonly taken by patients who

2  have AFib; correct?

3  A.   Yes.

4  Q.   Was Betty taking that drug when she started Pradaxa?

5  A.   Yes.

6  Q.   I want you to look back on Page 2 there is a section

7  5.3 at the very bottom of this label.  And you see it's

8  called "Effect of P-gp inducers inhibitors on dabigatran

9  exposure."  Do you see that?

10 A.   Yes.

11 Q.   Okay.  And that's what we're talking about.  Coreg is a

12 P-gp inhibitor; right?

13 A.   Yes.

14 Q.   Is the word "Coreg" or the chemical name "Carvedilol,"

15 are either of those in this label at all?

16 A.   No.

17 Q.   All right.  I want to turn now to a change that was

18 made in the label after Betty started taking Pradaxa.  Okay?

19      If we could look at Exhibit 88 which is the label as it

20 was revised in January, 2012.  Betty is already on Pradaxa.

21 The decision had already been made to put her on it.  Do you

22 see that?

23 A.   Yes.

24 Q.   Now, when we look at this section in the "Highlights of

25 Prescribing Information --"

Hazem Ashhab - Direct (Childers)

1    I'm sorry.  Let's take that down.

2        MR. CHILDERS:  I apologize, Your Honor.  I thought

3    that was already in evidence.  I would move Exhibit 88 into

4    evidence.

5        THE COURT:  Any objection?

6        MR. LEWIS:  No objection, Your Honor.

7        THE COURT:  It's admitted and may be published.

8        MR. CHILDERS:  Thank you, Your Honor.

9        (Plaintiffs' Exhibit Number 88 admitted into evidence.)

10   BY MR. CHILDERS:

11   Q.   And that particular label -- if we could put it back up

12   -- sometimes I get a little ahead of myself.  Sorry.

13       Do you see now there's a section that's been added

14   called "Drug Interactions"?

15   A.   Yes.

16   Q.   Okay.  And the third item in that section says, "P-gp

17   inhibitors in patients with severe renal impairment Pradaxa

18   use is not recommended."

19       Do you see that?

20   A.   Yes.

21   Q.   Then if we turn to Section 5.3 which is on the third

22   page of the label -- if we could blow up 5.3, that whole

23   section.  Okay.

24       Do you see the little line along the edge?  It's a

25   straight line going down next to the second two paragraphs

Hazem Ashhab - Direct (Childers)

1   in this section.  Do you see there's a little line there

2   next to it?

3   A.   Yes.

4   Q.   Okay.  That information was not -- the part that's in

5   this, these two paragraphs was not in the label we just

6   looked at from when Betty started taking Pradaxa; correct?

7   A.   That's correct.

8   Q.   And then at the very last sentence, again it says,

9   "Avoid use of Pradaxa and P-gp inhibitors in patients with

10  severe renal impairment."  Correct?

11  A.   Yes.

12  Q.   It doesn't say avoid certain P-gp inhibitors in

13  Pradaxa.  It's just P-gp inhibitors in general.  Correct?

14  A.   Yes.

15  Q.   Okay.  I want to take you to one more part in here, the

16  very next page.  There's a drug interaction section again.

17  Do you see that?

18  A.   On Page 4 you said?

19  Q.   Yes, sir, the very next page, Page 4.

20  A.   Yes.

21  Q.   And here at the very bottom do you see the sentence

22  that says, "The concomitant use of Pradaxa and P-gp

23  inhibitors in patients with severe renal impairment should

24  be avoided."

25       Do you see that?  It's the last, the last sentence in

Hazem Ashhab - Direct (Childers)

1    that section of Drug Interaction.

2    A.    Page 4?

3    Q.    I'm sorry, Page 4, Section 7.

4    A.    Section 7.  Yes, I see that.  Yes, that's correct.

5    Q.    These changes that we just looked at in this label, as

6    a doctor would you consider those to be significant changes

7    to the label?

8    A.    Yes, very much so.

9    Q.    And as a doctor, what would you expect the drug company

10   to do when they make significant changes like this to a drug

11   label?

12   A.    They contact the doctors, the pharmacists, and -- the

13   pharmacies and sometimes even the patients.

14   Q.    And how do they do that?  Do they send letters?  Do

15   they call them?  What do they do?

16   A.    They send a letter with a big label on it that says

17   "Warning" in red.  And, and they mention these changes and

18   they usually are highlighted.

19        And then often we get calls from the pharmacy saying

20   that we got an update on this medication by the manufacturer

21   and your patient is taking this and this medication and I

22   think they shouldn't be together, so you have to choose

23   between the two.  So we get it in more than one way.

24   Q.    And in this particular case having reviewed the

25   evidence about what happened with Ms. Knight, do you know --

Hazem Ashhab - Direct (Childers)

1  the company never sent a letter like that to Dr. MacFarland;

2  correct?

3  A.   To my knowledge, they did not.

4  Q.   One more section I want to look at here with you on

5  Page 2 of this document.  It's called "Dosing Adjustments."

6  Do you see that?

7  A.   Yes.

8  Q.   And, again, it's got a little line there saying they've

9  made some changes here.  Do you see that?  The line that

10  goes along the side of it on the left-hand side?

11  A.   Yes.

12  Q.   Okay.  This tells the doctor what dose you should give

13  to your patient; right?

14  A.   Yes.

15  Q.   Does it say anything in here in this dosing section to

16  tell a doctor, "Don't give Pradaxa to a patient with severe

17  renal impairment if they're already taking a P-gp

18  inhibitor"?

19  A.   No, it does not.

20  Q.   Do you recall reading Dr. MacFarland's deposition in

21  preparation for -- or in forming your opinions in this case?

22  A.   Yes.

23  Q.   And do you recall she was asked all kinds of questions

24  about how difficult it was on occasion to keep Betty Knight

25  in INR range?

Hazem Ashhab - Direct (Childers)

1    A.    Yes.

2    Q.    If Pradaxa is not an appropriate medication for

3    anticoagulation for a patient, what difference does it make

4    if you have to adjust their warfarin if they can't go on

5    Pradaxa anyway?

6    A.    Not much.  It's a little inconvenience, but the patient

7    will come to the doctor and have the INR done if need be.

8    Q.    Okay.  Based on what you see in the label as it was

9    changed after Betty had already been started on the

10   medication, would you agree that it's not an appropriate

11   medicine for her?

12   A.    It should have been stopped, no.

13   Q.    And in order for the doctor to know that change has

14   been made, the drug company has to take some affirmative

15   action to tell them; correct?

16   A.    That, that's correct.

17   Q.    You get letters like that; right?

18   A.    I do.

19   Q.    Okay, all right.  I want to talk to you now about what

20   happened to Betty after she had the bleed.  Okay?

21   A.    Okay.

22   Q.    If we could go back to this section 2000-A, go to the

23   34th page.  Let me know when you're there.

24   A.    Page 34?

25   Q.    Yes, sir.  Do you see this is the Discharge Summary

Hazem Ashhab - Direct (Childers)

1  from June 8th when Betty got out of the skilled nursing

2  portion of the hospital?

3  A.    Yes.

4  Q.    Okay.  And the first diagnoses was the admitting

5  diagnoses and the discharge diagnoses.  It says, "General

6  debility stemming from various medical problems including,"

7  it says, "chronic anemia stemming from severe

8  gastrointestinal blood loss due to an AV malformation."

9        Do you see that?

10  A.    Yes.

11  Q.    Do you recall from Dr. Abdelgaber's testimony he said

12  that word actually should say "acute anemia?"  Do you recall

13  he said that?

14  A.    Yes.

15  Q.    And do you agree with that based on your review of the

16  records?

17  A.    Yes.

18  Q.    Between the hospital and the skilled nursing center,

19  Betty was in -- Betty was in their care at St. Mary's for

20  about three weeks; right?

21  A.    Correct.

22  Q.    In your experience, is that an unusual amount of time

23  for someone to have to be in a hospital for a GI bleed?

24  A.    Yes, it's too long.

25            MR. LEWIS:  Objection, Your Honor, leading.

Hazem Ashhab - Direct (Childers)

1          THE COURT:  I'm sorry?

2          MR. LEWIS:  He's doing a lot of leading here in

3     the last few minutes.

4          THE COURT:  He's an expert, but don't lead him

5     about matters like that.

6          MR. CHILDERS:  Sure.  Sorry, Your Honor.

7     BY MR. CHILDERS:

8     Q.   In your experience, how does three weeks in a hospital

9     compare for a GI bleed patient?

10    A.   Usually people with simple gastrointestinal bleed stay

11    just for a couple of days.  When the bleeding is

12    life-threatening, it's expected they stay longer than a

13    couple of days, maybe five to seven days.

14         But when people have a life-threatening condition and

15    they also have co-morbidities, it may take them longer.  But

16    usually in this day and age a hospital stay more than a week

17    is considered too long unless there are things going on or

18    surgeries or other complications.  But for a

19    gastrointestinal bleed, staying in a hospital for two to

20    three weeks is too long of a period.

21    Q.   Where it says on that diagnoses that we just saw, it

22    said "general debility."  Do you recall it said that?

23    A.   Yes.

24    Q.   What does that mean as far as what was going on with

25    Betty Knight at that time?

Hazem Ashhab - Direct (Childers)

1 A. At the time of discharge you mean or admission or --

2 Q. During that time where she was -- why does that --

3 okay. First of all, it's in the diagnoses. So my question

4 to you is what does that mean so we can explain to the jury?

5 A. Well, you have someone with multiple medical problems,

6 elderly person, and they get an insult on top of that and

7 they de-condition. They will be performing in a certain

8 baseline performance which is not great, but it's getting

9 them from here to there to do their daily activities.

10 And then they go through a major insult, in this case a

11 life-threatening bleeding, they de-condition from that level

12 of just getting by or getting along and they are -- they

13 cannot go back to that level. So we call them

14 de-conditioned or debilitated.

15 That includes generalized weakness, not being able to

16 perform daily functions, sometimes not able to take care of

17 themselves.

18 Q. Okay. What was your understanding from this record

19 what the cause of the general debility was for Betty Knight?

20 A. Multiple medical problems compounded by a

21 life-threatening GI bleed.

22 Q. Did you review the records for Betty's treatment after

23 the GI bleed up until the time she passed?

24 A. Yes.

25 Q. And I want to ask you about some of those. Okay?

Hazem Ashhab - Direct (Childers)

1   A.   Okay.

2   Q.   If we could turn to Page 37 in the record.  We've

3   already looked at it once, but I want to talk to you about a

4   different part of it.  Okay?

5   A.   Okay.

6   Q.   This is the record from July 12th, 2013, Dr.

7   Linsenmeyer.  Do you see that?

8   A.   Yes.

9   Q.   If you look down under "History of Present Illness,"

10  the second full paragraph --

11  A.   Yes.

12  Q.   -- do you see the first sentence?  Could you read that

13  to the jury?

14  A.   "She has been weak since all of her recent admissions.

15  She is just not bouncing back.  She is having exertional

16  shortness of breath."

17  Q.   Okay.  Let me stop you there.  The statement she's just

18  not bouncing back, what, what does that mean to you?

19          MR. LEWIS:  Objection, Your Honor, foundation.

20  That's not a medical term.

21          THE COURT:  Sustained.

22          MR. CHILDERS:  I'll withdraw the question, Your

23  Honor.

24  BY MR. CHILDERS:

25  Q.   Was that a common thing that you saw in these records

Hazem Ashhab - Direct (Childers)

1    saying that she wasn't bouncing back after the bleed?

2    A.    Yes.  I believe it was mentioned on more than one

3    occasion.

4    Q.    Okay.  Let's look, then, if we could on Page 40.  Do

5    you see this is a History and Physical from June 22nd, 2013?

6    A.    Yes.

7    Q.    What's the chief complaint?

8    A.    She is not any better is her chief complaint.

9    Q.    Is that consistent with the record we just saw?

10   A.    Yes.

11   Q.    Okay.  And then if we turn Page 43, do you see this is

12   a Discharge Summary from July 22nd, 2013?

13   A.    Page 43?

14   Q.    43, yes, sir.

15   A.    Yeah.

16   Q.    Do you see that?

17   A.    Yes.

18   Q.    What's the first diagnosis?

19   A.    Generalized debility and disuse myopathy.

20   Q.    Okay.  And you told us about debility a few minutes

21   ago; right?

22   A.    Yes.

23   Q.    And then if we go under "Hospital Course," if we could

24   blow that up, could you read for us what the first, the top

25   line says?

                    Hazem Ashhab - Direct (Childers)

1    A.    Under "Hospital Course"?

2    Q.    Yes.

3    A.    "The patient came in because of multiple complaints.

4    She is extremely weak.  She is not getting better."

5    Q.    Is that consistent with the two records that we just

6    looked at?

7    A.    Yes.

8    Q.    Then if we turn to Page 45, do you see this is another

9    Discharge Summary from August 17th, 2013?

10   A.    Yes.

11   Q.    And do you see under -- if we could blow up "Hospital

12   Course" again.

13         Could you read for the jury, what's the first sentence

14   that it says under "Hospital Course"?

15   A.    "The patient was admitted to our skilled nursing unit

16   due to just general debility."

17   Q.    Is that consistent with the records that we have just

18   talked about?

19   A.    Yes, it is.

20   Q.    Is that consistent with the Discharge Summary we saw

21   from where she got out of the skilled nursing after the GI

22   bleed?

23   A.    Yes, it is.

24   Q.    Then if we turn to Page 47, do you see this is a

25   History and Physical from August 22nd, 2013?

Hazem Ashhab - Direct (Childers)                                725

1    A.    Yes.

2    Q.    Then if we could blow up "History of Present Illness."

3    Could you just read the first sentence?

4    A.    "The patient is an 84-year-old lady with multiple

5    medical problems recently admitted with chest pain and

6    generalized debility."

7    Q.    And then what it does it say, the rest of that

8    sentence?

9    A.    "Was sent to the skilled nursing unit where she had

10   some rehabilitation."

11   Q.    Okay.  And then I want to -- if we could blow up "Past

12   Medical History" that's just underneath there.

13   A.    Uh-huh.

14   Q.    And this is more than two months after she got out of

15   the hospital for the GI bleed; correct?

16   A.    Yes.

17   Q.    Okay.  Number 15, could we call that out.  What does

18   that say?

19   A.    "History of AV malformation and bleeding."

20   Q.    Is that the bleeding from the May, 2013,

21   hospitalization?

22   A.    Yes.

23   Q.    Then if we could turn to Page 50.  Do you see this as a

24   History and Physical from September 1st, 2013?

25   A.    Yes.

Hazem Ashhab - Direct (Childers)

1  Q.   And I want to blow up "History of Present Illness."

2  This is the day before she died; right?

3  A.   Yes.

4  Q.   And if we look at the first sentence, it starts out --

5  it says, "Weak and debilitated 84-year-old white female with

6  a long list of medical problems including," and it has quite

7  a few listed; correct?

8  A.   Yes.

9  Q.   And do you see five sentences down and they include in

10 this AV malformation with bleed of some sort?  Do you see

11 that?

12 A.   Yes.

13 Q.   Okay.  Did you review Dr. Abdelgaber's testimony in

14 this case?

15 A.   Yes.

16 Q.   Okay.  Do you recall his testimony that from the time

17 Betty Knight suffered her GI bleed in May of 2013 that her

18 health declined and never really recovered like he hoped it

19 would?  Do you remember him saying that?

20 A.   Yes, I do.

21 Q.   And do you remember him saying that multiple times

22 between the bleed and the time of her death she came back to

23 the hospital and was complaining each time that she just

24 wasn't getting better?  Do you recall him saying that?

25            MR. LEWIS:  Objection to leading again, Your

Hazem Ashhab - Direct (Childers)

1   Honor, walking evidence in the record.

2           THE COURT:  Well, it is evidence in the record.

3   Try not to lead.

4           MR. CHILDERS:  Yes, sir.  I apologize.  I didn't

5   feel like I was leading, but I'll rephrase the question.

6   BY MR. CHILDERS:

7   Q.   Do you remember Dr. Abdelgaber's testimony --

8   A.   Yes.

9   Q.   -- about what he thought of how Betty Knight did after

10  she had the bleed?

11  A.   Yes.

12  Q.   And the jury has seen that as well.

13  A.   Yes.

14  Q.   Do you agree with Dr. Abdelgaber with what he said

15  about Betty Knight's debility after the bleed up to the time

16  of her death?

17  A.   Yes, I do.

18  Q.   Do you believe that Betty Knight's bleed in May of 2013

19  contributed to her death in September of that same year?

20  A.   Yes, I do.

21  Q.   Could you explain to the jury why you think that, why

22  you believe that?

23  A.   Okay.  So you get somebody, in this case Ms. Knight,

24  with multiple medical problems.  She has multi organs that

25  do not function well.  And she's just pivoting around the

Hazem Ashhab - Direct (Childers)

1    edge.

2        And then you hit them with a life-threatening GI

3    bleeding.  You think they may not even survive from it.

4    Well, she pulled through, but she never went back to where

5    she was before because it was just too much of a hit on her.

6        Her hemoglobin dropped down to 6.  She wasn't

7    delivering enough oxygen to her vital organs.  She became

8    weak and debilitated.  They did all that they could for her.

9    They gave her blood.  They sent her to rehab.  They gave her

10   medication.  But she just did not bounce back to where she

11   was before that major hit on the head, the major GI bleed.

12       It's life-threatening.  It's a big hit.  Some people

13   even don't make it through the bleed itself.  She was lucky

14   to make it for a few months, but it was too big of a hit on

15   somebody with all these risk factors at her age.

16   Q.   And I just want to make sure the jury understands.

17   What's your opinion on whether or not she would have had

18   this GI bleed if she had been on warfarin and had not

19   switched to Pradaxa?

20   A.   I don't think she would have had it as bad.  I mean,

21   she's at high risk for bleeding but she was on Coumadin for

22   years and the level was high but she never had the

23   life-threatening bleed.  So from that history on that

24   particular patient, I would say "no."

25   Q.   The opinions that you've given us today, have they all

Hazem Ashhab - Direct (Childers)

1   been to a reasonable degree of medical certainty?

2   A.   I believe so.

3          MR. CHILDERS:  That's all the questions I have.

4          THE COURT:  All right.  We're going to take about

5   a ten-minute recess before the cross-examination.  You may

6   retire to the jury room.

7      Doctor, you can step down but don't discuss your

8   testimony.  Thank you.

9      (Recess taken at 3:07 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hazem Ashhab - Cross (Lewis)                    730

1          (Jury not present.)

