IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
        Plaintiffs,
vs.                                          No. 3:15-CV-06424

BOEHRINGER INGELHEIM                         Volume 5
PHARMACEUTICALS, INC.,                       Pages 846 through 959

        Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

WEDNESDAY, OCTOBER 10, 2018, 9:00 A.M.

---o0o---


For the Plaintiffs:     CHILDERS, SCHLUETER & SMITH
                        1932 North Druid Hills Road, Ste 100
                        Atlanta, Georgia  30319
                        BY:  C. ANDREW CHILDERS

                        URY & MOSKOW
                        883 Black Rock Turnpike
                        Fairfield, Connecticut 06825
                        BY:  NEAL L. MOSKOW

            (Appearances continued next page...)


Reported by:   KATHY L. SWINHART, CSR
               LISA A. COOK, RPR-RMR-CRR-FCRR
               Official Court Reporters
               (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                     APPEARANCES (Continued)

 2

 3     For the Plaintiffs:

 4                     FERRER, POIROT & WANSBROUGH
                       2100 RiverEdge Parkway, Suite 1025
 5                     Atlanta, Georgia  30328
                       BY:  RUSSELL ABNEY
 6                     and  HUNTER VANCE LINVILLE

 7

 8     For the Defendant:

 9                     TUCKER ELLIS
                       925 Euclid Avenue, Suite 1150
10                     Cleveland, Ohio  44115
                       BY:  JOHN Q. LEWIS
11

12                     COVINGTON & BURLING
                       One City Center
13                     850 Tenth Street NW
                       Washington, D.C.  20001
14                     BY:  PHYLLIS ALENE JONES
                       and  NICHOLAS HAILEY
15

16                     JACKSON KELLY
                       Post Office Box 553
17                     Charleston, West Virginia  25322
                       BY:  GRETCHEN M. CALLAS
18

19

20     Also Present:

21             CLAUDE R. KNIGHT, Plaintiff

22             CLAUDIA STEVENS, Plaintiff

23

24

25
```

1                                INDEX

2

3    PLAINTIFF'S WITNESSES:                          PAGE:

4

     MARTINA BRUECKMANN

5

     VIDEOTAPED DEPOSITION PLAYED                     854

6

7    CLAUDE R. KNIGHT

8    DIRECT EXAMINATION BY MR. CHILDERS               870
     CROSS-EXAMINATION BY MR. LEWIS                   916

9

10   CLAUDIA STEVENS

11   DIRECT EXAMINATION BY MR. CHILDERS               922
     CROSS-EXAMINATION BY MR. LEWIS                   940

12

13

     DEFENDANT'S WITNESSES:                          PAGE:

14

15   CHARLES HUH, M.D.

16   VIDEOTAPED DEPOSITION PLAYED                     950

17

18

19

20

21

22

23

24

25

846

```
 1              HUNTINGTON, WEST VIRGINIA

 2          WEDNESDAY, OCTOBER 10, 2018, 9:03 A.M.

 3              (Jury not present.)

 4          THE COURT:  Good morning.

 5      While we're getting started before we bring the jury

 6  in, let's deal with exhibits.

 7              MR. MOSKOW:  Thank you, Your Honor.

 8          Your Honor, for the plaintiff --

 9              THE COURT:  Go ahead.  It's all right.  It's an

10  exhibit.

11              MR. MOSKOW:  I'm getting hit so I just wanted to

12  make sure I was doing the right thing, Your Honor.

13              THE COURT:  That's fine.

14              MR. MOSKOW:  Your Honor, with regard to the

15  deposition by Dawn MacFarland, while all of the exhibits

16  that were shown to her from the plaintiffs' perspective were

17  included in Exhibit 2000, which are all of the exhibits,

18  specifically we can identify individual records on the

19  defendant's list which would be 9117, 9135 --

20              THE COURT:  Go slow so we can write these down.

21              MR. MOSKOW:  I'm sorry.  Exhibit 9117, Exhibit

22  9135, and Exhibit 9120.

23              THE COURT:  Any objection to their admission?

24              MR. LEWIS:  No objection, Your Honor.

25              THE COURT:  They are admitted.
```

1          (Exhibits 9117, 9135, 9120 admitted into evidence.)

2          MR. LEWIS:  On the defense plays, Your Honor, we

3    have the following exhibits that we're moving for admission:

4          9118-A, 9119, 9120, 9121, 9122, 9123, 9124, 9125, 9126,

5    9127, 9128, 9130, 9131, 9132, 9133, 9134, 9135, 9136, 9137,

6    9138, 9139, 9140, 9141, 9142.

7          And we move for the admission of those exhibits.

8          THE COURT:  All right, they're each admitted.

9          MR. MOSKOW:  No objection, Your Honor.

10         (Exhibits 9118-A, 9119, 9120, 9121, 9122, 9123, 9124,

11   9125, 9126, 9127, 9128, 9130, 9131, 9132, 9133, 9134, 9135,

12   9136, 9137, 9138, 9139, 9140, 9141, 9142 admitted in

13   evidence.)

14         MR. MOSKOW:  Your Honor, with regard to the

15   deposition play of Dr. Abdelgaber, plaintiff again notes

16   that all of the medical records are included in that large

17   Exhibit 2000, but specific references for the record for

18   this purpose we'll use defense ID numbers.

19         And those would be Exhibits 9087, 9092, 9094, 9096,

20   9097, 9098, 9099, 9100, 9101, 9102, and 9103.

21         THE COURT:  All right.  They're admitted.

22         MR. LEWIS:  No objection on those.

23         (Exhibits 9087, 9092, 9094, 9096, 9097, 9098, 9099,

24   9100, 9101, 9102, 9103 admitted in evidence.)

25         MR. LEWIS:  For the defense plays for Dr.

1    Abdelgaber we have four to move in.  So these will be -- the

2    defense is moving for the admission of the following

3    exhibits:

4         9089-A, 9092, 9093, 9094.

5              THE COURT:  All right, they're admitted.

6         (Exhibits 9089-A, 9092, 9093, 9094 admitted in

7    evidence.)

8              MR. MOSKOW:  And, finally, Your Honor, with regard

9    to the deposition played by Dr. Van Ryn, plaintiff moves

10   Exhibits 171, Exhibit 934, Exhibit 1256, Exhibit 1629,

11   Exhibit 5563.

12             THE COURT:  All right.  Those will be admitted.

13        (Exhibits 171, 934, 1256, 1629, 5563 admitted in

14   evidence.)

15             MR. LEWIS:  Then on the defense play, Your Honor,

16   we move for the admission of the following exhibits:  5147,

17   5741.

18             THE COURT:  All right.  Those are admitted as

19   well.

20        (Exhibits 5147 and 5741 admitted in evidence.)

21             MR. CHILDERS:  Your Honor, pursuant to the

22   stipulation of the parties, plaintiffs have redacted medical

23   bills of Betty Knight.  The stipulation too is that they are

24   admissible once redacted.  So we would also move in Exhibits

25   2005, 2006, and 2007.

849

