IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---oOo---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
        Plaintiffs,
vs.                      No. 3:15-CV-06424

BOEHRINGER INGELHEIM         Volume 6
PHARMACEUTICALS, INC.,      Pages 960 through 1100

           Defendant.
_____/

---oOo---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

THURSDAY, OCTOBER 11, 2018, 1:00 P.M.

---oOo---


For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                     1932 North Druid Hills Road, Ste 100
                     Atlanta, Georgia  30319
                     BY:  C. ANDREW CHILDERS
                     and  EMILY TWEED ACOSTA

                     URY & MOSKOW
                     883 Black Rock Turnpike
                     Fairfield, Connecticut 06825
                     BY:  NEAL L. MOSKOW

           (Appearances continued next page...)

Reported by:   KATHY L. SWINHART, CSR
              LISA A. COOK, RPR-RMR-CRR-FCRR
              Official Court Reporters
              (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

1                      APPEARANCES (Continued)

2

3    For the Plaintiffs:

4                     FERRER, POIROT & WANSBROUGH
                      2100 RiverEdge Parkway, Suite 1025
5                     Atlanta, Georgia  30328
                      BY:  HUNTER VANCE LINVILLE
6

7    For the Defendant:

8                     TUCKER ELLIS
                      925 Euclid Avenue, Suite 1150
9                     Cleveland, Ohio  44115
                      BY:  JOHN Q. LEWIS
10

11                    COVINGTON & BURLING
                      One City Center
12                    850 Tenth Street NW
                      Washington, D.C.  20001
13                    BY:  PHYLLIS ALENE JONES
                      and  NICHOLAS HAILEY
14                    and  JESSICA PEREZ

15

16                    JACKSON KELLY
                      Post Office Box 553
                      Charleston, West Virginia  25322
17                    BY:  GRETCHEN M. CALLAS

18

19

20

21

22

23

24

25

1                                        <u>INDEX</u>

2
                                                                    <u>PAGE:</u>
3

4     ARGUMENT ON MOTION FOR DIRECTED VERDICT                         960
      ARGUMENT ON JURY INSTRUCTIONS                                  1051
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

960

```
 1                  HUNTINGTON, WEST VIRGINIA

 2              THURSDAY, OCTOBER 11, 2018, 1:04 P.M.

 3        (Jury not present)

 4              THE COURT:  Good afternoon.  Are we ready to

 5    proceed?

 6              MR. LEWIS:  Yes, Your Honor.

 7              THE COURT:  All right.  Let's start first with the

 8    defendant's pre-emption motion, with your argument first.

 9              MR. LEWIS:  Thank you, Your Honor.  Give me a

10    second to get set up.

11              THE COURT:  Sure.

12        (Pause)

13              MR. LEWIS:  May it please the Court, thank you,

14    Your Honor, for the opportunity to be heard on our motion

15    for directed verdict.

16        We're moving for directed verdict on all of the claims

17    left in this case on the grounds of pre-emption.  And I

18    guess I want to first start with -- I had an opportunity to

19    review the plaintiffs' filing from this morning and I've got

20    to be honest.  I was a little bit shocked by one of the

21    things, among others, that was said in that paper.  And

22    it's, and it's this in particular:

23        "At the outset, it is important to note what plaintiffs

24    are not claiming.  Plaintiffs are not making a claim that

25    the Medication Guide is defective."
```

1      That's right in the plaintiffs' papers.  I think that's

2  a very disingenuous statement to the Court.  The plaintiffs

3  have tried this case on the Medication Guide every single

4  day, including from the opening statement.  In fact, from

5  the opening statement that Mr. Childers made, "And, so, --"

6      MR. MOSKOW:  Your Honor, my understanding from

7  the, before evidence started in this case is that we were

8  not to rely on the unofficial transcripts.  And, yet, you

9  know, that's how the argument is starting.  I'm a little

10 concerned that we have not had access to an official

11 transcript for purposes of this type of argument.

12      MR. LEWIS:  May I respond to that?

13      THE COURT:  Yes.

14      MR. LEWIS:  Two things.  One, these are actually

15 official transcripts.  We confirmed that with our court

16 reporters that these are official transcripts.

17      And, number two, I'm quite clear that we discussed

18 about the transcripts, that they could be used for things

19 like this, for court proceedings and things along those

20 lines.  And we were going to table perhaps whether the jury

21 could see them because of some other issues, but clearly

22 relevant for this purpose and this is what he said.

23      THE COURT:  Well, the Court recalls that we did

24 discuss the fact that one side was getting daily

25 transcripts.  I certainly made clear that we would explain

1    to the jury that there wouldn't be transcripts available for

2    them.

3        I don't know or recall specifically understanding that

4    either side intended to use them for argument of motions in

5    the case.  Frankly, I haven't had a chance to talk to either

6    of the court reporters to determine whether they perceive

7    these to be official transcripts or not.  I haven't looked

8    to determine whether they've been docketed.

9        Do you know?

10            MR. LEWIS:  Yes.

11            THE COURT:  Well, if they've been docketed, then I

12   suspect the certification is attached from the court

13   reporter that they are official transcripts.

14            MR. LEWIS:  It is.  Yeah, they're -- this is what

15   we're getting:  "We," the court reporters, our great court

16   reporters, "certify --" and that's on the record right now,

17   "certify that the foregoing is a correct transcript."  This

18   is an official transcript.

19            MR. MOSKOW:  Your Honor, they were made official

20   this morning after we had -- or at the same time we were

21   filing our brief I've just been informed.

22        So, regardless, we also have a concern about, you know,

23   reference to opening statements which are clearly not

24   evidence for purposes of the directed verdict.

25        So we're just, we're just concerned that we're not

1  playing, you know, with the same pieces on the table and

2  want to make sure that everybody has that same opportunity.

3          THE COURT:  Well, I'm going to allow the defense

4  to continue.  I certainly think that they are allowed to use

5  counsel's statements to explain their view of what counsel

6  and the plaintiffs' position is with respect to legal issues

7  certainly.  So I'll allow them to continue.

8          MR. LEWIS:  Thank you, Your Honor.

9      Mr. Childers said in opening statement, and there's no

10 question about it, we all were here, "We're going to show

11 you with this Medication Guide there are several pieces of

12 information missing that the patient should have known."

13     And we wrote these things down and we've been referring

14 to them throughout the whole trial.  So with the four and a

15 half days of testimony, repeatedly this has been trotted out

16 and repeatedly even ending with Dr. Ashhab and the

17 plaintiffs, "Did you know about this?  Did you know about

18 that?  Should that have been in the Medication Guide?"  Over

19 and over and over these five things.

20     So I was pretty shocked to see that the response paper

21 to our pre-emption motion was, "We're not criticizing the

22 Medication Guide."  But I know why they did that.  They did

23 that because if they are trying to challenge the Medication

24 Guide, these claims are pre-empted and there's no question

25 about it.  It's right in the federal regulations.

1    We cannot change the Medication Guide without FDA

2    approval.  There are no exceptions to that.  There's no

3    voluntary change in the Medication Guide.  And if their

4    claim is premised on the Medication Guide and the challenge

5    to it, the claim's pre-empted, clear as day.  So that's why

6    they're making the argument.

7    But putting aside that piece, the claim is not saved by

8    what they say in their papers.  So what they say in their

9    papers is, "We're not challenging the Medication Guide but

10   we're saying you should have said other stuff to the

11   plaintiff or to the doctors or whatever."

12   But as we heard from Dr. Plunkett and even the BI

13   witness, Michelle Kliewer, and, and the law says this,

14   everything is a labeling.  So any communication about the

15   product, whether it's a Medication Guide, a physician label

16   or something else, every communication about the product is

17   a labeling.  It's a label.

18   So the real question in this case is, does what the

19   plaintiffs are saying we should be doing under West Virginia

20   tort law, will that require us to do something we can't do

21   under federal law, basic conflict pre-emption?  If we can't

22   make both masters happy, then that's conflict pre-emption.

23   Federal pre-emption always wins out.

24   So that's our argument here, that it doesn't matter if

25   really -- they're clearly challenging the Medication Guide.

1    If you told that jury that, "Oh, by the way, they're

2    actually not challenging it," we'd have the most confused

3    jury in West Virginia history.  But it doesn't really matter

4    for purposes of this analysis because whatever they're

5    saying is basically they're trying to impose a duty under

6    West Virginia tort law.  And the question is, does that make

7    us violate federal law.

8        And, so, Your Honor, if you don't mind, I have this --

9    to keep it in my head how this conflict pre-emption analysis

10   works, I have a little flowchart I'd like to put up.

11             THE COURT:  Go ahead.

12             MR. LEWIS:  So this is -- this basically helps me

13   understand the case law and how it all works together.

14       I think the best case to look at, frankly, is a case

15   that involves a drug right in this class of drugs.  It's the

16   *Utts* case that's from recently this year out of New York and

17   it's about Eliquis which is a novel anticoagulant

18   medication, the Eliquis case.  It goes through this analysis

19   pretty well.  There's some other cases we cited as well.

20   But this is basically the analysis.

21       If you have a label and it's an FDA approved label, the

22   first question is, can you change that without FDA approval.

23   Because if you can't change it without FDA approval, then

24   any challenge to that is pre-empted.

25       And that's what this -- this is kind of the first

1    level.  That's where the Medication Guide comes in.  And

2    that's where the communication to the patients comes in.

3    And pretty much any challenge at all is not permitted

4    without FDA approval.  But there are some exceptions to

5    that.

6        So the exception to that is for brand manufacturers,

7    there are certain exceptions where they can voluntarily

8    change the label.  Typically, that's called Changes Being

9    Effected section.  And what that allows brand manufacturers

10   to do if they acquire new information that supports a

11   change, let's say there's new information that's discovered

12   the FDA hadn't considered before, then did that newly

13   acquired information support a change under the CBE, or the

14   Changes Being Effected section.

15       What the case law makes clear, and *Utts* describes this

16   very, very well, the plaintiff has to demonstrate that there

17   was newly acquired information.  You can't just say, "Oh,

18   you could have changed the label under CBE."  The plaintiff

19   has to say, "You should have changed the label because you

20   had newly acquired information."

21           THE COURT:  Doesn't newly acquired information

22   include analysis?

23           MR. LEWIS:  Well, if the FDA had the material --

24   and there could be a, there could be an argument here about

25   whether that's the case or not, but if the FDA had the

1   material already and the analysis was done, then that, that

2   is not newly acquired information.  But under *Mensing* --

3          THE COURT:  But you just said "and the analysis is

4   done."

5          MR. LEWIS:  Correct.

6          THE COURT:  And it seems to me throughout

7   plaintiffs' evidence about the process here by which you

8   got, you got approval for Pradaxa and then changed the label

9   over time was based upon new analyses of the RE-LY study and

10  internal reports.

11     And you know much better than I do how often through

12  plaintiffs' evidence there were key people from Reilly to

13  Connolly to these different BI employees where they all

14  talked about do we need to start explaining something

15  different about some of these risks.  And there were a

16  number of different facets to that.

17     But why isn't all of that new analysis of existing

18  data?

19          MR. LEWIS:  It could be.  It could be.  But look

20  at what the challenge is here in this case; never tested in

21  severe renal patients.  There was no new analysis.  That was

22  known and analyzed by the FDA before the drug was approved.

23  And there was no new information submitted by the plaintiff

24  to change that.

25          THE COURT:  But weren't there reports from --

1    exchanged in some of these emails and then in some of the

2    literature where there was further analysis of patients who

3    had severe renal problems and how this drug might have a

4    different result with them that ultimately rose to the point

5    where you even included a contraindication for severely

6    impaired renal patients who were taking other drugs?

7            MR. LEWIS:  No.  That was done at the beginning,

8    Your Honor.

9            THE COURT:  At what point -- wasn't the label

10   changed at one point to say it's contraindicated to give

11   Pradaxa to these patients?

12           MR. LEWIS:  No.  At the beginning, the evidence is

13   from Michelle Kliewer that the evidence was the company

14   before the drug was approved submitted a label that said it

15   should be contraindicated in patients with severe renal

16   function between 15 and 30 --

17           THE COURT:  Okay.

18           MR. LEWIS:  -- CiCL or CrCL.  That was submitted

19   to the FDA prior to new drug approval.

20       The FDA struck that out, that contraindication out and

21   instead said, no, we want you to make a 75-milligram dose

22   for those patients between 15 and 30.  That was all done

23   before approval.

24           THE COURT:  That was done.  What I'm referring

25   to -- and maybe I just misunderstand the sequence.

1    Plaintiff quotes from it, so that's what refreshed my

2    recollection that the evidence was there.  But on Page 3 of

3    plaintiffs' response they say, "Among information added to

4    the physician label after product launch is the following."

5    Number 2, that P-gp inhibitors in patients with severe renal

6    impairment Pradaxa use not recommended.

7             MR. LEWIS:  Oh, the P-gp inhibitor piece, yeah.

8    I'm sorry.  I was thinking of the contraindication at all

9    for use of the product at all.

10            THE COURT:  Right.

11            MR. LEWIS:  Okay.  That's what they're saying in

12   Number 1 there.

13            THE COURT:  Okay.

14            MR. LEWIS:  Number 1 is pre-empted.  Never tested

15   in patients, the FDA knew that, yeah.

16            THE COURT:  All right.

17            MR. LEWIS:  Number 2, never tested 75 milligrams.

18   That's pre-empted.  They already knew that and there was no

19   further analysis done.

20       Now, don't take Pradaxa and Coreg.  There was a label

21   change between the time that the drug was on the market and

22   later in April of 2013.

23            THE COURT:  And that's what I was referring to.

24            MR. LEWIS:  Okay.  So that's what Your Honor was

25   referring to.  There was a label change on P-gp inhibitors.

1   But that label change was made in April of 2013 before the

2   prescription that led to the injury by Mrs., that Mrs.

3   Knight complained of or her children now complain of.

4        The label was updated before the prescription that

5   caused the complication.  That's why we were focused so much

6   on the April, '13 change because Dr. MacFarland is out of

7   the picture at that point in time.  She's not prescribing

8   Pradaxa anymore.

9        Mrs. Knight goes in for a stent procedure in April of

10  2013.  And Dr. Stephanie Graham who for the first time in

11  May prescribes -- right after that stent procedure

12  prescribes her Pradaxa.

13       And at that time, that label is updated to include the

14  contraindication on P-gp inhibitors.  The doctor chose to

15  prescribe it anyway -- actually, it wasn't a

16  contraindication.  It was a "not recommended" which is a big

17  difference.  I apologize for the misstatement.  It was a

18  "not recommended" and the doctor chose to prescribe it

19  anyway in the face of that "not recommendation."

20       So -- and there was certainly no new information

21  between April and May of 2013.  So that claim is pre-empted

22  because it was already in the label.

23       The no reversal agent, that was known by the FDA at the

24  time that the product came onto the market in 2010.  That's

25  pre-empted and there was no new information about that

1    piece.

2         More likely to have a GI bleed.  That was right in the

3    label of the physician label at the time of the new drug

4    approval.

5         So every single one of these, every single one of these

6    was either in the label at the time or certainly in the

7    label at the time that Mrs. Knight received the Pradaxa

8    prescription.

9         So the P-gp -- I'm getting my -- right.  So let me get

10   my facts straight on this.

11        So the update on the P-gp not recommended was done in

12   November of 2011, about a month after the -- Mrs. Knight

13   started taking Pradaxa and certainly well before the

14   decision was made to prescribe her Pradaxa in 2013 that led

15   to the injury.

16        So all five of those claims ought to be pre-empted.

17        And whether we're talking Medication Guide or we're

18   talking physician label, the same analysis is true.  In the

19   first instance can we make a proposed change without FDA

20   approval, any challenge to the Medication Guide or direct

21   patient communication, there's no evidence in the record at

22   all and the regulations don't provide for us to be able to

23   change the communication.

24        And, by the way, that makes complete sense.  The FDA

25   doesn't want us to submit a Medication Guide on the one hand

972

1    and then sneak in other communications in other forms on the

2    other.  When the FDA has an approved Medication Guide,

3    that's the communication to the patient.  And the

4    manufacturer isn't permitted.

5        I mean, this rule runs both ways.  Right?  It runs

6    against plaintiff lawyers here, but it also runs against us.

7    We're not allowed to submit different types of information

8    to patients that contra -- is contra to the Medication

9    Guide.  So that, that takes care of all patient

10   communications in the first instance.

11       In the second instance, there's no newly acquired

12   information that supports a different label at the time that

13   the label existed for the prescription where she took the

14   Pradaxa that eventually led to her injury.

15       We don't even get in this case to a clear evidence

16   analysis.  And I know that's the third step in the process.

17   But really none of the claims here get to clear evidence

18   because usually if a plaintiff comes forward with newly

19   acquired information, you should have gone through the CBE

20   route, you should have changed your label, typically a

21   manufacturer will come forward and say, "Well, wait a

22   minute.  The FDA would have rejected that change."

23            THE COURT:  How does the label -- what was the

24   process for the label changes that did occur?

25            MR. LEWIS:  The process for the --

1    THE COURT:  For the label changes that did occur

2    over time after the new drug approval.

3    MR. LEWIS:  It depends on which one specifically.

4    But typically there would be a submission to the FDA to

5    support a label change.  There's like a supplement or

6    submission that you ask for FDA approval.  And then, and

7    then the FDA decides whether or not to approve it.

8    THE COURT:  Well, as I understand it, some of

9    plaintiffs' criticism and basis for failure to warn is based

10   on the premise that at different points in time you have

11   given stronger warnings in the label, but that they are --

12   you've had that information and should have known all along

13   that this should be included.

14   And the evidence is that even with respect to these

15   issues, there have been iterations of the label.  There have

16   been changes in the label.

17   MR. LEWIS:  Sure.

18   THE COURT:  And were those changes the result of

19   CBE proceedings with the FDA in each instance?

20   MR. LEWIS:  I'm not sure if it's in each instance,

21   but in most instances --

22   THE COURT:  Okay.

23   MR. LEWIS:  -- it's either that or a communication

24   directly with the FDA that, where we ask for -- we didn't

25   make the label change before the FDA approval.  We may have

1   made the label change, submitted it, and then the FDA

2   approved it.  It just depends.

3           THE COURT:  You know, it probably won't be a

4   surprise to you that this is fairly confusing to the Court.

5   I spent a fair amount of time this morning first just

6   reading through the *Dolin* case, the Seventh Circuit case.

7           MR. LEWIS:  Right.

8           THE COURT:  And I actually had been reading that

9   before I even got plaintiffs' response.  So I admit that --

10  and I'll ask them about this.  I was surprised a bit about

11  the plaintiffs' characterization of their criticisms of the

12  Medication Guide.  You've already raised that.

13      But as I walked through that *Dolin* case where they did

14  find pre-emption, it was, there was a lengthy discussion

15  where at many different turns in the FDA process over time

16  the manufacturer had tried to get changes in the label and

17  had been denied, refused.

18      And at the end of the day, the very warning that the

19  plaintiffs advocated in *Dolin* was pretty much what the

20  manufacturer had sought, more or less, to get the FDA to

21  allow and had been refused.

22      I don't see that sort of fact pattern here at all where

23  it seems that the -- you've gotten subsequent changes in the

24  label that plaintiff has pointed to as evidence that you

25  folks knew or should have known that these were warnings

1   that were necessary and appropriate.

2       So these, these weren't warnings that were, where you

3   tried to warn and the FDA said, "No, you can't do that."

4   Clearly under *Dolin* that was the reason that the Court

5   determined that those were pre-empted.

6       But here we don't have that sort of pattern where -- I

7   guess what it comes down to is where you've shown that you

8   couldn't do what plaintiff asked because the FDA had

9   rejected those positions other than I guess maybe the

10  argument on the 75.  But --

11          MR. LEWIS:  Well, no.  So let me, let me clarify

12  it.

13          THE COURT:  Go ahead.

14          MR. LEWIS:  It depends on what the claim is.

15          THE COURT:  Right.

16          MR. LEWIS:  Right.  So it's all about what

17  challenge are you trying to make.  The plaintiff has to make

18  some sort of challenge.  They just can't throw everything

19  against the wall and say, "I generally think your label --

20  what about the label is wrong?"  They've picked their five

21  things about the communication that are wrong.  And when we

22  tick through each one of those, we see that each one fails

23  independently for different reasons.

24      So, yes, there were label changes that were made over

25  time, perhaps due to newly acquired information, that may

976

1    have been in completely different areas that aren't at issue

2    in this case.