2              THE COURT:  All right.  Are we ready to proceed?

3     Let's bring the jury out.

4          (Jury present.)

5              THE COURT:  All right.  Be seated.

6              Mr. Lewis, cross-examination?

7              MS. JONES:  May it please the Court, Members of the

8     Jury.

9                         CROSS-EXAMINATION

10    BY MR. LEWIS:

11    Q.  Dr. Ashhab, how are you, sir?

12    A.  Good.  Thank you.

13    Q.  We've met outside in the hallway, but for the record, my

14    name is John Lewis, and I have some questions for you this

15    afternoon.

16         Doctor, for your convenience, I've set some of the

17    documents that I may cover with you in front of you.  I've

18    also provided a copy to opposing counsel and the Court as

19    well.  Let me get a few kind of basics out of the way, if I

20    may, Doctor.

21         Now, you are a gastroenterologist; is that correct?

22    A.  Correct.

23    Q.  All right.  In so being a -- and may I say GI?

24         Is that a common --

25    A.  Yes.

Hazem Ashhab - Cross (Lewis)                      731

1   Q.  -- abbreviation?

2       You probably don't like that.

3   A.  No, it's fine.

4   Q.  But in the context of being gastroenterologist, the GI,

5   you did prescribe medication for some of your patients.

6       Is that fair to say?

7   A.  Yes.

8   Q.  What you don't do is ever prescribe Pradaxa or

9   anticoagulant medication, correct?

10  A.  Correct.

11  Q.  Okay.  But with respect to the medications that you do

12  prescribe, you, before you do so, review the physician label

13  for those medications.

14      Is that fair?

15  A.  Correct.

16  Q.  And you have a communication with your patient about the

17  risks and benefits of that medication, correct?

18  A.  Yes.

19  Q.  And to the extent those medications come with a patient

20  guide or a Medication Guide, you provide that to your

21  patients, right?

22  A.  Yes.

23  Q.  But you don't leave the room and rely solely on the

24  Medication Guide to provide risk and benefit information to

25  your patients, do you?

Hazem Ashhab - Cross (Lewis)                     732

1    A.  No.  I discuss it with them.

2    Q.  You have a verbal discussion?

3    A.  Yes.

4    Q.  And as far as you know, that is the way doctors do it here

5    in West Virginia, right?

6    A.  Correct.

7    Q.  This state is no different than any other in the United

8    States when it comes to prescription medicines, is it?

9    A.  That's true.

10   Q.  All right.  And when patients ask for the physician

11   label -- I don't know how many of yours do, but when they do,

12   you provide it to them, right?

13   A.  Yes.

14   Q.  Do some of your patients ask for the more technical

15   information in the physician label to take a look at it before

16   they take a medication?

17   A.  Some of my patients will ask about resources.  We are in

18   the era of the Internet, so I point them to certain websites

19   to get more information about it.

20   Q.  All right.  And to educate yourself about a medication

21   before you prescribe it to a patient, you do a little bit of

22   your own research, don't you, sir?

23   A.  Yes.

24   Q.  You not only rely on the physician label, but you may do

25   additional research yourself, correct?

1   A.  Sometimes I do.

2   Q.  A good doctor is going look at literature or maybe talk to

3   colleagues or something along those lines, fully educate

4   yourself about the risks and benefits associated with a

5   medication that you're going to prescribe.

6       Fair to say?

7   A.  Yes, sir.

8   Q.  All right.  And that's what you do in your practice?

9   A.  Yes.

10  Q.  And you think that's a reasonable approach to educating

11  patients about the risks and benefits of a medication?

12  A.  I do.

13  Q.  How many times in your career have you prescribed a

14  medication solely because a patient came in and said they saw

15  a TV ad and did no research on your own?

16  A.  I do not do that usually.

17  Q.  You would never do that, would you, Doctor?

18  A.  I wouldn't.

19  Q.  Right.

20      So even if a patient came to you and said, hey, I saw a TV

21  ad, you would assess the risks and benefits for that patient

22  independently on your own before prescribing that medication.

23      Fair to say?

24  A.  Yes.

25  Q.  All right.  Let's move to a different subject, and that is

Hazem Ashhab - Cross (Lewis)                    734

1    your treatment and diagnosis of what I'll call GI bleeds,

2    gastrointestinal bleeds.  Okay?  And you talked a little bit

3    about that in your direct examination.

4        If I recall correctly, you treat maybe a GI bleed once or

5    twice or even more per week, right?

6    A.  Yes.

7    Q.  Okay.  Fair to say it's a frequent occurrence in the

8    United States in the patient population to have GI bleeds?

9    A.  Yes.

10   Q.  Okay.  Doctors like yourself exist all over the United

11   States treating those complications.  Is that fair?

12   A.  Correct.

13   Q.  And you would agree with me that they're more prevalent in

14   the elderly population?

15   A.  Correct.

16   Q.  All right.  One type of -- and GI bleeds can occur -- you

17   can have upper GI bleeds, you can have lower GI bleeds.  They

18   can occur anywhere in the GI system.

19       Fair to say?

20   A.  Correct.

21   Q.  In the lower GI system, those are often diagnosed with a

22   colonoscopy; is that fair?

23   A.  Correct.

24   Q.  But you can also diagnose a lower GI bleed without doing a

25   colonoscopy on occasion; is that right?

Hazem Ashhab - Cross (Lewis)                    735

1    A.   Yes.

2    Q.   Okay.  Perhaps a patient is too ill or not well enough to

3    do a colonoscopy, so you have to look at other information or

4    other detail to see if there is a GI bleed; is that right?

5    A.   Yes.

6    Q.   And you've done that on occasion, correct?

7    A.   Sometimes.

8    Q.   You would prefer to do a colonoscopy, is that right, to

9    rule it in or rule it out?

10   A.   Well, it's really more accurate and precise, and it gives

11   you the option to do a therapeutic intervention.  So I don't

12   know what you are talking about in terms of other methods,

13   but -- a bleeding scan is a common thing we use sometimes, but

14   it gives you a road map.  It doesn't give you exact location.

15   Q.   Right.

16        Oftentimes during a colonoscopy, you can repair or treat

17   the very source of the bleed or the injury; is that fair?

18   A.   Yes.  Correct.

19   Q.   All right.  You talked a little bit about AVM, antero --

20   A.   Arteriovenous malformation.

21   Q.   Arteriovenous malformation.

22        That is something that can occur in patients who are

23   elderly.  Is that fair to say?

24   A.   Yes.

25   Q.   Or not elderly; is that right?

Hazem Ashhab - Cross (Lewis)                        736

1   A.  Less common.

2   Q.  Okay.  You've treated folks for AVMs who have not been on

3   anticoagulant medication; is that right?

4   A.  Yes.

5   Q.  Okay.  And you've treated folks for AVMs that have been on

6   anticoagulant medication, right?

7   A.  Yes.

8   Q.  And when I say anticoagulant medication, you've treated

9   folks for GI bleeds, including AVMs, who have been on

10  warfarin, right?

11  A.  Yes.

12  Q.  Okay.  That can happen, right?

13  A.  Yes.

14  Q.  It's a risk of anticoagulant medication, correct?

15  A.  Yes.

16  Q.  You've treated patients who have been on Xarelto, right?

17  A.  That's true.

18  Q.  And Pradaxa?

19  A.  Yes.

20  Q.  And Plavix?

21  A.  Uh-huh.

22  Q.  Yes?

23  A.  Yes.

24  Q.  And Eliquis?

25  A.  Yes.

                      Hazem Ashhab - Cross (Lewis)                    737

1    Q.  All right.  Fair to say that no anticoagulant medication

2    exists in the United States today that avoids entirely the

3    risk of a GI bleed?

4        Is that fair to say?

5    A.  I don't know of any.

6    Q.  You're unaware of any sitting here today.

7        Okay.  Let's talk about the treatment of a diagnosed GI

8    bleed.  If you're aware that a patient has a GI bleed, the

9    first thing you want to do is make sure the patient is stable.

10       Is that fair?

11   A.  Yes.

12   Q.  And by stable, I mean not in a distress and not in a

13   situation where their life is seriously and imminently in

14   danger.

15       Fair to say?

16   A.  Correct.

17   Q.  Okay.  Once that is done, then you start to figure out a

18   plan of how to address the complication; is that correct?

19   A.  Yes.

20   Q.  And that could mean adjusting medication at least

21   temporarily; is that right?

22   A.  Yes.

23   Q.  For someone on an anticoagulant medication, any of them --

24   Xarelto, Eliquis, Pradaxa, warfarin -- you might stop the

25   medication for a temporary period of time?

Hazem Ashhab - Cross (Lewis)                          738

1   A.  Yes.

2   Q.  And that allows you to better treat the complication; is

3   that fair?

4   A.  Yes.

5   Q.  All right.  That's very common; is that right?

6   A.  Yes.

7   Q.  The next thing you may want to do, and probably do, is to

8   identify the source of the injury or the complication; is that

9   right?

10  A.  Yes.

11  Q.  And in the source of -- in the instance of an AVM, you

12  want to identify where the AVM is and determine whether

13  something can be done to repair or treat it.

14      Fair to say?

15  A.  Yes.

16  Q.  All right.  And you would agree with me that, generally

17  speaking, complications in the lower GI tract like AVMs are

18  typically resolved within about a day, most of them?

19  A.  If you do intervention, you mean?  If you clip them or

20  burn them?

21  Q.  Correct.

22  A.  Yes.

23  Q.  They're treated.

24  A.  They are treated, yes.

25  Q.  So if they're identified and treated, generally speaking,

Hazem Ashhab - Cross (Lewis)                    739

1    most of them are done or treated within about a day.  That

2    would be a successful treatment of an AVM or a GI bleed.

3         Is that fair?

4    A.  Yes.

5    Q.  Okay.  So just so I'm clear, if you have a patient, and

6    they present with a GI bleed that you suspect is an AVM, you

7    would deem it to be a successful intervention or a successful

8    treatment if you can repair that complication within about a

9    day; is that fair?

10   A.  Yes.

11   Q.  And that is about 90 percent of the folks that you treat,

12   you do repair or treat successfully within about a day?

13   A.  If we are able to identify the source, yes.

14   Q.  And that is true for anybody who is on any kind of

15   anticoagulant medication, right?

16        That would still be a successful treatment if you could

17   get after that complication and get it repaired within a day;

18   is that right?

19   A.  Yes.

20   Q.  Okay.  Let's about talk about Mrs. Knight for a couple of

21   minutes.

22        Now you've had a chance, as part of your work in this

23   case, to review a lot of medical records related to

24   Mrs. Knight; is that fair?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                    740

1   Q.  And you feel like you've reviewed all of the records that

2   you need to review to form your opinions?

3   A.  I believe so.

4   Q.  And you've seen the medical histories dating back in time

5   maybe six, seven, maybe more years; is that fair?

6   A.  Yes.

7   Q.  All right.  And you've read the home health care records

8   and the doctors' notes and the reports from office visits,

9   things like that; is that right?

10  A.  Yes.

11  Q.  You would agree that Mrs. Knight, at the time that she

12  first went on an anticoagulant medication, which was warfarin,

13  she needed it?

14      Fair to say?

15  A.  Yes.

16  Q.  Okay.

17      MR. LEWIS:  And if we could get the opening slide

18  related to the risk factors.

19  Q.  You actually -- as part of your work in this case, you did

20  look at Mrs. Knight's circumstances -- and I have on the

21  screen to your left some of the risk factors.

22      But you independently looked to see whether Mrs. Knight

23  did have a high risk of suffering from stroke based on her

24  circumstances at the time that she took warfarin; is that

25  right?

                          Hazem Ashhab - Cross (Lewis)                741

1    A.  Yes.

2    Q.  Okay.  And she did, right?

3    A.  Yes.

4    Q.  All of these factors -- the age, the fact that she's a

5    female unfortunately, a prior stroke that she had,

6    hypertension, vascular disease, diabetes, congestive heart

7    failure that she was experiencing -- those things increased

8    Mrs. Knight's risk of a stroke at the time that she began

9    anticoagulant medication; is that right?

10   A.  Yes.

11   Q.  And you would agree with me that these risk factors only

12   got worse with time?

13   A.  Yes.

14       There is, however, a discrepancy in the record towards

15   congestive heart failure because it was not consistent in the

16   mention.  The other factors were all the time consistent.  I

17   just want to point that out.

18   Q.  Okay.  Periodic congestive heart failure, is that fair to

19   characterize it that way?

20   A.  Maybe.

21   Q.  Okay.  There were lots of instances in the record where

22   Mrs. Knight had experienced heart failure symptoms; is that

23   right?

24   A.  That's true.

25   Q.  Okay.  She had a history of heart attacks?

Hazem Ashhab - Cross (Lewis)                742

1    A.  Yes.

2    Q.  And there's no question in your mind that she was an

3    appropriate patient for anticoagulant medication.

4        Fair to say?

5    A.  Yes.

6    Q.  Okay.

7            MR. LEWIS:  Finished with that slide.  Thank you.

8    Q.  Now, you know that in 2005, Mrs. Knight began to take

9    warfarin or coumadin as a medication, an anticoagulant

10   medication, right?

11   A.  Yes.

12   Q.  All right.  You reviewed medical records beginning in

13   2007; is that right?

14   A.  Around that time, yes.

15   Q.  All right.  And there were a handful of physicians that

16   prescribed warfarin and treated Mrs. Knight between 2005 and

17   2007; is that right?

18   A.  Yes.

19   Q.  Those are records that you haven't reviewed, correct?

20   A.  I did not review all those, no.

21   Q.  So sitting here today, we don't know -- based on the

22   records, the medical records that were made available to you,

23   we don't know how she did on warfarin when she first took it

24   for the first two years; is that right?

25   A.  I believe the records I have start around 2008 --

Hazem Ashhab - Cross (Lewis)                    743

1   Q.  Okay.

2   A.  -- on through 2013.

3   Q.  Okay.  So 2005, '06 and '07, those are just records that

4   you didn't have an opportunity to review?

5   A.  That's correct.

6   Q.  Did you want to see those, if they were available?

7   A.  I'm not sure how relevant they would be.

8   Q.  Would you want to have known if Mrs. Knight had

9   experienced a prior bleed on warfarin in that time frame?

10  A.  Yeah.  That would be important information.

11  Q.  Would you want to have known if Mrs. Knight had

12  experienced stroke during that time frame?

13  A.  They mention in the record that she had a previous history

14  of stroke, so we knew it happened before 2008.

15  Q.  Okay.

16  A.  That's in the record.

17  Q.  When Mrs. Knight started on warfarin in 2005, she was at

18  less risk of a stroke than she was later on in her life.

19      Is that fair to say?

20  A.  Because she got older.

21  Q.  And many of the things that caused her to have high stroke

22  risk in 2005 continued to get worse over time; is that right?

23  A.  Yes, sir.

24  Q.  So that risk became increased?

25  A.  Yes.

Hazem Ashhab - Cross (Lewis)                744

1    Q.  Fair to say?

2        Now in 2005, when Mrs. Knight went on warfarin, there was

3    really one choice for anticoagulant medication, right,

4    warfarin?

5    A.  Yes.

6    Q.  All right.  Pradaxa wasn't on the market until 2010,

7    right?

8    A.  Yes.

9    Q.  And these other medications, such as Xarelto and Eliquis,

10   weren't available until later either, correct?

11   A.  Yes.

12   Q.  All right.  And warfarin at the time was really the number

13   one and really the only medication to treat folks who had

14   AFib, atrial fibrillation -- the jury has heard AFib -- with a

15   significant stroke risk?

16   A.  Yes.

17   Q.  The thing about warfarin, though, is it did come with some

18   risks, right?

19   A.  Yes.

20   Q.  One of the risks is if you thin the blood, you can

21   obviously have bleeding events, right?

22   A.  Yes.

23   Q.  Warfarin has that same risk, and it's a significant risk,

24   right?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                745

1    Q.   Okay.  The other thing about warfarin is, is it's kind of

2    tough to keep it within the therapeutic range.

3         Fair to say?

4    A.   Yes.

5    Q.   There's a therapeutic range with warfarin, and it's

6    measured by looking at INR levels.  INR, the jury has heard

7    that.

8    A.   Yes.

9    Q.   You're familiar with that?

10   A.   Yes.

11   Q.   And I think that is International Normalized Ratio is what

12   that stands for, right?

13   A.   Correct.

14   Q.   All right.  And the key is you want to keep that

15   therapeutic range, you want to keep the INR levels with a

16   patient generally between 2 and 3; is that right?

17   A.   Yes.

18   Q.   And if you go below 2, you're going to increase the risk

19   of stroke; is that right?

20   A.   Yes.

21   Q.   And if you go above 3, then you're going to increase the

22   risk of a bleeding event to occur; is that right?

23   A.   Yes.

24   Q.   So it's really, really important to keep those INR levels

25   between 2 and 3; is that right?

Hazem Ashhab - Cross (Lewis)                746

1    A.  Yes.

2    Q.  And that can be a problem for folks as they get older to

3    keep the range between 2 and 3; is that right?

4    A.  Yes.

5    Q.  Gotta be very careful with your diet, correct?

6    A.  Yes.

7    Q.  Gotta be very careful with what other medications you're

8    taking, correct?

9    A.  Yes.

10   Q.  You gotta be careful with what you eat, right?

11   A.  Yes.

12   Q.  And you gotta make sure that you go to the doctor on a

13   regular basis and that you get to the physician's office to

14   have those blood levels monitored, correct?

15   A.  Correct.

16   Q.  And all of those things need to happen in order to

17   maintain that therapeutic range with warfarin, right?

18   A.  Yes.

19       But doctors have also designed and came up with a warfarin

20   clinic.  So some of these challenges are really managed

21   through a designed clinic that provides information about diet

22   and look at medication interaction and make sure the patients

23   get their blood tested on time or send a nurse or a home

24   health care to do their blood.  So it's not always the patient

25   has to actually come to the doctor to have it done.  There are

Hazem Ashhab - Cross (Lewis)                    747

1    other ways to make life easier to monitor their INR.

2    Q.  But, Doctor --

3    A.  But it has to be monitored, you're right.

4    Q.  Okay.  Thank you.

5        If you could answer my question, I promise I'll get you

6    out of here today.  If you don't, I can't promise you

7    anything.  Okay?

8        All right.  Fair enough, though.

9    A.  It's not a threat.  It's a promise, not a threat.

10   Q.  That's right, only promises.

11   A.  All right.

12   Q.  All right.  But let's be fair, there are some physicians

13   who have made it a little bit easier to get blood tested when

14   they have a patient on warfarin than others.