```
 1              THE COURT:  All right, those are admitted by
 2    stipulation.
 3              MR. LEWIS:  Yes, Your Honor.
 4              THE COURT:  They're admitted.
 5         (Exhibits 2005, 2006, 2007 admitted in evidence.)
 6              MR. LEWIS:  Can I just confer with my counsel on
 7    that?
 8              THE COURT:  Yes.
 9         (Pause)
10              MR. LEWIS:  No objection, Your Honor.
11              THE COURT:  So to be clear, Mr. Moskow, the
12    exhibits -- some of the exhibits that you've had admitted
13    are labeled defendant's exhibit and on the defendant's list.
14              MR. MOSKOW:  That's correct, Your Honor.
15              THE COURT:  And plaintiff is moving their
16    admission.
17              MR. MOSKOW:  That's correct, Your Honor.
18              THE COURT:  All right.
19              MR. MOSKOW:  And we provided kind of tally sheets
20    of these exhibits to your deputy.  We're not moving those
21    tally sheets as, as exhibits.  They were just for her
22    edification.
23              THE COURT:  All right, fine.
24              MR. MOSKOW:  Your Honor, finally, during the
25    plaintiffs' direct and, and redirect of Dr. Ashhab yesterday
```

1    a subset of Exhibit 2000 was used.  We've identified it as

2    Exhibit 2000-A.  It was included in the books.  And we would

3    just move that subset as an exhibit as well.

4            MR. LEWIS:  No objection.

5            THE COURT:  All right, 2000-A is admitted.

6            MR. MOSKOW:  Thank you, Your Honor.

7        (Exhibit 2000-A admitted in evidence.)

8            THE COURT:  I also note, as I understood it, that

9    you referred sometimes -- and this was in the notebook for

10   Dr. Ashhab -- to Exhibit, Plaintiffs' Exhibit 86 which is

11   one of the labels revised in 2011 I believe.  But then there

12   was a separate identical label already admitted as a

13   different number.

14           MR. MOSKOW:  As a defendant's exhibit, Your Honor.

15   That's correct.

16           THE COURT:  All right.

17           MR. MOSKOW:  And part of it I think is just in the

18   parties' preparation we used our own exhibit number.  It

19   becomes easier to do that in the courtroom.

20           THE COURT:  All right.  Do you recall what the

21   admitted defendant exhibit is that embodies the same label?

22           MR. MOSKOW:  If you give me a couple seconds, I

23   can.

24       (Pause)

25           THE COURT:  Well, maybe we needn't be too

1    concerned.  You did not move the admission of 86?

2            MR. MOSKOW:  I believe we did move the admission

3    of it.

4            THE COURT:  I didn't go back and look in my notes.

5    All right.

6            MR. MOSKOW:  Yeah.

7            MS. JONES:  Your Honor, I thought 86 had come in

8    with Dr. Plunkett.

9            THE COURT:  Is your microphone on?  I can't hear

10   you.

11           MS. JONES:  It appears to be.  My recollection was

12   that 86 was moved in with Dr. Plunkett and admitted without

13   objection.

14           MR. MOSKOW:  That's correct.

15           THE COURT:  Oh, all right.  So it's the same

16   exhibit, not an identical document with a different exhibit

17   number.

18           MR. MOSKOW:  Well, I believe that the defense used

19   a version of the same label with the defense number.  I'm

20   just looking for that now, Your Honor.

21           THE COURT:  Well, let's be clear.  You say a

22   version of it.  Do you mean the identical label?

23           MR. MOSKOW:  Correct.  I believe it was 5882.

24           MS. JONES:  Yes.  And Mr. Hailey just whispered

25   that in my ear.

1          THE COURT:  All right.  So 582 and 86 are the same

2   document.

3          MR. LEWIS:  That's correct, Your Honor.

4          MS. JONES:  Yes, Your Honor.

5          THE COURT:  All right.  We'll worry about that

6   later.  Is there anything else we need to take up?

7          MR. LEWIS:  A couple of issues, Your Honor.

8          THE COURT:  What about the pending admission of

9   900 --

10          MR. LEWIS:  We're still meeting and conferring on

11   that.  We're going to clean it up.  There's a couple things

12   we need to fix.

13          THE COURT:  All right.  That's fine.  I'll

14   withhold ruling on it.

15          MR. LEWIS:  A couple of other issues.

16      We do have some objections to some of the disclosed

17   exhibits to be used with the plaintiffs who I think are

18   going to testify after a video today.  I think a video is

19   going to go first for about an hour.  We can either take

20   those up now or take those up at a break, whatever the Court

21   prefers.

22          THE COURT:  Well, I just as soon get started and

23   deal with it at a break.

24          MR. LEWIS:  Okay.  And then one last thing, Your

25   Honor.  Some, some folks have noticed jurors sharing some of

1   the notes.  And we were wondering if it might be good to, to

2   give a reminder on that.

3            THE COURT:  I'll do that.

4            MR. LEWIS:  Thank you.

5            THE COURT:  All right.  Let's bring the jury in.

6       (Jury returned into the courtroom at 9:13 a.m.)

7            THE COURT:  Good morning, ladies and gentlemen.

8   We're about to start again.

9       One relatively minor matter I just wanted to repeat,

10  though.  I noticed yesterday many of you are taking notes

11  and that's fine.  I've given you instructions about that.

12      A reminder, though.  If you take notes, they are for

13  each individual juror's use exclusively.  So you're not to

14  share notes and you're not to communicate by writing each

15  other notes out here.

16      And then when you go in to deliberate, just remember

17  that notes are for the individual juror and those notes are

18  only as good as the recollection and attention that the

19  jurors have about the witness.  So don't depend on somebody

20  else's notes for what you recall the evidence to be.

21      With that, you can call your next witness.

22            MR. CHILDERS:  Your Honor, the plaintiffs next

23  call by video Martina Brueckmann.  She's a Boehringer

24  employee.  And just so everyone is clear, she's a native

25  German speaker, so there's a little lag between the

1   translation and when the answer and the question happens.

2          THE COURT:  All right.  How long is your portion

3   of this deposition?

4          MR. CHILDERS:  Forty minutes.

5          THE COURT:  All right.  We'll take a break at the

6   end of that 40 minutes.

7          THE COURT:  All right.

8          **VIDEOTAPED DEPOSITION OF MARTINA BRUECKMANN,**

9   **PLAINTIFFS' WITNESS, PLAYED.**

10      (Videotaped deposition paused.)

11         MR. CHILDERS:  That's the end of the plaintiffs'

12  play, Your Honor.

13         THE COURT:  All right.  Defendant.

14         MR. LEWIS:  Yes, Your Honor.  I wasn't sure if you

15  wanted to take a break now or --

16         THE COURT:  We will.  How long is your part?

17         MR. LEWIS:  About 30 minutes.

18         THE COURT:  Okay.  Let's take a little recess.

19  You may retire to your jury room.  We'll be back in about

20  five minutes.

21      (Jury retired to the jury room at 9:56 a.m.)

22         THE COURT:  Terry has some things she wants to

23  have you clarify about the exhibits, if you want to just

24  approach the bench and step up here to do it.  You don't

25  need to do it on the record.

1        (Pause in proceedings)

2             THE COURT:  All right.  Are we ready?

3             MR. LEWIS:  Yes.  May I just ask one question?

4             THE COURT:  Sure.

5             MR. LEWIS:  Is it okay if I mention to the jury

6   that we cut out the translation of the question from English

7   to German?

8             THE COURT:  Sure.

9             MR. LEWIS:  Thank you, Your Honor.

10            THE COURT:  All right.  Let's bring the jury in.

11       (Jury returned into the courtroom at 10:07 a.m.)

12            THE COURT:  All right, Mr. Lewis, do you want to

13  introduce the defense portion of the witness examination?

14            MR. LEWIS:  Yes, Your Honor.

15       And, members of the jury, this will be the defense play

16  of Dr. Brueckmann.  And just for clarification, we have

17  edited out -- we had a translator at the deposition because

18  Dr. Brueckmann's first language is German.  And we have

19  edited out the translation of the question by the U.S.

20  lawyer into German just for efficiency purposes, Your Honor.

21            THE COURT:  All right.

22       (Videotaped deposition resumed.)

23       (Videotaped deposition concluded.)

24            THE COURT:  All right.

25            MR. LEWIS:  That concludes the defense play, Your

856

1    Honor.

2          THE COURT:  All right.  We're going to take about

3    a 15-minute recess.  I have a matter I need to take up with

4    counsel before we go to the next witness.  You may retire to

5    the jury room.  We'll be back with you shortly.

6       (Jury retired to the jury room at 10:38 a.m.)

7          MR. MOSKOW:  May we move the exhibits for that

8    play while we're here?

9          THE COURT:  Yes.  Go ahead.

10         MR. MOSKOW:  For the plaintiff, Your Honor, --

11      Your Honor, for the plaintiff we move the following

12   exhibits that were just shown as part of the Dr. Brueckmann

13   play:

14      Exhibit 1468, Exhibit 151, Exhibit 1671, Exhibit 63 and

15   Exhibit 305.

16         MR. LEWIS:  No objection.

17         THE COURT:  They're admitted.

18      (Exhibits 1468, 151, 1671, 63, 305 admitted in

19   evidence.)

20         MR. LEWIS:  For the defense play, Your Honor, we

21   move for the admission of Exhibit, Defense Exhibit 5785.

22         THE COURT:  Any objection?

23         MR. MOSKOW:  No, Your Honor.

24         THE COURT:  It's admitted.

25      (Exhibit 5785 admitted in evidence.)

1    MS. JONES:  Your Honor, at an appropriate time --

2    I don't think it would have to be right at this moment -- I

3    think we probably need to have a discussion with the Court

4    about where we stand on schedule and timing for the balance

5    of the week if you don't mind.

6    THE COURT:  All right, we'll do that shortly.

7    Your next witnesses?

8    MR. CHILDERS:  Will be Rick Knight and then

9    Claudia Stevens.

10    THE COURT:  All right.  You've got some matters

11    relative to exhibits from those witnesses?

12    MR. LEWIS:  Yes, Your Honor.  There's basically

13    three issues --

14    THE COURT:  All right.

15    MR. LEWIS:  -- that I need to discuss.

16    Number one relates to a series of documents that we

17    were supplied last night that were going to be used today.

18    There's an obituary for Mrs. Knight, and it looks to me

19    like perhaps a funeral home display or program from Mrs.

20    Knight's funeral.

21    Those documents in our view, number one, I mean,

22    technically they're hearsay.  But really, more importantly,

23    they're not relevant to any of the issues in the case and

24    clearly designed to appeal to the sympathy of the jury

25    without any probative value and would be excluded under 403

1    as well.

2         THE COURT:  All right.  Let's start with those.

3    What's your response?

4         MR. CHILDERS:  Your Honor, we have a wrongful

5    death claim in the case and the obituary and the funeral

6    program are relevant to those claims in particular.  The

7    plaintiffs helped to draft both those.  It's not hearsay.

8    They going to say, "We actually helped participate in

9    writing these."

10        But as far as being more probative -- more prejudicial

11   than probative, it tells about her life.  We're going to

12   talk about her life.  It's, it's -- and we are happy to show

13   it to you.  It's not overly emotional.  It's basically

14   factual, both of them.

15        THE COURT:  So, first, it's an obituary.

16        MR. CHILDERS:  Yes, sir.

17        THE COURT:  Second, it's the typical program

18   handed out at a funeral?

19        MR. CHILDERS:  Correct.

20        THE COURT:  All right.

21        MR. CHILDERS:  And I want to point out they

22   weren't just handed over last night.  These have been on our

23   exhibit list since April.  We exchanged exhibits according

24   to the protocol that we had.  We haven't heard any objection

25   to any of these.  And they've been on notice that we plan to

1    use them at trial since we put our exhibit list together.

2         THE COURT:  And you expect that one or both of

3    your witnesses would testify that they are the, essentially

4    the drafters, the writers of those documents?

5         MR. CHILDERS:  Correct.  They'll testify that they

6    went to the funeral home and participated in drafting these

7    documents after Ms. Knight passed away and that they were

8    then published.

9         MR. LEWIS:  Well, they're still hearsay, Your

10   Honor, despite the fact that they may have participated.

11   They're published not by the plaintiffs, number one.  But

12   it's really not about the hearsay objection.  It's about the

13   pull on the sympathy strings of, of the jury.

14       You know, I've done some these cases.  I've never seen

15   an obituary and a funeral home program admitted into

16   evidence.  I understand you can do some of that, but that

17   seems over the top in my mind.  And there's no probative

18   value whatsoever for the jury.  This case needs to be

19   decided on the facts and the law and, and not sympathy.

20        THE COURT:  Well, I think I agree with the

21   defendant.  It's my conclusion that, first, these witnesses

22   can testify about all these matters as -- to provide

23   relevant evidence to help the jury determine, if they get to

24   this, wrongful death damages.

25       I don't know what having the obituary or the funeral

1    program separately would add to that.  So I don't think -- I

2    think it would be cumulative and I don't think it's

3    relevant.

4              MR. CHILDERS:  That's fine, Your Honor.

5              THE COURT:  Okay?

6              MR. LEWIS:  The second subject really deals with a

7    similar situation.  We, we have a number of photographs and

8    I believe 95 different family photographs dating back in

9    time many decades it appears to be.

10        Now, again, here's my technical objection.  We did ask

11   for this stuff in discovery.  There was a response to

12   Request for Production Number 5 when we said, "Hey, we want

13   to see any photos, day-in-the-life, or anything depicting

14   Mrs. Knight," and they didn't give these.

15        Now, they did put them on their exhibit list, but these

16   weren't produced in discovery in response.

17        But putting that aside, I understand some of this might

18   be able to get in, but 95 different photographs I think is

19   excessive and cumulative, number one, on the photographs.

20             THE COURT:  All right.

21             MR. LEWIS:  There's a separate related issue, I

22   think, to the photographs --

23             THE COURT:  Okay.

24             MR. LEWIS:  -- which is there's a video or a slide

25   show that was provided to us.  And it's, again, a number --

1  looks like a number of photographs of Mrs. Knight and her

2  family to music in the background.  I believe the song is

3  *Ill Fly Away*.

4       So, again, I think a slide show with music is pulling

5  too far in the direction of sympathy to the jury and there's

6  not much probative value in that.

7       I understand some photographs may make some sense.  I

8  get that.  But we have to have some limitations on that,

9  Your Honor.

10            THE COURT:  All right.

11            MR. CHILDERS:  Can I go in reverse order there,

12  Judge?

13            THE COURT:  Sure.

14            MR. CHILDERS:  We're not going to play the video.

15            THE COURT:  Okay.

16            MR. CHILDERS:  So that's fine.

17            THE COURT:  Easy.

18            MR. CHILDERS:  The pictures that we will intend to

19  show came out of that video.  So we disclosed both the video

20  and the pictures just to be on the safe side.

21       As far as -- and we're not going to put 95 pictures in.

22  Each of them will come in in context as part of testimony

23  through the witnesses.  It's not just going to be a slide

24  show where we just put them up and click through them.

25       As far as the production during discovery, there was a

1    request for photographs, but the request was very specific.

2    It said photographs portraying plaintiff and/or decedent and

3    purporting to demonstrate any physical or emotional

4    condition and/or injuries and damages sustained as a result

5    of decedent's use of Pradaxa.

6        We didn't have any pictures of her bleeding.  We don't

7    have a picture of her laid out in a coffin.  These are

8    pictures that were taken during her lifetime.  They are not

9    responsive to this particular request.

10            THE COURT:  Are all of the photos that you intend

11   to use photos of Ms. Knight and/or other members of her

12   family?

13            MR. CHILDERS:  Correct.  She's in every photo,

14   Your Honor.

15            THE COURT:  All right.  And how many do you expect

16   to actually use?

17            MR. CHILDERS:  I think it's around 15 or 20.  I

18   haven't counted up the exact number, but it's nowhere near

19   95.

20            MR. LEWIS:  Okay.  I mean, I think that's a closer

21   number to what would be appropriate.

22            THE COURT:  All right.

23            MR. LEWIS:  If it's around that, then --

24            THE COURT:  All right.  I'm going to deny your

25   objection, then, based on counsel's representation as to the

1    nature and number of photographs to be used.

2            MR. LEWIS:  Okay.  So that takes care of the 403

3    issues.

4        I wanted to just address in advance the possibility of

5    eliciting some testimony from the plaintiffs related to the

6    Medication Guide and whether or not the plaintiffs, had they

7    known more information, would have made different decisions

8    about that Medication Guide.

9        And the relevant inquiry here is Mrs. Knight's decision

10   and her physician's decisions.  And I would argue that the

11   decisions by either of the plaintiffs, her children, are not

12   relevant for the jury to determine warning causation in this

13   case.  And I would ask the Court not permit that type of

14   testimony.

15           THE COURT:  All right.  Do you want to respond?

16           MR. CHILDERS:  Your Honor, I think we've made it

17   very clear in the evidence through the depositions and the

18   motions that have been filed this was a decision that the

19   three of them made together.  And, so, they should be

20   permitted to testify about what they considered and the

21   information they had at the time.

22           THE COURT:  I agree.  I'm going to deny this

23   motion.  I expect as part of the foundation you'll offer

24   testimony before you get into the Medication Guide about the

25   role that one or both of your plaintiffs played in helping

1    advise Ms. Knight about medication decisions in particular

2    and/or treatment in general.

3              MR. CHILDERS:  Absolutely, Your Honor.

4              THE COURT:  All right.  Does that do it?

5              MR. LEWIS:  That does it on that issue, on the --

6              THE COURT:  Okay.

7              MR. LEWIS:  I didn't know if you wanted to discuss

8    the schedule while we had time or not.

9              THE COURT:  Why don't we do that after we get

10   through these next two witnesses.  I think -- how long do

11   you expect these witnesses to take?

12             MR. CHILDERS:  I don't know how long they'll be

13   cross-examined.  I don't expect between the two of them to

14   be more than a couple of hours.

15             THE COURT:  Okay.  Well, obviously at a quarter

16   till 11:00 it's likely before we finish these witnesses