3        What's at issue in this case are those five things.

4    That's what they're saying we did wrong with our labeling.

5    And when we look at all five of those things, we see that

6    they all -- never tested in severe renal patients.  That's

7    something that the FDA knew at the time that it approved the

8    drug and that is not a challenge that the plaintiffs can

9    make in this case.  They knew that already.

10       And there's been no newly acquired information.  We

11   don't even get to clear evidence because the FDA already

12   knew and there's no newly acquired information.

13       In *Dolin* what had happened was we had a situation where

14   there was newly acquired information by the company with

15   respect to particular challenges to the label.  And

16   therefore, the defendant came forward and said, "No, wait,

17   the FDA has actually specifically rejected those changes."

18       But that's why this flowchart is helpful because we

19   don't even get to that analysis if in the first instance

20   there was newly acquired information or the FDA already knew

21   about the information.

22       And when we tick through those five, never tested the

23   75-milligram, again that is already known by the FDA at the

24   time, every single one of those.

25            THE COURT:  What about the characterization of

1    these internal emails and discussions about some of the

2    studies as newly acquired analysis, new analysis of already

3    acquired information that the, even the BI people recognized

4    could suggest that there should be a way of testing for

5    plasma concentration levels and some of those other things?

6              MR. LEWIS:  All right.  Well, let me, let me put

7    that one aside for just a second --

8              THE COURT:  Okay.

9              MR. LEWIS:  -- because that's not on this list.

10   That hasn't been part of their challenge to the

11   communications that we made to the patient or the physician.

12   There's no, there's no monitoring --

13             THE COURT:  Well, he didn't write it on this chart

14   but then he made -- elicited testimony about it through a

15   number of witnesses.

16             MR. LEWIS:  But their, their argument all along

17   has been exactly, has been exactly this, these, these

18   criticisms.  And for any of these criticisms, there have

19   been, there's been no evidence of new analysis on these

20   issues, none, that the FDA didn't already know about.

21        And on the monitoring, remember that there was a, there

22   was a change that was -- or a suggestion that was struck

23   out -- even on the monitoring there was a change that was

24   struck out pre-approval that suggested that the aPTT levels

25   over 80, you know, could be used as a guide for physicians.

1    But the important thing is that the expert,

2    Dr. Plunkett, did not testify, and even Dr. Ashhab did not

3    testify that the label was defective or deficient or

4    anything that the company said was defective or deficient

5    because it didn't have something in there about monitoring.

6    That hasn't been the testimony.

7    They've run through this list with every single

8    witness.  They've talked about monitoring.  They've

9    certainly suggested here and there that maybe you should

10   monitor and you don't really have a monitoring --

11        THE COURT:  I thought it was pretty explicit from

12   some of their experts that they testified that BI should

13   have developed and informed physicians of the need and

14   method by which to monitor blood plasma levels with Pradaxa.

15        MR. LEWIS:  To my knowledge, that has not been a

16   criticism of the label.  They haven't put that list out.

17   It's not on there.  I mean, they've asked the plaintiffs the

18   questions.  They did not cover monitoring with the

19   plaintiffs.

20        THE COURT:  How is that not implicating the label

21   when they complain -- when the experts testify that BI

22   failed to inform physicians of the need and method to

23   monitor blood plasma levels?  How is that not a label

24   deficiency?  That's how you communicate to the doctor.

25        MR. LEWIS:  Well, they haven't presented that as a

1    criticism of the label.  They've been challenging it on

2    these other grounds.  And at a minimum, these all have to be

3    out.

4        Let's just say for the sake of argument that the Court

5    finds that, you know what, I think the monitoring piece,

6    that piece is a challenge that, you know, maybe there was

7    newly acquired information and I don't find clear

8    evidence --

9            THE COURT:  Let me stop you there --

10           MR. LEWIS:  Okay.

11           THE COURT:  -- because as I think -- it seems to

12   me that's what I've always considered to be part and parcel

13   of criticism number one, never tested on severely impaired

14   renal patients.

15       And as a result, the company didn't know, didn't

16   develop and then report to doctors the means and method to

17   do monitoring.  And subsequent to Pradaxa being approved,

18   they had internal discussion about the desirability, and

19   from some points of view the necessity, of being able to

20   develop that.

21       So I don't see how that's not inherently a criticism of

22   the label.

23           MR. LEWIS:  Not in that respect.  That, that --

24   never tested in -- every time that they talked about bullet

25   number one on their criticism, they've always said -- and it

1    was clear when they talked to the plaintiffs.  "Would you

2    have used this if you knew that it wasn't tested in

3    severe --" their complaint has always been we didn't do a

4    clinical trial on those patients.  They've never tied

5    monitoring to that claim in this case.

6          THE COURT:  Well, I mean, I don't get that because

7    their criticism isn't simply never tested on severe renal

8    impaired patients.  It is that because you never tested it

9    on these patients, you did not know and should have known

10   that for severely impaired renal patients there ought to be

11   a way of testing and monitoring their plasma levels so that

12   as -- if they get too much Pradaxa in their system because

13   of that poor renal function, they've increased their risk of

14   bleed without improving their risk of avoiding stroke.

15       So, I mean, I appreciate that you're using his argument

16   and that these are the points he made.  But I don't -- I

17   guess I don't see how in this first instance it's not a

18   criticism of the label because it is a criticism of the

19   label if the label is where BI should tell doctors whether

20   and how to monitor blood plasma levels.

21         MR. LEWIS:  But that's not the bullet number one

22   that they've been arguing the whole trial.  As I say, those

23   five should be out because they have argued that the

24   deficiency in the communication is that we didn't tell

25   people that it wasn't tested.

1     The monitoring issue, to the extent the Court's going

2     to allow the plaintiffs to pursue that failure to warn

3     theory that in my view they haven't presented throughout the

4     trial but, you know, we just maybe agree to disagree, but

5     these five things are all out.

6     I mean, that first bullet is -- says nothing about

7     monitoring.  And when they talk about that bullet, they've

8     never tied that to monitoring in any way.

9     They've always tied it to you didn't test it at all.

10    You didn't do a clinical study or trial or you didn't even

11    put this in patients at all before you brought it onto the

12    market, severe renally impaired.  You excluded them from the

13    clinical trial.  How many times have we heard it?  You

14    purposefully excluded them from the clinical trial.

15    THE COURT:  Okay.  So if I agree with you that

16    they are not permitted to argue that the label is defective

17    for its failure to report that there was no testing of

18    severely impaired renal patients, they nonetheless may be

19    able to argue that the label is deficient because it did not

20    include a means or method for checking blood plasma levels

21    in these patients.

22    And they had newly acquired information through the

23    form of new analyses that they discussed in their emails and

24    elsewhere about the appropriateness of undertaking that step

25    in issuing a label consistent with that.

1      MR. LEWIS:  Okay.  So may I break that down a

2  little bit?

3      THE COURT:  Sure.

4      MR. LEWIS:  So let's carve that, how Your Honor

5  described that piece.

6      THE COURT:  Okay.

7      MR. LEWIS:  Let's just put that aside --

8      THE COURT:  All right.

9      MR. LEWIS:  -- for just a second.

10     So there are two sort of discussion points.

11     Number one is any criticism of the patient

12  communication is out on pre-emption.  We cannot change the

13  Medication Guide and there's no way to communicate directly

14  with the patient in any other way without prior FDA

15  approval.

16     So the first thing is they can't even argue the

17  monitoring opinion is a direct to patient violation or

18  deficiency.  They cannot argue that.  Any claim is

19  pre-empted if it relates to the company's communication with

20  the plaintiff.  So that's out.  I mean, that's just --

21  that's in the FDA regulations.

22     But if the Court permits the plaintiffs to make an

23  argument that -- and, again, I don't think they've made this

24  argument.  Dr. Plunkett testified that the physician label

25  was irrelevant.  They have not presented their case this

1    way.

2        But if they are suddenly going to be able to argue,

3    well, now the physician label is relevant and the deficiency

4    in the physician label is the fact that you didn't tell

5    physicians that you need to monitor the patients because

6    there was newly acquired analysis done in the paper or the

7    RE-LY, the Reilly paper and you should have made a change or

8    something along those lines to give doctors more

9    information, I still think that claim fails for other

10   reasons, but it may not be pre-empted.

11       It may fail for causation or the fact that it's not

12   even within the scope of the duty in West Virginia, but it

13   may be able -- it may be able to survive pre-emption.  I

14   mean, I think there are arguments against it, but let's just

15   put that aside.

16       But all of these are out.  And the Medication Guide and

17   any challenges to what we said to patients has to be out

18   under pre-emption principles.  And the only thing that's

19   possibly left is -- that survives pre-emption analysis

20   perhaps is the monitoring piece which may fail for other

21   reasons that we may talk about later when we talk about the

22   kind of round two of our directed verdict.

23       But these and the direct communications to the patients

24   have to be out on pre-emption.  We don't even get to clear

25   evidence.  Like in *Dolin* they had to get to clear evidence

1    because there was no information on any of these things, any

2    of these.

3              THE COURT:  Okay.  Thank you.

4              MR. LEWIS:  Thank you.

5              MR. MOSKOW:  May it please the Court, thank you

6    for the opportunity to brief this overnight.  And while I

7    understand some of the language may have been not as artful

8    as it could have been, I think I can give the Court a, kind

9    of a big picture of where we are.

10             THE COURT:  All right.

11             MR. MOSKOW:  And then I'd love to hear or answer

12   some of the Court's questions that I just heard during Mr.

13   Lewis's argument.

14       One of the -- let me just start by saying we think that

15   this motion has already been decided as part of the summary

16   judgment briefing and we quoted that in the papers.  We

17   think it's untimely.  There was a scheduling order for

18   dispositive motions and this was not brought.  We think it

19   can be ruled on that.  But we do want to address the merits

20   and so let me kind of jump right in.

21       And at its most basic, Your Honor, this is about

22   changes that were actually made to the label that were never

23   communicated to Mrs. Knight and her family.  And while I

24   appreciate Mr. Lewis's reliance on the five items there, I

25   think the record is clear these are five items that were not

1  communicated to the Knight family.  And that's the gravamen

2  of, of these items.

3      But both Dr. Ashhab and Dr. Plunkett spoke at length

4  about the need for physicians to have additional information

5  specifically with regard to whether or not there is a

6  therapeutic range, whether or not there's a value not to be

7  exceeded, and whether there's an ability to identify

8  patients who are at particular risk, the one in five that

9  we've heard about repeatedly in this case.

10      So those matters while not on this particular list were

11  certainly articulated in front of the jury.

12          THE COURT:  And those are part of a failure to

13  warn because the label didn't address it.

14          MR. MOSKOW:  That's correct, Your Honor.

15      And I, I want to highlight for the Court -- and I don't

16  have the benefit of the daily transcripts.  But I want to

17  highlight to the Court's memory the deposition play of

18  Michelle Kliewer who specifically stated that there was

19  analysis, internal analysis with regard to this therapeutic

20  range and this idea of a cutoff value of 215 nanograms per

21  milliliter or 200 nanograms per milliliter which was never

22  communicated to the FDA.

23      So whether the launch label included information or

24  didn't include information goes right to the heart of

25  plaintiffs' claims.  And I think that may be a good place

1    for me to, to transition, Your Honor.

2         If we were to look at Exhibit 5881, which is the

3    defense version of the launch label -- I'm going to put it

4    up on the screen, Your Honor.

5         So this is the highlight section in the launch label,

6    Your Honor.  And just to superimpose on top of it, the

7    highlight section in the January, 2012, label which is

8    Plaintiffs' Exhibit -- oh, let me start.

9         If you note, Your Honor, this section in particular

10   there is no mention of drug interactions.  And there's no --

11   well, that's the part I really want to focus on right now.

12   I'm going to switch gears a little bit.

13        And then over here there's no specific information

14   about assessing renal function.

15        And when we superimpose Exhibit 88, the January, 2012,

16   label, you'll see now there's an addition of the P-gp

17   inhibitors in patients with severe renal impairment, Pradaxa

18   use not recommended.

19        And you'll also see that there is information here

20   about assessing renal function during therapy and adjusting

21   the therapy accordingly.

22        These were changes that were actually initiated without

23   FDA approval through the CBE process in November of 2011.

24   And then there was a negotiation.  Once the label was

25   changed unilaterally, there was a negotiation between

1  Boehringer and the FDA.  And this January, 2012, label is

2  the product of those negotiations.

3      There is not one scintilla of evidence in the record

4  that the defendants sought to include in the Medication

5  Guide this information at the time they made the unilateral

6  change.

7      In other words, when they made the unilateral change

8  and then there was a negotiation with the FDA, there is not

9  any evidence in the record in this case that during that

10  period of negotiation they sought to include the same

11  information in the Medication Guide.

12      We would submit that the defendant cannot meet its

13  burden on impossibility pre-emption without showing that

14  they requested the change and that it was not made.  We're

15  not saying that they could make it unilaterally in this

16  case.  But we're saying once they unilaterally put the

17  information into the label, they had an obligation to inform

18  patients in West Virginia.

19      And the only evidence that we have of their attempts to

20  inform patients in West Virginia of the risks and benefits

21  of Pradaxa are a TV commercial which is not subject to the

22  FDA pre-approval.  It's a whole different regulatory scheme.

23  They could communicate with patients directly by TV.

24  There's no indication that they ever tried to communicate

25  directly by TV that patients should not take Coreg and

1    Pradaxa at the same time.  So that's, that's the one hand.

2         The other hand, Judge, is that if this is the only

3    information that they've conveyed to, to patients in West

4    Virginia -- when I say "this," I mean the Medication

5    Guide -- then the only evidence in the record is that they

6    failed to warn on these things.

7         So -- and I'm pointing at the board that we've been

8    talking about with the five things.  So they can't have it

9    both ways.  The defendants can't say they're meeting their,

10   their obligation under West Virginia law to warn of known

11   hazards of the drug when they are specifically identifying

12   them to physicians but not communicating them to individual

13   patients.

14        And that gets me right to the, the nub of the point

15   where Mr. Lewis started his argument and the Court's

16   question about our language in our briefing.

17        The plaintiffs' position is that the Medication Guide

18   is as much evidence of what was not done as it is evidence

19   of what was done.  In other words, by pointing out that

20   information is not in the Medication Guide, we are

21   establishing that Boehringer never met its state law

22   obligation to specifically warn patients of the risks

23   associated with Pradaxa.

24        I think this is particularly significant here, Judge,

25   when I know we've used language like guinea pig and it's

1    evocative language and I'm sure, you know, that there's a, a

2    sense that that's not fair.

3         I want to point out to the Court, though, if we look at

4    the launch label again -- this is 5881 -- if we go to the

5    section on clinical trials -- I'm sorry.  It's Section 12.3

6    Your Honor, "Pharmacodynamics."  And specifically it relates

7    to severe -- I'm talking about the area at renal impairment

8    that's on Page 5815.  And you'll see -- and I'm going to

9    really hone in on this.

10        You'll see that they include Table 3 which identifies

11   normal, mild, and moderate renal impairment.  And you see

12   how it's highlighted underneath that, Judge.  That's because

13   in Exhibit 88 in Section 12.3 on Page 6 the defendants have

14   now added -- excuse me -- defendant has now added not only

15   severe renal impairment, but you'll see they've added a

16   statement underneath, "Patients with severe renal impairment

17   were not studied in RE-LY.  Dosing recommendations in

18   subjects with severe renal impairment are based on

19   pharmacodynamic models."

20             MR. LEWIS:  I'm sorry.  What date is that label?

21             MR. MOSKOW:  Page 6 of 88.

22             MR. LEWIS:  What's the date, though?

23             MR. MOSKOW:  This is January, 2012.

24        Your Honor, so Boehringer updated its physician's label

25   after the FDA approved the launch label which had no

1    information about severe renal, had no information that the

2    patients had not been studied.

3        So there was an update to the label that specifically

4    references that, but it's not communicated to individual

5    patients either in the Medication Guide, on TV, in a direct

6    mailing, in a "dear patient" letter.  Dr. Plunkett talked

7    about the ability to do that.

8        And we want to make clear, Your Honor, that drug

9    companies are permitted to communicate info in the label

10   direct to consumers.  That's why we have these TV

11   commercials.

12       And the statutory scheme or the regulatory scheme for

13   that is that they submit the commercials to the FDA, but

14   they don't have to wait for FDA approval to play the

15   commercial.

16       Now, they do so at their peril.  They may be subject to

17   a cease and desist letter if it's inaccurate.  But if it's

18   consistent with what's in the label, they're allowed to

19   communicate that directly to consumers.

20       There's no indication in this case that at any time

21   after Mrs. Knight started on this drug that a commercial was

22   played in Connecticut that communicated the things that they

23   were already telling to doctors, let alone the things that

24   we say they should have told doctors but have not.

25       The, the reliance on a, on a specific regulation which

1   has never been interpreted by any court at this late hour to

2   try to knock out all of these claims to me really reflects

3   the fact that there is no legal basis to do so.  It would

4   have been challenged in summary judgment.  We would have

5   seen an affidavit from a regulatory affairs expert on their

6   side saying all of these things.

7       And the, the suggestion that these are new arguments,

8   that they couldn't anticipate them, is belied by the fact

9   that in the very briefing for summary judgment, the

10  plaintiff specifically identified the failure to include

11  information in the Medication Guide as evidence that the

12  defendants had not met their state failure to warn

13  obligations.

14      I have more, but I want to make sure I'm answering your

15  questions, Your Honor.

16          THE COURT:  Well, you're helping.  And I

17  understand that you believe there are criticisms that are

18  not pre-empted that are not among these five.  But tell me

19  about your, your view of how you approach applying *Levine* to

20  number two, never tested in the 75 dose.

21          MR. MOSKOW:  Yes, Your Honor.  So, actually, I

22  appreciate that.

23      So if we go to Section 14 of -- it's actually in the

24  original launch label as well.  So this is both in 88 and

25  5881.

1        In both of those labels you'll see there is language,

2   and I'm -- it's hard to -- I want to make sure you can read

3   it as I'm putting it up on the screen.  But you'll see that

4   there's language in "Clinical Studies," Judge, which

5   specifically identifies that an approval is based on the

6   RE-LY study that compared two blinded doses of Pradaxa,

7   110 milligrams twice daily and 150 milligrams twice daily.

8        So there is information in the launch label for

9   physicians that indicates that the 75-milligram dose had not

10  been tested.

11       Now, it is made more clear in the subsequent label

12  which I, I showed you, Exhibit 88, where they specifically

13  identify in Section 12.3 that severe renal impairment was

14  not studied.

15       But -- actually, I think I missed the screen there.

16  But severe renal impairment was not studied.  But there is

17  information here, Judge, where a physician could identify

18  the 75-milligram dose was not tested.

19       So the FDA has already approved this language being

20  communicated.  This is not a question of whether the FDA

21  would approve it.  They did.  There is no evidence in the

22  record that defendants ever sought to include similar

23  language, plain language in the Medication Guide and that

24  the FDA rejected it.

25       So what we have here is evidence that the language was

1    requested. It was included in the physician's label. We

2    have no evidence that it was ever rejected -- requested or

3    rejected from the, the Medication Guide.

4        And this is a defense. This is not plaintiffs'

5    obligation to disprove. This is defendant's obligation to

6    prove that the matter is pre-empted. And they can't meet

7    their burden based on the, the language of the labels.

8        As we indicated in our, our opposition papers, Judge,

9    if you look at the five statements that are there -- I just

10   want to be very clear. We were responding to a motion. And

11   that motion attacked these five opinions.

12       It didn't mention our other labeling criticisms

13   regarding the failure to include a therapeutic range, the

14   failure to identify a test -- Dr. Plunkett talked about the

15   fact that we need to know exactly what excessive dabigatran

16   exposure is and that information isn't in the label.

17       She talked about the fact that there's a close

18   correlation between the amount of Pradaxa and the bleed

19   risk. That specifically wasn't in the label.

20       And, Your Honor, I think the best evidence of how

21   important that is was when we heard from Dr. Abdelgaber who

22   testified repeatedly that he was not aware you could get too

23   much Pradaxa based on his understanding of how the drug

24   worked. The company knew you could, but he didn't.

25       So I think the issue of -- and I could go on, but the

1   issue of whether these labeling criticisms have been made

2   and whether there's evidence in the record, you know, I'll,

3   I'll leave to my colleagues to, to argue in the next motion.

4        But what's, what's most important for purposes of this

5   discussion is that the defendants cannot show that with

6   regard to these five items, the FDA would not have approved

7   a request for them to be included in the Medication Guide.