15       Fair to say?

16   A.  Yes.

17   Q.  They've sort of designed their office around helping

18   patients make it a little easier because it's really, really

19   important to keep the blood within that therapeutic range,

20   right?

21   A.  Yes.

22   Q.  That's why doctors have set up these special circumstances

23   and situations to make it easier for patients, right?

24   A.  I meant to say there is a warfarin clinic that doesn't

25   belong to any certain doctor.

Hazem Ashhab - Cross (Lewis)                748

1    Q.  Sure.

2    A.  We can refer them to the warfarin clinic to help them.

3    Q.  Right.

4    A.  That's what I meant.

5    Q.  Right.

6        There are clinics that have been set up to make it easier

7    for patients, right?

8    A.  Yes.

9    Q.  Because it's so important to keep those levels between 2

10   and 3, right?

11   A.  Yes.

12   Q.  Because the last thing we want are patients who are

13   outside of that 2 and 3 because then the risks increase,

14   correct?

15   A.  Yes.

16   Q.  All right.  Fair enough.

17       Now, have you reviewed the label for warfarin?  I assume

18   you have --

19   A.  Yes.

20   Q.  -- when you treat patients.

21   A.  Yes.

22       MR. LEWIS:  It's Exhibit 5861, the very first one in

23   your binder.

24       At this time, Your Honor, I'll move for the admission

25   of 5861, Defendant's 5861 into evidence.

1          THE COURT:  Any objection?

2          MR. CHILDERS:  No, Your Honor.

3          THE COURT:  It's admitted.  It may be published.

4     (DEFENDANT'S EXHIBIT 5861 ADMITTED INTO EVIDENCE.)

5          MR. LEWIS:  Let's take a look at the first page,

6     Doctor.

7     Q.  These labels for medicines look similar, they're designed

8     similarly.

9          Is that fair to say?

10    A.  Yes.

11    Q.  One of the things that you see is up in the upper

12    left-hand corner, there is a lot of important information

13    usually in that spot, right?

14    A.  Yes.

15    Q.  In the warfarin label from 2011, we see that down in the

16    bottom right-hand corner.  No question about it, coumadin or

17    warfarin -- that's the same, it's the same medicine, right?

18    A.  Yes.

19    Q.  Can cause major or fatal bleeding, correct?

20    A.  Yes.

21    Q.  Perform regular monitoring, that's what we talked about,

22    correct?

23    A.  Yes.

24    Q.  Drugs and dietary changes can affect INR levels.  That's

25    important, we talked about that, right?

Hazem Ashhab - Cross (Lewis)                    750

1    A.  Yes.

2    Q.  And then obviously instruct patients to minimize the risk

3    of bleeding and to report signs.  That's in a box in the upper

4    left-hand corner.  That means it's really, really important

5    information; is that right?

6    A.  Correct.

7    Q.  All right.  And if we look at the right-hand side, Adverse

8    Reactions, most common adverse reactions to coumadin are fatal

9    and non-fatal hemorrhage from any tissue or organ.

10       That's a bleed, right?

11   A.  Yes.

12   Q.  Then you can have with warfarin life-threatening bleeds

13   just like you described, correct, where there is several pints

14   of blood that have to be transfused, right?

15   A.  Yes.

16   Q.  That can happen on warfarin, right?

17   A.  Usually not in the therapeutic range.  When somebody is

18   over-anticoagulated, it may happen.

19   Q.  Somebody who is outside of the range --

20   A.  Yes.

21   Q.  -- is more likely to get a very, very serious

22   life-threatening bleed.

23       Fair to say?

24   A.  That's correct.

25   Q.  Probably in the range of about 3, not below.  But you're

Hazem Ashhab - Cross (Lewis)                    751

1   probably more likely to get a life-threatening bleed if you're

2   outside and higher than that INR level of 3; is that right?

3   A.  Usually more than 5 or even 10.

4   Q.  Okay.  And you agree with me that the most serious risk

5   for patients who are on warfarin is a bleed risk when their

6   INR levels are outside of the range, right?

7   A.  Yes.

8   Q.  Okay.  Now, there's also a section called

9   Contraindications, and that is going to be on page -- it's

10  going to start on page 5861-009.  There are numbers at the

11  bottom of the page.

12  A.  Okay.

13  Q.  And if we go to the next page, 010, these are

14  contraindications, and the fifth bullet point down:

15  Unsupervised patients with conditions associated with

16  potential high level of noncompliance.

17       You know what that means, don't you, Doctor?

18  A.  Where was that again?

19  Q.  Sure.  That is --

20  A.  Page 10?

21  Q.  -- on page 5861-010, fifth bullet point down, right after

22  the --

23  A.  Yes.  Unsupervised with conditions associated with

24  potential high level of noncompliance.  Yes, I found it.

25  Q.  Right.

Hazem Ashhab - Cross (Lewis)                    752

1    And noncompliance is patients who don't take their

2    medication on a regular basis or perhaps forget it, right?

3    That could be noncompliance, correct?

4    A.  Yes.

5    Q.  Or patients who aren't able to or won't go to the doctor

6    and have -- or a clinic and have their blood tested on a

7    regular basis, correct?

8    A.  Correct.

9    Q.  Because patients who make it difficult to monitor the INR

10   levels are patients who are at a higher risk of bleed or

11   stroke, right?

12   A.  Yes.

13   Q.  And in fact, these patients are contraindicated by the

14   label.  Is that fair to say?

15   A.  Yes.

16   Q.  Okay.  And that would include patients who may be

17   suffering from dementia and are having trouble remembering

18   whether they took their medication as well, correct?

19   A.  Yeah.  If they have no care provider to give it to them,

20   yes.

21   Q.  And we know also later in the label, pages 14 and 15,

22   discuss the various interactions.

23        You're aware, Doctor, that there are many, many drug

24   interactions that affect warfarin in a patient, right?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                    753

1   Q.  And if we look at the CYP450 interactions -- do you know

2   what that means?

3   A.  Yes.  That is a measure, cytochrome p450 in the liver.

4   That is responsible for a whole type of metabolism of

5   medications.  I cannot name how many there are.  Almost

6   everybody goes through cytochrome p450.  So --

7   Q.  All right.  Most medications are metabolized through the

8   liver, or many of them, right?

9   A.  Yes.

10  Q.  And warfarin is one of those medications?

11  A.  Yes.

12  Q.  And if you have another medication that is metabolized

13  through the liver that you're taking, it can really affect

14  your warfarin absorption, correct?

15  A.  Yeah, if they are inducers or inhibitors.  So some

16  potentiate the effect, and some inhibit the effect.

17      Depends on the action of --

18  Q.  It depends.  One could do one thing, and one could do

19  another, right?

20  A.  That's true.

21  Q.  And if you look at the next page, we have examples of

22  these inhibitors, right, that --

23  A.  Yes.

24  Q.  -- you have to watch?

25      And there's a whole laundry list of those potential

Hazem Ashhab - Cross (Lewis)                    754

1   medications that can affect warfarin levels, right?

2   A.  That's true.

3   Q.  So if you have a patient that is on a lot of other

4   medications, that can be a real problem to manage that

5   patient's warfarin, correct?

6   A.  Yes.

7   Q.  All right.  And I think we already discussed the fact that

8   foods can affect it, too.  A lot of leafy greens and foods

9   with vitamin K can affect the warfarin interaction; is that

10  right?

11  A.  Yes.

12  Q.  If we look at the page -- and I'll just go to page

13  5861-31, you see that warfarin also comes with a Medication

14  Guide just like Pradaxa.  Just like all anticoagulant

15  medications, there's a Medication Guide, and so I want to ask

16  you a couple of questions about that.

17      First of all, you agree with me that a Medication Guide

18  shouldn't have all of the technical information that a

19  physician label has, correct?

20  A.  Yeah.

21  Q.  These are made for patients, right?  And it needs to be

22  more simpler language so the common person can understand it,

23  right?

24  A.  Yes.

25  Q.  All right.  And you see here, what is the most important

Hazem Ashhab - Cross (Lewis)                    755

1    information I should know about coumadin, can cause bleeding

2    which can be serious and sometimes lead to death.

3              MR. CHILDERS:  Judge, could we have a side bar?

4              THE COURT:  Yes.

5          (Bench conference, reported.)

6              MR. CHILDERS:  Your Honor, I didn't ask any questions

7    about the Medication Guide.  I --

8              THE COURT:  With respect to coumadin?

9              MR. CHILDERS:  With respect to either.  I only asked

10   about the physician label, not the Medication Guide.  So

11   Mr. Lewis is outside the scope.

12             MS. JONES:  I mean, the theory in the case is that

13   your Medication Guide was deficient.  I don't know how you can

14   separate one from the other.  I mean, they are basically

15   saying we didn't warn patients about the risks associated with

16   this particular drug.  I mean, that's the heart of the case.

17             THE COURT:  But this is not the expert who is

18   supplying that.  Certainly not with respect to the Medication

19   Guide that refers to Pradaxa, but nothing like this was in his

20   examination of the doctor pertaining to warfarin or coumadin.

21             MR. LEWIS:  Well, the testimony was that if she were

22   on warfarin, she would have been okay.  And because she

23   wasn't, she wasn't okay.  She was on Pradaxa.

24             So I'm showing two things with the Medication Guide.

25   Number one is that the information we supplied to

Hazem Ashhab - Cross (Lewis)                    756

1    physicians -- and by the way, the Medication Guide is provided

2    to physicians, the Medication Guide is also provided to

3    physicians, so this is within the realm of something that a

4    physician would review.  So that's number one.

5           Number two is it also goes to causation, that warfarin

6    has the same risks associated with it as Pradaxa does.

7           MR. CHILDERS:  I didn't object to that from the label

8    because I asked him about the physicians label.  Dr. Plunkett

9    talked about the Medication Guide.  That would have been the

10   witness to ask these questions to.  He's not testified at all

11   about the Medication Guide.  All he has talked about is the

12   physician label.

13          THE COURT:  But he's also testified doctors receive

14   the Medication Guides and consult them as well, so I'm going

15   to allow it.

16          MR. CHILDERS:  I didn't ask him that.

17          THE COURT:  That's what I'm saying.

18          Your witness has testified --

19          MR. CHILDERS:  I understand.  Okay.

20          Thank you, Your Honor.

21       (Bench conference, concluded.)

22          MR. LEWIS:  Just to pick up where I left off, the

23   Medication Guide for warfarin or coumadin says:  Coumadin can

24   cause bleeding which can be serious and sometimes lead to

25   death.

Hazem Ashhab - Cross (Lewis)                757

1    Q.  And that's right there for patients to see, right, Doctor?

2    A.  Yes.

3    Q.  All right.  And if we scroll a little bit further down, we

4    see you may have a higher risk of bleeding if you take

5    coumadin and -- and there is a whole laundry list of other

6    things.  Just like Pradaxa has some things that increase the

7    risk of bleeding, coumadin has the same thing, correct?

8    A.  Yes.

9          THE COURT:  Pull that microphone down just a little

10   bit.

11         THE WITNESS:  Yes.  But be careful with this data

12   because it plays against some of the stuff you started with.

13         So, for example, No. 4 says history of stroke.  But

14   you, just in your introduction, told me we give the blood

15   thinner to prevent stroke.  So if this wording was correct,

16   then she wouldn't get coumadin or any blood thinner, but

17   that's not the truth.

18         See, there's a difference in practice when you have a

19   patient to treat between what is in the paper and what is in

20   the trials and what are the risks for that particular patient.

21         MR. LEWIS:  Wholly agree with you, Doctor.  I want to

22   ask you about that.

23   Q.  So you would agree with me that sometimes a doctor has got

24   to put this label aside and treat a patient, that particular

25   patient in front of him or her.

Hazem Ashhab - Cross (Lewis)                    758

1      Fair to say?

2    A.  I wouldn't say put it aside.  I would say take it into

3    consideration.  But then, on top of that, add special

4    circumstances for that particular patient that make them maybe

5    not a candidate for that medication, only actual testing for

6    that medication.

7    Q.  But each one of those inquiries is specific to a

8    particular patient that is sitting in front of that doctor,

9    right?

10   A.  Exactly.

11   Q.  Right.

12      And as a physician, the Medication Guide and the physician

13   label is informative, correct?

14   A.  Yes.

15   Q.  But you also use your experience, correct?

16   A.  Yes.

17   Q.  And you also use your assessment of that patient, correct?

18   A.  Yes.

19   Q.  And you have to make a risk-benefit decision for that

20   patient on what the best medication is, right?

21   A.  Correct.

22   Q.  And you know that in your practice -- in your practice,

23   you don't actually make those risk-benefit decisions when it

24   comes to anticoagulant medication, correct?

25   A.  Usually the patient comes to me with a problem that

Hazem Ashhab - Cross (Lewis)                    759

1  happened, and they have already been on the medication.

2  However, I do recommend based on my findings, with the

3  measurement of the bleeding, recommendations towards whether

4  the patient should discontinue this medicine or the other, and

5  discuss it with the prescribing doctor.

6  Q.  Fair enough.

7      Just to close out this Medication Guide, the one thing I

8  wanted to cover was that last bullet point that says:  You may

9  have a higher risk of bleeding if you take coumadin or

10  warfarin -- sodium, that's the active ingredient, right,

11  Doctor?

12  A.  Yes.

13  Q.  If you take it for a long time, right?

14  A.  Yes.

15  Q.  The longer you're on warfarin, the higher the risk you

16  have of a bleed, right?  That's what it is saying right there.

17  A.  Yes.

18  Q.  And that is true, right?

19  A.  Yes.

20  Q.  You know that?

21  A.  Yes.

22  Q.  Okay.

23      MR. LEWIS:  I am finished with that.  Thank you.

24      Now, you talked a little bit about Mrs. Knight's

25  experience on warfarin.  And as I recall you testifying, you

1   indicated that she probably would not have had a bleed if she

2   were on warfarin in 2013 instead of Pradaxa.

3   Q.  Did I get that right?

4   A.  Close, but not quite.

5   Q.  Okay.

6   A.  I said wouldn't have had a life-threatening bleed --

7   Q.  Okay.

8   A.  -- compared with Pradaxa.

9   Q.  Okay.  So your testimony is that she may have -- she was

10  probably just as likely to have had a bleed with warfarin as

11  she was -- as she did with Pradaxa, the risk was the same?

12  A.  No, not as likely.  It is more likely to bleed on Pradaxa

13  as compared with coumadin from the gastrointestinal tract.

14  Q.  So what I wanted to ask you about is, you also said she

15  had -- she was well managed on warfarin?  Is that what you had

16  indicated?

17  A.  I don't think that came up in the discussion.  I said she

18  was managed on coumadin with monitoring INR.

19  Q.  Understood.

20      So do you believe, is it your opinion that she was managed

21  successfully while she was on warfarin or coumadin?

22  A.  To the best of my recollection of the record, that she had

23  sometimes INRs that were above the desired range.  But I do

24  not recall that she ever had a gastrointestinal bleed on

25  coumadin.  For sure, she did not have any life-threatening

1   bleeding on coumadin for that time that I viewed.

2   Q.  But you agree that when the INR levels are out of the

3   therapeutic ranges, there is a significant risk of bleed if

4   they are significantly above 3?

5   A.  I said significant bleed usually we see above 5 and 10,

6   not just above 3.  Because there are some people whose

7   therapeutic range is really up to 3 and a half, for example,

8   and that is their desired range.  So I usually, in my over 20

9   years of experience, do not see GI bleeds with an INR of 2 and

10  a half, 3, 3 and a half or even close to 4.  Very, very

11  rarely.  The ones I see are usually INR way high above 5 and

12  above 10.

13       MR. LEWIS:  All right.  Well, let's go to an opening

14  slide on the INR levels.  This was shown in opening by

15  Ms. Jones.

16  Q.  And you looked at all of the medical records associated

17  with the INR readings for Mrs. Knight, right?

18  A.  The ones that were provided to me --

19  Q.  Right.

20  A.  -- I did.

21  Q.  And there were a lot of INR readings, correct?

22  A.  Several ones, yes.

23       MR. LEWIS:  Your Honor, we've prepared a summary of

24  the INR levels that has been marked as Defendant's Exhibit

25  9009S.  It's a Rule 1006 summary.  I would move for the

1   admission of that summary at this time.

2           THE COURT:  Any objection?

3           MR. CHILDERS:  I'm going to object to the admission as

4   an exhibit.  If it's a demonstrative, that's fine, but I don't

5   believe this has been authenticated, a foundation hasn't been

6   laid for it.  So --

7           THE COURT:  So is it a demonstrative exhibit?

8           MR. LEWIS:  This is a demonstrative.  I have a summary

9   that is not a demonstrative that is being moved into evidence

10  that I've provided to Mr. Childers.

11          THE COURT:  And this chart purports to represent the

12  document you just referred to that is the summary of all of

13  her INR reports?

14          MR. LEWIS:  Correct.  And we've made the documents

15  available to Mr. Childers.  In fact, I provided those to

16  opposing counsel this morning as back-up, but they were

17  medical records that were already exchanged.

18          THE COURT:  All right.  On that representation, I'll

19  allow you to use them.

20          MR. LEWIS:  So could we pull up 9009S.

21          All right.  So this is a very generic chart that is in

22  front of you.  And this is just charts in the medical records

23  as 9009S, charts in the medical records, the INR readings from

24  the various medical records over time.

25          And if we just scroll down, you can see that there

1   is -- the numbers change over time.  There's a date, the

2   numbers are in the middle.  You can see that.

3            And you can see that there is --

4            THE WITNESS:  Do I have that in here?  Do I have this

5   here?

6            MR. LEWIS:  You have it in front of you.  It is

7   towards the back of your binder, and it would be 9009S.

8            THE WITNESS:  Okay.

9   BY MR. LEWIS:

10  Q.  You reviewed the INR levels for Mrs. Knight, though, as

11  part of your work in this case, right?

12  A.  Yes.

13  Q.  And so you know that she spent more time out of

14  therapeutic range than in therapeutic -- in therapeutic range,

15  right?

16           Did you ever count them up?

17  A.  I didn't really count them up.  I looked at them, but I

18  didn't count them one by one.

19           MR. LEWIS:  Well, the demonstrative plots these

20  numbers, so let's go to that.

21  Q.  And you can see here that the therapeutic range in the

22  demonstrative that is in front of us shows the range 2 to 3,

23  and the yellow is the therapeutic range.  And anytime there's

24  a white dot, that is outside the therapeutic range, right?