17   either direct or cross we'll be taking a recess.  So why

18   don't we take this up when you start the lunch recess.

19             MR. LEWIS:  Makes sense, Your Honor.

20             MR. CHILDERS:  Can I alert the Court?  We do

21   intend to rest after they testify.

22             THE COURT:  Well, --

23             MR. CHILDERS:  And we've told them that.

24             THE COURT:  Okay.  So I take it your request to

25   discuss the scheduling pertains to how you're going to

1    present your stuff.

2            MR. LEWIS:  Correct.

3            THE COURT:  Is there something we need to talk

4    about more immediately given that it may be right after

5    lunch that the case shifts to the defense?

6            MS. JONES:  Well, in short, Your Honor, I think

7    the good news is that we're moving much more quickly than

8    anyone anticipated having gotten through a little bit of a

9    lag period with Dr. Plunkett.

10       The less good news is that's created a little bit of a

11   witness scheduling issue for us.  Our primary witnesses --

12   we currently intend to call two -- are both practicing

13   doctors who are based in Charlottesville and in Nashville,

14   Tennessee.

15       They have adjusted their schedules to be here but did

16   that to be here next -- on Monday of next week because we

17   anticipated that the trial, the plaintiffs' case-in-chief

18   would take up most of this week and that we'd probably have

19   time to have to do directed verdict and jury instructions.

20       We've now learned that the intention is to rest it

21   sounds like early afternoon which creates some scheduling

22   challenges for us.  We obviously don't want to waste either

23   the Court's time or the jury's time, but we did want to

24   bring that to Your Honor's attention.

25       I, I don't expect that we will run any further in our

1 case past Wednesday at noon at the very, very latest.  That

2 really would be the outer limit.  But we've got some really

3 serious scheduling challenges with a couple of doctors who

4 kind of arranged their clinical schedules based on their

5 need to be here.

6     THE COURT:  Well, given the circumstances, first,

7 I would direct that you contact those experts and explain

8 that this trial has proceeded more quickly and see if they

9 can't be available sooner than next week.

10  It would certainly be my strong preference at this

11 point to try to keep this case moving in terms of the jury's

12 time so that they hear all the evidence as soon as they can.

13  Do you have other evidence through depositions or other

14 things that we can do today?

15     MS. JONES:  I think we have -- I'm looking to

16 Mr. Hailey to confirm this.  I think we have a relatively

17 brief video play from Dr. Huh who was a gastroenterologist

18 who treated Mrs. Knight, but I think it's quite brief.  It's

19 roughly 15 minutes I'm told.

20     THE COURT:  Well, all right.  So outline this for

21 me.  So you've got that video.  You've got the two live

22 experts.

23     MS. JONES:  Yes, Your Honor.

24     THE COURT:  What else do you expect to offer?

25     MS. JONES:  I think that's likely to be the extent

1    of our case.  We'll obviously make the -- we've been in

2    touch with our experts at great length over the course of

3    the last few days just to try to plan accordingly and we'll,

4    we'll follow up with them again.  But that's what we

5    currently envision.

6              THE COURT:  All right.  Well, I'd like for you to

7    try to run them down this morning sometime before early

8    afternoon perhaps by the time we reconvene after the lunch

9    break to see what their availability could be this week.

10        You know, I appreciate that you are surprised at how

11   quickly the plaintiffs' case is coming to a conclusion.

12             MS. JONES:  And that's not, that's not a criticism

13   of them obviously.

14             THE COURT:  I don't take it that way either

15   certainly.  I think both sides, I'm sure, are also aware

16   that it's really difficult to ask a jury to have a three- or

17   four-day hiatus and keep a grasp of everything in the case.

18        So I'm very concerned because of that, as well as the

19   imposition on the jury to have them have to come back next

20   week when matters perhaps could have been concluded this

21   week.

22        So at this point, no need to talk about it further than

23   I just ask that you communicate with these two experts and

24   see how fast you can get one or both of them up here and

25   let's see where we stand after you've had those

1    conversations with them.  If they can readjust their

2    schedules to get here sooner, that would be great.

3        I also recognize we do need to set aside some time for

4    argument of any motions concluding the plaintiffs' case and

5    also go over final instructions.

6        So my thought would be that assuming today that once

7    the plaintiffs have rested that your first evidence will be

8    this short deposition of Dr. Huh.  Then my thought would be

9    to defer any defense motions challenging the sufficiency of

10   the plaintiffs' evidence until after that doctor has

11   testified.

12       So that if we can finish with him mid afternoon, then I

13   can let the jury go and you can take the time for motions

14   and argument concerning the sufficiency of the plaintiffs'

15   case.

16       Is that all right with the defense?

17            MR. LEWIS:  As long as there's no waiver issue

18   there, Your Honor, but it doesn't sound like there is.

19            THE COURT:  Yeah, I would declare it -- I would

20   find that there's no waiver at all and that the delay in the

21   consideration of any defense motion challenging the

22   sufficiency of the plaintiffs' evidence would be the result

23   of the Court's direction to counsel and not because counsel

24   omitted or failed to take appropriate action to preserve its

25   right to argue the motions.

1          MR. LEWIS:  The only other thing I'd mention, Your

2     Honor, is that we do have some papers that we would file on

3     that issue.  We wanted to wait and see exactly what the

4     plaintiffs did with their case.  We had some potential

5     videos that could be played.  So we were waiting until the

6     end of that.  We'll be ready to file those this afternoon as

7     soon as the plaintiffs close their case.

8        It might make some sense to deal with directed verdict

9     in the morning to give everybody a chance to --

10         THE COURT:  Well, that may be fine as well.

11         MR. LEWIS:  Okay.

12         THE COURT:  My point was mostly that we wouldn't

13    interrupt -- we wouldn't take up the time while the jury is

14    here to deal with this --

15         MR. LEWIS:  Yes.

16         THE COURT:  -- if we can have ample time later.

17         MR. LEWIS:  Makes perfect sense, yes.

18         THE COURT:  All right.  Is there anything else we

19    need to talk about?  I'd like to give you about a

20    five-minute break before we do this.  All right.

21         MR. CHILDERS:  That would be great.

22         MS. JONES:  Thank you, Judge.

23         THE COURT:  So we'll recess.  Get back in the next

24    five or ten minutes or so.

25        (Recess taken from 10:55 a.m. until 11:03 a.m.)

1          THE COURT:  All right.  Are we ready to proceed

2    with the next witnesses?

3          MR. CHILDERS:  Yes, Your Honor.

4          THE COURT:  Let's bring in the jury.

5          (Jury returned into the courtroom at 11:04 a.m.)

6          THE COURT:  All right, we're ready to proceed.

7    Call your next witness.

8          MR. CHILDERS:  Plaintiffs call Rick Knight to the

9    stand, Your Honor.

10          THE COURT:  Sir, if you'll step over here, my

11    clerk will swear you in.

12          **CLAUDE RICHARD KNIGHT, PLAINTIFFS' WITNESS, SWORN**

13                    DIRECT EXAMINATION

14    BY MR. CHILDERS:

15    Q.   Rick, I've introduced you to the jury but I'd like for

16    you to introduce yourself to them.  I don't think you've had

17    an opportunity to speak to them.

18    A.   My name is Rick Knight.

19    Q.   What's your, what's your full name?

20    A.   Claude Richard Knight.

21    Q.   And you go by Rick?

22    A.   Yeah.

23          THE COURT:  If you would, just bend that

24    microphone down a little bit.  Unfortunately we've realized

25    now that if witnesses don't speak -- it's pretty much a

Claude Richard Knight - Direct (Childers)                871

1   directional mic.  And if you'll speak toward it, it will

2   pick you up.

3           THE WITNESS:  Rick Knight.

4   BY MR. CHILDERS:

5   Q.   Were you named after your father?

6   A.   Yes.

7   Q.   Okay.  He was Claude Knight as well?

8   A.   Yes.

9   Q.   Where do you live, Rick?

10  A.   I live at 1323 Charleston Avenue, Huntington, West

11  Virginia.

12  Q.   How long have you lived in Huntington?

13  A.   I was born and raised here and I've been transferred to

14  a couple different cities.  I've lived off and on in

15  Huntington my whole life.

16  Q.   So did you go to high school here?

17  A.   Yes.

18  Q.   Where did you go?

19  A.   Huntington East High School.

20  Q.   And what about college?

21  A.   I went to Marshall University.

22  Q.   Are you Betty Knight's son?

23  A.   Correct, yes.

24  Q.   Okay.  And your family -- besides you and Betty Knight,

25  who, who else was in your immediate family?

Claude Richard Knight - Direct (Childers)

1    A.   My sister, Claudia, and my father, Claude Knight.

2    Q.   If you can, Gina, put up photo 7.

3         I'm sorry.  Could you look at photo 7 in your binder.

4    It's at the back, first picture, black and white.  Do you

5    recognize that photo?

6    A.   Yes.

7    Q.   Okay.  And who does that photo depict?

8    A.   That's my dad, my mom, myself, and Claudia.

9         MR. CHILDERS:  Judge, I'd move Exhibit 2012-007

10   into evidence.

11        THE COURT:  Any objection?

12        MR. LEWIS:  No objection.

13        THE COURT:  It's admitted.

14   (Plaintiffs' Exhibit 2012-007 admitted in evidence.)

15        MR. CHILDERS:  May I publish that, Your Honor?

16        THE COURT:  You may.

17        MR. CHILDERS:  Could you put that up too?

18   BY MR. CHILDERS:

19   Q.   All right.  So tell the jury who these folks are.

20   A.   That's my dad, my mother, Claude Knight, Betty Knight,

21   and myself and Claudia.

22   Q.   And that was when you were kids.  Was that here in

23   Huntington?

24   A.   Yes.  Olan Mills took the picture.

25   Q.   Okay.  When were your mother and father married?  Do

Claude Richard Knight - Direct (Childers)

1   you recall?

2   A.   I believe it was maybe '48 or '49.  Mom graduated high

3   school in '47 and she moved to Huntington.  They met and

4   they were married in '49 I believe.

5   Q.   Do you recall how they met?

6   A.   I'm trying to think of that.  I knew that story and

7   it's not coming to my mind right now.

8   Q.   That's okay.  How long were your mother and father

9   married?

10  A.   Until he died in '95.

11  Q.   What did your dad do for a living?

12  A.   He worked for Huntington -- well, it's International

13  Nickel, a nickel plant.  That's a local plant here in

14  Huntington.  I believe it's called Huntington Steel now.

15  Q.   Just make sure you speak up.  I know it's difficult.

16  A.   Yeah.  I'm sorry.

17  Q.   How long did he work there?

18  A.   Over 25 years.  He was in the Quarter Century Club.  He

19  retired from there, so between 25 and 28 years.

20  Q.   Okay.  The jury's heard a lot about your mom's medical

21  records, but they haven't heard a lot about her.  So I want

22  you to help us get to know who she was.  Okay?

23       Let me start -- let me ask you some questions so we can

24  do that.  Did she work?

25  A.   Yes, she did work.  When I was in junior high, my mom

Claude Richard Knight - Direct (Childers)

1   was a cook at the elementary school where Claudia was going

2   and where I had gone, Emmons Elementary in Huntington.  She

3   was a cook there for about three years.

4       While she was a cook, she took night classes at

5   Huntington East High School for shorthand and typing.  And

6   she graduated -- or she took the classes and then she became

7   a secretary, elementary secretary at Cox Landing Elementary.

8   And she was there until she retired.

9   Q.   Is that here in Huntington?

10  A.   Cabell County, uh-huh.

11  Q.   Okay.  When did she retire from being an elementary

12  school secretary?

13  A.   She retired from the Board of Education in 1994.

14  Q.   So several years ago.  Do you ever run into folks who

15  still remember your mom being there?

16  A.   Yeah.  My mom was like everybody -- their mom at

17  school.  You know, the secretary -- she took care of you.

18  If you were sick, you went into her office and she would

19  call your mom and dad or whoever she had to to get you home

20  or do whatever she had to do.  She just was very attentive.

21      And the kids -- I still run into people who have known

22  my mom that she had and as a secretary and their kids

23  attended the elementary too.

24      Yeah, it's nice to run into them because they've always

25  got something nice to say about my mom.  I appreciate that.

Claude Richard Knight - Direct (Childers)

1   I like to talk about her.  She's a wonderful, wonderful

2   mother.  So she --

3   Q.   Were you and your mom --

4   A.   I'm sorry.  She, she didn't get home -- like she worked

5   with the kids all day long and she did her job.  She never

6   got home until about 8:30 or 9:00 at night because she had

7   to do her job after they left.

8   Q.   Were you and your mom pretty close?

9   A.   Yes.

10  Q.   Okay.  After she retired, was she active?  Did she do

11  things?

12  A.   Yes.  The year after my dad -- my dad died a year after

13  she retired.  They traveled some to the beach to Florida,

14  Myrtle Beach, California.  My dad's identical twin lived out

15  in California, so they made a trip out there.  They went to

16  Niagara Falls with some other people.

17       And then after dad died, actually the next year, we

18  went with a -- she went with me and a friend and some other

19  teachers to Greece and Italy.

20  Q.   Let me stop you there.  If you would look in your

21  binder at the next photograph, number 8, do you see that?

22  A.   Uh-huh.

23  Q.   Do you recognize that picture?

24  A.   Uh-huh.

25  Q.   Did you take that picture?

Claude Richard Knight - Direct (Childers)

1    A.    I'm not sure whether I did or somebody else in the

2    group took it.

3    Q.    Okay.

4    A.    It's at the Hard Rock Cafe and that's in Greece.

5    Q.    Is that from the trip you were just telling us about?

6    A.    Yeah.

7    Q.    Okay.

8          MR. CHILDERS:  Judge, I would move Exhibit

9    2012-008 for admission.

10         MR. LEWIS:  No objection.

11         THE COURT:  It's admitted.

12    (Plaintiffs' Exhibit Number 2012-008 admitted in

13    evidence.)

14         MR. CHILDERS:  May I publish it, Your Honor?

15         THE COURT:  You may.

16         MR. CHILDERS:  Thank you.

17    BY MR. CHILDERS:

18    Q.    So this is when you guys went to Greece after she had

19    retired?

20    A.    Yes.

21    Q.    How long was that trip?

22    A.    Almost three weeks.  We started out in -- well, we went

23    to Greece and Italy and we ended up on a three-day

24    Mediterranean cruise.  So it was a nice time.

25    Q.    You mentioned cruise.  I want you to turn in your book

                    Claude Richard Knight - Direct (Childers)

1   to another photo, number 61, if you get almost toward the

2   back.  Do you see that?

3   A.    Yes.

4   Q.    Do you recognize who's in that picture?

5   A.    My mom.

6   Q.    And can you tell us where she is?

7   A.    I really don't know where this was.  She went on one or

8   two cruises with retired employees from the Cabell County

9   Board of Education.

10  Q.    Was this one of those cruises?

11  A.    Yes.

12  Q.    Okay.  I didn't mean the exact location.

13  A.    Oh, yeah.

14        MR. CHILDERS:  I would move 2012-061 into

15  evidence, Your Honor.

16        MR. LEWIS:  No objection.

17        THE COURT:  It's admitted.

18     (Plaintiffs' Exhibit Number 2012-061 admitted in

19  evidence.)

20        MR. CHILDERS:  May we publish that, please?

21  BY MR. CHILDERS:

22  Q.    All right.  So that's her traveling by herself?  You

23  weren't there on that trip?

24  A.    Correct.  She went with other retired employees from

25  the credit -- from Cabell County.

Claude Richard Knight - Direct (Childers)

1  Q.  Okay.  Did you ever travel to the beach with her?

2  A.  Yes.

3  Q.  Okay.  If you would look at photo number 2012-009.  It

4  was right after the Greece photo that we looked at.  Do you

5  see that?

6  A.  Uh-huh, yes.

7  Q.  Who's in that photo?

8  A.  That's my mom.

9  Q.  And where is she?

10  A.  I'm thinking -- I think this is Daytona Beach.  Her

11  mother had -- her aunt lived -- aunt and uncle lived in

12  Daytona Beach.  And then my grandmother retired to, to

13  Daytona Beach.  And my mother's brother and sister all ended

14  up at Daytona Beach.

15      So she would go down there after she retired a couple

16  times a year.  And then she was down there quite a bit.  Her

17  mother was ill.  She passed away down there.  So --

18  Q.  She went down and helped with her mother?

19  A.  Yeah.  She went down -- at one point she was down there

20  for a couple months.

21  Q.  Okay.

22      MR. CHILDERS:  I would move, Your Honor, 2012-009

23  into evidence.

24      MR. LEWIS:  No objection.

25      THE COURT:  It's admitted.

Claude Richard Knight - Direct (Childers)

1    (Plaintiffs' Exhibit 2012-009 admitted in evidence.)

2   BY MR. CHILDERS:

3   Q.   Okay.  Is that your mom at the beach in Daytona Beach?

4   A.   Yes.

5   Q.   Okay.  Besides traveling, what other kind of things did

6   your mom do with her time?

7   A.   She enjoyed going with friends out to, to dinner.  She

8   would meet with some of the teachers from the elementary

9   school she was at and they'd all go out to dinner.

10       Church.  When we were growing up, we went to church.

11   It's a very small church, Huntington Evangelistic Center.

12   She still attended church.

13       She enjoyed Marshall Artists Series.  She went to that.

14   We had tickets to that for a couple years.

15       She just enjoyed getting out and getting around.  My

16   aunt -- my dad's oldest sister was her best friend, Jenny

17   Brannon (phonetic) and they traveled.  You know, they'd get

18   out and get their hair done.  They'd go to the mall.  They

19   were out and about all the time.

20       She was -- mom was -- when I was in college mom was

21   involved with the fraternity mothers at the fraternity I was

22   involved in.  And then later on after I was out of college,

23   my Aunt Jenny became the house mother for my fraternity.  I

24   wasn't there, though, at the time.

25   Q.   Probably a good thing; right?

Claude Richard Knight - Direct (Childers)

1    A.    Probably.

2    Q.    If you would look in your binder at picture number 40.

3    A.    Yes.

4    Q.    Do you recognize that picture?

5    A.    Yes.

6    Q.    Can you tell us what is happening in that picture?

7    A.    This is Halloween.  My mom loved Halloween.  She'd

8    decorate at the school, her office.  But this picture is at

9    my sister's house.

10        After my sister had her children, my mom and dad quit

11   giving candy out at their house and they'd go up -- we'd go

12   up to Claudia's house and have Halloween up there.  And mom

13   continued to do that until she died.

14   Q.    Who else is in that photo with your mom?

15   A.    Claudia, me, Claudia's son, Brad, and his two

16   daughters, Kaylee and Taylor.  She'd go up -- Claudia would