8        And the reason for that, Your Honor, as identified in

9   our, in our opposition is that all five of these claims were

10  either added to the physician label -- or all five of these

11  warnings were either added to the physician label after the

12  launch label or included in the launch label.  And there's

13  no evidence that they were ever sought to be included in the

14  Medication Guide.

15       That really goes back to I think a fundamental

16  misunderstanding of how the FDA works.  You know, FDA

17  knowledge at a point in time is irrelevant if the defendants

18  did not provide all of the analysis that they had of the

19  data.

20       And what we heard from Michelle Kliewer is that on

21  multiple issues that are germane to these specific warnings

22  and the others that were identified by Dr. Ashhab and, and

23  Dr. Plunkett, those analyses of that data were never

24  provided or were provided at a time after the, the decedent

25  took the drug.

1    One of -- you know, we saw a transcript reference to

2  one statement that Mr. Childers made about evidence that we

3  were going to show that the family was never warned.  And

4  he, he talked about the Medication Guide.  And that is

5  evidence of what the family was not told.  What's missing is

6  what they were not told.

7    But he also used this slide, Judge, which was a clear

8  indication that we were making a labeling criticism that

9  this particular drug required -- well, has a therapeutic

10  range and that there is a need to be able to identify it.

11    And how do we know that?  Because the very next slide

12  Mr. Childers showed was that monitoring was an issue here.

13  And he also showed this slide, Judge, that one in five

14  patients are at unnecessary risk because the defendants were

15  not identifying what the therapeutic range was and how to

16  identify people who are getting too little or too much of

17  the drug.

18    So, you know, to cherry-pick, you know, one statement

19  from a 48-minute opening I think misses the boat and

20  certainly misses what Dr. Plunkett and Dr. Ashhab testified

21  to.

22    Just looking at some notes that I'm --

23        THE COURT:  Certainly.

24    (Pause)

25        MR. MOSKOW:  You know, one of, one of the

1   difficult things about trying a wrongful death case is that

2   you're trying to reconstruct information.  And, obviously,

3   with, with Rick and Claudia, we hope we've told that story

4   to the jury.

5        But the position that the plaintiffs have asserted

6   here, and I believe that a reasonable jury could draw from

7   the evidence that's been produced, is that had, had these

8   warnings been provided, had Mrs. Knight and her family known

9   that, for example, there was no reversal agent when she had

10  actually been administered Vitamin K, the reversal agent for

11  warfarin, she would not have taken the drug.

12       I think that's a pretty significant issue here, Judge,

13  because if we look at the launch label and we look at

14  Section 5.1 -- this is Exhibit 5881, Page 2, Your Honor.

15  And if we, if we look at Section 5.1, you'll see I've

16  highlighted nothing.

17       And that's because if we now go to the January, 2012,

18  label, to that same section, 5.1 -- this is on Page 3 of

19  Exhibit 88 -- we now see that the language "a specific

20  reversal agent for dabigatran is not available."

21       So that's information that was not in the launch label,

22  Your Honor.  It's number four on Mr. Childers's chart.  And

23  there's no indication that that information has ever been

24  communicated to the Knight family, not from Dr. MacFarland,

25  not from her nurse, not from Dr. Abdelgaber, not from Rick

1    and Claudia.

2        The only evidence that we have that demonstrates that

3    there was no effort to communicate that is the fact that

4    it's not in the Medication Guide.  So the Medication Guide

5    in this particular case becomes evidence of a failure to

6    warn, not the violation of the duty, but evidence that it

7    had never been communicated.

8        And what you heard from, from the physicians was that

9    there were times when Mrs. Knight needed to have her

10   anticoagulant reversed and it was.

11       The last thing, Judge, I just wanted to touch on before

12   I sit down and I may go back to -- would you mind bringing

13   that slide up, please?  Thank you.

14       Your Honor, what's particularly interesting about this

15   chart is that everything ends up pre-empted.  There's,

16   there's no way based on this chart to ever update the label.

17            MR. LEWIS:  That's not true.  Hold on.  It says

18   "claim not pre-empted" right there.  Let's get it right

19   here.

20            MR. MOSKOW:  I'm sorry.  We have one, one way

21   apparently to get there.

22       Let's, let's really walk through this, though, Judge.

23   Can the proposed change be made without FDA approval?

24       So in this particular case what we're saying as it

25   relates to the label is whether they can communicate

1    specifically to the physician that there's a therapeutic

2    range, there's a value not to exceed, there's a way to

3    identify patients at excessive risk, and that Coreg in

4    particular -- and we, we've made the comparison to Verapamil

5    but specifically identifying Coreg among the other claims

6    that Dr. Plunkett and Dr. Ashhab mentioned.

7        All of those are based on information that was

8    developed by the company after the launch label either

9    through re-analysis of the RE-LY trial, through

10   post-marketing studies in the population, or through changes

11   in science.  It's not a static process.

12       Did the plaintiff demonstrate there was newly acquired

13   information?  Through papers that were published after the

14   date of the drug, the Eikelboom paper from 2011, the

15   Wechsler paper from 2015, the Reilly paper from 2014.  We

16   identified that there were changes that became known after

17   the date of approval.

18       And significantly, Your Honor -- and I have to admit I

19   don't know whether Dr. Ashhab testified to this.  I just

20   don't have a specific memory of it.  But in his report he

21   specifically stated, "Boehringer Ingelheim --" "had

22   Boehringer Ingelheim instructed Ms. Knight's physicians to

23   measure dabigatran levels and provide guidance on how to

24   measure and interpret her dabigatran plasma concentration,

25   it is more likely than not that they would have found hers

999

1   to be elevated and they would have either reduced her dose

2   of Pradaxa further or switched her to another readily

3   available anticoagulant to prevent such a deadly

4   complication."

5           MR. LEWIS:  I've got to -- I mean, I was objected

6   to during my argument.  He did not testify to that.  And

7   I'll pull the transcript if I have to because that --

8           THE COURT:  Well, I think counsel just

9   acknowledged he wasn't sure what --

10          MR. LEWIS:  He's arguing the evidence.

11          MR. MOSKOW:  But my point, Your Honor, is that

12  the, the citation for that comment was the Reilly Lehr

13  paper.  The 2014 re-analysis that the Court has heard

14  testimony went through many iterations that removed from it

15  a clear indication of a therapeutic range, removed from it

16  the idea that patients' outcomes could be improved by

17  testing to see if they were at excessive risk of exposure.

18      But let's go to the next one.

19          THE COURT:  Well, before you do that, so it would

20  be your view that the things you just listed would fall

21  within the area where Boehringer could have used the CBE

22  process and modified its labels to include those specific

23  warnings.

24          MR. MOSKOW:  That's correct.

25          THE COURT:  And as a result, those aren't

1  pre-empted.

2          MR. MOSKOW:  That's correct.

3          THE COURT:  Where would you -- how would you apply

4  that same test to these and which are things that are in or

5  not in the label issue?

6          MR. MOSKOW:  So, Your Honor, every one of these

7  items is in the label, is in the physician's label.  The,

8  the lack of it being in the consumer label, the Medication

9  Guide is evidence that the defendants never properly warned

10  the Knight family of known risks and hazards of the drug

11  that went directly to their ability to make an informed

12  decision about the risks and benefits.

13      It's not, it's not de facto.  It's not because it's not

14  there, we win.  It's evidence that the jury can consider in

15  combination with the fact that, as Dr. Plunkett testified,

16  there was no "dear healthcare professional" letter.  There

17  were no, no direct-to-consumer advertising that indicated

18  these changes.

19      And, you know, what's particularly significant, Your

20  Honor, is that items one, two, three, four were not in the

21  launch label.  Those were all added afterwards.

22      But our point is that because they were added

23  afterwards, there was a potential that they could have been

24  added to the Medication Guide.  But it's irrelevant to our

25  claim.

1    Our claim is the fact that they weren't means that

2    there's no evidence that the Knight family ever received

3    warnings that were germane to their consideration.  And the

4    inclusion in the label, the inclusion of these things in the

5    label, particularly after the launch, is evidence that the

6    company identified these as important risks that needed to

7    be taken into account for purposes of a risk-benefit

8    analysis, yet failed to actually communicate them to the

9    people under West Virginia law who were required to get

10   them.

11         THE COURT:  All right.

12         MR. MOSKOW:  I believe -- Your Honor, unless you

13   have more questions, I could probably go on talking for a

14   while, but I think you know the issues and you --

15         Mr. Childers wanted me to remind the Court and myself,

16   apparently, that our claim starts in November of 2011; that

17   had this information been communicated to Mrs. Knight at

18   that point in time, her family would not have made the

19   decision to put her on the drug.  The three of them would

20   not have gone on the drug.

21         So the fact that there were subsequent failures to warn

22   is significant and we think it shows a reckless disregard

23   for patient safety that would lead a reasonable jury to

24   conclude that punitive damages are warranted.

25         But the gravamen of the claim is that as of the time

1    she went on the drug, the defendants knew or should have

2    known each one of theses things and they didn't communicate

3    them to Betty Knight or her family.

4              THE COURT:  All right.  Thank you.

5         All right, Mr. Lewis, I'll give you a few minutes of

6    rebuttal.

7              MR. LEWIS:  Thank you, Your Honor.  Just a few

8    things, Your Honor, in response.

9         We cited the regulation -- we cited the regulation in

10   our papers, but I did want to indicate to the Court that the

11   C.F.R. section that we're relying on is 21 C.F.R. 314.70.

12   And the Medication Guide is called out in there.

13        And, and the argument that was just made was exactly

14   the argument that we think makes the claim pre-empted.  We

15   can't change that label.  Remember, we get back to conflict

16   pre-emption.

17        The question is, are they trying to make us do

18   something under West Virginia tort law that we can't do

19   under federal law.  And the answer is "yes."  The argument

20   is you should have put all of these things in the physician

21   label in that Medication Guide or otherwise communicated

22   those to the plaintiff directly.  And that's the kind of

23   claim that's pre-empted.

24        Now, I want to address the argument that we should have

25   asked because that's, that's dealt with directly in the

1    *Mensing* Supreme Court decision.  And that argument was made;

2    you should have asked.

3          And here's what the Supreme Court says.  "The Court

4    rejects the argument that their pre-emption defense fails

5    because they failed to ask the FDA to change the label."

6                THE COURT:  But wasn't it in the context where the

7    generic manufacturer was sued and the claim was the generic

8    manufacturer should have asked the FDA or asked the brand

9    name manufacturer to change it?

10               MR. LEWIS:  Yes.  That was the case.  But it's

11   exactly the situation that we have here.  Here's why.

12         The Medication Guide is akin to a black box warning or

13   a generic label in the same sense that you can't change it

14   without FDA approval.

15         There's this other path where you can voluntarily

16   change some things.  That's the CBE.  But the Medication

17   Guide is just like a generic label.  You can't change it

18   unless you first get FDA approval.

19         And so what they argued in the generic case is just

20   what the plaintiffs are arguing here.  You should have

21   asked.  And because you didn't ask the FDA, the claim isn't

22   pre-empted.

23         And the Supreme Court rejected that argument right

24   here.  It said that's -- you're not -- the pre-emption

25   defense is still good even if you could have asked and you

1    didn't ask.  The reason why is you're engaging in all kinds

2    of speculation.  And this is what the Court says.

3        It would render the pre-emption defense, conflict

4    pre-emption all but meaningless.  It's enough to hold that

5    when a party -- and this isn't limited to generics here.

6    This is a statement by the U.S. Supreme Court.

7        When a party cannot satisfy its state duties without

8    the federal government's special permission and assistance,

9    which is dependent on the exercise of judgment by that

10   federal agency, that party cannot independently satisfy

11   those state duties.

12       So this isn't limited to generics.  It's any time that

13   you need the FDA approval and the other side is trying to

14   say you should do something else that you don't have FDA

15   approval to do, the claim is pre-empted and you don't have

16   to ask.  That's what, that's what the law of the Supreme

17   Court says right there.

18       And that's why the Medication Guide argument and all of

19   the arguments surrounding the Medication Guide, it should

20   have been in there, we should have said this, we should have

21   said that --

22       THE COURT:  Even if I agree with you, why

23   shouldn't the relief be restricted to instructing the jury

24   clearly that plaintiff is not claiming that the Medication

25   Guide is defective or fails to warn because the Medication

1     Guide can't be changed without FDA approval?

2          MR. LEWIS:  I would be -- I think that is an

3     appropriate relief here.  I really do.  I think that this

4     jury is going to be extremely confused if the Court doesn't

5     give that instruction.  I mean, at a minimum the Court has

6     to instruct the jury that in my view.

7          The directed verdict should be granted on that --

8     however the Court wanted to frame that piece, that has to be

9     the instruction because they're going to be way too confused

10    if we don't instruct them of that.

11         THE COURT:  All right.  I know you folks had some

12    discussions about instructions.  And yesterday you indicated

13    you've got some more coming.  Do you all have an instruction

14    that addresses that?

15         MR. LEWIS:  We'll work on one because I wasn't

16    sure how this was going to play out.  But I also want to

17    point out a couple of things about the label challenges if I

18    may.

19         So part of this may be a dispute about what the

20    relevant label time period is.  And the Court may just have

21    to decide that as a matter of law what the relevant --

22    because it's not really a jury issue.  It's, it's --

23         THE COURT:  Why isn't it a jury issue to determine

24    at what point the company should have warned her, or

25    whatever it is the jury ultimately concludes, was the

1    failure to warn?

2         MR. LEWIS:  Because the, the operative

3    prescription and ingestion of medication that is at issue in

4    this case took place in 2013.

5         So there was ingestion of medication that allegedly led

6    to an injury that took place in 2013.  And, so, the Court

7    for purposes of assessing the pre-emption defense should

8    look at the label as it existed at the time that that

9    allegedly offending prescription and ingestion was made.

10        In all of the, all of the things that were complained

11   about, including the P-gp inhibitor, the Coreg, Pradaxa, the

12   no reversal agent, those were all from the January, 2012,

13   label.  They were, they were already in the label to

14   physicians by the time the allegedly offending prescription

15   and ingestion of medication was made.

16        I think just a straight up issue that the Court can

17   find for purposes of pre-emption; that that's, that's the

18   label we have to address is that one because we have

19   completely different physicians involved at that time.

20        I mean, if there was testimony in the case from a

21   doctor that had prescribed the medication for two years and

22   testified that never got a new label, never saw a new label

23   and just kept renewing the -- but that's not the facts here.

24        The facts are that we have a brand new physician,

25   Stephanie Graham, in 2013 who in the first instance

1    prescribes Pradaxa that's the allegedly offending

2    prescription and ingestion.  And the label that existed at

3    that time was the one that has all of the information.

4         THE COURT:  But under West Virginia law applicable

5    to this case, the duty is on the manufacturer to warn the

6    patient.

7         MR. LEWIS:  And that's where we get into the

8    Medication Guide again because the company doesn't have --

9    the company has one avenue to communicate with the patient.

10   That's the Medication Guide.  And to suggest that any other

11   communication should have taken place would offend federal

12   law.

13       That's why the only way to pursue the case for the

14   plaintiffs is to somehow use the physician label to argue

15   that it would have changed plaintiff behavior, patient

16   behavior.  That's the only way they can pursue this claim

17   just based on the way the federal regulations are written

18   for this particular case.

19       I want to just point out one other thing.  And this

20   just must have been a mistake.  But the launch label --

21       Can we get Exhibit 5881, Section 10?  I believe that

22   has -- yeah.

23       There's no antidote to dabigatran.  There was language

24   in the label that there was no reversal agent, no antidote

25   in the launch, and then it got moved to another section in

1    the later label.  I just wanted to clarify that.  That's

2    just -- it must have just been an oversight.

3         In any event, I think that's all I have, Your Honor.

4    But we definitely will craft an instruction on the

5    Medication Guide for the Court's consideration.

6              THE COURT:  All right.  I'll just comment.  The

7    defendant -- or the plaintiff only made passing reference to

8    the timing of this.  Why didn't you file this motion with

9    dispositive motions?

10        I'm going to tell you for me the biggest problem is

11   that suddenly, less than 24 hours ago, you present me with a

12   pretty nuanced and complicated pre-emption argument.  And I

13   went back and looked at the summary judgment motion you

14   filed and there was a three- or four-sentence reference

15   there to pre-emption.  But it was in the context of a

16   warning that has never really been at issue and certainly

17   hasn't been presented here.  So --

18             MR. LEWIS:  Right.  Well, I have two responses to

19   that, Your Honor.

20        The first response is there's no waiver of a defense.

21   The thing that's going to go up on appeal is whatever the

22   trial record is.

23        And even in the *Dolin* case you see that what happened

24   was there was a verdict against the defendant.  And during

25   the trial, the defendant put in pre-emption evidence that

1   was eventually relied upon by the Court of Appeals and

2   that's why the reversal took place based on those facts.

3   But they, they only looked at the trial facts.

4        And, so, as we got into this case and saw what the

5   plaintiff presented, in our view it led to a very strong

6   pre-emption defense that maybe we weren't exactly sure how

7   the plaintiffs were going to present their case on summary

8   judgment.

9        Now, the other thing is there are a lot of cases out

10  there.  Now the *Eliquis* case, the *Utts* case from the

11  Southern District of New York is a motion to dismiss, but

12  there are a lot of other cases where courts are finding

13  factual issues in the context of pre-emption.  And we wanted

14  to wait to get all the facts in before we made our defense

15  in this case to be honest.

16       And I apologize to the Court that we, you know, made a

17  complicated defense during trial, but we're permitted to do

18  that.  We don't waive anything by not filing a summary

19  judgment motion or a motion to dismiss on these issues.  So

20  I guess that's, that's my point.

21       The other real point, though, is we've been trying to

22  figure out what their theory is here all along.  And I'm not

23  criticizing the plaintiffs, but they've bounced around quite

24  a bit throughout this case.

25       We didn't hear -- if you watched the depositions of the

1    physicians, you don't see a lot of testimony about the

2    Medication Guide and what was in it.

3         Then all of a sudden we get to trial and we see a

4    frontal attack on the Medication Guide, I think perhaps

5    because the law of West Virginia that applies in this case

6    is a little bit different than what we're typically used to

7    as pharma lawyers on both sides with learned intermediary.

8    Perhaps the cases change a little bit.

9         So I would, I would also suggest that, you know, both

10   sides have made some modifications to the way they present

11   this case given that it's a different dosage than we're used

12   to in some of these cases and also a little bit different

13   law.

14        But there's no waiver issue because we didn't have to

15   raise it at summary judgment.  We can, we can base it on the

16   trial evidence.

17        Thank you, Your Honor.

18             THE COURT:  All right.  Thank you.

19        All right.  Do you want to sur-reply briefly?

20             MR. MOSKOW:  Very briefly, Your Honor.  Literally

21   it fit on three post-its.

22             THE COURT:  Go ahead.

23             MR. MOSKOW:  There's a huge difference, as

24   Dr. Plunkett testified to, between warnings and other

25   information in the label.

1      The inclusion of no reversal agent in the overdose

2   section in the launch label, but then the prominent

3   placement in the risk of bleeding warning in subsequent

4   labels is an incredibly significant change, one that was

5   never communicated by "dear healthcare professional" letter,

6   was never communicated to patients or specifically here

7   Betty Knight and her family.

8      And I want to make clear, Your Honor, far from only

9   having one avenue to communicate with patients, the

10  defendants in this case -- the defendant in this case has

11  availed itself of at least two other methods,

12  direct-to-consumer advertising on TV and direct-to-consumer

13  advertising in print.

14     If they wanted to communicate these risks, they had the

15  ability to do so.  There is no evidence that that was

16  communicated to Mrs. Knight or her family.

17     Secondly, Your Honor, you've already ruled on which

18  labels are at issue for the jury as part of the summary

19  judgment and motion *in limine* practice that happened in a

20  timely manner in this court.

21     And as the -- as Mr. Childers reminded me and I said to

22  the Court, the plaintiffs' claim is that Mrs. Knight would

23  not have ever started on this drug had she been adequately

24  warned.  So the label in effect at the time she first

25  started is significant.  The label at each time she refilled

1    her, her prescription was also relevant.

2         The one thing there's no evidence in this case, though,

3    is this physician who -- I don't even know her name, the

4    physician who put her on it in April of 2013 because that

5    has not come before this jury.  That's not an issue for

6    purposes of directed verdict.

7         What is an issue under *Ilosky* vs. *Michelin* is that it's

8    black letter law in West Virginia that the adequacy of a

9    label is a jury question.  It's not a question of law.