25  A.  Yes.

Hazem Ashhab - Cross (Lewis)                    764

1    Q.  And you see that at least on a couple of occasions she had

2    INR levels as high as 8.

3        That's a serious risk of bleed right there, right?

4    A.  Yes.

5    Q.  And other levels that approach 6 and were above 6 in other

6    instances, right?

7    A.  Yes.

8    Q.  And then several levels below 2.  That means that she is

9    at a higher risk of stroke because she's not within the right

10   level; is that correct?

11   A.  Yes.

12   Q.  All right.  And you see that over time there was

13   consistent out-of-range readings on the INR levels.  If you

14   just look at the time frame, it's consistent, right, just like

15   Dr. MacFarland said?

16   A.  Yes.

17       MR. LEWIS:  And let's take a look at Mrs. Knight's

18   circumstances on warfarin in 2008.  And if we could -- I am

19   finished with that exhibit.

20       I'm going to move for the admission of Exhibit 9003A,

21   which is a sub-exhibit of the medical records similar to what

22   the plaintiffs have done here.

23       MR. CHILDERS:  No objection, Your Honor.

24       THE COURT:  It's admitted.

25       (DEFENDANT'S EXHIBIT 9003A ADMITTED INTO EVIDENCE.)

Hazem Ashhab - Cross (Lewis)                    765

1          MR. LEWIS:  If we look at 9003A.  Sorry.  Exhibit

2     9003A.

3          THE WITNESS:  9003, you said?

4          MR. LEWIS:  Yes.

5          THE COURT:  3A.

6          THE WITNESS:  Thank you, Your Honor.

7          Yes, sir.

8          MR. LEWIS:  Are you able to -- do you have that?

9          THE WITNESS:  I have, yeah, 9003A.

10          MR. LEWIS:  All right.  Just to orient ourselves, so

11     Mrs. Knight -- this is a record from the 2008 time frame

12     that's in front of you.  And --

13          THE COURT:  The first page of it is the certification.

14          MR. LEWIS:  Sorry.  The second page of 9003A.  You

15     have a certification that shows it was --

16          THE WITNESS:  Yes.

17          MR. LEWIS:  -- authenticated, and now we have the

18     record itself.

19          THE COURT:  It's page 10 in this sequence at the

20     bottom?

21          MR. LEWIS:  Correct.

22          THE WITNESS:  This chart summary?

23          MR. LEWIS:  Ten at the bottom, 9003-10.

24          THE WITNESS:  Yes.

25          MR. LEWIS:  Okay.  Go to the second page.

Hazem Ashhab - Cross (Lewis)                766

1          And we see up in the top, this is -- date admitted was

2   August 7th of 2008.

3   Q.  This is a Dr. MacFarland record; is that right?

4   A.  Yes.

5   Q.  And we have here Mrs. Knight coming to see Dr. MacFarland

6   for a number of things, but really acute respiratory failure.

7          If you look at the brief history and hospital course

8   shortly down, you see that she's had a number of issues.  But

9   she's coming to see Dr. MacFarland because, in the fourth line

10  down, she called and went to the emergency room with acute

11  respiratory failure and then eventually wanted to come to see

12  Dr. MacFarland, right?

13  A.  Yes.

14  Q.  And if we fast-forward to two thousand -- excuse me --

15  9003-12, you see under diet, as tolerated?

16  A.  Yes.

17          MR. LEWIS:  Are you able to scroll through the next --

18  the same day, it's just two pages -- there you go, she is

19  currently off.

20  Q.  You see Dr. MacFarland is noting that Mrs. Knight is off

21  coumadin, off warfarin at this time in 2008?

22  A.  Yes.

23  Q.  She's going to try something else.  And Dr. MacFarland is

24  explaining to her that coumadin is the gold standard, but at

25  this time Mrs. Knight doesn't want to come to the office to

Hazem Ashhab - Cross (Lewis)                    767

1   get the blood work checked as frequently, right?

2   A.  Yes.

3   Q.  She's declining it at that point in time.

4       Is that fair to say?

5   A.  That's what she said, yes.

6   Q.  Okay.  But if we fast-forward one month --

7           MR. LEWIS:  And this is going to be Exhibit 9007, and

8   I move for the admission of 9007A.  Those are medical records.

9           MR. CHILDERS:  No objection, Your Honor.

10          THE COURT:  They're admitted.

11      (DEFENDANT'S EXHIBIT 9007A ADMITTED INTO EVIDENCE.)

12          MR. LEWIS:  9007A, pages 8 and 9.

13          THE WITNESS:  Yes.

14          MR. LEWIS:  So we see this is a visit with Dr.

15  Haberman from a month later, September 18th, 2008.

16          And if you look at the bottom impression, she has a

17  history of stroke.  And Dr. Haberman is saying Mrs. Knight

18  absolutely needs to get back on her coumadin because her risk

19  having another stroke, another stroke, is high.

20          Now, if we look at the next page on -- look at No. 3.

21  This is what Dr. Haberman did.  She was on Plavix.  Took her

22  off Plavix and said discontinue Plavix to prevent bleeding

23  from the concomitant --

24  Q.  That means at the same time, right, Doctor?

25  A.  Yes.

Hazem Ashhab - Cross (Lewis)                    768

1   Q.  -- aspirin and coumadin therapy.

2        Dr. Haberman, right, Doctor, is expressing a concern about

3   putting this particular patient on Plavix and warfarin at the

4   same time.

5        Is that fair to say?

6   A.  Yeah.  The more blood thinners you have, the higher the

7   risk of bleed.

8   Q.  Right.

9        And that is something that Dr. Haberman is concerned about

10  as early as 2008, right?

11  A.  Yes.

12  Q.  So that --

13  A.  But also I'm not sure what is the indication here for

14  Plavix.  It was given because she did not want to take the

15  coumadin.  But now that she agrees to the coumadin, she

16  doesn't need the Plavix.  I'm not sure that he needs to stop

17  it.  She doesn't need it.

18  Q.  If you read No. 3, it says:  Discontinue Plavix to prevent

19  bleeding from concomitant aspirin and coumadin therapy, right?

20  A.  Yeah, I see what you're saying.

21  Q.  Right.

22       He considered triple therapy and said no, right?

23  A.  Yes.

24  Q.  Okay.  If we go later into 2008, we talked a little bit

25  about whether or not she had a bleed.  And it's your opinion

1    that she didn't experience a bleed after she went back onto

2    coumadin at this time; is that right?

3    A.  I saw no evidence of that in the chart.

4    Q.  Okay.  Well, if we go to 9007-19 --

5    A.  Dash 19.

6    Q.  -- we just see here that this is Mrs. Knight coming in to

7    see Dr. MacFarland and to discuss some mental status changes.

8        She's experiencing some weakness, right?

9    A.  Yes.  Yes.

10   Q.  Okay.  And at this point in time, she's also -- her family

11   is concerned about -- if you see in the history of present

12   illness, is concerned about a little bit of her potentially

13   progressing dementia at the time; is that right?

14   A.  Yes.

15   Q.  Okay.  And there was some concern about that.

16       If we go to 9007-36 and -37 during the same time frame --

17   if we go to 9007-36, we see that eventually Mrs. Knight works

18   her way to Dr. Haberman again.

19   A.  Yes.

20   Q.  And he notes here on the front page -- and this is right

21   around the same time frame, mid November 2008.  She's on

22   coumadin.

23       And if we go to page 37, the very next page, Dr. Haberman

24   down in impression, in recommendations says:  She is

25   experiencing anemia, which might be secondary to the recent

1  initiation of coumadin, right?

2  A.  That's what it says.

3  Q.  He's saying that she might be experiencing a bleed because

4  of the recent initiation of coumadin, correct?

5  A.  That's what it says, yes.

6  Q.  That's what he is suspecting here in November of 2008,

7  right?

8  A.  Yes.  He's suspected that, yes.

9  Q.  Right.  Sure.

10      And the very first thing he says in his recommendations is

11  stop coumadin, right?

12  A.  That's what it says, yes.

13  Q.  Okay.  And if we flip back into 9007-25, we see this is a

14  consult right around the same time frame, in mid November,

15  with Dr. Rohrbach.

16      Do you see that on the right-hand side?

17  A.  Yes.

18  Q.  Now you know Dr. Rohrbach is a GI specialist here in

19  Huntington, right?

20  A.  Yes.

21  Q.  Okay.  And Dr. Rohrbach says in the history:  She has been

22  seen by Dr. Haberman, and she was found to be anemic.

23      Do you see where it says that in the middle of history?

24  A.  Yes.

25  Q.  In the emergency room, her hemoglobin was 10.  By

1   yesterday it was down to 9.

2       It's dropping, correct, Doctor?

3   A.  Yes.

4   Q.  Okay.  She's been transfused two units.

5       Do you see where it says that?

6   A.  Yes.

7   Q.  That suggests a blood loss, right, Doctor?

8   A.  Well, she has more than one reason to be anemic, but it

9   did drop from 10 to 9.

10  Q.  And she is transfused with two units of blood, right?

11  A.  Yes.  Yes.

12  Q.  That suggests she's losing blood, correct?

13  A.  Not always.  I hate to get into this, but people can have

14  hemolysis or can have lack of production or can have bleeding.

15  But the problem here is nobody documents that they have seen

16  any blood or tested for any blood.

17  Q.  Understood.

18  A.  So I don't see a GI bleed here.  He's implicating or he's

19  guessing, but there really -- there is no documentation that

20  she has GI bleeding --

21  Q.  Understood.

22  A.  -- and that's the problem.

23  Q.  Understood.

24      But the GI specialist is being consulted here, correct?

25  A.  Correct.

Hazem Ashhab - Cross (Lewis)                              772

1    Q.  And he's noting that she is -- her hemoglobin is dropping,

2    and she's been transfused two units, correct?

3    A.  Correct.

4    Q.  And then he goes on to say she's had some darker stool,

5    which is indicative of a potential GI bleed, correct, Doctor?

6    A.  Correct.

7    Q.  Okay.  This GI specialist is suspicious of a GI bleed,

8    correct?

9        Now you know from the records that eventually a

10   colonoscopy wasn't done because they felt Mrs. Knight was too

11   ill.  You know that, right?

12   A.  That's what it says in the records.

13   Q.  Right.  Okay.

14       But when we look at what the doctor said later in the

15   documents that weren't shown to you on direct examination, we

16   see that they do refer to a GI bleed, right?  You know that,

17   right?

18   A.  They mention it in the notes.

19   Q.  Right.  So --

20   A.  But there's no documentation of it.

21   Q.  Okay.

22       MR. LEWIS:  Let's take a look at the documentation in

23   Exhibit 9009, which I'll move for admission of at this time.

24       THE COURT:  Any objection?

25       MR. CHILDERS:  No, Your Honor.

Hazem Ashhab - Cross (Lewis)                    773

1          THE COURT:  It's admitted.

2     (DEFENDANT'S EXHIBIT 9009 ADMITTED INTO EVIDENCE.)

3          MR. LEWIS:  If we go on to 9009A, and we go to page

4     273 and 275 -- we'll just go to 273.

5     Q.  We see this is Dr. Gunnalaugsson from December of 2008,

6     and you see that in the history of present illness, Dr.

7     Gunnalaugsson is talking about doing a stent procedure,

8     correct?

9     A.  Yes.

10    Q.  And he's choosing a bare metal stent, correct?

11    A.  Yes.

12    Q.  And a bare metal stent is chosen if a doctor is worried

13    about extensive bleeding because you have to go on less

14    anticoagulant medication with a bare metal stent.

15         Fair to say?

16    A.  Less blood thinners, yes.

17    Q.  Yes.

18         And if we go to what Dr. Gunnalaugsson says on page 275

19    under Assessment and Plan, you see right in the middle:  She

20    has been on coumadin for atrial fibrillation, but this was

21    stopped because of her chronic bleed.

22         You see where it says that?

23    A.  Yes.

24    Q.  And then instead, she's on aspirin and Plavix, and they

25    took her off coumadin, right?

Hazem Ashhab - Cross (Lewis)                    774

1  A.  I see that, yes.

2  Q.  Okay.  And this is right in the records.  This is in

3  writing, right?

4  A.  Yes, I see it.

5  Q.  Okay.  If we look back at 9007, we see what happens

6  because she wasn't on coumadin.

7     On 9007-55, we see this is Dr. Linsenmeyer for Mrs. Knight

8  in February of 2009.  Again, Dr. Linsenmeyer is consulting

9  with Dr. Gunnalaugsson.  Mrs. Knight is not on coumadin at

10  this point.  Dr. Gunnalaugsson thinks it's because of prior

11  bleed.

12     And we say:  For the last five days prior to presentation,

13  the patient noticed that her fingerprints were turning

14  discolored.  She began to experience severe right brachial arm

15  pain.

16     She has a blood clot here, right, Doctor?

17  A.  Yes.

18  Q.  She suffers from a blood clot in February of 2009, right?

19  A.  Yes.

20  Q.  Okay.  And this is the constant problem that the

21  physicians were facing with Mrs. Knight during the entire

22  course on warfarin, right?  This was a problem for them,

23  wasn't it?

24  A.  After they stop it, they got a clot.  If they don't stop

25  it, they have a hard time monitoring it.

Hazem Ashhab - Cross (Lewis)                    775

1   Q.  Right.

2   A.  Yeah, it was a challenge.  It was a big challenge, yeah.

3   Q.  They were having trouble keeping Mrs. Knight on warfarin

4   within the therapeutic range.

5       Fair to say?

6   A.  Fair to say.

7   Q.  And we just saw an example where, because her INR levels

8   were too high, she suffered from a suspected bleed, correct?

9   A.  Correct.

10  Q.  And when they try to take her off the warfarin to try to

11  bring the INR levels down, she suffers a clot, right?

12  A.  Correct.

13  Q.  That's not a well managed warfarin patient, is it, Doctor?

14  A.  She seems to have problems either way.

15  Q.  Yeah.

16      Difficult, right?

17  A.  Difficult, yes.

18  Q.  Very difficult.

19  A.  A challenging patient.

20  Q.  And some patients are like that, correct?

21  A.  Correct.

22  Q.  Some patients like Mrs. Knight are very, very difficult to

23  manage on any medication, including warfarin, right?

24  A.  Correct.

25  Q.  On the one hand, you are darned if you do, and you are

Hazem Ashhab - Cross (Lewis)                    776

1   darned if you don't, right?

2   A.  Yes.

3   Q.  And that's what is going on here in 2009 with Mrs. Knight,

4   right?

5   A.  Correct.

6   Q.  It gets worse by 2011, doesn't it, Doctor?

7   A.  Yes.

8        MR. LEWIS:  In fact, let's go to Exhibit 9009-389.

9        THE COURT:  9009A?

10        MR. LEWIS:  Sorry.  9009A-389.  Sorry, Your Honor.

11        Let's look at the last seven days Mrs. Knight was on

12   warfarin.  Day one, October 10, 2011, Dr. MacFarland gets a

13   call.  Mrs. Knight's INR levels are at 8 again.

14   Q.  You see that on the message, 9009-389?

15   A.  Oh, 389.

16   Q.  Sorry.

17   A.  Yes.

18   Q.  INR of 8; you see that?

19   A.  Yes.  Yes.

20   Q.  That is serious, right?

21   A.  Yes.

22   Q.  Here she is at a bleed risk again, correct?

23   A.  Yes.

24   Q.  Dr. MacFarland says go to the ER, right?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                         777

1    Q.  And you see a note here that the wait maybe at the ER was

2    too long or was called in, and she couldn't get her in.  So

3    call in vitamin K.

4        That's the antidote, right?

5    A.  Yes.

6    Q.  All right.  And then if we go to 9009-385, two days later,

7    her INR is 5.

8        That is still high, right, Doctor?

9    A.  Yes.

10   Q.  Dr. MacFarland is saying hold the coumadin tonight, don't

11   take it, recheck the INR tomorrow, correct?

12   A.  Yes.

13   Q.  If we go to 9009-383, a day later, her INR is back up to

14   6.3.

15       That's a high risk of bleed still, right?

16   A.  Yes.

17   Q.  So now we're on day three of high risk of bleeding for

18   Mrs. Knight in October of 2011, correct?

19   A.  Yes.

20   Q.  All right.  If we go to 9009-448, we see in the middle the

21   INR reading is now down to 4.6.

22       Do you see that?

23   A.  Yes.

24   Q.  It's getting better, it's improving, correct?

25   A.  Yes.

1  Q.  The doctor says take vitamin K, and we're going to recheck

2  the INR, correct?

3  A.  Yes.

4  Q.  If we go to 9009-425, it is a handwritten note, kind of

5  hard to read.

6  A.  Oh, yes.

7  Q.  But if we look at the data reviewed towards the bottom of

8  425, we see now that they've overshot this.  Now the INR is at

9  1.6.

10 A.  Yes.

11 Q.  Data reviewed, the INR is now at 1.6.

12     Now she's back on the high risk of stroke, right?

13 A.  Yes.

14 Q.  During this entire time, none of these readings are within

15 the therapeutic range, correct?

16 A.  Yes.  That's why you send these people to the warfarin

17 clinic.

18 Q.  The doctors are struggling to keep Mrs. Knight in the

19 therapeutic range, right, Doctor?

20 A.  Yes.

21 Q.  And look at what is said in the upper left-hand corner of

22 this document:  Want to replace coumadin.  New medication,

23 Pradaxa.

24     There's nothing about a TV ad in here, is there?

25 A.  I don't see it here.

Hazem Ashhab - Cross (Lewis)                    779

1    Q.  What's going on here when the switch is made from coumadin

2    to Pradaxa is that the doctors were struggling to keep her

3    safe on warfarin, right?

4    A.  That's what this record says.

5    Q.  Okay.  And let's look at what Dr. MacFarland herself said

6    on 9009-580.

7    A.  Dash five --

8    Q.  Dash 580, 9009A-580.

9    A.  Got it.

10   Q.  You know, sometimes you probably have done this, you had

11   to fill out forms to justify medications?

12   A.  Yes, sir.

13   Q.  And when you do that, it's important to tell the truth and

14   be honest and accurate about that; is that right?

15   A.  Yes, sir.

16   Q.  Okay.  And Dr. MacFarland is filling out this form on

17   October 18th of 2011, after these seven or eight days of never

18   having Mrs. Knight within a safe range to use warfarin, right?

19   A.  Yes.

20   Q.  And the diagnosis is:  Sporadic and supratherapeutic on

21   coumadin.  Do you see that?