17   fix chili on Halloween night, trick-or-treat night, and we'd

18   all eat.

19        And then mom would have a tablet next to the door.  And

20   every time the kids came down, she'd keep a count, a note so

21   we'd know how many kids we gave candy to.

22            MR. CHILDERS:  Your Honor, I move 2012-040 into

23   evidence.

24            MR. LEWIS:  No objection.

25            THE COURT:  Admitted.

Claude Richard Knight - Direct (Childers)

1      (Plaintiffs' Exhibit 2012-040 admitted in evidence.)

2  BY MR. CHILDERS:

3  Q.   So what was she dressed up as that year?

4  A.   I think she didn't have her teeth in -- her vampire

5  teeth.  She was a vampire.

6  Q.   Did she dress up every year?

7  A.   Yeah.  She had somekind of costume on, you know,

8  whether it was just a cape or a witch's hat or something,

9  you know.

10  Q.   When, when I did the opening statement you might

11  remember we showed the jury a picture of the *We Are Marshall*

12  premier and you went with Claudia and your mom?

13  A.   Correct.

14  Q.   Let me have you look at photograph number 42.  Do you

15  see that?

16  A.   Yes.

17  Q.   And who's in that picture?

18  A.   That would be my mom, Claudia, and myself.

19  Q.   The photo from going to that premier?

20  A.   It was going to the *We Are Marshall* premier.  That's in

21  front of the Marshall memorial.

22  Q.   Let me stop you there so the jury can see it.

23          MR. CHILDERS:  Your Honor, I'd move 2012-042 into

24  evidence.

25          MR. LEWIS:  No objection.

Claude Richard Knight - Direct (Childers)

1    THE COURT:  Admitted.

2    (Plaintiffs' Exhibit 2012-042 admitted in evidence.)

3  BY MR. CHILDERS:

4  Q.   All right.  Where are you guys?

5  A.   That's at Marshall University in front of the memorial

6  fountain.  That was actually before the, the premier, before

7  we rode the bus downtown.  They had -- my mom said this

8  would never happen in her lifetime again to be able to go to

9  a premier.

10    So she got -- she wanted to go and she wanted us to go

11  with her, so she bought the tickets.  They were something --

12  I, I wouldn't have paid what she paid for them, I mean, but

13  it took us to a couple parties.  It took us to the

14  pre-party.  We got to meet -- well, the Governor was there,

15  Manchin at the time, and the stars.  I don't know whether --

16  McConaughey.

17  Q.   Did you get to meet them?

18  A.   Well, we had our picture made with Manchin.  But

19  McConaughey -- my sister had hers with Matthew McConaughey.

20  She's standing next to him.  So we went to that party and

21  then we rode the bus down to the, to the theater, to the

22  Keith Albee.

23    And then we walked, walked like the red carpet.  They

24  had a green carpet down and they had you on TV.  And she

25  enjoyed it.  I did too actually.

Claude Richard Knight - Direct (Childers)

1   Q.    Why was she so excited about that?

2   A.    Well, they were Marshall fans.  Her and my dad went to

3   all the games -- most of the games with my -- with their

4   grandchildren.  They enjoyed doing that.  So we're Marshall

5   fans.  So -- and we were here when the plane crash happened,

6   so we related to it very much.

7         And then after the movie, there was another party.

8   They had a band.  And that was at the Civic Center.  And

9   that's where we saw most of the people that were involved in

10  it, directors and, and people that starred in it.  It was a

11  nice evening, something to remember.

12  Q.    How often did you talk to your mom while she was alive?

13  A.    Oh, you know, it wasn't unusual to talk to her once a

14  day, you know.  It's just a -- she wasn't that far away, you

15  know, 10 minutes.

16  Q.    That's what I was going to ask you.  How far away did

17  you guys live from each other?

18  A.    At the most, 10 minutes.  I lived over by -- on

19  Charleston Avenue close to Ritter Park and she, she still

20  lived in our family home and that was in the east end of

21  Huntington on Chesapeake Street behind Spurlock's Flowers if

22  you know where that is here in Huntington.  And she lived

23  there until she passed away, so --

24  Q.    How often did you see her?

25  A.    You know, at least a couple times a week, you know,

Claude Richard Knight - Direct (Childers)

1   when she was real healthy, you know.  We'd get together.

2   I'd either stop by or maybe we'd go out to dinner or

3   something.  She was a lot of fun to be around.

4   Q.   Let me -- actually let me point you to another picture

5   in the book, picture 43.

6   A.   Uh-huh, yes.

7   Q.   Do you see that?

8   A.   Yes.

9   Q.   What's that a picture of?

10  A.   She's got a corsage on, so that was a Mother's Day.

11  Q.   And who's in the picture?

12  A.   My sister and myself and my mother.

13          MR. CHILDERS:  Your Honor, I'd move 2012-043 into

14  evidence.

15          MR. LEWIS:  No objection.

16          THE COURT:  Admitted.

17      (Plaintiffs' Exhibit 2012-043 admitted in evidence.)

18  BY MR. CHILDERS:

19  Q.   And, so, is this one of those occasions where you all

20  went out to dinner together?

21  A.   Correct.

22  Q.   And this one happened to be Mother's Day?  Is that what

23  you said?

24  A.   Yeah.  She's got a corsage on so it was -- you know,

25  it's probably not Mother's Day.  It's probably Easter, one

Claude Richard Knight - Direct (Childers)

1    of the two I would say.

2    Q.   Did you all get together on all the holidays?

3    A.   Yes, yeah.  We celebrated usually at my sister's house,

4    like my niece and my nephew's birthdays.  Mother's Day we

5    celebrated my birthday and Mother's Day.  I was born right

6    around Mother's Day and, so, we celebrated those two

7    together usually, and everybody's birthday.

8        And then we'd -- every holiday, you know, we'd get

9    together, maybe have a cookout, 4th of July, Memorial

10   Weekend, Christmas and Thanksgiving.  Mom cooked

11   Thanksgiving until -- I think until right after my dad died.

12   And then my sister started cooking Thanksgiving dinner, so

13   we went up there.

14   Q.   Would your mom always come to the family gatherings?

15   A.   Oh, yes.

16   Q.   I want to shift gears a little bit now and talk about

17   your mom's overall health.  The jury's heard that you were

18   involved in helping get her to the doctor and do other

19   things, but I want to get some more details.  Okay?

20       I understand that your mom had quite a few health

21   problems.

22   A.   Correct.

23   Q.   Okay.  And even before she switched to Pradaxa, she had

24   health problems.

25   A.   Correct.

886

Claude Richard Knight - Direct (Childers)

1  Q.  And she had some problems with her heart?  You knew

2  that?

3  A.  Yes.

4  Q.  Did she have to have procedures or hospitalizations

5  over the years that related to her heart?

6  A.  Yes.

7  Q.  Did she take any medications that you knew of for her

8  heart?

9  A.  Yes.

10  Q.  Okay.  Was she diabetic?

11  A.  Yes.

12  Q.  Did she do anything for that, take any medicine or

13  anything like that?

14  A.  She didn't have to take insulin.  She just took a pill

15  for her diabetes.

16  Q.  What about checking her blood sugar?  How did she do

17  that?

18  A.  You know, I really didn't know until later on.  She was

19  put on -- she went on warfarin after, I guess, a stroke.

20  And I was living in Roanoke at the time in Virginia.  And I,

21  I didn't keep up with her medications, you know, so I didn't

22  know.

23      But later on when I moved back, she was still on

24  warfarin or Coumadin and she had to get her blood checked an

25  awful lot.

Claude Richard Knight - Direct (Childers)

1   Q.   I'm sorry.  I'm talking about her diabetes.  Do you

2   know how she --

3   A.   Oh, I'm sorry.

4   Q.   Do you know how she checked her blood sugar?  Did you

5   help her with that or did you --

6   A.   She pricked her finger --

7   Q.   Okay.

8   A.   -- with a little machine.

9   Q.   Okay.  The jury's heard a term "situs inversus," a

10  condition that your mom had that's very unusual.

11  A.   Very.

12  Q.   What do you understand about that?

13  A.   Well, it's not just -- it's -- her organs were totally

14  turned around, not just her heart but all of the organs were

15  on the other side.  So it was unusual, challenging for some

16  of the doctors.

17  Q.   Sort of a mirror image of what --

18  A.   Correct.

19  Q.   -- most people have?

20  A.   Uh-huh.

21  Q.   To your knowledge, did that particular condition cause

22  her any health problems?

23  A.   No.

24  Q.   It seemed to me the doctors seem to remember her

25  because of that.  Is that your recollection?

                    Claude Richard Knight - Direct (Childers)

1   A.   That's correct.

2   Q.   Okay.  I think the jury saw some evidence of the

3   hospitalization where your mom needed to be intubated

4   several years ago, several years before she passed.  Can you

5   tell us about that situation?  Were you involved in getting

6   her --

7   A.   Yes.  Claudia and I both were.  She was having some

8   breathing problems and we were at the ER at St. Mary's.  And

9   the doctor wanted to put a tube down her to intubate her to

10  make her breathing easier.

11       And she, she told him, no, she didn't want to be.  She

12  was afraid of it.  And she had heard that if you were

13  intubated that -- and I thought the same thing also -- that,

14  you know, would you get off of it?  I didn't know.  But she

15  was scared.  She didn't want them to do it to her.

16       The doctors talked to Claudia and I.  And he said, "No,

17  we just want to do this to make it easier for her to breathe

18  right now so we can get her well."

19       And we went in and talked to her, Claudia and I, and we

20  talked her into going ahead and, you know, and her doing the

21  procedure.

22  Q.   That was a decision the three of you all made together?

23  A.   Correct.

24  Q.   Okay.  Was it unusual for you and Claudia to be

25  involved in your mom's medical decisions?

Claude Richard Knight - Direct (Childers)

1   A.   Not later on in life.  My mother was a very private

2   person.  I mean, I didn't know a lot of her medical history

3   until later, until later years.

4        I, I really didn't know about her kidney, her kidneys

5   were so serious.  I took her to a kidney doctor once but

6   nobody ever told me that she had chronic kidney disease.

7        There were just things in her medical notes that I

8   never -- that she never told us.  She just kept her -- we

9   didn't know about how her finances were or anything until a

10  couple months -- well, maybe a year before she passed away

11  and she let me write her checks.  She had missed a few bills

12  and 25-dollar late fees weren't too -- she wasn't crazy

13  about them.  So I took care of that.  I started doing that

14  for her.  I'm sorry.

15  Q.   So the fact that you didn't know of some of her medical

16  conditions until later I think is a good segue.  Was she

17  living by herself during all this time?

18  A.   Yes.

19  Q.   Independently?

20  A.   Yes.

21  Q.   She didn't have anybody that lived there with her

22  full-time?

23  A.   No.  Later on in probably the last year, she wasn't

24  able to take care of herself like she always had before.  It

25  was a little bit harder to bathe, to do housework.

Claude Richard Knight - Direct (Childers)

1    So she was on a fixed income and I found a -- it was a

2    group, and I can't remember the name of it actually, but I

3    got some information on them and called them.  And for fixed

4    income they could, they would send somebody at a reduced

5    price to help, help the elderly.

6        So they -- and she could get help I think it was three

7    days a week or two days -- maybe it was three days a week

8    for two hours at a time or either two days a week for three

9    hours at a time.  I can't remember.  But she, she had a

10   little assistance then.

11   Q.   Other than that, there was nobody there helping her on

12   a regular basis --

13   A.   No.

14   Q.   -- other than you and Claudia may come by to help her?

15   A.   Correct.

16   Q.   Okay.  And that was all the way up until she passed

17   away?

18   A.   Correct, yeah.

19   Q.   What kind of stuff did the folks who came in and helped

20   her actually do for her?

21   A.   She came in early enough to fix mom breakfast, maybe

22   8:00 or 8:30 and she'd fix her breakfast.  Her pills I

23   already had fixed out in a box for her by the day for a

24   week.  And if she needed, needed help bathing, they would

25   help her.  They did a little bit of like running the sweeper

Claude Richard Knight - Direct (Childers)

1  or changing the bed, washing the sheets, running the

2  sweeper.  It wasn't anything --

3  Q.   Was it medical help or just help around the house?

4  A.   That was just help around the house.

5  Q.   Okay.  That's what I was trying to figure out.

6  A.   Yeah.

7  Q.   You mentioned that you did something with her pills for

8  her?

9  A.   Yes.

10  Q.   What did you do?

11  A.   She was taking -- she had several pills that she was

12  on.  And she would -- she'd get them out every day and take

13  the pill out of the bottle.  And finally we decided, you

14  know, it would be better to do them weekly.

15       So I went over and -- we got a pill box for seven days

16  and I went over and put the pills in the time frame that she

17  was supposed to take them for seven days at a time.

18  Q.   Okay.  And did you do that all the way up until the

19  time she passed?

20  A.   Yes.

21  Q.   We know she took a lot of medicines, you just told us,

22  quite a few medicines.  Do you remember your mother ever

23  having a bad reaction to any medicine?

24  A.   She couldn't take statins.  She had --

25  Q.   Statins being cholesterol medication?

Claude Richard Knight - Direct (Childers)

1    A.    Yes.

2    Q.    What happened to her when she took them?

3    A.    Her legs.  They made her legs hurt.  Actually, they do

4    me too.  But they -- she had -- I didn't know that, you

5    know, that they caused -- that was one of the side -- could

6    cause leg camps, legs to hurt.  And she told us about that.

7    It was on the label of the medicine that you got from the

8    pharmacy.  So she quit taking statins.  She talked with the

9    doctor and she didn't take any statins.

10   Q.    So the doctor prescribed them to her but because it

11   hurt her, she said, "I don't want to take this."

12   A.    Correct.

13   Q.    All right.  I'm going to move into your mom's use of

14   blood thinners, anticoagulant medication.  You mentioned

15   when you came back from Roanoke I think you said she was

16   already on warfarin.

17         How many years did you live in Roanoke?

18   A.    I was there a little over five years.

19   Q.    Okay.  And then you came back here and have been here

20   since?

21   A.    Yes.

22   Q.    Okay.  Were you in Roanoke when your mother had a

23   stroke?

24   A.    I was.

25   Q.    What was your understanding -- were you talking with

Claude Richard Knight - Direct (Childers)

1  Claudia and your mom when that was happening?

2  A.   I was shocked.  Claudia called me at work and said,

3  "Mom's had a stroke."  So I was going to get in the car and

4  come.  And she said, "No, wait.  Let me find out what's

5  going on."

6       So I waited to find out.  And I came in on the weekend

7  and it wasn't, it wasn't as bad as what -- thank goodness it

8  wasn't a serious one, I mean a bad one.

9  Q.   How did your mom do after she had that stroke?

10  A.   She recovered.  I mean, you know, somebody mentioned

11  something about her left side, she had some paralysis or

12  something.  I don't remember her ever having any, any

13  effects that lingered.

14  Q.   Was she still able to walk okay after the stroke?

15  A.   Oh, yeah.

16  Q.   Was she able to talk okay?

17  A.   She used her hands.  She walked, talked.

18  Q.   Was she able to still drive?

19  A.   Yes.

20  Q.   She still drove?

21  A.   Oh, yeah.  She drove until probably the last year, the

22  last year she lived.  It was just -- and we let her make

23  that decision, you know.  She was very independent, like I

24  said, and she didn't want to give up her car keys.

25       So I sort of kept her car at my house for a while,

894

Claude Richard Knight - Direct (Childers)

1  which I tried to explain to her that her reaction time, you

2  know. She was -- here she was. She was 82, 83. You know,

3  your reaction time is not as fast.

4      She would say -- she was weak. She just couldn't --

5  you know, you put your foot on the brake and you might not

6  be able to put it all the way down to get the car stopped.

7  So I pointed that out to her and she really didn't fight us

8  on it. She just didn't drive anymore.

9  Q.  So you started driving her around more when that

10 happened?

11 A.  Uh-huh, yeah, take her to get her hair done on Saturday

12 morning, you know, yeah.

13 Q.  After the stroke was your mom still able to live by

14 herself?

15 A.  Yes.

16 Q.  To your knowledge, was there anything that your mom

17 could do before her stroke that she couldn't do after her

18 stroke?

19 A.  No.

20 Q.  Do you recall your mother ever telling you she was

21 afraid she was going to have another stroke or anything like

22 that?

23 A.  No.

24 Q.  You mentioned her taking warfarin and that you recall

25 that she took that drug.

                    Claude Richard Knight - Direct (Childers)

1    A.    Yes.

2    Q.    Do you recall whether or not she had to have her blood

3    checked?

4    A.    She went on warfarin after the stroke and I wasn't

5    living in town at the time.  And she had issues with -- she

6    had to go to the doctor's office quite often, you know,

7    sometimes often to get, get her blood checked, the range for

8    her Coumadin.

9    Q.    Was that a little bit inconvenient for her?

10   A.    Yeah.

11   Q.    It's inconvenient for anybody.

12   A.    Correct.

13   Q.    Did she ever tell you that she wanted to stop taking

14   that drug Coumadin because she had to get her blood checked?

15   A.    I don't remember her ever saying that to me.  But it's

16   there in the, in the notes that she told the doctor that she

17   didn't want to take Coumadin any longer.  So, you know, I

18   wasn't aware until the notes that she didn't want to take

19   it, but she had to get her blood checked.

20   Q.    Are you talking about the note we saw, I think it was

21   yesterday, from 2008 where she went off of it for about a

22   month?

23   A.    Yes.

24   Q.    Did she go back on it after that month?

25   A.    Yes.

Claude Richard Knight - Direct (Childers)

1  Q.   Okay.  And after that, did she ever tell you, "I don't

2  want to take this anymore"?

3  A.   And I said, yes, she went back on it.  The only reason

4  I know that is because I did her medicines.  So I was doing

5  warfarin up until the point -- or Coumadin or whatever up

6  until the point where we switched to Pradaxa.

7  Q.   Did she ever tell you in that time period, "Hey, Rick,

8  I don't want to take this medicine anymore"?

9  A.   No.

10 Q.   Were you taking her back and forth to get her blood

11 checked on occasion?

12 A.   Some of the times later on, you know.  There again, it

13 was maybe the last two years of her life.  She wasn't as

14 strong, you know, to drive herself.  She was 82 at that

15 point, you know.

16 Q.   Before that, how did she get to and from --

17 A.   She drove.

18 Q.   She would drive to --

19 A.   She drove to the doctor, yeah.

20 Q.   Were there any dietary issues, stuff your mom wasn't

21 supposed to eat that you're aware of because she was taking

22 that drug?

23 A.   Yes.

24 Q.   What do you remember?

25 A.   Greens, green vegetables, salads.  She liked salads.