10        And then, finally, Your Honor, the -- the *Johnson* case

11   which is cited in our papers is a direct-to-consumer, not a

12   learned intermediary case.  So I wanted to just highlight

13   that for the record.

14        The final thing I was going to say, Your Honor, by way

15   of sur-reply is that, as the Court pointed out, *Mensing* --

16   and, and to the extent that the defense relies on *Pliva* were

17   totally different situations.

18        In those situations under both law and regulation the

19   defendants, who are generic drug manufacturers, had no

20   ability to change their label absent a change in label of

21   the name brand.

22        That's not the situation we have here.  This is the

23   name brand manufacturer.  They actually did change their

24   label.  And pre-emption is not a valid defense.

25        Thank you, Your Honor.

1       THE COURT:  All right.  Thank you.

2    Okay.  Let's go to motion number two.

3       MR. HAILEY:  Good afternoon, Your Honor.

4    I want to focus my argument on two issues; first,

5    proximate cause, otherwise known as warnings causation, and

6    then I want to focus on our punitive damages argument.

7       On warnings causation there are, there are three key

8    arguments I just want to flag for the Court.  We briefed

9    these issues.  I just want to flag what we think are the

10   most important.

11      The first is that there has been no evidence in this

12   case that Mrs. Knight ever actually read the Medication

13   Guide at issue here.

14      I just heard Mr. Moskow say that plaintiffs' claim in

15   this case is that Mrs. Knight would never have started this

16   medicine if she'd been properly warned.  And I think that

17   that's the, that's the case that they've put on.

18   Notwithstanding what we've heard today about physician

19   labels, the case has focused on the warnings that were

20   communicated to, to Mrs. Knight.

21      But there's, there's been no showing of proof by the

22   plaintiffs that Mrs. Knight ever actually read the

23   Medication Guide.

24       THE COURT:  Have you gone back and looked at the

25   opinion I did on summary judgment?  I haven't, to be candid

1    with you, since this came up yesterday.

2         But I think I addressed this and I think I made

3    findings based upon argument as to what that evidence might

4    be.

5         Can you point to evidence that I cited as a reason for

6    denying summary judgment on this issue that evaporated at

7    the trial in plaintiffs' case?

8              MR. HAILEY:  Well, sure, Your Honor.  I think on,

9    on summary judgment the evidence in the record was the

10   deposition testimony and the briefing.  But we just had Mr.

11   Knight and Ms. Stevens testify in court yesterday.  And I

12   think that's, that's the evidence that plaintiffs have put

13   forth in this case and that's what we should be focusing on.

14             THE COURT:  Well, I agree.  But my point is I

15   think I laid out what I understood the evidence to be and

16   why it was sufficient.  Now they've put on their evidence.

17        What about what they argued have they failed to produce

18   here?  That's what I'm really getting at.  How has it

19   changed?  What's changed from the record I had before me at

20   summary judgment to the actual evidence at trial that makes

21   this now deficient?

22             MR. HAILEY:  Well, let me, let me first state what

23   we didn't hear yesterday when Mr. Knight and Ms. Stevens

24   testified.

25        They, they never testified that their mother actually

1    read the Medication Guide.  They were never asked, "Did your

2    mother read the Med Guide?  Did your mother receive the Med

3    Guide at the pharmacy?  Did you ever see a copy of the Med

4    Guide in your mother's possession?"  They were never asked

5    any of those questions.  They could have been asked those

6    questions to answer this issue.

7         Going back to summary judgment, the only evidence --

8    and this was -- we heard a little bit of this yesterday.

9    The, the only evidence that the plaintiffs can point to on

10   whether or not Mrs. Knight actually read a Medication Guide

11   is the testimony from Ms. Stevens.

12        And first Ms. Stevens testified that Mrs. Knight,

13   quote, kept papers, end quote, from the pharmacy in a drawer

14   in her house.  She also said that -- Ms. Stevens when she

15   was shown the Pradaxa Medication Guide on the screen

16   yesterday, she said that that was the kind of paper that her

17   mother would keep in a drawer.

18        But she never said that that, that she saw the Pradaxa

19   Medication Guide specifically, that she -- she could never

20   give anymore unequivocal testimony that --

21            THE COURT:  Why doesn't that just go to the weight

22   of the evidence and let the jury decide?  She testified that

23   it was her practice for her mother to keep the papers she

24   got from the pharmacy.  I don't think there's any question

25   in the evidence that would include a label and a Medication

1    Guide.  And I think the -- maybe one of the other doctors or

2    other experts testified that's what goes with a

3    prescription.

4         So what they got was evidence that it was her practice

5    to keep that type of paperwork.  One could infer -- and I

6    think there was at least in Rick Stevens's testimony that

7    he -- or Knight's testimony he knew that she actually read

8    the information about warfarin because she brought up the

9    fact that the, she had a problem with it or an allergic --

10   something -- there was something like that.  I'm going to

11   get this confused.

12        But, in any event, there was evidence from them that --

13   from which a jury could infer that she may have read the

14   label and/or the Medication Guide.

15             MR. HAILEY:  So a couple of responses.

16             THE COURT:  Go ahead.

17             MR. HAILEY:  I think from the evidence that's come

18   in the case we, we know that Mrs. Knight was on a whole host

19   of medications.  I don't think there's testimony that she

20   kept every paper that she received in connection with her

21   medications; that she kept, may have kept some papers from

22   the pharmacy.

23        And also the fact that she received papers from the

24   pharmacy and put them a drawer, there's been no evidence, no

25   proof that she ever actually read any of those warnings.

1    And that's what, that's what is important in this case is

2    whether she read and understood and the warnings were

3    actually communicated to her by reading the Medication

4    Guide.  And there's been absolutely no proof on that point.

5        And plaintiffs could have offered that proof.  Mr.

6    Knight and Ms. Stevens were in this courtroom yesterday and

7    they, they --

8            THE COURT:  Well, I agree it's pretty thin and

9    I've been concerned about that from the beginning.  What I

10   plan to do is go back and first review the summary judgment

11   discussion of this and then compare that with what I

12   understand the evidence to be.

13       I know you cite a couple of cases.  But in the cases

14   where I've seen where the judge has taken this issue from

15   the jury and decided it as a matter of law were cases where

16   people testified they did not read the papers that came with

17   the prescription.

18       And we certainly don't -- that's on the other end of

19   the continuum and we certainly don't have evidence like that

20   here.  So we're somewhere in between.

21           MR. HAILEY:  Well, unfortunately we don't have

22   testimony from Mrs. Knight in this case.  And I, I think the

23   best testimony there is from Mr. Knight and Ms. Stevens is

24   that they don't know.  And I think that's, that's a failure

25   of proof on plaintiffs' part because --

1        THE COURT:  Okay.

2        MR. HAILEY:  -- that's one of the elements of

3  their claim is they have to show proximate cause.

4        THE COURT:  All right.

5        MR. HAILEY:  The, the second warnings causation

6  argument that I just want to flag is there also has been no

7  showing that a different warning in this case would have

8  made a difference.

9      The standard -- this is under *Meade* vs. *Parsley*.  The

10  standard is that the plaintiffs must establish that the

11  warnings suggested by the plaintiffs would have caused the

12  patient, Mrs. Knight, to act differently or otherwise change

13  her behavior in a manner which would have avoided her

14  injury.

15      And, again, I think, I think it will help just to go

16  through the testimony on this point because the plaintiffs

17  submitted a long brief with a long chart sort of summarizing

18  their view of what the, the evidence has been in this case.

19      But comparing what plaintiffs say in their brief to

20  what is actually in the transcripts and the testimony that's

21  actually come in in this courtroom, it's, it's -- what

22  plaintiffs say is inconsistent with what the jury has heard.

23      Mr. Knight was asked about the October 17th, 2011,

24  office visit with -- at Dr. MacFarland's office where

25  Pradaxa was first prescribed.  He said that he didn't

1    remember the details of that meeting.

2        This is in -- and, and we submitted a copy of the,

3    yesterday's transcript this morning and flagged some

4    testimony for the Court.

5        I think the most important testimony there is Rick

6    saying, "I don't remember the meeting at all."  That's at

7    Page 917, lines 7 to 14.

8            THE COURT:  But then didn't he also say that there

9    was -- upon asked specific elements of the warning

10   plaintiffs have advocated that he wasn't told those things?

11           MR. HAILEY:  Well, that's where I wanted to go

12   next.

13           THE COURT:  Okay.

14           MR. HAILEY:  So on that question he was first

15   asked, "If you had known any of these things, would you have

16   requested that your mom be switched from warfarin to

17   Pradaxa?"

18       And any of those things was focused on those, those

19   five criticisms plaintiffs have made of the Med Guide.

20       Rick's answer was, "Would I have -- if I had known

21   this?  I think it would have been -- it would have played

22   into the decision.  I can't say 'yes' or 'no' because I

23   didn't, you know, we didn't have to make that decision."

24       "I can't say 'yes' or 'no.'"  That's definitionally a

25   failure of proof if he can't say "yes" or "no."

1          Now, plaintiffs' counsel came back and followed up and

2    pressed him about that answer.  And ultimately he -- Mr.

3    Knight testified if he had had that information today, it

4    might have changed his decision.

5          But that's not the issue before the jury.  That has

6    nothing to do with the issue here.  The question is would

7    that decision have been made in October, 2011, when the

8    prescription was made.

9               THE COURT:  Well, I mean, I don't know that I read

10   quite that much into his statement or answer to if he knew

11   this today.  I think a reasonable person when asked this

12   question, he's thinking in terms of, "If you tell me today

13   about this stuff, yes, it would have affected what I would

14   have done before."

15         I mean, it's -- to me, that really is up to the jury.

16   I tried to listen pretty carefully to his testimony.  I

17   certainly agree it wasn't very strong.  But he did testify

18   specifically that these were things he didn't know about,

19   and if he had known about them, I think a jury could find

20   that his answer was, yeah, he would have spoken up.

21         It is pretty clear from the evidence from he and his

22   sister that they were the ones who initiated this whole plan

23   to change to Pradaxa.  And I think they each testified that

24   they were pretty involved, especially Rick, with her

25   medications.  He's the one who put her pills together for

1    her, things like that.

2        So it does seem very reasonable for a jury to conclude

3    that the children played a substantial role, characterize it

4    as significant, substantial, however you want to, but a real

5    role in helping their mother decide what to do.

6        And in this particular instance, they were the ones who

7    suggested to her and made the arrangements to talk to the

8    doctor about changing to Pradaxa.  And they said if they had

9    known these things, they wouldn't have made that suggestion.

10           MR. HAILEY:  Well, I think that, that goes --

11   that's a good segue to the third point that I wanted to make

12   on warnings causation.

13           THE COURT:  Okay.

14           MR. HAILEY:  And that's what we see as a real gap

15   in the proof the plaintiffs have put on.  That's -- there's

16   no, there's no nexus between the warnings criticisms that

17   the plaintiffs are making on the one hand and the actual

18   facts that we heard yesterday of the communications and the

19   information that was communicated in this case.  And let me,

20   let me explain what I, what I mean.

21       Plaintiffs' labeling expert, Dr. Plunkett, when she

22   took the stand she, she criticized the Medication Guide.

23   Plaintiffs' counsel now, you know, say that she was

24   criticizing the Medication Guide and the labeling more

25   broadly.

1          What we didn't hear from Dr. Plunkett and what we

2     haven't heard until today is any criticisms of TV

3     advertisements or direct-to-consumer advertising regarding

4     Pradaxa.

5          The, the plaintiffs' case has, has focused on

6     criticisms of the Medication Guide and maybe to some extent

7     the doctor label.  But --

8               THE COURT:  I thought Rick testified in particular

9     that he remembered the ad, and maybe it was his sister

10    instead.  Somebody testified they remembered the ad.  They

11    remembered particularly that it said you don't have to be

12    monitoring this, you can eat all the greens you want, words

13    to that effect, and nothing else about any other aspects of

14    significance in changing to Pradaxa.

15              MR. HAILEY:  Well, that's, that's what I'm sort of

16    getting to.  The, the, the expert case that they've put on

17    has been a criticism of the Med Guide and, and possibly the

18    doctor warnings.

19         Dr. Plunkett didn't, didn't get up and offer any

20    criticisms.  She, she could have.  She, she purports to have

21    expertise on those areas.  She could have offered criticisms

22    about the DTC or the other promotional materials.  She

23    didn't.

24         The first we heard about those TV ads was yesterday.

25    And the reason is because there's no dispute that, that Mr.

1    Knight and Ms. Stevens, they never saw the Medication Guide.

2    So that's, I think, where the disconnect is, that the

3    warnings that the jury is hearing about, those are in the

4    Medication Guide and the doctor label.

5        Then we have the testimony about the TV ad.  There's

6    no, there's no link there between these warning criticisms

7    that plaintiffs have been making and then the actual

8    communication, the information that came through the TV ad.

9        We haven't even seen -- other than, other than the very

10   brief testimony about -- I believe it was Ms. Stevens who

11   recalled that the ad she thought said no monitoring and you

12   can have leafy greens.  That's all that we've heard.

13       Plaintiffs have not tried to play the advertisement.

14   They haven't shown any, you know, a script of the

15   advertisement.  That information is in the, is in the

16   material that has been produced as part of this litigation.

17   They could have put on evidence of that and -- but they have

18   not.  And that's, that's an important gap here because

19   this -- what, what plaintiffs are arguing should have been

20   communicated is in, is in one bucket of information.  That's

21   in the Med Guide.  But --

22               THE COURT:  Or the label.  I mean, it's not

23   just --

24               MR. HAILEY:  Correct.

25               THE COURT:  All right.

1          MR. HAILEY:  But there's no dispute that Mr.

2   Knight and Ms. Stevens never saw the Med Guide, never saw

3   the label.  It's not an absence of proof.  There's no,

4   there's no question there that they, they didn't see those

5   materials.

6      All they saw was an advertisement that -- the first the

7   jury's heard about was yesterday and plaintiffs haven't

8   offered anymore information on what supposedly was in that

9   advertisement.

10         THE COURT:  I want to think about this because it

11  does seem -- sometimes I feel like we're chasing our tails

12  on some of these issues.

13     But plaintiffs have the burden of proof.  They have to

14  prove that the warnings were inadequate.  They've had one or

15  two people testify about seeing an ad, understanding from

16  that ad only that Pradaxa sounded like a really good choice

17  for their mother because you didn't have to have monitoring

18  and it would ease up her diet.

19     And then they testified that they met with the nurse

20  practitioner and the doctor and these specific things were

21  never brought to their attention.

22     So I'm just curious, why would a jury not be able to

23  infer -- you never produced any TV ad where you said, well,

24  yeah, we say all this stuff in the TV ad.  So they've said

25  they never got the warning and it's deficient because it

1    didn't address these things.  And they say the source of

2    information is the TV ad.  Then why couldn't the jury infer

3    that the TV ad was insufficient to convey these warnings?

4         MR. HAILEY:  Mr. Moskow talked about how the TV

5    ads are subject to a, a regulatory approval scheme just like

6    labeling and the Med Guide.  We've all seen the TV ads with

7    all the fair balance, all the --

8         THE COURT:  I'm sure you have.

9         MR. HAILEY:  -- narration.  I mean, just of, of

10   pharmaceutical drugs in general, the DTC ads.  They, they

11   walk through all the warnings, all the fair balance.  We, we

12   haven't heard that.

13        The evidence that's been put on has been misleading to

14   the jury on -- it's, it's just --

15        THE COURT:  Well, we're probably chasing a loose

16   end we don't need to because I don't understand them to

17   argue that there was a deficiency in the TV ad itself or the

18   TV ad somehow violated some requirement.

19        MR. HAILEY:  Well, if Your Honor doesn't

20   understand there to be a deficiency in the TV ad and that's

21   the one communication, that's the only nexus between the

22   company and Ms. Stevens, Mr. Knight, and Mrs. Knight, then

23   there couldn't be a breach of any duty to warn.

24        THE COURT:  What about when they sit down with the

25   nurse practitioner and discuss the medicine?

1    MR. HAILEY:  Well, that's -- I think then we're

2    getting into the situation of talking about the, the

3    physician warnings that the company provides as part of the

4    doctor label.  And that -- again, the case that we've heard

5    over the last week and a half has been about the warnings to

6    the patient.  That's, that's the standard that -- that's the

7    standard under West Virginia.

8    You know, we also, of course, communicate a lot of the

9    important safety and efficacy information to doctors.  But

10   that's not what plaintiffs have been arguing and that's -- I

11   don't think we heard anything yesterday from Mr. Knight or

12   Ms. Stevens about information that, you know -- I think the

13   testimony from Mr. Knight was he doesn't even really

14   remember that meeting.

15   THE COURT:  Okay.

16   MR. HAILEY:  I think I can, I can just jump now to

17   punitive damages.  I think plaintiffs', plaintiffs' brief

18   that they filed with the chart makes, makes pretty clear

19   that their warranty claims are co-extensive with their

20   failure to warn claims.

21   They rely -- if you look at the chart, they rely on the

22   same causation element for their warranty claims as they do

23   for their failure to warn.  They -- it's either talking

24   about the label or TV ads.  Those are the, those are the two

25   communications that -- excuse me -- the Med Guide and the TV

1    ad.  Those are the communications that they're pointing to.

2    So I think we've already covered those in argument.

3         And just, just very briefly on the punitive damages.

4    When, when Mr. Moskow was, was arguing the pre-emption

5    motion, he walked through a number of areas of, of warnings

6    that were included in the doctor label but not included in

7    the Med Guide.

8         And, in my view, that sort of encapsulates why this is

9    not a case where a punitive damages claim is appropriate

10   because how can you say that the company is exhibiting

11   reckless indifference or, or malice to patients when we are

12   warning doctors -- we are putting warnings out about this

13   information that plaintiffs are saying that we have not been

14   warning about, and it's just a matter of, well, we're

15   warning the physicians and we're not providing quite enough

16   information directly to the patients?

17        That to me -- that, that fact that -- we are, we are

18   warning of this information.  It's just plaintiffs are

19   arguing about the adequacy of the warning.  That should, I

20   think, defeat the punitive damages claim.

21        And I just want to direct the Court's attention to a

22   case which I believe plaintiffs' counsel mentioned in their

23   pre-emption argument.  And that's *Ilosky* vs. *Michelin Tire*

24   *Corp*.  That's a West Virginia Supreme Court case, 307 S.E.2d

25   603.  And I think -- I just wanted to flag very quickly the

1    language from that case.

2        "The evidence showed that Michelin had taken steps to

3    warn the public about mixing radial and conventional tires.

4    These efforts included placing warnings and recommendations

5    against such action in literature distributed to consumers

6    and to individual dealers who carried Michelin brand tires.

7    The fact that these warnings may have been inadequate to

8    fully warn of the hazards of such use does not obviate the

9    fact that Michelin made some effort.  This case does not

10   involve a situation where the manufacturer or distributor

11   made no effort to warn about the use of the product.

12   Therefore, the facts do not meet the willfulness,

13   wantonness, or malice standard."

14       And that, I would submit, is this case as well and

15   that's why punitive damages should --

16           THE COURT:  What about the evidence that the

17   plaintiff has put on through these email exchanges and other

18   communications where there's a fairly explicit discussion

19   about the reluctance of the company to increase these

20   warnings to address some of these medical issues because

21   they were afraid that it was going to hurt the marketing of

22   this product as compared to your competitors?

23           MR. HAILEY:  Well, I think we would obviously

24   dispute plaintiffs' characterization of those emails.

25           THE COURT:  Understandably.  But if the jury looks

1    at those and thinks plaintiffs got the right

2    characterization, wouldn't that support punitive damages?

3                MR. HAILEY:  Well, I think -- I mean, most of

4    those emails were relating to a paper, the Reilly paper, the

5    2014 Reilly paper that was ultimately published.  Those

6    emails discuss this question of whether monitoring is

7    appropriate.

8        That's a, that's a question that has been explored

9    extensively, publicly among regulators, among the scientific

10   community.  And that's -- the consensus now is the data does

11   not support monitoring.

12       So that would be, that would be our response.  I think

13   we've already brought that, that evidence in during

14   plaintiffs' case.  We are going to continue to develop that

15   record.

16       But I don't think that -- I don't think the evidence

17   currently supports -- given the warnings, given the fact

18   that even on those monitoring issues there are warnings

19   relative to monitoring relative to the 10th to 90th

20   percentile of plasma concentrations.  Those are included in

21   our label.