22   A.  Yes.

23   Q.  That means they can't keep her within a safe range, right?

24   A.  Correct.

25   Q.  And if we look at the next page, 9009-581:  Patient is

Hazem Ashhab - Cross (Lewis)                    780

1  sporadic and supratherapeutic on coumadin since 2008 until

2  present.

3      That's what Dr. MacFarland says in October of 2011, right?

4  A.  Yes.

5  Q.  That's what she said to justify the switch from warfarin

6  to Pradaxa in 2011, right?

7  A.  Yes.

8  Q.  Warfarin wasn't working for her.  Warfarin wasn't working

9  for Mrs. Knight.  Do you agree with that?

10 A.  That's what the record reflects.  It depends on what you

11 mean by not working.  It was given to prevent stroke.  I don't

12 see a record here that she had any stroke during the coumadin

13 period.

14 Q.  You would agree with me that Dr. MacFarland is expressing

15 an opinion here that she needs to go off warfarin because she

16 can't control the therapeutic range with Mrs. Knight, correct?

17 A.  That's correct.  That statement is correct.

18 Q.  It doesn't say anything about a TV ad in this document --

19 A.  Uh-huh.

20 Q.  -- right?

21 A.  Correct.

22     MR. LEWIS:  All right.  Now let's talk about -- you

23 reviewed the records -- I'm finished with that.  Thank you

24 very much.

25 Q.  You reviewed the records for Mrs. Knight's Pradaxa use,

1   correct?

2   A.   Yes.

3   Q.   And you're familiar with the fact that before this stent

4   procedure in April of 2013, so between October of 2011 and

5   April of 2013, Mrs. Knight was on Pradaxa, correct?

6   A.   Correct.

7   Q.   Okay.  And in April of 2013, she had a stent procedure,

8   correct?

9   A.   Correct.

10   Q.   We're going to talk about that in a second.

11        But between October of 2011 and April of 2013, while Mrs.

12   Knight was on Pradaxa, she didn't suffer a stroke, and she

13   didn't suffer a bleed event, correct?

14   A.   Correct.

15   Q.   And that's 18 months, correct?

16   A.   Correct.

17   Q.   And then something happened in April of 2013, correct?

18   A.   Correct.

19   Q.   She had a stent procedure.

20        And if we go to 9007-94 --

21   A.   9007 --

22   Q.   9007A-94.  This is April 22nd, 2013, from Dr. Maru, right?

23   Referring physician, Dr. Graham.

24   A.   Yes.

25   Q.   Okay.  Now, just to help orient the jury, by this time Dr.

Hazem Ashhab - Cross (Lewis)                    782

1    MacFarland is no longer treating Mrs. Knight, correct?

2    A.  It seems like it.

3    Q.  She has switched physicians by this time, correct?

4    A.  Okay.

5    Q.  And so the decisions on prescribing Pradaxa in 2013 are no

6    longer being made by Dr. MacFarland, correct?

7    A.  Yes.

8    Q.  Other physicians are involved in this, correct?

9    A.  Yes.

10   Q.  All right.  And you see here in the procedure, bare metal

11   stent -- again, that's a stent placed to avoid having to be on

12   blood thinners too long, correct?

13   A.  Yes.

14   Q.  Okay.  Was placed.

15       And if we go to 9007-0095, we see under Conclusion a

16   recommendation:  Continue aspirin indefinitely and Plavix for

17   a minimum of four weeks, preferably longer if the patient can

18   tolerate it.  Resume her Pradaxa tonight.

19       Now let's look at what the next line says.

20       By the way, Dr. Maru is a cardiologist.  Did you know

21   that?

22   A.  From the record.

23   Q.  Okay.  Due to triple therapy -- and you know what triple

24   therapy is, right?

25   A.  Yes.

1    Q.  That's aspirin, Plavix and Pradaxa.  That's called triple

2    therapy, right?

3    A.  Yes.  In her case, yes.

4    Q.  In her case.  It might mean something different in a

5    different context.

6    A.  Yes.

7    Q.  Okay.  Due to triple therapy, I am not sure the patient

8    will tolerate long-term Plavix, so minimum would be four

9    weeks, and that's the main reason bare metal stenting was

10   chosen during this PCI procedure.

11       Do you see that?

12   A.  Yes.

13   Q.  Okay.  So the doctor here is concerned that it's the

14   Plavix that Mrs. Knight won't tolerate in this triple therapy,

15   right?

16   A.  That's what he says.

17   Q.  And that's the thing that is going to change here in April

18   of 2013, right?

19   A.  That's what he said.  He added Plavix, yes.

20   Q.  Because during the 18 months that Mrs. Knight was on

21   Pradaxa before the stent procedure, she was taking Coreg,

22   right?

23   A.  According to the record.

24   Q.  She was taking aspirin, right?  Omeprazole, a P-gp

25   inhibitor?

Hazem Ashhab - Cross (Lewis)                          784

1    A.   Yes.

2    Q.   Coreg is a P-gp inhibitor?

3    A.   Yes.

4    Q.   She was taking those medications from October of 2011 to

5    April of 2013, right?

6    A.   That's true.

7    Q.   No stroke, no bleeding, correct?

8    A.   Yes.

9    Q.   The one thing that changed was adding Plavix to the

10   medication profile in April of 2013, correct?

11   A.   Yes.

12   Q.   That's what changed.

13        And you would agree with me that Plavix has a risk,

14   independently of being mixed with Pradaxa or aspirin, of

15   bleed?

16   A.   Yes.

17   Q.   Just like other anticoagulant medications, Plavix too has

18   a risk of bleeding?

19   A.   Yes.  All of them do.

20   Q.   All of them do.

21        And when you mix more than one blood thinner, you increase

22   the risk of bleed?

23   A.   That's true.

24   Q.   Okay.  And when you increase the risk of bleed with other

25   risk factors such as age, you're compounding the risk of

Hazem Ashhab - Cross (Lewis)                    785

1   bleed, correct?

2   A.  Correct.

3   Q.  But you don't criticize the decision to put Mrs. Knight on

4   Plavix, Pradaxa and aspirin in April of 2013, do you?

5   A.  I'm not in that position to make a decision.  The

6   cardiologist put a stent, and he wanted to protect the stent,

7   so that's his decision.

8   Q.  Right.

9       Because once you put in a stent, you run a higher risk of

10  stroke, right?

11  A.  Not from the stent, no.  He put the Plavix to prevent the

12  stent from clotting.

13  Q.  Correct.

14      You have a high --

15  A.  But the stent doesn't cause a stroke.

16  Q.  You have a higher risk of blood clots, correct?

17  A.  In the stent.

18  Q.  Correct, with a stent.

19  A.  In the stent.

20  Q.  Yes, in the stent --

21  A.  Yes.

22  Q.  -- itself.  Okay.  Let me get this right.  Thank you for

23  correcting me.

24      When you put in a stent, you run an independent risk of

25  higher risk of blood clots in the stent, correct?

Hazem Ashhab - Cross (Lewis)                    786

1    A.  Yes.

2    Q.  Okay.  And to counteract that, physicians will sometimes

3    prescribe Plavix; is that right?

4    A.  Yes.

5    Q.  Okay.  So at the time that Mrs. Knight is having her stent

6    procedure in April of 2013, the doctor is concerned about

7    blood clots because of the stent, right?

8    A.  Yes.

9    Q.  She still needs an anticoagulant like Pradaxa, right?

10   A.  Yes.

11   Q.  And they're giving her aspirin as well because they are

12   concerned about the stroke risk, right?

13   A.  Correct.

14   Q.  Okay.  But, of course, that comes with a higher risk of

15   bleeding, right?

16   A.  Correct.

17   Q.  And these doctors are trying to make difficult decisions

18   with a patient who has lots of risk factors, right?

19   A.  Correct.

20   Q.  Fair to say?

21   A.  Uh-huh.  Correct.

22   Q.  Okay.  And it is another one of those darned if you do,

23   darned if you don't situations, correct?

24   A.  It is difficult.

25   Q.  All right.  And, of course, you have already covered some

Hazem Ashhab - Cross (Lewis)                787

1    of the documents related to -- and I'm finished with that --

2    Mrs. Knight's bleed event that took place in May of 2011,

3    right?  You covered that.

4        Okay.  You know that she was treated by a GI specialist

5    called Dr. Huh; is that right?

6    A.  Yes.

7    Q.  Okay.  So let me see if I can get some of these facts out.

8        Mrs. Knight was brought in to see Dr. Abdelgaber after she

9    had witnessed some bleeding for about six days.

10       Do you recall that?

11   A.  Yes.  Yes.

12   Q.  Okay.  So she had been experiencing some bleed symptoms

13   for about six days, correct?

14   A.  I'm not sure if it's six.  It says a few days --

15   Q.  A few days.

16   A.  -- in the record, yes.

17   Q.  Okay.  So a few days before she sees Dr. Abdelgaber,

18   correct?

19   A.  Yes.

20   Q.  And then when she sees Dr. Abdelgaber, he refers Mrs.

21   Knight to Dr. Huh, correct, the GI specialist?

22   A.  Yes.

23   Q.  Okay.  And Dr. Huh on May 20th of 2013 sees Mrs. Knight,

24   correct?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                    788

1  Q.  He assesses her?

2  A.  Yes.

3  Q.  She was in stable condition, correct?

4  A.  I have to look at the record.

5  Q.  Go ahead.

6  A.  Was that that time she was admitted?

7  Q.  Correct.

8  A.  Yeah.  The gastroenterologist saw her after she received

9  the blood.

10 Q.  Absolutely.

11 A.  So she was relatively stabilized.

12 Q.  Okay.  She was stabilized.

13      And in fact, Dr. Huh did not immediately perform a

14 procedure on Mrs. Knight --

15 A.  That's correct.

16 Q.  -- is that correct?

17      He actually let her stay in the hospital overnight,

18 correct?

19 A.  Yes.

20 Q.  And said that I'm going to handle this procedure in the

21 morning, correct?

22 A.  Yes.

23 Q.  And then the next morning, Dr. Huh came in, and he did a

24 colonoscopy, correct?

25 A.  Yes.

1   Q.  And he found when he did the colonoscopy an AVM, correct?

2   A.  Yes.

3   Q.  And he treated it, correct?

4   A.  Yes.

5   Q.  He stopped the bleeding?

6   A.  Correct.

7   Q.  He stabilized her?

8   A.  Further, yes.

9   Q.  Within 24 hours of presenting to Dr. Huh, Mrs. Knight was

10  stabilized, and her AVM was treated, correct?

11  A.  Correct.

12  Q.  And it was treated successfully at that time, correct?

13  A.  Correct.

14  Q.  The bleeding stopped?

15  A.  Correct.

16  Q.  Okay.  She was allowed to leave the emergency situation of

17  having an AVM that needs treatment, correct?

18  A.  Correct.  For the AVM, yes.

19  Q.  For the AVM.

20      It was -- it was repaired, right?

21  A.  Yes.

22  Q.  Okay.  That would be a successful repair of an AVM by your

23  own definition, correct?

24  A.  Yes.  If you clip it, and the bleeding stops, then the job

25  is done.

Hazem Ashhab - Cross (Lewis)                    790

1   Q.  Okay.  Now later on that year, 2013, there's a question

2   about whether or not Mrs. Knight should go back on the Plavix,

3   isn't there?

4   A.  Yes.

5   Q.  And then if we go to 9007-146, this is from August 23rd of

6   2013, and we see this is one of the doctors -- referring is

7   Dr. Abdelgaber, and one of the consultants is Dr. Snavely.

8   You see the reason for consultation is elevated troponin.

9        That is suggestive of a possible heart attack, isn't it,

10  Doctor?

11  A.  Yes.

12  Q.  When there is elevated troponin, it's a big red flag for

13  physicians that a patient may be experiencing a serious heart

14  condition, correct?

15  A.  Yeah.  Depending on the clinical scenario, but yes.

16  Q.  Okay.  And we see that in the third paragraph, it says:

17  The patient states that she's been doing fairly well in her

18  typical state of health, but she did begin to have some

19  heart -- some chest pains essentially, correct?

20  A.  Yes.

21  Q.  Okay.  And when we go to 9007-148, 9007A-148, we see

22  there's a plan.

23  A.  Yes.

24  Q.  And you see that the doctor talked to her son, Mr. Knight,

25  all on the phone, and that she had had a similar presentation

1    in July.  You see where it says that?

2        And Dr. Gunnalaugsson is the cardiologist who said that

3    they should take a conservative approach.  You see that?

4    A.  Yes.  Yes, I see that in the last paragraph under Plan.

5    Q.  Right.

6    A.  Yes.

7    Q.  Well, let's look at what he says at the bottom:  It should

8    be noted that Dr. Gunnalaugsson did not want her back on

9    Plavix due to the history of gastrointestinal bleeding.

10       You see where it says that?

11   A.  Yes.

12   Q.  This cardiologist is afraid to put her on Plavix, right?

13   A.  Yes.

14   Q.  Because he's worried that what happened in May is going to

15   happen again, correct?

16   A.  Yes.

17   Q.  And he says:  Will keep her on low-dose aspirin along with

18   Pradaxa.

19       He's not afraid of Pradaxa at this point in time, correct?

20   A.  That's what his note says.

21   Q.  Okay.  He's afraid of Plavix, correct?

22   A.  Yes.

23   Q.  And he says:  As I do not think Pradaxa could be held in

24   the long term given her multiple issues with blood clot,

25   correct?

Hazem Ashhab - Cross (Lewis)                    792

1    A.  The issue here is to compare between the need for Pradaxa

2    versus Plavix.  She passed the month since the stent was put

3    in, right?  Help me out here.

4    Q.  Well, let me try to help you out with a couple of

5    questions, see if we can get those answered first.

6        So this note reflects that Dr. Gunnalaugsson said, ah, did

7    not want her back on Plavix due to the history of

8    gastrointestinal bleeding, correct?

9    A.  Yes.

10   Q.  Plavix could potentially treat a problem that she was

11   having with the stents at this time if she was having a

12   problem, correct?

13   A.  Correct.

14   Q.  Okay.  If she was having -- if the cardiologist felt she

15   was having a problem with the stent, Plavix could help treat

16   that, right?

17   A.  Correct.

18   Q.  And Dr. Gunnalaugsson is saying don't do that, I'm afraid

19   of a bleed, correct?

20   A.  Correct.

21   Q.  But he is saying go ahead and keep her on Pradaxa because

22   I'm worried about stroke and blood clots, right?

23   A.  Yes.

24   Q.  He's not afraid of a bleed with Pradaxa at this point in

25   time, correct?

1    A.  To me that not really is concerning.  Because if they

2    believe this troponin is an indicator of a heart attack, then

3    she didn't really need the Plavix.  Maybe he's just not

4    convinced of it.  Because I wouldn't want somebody bleeding if

5    they have a heart attack, because they will die first from a

6    heart attack.  So to me, this -- this record really

7    contradicts itself.

8    Q.  My question is this.

9        The physician that was treating her and had seen her many,

10   many times before this point in time -- right?

11       Dr. Gunnalaugsson --

12   A.  Yes.

13   Q.  -- a cardiologist --

14   A.  Yes.

15   Q.  -- in the field of working heart conditions, correct?

16   A.  Yes.

17   Q.  He concluded to stay on Pradaxa and not take Plavix,

18   correct?

19   A.  Yes.

20   Q.  And the reason he made that decision was that he was

21   afraid that Plavix could trigger a bleed, correct?

22   A.  Yes.

23   Q.  And he was not afraid of that, according to this note,

24   with Pradaxa, correct?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                    794

1   Q.  And in fact, if we go to 9005A-5 --

2   A.  9005A-5.

3   Q.  Do you see on 9005-5, we've got a note from August 29 of

4   2013?

5   A.  Yes.

6   Q.  And this is from Dr. Gunnalaugsson, and the primary care

7   physician is Dr. Abdelgaber.  And you see:  She was

8   hospitalized with anemia due to GI bleed.  She was eventually

9   surprisingly put back on Pradaxa.

10      You see where it says that?

11  A.  Yes.

12  Q.  Okay.  She has been off Plavix.  I have suggested her not

13  to take aspirin given the situation, correct?

14  A.  Yes.

15  Q.  That's what it says.

16      Worried about a bleed, correct?

17  A.  Yes.

18  Q.  Later on, it says:  We had done a nuclear stress test last

19  year, and then she had a coronary intervention earlier this

20  year.

21      That would be the stent, correct?

22  A.  Yes.

23  Q.  Okay.  And was put on Plavix which probably triggered her

24  bleed.

25      Right in the record, right?  You see that?

1    A.  That's what he is saying, yes.

2    Q.  That's what he is saying.

3        Plavix triggered the bleed according to this physician who

4    treated Mrs. Knight during this time frame, correct?

5    A.  That's what he says.

6    Q.  And you disagree with that?

7    A.  No, I'm not saying that.  The issue with Pradaxa is how

8    much you bleed, not what triggers the bleeding.  I mean, you

9    can bleed for 5 or 6 cc's or half a unit.  The issue is

10   life-threatening blood, a hemoglobin of 6.

11       So the trigger could be anything.  Anything can -- you

12   know, it could be the straw that breaks the camel's back.

13   Q.  So you agree --

14   A.  But it's not because the straw is so heavy.  It just

15   happens to be the back is just about to break.

16       You know, the camel's back is about to break --

17   Q.  Doctor --

18   A.  -- and you just added a straw.

19   Q.  Doctor, yes or no, do you agree with this doctor's

20   conclusion that Plavix probably triggered her bleed?  Yes or

21   no?

22   A.  I can't tell.  It could be.  I cannot say right or wrong.

23   It could be.

24   Q.  All right.  And if we look at 9005-6, which is the next

25   page.

```
                    Hazem Ashhab - Cross (Lewis)                796
 1    A.  Yes.
 2    Q.  And on August 29th, 2013, this doctor concludes -- this is
 3    9005A-6.
 4    A.  Yes.
 5    Q.  She will remain on Pradaxa since she is tolerating this
 6    right now.
 7         You know what tolerating means?
 8    A.  Yes.
 9    Q.  It's working for her, right?
10    A.  That she's able to take it without much problems.
11    Q.  Right.
12         She's not experiencing side effects or complications,
13    right?  Correct?
14    A.  Yes.  That's what he says, yes.
15    Q.  And it's working.  It's effective for her, right?
16    A.  Yes.
17    Q.  That's what this doctor is concluding on August 29th of
18    2013, correct?
19    A.  Correct.
20    Q.  Yes or no, do you agree with this doctor's conclusion
21    about Pradaxa being tolerated by Mrs. Knight at this time?
22    A.  Tolerated as meaning preventing stroke or not causing side
23    effects?
24    A.  Both.
25         Yes or no, do you agree with this doctor's conclusion or
```

Hazem Ashhab - Cross (Lewis)                    797

1    not?