Claude Richard Knight - Direct (Childers)

1  She liked broccoli.  She liked greens and she couldn't --

2  she wasn't supposed to eat them.  And -- but she wasn't

3  supposed to eat candy either but she's like me.

4  Q.   Sometimes she would eat it?

5  A.   Every once in a while.

6  Q.   Did your mom ever tell you she wanted to stop taking

7  Coumadin because of that issue, that she wasn't supposed to

8  eat greens?

9  A.   No.

10 Q.   Do you recall anything about your mom's INR levels?

11 When I say "INR," you know the blood test that they do on

12 warfarin?  Do you remember anything about that?

13 A.   I don't -- didn't know anything about that.  I mean, I

14 knew there was a test she had to take to see what range her

15 blood was in.  But she just didn't like going -- having to

16 go to the doctor to get it checked all the time.

17 Q.   But she did it anyway?

18 A.   Yes.

19 Q.   And sometimes you even took her?

20 A.   Uh-huh, yes.

21 Q.   Okay.  Do you remember her dose of warfarin ever

22 changing, having to change?

23 A.   Yes.  Yeah, because in the medicine cabinet that I'd

24 have sometimes I'd have a -- I think it came in like .2 and

25 then there was a .5.  So if, if her range was, was off, then

Claude Richard Knight - Direct (Childers)

1  I would -- I had the medicine that she could either -- to

2  get it up or to get it down.

3  Q.   You would help her get her pills in order?

4  A.   The doctor would tell us what, you know, what dosage to

5  give her, what pill to give her.  And then if I had it in

6  there, then I'd give it to her.  If not, the doctor would

7  have to call it in.

8  Q.   During that time period when you -- when your mom was

9  on warfarin, do you recall her ever having a stroke?

10 A.   Not while she was on warfarin, no.

11 Q.   Do you recall her ever having any kind of blood clot

12 while she was on warfarin?

13 A.   I don't remember her having any bleeds while she was on

14 warfarin.  I mean, --

15 Q.   That was going to be my next question.

16 A.   Oh, yeah.  I don't remember any bleeds while she was on

17 warfarin.

18 Q.   We heard that you went to some of her doctors'

19 appointments with her and some of the doctors seemed to be

20 familiar with you when we saw their depositions.  Did any of

21 them ever tell you, "We want to switch your mom off of

22 warfarin to a different drug"?

23 A.   No.

24 Q.   I want to talk about the switch from warfarin to

25 Pradaxa.  Can you tell the jury where the idea for that came

Claude Richard Knight - Direct (Childers)

1  from?

2  A.   Yes.  I didn't remember this until I had to have my

3  memory refreshed and I saw the memo.  But my sister had, had

4  seen a commercial on TV.  And it said that you didn't have

5  to monitor your blood and -- or your diet.

6      And she called me about it.  And we both thought, you

7  know, maybe this is something mom would like to do because

8  she wouldn't have to go back to the doctor's office that

9  often.

10     So Claudia and I decided we'd talk to her about it.  So

11  from the memo from the doctor's office --

12  Q.   Well, let me, let me --

13  A.   I'm sorry.

14  Q.   Actually, that's already admitted into evidence.  Let's

15  look at it so you can -- we can, we can all see again what

16  actions you took.

17          MR. CHILDERS:  If we could bring up Exhibit

18  2000-2817.

19     This is already admitted, Your Honor.

20  BY MR. CHILDERS:

21  Q.   Is this the memo you're talking about and the phone

22  message?  And that's in your, in your binder too if you

23  can't see it there.

24  A.   Yes, it is.

25  Q.   Okay.  And what -- tell us what this, this says.

Claude Richard Knight - Direct (Childers)

1  A.   It appears that I called that morning about 9:30, 9:40.

2  And I'm assuming that she had a 3:00 appointment that day.

3  And they said that we'd like to talk to her about a

4  replacement drug for Coumadin.  So it was our -- my sister

5  and I initiated the, the request due to the fact that she

6  had seen a commercial and we thought it might be the answer

7  to her situation.

8          THE COURT:  Could you scoot up just a little bit?

9          THE WITNESS:  Oh, I'm sorry.

10 BY MR. CHILDERS:

11 Q.   And when you said the answer to her situation, what do

12 you mean?

13 A.   She could eat her greens again --

14 Q.   Okay.

15 A.   -- and she wouldn't have to go to the doctor all the

16 time to get her, her blood checked.

17 Q.   Okay.  And then if we could -- if you could turn one

18 page.

19     Gina, could you bring up 2000-2860.  Could we blow up

20 the top half -- top quarter I guess.

21     And do you see -- do you remember seeing this

22 yesterday?

23 A.   Yes.

24 Q.   This was the --

25 A.   Yes.

Claude Richard Knight - Direct (Childers)

1  Q.  And the date is the same as that phone message we just

2  saw, October 17th, 2011.  Right?

3  A.  Correct.

4  Q.  And then if we look under the chief complaint, do you

5  see it there?  It says, "Want to replace Coumadin with new

6  medication Pradaxa."

7  A.  Correct.

8  Q.  Who, who told the doctor that or who told the nurse

9  that?

10 A.  Well, it was either Claudia or I because we were the

11 ones that initiated the, the inquiry about the drug.

12 Q.  And did you specifically ask for Pradaxa like it's

13 written on here?

14 A.  Yes, because that's the commercial that Claudia had

15 seen, so we knew the name of that particular drug.  I mean,

16 I didn't even know there were any other drugs out there like

17 that.

18 Q.  This office visit that we're looking at, were you there

19 with Claudia and your mother for this particular office

20 visit?

21 A.  I would say -- I can't -- you know, I don't remember

22 particularly this one.  But saying that, with the Pradaxa, I

23 brought it up, so -- and we had a 3:00 meeting.  I would

24 say, yes, I was there.

25 Q.  Okay.  As far as the decision to go ask for Pradaxa,

Claude Richard Knight - Direct (Childers)                    902

1  was that a decision that you and Claudia and your mother

2  made together or how did that come about?

3  A.   Well, Claudia and I made -- brought the idea up.  And

4  then mom agreed that she'd like to find, you know --

5              MR. CHILDERS:  I'm going to move over here just

6  for a minute, Your Honor.

7  BY MR. CHILDERS:

8  Q.   Now, Rick, when you made that decision, you and Claudia

9  and your mom, did you know that Pradaxa had never actually

10  been clinically tested in patients like your mom who had

11  severe renal impairment?

12  A.   Did I know that?  No.

13  Q.   Did you -- when you made that decision to go ask for

14  Pradaxa, did you know that the dose they were going to

15  prescribe to her had never actually been tested in humans?

16  A.   No.

17  Q.   When you made that decision to go ask for Pradaxa for

18  your mom did you know that patients like your mom who were

19  taking Coreg and had severe renal impairment weren't

20  supposed to take Pradaxa?

21  A.   No.

22  Q.   When you made the decision to ask for Pradaxa, did you

23  know there was no reversal agent for that drug?

24  A.   No.

25  Q.   And when you made the decision to ask your mom's

Claude Richard Knight - Direct (Childers)

1  physician to change her to Pradaxa, did you know that your

2  mom would be more likely to have a GI bleed on Pradaxa than

3  she was on the warfarin that she was already taking?

4  A.   No.

5  Q.   If, if you had known any one of these things, would you

6  have requested that your mom be switched from warfarin to

7  Pradaxa?

8  A.   Would I have -- if I'd known this?  I think it would

9  have been -- it would have played into the decision.  I

10  can't say "yes" or "no" because I didn't -- you know, we

11  didn't have it to make that decision.

12  Q.   And I understand you didn't have it then.  Having it

13  now, knowing these things now, would you have asked that

14  your mom switch or would you have wanted her to stay on --

15  A.   What were the benefits of switching, you know, against

16  the warfarin?  She'd never had a bleed, you know.

17  Q.   Right.

18  A.   So I, I would probably have said, no, I, I wouldn't,

19  you know, I wouldn't have switched.  But there again, I

20  don't remember this meeting that we were in and I don't --

21  so if I don't remember the meeting, I don't know what was

22  said, you know, in there.

23  Q.   I understand that.  But as far as the decision itself,

24  if you knew that these issues were there, were present, is

25  this a drug you would have wanted your mom to be on?

Claude Richard Knight - Direct (Childers)          904

1    A.   No.

2    Q.   Why was it important for you and your sister to be a

3    part of this decision with your mom?

4    A.   Well, she didn't know about the drug and we wanted to

5    make it easier for her, make her life easier.  So that's why

6    we called in and questioned the drug, questioned if it was a

7    drug for her.

8    Q.   After that meeting, did Dr. MacFarland's office

9    prescribe Pradaxa for your mom?

10   A.   It was -- I think I saw the notes yesterday where she

11   sent something to the insurance company the next day.  And

12   then the pharmacy filled the -- I think a day or two later

13   the pharmacy filled the prescription for Pradaxa.

14   Q.   Did your mom pick up her own prescriptions?

15   A.   Yes, until, until probably the last year.

16   Q.   Can we pull up, Gina, Exhibit 2000-2343.  And can you

17   blow up the top where it says -- yeah.

18        Did she go to the CVS Pharmacy?  Is that where she got

19   most of her medicines?

20   A.   Yes.  It was right next -- it was on her way from the

21   doctor's office.  You go to CVS, drive through the

22   drive-through window, and then make a right-hand turn and

23   she was home on her street.  So it was very convenient for

24   her.

25   Q.   And do you see here on that CVS Pharmacy record it

Claude Richard Knight - Direct (Childers)

1   looks like two days after you had that meeting on

2   October 19th, 2001 (verbatim), they filled that Pradaxa

3   prescription the first time?

4   A.   Yes.

5   Q.   And she would have picked that up herself to your

6   knowledge?

7   A.   To the best of my knowledge, yes.

8   Q.   Okay.  You can take that down.

9        I want to shift gears again now and talk about the time

10  period around when your mom had the GI bleed in May of 2013.

11  Do you recall that time?

12  A.   Yes.

13  Q.   When did you come to learn that your mom was having an

14  issue with bleeding?

15  A.   I think that earlier in the week the -- you know, I'm

16  not sure.  But to be honest with you, I saw the bleeding on

17  the day that I took her to the doctor's office.  She may

18  have mentioned the day before or a couple days that she had

19  some minor bleeding, but I can't recall that, you know, to

20  be honest with you.

21       So I'd have to say when I saw the blood in the commode

22  myself and how much it was, it concerned me.  So I called

23  the doctor's office and got her in the car and went to Dr.

24  Abdelgaber's office.

25  Q.   That was the first thing you had actually seen that she

Claude Richard Knight - Direct (Childers)

1    had any blood?

2    A.    Yes.

3    Q.    And you took her right over to Dr. Abdelgaber?

4    A.    Correct.  She was very white and weak.

5    Q.    What happened when you got to Dr. Abdelgaber's office?

6    A.    To the best of my knowledge, he looked at her and he

7    knew something was wrong.  And he went ahead and admitted

8    her over the phone so could I take her directly in the

9    hospital.  She wouldn't have to wait for admission.

10   Q.    Did you understand at all what was happening with her,

11   what kind of a problem she was having?

12   A.    You know, I never really understood.  Every time my

13   mother went in for any episodes into the hospital, she

14   always bounced back.  I never -- I don't know whether it was

15   I didn't want to think it or whether I didn't -- I just

16   never thought that anything was fatal, you know.  I thought

17   that she would just bounce back like always.

18   Q.    And this particular time, was this the first time you

19   recall her having a GI bleed?

20   A.    Yes.

21   Q.    And would your -- what was your understanding about how

22   bad it was or how serious it was?

23   A.    Well, she had lost quite a bit of blood, so it was

24   serious.  I did know that at that point.  We were dealing

25   with something serious, but I didn't know how serious.

Claude Richard Knight - Direct (Childers)

1  Q.  Did you go to the hospital every day with, to see your

2  mom while she was there?

3  A.  I don't know whether it was every day or not.  I'd call

4  and talk to her on the phone.  Claudia or I one would stop

5  by.  Maybe Claudia, she went over for lunch or I'd go over

6  for lunch.  She was still working and I was retired.  But

7  she did a lot of sleeping, so I might not have gone every

8  day, but I talked to her on the phone at least.

9  Q.  At some point, your mom got moved from the hospital

10  into the skilled nursing facility.  Do you recall that?

11  A.  Correct.

12  Q.  Okay.  Let's pull up Exhibit 2000-3431 if we could.

13      And that is in your binder, Rick, if you'd look at the

14  bottom number.

15  A.  What number is that?

16  Q.  On the very bottom it says 2000-3431.  It should be in

17  numerical order.  Oh, I'm sorry.  It's under the 2000-B tab.

18  A.  Thank you.

19  Q.  Do you see that?

20  A.  Oh, yes.

21  Q.  Okay.  This is the Discharge Summary when your mom left

22  the skilled nursing facility.  Do you see that?  It's dated

23  June 8th, 2013.

24  A.  Oh, I see it.

25  Q.  Do you remember your mom coming home from that skilled

Claude Richard Knight - Direct (Childers)

1  nursing facility after she'd been there for a while?

2  A.   Do I remember her coming home from this specifically?

3  Q.   I don't mean like do you remember the trip from the

4  hospital.

5  A.   No, I don't.  I don't remember that, you know.  After

6  she was in there for a while, then she, then she was

7  released and went home, yes.

8  Q.   And what were your observations about her overall

9  health when she got back after that GI bleed?

10  A.   She just -- she was worn out.  She was just tired.

11  Q.   Was that different than you recalled from other

12  hospitalizations when she came home?

13  A.   I think I said, you know, before that she -- any time

14  she was in the hospital, been to the doctor, been sick, she

15  got -- she bounced back to herself, you know.  She wasn't --

16  she was older.  But she just never got the jump in her feet,

17  you know, the shuffle in her feet.  She just was -- I don't

18  know how you explain it.  She just wasn't herself.

19  Q.   The jury has heard that she had some stents put in her

20  heart in April of 2013 and before she had the bleed.  Do you

21  recall that happening?

22  A.   I remember her getting some stents, yes.

23  Q.   Okay.  After she got out of the hospital from the

24  stents, did you guys as a family have any kind of event or

25  celebration?

Claude Richard Knight - Direct (Childers)

1  A.   I think I said that before.  We always got together for

2  Mother's Day.  Actually, we had one right before this.  I'm

3  trying to think what I was going to say.  Excuse me.

4  Mother's Day and my birthday.

5  Q.   Was that a special birthday for you that year?

6  A.   Yeah.  I turned 60.

7  Q.   You don't look 60.

8  A.   I don't act it either.

9  Q.   Did your mom -- did you have a party?  Did you have a

10  gathering?

11  A.   A couple of my friends came to my sister's house.  Mom

12  was there.  And she had a friend of mine go take her to the

13  mall and she got me a 60 coffee mug.  I got one when I was

14  40 too and I've still got it, you know, "lordy, lordy, my

15  child is 40."  My dad and my mom wore those T-shirts when I

16  turned 40, decorated my yard at 40.  You know, they couldn't

17  embarrass you anymore.

18       But I've still got the 40 cup and I've got the 60 cup

19  too, you know.  Those were stepping stones in my life, marks

20  in my life that, that I got to celebrate with my parents,

21  you know.  And the 40th was fun, the T-shirts.  I think, I

22  think she still had the T-shirt when she died.

23  Q.   On your 60th birthday gathering was your mom there?

24  A.   Yes.

25  Q.   Was she able to hang out with you guys and enjoy

Claude Richard Knight - Direct (Childers)

1   herself?

2   A.    Yes.

3   Q.    And then the bleed was two or three weeks after that?

4   A.    Yeah.  My birthday and Mother's Day, I think it was, it

5   was probably a Sunday that we were celebrating on.

6   Q.    Okay.  What's your birthday so we all know?

7   A.    May 15th, 1953.

8   Q.    Okay.  So it was about five days before she went in the

9   hospital with the bleed.

10  A.    Correct.

11  Q.    When she came to that party was she complaining about

12  having bleeding?

13  A.    No.

14  Q.    After she was in the hospital for the bleed, did your

15  mom have a birthday?

16  A.    She did.  July the 11th is her birthday.

17  Q.    What did you guys do to celebrate her birthday?

18  A.    Well, usually Claudia would cook dinner or we'd go out

19  to dinner.  But she didn't feel good.  We didn't do anything

20  on that, that birthday.  She didn't feel, she didn't feel up

21  to it.

22  Q.    Was that unusual?

23  A.    Very.

24  Q.    Do you recall ever having a birthday of hers where you

25  guys didn't get together?

Claude Richard Knight - Direct (Childers)                    911

1  A.   Not unless I was out of town.

2  Q.   And as far as why she didn't want to get together, what

3  was happening with her?

4  A.   Well, she just didn't, didn't feel good.

5  Q.   And I'm going to move now to September 1st, 2013.

6  A.   Uh-huh.

7  Q.   Were you at your mom's house at some point that day?

8  A.   Yes.  Actually, she had just gotten out of the hospital

9  a few, a few days before if I'm not mistaken.

10  Q.   Okay.  And that day in particular were you --

11  A.   I had stayed a few nights with her because she wasn't

12  feeling good and she had gotten out of the hospital and she

13  was just walking around on her walker and she had carpet.

14  So it was a little rough to push it.  But, yeah, so I had

15  stayed there that, that, the night before.

16  Q.   And can you tell the jury what happened during the day

17  there at her house on September 1st, 2013?

18  A.   Actually, she wasn't feeling good when she, when she

19  woke up.  And I called Claudia and said, "Why don't you come

20  down.  Mom's not, not acting --" she wasn't feeling good,

21  acting right, whatever.

22        So Claudia came down and we got her to sit up in the

23  bed, on the side of the bed, and helped her eat some food,

24  not a whole lot but a little bit.

25        And then Claudia mentioned, "Do you want to go in the

Claude Richard Knight - Direct (Childers)

1   living room and sit and watch TV for a little bit?"  She

2   didn't have a TV in her bedroom.  So she said, "Yeah."

3       So we got on -- one of us got on each side of her and

4   she held onto her walker.  And it's not very far from her

5   bed, maybe to that stand right there to the living room to

6   get her down a little hallway and into the living room.

7       But we walked, both of us, one on each side of her and

8   we walked her into the living room.  And she turned around

9   and she just sort of plopped down on the, on the couch.

10      And she goes -- I, I can't remember exactly.  I think

11  it was, "That was tough."  And right after she said that,

12  something happened.  And she just sort -- her eyes just sort

13  of glazed over.

14      And I told Claudia to call 911 and I got a

15  nitroglycerine tablet under her tongue and was talking to

16  her.  But she wasn't -- she couldn't communicate with me

17  right then.  So the ambulance came.

18  Q.   Where did the ambulance take her?