22       We proposed the warning to the FDA about an 82nd

23   threshold for the aPTT that would be essentially a

24   monitoring warning.  That was rejected by the FDA.  I think

25   there's evidence that we have proposed these warnings.

1    We're, we're now in the world where we're talking about

2    the adequacy of the warnings, not whether we warned at all.

3    And that's the *Ilosky* case and that's --

4              THE COURT:  Well, adequacy in the timing.

5              MR. HAILEY:  Well, we proposed -- prior, prior to

6    approval we proposed a warning about the aPTT test.

7              THE COURT:  Right.

8              MR. HAILEY:  That was, that was before Pradaxa was

9    ever prescribed to a single patient in the U.S.  And that

10   was proposed.  That was rejected by the FDA.

11   And even after, even after -- our approval label still

12   included data about plasma concentrations from the RE-LY

13   trial so that physicians could take that information.  They

14   could see using those aPTT numbers who's in the top

15   10 percentile, who's in the bottom 10 percentile.

16             THE COURT:  Well, you know, I do think that if it

17   gets to the jury, it's going to have to be focused and

18   limited and would only be with regard to whether the jury

19   would find that BI used its marketing or financial interest

20   as -- protected its marketing and financial interest at the

21   expense of the adequacy of its warnings.

22   I think you even had a couple of your people who said

23   the efficacy and safety of the product is the number one

24   consideration.  So if there's evidence that decision-makers

25   in the company essentially failed to follow that direction

1    and decided because of marketing concerns not to make, issue

2    warnings that were adequate for the safety and efficacy of

3    the medication, the jury could find that that's an

4    intentional act and award punitive damages based on that.

5        I don't see any other area, but I don't understand why

6    you don't think that's at least a jury question.

7            MR. HAILEY:  I mean, I think from the company

8    witnesses -- I think to a person the company witnesses have,

9    have ultimately testified in the deposition videos that

10   it's, it's medicine.  It's medical need.  It's science that

11   is driving decision-making at the company.  And it's, it's

12   not this other suggestion that we've heard.

13           THE COURT:  All right.  Thank you.

14       All right.  For the plaintiffs?

15           MR. CHILDERS:  Your Honor, I'm actually not going

16   to handle this.  I just wanted to introduce Emily Acosta

17   from my office.  She drafted the response, so we thought she

18   would be the best person to handle this.

19           THE COURT:  Straight to the source.

20           MR. CHILDERS:  She hasn't appeared before you

21   before so I wanted to introduce her.

22           THE COURT:  Welcome.

23           MS. ACOSTA:  Thank you.

24       So I guess as an initial matter I think it's probably

25   helpful to return to what the standard is for a directed

1   verdict.

2       Essentially, the plaintiff needs to offer a prima facie

3   case as to each and every element.  I think the intention

4   behind doing our response the way we did is that we wanted

5   to provide the Court with a list that is long but not

6   comprehensive of all of the evidence that we think is

7   relevant to establish a prima facie case which, of course,

8   is a relatively low standard.  It's not the standard we

9   would have to meet at summary judgment.  And it's also not

10  the standard that the jury will be evaluating.  It's a

11  remarkably low standard in that regard.

12      Also, for purposes of granting a directed verdict, the

13  evidence has to point to a single conclusion.  I think

14  probably the conversations with Mr. Hailey indicate that

15  that's not possible here.  There is at least for every

16  scientific article he can show you, we can show you another

17  that was presented through Dr. Plunkett or some through

18  Dr. Ashhab.  I think that in and of itself indicates that a

19  directed verdict as to all of our claims is inappropriate.

20      I'm certainly happy to address Mr. Hailey's points, but

21  if the Court has any additional questions as to the other

22  ones he raised --

23          THE COURT:  Well, why don't you respond to his

24  arguments first.  And then I'd like to sort of quickly walk

25  through the evidence as well.  I appreciate the chart you've

1    given me.  I want to make sure that I grasp it and that I

2    understand how it's responding to the defendant's original

3    motion.

4            MS. ACOSTA:  Sure, absolutely.

5        I think the, probably first way in which the response

6    is responsive is to show that there is at least a scintilla

7    of evidence, which is the standard, relative to each and

8    every claim.

9        The other thing that's probably important to mention

10   and that I think has been perhaps glossed over is that

11   plaintiffs can rely on direct or circumstantial evidence.

12   This is perhaps a good segue for Mr. Hailey's causation

13   argument.

14       It is certainly the case that plaintiff has presented

15   direct evidence of the kinds of warnings that were given to

16   Ms. Knight and her family and the kinds of information that

17   were not included in those warnings.

18       Again, I think it's important to understand the nature

19   of plaintiffs' claims.  Certainly we are not claiming that

20   BI made no warnings.  Indeed, we could not do that.

21       But Dr. Plunkett's criticism in sort of broad strokes

22   is that the warning is incomplete.  And, so, the information

23   that is not in the warning is remarkably relevant to the

24   kinds of information which is, you know, detailed on this

25   chart as well, but the kinds of information that the Knight

1    family did not have that would have made a difference,

2    particularly with regard to this decision as to whether or

3    not this was an appropriate medication for Ms. Knight and

4    whether or not it was a medication that she could safely

5    take.

6         With respect to direct evidence as to causation, I

7    think we have the Medication Guide.  Claudia testified that

8    her mother kept Medication Guides.  Dr. Plunkett also

9    testified that pharmacies are required to give Medication

10   Guides to patients when they fill prescriptions.

11        The physician label which, again, is another way of

12   communicating vis-a-vis the doctor to patients, and BI has

13   clearly availed itself of that mechanism.  And those

14   warnings to physicians are relevant, particularly to the

15   extent that they do not adhere to these five criticisms as

16   well as many other criticisms that we do have of the label,

17   including the fact that the label doesn't really tell people

18   how to identify folks that are at a risk of being at an

19   excessive level of a dabigatran concentration.  And it

20   doesn't give them a mechanism by which to test that

21   reliably.

22        Dr. Plunkett speaks at length about the aPTT test.

23   And, indeed, that is reflected in several BI documents that

24   that test is sort of a proxy but not a way to really test.

25   And BI knows that there's a way to test using a test like

1    hemoclot, for example, directly the thing that you're trying

2    to get at rather than indirectly.

3        So to the extent that information was known and not

4    communicated to the Knight family, that is relevant and

5    important and helps to satisfy our burden as to causation.

6        The third piece of direct evidence that I would mention

7    is the TV commercial.  You know, I, I was listening to

8    Mr. Hailey's argument about what the ad says and what it

9    didn't say.  And the truth of the matter is the ad has never

10   been shown.

11       So there's no evidence to contradict what it is that

12   Ms. Stevens saw out of the ad.  And if they wanted to elicit

13   that on cross, I think they could.  But now it's, it's sort

14   of too late, I think, to be able to put on that kind of

15   evidence through her as a way of proving the things she knew

16   and didn't know by virtue of seeing that ad.

17       With respect to circumstantial evidence, I, I think the

18   Court mentioned Ms. Stevens also testified about a time when

19   Ms. Knight, several years before she switched to Pradaxa,

20   had an adverse reaction to a drug.

21       In connection with having that adverse reaction, she

22   had mentioned to Claudia that she had taken statins.  They

23   caused her legs to hurt.  And she stopped taking them.  I

24   think that's persuasive circumstantial evidence that if Ms.

25   Knight had appreciated the risk that Pradaxa caused to her

1    and if she had -- that she would have taken a different

2    medicine or would have decided to, you know, refuse a

3    Pradaxa prescription or would have never suggested that she

4    start taking Pradaxa.

5         So, again, I, I appreciate maybe that it's, it's not an

6    overwhelming amount of evidence, but it's, it's more than a

7    mere scintilla and I think that's sufficient here.

8         Also, the, you know, the jury is the one that's tasked

9    with deciding whether or not a label is adequate.  Adequacy

10   of a label, that's black letter, you know, West Virginia

11   law.  And, you know, there's no reason to take the case from

12   the jury simply on that point.

13        With respect to the warning causation, there -- again,

14   there's no affirmative testimony that Ms. Knight did not

15   meet or did not read the Medication Guide or did not read

16   the labeling.  So it's a little unusual that now after the

17   evidence has already come in BI can introduce the absence of

18   evidence as, as a way of defeating plaintiffs' case.

19        That's -- that, that goes to evaluating the evidence

20   and the weight of the evidence.  It does not go to whether

21   or not the evidence is sufficient to begin with.  And that's

22   an inappropriate inquiry for purposes of a directed verdict

23   here.

24        Also, I, I think it's worth noting that Rick Knight's

25   testimony in a way is actually quite helpful to plaintiffs

1    because he testified that if he had known then what he's

2    known now by virtue of sitting in this trial and hearing all

3    of these different criticisms of the label and all the

4    different deficiencies of the label that he would have made

5    a different decision which is, is sort of part and parcel of

6    our argument.

7         If the label had contained additional information that

8    would have clearly identified that Pradaxa was not a good

9    medication for Ms. Knight, he would have made a different

10   decision.  I, I think the testimony is particularly helpful

11   in that regard.

12        The -- I have -- much like my colleague, I have other

13   points that are perhaps jogging around, but the other thing

14   that wasn't mentioned is Dr. MacFarland does testify that

15   the impetus for asking for the switch from Coumadin to

16   Pradaxa was, was because they saw an ad.

17        And, so, while that, that note may not have more

18   information, Dr. MacFarland's testimony does.  And that was

19   also presented to the jury.

20        Also, I, I would sort of note -- I know that Mr. Hailey

21   mentioned with respect to monitoring that this is a question

22   that the company has explored.  I -- you know, while I

23   appreciate that there are documents sort of discussing this

24   as a matter of science, BI's exploration on the topic does

25   not, you know, end the inquiry for purposes of this

1    courtroom or for purposes of the jury.  Obviously, if BI

2    could determine all the facts, the case would be relatively

3    straightforward.

4        And, and there's ample scientific proof both from our

5    specific and our general causation experts to suggest that

6    BI has made no efforts or arguably insufficient efforts to

7    warn of the dangers of excessive dabigatran concentrations.

8    And this kind of transitions maybe into punitive damages.

9        The important inquiry here is to ask why because if,

10   for example, it was because the company did not appreciate

11   those risks, that would be a far different case.

12       This is a case where BI not only appreciates the risk,

13   but they intentionally choose not to tell prescribers in the

14   United States, not to tell consumers in the United States

15   because they don't want to lose money.  And that is a fraud

16   claim.  That is absolutely a fraud claim.  And it's the

17   exact same kind of evidence that you can base a punitive

18   damages award on.

19       And, you know, again, Dr. Plunkett does testify that BI

20   manipulated the science and that their interpretation of the

21   science is perhaps ingenuous.  That would also be a basis

22   for, you know, awarding punitive damages and a basis for

23   concluding that the fraud claim can go forward to the jury

24   and that the jury could award damages based on the fraud

25   claim.

1    Also I, I think it's, it's worth noting with respect to

2    the DTC advertising that Dr. Huh is the first witness that

3    BI put on.  And it was a short clip, but within a few

4    minutes in, he admits that part of how he learned about

5    Pradaxa was through commercials.

6    I, I think it's a little disingenuous to suggest that

7    consumers are the only people that, that watch commercials.

8    Doctors get information from a variety of sources and the

9    label can still be inadequate.

10    And I, I've got other tiny points, but I'm, I'm happy

11    to answer questions to the extent you have any.

12        THE COURT:  I think you've responded to their

13    arguments.  Thank you.

14        MS. ACOSTA:  Thank you, Judge.

15        THE COURT:  Do you want a brief reply and move on

16    to the instructions?

17        MR. HAILEY:  So I just want to quickly respond on

18    some of the causation arguments that plaintiffs' counsel

19    raised.

20    There, there is still no testimony in this case that

21    Mrs. Knight read the Medication Guide.  Your Honor asked

22    when I was up here earlier about what has changed between

23    the summary judgment stage and the testimony yesterday.  And

24    I -- my colleague pulled your summary judgment order and I

25    want to just flag -- this is ECF No. 118 and this is Page 32

1    of the order.

2        The Court writes, "Mr. Knight confirmed that Ms. Knight

3    read drug labels."  And that was -- that's based on Mr.

4    Knight's deposition testimony.

5        When Mr. Knight took the stand yesterday and testified

6    in this case, he, he didn't offer that testimony.  He did

7    not say unequivocally or otherwise that, that his mother

8    read drug labels.  We did not hear that testimony from him

9    and that was one of the bases that the Court allowed this

10   claim to survive summary judgment.

11       I'll go on.  The Court concluded that Ms. Knight kept

12   medication labels and that she was known to have read drug

13   labels meets the evidentiary burden for that question to

14   survive summary judgment.

15       Now, here, again, we have this suggestion that she may

16   have kept some materials from the pharmacy, no testimony

17   that she read any of those materials.  And we no longer have

18   this, this statement from summary judgment about Ms. Knight

19   actually -- Mrs. Knight actually reading the drug labels.

20   We did not hear that testimony yesterday.

21       More broadly, I would invite the Court to, to read the

22   transcripts from Mr. Knight and Ms. Stevens' testimony

23   yesterday.  They're -- I think there are a couple of areas

24   like this where plaintiffs' counsel may be overstating

25   exactly what, what the testimony was that came in.

1    For instance, in plaintiffs' brief at Page 10 it

2  states -- this is on the causation element for the failure

3  to warn claim.  Plaintiffs's brief states if Claudia -- and

4  this is purporting to state what Ms. Stevens testified

5  yesterday.  "If Claudia had known any of these additional

6  risk factors, Claudia would not have requested her mother

7  switch from warfarin to Pradaxa."

8    This is the testimony on that point.  And if you look

9  at lines 6 to 9 that's not, that's not the testimony that

10  came in.  The question here is, "Did you know at the

11  time that a patient on Pradaxa --"  I'm sorry.  I'm reading

12  the wrong line.

13    "If you had known any of those things," and again it's

14  talking about these five issues, "would you have asked that

15  your mom switch from Pradaxa to warfarin?"

16    That's, that's reversed.  That's not, not what

17  plaintiffs are saying is the evidence that we heard

18  yesterday.

19    Ms. Acosta also I think said it wasn't appropriate for

20  us to be raising an absence of proof at this point in the

21  case.  But I'd submit that that's exactly what we should be

22  doing at the directed verdict stage.

23    Plaintiffs have had their shot to put on their

24  evidence.  And if they haven't satisfied their claims at

25  this point, that's, that's why a directed verdict is

 1    appropriate.

 2              THE COURT:  All right.  Go ahead.

 3              MR. CHILDERS:  Can I just address that one last

 4    point, Judge?

 5              THE COURT:  Well, I'll give you a chance in a

 6    minute.

 7              MR. CHILDERS:  I'm sorry.  I thought he was done.

 8    I apologize.

 9              MR. HAILEY:  Ms. Acosta also mentioned

10    Dr. MacFarland's testimony suggesting that Dr. MacFarland

11    independently testified about Mr. Knight seeing a Pradaxa ad

12    on TV.  And that's, that's not the testimony in this case.

13        It's lines 122 of MacFarland's deposition, Page 122

14    lines 9 to 15 as you can see.  This is plaintiffs' counsel

15    making the representation that, that Rick saw that ad, not

16    any independent testimony by Dr. MacFarland.

17        And I -- since Ms. Acosta raised the issue of the fraud

18    claim, I just wanted to -- and this may help the parties on

19    figuring out our jury instructions issues.

20        Fraud requires a, a higher showing.  That's clear and

21    convincing evidence.  I think as we've already talked about

22    with, with the causation, this is -- if, if you accept that

23    there is -- you know, to the extent that there has been any

24    evidence that Mrs. Knight actually read these warnings, it

25    certainly doesn't reach a clear and convincing standard.

1    There's certainly not enough evidence here to meet that

2    higher burden required for a fraud claim.

3        Also, on the, on the warranty claims, the plaintiffs

4    are required to show that an affirmative statement of fact

5    that is, was false or, or inaccurate was actually

6    affirmatively made.

7        And, again, looking at the evidence in this case,

8    there's no evidence that the, that a Med Guide was ever

9    actually read by the patients or Mr. Knight or Ms. Stevens.

10       And this, this one suggestion about the DTC ad, that's,

11   that's all there is.  There hasn't been any showing that

12   those statements are false or misleading.  We don't even

13   know really what the statements were in the ad.

14           THE COURT:  Well, you brought up something that

15   I'm glad you did because I want to ask plaintiffs about

16   that.  I think I understand your argument with regard to

17   implied warranty.  I want to see what they say about the

18   express warranty.

19           MR. HAILEY:  And then finally just one minor point

20   on Dr. Huh about him mentioning the commercial.

21       Dr. Huh is -- he's not a prescriber in this case.  He

22   doesn't, he doesn't prescribe Pradaxa.  He wasn't asked

23   about that.  He was -- he performed the surgery.  So --

24           THE COURT:  Okay.  Thank you.

25           MR. HAILEY:  Thank you.

1          THE COURT:  All right.  Mr. Childers, you wanted

2     to respond to one particular point and then I'd like Ms.

3     Acosta to address the warranty claims.  I'll give her a

4     chance to reply on that because they didn't mention those in

5     the opening argument.

6          MR. CHILDERS:  I appreciate that, Your Honor.

7        The transcript there -- first of all, it's not

8     certified because it came from yesterday.

9        Second of all, I have to believe that the words "from"

10    and "to" were transposed.  The question I asked, "Would you

11    have asked her to be switched to Pradaxa from warfarin?"

12    She never was switched from Pradaxa to warfarin.  That

13    clearly never happened.

14       So I'm kind of shocked they would get up and make that

15    argument here as part of their causation.  But certainly if

16    we need to listen to the tape or whatever it may be, I know

17    I didn't say that and there's no evidence that she ever

18    moved from Pradaxa to warfarin.

19          THE COURT:  All right.  Thank you.

20          MS. ACOSTA:  So I guess to address the other

21    transcript issue, the, the next question and answer that

22    followed in Dr. MacFarland's testimony was whether or not

23    patients often come in after having seen DTC ads and request

24    drugs and she says, yes, that happens.

25       So, again, I think that there's at least enough for a

1    jury to reasonably disagree, and clearly Mr. Hailey and I

2    reasonably disagree, as to whether or not that is what the

3    evidence says and whether or not it's sufficient for

4    purposes of a directed verdict here.

5         I think with respect to the fraud claim -- well, and I

6    guess let me just back up.  The *Johnson* case in this regard

7    I think is particularly helpful because it helps us to

8    contextualize and better understand the law in West

9    Virginia.

10        That case is particularly premised on the idea that

11   pharmaceutical companies have a megaphone through which to

12   communicate with patients.  And because of that, they have

13   also a duty, a companion duty to communicate with patients

14   as to the risks they know and the risks that they reasonably

15   should know.

16        And to the extent that BI failed to do that, I don't

17   think the mechanism really matters because they can either

18   do it vis-a-vis the physician using the physician's label,

19   they can do it using DTC ads, and they can do it during the

20   Medication Guide.

21        And, yet, despite all of these avenues, they, they

22   didn't adequately communicate a number of, of warnings and a

23   number of sort of risk multipliers that made Pradaxa more

24   dangerous for Ms. Knight and more -- they made it more

25   likely that she would be at an excess dabigatran level and

1    which, of course, increases bleeding.  And there's all sorts

2    of evidence on that point.

3        With respect to the express warranty, I think, again,

4    the defendant BI in their papers quoted the statute.  But

5    what they didn't provide the Court with is case law that

6    interprets that, that statute and tells you exactly what

7    those words and phrases mean.  And, and that's in our papers

8    at Page 20 in a footnote.

9        Essentially, the, the express warranty doesn't -- we

10   don't need to show exclusive reliance or that the reason

11   that Ms. Knight switched from Pradaxa is, is only

12   attributable to the DTC ad.  Conveniently, that's kind of

13   what the evidence shows here but that's not our burden and

14   that's not what we're required to do.

15       And there's, again, the distinction between direct and

16   circumstantial evidence is important and we're allowed to

17   rely on that in, in defeating the directed verdict motion.

18            THE COURT:  Can you particularize for me the

19   statements that you believe are contained within these

20   different sources, the labels, the Medication Guide, and the

21   commercials that were the affirmative statements?

22            MS. ACOSTA:  Sure.  So I think in the broad sense

23   it's, it's easier maybe to start with the commercial first

24   because the commercial -- Claudia testified that the

25   commercial communicated to her that the difference, the only

 1    difference between Pradaxa and warfarin was that you didn't

 2    have to watch your diet and you didn't have to do

 3    monitoring.