2    A.  So far at this point, correct.

3    Q.  Okay.  Now --

4         MR. LEWIS:  I am finished with that exhibit.  Just a

5    couple more topics, Doctor.

6    Q.  You have testified that Mrs. Knight was

7    over-anticoagulated?  Is that the right term?

8    A.  Yes.

9    Q.  Okay.  And none of the records that we just reviewed used

10   the word over-anticoagulated on Pradaxa, do they?

11   A.  I did not see it.

12   Q.  It's not in there, is it?

13   A.  I didn't see it.

14   Q.  And you would have pointed that out if it was in there,

15   wouldn't you have?

16   A.  I would have.

17   Q.  I figured, yeah.

18        But you base that conclusion on an aPTT test that was run

19   on May 21st of 2013, correct?

20   A.  Yes.

21   Q.  After Mrs. Knight had a bleed event that was fixed or

22   repaired, treated, right?

23   A.  Yes.

24   Q.  Okay.  And you're saying that, based on that aPTT test,

25   she was over-anticoagulated some day before that?

1    A.   Yes.

2    Q.   Okay.  But you don't have an aPTT test to prove that, do

3    you?

4    A.   The day before, no, I don't.

5    Q.   Okay.  Or the week before?

6    A.   It's true.  Whatever is in the record is what I have.

7    Q.   Okay.  Just the one after --

8    A.   Yes.

9    Q.   -- of 47?

10   A.   Yes.

11   Q.   Okay.  But you know several times throughout Mrs. Knight's

12   history with anticoagulant medication, she's been over 47.

13        You know that, right?

14   A.   Yes.

15   Q.   And in fact, if we go to the aPTT test from opening

16   statement -- and these are in the record, but this is a

17   demonstrative.

18        This is a demonstrative that shows in the record all of

19   the instances where Mrs. Knight, while on warfarin, had

20   similar or higher aPTT tests, right?

21   A.   Yes.

22   Q.   On at least six different occasions while on warfarin,

23   Mrs. Knight had higher or the same -- 46.1.  The other five

24   are higher, right?

25   A.   Yes.

Hazem Ashhab - Cross (Lewis)                    799

1   Q.  The fact is that your conclusion that Mrs. Knight was

2   over-anticoagulated at the time of a bleed that had apparently

3   started several days before, the fact is you're guessing,

4   right?

5   A.  Yes.

6          MR. LEWIS:  All right.  I'm finished with that

7   exhibit.

8   Q.  The last subject, Doctor, is Mrs. Knight passed away on

9   September 2nd of 2013, correct?

10  A.  Yes.

11  Q.  Okay.  I want to ask you about a document, a medical

12  document that was associated with that time frame.  Okay?

13  A.  Yes, sir.

14         MR. LEWIS:  I'm going to move for the admission of

15  9001.

16      (Counsel conferring.)

17         MR. CHILDERS:  No objection, Your Honor.

18         THE COURT:  It's admitted.

19      (DEFENDANT'S EXHIBIT 9001 ADMITTED INTO EVIDENCE.)

20  BY MR. LEWIS:

21  Q.  Doctor, you would agree with me that filling out a

22  certificate, a death certificate -- have you ever filled out a

23  death certificate before?

24  A.  I did on more than one --

25  Q.  You know that is something that is required by law?

Hazem Ashhab - Cross (Lewis)                    800

1    A.  Yes.

2    Q.  It is supposed to be accurate, truthful?

3    A.  Yes.

4    Q.  Okay.  And you know Dr. Abdelgaber filled this out for

5    Mrs. Knight?

6    A.  Yes.

7    Q.  Okay.  And if we look in the center, the doctor has to

8    indicate what the immediate cause was --

9    A.  Yes.

10   Q.  -- right?

11       And, again, this isn't something that was covered during

12   Dr. Abdelgaber's deposition.  You probably haven't -- have you

13   seen this document before?

14   A.  I'm not sure.

15   Q.  Okay.  You see that Dr. Abdelgaber -- that was her

16   treating physician at the time, right

17   A.  Yes.

18   Q.  Okay.  And he indicates cardiopulmonary arrest.

19       Do you know what that is?

20   A.  Yes.

21   Q.  That's a heart attack, right?

22   A.  The second one is the heart attack.

23   Q.  Okay.  Cardiopulmonary arrest?

24   A.  Is when both the heart and the lungs stop.

25   Q.  And due to or as a consequence of acute myocardio

Hazem Ashhab - Cross (Lewis)                                    801

1   infarction, that's a heart attack?

2   A.  Yes.

3   Q.  And then it also indicates coronary artery disease,

4   something that Mrs. Knight unfortunately had been struggling

5   with for a number of years, correct?

6   A.  Yes.

7   Q.  And what's that last --

8   A.  Hyperlipidemia.

9   Q.  What is that?

10  A.  I think this is just a comorbid condition he listed.  It

11  is when your triglycerides or lipids and cholesterol is

12  elevated.

13  Q.  And you see that other significant conditions attributing

14  to death are listed even below that, right?

15  A.  Yes.

16  Q.  And it doesn't appear to have any kind of a limit on how

17  many can be listed there, right?

18  A.  No.  You can list as many as you want.

19  Q.  And he lists four of them, right?

20  A.  Yes.

21  Q.  CHF, do you know what that stands for?

22  A.  Yeah, congestive heart failure.

23  Q.  HTN, hypertension?

24  A.  Yes.

25  Q.  CKD, chronic kidney disease?

Hazem Ashhab - Cross (Lewis)                    802

1    A.  Kidney disease, correct.

2    Q.  And dementia?

3    A.  Yes, sir.

4    Q.  Dr. Abdelgaber doesn't mention a GI bleed or Pradaxa in

5    any way, does he?

6    A.  Not in this certificate, he does not.

7           MR. LEWIS:  I'm finished with that.  I just have,

8    like, five or ten minutes left.

9           Doctor, I just want to ask you about warnings, which

10   is something that you covered in your direct examination.

11   Q.  You've reviewed the Pradaxa label, correct?

12   A.  Correct, sir.

13   Q.  Okay.  And you know that the decisions to put Mrs. Knight

14   on triple therapy after the stent procedure were made in April

15   of 2013, right?

16   A.  Yes.

17   Q.  By physicians other than Dr. MacFarland --

18   A.  Yes.

19   Q.  -- right?

20          And those physicians had to make that difficult decision

21   as to whether and how much blood thinner to put Mrs. Knight on

22   after her stent procedure, right?

23   A.  Yes.

24   Q.  That was a very difficult choice?

25   A.  Yes.

Hazem Ashhab - Cross (Lewis)                803

1   Q.  Okay.  Sometimes there's no easy answer to some of these

2   difficult choices on risks and benefits?

3   A.  Correct.

4           MR. LEWIS:  I don't think 5889 has been admitted, but

5   that is our label from April of 2013.

6           MR. CHILDERS:  No objection.

7           THE COURT:  It's admitted.

8       (DEFENDANT'S EXHIBIT 5889 ADMITTED INTO EVIDENCE.)

9   BY MR. LEWIS:

10  Q.  So you've reviewed the label for physicians, like the

11  physicians who would be prescribing triple therapy in April of

12  2013, for Pradaxa, haven't you?

13  A.  Yes.

14  Q.  Okay.  And there's no question about it in the Warnings

15  and Precautions, the physicians are well aware and made aware

16  that there is a serious risk of bleeding, correct?

17  A.  Correct.

18  Q.  Okay.  And there's no question that for those physicians

19  making that difficult decision in April of 2013, under Drug

20  Interactions right on the front page:  P-gp inhibitors in

21  patients with severe renal impairment, Pradaxa use is not

22  recommended.

23      It's right there on the first page, right, Doctor?

24  A.  Was that present at the time she was prescribed the

25  medicine?

Hazem Ashhab - Cross (Lewis)                    804

1    Q.  I'm talking about in April of 2013.

2        April of 2013, this is --

3            THE COURT:  He's referring to tab 5889.

4            MR. LEWIS:  You see it was revised --

5            THE COURT:  It's in the notebook.

6            THE WITNESS:  I see.  And at that time it was, yes.

7    BY MR. LEWIS:

8    Q.  In April of 2013, those physicians who had to make the

9    decision to put Mrs. Knight on triple therapy after the stent

10   procedure, they're going to have this label in April of 2013,

11   right?

12   A.  Yes.

13   Q.  And you would agree that they should have read it, right?

14   A.  Yes.

15   Q.  And a good doctor will read the label periodically, right?

16   A.  This label has changed.  I think that's the problem here.

17   Because if you read it one time, you may not know that it was

18   changed if nobody told you.

19   Q.  Doctor, you see that this was a label that was in

20   existence at the time that Mrs. Knight was prescribed Pradaxa

21   in April of 2013, correct?

22   A.  Correct.

23   Q.  All right.  And you see that -- you would agree with me

24   that a good doctor will review labels for medications on

25   occasion, right?

Hazem Ashhab - Cross (Lewis)                                    805

1    A.  Correct.

2    Q.  Okay.  And right there on the front page, it says recent

3    major changes.  Right on the first page, right?

4    A.  Correct.

5    Q.  Okay.  And this label right on the first page:  P-gp

6    inhibitors in patients with severe renal impairment, Pradaxa

7    cannot be recommended, correct?

8    A.  Correct.

9    Q.  Okay.  And you would agree with me that a physician who is

10   prescribing Pradaxa in April of 2013, who read this label,

11   would know about that risk, correct?

12   A.  I would assume so.

13   Q.  Okay.  And you also agree with me that sometimes doctors

14   have to make difficult choices to prescribe medication in the

15   face of risk, right?

16   A.  Correct.

17   Q.  To avoid other risks, right?

18   A.  Correct.

19   Q.  And you don't have any criticism, do you, of the doctors

20   who had to prescribe Mrs. Knight triple therapy in 2013?

21   A.  Actually I do.

22   Q.  Okay.  You don't think they should have put her on triple

23   therapy?

24   A.  The record actually has a little bit of contradiction.  On

25   one side, they said she had a heart attack, but then they go

Hazem Ashhab - Cross (Lewis)                    806

1    ahead and say we don't want to give her the Plavix, but then

2    the death certificate says she died of a heart attack.  If you

3    add all these together, it doesn't add up.

4        So I think there is -- I have a couple of issues with

5    that.  If you believe she has a heart attack, and that's the

6    imminent risk for her, then you should keep Plavix and maybe

7    stop Pradaxa.  But that's not what they did, and they said

8    because of fear of GI bleeding.  But then they say she had

9    elevated troponin.  So I'm a little concerned about that.

10   Q.  You would agree with me that the decision that the

11   physicians had to make in April of 2013 was a difficult one?

12   A.  I agree with that.

13   Q.  Mrs. Knight had serious risks of blood clots, stroke and

14   heart disease, correct?

15   A.  Correct.

16   Q.  And she also had a history of bleeding and anemia,

17   correct?

18   A.  Correct.

19   Q.  Okay.  And so the decision on what medications to put her

20   on and how much was a difficult one, correct?

21   A.  It was.

22   Q.  Okay.  But there's no question in your mind that those

23   physicians should have been aware that there's a risk of

24   bleeding when those medications were prescribed, correct?

25   A.  Correct.

Hazem Ashhab - Cross (Lewis)                              807

1   Q.  Okay.  And in fact, if we go to 5889-12, there's a

2   Medication Guide for Pradaxa, and this is for the patients.

3       And this is also received by those physicians, correct,

4   5889?

5   A.  Yes, the Medication Guide for Pradaxa.

6   Q.  Right.

7       And Medication Guides are received by physicians, correct?

8   A.  Correct.

9   Q.  Okay.  And if you look down, scroll down to you may have a

10  higher risk --

11  A.  Yes.

12  Q.  -- over 75 years old, that was something that Mrs. Knight

13  had a higher risk of bleeding --

14  A.  Yes.

15  Q.  -- correct?

16      Kidney problems, a higher risk of bleeding, correct?

17  A.  Yes.

18  Q.  And specifically mentions on the fifth bullet point down

19  Plavix --

20  A.  Yes.

21  Q.  -- correct?

22  A.  Correct.

23  Q.  And so the very risk that is contained in this warning

24  document to physicians and patients occurred with Mrs. Knight,

25  correct?

Hazem Ashhab - Redirect (Childers)                808

1    A.   Correct.

2            MR. LEWIS:  That's all I have at this time, Your

3    Honor.

4        (Defense counsel conferring.)

5            MR. LEWIS:  Your Honor, actually my co-counsel

6    indicated that I haven't moved in 9005A, and so I move for the

7    admission.  It's a medical record subset, and I apologize for

8    that.

9            THE COURT:  Any objection?

10           MR. CHILDERS:  Not if it's a medical record, Your

11   Honor.

12           THE COURT:  It's admitted.

13           MR. LEWIS:  Thank you.

14       (DEFENDANT'S EXHIBIT 9005A ADMITTED INTO EVIDENCE.)

15           THE COURT:  All right.

16                      REDIRECT EXAMINATION

17   BY MR. CHILDERS:

18   Q.   Doctor, I'm going to move up here because I'm going to use

19   the Elmo to ask you some questions, follow-up questions.

20       Okay?

21   A.   Okay.

22           MR. CHILDERS:  I'm sorry.  Neal knows how to use it,

23   and I don't.  Let me start with this before we get to the

24   Elmo.  I'm sorry.

25           Gina, could you pull up --

Hazem Ashhab - Redirect (Childers)                    809

1    Q.  So this is the label that you were just asked about, that

2    April of 2013 label, correct?

3    A.  Correct.

4    Q.  And it says that patients on P-gp inhibitors with severe

5    renal impairment, Pradaxa use not recommended.

6         Do you see that?

7    A.  Correct.

8    Q.  And then it tells the physician Section 7 is where they

9    can go look to get more information, right?

10   A.  Yes.

11        MR. CHILDERS:  Could you take us to Section 7, Gina.

12   Blow that up.

13   Q.  Tell the jury where it says Coreg or carvedilol in this

14   section.

15   A.  I don't think it is present.

16   Q.  Again, you told us earlier Coreg is a common medication

17   for atrial fibrillation patients?

18   A.  Yes, it is.

19   Q.  And you told us about it being a P-gp inhibitor.

20        So my question to you is, did you know it was a P-gp

21   inhibitor before you looked into it for this case?

22   A.  Not really.

23   Q.  How many P-gp inhibitors are there?

24   A.  Oh, a lot, a long list of them.

25   Q.  Dozens and maybe more?

Hazem Ashhab - Redirect (Childers)                    810

1   A.  I can only remember the ones that I prescribed in my

2   medical practice, including the proton pump inhibitors, like

3   your Prilosec and Prevacid, because I prescribe those.  I know

4   about a couple of antibiotics because I run into those

5   commonly.  But there's a lot of others I didn't even know

6   about until I read this case.

7   Q.  Coreg being one of them?

8   A.  Yes.

9   Q.  Okay.  And if there's a medication that you know is often

10  given to a patient population who's going to take a medicine

11  like Pradaxa, do you expect as a physician that the drug

12  company is going to tell you if there's an interaction with

13  that drug?

14  A.  Yes.

15  Q.  Okay.  And in this label, does the word Coreg appear

16  anywhere?

17  A.  I don't see it.

18  Q.  Does the word -- and carvedilol is the chemical name for

19  it, the generic name?

20  A.  Yeah.  I don't see it here.

21  Q.  That's not in there either, right?

22  A.  No.

23  Q.  Okay.  Doctor, have you misrepresented anything to this

24  jury?

25  A.  No, not to my knowledge.

Hazem Ashhab - Redirect (Childers)                811

1   Q.  And do you agree with me it wouldn't be fair for counsel

2   to misrepresent anything to this jury either, would it?

3   A.  That's a question better addressed to him.

4   Q.  I'm sorry?

5   A.  That is a question to him.  It's not good to misrepresent

6   anything in this courtroom, I believe.

7   Q.  You swore to tell the truth.  You swore an oath, right?

8   A.  Yes.

9   Q.  And do you understand the lawyers here, we do that every

10  day when we walk into court, we have to tell the truth?

11      You understand that?

12  A.  Yes.

13  Q.  Okay.  This chart that Mr. Lewis showed you, he said look

14  at all of these aPTT readings from when Mrs. Knight, Betty

15  Knight was on warfarin.

16      Do you remember that?

17  A.  Correct.

18  Q.  Let me show what those readings actually are.  Okay?

19      I'm going to save the first one for last.  The first one

20  says April 9th, 2009.  I'm going to save that for last.  I'm

21  going to start with September 16th, 2010.

22      He said the aPTT test was 51.  Do you see that on here?

23  A.  Yes.

24  Q.  And the jury was told that in opening statement, too.

25      Remember he told you that?

Hazem Ashhab - Redirect (Childers)                  812

1    A.  Yes.

2    Q.  All right.  Let's look at that record.

3        Doctor, is aPTT even measured on this test -- on this

4    sheet?

5    A.  No.  That's a pro time INR measurement.

6    Q.  That is not an aPTT test, is it?

7    A.  No, these are two different things.

8    Q.  The PT is part of the INR test, correct?

9    A.  The INR is a reflection of the pro time, and this is what

10   we use to monitor for patients who are on coumadin.  The aPTT

11   is not used to monitor people on coumadin.

12   Q.  Okay.  Let me show you -- I'll show you again this chart.

13       So the next one that he told you had an aPTT of 16.6 was

14   June 8th, 2011.  Do you see that?

15   A.  Yes.

16   Q.  Let's look at that record.

17       June 8th, 2011, do they measure the aPTT?

18   A.  I don't see it.  I see a pro time, PT.

19   Q.  And the PT is 16.6, the number that Mr. Lewis told this

20   jury was her aPTT reading, correct?

21   A.  No, these are two different things.

22   Q.  Right.

23       All right.  Let's look at the next one.  8/17/11, do you

24   see that the chart says her aPTT was 46.1 that day?

25   A.  Yes, I see it.

1   Q.  All right.  Let's look at that record.

2       46.1, is that the aPTT or the PT?

3   A.  I do not see an aPTT here.

4   Q.  Okay.  That's not the same test, is it?

5   A.  No, it's not.

6   Q.  Okay.  The next one, he says on 10/13 -- I may have missed

7   one.  On 10/13/2011 -- and I'll try to find this one that says

8   96.2.