19  A.   St. Mary's.

20  Q.   Did you ride in the ambulance or did you follow the

21  ambulance?

22  A.   No, Claudia and I both waited -- the ambulance -- they

23  got her into the ambulance and they sat in front of the

24  house for a long time.  I still don't know why they were

25  there.  Maybe that's when they were trying to do something

913

Claude Richard Knight - Direct (Childers)

1   to her.  I don't know.

2       The ambulance went to the hospital.  Claudia and I

3   followed the ambulance.  And we started to go into the

4   ambulance entrance because that's what we'd done before when

5   the ambulance would take her.

6       But they stopped us at the entrance to the, to the

7   emergency room and said, "No, you need to go around front."

8   And we looked, you know, just like why do we need to go --

9   we always come through here.  They said, "You need to go to

10  the front."

11      So I think at that -- both of us sort of thought, you

12  know, this is really serious.  Something's going on.  And

13  they didn't let us back for a while, you know.

14      Then when we got back there, they had already put

15  tubes -- she was hooked up to -- I don't know what machines

16  but there were a lot of machines.  She was already, had the

17  tube --

18  Q.  Intubated?

19  A.  Yes.

20  Q.  So they had to put the tube down her that she was

21  afraid of?

22  A.  Correct, uh-huh.

23  Q.  Did your mom have what's called a Living Will?

24  A.  Yes.

25  Q.  And that tells doctors what she wants and doesn't want

Claude Richard Knight - Direct (Childers)

1  to have them do to her if she's potentially dying?

2  A.   Correct.

3  Q.   And what did her Living Will, to your knowledge, say

4  about being on a ventilator?

5  A.   Well, we knew that she didn't want to be put on a

6  ventilator.  She thought -- you know, like I said, the time

7  before when Claudia and I had to talk her into just having

8  it on for a few days.  She was like me.  I -- she didn't

9  want to live on a ventilator.

10 Q.   So did you and Claudia make a decision at that point

11 about the ventilator?

12 A.   We were sort of a little bit -- yeah.  When we saw it,

13 we were in shock I think more than anything else.

14      And then when they got her up to IC -- or ICU I think

15 or cardiac ICU, whatever, where they got her out of the ER

16 and I don't even remember the doctor that we talked to.  But

17 we, we knew that she didn't want to be on that.  So we

18 decided to have them remove the tube and then hopefully

19 she'd breathe on her own.

20 Q.   What happened after the tube was removed?

21 A.   She died at 4:20 that afternoon, that evening.

22 Q.   Were you there?

23 A.   Yes, yes, I was.  I was on one side.  Claudia was on

24 the other.

25 Q.   The last thing I want to ask you is as best you can,

Claude Richard Knight - Direct (Childers)

1   tell the jury what it is you miss most about your mom.

2   A.    I miss her company.  It's funny.  The older you get,

3   the more you realize who your best friends are.  And my

4   parents were my best friends, my cheerleaders throughout my

5   life.  There wasn't anything that my mother wouldn't do for

6   me.

7        I'll share this with you.  I shared it with you

8   yesterday.  My mother couldn't have kids and she had to have

9   two special operations in the '50s to have children.  So

10  she, she got two children and they were wanted and they were

11  loved by both our parents.

12       You know, it's just -- I miss -- like I said, we went

13  to musical art guilds.  We went to movies, out to dinner,

14  church.  Just -- I miss her companionship, picking up the

15  phone when something happens and you go, "Mom."

16       And that goes on, you know, you still miss that.  I

17  still miss her voice, you know.  I still miss my dad's voice

18  too and he's been gone since '95.  I miss her coming over to

19  my house and watching movies.  We'd put a movie on.  I had

20  dogs.  I've always had dogs.  And she loved them, you know,

21  loved the animals.

22       We'd sit out in my backyard in the swing.  We didn't

23  have to do anything.  We just spent time together.  So I'm

24  sure I got on her nerves.  You know, we get on each other's

25  nerves, you know.  I can take you for two hours and then --

Claude Richard Knight - Cross (Lewis)

1     But it's -- that's what I miss, though.  I miss not

2  having her around.  And she was 84 when she passed away.

3  She had a good life.  But you're never prepared.

4  Q.   Thank you, Rick.  I think the defense will have some

5  questions for you.

6  A.   Thank you.

7          THE COURT:  All right.

8          MR. LEWIS:  Real quickly, Your Honor.

9          THE COURT:  Go ahead.

10                 CROSS EXAMINATION

11  BY MR. LEWIS:

12  Q.   Good afternoon, Mr. Knight.  How are you?

13  A.   Good afternoon.

14  Q.   We've met a couple of times here during the trial.  I

15  want to be respectful.  I just have a couple of questions.

16  A.   I understand.

17  Q.   When you and your mom and your sister were making

18  medical decisions for the benefit of your, for your mom, did

19  you rely on the advice and the medical judgment of her

20  physicians?

21  A.   Do you know -- are you talking particularly about

22  Pradaxa?

23  Q.   Just generally.

24  A.   Do you know she stayed on -- this is the only drug that

25  we talked to them about because she was already on her drugs

Claude Richard Knight - Cross (Lewis)

1  when I got back from, from Roanoke.  And I just picked them

2  up for her if she couldn't pick them up.  And I did her

3  medicines in the, in the box so it would be easier for her.

4      But as far as drugs, this is the only drug that we ever

5  had any response with because we thought it would be easier

6  for her.

7  Q.  And when the decision was made for Pradaxa in

8  particular, did you rely on the advice of Dr. MacFarland?

9  Did you rely on the medical judgment of Dr. MacFarland?

10 A.  I have to tell you I don't know because I don't

11 remember the meeting at all.  But I -- excuse me.  The only

12 way I knew was because of the telephone note and it said

13 what I had said there and, and that was it.  We asked for

14 Pradaxa.

15 Q.  Fair enough.  And with respect to the GI bleed --

16 A.  Yes.

17 Q.  -- that your mom experienced, do you recall any doctor

18 ever coming to you and saying that that was caused by

19 Pradaxa?

20 A.  Did any doctor ever tell me that Pradaxa caused it?

21 No, sir.

22 Q.  Okay.  Thank you for your time, sir.

23          THE COURT:  All right.  Any other questions?

24          MR. CHILDERS:  No, Your Honor.

25          THE COURT:  All right.  You may step down.  Thank

Claude Richard Knight - Cross (Lewis)

1    you.

2          (Witness stood aside.)

3              THE COURT:  We'll take our lunch recess at this

4    time.  We'll stand in recess until 1:15.  Remember my

5    instructions.  Don't deliberate or discuss the case.  And

6    I'll see you back here at 1:15.

7          Could I see counsel just for a sidebar?

8          (Jury retired from the courtroom at 12:09 p.m.)

9          (Pause in proceedings)

10         (Recess taken at 12:10 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

919

1              HUNTINGTON, WEST VIRGINIA

2         WEDNESDAY, OCTOBER 10, 2018, 1:16 P.M.

3                     ---o0o---

4        (Jury not present.)

5              THE COURT:  All right.  Before we proceed with the

6    jury, can we get an update from the defense?

7              MR. LEWIS:  Yes.

8              We reached out to -- we really have two witnesses, and

9    we reached out to both of them.  There's one witness that just

10   has too many patients scheduled all week.  He is really saying

11   these people need to be treated, and he has to take care of

12   them.

13             Our other witness has patients all the way through

14   into early evening Thursday, but is in Charlottesville,

15   Virginia, and was out of the country until Sunday, so I

16   haven't talked to her in several weeks.  So it would be, in my

17   mind, a real hardship and really not do justice to this case

18   and the seriousness to have her drive all the way up, get here

19   at midnight and testify at 9:00 the next day.  I mean, it

20   would be a real hardship and not give the attention that this

21   case needs.

22             I know that at least one of the days we could do work

23   with the Court.  I think we have a pretty substantial directed

24   verdict motion, and we could hammer out the jury instructions

25   in a charge conference, and so we're talking about one day.

1      We don't really want to fill that time with evidence

2  that we don't need.  We've really shaved our case down to just

3  two witnesses and that little video that we'll play this

4  afternoon.  So in that way, you know, the decision was made

5  earlier this week, when we were talking to the doctors what

6  days we had to pick, you could testify Thursday, Friday or

7  Monday, Tuesday possibly, and we told them to plan for Monday,

8  Tuesday.

9      THE COURT:  All right.  You want to comment one way or

10  the other?

11      MR. CHILDERS:  I'm not really sure what I could add.

12      THE COURT:  Well, thanks for checking with them.

13  Let's ponder this a bit.  We'll go ahead with the plaintiffs'

14  last witness.  We'll take a brief recess after that.  If you

15  would feel more comfortable, I'll let you make a motion

16  without articulating the grounds, and I'll hold further

17  discussion of it in abeyance until we have finished with the

18  jury today.  That will allow you to go ahead and play this

19  video.  And then sometime before then, and obviously before we

20  send this jury home for the day, we'll have to have a

21  resolution of what we're going to do going forward.

22      MR. LEWIS:  Okay.

23      THE COURT:  This will give us a little bit of time to

24  think about it.

25      MR. LEWIS:  I don't make my motion in front of the

921

1      jury.  I wait --

2                THE COURT:  No.

3                MR. LEWIS:  Okay.

4                THE COURT:  All right.

5                MR. CHILDERS:  Just before the jury comes back,

6      Mr. Lewis and I reached an agreement on the rest of the

7      photographs, that we could just go ahead and have them

8      admitted so I wouldn't have to lay a foundation every time.

9                THE COURT:  All right.

10               MR. CHILDERS:  So if I could just go ahead and put on

11     the record, Your Honor, Exhibit 2012 dash A, I move for its

12     admission.

13               MR. LEWIS:  No objection.

14               THE COURT:  And it's admitted.

15               MR. CHILDERS:  I'm sorry.  Not dash, 2012A without a

16     dash.  I apologize.

17               MR. LEWIS:  No objection.

18               THE COURT:  It's admitted.

19               MR. CHILDERS:  Thank you, Your Honor.

20          (PLAINTIFFS' EXHIBIT 2012A ADMITTED INTO EVIDENCE.)

21               THE COURT:  All right.  Are we ready, then, to bring

22     the jury out?

23               MR. CHILDERS:  Yes, sir.

24               THE COURT:  Let's go ahead.

25          (Jury present.)

1          THE COURT:  All right.  Plaintiffs may call their next

2     witness.

3          MR. CHILDERS:  Your Honor, plaintiffs call Claudia

4     Stevens.

5          THE COURT:  All right.  Ms. Stevens, if you will step

6     up here, my clerk will swear you in.

7          THE CLERK:  Please raise your right hand.

8          CLAUDIA STEVENS, PLAINTIFFS' WITNESS, SWORN

9          THE WITNESS:  I do.

10          THE CLERK:  Have a seat.

11                    DIRECT EXAMINATION

12     BY MR. CHILDERS:

13     Q.  Claudia, would you please introduce yourself to the jury?

14     A.  Claudia Erlene Stevens.

15     Q.  Where do you live, Claudia?

16     A.  Huntington, West Virginia.

17          THE COURT:  You might need to get just a little closer

18     to the microphone.

19          THE WITNESS:  I'm sorry.  Huntington, West Virginia.

20     BY MR. CHILDERS:

21     Q.  Have you ever testified in court before?

22     A.  No.

23     Q.  Okay.  Are you a little nervous?

24     A.  Yes.

25     Q.  Okay.  You will relax after a few minutes, but I

Claudia Stevens - Direct (Childers)                923

 1   understand.

 2        Where do you work, Claudia?

 3   A.  I work for the Cabell County Board of Education.

 4   Q.  And what do you do there?

 5   A.  I work in the business office, payroll.

 6   Q.  How long have you worked there?

 7   A.  I have worked for the Board of Education for 41 years.

 8   Q.  Where did you grow up?

 9   A.  Huntington, West Virginia.

10   Q.  Have you lived here your whole life?

11   A.  Yes.

12   Q.  Okay.  Where did you go to high school?

13   A.  Huntington East High School.

14   Q.  The same place Rick went?

15   A.  Yes.

16   Q.  Okay.  Have you taken any college courses?

17   A.  Yes, went one semester.

18   Q.  Tell us what you took.

19   A.  Business classes.

20   Q.  Do you -- are you married?

21   A.  Divorced.

22   Q.  Okay.  Do you have any children?

23   A.  I have two sons.

24   Q.  Okay.  And where do they live?

25   A.  One lives in Charleston, South Carolina, and one lives in

Claudia Stevens - Direct (Childers)                924

1   Huntington.

2   Q.  What are their names?

3   A.  Brad, David Bradley Stevens and Brandon Scott Stevens.

4   Q.  Rick told us some about your mom, and I'd like to get you

5   to tell us more about your relationship that you had with your

6   mother.  Okay?

7   A.  I had a very close relationship with my mother.  We did a

8   lot together with her and my father.  We did a lot of

9   traveling with my grandsons, their baseball tournaments.  Ah,

10  she was at our house for every holiday, every birthday, just

11  all the time.

12      She's a very loving mother, caring mother, and she loved

13  her grandchildren.  And she got to meet her two -- well, four

14  of her great grandchildren.

15  Q.  She has great grandchildren?

16  A.  Yes, I'm sorry.  Yes, great grandchildren.

17  Q.  Your children's children?

18  A.  Yes.

19  Q.  Okay.  Did she ever watch your children or take care of --

20  A.  Yes, she did.  She watched them, and she actually even

21  watched two older grandchildren, her great grandchildren at

22  times.

23  Q.  Did she like being a grandmother?

24  A.  She did.  She loved children.

25  Q.  And in particular, did she do things with your -- with

Claudia Stevens - Direct (Childers)                    925

1   your children?

2   A.  Yes.  We would go to Billy Bob's and just different

3   things.  And baseball games.  I had sons, and so that is

4   basically what they did.

5   Q.  Were they on traveling baseball teams where they played in

6   tournaments --

7   A.  They won state tournaments, and we would go to St.

8   Petersburg, Florida, and all the state tournaments and

9   regionals.

10  Q.  Did your mom go along for those?

11  A.  Yes.

12  Q.  How often did you talk to your mom while she was alive?

13  A.  Pretty much every day.

14  Q.  How far apart did you all live?

15  A.  15 minutes, 20 minutes.

16  Q.  And how many times a week do you think you saw your mom --

17  A.  At least two, but, you know, could be more.

18  Q.  What kind of things did you and your mom do together?

19  A.  We went out to eat a lot, went to church.  She would come

20  to the house a lot and spend time with her grandchildren.  Ah,

21  shopping.

22  Q.  Shopping, is that what you said?

23  A.  Oh, yes.

24  Q.  Okay.  She liked to shop at --

25  A.  Yes.

Claudia Stevens - Direct (Childers)                926

1    Q.  What did she like to shop for?

2    A.  Clothes, anything for herself.

3    Q.  I want to talk a little bit about her health.  We've heard

4    here that she had quite a few different kinds of health

5    problems in her lifetime.

6        Is that fair to say?

7    A.  Yes.

8    Q.  And that she had to take medicines for those conditions.

9    You knew that?

10   A.  Yes.

11   Q.  And that she was sometimes hospitalized because of those

12   other conditions.  Did you know that?

13   A.  Yes.

14   Q.  Okay.  Prior to May of 2013, how would you describe how

15   your mother recuperated after each of the times that she was

16   in the hospital?

17   A.  She always bounced back.  She would get ill, be in the

18   hospital, and then she would be back to normal.

19   Q.  Rick told us about this one particular time when your mom

20   had to be intubated, and she didn't want to be?

21   A.  Yes.

22   Q.  And can you tell us your recollection of that?

23   A.  We just went there, and she was having trouble breathing.

24   And they were going to get her ready to do that, and she

25   refused it.  And the doctors called us out and said, you know,

Claudia Stevens - Direct (Childers)                    927

1    this is not, you know, like life-threatening, it's just to

2    help her breathe for a few days.  So we went back and

3    explained that to her.  And once she understood that, she was

4    okay with it.  She just didn't want to be put on something for

5    life.

6    Q.  Okay.  And that was a decision that you helped her --

7    A.  Yes.

8    Q.  -- you and Rick helped her make together?

9    A.  Yes.

10   Q.  Okay.  Do you recall -- let me ask you a different

11   question.

12       Your mom, did she live by herself or with somebody else?

13   A.  She lived by herself.

14   Q.  And how was she able to do that?  Was she --

15   A.  She could take care of herself.  She was very independent.

16   Q.  And that was all the way up until the time she passed?

17   A.  Yes.

18   Q.  And I understand -- we heard from Rick you had some home

19   helpers that would come in and help her with cooking,

20   cleaning, that kind of thing --

21   A.  Yes.

22   Q.  -- is that right?

23   A.  Yes.

24   Q.  And what was your recollection on how often they came to

25   her house?

Claudia Stevens - Direct (Childers)                    928

1   A.  They just -- they came I think it was like twice a week

2   just for a couple hours a day.

3   Q.  Did you guys celebrate holidays together?

4   A.  Always.  We missed one.

5          MR. CHILDERS:  We've got some pictures in the binder

6   that is in front of you that I was hoping you could identify

7   for the jury so they can just get a little bit better idea

8   about your mother.

9          These have already been admitted, Your Honor.

10         The first one is No. 14.  Pull that up.

11  Q.  You see that?

12  A.  Yes.

13  Q.  Can you tell us who is in this picture?

14  A.  That's my youngest son Brandon and my mother at

15  Christmastime.

16  Q.  Whose house were you at?

17  A.  At her house.

18  Q.  She had a tree up at her house, and you went over there?

19  A.  We did Christmas Eve at her house and Christmas at mine.

20  Q.  We do the same thing in my family.

21      I want to show you another picture.  If you would flip to

22  page 39.

23      You mentioned you guys would go out to dinner --

24  A.  Yes.

25  Q.  -- is that right?

Claudia Stevens - Direct (Childers)                     929

1        Okay.  Who is in this picture with you and your mom?

2   A.   That's my two granddaughters, her great granddaughters.

3   Q.   And is it somebody's birthday or some kind of -- I see a

4   cake there or --

5   A.   It must have been one of the girl's birthdays.  Probably

6   just out to dinner.  We always had big celebrations at home,

7   but we probably just went out to dinner and had something.

8   Q.   Do these granddaughters live here or are they --

9   A.   Yes.

10  Q.   So did they get to see your mom very often?

11  A.   Yes.  Kayley now is almost 21, and Taylor is 17.

12  Q.   Okay.  And then if you could go to picture No. 45.

13       This is you and Rick and your mom?

14  A.   Yes.

15  Q.   And do you remember when that picture was taken?

16  A.   It was Mother's Day, and it was at Red Lobster.