 4        If that were an adequate warning, if that were an

 5    accurate, correct, factually true statement, it would also

 6    have to have included all sorts of information about the

 7    particular risk factors that Ms. Knight would have had.  It

 8    wouldn't be an equally safe alternative to warfarin.  It

 9    would have had to include more information.

10        And for that reason, that's why that's West Virginia

11    sort of black letter law that a failure to warn claim is

12    sort of encompassed in a -- or I'm sorry.  That's backwards.

13        An express warranty or an implied warranty claim is

14    sort of encompassed and, and relies on a lot of the same

15    evidence that's used to prove a failure to warn claim

16    because essentially a failure to warn claim is, is premised

17    on the idea that the information was either inaccurate,

18    incomplete or absent.

19        Obviously, it's not absent but we've proven it's

20    inaccurate and it's incomplete.  And that's the information

21    that we need for purposes of statements.

22        And, again, that information is, is most clearly

23    reiterated in the commercials, but it's also in the

24    Medication Guide and we've pointed out, I think, a number of

25    factors and deficiencies with respect to the Medication

1   Guide.

2       This is also true of the label and there are more

3   sophisticated criticisms of the label.  But, again, the, the

4   thrust of our case is not that the ad provided no warnings.

5   It's that the warnings weren't complete.

6       And it's not that the statements were -- and it's

7   rather that the statements were misleading.  They were

8   inaccurate.  They weren't true.  And that's, that's a

9   warranty claim.  And that's an implied merchantability

10  claim.  And it's also an express warranty claim.  BI doesn't

11  have to say this is a warranty in order to create that as a

12  matter of common law in West Virginia.

13      And, again, in, in our papers we cite the, the, I guess

14  it's *Keefer* (phonetic) vs. *Wyatt* (phonetic) case that talks

15  about the co-extensively of products liability actions and

16  warranty claims.

17      I don't know if I've glossed over something that --

18          THE COURT:  Thank you.  Briefly?

19          MR. HAILEY:  Very briefly, Your Honor.

20      I think Ms. Acosta's response sort of made clear our

21  view that all of their, all of their claims here are

22  alleging sort of the same thing.  And we don't think it's

23  proper to send, send five claims to the jury that are making

24  the same allegation.

25      This case has been about the Med Guide.  It's been a

1    failure to warn claim and talk about alleged omissions from

2    a label for a Med Guide.

3         To the extent that plaintiffs are going to now claim

4    that there's, there's misleading or false evidence in the

5    Med Guide, I would say I don't think the evidence supports

6    that.

7         I would also direct the Court to the *Wyeth* vs. *Levine*

8    case.  We cite this quote on Page 3 of our pre-emption

9    motion.

10        "The FDA will approve an NDA only if the agency finds,

11   among other things, that the proposed label is not false or

12   misleading in any particular."

13        I think that undermines their, their warranty claim,

14   their fraud claim, and any allegations that we are

15   affirmatively making misstatements.

16        If it's their claim that there are omissions, then that

17   should go to the failure to warn.  But they shouldn't be

18   able to send all these co-extensive claims that are making

19   the same allegations.

20             THE COURT:  All right.  Thank you.

21        Okay.  I'm going to take this under advisement.

22        What's the status of your instruction deliberation?

23             MR. CHILDERS:  We had a productive meeting.  We

24   just got red line versions back from the defense.  If we

25   could have 20 minutes or so to go through them and see if we

1    come to anymore agreement before we bring you our --

2              THE COURT:  That would be great.  We'll take a

3    20-minute recess.

4              MR. CHILDERS:  Thank you, Your Honor.

5         (Recess taken at 3:11 p.m.)

1051

1     (Back on the record at 4:01 p.m.)

2         THE COURT:  All right.  Does someone want to summarize

3     your progress and what remains at issue?

4         MS. JONES:  I'm standing so I guess I'll start, Your

5     Honor.

6         So, as Mr. Childers mentioned, we had a productive

7     session this morning.  We now have a red-line document that

8     we've shared with plaintiffs' counsel, and we're happy to hand

9     a copy up to Your Honor and to your clerk, if that would be

10    helpful.  And I think we can walk through the issues that we

11    have, and we can let you know where we have agreement, if that

12    makes sense in terms of the process.

13        THE COURT:  That would be great.

14        MR. CHILDERS:  That sounds good.

15        THE COURT:  All right.  Lead the way.

16        MS. JONES:  Sure.

17        So, Your Honor, basically what we did was took the

18    defendant's proposed set and then made adjustments.  And we

19    flagged some places where there are objections and issues, and

20    we integrated some proposals by plaintiffs where we may or may

21    not have agreement.

22        So I guess we'll just go, starting from instruction

23    No. 1 on page 2, where we're in agreement on that as an

24    appropriate introduction.

25        THE COURT:  Okay.

1    MS. JONES:  Instruction No. 2, we're in agreement on

2    direct and circumstantial evidence.

3    THE COURT:  Okay.

4    MS. JONES:  Instruction No. 3, we're in agreement on

5    the credibility instruction.

6    THE COURT:  All right.

7    MS. JONES:  Instruction No. 4 -- we had a section that

8    included essentially limiting instructions.  The first

9    instruction relates to foreign labeling.  As the version that

10   you have is edited here to replace the words the 75-milligram

11   dose with Pradaxa, that is agreed upon.

12   THE COURT:  Okay.

13   MS. JONES:  There is -- we've also proposed a limiting

14   instruction with regard to the topic of failure to test.  I

15   believe that was an instruction that plaintiffs' counsel

16   wanted to review and confer about further.

17   MR. CHILDERS:  Your Honor, on that particular

18   instruction, plaintiffs would request that the third and the

19   last sentences be struck, and then we would be fine with the

20   remainder of that.

21   THE COURT:  So the sentence starting further?

22   MR. CHILDERS:  Yes, sir.

23   THE COURT:  First tell me, why do you object to the

24   further sentence?

25   MR. CHILDERS:  I don't believe that's an accurate

1053

1    statement of law, Your Honor.  It's failure to warn, and the

2    jury has heard there's been a failure to inform the Knight

3    family that there was no clinical testing.  I don't think we

4    can now tell them, because there is no law to support it, that

5    they can't consider that as a failure to warn.

6          And then the last sentence, the process of clinical

7    testing performed is not considered a risk or danger

8    associated with the use of Pradaxa, there's no legal support

9    for that either.

10         MS. JONES:  Well, Your Honor, as to the first issue,

11   which I guess is the third sentence in that proposed

12   instruction on failure to test, our view is that the Woodcock

13   versus Mylan case, cited on page 7 of the red line, 661

14   F.Supp.2d 602, which is a case from this district, advises

15   that a failure to warn cause of action covers situations when

16   a product may be safe as designed and manufactured, but which

17   becomes defective because of the failure to warn of dangers

18   which may be present when the product is used in a particular

19   manner.

20         We don't view that fact of how a medicine was tested

21   to be a danger of the medicine necessarily.  We view that to

22   be an appropriate statement of the law as to that third

23   sentence.

24         As to the remaining two sentences in that instruction,

25   I suppose we could probably agree to cut those out, but we

1054

1    think that third statement is an accurate statement of the

2    law.

3         THE COURT:  I'm not sure I even understand what the

4    last sentence means.

5         MS. JONES:  Well, I think it feeds into the third

6    sentence, which is this idea that if the obligation is to warn

7    of the dangers of a medicine in a context like this, the

8    testing or lack of testing is not a danger of the medicine.

9         The danger of the medicine would be bleeding --

10        THE COURT:  Oh, I see.

11        MS. JONES:  -- in the case of a medicine like Pradaxa.

12        But, as I mentioned, we believe that the third

13   sentence in that instruction is appropriate under the law.  If

14   plaintiffs have objection to the fourth and the fifth

15   sentences, we would be fine with cutting those out.

16        MR. CHILDERS:  Your Honor, you may imagine I disagree.

17        I do believe the fact that there is no clinical data,

18   there is no testing that was done is important information

19   that relates to the risks that a patient is going to undertake

20   by using a medicine that hasn't been tested.  That clearly is

21   something that goes directly to the risk-benefit analysis a

22   patient would make as far as whether or not they would be

23   willing to take that.

24        And, additionally, Your Honor, Dr. Friedman's

25   testimony -- he was the first witness we played.  He testified

1   he couldn't say one way or the other if this medication was

2   safe for severe renal patients, and he works for Boehringer.

3   So clearly that goes to the warnings and risk benefit.

4        THE COURT:  Well, I agree with plaintiff as to the

5   first sentence, the first disputed sentence:  Further, BI

6   cannot be liable for failure to provide a warning in the

7   clinical testing of Pradaxa.  I think that sentence should

8   stay in.

9        MR. CHILDERS:  Stay in or come out?

10        THE COURT:  Come out.

11        MR. CHILDERS:  Thank you.

12        THE COURT:  I think the last sentence is confusing to

13   even say what you purport to want it in for.

14        MS. JONES:  Well, just -- and I think the last

15   sentence is probably not a sentence that we are -- you know,

16   it's not a hill that we are going to die on necessarily.

17        THE COURT:  Right.

18        MS. JONES:  But I think the concern that we have about

19   the way that the evidence has come in during the trial is

20   there's been a lot of emphasis on testing, whether the company

21   tested.  Dr. Plunkett spent a good bit of time criticizing the

22   company for failing to conduct tests.

23        We don't think there is any question that in West

24   Virginia there is not a standalone failure to test claim.  We

25   want to be clear that the obligation of the company is to warn

1056

1    of the dangers of the medicine, not necessarily to conduct

2    certain testing or even to provide information about what type

3    of testing was done.

4         So that was the goal and the spirit of this particular

5    instruction.  And so I think the fourth sentence, if we are

6    taking out sentence three, becomes more important because we

7    need to be making clear for the jury what exactly they're

8    supposed to be considering with respect to the company's

9    obligation to warn.

10        MR. CHILDERS:  We didn't object to the fourth

11   sentence, Your Honor.

12        MS. JONES:  Oh, okay.

13        MR. CHILDERS:  It was the third and the fifth.

14        THE COURT:  I'm looking at the fifth, the last

15   sentence.

16        MR. CHILDERS:  Sorry, Phyllis.

17        MS. JONES:  No, that's fine.  I may have

18   misunderstood.

19        THE COURT:  Okay.  So that's what I -- the process of

20   clinical testing performed is not considered a risk or danger

21   associated with the use of Pradaxa.

22        If what you're saying is that the process of clinical

23   testing --

24        MS. JONES:  I think what we're trying to say is the

25   company doesn't have an obligation necessarily to warn about

 1    every way in which the medicine was tested or not tested.

 2            The obligation under West Virginia law is that you

 3    warn about the risks or the dangers of the medicine, which --

 4            THE COURT:  I think if you said that, I would be okay

 5    with it.  So if you want to figure out a substitute

 6    sentence --

 7            MS. JONES:  Okay.

 8            THE COURT:  -- that says that, at least I think that

 9    presents a statement that I understand, and we will see if you

10    can craft one that the plaintiffs agree with or not.  And if

11    not, we can deal with it later.

12            So I'm just going to make a note here that the

13    defendant will propose an amended version of that sentence.

14            MS. JONES:  Okay.  Thank you, Your Honor.

15            On page 7, we put this in limiting instructions,

16    although Mr. Childers, I think rightly, pointed out that it's

17    probably not really a limiting instruction.  And if the Court

18    was inclined to provide it, we probably want to put it

19    somewhere else.

20            But it relates to the relevance of physician warnings

21    and the extent to which the jury is permitted, particularly on

22    the record that has come out in this particular trial, that

23    Mrs. Knight relied on her doctors, her children, and she

24    trusted her doctors and relied on their judgment in making

25    decisions about her medical care, that this is an appropriate

1058

1    instruction to give.  Particularly since the physician

2    labeling, based on the discussion that I believe we had with

3    regard to directed verdict, is very much in play in the case.

4         THE COURT:  Okay.  So the only disagreement between

5    the parties is where to put this language, not the use of this

6    language?

7         MS. JONES:  I think we have --

8         MR. CHILDERS:  No, Your Honor.

9         THE COURT:  Okay.  Sorry.

10        MS. JONES:  Go ahead.

11        MR. CHILDERS:  Your Honor, we would object.  That's

12   not -- there's no basis in law for this, first of all.

13        They can argue to the jury, if they'd like, all of the

14   different ways they believe they provided warnings to Betty

15   Knight and her family, but the law in West Virginia is that

16   the warning goes to the patient.  So if you then instruct them

17   that there's law that warnings to the physician somehow is

18   interplayed with that, that is going to confuse the jury

19   because I do believe that is not a correct statement of the

20   law here.

21        And we would have to list -- if we were going to do

22   this, we would need to list direct-to-consumer advertising,

23   magazine articles, television articles [sic], every other way

24   in which information is provided to patients.  This is

25   unnecessary, and I think it's an inaccurate statement of West

1059

1    Virginia law.

2          THE COURT:  Well --

3          MS. JONES:  Your Honor, just to respond to that.

4          We're certainly not suggesting anything other than

5    what we all understand to be the case under West Virginia law.

6    We're just -- we think it needs to be clear to the jury that

7    that's something they may consider as they evaluate the

8    adequacy of the warnings to Mrs. Knight.

9          MR. CHILDERS:  And my point on it, Your Honor, is they

10   can argue that all day long.  That's how this works.  We don't

11   have an instruction that is going to tell them a list of every

12   single piece of evidence they can consider.  The evidence is

13   what the evidence is.

14         And so to point out this one particular thing in a

15   separate instruction I think highlights for the jury a piece

16   of evidence that is just one piece of evidence in a long list

17   of ways that warnings are communicated to patients.  And if we

18   were in another state, I wouldn't be making this argument.

19   But here in West Virginia, that's not the duty.  The duty is

20   to warn the patient.

21         THE COURT:  Well, all right.  I'm going to think about

22   that one before I rule.

23         MS. JONES:  Thank you, Your Honor.

24         Our proposed instruction No. 5 on expert testimony was

25   agreed upon by the parties, so we have nothing to discuss on

1060

1   that point.

2          THE COURT:  Okay.

3          MS. JONES:  On proposed instruction No. 6 regarding

4   the necessity of expert testimony, I believe there was only

5   one disagreement with respect to the first sentence of the

6   second paragraph:  For example, the only way that plaintiff

7   can prove that Pradaxa's warnings were inadequate is through

8   expert testimony.

9          MR. CHILDERS:  And, Your Honor, we do object to that

10  sentence for basically the same reason we just argued.

11         This is an unusual state in which warnings have to be

12  given directly to patients.  Everybody that sits in this jury

13  box is one of those people.  This is not a case where the

14  doctor is the one who gets the warning.  And so, in this

15  particular case, I believe it's appropriate for the jury to

16  use their common sense to know if a warning to a patient was

17  adequate or not, and it doesn't have to be established through

18  expert testimony only.

19         THE COURT:  Yeah, I'm troubled with requiring --

20  focusing the jury on only expert testimony when it's a

21  direct-to-patient warning that's at issue.

22         MS. JONES:  Well, Your Honor, the basis for our

23  proposed instruction was actually from the J.C. by and through

24  Michelle C. versus Pfizer case, which is 240 West Virginia

25  571.  That's from 2018.

1       Syllabus point No. 7 provides:  The determination of

2  whether expert testimony is necessary to sustain the burden of

3  proof in complex cases involving matters of science, medicine,

4  engineering, technology and the like, is made on a

5  case-by-case basis.  When the issues involved are beyond the

6  common knowledge and experience of the average jury, expert

7  testimony shall be required.

8       From our point of view, given the evidence that's been

9  presented, and the way that it's been presented on the

10  warnings specifically by an expert -- Dr. Plunkett was called

11  to talk about the FDA process, how labeling is created, the

12  contents of the label, why some was good, why some was bad.

13       From our perspective, the fact of her presence in this

14  trial confirms what is represented here, that they need expert

15  testimony to carry their burden on that.

16       THE COURT:  Mr. Childers, why isn't it the case that

17  expert testimony is needed to show the inadequacy of the

18  warning?

19       MR. CHILDERS:  Well, Your Honor, first of all, I want

20  to point out the case that they cite, this is dealing with a

21  general causation opinion.  You see they're talking about

22  animal studies, epidemiology, adverse event reports, core data

23  sheets and FDA regulations.  What they're talking about there

24  is testimony to establish a -- if I could back up.

25       In the Zoloft litigation, there was a dispute whether

1  Zoloft could or could not cause the injury that occurred.  We

2  don't have that here.  We know that Pradaxa causes bleeding

3  because they tell us it causes bleeding, and so that is not a

4  warning issue.  That is a causation issue.

5       Here -- and it specifically says just above that, it

6  is talking about how language in the label might be

7  interpreted by physicians.  That's not at issue in this case.

8       I don't know when this case was particularly tried,

9  but I do know the law here has changed since the time that we

10  filed this case, and that now there is a learned intermediary

11  defense for cases that are filed.  That may have been the case

12  here.  I honestly don't know.

13       But, regardless, this is talking about general

14  causation, which is not at issue.  Dr. Plunkett wasn't

15  cross-examined on, hey, can Pradaxa really cause bleeding?

16  That's never been an issue in the case.

17       THE COURT:  I agree, but what about my query?

18       Don't you have to have expert testimony to identify

19  the adequacy or inadequacy of the warning?  Isn't an expert

20  required to assess what is and should be in the warning?

21       MR. CHILDERS:  I think if it was a direct -- excuse

22  me -- if it was a learned intermediary situation where you

23  were giving a warning to a medical professional, then I agree

24  with Your Honor.  But here the duty is whether or not they

25  warned the patient.  And so our objection is to say that that

1063

1   can only be established through expert testimony.

2         I don't have a problem if they want to say that expert

3   testimony should be considered.  But when the -- when the duty

4   is to provide a warning directly to the patient, that's common

5   sense.  That doesn't need expert testimony for a juror to say,

6   well, if I knew that, I wouldn't take that medicine.

7         That's what the testimony has been from the

8   plaintiffs.  If we knew that, our mom would have never taken

9   the medicine.  We don't need expert testimony for that.

10        MS. JONES:  Well --

11        MR. CHILDERS:  And these are -- I'm sorry.

12        And the issues that we raise, these are facts about

13  the medicine that went into the label afterward.

14        THE COURT:  It seems to me this ought to be something

15  that the parties could resolve.  I think you both make good

16  points.

17        I think you have to have an expert in a warning case

18  like this because I don't think a lay citizen could offer the

19  opinion as to what ought to be in the label.  I mean, I think

20  that perhaps a layperson could testify as to what the meaning

21  is conveyed in the label, whether that's enough or not.  But I

22  don't think you could have a lay witness come in and say,

23  yeah, you know, they ought to put eight more statements in

24  this label about whatever the subject is, and automatically

25  that goes to the jury, and that's sufficient just because you

1064

1    don't have to be an expert to establish a failure to warn a

2    patient.

3         So that is -- it seems to me perhaps the easiest way

4    to address this is to say something to the effect -- I mean,

5    the whole purpose of this is to speak to experts.  Surely

6    there is some way of saying that plaintiffs -- the plaintiffs'

7    evidence includes expert testimony that the jury has to

8    evaluate.

9         I don't think it's wrong to say expert testimony has

10   to be considered, but I guess this goes maybe further than

11   just saying that.

12        MS. JONES:  Well, we're certainly happy to continue to

13   see if we can sort this out.

14        The one other example that I would just cite on this

15   general idea, Your Honor, is if you take, for example, their

16   blood plasma monitoring claim, the foundation of that

17   inadequacy claim is all that stuff Dr. Plunkett did for the

18   jury on the flip charts and the boards and, you know, the kind

19   of gingerbread man looking drawing.  So none of that is

20   something that is accessible to the lay person and absolutely

21   would have required expert testimony to shore up an inadequacy

22   claim on the basis of that type of scientific evidence.

23        So, from our perspective, that is exactly why this

24   type of instruction is appropriate.

25        MR. CHILDERS:  I don't disagree at all with what she

1065

1     just said.  I believe that -- that you get back into a

2     causation argument.  Is that the need to monitor and assess

3     patients?  Well, they disagree that that needs to be done.

4     Dr. Plunkett and Dr. Ashhab testified it does need to be done.

5     The warnings that we're talking about, that's information that

6     they agreed is accurate, and it's whether or not it was

7     transmitted to the plaintiffs or not.

8          But I'm happy to work with them to see if we can craft

9     some new language.