9       It says the aPTT was 75.7.  Do you see that?

10  A.  Yes.

11  Q.  Let's look at the test.  It's not the test actually.  It's

12  a message from Dr. MacFarland's office.

13      What does she say was 75.7?

14  A.  The pro time.

15  Q.  Is that the same as the aPTT?

16  A.  They are different measurements.

17  Q.  Okay.  Now I said I was going to save the first one for

18  last, and there's a reason for that.

19      Do you see that on April 9th, 2009, it says the aPTT was

20  62 on this chart?

21  A.  Yes.

22  Q.  And you recall I think in your -- in the deposition of Dr.

23  Abdelgaber, do you remember he said she had an aPTT of 62 when

24  she was on Pradaxa when it was measured once, correct?

25  A.  Yes.

Hazem Ashhab - Redirect (Childers)                814

1   Q.  All right.  Let's look at that record.

2       Now on this one, they actually did measure her aPTT.  Do

3   you see that?

4   A.  Yes.

5   Q.  And it was 62, right?

6   A.  Yes.

7   Q.  What was her INR that day?

8   A.  4.3.

9   Q.  Was she over-anticoagulated that day, Doctor?

10  A.  Yes.

11  Q.  That's a clear sign to you that she was

12  over-anticoagulated because of the INR, right?

13  A.  By all measures.

14  Q.  There's no question about that?

15  A.  That's true.

16  Q.  And her aPTT was 62 that day, correct?

17  A.  Yes.

18  Q.  I'm going to show you the demonstrative -- not

19  demonstrative, I'm sorry -- this chart that Mr. Lewis showed

20  you.

21      Do you recall that?

22  A.  Yes.

23  Q.  And he asked you didn't her INRs fluctuate during this

24  time period, correct?

25  A.  Yes.

Hazem Ashhab - Redirect (Childers)                815

1   Q.  Did Betty have a bleed at any point during this time

2   period?

3   A.  Not that was documented, no.

4   Q.  And I'm going to get to that in a minute.

5       Did she have a stroke at any point during this time

6   period?

7   A.  No.

8   Q.  Does INR fluctuation somehow make Pradaxa an appropriate

9   medication for a patient with severe renal impairment who is

10  also taking a P-gp inhibitor?

11  A.  That is not enough reason to switch.

12  Q.  When Dr. MacFarland actually switched Betty to Pradaxa,

13  did the label tell her don't give this medicine to a patient

14  who has severe renal impairment and is taking a P-gp

15  inhibitor?

16  A.  No.  It was not in the label at that time.  It was added

17  on later.

18  Q.  Did the label ever tell physicians Coreg is a P-gp

19  inhibitor?

20  A.  It does not.

21  Q.  I want to show you about the chronic bleed again.  This is

22  is the record you were shown from Dr. Gunnalaugsson from

23  December 5th, 2008.

24      Can you see that?

25  A.  Yes.

Hazem Ashhab - Redirect (Childers)                    816

1   Q.  That's after the hospitalization where the warfarin was

2   stopped, correct?

3       Wasn't that in November?  I'm sorry, Doctor.

4   A.  I believe so, yes.

5   Q.  Okay.  And he says that it was stopped because of a

6   chronic bleed.

7       You looked at all of the records themselves, and we went

8   through them with the jury, correct?

9   A.  Yes.

10  Q.  Was there any evidence on the record of anyone actually

11  seeing a bleed?

12  A.  No.  It was assumed --

13  Q.  And we --

14  A.  -- but not documented.  Nobody found bleeding at that

15  time.

16  Q.  Okay.  Let's show you what was shown right early on in

17  your testimony on cross.

18      This was the coumadin label.  Do you remember that?

19  A.  Yes.

20  Q.  And Mr. Lewis asked you, isn't it true that the bleed

21  warning is in this box up front?  Do you remember that?

22  A.  Correct.

23  Q.  And I think he asked you, isn't that a good warning.

24      Do you recall that?

25  A.  Yes.

Hazem Ashhab - Redirect (Childers)                817

1  Q.  Wouldn't that be a good warning for Pradaxa to have to

2  tell doctors that there's a serious, serious risk here and

3  draw it right to their attention right at the top?

4  A.  I believe so.

5  Q.  Does it --

6  A.  It should be.

7  Q.  Does it have a warning like that?

8  A.  Not in there.  Not in their information, it does not.

9  Q.  Okay.  I want to ask you about when Betty was switched

10  from warfarin to Pradaxa.  Okay?  I'm going to show you these

11  records that were in the binder that you have up there.

12      The first one was where Rick actually called the office,

13  and I think we saw this during Dr. MacFarland's deposition,

14  saying, hey, I'd like to talk to you about a new drug to

15  replace coumadin.

16      Do you recall that?

17  A.  Yes.

18  Q.  Okay.  And that was on the 17th of October 2011.

19      Do you see that?

20  A.  Yes.

21  Q.  And then it says:  We want to talk before we come in

22  today.  They're coming in at 3:00 today for an appointment.

23      Do you see that?

24  A.  Yes.

25  Q.  And then we have the record you were shown from that

Hazem Ashhab - Redirect (Childers)                818

1   actual appointment, right?

2   A.  Yes.

3   Q.  The same day, 10/17/11?

4   A.  Yes.

5   Q.  Where it says want to replace coumadin with new med

6   Pradaxa, is that under the Chief Complaint section of the

7   record?

8       Do you see that just above --

9   A.  Yes.

10  Q.  And then --

11  A.  Want to replace coumadin.

12  Q.  It says sleeps all the time.  Do you see that?

13  A.  Yes.

14  Q.  The chief complaint section, is that information the

15  patient gives to the doctor or is that information the doctor

16  is giving to the patient when you write the chief complaint?

17  A.  It's what the patient tells us.

18  Q.  Okay.  And what does this tell you -- tell us that the

19  patient said she wanted to replace coumadin with?

20  A.  That's what it said.

21  Q.  With what?

22  A.  With Pradaxa.

23  Q.  Specifically asked for Pradaxa?

24  A.  Yes.

25  Q.  Let me show you this express scrips that we were shown,

Hazem Ashhab - Redirect (Childers)                819

1    too, where it was the authorization form for Betty to get

2    Pradaxa.

3        Do you recall that?

4    A.  Yes.

5    Q.  And as a doctor, you know that sometimes when you

6    prescribe a medication, it's not going to be covered, and so

7    you have to fill out a form to tell the company why you want

8    it for that particular patient?

9    A.  Yes.

10   Q.  At the time that -- this is dated October 18th, 2011.

11       At the time that this was written and sent by Dr.

12   MacFarland, did the Pradaxa label tell her Pradaxa was not an

13   appropriate medication for a patient with severe renal

14   impairment who was taking Coreg?

15   A.  Not at that time, no.

16   Q.  Okay.  If a doctor -- you as a doctor, if you were to fill

17   out one of these forms that said my patient wants to switch

18   medicine because they say a TV ad, do you expect that the

19   insurance company is going to cover it for that reason?

20   A.  No.

21   Q.  All right.  Let me show you the Gunnalaugsson record that

22   you were asked about there at the end.

23       Notes that she had been hospitalized with severe anemia

24   due to GI bleed, right?

25   A.  Yes.

Hazem Ashhab - Redirect (Childers)                820

1   Q.  And then it says she was eventually surprisingly put back

2   on Pradaxa.  Do you see that?

3   A.  Yes.

4   Q.  Is that a surprise -- does that surprise you, too?

5   A.  Yes.  If they assumed there was a GI bleed or they proved

6   there was a GI bleed, then they shouldn't have put it.

7   Q.  And does this tell you what he thought about that?

8       What does it tell you about what he thought about her

9   being back on Pradaxa when he says surprisingly?

10  A.  He said something about the Plavix, which probably

11  triggered her bleeding.

12  Q.  And that's what I wanted to ask you next.

13      Triggering the bleed, you don't dispute that Plavix could

14  have triggered the bleed, right?

15  A.  Could be Plavix or aspirin, either one.

16  Q.  Explain to the jury why you think Pradaxa was the most

17  substantial factor in the bleed and the extent of the bleed

18  and the damage it did to Betty.

19  A.  Anybody can bleed from trivial things.  You can cut

20  yourself when you are shaving or anything.  It's the issue of

21  what stops you or does not stop you from bleeding.

22      I think her blood was too thin than what she had any

23  reason to bleed whatsoever.  In this case, the AVM maybe

24  touched by the aspirin, then the bleeding would not stop.  You

25  open the faucet, and you cannot stop it because the plug is

Hazem Ashhab - Redirect (Childers)                821

1    the fibrin.  To make a clot, you need thrombin and fibrin.

2    Well, guess what, the Pradaxa prevents you from making that

3    clot because it inhibits the thrombin.

4        So you have got a faucet that is oozing.  Now it's

5    bleeding, it is wide open, and you need a plug.  Well, the

6    plug is made of fibrin and thrombin, and Pradaxa prevents

7    those from working.  So the blood is too thin to make the plug

8    to stop the bleeding.

9        You can trigger the bleeding by anything, but the body has

10   mechanisms to stop bleeding.  In this case, she had Pradaxa

11   which prevents the body from making the clot or the plug to

12   stop that faucet that is bleeding.  So that's the difference.

13       MR. CHILDERS:  Could we go back to the label, Exhibit

14   No. 88, which was the 2012 label.  Page 4, if you could.

15       THE WITNESS:  Is that in your folder or --

16       MR. CHILDERS:  That's my fault, not yours.

17       Oh, I'm sorry.  It's in my folder, yes.

18       THE WITNESS:  Your folder.  Okay.  And direct me to

19   that page again.  I'm sorry.

20       MR. CHILDERS:  Exhibit 88, page 4.  This is the

21   Pradaxa label.

22       If you could blow up the very first sentence at the

23   top, Gina.  I'm sorry.  The first two sentences.  Highlight

24   that second sentence for me.

25   Q.  You had told the jury you thought that Betty Knight likely

Hazem Ashhab - Redirect (Childers)                     822

1   would not have had a bleed or at least a bleed to the extent

2   she did if she had been on warfarin.

3       Do you remember that?

4   A.  Yes, I do.

5   Q.  Okay.  I want to show you in the label -- do you see here

6   where it says:  There is a higher rate of major

7   gastrointestinal bleeds in patients receiving Pradaxa 150

8   milligrams than in patients receiving warfarin.  And then it

9   says 1.6 versus 1.1.

10      Do you see that?

11  A.  Yes.

12  Q.  Okay.  How does that play into your opinion about whether

13  or not she would have had a bleed like this on warfarin?

14  A.  I believe it would not have been life-threatening like it

15  was.

16  Q.  And how does this particular information, ah, feed into

17  your --

18  A.  That supports my opinion that there is higher incidence of

19  GI bleeding, gastrointestinal bleeding with Pradaxa compared

20  with warfarin.

21      In this particular case, we know that she was on warfarin

22  for years.  We know that even if she bled, it would minimum

23  ooze, never had a life-threatening condition where her

24  hemoglobin dropped down to 6.

25      So I have the data that supports my opinion that it is

Hazem Ashhab - Redirect (Childers)                    823

1    more likely to bleed with Pradaxa than coumadin.  From her own

2    history as a patient, she was on coumadin for years.  She did

3    not have any life-threatening bleeding.  She never had

4    documented bleeding.  With Pradaxa, her bleeding almost led to

5    her demise when her hemoglobin dropped to 6.

6         So that supports my opinion.

7    Q.  Can you remind the jury what organs filter Pradaxa out of

8    your body?

9    A.  It is cleared by the kidneys.  So when you have kidney

10   failure or your kidneys are not working well, then you don't

11   clear the medication out of your system as fast.

12   Q.  And warfarin, is that cleared through the kidneys or a

13   different organ?

14   A.  Usually it is metabolized in the liver.

15   Q.  Okay.  So if you have a patient who has kidney problems,

16   does that affect their warfarin level like it does with

17   Pradaxa?

18   A.  No.  Usually it will affect Pradaxa more.

19   Q.  The jury heard, and you read, Dr. MacFarland's deposition.

20   They heard it this morning when she said that Betty would get

21   dehydrated sometimes, and that would cause her kidney function

22   to go down.

23        Do you recall reading that?

24   A.  Yes.

25   Q.  How is that significant as it relates to her using Pradaxa

Hazem Ashhab - Redirect (Childers)                    824

1   as an anticoagulant versus warfarin?

2   A.  Well, it will affect it, and it will cause a fluctuation

3   in the level simply because we rely, as physicians, on certain

4   measurements to tell you how well your kidney is working.  And

5   that blood measurement reflects the function of your kidney at

6   that point in time when the blood test was done.  So if you

7   are a sick person like Mrs. Knight, and you have multiple

8   medical problems and episodes of dehydration, then your

9   kidneys could have been a lot worse than they are when you

10  came to the doctor.

11      Because usually when you come to the doctor for a routine

12  visit, you probably will get dressed and have breakfast and

13  drink.  Maybe on a different day, your actual creatinine

14  clearance will be even much worse, and you will not know it.

15  So that fluctuation will lead to a fluctuation in the

16  medication level and the degree of anticoagulation or

17  over-anticoagulation.

18      It could happen anytime between doctor visit and you not

19  knowing about it --

20  Q.  Anytime --

21  A.  -- because you really don't have a way of measuring it.

22  Q.  Anytime her kidney function decreased because she was

23  dehydrated, what would you expect to happen to her Pradaxa

24  level?

25  A.  Probably went up.

Hazem Ashhab - Redirect (Childers)                825

1    Q.  Okay.  And that's based on science, right?

2    A.  Yes.  Because that's how the medication is cleared out of

3    your system.

4    Q.  Are all anticoagulant medications appropriate for all

5    patients?

6    A.  No.

7    Q.  Pradaxa has been on the market now for almost eight years,

8    right?

9    A.  Yes.

10   Q.  So have all of the anticoagulant patients switched to

11   Pradaxa from warfarin?

12   A.  No.

13   Q.  Well, why is that?  Why would patients still use warfarin

14   if they had Pradaxa available?

15   A.  Because of the problems we have been discussing.  There

16   are a certain patient population where Pradaxa or other

17   anticoagulants are not suitable for them.  They may have more

18   side effects than they will have with coumadin.  So it's not

19   for everybody.

20   Q.  You were asked about the Medication Guide.  Do you

21   remember that on cross?

22   A.  Yes.

23   Q.  I didn't ask you about it on your direct exam, but I want

24   to ask you about it now since it was brought out in

25   cross-examination.

Hazem Ashhab - Redirect (Childers)                    826

1    You read the Medication Guide that Betty and her family

2    received, right?  You read it?

3    A.  Yes.

4    Q.  Did it tell them that Pradaxa hadn't been tested in

5    patients like Betty?

6    A.  No, it does not say that.

7    Q.  Did it tell them that that dose had never been tested?

8    A.  It does not.

9    Q.  Did it tell them don't take Pradaxa if you take Coreg?

10   A.  It does not.

11   Q.  Did it tell them don't take Pradaxa if you take any P-gp

12   inhibitor?

13   A.  It does not.

14   Q.  Did it tell them that there was no reversal agent for

15   Pradaxa?

16   A.  If does not.

17   Q.  Did it tell them that Betty was more likely to have a GI

18   bleed on Pradaxa than she was on warfarin that she had already

19   been on?

20   A.  I don't believe they told her that.

21        MR. CHILDERS:  I don't have anything else, Your Honor.

22        MR. LEWIS:  May we approach?

23        THE COURT:  Yes.

24    (Bench conference, reported.)

25        MR. LEWIS:  Maybe I opened the door, but he directly

Hazem Ashhab - Redirect (Childers)                827

1    violated the Court's ruling on the 75 and not tested and not

2    in the Medication Guide.  I didn't ask him about that on his

3    cross-exam.  I asked him specific things about the Medication

4    Guide.  I never touched that 75 or that renal function, never

5    touched it.  I think he violated the motion in limine.

6            MR. CHILDERS:  He opened the door, Your Honor.

7            THE COURT:  How is that?

8            MR. CHILDERS:  I didn't talk about the Medication

9    Guide at all.  What he said was this is information that not

10   only the doctors have, but also the patients have and went

11   through specific items that are listed in there.  And I think

12   we have a right to say, but things are not listed in there

13   when he does that on cross-exam.

14           MR. LEWIS:  The reason he can't offer those opinions

15   doesn't change just because I covered that with him.  Because

16   he did offer opinions about the Medication Guide and the

17   physician label in his report.  It was all about risk of

18   bleed -- everything that I covered was about risk of bleed and

19   increased risk of bleed.  I never touched on 75, and I never

20   touched renal function.

21           So I get to cross-examine him on the opinions he did

22   offer, but what I'm not allowed to do is try to cross-examine

23   him on the 75 or the renal function and then preclude it.  I

24   never touched that, Your Honor.

25           MR. CHILDERS:  May I?

Hazem Ashhab - Redirect (Childers)                828

1        THE COURT:  Yes.

2        MR. CHILDERS:  He didn't offer opinions on the

3    Medication Guide in his report or in his deposition.  He

4    opened the door on that.  We had this discussion before.

5        THE COURT:  He didn't open the door that you raised in

6    the motion, so I do think that you violated the order.  The

7    question is now what is the remedy you'd like to suggest to

8    the Court?

9        MR. LEWIS:  Can we give that some thought?  I mean,

10   it's already out.

11       THE COURT:  Are you finished with him?

12       MR. CHILDERS:  Yes.

13       MR. LEWIS:  I have very brief recross.

14       THE COURT:  So --

15       MR. LEWIS:  I don't want to touch it on recross.

16       THE COURT:  One option would be that the Court can

17   instruct the jury that to the extent what was commonly a

18   failure of the label to test the 75 dose or testing of

19   patients with severe renal problems, the expert is not

20   offering an opinion that the label is deficient based on that.

21   That's outside the scope of his opinions.

22       MR. LEWIS:  And they can't consider it.

23       MR. CHILDERS:  That's fine.

24       THE COURT:  Okay.

25       MR. LEWIS:  They can't consider it.

Hazem Ashhab - Redirect (Childers)                   829

1        THE COURT:  I don't want to say you can't -- yeah,

2    they might get confused.  You can't consider the fact even if

3    established by some other expert's opinion?

4        The point is to say this witness wasn't offering an

5    opinion that the label was deficient for failure to report in

6    the label the 75 dose testing or the testing on patients with

7    severe renal problems.

8        MR. LEWIS:  Okay.  The instruction works out.  You

9    need to put the flip chart away.