17  Q.   Did you guys -- the one that is right down the street over

18  here?

19  A.   Yes.

20  Q.   Okay.  Did you guys celebrate Mother's Day together every

21  year?

22  A.   Yes.

23  Q.   And I think it's close to Rick's birthday; is that right?

24  A.   Right.  Yeah.

25  Q.   Did you guys do something -- sort of a dual type thing

1  usually?

2  A.  Usually.

3  Q.  Were there any holidays that you didn't spend together?

4  A.  Just her last birthday.

5  Q.  Let me ask you about that.

6     Rick told us a little bit about that already, but what was

7  your recollection as to why your mother wasn't --

8  A.  She was just too ill to go at that time, and I think she

9  went in the hospital the day before my birthday.  I believe it

10  was July the 12th she went in the hospital.

11  Q.  And prior to that, had there ever been a birthday where

12  you can recall your mom saying I just don't feel like --

13  A.  No.

14  Q.  The jury has heard a lot of -- has heard some talk about

15  the fact that your mom had been diagnosed with dementia.

16     Are you aware of that?

17  A.  I don't think -- I mean, I think maybe a little bit,

18  just --

19  Q.  That's what I wanted to get and see if you could sort of

20  explain to us your interactions with your mom.

21     How bad was her memory?

22  A.  Not that bad.  I mean, just, you know, a little bit of

23  memory loss.  You know, when you get older, you know, you get

24  forgetful or maybe repeat yourself.  But, I mean, it wasn't

25  bad.

Claudia Stevens - Direct (Childers)                931

1   Q.  She still lived by herself?

2   A.  Yes.

3   Q.  Okay.

4   A.  And it's not like she forgot her name or forgot us or --

5   Q.  Yeah.

6       So did she ever forget who you were --

7   A.  No.

8   Q.  -- or your grandkids or anybody like that?

9   A.  No.

10  Q.  Did she forget how to talk or how to do anything?

11  A.  No.

12  Q.  I want to talk to you now about your mom's use of blood

13  thinners.  That is obviously the reason why we're here.

14      You recall your mom having a stroke in the mid 2000s?

15  A.  Yes.

16  Q.  Around the 2005, 2006 time period?

17  A.  Yes.

18  Q.  And what do you recall about that?

19  A.  We went -- I went down to her house, and she -- I'm just

20  thinking she might have just had a little bit of slurred

21  speech.  And she actually didn't want to go to the hospital,

22  but we did -- my son, Brandon and I took her to the hospital.

23  Ricky was out of town; he was living in Roanoke.

24      And we took her there, and I was there with her most of

25  the night, and they ran tests.  And at first they said it

Claudia Stevens - Direct (Childers)                    932

1    wasn't a stroke.  So then I went home, and they actually

2    called, the doctor called me at home and said that she did

3    have a stroke.  So I came back to the hospital and talked to

4    Dr. McComas, and he did say it was a mild stroke.

5    Q.  How did your mom do after the stroke?

6    A.  She was fine.  She didn't have anything -- any side

7    effects from it.

8    Q.  Could still talk?

9    A.  Yes.

10   Q.  How about walk, was she able to walk?

11   A.  Yes.

12   Q.  And was she able to still drive?

13   A.  Yes.

14   Q.  And she was still able to live by herself?

15   A.  Yes.

16   Q.  Did she start taking any blood thinners at that point

17   after she had the stroke?

18   A.  I believe that's when she started taking coumadin.

19   Q.  Okay.  While she was on coumadin, do you recall your

20   mother ever having a GI bleed?

21   A.  No.

22   Q.  While she was on coumadin, do you recall your mother ever

23   having a stroke or a blood clot?

24   A.  No.

25   Q.  The jury has heard some about this reason why you and Rick

Claudia Stevens - Direct (Childers)                    933

1    thought Pradaxa may be a good medication for your mom.

2        Could you tell us from your memory what prompted that?

3    A.   I saw a commercial on TV for Pradaxa, and it said that,

4    ah, you didn't have to test your blood for it, and you didn't

5    have to watch what you ate.

6    Q.   And why did that make you think about your mom?

7    A.   Because she was getting tired of having to go to the

8    doctor a couple times a week to get the levels checked.  And

9    she liked to eat salads, and she liked green foods, and you

10   have to watch -- you can't eat that kind of stuff.  And so we

11   just thought that this would be, you know, a chance for her to

12   be able to eat what she wanted to eat.

13   Q.   Was there anything about that commercial that made you

14   think that there was a difference between Pradaxa and warfarin

15   that would be good or bad for your mom?

16   A.   Just good for those two reasons.  I didn't know bad,

17   anything bad.

18   Q.   What did you do after you saw that commercial?

19   A.   I called Ricky and had him call the doctor.

20   Q.   We saw earlier the note where he called the doctor, and

21   then the note where you all went in and asked for Pradaxa.

22       We don't have to see that again.  I just want to ask you

23   your recollection of that appointment with Dr. MacFarland's

24   office.

25   A.   I just remember going in, asking her -- you know, telling

Claudia Stevens - Direct (Childers)                    934

1   her, you know, about the drug and asking her if she thought it

2   would be okay to change it, and she said yes.  And there was

3   no questions about it.  She didn't question us or -- or tell

4   us anything else about the drug.  Just that, you know, they

5   could try it.

6   Q.  Prior to that time, do you recall any of your mother's

7   doctors telling you that they thought your mom needed to go on

8   a drug different than coumadin?

9   A.  No.

10  Q.  Did your mom ever tell you, hey, my doctors want me to try

11  something different other than coumadin?

12  A.  No.

13  Q.  Okay.  When you went to Dr. MacFarland's office and asked

14  her nurse to switch your mom from warfarin to Pradaxa, did you

15  know that Pradaxa had never been tested in patients who had

16  severe kidney problems?

17  A.  No.

18  Q.  Did you know at that time that the 75-milligram dose that

19  your mom got prescribed had never been tested in patients?

20  A.  No.

21  Q.  Did you know at that time that patients who had kidney

22  problems like your mom had, who was also taking Coreg, that

23  they shouldn't take Pradaxa?  Did you know that?

24  A.  No.

25  Q.  Did you know at that time that there was no reversal agent

Claudia Stevens - Direct (Childers)                    935

1    in a situation if your mom had a bleed?

2    A.  No.

3    Q.  Did you know at that time that a patient on Pradaxa would

4    be more likely to have a GI bleed than a patient on warfarin?

5    A.  No.

6    Q.  If you had known any of those things, any one of them,

7    would you have asked that your mom be switched from Pradaxa to

8    warfarin?

9    A.  No.

10   Q.  Did you do anything to try to help make sure your mom took

11   her medicines every day?

12   A.  I did.

13   Q.  What did --

14   A.  I called my mom every morning to remind her to -- she

15   slept a lot, and I was always afraid she would go back to

16   sleep and not take her medications.  So I would call her in

17   the morning and I would call her in the evening just to make

18   sure she got up and took her medicine.

19   Q.  And how was her medicine laid out for her; do you recall?

20   A.  It was in just a pill box.

21   Q.  Okay.  That's what Rick told us that he put together for

22   her?

23   A.  Yes.

24   Q.  Okay.  So he put them together, and then you would call to

25   make sure every day that she actually took them?

Claudia Stevens - Direct (Childers)                     936

1   A.  Yes.

2   Q.  Do you know if your mother kept papers that she got from

3   the pharmacy when she filled prescriptions?

4   A.  Yes, she did.

5   Q.  What do you remember about that?

6   A.  She had a three-drawer plastic drawer cabinet that she

7   kept in the kitchen that she kept them all in.

8   Q.  Okay.

9        MR. CHILDERS:  Let me show you, if we could, Exhibit

10  88.  If you could open up your binder -- on page 11, Gina.

11  This is already in evidence.

12  Q.  Do you see the Medication Guide here for Pradaxa?

13  A.  Yes.

14  Q.  Is that the kind of paper that your mom would keep in that

15  three-drawer container?

16  A.  Yes.

17  Q.  Okay.  Did mother ever tell you anything about any drugs

18  that led you to believe she got it from the information she

19  got from the pharmacy?

20  A.  I'm not sure.

21  Q.  Did she ever have a bad reaction to a medicine and told

22  you she read about what it was?

23  A.  The statins, yes, that drug.  She said it made her legs

24  hurt.

25  Q.  Okay.  And what was your understanding as to how she sort

Claudia Stevens - Direct (Childers)                    937

1   of put that together, how she figured out --

2   A.  I would say it would be from reading the pamphlets.

3   Q.  Okay.  Rick told us about your mom's bleed in 2013, and

4   the jury has seen the records, and they've heard from the

5   doctors, so we really don't need to rehash that, and I don't

6   want to put you through that again.  I do want to ask you,

7   though, a little bit about after that.  Okay?

8       When your mother came back home after being in the skilled

9   nursing facility, did you notice her health being any

10  different than previous times that she had come home from the

11  hospital?

12  A.  Yes.  She was very weak and very pale and really just

13  didn't want to get out of bed at all.

14  Q.  Do you recall anything other than the -- you've told us

15  about the birthday.

16      That was unusual?

17  A.  Uh-huh.

18  Q.  Prior to the birthday, her birthday after -- that happened

19  after the May hospitalization, were there any family events

20  that she attended prior to the May hospitalization that you

21  remember?

22  A.  Yes, Ricky's 60th birthday.

23  Q.  Okay.  And what do you remember about her being there at

24  that particular get-together?

25  A.  She was fine.  I mean, she interacted with everyone there

Claudia Stevens - Direct (Childers)                    938

1    and ate and fixed her hair and put her make-up on and did her

2    nails.

3    Q.  I want to go through just a few more -- well, let me ask

4    you this.

5        You guys had a funeral for your mom?

6    A.  Yes.

7    Q.  Did you have it here in Huntington?

8    A.  Yes.

9    Q.  And I understand at the funeral there was a video that you

10   and Rick put together with pictures and music?

11   A.  Yes.

12   Q.  We're not going to play that, but I would like to ask you

13   about some of the pictures that were in there -- okay -- if

14   you could, just to help the jury know a little bit more about

15   your mom.

16       If you would look to picture No. 20.

17   A.  Yes.

18   Q.  Who is in this picture?

19   A.  That's me and my mother and her mother and my two sons.

20   Q.  When did her mother pass?

21   A.  I'm not sure what year she passed away.  She was -- she

22   was -- I think she was about 92.

23   Q.  Okay.  Did she live here?

24   A.  No.  She lived -- she lived in Cincinnati and then moved

25   to Daytona Beach.

Claudia Stevens - Direct (Childers)                    939

1   Q.  Okay.  And that was the mother that she would go down to

2   the beach --

3   A.  Yes.

4   Q.  Okay.  How about picture No. 29, can you look at that, on

5   the next page?

6   A.  Yes.  That's my friend Pat and my mother at my son's

7   wedding.

8   Q.  Which one of your sons?

9   A.  Brandon.

10  Q.  And she's dancing with your friend Pat there?

11  A.  Yes.

12  Q.  Okay.  Let's look at the next exhibit, No. 39.

13  A.  That's my son and my mother.

14  Q.  That's at his wedding?

15  A.  Yes.

16  Q.  Could we go to 62?

17  A.  That was --

18  Q.  Who is that with your mom in that picture?

19  A.  That's River, her great grandson.  That was August the

20  2nd.  He was a month old.

21  Q.  Right about a month before she passed?

22  A.  Yes.

23  Q.  Okay.  And she got to meet her great grandson?

24  A.  Yes.

25  Q.  And then there was one more picture I wanted to ask you

Claudia Stevens - Direct (Childers)                    940

1   about, No. 38.

2        Tell us who is in this picture.

3   A.  That's my mother and my son Brad and his two daughters, my

4   granddaughters Kayley and Taylor, and me and Ricky.

5   Q.  What was this?  What was happening?

6   A.  That was mom's birthday, her birthday.

7   Q.  Whose house were you at?

8   A.  That was at Ricky's house.

9   Q.  I just have one more question for you, and it's not an

10  easy one.

11       Could you tell the jury what you miss most about your

12  mother?

13  A.  Just talking to her every day and going out and spending

14  the holidays with her.  Just having someone to call and talk

15  to.  You know, a mother is always someone you can lean on.

16  I'm sorry that she's missed out on some of her great

17  grandchildren.  I just miss being around her.

18            MR. CHILDERS:  That's all the questions I have, Your

19  Honor.

20            THE COURT:  All right.  Cross?

21            MR. LEWIS:  Very briefly, Your Honor.

22                         CROSS-EXAMINATION

23  BY MR. LEWIS:

24  Q.  Ms. Stevens, good afternoon.  I just have a few questions

25  for you.  And, again, like with your brother, I want to be

Claudia Stevens - Cross (Lewis)                    941

1    respectful about the situation.

2        In October of 2011, do you recall going to a meeting where

3    you met with your brother and Dr. MacFarland with your mom to

4    talk about switching to Pradaxa?

5    A.  Yes.

6    Q.  Okay.  And Dr. MacFarland was there?

7    A.  I thought Dr. MacFarland was there, but it might have been

8    Nurse Clagg.

9    Q.  Do you agree that with respect to anyone who treated your

10   mom for the conditions that she had, that there was a level of

11   trust with those physicians?

12   A.  Yes.

13   Q.  Okay.  And that you and your brother and your mom did

14   trust the judgments of those doctors at those times?

15   A.  Yes.

16   Q.  To the best of your recollection, did any of the doctors

17   that treated your mom tell you that Pradaxa caused her decline

18   or her death?

19   A.  No.

20        MR. LEWIS:  Thank you for your time, ma'am.

21        THE COURT:  All right.  Any other questions?

22        MR. CHILDERS:  No, Your Honor.

23        THE COURT:  Thank you, ma'am.  You're excused.  You

24   may step down.

25        All right.  Mr. Childers?

1          MR. CHILDERS:  I think we just need to make sure we

2    have moved all of our exhibits into evidence, Your Honor.  If

3    I could have just a moment.

4          THE COURT:  Certainly.

5       (Plaintiffs' counsel conferring.)

6          MR. CHILDERS:  I am told the only exhibit that we need

7    to move in is 2000B.

8          THE COURT:  B?

9          MR. CHILDERS:  Yes, sir.

10         MR. LEWIS:  No objection, Your Honor.

11         THE COURT:  All right.  2000B is admitted.

12      (PLAINTIFFS' EXHIBIT 2000B ADMITTED INTO EVIDENCE.)

13         MR. CHILDERS:  Just subject to cleaning up any exhibit

14   issues, plaintiffs rest, Your Honor.

15         THE COURT:  All right.  Ladies and Gentlemen, the

16   plaintiffs rest their case.  As a result, now it will be the

17   defendant's opportunity to present evidence.  I know that they

18   have evidence, so let's take a recess now.  That will give

19   them a chance to set up and be prepared to start presenting

20   their evidence.

21         So, again, don't start deliberating, but retire to the

22   jury room, and we'll be back with you in just a few minutes.

23      (Jury not present.)

24         THE COURT:  All right.  You may be seated.

25         Mr. Lewis, you want to formally make your motion?

943

1          MR. LEWIS:  Yes, Your Honor.

2          At this time, defendants move for a directed verdict

3     on all of the claims.  With the understanding of counsel and

4     Your Honor, more detailed discussion and argument will take

5     place at another point in time.

6          THE COURT:  Is the plaintiff agreeable with that?

7          MR. CHILDERS:  Yes, Your Honor.  Clearly we oppose it,

8     and we'll be happy to discuss it with you at that time.

9          THE COURT:  All right.  So I'll defer further

10    consideration of your motion.

11         We'll take a brief recess.  That will allow you to set

12    up your next -- your first witness is going to be by

13    deposition.  How long does that take?

14         MR. LEWIS:  Very short, maybe 20 minutes at the most.

15    And we're going to actually combine the play, so we'll play it

16    straight through.

17         THE COURT:  So that will be --

18         MR. CHILDERS:  Yes.  It's so short --

19         THE COURT:  -- plaintiffs' version as well.

20         All right.  And then that will conclude your case?

21         I mean today --

22         MR. LEWIS:  Today.

23         THE COURT:  -- for what you have today.  Sure.

24         And so have you had any -- well, let's talk when you

25    come back in a few minutes about what we do going forward.

944

1          MR. CHILDERS:  I would propose maybe we have an

2     off-the-record discussion and try to figure out -- we're open

3     to ideas.

4          THE COURT:  All right.  So why don't you do that, and

5     we'll take about a 10-minute recess at this time.

6          All right?

7          MR. CHILDERS:  Thank you, Your Honor.

8          THE COURT:  We stand in a recess.

9          THE COURT SECURITY OFFICER:  All rise.  This court

10    stands in recess.

11      (Recess taken from 1:47 to 2:00 p.m.)

12          THE COURT:  All right.  Be seated.

13          Have you had a chance to talk, first of all?

14          MR. CHILDERS:  We have talked, but there's not really

15    a resolution.  We have given some ideas --

16          THE COURT:  Well, here's my suggestion.

17          First, I'm certainly not going to penalize the

18    defendant for the unavailability of its two experts under the

19    circumstances.  Much as I hate to delay proceeding with the

20    evidence for the sake of the jury's memories as well as for

21    their schedules, under the circumstances, I'm not inclined to

22    fault the defendants for not being able to get these witnesses

23    here until Monday and/or Tuesday.

24          Given that, what I'm inclined to do is to do this

25    evidence today, adjourn the trial for the day, have the jury

1    come back Monday.  I would expect to have you folks here

2    tomorrow and argue the motions at the close of plaintiffs'

3    case and to work on instructions, see where we get, and then

4    perhaps excuse you folks until Monday.

5         You've indicated you're going to file a written motion

6    with respect to at least part of your grounds for judgment as

7    a matter of law.  When do you expect to do that?

8         MS. JONES:  I think we'll do it -- and I'm looking at

9    Mr. Hailey.  I think it will be well before the close of

10   business today.  I mean, the briefs are basically ready.

11        THE COURT:  Well, here's what I would be inclined to

12   do, assuming that.  I would give plaintiffs until tomorrow

13   morning to file any written response.

14        Have you folks first meet and confer tomorrow morning

15   about instructions.  I will make the comment that, in

16   reviewing the preliminary instructions, you each refer

17   considerably to the state pattern instructions, and so it

18   didn't strike me that there were huge differences.  I would

19   hope that you folks could take the time to try to narrow the

20   differences and reach agreement on what you can.  And then

21   we'll obviously go through on the record argument about what

22   remains in dispute.

23        But my thought would be to have you come back tomorrow