10         THE COURT:  All right.  Well, I'll withhold ruling on

11    it --

12         MS. JONES:  That's fine.  I mean, I guess just one

13    response on that.

14         The scientific judgment of whether or not that data is

15    appropriate for a label, that requires more than just a lay

16    person's understanding.

17         THE COURT:  That's what I think, yeah.

18         MS. JONES:  But we will --

19         MR. CHILDERS:  Fair enough, Your Honor.

20         MS. JONES:  But we will talk about it.  Okay.  We'll

21    confer on that one further, Your Honor.

22         I think the next item is proposed instruction No. 7 on

23    deposition testimony.  We had made some slight changes to the

24    pattern instruction on this issue, which I think were fine

25    with plaintiffs.

1066

1    THE COURT:  Okay.

2    MR. CHILDERS:  I'm sorry.  No. 7?

3    MS. JONES:  No. 7.

4    MR. CHILDERS:  Correct.

5    MS. JONES:  Okay.  Your Honor, on proposed instruction

6    No. 8 regarding burden of proof, the original -- and this is a

7    little bit of a curiosity at least to our minds.

8    The pattern instruction as to each of these last three

9    sentences says, if plaintiffs prove their claim by the greater

10   weight of the evidence, then you may find in favor of them.

11   And then it goes on to say that if the plaintiffs did not

12   prove their claims by the greater weight of the evidence, then

13   you may find for BI.

14   Our view is that the law is if they make their burden,

15   then they must find for them.  If they don't make their

16   burden, then they must find for BI.

17   And, in fact, that would be consistent with what Your

18   Honor instructed in the pre-charge where you said:  Burden of

19   proof.  This is a civil case.  In a civil case, a plaintiff

20   must prove every essential element in connection with each

21   cause of action by a preponderance of the evidence, not beyond

22   a reasonable doubt.

23   So, you know, our view is that the pattern is just not

24   an accurate statement of what actually is supposed to happen

25   if there is a determination by the jury in either direction

1067

1    with respect to the balance of the evidence.

2              THE COURT:  So the pattern instruction uses may?

3              MS. JONES:  It does.  We propose must.

4              MR. CHILDERS:  That's correct.  And we just would

5    request we get the pattern charge, Judge.  That's been found

6    to be adequate in this state.

7              THE COURT:  I'll think about it.

8              If you like, you can just skip over to the ones where

9    there's an issue.

10             MS. JONES:  Sure.  Sure.

11             THE COURT:  I don't intend to necessarily get through

12   all of these, but I'd like to identify as many -- that will

13   give me an idea of what remains to be done.

14             MS. JONES:  Sure.

15             On proposed instruction No. 11, which is on page 15 of

16   the document that we handed up, I think we basically are in

17   agreement.  We've made some additions to the language here to

18   change the phrasing that includes just the reference to death

19   to be injuries including her death.  By agreement, that's been

20   changed.

21             The one big picture point that I don't think we have

22   to hash out in great detail now for Your Honor, but we did

23   want to raise, is that our view is it's not appropriate for

24   the jury to be charged on five different variations of the

25   same failure to warn theory.  I think the way that the trial

1068

1    has been -- has been litigated and the way that the evidence

2    has come in is that there is a single universe of evidence.  I

3    think Mr. Childers stood up in opening and said this is all

4    about a failure to warn case.

5           So, from our perspective, charging them on five

6    different variations on what are all failure to warn theories

7    is not appropriate.

8           THE COURT:  Mr. Childers?

9           MR. CHILDERS:  Judge, I think West Virginia law says

10   that's the appropriate way to handle the claims, and we would

11   ask you to follow that.

12          THE COURT:  I think clearly even when they all depend

13   upon the same core facts, there can be different theories.

14   And even though here these theories all seem to rise or fall

15   pretty much on the same core facts, I think plaintiffs are

16   entitled to pursue each claim that they included in their

17   complaint.

18          Having said that, I really wonder about the wisdom of

19   putting five -- or at least three claims here that are pretty

20   much going to rise or fall on the same evidence.  I think it's

21   going to be more difficult for the jury and more instructions

22   and more confusion.  But I think plaintiffs have a right to go

23   to the jury on each claim that they presented if the evidence

24   gets them to the jury.  And subject to my ruling on the

25   directed verdict, that is where we are.

1069

1       MS. JONES:  Understood, Your Honor.

2       THE COURT:  So --

3       MR. CHILDERS:  And, Your Honor, I just wanted to point

4  out we just noticed on this draft -- and we haven't had a

5  chance to confer with the defendants, but we believe it should

6  be that Pradaxa injured Mrs. Knight and was a cause of her

7  injuries, including death, not was -- and not just caused her

8  injuries and death.

9       MS. JONES:  Andy, where are you looking on the page?

10      MR. CHILDERS:  The first sentence and then the first

11  sentence that is after the broken-out claims.

12      THE COURT:  So you would say what in that phrase?

13      MR. CHILDERS:  So it would say:  Plaintiffs' claim

14  that Pradaxa, which was sold by BI, injured Mrs. Knight and

15  was a cause of her injuries, including her death.

16      I believe that's an appropriate statement of the law.

17      THE COURT:  I think it is, too.  And I would assume if

18  it's -- if you've addressed proximate cause somewhere in here,

19  you probably used that same phrase.  It doesn't have to be the

20  cause, it has to be a cause.

21      MS. JONES:  Just one moment, Your Honor.

22      THE COURT:  Yes.

23   (Defense counsel conferring.)

24      MS. JONES:  Okay, Your Honor.

25      THE COURT:  Okay.

1070

1    MS. JONES:  I think those were the only issues on that

2    instruction.  Flipping to the next ones where we had

3    disagreement.

4        On proposed instruction No. 14, this is the outline of

5    the strict liability failure to warn essential factual

6    elements.  There was a proposal from plaintiffs for additional

7    language, which has been included in the red line at the

8    bottom.  We object to that last paragraph, but we don't have

9    an objection to the statement, Boehringer has a duty to warn

10   patients directly about the risks of Pradaxa, subject to what

11   we have already said about what we think is an appropriate

12   instruction on the fact that the jury may consider warnings to

13   doctors as well.

14       THE COURT:  Go ahead.

15       MR. CHILDERS:  Your Honor, that second paragraph is

16   taken from the Wyeth versus Levine case, which you've heard

17   plenty about already today.  I don't think I have to repeat

18   it.  But we think it's an important instruction to give, first

19   of all, because it's the law of the United States.

20       And second of all, because what the jury has heard and

21   will continue to hear is that, hey, the FDA approved this

22   medication and, therefore, it's safe -- and in fact, you gave

23   an instruction in the preliminaries that told the jury that

24   compliance with federal regulations was evidence of -- I can't

25   remember what the word was, but basically saying that what

1    they had done was okay.

2         So it's important that the jury know that the law is

3    actually it is the manufacturer's duty, not the FDA's duty,

4    according to the Supreme Court of the United States, to make

5    sure that the label is accurate and the warnings are

6    sufficient.

7         (Plaintiffs' counsel conferring.)

8         THE COURT:  Do you want to reply?

9         MS. JONES:  Yes.  Yes, Your Honor.

10        THE COURT:  Go ahead.

11        MS. JONES:  Your Honor, I guess the one -- the one

12   reaction we had is, one, this seems unnecessary.  I mean, they

13   can certainly get up and say this is the evidence that the

14   company owns the label, it's their obligation to manage it

15   throughout the life of the product.

16        The second point is, you know, there are a lot of

17   statements in different cases that we'd be happy to propose,

18   including from the Wyeth case, that we might put in here.  I

19   don't think the idea is that we lard up an already long charge

20   with those types of things.  We don't think this necessarily

21   adds to what the jury is already being told about the

22   essential elements.

23        THE COURT:  Well, I think I'm going to include the

24   instruction.

25        I do have some trouble with the reference there to the

1072

1   Medication Guide because that sounds like it's awfully close

2   to the claim --

3         MR. CHILDERS:  We don't mind taking that out if the

4   Court --

5         THE COURT:  All right.  So it would just be Boehringer

6   is required to -- instead of craft, why don't we say to

7   provide an adequate --

8         MR. CHILDERS:  That's actually the language from

9   Wyeth.  But if you want to use different -- they used the word

10  craft, but if you think there might be a better word for this

11  jury --

12        THE COURT:  I think it's clearer just to say to

13  provide an adequate -- I would say to provide adequate

14  warnings for Pradaxa, and leave it at that.

15        MR. CHILDERS:  Yes, sir.

16        MS. JONES:  So just to be clear, Your Honor, it would

17  say:  Therefore, Boehringer is required by law to provide an

18  adequate warning label for Pradaxa?

19        THE COURT:  Well, actually to say:  Boehringer is

20  required by law to provide adequate warnings for Pradaxa.

21        MR. CHILDERS:  And would the rest of the sentence

22  remain?

23        THE COURT:  Right.

24      (Defense counsel conferring.)

25        MS. JONES:  I apologize, Your Honor.

1073

 1          THE COURT:  That's okay.

 2       (Defense counsel conferring.)

 3          MS. JONES:  Your Honor, I think we've made our

 4    objection for the record.

 5          To the extent that we're drawing on the Wyeth case, we

 6    might have an additional sentence that we think is appropriate

 7    given --

 8          THE COURT:  Okay.

 9          MS. JONES:  -- the fact that this instruction is going

10    to be included.

11          THE COURT:  All right.  We'll see.

12          MS. JONES:  And, Your Honor, I apologize for taking us

13    backwards.

14          But on instruction No. 11, to the extent we're making

15    a change where it says was a cause --

16          THE COURT:  Yes.

17          MS. JONES:  -- would it be appropriate or we think it

18    would be appropriate under West Virginia law to say was a

19    proximate cause.

20          THE COURT:  Do you have a proximate cause instruction

21    somewhere --

22          MS. JONES:  We do.

23          THE COURT:  -- in here?

24          MR. CHILDERS:  Yes, Your Honor.

25          THE COURT:  Then, sure, add proximate there.

1           MS. JONES:  Okay.  Okay.

2           Your Honor, on proposed instruction No. 15, I believe

3       plaintiffs had an objection to this instruction potentially,

4       but they were going to review the underlying Morningstar case.

5           MR. CHILDERS:  Yes.

6           Your Honor, this instruction deals with state of the

7       art, which we don't believe is at issue with a warnings case.

8       It's more of a design of the product itself.

9           And in the Morningstar case, although it does say

10      that -- includes the language adequate labels, I think, when

11      it's talking about state of the art, it says that that is to

12      be taken in conjunction with the costs associated therewith.

13      We haven't had any evidence that there was some cost or other

14      prohibitive reason why this label couldn't be changed or

15      whatever instructions and warnings were given couldn't have

16      been given.  So I think it's inappropriate, unnecessary and

17      confusing to the jury.

18          And the other issue is, it's talking about year 2013,

19      and obviously Your Honor has pointed out earlier today that

20      we're talking about a time frame that is broader than that.

21          MS. JONES:  Well, I suspect we could reach agreement

22      on the topic of the time frame, Your Honor.  But under the

23      Morningstar case, we think this is an appropriate instruction.

24          As Mr. Childers mentioned, the Morningstar case

25      specifically refers to having in mind the general state of the

1075

1    art of the manufacturing process, including design, labels and

2    warnings as it relates to economic costs at the time that the

3    product was made.  The fact that there hasn't been evidence

4    entered with respect to costs doesn't mean that that general

5    proposition doesn't apply equally here.

6         THE COURT:  What are you referring to, then, when you

7    say general state of the art?  What do we think that is

8    referring to in this case?

9         MS. JONES:  Well, I think in this particular case it

10   refers to the backdrop of what the FDA has typically required.

11   I think it refers to the warfarin label, which is in evidence,

12   and how that label includes certain information, how it's

13   structured, both the doctor label and the Medication Guide.

14   So I think there are some comparators that are relevant for

15   purposes of an instruction like this.

16        MR. CHILDERS:  Your Honor, I would just point out,

17   this came from the pattern charge that only talks about the

18   manufacturing process, and they have struck that language and

19   stuck in there warnings.

20        The Morningstar case -- although I will confess, I

21   have never heard of state of the art being part of the

22   warnings, and I may just be missing it -- specifically says

23   that the state of the art to be considered is as it relates to

24   economic costs, and that's not at issue in this case.  There

25   is no issue that we could not do this because it would be too

1076

1    costly or too burdensome.

2            THE COURT:  Couldn't change the warning --

3            MR. CHILDERS:  Yes, sir.  We're talking about printed

4    labels.

5            THE COURT:  I think this is a confusing instruction,

6    and I think I agree with Mr. Childers.  I don't think the

7    context of this discussion in Morningstar was really to

8    address the state of the warnings at the time.  I think it's

9    talking about the manufacturing process and design process at

10   the time.  And I think the Morningstar case is addressing

11   design defects, not warning defects.

12           So at this point, I'm going to deny the instruction.

13   If you think a revision of it somehow will meet my objections,

14   you can propose it.

15           MS. JONES:  Okay.  Thank you, Your Honor.

16           I think the next instruction that we had some

17   outstanding issues on was instruction No. 16.  And I believe

18   that plaintiffs had some -- I think this tracks the additions

19   we've already made.

20           Am I right about this, Andy, that we already made to

21   the earlier --

22           MR. CHILDERS:  The addition -- I'm sorry.

23           MS. JONES:  No, no -- the earlier instruction?

24           MR. CHILDERS:  Somewhat.  I think that it's just

25   missing the word warn or instruct, the word or, and that would

1077

 1    be consistent with the preliminary instruction that you

 2    already gave the jury, Your Honor.  You told them warn or

 3    instruct, and that's the pattern charge as well.

 4         MS. JONES:  And we would just note our objection to

 5    the use of the word instruct for purposes of the record, Your

 6    Honor.

 7         THE COURT:  So let me see if I understand.

 8         On No. 5, do the parties agree that this phrase or

 9    instructed on the safe use of Pradaxa -- there's a

10    strikethrough there.

11         MS. JONES:  I apologize.  I was not being fully clear.

12         So at the very top of the page, there's a reference to

13    reasonable care to warn slash instruct, and the word instruct

14    is stricken.  The second line.

15      (Counsel conferring.)

16         THE COURT:  Now I'm afraid I'm more lost than I was.

17         So we're on 16?

18         MS. JONES:  We're on instruction No. 16, Your Honor.

19         On the very second line, it says:  Plaintiffs claim

20    that BI was negligent by not using reasonable care to warn

21    slash instruct.

22         BI had proposed to eliminate the word instruct there.

23         THE COURT:  Okay.

24         MS. JONES:  And then in No. 7 --

25         THE COURT:  Right.  Okay.  So do the parties agree on

1078

1    the strikethrough at line 5?

2         MS. JONES:  We do not, Your Honor.

3         THE COURT:  That's part of the disagreement?

4         MS. JONES:  That's the disagreement.

5         THE COURT:  Okay.

6         MR. CHILDERS:  I'm sorry I wasn't clear on that, Your

7    Honor.

8         THE COURT:  No, I just didn't understand.  It wasn't

9    highlighted.

10        I think this is really pretty nitpicky for you all to

11   be worried about, to be blunt about it.

12        This has been discussed primarily as a warning.  I

13   don't know that either side used the word instruct with regard

14   to any of the messages to patients or doctors or otherwise, so

15   I am inclined to keep it simple and consistent with the way

16   the case has been presented, and I agree, therefore, with the

17   defendant that we ought just talk about the reasonable care to

18   warn and not include the references to instruct.

19        MR. CHILDERS:  Would that include the fifth sentence

20   as well?

21        THE COURT:  Yes.

22        MR. CHILDERS:  The only other thing would be the

23   addition of the language we talked about in --

24        THE COURT:  I think it's there at the bottom.

25        MS. JONES:  No.  We had discussed with respect to

1079

1   strict liability failure to warn, instruction No. 14, that

2   addition from the Wyeth case.  We would just -- we would do

3   the same -- we'd note the same objections to the addition, but

4   I think that that would carry over equally.

5            MR. CHILDERS:  And the Johnson case.

6            MS. JONES:  Oh, right, the one we don't object to.

7            MR. CHILDERS:  Right.

8            MS. JONES:  Yeah.

9            MR. CHILDERS:  I just -- okay.

10           THE COURT:  Okay.  So both sides agree to 17.

11           18, it appears, has a dispute?

12           MS. JONES:  Yes, Your Honor.

13           So this instruction relates to warning causation.  We

14   have made some proposed changes in connection with the case

15   law that we cite at the bottom of the page, which we think is

16   a reasonable encapsulation of West Virginia law on the topic.

17   The principal changes are to make the point that plaintiffs

18   have a burden of proving that a different warning would have

19   made a difference.

20           And then towards the bottom of the page of that same

21   instruction -- excuse me -- we've proposed that if plaintiffs

22   did not prove that Mrs. Knight read the warnings provided by

23   BI, they cannot prove that different warnings would have

24   caused her to change her behavior.  Further, if plaintiffs did

25   not prove that Pradaxa caused Mrs. Knight's death, then you

1080

1    must find in favor of BI.

2         So I believe plaintiffs had some objections to some

3    parts of that and perhaps were fine with other parts.

4         THE COURT:  Okay.

5         MR. CHILDERS:  Your Honor, you gave a preliminary

6    instruction on this particular issue at page 4 to 5 of the

7    preliminary instructions.  We would ask that you give that

8    again.

9         And I would also point out that the defendants here

10   again have tried to pigeonhole this into just a wrongful death

11   case, even though there are injury claims as well, and so that

12   would be improper and a deviation from the pattern charge,

13   which I think you read the pattern charge at the beginning of

14   the trial.

15        THE COURT:  All right.  I'm going to hold that and

16   look at the preliminary instruction, and we'll talk about it

17   further.

18        MS. JONES:  Okay.

19        On instruction No. 19, there was an objection by

20   plaintiffs to the second statement, the second element listed

21   under the express warranty instruction.  We had proposed that

22   it read that BI made a statement of fact to Mrs. Knight

23   related to Pradaxa.

24        MR. CHILDERS:  Your Honor, this, again, would -- we

25   would just ask that this mirror what you gave in the

1    preliminary instructions, which said that Boehringer made a

2    statement of fact to Betty Knight that Pradaxa was safe for

3    her.  That's what you read to the jury previously, and we

4    would ask that that be what you read to them again.

5             THE COURT:  So I take it what the defense wants is

6    just that BI made a statement of fact to Mrs. Knight related

7    to Pradaxa.

8             MS. JONES:  Yes, Your Honor.

9             THE COURT:  Okay.  So if I said in the preliminary

10   that the statement of fact was that the drug was safe for her,

11   why should we not just track that here?

12            MS. JONES:  Well, I think we had an objection to the

13   preliminary instruction as well, Your Honor.  So we were just

14   making our objection for the record to the reuse of that --

15            THE COURT:  Okay.

16            MS. JONES:  -- language.

17            I don't know that there's been any evidence in the

18   record, for what it's worth, that Mrs. Knight ever received

19   any statement of fact that Pradaxa was safe for her.  I don't

20   know that anyone has testified to that.

21            THE COURT:  Well, I think there's a lot of dispute

22   about whether she read or saw a label or the Medication Guide

23   or anything else.  But if that goes to the jury, then it seems

24   to me the statement that they should focus on that is the

25   source of the express warranty is Pradaxa is safe for you,

1082

1    Mrs. Knight.

2         MS. JONES:  There is not any evidence to suggest that

3    there was any such representation made to Mrs. Knight.  That's

4    the challenge that we have with this particular --

5         THE COURT:  Well, is that --

6         MS. JONES:  -- instruction.

7         THE COURT:  -- because there is a question about

8    whether she read anything?

9         MS. JONES:  Well, I think there's a question of

10   whether she read anything.  I don't think there's any question

11   that she never saw any television advertisement at all.

12        THE COURT:  Right.

13        MS. JONES:  And so there was no representation made

14   through that channel.

15        THE COURT:  Well, maybe this will help me grasp some

16   of this for other reasons.

17        So if there was evidence here that Ms. Knight read the

18   label -- forget the Medication Guide, she read the label --

19   would you agree that plaintiffs could make a claim that there

20   is an express warranty, and the statement upon which that

21   express warranty can be based is in the label to the effect

22   this Pradaxa is safe for you?

23        MS. JONES:  If there was evidence that Mrs. Knight had

24   seen labeling that said Pradaxa is safe for you, Mrs. Knight,

25   then I think we would not object to that.  But there is no

1083

1    evidence at all in the record that there was any such

2    representation to Mrs. Knight.  That is the challenge that we

3    have.