10       MR. CHILDERS:  Sure.

11       THE COURT:  All right.  So do you want me to give this

12   instruction first and then you're going to recross or after

13   you recross?

14       MR. LEWIS:  How about after recross?

15       THE COURT:  Okay.

16       MR. CHILDERS:  Thank you.

17    (Bench conference, concluded.)

18       THE COURT:  All right.  I think we're almost done with

19   this witness.  Are you folks okay for another five or ten

20   minutes to do that?

21       Okay.  Great.  That will save us time in the long run,

22   I believe.

23       All right.  Recross.

24       MR. LEWIS:  Yes, Your Honor, very briefly.

25       Thank you, Members of the Jury and Dr. Ashhab for

Hazem Ashhab - Recross (Lewis)                    830

1   hanging in there today.  I appreciate trying to get you

2   finished up.

3                      RECROSS-EXAMINATION

4   BY MR. LEWIS:

5   Q.  The first thing I need to do is stand corrected.  You

6   pointed out a mistake that I made in a slide that I created

7   last night before I examined you, and that was with respect to

8   the aPTT levels.  So I do want to cover the documents that you

9   covered with Mr. Childers, though, because I clearly misread

10  the medical records.

11       But I think I read something correctly, and I just want to

12  make sure that I get it correct.  Okay?

13  A.  Okay.

14       MR. LEWIS:  I'm going to go to 9009A.

15  Q.  And these are corresponding to those dates that you

16  covered with Mr. Childers on the PT levels.

17  A.  Yes, sir.

18  Q.  And the first one I want to cover is 179, 9009A-179.

19  A.  Yes.

20  Q.  Definitely there's a PT test.  That's not aPTT, right?

21  A.  Yes.

22  Q.  A different test.

23       But there is an INR reading?

24  A.  Yes.

25  Q.  And the INR reading is elevated, correct?

1   A.  Correct.

2   Q.  Okay.

3       (Off the record.)

4   BY MR. LEWIS:

5   Q.  That's elevated.  That's a higher risk of bleed at that

6   time?

7   A.  Correct.

8   Q.  Okay.  If we go to 9009-206, that was another one

9   mentioned on that slide.

10  A.  Correct.

11  Q.  There we do have an aPTT level at 62, right?

12  A.  Yes.

13  Q.  That's elevated, correct?

14  A.  Yes.

15  Q.  And if you go down to the INR, that is 4.3.  That is

16  elevated, correct?

17  A.  Correct.

18  Q.  Okay.  If we go to -- the next one that I mentioned was in

19  383.  There's that PT again.  That is 75.7.

20      That's not aPTT, correct?

21  A.  One more time the page, please?

22  Q.  383.  Sorry.  Thank you, Doctor.

23  A.  Yes, sir.

24  Q.  Okay.  But the INR is elevated, and that is 6.3?

25  A.  Correct.

Hazem Ashhab - Recross (Lewis)                               832

1    Q.  Higher risk of bleed?

2    A.  Correct.

3    Q.  The next one is 389.

4        There is no aPTT test there, correct?

5    A.  Correct.

6    Q.  But there is an INR test.  That is at 8.0 on October 10,

7    2011.

8    A.  Correct.

9    Q.  That is significantly elevated, correct?

10   A.  Correct.

11   Q.  Okay.  The next one is 9009-451.  Again, not aPTT, my

12   mistake.  But there is an INR, and that is elevated again,

13   correct?

14   A.  Yes.

15   Q.  Okay.  And the last one is 461.  Again, no aPTT, my bad.

16   But the INR is measured, and that is elevated again, correct?

17   A.  Correct.

18   Q.  Okay.  I apologize for the mistake that I made in the

19   slide, but the records do reflect that on each of the

20   occasions that we've just discussed, Mrs. Knight was at a

21   higher risk of bleed because of her higher INR levels on

22   warfarin, correct?

23   A.  Correct.

24   Q.  Okay.  The last thing I want to discuss is the Pradaxa

25   physician label.  That is Exhibit 5889.

Hazem Ashhab - Recross (Lewis)                    833

1      And first of all, if you look at the Warnings and

2   Precautions, risk of bleeding is on the first page of the

3   physician label, correct?

4   A.   Correct.

5   Q.   Any physician who is prescribing anticoagulant medication

6   is going to understand there is a significant risk of bleeding

7   when prescribing that medication, right, Doctor?

8   A.   Correct.

9   Q.   Does it matter whether it's on the left side or the right

10  side on the first page of the physician label?

11  A.   No, but there is a box where something kind of attracts

12  your attention more.  So you pay attention if you see it

13  outlined or in bold.  But whether it is on the right or the

14  left, no.

15  Q.   On page 5889-04, there is -- this is a physician label.

16      By the way, do you read physician labels?

17  A.   I read them when it pertains to a certain patient's risk,

18  yes.

19  Q.   Right.

20      And do you sometimes read study results?

21  A.   I do.

22  Q.   Okay.  And do you take those into account when you're

23  prescribing medication for your patients?

24  A.   That's correct.

25  Q.   And you understand that some medications have higher risks

Hazem Ashhab - Recross (Lewis)                834

1   of one thing and lower risks of another?

2   A.  Correct.

3   Q.  And you, as a physician, have to take those -- the menu

4   unfortunately of risks that come with a medication and factor

5   that into your decision, right?

6   A.  Correct.

7   Q.  And then you also have to understand the benefits of a

8   particular medication, right?

9   A.  Correct.

10  Q.  Okay.  And you know that BI, Boehringer ran a clinical

11  trial called the RE-LY study that is reflected in this label,

12  right?

13  A.  Yes.

14  Q.  And that study did reflect, as indicated here, there was a

15  higher rate -- right under the chart, the second paragraph --

16  there was a higher rate of major gastrointestinal bleeds in

17  patients receiving Pradaxa.

18      That's the higher dose, the 150, right?

19  A.  Yes.

20  Q.  That is right in the physician label, right?

21  A.  Yes.

22  Q.  There are no secrets here.

23      Boehringer is telling physicians, in our trial, we did

24  have a higher rate of major gastrointestinal bleeds, correct?

25  A.  Yes.

Hazem Ashhab - Recross (Lewis)                    835

1   Q.  That's what they should be telling physicians if that is

2   what the data shows, correct?

3   A.  Correct.

4   Q.  But you also know that in that same chart that is just

5   above there, Pradaxa performed better in a different type of

6   risk, correct?

7   A.  Correct.

8   Q.  Do you know what a brain bleed is?

9   A.  Yes.

10  Q.  And that's what is referred to when it's intracranial

11  hemorrhage?

12  A.  Yes.

13  Q.  Okay.  You see Pradaxa had a lower risk of that particular

14  complication, right?

15  A.  Yes.

16  Q.  And brain bleeds or intracranial hemorrhages can be very,

17  very serious complications, too, right?

18  A.  Yes.

19  Q.  So these physicians have to make this choice, well, I've

20  got a lower risk of a brain bleed, but maybe a higher risk of

21  a GI bleed.

22      Those are the choices that physicians have to make when

23  they are assessing an individual patient, right?

24  A.  Correct.

25  Q.  And one physician may choose to avoid the brain bleed and

Hazem Ashhab - Recross (Lewis)                    836

1   take the high risk of a gastrointestinal bleed, correct?

2   A.  Depending on the clinical scenario, and each particular

3   patient is unique.

4   Q.  Right.

5       And if we look at 5889-08, you also know, don't you, that

6   that RE-LY study, as this chart reflects, showed that Pradaxa

7   had a lower risk of stroke events as compared to warfarin in

8   that trial, right?

9   A.  Yes.

10  Q.  That's a benefit, right?

11  A.  Yes.

12  Q.  So when we look at the full menu of risks and benefits,

13  we've got three things to consider at least, right?  We've got

14  to consider that in the trial Pradaxa offered better stroke

15  protection, correct?

16  A.  Yes.

17  Q.  Better avoidance of risk of brain bleed, correct?

18  A.  Yes.

19  Q.  But at a higher risk of GI bleed, correct?

20  A.  Correct.

21  Q.  And so the physician has to balance those things, among

22  others, when prescribing Pradaxa to a patient, correct?

23  A.  In general.

24  Q.  Okay.  In general?

25  A.  For Mrs. Knight, it was the wrong drug to start with.

Hazem Ashhab - Recross (Lewis)                          837

1    Q.   Understood.

2         But her physicians might have chosen -- we know this.

3         We know that she didn't have a stroke while she was on

4    Pradaxa, correct?

5    A.   Correct.

6    Q.   We know that she didn't a brain breed while she was on

7    Pradaxa, correct?

8    A.   Correct.

9    Q.   And those things could have been way more important to her

10   physicians than the GI bleed risk, correct?

11   A.   But that's not what the case turned out to be.

12   Q.   Understood.

13   A.   That's the problem.  It's -- what you're talking about

14   here is all correct for the general population, maybe for the

15   majority of the population.  The problem we face here with

16   Mrs. Knight is she's in that minority of population who has

17   multiple medical problems, kidneys are not working properly,

18   taking medications that interfere with the medicine.  So she

19   is, in my opinion, the wrong patient to take that medication.

20        I'm not saying the medication is a bad medication.  It's a

21   very good medication, but I think it was given to the wrong

22   person.  I think there ought to be something to tell the

23   physician don't give this drug to this patient.

24        It is probably good for the next person, the next ten

25   people after Mrs. Knight.  But for her, I think it was the

Hazem Ashhab - Recross (Lewis)                              838

1    wrong medicine, and I think the doctors were not fully

2    informed that they shouldn't have given her the medicine.

3    That's all what I'm trying to say.

4    Q.   Doctor, yes or no, Mrs. Knight's physicians could have

5    chosen to take the risk of the GI bleed to get the benefits of

6    better stroke protection and the avoidance of a brain bleed.

7        That's a choice that her physicians might have made,

8    correct?  Yes or no?

9    A.   The issue is I don't know if they were fully informed

10   about these risks.

11       I mean, we're not really comparing apples with apples here

12   because the risk of stroke in atrial fibrillation is less than

13   5 percent anyway.  But the risk of bleeding may be a lot more

14   in somebody with poor creatinine clearance who takes Coreg.

15   So it's not comparing apples with apples and saying it's a

16   bleed in the brain or in the colon.  No, the likelihood of

17   having that event is very different.

18       So you're trying to prevent a stroke.  Well, what are the

19   chances of getting a stroke in an AFib patient?  It's 2 to 3

20   percent, less than 5 percent anyway.

21   Q.   Can you answer my question, Doctor?

22   A.   Yes, sir.

23   Q.   Okay.  I'll give it another run.

24       Mrs. Knight's physicians, when choosing to put her on

25   Pradaxa in April of 2013 and combine it with Plavix and

1   aspirin, could have been choosing to avoid the risk of brain

2   bleed, get the benefit of stroke protection and take on the

3   risk of gastrointestinal bleeding?  That's the choice that

4   they could have made at that time, correct?

5   A.  They could have.

6   Q.  Okay.  And isn't it true that you, in your practice,

7   Doctor, don't make those type of risk-benefit decisions for

8   anticoagulant medication.

9        You don't prescribe anticoagulant medication, do you?

10  A.  But I do participate in these decisions.  When somebody

11  has GI bleeding, then I'm part of the team.  It's a

12  consultation between the cardiologist, the primary care

13  physician and the gastroenterologist to reach what you just

14  talked about, what is the best medicine for that person.

15  Q.  That's not my question.

16       You don't prescribe anticoagulant medication, and so you

17  don't make the ultimate risk and benefit determination for

18  those patients, correct?

19  A.  Partially correct.  I do not prescribe the medication, you

20  are correct.

21  Q.  Thank you, Doctor.

22  A.  I do contribute to the decision to prescribe.

23            MR. LEWIS:  Thank you for your time.

24            THE WITNESS:  Thank you.

25            THE COURT:  All right.  Any --

840

1          MR. CHILDERS:  Judge, can we see you one more time?

2          THE COURT:  Yes.

3       (Bench conference, reported.)

4          THE COURT:  So make sure you use the microphone.

5          MR. CHILDERS:  To address this issue with the testing,

6  he just went through the RE-LY study results with him that

7  don't include the 75 milligram or severe renal patients.

8  Right after we just had this discussion, and we agreed we were

9  going to give a limiting instruction, he went into trying to

10 convince the doctor to tell the jury that a patient is better

11 off on Pradaxa than warfarin when it hasn't been tested at

12 that dose.

13         MR. LEWIS:  No, he testified on redirect about the

14 gastrointestinal bleed increase.  He covered the very same

15 line that I just addressed with him, and my only rebuttal to

16 that was there's more than one risk to consider.  I never

17 talked about the dosage.

18         THE COURT:  Okay.  I agree with the defendant.

19         MR. CHILDERS:  Fair enough, Your Honor.  Thank you.

20         MR. LEWIS:  Thank you.

21      (Bench conference, concluded.)

22         THE COURT:  All right.  Doctor, that concludes your

23 testimony.  Thank you.  You may step down.

24         THE WITNESS:  Thank you.

25         THE COURT:  All right.  Ladies and Gentlemen, there's

1    one matter I need to instruct you concerning.

2         At the close of the redirect examination by

3    Mr. Childers, if you recall, he used the handwritten chart

4    that he had developed in his opening statement, and he walked

5    through that chart with Dr. Ashhab, asking him about opinions

6    with respect to the adequacy, the sufficiency of the label as

7    to each of those points.

8         An expert in a case is required to disclose opinions

9    in advance of trial, and the Court has determined here that

10   two of the opinions that he offered in that brief questioning

11   were not opinions that he had offered during the course of his

12   disclosures of his expert opinions.  So I want to give you an

13   instruction concerning those.

14        Specifically on that chart, it was noted in response

15   to plaintiffs' counsel's questions that there was, first, what

16   he considered a failure to include as a warning in the label

17   the fact that Pradaxa was not tested on people with severe

18   renal impairments.  Secondly, he also testified an opinion

19   that the label was inadequate because the testing was not done

20   on people taking -- in studies, on people taking 75-milligram

21   doses.

22        The Court would find and instruct that those were two

23   opinions that were outside of his disclosure.  To the extent

24   plaintiff is relying upon those as evidence of a defect, they

25   have to get that evidence from other witnesses besides Dr.

842

1    Ashhab.  Dr. Ashhab is not permitted to testify to those two

2    specific opinions because he didn't disclose them before.  If

3    the plaintiff make arguments about those alleged failures of

4    the label, they have to depend upon someone other than Dr.

5    Ashhab for that testimony.

6         Do counsel have any quarrel with the instruction that

7    I've given?

8         MR. CHILDERS:  No, Your Honor.

9         MR. LEWIS:  No, Your Honor.

10        THE COURT:  All right.  With that, Ladies and

11   Gentlemen, that concludes our work for today.  I'm going to

12   excuse you until 9:00 a.m. tomorrow.

13        Remember, as we have done throughout the trial, I'm

14   ordering that you not discuss the case with anyone or try to

15   do any investigation or look into any matters on your own.

16   With that, I'll see you back here at 9:00 a.m. tomorrow.

17        I do have one brief housekeeping measure to take up

18   with counsel.  If you can stick around, it will only take a

19   minute.  The jury is excused.

20        (Jury not present.)

21        THE COURT:  As the jury leaves, I want to clarify with

22   counsel a couple of the exhibits.

23        Mr. Lewis, you used in your examination an exhibit

24   that is the -- I don't remember if it has a number, but it's a

25   colored chart that shows the INR values up and down.  You said

843

1    that you were offering that chart into evidence under Rule

2    1006.  And then either in the exchange or in response to

3    Mr. Childers' objection, you said that you have an exhibit

4    which I've seen that purports to be a summary of all of the

5    medical records that include or are included in the INR

6    reporting history, and that has been marked as Exhibit 9009S.

7         MR. LEWIS:  Yes.

8         THE COURT:  And so as I understand the rule, I think

9    if counsel for the plaintiffs has no objection to the accuracy

10   of the 9009S chart, that it's admissible under 1006 as a chart

11   or summary based upon voluminous documents that can be

12   admitted into evidence to establish the contents of the

13   document.

14        And as I understood it, these are documents, medical

15   records that have been obtained through the certification

16   process and, as I understood it, disclosed to plaintiffs

17   beforehand.  If that's not the case, then we need to address

18   that.

19        But it seems to me that this chart and the

20   accompanying medical records may be admitted as one exhibit.

21   But I considered the first chart that you had to be a

22   demonstrative aid, which is not admitted into evidence.

23        MR. LEWIS:  Correct.

24        THE COURT:  So is that the way you offer and intend to

25   use these two different documents?

844

1        MR. LEWIS:  Yes.  The color chart is a demonstrative

2   only.  The more generic chart with the numbers in it was the

3   summary --

4        THE COURT:  Okay.

5        MR. LEWIS:  -- for admission.

6        THE COURT:  Right.  Okay.

7        MR. CHILDERS:  Thank you, Your Honor.

8        The only thing I would ask is we did get that, but it

9   was today.  I'm certain it's probably right.  If you would

10  just give us overnight to look at it --

11       THE COURT:  I'll withhold ruling on the admissibility

12  of 9009S until plaintiffs have had a chance to review the

13  underlying records.

14       MR. CHILDERS:  Thank you, Your Honor.

15       THE COURT:  In any event, the first chart you used is

16  a demonstrative aid only.

17       MR. LEWIS:  Correct.

18       THE COURT:  All right.  Thanks for clearing it up.

19       Is there anything else we need to take up today?

20       MR. CHILDERS:  We have many exhibits that came in

21  today, and we talked to Terry about doing those first thing in

22  the morning because it's a little late.

23       Is that --

24       THE COURT:  Sure.  That's fine.

25       MR. CHILDERS:  Thank you, Your Honor.

845

1            MR. LEWIS:  Thank you.

2            THE COURT:  See you back here at 9:00 a.m. tomorrow.

3            Let's try to start about five minutes early, if you

4    don't mind.  If we've got all of the jurors back here, we can

5    do the exhibits then.

6            MR. CHILDERS:  Yes.

7            THE COURT:  Thank you.

8            THE COURT SECURITY OFFICER:  All rise.  This honorable

9    court will be adjourned.

10               (Proceedings were adjourned at 5:34 p.m.)

11                        ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2           We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3    RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter as reported on October 9, 2018.

6

7

8    October 10, 2018          _____
     DATE

9

10   /s/ Kathy L. Swinhart  _____
     KATHY L. SWINHART, CSR

11

12   /s/ Lisa A. Cook_____  _____
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25