24   afternoon.  That would give you a chance to file a written

25   response, if you desire, and for the Court to give thought to

946

1    it and then hear argument tomorrow afternoon after lunch about

2    the motion, and then go through instructions, and hopefully be

3    able to send you folks on your way tomorrow late afternoon,

4    early evening, and have the witnesses here Monday for the

5    defense to testify.

6          You've indicated you have two live witnesses.  Do you

7    have any idea how long each of them would take?

8          MR. LEWIS:  I think that they won't take the same

9    amount of time.  Dr. Shami will probably take, my guess is,

10   about the same amount of time as Dr. Ashhab.  He is in a

11   similar field, so I think that took about three hours total,

12   direct and cross.

13         Dr. Crossley is a little bit more involved, and I will

14   defer to my colleague maybe on the length of time.

15         MS. JONES:  We're going to endeavor to narrow his

16   examination in light of the evidence that has come in so far.

17   I expect he'll probably be longer than Dr. Shami, but no more

18   than four and a half hours.

19         THE COURT:  Well, will you have both available Monday?

20         MS. JONES:  Yes.

21         MR. LEWIS:  Yes.

22         THE COURT:  So we can take one and then immediately

23   start with the other --

24         MS. JONES:  Start the next one, yes.

25         THE COURT:  -- and get through it?

1           MR. LEWIS:  Yes.

2           THE COURT:  Well, what do you say to all that,

3    Mr. Childers?

4           MR. CHILDERS:  I agree, it's not something that

5    anybody can really fix.

6           One thing I would ask is maybe the Court consider,

7    since the jury is going to be missing a few days, perhaps we

8    can at least just recap certain witnesses have testified -- we

9    don't have to say what they testified about -- who they are

10   and what order they were presented, so we at least refresh

11   where we left off, something like that.

12          I mean, I could come up -- we were just sort of trying

13   to think of a way to make it so there's not such a gap that

14   they forget what they've already heard.

15          THE COURT:  And when would you propose to do that?

16          MR. CHILDERS:  Probably first thing Monday morning.

17          MS. JONES:  For what it's worth, Your Honor, if it's

18   just a listing of these are the witnesses you have heard from,

19   I don't think we're going to have any objection to that, if

20   that is something the Court is open to.

21          THE COURT:  Well, I think you're talking about more

22   than just listing witness names.

23          MR. CHILDERS:  Yes, subject matter, kind of -- no

24   opinions or anything like that, but --

25          THE COURT:  Here's what I'm willing to do.

1         First, I think that's a fair idea given the

2    circumstances.  If we have to delay proceeding, even though

3    through no fault of the defendant, it is still because of the

4    defendant's unavailability of witnesses, I am amenable to you

5    preparing some type of limited presentation for the jury for

6    first thing Monday to recap your case.

7         What I would suggest is that you provide a brief

8    narrative summary of maybe the highlights of your witnesses

9    and provide that to the defendants in advance of Monday, see

10   if they want to supplement or add or subtract to it, see if

11   you all can reach some type of an agreement.

12        The purpose of it would be just to try to refresh the

13   jury's recollection about who the witnesses were and, in a

14   very general way, the nature of their testimony.  So I will

15   consider doing that.

16        I would say as soon as you can prepare something and

17   let them see it, and we get a reaction, I'm happy to evaluate

18   it quickly and see if that helps lessen the effect of this

19   delay.

20        MR. CHILDERS:  Thank you, Your Honor.

21        The only other issue I would ask is -- it sounds like

22   they have just these two witnesses.  Can we at least sort of

23   lock in that we know we're going to do closing on Wednesday so

24   that we can prepare effectively to do that and allow the jury

25   time to deliberate before this three weeks is over?

1          THE COURT:  Well, certainly it sounds to me like there

2     is maybe reason to believe if we've gotten the instructions

3     finished, that we could be giving this case to the jury even

4     on Tuesday or Tuesday afternoon.  So I will instruct the

5     parties to be prepared for that, if it occurs.

6          I do believe that if we take advantage of this delay

7     by doing what we have to do without the jury's presence, we

8     ought to be able to accelerate things to get it to the jury

9     when we close the evidence, and that would be what I would

10    insist upon under the circumstances.

11         MR. CHILDERS:  Thank you, Your Honor.

12         THE COURT:  All right?

13         Anything else we need to take up before we bring the

14    jury out?

15         MR. LEWIS:  No, Your Honor.

16         THE COURT:  Let's bring the jury out.

17      (Jury present.)

18         THE COURT:  All right.  Ladies and Gentlemen, as you

19    heard just before the break, the plaintiffs rest their case.

20    Now it is the defense opportunity to present evidence.

21         Mr. Lewis, call your first witness.

22         MR. LEWIS:  Yes, Your Honor.

23         Members of the Jury, the defense opens the case with a

24    short video deposition of Dr. Charles Huh, who is a treating

25    physician for the plaintiff.

1          THE COURT:  All right.  Go ahead.

2             CHARLES HUH, M.D., PLAINTIFFS' WITNESS,

3                videotaped deposition played.)

4          MR. LEWIS:  That concludes the play, and it also

5    included the cross-examination and redirect of this particular

6    witness.

7          THE COURT:  All right.  Ladies and Gentlemen, that

8    concludes that witness's testimony.

9          Now I must explain to you that before this trial

10   started, counsel for both sides had a good faith belief that

11   it was going to take us this three-week period.  That's why we

12   sent out a jury questionnaire in advance to put possible

13   jurors on notice of that.

14         The good news is that we have proceeded much more

15   quickly.  I commend counsel for both sides for helping us get

16   to this point where plaintiffs have presented all of their

17   case and defendant began presenting its case.

18         Unfortunately, as you can imagine, when lawyers are

19   securing the attendance of witnesses for trial, they have to

20   give them an idea of when they would be expected.  The defense

21   reasonably did not expect that the two experts it intends to

22   call as live witnesses would be able to testify this week.  As

23   a result, even though they have checked throughout the day

24   with them, they both have circumstances that unfortunately

25   prevent them from being here today, tomorrow or Friday.

1          As you already know, both sides have invested much

2     time, energy and emotion into this case.  And so, in fairness

3     to the defense, I've agreed that they can call those witnesses

4     Monday and/or Tuesday as necessary so that they can present

5     their case.  Plaintiffs do not object to that.  This is

6     something that just happens sometimes in the course of trying

7     to put a complex case on over a period of time.

8          As a result, your work is going to come to a halt now,

9     but you're going to come back next week.  I'm going to direct

10    that you appear back here at 9:30 on Monday morning.

11         I'm assured that both of these defense witnesses will

12    be available, and we'll begin their testimony on Monday.  And

13    I'm relatively certain we will complete it by Tuesday at a

14    reasonable hour, and we may be able to get this case to you

15    and expect to get this case to you either Tuesday or

16    Wednesday.

17         As a result, though, I'm going to ask that you

18    separate yourselves from this case for a few days.  It's a

19    delicate balance because I don't want you to forget anything

20    that you've been hearing this past week.  It's extremely

21    important evidence.  And I realize that it's much more

22    difficult to keep a grasp of all of this complex evidence if

23    you leave this case for what will now be a period of four or

24    five days.

25         I am going to try to develop some type of a brief

1    summary of the witnesses you've heard to date to give you

2    Monday morning to sort of reorient you and bring you --

3    refresh your recollections about the witnesses since we will

4    have that gap.  But, in the meantime, obviously while I don't

5    want you to forget anything, and I certainly invite you to

6    consider -- keep in your own mind thinking about the case, I

7    want to reemphasize what I've been telling you about every

8    day.

9         It's extremely important that you not try to make up

10   your mind about this case until you can go to the jury room

11   together having heard all of the evidence from both sides, my

12   instructions and the arguments of counsel, and then together

13   discuss what the evidence produces, what you believe you can

14   conclude based on that evidence and my instructions.

15        So I want to emphasize, again, please do not get to

16   the point where you're making up your mind about what the

17   verdict ought to be.  Especially do not try to do any sort of

18   independent research.  Don't ask anybody.  Don't look up

19   anything on the Internet.  Don't attempt to do any sort of

20   separate investigation.  You have to decide this case together

21   based only on what you see and hear in this courtroom.

22        So, with that, I'm going to excuse you until 9:30

23   Monday morning.

24        What I'm contemplating is whether I want you to call

25   in, but I don't think so.  I'm sure that if something happens,

1    and I can't believe that it will -- but if something happened

2    that delayed this more than Monday morning, I'll have the

3    clerk's office let you know Sunday night.  What I started to

4    do was say call in.  I'm not going to put that responsibility

5    on you.  If anything is going to change, we will call you.

6    Otherwise, we'll see you back here at 9:30 a.m. on Monday.

7            Also, as I mentioned before with these notes, I don't

8    know how many of you are taking active notes, but I don't want

9    you to take those with you.  I don't want to risk that

10   anything is lost or that anything is brought in accidentally

11   when you come back.  So what I'd like you to do is to take

12   your notepad, write your name on the back of it and then take

13   it in here and put it face down on the conference table and

14   leave it there until you each return on Monday.  There will be

15   no reason for anyone to enter that room between now and then

16   other than perhaps our staff cleaning and checking on things.

17   But that way, we'll know that your notes are still here, not

18   used or tampered with in any way and available for you to use

19   again on Monday, as you desire.

20           So is there anything else counsel want me to address

21   with the jury before we let them go?

22           MR. CHILDERS:  I don't believe so, Your Honor.

23           MR. LEWIS:  No, Your Honor.

24           THE COURT:  All right.  With that, there are a couple

25   matters we're going to talk about.

954

1      And I will let you know this.  The only silver lining,

2  if there is one, with this delay is there is always extensive

3  discussion between the Court and the parties about final

4  instructions that are given in a case like this.  You've

5  already heard the preliminary instructions.  The final

6  instructions will elaborate on much of that.

7      So I'm going to require the lawyers to be back here

8  tomorrow, and we're going to work through hopefully everything

9  with respect to final instructions so that once you've heard

10 all of the evidence, the Court can give you instructions, and

11 there will not be any delay while the lawyers argue about what

12 these instructions ought to say.  We'll resolve that in

13 advance.  I'll make sure that we use this time prudently.

14     So, with that, we'll see you back here Monday morning

15 at 9:30.  And don't forget to leave your legal pad in the

16 conference room.

17     Everyone else should remain in the courtroom until all

18 of the jurors depart.

19   (Jury not present.)

20     THE COURT:  You may be seated.

21     We'll stand in a brief recess for about five minutes.

22 I've got a couple of things I need to do, and then we'll come

23 back out and discuss logistics.

24     MR. CHILDERS:  Thank you, Your Honor.

25     MR. MOSKOW:  Thank you, Your Honor.

955

1          (Recess taken from 2:32 to 2:36 p.m.)

2               THE COURT:  All right.  Yes.

3               MR. LEWIS:  We have to move two exhibits into evidence

4      from the video deposition.

5               THE COURT:  Go ahead.

6               MR. LEWIS:  At this time, the defense moves into

7      evidence Defense Exhibit 9112.

8               THE COURT:  Any objection?

9               MR. MOSKOW:  No objection.

10              THE COURT:  It's admitted.

11         (DEFENDANT'S EXHIBIT 9112 ADMITTED INTO EVIDENCE.)

12              MR. LEWIS:  And the defense moves into evidence

13     Defense Exhibit 9113.

14              MR. MOSKOW:  No objection.

15              THE COURT:  It's admitted as well.

16              MR. LEWIS:  Thank you, Your Honor.

17         (DEFENDANT'S EXHIBIT 9113 ADMITTED INTO EVIDENCE.)

18              THE COURT:  All right.  Do the parties want to be

19     heard further to comment on the Court's suggested plan for the

20     balance of the case?

21              MR. CHILDERS:  No, Your Honor.  Thank you.

22              MR. LEWIS:  No further comments on that.

23              THE COURT:  All right.  So assuming then that -- do

24     you have a little better idea how soon at this point you're

25     going to file your written motion or memoranda in support

1    of --

2         MR. LEWIS:  We have two motions.  My understanding is

3    the first -- we're going to break it up.  The first one will

4    be on the issue of preemption.  That will be filed within the

5    next -- within the hour.

6         THE COURT:  Okay.

7         MR. LEWIS:  And then there is more of, I'll call it, a

8    standard directed verdict motion on the substantive claims.

9    We expect that to be filed in a couple of hours, near the

10   close of business today.

11        THE COURT:  All right.  Then I would like plaintiffs

12   to file any written response, if you intend to, by let's say

13   10:30 tomorrow morning.

14        MR. MOSKOW:  Your Honor, I think that's fine with

15   regard to the directed verdict motion.  I think to the extent

16   that the preemption motion is in the nature of a dispositive

17   motion that could have been filed earlier, we may have a

18   different idea of the response time.  But we don't know until

19   we see it.

20        THE COURT:  All right.  Well, we can wait until we see

21   it and then take whatever action you deem appropriate.  And so

22   I'll certainly consider any suggestion that you make if you

23   believe you should have some deferred opportunity or something

24   like that.

25        MR. MOSKOW:  Appreciate that, Your Honor.

957

1          THE COURT:  So here's what I'd like to do.

2          I'm going to direct that counsel for both sides be

3     back here at this courthouse tomorrow morning at 10:00 to talk

4     through, at an informal conference, the final instructions.

5     I'm going to have my law clerk available.  He's not going to

6     be here to answer or argue.  He knows a lot less about

7     instructing than you folks do because this is his first trial

8     as a law clerk, but I want him to be able to monitor and

9     understand things.

10          To the extent which you can reach agreement,

11     wonderful.  I will take it up with you tomorrow afternoon.

12          Tomorrow at 1:00, we'll reconvene.  I'll hear argument

13     on and reaction to the defense motions.  Following that, I'll

14     want to get updated on the instructions, and I believe we'll

15     probably work through whatever is in dispute, my hope being

16     that we can finish that up tomorrow before you leave.  And if

17     that works out, we won't need to see you until Monday morning.

18          I'm going to direct that by Friday morning plaintiffs

19     submit to the defense your proposal for an outline or summary

20     to the jury of the evidence that they've heard in the case in

21     chief.  I would expect the defense to discuss it with

22     plaintiffs' counsel, see if you can reach agreement.  If you

23     can't, then I would expect you to -- I guess at that point for

24     the parties to file with the Court their proposals for this

25     sort of summary before the end of business tomorrow -- before

1    5:00 on Friday, that is.

2            And then I'll expect to see you back here at 9:00 a.m.

3    on Monday to take that up if there is anything in dispute.

4    That's why I had the jury come in at 9:30.  Again, I will

5    assume at this point that the defense will have both of its

6    experts ready to testify back to back starting Monday at 9:30.

7            Is there anything else that we need to take up today?

8            MR. LEWIS:  Just one open issue.

9            We had moved for the admission of Exhibit 9009S.  That

10   was a summary.  We're still in the negotiation stage.  We're

11   going to try to clean that up and notify the Court of where we

12   are on that.

13           THE COURT:  All right.  That's fine with me.

14           MS. JONES:  Your Honor, just one other thing.

15           We obviously had submitted, consistent with Your

16   Honor's pretrial scheduling order, a set of proposed jury

17   instructions.  There are probably a couple of additional

18   instructions that we would propose to include in the final

19   instructions given the way some of the case has come in.

20   We'll obviously share that with plaintiffs' counsel, and we'll

21   make a submission to the Court, but we just wanted to flag

22   that as a possibility.

23           MR. CHILDERS:  I think we will as well, Your Honor.

24           THE COURT:  All right.  I would expect both sides to

25   do that based upon the actual evidence at trial.

959

1          Is there anything else we need to take up today?

2          MR. LEWIS:  No, Your Honor.

3          THE COURT:  If not, tomorrow at 10:00 be back here.

4    We can open the courtroom.  You can use the jury -- well, you

5    can't use the jury room.  You can use this conference room or

6    in here, however you folks like, or we can make another space

7    available.

8          Blake will be sitting in on some, monitoring it,

9    giving me some idea of whether it's working or not.  And then

10   I'll see you here formally at 1:00 to take these matters up on

11   the record.

12         MR. LEWIS:  Thank you, Your Honor.

13         MR. CHILDERS:  Thank you, Your Honor.

14         MR. MOSKOW:  Thank you, Your Honor.

15         THE COURT SECURITY OFFICER:  All rise.  Court is

16   adjourned.

17              (Proceedings were adjourned at 2:42 p.m.)

18                       ---o0o---

19

20

21

22

23

24

25

1    CERTIFICATION:

2            We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3    RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter as reported on October 10, 2018.

6

7

8    October 10, 2018          _____
     DATE

9

10   /s/ Kathy L. Swinhart  _____
     KATHY L. SWINHART, CSR

11

12   /s/ Lisa A. Cook_____  _____
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25