4           The hypothetical that you're posing --

5           THE COURT:  Well, maybe it's just my inadequate

6    analysis of this, but to me we are sort of meshing two parts

7    of this.

8           So, first, clearly there is a dispute about whether

9    she looked at or knew anything.  Set that aside.

10          If a patient had the label and read it, would the

11   patient -- if Mrs. Knight had the label and read it, would she

12   not have a claim for express warranty based upon the statement

13   in the label that Pradaxa is safe for you, Ms. Knight?

14          MS. JONES:  No, because that's not in the label.

15          The label -- the labeling for patients says this is a

16   medicine that could cause you to bleed so seriously that it

17   could cause you to die, and then it lists risk factors for

18   that.  It says don't stop the medicine without talking to your

19   doctor first because it could increase your stroke risk.

20          There is no labeling for Pradaxa -- I don't think the

21   FDA would permit there to be labeling for any prescription

22   medicine that says this medicine is safe for you, person X, Y

23   or Z.  That has just not been a representation that there's

24   been any evidence that Mrs. Knight ever received.

25          That's the challenge --

1084

1    THE COURT:  Well, this is getting -- we are struggling

2    to get through these instructions, but this is something that

3    has troubled me that we didn't really hear much about a few

4    minutes ago when we were arguing these motions.

5         And I know in your chart you provide a general

6    reference to the express warranties as being statements in

7    various documents, but I don't know what specific statements

8    those were.  And typically in an express warranty case, you've

9    got a document, you know, the car brochure or the warranty

10   document from the product, that says a statement in and of

11   itself, and that statement becomes the express warranty.  And

12   so I've been troubled by not understanding clearly what

13   express warranty plaintiffs have asserted.

14        MR. CHILDERS:  I'll try to address that, Your Honor.

15        As you point out, when she got the label -- which, as

16   we know, when you get prescriptions, you get --

17        THE COURT:  Right.

18        MR. CHILDERS:  -- the label and the Med Guide.

19        The testimony was that she kept the papers that the

20   pharmacist gave her, and we think that she read them.

21        THE COURT:  Right.

22        MR. CHILDERS:  The label that she got with her first

23   prescription said, if you have severe renal impairment, you

24   can take the 75-milligram dose.

25        THE COURT:  Okay.  So --

1    MR. CHILDERS:  It didn't say you can't take it,

2  Mrs. Knight, because you're taking a P-gp inhibitor.  It did

3  not say that.  So that is the representation, that is one of

4  the representations we think, ah, that was made that was

5  inaccurate.

6    MS. JONES:  And putting aside, Your Honor, just our

7  general concerns about the warranty claim that have been

8  addressed in our directed verdict motion, that is why we

9  proposed as to element three that it just say that Pradaxa --

10  excuse me -- that BI made -- as to element two, that BI made a

11  statement of fact to Mrs. Knight related to Pradaxa, because

12  we've got this situation where we know she wasn't told this

13  medicine is safe for you.

14    THE COURT:  I agree with you.  Given the clarification

15  that plaintiffs provide about the express warranties and the

16  source, I don't think that it is appropriate to just simply

17  say the statement of fact that Pradaxa was safe for her

18  standing alone.

19    So I agree --

20    MR. CHILDERS:  Understood, Your Honor.

21    THE COURT:  I'm going to use the defense version.

22    MR. CHILDERS:  Yes, sir.

23    THE COURT:  Okay.

24    MS. JONES:  On instruction No. 20, which is implied

25  warranty of merchantability, there was disagreement as to

1    element three, Pradaxa was not fit for the ordinary purposes

2    for which it is used.

3          There is -- I believe in the pre-charge that Your

4    Honor gave, there was a more robust statement of that element

5    that included a reference to and/or it did not confirm --

6    conform to the promises or affirmations of fact made in the

7    label or Medication Guide.

8          We spent a fair bit of time talking about this because

9    what was charged in the pre-charge is not actually what is in

10   the model, but the model then references a statute that

11   includes this additional language.  Our view is that this

12   additional language is really going to an express or

13   affirmative representation by the company, and so that really

14   is captured by the express warranty claim and isn't

15   appropriate in an implied warranty of merchantability

16   instruction.

17         THE COURT:  So defendant's position is the instruction

18   that you highlighted in red with the strikethrough is the

19   version you would prefer?

20         MS. JONES:  Yes, Your Honor.  And I believe that is

21   the version that is -- I think that's the pattern instruction,

22   if I'm recalling correctly.

23         MR. CHILDERS:  If I may, Your Honor.

24         The pattern instruction allows for the very specific

25   language you included.  The instruction -- and, I'm sorry, I

1    don't have it right here in front of me -- refers to several

2    things that you can say after such goods are used and/or, one

3    of which is any of the things listed in a specific statute.

4    This language is directly out of that statute, and I believe

5    that's why Your Honor gave that to the jury before.

6          So it's not accurate to say it's not in the pattern

7    charge.  The pattern charge just references the statute

8    instead of typing it all out.

9          THE COURT:  I think I did look at this for the

10   preliminary.  I think I'm going to stick with the preliminary

11   instruction version.

12         MS. JONES:  Your Honor, I think the next issue was

13   with respect to proposed instruction No. 22.

14      (Defense counsel conferring.)

15         MS. JONES:  So I think just to present this as one

16   issue, Your Honor, there are kind of related proposed

17   instructions from both sides.  I think we both have objections

18   to our respective instructions.

19         One is No. 22, which is our proposal on compliance

20   with safety standards, which I believe was in the pre-charge.

21   And then on page 43, we've included a proposal from plaintiffs

22   on -- what I think was described in their proposal is

23   presumption per se -- I think in their proposal it said

24   something other than negligence per se, but this is the

25   language on page 43.

1088

1      And the discussion that we've been having is the

2  extent to which compliance or noncompliance by the company

3  should be relevant for purposes of the jury's determination.

4      THE COURT:  So plaintiffs are offering a negligence

5  per se instruction.

6      MR. CHILDERS:  What we had proposed, Your Honor, is

7  that we would try to combine some of this language together in

8  one instruction.  And what plaintiffs would propose is that

9  the first sentence from -- it's not called negligence per se

10 in the pattern charge, but I certainly can see why it is

11 construed that way.

12     That if you -- after the sentence that was added to

13 the pattern charge in the preliminary instruction, which was,

14 Compliance with appropriate regulations is competent evidence

15 that BI exercised due care in marketing Pradaxa, we would

16 request that the next -- that another sentence be added that

17 says -- right out of this pattern charge, which I think is

18 427.  It says:  "If you find that Boehringer violated one or

19 more state or federal laws or regulations relating to Pradaxa,

20 then the evidence of such violations raises a presumption of

21 negligence.

22     Because the sentence that was added previously is

23 basically the mirror image of that.

24     MS. JONES:  And we have an objection to that proposed

25 instruction, Your Honor, for two reasons.

1089

1    One is, to the extent that it really is tracking a

2  negligence per se theory -- and I hate to bring up preemption

3  again -- it implicates a whole different type of preemption,

4  known as Buckman preemption, which is to say there is not a

5  standalone cause of action for violations of the Federal Drug

6  and Cosmetics Act.

7    The second concern that we have about this instruction

8  is that there has not been any evidence that I can recall or

9  any testimony that Boehringer somehow violated a state or

10 federal law or regulation relating to Pradaxa.  So --

11    THE COURT:  Let me stop you there.

12    What is your evidence of a violation of a federal law

13 or regulation?

14    MR. CHILDERS:  Dr. Plunkett, Your Honor, testified to

15 specific federal CFRs that require warnings to be made that

16 weren't made.  But -- and I understand your concern.

17    Our issue is if we're going to say compliance with

18 regulations is competent evidence, then the jury needs to know

19 if they violated it, which Dr. Plunkett testified they did,

20 well, that's also evidence of a presumption of negligence.  So

21 the other proposal I have is to take it out entirely.

22    THE COURT:  Why don't we just add the mirror image of

23 that last sentence and say:  Failure to comply with federal

24 regulations is competent evidence that BI failed to exercise

25 due care?

1090

1    MS. JONES:  Well --

2    MR. CHILDERS:  I'm fine with that, Your Honor.  I'm

3    sorry

4    MS. JONES:  No problem.

5    We would still object to that, Your Honor, because we

6    don't -- I don't believe there's been any -- I don't believe

7    Dr. Plunkett ever said BI violated this regulation or this

8    law.

9    THE COURT:  You know, it didn't catch my attention in

10   that way, but I'm going to add the sentence that I just spoke

11   of, the mirror image of failure or a violation of a

12   regulation.  But I'm going to go back and look at my notes and

13   perhaps her testimony and see how she brought out a violation

14   of a regulation and what it was specifically before I think

15   it's appropriate to give this.

16   MR. CHILDERS:  Your Honor, I would point out, if in

17   fact you decide that whatever her testimony was didn't get

18   there, they haven't put on any evidence of compliance with

19   federal regulations.  And we know they only have two experts

20   coming, neither one of which is an FDA expert, to say we did

21   comply.

22   THE COURT:  Well, you know, there is ample evidence

23   from your witness that there are many statutes and regulations

24   pertaining to the approval of a drug which they complied with.

25   I think they are entitled -- it is uncontroverted evidence

1    that Pradaxa was an approved drug.  I'm not sure the extent to

2    which any of this is really at issue of anything, but there is

3    evidence of compliance with the federal regulatory program.

4    And it seems to me, even in this context, they're entitled to

5    argue we complied with the regulations, we complied with the

6    statute.  This is a newly approved drug.  We went through that

7    process, we submitted all of the things, and we got that

8    approval.

9         MR. CHILDERS:  Understood.

10        THE COURT:  All right.  So I'm going to add that

11   mirror sentence and then look more closely at the evidence

12   concerning violation of the regulation.

13        MR. MOSKOW:  Your Honor, with Court's indulgence, may

14   I have permission to leave?  I have a flight home tonight out

15   of Charleston, and I'm not arguing right now, but I didn't

16   want to leave without your permission.

17     (Off-the-record discussion.)

18        THE COURT:  Go ahead.

19        MR. MOSKOW:  Thank you very much, Your Honor.

20        MR. CHILDERS:  Thank you, Your Honor.

21        MS. JONES:  Your Honor, I think the next issue was

22   with respect to the instructions on punitive damages.  We had

23   proposed -- and this is in the bolded text, some additions to

24   the instruction at instruction No. 24, which we believe are

25   supported by the cases and authority that we cite.

1    THE COURT:  All right.  I'll just take those under

2  advisement.

3    And let me say with all of these, my plan would be to

4  the extent to which I've made decisions on some of these

5  things, Blake will have those reflected in a draft.  Some of

6  these things obviously I haven't decided today.  We will have

7  a chance on the record again to go through a final version of

8  these things before I decide everything and then give the

9  charge.

10    MS. JONES:  We appreciate it, Your Honor.

11    THE COURT:  Blake is leaving, too.  He's driving to

12  Richmond this evening, so I'm going to let him go.

13    MS. JONES:  Okay.  Thanks, Blake.

14    THE COURT:  And if you just want to call my

15  attention -- the punitive damage instructions --

16    MS. JONES:  Yes, I think through 27 are all punitive

17  things.  I'm just looking to see if we have any other hotly

18  disputed issues.

19    THE COURT:  Is there a dispute about a learned

20  treatise?

21    MR. CHILDERS:  No, sir.

22    MS. JONES:  No, Your Honor.  That was just an addition

23  that we made, so that is agreed upon.

24    THE COURT:  Okay.

25    MS. JONES:  We did include a proximate cause

1    instruction that had been proposed by plaintiffs.  I think

2    this was largely the model.  We had suggested that the

3    reference to or only cause on the second to last line of that

4    instruction was not necessary given what the cases say.  I

5    think saying the sole proximate cause adequately covers what

6    the law is in West Virginia.  But otherwise, we didn't have a

7    disagreement with that instruction.

8           THE COURT:  All right.  I'll take a look at that.

9           MS. JONES:  And then I think everything is -- I don't

10   want to speak too soon, but I think everything else is agreed

11   upon other than on page 44.

12          Plaintiffs have proposed a so-called concurrent

13   negligence instruction, which we object to because we don't

14   think there has been any evidence or will be any evidence that

15   there was negligence by another nonparty or, you know, party

16   who might somehow be involved in the case.

17          THE COURT:  What do plaintiffs base this instruction

18   on, what evidence?

19          MR. CHILDERS:  Your Honor, there has been suggestion

20   that Ms. Knight's doctors knew about these risks.  You heard

21   today that there was a doctor that prescribed her Pradaxa in

22   2013 who was a new doctor.

23          Telling the jury that, that may lead them to think

24   that a doctor who is a nonparty to this case is also at fault.

25   And this covers that particular scenario should the jury --

1094

1    I'll be shocked if it's not argued to them that the doctor was

2    warned and should have known about this.  So that covers that

3    issue.

4         MS. JONES:  We certainly intend to argue that her

5    doctors were warned.  We do not intend to argue that any of

6    her doctors were negligent.  So this instruction, from our

7    point of view, is inappropriate because it specifically refers

8    to possible negligent acts by nonparties or other parties.

9         THE COURT:  So if they agree that there is no evidence

10   that any doctor was negligent in their care and treatment of

11   Ms. Knight, why would you need this?

12        MR. CHILDERS:  I wouldn't if the jury is specifically

13   told that nobody in this case is blaming the doctor.

14        They're going to -- they're going to suggest it

15   without saying it, Your Honor, is what I'm concerned about.

16   They may not get up and say they were negligent, but they're

17   going to get up and say the doctor knew about all of these

18   risks, and the doctor put her on that medicine.  If you're a

19   juror sitting on the jury, that may lead you to believe, well,

20   they're saying it's the doctor's fault, so let's blame the

21   doctor instead of the pharmaceutical company.

22        If they're willing to stipulate, and we can read a

23   stipulation to the jury that says no party is blaming any

24   doctor for the injuries that occurred to Ms. Knight, I'm fine

25   with that.  But I don't believe that they would be willing to

1    do that.

2         MS. JONES:  Well, I don't think a stipulation is

3    necessary, Your Honor.  And I certainly have no intention of

4    saying to the jury that we think that her doctors were somehow

5    negligent in prescribing her the medicine.  We think they

6    exercised appropriate clinical judgment based on her medical

7    care, which I think has been the evidence so far and will be

8    the evidence next week.  So we view this instruction as being

9    inappropriate.

10        THE COURT:  Well, I want to think about this.  I think

11   I see plaintiffs' point.

12        They may be concerned that the jury -- even if you

13   don't argue it that way, if the jury believes that these

14   warnings are inadequate, that doctor shouldn't have prescribed

15   this for her in April of 2013 and that, therefore, that doctor

16   was negligent, and that's the cause of her taking Pradaxa and

17   somehow alleviates the fault of Pradaxa -- BI, even if they

18   would otherwise find that there were inadequate warnings.

19        I'll think about that.  I think I'm inclined to agree

20   with plaintiff, but I'll give some thought to it.

21        MS. JONES:  Okay.

22        MR. CHILDERS:  Your Honor, I just wanted to point out

23   on the punitive damages charge, we submitted a pattern charge.

24   I don't think that is included in here, but that was our

25   proposal and not the extra charges.

1096

1        THE COURT:  Okay.

2        MR. CHILDERS:  Thank you, Your Honor.

3        THE COURT:  All right.  Thank you all for sticking

4    around.

5        MS. JONES:  The one other thing, Your Honor, is that

6    we have conferred also about a verdict form.

7        THE COURT:  Okay.  Great.

8        MS. JONES:  They've marked up our version.  I'm not

9    sure if it makes sense to march through it right now, but we

10   have discussed that and are in a position whenever the Court

11   is inclined.

12       THE COURT:  Well, I'm glad that you mentioned that.

13       So at this point, you don't have an agreed-upon

14   verdict form --

15       MS. JONES:  No, Your Honor.

16       THE COURT:  -- but you are still working toward it?

17       MS. JONES:  Yes.

18       THE COURT:  Okay.  What I'd like you to do, then, is

19   continue working on it.  Bring me up to date on this on Monday

20   morning.  If you have not resolved it by a reasonable time

21   Monday morning, like by lunch or at lunch, then I am probably

22   going to require each side to submit proposed versions, and we

23   will see what is at issue.

24       Have you given any further thought to some type of

25   summary of evidence that you would want to give to the jury?

1       MR. CHILDERS:  Yes, Your Honor.  We've been working on

2  that and plan to provide it to the defendants tomorrow morning

3  as you instructed.

4       THE COURT:  Okay.  So what I'd like to do, and I may

5  have said this, but I want to know before the end of business

6  tomorrow if you have an agreement and, if you don't, what is

7  agreed, what is disagreed.  So if you would file something

8  that reflects that so that I could have it to be looking over

9  over the weekend.

10      My plan would be -- we're back here at 9:00 on Monday

11 morning.  My plan would be to take that up immediately and

12 resolve it, and then bring the jury in and get started.

13      You're still in good shape with your two witnesses, I

14 take it?

15      MS. JONES:  We are, Your Honor.

16      THE COURT:  All right.  Then as far as I'm concerned,

17 we can adjourn until 9:00 on Monday.

18      MS. JONES:  And, Your Honor, just for record purposes,

19 on the jury instructions, do we need to be submitting

20 something to the docket to reflect the parties' respective

21 positions on these things?  Obviously this will all be in the

22 transcript, but what would you like us to do?

23      THE COURT:  Here's my suggestion.  Part of that

24 depends upon how extensive the disagreement is.  You know,

25 obviously you want the record to be clear and as clean as

1098

1    possible.

2        I'm happy -- and at this point, from what I've heard,

3    I believe it's the case that you can probably do all of this

4    in a conference, in a hearing where you can simply state these

5    things and not have to file separate documents or supporting

6    documents.

7        You've each submitted --

8        MS. JONES:  Yes.

9        THE COURT:  -- proposed instructions.

10       MS. JONES:  We've submitted proposed instructions I

11   think on both sides.

12       We've had some additions --

13       THE COURT:  All right.

14       MS. JONES:  -- based on the evidence.

15       THE COURT:  What I've read here and you've told me

16   about that is in dispute I think can be easily handled on the

17   record orally --

18       MS. JONES:  Okay.

19       THE COURT:  -- as opposed to requiring further

20   documents.

21       And I don't see a need for you to submit further

22   documents to document -- to put everything on the record and

23   preserve your objections.

24       MS. JONES:  Would you have any -- it would be -- for

25   belt and suspender purposes, would you have any objection to

1099

1    us just putting on the docket what we had proposed so that we

2    have that on the docket?

3           THE COURT:  When you say what you had proposed, what

4    do you mean?

5           MS. JONES:  It would be essentially what we started

6    with this morning.

7           THE COURT:  I guess I don't mind.

8           MS. JONES:  Okay.

9           THE COURT:  You know, what I am wary of is throwing in

10   a document that entails all of the objections -- or all of the

11   instructions as originally proposed, and then finding out that

12   you are trying to preserve an objection to something that you

13   didn't really raise in these discussions --

14          MS. JONES:  Yes.

15          THE COURT:  -- or with me.

16          And I don't want to have to be looking over my

17   shoulder to make sure --

18          MS. JONES:  Oh, understood.

19          THE COURT:  -- you know.

20          MS. JONES:  Understood.

21          THE COURT:  I know what's at issue, and I've ruled on

22   what's at issue.  That neither side is holding something back,

23   so to speak, just to point to later and say these instructions

24   were offered and rejected.

25          MS. JONES:  That was not our intention at all, Your

1100

1    Honor.

2         THE COURT:  Okay.  So if you feel there is some need

3    to submit some written document, certainly feel free to.

4         MS. JONES:  Okay.  Thank you, Your Honor.

5         THE COURT:  All right.  Anything else?

6         MR. CHILDERS:  Thank you, Your Honor.  Have a good

7    weekend.

8         THE COURT:  You, too.  See you Monday.

9         MS. JONES:  Thank you.

10        THE COURT SECURITY OFFICER:  All rise.  This court

11   stands in recess.

12            (Proceedings were adjourned at 5:07 p.m.)

13                         ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

1   CERTIFICATION:

2        We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3   RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter as reported on October 11, 2018.

6

7

8   October 11, 2018           
     DATE

9

10  /s/ Kathy L. Swinhart       
     KATHY L. SWINHART, CSR

11

12  /s/ Lisa A. Cook         
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25

KATHY L. SWINHART, Official Court Reporter (304) 528-2244