IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                                        No. 3:15-CV-06424

BOEHRINGER INGELHEIM                       Volume 7
PHARMACEUTICALS, INC.,                     Pages 1101 through 1439

         Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

MONDAY, OCTOBER 15, 2018, 9:00 A.M.

---o0o---


For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                       1932 North Druid Hills Road, Ste 100
                       Atlanta, Georgia  30319
                       BY:  C. ANDREW CHILDERS
                       and  EMILY TWEED ACOSTA

                       URY & MOSKOW
                       883 Black Rock Turnpike
                       Fairfield, Connecticut 06825
                       BY:  NEAL L. MOSKOW

           (Appearances continued next page...)

Reported by:  KATHY L. SWINHART, CSR
              LISA A. COOK, RPR-RMR-CRR-FCRR
              Official Court Reporters
              (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                      APPEARANCES (Continued)

 2

 3      For the Plaintiffs:

 4                    FERRER, POIROT & WANSBROUGH
                      2100 RiverEdge Parkway, Suite 1025
 5                    Atlanta, Georgia  30328
                      BY:  RUSSELL ABNEY
 6                    and  HUNTER VANCE LINVILLE

 7      For the Defendant:

 8                    TUCKER ELLIS
                      925 Euclid Avenue, Suite 1150
 9                    Cleveland, Ohio  44115
                      BY:  JOHN Q. LEWIS
10

11                    COVINGTON & BURLING
                      One City Center
12                    850 Tenth Street NW
                      Washington, D.C.  20001
13                    BY:  PHYLLIS ALENE JONES
                      and  NICHOLAS HAILEY
14                    and  JESSICA PEREZ

15

16                    JACKSON KELLY
                      Post Office Box 553
                      Charleston, West Virginia  25322
17                    BY:  GRETCHEN M. CALLAS

18

19

20

21

22

23

24

25
```

1                                 <u>INDEX</u>

2

3     <u>DEFENDANT'S WITNESSES:</u>                          <u>PAGE:</u>

4
      VANESSA SHAMI, M.D.
5
      DIRECT EXAMINATION BY MR. LEWIS                   1140
6     CROSS-EXAMINATION BY MR. CHILDERS                 1257
      REDIRECT EXAMINATION BY MR. LEWIS                 1374
7     RECROSS-EXAMINATION BY MR. CHILDERS               1387

8

9     ARGUMENT ON JURY INSTRUCTIONS                      1401

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                HUNTINGTON, WEST VIRGINIA

2             MONDAY, OCTOBER 15, 2018, 9:04 A.M.

3                (Proceedings held in the conference room, jury not

4    present.)

5                THE COURT:  Good morning.

6         All right.  So first I wanted to take up the summary

7    presentation that the plaintiffs have offered.  I've read

8    the plaintiffs' submission and the defendant's submission.

9    I don't think there's a whole lot of significant issue.  I'm

10   prepared to just go through and tell you what I think.

11               MR. CHILDERS:  Sure.

12               THE COURT:  You can -- so we'll just use the

13   defendant's response where they state their objections to

14   the amended version of plaintiffs' presentation.

15        As I understand it, the first one is on Page 4, slide

16   4.  This was an objection to the final statement concerning

17   Dr. MacFarland.  As I read it, the defendant merely wants to

18   make clear that in the statement referring to the knowledge

19   that Dr. MacFarland had about Pradaxa at the time it was

20   first prescribed to her, the plaintiff wanted to leave the

21   word "first" out.

22               MR. CHILDERS:  I think you have it the other way

23   around, Your Honor.

24               THE COURT:  Okay.  So what I'm reading is the

25   defendant's response.

1          MR. CHILDERS:  I'm sorry.  I'm sorry.  You are

2     right.

3          THE COURT:  Yeah, all right.  I want to make sure

4     I'm properly oriented to time and space this morning.

5          So I agree with the defendant.  The only issue about

6     her is when it was first prescribed.  She wasn't providing

7     testimony about any of the later ones.

8          The second, the defendant objects to the reference to

9     Mrs. Knight's health issues.  I agree with the plaintiff on

10    this.  "Issues" to me is a broader term.  It encapsulates a

11    lot of her conditions.  She had more than one health

12    problem.  So I'm inclined to leave it as plaintiff has

13    proposed it.

14         Number 6, Dr. Van Ryn.  The defendant objected to the

15    very last statement, said it was redundant.  I disagree.  I

16    think that the statements go hand-in-hand because I think

17    the first statement to which there's no objection is just

18    summarizing that she described generally the relationship

19    between patients, Pradaxa exposure, and bleeding risk and

20    then concluded that increased blood levels of Pradaxa

21    increase bleeding risk.  I think it's an accurate statement

22    of her testimony.

23         Dr. Ashhab.  The defendant objects to the reference to

24    the fact that he treats patients from the Charleston area.

25    I think it's fair to remind these jurors that he's a

1    practicing physician.  So what I would insert is just to

2    simply say "practicing physician in the Charleston area,"

3    and substitute that for either of the other versions you all

4    propose.

5         Dr. Brueckmann.  The defendant complains that this last

6    statement by her where she -- where in the summary plaintiff

7    says Boehringer's duty to minimize risk to patient, the

8    defendant says is an incomplete characterization.  And I

9    wondered what you meant by that was incomplete or what --

10             MR. HAILEY:  Well, so, our objection, Your Honor,

11   was that this is highlighting one piece of Dr. Brueckmann's

12   testimony also in a way that suggests that, or focuses on

13   the fact that she, she made this one statement about a

14   potential duty while sort of not emphasizing the, her

15   testimony in a more holistic manner.

16             THE COURT:  What would you, what would you say

17   should be added to make it more holistic?

18             MR. HAILEY:  Well, I think for this we'd be fine

19   in stating this in a more neutral manner to say whether or

20   not Boehringer has a duty to minimize risk to patients.

21             MR. LEWIS:  Or we could even -- not to interrupt,

22   Your Honor, but I was just thinking or just generally

23   Boehringer's duties to patients in a generic way rather than

24   focusing on minimizing the risk.

25             MR. CHILDERS:  That was the only duty that she

1    talked about, Your Honor.  We kept it really short with her.

2            THE COURT:  That's pretty close to just a direct

3    quote from her deposition.  So I disagree.  I'm going to

4    leave that in.

5        Next, and I think this is actually in two places.

6    First, on slide 9 and then again on slide 10 where in

7    plaintiffs' summary they want to describe it as the family's

8    decision to switch Betty Knight from warfarin.

9        Defendant objects to that.  And I think I agree with

10   the defendant.  It was not just a family decision because

11   Dr. MacFarland and her office participated in it.  So just

12   take out "family."  Just refer to the decision to switch

13   her.

14           MR. CHILDERS:  Might I offer --

15           THE COURT:  Sure.

16           MR. CHILDERS:  And I thought about this over the

17   weekend too.

18           THE COURT:  Okay.

19           MR. CHILDERS:  If we put the word "family's

20   decision to request Betty Knight's switch," I think that was

21   accurate from all the testimony we heard.

22           THE COURT:  I don't disagree with that.

23           MR. HAILEY:  I think, I think we'd be inclined to

24   go with Your Honor's first proposal which is just, I think,

25   a simpler statement and, and reminds the jury of the topic

1   of her, of Mr. Knight and Ms. Stevens' testimony rather than

2   really suggesting --

3           THE COURT:  Yeah, I'm going to agree with the

4   defendant.

5           MR. CHILDERS:  Okay.

6           THE COURT:  His testimony was not just their

7   family meeting but they were at the meeting with the nurse.

8   So just take out the word "family" there.

9           MR. CHILDERS:  Okay.  Just the decision?  Yes,

10  sir.

11          THE COURT:  Yes, and then in Claudia's similar

12  statement.

13          MR. CHILDERS:  Okay.

14          THE COURT:  And then next the defendant objects

15  again to both of the childrens' slides about including the

16  statement "Betty Knight's prior history reading medication

17  labels."  And that's what they testified about.

18      Certainly it's a dispute in the evidence and you can

19  argue that the jury could reject the inference that

20  plaintiffs are claiming from their literal testimony.  But

21  just to say that they testified about Betty Knight's prior

22  history of reading medication labels, to me that's neutral.

23          MR. HAILEY:  Well, I, I think BI's objected to

24  this on really two grounds.  One, we think it's inconsistent

25  with the testimony for the reasons we argued at the directed

1    verdict stage.

2        The testimony was that Mrs. Knight may have read a

3    label for a statin drug specifically.  But, but this

4    statement here suggests that she had some broader history or

5    practice of reading medication labels.

6        And since this is a disputed issue, I think it's just

7    inappropriate to be framing it in this way in what's

8    supposed to be sort of a more neutral presentation to the

9    jury.

10        THE COURT:  What would you suggest as an

11    alternative to refresh their recollection because they did

12    testify -- it's a little differently -- about facts from

13    which a jury may infer that Betty read labels.

14        MR. HAILEY:  Well, if, if the issue here is

15    whether or not Mrs. Knight read labels, and that's what the

16    testimony is going to, I think we'd suggest that the bullet

17    read whether or not Mrs. Knight read medication labels.  And

18    that doesn't suggest one way or the other.  It's more of a

19    neutral statement.

20        MR. CHILDERS:  I think they're both neutral.  I

21    think what we said was neutral as well.

22        THE COURT:  I'm going to leave it as it is.  I do

23    intend to make clear to the jury before and after this is

24    given that this is not evidence and it's merely a summary to

25    help remind them of what the evidence was about and what the

1    testimony was about.

2        You guys are going to argue this like crazy if it gets

3    to that anyway.  So I don't think it's necessary to give a

4    more detailed sort of summary of the evidence.  So I'm going

5    to leave it as it is.

6        And then the last one, the reference to Dr. Huh's

7    testimony, it was very short testimony.  First you object to

8    them making reference to epinephrine not stopping the

9    bleeding.

10        MR. HAILEY:  Yeah.  So that's, that's just

11   inconsistent with the testimony.  The question was did

12   the -- the question from plaintiffs' counsel was the

13   epinephrine didn't stop the bleeding.  And the response was

14   it slowed the bleeding.  That's what it's designed to do.

15   So I think that's -- it's sort of a misleading statement of

16   the testimony.  And --

17        THE COURT:  Okay.  I, I think I agree with that.

18   Why don't you change it to say epinephrine slowed but did

19   not stop the bleeding.

20        MR. HAILEY:  And -- well, I think just more

21   broadly highlighting these details about the procedure, I

22   mean, I think if we wanted to give a more balanced view of

23   the testimony, the take away from the testimony is that this

24   was a standard procedure.

25        THE COURT:  Talking about Dr. Huh's testimony.

1    MR. HAILEY:  Yes.  It was a standard procedure and

2  didn't require any incisions.  Mrs. Knight was in stable

3  condition after the procedure.  Dr. Huh had no expectation

4  that there would be further bleeding.

5    So I think our broader concern is just that by

6  highlighting this, these isolated details, it's, it's trying

7  to tip the scales one way or the other.  And we'd suggest

8  just leaving it as testified about the procedure he

9  performed and leaving it at that without adding all this

10  additional detail.

11    MR. CHILDERS:  That's fine, Judge.  We were just

12  trying to include facts.  But if that's a problem --

13    THE COURT:  Well, are you willing to just accept

14  their --

15    MR. CHILDERS:  Yeah.  I don't want to make the

16  shortest deposition play have the most amount of information

17  under it on the slide --

18    THE COURT:  Okay.

19    MR. CHILDERS:  -- like it sounds like we're going

20  to have to do otherwise.

21    THE COURT:  Okay.  So you'll just leave it at --

22  just eliminate those last three bullet points.

23    MR. CHILDERS:  Sure.

24    MR. MOSKOW:  How about testified about the

25  procedure he performed to stop the bleeding.

1          THE COURT:  I don't mind that.  I mean, I think

2     it's probably good to remind them which procedure this was.

3          MS. JONES:  I think that's fine, Your Honor.

4          THE COURT:  Okay.  So put that in.  Okay.

5          MR. MOSKOW:  I'm going to run this out to our tech

6     person.

7          THE COURT:  Yeah.  I was just going to ask what

8     you need to do.

9          MR. LEWIS:  So, Your Honor, how will this be

10    presented?

11         THE COURT:  Well, the way I would suggest is I

12    would introduce this by saying that at my direction, I asked

13    the parties to confer and prepare a brief summary so as to

14    refresh the recollection of the jury about the evidence that

15    they heard last week since we've had this now four-day

16    interruption, and that this is merely a summary and not in

17    and of itself evidence and they won't see this again.  It's

18    not an exhibit that's going to be introduced, and that they

19    should bear in mind that they decide what the evidence is

20    and what the facts are.

21         And then I will let them -- I've got to let them show

22    it and then remind them at the conclusion of it again this

23    wasn't evidence.  This was just a summary because we've had

24    this four-day interruption.

25         MR. LEWIS:  Should we liken it to an opening

1   statement or a closing argument so they have some conception

2   that this is the lawyers talking and not the evidence?

3          THE COURT:  Well, I'm going to make it clear this

4   was prepared by the lawyers.  And I think that's so

5   self-evident I don't think it needs to be said.  And I don't

6   want to compare it to an opening statement because then it

7   sounds like it's coming from just one side or something.

8   It's a summary --

9          MR. LEWIS:  Okay.

10          THE COURT:  -- now essentially prepared by the

11   lawyers with even a few minor disagreements remaining.  I

12   understand that you still disagree with some of my rulings

13   on this, but I think it's just that.

14      And I intend to just say it that way for them, that

15   this is just because we've had this interruption and as a

16   result -- I don't even want to call it an interruption.  I

17   don't want to make it sound negative, you all interrupted.

18   This delay and that's the purpose of it.

19          MR. LEWIS:  And do you want us to -- so I assume

20   that the lawyers for the plaintiff will read theirs.  Do you

21   want us to read Dr. Huh?  I mean, technically he was in our

22   case.

23          MR. CHILDERS:  That's fine.

24          THE COURT:  Are you going to read this or just

25   show it to them?

```
1           MR. CHILDERS:  Our expectation was to read it just
2    to make sure that there was enough time up on the screen so
3    they could see it.  I don't know how else to really time it.
4           THE COURT:  Okay.  We'll do it that way.
5           MR. LEWIS:  Okay.  Thank you.
6           MR. CHILDERS:  And I'll just word-for-word read it
7    obviously.
8           THE COURT:  Right, okay.  So then let's go to the
9    motion regarding Dr. Crossley.  I've read all of it,
10   including the attachments.
11          First, the defendant -- or plaintiff raised the
12   objection that Dr. Crossley might be testifying about aPTT
13   and INR levels for Betty Knight while she was on warfarin.
14          My understanding is from looking at the reports, first
15   he does discuss this probably more thoroughly in terms of
16   the principles involved in his general report.
17          I found that in his case specific report he made one
18   reference to the fact that Betty warfarin (verbatim) had
19   aPTTs -- and I don't know if he included INRs in this or
20   not -- but aPTT levels that were above normal while she was
21   on warfarin.
22          And then clearly he was asked about this when he was
23   deposed specifically.  And, as I recall, he talked about two
24   or three specific aPTT or INRs while Betty was on warfarin.
25          So I think it's there.  I think it's out there and I
```

1      think that's adequate notice.

2             MR. ABNEY:  Can I --

3             THE COURT:  Yeah.

4             MR. ABNEY:  -- jump in and give you a different

5      perspective?

6             THE COURT:  Sure.

7             MR. ABNEY:  So in his general report he talks

8      about, like all doctors do, warfarin patients have to have

9      their blood checked and the INRs, you know, you have to

10     adjust the medication.  Nobody likes that.

11            THE COURT:  Right.

12            MR. ABNEY:  His case specific report for Ms.

13     Knight, he doesn't mention INR any place, any time,

14     anywhere.

15            THE COURT:  One reference to aPTT.

16            MR. ABNEY:  And here's the difference.  This is

17     like saying we have, you know, a test to look at red blood

18     cells and a test to look at white blood cells.  He's talking

19     about one in his expert report.

20         And in his deposition Mr. Childers asked him about that

21     one statement he has about aPTTs.  And now he wants to come

22     into court and talk about a totally different test that he

23     has never referenced anywhere.  And they're completely

24     different studies.  They're different tests.

25         The INR, which is based on the PT test, is used to

1   adjust warfarin doses.  The PTT or aPTT is a different test

2   that looks at different clotting factors in the clotting

3   cascade.  And it's FDA approved by a couple of manufacturers

4   to look at Heparin patients.  The label says you can use it

5   to look at Pradaxa patients.  But nobody is talking about

6   aPTT being a surrogate or something similar to an INR for

7   warfarin patients.

8        So in his report he only references aPTT because he

9   read Dr. Ashhab's report.  And he says Dr. Ashhab was

10  looking at her aPTT results and said that indicates she's

11  over-anticoagulated on Pradaxa because the Pradaxa label

12  says you can look to aPTT to see how anticoagulated a

13  patient is from Pradaxa.  So that was Dr. Ashhab's statement

14  and what he testified to.

15       So Dr. Crossley says, well, that's not a valid

16  statement because her aPTT was elevated before she ever went

17  on Pradaxa, suggesting that maybe she just had an abnormal

18  aPTT whether she's on Pradaxa or not.

19       So that was a statement in his expert report was

20  Dr. Ashhab's wrong because her aPTT was elevated before she

21  ever went on Pradaxa.  So looking at aPTT for Pradaxa is a

22  fallacy.  That was what his report said.

23       Mr. Childers then said, "Okay, was she

24  over-anticoagulated before she went on Pradaxa when her aPTT

25  was elevated?"  And Dr. Crossley said, "No, she wasn't."

1       So then Mr. Childers pulls out each one of those lab

2   tests where she had her aPTT and it was elevated.  And she

3   also had an INR which was elevated.  And she was on

4   warfarin.

5       So Dr. Crossley says, "Well, yeah, you're right.  She

6   was over-anticoagulated.  She was on warfarin."  They looked

7   at her INR.  It was elevated.  Warfarin can also elevate

8   aPTT.  So that's why her aPTT was elevated.  That was the

9   entire testimony.

10      He has never in any semblance said, "I think she was

11  out of therapeutic range a lot.  I don't think she was an

12  appropriate candidate for warfarin.  I have opinions that

13  are based on her INRs."

14      He's never said any of that.  In fact, in his

15  deposition he said, "I think it would have been appropriate

16  for them to keep her on warfarin."

17      And now he wants to show up and put up 50 different INR

18  readings and talk about how she was out of range and she

19  wasn't well controlled on warfarin and her risks were

20  astronomical.  None of that he ever disclosed in his report

21  or in his deposition.  This is just total trial by ambush,

22  Judge.

23          MS. PEREZ:  I mean, I'm just looking at the

24  deposition here Page 238, line 18.  "If you're on warfarin

25  and your INR is over 3, aren't you considered to be

1    over-anticoagulated?"

2         And then later, "If you have an INR of 3.7 is that

3    considered to be over-anticoagulated?"

4         "Yes."

5         "If you have an INR of 4.3 is that considered to be

6    over-anticoagulated on warfarin?"

7         "Correct."

8         The plaintiffs' counsel then goes on to pull out Ms.

9    Knight's specific records where she has those INRs and show

10   them Dr. Crossley.

11        I mean, the plaintiffs could have explored this further

12   in the deposition.  The fact that they chose not to is not a

13   reason to preclude Dr. Crossley from testifying to these

14   facts.

15        I mean, the fact is he spoke about INR variability in

16   some detail, as you mentioned, in his general report.  He

17   spoke about how she had a bleed on warfarin in his specific

18   report and how the switch to Pradaxa was appropriate.

19        The idea that the plaintiffs are somehow surprised by

20   this opinion when this has been a central theme in the case

21   I just think is not credible.

22             MR. ABNEY:  Well, first of all, Judge, it wasn't a

23   central theme in this case until they raised it on

24   cross-examination of our expert.  None of their experts have

25   put together this chart that they're talking about showing

1   and using and arguing that she was out of INR range.

2         The, the INRs that were talked about in that deposition

3   were only because Dr. Crossley incorrectly said she had aPTT

4   elevation before Pradaxa.  And that's, you know, that was

5   the whole issue.

6               THE COURT:  Well, I'm sorry.  Go ahead.

7               MR. ABNEY:  He, he never, ever said, "My opinions

8   are based on her INR readings," or, "I think she was out of

9   range."  He said it was inappropriate for them to keep her

10  on warfarin.

11        They want to come in and talk about 50 readings because

12  he was cross-examined on four.  And, you know, we could have

13  followed up.  He never gave us any indication that there was

14  anything to follow up on.

15        He never said she was out of therapeutic range on

16  warfarin.  He never said, "I don't think warfarin was good

17  for her because she was out of range a lot."  He never said,

18  "I have opinions that are based on her INR readings."  He

19  never mentioned her INR readings one time ever.  And now he

20  wants to come in and testify that's a central focus of his

21  testimony.

22              THE COURT:  Well, I disagree.  I agree with the

23  defendant.  The issue of INRs and what the therapeutic range

24  is, whether it's evidence of, of over-anticoagulation or not

25  was raised and he was asked several questions about it.

1    So I don't think I can restrict him to just the one or

2    two that you all asked him about.  He clearly offered

3    opinions about how to characterize those particular INRs.

4    That at a minimum put you on notice that he's got opinions

5    about the significance of those INR readings.

6        And if he said the things that you just said, some of

7    which I see that he did, some of which I don't know,

8    cross-examine him with it.  And if he admitted that, that he

9    never -- you have said that he never claimed that she was

10   over-anticoagulated on warfarin.

11       So you can cross-examine him if he now tries to say,

12   "Oh, yeah, this was -- warfarin wasn't working for her the

13   whole time."  I think that's, I think that's something

14   you're just going to have to pursue on cross-examination.

15       As to the second, as I understand it, defendant agrees.

16   And the issue there was the extent to which Crossley might

17   testify about what the FDA considered and whether they

18   approved or didn't approve of certain things.

19       The defendant acknowledges that this Court issued a

20   ruling pursuant to plaintiffs' motion to limit that

21   evidence.  And they've indicated that they intend to abide

22   by it.

23       I went back and re-read those four or five pages of the

24   opinion and I think that it was pretty clearly stated.  And,

25   so, I expect them to live with that.

1          MS. PEREZ:  Yes, Your Honor.

2     And we just want to clarify as to the topics that we

3  listed in our opposition to the motion, the fact that, you

4  know, he is a practicing cardiologist.  He prescribes

5  Pradaxa in accordance with the FDA approved label which does

6  not require monitoring and the effect he sees on his

7  patients from that.  We think that is not precluded by the

8  Court's order and we just wanted to confirm.

9          THE COURT:  I agree.  I don't think that would be

10 precluded by it.

11         MR. ABNEY:  And we're not arguing that, Your

12 Honor.

13         THE COURT:  Right.

14         MR. ABNEY:  We gave you some examples.  I mean,

15 he, he would make a statement and when he was asked, "What

16 data do you have to support that statement," he would run

17 back to his, you know, talking point of, "Well, the FDA

18 reviewed all of that data and they approved it as safe and

19 effective, so that's the data I'm talking about."

20         THE COURT:  Uh-huh.

21         MR. ABNEY:  And I think that's improper.

22         MS. JONES:  Just to be clear, I do think on the

23 condition he is permitted to say, "When I make judgments

24 about whether a medicine is appropriate, part of what I rely

25 on is the FDA's judgment based on his review of the data."

1   I don't think that's an inappropriate statement for him to

2   offer as a clinician.

3           THE COURT:  I agree, but I think he probably needs

4   to stop there because I think when he starts trying to get

5   into an answer that implicates the data and the analysis

6   underlying it, he's going beyond what he can do.

7           MS. JONES:  Okay, understood.

8           THE COURT:  Okay?  All right.  We're on track for

9   your witnesses this morning?

10          MS. JONES:  They are here.

11          MR. LEWIS:  Yes.  We'll start with Dr. Shami.

12          THE COURT:  Okay.  I've, I've gone through most of

13  the instruction issues that you left me with last week.  I'm

14  going to be working through the day with Blake to try to put

15  those into some draft shape.

16      My plan at this point would be to try to get that to

17  you most likely right after lunch, give you the afternoon

18  and a while this evening.  I'm probably -- depending on how

19  long we go with these witnesses, I'm probably going to

20  require you to stay over this evening after we finish the

21  evidence today, whatever we get through, to take up the

22  instructions and try to wade through most of it, if not all

23  of it.

24      Do you still sense that we're probably looking at a day

25  and a half of testimony for these two experts?

1120

```
1          MR. LEWIS:  Yes.

2          THE COURT:  Okay.  So we'll kind of track that.

3    But I, I want to keep moving towards final instructions and

4    certainly still intend to make sure that we have an adequate

5    conference on the record to let each side voice any final

6    objections.

7       And then did you get anywhere with the verdict form

8    yet?

9          MR. CHILDERS:  We sent out a version yesterday

10   afternoon.  Hopefully we'll hear back from the defendants.

11         MS. JONES:  I don't think our views on what we

12   talked about last week have changed.  I think the only

13   change we got yesterday was something in a particular part

14   of the verdict form.  So we'll need some time with the Court

15   on that because we do have probably four or five material

16   issues we need to sort through.

17         THE COURT:  Okay.

18         MS. JONES:  And I assume both sides will want to

19   use the verdict form in closing.  So with that in mind --

20         THE COURT:  Sure.  Well, I haven't looked at what

21   was originally submitted by either side yet.  Is your

22   proposal yesterday significantly different from that?  Do

23   you remember?

24      Why don't you all just send Blake your latest version,

25   understanding that you all haven't read it yet, or at least
```

1    haven't finished reviewing it yet.  And then maybe you can

2    let us know later this morning or at noon when you expect to

3    have a counter proposal or something so we can at least

4    start seeing where the differences are between the two

5    approaches.

6            MS. JONES:  Okay.

7            THE COURT:  Is there anything else we need to take

8    up before we start?

9            MR. CHILDERS:  We did have a few outstanding

10   objections to the exhibits they told us they were going to

11   use.  We can start with Dr. Shami I guess.

12           THE COURT:  All right.

13           MR. CHILDERS:  I'm sorry.  I'm having to do this

14   off the top of my head.

15           MR. LEWIS:  There were four objections.

16           MR. CHILDERS:  The first was the Coumadin label

17   which she did not list as a reliance material in either of

18   her reports and did not reference specifically in her

19   report.  Also the Plavix label, same issue.  She didn't, she

20   didn't list it as a relied upon material or reference it

21   specifically in her report.

22       The death certificate, believe it or not, was not

23   something that she relied on either or listed as a reliance

24   material in any of her reports.

25       And then, finally, that summary INR chart that we have

1    sort of been talking about today with Dr. Crossley, we had

2    objections to some of the slides being incorrect.  We gave

3    those to the defendants on Wednesday.  They did send us back

4    a new version but it was after 10:30 last night and we

5    haven't had a chance to go through it.  It's a very

6    voluminous document.

7        And, so, we object to using that with either of these

8    witnesses until we actually have some time to go through

9    page by page to make sure that it was changed.

10           THE COURT:  Okay.  So you wouldn't object to them

11   using the underlying INR report but not using the chart.

12           MR. CHILDERS:  Correct.

13           THE COURT:  Well, I think under the circumstances

14   my understanding was at the time you presented it, you

15   agreed that you had not developed that chart in advance or

16   given it to plaintiffs in advance.  You represented that all

17   the records underlying it were attached.

18       I have no problem with you using the underlying

19   records.  But if there's a dispute that remains about the

20   accuracy of the chart, then you probably best use the

21   underlying records so we don't have a problem.

22           MR. LEWIS:  Well, I intend to use what I've used

23   before which was the demonstrative that shows the in and out

24   of range for the INR that was created.  That's not going to

25   go back to the jury.

1          THE COURT:  Right.

2          MR. LEWIS:  And then we have the -- let the

3    plaintiffs have more time to review the summary I guess.  I

4    mean, we made the corrections that they asked us to make.  I

5    don't know why that's going to be such a hold-up, but I

6    would ask that they promptly look at that.

7          THE COURT:  When is the, that person expected to

8    testify?

9          MR. LEWIS:  Dr. Shami is going to be the first

10   witness.

11         THE COURT:  First?

12         MR. LEWIS:  Again, I can work through the

13   examination by only using the demonstrative, but I

14   definitely want to get that document into evidence.  And

15   we've done what the plaintiffs have asked us to do on that

16   document.

17         THE COURT:  Well, how much more do you think --

18   how much more time do you think you need to review it?

19         MR. CHILDERS:  When we got it the first time it

20   took a few hours to go through because it was -- you saw --

21   a lot of pages.  And we found mistakes.  So we want to make

22   sure, again, that mistakes were corrected.

23         MR. LEWIS:  Well, if I recall correctly, the

24   request was to add additional INR readings that were in the

25   medical records to the chart, which is what we did.

1        MR. CHILDERS:  That's not accurate, Judge.  That's

2   not -- we had a whole list of requests, I'm happy to share

3   them with the Court, that related to incorrect information

4   being on the chart, having INRs listed when she was on

5   Pradaxa, not warfarin, having the same reading listed more

6   than once.  I mean, there were all kinds of issues.

7        THE COURT:  Well, given that plaintiffs have

8   raised that objection, and I'm going to take Mr. Childers at

9   his word that they go beyond just additions, you can't

10  authenticate the chart at this point.

11       MR. LEWIS:  Okay.

12       THE COURT:  So I couldn't let you use it unless we

13  get to that point.

14       MR. LEWIS:  Understood.

15       MS. JONES:  But Your Honor's question I think is

16  well-taken because we're raising it toward the end of trial.

17  We're going to be very soon at the end of our case where we

18  would want all of the evidence we need in the record.

19     I understand we just sent it to you last night, but

20  what is a realistic time frame for getting that I think is

21  the question that we would have at this juncture.

22       THE COURT:  Well, I don't want to invite them to

23  go into a stall tactic here.  The problem is this, this is a

24  piece of evidence --

25       MS. JONES:  Uh-huh.

1    THE COURT:  -- that you all probably should have

2  presented to them before trial and said, "Here's the chart

3  that we want admitted into evidence under the rule that is a

4  substitute for all of the underlying documents that are

5  voluminous."

6    So it's your-all's burden to establish those things and

7  I'm not faulting either side.  But if you wait until trial,

8  you run the risk that they don't have time or not only do

9  they have a shortage of time to go through it, they find

10  things wrong that throw it into doubt.  So that seems to be

11  where we are.

12    MS. JONES:  But using a collection of the

13  underlying records is not an issue with the witnesses today.

14    THE COURT:  Well, if they're authenticated

15  otherwise, no.  And I don't think there's been any dispute

16  from either side that --

17    MS. JONES:  Okay.

18    THE COURT:  -- about medical records.  But if the

19  chart becomes the evidence, you have to authenticate it to

20  get it into evidence.  And right now I don't think that's

21  going to be successful given the level of problems Mr.

22  Childers has got.

23    MR. LEWIS:  Okay.

24    THE COURT:  So, then, these other three, so what

25  do you say?

1    MR. LEWIS:  So on the death certificate, the death

2  certificate was right in the medical records that were

3  collected from Salim-Beasley.  There's a --

4    MS. JONES:  We disclosed it.

5    MR. LEWIS:  They reviewed all the medical records.

6    THE COURT:  The way I view this is really this is

7  the way they've raised it.  I'm assuming there's kind of two

8  issues.  But one is getting the document in.  That death

9  certificate is already here in evidence.

10    MR. LEWIS:  It's already in.

11    THE COURT:  So really what they're saying is she

12  didn't rely upon it in her disclosures, so she can't now

13  rely upon it to give an opinion.  So how were you intending

14  to use it?

15    MR. LEWIS:  Well, she indicated that she reviewed

16  all of the medical records that were provided by the

17  plaintiffs.  And there's a Bates number right on the death

18  certificate that indicates that it's from Salim-Beasley LLC

19  which is the entity that was used to produce the medical

20  records.

21    THE COURT:  I haven't seen the report.  So what

22  did she conclude about it?

23    MR. LEWIS:  She says that the death summary

24  indicated that cardiac arrest was the cause of death.  And

25  that's in her case specific report.  It's the very last

1    sentence of her report.

2         MR. CHILDERS:  I agree she said that.  The death

3    summary is a medical record.  It's not the death

4    certificate.  The records that she reviewed, she

5    specifically listed out from each provider.  She didn't say,

6    "I looked at every medical record that plaintiffs produced."

7         And what she listed as -- what she says was listed in

8    the death summary as the cause of death is not what it says

9    on the death certificate.  So I don't believe they have

10   referenced it.  They definitely didn't -- she definitely did

11   not list it as a specific document that she relied on for

12   her report.

13        MR. LEWIS:  It wasn't -- I'm sorry.  I didn't mean

14   to interrupt you.

15        MR. CHILDERS:  I'm trying to find the report, Your

16   Honor, so we can see specifically what we're talking about

17   and not have to think of it in a vacuum.

18        MR. LEWIS:  It's not, it's not individually as one

19   page called out as reliance material in her report, but she

20   relied on the medical, voluminous medical records which were

21   provided by the plaintiffs in this case.  They produced a

22   Bates numbered set of medical records.  The death

23   certificate is -- I believe it's Bates Number 1 if I recall

24   correctly of the records that were provided by the, by the

25   plaintiffs.  So she's familiar with the document.

1        MR. CHILDERS:  This is her report.

2        MR. LEWIS:  She testified and gave an opinion in

3   the very last summary of opinions that the recognized cause

4   of death.

5        THE COURT:  Well, what, what do you think she's

6   referring to when she says --

7        MR. CHILDERS:  There's a medical record actually

8   called a death summary that more closely follows this.  The

9   death certificate doesn't say cardiac arrest anywhere.  It

10  says cardiopulmonary arrest.  And then it says myocardial

11  infarction.

12    She's talking about a medical record.  She's not

13  talking about the death certificate.  I don't have any

14  problem with her talking about of any these records that she

15  listed.  But I went and looked through all these records and

16  the death certificate wasn't included in any of them.  It's

17  a separate document.

18       MR. LEWIS:  She has indicated --

19       THE COURT:  Well, do you intend -- so what are you

20  objecting to exactly then?  I thought you were objecting to

21  the exhibit.

22       MR. CHILDERS:  I'm objecting to her relying on an

23  exhibit that she's never told us she's ever utilized.

24       MR. LEWIS:  She's clearly offered -- I mean, she

25  referred to -- there are various documents that talk about

1    the cause of death.  She's seen the death certificate.  It's

2    not inconsistent.

3                THE COURT:  Honestly, I think they can ask her

4    what she relied upon.  And if she says she's seen the death

5    certificate, she can testify about the death certificate.

6    If she -- you can cross-examine her about what -- if that's

7    actually what she had seen, that she didn't use the same

8    phrase.

9        I can't tell from that what she relied upon, but I

10   don't think it's sufficient for me to exclude that she might

11   have been relying upon the death certificate that's part of

12   the medical records.

13               MR. LEWIS:  On the label -- the labels for Plavix

14   and Coumadin were not specifically listed as reliance

15   materials.  The basis for her looking at those are that

16   she's been a practicing physician, gastroenterologist, seen

17   those labels numerous times throughout her practicing career

18   and that's -- and her opinions are premised upon her

19   training and experience and in treating other physicians in

20   addition to reviewing the medical records.

21               THE COURT:  Well, but an expert has to disclose

22   the basis of their opinions when you're using them as an

23   expert witness, not just a treating physician.  And if she

24   provides an explanation in her reports of what she relies

25   upon, then, yes, she may well have seen the Coumadin label

1    500 times.  But if she doesn't say, "I'm relying upon the

2    Coumadin label," she can't rely upon it now.

3                    MR. LEWIS:  Well, may I?

4                    THE COURT:  Yes.

5                    MR. LEWIS:  When it's something broadly, training,

6    experience, and treating patients as a basis, and that

7    encompasses reviewing labels, then that's fair game for her

8    to rely upon her review of those labels for purposes of her

9    opinion.

10       To the extent that there were specific records that

11   otherwise wouldn't be encompassed within her training and

12   experience as a clinician, a practicing clinician, those

13   were specific recall.  Her general report talks about

14   warfarin and all of the various risks associated with it

15   that she's familiar with from her practice.  So the label is

16   a supplement to that, that testimony.

17                   THE COURT:  Well, that strikes me that the label

18   is becoming additional evidence beyond what she testified

19   about or explained as the basis for her opinion.

20                   MR. LEWIS:  I can just ask her if she's reviewed

21   the label and is familiar with risks of these particular

22   medicines as part of her training and experience and not

23   introduce the label itself.

24                   THE COURT:  I think you can do that.

25                   MR. LEWIS:  Okay.

1      MR. CHILDERS:  Understood.  Same with the Plavix

2  label I take it, Your Honor.

3      MR. LEWIS:  Yeah.  I was covering both of them.

4      THE COURT:  Okay, all right.

5      MR. LEWIS:  And then there was one other issue I

6  believe.

7      THE COURT:  There was four.  That's four.

8      MR. LEWIS:  Was that four?  Okay.

9      MS. JONES:  There were issues as to Dr. Crossley.

10  Some of them are overlapping.  We've talked about the INR

11  issue.  I assume that Your Honor's ruling would apply

12  equally -- I'm sorry, I'm losing my voice a little bit --

13  would apply equally as to the death certificate for Dr.

14  Crossley, but we can certainly talk about that in greater

15  detail if that's not the case.

16      THE COURT:  I don't know what you mean.

17      MS. JONES:  Well, they've raised a similar

18  objection to Dr. Crossley being shown the death certificate

19  for Mrs. Knight during his direct examination whenever we

20  get to that.

21      I think our response would be fundamentally the same,

22  which is these people, at least experts, have plainly

23  disclosed opinions on the cause of death.  And he, I think,

24  specifically invoked myocardial infarction and referenced

25  the fact that he had looked at the medical records.  So I

```
1   think the analysis would be the same.

2           THE COURT:  Okay.  I see what you're saying.  I

3   agree.

4           MS. JONES:  There's a reference to additional

5   medical records and I'm not even sure exactly what this one

6   is.  Okay.  The 9017 is not an issue.  And then there was an

7   article that they've objected to.  Let us confer about that.

8   We may be able to work that out.

9           THE COURT:  Okay.  I haven't seen any of this.

10          MR. MOSKOW:  Our agreement is that we object by

11  8:00 a.m. in the morning.  We disclose by 8:00 p.m. the

12  previous evening and we object and try to work through them.

13          MS. JONES:  May I raise one other issue?

14          THE COURT:  Yes.

15          MS. JONES:  You had asked us to go back and take a

16  crack at revising the failure to test jury instructions.  We

17  had them emailed over the weekend.  We couldn't reach

18  agreement.  Should we just go ahead and submit our

19  respective proposals on that so you can consider that?

20          THE COURT:  Yes.

21          MS. JONES:  Okay.

22          THE COURT:  Did you intend to offer some

23  instructions concerning the Medication Guide?

24          MS. JONES:  Well, I guess we were intending to be

25  guided by however Your Honor ruled on the directed verdict
```

```
 1   motion.
 2          THE COURT:  Well, at this point, I think -- I'm
 3   still reserving judgment on it.  I am considering that I may
 4   agree with you in part such that I would instruct the jury
 5   in a limiting instruction concerning the theory that the
 6   Medication Guide issue has been relied upon by plaintiffs as
 7   part of the failure to warn.  I don't want to go through
 8   that whole discussion again.  You know what I'm talking
 9   about.
10          MS. JONES:  Yeah.
11          THE COURT:  So if you're going to offer an
12   instruction about that, I'd like you to prepare that.
13          MS. JONES:  Okay.
14          MR. LEWIS:  May we have two or three minutes?  I
15   just want to inform the witness of the rulings.
16          THE COURT:  Yes.  What time is it?
17          MR. MOSKOW:  It's about a quarter of, Your Honor.
18          THE COURT:  Okay.  Yeah.
19          MR. LEWIS:  Thank you, Your Honor.
20          MS. JONES:  Thank you, Your Honor.
21          MR. MOSKOW:  Thank you, Your Honor.
22       (Recess taken from 9:46 a.m. until 9:50 a.m.)
23          THE COURT:  Good morning.  All right, so we're
24   ready to proceed?
25          MR. CHILDERS:  Yes, Your Honor.
```

1   MR. MOSKOW:  May I have 30 seconds, Your Honor?

2   THE COURT:  Yes.

3   MR. LEWIS:  Your Honor, we're going to start with

4   the summary.

5   THE COURT:  Yes.  That's what I was going to do

6   first.

7   MR. MOSKOW:  All set, Your Honor.

8   THE COURT:  All right.  Let's bring the jury out.

9   (Jury returned into the courtroom at 9:52 a.m.)

10   THE COURT:  Good morning, ladies and gentlemen.

11   Be seated.

12   Welcome back.  I think I may have mentioned when we

13   left here on Wednesday it's unusual to have a four-day

14   hiatus break in a trial like this.  And, so, I've decided

15   and so inform you all and the parties that I wanted the

16   parties to prepare some type of a brief summary of the

17   testimony of the witnesses that you've heard thus far as an

18   aid to refresh your recollection as we start again this

19   morning.

20   Today you're going to be hearing witnesses from the

21   defendant.  But before we do that, I'm going to ask that the

22   parties provide this brief summary.  I've reviewed it.

23   I want to stress that this is just a summary that the

24   Court has asked the parties to develop as an aid to refresh

25   your recollection.  It is not evidence.  It is not an

1    exhibit that will be introduced into evidence.  It is not

2    any attempt by the parties or the Court to state to you what

3    the facts are that you must find.  Rather, it is simply to

4    help refresh your recollection about who testified.

5         As part of this they're going to show you the

6    photograph of the person who testified.  A couple of these

7    were live witnesses.  Some are videotape witnesses that

8    you've seen.

9         So as the parties do this, I'm going to ask first the

10   plaintiffs to go through their witnesses.  As you recall,

11   they completed their case.  The defendant had only called

12   one witness.  And, so, they're going to present that one

13   last.  It was very short.

14        But, again, this is just to help bring back your

15   recollection of these people and the testimony.  It will

16   always be your responsibility to decide what the evidence

17   was and what the facts are of this case.

18        With that, Mr. Childers, you can present the

19   plaintiffs' portion.

20              MR. CHILDERS:  Thank you, Your Honor.

21        Good morning, everyone.  Can everybody hear me okay?

22   All I'm going to do is read what's on the, the slides.

23        The first witness was Dr. Jeffrey Friedman, therapeutic

24   area head, cardiovascular, Boehringer.  Testimony addressed:

25        Pradaxa development; Pradaxa's safety risks and

1   efficacy; role of kidney -- excuse me -- role kidney

2   function plays in Pradaxa blood levels; exclusion of

3   patients with severe renal impairment from Pradaxa clinical

4   trials; and identifying people at high bleed risk on

5   Pradaxa.

6        Michelle Kliewer was the second witness, Director of

7   Regulatory Affairs for Boehringer.

8        Her testimony addressed:

9        Pradaxa regulatory issues; communications between

10  Boehringer and the FDA regarding Pradaxa; Pradaxa's

11  physician and patient warnings, and communications between

12  Boehringer and the FDA regarding these warnings; and

13  Boehringer's duty to ensure Pradaxa warnings are complete

14  and accurate.

15       The third witness was Dr. Laura Plunkett, plaintiffs'

16  expert witness, pharmacology, toxicology, regulatory.

17       She provided opinions regarding:

18       FDA regulatory requirements; Pradaxa's warnings and

19  whether they are adequate; Pradaxa's safety and risks and

20  efficacy, including the 75-milligram dose; and Boehringer's

21  legal duty to ensure Pradaxa warnings are complete and

22  accurate.

23       The next witness was Dr. Dawn MacFarland, Betty

24  Knight's primary care physician when Betty Knight was first

25  prescribed Pradaxa in October, 2011.

1    Testimony addressed Betty -- the testimony addressed

2    Betty Knight's medical history, including her use of

3    warfarin from the mid 2000s to October, 2011; her switch

4    from warfarin to Pradaxa in October of 2011; and her

5    knowledge about Pradaxa at the time it was first prescribed

6    to Betty Knight.

7        The next witness was Dr. Ahmed Abdelgaber, Betty

8    Knight's primary care physician from April, 2013, until her

9    death in September, 2013.  His testimony addressed Betty

10   Knight's medical history, including:

11       May, 2013, GI bleed and hospitalization; her health

12   issues following the May, 2013, bleed; the causes of her

13   death.  And he testified about his knowledge of Pradaxa.

14       The next witness was Dr. Joanne Van Ryn, Pradaxa's

15   scientific support at Boehringer Ingelheim.  Her testimony

16   addressed:

17       Pradaxa's development; Pradaxa's safety and risks and

18   efficacy; relationship between patient characteristics,

19   Pradaxa exposure, and bleeding risk; and the increase in

20   Pradaxa blood level increases bleeding risk.

21       The next witness was Dr. Hazem Ashhab, plaintiffs'

22   expert witness, Board Certified in gastroenterology and

23   internal medicine, the practicing physician in the

24   Charleston area, provided opinions regarding:

25       Betty Knight's warfarin and Pradaxa use; Pradaxa's

1   warnings and whether they were adequate; Betty Knight's

2   medical history, causes of Betty Knight's May, 2013, GI

3   bleed; Betty Knight's health following the May, 2013, bleed;

4   and causes of Betty Knight's death.

5        Plaintiffs' next witness was Dr. Martina Brueckmann,

6   Deputy Therapeutic Area Head, cardiovascular at Boehringer.

7   Her testimony addressed Pradaxa's development; Pradaxa's

8   safety, risks and efficacy; the relationship between patient

9   characteristics, Pradaxa exposure, and bleeding risk; and

10  Boehringer's duty to minimize risk to patients.

11       Plaintiffs' next witness was Rick Knight, plaintiff,

12  son of Betty Knight.  His testimony addressed:

13       Betty Knight's family, health, work, and travel; the

14  decision to switch Betty Knight from warfarin to Pradaxa in

15  October, 2011; Betty Knight's prior history reading

16  medication labels; and Betty Knight's health before and

17  after her May, 2013, gastrointestinal bleed.

18       Plaintiffs' final witness was Claudia Stevens, also

19  plaintiff and daughter of Betty Knight.  Her testimony

20  addressed:

21       Betty Knight's health, medications, and family life;

22  the decision to switch Betty Knight from warfarin to Pradaxa

23  after Claudia saw a Pradaxa television commercial; Betty

24  Knight's prior history reading medication labels; and Betty

25  Knight's health before and after her May, 2013,

1   gastrointestinal bleed.

2            THE COURT:  All right.  Mr. Lewis.

3            MR. LEWIS:  May it please the Court, members of

4   the jury, good morning.

5       Defendant's first witness was Dr. Charles Huh.  He was

6   a gastroenterologist at St. Mary's who treated Betty

7   Knight's May, 2013, gastrointestinal bleed.  He testified

8   the procedure he performed to stop the bleeding.

9       Thank you.

10           THE COURT:  All right.

11      Again, ladies and gentlemen, the summary you just heard

12  was an aid for your use to refresh your recollections about

13  the testimony of the witnesses.  That summary was not

14  evidence and you may not rely upon any part of that summary

15  in determining the facts or reaching your verdict in this

16  case.

17      With that, are we ready to call the next defense

18  witness?

19           MR. LEWIS:  Yes, we are, Your Honor.

20           THE COURT:  Go ahead.

21           MR. LEWIS:  Defense calls Dr. Vanessa Shami.

22           THE COURT:  All right.

23      Doctor, if you'll step up here, my clerk will

24  administer the oath.

25           **VANESSA SHAMI, DEFENDANT'S WITNESS, SWORN**

Vanessa Shami - Direct (Lewis)

1                          DIRECT EXAMINATION

2    BY MR. LEWIS:

3    Q.   Good morning, Dr. Shami.  How are you?

4    A.   Good morning.  I'm well.  How are you?

5    Q.   Could you please introduce yourself to the jury?

6    A.   Sure.  My name is Vanessa Shami.  I'm a

7    gastroenterologist from the University of Virginia.  I

8    practice -- I'm a professor there.  I've been there since

9    1992.

10        So I actually started medical school there and did my

11   formal internal medicine residency training there.  I did my

12   gastroenterology fellowship there as well, and then did an

13   interventional, which is fellowship where I do more kind of

14   complex procedure learning at the University of Chicago, and

15   then came back on faculty 16 years ago.

16   Q.   Okay.  Thank you very much.  We'll get into a little

17   bit of your background later.  But, generally speaking, do

18   you treat patients?

19   A.   I do.  I treat patients four days out of the five days

20   formally.  When I'm on service or call, I'll treat patients

21   seven days a week.

22   Q.   Okay.  And, generally speaking, are you also a

23   professor?

24   A.   I am.  A professor basically means -- in an academic

25   institution it means that, you know, initially you come in

Vanessa Shami - Direct (Lewis)

1    in your clinical -- you're an assistant.  Then you have to

2    submit paperwork and prove that you've done research, that

3    you've done accurate clinical work.  Then you apply for

4    associate; and then after that, tenure; and then

5    professorship.

6         So it's kind of a long process, but after, after a few

7    years, if everything is going well, then you become a

8    professor.

9    Q.   Okay.  And as far as being a clinician, someone who

10   treats patients, how long have you been doing that?

11   A.   So I've been treating patients as an attending

12   physician for 16 years.

13   Q.   And how long have you been teaching med students and

14   other students the topics that you teach?

15   A.   Sixteen years as well.

16   Q.   All right.  And at one point in time did you treat some

17   folks from the Charleston area?

18   A.   I, I have.  And, so, the thing about the University of

19   Virginia is that we have a very large referral base.  And,

20   so, we do treat patients from Charleston a little bit more

21   than before.  I think Charleston has grown a lot and has

22   very good physicians.  But, yes, we do treat patients from

23   Charleston.

24   Q.   Okay.  Now, the one thing you haven't done in 16 years

25   is what you're doing today; right?

Vanessa Shami - Direct (Lewis)

1   A.   That is correct.  This is the first time I've ever been

2   in a courtroom.

3   Q.   Okay.  And, so, you don't make it a practice to testify

4   on a regular basis for lawyers or parties in litigation; is

5   that right?

6   A.   Absolutely not.  That is correct.

7   Q.   All right.  And this is your first time.  If you're a

8   little nervous or whatever, it's expected.  We're all

9   nervous.

10  A.   I appreciate that.

11  Q.   All right.  Doctor, I asked you to do five things.  And

12  I want to discuss those five things with you at a high level

13  right now and we'll get into more detail later on in the

14  testimony.

15       But one of the, one of the five things that I asked you

16  to do in this case was to look into whether warfarin was a

17  safe and effective option for Mrs. Knight.  Were you able to

18  do that for me?

19  A.   I was.

20  Q.   And do you have an opinion about that topic?

21  A.   Yes.  So let me start by saying warfarin is a perfectly

22  good drug.  We've had it for many, many years.  We've had it

23  since I was in medical school.  So I'm very familiar with

24  the drug.

25       The hard part about warfarin is trying to keep it

Vanessa Shami - Direct (Lewis)                    1143

1    within a certain range.  It's very challenging for patients.

2    It requires a certain diet.  It requires blood work, dose

3    adjustment.

4         And if you're not in that range, if it's too low, if

5    your what we call the INR, which is the blood test that we

6    check, if it's too low, then patients are at risk for, you

7    know, stroke and emboli, so clots.  If it's too high, then

8    patients can have bleeding.

9    Q.   Okay.  And did you make a determination as to whether

10   or not warfarin was a safe and effective option for Mrs.

11   Knight?

12   A.   I did.

13   Q.   And what was that determination?

14   A.   So if you look at her INRs over time, they fluctuated

15   quite a bit.  Usually we as physicians globally think of

16   wanting to have that INR range within 2 and 3 about

17   70 percent of the time or more.

18        Unfortunately in the case of Ms. Knight, which is very

19   common in certain patients, that range wasn't reached over

20   50 percent of the time.  So her chances of actually having

21   bleeding or clots form were, were high.  So it was not the

22   perfect drug for her.

23   Q.   Okay.  Now, the second thing I asked you to do was to

24   look into whether Pradaxa was a safe and effective option

25   for Mrs. Knight.  Were you able to do that?

Vanessa Shami - Direct (Lewis)                              1144

1   A.    I was.

2   Q.    And did you draw an opinion as to that topic?

3           MR. CHILDERS:  Your Honor, I apologize.  May we

4   have a sidebar?

5           THE COURT:  Yes.

6           (Bench conference on the record)

7           MR. CHILDERS:  Your Honor, I have the report here

8   for you.  First, that's not one of her opinions.  This is,

9   again, not one of her opinions that's listed in her report.

10          THE COURT:  Which opinion are you referring to

11  now?  About Pradaxa?

12          MR. CHILDERS:  I let it go with warfarin because I

13  thought that was the end of the questioning.  She was never

14  asked if Pradaxa is an appropriate medicine for her.  In

15  fact, she doesn't prescribe Pradaxa to patients.  It's not

16  one of her opinions.  It's not included in anything she

17  disclosed.

18          MR. LEWIS:  It clearly is.  Her -- all of her

19  testimony is specific causation testimony all about Mrs.

20  Knight.  She reviewed all of the medical records and she

21  concluded that warfarin was not a good option for her and

22  that Pradaxa was a good option for her.

23          THE COURT:  Where does she say that in the report?

24          MR. LEWIS:  Can I get my note?  I didn't know it

25  was going to be challenged.

1          THE COURT:  Yes.

2      (Pause)

3          MR. CHILDERS:  It goes on to the next page, Your

4   Honor.

5          MR. LEWIS:  In her, in her specific report on

6   Pages 1 and 2 she didn't --

7          THE COURT:  Is this it?

8          MR. LEWIS:  Yes.  She goes through the extensive

9   history of Mrs. Knight with warfarin, including the fact

10  that she had a suspected GI bleed in 2008.

11      And in her depo she does that as well.  Between Pages

12  106 and 112 she was questioned extensively about the

13  particular GI bleed that she had on warfarin and that was a

14  problem.

15      Also in the specific report that Your Honor has in

16  front of him, she indicates that the records show that she

17  had a challenge keeping the INR in the therapeutic range

18  which is the basis for her testimony that warfarin is not a

19  safe option.

20          THE COURT:  Where is that?

21          MR. LEWIS:  It's on Page 2 of --

22          THE COURT:  Okay, okay.

23          MR. LEWIS:  So that was -- that's the basis of it.

24  I mean, that's --

25          THE COURT:  Well, take me to the second opinion

1    that Pradaxa was safe and effective.

2         MR. LEWIS:  Right.  So then she discusses in her

3    specific report picking up in October of 2011 the fact that,

4    number one, she had no problems with Pradaxa prior to that.

5    And she also said she had no problems with Pradaxa prior --

6    there were no problems indicated in the medical records with

7    Pradaxa prior to the stent procedure and that she started

8    triple therapy after the stent procedure in April of 2013,

9    and that has a significant risk of bleeding with it.

10        And then she also cites to the doctor notes that talk

11   about Mrs. Knight tolerating the Pradaxa and that it could

12   not be held if she needed it because later on in 2013 the

13   doctor said that she could not hold Pradaxa.

14        THE COURT:  So she, she didn't offer the specific

15   general opinion that Pradaxa was safe and effective for her?

16        MR. LEWIS:  I should show you the general report

17   as well.  She did a general report and a specific report.

18   And, so, she absolutely does in the general report.  I

19   thought the challenge was with Mrs. Knight specifically.

20        In her general report she goes through the warfarin and

21   its risks and benefits and Pradaxa and its risks and

22   benefits in her general report at length.  Maybe I should

23   get that for you too.

24        But when you combine the general report where she's

25   talking generally about the safety and efficacy of the risks

1   and benefits of both drugs, and then in the specific report

2   she applies the circumstances to this particular plaintiff.

3              MR. CHILDERS:  Which would be fine, Judge, if she

4   actually said that in her case specific report, but she

5   never did.  She didn't say that in her deposition.  In fact,

6   she said, "I don't prescribe Pradaxa."

7       And, so, to get up here and say, "I've asked you to do

8   five things for me, one of which is tell me if Pradaxa is

9   appropriate," that's not in the report.

10             THE COURT:  Well, I'm going to sustain the

11  objection.  I think you can go through her opinions.  It

12  seems to me that what you've cited is perhaps a basis for

13  her to reach a conclusion that Pradaxa was safe and

14  effective.

15      But if she doesn't say that directly in her report, I

16  think you've got to wade through the particulars that she

17  did say in her report, and you can use those.

18             MR. LEWIS:  I can show Your Honor the general

19  report then?  Because that's going to -- I mean, that's

20  going to inform Your Honor on her specific opinions on the

21  drugs themselves.

22             THE COURT:  You know, probably not because

23  honestly if she provided that opinion and had that

24  discussion in her general report, she should have included

25  it here.

Vanessa Shami - Direct (Lewis)

1    And when I see a general report from an expert and then

2    a case specific report, the case specific report has to

3    include the specifics opinions that the expert is going to

4    testify to about the potential in the case.

5    So her general opinions about something may not be

6    applicable in the case specific report.  If, if it's -- if

7    she doesn't tie them together in her case specific report, I

8    don't think she can come in and testify about the general

9    things.

10   But you asked her more than just generally.  You said,

11   "Is Pradaxa safe and effective for Mrs. Knight?"  And I

12   don't see that she offered that specific opinion.

13   I see that you asked her about her course and what went

14   right or what went wrong or what didn't go wrong.  And I

15   think you can do that.  But I think you're going to have to

16   confine it to, to the way she addressed it in the report and

17   not now include some general all-encompassing opinion that

18   she didn't state in her report.

19             MS. JONES:  But we're allowed to go through with

20   her the specific instances that she views as signaling that

21   Pradaxa was an effective and safe medicine for Mrs. Knight?

22             THE COURT:  Absolutely.

23             MS. JONES:  Okay.

24             MR. LEWIS:  Okay.

25             THE COURT:  Sorry if it complicates your

Vanessa Shami - Direct (Lewis)

1  examination, but I think that's the way you have to address

2  it, the way she did in her report.

3             MR. LEWIS:  Okay.

4             (Bench conference concluded)

5             THE COURT:  All right.  I'm going to sustain the

6  plaintiffs' objection and direct defense counsel to reframe

7  the question that he's about to ask of the expert.

8  BY MR. LEWIS:

9  Q.   Dr. Shami, one of the things that I asked you to do was

10  to make a determination as to the cause of Mrs. Knight's GI

11  bleed that she experienced in May of 2013.  Were you able to

12  do that?

13  A.   I was.

14  Q.   Okay.  And did you make a determination as to whether

15  or not in connection with Mrs. Knight's GI bleed she was

16  over-anticoagulated on Pradaxa?

17  A.   So we don't use that word usually in clinical medicine.

18  We can use supratherapeutic, subtherapeutic.

19  Over-anticoagulated is a word that assumes that there is

20  actually a range for Pradaxa that has been defined.  So, no,

21  I, I mean, I don't think she was over-anticoagulated.

22  Q.   And as part of your review, did you look at

23  Dr. Ashhab's view that if Mrs. Knight had been on warfarin

24  instead of Pradaxa that she would not have suffered a bleed?

25  A.   I saw that.

Vanessa Shami - Direct (Lewis)

1  Q.   Do you agree with that?

2  A.   I absolutely do not agree with that whatsoever.  I

3  don't think anybody can say that if she were on a different

4  blood thinner, the outcome would have been different,

5  especially when we know what bled.  There's an AVM or, you

6  know, arteriovenous malformation.  It's clear that Dr. Huh

7  saw it.  We know it was bleeding.

8  Q.   Okay.  And the last thing I asked you to do was to look

9  into whether either Mrs. Knight's May, 2013, GI bleed or

10  Pradaxa led to her passing in September of 2013.  Were you

11  able to do that?

12  A.   I did look at that.

13  Q.   And Dr. Ashhab suggested that Pradaxa or the GI bleed

14  contributed to Mrs. Knight's passing.  Do you agree with

15  that?

16  A.   I disagree with that.  Would you --

17  Q.   Sure, if you want to briefly.

18  A.   So a few things is her repeat hospitalizations before

19  and after that.  The majority of cases were due to heart

20  issues.  So her course after that GI bleed was not very

21  different than her course in 2008 and 2011.

22  Q.   Okay.  We're going to talk more specifically about each

23  of those opinions and how you came about getting to them.

24  But let's just back up for a couple of seconds and again

25  talk a little bit about your education, your employment, and

                    Vanessa Shami - Direct (Lewis)

1    your training.

2        So let's first start with where you went to undergrad.

3    A.    Colgate University which is a small liberal arts school

4    in upstate New York.

5    Q.    And what was your degree?

6    A.    Biology.

7    Q.    And then did you go on to medical school after that?

8    A.    I did.

9    Q.    And where was that?

10   A.    The University of Virginia.

11   Q.    Okay.  And after -- and how long does that take

12   typically?

13   A.    It takes four years.

14   Q.    Okay.  And after that, did you do a fellowship?

15   A.    So after that, I did an internship and residency in

16   internal medicine.  And that was also at the University of

17   Virginia.  And then -- so that was three years.  And then I

18   did another three years of training as a gastroenterology

19   fellow at the University of Virginia.

20   Q.    Okay.  And what does it mean to be a fellow?

21   A.    So what a fellow means is, first of all, you need to

22   have completed your internal medicine education.  And you

23   need to eventually get board certification in internal

24   medicine.

25        After that, then you can choose a track in internal

Vanessa Shami - Direct (Lewis)                    1152

1   medicine.  It can be cardiology.  It can be

2   gastroenterology.  It can be nephrology, or kidneys.  So

3   there's numerous different paths you can potentially go to.

4   And I chose gastroenterology.  So I did three years of

5   gastroenterology training.

6   Q.   And did you eventually become Board Certified in

7   gastroenterology?

8   A.   I did.  So after my GI fellowship, I actually went to

9   the University of Chicago and did an additional year of

10  procedures, and then came back on faculty and then got my --

11  after that year, I did get Board Certified.

12  Q.   And is that something that has to be renewed or kept

13  up-to-date over time?

14  A.   It is.  So what we do is we have these maintenance of

15  certification points that we have to take, and they are

16  certain courses.  So you have to do that and you have to

17  renew.  So not only do you have to do course work, and it

18  can be through conferences, but in addition to that you have

19  to take a test every 10 years.  And, so, I've renewed once.

20  Q.   So you're currently Board Certified or you've been

21  recertified and you're under that certification at this

22  time?

23  A.   Correct, in gastroenterology.

24  Q.   Okay.  Now, are there some key organizations that folks

25  in your space typically join, gastroenterologists, things

1    like that where they learn maybe from others or go to

2    training programs or seminars?

3    A.    Yes.  So there are three major societies in

4    gastroenterology.  Those are the American College of

5    Gastroenterology, the American Society for Gastrointestinal

6    Endoscopy, and the American Gastroenterology Association.

7    Q.    And do you have any leadership positions on any of

8    those organizations?

9    A.    So I do.  I work -- because the American Society for

10   Gastrointestinal Endoscopy focuses on endoscopy, scoping

11   procedures, and that's my specialty and my interest and

12   passion, I actually am on the leadership of that society.

13   Q.    Now, how many folks are on the leadership or the board

14   of that society?

15   A.    So 10 of us are.

16   Q.    And how big is the group that the board oversees?

17   A.    It's almost 15,000 gastroenterologists.

18   Q.    And what kinds of things do the folks on the board like

19   yourself end up doing for the greater population of

20   membership?

21   A.    So we represent the gastroenterologists in legislation

22   in terms of reimbursement.  We also are very crucial in

23   coming up with appropriate guidelines for patient care such

24   as, you know, GI bleeding, you know, what's the next test to

25   come up with an algorithm.  So we foresee that.  We actually

Vanessa Shami - Direct (Lewis)

1  basically run anything you would imagine with a, with a

2  society in general.

3  Q.    Now, I also noticed from your resume that you've had a

4  number of publications in the field of gastroenterology; is

5  that correct?

6  A.    That is correct.

7  Q.    A few dozen maybe.  I didn't count them all up.  But

8  what generally are the topics that you've published on?

9  A.    Yeah.  The majority of my topics are on, you know,

10  complex endoscopic procedures and outcomes; so, you know,

11  anything to do with endoscopy.

12      I do a lot of internal ultrasound biopsies.  So if

13  somebody has pancreatic cancer, I do a biopsy or lung cancer

14  I do it from inside out essentially.

15      I do a lot of resections.  I remove a lot of lesions

16  that patients would normally go to surgery for.  I do a lot

17  of -- I do actually a lot of GI bleeding only because often

18  times people are referred to us because they have a bleed

19  that can't necessarily be stopped elsewhere.  So anything,

20  you know, endoscopy related is kind of what I focus on and I

21  publish.

22  Q.    Do you also present at conferences where other

23  gastroenterologists are there to learn more about the signs

24  and treatment, diagnosis of things that are of interest?

25  A.    I do.  I do a lot of teaching.  I go to different

Vanessa Shami - Direct (Lewis)

1    institutions.  I was just at Northwestern.  I was just in

2    Guayaquil, Ecuador.  A lot of what I do is either I'm doing

3    the procedure, talking to the audience and the panel.

4    They're asking me questions while I'm actually doing the

5    procedure.  It's as stressful as being in court.

6          And then I also do a lot of lecturing.  So, you know, I

7    do a lot of post-grad, we call post-graduate courses.  And

8    those are anywhere between, you know, two to three thousand

9    gastroenterologists in the audience.  So -- and I enjoy it.

10   I enjoy teaching.

11   Q.   And do you sometimes get invited and then do procedures

12   while you're talking through the procedure so other folks

13   can see how to do maybe a treatment of a GI bleed or

14   something along those lines?

15   A.   Absolutely.  I just, again, in, in August was in

16   Ecuador and I did, I did cases.  Needless to say, it's, you

17   know, it's stressful.  And you feel a lot of responsibility

18   because you are doing procedures on people that, you know,

19   need them but may not necessarily be close-by all the time.

20   So --

21   Q.   Now, you're getting paid for your time here in court

22   today; is that correct?

23   A.   I am.

24   Q.   And that's approximately $600 an hour for your time?

25   A.   Yes, here.

Vanessa Shami - Direct (Lewis)

1    Q.    Here today.  And then in other work that you've done in

2    this case, you've gotten paid about $450 an hour; is that

3    right?

4    A.    That is correct.

5    Q.    Okay.  And this is your first time in court; right?

6    A.    It is.

7    Q.    All right.  With respect to the work that you did in

8    this case, did you bring -- and this may seem obvious.  But

9    did you bring all of the training and the experience and the

10   things that you've learned and taught other people to bear

11   here when you were forming your opinions?

12   A.    I did.

13   Q.    And let's talk about what else you did besides relying

14   on your training and experience in the clinical practice and

15   teaching.  Did you review some materials in this case?

16   A.    I did.

17   Q.    Did you review Mrs. Knight's medical records, for

18   instance?

19   A.    Absolutely, yes.

20   Q.    Did you review the depositions of the treating

21   physicians and other folks who worked with Mrs. Knight?

22   A.    I did.

23   Q.    All right.  And did you find that in looking at the

24   medical records that there were any gaps in the history of

25   Mrs. Knight's warfarin experience?

Vanessa Shami - Direct (Lewis)                                    1157

1   A.    So in 2008 there are, there are sizeable gaps in sort

2   of her hospital course and, and what had happened to her

3   warfarin, like why, you know -- before what I feel to be her

4   GI bleed in November of 2008.  She was off the warfarin for

5   a while.  And, so, it's kind of unclear what, you know,

6   prompted that before that 2008 hospitalization.

7         So, yes, there were gaps in her medical record.

8   Q.    And then as well I gave you -- I asked you to look at

9   Dr. Ashhab's testimony from the trial as well.

10  A.    You did.

11  Q.    And you looked at that as well?

12  A.    I did.

13  Q.    Okay.  And I might ask you some questions about that.

14        Before we get into specific things related to Mrs.

15  Knight, it might be helpful to do maybe a high level

16  tutorial on gastroenterology.

17        I'll call it Gastroenterology 101.  And do we have a

18  demonstrative that we could pull up for that?

19        Doctor, I think maybe just describe a little bit for

20  the jury what does gastroenterology entail and sort of where

21  this fits into this case.

22  A.    Sure.  So you can see on this patient who has an

23  extremely long neck, you can see that there is -- this is

24  the digestive tract.  So it involves the luminal tract which

25  is the esophagus here.  And then you've got the stomach.

Vanessa Shami - Direct (Lewis)                    1158

1   And then after the stomach, that's the upper GI tract.  So

2   this is the upper GI tract.  Okay?  And then this is the

3   colon.  So you can see the colon here.  Okay?

4       So that is what we usually cover with standard

5   endoscopy.  All the rest of the gut, which is the small

6   bowel, is in between that.  And when we do endoscopy, most

7   of the times we're not covering that area.

8       So my specialty has to do with this as well as the bile

9   ducts which are here, the pancreas, and, and liver.  So

10  anything that has to do with digestion, both the lumen as

11  well as the organs that help with digestion.  So we can go

12  to the next slide.

13      So looking at this figure -- and I need to erase if I

14  can -- I'm not sure how to erase this.

15  Q.   Is there a "clear" in the bottom right-hand corner?

16  A.   No.  So if we can -- perfect.  Thank you.

17      So if you look here, I just want you to keep in mind

18  the person, or this figure is looking at you.  So what you

19  would notice, you know, looking at it, left is actually

20  right because, again, the figure is looking at you if that

21  makes any sense.  It's facing you.

22      And these are the labels of the different parts of the

23  GI tract.  You can see the esophagus, which is our

24  swallowing tube.  We've got the stomach which collects the

25  food.  And anything that you see in that blue/purple color

1   is what we cover with the upper endoscopy.

2        Then this is the small bowel here, the duodenum we call

3   it, the first part of it.  Again, this is the small bowel

4   and this is the colon right here (indicating).

5        And so, again, since it's facing you, anything on your

6   right is the left of the patient.  And anything to the left

7   is the right of the patient if that makes any sense.  So

8   that is the GI tract close-up.

9        If we can go to the next figure.

10        So this is an upper endoscopy or EGD.  I'm sure you've

11   heard of this over the last few days.  When we do an upper

12   endoscopy, we take a scope with a camera.  We go down the

13   mouth and obviously the patient is sedated.  We look at the

14   esophagus, the stomach, and small bowel.  And that is the

15   amount of territory that it covers.

16        So you can see the majority of the GI tract is not

17   looked at.  Okay?

18        And then if we can go to the next, this is the

19   colonoscopy.  We're looking at the large intestine.  And

20   that's how far it covers.  So it goes all the way to the end

21   of the large intestine, but does not again cover the small

22   intestine.

23        So when we're doing an upper endoscopy and lower

24   endoscopy or colonoscopy, this is what we mean.

25        Now, one thing I want to emphasize is when you're

Vanessa Shami - Direct (Lewis)                    1160

1   having a GI bleed, it can be like a cut where you bleed red.

2   Okay.  So we all, you know, we bleed red when we're cut.

3       But in the GI tract sometimes the blood, if it's

4   digested, can be dark or black.  So that's why as

5   gastroenterologists we keep asking, "Have you had red blood?

6   Have you had dark blood?  Have you had black stools?"

7       Okay?  So that's extremely important to keep in mind.

8   So when we ask that as gastroenterologists, there is a

9   reason for that.

10      So if we can go to the next slide.

11      So this is a colon you can see there.  And there are

12  many reasons why people can bleed.  You know, this right

13  here is a depiction of an AVM.  It has a fern-like pattern

14  if you look at it.  And these are little vessels that come

15  up to the surface of, of the lumen.  Okay.  They're

16  irregular.

17      And the other thing about them is the walls are really

18  fragile.  Okay?  We see this all the time in GI.  They're a

19  major reason for bleeding, especially in elderly folks.

20  Okay?

21      They're managed very readily.  But you can see -- and

22  they can be actually anywhere in the GI tract.  But if

23  they're in the colon, they're usually on that right side of

24  the colon as you can see here.

25  Q.   And let me ask you just for a second, the jury's heard

1    a little bit about AVMs or arteriovenous malformation.  Did

2    I get that close?

3    A.   That was perfect.

4    Q.   Okay.  And can those occur in folks who are on no

5    medications at all?

6    A.   Absolutely.  We see it all the time.

7    Q.   And can they occur in folks who have anticoagulant

8    medicines that they're taking?

9    A.   Absolutely.

10   Q.   And does it matter what anticoagulant medication that

11   the folks are taking?

12   A.   No.

13   Q.   You've seen bleeds in your practice with folks off --

14   without any medicine or different anticoagulants?

15   A.   Correct.

16   Q.   Xarelto, Pradaxa, warfarin, or Coumadin, all of the

17   above.  Would that be fair?

18   A.   That is totally fair.

19   Q.   Okay.  So let's talk a little bit more about -- and I

20   think you were getting into this -- sort of how you go about

21   figuring out when someone presents to you with a suspected

22   bleed what they have and how to treat it.

23   A.   So when somebody presents, the first thing you're going

24   to do is you're going to ask them questions.  So you're

25   going to take a history; when did the GI bleed start, you

Vanessa Shami - Direct (Lewis)

1  know, what are you having?  Are you vomiting blood?  Because

2  if they're vomiting blood, you would think it's from that

3  upper GI tract.

4      And if we could go back a couple, it would be --

5  usually if they vomit blood it will be from -- one more --

6  somewhere in that blue -- one -- I'm sorry -- yeah, so

7  somewhere in that blue/purple area if they vomit up blood.

8  And when I say blood, again, I mean dark vomitous.  So black

9  or dark is blood or red.  Okay?  So that's, that would be

10 from the upper GI tract.

11     And then you ask them, "Have you passed red stools or

12 dark stools?"  So that's the next thing.  You always want to

13 look at their vital signs, you know; are they stable, is

14 their blood pressure okay, is their heart rate okay.

15 Because if it's not, if it's a really severe bleed, we will

16 actually manage them in the intensive care unit.

17 Q.   Okay.  And with respect to looking for an AVM that may

18 be in the colon, how would you go about figuring out whether

19 that may be the case and how would you go about treating

20 someone that had that that was bleeding?

21 A.   Yeah.  So if, if we're suspecting an AVM in the colon,

22 the way we would do it is do a colonoscopy.  So the first

23 thing we would do is have somebody drink that great old jug

24 of GoLytely usually is what we use.

25     And then we go ahead with the camera and the scope and

Vanessa Shami - Direct (Lewis)                    1163

1    we look at the entire colon.  We want to look really

2    carefully because they can sometimes be missed.

3         When we see the actual AVM, what we can do is we can

4    treat it.  So we can either, you know, we can inject it and

5    put a little heat on it.  We can clip it.  We can put a

6    rubber band around it.

7         So we have options on how to it treat these AVMs.

8    They're very -- again, we see them all the time.  They're

9    straightforward usually to treat, especially in the colon.

10   Q.   And as far as the timing of treatment, for most of the

11   times that you have to treat an AVM -- and, by the way, can

12   an AVM bleed when someone is not on an anticoagulant

13   medication?

14   A.   Absolutely, yes.

15   Q.   And if they are on an anticoagulant medication,

16   obviously a bleed could occur as well?

17   A.   Absolutely.

18   Q.   And if you had to describe what you would think from

19   your clinical experiences a successful treatment of an AVM

20   bleed, how would you describe that?  What characteristics

21   would there be about a successful treatment?

22   A.   If we can find the actual AVM bleed, once we see the

23   lesion, it's close to 100 percent.  Sometimes AVMs can be a

24   little tricky because they will be in the small bowel.  And

25   as we kind of stated, in that small bowel area it's kind of

Vanessa Shami - Direct (Lewis)

1  tricky to get to.  It takes special endoscopic equipment to

2  get to that area.

3  Q.   And as far as the timing of the hospital stay, what

4  would you say a successful treatment of an AVM bleed would

5  be?  What would the outcome be as far as timing a hospital

6  stay and how long someone took to kind of have the bleeding

7  stopped?

8  A.   Sure.  You know, we would consider it successful if you

9  can stop it within the first day or so.  And usually

10 hospitalizations aren't very long for AVM bleeds, especially

11 if we can find them and treat them.  It should only be a few

12 days.

13 Q.   Okay.  Now, the jury has heard in this case the fact

14 that anticoagulant medications across the board can increase

15 the risk of a bleed and also affect the amount and the

16 ability to stop a bleed.  And are you aware of that from

17 your experience as well?

18 A.   Yes.  So anticoagulants can definitely, you know,

19 increase the amount of a bleed.

20 Q.   And from your experience, is that something that's

21 well-known by folks who treat patients for bleeds like

22 yourself?

23 A.   Absolutely.

24 Q.   And with respect to the special circumstance of someone

25 who presents, say I present with a suspected bleed and I'm

1   on an anticoagulant medication, what's one of the first

2   things that you're going to do?

3   A.   So we usually will hold.  So obviously we'll assess you

4   like I described before, but we would hold that

5   anticoagulant.  And then we would go ahead and try to, try

6   to find the reason for the bleeding.

7        We're very fortunate now in that we have tools that we

8   can use.  And when I say that, the last 15 or so years we

9   have what are called clips.  They're little metallic clips

10  that literally can go onto the lesion and we close it

11  through the scope and they're very easy to use.  And you can

12  do that in somebody who's anticoagulated and it makes it

13  very easy.

14  Q.   And how soon after would you start someone back on an

15  anticoagulant medication if you treated them successfully

16  for a bleed?

17  A.   So I personally would look to see what risk factors the

18  patient has for clotting; you know, have they had a stroke

19  before, have they had clots before.

20       You really want to assess their risk of having those

21  problems because if you look at bleeding versus clot,

22  stroke, usually clot and stroke is very tough once you have

23  a big stroke to recover from that.

24       So bleeding usually we can do something for.  We can

25  treat it.  So I really, really -- you know, we all as

Vanessa Shami - Direct (Lewis)

1  physicians favor, you know what, let's start this because we

2  don't want people to have strokes.  We don't want people to

3  have clots.

4       But in all fairness, often times if I have any

5  question, it will be in consultation with a cardiologist or

6  the physician who put the patient on the anticoagulant.

7  Q.   Fair enough.  All right.  Have you told us -- have you

8  kind of given your Gastroenterology 101 with us and we'll

9  move on to Mrs. Knight's scenario or is there anything else

10 that you wanted to make sure that the jury understood before

11 we did that?

12 A.   No, I think, I think we're good.  Thank you.

13 Q.   Thank you for that.

14      One of the things that you did as your, part of your

15 work in this case was to look at Mrs. Knight's experience

16 while she was on the warfarin medication; is that right?

17 A.   That is correct.

18 Q.   And you made -- you drew some conclusions about

19 specific medical events that were associated with her

20 experience on warfarin.  Is that fair to say?

21 A.   I did.

22 Q.   Now, are you familiar in your practice generally with

23 the medicine warfarin?

24 A.   Absolutely.

25 Q.   Have you treated patients that have had bleeds while on

Vanessa Shami - Direct (Lewis)

1  warfarin?

2  A.    All the time.

3  Q.    As part of your training and experience and knowledge,

4  are you familiar with the risks that are associated with

5  warfarin?

6  A.    I am.

7  Q.    Could you outline just at a high level some of the

8  risks that are associated with warfarin?

9  A.    Sure.  The, you know, major risk, obviously you're

10 giving somebody an anticoagulant, so, you know, the major

11 risk is bleeding with warfarin.

12 Q.    And with respect to sort of digging in a little deeper

13 into that issue, what about drug interactions with warfarin?

14 Is that something that you've considered as part of your

15 practice?

16 A.    Yes.  So there is a long list of drug interactions

17 because it is metabolized in the liver.  So there are many

18 drugs that can interact with warfarin.

19     The other thing about warfarin, again, is you've got to

20 avoid -- the way warfarin works is it's a Vitamin K

21 antagonist.  So if you -- you want to avoid foods that are

22 high in Vitamin K, so leafy vegetables.  There's -- leafy

23 vegetables like lettuce.  There's -- spinach.

24     So there's a lot of things that patients find difficult

25 to comply with because we're not talking about a day.  We're

Vanessa Shami - Direct (Lewis)

```
 1   not talking about dietary restriction for three days.  We're
 2   talking for the rest of the course on that drug.
 3   Q.   Right.  And let, let me focus first on drug
 4   interactions and then I'll get into the diet.  But with
 5   respect to drug interactions, if I have a lot of medications
 6   that I'm taking that are metabolized in the liver, is that
 7   going to affect how my warfarin reacts inside my body?
 8   A.   Yes.
 9   Q.   Okay.  And which way will it affect it?
10   A.   Either way.
11   Q.   So it depends on the medications that I'm taking?
12   A.   That is correct.
13   Q.   One could inhibit, in other words, make warfarin sort
14   of more effective or make my blood thinner.  Is that fair?
15   A.   That is correct.
16   Q.   And then some medications might make my blood, for lack
17   of a better term, thicker?
18   A.   That's correct.
19   Q.   Which would increase my stroke risk; right?
20   A.   Yes.
21   Q.   And that has to be taken into account by physicians who
22   are monitoring patients on warfarin?
23   A.   Correct.
24   Q.   And then with respect to dietary restrictions, same,
25   same effect.  If I eat too many green, leafy vegetables over
```

Vanessa Shami - Direct (Lewis)                          1169

1    the course of a week, that may make my warfarin less

2    effective because it's going to make my blood a little

3    thicker with the Vitamin K.  Is that fair to say?

4    A.    That is correct.

5    Q.    The jury's heard some about therapeutic range with

6    warfarin.  Are you familiar with that phrase as it's used

7    with warfarin treatment?

8    A.    I am.

9    Q.    Okay.  And could you describe for the jury a little bit

10   about what that means?

11   A.    Sure.  We touched a little bit about -- on this

12   earlier.  As physicians, we check an INR.  It's how thin the

13   blood is.  And that is specific to or pertains to warfarin

14   or Coumadin.

15        And in order for warfarin to work well and to avoid

16   clots and strokes, you want that INR level between 2 and 3.

17   Q.    Now, as part of your work in this case did you happen

18   to look at Mrs. Knight's medical records, and specifically

19   the various INR readings that she has had over time, had had

20   over time with, while she was on warfarin?

21   A.    I did.

22   Q.    Okay.  And did you happen to sort of plot those out

23   over time?

24   A.    I did.

25   Q.    All right.  If we could have the demonstrative, please,

Vanessa Shami - Direct (Lewis)                              1170

 1   of the fluctuating.  And the jury has seen this.

 2           MR. CHILDERS:  Judge, could we have another

 3   sidebar?

 4           THE COURT:  Yes.

 5           (Bench conference on the record)

 6           MR. CHILDERS:  The question just asked was, "Did

 7   you happen to plot those out over time?"  She clearly never

 8   gave me an exhibit showing she plotted these things out over

 9   time.

10           MR. LEWIS:  Well, she reviewed the INR levels.

11   They're all in the medical records that were provided.  She

12   reviewed each one of them and worked with us to make sure

13   that they were plotted in that demonstrative that the jury

14   has seen over and over and over.

15           THE COURT:  Well, rephrase your question and

16   phrase it that way so that it doesn't suggest that she

17   prepared the chart.

18           MR. LEWIS:  Okay.  I can do that.

19           THE COURT:  And then if you like, I can instruct

20   the jury that this chart is a demonstrative exhibit only and

21   the extent -- the jury shouldn't treat it as evidence.  It

22   can be used, but it's up to the jury to decide whether or

23   not it's supported by the underlying records.

24           MR. CHILDERS:  That would be great, Your Honor.  I

25   just wanted to make sure they didn't think she made the

Vanessa Shami - Direct (Lewis)                    1171

1    chart because she didn't.

2              THE COURT:  Okay.

3              MR. LEWIS:  She assisted on it, but whatever.

4    It's not worth arguing about.

5              THE COURT:  It did sound a little bit like that.

6              MR. LEWIS:  While we're at sidebar, because the

7    summary is not coming in, I'm putting in what's behind the

8    summary which is all of the medical records that show the

9    INR levels.  This is what he wants me to do, so I'm going to

10   put that stack of medical records in.  It reflects the INR

11   levels that she reviewed.  I should be able to do that.

12             MR. CHILDERS:  I thought it already came in.

13             THE COURT:  Well, it's part of the chart so

14   it's -- I've said that the underlying medical records are

15   sufficiently authenticated to be independently admissible.

16             MR. CHILDERS:  I think they've already been

17   admitted as part of the big record anyway.

18             THE COURT:  Separately from that?

19             MR. CHILDERS:  Yes.

20             THE COURT:  Well, either way you're free to use

21   the exhibit.

22             MR. LEWIS:  Okay.

23             THE COURT:  Put them in a third time.

24             (Bench conference concluded)

25             THE COURT:  All right.  Counsel is about to use a

Vanessa Shami - Direct (Lewis)

1   chart.  I think this was used earlier in the examination of

2   witnesses.

3       I just want to remind the jurors that charts like this

4   are what we call demonstrative aids, meaning they're merely

5   used -- prepared by the lawyers and used to help explain and

6   summarize evidence.

7       This chart and similar demonstrative aids are not

8   evidence and you can only use or rely upon the chart to the

9   extent that you find it is supported by the underlying

10  evidence.

11      So when somebody on either side has a chart that

12  purports to summarize medical records or medical history,

13  it's not the chart that is the evidence.  It is the

14  underlying records.

15      And, so, if there's a difference between underlying

16  records and the chart, obviously you should not consider the

17  demonstrative aid accurate.  If there isn't any difference,

18  then it is a demonstrative aid to help summarize the chart.

19      With that, do you want to restate your questions and

20  get into this chart?

21          MR. LEWIS:  I do, Your Honor.  Thank you.

22  BY MR. LEWIS:

23  Q.  Dr. Shami, so with respect to the demonstrative that

24  I'm going to show you, that was prepared by trial graphics

25  folks that are working with me; right?

1   A.   That is correct.1178

2   Q.   Okay.  What you did is you reviewed the underlying

3   medical records that are associated with those INR readings;

4   is that right?

5   A.   Absolutely.

6   Q.   And you looked to make sure that that was consistent

7   with your review of the medical records?

8   A.   Absolutely.

9   Q.   Okay.  So if we could show the demonstrative, so, Dr.

10  Shami, tell us what is significant about what you're seeing,

11  what the jury is seeing right here in this demonstrative

12  exhibit.

13  A.   So on the left you can see the numbers and you can see

14  it says "INR scale."  And what we're aiming for for patients

15  is an INR within that yellow range, so between 2 and 3

16  because we know that is the range where if it's, again, if

17  it's too high, your chances of bleeding goes up.  If it's

18  too low, then we're not serving the, the purposes of trying

19  to avoid a stroke or a heart attack or, or any sort of clot.

20       And what you can see here, the INRs have been plotted

21  out.  And anything that is outside that yellow bar, so

22  either above it is too high.  Below it is too low.

23       You can see about -- and I think I actually counted.

24  It's about, less than 50 percent of the time is her INR

25  within the desired range.

Vanessa Shami - Direct (Lewis)                1174

1    So, again, this puts her at risk of either bleeding or

2  clotting.  And it's not an ideal medication in somebody who

3  can't keep that range.  And it's not a fault.  It's just

4  very difficult in some patients to keep it within that ideal

5  range.

6  Q.   And I wanted to ask you about that, what you just said

7  at the end which is it's, it's not the patient's fault

8  necessarily that this medication is working this way.  Is

9  that fair?

10 A.   That is correct.  It is absolutely not the patient's

11 fault.

12 Q.   And it's not necessarily the doctor's fault either?

13 A.   No.

14 Q.   Is that fair?

15 A.   That is fair.

16 Q.   Okay.  Would it be fair that this just sometimes can

17 happen with warfarin patients?

18 A.   Yes.

19 Q.   And would you agree that this isn't a safe way to be on

20 warfarin?

21 A.   Yes.

22       MR. LEWIS:  Now, Your Honor, I'm going to move

23 into admission the actual medical records that back up the

24 demonstrative as 9009-S without the summary chart that's at

25 the beginning of that exhibit.

                    Vanessa Shami - Direct (Lewis)                    1175

1              THE COURT:  All right.  Does plaintiff have any

2    objection?

3              MR. CHILDERS:  To the medical records, Your Honor?

4              THE COURT:  Yes.

5              MR. CHILDERS:  No objection.

6              THE COURT:  All right, the medical record will be

7    admitted.  And that's 9009-S without the chart.

8              MR. LEWIS:  Correct.

9         (Exhibit Number 9009-S admitted into evidence.)

10   BY MR. LEWIS:

11   Q.   And, Dr. Shami, --

12             MR. LEWIS:  In fact, Your Honor, if I may, I have

13   the exhibits that I'm using with the witness.  May I

14   approach to make sure the Court has those?

15             THE COURT:  Yes.

16             MR. CHILDERS:  I'm sorry, Your Honor.  I

17   understood 9000-S to be the chart.

18             THE COURT:  Well, what he's now moving is Exhibit

19   9009-S consisting only of the underlying medical records

20   that were part of the originally tendered exhibit.  The

21   chart is withdrawn.

22             MR. CHILDERS:  Understood.  Thank you, Your Honor.

23             THE COURT:  Okay.

24   BY MR. LEWIS:

25   Q.   And, Dr. Shami, do you have that exhibit in front of

Vanessa Shami - Direct (Lewis)

1   you?

2   A.   I have 900 --

3   Q.   -- 9-S?

4   A.   Uh-huh.

5   Q.   Okay.  And if we just look at -- if you go to the -- I

6   just want to double-check a couple of these references just

7   to make sure.

8   A.   Sure.

9   Q.   If we go to 9009-172 you'll see that there are Bates

10  numbers at the bottom center of each of the documents.  Do

11  you have that page?

12  A.   I do have that page.

13  Q.   And you see that there's an INR reading of 1.9?

14  A.   I do.

15  Q.   From -- looks like April of 2007?

16  A.   Yes.  It's April 4th, 2007, correct.

17  Q.   And if we look at the chart, we see in April --

18  sometime in early April of 2007 there is -- the INR reading

19  is 1.9, so it's just out of range, just below 2.

20  A.   That is correct.

21  Q.   And that's plotted on this particular demonstrative; is

22  that right?

23  A.   Yes.

24  Q.   And did you spot-check some of the INRs for this

25  particular demonstrative?

Vanessa Shami - Direct (Lewis)

1   A.   I did.

2   Q.   Okay.  With respect to warfarin patients that you've

3   seen in your experience, when there is a bleed event with

4   someone who maybe has an AVM -- let's just talk about an AVM

5   because that's the subject matter here -- does it matter

6   whether their INR levels are within a therapeutic range or

7   not when it comes to your treatment of a bleed event?

8   A.   So that's a good question.  What I tend to do is --

9   first thing I would do is stop the warfarin.  If the INR is

10  really, really high and they're bleeding so briskly that

11  they're in the ICU and I'm having trouble kind of keeping up

12  with their blood counts, despite transfusions, then I would

13  make that decision to potentially reverse the warfarin.

14       So I can give somebody Vitamin K, although Vitamin K

15  takes hours, or fresh frozen plasma is usually what we use.

16  Again, it has its side effects, especially in people with

17  heart failure.  There's a lot of volume.  But that's what we

18  would do.

19  Q.   When you're treating a bleed with warfarin versus a

20  bleed with maybe a NOAC like Pradaxa --

21  A.   Uh-huh.

22  Q.   -- oral anticoagulant, is there a difference from your

23  experience in the timing of when you stop the medication and

24  the ability to control the bleeding?

25  A.   Yes.  So the half-life -- so the amount of time it

Vanessa Shami - Direct (Lewis)

1   takes for the drug to come out of the body is a lot shorter

2   for the NOAC drugs than it is for warfarin.  And that's

3   predominantly the reason why if you have somebody with an

4   extremely severe bleed that you cannot control that we

5   reverse it.

6       So the NOACs, if you stop it, by the next day or two

7   days from then, it should be out of the patient's system.

8       But with warfarin we wait five to seven days before

9   doing an elective procedure.  Obviously, if it's an urgent

10  procedure, we'll do it right away.  So there is a

11  difference.

12  Q.  And with respect to this therapeutic range or being out

13  of a therapeutic range, would there be -- would it be fair

14  to say that someone perhaps with an INR level of 8 is going

15  to be more difficult to control from a bleeding perspective

16  than someone in the therapeutic range?

17  A.  Potentially.  Again, if we, if we find the lesion --

18  it's all about the lesion.  If we can find the lesion that's

19  bleeding, we can clamp it.  We have ways now to treat

20  patients on anticoagulation.

21  Q.  Okay, all right.  I'm finished with that demonstrative.

22      Did you as part of your work also look into the use of

23  warfarin in Mrs. Knight's experience and, and whether she

24  was on it and off it at various points in time?

25  A.  I did.

1   Q.   Okay.  And, in particular, in 2008 do you recall an

2   instance where she had gone off warfarin because she didn't

3   want to get her levels checked, going to the physician to

4   get her levels checked?

5   A.   Again, this is a spotty area in the chart.  But, yes,

6   she was off of it in September, 2008.  And the way I know

7   that is that there's a note from her cardiologist,

8   Dr. Haberman, stating that she should be back on an

9   anticoagulant.

10  Q.   And let's take a look at that.  This has been admitted

11  into evidence as 9007-A already.  And if you look at that in

12  your notebook, the first page is just the certification of

13  medical records.  But if we could see 9007-A-8, is this the

14  record that you were referring to?

15  A.   It is.

16  Q.   And this is a note from Dr. Haberman from September of

17  2008; is that right?

18  A.   That is correct.

19  Q.   And, in particular, there's -- as you scroll down, I

20  believe the note is referring to an impression.  Obviously,

21  there's a history of stroke.  Is that what you're referring

22  to when, when you're talking about kind of the records

23  before this time not being available?

24  A.   Yeah.  It's unclear -- exactly.  I mean, we don't have

25  the records prior to this point.

1  Q.    But a doctor is noting somewhere along the way, Mrs.

2  Knight had had a stroke at some point?

3  A.    Oh, yeah, it's clear that she's had a stroke.  They

4  actually even say she's had left-sided weakness from the

5  stroke.

6  Q.    Okay.  And Dr. Haberman is noting, if we go to the

7  recommendation and we scroll just a little bit further, what

8  is -- if we highlight number one, Mrs. Knight absolutely

9  needs to get back on her Coumadin.  That's the same word for

10 warfarin.  Right?

11 A.    Correct.

12 Q.    Because her risk of having another stroke with her

13 chronic AFib, atrial fibrillation, is high.  And, so, he's

14 putting her -- he's recommending that she go back on

15 Coumadin.  Is that correct?

16 A.    That is correct.

17 Q.    And then there's a note on the next page related to

18 Plavix.  Do you see that?

19 A.    I do.

20 Q.    Okay.  And what does that indicate to you as someone

21 who is familiar with the concept of Plavix, other

22 anticoagulants?

23 A.    I think his concern here is having triple therapy,

24 having all three on board.  So, again, it says, "Discontinue

25 Plavix to prevent bleeding from concomitant," which means at

Vanessa Shami - Direct (Lewis)

1    the same time use, "aspirin and Coumadin therapy."

2        So then, again, the physicians are very conscious of

3    bleeding risks versus stroke and clot risk.  So this is in

4    their assessment the entire time you can tell looking at

5    medical records.

6    Q.   And would it be fair to say that at least at this point

7    in time, Dr. Haberman is concerned about using warfarin with

8    Plavix and aspirin for Mrs. Knight?

9    A.   Yes.

10   Q.   Because of the bleed, the potential for a bleed?

11   A.   That is correct.

12   Q.   Okay.  And is that -- and, by the way, is that

13   something that's sort of -- do you understand what triple

14   therapy is?  Have you had patients present with bleed events

15   while on triple therapy?

16   A.   Yes.

17   Q.   And that would be basically three different types of

18   anticoagulant or anti-platelet medication.  Would that be a

19   way to characterize it?

20   A.   That is correct?

21       MR. CHILDERS:  Your Honor, I just want to

22   interpose an objection to leading here.  He's been leading

23   her over and over and I would just ask him not to lead.

24       THE COURT:  All right.  Try to avoid leading.

25       MR. LEWIS:  Sure.

Vanessa Shami - Direct (Lewis)                    1182

1    BY MR. LEWIS:

2    Q.   Doctor, did you look into -- and I'm finished with

3    that.  Thank you.

4         Did you look into whether or not there may have been a

5    bleed event with Mrs. Knight while she was on warfarin?

6    A.   I did.  So in November, 2008, she had presented to the

7    hospital with dark stools and, and, and some weakness.  And

8    if you look at her blood levels, her blood levels went down

9    and she had dark stools.  So the physicians were concerned

10   about a GI bleed and they actually consulted a

11   gastroenterologist.

12   Q.   So let's take a look at a couple of the records that

13   you had pointed out to me.  This would be in 9007-A also.

14   And start first with Page 19 and the history of the present

15   illness.  Do you have that in front of you, Doctor?

16   A.   I do.

17   Q.   And can you describe for the jury what's significant

18   about what's being discussed here in this note?

19   A.   Sure.  If you look at the chief complaint, and that's

20   usually why the patient comes to medical attention at that

21   visit, you can see it says "mental status changes and

22   weakness."  And so, you know, you have to then figure out,

23   you know, why it is that she's weak.  She has a rapid heart

24   rate which is -- can contribute to, to dizziness and

25   weakness.

Vanessa Shami - Direct (Lewis)

1    But the other thing they noticed during that

2    hospitalization again is that she's had dark stools.  And,

3    so, bleeding can also contribute to dizziness and weakness.

4    Q.   And let's go to 9007-A-25 and 26.  I think this is what

5    you may have been referring to.  This is during that same

6    time frame in mid-November of 2008; is that right?

7    A.   That is correct.

8    Q.   And the consultant here is Dr. Matthew Rohrbach who the

9    jury's heard is a gastroenterologist locally here, maybe

10   even a politician I think.  Are you familiar with this being

11   a gastroenterologist note?

12   A.   I am.

13   Q.   Okay.  And what was significant about this particular

14   note?

15   A.   What is significant is, first of all, a

16   gastroenterologist was consulted.  So that would mean that

17   whoever consulted the gastroenterologist was thinking that

18   she's potentially bleeding.

19       Second, what he clearly noted is that her blood counts

20   went down.  So her hemoglobin went from 10 the day before to

21   9.  Hemoglobin of one point drop is a bag of blood, or a

22   pint of blood.  So it's not insignificant.

23       And then she -- he noted that she had darker than usual

24   stools.  And, again, as we talked about, dark black, that

25   usually will indicate if you pair that up with a decreasing

Vanessa Shami - Direct (Lewis)                    1184

1   hemoglobin in patient symptoms would indicate GI bleeding.

2   Q.   And if we go to -- and then the note also indicated

3   that she had been transfused two units as well.  Is that

4   significant?

5   A.   That is correct.  Again, they feel like her blood

6   counts are too low.  She has symptoms from them and they're

7   dropping.  So they felt like she was bleeding and they've

8   given her blood.

9   Q.   Okay.  And if we go to the next page, 9007-26 on

10  "Impression," it does indicate -- there's a reference to

11  anemia and then talking about the possibility for a

12  colonoscopy.  What's the significance of this piece?

13  A.   So, obviously, the gastroenterologist agrees that there

14  probably -- there is blood loss.  And, so, what the

15  gastroenterologist is saying that he's going to work her up

16  with an upper endoscopy, like we talked about before, and

17  potentially a colonoscopy.

18       And he says, "We will start her work-up with the upper

19  endoscopy," which is very reasonable.  Usually we kind of

20  will do the upper endoscopy first.  It's easier.  It doesn't

21  take a prep.  If you find a reason, then you can stop there.

22       And especially with her, Ms. Knight did have a lot of

23  medical issues at that time as well.  So that's sort of the

24  easier procedure.  And then if that's okay, at some point he

25  was considering the colonoscopy.

Vanessa Shami - Direct (Lewis)                    1185

1   Q.   Okay.  And from your review of the records, was a

2   colonoscopy ever done on Mrs. Knight at this time frame in

3   2008?

4   A.   It was not.

5   Q.   Okay.  And do you know whether or not any further

6   evidence of bleeding took place one way or the other after

7   this particular time frame?

8   A.   Not in November.

9   Q.   All right.  I'm finished with that exhibit.

10          MR. LEWIS:  Judge, I wasn't sure when and if you

11   were going to take a morning break today.

12          THE COURT:  Well, let's go a little bit longer.

13          MR. LEWIS:  Okay, fair enough.

14   BY MR. LEWIS:

15   Q.   Did you review records after November of 2008 that

16   discussed whether or not Mrs. Knight had had a prior bleed

17   event as part of your work in this case?

18   A.   Yes.

19   Q.   Okay.  And what's the significance of, of that?  What's

20   the significance of a medical record later in time that

21   recounts a history of a patient prior to that?

22   A.   It just notes that, you know, all the healthcare

23   providers are in agreement that she's had a GI bleed.

24   Q.   Let's take a look at Exhibit 9009-A, Page 273.  This

25   has been admitted.  Here we have about a month, maybe even

1    just a couple of weeks later Dr. Gunnalaugsson -- do you

2    understand that he's a treating cardiologist, Doctor?

3    A.    I do.

4    Q.    -- is commenting on his treatment of Mrs. Knight at

5    this time.  And if we look at the history of present

6    illness, Dr. Gunnalaugsson says some things that you wanted

7    to point out to the jury.

8    A.    Yes.  So he performed a stent of her heart.  "So I did

9    a stenting of her LAD," which is the major branch of the

10   heart, "with a bare metal stent two weeks ago."

11       So one thing you'll notice is the reason they choose

12   the type of stent for her is because of her, her history of,

13   of bleeding.  Bare metal stents require a shorter course of

14   Plavix or an anti-platelet agent.

15       She has had some bleeding and, therefore, a bare metal

16   stent was chosen.

17   Q.    And then if we look at 9009-A-275 with the assessment

18   or the plan -- I'll blow that up a little bit -- I wanted to

19   reference again the middle of that paragraph.  She's been on

20   Coumadin, the next two sentences, and indicate whether

21   that's significant to you from this treating cardiologist in

22   December of 2008.

23   A.    It is because he clearly acknowledges that she's had a

24   bleed.  So she -- and I'll quote him.

25       "She has been on Coumadin for atrial fibrillation but

1  this was stopped because of her chronic bleed."

2  Q.   And is this also one of those situations where the

3  doctor is considering triple therapy?

4  A.   Absolutely.

5  Q.   And how is this cardiologist feeling, at least from

6  your review of the records, about whether Mrs. Knight could

7  use warfarin as an anticoagulant on a triple therapy?

8  A.   I mean, I think he's doing what, what he should be

9  doing.  He's, he's cautious.  Right?  He, on the one hand,

10 wants to make sure her stent doesn't clot in her heart.  He

11 wants to make sure she doesn't get a stroke or a clot

12 elsewhere.  But at the same time, he wants to minimize her

13 chances of bleeding.

14     So it's a struggle.  It's not an easy situation.  It's

15 a, it's a difficult situation.

16 Q.   And when we fast forward to February of 2009, at that

17 point in time she's off --

18     And I'm finished with that.  Thank you.

19     If we go to 9007, 9007-A-55 and 57, do we see the

20 ramifications here?

21     And we'll just kind of orient ourselves with the date,

22 February 8th of 2009.  So this is, this is about two months

23 after the note that we saw from Dr. Gunnalaugsson where she

24 went off Coumadin.  She had the bare metal stents placed and

25 was on Plavix.  And now something happens in February of

                    Vanessa Shami - Direct (Lewis)

1   2009 on the other side.

2   A.   Yes.  So if you notice here, she did present with chest

3   pain.  But if you look here -- and is it okay if I mark

4   this?

5   Q.   Yes.

6   A.   Okay.  "The patient noticed that her fingertips," if

7   you start there, "were turning discolored."

8        And what that indicates is that she had decreased blood

9   flow to that arm.  And what they subsequently discovered was

10  it was due to a clot which, again, is the whole struggle

11  here with -- unfortunately with Ms. Knight is, you know, the

12  weighing the risks of bleeding and clotting.  Again, it's a

13  very complicated situation.

14  Q.   Okay.  And if we go to 9007-A-57, we see under

15  "Assessment" acute right brachial emboli.  What is that,

16  Doctor?  Do you know what that is?

17  A.   Yeah.  So the brachial artery is the major artery in

18  the arm.  And presumably what's happened is because she has

19  atrial fibrillation, your blood flow in your heart is not

20  normal.

21       And, so, there are areas of the heart that don't move

22  as well.  And those are areas where blood can clot.  And

23  when blood clots in the heart, it will, it will flick off

24  and it can go to other places in the body.

25       Obviously, the most severe area is the brain.  But

Vanessa Shami - Direct (Lewis)

1  sometimes it can go to other areas such as the extremities,

2  the arms, the legs.  It can essentially go anywhere in the

3  body.

4  Q.   And then if we look at number four, we see sort of what

5  I think you've already indicated, but she wasn't on Coumadin

6  at this time because she had had a stent procedure where

7  Plavix was used to prevent clotting in the stent.

8  A.   That is correct.

9  Q.   Okay.  And the plan here, even though she had had a

10 clot or an emboli, was not to put her on Coumadin at this

11 time; right?

12 A.   That's correct.

13 Q.   Okay.  Are you aware -- but they wanted to continue

14 Plavix; is that right?

15 A.   Yes.

16 Q.   Okay.  They just don't want to, again, combine the

17 three all at once.  Is that what appears to be the case?

18 A.   That is correct.

19 Q.   Okay.  Are you aware that she eventually did start back

20 on Coumadin at some point in time in 2009?

21 A.   She did.

22 Q.   Okay.  And if we look at 9005-A, Pages 26 and 27, that

23 takes us to March of 2009.  And we see here a note, again

24 just to orient everyone, from Dr. Gunnalaugsson, her

25 cardiologist, and he's talking about what his, I guess,

Vanessa Shami - Direct (Lewis)

1    observations are of her at this point in time.  What's

2    significant about the kind of history that he's recounting

3    here?

4    A.    So he states specifically that she had not been on

5    Coumadin because of her GI bleed.  So that's -- and then

6    he's also noting that she had an embolus down her right arm.

7    Q.    Is that the record we just looked at, the fingertips?

8    A.    Yes.  That was the hospitalization we looked at.  And

9    then she was since put on Coumadin which would, again, make

10   sense to put somebody who's having clots on a blood thinner.

11   Q.    Okay.  And if we look at 9005-A, Page 27, under

12   "Assessment and Plan," there's some information here as well

13   that you wanted to point out to the jury.  Is that right?

14   A.    Yeah.  So on the second sentence it says, "The patient

15   has a serious problem with anemia requiring blood

16   transfusions.  Unfortunately I don't think she can take

17   Coumadin, aspirin and Plavix."

18        So at that point they stopped the Plavix now and that's

19   because she's been on the Plavix for over a month since her

20   stent.  So -- and, again, we can see that the physician is

21   struggling.  "There may be a slight increase of stent

22   thrombosis because ideally you would be on Plavix for

23   greater than a month.  But I think the risk of her having a

24   bleed at this point outweighs that risk."

25   Q.    So -- thank you for that.  So, Dr. Shami, based on the

1   records that you've seen and the physicians that you've seen

2   their records and you've looked at their testimony, what do

3   you think, in your opinion, is occurring in the 2009 time

4   frame with respect to Mrs. Knight's warfarin experience?

5   A.   I think it's challenging.  I think -- you know, first

6   of all, like we talked about, the levels were difficult to

7   control.

8        Second of all, you know, she was having some bleeding

9   from 2008.  And then she comes off of the warfarin and she

10  gets an arm clot.

11       So it's a -- again, it's a very, it's been very

12  challenging for the physicians and for Ms. Knight.

13  Q.   Okay.  And the jury has heard that Pradaxa came to the

14  market in 2010.  So in this time frame are you aware of any

15  other anticoagulant medication that was available to help

16  with patients who were struggling on warfarin?

17  A.   No.

18  Q.   Okay.  That only came later with Pradaxa and some of

19  the others such as Xarelto and Eliquis that the jury's heard

20  about?

21  A.   That is correct.

22  Q.   As part of your work in this case did you take a look

23  at sort of the, the medications that Mrs. Knight happened to

24  be taking along with the dosage adjustments that were

25  required in combination with the INR readings that her

Vanessa Shami - Direct (Lewis)                    1192

1   physicians had made?

2   A.   I did.

3   Q.   Okay.  And we have a demonstrative.  Let me just ask

4   you generally.

5   A.   Okay.

6   Q.   I should just pull up the demonstrative.  This would be

7   the dose adjustments in July of 2009.

8        A lot going on in this demonstrative.  And, again, this

9   is something that I prepared with the trial graphics folks

10  that we have.  But it is a reflection of medical records

11  that you have reviewed in this case.  Is that fair to say,

12  Dr. Shami?

13  A.   That is fair to say.

14  Q.   Okay.  And what, what are we trying to kind of display

15  here in this time frame?

16  A.   So what you notice is, you know, this is the dosage

17  here in milligrams of warfarin that has been prescribed.

18  And if you go from week to week, you notice that the amount

19  of warfarin needed has changed.

20       And the reason for that is initially you see this INR

21  of 1.6.  Again, you want to be in the range of 2 to 3.  So

22  then they go up to 7 milligrams, right, and then they check

23  another INR.  So they go to 6 milligrams.  They recheck that

24  INR the next day and still go up.

25       So you can see it's been very challenging and they,

Vanessa Shami - Direct (Lewis)

1    they -- understandably her physicians -- I presume this is

2    Dr. MacFarland -- continue her on the higher dose of

3    warfarin.

4        And then on the 15th what you notice is that INR is 8.

5    So it's well above the range of 2 to 3.  And that can be

6    dangerous.

7        So what they've done is they actually sent her to the,

8    I believe to the hospital for a Vitamin K shot to try to

9    decrease that.  And then they hold this.  They hold the

10   warfarin here.  They hold it here.  And they hold it here.

11       And then again her INR comes back .8 which is too low.

12   And then they have to go back up on that warfarin.

13   Q.   Okay.  And this is just, just kind of a demonstrative

14   month in Mrs. Knight's history that we picked out.

15       Based on your review of the records, is this consistent

16   with what life was like for Mrs. Knight while on warfarin?

17   A.   That is correct.

18   Q.   Okay.  Just so I make sure that I understand what this

19   is showing is that on July 7th and 8th Mrs. Knight's INR

20   readings are under the therapeutic range.  And does that

21   mean she is at a higher stroke risk?

22   A.   Yes, she's at a higher stroke risk when the INR is less

23   than 2.

24   Q.   Okay.  So they up the warfarin dosage to make her blood

25   thinner and avoid the stroke risk.  Is that what's going on

Vanessa Shami - Direct (Lewis)                    1194

1   there?

2   A.   That is correct.

3   Q.   And then by July 15th her blood is becoming too thin.

4   And is that what those INR readings of 8 are showing?

5   A.   Yeah.  So here it's very, very thin.  Again, it's way

6   above 3.  And that's where they were concerned

7   appropriately.  And she received the Vitamin K shot on the

8   16th.

9   Q.   Okay.  And with the INR readings of 8, that's -- in

10  your view is that a significant bleed risk for a patient

11  that has an INR of 8?

12  A.   Sure.  It's high.  It's not ideal.

13  Q.   Okay.  And then after the Vitamin K shot and holding

14  the Coumadin, her INR levels are tested.  And now she's back

15  down with a higher stroke risk because it's under 2.  Is

16  that what that's showing?

17  A.   That is correct.

18  Q.   Okay.  So in the span -- let me make sure that I

19  understand.  So in the span of a month she was at a higher

20  stroke risk on two different occasions and at a significant

21  risk of bleed on another occasion that month for her?

22  A.   That is correct.

23  Q.   Okay.

24          MR. LEWIS:  I'm finished with that.  Thank you.

25  BY MR. LEWIS:

Vanessa Shami - Direct (Lewis)                    1195

1   Q.   Now, do you recall, Doctor, that by October of 2011

2   Mrs. Knight's experience on warfarin led to a change in her

3   treatment for anticoagulant medication?

4   A.   Yes, that is correct.

5   Q.   Okay.  And what happened in October of 2011 based on

6   your review of the medical records and the testimony?

7   A.   Yeah.  I think if you look at the records and look at

8   specifically Dr. MacFarland's notes, it was felt that

9   Coumadin was no longer the appropriate anticoagulant and

10  that there was a need for another one and it shows Pradaxa.

11        THE COURT:  Would this be a good point to --

12        Would you folks like a little break?

13        All right.  We're going to take about a ten-minute

14  recess.  As a result, we'll probably go past noon before we

15  take a break.

16        You can step down.  Don't discuss your testimony.

17        You may retire to the jury room.  Remember my previous

18  instructions.

19        We'll take a ten-minute recess.

20        MR. LEWIS:  Thank you, Your Honor.

21        (Recess taken at 11:23 a.m.)

22

23

24

25

Vanessa Shami - Direct (Lewis)                    1196

1    (Back on the record at 11:36 a.m.)

2        THE COURT:  All right.  Ready to go?  Bring the jury

3    out.

4        (Jury present.)

5        THE COURT:  All right.  Be seated.

6        Mr. Lewis, you may resume.

7        MR. LEWIS:  Thank you, Your Honor, members of the

8    jury.

9        Dr. Shami, we were talking about the time frame of

10   October 2011 right before the break and, in particular, the

11   switch that occurred in Ms. Knight's anticoagulant treatment

12   at that time.

13   Q.  Do you recall our discussion there?

14   A.  I do.

15   Q.  Okay.  And in particular, the reason for that switch, from

16   your understanding of the medical records and the testimony

17   that you read, was what?

18   A.  Ah, was the fact that it was so difficult to manage her on

19   warfarin.  And she was at such a high risk of stroke and

20   emboli, which we just showed that she had in November prior to

21   that, that it was a struggle.  And she needed to be on an

22   anticoagulant, but the warfarin just did not work for her.

23   Q.  Okay.  And is there support from Mrs. Knight's own

24   physician on that point?

25   A.  There is.

Vanessa Shami - Direct (Lewis)                    1197

1        MR. LEWIS:  If we could look at 9009A, page 580 and

2    581 -- we'll go to 580 first, if we may.

3    Q.  Okay.  So, Doctor, tell us what this document reflects and

4    if you're familiar with something like this.

5    A.  I am.  This is a prior -- this is an authorization form.

6        So oftentimes insurance companies want you to justify or

7    give a reason for a drug switch, so why is it that you're

8    going from one drug or, i.e., one anticoagulant to another

9    anticoagulant.  So oftentimes we're required to fill these

10   forms out.

11       And if you look at this form, the prescriber name is Dawn

12   MacFarland, Ms. Knight's primary care physician.  And the

13   diagnosis, which would be the reason why you're doing this

14   switch, is sporadic -- which means intermittent, on and off --

15   and supratherapeutic, which means above the 2 to 3 INR range,

16   on coumadin.  So that's the reason why she was switched.

17   Q.  And if we look at the addendum, which was the next page,

18   9009A-581, does Dr. MacFarland provide a time frame for which

19   this has been occurring for Mrs. Knight?

20   A.  Yes.  She says since 2008 until present.

21   Q.  Based on your review of the records, the medical records

22   that you've seen -- and we've covered many of them this

23   morning -- do you agree with Dr. MacFarland's statement right

24   here?

25   A.  I do.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Direct (Lewis)                    1198

1   Q.  Do you agree that a switch from warfarin or coumadin was

2   warranted at this time?

3   A.  Yes.  She needed to be on an anticoagulant, and she --

4   obviously this wasn't the drug.

5   Q.  Now, you read Dr. Ashhab's testimony, and we're going to

6   talk about the May 2013 bleed event that occurred in just a

7   few minutes.  But Dr. Ashhab says, you know what, if she just

8   would have stayed on warfarin, she would not have had that

9   bleed event.

10      Do you agree with that?

11  A.  No.

12  Q.  Why not?

13  A.  I mean, how could you say, when somebody has had a history

14  of GI bleeding -- we know what she bled from, an AVM.  She

15  could have bled whether she was on no medications, whether she

16  was on warfarin, whether she was on Pradaxa.  And keep in

17  mind, she was also on aspirin and Plavix.  So the ability to

18  state that she absolutely would not have bled if she was on

19  warfarin doesn't make sense to me.

20      MR. LEWIS:  Thank you.  Finished with that.

21      The second thing I asked you to do was to look into

22  Mrs. Knight's experience with Pradaxa.

23  Q.  And you know that she went on Pradaxa in roughly October

24  of 2011 right after this change was made consistent with Dr.

25  MacFarland's note, correct?

Vanessa Shami - Direct (Lewis)                    1199

1    A.  That is correct.

2    Q.  And did you look at the medical records for -- and let's

3    just reference point the 18 or so months prior to the April of

4    2013 stent procedure that the jury has heard about that Mrs.

5    Knight underwent.

6        Did you look at the medical records to see if Mrs. Knight

7    was having any problems on Pradaxa?

8    A.  No.  For those 18 months, from what I could gather from

9    all of the records -- and those 18 months are very complete --

10   that she had had no problems with taking the Pradaxa drug.

11            MR. LEWIS:  Okay.  And if we could just look at the

12   eighteen -- the demonstrative.  I'm sorry.  That was a

13   terrible description of that.

14   Q.  This is the time frame, is it not, Dr. Shami, for which

15   you've looked at the medical records and discovered no stroke

16   and no bleed or other problems while -- that were linked to

17   Pradaxa?

18   A.  That is correct.

19   Q.  Okay.  Now I want to draw up on this board, I'll just kind

20   of draw one line here.

21       Did you look at the medications that Mrs. Knight was on

22   during this time frame to determine, for instance, if she was

23   on other medications like P-gp inhibitors?

24   A.  Yes, I did.  So P-gp inhibitors are permeability

25   glycoproteins, which I think you have probably heard about by

Vanessa Shami - Direct (Lewis)                    1200

1    now.  But they're little proteins that are on the cell

2    membrane, and they transport things outside of the membrane --

3    Q.  Okay.

4    A.  -- just to begin with.

5    Q.  Okay.  And was Mrs. Knight on P-gp inhibitors prior to the

6    April 2013 stent procedure while she was on Pradaxa?

7    A.  Yes.

8    Q.  Okay.  To the best of your recollection, was Mrs. Knight

9    on at least sporadically or intermittently aspirin during that

10   time?

11   A.  She was on aspirin.

12   Q.  We know she was on Pradaxa --

13   A.  Correct.

14   Q.  -- for that 18 months.

15       Was Mrs. Knight at that point in time over the age of 75?

16   A.  Yes, she was.  She was 83.

17   Q.  She was not on Plavix, correct?

18   A.  Not before April of 2013, she was -- that's correct.

19   Q.  Not on Plavix.

20       So between the time that she began taking Pradaxa in

21   October of 2011 and April of 2013, there were no Plavix

22   prescriptions for Mrs. Knight; is that correct?

23   A.  That is correct.  And she did well on the Pradaxa during

24   that period of time.

25   Q.  Now, are you -- you're familiar with the medication

Vanessa Shami - Direct (Lewis)                    1201

1   Pradaxa obviously with patients that come to see you?

2   A.  That's another medication that's been out there not as

3   long as warfarin, but -- but for years.

4   Q.  All right.  And as part of your work in this case, did you

5   review the physician label and product information that came

6   with the Pradaxa medication?

7   A.  Yes.

8   Q.  Okay.  And did you assess whether the product information

9   and the label were a reasonable and appropriate description of

10  the risks and benefits associated with the medicine?

11  A.  Absolutely.

12          MR. LEWIS:  If we could take a look at 5889.  It's

13  been admitted into evidence.

14          We see here that --

15  Q.  And by the way, have you reviewed the different labels --

16  you see here in the upper left that Pradaxa was initially

17  approved in 2010.  There were different labels over time.  As

18  information became available, the labels changed.

19      Is that fair to say?

20  A.  Absolutely.  And we, as physicians, will periodically

21  re-review labels on the medications our patients are on.

22  Q.  Okay.  And when you do that, do you ever look on this

23  left-hand side where it says Recent Major Changes?

24  A.  I do.

25  Q.  Okay.  Why would you do that as a physician?

Vanessa Shami - Direct (Lewis)                    1202

1   A.  Well, I mean, you want to know whether there have been any

2   new warnings just for the safety of your patient.  Ah, it

3   would behoove me, and as well as my patient, to know that.

4   Q.  Okay.  Now if we scroll down a little bit further, in the

5   bottom right we see that this is the label from April of 2013

6   that I wanted to discuss with you.

7   A.  That is correct.  That is -- at the time, this is the

8   label that was available at that time of the -- of the

9   stenting procedure --

10  Q.  Right.

11  A.  -- and prior to her bleeding.

12  Q.  Okay.  So some of the other labels before this may have

13  not had the information that this particular label had in it.

14      Fair to say?

15  A.  That is correct.

16  Q.  And some of the earlier labels, like the very first label

17  in 2010 in particular, did not have under Warnings and

18  Precautions -- or excuse me -- under Drug Interactions:  P-gp

19  inhibitors in patients with severe renal impairment, Pradaxa

20  use not recommended.

21      That wasn't in the original label --

22  A.  You are correct.

23  Q.  Okay.  It got --

24  A.  That was not.

25  Q.  It got updated in 2012 or something along those lines?

Vanessa Shami - Direct (Lewis)                    1203

1   A.  January 2012, I believe.

2   Q.  Okay.  But when the physicians who went to prescribe

3   Pradaxa for Mrs. Knight in April of 2013, that was in the

4   label.

5       Is that your understanding?

6   A.  This was -- this was the label, yes, that is correct.

7   Q.  All right.  Now, were the doctors who were treating and

8   prescribing Pradaxa in April of 2013 different than the

9   original physician who prescribed Pradaxa for Mrs. Knight in

10  2011?

11  A.  So it looks like Dawn MacFarland, from my understanding of

12  the records, so looking at it, had prescribed the first

13  prescription.  She did have other providers prescribe, you

14  know, Pradaxa at times, but it was mostly Dawn MacFarland.

15      So one of two things.  If a new provider is writing a

16  prescription, they will usually look again, re-review to make

17  sure there is no difference in the label.

18      The other thing is, you know, I'm sure Dr. MacFarland, as

19  any conscientious physician would, would intermittently -- I'm

20  not saying every time, but intermittently review to make sure

21  there are no updates on labels.

22  Q.  Okay.  And by April of 2013, Dr. MacFarland is out of the

23  picture, and there are some new physicians --

24  A.  There is.  Abdelgaber, I believe, is her new primary at

25  that time.

1    Q.  Okay.  All right.  Let's get back to the label.

2         So have you looked at the Medication Guide that also

3    accompanies the physician label?  Did you look at all the

4    product information --

5    A.  I did.

6    Q.  Okay.  And why don't you tell the jury about your views on

7    whether the risks associated with the use of Pradaxa, as a

8    practicing clinician, someone who treats folks who come in

9    with bleed events, whether the information contained in the

10   physician label and the Medication Guide are reasonable

11   disclosures of risks.

12   A.  I do think they're reasonable.

13   Q.  Okay.  And at a high level, could you explain why?

14   A.  So which one, the label or the Medication Guide?

15   Q.  Let's take them one at a time.  Let's talk about the

16   physician label to begin with.

17   A.  Sure.

18        So if you look at the physician label, there is clear, you

19   know, warnings of the expected bleeding risks.  So obviously

20   you're on anticoagulation, so your chances of bleeding are

21   higher.

22        With the test of time, they've had more and more data

23   since -- again, this was approved in 2010.  Now this label is,

24   you know, 2013.  People have realized, okay, there are certain

25   risk factors again that increase your chances of bleeding,

1   those being the G-pg inhibitors, age, creatinine clearance or

2   renal problems.  And so all of this is clearly defined in this

3   label.

4       In terms of the Medication Guide, and I don't have it in

5   front of me, but I can tell you that patients want to know

6   globally -- I would as a patient want to know, you know, what

7   am I at risk of?  And it clearly says bleeding on there.

8       And then it says that please, you know, tell your doctors

9   if you're on other medications.  It actually asks the

10  physician -- there's a statement there, please inform them of

11  all of the medications you're taking.

12      And it also goes on to say, you know what, if you want

13  more information, you can request the physician --

14  Q.  So if we look --

15  A.  -- label.

16  Q.  I'm sorry.  I didn't meant to interrupt.

17      If we look at Exhibit 5889, page 12, we see towards the

18  back of that exhibit the actual Medication Guide sort of

19  attached to the back.  So both are in that same exhibit.

20      And that's the Medication Guide that you reviewed as part

21  of your work in this case?

22  A.  That is correct.

23  Q.  And if -- I'm sorry.  Go ahead.

24  A.  No.  I mean, what I was saying is clearly it identifies

25  you may have a higher risk of bleeding if you take Pradaxa and

1    are over 75 years old, have kidney problems, have stomach or

2    intestinal bleeding.  I mean, they identify risk factors for

3    increased bleeding, which I as a patient would want to know.

4    Q.  Okay.  There's also a mention of taking other medications.

5        And is there a specific call-out for Plavix?

6    A.  No.

7    Q.  On the Medication Guide, if we look at the fifth bullet

8    point on that -- on the specific Medication Guide page, not

9    the physician label.

10   A.  I'm sorry.  So what page are we on?

11   Q.  On 5889-12.

12   A.  Oh, yeah.  I see what you're asking.  I'm sorry.  I

13   misunderstood your question.

14       So is there a specifically -- does it specifically state?

15   Yeah, it specifically states a handful of medications, and I

16   can -- wait, let me see what they are.

17       Plavix is one of them.  It says here coumadin, heparin,

18   Plavix, Effient.  So it states those in particular, but that's

19   not all inclusive.  I mean, there are other ones, and that's

20   why they suggest telling your physician what medications

21   you're on.

22   Q.  Right.  And so let's go to that, 5889-14 in bold, about

23   the third paragraph down.

24       Was that what you were referring to with respect to

25   telling the doctor?

1    A.   That is correct.

2    Q.   Okay.  So I want to ask you about this just for a second,

3    about the communication.

4         Do you prescribe medications -- maybe not Pradaxa, but do

5    you prescribe medications for some of your patients?

6    A.   Yes, I do.  Not Pradaxa, but other medications --

7    Q.   Okay.

8    A.   -- that's true.

9    Q.   And when you do, what is your normal process for talking

10   with a patient about a medication that you're going to

11   prescribe?

12   A.   So the majority of the time -- so if it's in clinic or if

13   it's after a procedure -- if it's after a procedure, I'll

14   bring a family member in because usually the patient has been

15   sedated.  And what I'll do is I'll say, you know, this is what

16   you need.  Usually it's going to be an acid suppression

17   medication, such as omeprazole or pantoprazole, because we use

18   that very, very commonly in gastroenterology.

19        And what I'll do is I will sit down and say, listen, this

20   is why I think you should take it, this is the reason for the

21   dose, and these are potential side effects.  And it's not like

22   a one-way decision.  It's a mutual decision that we make

23   together.

24        It's rare that a patient or a family says, no, you know,

25   we don't want to be on that medication if it's recommended by

1   the physician.  But, I mean, it does happen for -- for, you

2   know, reasons.  And so I think it's -- again, it's very

3   important to sit down and review all of that, and that's

4   standard -- pretty standard care.

5   Q.  Okay.  Have you ever, when prescribing a medication, just

6   handed a patient a document and let them make the decision for

7   themselves?

8   A.  Absolutely not.

9   Q.  Okay.  Have you always had a verbal conversation where you

10  talk with the patient about the risks and benefits of the

11  medication?

12  A.  I do.

13      I have had instances where I don't feel strongly -- it's

14  rare -- either way, and then I will -- you know, again, I may

15  not indicate 100 percent.  But, yeah, absolutely will not just

16  give a document over.  That's not practicing good medicine.

17  Q.  And do you think it's reasonable for a maker of medicine

18  like Boehringer to, in the document that is supposed to go to

19  the patient, encourage a discussion between doctor and

20  patient?

21      Do you --

22  A.  Yes.

23  Q.  -- think that is a reasonable thing to do?

24  A.  Yes.

25  Q.  And if we go to the next page, 5889-15, general

1    information about Pradaxa, I think this is the other piece of

2    this Medication Guide that you were referring to.

3        But in the middle paragraph, it says:  This Medication

4    Guide summarizes the most important information about Pradaxa.

5    If you would like more information, talk with your doctor.

6    And you can ask either the pharmacist or the doctor for more

7    information, such as the physician label, the health

8    professional document.

9        So let me ask you this.  Have you had patients, in the

10   course of your clinical practice, ask for that information?

11   A.  Yes.

12   Q.  Have you provided it to them?

13   A.  Yes.

14   Q.  Do you think it's a reasonable thing for a maker of

15   medicine like Boehringer to do, to make the physician label or

16   to suggest that the physician label is available to patients

17   who want to consider that information?

18   A.  I do.

19   Q.  So to wrap up your opinions with respect to the Pradaxa

20   physician label and product information that we're looking at,

21   is it your opinion to a reasonable degree of medical and

22   scientific certainty that the product information and the

23   physician label are adequate disclosures of risks to patients

24   and doctors?

25   A.  Yes.

Vanessa Shami - Direct (Lewis)                1210

1    Q.  And do you hold that opinion to a reasonable degree of

2    medical and scientific certainty?

3    A.  I do.

4           MR. LEWIS:  I'm finished with that.  Thank you.

5           Now I want to go to the next opinion, the next thing I

6    asked you to do, and that was to discuss what caused or the

7    source of Mrs. Knight's GI bleed in May of 2013.

8    Q.  Describe for me a little bit about what was going on with

9    Mrs. Knight's care, from your review of the records, around

10   the time of April and May of 2013.

11   A.  So in April, that was when she had two heart stents

12   placed.  And anytime you have a stent, you have to decide --

13   again, the cardiologists have an option of stents, and they

14   chose again a bare metal stent like they had in the past.  And

15   that was -- you can see in the notes, they were again

16   struggling because she needed to be on Plavix.  And with her

17   history of chronic bleeding, it's a difficult decision but, on

18   the other hand, you don't want her to have a heart attack.

19        So they started her on triple therapy.  So she was -- at

20   that point in April, when she was discharged, she was on

21   aspirin, Plavix and Pradaxa.

22   Q.  And let's look at that record just to be clear.  That

23   would be 9007A, page 94.

24        We see here this is roughly the time frame, April 22nd,

25   2013, and there is a description of the procedures.

Vanessa Shami - Direct (Lewis)                1211

1    Are the doctors here describing the procedure, the stent

2    procedure that you just talked about?

3    A.  Yes.  So they're describing placement of two stents, and

4    it's, I think, Dr. Maru.  I hope I'm saying his name

5    correctly.  He was substituting because her primary -- it

6    sounds like cardiologist was out of town.

7    Q.  Okay.  And Dr. Graham was also involved in some way at the

8    hospital?

9    A.  That is correct.

10   Q.  Okay.  And if we go to page 9007A-95, towards the bottom

11   there is a recommendation.

12   A.  Yeah.

13   They say:  Continue aspirin indefinitely and Plavix for a

14   minimum of four weeks, preferably longer if the patient can

15   tolerate.

16   So ideally, again, even with bare metal stents -- and I'm

17   not a cardiologist, but I do know -- I've had many patients

18   with cardiac stents, they would ideally be on Plavix for three

19   to six months.  So the longer you are on Plavix, the better in

20   terms of putting a clot or a stent thrombosis, we call it.

21   The first month of the bare metal stent is kind of the

22   critical month.  But if patients can tolerate being on it

23   longer, that's ideal.

24   Q.  And then it goes on to say:  Her Pradaxa will be resumed

25   tonight.  And due to triple therapy -- we kind of have a mid

1    sentence here.

2        Due to triple therapy, and it goes onto the next page to

3    say --

4    A.   I am not sure the patient will tolerate long-term Plavix,

5    so minimum would be four weeks, and that's the main reason

6    bare metal stenting was chosen during this PCI procedure, just

7    a percutaneous catheterization.

8    Q.   Okay.  And so what is this telling you about the decision

9    that the doctors are making and the balancing of risks and

10   benefits that the doctors for Mrs. Knight are making at this

11   time that she has the stent procedure?

12   A.   Again, it's a very difficult situation between, you know,

13   clotting and bleeding.  It's a very, very challenging

14   situation, one that we as gastroenterologists and

15   cardiologists have to discuss all the time.  Ah, we have to

16   weigh the risks and benefits of any treatment that we do.

17   Q.   Now, eventually she has, Mrs. Knight has a GI bleed in May

18   of 2013.

19   A.   Yes, she does.

20   Q.   I'm going to talk about that in a second.

21       But are you familiar with the medications and the

22   circumstances of Mrs. Knight between the time she had the

23   stent procedure and May of 2013?

24   A.   Yes.  So in April when she was discharged, she was

25   discharged on all of her prior medications, and one was added

1   on.  And that was Plavix was added on to her regimen.

2   Q.  So --

3   A.  So --

4   Q.  -- at that point -- we just saw aspirin.

5       So she was still on P-gp inhibitors?

6   A.  She was on P-gp inhibitors.

7   Q.  Pradaxa was started, and obviously Mrs. Knight at the time

8   was over 75.

9       And then at this point in time, Plavix is added to her

10  therapy; is that right?

11  A.  Yes, Plavix is added to her therapy.

12  Q.  Okay.  And during this time that Plavix was added, she had

13  a GI bleed; is that right?

14  A.  Yes.  In the context of triple therapy, that is correct.

15  Q.  Okay.  Let's talk about the GI bleed for a second.

16      Have you reviewed the records associated with Mrs.

17  Knight's GI bleed from May of 2013?

18  A.  Yes.

19  Q.  Okay.  And the jury's already heard from the

20  gastroenterologist who performed the procedure to stop the

21  bleeding, Dr. Huh.

22      Have you reviewed his description of what he did and the

23  records associated with that?

24  A.  I did.

25  Q.  Okay.  We're going to look at a couple of the records, but

1   just at a high level, Doctor, what is your view on how the GI

2   bleed that Mrs. Knight had in May of 2013 was treated?

3   A.  So -- yeah.

4       So looking at Dr. Huh's -- his consult notes, she was

5   initially seen by her primary care physician in the clinic and

6   then admitted to the hospital, and they consulted GI.

7       Dr. Huh noticed that she had had six days or -- you know,

8   or so of bleeding.  Fortunately Mrs. Knight was very stable.

9   Her heart rate was normal, her blood pressure was fine, and so

10  they had chosen to put her on the floor.

11      Dr. Huh saw her in consult and noted she was bleeding,

12  also noted she was stable, and made a very reasonable decision

13  to proceed with watching her and having her prep overnight to

14  do the colonoscopy and upper endoscopy.  The AVM was found and

15  was promptly treated the next day.

16  Q.  So let's walk through a couple of the medical records that

17  were associated with that particular event.  We'll start with

18  9003A-386 to 389.

19      And you see that at this time, this is May of -- May 20th

20  of 2013?

21  A.  I'm sorry.  Mr. Lewis, I think I -- you said nine zero

22  zero --

23  Q.  I'm sorry.  9003-386.  And this is the one where the

24  labels are really small at the bottom.  I apologize.

25  A.  Got it.

Vanessa Shami - Direct (Lewis)                    1215

1   Q.   Okay.  And this is Dr. Abdelgaber's record when Mrs.

2   Knight initially presented on May 20th, 2013; is that right?

3   A.   That is correct.

4   Q.   Okay.  And what does he note as far as the history and the

5   chief complaint?

6   A.   So the chief complaint is dizziness and blood in stools,

7   so she's clearly having a GI bleed.  And he says the blood was

8   initially mixed with the stools, then it started coming on top

9   of the stools.  And then just blood with lots of blood clots

10  is what he states.

11  Q.   And how long had it been -- based on his record, how long

12  had there been some suggestion --

13  A.   It had been going on for days.

14  Q.   And Dr. Abdelgaber did a physical exam.

15       That would be appropriate in the instance, I would assume?

16  A.   Absolutely.

17       And if you look at the physical exam notes, and I was kind

18  of alluding to that before, fortunately Mrs. Knight was

19  sitting comfortably, and she was in no apparent distress.  If

20  somebody is having a really, really brisk GI bleed, they don't

21  feel comfortable.  They are in distress.  They are short of

22  breath, having chest pain.  You know, something is usually

23  going on.  Their blood pressure is really low.  Patients can

24  pass out.  But fortunately Mrs. Knight was stable.

25  Q.   Okay.  And have you had patients that have had bleed

Vanessa Shami - Direct (Lewis)                    1216

1   events where they presented to you, and this wasn't the

2   situation, it was a different situation, a more serious

3   situation?

4   A.  Almost every day.

5   Q.  And if you were taking a doctor note in that kind of a

6   situation, what would you say if the patient had a very, very

7   serious, severe, distressful bleed event?

8   A.  You mean unlike --

9   Q.  Yeah.

10  A.  -- Mrs. Knight?

11      I would -- well, I mean, I would automatically call the

12  intensive care unit and transfer them right to the intensive

13  care unit.

14  Q.  Okay.  And did that happen with Mrs. Knight?

15  A.  No.  My understanding from the records is she was on the

16  floor.  She was sitting comfortably, and her vital signs were

17  stable.  There was no reason for the intensive care unit.

18  Q.  Okay.  and if we look at the next page, 9003A, again under

19  Neurological, is that important information, alert and --

20  A.  Yeah.

21      Like I said, if you have brisk bleeding, and your blood

22  counts drop extremely quick -- so not only does it have to do

23  with the quantity of blood, but what we say the acuity, how

24  fast it drops.  So if you drop it all in one day, that is

25  different than if you drop it over five or six days, because

1    your body can get -- can adjust for it over a period of time.

2         So she is alert, fortunately she's awake.  And moving all

3    extremities means, you know, she is healthy, and she's doing

4    well.

5    Q.  Okay.  And if we --

6    A.  I don't know about healthy, but she's definitely doing

7    well.

8    Q.  And if we look at the plan at the bottom, Dr. Abdelgaber

9    suggests that she's going to need further workup and to get a

10   gastroenterologist involved.

11   A.  Absolutely.

12   Q.  And that's the --

13   A.  And that's the right thing --

14   Q.  That's the right thing to do?

15   A.  The right thing to do.

16   Q.  Okay.  Now all bleeds are serious, though?

17   A.  Absolutely.

18   Q.  And this was a bleed that needed to be treated by a

19   gastroenterologist.

20   A.  Absolutely.

21   Q.  I don't want to minimize --

22   A.  No.

23   Q.  -- this situation.

24        But on the scale of things, it was a good thing that she

25   was stable, her vital signs were fine, and she was able to not

Vanessa Shami - Direct (Lewis)                    1218

1   have to go into ICU or an emergency situation.

2        Is that fair?

3   A.   Absolutely.

4   Q.   The next record will be 9007A, page 107.

5        I think this was also -- so now we're looking at Dr. Huh,

6   and this is also on the same day.

7        So Dr. Huh is the gastroenterologist; is that right?

8   A.   He is.

9   Q.   And so he gets the referral from Dr. Abdelgaber on that

10  same day, and he does an assessment.

11       Is that fair?

12  A.   He does assess Mrs. Knight, correct.

13  Q.   And that's what you want to do as a gastroenterologist, is

14  assess the situation to see whether immediate action needed to

15  take place or some other plan could be put in place.

16       Is that fair?

17  A.   That is correct.

18       If she was having an extremely severe bleed and was in the

19  ICU and losing blood, my decision as a gastroenterologist, and

20  I'm sure as Dr. Huh would do, would be to admit or transfer

21  the patient to the intensive care unit and do that colonoscopy

22  and upper endoscopy immediately.

23       What we can do is -- the upper endoscopy is easy enough.

24  The colonoscopy sometimes, if we need to do it urgently, is we

25  can put -- we can either ask the patient to drink real fast.

Vanessa Shami - Direct (Lewis)                    1219

1    And if they can't, we can put a tube into the stomach through

2    the nose -- we do it quite a bit -- and then pour the prep in

3    there and do what is called a rapid prep.  But fortunately in

4    Ms. Knight's case, that was not needed.

5    Q.  Okay.  If we go to 9007, page 108, the next page, Dr. Huh

6    himself performs a review of the systems and a physical

7    examination; is that right?

8    A.  He does.

9    Q.  Okay.  Let's be fair, when we go to general, Mrs. Knight

10   is reporting fatigue and weakness?

11   A.  Absolutely she is.

12   Q.  Okay.  And is that something that is common with all GI

13   bleeds?

14   A.  Yeah, it is.  It's not what you want, but it is -- it is

15   common with GI bleeds.

16   Q.  Okay.  And if we look at the physical exam, is Dr. Huh

17   finding sort of the same thing that Dr. Abdelgaber found with

18   respect to whether she was stable or not?

19   A.  Yes.  He has assessed her and concluded that she was

20   stable.  He was obviously in agreement with keeping her on the

21   floor and felt, looking at this note, that she was -- you

22   know, she can have a prep overnight and that they can do the

23   procedure the next day.

24   Q.  Okay.  And that's on page 9007A-109, which is the next

25   page.

Vanessa Shami - Direct (Lewis)          1220

1   A.  That is correct.

2   Q.  And if we look at Assessment and Plan --

3   A.  It says, under 3:  We will plan EGD and colonoscopy -- so

4   an esophagogastroduodenoscopy is so long a word, that is why

5   we use EGD -- and colonoscopy in the AM.  Continue to hold

6   aspirin and Plavix and Pradaxa for now.  We will set coags --

7   it sounds like they didn't get an INR or a PTT at the time --

8   and we will change oral proton pump inhibitors to IV.

9   Q.  Okay.  And we also know that there was a note on blood

10  loss above on the diagnostic data.

11  A.  That is correct.

12  Q.  Okay.

13  A.  If you look at her hemoglobin, so that's the number we've

14  been sort of talking about this entire morning, at baseline,

15  her hemoglobin was 10.  11, 10, when she got down to 9 while

16  she was in the hospital in November of '08, as you recall, she

17  needed blood transfusions.

18      So here she is 6.4, so her drop is more significant than

19  it was during her last GI bleed.

20  Q.  And Dr. Huh took that into consideration when he decided

21  to design the plan to have her stay overnight and handle the

22  situation the next day?

23  A.  Absolutely.

24      So what he did is he gave her two units -- or I don't know

25  who physically gave her the two units of blood, but the

Vanessa Shami - Direct (Lewis)                    1221

1   physicians agreed that she needed two units of blood.

2   Q.  Okay.  And do you have any criticism at all of Dr. Huh, in

3   the face of this diagnostic data, waiting overnight and

4   handling the event the next morning?

5   A.  Absolutely not.  He did exactly what I would personally

6   do.

7   Q.  If we look at the next -- and by the way, did you review

8   the records associated with the -- first of all, did Dr. Huh

9   perform a surgery on Mrs. Knight?

10  A.  No.

11  Q.  Would you characterize -- how would you characterize --

12  A.  Yeah, absolutely.

13      So we're not surgeons.  Some -- we're gastroenterologists.

14  We're proceduralists.  So surgery is when you cut through the

15  skin.  We don't do that.  The only time we ever do anything to

16  the skin is a feeding tube.  We are not -- we do not cut

17  people open.  We do not go from outside in.  We work all

18  internally.  So there is a big difference between surgery or a

19  surgeon and a proceduralist or a gastroenterologist doing

20  procedures.

21  Q.  Okay.  And if we look at 9007A-112 and 113, we see the

22  operative report that Dr. Huh for this procedure did.

23  A.  We do.

24  Q.  Okay.  And there was some anesthesia used; is that right?

25  A.  Yes, there was anesthesia used.

1   Q.   What is MAC?

2   A.   It's monitored anesthesia care.  It's delivered by an

3   anesthesiologist.  And I think she received propofol, and

4   whether a gastroenterologist can give propofol or not is state

5   dependent.  In the state of West Virginia and Virginia and

6   many other states, it can only be administered by an

7   anesthesiologist or they have anesthesia assistance.

8   Q.   Okay.  And if we look down towards the bottom of -- with

9   the description, we see there was an active bleeding lesion

10  kind of towards the last few sentences, possibly an AVM.

11       And I want to ask you about I injected the area -- there's

12  an injection of some sort that is done.

13  A.   Yeah.  So what we can do -- whether you inject it or not

14  is kind of, I think, preference.  You know, it's a

15  GI physician's preference.

16       Epinephrine is a drug that will take the vessel and will

17  make it constrict, it will make it get tight, so it will

18  decrease the amount of bleeding.  Epinephrine is not meant to

19  treat the bleeding alone.  We have a lot of data saying

20  epinephrine alone is not enough in GI bleeding.

21       So it's very appropriate for him -- he saw a bleeding

22  lesion, he injected some epinephrine.  It did decrease the

23  amount of bleeding, didn't stop it.  Again, you do not just

24  use epinephrine in any endoscopic procedure.  And then he

25  placed that metallic clip over the AVM, and he stopped the

Vanessa Shami - Direct (Lewis)                    1223

1    bleeding immediately.  So it was a good outcome.

2    Q.  And that's what I wanted to ask you.

3        Did it appear that Dr. Huh found the source of the bleed?

4    A.  He did.  And he took care of it with epinephrine and two

5    clips.

6    Q.  Okay.  And if we go to the patient tolerated the procedure

7    well, what does that mean in -- in doctor speak?

8    A.  Yeah.  That is kind of a drop-down menu on our -- what we

9    call the electronic medical record.

10       Basically the bottom line, it means the patient did well.

11   Vital signs were stable.  They didn't have any troubles with

12   the sedation.  The procedure went well.  So there was no issue

13   during the procedure.

14   Q.  Okay.  And this appears to be dictated -- I was looking

15   for the date.  It's on the next page.

16   A.  It was dictated on 5/21.

17   Q.  Okay.  The day of -- it looks like the day of the

18   procedure?

19   A.  The day of the procedure, which is the day after she was

20   admitted on the 20th.

21   Q.  So Mrs. Knight saw Dr. Abdelgaber on the 20th, was

22   referred to Dr. Huh in the evening of the 20th, and the very

23   next morning Dr. Huh performed a procedure.

24       And did he stop and repair and treat that particular GI

25   bleed at that point in time?

Vanessa Shami - Direct (Lewis)                1224

1    A.  Yes, he did.

2    Q.  And did he treat it successfully in your opinion?

3    A.  Yes.

4    Q.  And did Mrs. Knight have any recurrence of a GI bleed,

5    based on your review of the records, after May 21st of 2013?

6    A.  No recurrence.

7        I do want to stipulate -- or say one thing.  We did

8    mention she had two units of blood overnight.  They did give

9    her another two units during that next day, so she had a total

10   of four units of blood.  I didn't want to give the impression

11   that she only got two units.  She got four units total.

12   Q.  So she got two one day and two --

13   A.  I believe two the next day.  It's hard to tell the actual

14   timing of it.

15   Q.  Sure.

16   A.  But, yeah, she had absolutely no bleeding after that was

17   placed.

18   Q.  And to a reasonable degree of medical and scientific

19   certainty, is it your opinion that Mrs. Knight's GI bleed was

20   successfully treated on May 21st, 2013?

21   A.  Absolutely.

22   Q.  Okay.  Now, you noted that there were four total pints of

23   blood provided or transfused for Mrs. Knight.

24       Now you've read the label or the data associated with the

25   clinical trial for Pradaxa --

Vanessa Shami - Direct (Lewis)                    1225

1    A.  Yes.

2    Q.  -- correct?

3        And there's sort of a distinction in how bleeds are

4    characterized in that trial?

5    A.  Yes.  So major bleeding is characterized by needing two

6    units of blood.  And I think life-threatening bleeding is four

7    units of blood.

8        I do want to say as a clinician, as a practicing

9    gastroenterologist, that's not how we look at severe or

10   life-threatening bleeding.  I mean, every bleeding is

11   important, and it -- and it requires vigilance.  But, on the

12   other hand, clinically that is not how we define -- I mean, it

13   needed to be done -- defined for the study.  But we as

14   physicians look at vital signs.  We look at whether people

15   need to be in the ICU.  So those are the factors we look at as

16   physicians.

17   Q.  Okay.  Well, let me just ask a question as a practicing

18   gastroenterologist.

19       At the time that Dr. Huh performed this procedure and

20   returned her to the recovery room and had stopped the

21   bleeding, was Mrs. Knight's life in danger or threatened by

22   the GI bleed at that time?

23   A.  No.

24   Q.  If we go to 9007A-110 and 111, we see now Dr. Abdelgaber

25   must have seen her after the procedure.

1        Does that appear to be what occurred?

2   A.   So we're looking at 110?

3   Q.   Yes.

4   A.   Yes.  So this is the discharge summary.

5   Q.   Okay.  And if we look down towards the bottom, we see that

6   both a cardiologist and a gastroenterologist were consulted as

7   part of this procedure that needed to take place.

8   A.   Right, which is very reasonable.

9   Q.   Because on the one hand, just like the jury has heard,

10  there's the bleeding risk.  With a GI bleed, that would be the

11  gastroenterologist; is that right?

12  A.   That is correct.

13  Q.   And then on the other side you have sort of the stroke

14  risk and the cardiologist who prescribed the anticoagulants or

15  oversaw that on the other side, right?

16  A.   That is correct.

17  Q.   And is this a good thing that these physicians are talking

18  to one another along with her primary care physician?

19  A.   Yeah.  You never want to -- you know, when you have two

20  competing or two issues where you're struggling, you really

21  want to get the expert on both ends to come together and give

22  their opinion.  And then you want to kind of come up with a

23  consensus or an agreement with those physicians to come up

24  with what the patient is discharged on, when they need to

25  restart anticoagulation, whether they need to start

Vanessa Shami - Direct (Lewis)                    1227

1    anticoagulation.

2        So it's very important to get both sides of the coin

3    involved.

4    Q.  Okay.  And in the hospital course, the last couple

5    sentences, just like you said, Dr. Shami, she was given

6    another two units for a total of four units.

7        And what does it say about her hemoglobin?

8    A.  Her hemoglobin stayed stable meanwhile.

9    Q.  Okay.  And it says that the number is 10.8.

10        Is that -- what does that number reflect?  Is that okay or

11   is that not okay?

12   A.  That is her -- that is Mrs. Knight's baseline hemoglobin.

13   Q.  Did you see anywhere in the records where Mrs. Knight's

14   baseline hemoglobin was 14 or anything like that?

15   A.  No.  I saw a 12, I believe, in two thousand -- before 2008

16   at some point, but I can't give you the precise date.

17   Q.  And do those change over time as folks age?

18   A.  Ah, they can.  They can change over -- over.  But she is

19   chronically anemic, so she has chronic low levels of

20   hemoglobin.

21   Q.  Okay.  And it says she remains stable.

22        I assume that was part of your opinion about whether or

23   not she was successfully treated with this particular

24   incident?

25   A.  There is no doubt in my mind as a gastroenterologist who

Vanessa Shami - Direct (Lewis)                    1228

1   practices that she was -- you know, she had a GI bleed, it was

2   taken care of, and that is now eliminated from the equation --

3   Q.  Okay.

4   A.  -- yes.

5   Q.  And if we look at the next page, 9007A-111, we see the GI

6   suggests that she can start back on only two of the three

7   things related to triple therapy; is that correct?

8   A.  That is correct.  They chose to discontinue the Plavix.

9        Now, mind you, ideally the Plavix would be on -- you can

10  say at that time frame it was almost four weeks that she was

11  on it.  But as her cardiologist mentioned before, ideally she

12  would be on it longer.

13  Q.  So after the May 2013 GI bleed, no more Plavix; is that

14  correct?

15  A.  That is correct.

16  Q.  And --

17  A.  And that was approximately four weeks, I think she is two

18  days short of that, but that is the minimum amount of Plavix

19  you want to give.  Ideally you would give a longer duration.

20  Q.  And after May of 2013 until Mrs. Knight's passing on

21  September 2nd, 2013, she did not have any further GI bleeds,

22  did she?

23  A.  That is correct.

24        THE COURT:  How much longer do you think your direct

25  will be?

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Direct (Lewis)                    1229

1        MR. LEWIS:  I probably have, Your Honor, maybe 15, 20

2   minutes.

3        THE COURT:  All right.  Let's go ahead and take a

4   recess now.  We'll take a lunch break until 1:30.

5        Remember my instructions.  Don't discuss the case.

6   Don't deliberate.  You can follow the same practice we did

7   last week about coming and going from this room.

8        Doctor, you can step down.  Just don't discuss your

9   testimony with anybody.  All right?

10        THE WITNESS:  Thank you.

11        THE COURT:  We'll take a recess until 1:30.

12     (Lunch recess taken at 12:27 p.m.)

13                         ---o0o---

14

15

16

17

18

19

20

21

22

23

24

25

Vanessa Shami - Direct (Lewis)                    1230

1       THE COURT:  All right.  Are we ready to resume?

2       MR. LEWIS:  Yes, Your Honor.

3       THE COURT:  Let's bring out the jury.

4    (Jury returned into the courtroom at 1:32 p.m.)

5       THE COURT:  All right, you may be seated.

6    Counsel, you may resume your examination of the

7    witness.

8       MR. LEWIS:  May it please the Court, good

9    afternoon, members of the jury.

10   BY MR. LEWIS:

11   Q.   Dr. Shami, where we left off was discussing after the

12   May, 2013, GI bleed experienced by Mrs. Knight.  And, so, to

13   orient us, I want to discuss some of the medical records and

14   discussions from physicians that treated her after that

15   point in time, and specifically, 9005-A, Page 5, which is

16   August 29th, 2013.

17   A.   I've got it.

18   Q.   And this is a note from Dr. Gunnalaugsson; is that

19   correct?

20   A.   Yes, it is.

21   Q.   And I want to kind of go over what Dr. Gunnalaugsson

22   says at this point in time.  And this is unfortunately a few

23   days before Mrs. Knight passed.  She came into the hospital

24   to see her physician.

25       And in the section that we have pulled up, Dr.

Vanessa Shami - Direct (Lewis)

1    Gunnalaugsson is commenting on the prior GI bleed; right?

2    A.    Yes.  He says, "Ms. Knight is an 84-year-old woman with

3    a history of multiple medical problems.  She was

4    hospitalized with severe anemia due to GI bleed."

5    Q.    And he goes on to say she was eventually surprisingly

6    put back on Pradaxa and she had been off Plavix.  So at this

7    point in time in August of 2013, Mrs. Knight is on Pradaxa,

8    off Plavix from the bleed event that took place in May of

9    2013.  And now Dr. Gunnalaugsson is suggesting not to take

10   aspirin as well.

11   A.    That is correct, yes.

12   Q.    Does that -- in your view, does that express a concern

13   about potential for bleed?

14   A.    I mean, I think again, yes, he's kind of struggling, as

15   I think the rest of the physicians are, about, you know,

16   bleeding versus clot or thrombosis.  And, obviously, in this

17   case he mentions the severe anemia and GI bleeding, so,

18   yeah.

19   Q.    Okay.  And then he goes on to say -- talks about the

20   stent procedure, the percutaneous coronary intervention.

21   That would be a stent?

22   A.    Yes, usually.  I mean, they can just dilate or stretch

23   it but, yeah, she was -- in her case, she was stented.

24   Q.    And then it indicated that, as we discussed, that

25   Plavix was added to her therapy, her anticoagulant therapy

1    due to the stent.  And Dr. Gunnalaugsson says was put on

2    Plavix which probably triggered her bleed.  So I want to ask

3    you about that.

4         Based on what you've seen in the medical records, do

5    you disagree with the treating cardiologist, Dr.

6    Gunnalaugsson, that Plavix probably triggered the bleed?

7    A.   I don't, I don't disagree, no.  I can tell you that we

8    know what -- we know what she was bleeding from and that's

9    an AVM.  And we also know again the one drug that was added

10   after which she bled from was the Plavix.  That's what I can

11   tell you.

12   Q.   And if we go to the next page, which is 9005-A, Page 6,

13   Dr. Gunnalaugsson is describing what was sort of the

14   assessment or plan that carries over from the prior page.

15   But there's a note that says, "She will remain on Pradaxa

16   since she is tolerating this right now."

17        Do you see where it says that?

18   A.   Yes.

19   Q.   Okay.  So this is the same record where Dr.

20   Gunnalaugsson, concerned about the bleed, takes away aspirin

21   after Plavix has been taken away; is that right?

22   A.   That is correct.

23   Q.   Okay.  So based on your experience -- and I think you

24   maybe have already told the jury this.  But when a doctor

25   says someone is tolerating a medication, what does that mean

Vanessa Shami - Direct (Lewis)                    1233

1    again?

2    A.   Usually it can mean a few things.  They're tolerating

3    it from a side effect profile.  So it can be simple things

4    such as nausea, diarrhea, you know, it's not making them

5    feel bad.

6         And in her case, I'm assuming he means from, you know,

7    from a bleeding standpoint.  She's tolerating it.  She's not

8    having anymore bleeding.

9    Q.   And is it the case, based on your review of the medical

10   records, that Mrs. Knight was not suffering, didn't

11   experience a GI bleed or a bleed of any kind after May of

12   2013?

13   A.   That is correct.

14   Q.   So I want to ask you some questions about the cause of

15   Mrs. Knight's GI bleed, and in particular your opinions

16   about that to a reasonable degree of scientific and medical

17   certainty.

18        Is it your opinion that the source of the GI bleed was

19   an AVM?

20   A.   Absolutely.

21   Q.   And do you hold that opinion to a reasonable degree of

22   medical certainty?

23   A.   I do.

24   Q.   Do you also agree that like any anticoagulant

25   medication, Pradaxa or even Plavix had some contribution?

Vanessa Shami - Direct (Lewis)                                    1234

 1   Let's talk about Pradaxa.

 2       So is it also your opinion that Pradaxa, like any

 3   anticoagulant medication, contributed in some way to the

 4   circumstances surrounding the bleed?

 5   A.   It can, yes.

 6   Q.   And is it your opinion that you can't disagree with Dr.

 7   Gunnalaugsson's opinion that the Plavix triggered it?  Is

 8   that fair?

 9   A.   That's fair.

10   Q.   And you hold those opinions to a reasonable degree of

11   medical certainty?

12   A.   I do.

13   Q.   Now, a couple things about Dr. Ashhab's testimony.

14       Number one, Dr. Ashhab testified that there's some

15   difference in the way someone experiences a bleed with

16   Plavix versus a NOAC like Pradaxa or Xarelto or Eliquis.

17   Are you familiar with any scientific literature that backs

18   up that kind of statement?

19   A.   Well, -- no.  The answer is, no, there is no literature

20   to back that up.

21   Q.   And there was some discussion in Dr. Ashhab's testimony

22   that there was an oozing versus a faucet.  Is that something

23   that you've ever seen in any of the literature?

24   A.   I have never seen or -- kind of heard GI bleeding

25   pertaining to that.  I've heard the word "ooze."  But there

Vanessa Shami - Direct (Lewis)                          1235

1   is absolutely no data out there that says one anticoagulant

2   causes oozing and an anti-platelet causes an oozing or a

3   faucet.  It's not a concept that we use in the literature

4   and it's not a concept that I've ever heard of.

5   Q.    Okay.  Now, let me ask you this.  As someone who is on

6   the board of a major organization of gastroenterologists,

7   who teaches medical students, who writes articles and goes

8   to conferences, do you think something like that would have

9   been discussed somewhere in your 16 years of your career if

10  that were the case?

11  A.    Yes.

12  Q.    Now, I want to get to the -- I'm finished with that --

13  the next opinion.  And that relates to whether if Mrs.

14  Knight had been on warfarin, some other different outcome

15  would have occurred.

16       Now, just to back up and orient us, nothing in Mrs.

17  Knight's experience with warfarin suggested she was on

18  Plavix and warfarin and aspirin at the same time; is that

19  right?

20  A.    That is correct, that is, the records that we have

21  available to us, yes.

22  Q.    In fact, the records that we looked at this morning

23  suggested doctors felt like they needed to make a choice

24  between one or the other when she was on warfarin.  Is that

25  fair?

Vanessa Shami - Direct (Lewis)                    1236

1   A.    That is correct.

2           MR. CHILDERS:  Judge, object to leading again.

3           THE COURT:  All right.  Refrain from leading.

4           MR. LEWIS:  Sure.

5   BY MR. LEWIS:

6   Q.   Do you have an opinion, Dr. Shami, to a reasonable

7   degree of medical certainty as to whether or not if Mrs.

8   Knight had been on warfarin instead of Pradaxa that she

9   would have experienced some easier, lesser, or different

10  kind of bleed?

11  A.   No.  And there's actually some literature to back that

12  up.

13  Q.   Okay.  And that's what I want to talk about.

14          MR. LEWIS:  Your Honor, Exhibit 5620-A is what we

15  would offer to publish as a learned treatise.  It's been

16  provided to counsel for the plaintiffs.

17          MR. CHILDERS:  I don't have any objection to her

18  testifying about the article.  It's not an exhibit

19  obviously.

20          THE COURT:  All right.

21          MR. LEWIS:  May I publish?

22          THE COURT:  You may.

23          MR. LEWIS:  If we could publish Exhibit 5620-A.

24  BY MR. LEWIS:

25  Q.   Doctor, is this one of the pieces of literature that

Vanessa Shami - Direct (Lewis)                    1237

1   you reviewed in forming your opinions?

2   A.   Yes.

3   Q.   Okay.  How did this article -- before we talk about it,

4   how did this article inform your opinion about what we've

5   just discussed?

6   A.   So basically what the article did was look at patients

7   who were on anticoagulation, so specifically Pradaxa or

8   warfarin, who had major GI bleeds.

9        And the GI -- not GI bleeds, all bleeds -- my

10  apologies.  So there are GI bleeds.  There are head bleeds.

11  They can be bleeds in the body or peritoneum, so all-comers.

12       And what they did was they analyzed how easy it was to

13  fix their bleed or stop their bleed as well as 30-day

14  mortality, which means their survival of 30 days.

15       What they saw out of those major bleeding patients in

16  those that occurred due to non-traumatic reasons, in other

17  words, they weren't in a car accident, they didn't fall down

18  the stairs, the bleeding just sort of occurred spontaneously

19  because of, you know, of the reason and being on

20  anticoagulants, of those people, they were actually able to

21  control the bleeding from the Pradaxa a little bit easier

22  than the Coumadin.

23       The other thing is the mortality rate was lower with

24  the Pradaxa than it was the warfarin or the Coumadin.

25       So I think this just kind of demonstrates to me that I

Vanessa Shami - Direct (Lewis)                    1238

1   don't think we could say there would be a difference in

2   outcome if Ms. Knight was on warfarin or if she was on

3   Pradaxa.  I mean, I just don't think you can say that

4   without a reasonable degree of doubt.

5   Q.   Okay.  And, so, just to step back a little bit, this

6   article is what's called a peer-reviewed article?

7   A.   It is a peer-reviewed article.

8   Q.   At a real high level for the jury, I don't think

9   they've heard a lot about what that means.  Are you able to

10  explain sort of to a common person like me what that means?

11  A.   Sure.  So a peer-reviewed article -- so, you know, we,

12  we come up with ideas to test -- come up with a hypothesis

13  and then the data.  And this -- these papers take weeks,

14  actually months to years.

15       And once they're put together, the data is put together

16  and the conclusions are drawn and you come up with the,

17  write the manuscript, you -- that's not enough to just get

18  it published.

19       And the reason for that is if we just are able to

20  publish anything, then we would have all of this data that's

21  not really relevant or, or not formulated in a proper way.

22       So what they usually do for these journals is they have

23  a group of physicians when you submit this manuscript and

24  they have a group of physicians review it.

25       If they feel like it's a good enough article, then it

Vanessa Shami - Direct (Lewis)                    1239

1    will get accepted and published.

2        Often times even if it gets accepted and published, the

3    review panel will ask them to make changes or ask questions

4    to, to revise the manuscript.  So it is an in-depth process

5    for it to be peer-reviewed.

6    Q.   And is it also appropriate in a peer-reviewed article

7    to discuss both some potential scientific limitations and

8    conflicts of interest?

9    A.   Absolutely.

10   Q.   And is that done in this article?

11   A.   It is.

12   Q.   If we look at 5628, Page 7, without getting into

13   detail, but the authors outline some of the scientific

14   limitations that the peer-reviewing folks have to consider

15   as part of the science?

16   A.   Yes.  And any time we have a peer-reviewed manuscript,

17   it's always proper to put the limitations so that the

18   readers realize that it's not kind of the -- the limitations

19   or the down sides, the weaknesses.

20       And in this case one of them was that it was a

21   retrospective study.  In other words, it was a study where

22   all the data -- the patients were taken care of.  All the

23   data was there.  And you have to go in hindsight and pick

24   out all that data.  So that's retrospective.  So that is one

25   limitation of the study.

Vanessa Shami - Direct (Lewis)

1  Q.   Sure.  But it passed peer-review if it got published?

2  A.   Absolutely.

3  Q.   And then if we go to the next page, 5628, we see that

4  there are various disclosures including that some of the

5  authors received money from Boehringer?

6  A.   Absolutely.

7  Q.   And that's appropriate to disclose that; right?

8  A.   You have to disclose that.

9  Q.   But if we scroll up just above "Disclosures," we see

10  that the peer-review folks approved this summary if we could

11  highlight the "Summary."  This is basically the gist of the

12  article or the ultimate conclusion of the article.

13  A.   So in summary, patients with different types, locations

14  and causes of dabigatran or Pradaxa associated major bleeds

15  can be managed effectively with supportive therapy, with

16  similar or better outcomes than patients with warfarin

17  associated bleeds.  This, together with the ease of

18  administration, adds to the advantages of treatment with

19  dabigatran, or Pradaxa, in the different subgroups discussed

20  here.

21  Q.   And based on what you saw from Dr. Ashhab's testimony

22  earlier in this trial that you read, did he cite to any

23  articles that suggested that he was right about warfarin

24  making a difference?

25  A.   No.

Vanessa Shami - Direct (Lewis)                                    1241

1   Q.    Okay.  Thank you.  Last subject.  Dr. -- last subject

2   on this particular point.

3         Dr. Ashhab also suggested that Mrs. Knight was

4   over-anticoagulated on Pradaxa at the time of the GI bleed.

5   So I want to ask you a couple questions about that.

6         First of all, do you agree with that statement?

7   A.    No.

8   Q.    Did you see anywhere in any medical record around the

9   time of Mrs. Knight's GI bleed where any physician said she

10  had too much Pradaxa in the blood or was

11  over-anticoagulated?

12  A.    No.

13  Q.    Is that a term that you are even familiar with when it

14  comes to that sort of assessment?

15  A.    We don't use -- we use "supra" which is high or, or --

16  you know, I mean, but "over-anticoagulated," no, especially

17  in a drug where no, you know, the therapeutic range is, is

18  not established.

19  Q.    You have treated folks who have been on warfarin?

20  A.    Yes, I have.

21  Q.    And we know that with warfarin -- we've talked about

22  this -- that there's a therapeutic range.  And if you're too

23  high, a 6, 7, 8, that's a bleed risk.  And so sometimes

24  physicians will hold the medication when that occurs.  Is

25  that correct?

Vanessa Shami - Direct (Lewis)                    1242

1    A.    Correct.

2    Q.    And you've done that before?

3    A.    Absolutely.

4    Q.    We know in this instance that after the bleed event,

5    there was one medication that was continued.  That was

6    Pradaxa; right?

7    A.    Yes.

8    Q.    Would you continue a medication if you thought that the

9    patient had too much of that medication in your -- in their

10   blood?

11   A.    No, I would not.

12   Q.    And we know that Plavix was discontinued after Mrs.

13   Knight's bleed.

14   A.    It was discontinued after her bleed, correct.

15   Q.    Okay.  The last subject relates to whether Pradaxa or

16   the GI bleed experienced by Mrs. Knight in May of 2013

17   contributed to her passing later that year.

18        And I think you've already explained that it's your

19   opinion to a reasonable degree of medical certainty that

20   neither the Pradaxa nor the GI bleed contributed to her

21   passing later that year?

22   A.    That is correct.

23   Q.    And let's look at a couple of the records that you

24   asked me to pick out to support that opinion.

25   A.    Absolutely.

Vanessa Shami - Direct (Lewis)                    1243

1   Q.   9007-A-146, which is admitted into evidence, is from

2   August 23rd of 2013?

3   A.   That is correct.

4   Q.   Do you recall this record?

5   A.   I do.

6   Q.   Okay.  And this is Dr. Snavely referred by Dr.

7   Abdelgaber in August.  And do you see where it says "reason

8   for consultation"?

9   A.   Yes, I do.

10  Q.   "Elevated troponin."  I think the jury may have heard

11  something about that earlier.  Do you know what that

12  generally means?

13  A.   Yeah.  So usually troponin levels can be elevated when

14  you have heart damage.  So the -- you know, it can occur

15  with heart failure as well.  But usually if you have

16  significant heart damage, those levels will be fairly high.

17       So it's, it's technically a, a blood test.  And it's --

18  we do it all the time to make sure somebody is not having a

19  heart attack.

20  Q.   And elevated means that there's a concern or potential

21  sign that a heart attack --

22  A.   Correct.

23  Q.   -- is being experienced?

24  A.   That's correct.

25  Q.   Okay.  And the jury is going to hear from another

Vanessa Shami - Direct (Lewis)                                    1244

1   cardiologist later, maybe even later today.  So we won't get

2   into too much more detail other than to look at the past

3   medical history down at the bottom of that page.

4        And you see that there is a recitation that goes -- it

5   starts on that page and actually rolls over to the next page

6   of many of the things.  And do you recall looking through

7   the medical records and seeing that Mrs. Knight was

8   struggling with many different conditions?

9   A.   Yes.

10  Q.   Okay.  And to the best of your recollection, are these

11  the conditions that are listed on Page 9007-A-147 and the

12  page before it?

13  A.   Yes.

14  Q.   Okay.  I want to go back to the page before it.  To be

15  fair, one of the things listed on number two is a history of

16  GI bleeding secondary to gastritis and what, kind of what

17  you've already told us, --

18  A.   AVM.

19  Q.   -- AVM.

20  A.   Correct.

21  Q.   So this doctor who is treating Mrs. Knight at this time

22  is aware, it appears, of this past history.  Is that fair?

23  A.   That is correct.

24  Q.   And that's important to be aware of past history.  As a

25  treating physician and getting referred to a patient, you

Vanessa Shami - Direct (Lewis)                    1245

1   want to figure that out, what else you've got to worry about

2   essentially; right?

3   A.    Absolutely.

4   Q.    And if we go to the plan which is on 148, let's look at

5   this.  And this is Dr. Snavely in the face of the

6   information he's collected on Mrs. Knight.

7         What does it say about Dr. Gunnalaugsson's view and the

8   medication that she had earlier for anti-platelet therapy?

9   A.    So it says clearly that he did not want her back on

10  Plavix due to the history of gastrointestinal bleeding.  And

11  --

12  Q.    And -- I'm sorry.  Go ahead.

13  A.    "We will keep her -- we will simply keep her on

14  low-dose aspirin along with the Pradaxa because I do not

15  think that the Pradaxa could be held in the long-term given

16  her multiple issues with blood clots."

17  Q.    So at this point in time, the decision was made,

18  despite the history, to keep her on Pradaxa and make sure

19  that she's not going to go back on Plavix even though she

20  had some signs of a potential heart attack.

21  A.    That is correct.  She needed to be on an anticoagulant.

22  Q.    Thank you for that.  And I just wanted to spend a

23  couple moments --

24        MR. LEWIS:  I'm going to move for the admission

25  first of Defendant's Exhibit 9013-B.  That's one that has

Vanessa Shami - Direct (Lewis)                    1246

1   not been admitted.  It is a subset of home healthcare

2   records.

3              MR. CHILDERS:  No objection, Your Honor.

4              THE COURT:  It's admitted.

5       (Defendant's Exhibit Number 9013-B admitted into

6   evidence.)

7              MR. LEWIS:  Permission to publish, Your Honor.

8              THE COURT:  You may.

9   BY MR. LEWIS:

10  Q.   And let me just step back for a minute.  As part of

11  your work in this case, did you review home healthcare

12  records related to Mrs. Knight's circumstances?

13  A.   I did.

14  Q.   And can you -- I don't think the jury has heard a lot

15  about home healthcare and what happened with Mrs. Knight

16  over time.  So could you kind of just describe a little bit

17  about the time frame that may have covered and what home

18  healthcare really is?

19  A.   Yeah.  My understanding looking at the records -- so

20  home health is -- so there's two kinds of, of assistance.

21      Home health usually means that somebody comes out to

22  the house as often as needed to check vital signs, to check

23  blood or to check on the patient, along with family members

24  being at home.

25      And then if you're in a rehab center, in-patient rehab

1    center, that's more of a, you know, daily -- it's not a

2    hospitalization at all but it's, it's a step up from home

3    health.

4         And in her situation, she's been in and out of skilled

5    nursing facilities, as well as have intermittent home health

6    the entire time that we've had records available.

7    Q.   And I just want to pick out one particular circumstance

8    and then maybe look at more of a summary which would be on

9    Page 9013-B-1539.

10   A.   Okay.  Mr. Lewis, I'm sorry.  I'm not following.  Which

11   tab was it?

12   Q.   9013-B.

13   A.   I think I'll look up here.

14   Q.   Okay.  It's pretty small and I apologize.  The home

15   healthcare reports are fairly lengthy when the folks come to

16   the house.  Is that fair?

17   A.   They are.  They're difficult to read as well.

18   Q.   And as part of the home healthcare, are they doing more

19   than just helping around the house?  Are they actually doing

20   some medical stuff?

21   A.   So they will check vital signs, as I was saying before.

22   They can check labs.  They can help with physical therapy,

23   occupational therapy.  So it really depends on what the

24   patient needs.

25   Q.   Could you blow that up the best you could?  I

Vanessa Shami - Direct (Lewis)                    1248

1   understand the print is really, really small and hard to

2   read.  I apologize for that.

3        But in this particular instance, this is from January

4   of 2012.  So this would be before Mrs. Knight had her stent

5   procedure.  But if -- I think this is one of the ones that

6   you had pointed out.  When the home healthcare provider

7   showed up at the house, Mrs. Knight had had a burning pan on

8   the stove.

9   A.   Yeah.  Unfortunately, she had, you know, an unsteady

10  gait.  There was a pan on the stove which, again, sort of

11  suggests issues with maybe potentially memory which has been

12  in her records.  She's had some documentation of dementia.

13  So the, the whole question of her safety has come up in this

14  note as well in a, in a few areas.

15  Q.   Okay.  And -- thank you.  I'm finished with that.

16       We prepared and you've looked at and sort of looked at

17  the backup medical records, a summary of some of the

18  conditions that Mrs. Knight had over time and, and --

19  including some of the hospitalizations.

20       Can you pull up the demonstrative of the list?

21       And if you look on the left-hand side, we see some of

22  the conditions that were problems or issues for Mrs. Knight

23  over the entire course of the records that you looked at.

24  Is that fair?

25  A.   That is correct.

Vanessa Shami - Direct (Lewis)

1    Q.    And would you agree that the conditions listed on the

2    left side, these are things that she had before she even

3    took Pradaxa?

4    A.    Yes.  And the list we have here is just 2008 to 2011.

5    Q.    So --

6    A.    And I think prior to, yes.

7    Q.    And several hospitalization stays.  There were multiple

8    days, particularly with her heart condition.  Is that right?

9    A.    That is correct.

10   Q.    And the longest was the clot that we've looked at

11   earlier today?

12   A.    She was there for 15 days, yes.

13   Q.    So when we get to the point in time of September of

14   2013 and Mrs. Knight passed away, there were physicians

15   on-site that had to make the decision as to the cause of her

16   death.

17   A.    That is correct.

18   Q.    This has been admitted into evidence as Exhibit 9001.

19   Are you familiar with -- unfortunately familiar with a death

20   certificate, the legal document where a doctor has to

21   indicate the cause of someone passing?

22   A.    Unfortunately, yes.

23   Q.    And do you see that this is a document that was signed

24   by Dr. Abdelgaber after Mrs. Knight passed away in

25   September?

Vanessa Shami - Direct (Lewis)                    1250

1   A.    That is correct.

2   Q.    And he indicates the, the immediate cause.  Do you see

3   where it says "cardiopulmonary arrest"?

4   A.    I do.

5   Q.    And do you -- based on your review of the medical

6   records to a reasonable degree of medical certainty, is that

7   consistent with what you have seen -- obviously, Dr.

8   Abdelgaber was on-site and present.

9   A.    Sure.

10  Q.    But is that consistent with what you saw in the medical

11  records as immediate cause of Mrs. Knight's passing?

12  A.    Yeah.  If you look at the medical records, she

13  complained, unfortunately, of chest pain, right-sided chest

14  pain.  And I think by the time the EMT docs got there, she

15  needed a breathing tube.  So the chest pain is one, one kind

16  of clue.

17      The second one is that her troponin levels when she

18  arrived were elevated.  They were significantly elevated,

19  which tells me she's had heart damage.  So I don't doubt

20  that diagnosis at all.

21  Q.    And Dr. Abdelgaber goes on to list three things that

22  may be underlying causes.  If you read to the left, that's

23  sort of the place where underlying causes, acute myocardia

24  infarction, --

25  A.    Atherosclerotic coronary artery disease and

Vanessa Shami - Direct (Lewis)                    1251

1    hyperlipidemia.

2    Q.   And, again, to a reasonable degree of medical

3    certainty, based on your review of the medical records, is

4    that consistent and do you agree with Dr. Abdelgaber's

5    listings here?

6    A.   Yes.

7    Q.   And then there are other significant conditions that

8    are listed under that.  And are you familiar with the

9    abbreviations that you see?

10   A.   Yes.  Congestive heart failure, CHF.  Hypertension or

11   high blood pressure is HTN.  CHD is chronic kidney disease.

12   And dementia is dementia, memory loss.

13   Q.   And based on your review of the records in this case,

14   was there support for those findings by Dr. Abdelgaber to a

15   reasonable degree of medical certainty?

16   A.   Yes.

17   Q.   Okay.  And so I want to ask you about this.  Do you

18   agree with Dr. Abdelgaber's decision not to put on this list

19   GI bleed or Pradaxa?

20   A.   Yes.

21   Q.   And would you state -- would you agree to a reasonable

22   degree of medical certainty that neither Pradaxa nor the GI

23   bleed from May of 2013 caused Mrs. Knight's passing?

24   A.   Absolutely.

25   Q.   Doctor, thank you for your time.  That's all I have for

1    now.

2    A.    Thank you.

3              THE COURT:  All right.

4              MR. CHILDERS:  Could I just have a few minutes to

5    set up?

6              THE COURT:  Yes.  We'll take about a five-minute

7    recess before we start the cross-examination.

8         (Recess taken from 2:08 p.m. until 2:15 p.m.)

9         (Jury not present)

10             THE COURT:  All right, Mr. Lewis, I understand

11   that there is a matter we need to address before.

12             MR. LEWIS:  Yes, Your Honor.  Thank you.

13        The Court is still considering the motion for directed

14   verdict and, in particular, related to the Medication Guide.

15   I'm concerned that more evidence on that issue, including

16   reciting the deficiencies as they've done with a lot of

17   witnesses in the case, is going to compound the problem that

18   I think we already have on that particular issue.

19        And I don't really know how to address it, but I wanted

20   to raise it with the Court now before the jury comes in on

21   how to, how to deal with that or whether we can preclude

22   that kind of an examination.

23             THE COURT:  Well, who's going to cross-examine?

24             MR. CHILDERS:  I am, Your Honor.

25             THE COURT:  Do you expect to ask her specific

1    questions about the adequacy of the Medication Guide?

2           MR. CHILDERS:  I don't, I don't expect to ask her

3    is it adequate, is it inadequate, anything like that.  I do

4    expect to ask her what's in it, what's not in it.  I believe

5    she was asked on direct about the label and the Medication

6    Guide.  So I think I have to follow up on that.

7           THE COURT:  Well, first, I think he's permitted to

8    ask what's in, what's out.  What you raised in your motion

9    was the preclusion of a claim based on the alleged

10   defectiveness, inadequacy of the Medication Guide itself as

11   a warning.

12       My understanding, and there doesn't appear to be any

13   dispute, is that under the federal regulations, the

14   Medication Guide is not subject to the unilateral change

15   that the label is subject to.

16       And it seems clear to me that both parties recognize

17   the case law from *Wyeth* and these subject cases has focused

18   on the labeling and the procedure by which a manufacturer

19   can unilaterally alter a label consistent with the same

20   regulations.

21       And I didn't recall -- my recollection was that

22   plaintiffs agreed that the Medication Guide was not subject

23   to unilateral modification, that the Medication Guide had to

24   go through an approval process.  And, therefore, they

25   weren't basing a claim of warning defect based on the

1    failure to change the Medication Guide.

2           MR. CHILDERS:  That's correct, Your Honor.  It's

3    just evidence of what was and what wasn't told to Ms.

4    Knight.

5           MR. LEWIS:  That's the -- see, here's the problem,

6    Your Honor.  The, the evidence of what's in, not in the

7    Medication Guide in making that presentation to the jury

8    that there's something missing from that, from the

9    Medication Guide is pre-empted.  That piece of their case is

10   pre-empted.

11          THE COURT:  I think there's a difference between

12   saying a claim based upon a failure of the Medication Guide

13   to constitute a sufficient warning is different from saying

14   what's in the Medication Guide, what's not in the Medication

15   Guide.

16          MR. LEWIS:  But if there's no claim that can be

17   had on what's in or not in the Medication Guide, then

18   there's no relevance under 402 and it's unfairly prejudicial

19   under 403 to even allow an examination or argument to that

20   effect.  The, the -- I'm sorry.

21          THE COURT:  Go ahead.

22          MR. LEWIS:  I was just going to say that's, that's

23   why there's a real problem with how they've presented their

24   case because they've presented their case as if there's a

25   problem with the Medication Guide because there's not stuff

1   in there that ought to be.  And if you're going to present

2   your case that way and make that argument or infer that to

3   the jury, that's pre-empted.  That's what the law doesn't

4   permit.

5          MR. MOSKOW:  Your Honor, may I ask the witness be

6   excused before I make my argument?

7          THE COURT:  Yes.  You will have to step down.

8          THE WITNESS:  Sure, absolutely.

9          THE COURT:  Why don't you go through here and shut

10  the door.

11         THE WITNESS:  Yes.

12     (The witness, Vanessa Shami, exited the courtroom.)

13         THE COURT:  All right.  I've asked my law clerk to

14  escort her down the hall.

15         MR. MOSKOW:  Thank you very much, Your Honor.

16     To be clear, the issue essentially raised on direct but

17  which is part and parcel of this entire case, is that the

18  only warnings the defendants can point to that they actually

19  gave to the Knight family are what's in the Medication

20  Guide.

21     So identifying information that is either in the label

22  or was in internal company documents within the knowledge of

23  BI that has not been given to the Knight family is fair game

24  for our failure to warn claim.

25     And this witness has now put herself out on a ledge

1    where she says that the label adequately warns of the risks

2    of the drug.  And now she's going to be entitled to sit

3    through cross-examination and identify what is in there and

4    what isn't, what the company knows, what it doesn't know,

5    and whether or not they properly advised the Knight family

6    of those issues.

7             MR. LEWIS:  Again, Your Honor, the testimony on

8    direct doesn't change the legal analysis on what they can

9    and cannot claim or present in the case.  Let me give the

10   Court another example.

11        There's a well established body of precedent that says

12   you cannot make a claim or infer that there was fraud on the

13   FDA.  It's called Buckman pre-emption, very, very commonly

14   comes up in these types of pharma cases as well.

15        That doesn't preclude the defendant from saying we gave

16   all of the stuff to the FDA that they needed to get.  But

17   the plaintiff cannot come into the case and say, "Oh, yeah.

18   Well, you committed a fraud on the FDA when you did that."

19   That piece of the case is barred by federal pre-emption.

20             THE COURT:  Well, I'm going to I guess effectively

21   deny your request to limit the scope of the

22   cross-examination.  I believe they can cross-examine her

23   about what is in the Medication Guide, what is not in the

24   Medication Guide.

25        I have indicated and I will confirm that I think the

Vanessa Shami - Cross (Childers)

1    appropriate way to address the Medication Guide and the

2    evidence about it is to explain what arguments are permitted

3    or not permitted concerning the claims as they might be

4    connected to the Medication Guide.  So that's the way I

5    intend to deal with it.

6              MR. LEWIS:  Thank you, Your Honor.

7              THE COURT:  Okay.

8              MR. MOSKOW:  Thank you, Your Honor.

9         (The witness, Vanessa Shami, returned into the

10   courtroom.)

11             THE COURT:  Let's bring the jury out.

12        (Jury returned into the courtroom at 2:25 p.m.)

13             THE COURT:  All right, you may be seated.

14        Plaintiffs may cross-examine the witness.

15             MR. CHILDERS:  Thank you, Your Honor.

16                      CROSS EXAMINATION

17   BY MR. CHILDERS:

18   Q.   Good afternoon, Doctor.

19   A.   Good afternoon.

20   Q.   Just toward the end of your direct examination you

21   spent quite a bit of time talking about medications that

22   Betty Knight had been on.  Do you recall that?

23   A.   Yes, I do.

24   Q.   And, in particular, one of the things that you talked

25   about was this chart that you called "Pradaxa no stroke or

Vanessa Shami - Cross (Childers)                    1258

1   bleed complications."  Right?

2   A.    That is correct.

3   Q.    And you pointed out on here that, in particular, Ms.

4   Knight was started on Plavix in April, 2013; right?

5   A.    That is correct.

6   Q.    I just want to make sure the jury is, is clear on this.

7   It's not your opinion that Plavix caused this bleed, is it?

8   A.    All I'm saying is that the, the difference between

9   those 18 months and whatever led to the bleed was the

10  addition of Plavix.

11  Q.    That's not my question.  My question is it's not your

12  opinion that Plavix caused Ms. Knight's bleed; correct?

13  A.    Correct.

14  Q.    Okay.  You don't have any opinion as to whether any of

15  the medications that Ms. Knight was taking caused her bleed;

16  isn't that right?

17  A.    My opinion is that any of them could have caused

18  bleeding.  I think the cause of bleed -- I've made this very

19  clear in the past -- is the AV malformation.

20  Q.    Ma'am, you don't have any opinion about whether

21  aspirin, Plavix, or Pradaxa played any part in Betty

22  Knight's bleed in May of 2013, do you?

23  A.    It potentially could have contributed to it.

24  Q.    Do you recall we met before, you and I, --

25  A.    I do.

Vanessa Shami - Cross (Childers)                    1259

1   Q.    -- in Charlottesville?

2   A.    I do.

3   Q.    And I took your deposition; correct?

4   A.    Yes, you did.

5   Q.    And before the deposition you prepared a report that

6   was given to me so that I could ask you questions; right?

7   A.    Absolutely.

8   Q.    And before the deposition, you raised your hand like

9   you did here in court and said, "I swear or affirm that I

10  will tell the truth."  Correct?

11  A.    Absolutely.

12  Q.    Okay.  And do you recall in your deposition that I

13  asked you --

14          MR. LEWIS:  Your Honor, could I get a page and

15  line number?

16          THE COURT:  Certainly.

17          MR. CHILDERS:  I'm happy to -- may I bring one up

18  to the witness, Your Honor?

19          THE COURT:  You may.

20  BY MR. CHILDERS:

21  Q.    I'll tell you exactly where I am.  Okay?

22  A.    Okay.

23  Q.    Do you recognize that as a copy of your deposition?

24  A.    I do.

25  Q.    Have you seen it before?

Vanessa Shami - Cross (Childers)                    1260

1    A.    I have.

2    Q.    Probably read it before you came here today; correct?

3    A.    A while ago, yes.

4    Q.    Okay.  If you look on Page 147, --

5    A.    I see it.

6    Q.    Actually, you know what.  Let's, let's start at 146.

7    Do you see I asked you at line 20, "I'm asking you if you

8    believe that Plavix played any part in her bleed."

9          And you answered, "I can't tell you."

10         Correct?

11   A.    Absolutely.

12   Q.    And then on the following page on Page 147 I asked you,

13   "Can you tell me if Plavix -- her being on Plavix didn't

14   contribute in any way?"

15         And you said, "I can't tell you."

16         Right?

17   A.    Correct.

18         MR. LEWIS:  Objection, Your Honor.  She hasn't

19   said anything inconsistent with either one of those things.

20         THE COURT:  Well, I'll leave that to the jury.

21   Overruled.

22   BY MR. CHILDERS:

23   Q.    And then I asked you, "Same question for aspirin.  Can

24   you tell me that didn't contribute to her bleed?"

25         And you said, "No."

Vanessa Shami - Cross (Childers)

1      Correct?

2   A.   Yes.

3   Q.   And then I asked you, "Can you tell me that any one of

4   them did contribute to Ms. Knight's bleed?"

5        And you answered, "No.  I think she had an AVM that

6   bled."

7        Correct?

8   A.   That is correct.

9   Q.   And then my follow-up question to that was, "And

10  whether or not aspirin, Plavix, or Pradaxa or any

11  combination of those drugs played a part in the bleed, you

12  don't have an opinion."

13       And you answered, "That's correct."

14       Right?

15  A.   I did answer that here.

16  Q.   And that's your opinion today; correct?

17  A.   My opinion is no different than what I just mentioned

18  before.  It's exactly the same.  She bled from an AVM and

19  I've been very --

20  Q.   Understood.  But you don't have an opinion that Pradaxa

21  or Plavix or aspirin or any combination of those drugs

22  played any part in that bleed; correct?

23  A.   You just read the deposition.

24  Q.   Is that what you told me in the deposition, ma'am?

25  A.   Yes.

Vanessa Shami - Cross (Childers)                    1262

1    Q.   Okay.  And that's what you're going to tell the jury
2    here today; correct?
3    A.   Sure.
4    Q.   Despite the fact that you talked about all these
5    medicines and showed them this chart, you don't have an
6    opinion that Plavix caused Ms. Knight's bleed; right?
7    A.   Correct.  And that chart is very relevant to show the
8    jury the sequence of medications that were added on.
9    Q.   Before you came here today, you billed 127 hours of
10   time working on Pradaxa in general and Pradaxa in this case;
11   correct?
12   A.   Correct.
13   Q.   Almost 60 hours of that was just this case, Betty
14   Knight's case; correct?
15   A.   That is correct.
16   Q.   And after spending all of that time working on this
17   case, you can't tell the jury if even one of the medications
18   Betty Knight was taking played any part in her bleed;
19   correct?
20   A.   There's nobody that's going to be able to tell you
21   which one, if not one, two, or three of them, contributed to
22   the bleed.
23   Q.   Ma'am, I'm not sure you heard my question.  My question
24   was, you can't tell the jury that any one of them or any
25   combination of them played any part in the bleed.  That's

Vanessa Shami - Cross (Childers)                    1263

1    what you told me when I took your deposition.  Correct?

2    A.   That's not quite but --

3    Q.   Do you want me to read it again?

4    A.   Go ahead.

5    Q.   Okay.  The question, "Whether or not aspirin, Plavix or

6    Pradaxa or any combination of those drugs played a part in

7    the bleed, you don't have an opinion."

8         And what was your answer?

9    A.   "No."

10   Q.   I believe your answer was, "That's correct."  Right?

11   A.   Which page are you on now?

12   Q.   Page 147 that we just read.

13   A.   Okay.  That's correct, yes.

14   Q.   You're not telling the jury today you have a different

15   opinion, are you?

16   A.   I have not suggested one bit.  The jury has heard that

17   I think she bled from an AVM.  She was --

18   Q.   And you don't -- I'm sorry.  Go ahead.

19   A.   No, go ahead.  I have not been inconsistent at all

20   today.

21   Q.   But you don't believe any medication played a part in

22   that AVM bleed; correct?

23   A.   It could have.

24   Q.   You don't have an opinion that any one of them did,

25   though; correct?

Vanessa Shami - Cross (Childers)                    1264

1   A.    They could have.

2   Q.    You don't have an opinion that one of them did to a

3   reasonable degree of medical certainty, do you, ma'am?

4   A.    No.

5   Q.    Okay.  You can't say putting Betty on Plavix caused her

6   bleed; right?

7   A.    That is correct.

8   Q.    You can't say that Pradaxa did not cause her bleed;

9   correct?

10  A.    I don't think you can say it did cause her bleed.

11  Q.    You can't say that it did not; correct?

12  A.    Correct.

13  Q.    Okay.  Do you agree that the Pradaxa label itself --

14  you've reviewed those labels; right?

15  A.    I have.

16  Q.    Do you agree that label says Pradaxa can cause

17  bleeding; correct?

18  A.    Absolutely.

19  Q.    And you agree that Pradaxa can cause what would

20  normally be insignificant malformations or lesions or

21  fissures in the GI tract to become major or life-threatening

22  bleeds; right?

23  A.    They could.  It definitely can.

24  Q.    Okay.  And you think that Ms. Knight, Betty, had a

25  malformation like that, an AVM; correct?

Vanessa Shami - Cross (Childers)                1265

1    A.    Yes.

2    Q.    You told us that's where she bled; right?

3    A.    Correct.

4    Q.    I think she had that AVM for several years before it

5    bled; correct?

6    A.    It's, it's possible that she had that one or if not

7    more.  Usually patients don't just have -- many times, about

8    40 percent of the time if they have one AVM, they can have

9    numerous AVMs.  And she has risk factors for those AVMs

10   including age, renal insufficiency, and cardiac issues.

11   Q.    How many AVMs did Dr. Huh find on the colonoscopy he

12   did?

13   A.    One.  But as you saw in my, my slide prior to this when

14   I opened up, we're just covering a very small portion of the

15   bowel when we do endoscopy.  The entire small bowel which is

16   actually many, many feet is left uncovered.  So we are

17   absolutely not taking a look at the entire GI tract.

18   Q.    So when you say she may have had more than one AVM,

19   that's just a guess; right?

20   A.    Absolutely.

21   Q.    Okay.  You don't have any evidence that she had more

22   than one AVM; right?

23   A.    I do not.

24   Q.    Okay.  Even though you think that Betty had that AVM

25   for several years, you agree with me that she never noticed

Vanessa Shami - Cross (Childers)                                    1266

1   blood coming from her rectum until May of 2013; right?

2   A.   That's incorrect.

3   Q.   But she -- you believe she noticed red blood coming

4   from her rectum prior to May of 2013?

5   A.   Blood can be dark.

6   Q.   Okay.

7   A.   And blood can be red.

8   Q.   Okay.

9   A.   So red blood, you're correct; dark blood, you're

10  incorrect.

11  Q.   Red blood would be evidence of a frank bleed, one

12  that's happening right now; right?

13  A.   Or it could be -- yes.  The answer is "yes."

14  Q.   She never had that prior to May of 2013, did she?

15  A.   She did not have red blood, correct.

16  Q.   And that wasn't just from her.  None of her doctors

17  ever noticed she had red blood coming from her rectum until

18  May of 2013; right?

19  A.   You are correct.

20  Q.   All right.  It seemed to me that you had sort of five

21  things that you wanted to tell the jury while you were

22  testifying today.  Let me see if I can get them right.

23  A.   Sure.

24  Q.   The jury has seen my handwriting before and it's not

25  great but I hope you guys can follow it.

Vanessa Shami - Cross (Childers)

1    The first one was:  Was warfarin safe and effective for

2  Betty Knight?  Right?  Wasn't that the first one you talked

3  to Mr. Lewis about?

4  A.    Yes, we did.

5  Q.    Okay.  You don't manage atrial fibrillation patients in

6  your practice; right?

7  A.    I have numerous patients with atrial fibrillation, but

8  I do not directly manage them, correct.

9  Q.    When you say you have numerous patients with atrial

10  fibrillation, that's the same as saying you have numerous

11  patients who have cancer but you're not treating their

12  cancer; right?

13  A.    Not quite correct but -- because I do endoscopic

14  ultrasound and I inject things into cancers.  So that's

15  incorrect.

16  Q.    Ma'am, do you remember I asked you that question at

17  your deposition?

18  A.    Uh-huh.

19  Q.    Do you want to look at it again?  If you'd go to Page

20  35.

21  A.    Sir, I now since that deposition inject fiducials and

22  that's a new procedure I do.  So I didn't feel like it would

23  be honest for me to preclude that.

24  Q.    That's something that you just started doing?

25  A.    Absolutely started doing.

Vanessa Shami - Cross (Childers)                1268

1    Q.   Okay.  But you do agree at the time of your deposition

2    saying you treat AFib patients with the same --

3    A.   I never placed a fiducial back then.

4         THE COURT:  Wait until he finishes his question.

5         THE WITNESS:  Absolutely.

6    BY MR. CHILDERS:

7    Q.   I didn't hear what you said, ma'am.

8    A.   You go ahead.

9    Q.   At the time of your deposition you agreed with me that

10   saying you treat atrial fibrillation patients is the same as

11   saying you treat cancer patients but you don't actually

12   manage any of their care; right?

13   A.   Absolutely.

14   Q.   Okay.  You don't typically calculate a patient's time

15   in therapeutic range on warfarin or Coumadin, do you?

16   A.   No.

17   Q.   But you told the jury that you did that here for Betty

18   Knight's case; right?

19   A.   I looked at the INRs.

20   Q.   And -- but, but if I understood you correctly, I think

21   you said you looked at all the INRs of the chart and you

22   just added up how many were in range and how many were out

23   of range and compared them?  Is that right?

24   A.   That is correct.

25   Q.   You know that's not how you calculate time in

Vanessa Shami - Cross (Childers)                    1269

1   therapeutic range; right?

2   A.   No, but we're demonstrating a point that she cannot --

3   it's very hard for her to stay in that 2 to 3 range.

4   Q.   Time in therapeutic range is an actual time when a

5   person stays in range.  It's not the number of tests they

6   have.  Correct?

7   A.   Correct.

8   Q.   And so you told the jury it was only about 40 percent

9   based on the way you did it which is not actually

10  calculating the time in therapeutic range; right?

11  A.   I said less than 50 percent, A; and, B, that is the

12  number of times I calculated based on the INR.  So that is

13  very consistent with what I've said.

14  Q.   If you calculate the time in therapeutic range

15  correctly by using the amount of time in therapeutic range,

16  would it surprise you to know Betty was actually in range

17  about 60 percent of the time?

18  A.   I wouldn't be surprised but that's below our goal of

19  70 percent.

20  Q.   Now, in the RE-LY trial patients who were on warfarin

21  that they compared Pradaxa to, they were less than

22  60 percent time in therapeutic range; correct?

23  A.   Yes.

24  Q.   So she actually had a better time in therapeutic range

25  on warfarin than the patients that were used in the trial,

Vanessa Shami - Cross (Childers)

1  Pradaxa trial to compare warfarin; correct?

2  A.    Correct, but it's not ideal.

3  Q.    While Ms. Knight, or Betty was on warfarin do you agree

4  with me that not one of her doctors put in the record that

5  they recommended she needed to switch to a different

6  anticoagulant medication?

7  A.    Yes.  However, I have a qualification to that.

8  Q.    Okay.

9  A.    The records are incomplete.

10 Q.    Okay.  You said you saw records from 2008 until the

11 time Betty died?

12 A.    You and I know there are many records in 2008 that are

13 missing.

14 Q.    Ma'am, you saw records from 2008 to 2009?

15 A.    Yes.

16 Q.    Okay.  And in any of those records did you see any

17 instance where any of her doctors, any of them, hospital,

18 doctors who treated her at their office said, "We think

19 Betty Knight needs to be on a drug different than warfarin

20 to prevent strokes"?

21 A.    Dr. MacFarland.

22 Q.    When was that, ma'am?

23 A.    When we showed you the switch to the NOAC.

24 Q.    To Pradaxa?

25 A.    Uh-huh.

1   Q.   You're aware that that was actually initiated by Betty

2   Knight's family; correct?

3   A.   Not according to the note.

4   Q.   Okay.  Have you reviewed all the records?

5   A.   Yes.

6   Q.   Okay.  Have you reviewed all the depositions?

7   A.   Yes.

8   Q.   Okay.  And you saw the -- you reviewed the deposition

9   of Rick Knight and Claudia Stevens; right?

10  A.   Yes.

11  Q.   Did you choose to disbelieve their testimony?

12  A.   No, absolutely not.

13  Q.   Okay.  And you saw -- you read the deposition of

14  Dr. MacFarland; correct?

15  A.   Yes.

16  Q.   And she said that the records reflected someone called

17  from Betty Knight's family and requested that she be

18  switched; correct?

19  A.   Correct.  But MacFarland wrote on an official piece of

20  paper that goes into the insurance company the reasons for

21  why the switch was made.  So I have no doubts about the

22  family contacting MacFarland, but it wasn't a unilateral

23  decision.

24  Q.   Understood.  Prior to that, prior to that medical

25  appointment that they had with Dr. MacFarland's office, did

Vanessa Shami - Cross (Childers)                    1272

1  you see any record where Dr. MacFarland wrote, "Betty Knight

2  needs to switch to a different anticoagulant medication"?

3  A.   No.

4  Q.   You spent some time talking about November of 2008

5  where you said that you thought the records reflected that

6  Betty had a GI bleed on warfarin; is that right?

7  A.   That is correct.

8          MR. CHILDERS:  I apologize, Your Honor.

9          THE COURT:  That's all right.

10     (Pause)

11 BY MR. CHILDERS:

12 Q.   You reviewed those records and I think even walked

13 through them some with Mr. Lewis; correct?

14 A.   Correct.

15         MR. CHILDERS:  May I approach, Your Honor?

16         THE COURT:  You may.

17 BY MR. CHILDERS:

18 Q.   Doctor, I've handed you the records from that November,

19 2008 deposition.  Do you see that?

20 A.   Yes.

21         MR. CHILDERS:  And for the record, Your Honor,

22 this is out of Exhibit 2000 which has already been admitted

23 into evidence and these are Pages 3178 through 3199.

24 BY MR. CHILDERS:

25 Q.   Correct?

Vanessa Shami - Cross (Childers)

1    A.    Correct.

2    Q.    Nothing in these records says that Betty Knight noticed

3    that she was having any red blood or bleeding that she

4    noticed; correct?

5    A.    There is a mention of dark stools.

6    Q.    We'll get there.  Is there any mention of a bleed in

7    the history and physical?

8    A.    No, not in -- not in the first page.

9    Q.    And that tells you why the person came into -- I'm

10   sorry.  Could we -- the history and physical tells you why a

11   person came into the hospital; right?

12   A.    Yes.

13   Q.    Chief complaint tells you this is why the person came

14   to the hospital; right?

15   A.    That is correct.

16   Q.    And then underneath that we have the history of present

17   illness which doesn't at all mention anything about GI

18   bleed; correct?

19   A.    Keep in mind -- no.  Her hemoglobin at that time was

20   10.

21   Q.    Does it mention GI bleed?

22   A.    Not there.

23   Q.    Okay.  And I thought you said earlier today that she

24   went to the hospital complaining of symptoms consistent with

25   a GI bleed; is that right?

Vanessa Shami - Cross (Childers)

1    A.    Yes, weakness and mental status changes.

2    Q.    Okay.  She was also coming in because of problems with

3    her heart; right?

4    A.    Correct.

5    Q.    Are weakness and mental status changes symptoms of

6    that?

7    A.    Yes, can be.

8    Q.    Okay.  If we would -- if you would turn the page with

9    me to 3179, if we look -- if we blow up under the Review of

10   Systems, do you see there's a section for GI in the Review

11   of Systems?

12   A.    Yes.

13   Q.    And that says no melena, hematochezia, nausea, vomiting

14   or diarrhea; correct?

15   A.    That is correct.

16   Q.    And that means -- well, let's start with melena.

17   Melena means black stools; right?

18   A.    It does.

19   Q.    It says she didn't have black stools; right?

20   A.    In there it does, yes.

21   Q.    And then hematochezia, that's a bloody stool; right?

22   A.    That is correct.

23   Q.    And it says she doesn't have that; right?

24   A.    In this note, yes.

25   Q.    Okay.  The lab at the hospital can actually -- if you

Vanessa Shami - Cross (Childers)                    1275

1  can't see blood, they can actually test someone's stool to

2  see if there's microscopic blood in the stool; correct?

3  A.   That's pretty archaic.  We don't do that very routinely

4  anymore.

5  Q.   Can they do it or not?

6  A.   You can do it.

7  Q.   Okay.  And it's called a guaiac test?

8  A.   Yes, but the guaiac is positive for numerous reasons so

9  we don't, we don't use it as gastroenterologists.  It's

10 extraordinary.  The last time I ordered a guaiac was maybe

11 four years ago.

12 Q.   You realize this was more than four years ago; right?

13 A.   Yes.

14 Q.   Okay.  This was 10 years ago; right?

15 A.   Ten years ago.

16 Q.   Yeah, November of 2008.

17 A.   Time flies when you're having fun.

18 Q.   So it wasn't such an ancient test back then; right?

19 A.   Yeah.

20 Q.   Okay.  And there's no evidence in the record that they

21 did -- that they found a positive guaiac from her stool;

22 correct?

23 A.   That is correct.

24 Q.   Okay.  If we could turn to Page 3181 which is a consult

25 from Dr. Haberman, do you see that?

Vanessa Shami - Cross (Childers)

1    A.    I do.

2    Q.    He doesn't mention GI bleed anywhere in this record;

3    correct?

4    A.    That is correct.

5    Q.    And he doesn't mention that he saw any evidence of a GI

6    bleed; correct?

7    A.    Let me see.  That is correct.

8    Q.    Okay.  If we turn to the next page, there's a section

9    called "Impression."  Do you see that?

10   A.    I do.

11   Q.    And it says on the third one, "Anemia which might be

12   secondary to the recent initiation of Coumadin."  Do you see

13   that?

14   A.    I do see that.

15   Q.    So this is the part where he's trying to decide what's

16   causing the anemia; right?

17   A.    Correct.

18   Q.    And he says it might be related to the Coumadin;

19   correct?

20   A.    Yes.

21   Q.    Okay.  So this is the beginning of the investigation

22   that he does; right?

23   A.    Yes.

24   Q.    Okay.  And then -- and, by the way, the words "GI

25   bleed" don't appear anywhere in that impression; correct?

1  A.   Not in there, no.

2  Q.   All right.  The words "GI bleed" don't appear in any

3  one of the pages out of the whole bunch that I gave to you,

4  do they?

5  A.   No, but why would you have a gastroenterologist

6  involved?

7  Q.   Is all you do is treat GI bleeds?

8  A.   No.  We treat other things.

9  Q.   Okay.  So it wouldn't be unusual for you to treat a

10  patient who wasn't having a GI bleed; right?

11  A.   As an in-patient, it's usually the majority of the time

12  GI bleeding.  It's not usually for reflux or something that

13  can be managed as an out-patient, so the majority of the

14  time.

15  Q.   Okay.  Did you see the words "GI bleed" anywhere in all

16  these records?

17  A.   No.  Like I said, I saw dark stools and a hematocrit

18  drop.

19  Q.   I promise you we'll get there.

20  A.   Okay.

21  Q.   If we could turn two pages to Page 3184, do you see

22  this is the following day?

23  A.   I do.

24  Q.   And this time she was seen by Dr. Rohrbach; correct?

25  A.   Yes.

Vanessa Shami - Cross (Childers)

1  Q.   Okay.  And we heard -- I think you talked a little bit

2  about this record earlier -- that he's a cardiologist; is

3  that right?

4  A.   That is correct.  He's a gastroenterologist.

5  Q.   Or a gastroenterologist.  I apologize.

6  A.   Yes.

7  Q.   And then do you see anything in the ancient -- in the

8  history that says she's noticed she's having blood coming

9  from her rectum?

10  A.   I don't know if I should repeat what he says again.

11  But it says clearly that she has had diarrhea for about two

12  days -- and mind you, you get diarrhea with GI bleeding --

13  after the CT scan and said it was a little darker than

14  usual.

15  Q.   Was that CT scan with or without contrast?

16  A.   I don't know.

17  Q.   Okay.  Would you expect a patient might have diarrhea

18  after getting contrast dye from CT?

19  A.   You can --

20  Q.   Okay.

21  A.   -- but not two days later.

22  Q.   He, he timed it to the CT scan; correct?

23  A.   He says for about two days after.

24  Q.   Okay.  Meaning for two days after she had that CT scan,

25  she said she had diarrhea; right?

Vanessa Shami - Cross (Childers)

1  A.   That is correct.

2  Q.   And then he says, "And said it was a little darker than

3  usual."  Right?

4  A.   That is correct.

5  Q.   And that's what you're telling the jury is black

6  stools; right?

7  A.   Absolutely.

8  Q.   Okay.  Did he say anywhere in the record that he saw

9  any black stools?

10  A.   No, he doesn't.

11  Q.   Did he say in the record anywhere that he had her

12  stools tested and they were guaiac positive meaning there

13  was blood in them?

14  A.   No.

15  Q.   Okay.  And then if we look on the following page, we

16  have a section called "Impression."  Do you see that?

17  A.   I do.

18  Q.   And it says, "Anemia.  This certainly does need

19  evaluation given her need for long-term anticoagulation.  We

20  will start her work-up with an upper endoscopy.  And if this

21  is unremarkable, at some point she will probably require

22  colonoscopy as well."  Right?

23  A.   That is correct.

24  Q.   And you told us about endoscopies.  You do them all the

25  time.

Vanessa Shami - Cross (Childers)

1    A.    Absolutely, yes.

2    Q.    That's using a scope to go look into the person's GI

3    tract?

4    A.    Yes.

5    Q.    If you turn to the next page, do you see this is the

6    following day while she's still in the hospital?

7    A.    My next page is a catheterization report.

8    Q.    That's right.  That's the next day while she's still in

9    the hospital; correct?

10   A.    Yes.

11   Q.    Okay.  And that catheterization report notes -- if we

12   can click off of that, Gina, down to the very bottom and

13   going on to the next page -- do you see it notes that during

14   this catheterization she had stents placed?

15   A.    That is correct.

16   Q.    To have a procedure like this, Betty had to be off of

17   her anticoagulant; correct?

18   A.    Potentially, yes.

19   Q.    That's standard practice.  If you're going to do a

20   stent, you're going to do a heart catheterization, you take

21   the patient off their anticoagulant, don't you?

22   A.    Yes.

23   Q.    Okay.  And then if we look at the following page, 3187,

24   this is that same record.  And the plan -- it says that the

25   decision -- number six says the decision of whether to

Vanessa Shami - Cross (Childers)

1  restart the Coumadin will be left to Dr. Haberman; right?

2  A.   Yes.

3  Q.   So the cardiologist did a heart catheterization while

4  she's not on, not on warfarin because that's standard

5  procedure; right?

6  A.   Correct.

7  Q.   And they said whether or not she restarts it, that's

8  somebody else's decision; right?

9  A.   Correct, but she's been in the hospital now -- if you

10 look at the date of procedure, she has been in the hospital

11 for a few days by then.  So --

12 Q.   I understand that.  My question simply was the doctors

13 who did the heart catheterization said somebody else is

14 going to decide whether or not she goes back on it; right?

15 A.   Correct.

16 Q.   And then if we turn one more page, we see the actual

17 endoscopy report that Dr. Rohrbach said he wanted to

18 perform; right?

19 A.   Yes.

20 Q.   And he did what's called an upper endoscopy meaning he

21 checked from her throat or -- excuse me -- from her mouth, I

22 guess, all the way into her stomach.  Did he go past her

23 stomach?

24 A.   To the small bowel, the beginning portion of the small

25 bowel which is, again, like I described before, just a

Vanessa Shami - Cross (Childers)                    1282

1    minority of the entire GI tract.

2    Q.   When you do an endoscopy, you do upper or you do lower

3    endoscopy; right?

4    A.   Yes.

5    Q.   This was the upper; right?

6    A.   That is correct.

7    Q.   Okay.  And what he said right here, no blood was noted.

8    Right?

9    A.   In the upper tract, yes.

10   Q.   Well, that's the only place he was checking; right?

11   A.   Yes.

12   Q.   The entirety of the area he checked, no blood was

13   noted; right?

14   A.   Correct.

15   Q.   And then he wrote "normal upper endoscopy;" right?

16   A.   He did.

17   Q.   This record from the actual test that was done where

18   the scope was put into Betty's body didn't show any evidence

19   of a GI bleed; right?

20   A.   Right.  About -- again, as I want to point out, it's

21   less than five percent of the GI tract.  So there was about

22   95 percent of the GI tract that's uncovered here.

23   Q.   Okay.  And in looking at that part of the GI tract,

24   there's not any evidence of a GI bleed; correct?

25   A.   That is correct.

Vanessa Shami - Cross (Childers)

1  Q.    You testified several times now Betty had dark stools;

2  right?  That was what you thought it meant when it said

3  diarrhea that was a little darker than usual?

4  A.    Yes.

5  Q.    Do you agree with me dark stools are more likely to be

6  from an upper GI bleed than from a lower GI bleed?

7  A.    That is correct.

8  Q.    Okay.  And, again, Betty's endoscopy showed no upper GI

9  bleed; correct?

10  A.    No, but I have a qualification there.

11  Q.    My question was really a "yes" or "no."

12  A.    Okay.

13  Q.    And then if we look to the following page, Betty was

14  discharged the following day; right?

15  A.    She was.

16  Q.    And then if we look below that, there's a list of 24

17  discharge diagnoses; right?

18  A.    Yes.

19  Q.    Not one of those says gastrointestinal bleed, does it?

20  A.    Iron deficiency, anemia.

21  Q.    Do you see the words "gastrointestinal bleed" anywhere,

22  Doctor?

23  A.    No.

24  Q.    All right.  You showed us a progress note from Dr.

25  Gunnalaugsson.  You talked about that with Mr. Lewis.  I

Vanessa Shami - Cross (Childers)                              1284

1   believe it was Exhibit 9009-0273.  And this was from, about

2   a month, less than a month later, December 5th, 2008;

3   correct?

4   A.   I see it.

5   Q.   And I think if you still have the binder that Mr. Lewis

6   gave you, it's in there under that number, tab 9009-A, page

7   number 273.  I wrote this down when you were testifying, so

8   I apologize if I got it wrong.  But I thought what I heard

9   you say was this one progress note meant to you that all of

10  Betty Knight's healthcare providers were in agreement that

11  Betty had a GI bleed.  Is that what you said?

12  A.   So there are numerous references to her chronic GI

13  bleeding.  MacFarland has mentioned it in prior notes.  Her

14  cardiologist has mentioned it in prior notes.  So it's not

15  all of them, but it's more than one.

16  Q.   So -- but that was based on this record that you told

17  us you thought this meant to you her doctors, whether they

18  be all or some, were in agreement that she had a GI bleed;

19  right?

20  A.   Yes.

21  Q.   And that GI bleed you're talking about is the one that

22  we just saw was not actually written as a GI bleed anywhere

23  in the records we looked at; right?

24  A.   It wasn't written in the records, correct.

25  Q.   Okay.  You relied on more than just this one record

Vanessa Shami - Cross (Childers)                    1285

1    from Dr. Gunnalaugsson; correct?

2    A.    Yes.

3    Q.    There was another office visit that you looked at with

4    Mr. Lewis from Dr. Gunnalaugsson that was from a few months

5    after this?

6    A.    Correct.

7    Q.    March 12th, 2009?

8    A.    Uh-huh.

9    Q.    And that was Exhibit Number 9005-26.  Do you recall

10   seeing that?

11   A.    I do.

12   Q.    My recollection was you guys talked about the second

13   page but didn't talk about the first page of this document.

14   Is that right?

15   A.    Correct.

16   Q.    Let's look at the first page with the jury.  Okay?

17         And if you could blow that back up, Gina.

18         I'm sorry, wrong page.  I'm sorry, past medical history

19   on Page 1.

20         Number four says "history of presumed GI bleed although

21   not confirmed."  Correct?

22   A.    It says it on there, but that's different than what he

23   said in other notes.

24   Q.    This is after the note that we just looked at that you

25   said was -- told you all of her doctors were in agreement

Vanessa Shami - Cross (Childers)                    1286

1   that she had a GI bleed; correct?

2   A.   She did have a GI bleed, correct.

3   Q.   This record is made by the same doctor who previously

4   said he thought she had a GI bleed; correct?

5   A.   Correct.

6   Q.   And this was three months after the record that we have

7   looked at before; right?

8   A.   Can I --

9   Q.   Is it three months after or is it not three months

10  after?

11  A.   It is.  But can I interject something important?

12  Q.   You can when your counsel gets back up and asks some

13  more questions.

14  A.   Okay.  Fair enough.

15  Q.   Sorry.  We have certain rules.

16  A.   Fair enough.

17  Q.   I think you also testified, if I heard you correctly,

18  Ms. Knight had never been on Plavix, aspirin, and Coumadin

19  at the same time; right?

20  A.   Not the records that I've seen, that I've been

21  provided.

22  Q.   Let's just look at the record we're on right now.

23  A.   Sure.

24  Q.   What's listed under "Medications"?

25  A.   Plavix, aspirin.

Vanessa Shami - Cross (Childers)                    1287

1    Q.    Okay.  If we go onto the next page of the same record,

2    Coumadin?

3    A.    Coumadin as directed.

4    Q.    Right, meaning whatever dose you're supposed to be

5    taking; right?

6    A.    Correct.

7    Q.    So when you told the jury she'd never been on those

8    three medications together, that's wrong based on this

9    record; correct?

10   A.    She's been on and off the Coumadin.  She's been on and

11   off the aspirin.  And, like I said, the records are pretty

12   incomplete when it comes to Coumadin.

13   Q.    This record is pretty clear.  On the medications that

14   she's on that day, Plavix, aspirin and Coumadin; correct?

15   A.    I see that, yes.

16   Q.    Okay.  So when you told the jury she'd never been on

17   all three of those medications before, you meant other than

18   this record; right?

19   A.    Well, I didn't notice this.

20   Q.    This is a record --

21   A.    My apologies to the jury.

22   Q.    You talked about this record with counsel in your

23   direct examination; right?

24   A.    I did.  I did.

25   Q.    She didn't have a bleed while she was on those three

Vanessa Shami - Cross (Childers)                    1288

1  medications together, did she, Plavix, aspirin and Coumadin?

2  A.   Not, not at this time.  You're correct.

3  Q.   She never did when she was on those three medications;

4  correct?

5  A.   That is correct.

6  Q.   Okay, all right.  I want to ask you some more about Dr.

7  Gunnalaugsson.

8  A.   Sure.

9  Q.   You didn't only rely on his records.  You relied on his

10  testimony too.  Correct?

11  A.   Yes.

12  Q.   Okay.  And you agree with me that when you read his

13  testimony, he said he was never able to confirm that she

14  actually had a bleed, that Betty actually a GI bleed in

15  November of 2008; correct?

16  A.   That's correct.

17  Q.   In fact, he said he didn't even look at the records

18  that you and I just looked at together, didn't he?

19  A.   I would have to re-read it.

20  Q.   I'll show you in your own deposition, if you'd turn

21  please to Page 115.

22  A.   115, sir?

23  Q.   Yes.

24       MR. LEWIS:  Your Honor, I object to the use of the

25  deposition.  She hasn't said anything inconsistent.

Vanessa Shami - Cross (Childers)                          1289

1      THE COURT:  Well, --

2      MR. CHILDERS:  May I refresh her recollection?

3      THE COURT:  Yes, you may.

4  BY MR. CHILDERS:

5  Q.   If you could just look --

6      MR. CHILDERS:  Sorry, Your Honor.  I went the

7  wrong way with that one.

8  BY MR. CHILDERS:

9  Q.   If you would look at Page 115, lines 22 through Page

10 116, line 7, do you see that?

11 A.   I do see that.

12 Q.   Does that refresh your recollection that Dr.

13 Gunnalaugsson said he never actually reviewed the records

14 you and I just looked at with the jury?

15 A.   Yes.

16 Q.   Thank you.

17 A.   That was nine months ago.

18 Q.   I understand.  So in Dr. Gunnalaugsson's records he

19 says, "I never could confirm the bleed."  And then in his

20 deposition said, "I never confirmed a bleed."  Right?

21 A.   Correct, but he says it numerous times in the notes.

22 Q.   I want to ask you about another hospital record that I

23 don't think you talked about on your direct exam.  It's

24 already in evidence.

25      MR. CHILDERS:  May I approach, Your Honor?

Vanessa Shami - Cross (Childers)                    1290

1    THE COURT:  You may.

2  BY MR. CHILDERS:

3  Q.   Do you see this as a consultation from February 10th,

4  2009?

5  A.   I see it.

6  Q.   Do you recall reading this?

7  A.   I do.

8  Q.   Okay.  And if we could look on this particular document

9  under the history of present illness about halfway down

10 starting -- do you see where it says, "Patient has been on

11 Coumadin in the past.  However, it was held because of the

12 percutaneous coronary intervention and was not restarted."

13 Do you see that?

14 A.   Correct.

15 Q.   The percutaneous coronary intervention is the stent

16 procedure that we just talked about as well; right?

17 A.   That is correct.

18 Q.   And that is a procedure in which it is standard

19 practice to stop taking an anticoagulant before you perform

20 it; correct?

21 A.   Correct, to stop it with a qualification.

22 Q.   Any anticoagulant, no matter what you're on, has to be

23 stopped before you have a procedure like that; right?

24 A.   Correct.

25 Q.   Okay.  This document -- and feel free to look at all

Vanessa Shami - Cross (Childers)                    1291

1   five pages -- doesn't say that Betty had a bleed while she

2   was on Coumadin; correct?

3   A.   Correct.

4   Q.   Okay.  Now, this is during a hospitalization that we --

5   you talked some about with Mr. Lewis where they found that

6   she actually had a clot in her arm?

7   A.   Correct.

8   Q.   Betty had a clot in her arm.  I want to ask you a

9   little bit further about that.  She wasn't on Coumadin at

10  the time; correct?

11  A.   Correct.

12  Q.   Even though she wasn't on Coumadin, Betty had anemia

13  during that hospitalization again; right?

14  A.   She did.

15  Q.   She hadn't been on Coumadin for three months at that

16  point?

17  A.   That is correct.

18  Q.   All right.  I want to talk to you about the records

19  from that particular hospitalization.

20       Actually, I apologize.  You already have them in front

21  of you, that same document that I already gave you.

22       The next page, if you'll turn over, do you see that,

23  3219?  That is a consult from three days after the record we

24  just looked at, four days, excuse me.  Sorry.  Three days

25  after; right?

Vanessa Shami - Cross (Childers)                    1292

1   A.    Yes.

2   Q.    Same hospitalization; right?

3   A.    Correct.

4   Q.    And the very first sentence under History of Present

5   Illness says, "The patient is a 79-year-old white female

6   seen in consultation at the request of Dr. MacFarland for

7   evaluation of anemia."  Right?

8   A.    That is correct.

9   Q.    And, again, it says further down that although she says

10  she had some dark stools at home prior to admission, she

11  denies any frank melanotic --" it should say "stools" but it

12  says "schools" -- or hematochezia."  Right?

13  A.    That is correct.

14  Q.    Again, that means she's not seeing any dark stools or

15  bloody stools?

16  A.    Not -- that's not quite correct.

17  Q.    Well, what does it say when it says denies frank

18  melanotic stools?

19  A.    She has had some dark stools at home prior to

20  admission.  The patient says that she has had some dark

21  stools prior to admission.  I'm assuming that's Betty

22  Knight.

23  Q.    Okay.  And, again, she's not on Coumadin at that time;

24  right?

25  A.    She is not on Coumadin.

Vanessa Shami - Cross (Childers)                1293

1   Q.   She's not on any anticoagulant; right?

2   A.   No.

3   Q.   Okay.  And if we look --

4   A.   She is on aspirin, an anti-platelet agent but she's not

5   on Coumadin.

6   Q.   If we turn to the next page, Gina, under "Diagnostic

7   Data," do you see that?

8   A.   Can I -- so she's on Plavix and aspirin at this point.

9   Q.   Understood.  She's not on warfarin; right?

10  A.   I just want to make that clear.

11  Q.   Sure.  She's not on Coumadin; right?

12  A.   She's not on Coumadin, correct.

13  Q.   And it says her hemoglobin on February 7th was 12.1.

14  It has dropped to 9.1.  She has received two units of packed

15  red blood cells.  Correct?

16  A.   That's correct.

17  Q.   That's almost identical to the same blood drop that she

18  had in the November, 2008, hospitalization; right?

19  A.   Absolutely.

20  Q.   When she was on Coumadin; correct?

21  A.   Correct.

22  Q.   Just like the November of 2008 hospitalization, there's

23  no mention in the records from this hospitalization that --

24  of a diagnosis of GI bleed; right?

25  A.   That is correct.

Vanessa Shami - Cross (Childers)

1    Q.    You testified earlier today that -- and, again, I'm

2    sorry if I -- I may be paraphrasing.  I think you said the

3    warfarin just didn't work for her, meaning Betty Knight.  Is

4    that what you said?

5    A.    It was very difficult for Betty Knight to stay

6    therapeutic.

7    Q.    Well, that's not what -- I'm sorry.  Go ahead.

8    A.    No.  That's what I said.

9    Q.    What you said was it didn't work for her; correct?

10   A.    Correct.

11   Q.    And when you say it didn't work for her, you mean it

12   didn't prevent strokes or it caused bleeds.  That's what

13   Coumadin is made to do, right, to prevent strokes and

14   hopefully not cause you to bleed.

15   A.    Right.  But it's not going to work for you if you can't

16   stay therapeutic.

17   Q.    And I think you said there were challenges keeping

18   Betty's INR in the therapeutic range.

19   A.    Absolutely.

20   Q.    Despite those challenges, you agree that none of those

21   challenges caused Betty Knight to have a stroke?

22   A.    She did not have a stroke during the time she was on

23   Coumadin.

24   Q.    She didn't have a clot of any kind; correct?

25   A.    That is correct.  That -- from the records that we have

1    which, again, are very shoddy at this time, that is correct.

2    Q.    They're what you base your opinions on, correct, the

3    records?

4    A.    Correct.

5    Q.    And in all the records you looked at, Betty Knight did

6    not suffer a stroke while she was on Coumadin; correct?

7    A.    That is correct.

8    Q.    There's not even a mention that Betty Knight had a

9    stroke while on Coumadin; correct?

10   A.    Correct.

11   Q.    In all the records you reviewed, none of the INR

12   challenges that Betty had caused her to suffer a bleed;

13   correct?

14   A.    She, like I said, had a bleed in November of 2008.

15   Q.    Okay.  We've talked about that.  I'm talking about her

16   INR fluctuations that you called challenges.  Okay?

17   A.    Okay.

18   Q.    You agree with me none of those fluctuations or

19   challenges led to Betty Knight having a bleed; right?

20   A.    Correct.

21   Q.    Okay.  So as far as preventing stroke, Coumadin worked

22   for Betty Knight; right?

23   A.    On the time she was on it, absolutely.

24   Q.    And as far as -- well, sorry.  I'm looking at my paper

25   while I'm trying to talk.  I think we're ready to move on to

Vanessa Shami - Cross (Childers)

1   topic two and you tell me if I get this right.

2       Topic two that you were asked about was:  What was the

3   cause of Betty's GI bleed?  Did I get that right?  Was that

4   the second thing that you were supposed to talk with him

5   about?

6   A.   That's fine.  That's one of them.

7   Q.   We already talked about the fact that you don't

8   actually have any opinion that any of the medications she

9   was on caused that bleed; right?

10  A.   Right.  We can't say which one did, which one didn't.

11  That is correct.

12  Q.   You're not giving any opinion that any one of them

13  played any part in her bleed; correct?

14  A.   I have not.

15  Q.   And you're not ever going to; correct?

16  A.   Ever going to?

17  Q.   In this case.

18  A.   That's a pretty -- yes.

19  Q.   Mr. Lewis isn't going to get back up and all of a

20  sudden you're going to say, "You know what.  I changed my

21  mind.  These did play a part."  You're not going to do that;

22  right?

23  A.   Correct.

24  Q.   The reduction of bleed risk in patients is a high

25  priority of your medical care, isn't it?

Vanessa Shami - Cross (Childers)

1    A.    Yes.

2    Q.    Okay.  And you agree with me that patients who are on

3    Pradaxa have a higher risk of GI bleed than patients who are

4    on warfarin; right?

5    A.    Correct, with a qualification.

6    Q.    In the clinical trials that were done on Pradaxa in

7    AFib patients, the risk of GI bleed was 50 percent higher if

8    you were on Pradaxa than if you were on warfarin; right?

9    A.    Correct.  But they had a lower incidence of brain

10   bleeds as well as strokes.

11   Q.    You don't treat brain bleeds, do you, Doctor?

12   A.    Not directly, correct.

13   Q.    You don't treat strokes, do you, Doctor?

14   A.    No, but I'm concerned about my patients getting those.

15   Q.    You treat GI bleeds; right?

16   A.    I do.

17   Q.    And that's why you're here?

18   A.    I am.

19   Q.    Okay.  And, so, when we're talking about GI bleeds, you

20   agree with me that patients on Pradaxa are 50 percent more

21   likely to have a GI bleed than a patient who's on warfarin;

22   right?

23   A.    That's correct.

24   Q.    If I understand correctly, you have no idea why that

25   is.  You don't know why patients who are on Pradaxa have

Vanessa Shami - Cross (Childers)                                    1298

1    50 percent more GI bleeds than on warfarin; right?

2    A.   That is correct.

3    Q.   I want to show you an exhibit and ask if you've ever

4    seen it.  This is Exhibit 138.

5              MR. CHILDERS:  May I approach, Your Honor?

6              THE COURT:  You may.

7              THE WITNESS:  Thank you.

8              MR. CHILDERS:  This is already admitted into

9    evidence, Your Honor, Exhibit 138.

10             THE COURT:  All right.

11   BY MR. CHILDERS:

12   Q.   Doctor, have you been provided this document by counsel

13   for Boehringer?

14   A.   It doesn't look familiar.

15   Q.   Do you see --

16   A.   But I've had a lot of records to review.

17   Q.   This is an email chain.  Do you see that?

18   A.   I do.

19   Q.   And the folks who are on this email chain are Dr.

20   Clemens, Dr. Heinrich-Nois, and Dr. Van Ryn.  Do you see

21   that?

22   A.   I do.

23   Q.   Are you aware they all work for Boehringer Ingelheim?

24   A.   Yes.

25             MR. LEWIS:  May we approach, Your Honor?

Vanessa Shami - Cross (Childers)                    1299

1          THE COURT:  Yes, you may.

2          (Bench conference on the record)

3          MR. LEWIS:  This is a document, Your Honor, that

4   this witness has no foundation to testify about.  It wasn't

5   in her reliance materials.  In fact, she didn't testify

6   about any company documents whatsoever.  It's not even

7   relevant to her testimony.  It's clearly outside the scope

8   of my direct.

9          THE COURT:  What do you intend to elicit?

10         MR. CHILDERS:  This is a document from the company

11  that says we think we know why people have a higher rate of

12  GI bleeds on Pradaxa than warfarin.  And my point is she's

13  testified she knows that's the case.  She doesn't know why.

14  And they haven't shared this information with her even

15  though they hired her as an expert in the case.

16         MR. LEWIS:  But I didn't even ask her about -- I

17  didn't even cover it with her.  It's not even part of her

18  opinion.  She's an expert that came in to assess the

19  specific circumstances of Mrs. Knight, not the general -- I

20  didn't ask her any general testimony about what is the cause

21  of GI bleeding generally in Pradaxa.  In fact, I was cut off

22  from that.  I was specifically not permitted to ask her

23  generally about whether Pradaxa was safe and effective.  I

24  was precluded from this very topic.

25         MR. CHILDERS:  I don't think that's the case.

Vanessa Shami - Cross (Childers)

1          THE COURT:  I think it was.  It's awful close to

2    that.

3          MR. CHILDERS:  The question he was not allowed to

4    ask was, was it safe and effective for Betty Knight.  That's

5    not my question to her.  My questions relate to does she

6    know why there's this higher incidence of GI bleeds or not.

7       If she says "no" -- I'm showing her documents from the

8    company that seem to explain why that is to see if she knows

9    that or not.  It's the company she's working for as an

10   expert.

11         MR. LEWIS:  I didn't cover any of this with her.

12   I didn't cover the reasoning behind the operation of the

13   medication and why there would be an increase of a GI bleed.

14   I didn't cover any of this with her.  It wasn't even in her

15   opinions.  I was precluded from asking about safety and

16   efficacy of Pradaxa for this patient.

17         MR. CHILDERS:  Her opinion is nobody can say she

18   wouldn't have had the same bleed on another medication.

19   This is evidence that she's more likely to have the bleed on

20   Pradaxa than warfarin.  And so it goes directly to that

21   opinion and it's from the company itself and it's already

22   into evidence, Your Honor.  That is clearly one of her

23   opinions.

24         THE COURT:  Who did this come from?

25         MR. CHILDERS:  Dr. Van Ryn's deposition.

Vanessa Shami - Cross (Childers)                    1301

1        MR. LEWIS:  She wasn't asked about the company

2   bases for her position on what the medication -- the

3   complication profile of the medication.  She wasn't asked

4   about those general things during her direct.

5        MR. CHILDERS:  She was asked -- she said my

6   opinion is you can't say she wouldn't have had this bleed on

7   Pradaxa -- on warfarin versus Pradaxa.  This is evidence to

8   support that you can say that and here's why because we know

9   why you have a higher risk of GI bleed on Pradaxa than you

10  do on warfarin.  I think it goes directly to her opinion.

11       THE COURT:  I'm going to allow it.  It's

12  cross-examination.

13       MS. JONES:  May I make one other point?  If this

14  has already been run through Dr. Van Ryn, then it's

15  cumulative of evidence the jury has already heard.  If our

16  experts are suddenly going to become a factor for them to

17  rewrite company documents, this is going to be a longer

18  trial than we anticipated.

19       THE COURT:  It's cross-examination of your expert.

20  I'll allow it.

21            (Bench conference concluded)

22       THE COURT:  Go ahead.

23       MR. CHILDERS:  Thank you, Your Honor.

24  BY MR. CHILDERS:

25  Q.   Doctor, did you have a chance to review this while we

Vanessa Shami - Cross (Childers)

1    were up there chatting with each other?

2    A.   I didn't know if I should or not to be honest so --

3    Q.   Fair enough.  Do you see again this is an email that is

4    being exchanged among employees at Boehringer Ingelheim;

5    correct?

6    A.   I do.

7    Q.   And this was back all the way in 2009; right?

8    A.   Okay.

9    Q.   Do you see that?

10   A.   I do.

11   Q.   Okay.  And the subject is "thrombin effects for

12   mucosa."  Do you see that?

13   A.   I do.

14   Q.   And when you read the -- if you would read the email,

15   if you need a minute to do it, I want you to look at it and

16   see if you agree with me that what they're trying to figure

17   out is why are we having more GI bleeds on Pradaxa than on

18   warfarin.  Do you see that?  Do you agree with me that's

19   what they're talking about?

20   A.   It appears that this email you gave me talks about

21   that, yes.

22   Q.   Okay.  And it started with Dr. Heinrich-Nois sending an

23   email to Dr. Van Ryn saying, "I'm trying to figure out

24   what's going on here.  What is this happening?"  Right.

25   A.   I guess so.  Again, I have no context here.  I'm just

Vanessa Shami - Cross (Childers)

1  given an email with the two different -- I've got two

2  different emails.  I have no idea what the context is.

3  Q.   Okay.  Let me read it to you and see if you agree that

4  I read it correctly.  Okay?

5       It says, "Dear Joanne, I'm still struggling with the

6  increased gastrointestinal bleed rate under dabigatran."

7       Do you see that?

8  A.   I do.

9  Q.   That's Pradaxa; right?  Dabigatran?

10  A.   Yes.

11  Q.   All right.  And then although she says there's no

12  obvious explanation, she goes on to say, "So I wonder

13  whether thrombin is known to play any role or contributes to

14  the composition of gastric mucous."

15       Do you see that?

16  A.   I do.

17  Q.   Okay.  And then Dr. Van Ryn responds to her the next

18  day.  Do you see?

19  A.   I do.

20  Q.   Okay.  And I want to go to the very last paragraph of

21  her response and look at that with you.

22       And do you see she says, "Last point about GI bleeds

23  and this is something you should get Sebastian Haertter to

24  look at closely.  I think that the 95 percent of dabigatran

25  that does not get absorbed but remains in the gut is also

Vanessa Shami - Cross (Childers)

1   converted into dabigatran by --"

2       Can you -- do you know what that word is?  It looks

3   like a medical word.

4   A.   Esterases.  They're enzymes.

5   Q.   And they're in the GI tract?

6   A.   Yes.

7   Q.   Okay.  And then she goes on to say, "I have talked to

8   several people, Joachim, Sebastian, and Astrid Volz," who

9   she notes is a P-gp specialist.  Right?  Do you see that?

10  A.   I see that.

11  Q.   And then she says, "and have received different answers

12  from all of them to, no, this does not happen to, yes, it is

13  completely converted to maybe partially converted."

14      And then she goes on to say, "If you have active

15  substance in the gut and slight GI injury somewhere, then

16  you have increased bleeding risks.  At least biologically

17  for me it would be an obvious explanation."

18      Do you see that?

19  A.   I see that.

20  Q.   Okay.  That was in 2009; right?

21  A.   An email in 2009, correct.

22  Q.   An internal company email in 2009; right?

23  A.   Correct.

24  Q.   Okay.  The next thing I want to show you --

25              THE COURT:  We need to take a break at a

Vanessa Shami - Cross (Childers)                    1305

1    convenient point.  Is now good or --

2               MR. CHILDERS:  That would be fine, Your Honor.

3               THE COURT:  All right.  We're going to take a

4    brief recess.  You may retire to the jury room.

5          (Recess taken at 3:23 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vanessa Shami - Cross (Childers)                    1306

1        (Back on the record at 3:30 p.m.)

2        (Jury not present.)

3             THE COURT:  Before we get back into this, I will just

4    tell you my clerk is assembling two copies for each side of

5    the Court's last draft of proposed final instructions.  So as

6    soon as he has got them out here, he is going to bring two

7    copies and lay them on your desk.

8             At this point, my guess is we're going to have to take

9    these up after the jury goes home this evening, so be prepared

10   to stick around awhile to do that.

11            With that, let's go back to this issue, then.  Where

12   are we?

13            MR. CHILDERS:  With the exhibit, Your Honor?

14            THE COURT:  Yes.

15            MR. CHILDERS:  So it does appear, and I apologize,

16   it's from Dr. Van Ryn's deposition, but it was not played.

17   That's my fault, I thought it had been played.  We've cut

18   these depositions up quite a bit.

19            But, regardless, Dr. Shami listed in her materials

20   reviewed transcripts and associated exhibits from depositions

21   taken in the Pradaxa litigation in the federal MDL Connecticut

22   state court proceedings.  That's where Dr. Van Ryn's testimony

23   was taken.  So she's relied on that material, or at least

24   purports to have relied on it in her report.  So it's an

25   admission of a party opponent that we believe would come in as

1    something she relied on.

2          MR. LEWIS:  The problem, Your Honor, is that the

3    proper foundation wasn't laid with this witness to talk about

4    that document.  It's not in her reliance materials.  She

5    hasn't even seen it before.  Maybe she reviewed some

6    depositions here and there, but it's definitely a real problem

7    that it was represented that it was admitted into evidence.

8          The basis of that was, I think, used by the Court to

9    rule that she could be cross-examined on it.  That deposition

10   has not been played to the jury, that issue hasn't come up in

11   Dr. Van Ryn's deposition, and I've got a real problem -- one,

12   it's not admissible independently without a foundation.

13   Number two, we need to fix what just happened here because

14   that's a serious issue what they just got into in front of the

15   jury.

16         THE COURT:  Anything else?

17         MR. CHILDERS:  I disagree, Your Honor.  I think if she

18   says she relied on the transcripts and exhibits from that

19   deposition, it's the entirety of it, not just what was played

20   in court.  And, I mean, she didn't break it all out by

21   witness, but she says transcripts, and it was an admission.

22         THE COURT:  Well, I don't think that's enough.

23         The witness, first, clearly responded that she didn't

24   recall the document, didn't testify that she had seen it.

25   When you folks assemble these huge files and provide it to

Vanessa Shami - Cross (Childers)          1308

1   each other or witnesses or experts, I think you bear the risk

2   of determining specifically, and in particular the case of

3   experts, what specifically they are relying upon in reaching

4   their opinions.  I think that I've applied the reverse of that

5   and precluded testimony about things where the witness didn't

6   indicate that, as an expert, he or she relied upon something

7   specific.

8        Here, I accept it as good faith, and I'm sure it was

9   meant that way, counsel's representation that it was already

10  admitted as an exhibit in Dr. Van Ryn's testimony.  Assuming

11  that to be the case, my finding was that you could examine her

12  about it.

13       I premised that conclusion based on, first,

14  determining that in the course of her direct testimony, she

15  testified extensively about what she characterized as the

16  difficulties or challenges presented by having Betty Knight on

17  warfarin and why both explicitly and implicitly it was good

18  for Betty Knight to change to Pradaxa.  And so I believed that

19  it would be fair to cross-examine her on an admitted statement

20  against interest or statement by a party that provided an

21  answer to a question that she said she didn't know and hadn't

22  been provided.

23       She was testifying essentially that she didn't know

24  what the -- what caused the Pradaxa bleed rates to be so much

25  higher.  If there was a company document which she had --

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Cross (Childers)                    1309

1    which was admitted, which she had testified she was aware of

2    that supplied that information, I think it would be fair to

3    cross-examine her on it.  I think it would be consistent with

4    my ruling even limiting the direct examination as I did when

5    Mr. Lewis first started.

6            But she can't authenticate this document.  She

7    testified she hadn't seen it, so she clearly has formed no

8    opinion about it.  I think it's inappropriate for her to be

9    examined about the document.

10           My inclination is to simply inform the jury that I'm

11   sustaining an objection by the defendant, finding that the

12   witness has not admitted that she was aware of this document

13   and that, therefore, any questions based upon this document

14   about what BI knew or suspected was the reason for GI bleeds

15   to be higher with Pradaxa is simply inadmissible.

16           MR. CHILDERS:  Your Honor, I'm sorry.  There's a

17   ruling that she couldn't authenticate it?

18           THE COURT:  That's part of it.

19           MR. CHILDERS:  Okay.  Because we have a stipulation

20   that if it's a Boehringer-created document with a Bates number

21   on it, it's deemed authenticated.  And that's in the pretrial

22   order, Your Honor.

23           MR. LEWIS:  But it's not just about authenticity.

24   It's the entire foundation.  It doesn't end with just

25   authenticity.  It's the foundation for the testimony.

Vanessa Shami - Cross (Childers)          1310

1      In other words, does this witness know enough about

2  this particular thing that is being admitted to be able to say

3  it is and should be admitted.

4      THE COURT:  Well, and literally I understood from

5  counsel -- clearly this is what you said -- that it was an

6  already admitted document.  So --

7      MR. CHILDERS:  That was incorrect, Your Honor.

8      THE COURT:  I understand that.  So based upon that,

9  I'm going to grant the objection.

10      MR. LEWIS:  Your Honor, may I be heard on the nature

11  of the instruction that you're going to give to the jury?

12      THE COURT:  Sure.

13      MR. LEWIS:  I'm a little bit concerned by the way the

14  Court -- sorry.  I'm a little bit concerned by the way -- and

15  I know Your Honor was just kind of talking through it, but the

16  way the Court described about how this witness hadn't seen the

17  document before.

18      And so I prefer a more generic statement, if I may,

19  Your Honor, that the testimony about that document -- the

20  objection is sustained, and the testimony about that document

21  should be not considered or --

22      THE COURT:  Well, I can do it simply enough by saying

23  that upon a close review of the record, we now realize that

24  this document had not been admitted into evidence.  We thought

25  that it had.  Since it hasn't been admitted into evidence, I'm

Vanessa Shami - Cross (Childers)                1311

 1   sustaining the objection to the question and ordering the jury

 2   to disregard her testimony as to that.

 3        MR. CHILDERS:  Understood, Your Honor.  Thank you.

 4        MR. LEWIS:  Thank you.

 5        THE COURT:  All right.  Let's bring the jury out.

 6   (Jury present.)

 7        THE COURT:  All right.  You may be seated.

 8        All right.  Ladies and Gentlemen, let's back up a

 9   little bit.

10        First, Mr. Childers was asking the witness a question

11   about matters contained in an e-mail that he presented to her.

12   Mr. Childers had a good faith belief at the time, as he

13   represented to the Court and the defendant, that that e-mail

14   was part of an exhibit that had already been admitted into

15   evidence when Dr. Van Ryn testified by deposition last week.

16        Upon closer inspection, we find that is not the case.

17   That document had not been admitted in her testimony.

18   Therefore, I've sustained the objection by the defendant to

19   the question and direct that you disregard any of the

20   questions or responses that were made by the witness

21   pertaining to that e-mail and what it said.

22        With that, you may resume the rest of your

23   cross-examination.

24        MR. CHILDERS:  Thank you, Your Honor.

25        Doctor, I want to show you an exhibit that you -- I'm

Vanessa Shami - Cross (Childers)                    1312

1    sorry -- an article that you listed as something you relied on

2    in this case.

3              Okay?

4              THE WITNESS:  Okay.

5              MR. CHILDERS:  May I approach, Your Honor?

6              THE COURT:  Yes, you may.

7    BY MR. CHILDERS:

8    Q.  You recognize this article, right?

9    A.  I do.

10   Q.  In fact, it's an article that you relied on for your

11   opinions in this case?

12   A.  Yes.

13   Q.  Okay.  Could you tell the jury who the first named author

14   is of this article?

15   A.  Eikelboom, E-I-K-E-L-B-O-O-M.

16   Q.  And you recognize Dr. Eikelboom as being one of the

17   authors who -- excuse me -- one of the scientists who worked

18   on the Pradaxa clinical trials, right?

19   A.  That is correct.

20   Q.  And he's published other articles about Pradaxa, correct?

21   A.  He has published, yes.

22   Q.  Okay.

23             MR. CHILDERS:  Your Honor, may I publish to the jury

24   the article?

25             THE COURT:  You may.

Vanessa Shami - Cross (Childers)                    1313

1        MR. CHILDERS:  If we could look first on page 4.

2   Q.  There's a section called Site of Major Gastrointestinal

3   Bleeding, correct?

4   A.  I see that.

5   Q.  And this particular section is, you'll recall from when

6   you read it before, Dr. Eikelboom and the other authors

7   talking about where they saw in the gastrointestinal tract

8   bleeding whether the patient was on Pradaxa or on warfarin,

9   right?

10  A.  Correct.

11  Q.  Okay.  And what they said was patients who had

12  gastrointestinal bleeds who were taking Pradaxa, that it was

13  about 50/50, right, 53 to 47 percent upper versus lower

14  gastrointestinal tract, right?

15  A.  That is correct.

16  Q.  And then when they looked at the warfarin patients, that

17  percentage was different, correct?

18  A.  It says 75/25.

19  Q.  Right.

20      So it was more likely for warfarin that you were going to

21  have a bleed in the upper GI than the lower GI, at least

22  according to the data that they collected in this trial,

23  right?

24  A.  Yes.  In this one trial, correct.

25  Q.  Okay.  And this trial is the big trial that we've all

Vanessa Shami - Cross (Childers)                    1314

1   heard about that had 18,000 patients, right?

2   A.  Yes.

3   Q.  And I think we heard it was the largest clinical trial for

4   an anticoagulant ever performed up to that point, right?

5   A.  Correct.

6   Q.  Okay.  And so what they saw was, in the patients who had

7   this GI bleeding, if it was in -- excuse me -- if they were on

8   warfarin, it was more likely to be in the upper GI, right?

9   A.  Correct.  On this, yes.

10  Q.  And then if we could turn, please, to page 8.

11      Do you see this is the section where they're talking

12  about -- what's called a discussion, and they're talking about

13  why they think this might be happening, right?

14  A.  Yes.

15  Q.  Okay.  And they say:  Blood level itself can't explain why

16  we're seeing more GI bleeding or gastrointestinal bleeding in

17  the lower GI tract with Pradaxa than we are with warfarin,

18  right?

19  A.  That's what they're discussing.  They're trying to figure

20  out why that is.

21  Q.  Okay.  And then a little further down, it says:

22  Dabigatran has a low bioavailability after oral ingestion,

23  right?

24  A.  I'm sorry.  Where are you?

25  Q.  The next sentence:  Dabigatran has a low bioavailability

1    after oral ingestion.

2         Do you see that?

3    A.  I do.

4    Q.  And then it says -- and what that means and what the jury

5    has heard is when you take a pill of Pradaxa, only a little

6    bit of it actually gets into your system as medicine, right?

7         Right?

8    A.  Okay.  Yes.

9    Q.  You know that to be --

10   A.  That's correct.

11   Q.  Okay.  And the rest of the medicine travels through the GI

12   tract before it leaves the body, right, the inactive part of

13   the medicine or the part that is not getting into your

14   bloodstream, right?

15   A.  Correct.

16   Q.  Okay.  And so what they're saying is -- I'm sorry.

17        What they go on to say is:  It's possible that metabolism

18   of dabigatran etexilate, which is the Pradaxa, by esterases,

19   which we saw before, leads to progressively higher

20   concentrations of the active drug during transit of the

21   gastrointestinal tract.

22        That's what they said, right?

23   A.  Right.  Again, they're trying to hypothesize or come up

24   with a reason.

25   Q.  And the reason that they're hypothesizing is as this drug

Vanessa Shami - Cross (Childers)                1316

1    that didn't get into the bloodstream is going through the GI

2    tract, it's actually having -- it's metabolizing in there and

3    causing anticoagulant effect inside the GI tract, right?

4    A.  This is a complete guesstimate on their part.

5    Q.  Understood.

6        That's what they are hypothesizing may be the issue,

7    right?

8    A.  Yes.

9    Q.  And you knew that when you read this article and relied on

10   it, correct?

11   A.  I mean, I relied on it for parts of the article, correct.

12   Q.  Okay.  And then if we look over to the next column, they

13   say:  Thus, local effects of dabigatran on diseased mucosa

14   could account for the relative increase in lower

15   gastrointestinal bleeding seen with dabigatran compared with

16   warfarin in elderly patients in the RE-LY trial, right?

17   A.  Correct.  Again, another guesstimate.

18   Q.  Sure.

19       And when they say local effects of dabigatran, they're

20   talking about Pradaxa, right?

21   A.  Yes, they are.

22   Q.  And when they say local effects on diseased mucosa, they

23   are talking about parts in the GI tract that have issues, that

24   have some sort of malformation or something else, right?

25   A.  The chances of dabigatran causing -- you're talking about

Vanessa Shami - Cross (Childers)                    1317

1    a couple, a few cells, I mean, compared to billions of cells

2    in the AVM.  So the chances of that pill hitting that AVM and

3    causing the bleed is close to zero.

4    Q.  Zero --

5    A.  It's -- just think of the surface area of the GI tract.

6    It doesn't make sense.

7    Q.  All I am asking you, ma'am, is if you can help me explain

8    this to the jury.

9    A.  Yeah.

10   Q.  And what they're saying is the local effect of that

11   Pradaxa that is going through the GI tract that didn't make it

12   into the bloodstream may be affecting places in the GI tract.

13   That's what they're saying.

14        I'm not saying you have to agree with it --

15   A.  Right.

16   Q.  -- but that's what they are saying, correct?

17   A.  Well, they're not saying this.  They're saying it's

18   possible.  Again, what we do in discussions is we guesstimate.

19        So I just want the jury to know that, they're just

20   pontificating --

21   Q.  I think --

22   A.  -- kind of thinking it through.

23   Q.  I think you've made that clear, and I don't disagree with

24   you at all.

25        This is a hypothesis, right?

Vanessa Shami - Cross (Childers)                    1318

1    A.  Correct.

2    Q.  Based on the data that they collected in the RE-LY trial,

3    right?

4    A.  Correct.

5    Q.  Okay.  And this article was published in 2011, right?

6    A.  Yes.

7    Q.  Okay.  That hypothesis came about at least as early as

8    2011, right?

9    A.  Okay.

10   Q.  It's a yes or no, ma'am.

11   A.  Yes.

12   Q.  Okay.  That's seven years ago, correct?

13   A.  That is seven years ago.

14   Q.  In that seven-year time period, has BI asked you or your

15   colleagues to study this issue to try to find out if this

16   hypothesis is correct?

17   A.  Not me personally, no.

18   Q.  How about anybody that you know?  Have they hired anyone

19   you know that's a GI specialist to study this issue and find

20   out were we right about this hypothesis that we published in

21   2011?

22   A.  I don't ask my colleagues if BI has asked them that

23   question.

24   Q.  Okay.  Well, we know they didn't ask you, right?

25   A.  That is correct.

Vanessa Shami - Cross (Childers)          1319

1   Q.  But they did hire you to testify in this case where a

2   patient had a GI bleed in the lower gastrointestinal tract

3   while they were on Pradaxa, right?

4   A.  That is correct.  But that precludes me from asking

5   colleagues about BI.

6   Q.  I'm asking about you, ma'am.

7       They didn't hire you to study this, but they did hire you

8   to testify in this case, right?

9   A.  Absolutely.

10  Q.  Okay.  I think you testified earlier that it would not be

11  possible to say that Betty Knight's treatment or outcome would

12  have been different if she had been on warfarin rather than

13  Pradaxa when she had her bleed, right?

14  A.  I agree.

15  Q.  If she had been on warfarin, you agree with me that she

16  could have been treated with either vitamin K or fresh frozen

17  plasma to reverse the anticoagulant effect of warfarin, right?

18  A.  Yes, because the half-life is so long.

19  Q.  And you have found yourself fresh frozen plasma to be

20  effective in the majority of patients you give it to who are

21  on warfarin, right?

22  A.  I give it to the minority of people that come in with GI

23  bleeds on warfarin, but it is very effective when I do give

24  it.

25  Q.  And when you treat a life-threatening bleed, that is

Vanessa Shami - Cross (Childers)                    1320

1    standard procedure for you to give either vitamin K, fresh

2    frozen plasma or both, right?

3    A.  Yes, with a qualification if I may.

4    Q.  It's a yes or no.

5        When you treat a patient --

6    A.  Yes.

7    Q.  -- on warfarin who is having a life-threatening bleed,

8    your standard procedure is you give them vitamin K, you give

9    them fresh frozen plasma or you give them both, right?

10   A.  If I'm concerned about them, and they're clinically

11   unstable, the answer is yes.

12   Q.  When I say life-threatening bleed, does that not mean to

13   you that it's serious and --

14   A.  We have different definitions of life-threatening bleed,

15   so that's why I'm taking a step back.

16   Q.  Okay.  Your definition of life-threatening bleed, that is

17   standard procedure for you, right?

18   A.  That is correct.

19   Q.  Okay.  You ever given a patient platelets to treat -- to

20   help treat a GI bleed?

21   A.  I have.

22   Q.  And that is if you think that they're having a problem

23   with their platelets, right?

24   A.  Yes.

25   Q.  And platelets are what is affected by Plavix and aspirin,

Vanessa Shami - Cross (Childers)                    1321

1    right?

2    A.   Correct.

3    Q.   Betty Knight was not given platelets when she had her May

4    2013 GI bleed, was she?

5    A.   She didn't need to be, no.

6    Q.   But she didn't get them, right?

7    A.   Correct.

8    Q.   Okay.  And she didn't need them, right?

9    A.   Correct.

10   Q.   All right.  I'm going to move on to No. 3.

11        I think the third question that Mr. Lewis asked you to

12   talk about was, was Betty over-anticoagulated on Pradaxa.

13        Did I get that one right?

14   A.   Correct.

15   Q.   Okay.  You agree with me the risk of bleed is related to

16   the Pradaxa level in a patient's blood, right?

17   A.   It can be.

18   Q.   It is, right?  Isn't that what the studies say?

19   A.   It can be.  Ah, demographic factors are really the most

20   important thing for clinical outcome and adverse events.

21        So --

22   Q.   Do you recall I asked you that same question at your

23   deposition last year?

24   A.   I do.

25   Q.   Okay.  And do you recall that the answer you gave me then

Vanessa Shami - Cross (Childers)          1322

1  was different than what you just told me now?

2  A.  I think your -- yeah, I don't think that they're

3  different.

4  Q.  Okay.  Turn to page 156 of your deposition, please,

5  starting at line 7.

6  A.  I'm sorry.  Which page?

7  Q.  156.

8  A.  I see it.

9  Q.  At line 7, do you see I asked you:  Do you agree that

10  Pradaxa plasma concentration correlates somewhat linearly with

11  the risk of having a bleed in a particular patient?

12      You see that?

13  A.  Yes.

14  Q.  And your answer was:  I don't know if it's linear, but it

15  does correlate.  Right?

16  A.  Correct.

17  Q.  Then I asked you:  And you read the Dr. Reilly article

18  that was published in 2014, right?  I think you cited it.

19      And you responded:  Yes.

20      Right?  Right?

21  A.  Yes.

22  Q.  And then my question was:  He said that in his article,

23  correct?

24      And you answered:  Yes.

25      Right?

Vanessa Shami - Cross (Childers)                    1323

1    A.  He did.  Uh-huh.

2    Q.  And then my last question was:  And you don't disagree

3    with that, right?

4        And your answer was:  I have no reason to disagree.

5        Correct?

6    A.  Correct.

7    Q.  And that's the same as today.  You agree that the risk of

8    bleed correlates with the Pradaxa blood level, right?

9    A.  Correct.  And then I go on to say I'm not sure if you can

10   correlate a plasma concentration with clinical outcome.  So I

11   said exactly what I just said before.

12   Q.  Ma'am, did I ask you about clinical outcome?

13   A.  No.

14   Q.  Okay.  I'm asking about bleed risk.  Okay?

15   A.  Okay.

16   Q.  So we're going to try to stay on the same page.

17       Bleed risk correlates with Pradaxa blood level, right?

18   A.  Yes.

19   Q.  Okay.  And you agree with me that if a patient is

20   over-anticoagulated on Pradaxa, they have a higher risk of

21   bleed than a patient who is not over-anticoagulated on

22   Pradaxa?

23   A.  I'm not sure what you mean by over-anticoagulated on

24   Pradaxa.  I'm not quite sure I understand that word.

25   Q.  Okay.  Let's look at your deposition again.

Vanessa Shami - Cross (Childers)          1324

1    A.  Uh-huh.

2    Q.  Page 157, line 14.

3    A.  I see it.

4    Q.  Do you see I asked you:  Do you agree that if a patient is

5    over-anticoagulated on Pradaxa, they have a higher risk of

6    bleeding than a patient who is not over-anticoagulated on

7    Pradaxa?

8        And your answer was:  I'm sure it's true.

9        Right?

10   A.  Yes.

11   Q.  Okay.  You didn't say I don't know what

12   over-anticoagulated on Pradaxa means, did you?

13   A.  It's not a term we use routinely.

14   Q.  At that time, you told me that was a true statement,

15   right?

16   A.  Yeah.  But it's still not a term I would have used at that

17   time.

18   Q.  I understand that.

19       But when I asked you that question at your deposition, you

20   agreed with me that that was a true statement, the same thing

21   I just asked you here in court, correct?

22   A.  Correct.

23   Q.  Okay.  You agree with me that Betty Knight was expected to

24   have a higher Pradaxa blood level because of her age, her

25   kidney impairment, and the fact that she was taking a drug

Vanessa Shami - Cross (Childers)                    1325

1   called Coreg, right?

2   A.  Yes.

3   Q.  Even though we expect that she would have a higher level,

4   it's your opinion that Betty's elevated aPTT test results

5   while she was on Pradaxa don't show that she was

6   over-anticoagulated, right?

7   A.  aPTT tests are qualitative tests.  They tell you whether

8   the patient has taken the Pradaxa.  It's not going to give you

9   exact blood levels of Pradaxa.

10  Q.  I understand.

11      My question was simply, even though you expect she's going

12  to have a high level, you don't think any of the aPTT test

13  results that she had were evidence that she had too much

14  Pradaxa in her blood, right?

15  A.  That is correct.

16  Q.  In fact, you don't think there is any level of aPTT that

17  would tell you a patient has too much Pradaxa in their blood,

18  right?

19  A.  I mean, I'm not an aPTT -- you know, I haven't looked at

20  people with aPTT tests that are sky high on NOACs and their

21  incidence of bleeding.  But, no, there is again no therapeutic

22  range that has been defined.

23  Q.  My question, ma'am, was you don't know what level, you

24  don't believe there is any level of aPTT that would tell you

25  this patient has too much Pradaxa in their blood, right?

Vanessa Shami - Cross (Childers)                1326

1    A.  I can tell you an instance where that would be the case.

2    Q.  Can you tell me whether or not you think there is a

3    particular level of aPTT that tells you this patient has too

4    much Pradaxa in their blood?

5    A.  Not necessarily, no.

6    Q.  You can't even tell us there's an aPTT level that says the

7    patient's at the right level of Pradaxa in their blood, right?

8    A.  Correct.

9    Q.  Okay.  Despite that, you agree with me that if you were

10   able to know a level like that that would tell you aPTT-wise

11   that a patient is at an increased risk of bleed, that is

12   something that could be helpful to you as a

13   gastroenterologist, right?

14   A.  It could be, yes.

15   Q.  Okay.  And you also agree that that kind of information

16   would be potentially useful for a physician who is prescribing

17   Pradaxa, right?

18   A.  It could be.

19        (Counsel conferring.)

20        MR. CHILDERS:  May I approach, Your Honor?

21        THE COURT:  You may.

22        THE WITNESS:  Thank you.

23   BY MR. CHILDERS:

24   Q.  You see this is a document called Summary of Product

25   Characteristics?

1    A.  I see that.

2    Q.  And it relates to Pradaxa, correct?

3    A.  Yes.

4    Q.  Would you turn to page 6 with me?

5         MR. CHILDERS:  This is Exhibit 80.  I'm sorry.

6         This is already admitted, Your Honor.

7         Would you turn to page 6, please?  Blow up the middle.

8    Q.  Have you ever seen this document before?

9    A.  It looks familiar.

10   Q.  This is the Pradaxa label that Boehringer Ingelheim gives

11   to doctors in other countries, right?

12   A.  The European.

13   Q.  And if we look at the first paragraph, we see they tell

14   doctors:  The presence of lesions, conditions, procedures

15   and/or pharmacological treatment such as NSAIDs,

16   antiplatelets, SSRIs and SNRIs, see Section 4.5, which

17   significantly increase the risk of major bleeding requires

18   careful benefit-risk assessment.

19        Do you see that?

20   A.  That is correct.

21   Q.  And then it says:  Pradaxa should only be given if the

22   benefit outweighs the bleeding risk, correct?

23   A.  Correct.

24   Q.  That statement doesn't appear in the label that Boehringer

25   Ingelheim gives to doctors here in the United States, right?

1   A.  Right.  The FDA has not required that statement being

2   there.

3   Q.  And from what you reviewed, Boehringer has never proposed

4   that that statement be included in the label, correct?

5   A.  I don't know if they proposed or not.

6   Q.  They haven't shown you anything that showed that they

7   proposed it to the FDA, have they?

8   A.  That is correct.

9   Q.  Okay.  And then the next paragraph, it says:  Pradaxa does

10  not in general require routine anticoagulant monitoring.

11      Do you see that?

12  A.  I do.

13  Q.  That does -- that information is included in the U.S.

14  Pradaxa label, isn't it?

15  A.  It is.

16  Q.  And the next sentence, though, says:  However, the

17  measurement of dabigatran-related anticoagulation may be

18  helpful to avoid excessive high exposure to dabigatran in the

19  presence of additional risk factors.

20      Do you see that?

21  A.  I do.  I see the word may.

22  Q.  Were you aware that Boehringer Ingelheim believes that the

23  measurement of dabigatran-related anticoagulation may be

24  helpful to avoid excessive high exposure to dabigatran in the

25  presence of additional risk factors?

1   A.  Can you rephrase the beginning of the question?  I'm

2   sorry.  I missed that.

3   Q.  Were you aware that Boehringer Ingelheim believes that the

4   measurement of dabigatran-related anticoagulation may be

5   helpful to avoid excessive high exposure to dabigatran in the

6   presence of additional risk factors?

7   A.  I mean, I've read it here.  And I'm sure BI is aware, but

8   I cannot tell you why the FDA doesn't require it in the label

9   here in the United States.

10  Q.  To your knowledge, Boehringer Ingelheim has never asked

11  that that language be included in the label in the United

12  States, right?

13  A.  Again, I don't know all the discussions that BI has had.

14  Q.  I'm asking about your knowledge.

15      You don't have any knowledge, you've never seen anything

16  to suggest to you this language has been requested by

17  Boehringer Ingelheim to be included in the U.S. Pradaxa label,

18  correct?

19  A.  That is correct.

20  Q.  Okay.  And then if we look underneath, there's a Table 2.

21  Do you see that?

22  A.  I see that.

23  Q.  And it says:  Table 2 shows coagulation test thresholds at

24  trough -- we've got something strange going on here.

25      Table 2 shows coagulation test thresholds at trough that

1    may be associated with an increased risk of bleeding.

2        Do you see that?

3    A.   I do.

4    Q.   And then it has four different tests listed, right?

5    A.   Yes.

6    Q.   And one of them is the aPTT, right?

7    A.   Yes.

8    Q.   And in particular, what this tells a doctor -- and this,

9    by the way, is for the 75-milligram dose -- it tells a doctor

10   that if the aPTT test is 1.3 times the upper limit of normal,

11   then that patient may be at an increased risk of bleed, right?

12   A.   That's what this says.

13   Q.   Okay.  And when we say the upper limit of normal, we are

14   talking about when you have a lab test, there is usually a

15   range where the result falls.  And if it's in that range,

16   that's good.  If it's outside that range, it's beyond the

17   upper limit of normal.  Right?

18   A.   That is correct.

19   Q.   Okay.  Did you know this information before today?

20   A.   I've read the -- I've seen the European label before.

21   Q.   Okay.  And in this label, the company is telling

22   physicians not only that excessive dabigatran levels may put

23   your patient at increased risk of bleed, but also telling them

24   here's what you need to look for to figure out if your patient

25   falls into that excessive dabigatran concentration, right?

Vanessa Shami - Cross (Childers)                    1331

1    A.   In this label.  But, again, in the United States,

2    obviously the FDA hasn't felt that that needed to be in there.

3    Q.   Ma'am, have you seen any document -- has any document been

4    provided to you to show that Boehringer Ingelheim has asked --

5    requested that the FDA include in the label aPTT of 1.3 times

6    upper limit of normal may indicate that patient is at an

7    increased risk of bleed?

8    A.   I'm not aware personally.

9    Q.   Okay.  You've not seen that document at all, right?

10   A.   Not to my knowledge.

11   Q.   All right.  I want to talk to you, if we could, in

12   particular about Betty Knight's aPTT levels.  Okay?

13   A.   Okay.

14   Q.   She had some aPTT testing done before she even was on

15   Pradaxa, right?

16   A.   That is correct.

17   Q.   And you've looked at some of those.  In fact, we looked at

18   them together, didn't we?

19   A.   We did.

20   Q.   Okay.  I want to look at those again with you.

21       Again, I want you to keep in mind I'm asking you these

22   questions in the context of question 3 here that you were

23   asked by Mr. Lewis, was Betty over-anticoagulated on Pradaxa.

24       Okay?

25   A.   Okay.

Vanessa Shami - Cross (Childers)                    1332

1      MR. CHILDERS:  May I approach, Your Honor?

2      THE COURT:  Yes, you may.

3      THE WITNESS:  Thank you.

4      MR. CHILDERS:  You're welcome.

5      And this is from the medical records exhibit that has

6  already been entered into evidence.  You'll see the first

7  page, which is 2000-2934.

8      The date is August -- sorry -- August 20th, 2011, if

9  you look right -- I'm sorry, Gina.  Can you go up a little

10 bit.

11 Q.  If you look here, you see there are some tests that were

12 done on August 20th, 2011.  Do you see that?

13 A.  I do.

14 Q.  Okay.

15     MR. CHILDERS:  And then, Gina, if we could go down to

16 the bottom section called Coagulation.

17 Q.  And you see on that particular day, Betty Knight had an

18 aPTT of 47?

19     Sorry.  You see that?

20 A.  I do.

21 Q.  And that same day, she's on warfarin then, right?

22 A.  Correct, but warfarin won't affect that aPTT.

23 Q.  You're not familiar with the fact that warfarin can affect

24 the aPTT?

25 A.  It's extraordinarily rare.

Vanessa Shami - Cross (Childers)                1333

1    Q.  The PT INR is the test you're looking at to determine if

2    warfarin is in the right range, correct?

3    A.  That is correct.

4    Q.  And her PTT -- excuse me.

5        Her PT INR was 3.7, right?

6    A.  That is correct.

7    Q.  You agree with me Betty Knight was over-anticoagulated

8    that day, right?

9    A.  She was supratherapeutic that day.

10   Q.  All right.  So if I'm correct, then, you don't use the

11   term over-anticoagulated even with warfarin patients?

12   A.  Correct.

13   Q.  Okay.  So let me see if I can ask it in a different way.

14       Do you agree with me that Betty Knight had too much

15   warfarin in her system that day?

16   A.  Yes.

17   Q.  Okay.  And because of that, you say she was

18   supratherapeutic, right?

19   A.  Correct.

20   Q.  If I say over-anticoagulated, you know what I mean, right?

21   A.  I do.

22   Q.  Okay.  And that is -- what I'm saying is the same as

23   supratherapeutic, right?

24   A.  Okay.

25   Q.  In your deposition, we talked about over-anticoagulated

Vanessa Shami - Cross (Childers)                    1334

1    the whole time.  Do you remember that?

2    A.  I do.  You insist on using it.

3    Q.  And you didn't seem to have a problem with it then,

4    correct?

5    A.  That -- I -- that is not true, but --

6    Q.  You just didn't tell me you had a problem with it.

7    A.  I guess.

8    Q.  Okay.  Fair enough.

9        Okay.  So we know this day she was over-anticoagulated.

10   Her aPTT happened to be 47, correct?

11   A.  She was supratherapeutic on coumadin, which should not

12   affect that PTT level.

13   Q.  Her PTT was high, right?

14   A.  The PTT was high for I don't know what reason.

15   Q.  Okay.

16   A.  But it didn't have to do with the coumadin.  I want to

17   make that very clear to the jury.

18   Q.  And it's your testimony that coumadin will not affect the

19   aPTT; is that right?

20   A.  It is very rare.  I see people on coumadin a lot, and it's

21   not the aPTT test that we follow with coumadin.  It's the PT

22   INR.

23   Q.  I understand that.

24       My question to you is, is it your testimony that coumadin

25   will not affect the aPTT?

Vanessa Shami - Cross (Childers)                    1335

1   A.   It -- it can rarely.

2   Q.   Okay.

3   A.   I see lots of patients on coumadin who have normal PTTs.

4   So to assume that this PTT was elevated because she was on

5   warfarin I think is incorrect.

6   Q.   That wasn't my question.

7        My question is simply this.  You agree with me she was

8   over-anticoagulated that day, right?

9   A.   She was supratherapeutic on her coumadin is what I'll

10  agree with, correct.

11  Q.   Okay.  And by that she had too much coumadin in her

12  system?

13  A.   Correct.

14  Q.   She was outside the therapeutic range?

15  A.   Correct.

16  Q.   That same day, her aPTT was 47, correct?

17  A.   Correct.

18  Q.   Okay.  And then if we could turn to the next page.

19       Do you -- I'm sorry.  Two pages over.

20  A.   Sure.

21       MR. CHILDERS:  Yes.  I'm sorry.  To 4002.

22  Q.   Okay.  Do you see this is, again, a lab test result

23  document for Betty Knight?

24  A.   Yeah, I do.

25  Q.   And this one in particular is in May of 2013, correct?

Vanessa Shami - Cross (Childers)                    1336

1    A.  I see it.

2         MR. CHILDERS:  Okay.  And if we look under this one,

3    Gina, for May 21st, 2013.

4    Q.  Do you see that she had her coagulation panel run again?

5    A.  I do.

6    Q.  And on that day, although it's a little hard to read, do

7    you see her aPTT was 47?

8    A.  I do.

9    Q.  And that was shown to be high, correct?

10   A.  It's above normal for their range, correct.

11   Q.  That's exactly the same number as it was when we looked,

12   and you agreed with me, that she was supratherapeutic on

13   warfarin back in 2011, right?

14   A.  That is correct.  But that doesn't have anything to do

15   with the PTT.

16   Q.  Okay.  Let's go then to --

17        MR. CHILDERS:  May I approach, Your Honor?

18        THE COURT:  You may.

19        MR. CHILDERS:  I'm going to hand you another --

20        THE WITNESS:  Thank you.  Appreciate it.

21        MR. CHILDERS:  -- set of records.  Again, these are

22   from the medical exhibit that has already been admitted.  We

23   start with page 2641.

24   Q.  You see that?

25   A.  I see this.

Vanessa Shami - Cross (Childers)                1337

1    Q.  And this is dated April 9th, 2009, right?

2    A.  I see that.

3    Q.  Ms. Knight was on warfarin at that point, right?

4    A.  Correct.

5    Q.  Okay.

6            MR. CHILDERS:  If we could go down, Gina.

7    Q.  They checked her aPTT as well as her PT INR, right?

8    A.  Yes.

9    Q.  Okay.  And her aPTT that day was 62, correct?

10   A.  Correct.

11   Q.  And it was found to be high, right?

12   A.  High for their reference range, yes.

13   Q.  And then if we look at her PT INR, it was 4.3, correct?

14   A.  That is correct.

15   Q.  That's supratherapeutic on warfarin, correct?

16   A.  The INR indicates that, yes, she is supratherapeutic on

17   warfarin.

18   Q.  So she has too much anticoagulant in her blood, right?

19   A.  Based on the INR alone, yes.

20   Q.  Okay.  And then if we could -- if you could turn the page

21   in your chart.

22           MR. CHILDERS:  And, Gina, I'm going to ask you to put

23   up page 2 -- I'm sorry -- 3759.

24   Q.  Do you see this is a clinical report from August 22nd,

25   2013?

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Cross (Childers)                1338

1   A.   I see it.

2   Q.   That's a little over a week before Betty passed away,

3   right?

4   A.   Yes.

5   Q.   Okay.  And Betty was on Pradaxa at that point?

6   A.   Correct.

7   Q.   Okay.  If we could turn to the third page.

8        Do you see that her aPTT was checked that day?

9   A.   I do.

10  Q.   And it was 62, right?

11  A.   Correct.

12  Q.   That's the exact same level it was when she had too much

13  anticoagulant in her system back in April of 2009, right?

14  A.   Too much warfarin.

15  Q.   Which is an anticoagulant, correct?

16  A.   That is correct.

17  Q.   Okay.  I think you testified earlier that when you looked

18  at the records, you didn't see any sign of Mrs. Knight having

19  a bleed after May of 2013; is that right?

20  A.   That is correct.

21  Q.   Okay.  Well, about a week after this is the August 22nd,

22  2013 record.

23       You agree with me that Betty had blood in her urine,

24  right?

25  A.   She had -- they noted red blood.

Vanessa Shami - Cross (Childers)                1339

1    Q.  Okay.  That was the day before she went to the hospital on

2    September 1st, right?

3    A.  Right.  But her urinalysis was negative.

4    Q.  There was blood found in her urine on the urinalysis.

5    A.  Barely.

6    Q.  Was there blood in the urine?

7    A.  Very little.  It's microscopic.  They needed a microscope

8    to see the blood cells.

9    Q.  They didn't need a microscope for her to see the blood

10   cells before she got to the hospital, right?  She saw it in

11   her urine; isn't that right?

12   A.  She saw some blood in her urine, correct.

13   Q.  Okay.  And then when she got to the hospital, they did a

14   urinalysis and said, yep, there's blood in the urine, correct?

15   A.  Yes.  And there was also bacteria, which is very

16   suggestive of a urinary tract infection, which she's had in

17   the past.

18   Q.  Okay.  My question was only was there blood in her urine,

19   ma'am.

20   A.  Sorry.

21   Q.  Was there blood in her urine?

22   A.  Yes.

23   Q.  That was the day before she passed, right?

24   A.  It was unfortunately, yes.

25   Q.  And she was still on Pradaxa at that time?

Vanessa Shami - Cross (Childers)                    1340

1    A.  She was.

2    Q.  Okay.  I think the next question you were asked was, did

3    Betty's May 2013 GI bleed contribute to her death.

4        Do you recall being asked that?

5    A.  I do.

6    Q.  Okay.  And I think you said unequivocally, no, you don't

7    believe it did, right?

8    A.  I don't believe it did, correct.

9    Q.  In fact, I think you told us that you don't even think

10   Betty had what is considered a severe bleed in May of 2013,

11   right?

12   A.  What I said it wasn't hemodynamically unstable.

13       I wouldn't characterize it -- for all the GI bleeds that I

14   see, it's not severe in that she wasn't clinically unstable,

15   and she did not need the intensive care unit.

16   Q.  You don't think she had a severe bleed in May of 2013?

17   A.  That is correct.

18   Q.  You reviewed Dr. Abdelgaber's deposition testimony in this

19   case, didn't you?

20   A.  I can't recall offhand but, yeah, I'm sure at some point.

21   Q.  Do you know who Dr. Abdelgaber is?

22   A.  It's her primary care physician.

23   Q.  He is the one who admitted her to the hospital for the

24   bleed, right?

25   A.  Yes.

Vanessa Shami - Cross (Childers)                1341

1  Q.  You listed his deposition as something you relied on for

2  your opinions in this case, right?

3  A.  Correct.

4  Q.  Okay.  But you can't remember -- see if I can refresh your

5  recollection.

6     Is this --

7        MR. LEWIS:  Your Honor, I'm going to object to this,

8  playing somebody else's deposition -- showing somebody else's

9  deposition.

10       THE COURT:  Well, whose deposition is this?

11       MR. CHILDERS:  This is Dr. Abdelgaber.

12       THE COURT:  Well, you can ask her --

13       MR. CHILDERS:  Okay.

14       THE COURT:  -- a question to see if it refreshes her

15  recollection about what he said.

16       MR. CHILDERS:  Fair enough.  Let me just do this if I

17  could, Your Honor.

18       May I approach?

19       THE COURT:  Yes.

20       MR. CHILDERS:  I'm just going to hand you this one

21  page of testimony --

22       THE WITNESS:  I'm sorry.  What are you handing me?

23  What is it?

24       MR. CHILDERS:  This is a page from Dr. Abdelgaber's

25  testimony.

Vanessa Shami - Cross (Childers)                1342

1   Q.  You relied on this for your opinions in this case, right?

2   A.  I see it.

3   Q.  Do you see line 14, where he was asked:  Did you feel at

4   any time during her admission her life was in danger from the

5   GI bleed?

6       And then he said:  I -- that's why I admitted her to the

7   hospital?

8   A.  Yes.

9   Q.  So does that refresh your recollection about Dr.

10  Abdelgaber's testimony in that regard?

11  A.  Yeah.  It's --

12  Q.  Okay.

13  A.  -- no different than what I said.

14  Q.  And you don't disagree with Dr. Abdelgaber, correct?

15  A.  No.  I would have admitted her to the hospital as well.

16  Q.  Okay.  And you looked at the discharge summary from when

17  Betty got out of the hospital, right?

18  A.  I did.

19  Q.  And you relied on that for your opinions in this case?

20  A.  I did.

21  Q.  And you looked at --

22          MR. CHILDERS:  May I approach, Your Honor?

23          THE COURT:  You may.

24          MR. CHILDERS:  I'm going to hand you the --

25          THE WITNESS:  Thank you.

Vanessa Shami - Cross (Childers)          1343

1    MR. CHILDERS:  -- front page of the discharge summary.

2   Q.  You see what I've handed you is the page with the

3   discharge diagnoses from the discharge summary?

4   A.  I see it.

5   Q.  And you reviewed this as you formulated your opinions in

6   this case?

7   A.  I did.

8   Q.  And you see the first one under Discharge Diagnoses is:

9   Severe gastrointestinal blood loss, anemia with symptomatic

10  initially, correct?

11  A.  That is correct.

12  Q.  And then if we turn in your exhibit one page -- this is

13  going to be page No. 3959, Gina -- this is the discharge

14  summary from when Betty got out of skilled nursing after being

15  in the hospital, right?

16  A.  Yes.

17  Q.  Okay.  And if we look under Discharge Diagnoses, No. 1

18  says:  General debility stemming from various medical problems

19  including chronic anemia stemming from severe gastrointestinal

20  bleed loss due to AV malformation, correct?

21  A.  Yes.

22  Q.  I take it you disagree with Betty's doctors who wrote down

23  that she had severe gastrointestinal blood loss?

24  A.  As a gastroenterologist, I do disagree.

25  Q.  Okay.  So you don't agree with the diagnosis on either of

Vanessa Shami - Cross (Childers)                    1344

1    these documents that we just looked at?

2    A.  We agree that she's had a GI bleed.  It's just the

3    severity of the bleed I disagree with.

4    Q.  Okay.

5    A.  Yes.

6         MR. CHILDERS:  Let me show you Exhibit --

7         (Counsel conferring.)

8         MR. CHILDERS:  May I approach, Your Honor?

9         THE COURT:  Yes.

10        THE WITNESS:  Thank you.

11        MR. CHILDERS:  I'm handing you the Pradaxa label,

12   physician label for when it was first put on the market.

13   Q.  You see that?

14   A.  I do.

15   Q.  And if you could turn with me to page 3, there's a Section

16   6.1.

17   A.  I see that.

18   Q.  Okay.  And if you look a little farther down on 6.1, about

19   halfway down the page, there's a section called Bleeding.

20   A.  Yes.

21   Q.  Okay.

22        MR. CHILDERS:  I understand from defendants this is

23   already admitted.  I didn't think it was, but --

24        THE COURT:  All right.  You want to state the number?

25        MR. CHILDERS:  It's Exhibit 86.

Vanessa Shami - Cross (Childers)                    1345

1        MS. JONES:  If it's not admitted, there's no objection

2   to the admission of this.

3        THE COURT:  All right.  You may publish it.

4        MR. CHILDERS:  And then if we could --

5   Q.  This is talking about the RE-LY study, right?

6   A.  It is.

7   Q.  And you talked with Mr. Lewis a little bit about how that

8   RE-LY study was set up, and how they categorized bleeding

9   events, right?

10  A.  Correct.

11  Q.  Okay.  And what they said -- if you go to right here,

12  Gina -- is:  A life-threatening bleed met one or more of the

13  following criteria.

14       The first one is fatal.  The second is symptomatic

15  intracranial bleed.  Then reduction in hemoglobin of at least

16  5 grams per deciliter.  And then transfusion of at least four

17  units of blood.  Then associated with hypotension requiring

18  the use of intravenous inotropic agents.  And then finally

19  necessitating surgical intervention.

20       Correct?

21  A.  I see that.

22  Q.  In this particular case, in Ms. Knight's case, she had a

23  reduction in her hemoglobin of at least 5 grams per deciliter,

24  correct?

25  A.  Incorrect.

Vanessa Shami - Cross (Childers)                    1346

1   Q.  How much was her --

2   A.  Her baseline is 5 -- or a 10.  She went to 6.4.

3   Q.  Okay.  She had a transfusion of at least four units of

4   blood.  We can agree on that?

5   A.  She did have four units of blood.

6   Q.  Okay.  So she meets the criteria or met the criteria from

7   the RE-LY trial for being categorized as a life-threatening

8   bleed, right?

9   A.  Correct.

10  Q.  Okay.

11          MR. CHILDERS:  You can take that down, Gina.

12  Q.  If I understood your testimony correctly, you don't

13  disagree with the RE-LY criteria, you just don't use it; is

14  that right?

15  A.  Correct.  It's very different.  You have to have objective

16  criteria when you are doing a study, but that is not how we

17  practice medicine as physicians.

18      And as gastroenterologists, you know, we have different

19  ways of assessing how severe bleeding is.  And I think I've

20  explained to the jury and you that we use clinical signs

21  and --

22  Q.  Understood.

23      And when you say doctors do it -- I guess treating doctors

24  do it differently, you're not including Ms. Knight's doctors

25  who said she had a severe bleed when they wrote the discharge

Vanessa Shami - Cross (Childers)                    1347

1   diagnoses, correct?

2   A.   Again, I'm not disagreeing with the word bleed.  I think

3   the severity of it is debatable.

4   Q.   Right.

5        And so you disagree with what her doctors wrote in the

6   discharge diagnoses?

7   A.   Yes, I do.

8   Q.   Okay.  Let's talk about how significant the bleed was to

9   Betty's health.  Okay?

10  A.   Okay.

11  Q.   I understand that it's very unusual for you to have to

12  send a GI bleed patient to skilled nursing after you've

13  treated them; is that right?

14  A.   That is correct.

15  Q.   And I think you testified earlier today that AVM bleeds,

16  which is what Betty had, should only require hospitalization

17  of a couple of days.

18       Is that what you told us?

19  A.   Yeah, a few days.  That's correct.

20  Q.   Okay.  Betty was in the hospital for five days, right?

21  A.   I believe she was in the hospital for three.

22  Q.   Okay.  Well, if we look at the --

23  A.   But it may --

24  Q.   We can look again if we need to at Dr. Abdelgaber's

25  deposition --

Vanessa Shami - Cross (Childers)          1348

1  A.  Yeah.

2  Q.  -- but, either way, she never left the hospital between

3  May 20th and June 8th, right?

4  A.  That's incorrect.

5  Q.  She never left the hospital facility that included the

6  skilled nursing between May 20th and June 8th, correct?

7  A.  Right.  The only reason why is because the skilled nursing

8  was in the physical hospital.  You can't assume that that's

9  the entire hospitalization.

10      She was in the hospital for three days or five -- I think

11  it was three -- and then she was discharged.  If the facility

12  was in a different building --

13  Q.  Did you read -- you read Dr. Abdelgaber's deposition?

14  A.  I did.

15  Q.  You saw where he said the skilled nursing is part of the

16  hospital, it's just in a different section.

17      Do you recall that?

18  A.  Right.  Physically it is part -- in the same --

19  Q.  Okay.

20  A.  But what I'm saying is in many institutions, that's not

21  the case, and you can't consider that the entire

22  hospitalization.

23      The acuity of the GI bleed was the first few days.  She

24  was discharged, there was a discharge summary, and

25  subsequently she was in rehab.

Vanessa Shami - Cross (Childers)                    1349

1    Q.  And that's what we're talking about --

2    A.  Correct.

3    Q.  -- right?

4        When she got finished with her inpatient hospital

5    treatment, they didn't send her home, right?

6    A.  That is correct.

7    Q.  She went to skilled nursing, right?

8    A.  That is correct.

9    Q.  For 15 days.

10   A.  That is correct.

11   Q.  Your personal practice is you hardly ever send a patient

12   to skilled nursing after a GI bleed, right?

13   A.  That is correct.  But Ms. Knight's been to that same

14   nursing facility multiple times in the past.

15   Q.  The last time she was there was 2008, right?

16   A.  I believe she had been there before, but I can't tell you

17   every single time she's been there.

18   Q.  You guys made a good chart that we can look at where you

19   actually put that information, right?

20       Remember this chart?

21   A.  I do remember that chart.

22   Q.  The only time on here that you noted that she went to

23   skilled nursing was in 2008, right?

24   A.  That is correct.

25   Q.  Okay.  And by the way, I noticed here on this entry for

1    November 13th to 19th, that's when you said she had a GI

2    bleed, right?

3    A.   Correct.

4    Q.   It doesn't say anything about a GI bleed on your chart,

5    does it?

6    A.   No.  I think he's putting exactly what was in the record.

7    Q.   And the record didn't say GI bleed, did it?

8    A.   Not -- not the chief complaint, that is correct.

9    Q.   Okay.  If we could go back to the discharge summary from

10   the skilled nursing facility being 3959, there's a section

11   here called Hospital Course.

12       Do you see that down at the bottom?

13   A.   Is this in the same packet you gave me?

14   Q.   I'm sorry.

15   A.   I'm sorry.

16   Q.   It was the one we were just looking at prior to the bleed.

17   A.   Okay.

18   Q.   The second page.

19       Do you see it says Hospital Course?

20   A.   I'm not trying to be difficult.  I don't.

21   Q.   If you look on the screen --

22       THE COURT:  Look at the monitor and see if you can

23   find it.

24       MR. CHILDERS:  -- that should help.

25       THE WITNESS:  Sorry.

Vanessa Shami - Cross (Childers)                    1351

1        MR. CHILDERS:  That's okay.

2   Q.  Do you see that it says:  Patient was admitted to our

3   skilled nursing unit due to general debility stemming from

4   anemia secondary to chronic blood loss.

5        Do you see that?

6   A.  That is correct.

7   Q.  And in fact, that's not correct.

8        You remember from Dr. Abdelgaber's deposition he said the

9   word chronic should have said acute, that that was a mistake

10  in this record, right?

11  A.  I saw that he changed it during the deposition, yes.

12  Q.  And you agree with him changing it to acute, correct?

13  A.  I mean, she's also had chronic blood loss, so I think

14  they're both correct.

15  Q.  Well, according to the doctor who treated her in the

16  hospital, it should have said acute blood loss, correct?

17  A.  I'm not arguing with that.

18  Q.  And acute blood loss means the blood loss that she was

19  experiencing when she had to have the colonoscopy and the

20  clipping, right?

21  A.  That is correct.

22  Q.  Okay.  Now we talked about some other hospitalizations or

23  you talked about some other hospitalizations that Betty had,

24  including one in April 2013 to have stents placed?

25  A.  Correct.

Vanessa Shami - Cross (Childers)                1352

1    Q.  Betty did not have to go to skilled nursing after having

2    the stents placed, right?

3    A.  That is correct.

4    Q.  She went home, right?

5    A.  She had home health.

6    Q.  Home health didn't live in her house, right?  They came

7    occasionally during the week to help her, right?

8    A.  We don't know how often they came but, yes, they came.

9    Q.  I thought you looked at all the home health records.

10   A.  I did look at the home health records.

11   Q.  So you know exactly how many times they came?

12   A.  Yeah, but I can't tell you after that hospitalization

13   every single time that they came in.

14   Q.  Well, you agree with me they weren't there every day,

15   right?

16   A.  Yes.

17   Q.  And she was able to go home even though they weren't there

18   every day and live there by herself, right?

19   A.  Ah, she had full family support.

20   Q.  Did her family live at her house with her?

21   A.  No, I don't think so.

22   Q.  Okay.  You read in Dr. Abdelgaber's deposition that he

23   testified that Betty did not seem to ever get better or bounce

24   back from the May 2013 GI bleed, didn't you?

25   A.  I saw that.

Vanessa Shami - Cross (Childers)                    1353

1    Q.  That's what he said, right?

2    A.  That is correct.

3    Q.  And you don't disagree with Dr. Abdelgaber, correct?

4    A.  I mean, again, Ms. Knight had multiple, you know,

5    co-morbidities.  She had multiple medical problems.  She's

6    been in and out of the hospital in 2008, 2011.  So -- and time

7    has gone by.  She's now 84.  She was 83 at the time of the

8    stents.  Unfortunately things happen over time.

9    Q.  Doctor, you don't disagree with Dr. Abdelgaber's statement

10   that Betty did not seem to ever get better or bounce back from

11   the May 2013 GI bleed, correct?

12   A.  I can't disagree with him, that is correct.

13   Q.  And you don't disagree with him, correct?

14   A.  I wasn't -- I mean --

15   Q.  Right.

16       You weren't there?

17   A.  No.

18   Q.  He was, correct?

19   A.  He was there.

20   Q.  And that's what he testified to, correct?

21   A.  That's what he testified, correct.

22   Q.  In fact, you will defer to Dr. Abdelgaber's opinion in

23   that, correct?

24   A.  Yes.

25   Q.  Okay.  All right.  The last thing I thought you were asked

Vanessa Shami - Cross (Childers)                    1354

1    was, did the Pradaxa label --

2         THE COURT:  Why don't you wait until you finish

3    writing so you can use the microphone so we can hear you.

4         MR. CHILDERS:  I'm sorry.

5         THE COURT:  Is it on?  There it is.

6         MR. CHILDERS:  Sorry.  Can you hear me now, Judge?

7         THE COURT:  Yes.

8         MR. CHILDERS:  Did the Pradaxa label adequately warn

9    about Pradaxa's bleed risk.

10   Q.  Is that right?

11   A.  That is correct.

12   Q.  Okay.  You've never prescribed Pradaxa, have you?

13   A.  I have not.

14   Q.  You've never once used the Pradaxa label to decide if

15   Pradaxa is the right anticoagulant medication for a patient,

16   have you?

17   A.  I've looked at the label.

18   Q.  I didn't ask you that, ma'am.

19        Have you ever used the label to decide if Pradaxa is the

20   correct anticoagulant for a particular patient?

21   A.  I don't make that decision --

22   Q.  You've never done that --

23   A.  -- that's correct.

24   Q.  -- right?

25   A.  I don't make the decision as to what anticoagulant

Vanessa Shami - Cross (Childers)                    1355

1  somebody goes on.

2  Q.  Okay.  And so when you are giving your opinions about the

3  adequacy of the Pradaxa label and the warnings, that's not

4  something in practice that you actually do for particular

5  patients, right?

6  A.  I do it for other medications, so I feel -- I read labels

7  all the time.  So I'm very -- I'm familiar with reading

8  labels.

9  Q.  The question is, do you do it for Pradaxa?

10  A.  Not specifically for -- to make a decision on whether

11  somebody should be on Pradaxa or not.  I do not write the

12  prescription, that is correct.

13  Q.  You understand that's why we're here, whether or not Betty

14  Knight should have been on Pradaxa?

15      You understand that, right?

16  A.  Yes.

17  Q.  Okay.  You would not second-guess a doctor -- another

18  doctor's choice of anticoagulant for their patient, would you?

19  A.  No.  I agree with her physicians who put her on Pradaxa.

20  Q.  I'm talking about any anticoagulant.

21      You would never step in and say, hey, Doctor X, I disagree

22  with what you prescribed to this patient, right?

23  A.  I can as a consulting gastroenterologist or somebody -- if

24  somebody is on my inpatient service, I can say, you know what,

25  I don't agree with the cardiologist.  But that rarely occurs.

1    Q.  You've never done that, have you?

2    A.  I have.

3        And if you're going to ask time frame, it was last month.

4    Q.  Okay.  So the only time you've ever done that was last

5    month, right?

6    A.  Yes.

7    Q.  Okay.  Which is after the time I took your deposition in

8    this case, right?

9    A.  Absolutely, which was nine months ago.

10   Q.  How long have you -- did you tell us you've been

11   practicing medicine?

12   A.  16 years as an attending physician.

13   Q.  Okay.  And so the only time you've ever done that was last

14   month?

15   A.  Yeah.

16   Q.  Okay.

17   A.  I can -- we as prescribing -- we can talk to cardiologists

18   and decide, especially if somebody is having a GI bleed,

19   whether to restart it, what to start.  I mean, that's part of

20   our daily practice.

21   Q.  That wasn't my question, though.

22       My question was whether or not you would second-guess the

23   anticoagulant choice that was made by another physician for a

24   patient.

25   A.  The word second-guess is --

Vanessa Shami - Cross (Childers)                    1357

1    Q.  You didn't have a problem answering when I asked you that

2    question at your deposition; do you recall?

3    A.  I do recall.

4    Q.  Okay.  And when I asked you, you wouldn't second-guess

5    that decision, you said that's correct, didn't you?

6    A.  Yeah.  I'm not going to second-guess one of our

7    cardiologists, but I will definitely put my input in there if

8    I need to.

9    Q.  I believe -- but you just don't actually change the

10   medication ever, except for this one time --

11   A.  I don't personally write the prescription, correct.

12   Q.  All right.  I believe you testified -- and I wrote this

13   down again, so if I got it wrong, I apologize -- but the

14   Pradaxa doctor label, which you have a copy in front of you,

15   Exhibit 86, adequately describes the Pradaxa bleed risk,

16   right?

17   A.  Correct.

18   Q.  Okay.  You have the label in front of you.

19   A.  I have the two thousand -- I have the old label in front

20   of me.

21   Q.  Okay.  And that label was in existence when --

22        MR. CHILDERS:  Which one is that?

23     (Plaintiffs' counsel conferring.)

24        MR. CHILDERS:  All right.  Fair enough.

25   Q.  Can you tell me -- can you tell the jury where that label

Vanessa Shami - Cross (Childers)                1358

1    tells doctors how much severe kidney impairment increases a

2    Pradaxa patient's bleed risk?

3    A.  Are you talking specifically about the older label --

4    Q.  You can look at --

5    A.  -- from 2011?

6    Q.  You're welcome to look at any Pradaxa label you want and

7    answer that question for me.

8        Where in the label does it tell a doctor how much severe

9    kidney impairment increases a patient's bleed risk if they're

10   on Pradaxa?

11   A.  It does not.

12   Q.  Okay.  Can you tell me where in any Pradaxa label you have

13   ever reviewed that tells a doctor how much taking a P-gp

14   inhibitor medication increases a patient's bleed risk?

15   A.  It doesn't.

16       It does specify that it does increase with the P-gp

17   inhibitors, and it does specify specifically that it does

18   increase based on creatinine clearance, which is a function

19   of -- of the way the kidneys work.

20   Q.  It just doesn't tell the doctor how much that increase is,

21   right?

22   A.  That is correct.

23   Q.  How much -- can you tell the jury where any of the Pradaxa

24   labels, ah, tell doctors how much being over the age of 80

25   increases a Pradaxa patient's bleed risk?

Vanessa Shami - Cross (Childers)                    1359

1    A.  In terms of percentage?

2    Q.  Yes.

3    A.  No, it does not.

4        But it does -- you know, again, it does state specifically

5    for kidney.  And it states specifically for P-gp inhibitors

6    that it does increase, potentially increase the levels.

7    Q.  Without any details about how much that increase would be,

8    right?

9    A.  That is correct.

10   Q.  And then could you tell the jury where any of the Pradaxa

11   labels that you've relied on tell a doctor how much being a

12   female increases the bleed risk for a patient on Pradaxa?

13   A.  It does not.

14   Q.  Can you tell the jury where any of the Pradaxa labels you

15   rely on tell a physician how much having diabetes increases

16   your risk of having a bleed on Pradaxa?

17   A.  It doesn't tell you about percentage, that is correct.

18   Q.  Does it say you have an increased risk of bleed if you

19   have diabetes?

20   A.  I don't know, sir.  I'd have to look at the label for

21   2013.  Do you want to give it to me?

22   Q.  Look at the one that is in front of you.

23   A.  This one is old.

24   Q.  Does it say it?

25   A.  This is obsolete, though.  This is not at the time of her

Vanessa Shami - Cross (Childers)                1360

bleed.

Q.  Well, it's at the time of when she was prescribed the

drug.

A.  Correct, but she's had multiple people -- I mean, she's

been prescribed the drug --

Q.  Understood.

    Tell me where it says diabetes increases your bleed risk.

A.  It does not.

Q.  Okay.  Can you tell the jury where that label or any label

that you have seen tells a doctor how much a patient's bleed

risk is increased if they have reflux or GERD?

A.  It does not.

Q.  Okay.  Can you tell the jury how much -- excuse me.

    Can you tell the jury where in that label it tells a

doctor how much giving a patient aspirin while they're on

Pradaxa increases the patient's bleed risk?

A.  It doesn't give you a percentage, but it does tell you it

increases the bleeding risk for -- for many of these things

you're talking about.

Q.  Can you tell the jury where in the label it tells doctors

how much bleed risk is increased for a patient who is taking

Plavix?

A.  It doesn't have a percentage, but it does state that it

can increase, your bleeding risk does increase while you're on

both.

Vanessa Shami - Cross (Childers)                    1361

1   Q.  When Betty Knight started taking Pradaxa, do you agree

2   with me that the doctor label did not tell doctors, nurses,

3   whoever was reading it, not to give Pradaxa to a patient with

4   severe renal -- severe kidney impairment who was also taking a

5   P-gp inhibitor?

6   A.  It said to tell your physicians what medications you're

7   on, and that you're at increased risk if you have -- you're

8   age greater than 75.

9   Q.  I'm talking about the doctor label, ma'am.

10  A.  The doctor or patient?

11  Q.  The doctor label.

12  A.  Okay.

13  Q.  You agree with me when Betty Knight was started on

14  Pradaxa --

15  A.  Okay.  This label, okay.

16  Q.  -- it did not say do not give Pradaxa to a patient who has

17  severe kidney impairment who is also taking a P-gp inhibitor

18  medication?

19  A.  That is correct.  But it did at the time of her bleed.

20  Q.  Can you tell me where in any label for Pradaxa you've ever

21  seen it tells physicians Coreg is a P-gp inhibitor?

22  A.  It doesn't say that specifically.  But we, as prescribing

23  physicians, know that.

24  Q.  Can you list for me every drug that is a P-gp inhibitor?

25  A.  No, I cannot.  Carvedilol is a very or Coreg is a very

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Cross (Childers)                    1362

1  commonly used drug.

2  Q.  Especially in atrial fibrillation patients, right?

3  A.  Yes.

4  Q.  One of those commonly used drugs you would expect the

5  company to say don't give this drug to a severely renally

6  impaired patient who is taking Pradaxa, right?

7  A.  No.  Labels do not treat patients, physicians do.  I mean,

8  you're kind of ignoring all of the benefits of the drug and

9  just concentrating on one thing.

10      It's not obsolete.  It's not a bad thing Ms. Knight was on

11  this drug.  I mean, we're preventing strokes.  We're

12  preventing emboli.  It's not a label that -- we're not

13  treating the patient based on a label.

14  Q.  Well, the label didn't tell Dr. MacFarland or her nurse,

15  Betty Knight's not a patient who this medicine should be given

16  to.  It didn't say that when they prescribed it to her, did

17  it?

18  A.  No.  But, again, she was prescribed the medication over

19  and over again.  And we as physicians will re-review labels

20  all the time, and it was on the label from 2013.

21  Q.  Okay.  You read Dr. MacFarland's deposition, correct?

22  A.  I have.

23  Q.  Okay.  And in that deposition, she said she only ever got

24  one dear doctor letter, and it related to mechanical heart

25  valves, correct?

Vanessa Shami - Cross (Childers)                    1363

1   A.  That's a dear doctor -- that's different than the --

2   Q.  Understood.

3   A.  -- than the label.

4   Q.  So when the label was changed to say a patient like Betty

5   Knight shouldn't get Pradaxa, she didn't get a letter like

6   that, did she?

7   A.  No.

8   Q.  Okay.  Nobody in the whole country got a letter like that

9   when that change was made to the label, did they?

10  A.  They did not, to my knowledge.

11  Q.  Do you agree with me that knowing that a patient who has

12  severe renal impairment and is taking Coreg should not take

13  Pradaxa is important information for a doctor to know?

14  A.  It's information that is in the label.

15  Q.  It wasn't at the time she got prescribed the drug by Dr.

16  MacFarland's office, correct?

17  A.  But you can't go based on a label that is two years old

18  when everything is -- you're talking about the GI bleed in

19  2013.  It's a little bit unfair to use an obsolete label.

20      I mean, with time comes knowledge.  And in 2013, when they

21  renewed her -- you know, renewed her Pradaxa, the label is

22  from 2013, and that's the one I think we should be reviewing.

23  Q.  Ma'am, you talked about whether or not the Pradaxa label

24  adequately warns about Pradaxa's bleed risk.

25      You weren't talking about one label, you were talking

Vanessa Shami - Cross (Childers)                    1364

1   about all of them over time, weren't you?

2   A.  I'm talking over time, correct.

3   Q.  Okay.  And you agree with me, when Betty Knight was

4   started on Pradaxa, her doctors were not told this medication

5   should not be given to a patient with severe kidney impairment

6   who was taking a drug like Coreg, correct?

7   A.  I think should is too absolute.

8   Q.  It says should be avoided in the label, doesn't it?

9   A.  Correct.  But that doesn't mean it's wrong for her.

10  Q.  That's information that the doctor has to know to be able

11  to make that decision, correct?

12  A.  That is correct.

13  Q.  Okay.  And like you said, Boehringer did add that

14  information to the label after Betty Knight had already

15  started it.

16  A.  Correct.

17  Q.  But as you agreed with me, they didn't communicate that in

18  writing, that change, they didn't send a letter to Dr.

19  MacFarland or any other doctor in the country saying, hey, we

20  changed the label to have this new information, correct?

21  A.  That is correct.

22  Q.  Okay.

23  A.  But we as physicians re-review labels intermittently, from

24  time to time, so that's pretty standard of care.

25  Q.  You agree with me the words Coreg or carvedilol have never

Vanessa Shami - Cross (Childers)                    1365

1    appeared in the Pradaxa label, right?

2    A.  No.

3    Q.  And they have never appeared in the patient Medication

4    Guide, correct?

5    A.  I would have to recheck that.  I don't think so.

6    Q.  Well, you went through the Guide with Mr. Lewis and said

7    there are some medications that are listed, and some aren't,

8    right?

9    A.  Right.

10   Q.  If Coreg was in there, you would have told us, right?

11   A.  That is correct.

12   Q.  Okay.  And you didn't tell us that, did you?

13   A.  No.

14   Q.  The label, the doctor label -- I want to make sure we are

15   clear on this --

16   A.  Uh-huh.

17   Q.  -- did not tell Dr. MacFarland and her nurse that Pradaxa

18   had never been tested in patients who had severe kidney

19   impairment when they started Betty Knight on Pradaxa, right?

20   A.  Can you -- I'm sorry.  I missed the first part.

21   Q.  The doctor label --

22   A.  Uh-huh.

23   Q.  -- did not tell Dr. MacFarland or her nurse that Pradaxa

24   had never been tested in patients with severe kidney

25   impairment when they started Betty on Pradaxa in October of

Vanessa Shami - Cross (Childers)                    1366

1   2011?

2   A.   It doesn't say that, correct.

3   Q.   The label also didn't tell Dr. MacFarland or her nurse

4   that the 75-milligram Pradaxa dose had never been tested in

5   atrial fibrillation patients, correct?

6   A.   That is correct.

7       But it was a model, it was modeled off of the RE-LY study.

8   And the FDA actually modeled that dose, they came up with that

9   dose, and BI independently did a study.  And so that's how

10  that dose came -- came to fruition.

11  Q.   The independent study you are talking about, that's not

12  with patients, right?  That was modeling as well?

13  A.   Right.  It's modeling.

14  Q.   Understood.

15  A.   And the FDA is full of very bright people, so it's hard

16  to, ah --

17  Q.   We all understand that.

18  A.   -- sway them.

19  Q.   The company didn't tell the doctors that this is only

20  based on modeling data, we didn't actually test it in

21  patients, did it?

22  A.   It doesn't say it specifically, that's correct.

23  Q.   Okay.  You said you also reviewed the Medication Guide

24  portions of all of the labels that you were given, correct,

25  the Pradaxa labels?

Vanessa Shami - Cross (Childers)                  1367

1    A.  Yes.

2    Q.  And you agree with me that none of those Medication Guides

3    have ever included information saying that Pradaxa has not

4    been tested in atrial fibrillation patients with severe renal

5    impairment, right?

6    A.  Yes.

7    Q.  Okay.  And you agree with me that the Medication Guide,

8    patient Medication Guide has never said the 75-milligram dose

9    of Pradaxa was never actually tested in atrial fibrillation

10   patients, correct?

11   A.  That is correct.

12       But the medication -- I mean, are we talking about the

13   patient guide now?

14   Q.  Yes.

15   A.  The patient guide says discusses all of your medications

16   with your physician.  And if you want additional information,

17   you can go and get additional information such as this guide,

18   and they provide a phone number.  So it's not like they

19   provide absolutely no information.

20   Q.  I didn't ask you if they provide no information.

21       I'm asking very specifically if certain information has

22   ever been included in those Medication Guides.  Okay?

23   A.  Correct.

24   Q.  The next -- and you agree with me the fact that the

25   75-milligram dose was not tested in patients for AFib, it

Vanessa Shami - Cross (Childers)                    1368

1   doesn't say that in the Medication Guide --

2   A.   That's correct.

3   Q.   And the Medication Guide has never said patients with

4   severe kidney impairment who are also taking a P-gp inhibitor

5   should avoid Pradaxa, right?

6   A.   In the Medication Guide?

7   Q.   That's right.

8   A.   No.

9        But they say -- they specifically say renal -- renal

10  problems, discuss with their physician, that you're at

11  increased risk of bleeding.

12       (Plaintiffs' counsel conferring.)

13  BY MR. CHILDERS:

14  Q.   If we could go back to the Medication Guide, page 12.

15  A.   I'm sorry.  Which one?

16  Q.   I'm sorry.  It's in the other binder that Mr. Lewis gave

17  you.  It's Exhibit 5889.

18  A.   I'll look here.

19  Q.   Okay.  That would be fine.

20       And this is a Medication Guide and the label that you and

21  Mr. Lewis talked about, right?

22  A.   It is.

23  Q.   And if we look under the you may have a higher risk of

24  bleeding if you take Pradaxa and section --

25  A.   Okay.  Yes.

Vanessa Shami - Cross (Childers)                1369

1   Q.  -- you see there is a part here about having kidney

2   problems and taking certain medications, right?

3   A.  Correct.

4   Q.  And the only two medications they list are dronedarone,

5   which is called Multaq, and ketoconazole tablets, which is

6   called Nizoral, right?

7   A.  Correct.

8   Q.  Are those P-gp inhibitors?

9   A.  No.

10      They are.

11  Q.  It's hard to know what's a P-gp inhibitor, isn't it,

12  Doctor, if they don't tell you?

13  A.  These two medications are extraordinarily uncommonly used

14  in medicine.  That's very different than carvedilol.

15      And I would like to also point out, since you're pointing

16  this point out, if you go down further on the page, it does

17  state to share all of your medications with your physician.

18  Q.  Ma'am, Multaq is used to help patients who have irregular

19  heartbeats, right?

20  A.  Yes.

21  Q.  Are you telling the jury that patients with atrial

22  fibrillation don't commonly take Multaq?

23  A.  I'm telling you it's not a very commonly used medication

24  in general.

25  Q.  Okay.  Well, let's get this straight.

Vanessa Shami - Cross (Childers)                    1370

1      Those are P-gp inhibitors, aren't they?

2   A.  Yeah.

3   Q.  Even you, an expert in this case hired by BI, didn't know

4   that just a second ago.

5   A.  I -- so, excuse me, I said they were.

6   Q.  First you said they weren't.

7   A.  Yes, I did.

8   Q.  Okay.  All right.

9      If we can go back to the Medication Guide.  Has the

10  Medication Guide, patient Medication Guide ever included a

11  statement or any information telling -- saying that you can't

12  reverse Pradaxa, there is no antidote or reversal agent for

13  Pradaxa?

14  A.  No.

15  Q.  Has the patient Medication Guide ever said patients who

16  take Pradaxa are more likely to have a GI bleed than patients

17  who take warfarin?

18  A.  No.

19  Q.  Okay.  This information, basically what we just talked

20  about, right?

21     You were hired by Boehringer to give opinions in this case

22  really about whether they warned properly and what happened

23  with the bleed, right?

24  A.  That's correct.

25  Q.  Has Boehringer or their counsel provided you anything --

1   Medication Guide, television ad, magazine ad, a letter to

2   patients, anything -- showing that they ever provided this

3   information to patients directly?

4   A.  Not directly in those words.

5        But they have -- I mean, again, they tell you not to take

6   a combination of medications.  So, No. 3, don't take Pradaxa

7   and Coreg, I mean, this is something they're going to share

8   with their physicians, but it does not say it directly.

9        It does say that they are more likely to have bleeding.

10  Q.  What does?

11  A.  The patient guide.

12  Q.  It says they're --

13  A.  It gives them risk factors --

14  Q.  Excuse me.

15       Does it say they are more likely to have a GI bleed on

16  Pradaxa than on warfarin?

17  A.  No.

18  Q.  Okay.  So my question to you was -- set the Medication

19  Guide aside.

20  A.  Okay.

21  Q.  Have you been provided anything by the counsel who hired

22  you, who is representing Boehringer, that shows any of these

23  issues, items, warnings, whatever you want to call them, have

24  ever been communicated directly to patients like Betty Knight?

25  A.  No.

1372

1       MR. CHILDERS:  Thank you.

2          (Plaintiffs' counsel conferring.)

3       MR. CHILDERS:  That's all the questions I have, Your

4   Honor.

5       THE COURT:  All right.  Redirect?

6       MR. LEWIS:  I do.  Do we want to give a couple minute

7   stretch break?

8       THE COURT:  Yes.  Would you like to stand up and

9   stretch for a minute, use the restroom?

10      We'll take a short break for that purpose.  As soon as

11  you're ready, come back out, and we'll get started.

12         (Recess taken from 4:53 to 5:02 p.m.)

13         (Jury not present.)

14      THE COURT:  Mr. Lewis, how long do you expect?

15      MR. LEWIS:  I'm hoping 20 minutes.

16      THE COURT:  Okay.

17      MR. LEWIS:  We really need to get this witness

18  finished today.

19      THE COURT:  Well, yeah, we'd like to, too.

20      What's your best guess about Dr. Crossley tomorrow?

21      MR. LEWIS:  I mean, he has to be done tomorrow.

22      MS. JONES:  He has to leave town by the end of the day

23  because he has patients on Wednesday.

24      I intend to streamline his examination in light of --

25      THE COURT:  If he wants to leave early, I betcha

1373

1   they'll chip in on --

2          MS. JONES:  I will communicate that option.

3          THE COURT:  Honestly, given this, is this the witness

4   that you thought would be shorter than Crossley or --

5          MR. LEWIS:  Kind of.

6          THE COURT:  So what I am getting at is we are probably

7   going to be all day tomorrow on Crossley, even though we do

8   have to finish.

9          MS. JONES:  I was going to say, I suspect the direct

10  with Dr. Crossley will be a little shorter because Dr. Shami

11  covered some things we won't need to recover.

12         So --

13         THE COURT:  Well, best guess.

14         All right.  So you all now have copies of the

15  instructions.  Obviously we are going to have to wait awhile

16  to talk about that.

17         MR. MOSKOW:  Does this reflect the discussions we had

18  on Friday or is this just a --

19         THE COURT:  Yes.

20         MR. MOSKOW:  Or Thursday.  Okay.

21         THE COURT:  What I tried to do is I made notes, and

22  what I did was make some changes based upon the conference

23  that we had.

24         MR. MOSKOW:  Okay.

25         THE COURT:  Okay.  Let's bring the jury in.

Vanessa Shami - Redirect (Lewis)            1374

1       THE COURT SECURITY OFFICER:  Yes, sir.

2        (Jury present.)

3       THE COURT:  All right.  We're going to do our best to

4  finish this in the next half hour or so.  All right?

5       Go ahead.

6       MR. LEWIS:  Thank you.  May it please the Court.

7  Members of the jury, thank you for your patience.

8       Dr. Shami especially, thank you for your patience this

9  afternoon.  I will try to be brief and cover just a few topics

10  that were covered during your cross-examination.

11                    REDIRECT EXAMINATION

12  BY MR. LEWIS:

13  Q.   The first topic that I would like to cover is Exhibit 86.

14  You were asked several questions about what was in the

15  physician label at various points in time.  This question

16  relates to aPTT tests.

17       This is a label that you were asked about from March of

18  2011, to orient everybody, before Mrs. Knight had Pradaxa

19  prescribed to her by her physician.  And if we go to page 5 of

20  this label, we see at the top something about aPTT.

21       The thing that was being complained about during your

22  cross-examination is addressed in this physician label; is it

23  not?

24       MR. CHILDERS:  Objection, leading, Your Honor.

25       MR. LEWIS:  Let me rephrase that.

Vanessa Shami - Redirect (Lewis)                    1375

1        THE COURT:  Please.

2   BY MR. LEWIS:

3   Q.  Dr. Shami, does Boehringer discuss aPTT tests in the label

4   for March of 2011?

5   A.  It looks like, yes.  Yes.  A recommended therapeutic dose

6   of dabigatran prolongs the aPTT, ECT and TT test.

7   Q.  What does -- as a doctor, what does that mean when you

8   read dabigatran prolongs aPTT?

9   A.  That means that you are more likely -- I mean, you're

10  anticoagulated.  That's exactly what it means.

11  Q.  It means you're going to get higher scores --

12  A.  Right.

13  Q.  -- on the aPTT test.

14  A.  I mean --

15  Q.  Is that how you understand it?

16  A.  Yeah.

17        MR. LEWIS:  I'm finished with that exhibit.  Thank

18  you.

19        You were asked all kinds of questions about the

20  label after -- the label changes after Dr. MacFarland

21  prescribed to Mrs. Knight Pradaxa for the first time in

22  October of 2011.

23  Q.  Do you recall those questions?

24  A.  Yes.

25  Q.  And just to orient everybody, Dr. MacFarland did not

1    prescribe Pradaxa in 2013 when she got the bleed; is that

2    right?

3    A.  That is correct.

4    Q.  Okay.  But Exhibit 5980, which is in evidence, is the

5    label from November of 2011.  One month after Dr. MacFarland

6    first prescribed Pradaxa, the label in 2011, November of 2011

7    was changed.

8        Do you remember reviewing that?

9    A.  Yes.

10   Q.  And for any doctor, whoever reviewed and was going to

11   prescribe Pradaxa to a patient after November of 2011, do you

12   think they should have reviewed the label just based on your

13   practice?

14   A.  Yes.  We review the label intermittently, yes.

15   Q.  Do you think in that 18-month time frame after Dr.

16   MacFarland first prescribed Pradaxa, that maybe she should

17   have reviewed the label?

18   A.  Yes, and she may have reviewed the label.

19   Q.  And nonetheless, two years later when other physicians are

20   prescribing Pradaxa, would you have expected them to have

21   reviewed the label back then?

22   A.  Yes.

23   Q.  Okay.  So November of 2011, in Drug Interactions, we see

24   on the third bullet point:  P-gp inhibitors in patients with

25   severe renal impairment, Pradaxa use not recommended.

Vanessa Shami - Redirect (Lewis)                    1377

1     That was in the label as of November of 2011; is that

2  fair?

3  A.  That is correct.

4  Q.  If we back out of that, and we go to page 6 under Table 3.

5     Here we are again, November of 2011, what does it say

6  right under Table 3?

7  A.  It gives you the percentage increase that the drug

8  increases the -- yeah.

9  Q.  Table 3 indicates the relative increase for folks who have

10  renal impairment; is that right?

11  A.  That is correct.

12  Q.  But let me read the sentence underneath the table:

13  Patients with severe renal impairment were not studied in

14  RE-LY.  So let me ask you about that.

15     Does it appear from the November 2011 label that

16  Boehringer has hiding the fact that patients with severe renal

17  impairment were not studied in RE-LY?

18  A.  No.

19  Q.  Is this a document that is referred to in the Medication

20  Guide as something that could be available to patients?

21  A.  Yes.

22          MR. LEWIS:  I'm finished with that exhibit.  Thank

23  you.

24          Are you able to pull up Exhibit 3124 that was referred

25  to?  It was a document, the Eikelboom paper.

Vanessa Shami - Redirect (Lewis)                1378

1   Q.  Just real briefly, this is a paper that you did review as

2   part of your work in the case; is that correct?

3   A.  That's correct.

4   Q.  Okay.  You weren't asked about certain portions of this

5   paper.  You were only asked about one piece of it, and so I

6   want to sort of reference point us to 3124, page 6, please.

7        And that first full paragraph, that first sentence, what

8   does that say?

9   A.  Intracranial bleeding remains one of the most feared

10  complications of anticoagulant therapy.

11       And --

12  Q.  What does that mean to you?

13  A.  That means that if somebody has a -- I mean, there are no

14  anticoagulation -- it's very hard to reverse somebody who has

15  a bleed in their head, so it's a very concerning thing.

16  People can die.  Even a harder scenario is when people can't

17  walk, they can't talk.  So it just means that it's a morbid --

18  it's a complication we don't want.

19  Q.  Now, Mr. Childers said, well, you don't treat brain

20  bleeds.

21       Does that mean that it's any less important to you?

22  A.  No, and I think I mentioned that to him.

23  Q.  Okay.  And you also mentioned the data that is reflected

24  in this paper about the difference in reduction of stroke risk

25  between warfarin and Pradaxa, right?

Vanessa Shami - Redirect (Lewis)                1379

1    A.  Yes.

2    Q.  How is that important to your analysis?

3    A.  I mean, again, when you are doing a risk-benefit ratio,

4    you know, we can treat GI bleeding promptly.  You know,

5    strokes are very hard to reverse.  Bleeds in the head, there

6    is very little you can do.  And yes, Mr. Childers was right, I

7    do not directly treat them, but I've seen people who have had

8    strokes and who have emboli, and it's not a scenario that you

9    want for a family member.

10       So oftentimes when we're making these decisions, we almost

11   have to juggle and say, you know, which one is worse?  Is it

12   the GI bleed or the -- you know, or any bleed or a stroke?  I

13   mean, it's a very difficult decision, as you saw that his

14   physicians -- her physicians struggled with.

15   Q.  When you're prescribing a medication, Doctor, is it fair

16   to say that you take into account all of the potential risks?

17   A.  Absolutely.  I mean -- I mean, most of them, yeah.  All of

18   the ones that we think are relevant to the patient,

19   absolutely.

20   Q.  Now, this paper, Exhibit 3124, was published in May of

21   2011, if we look at the circulation at the top of the very

22   page we're looking at.

23   A.  Okay.  Yes.

24   Q.  Maybe go to the next page, please.  You see it was

25   circulated May 31st of 2011.

Vanessa Shami - Redirect (Lewis)          1380

1     Are you aware that Boehringer funded this study and the

2     publication of this paper?

3     A.  Yes.

4     Q.  And in this paper, there's a description of the lower risk

5     of stroke with Pradaxa versus warfarin; is that right?

6     A.  That is correct.

7     Q.  And there is a description of a lower risk of brain bleed

8     with Pradaxa versus warfarin; is that right?

9     A.  That is correct.

10    Q.  And there is a description of a higher risk of

11    gastrointestinal bleed with Pradaxa versus warfarin, right?

12    A.  That's correct.

13    Q.  And is it fair that a physician prescribing Pradaxa or

14    considering Pradaxa versus warfarin consider all of those

15    factors?

16    A.  Yes, absolutely.

17    Q.  Not just gastrointestinal bleed?

18    A.  Yes.

19         MR. LEWIS:  I'm finished with that exhibit.

20         Now I want to ask you back about some of the documents

21    that were covered by Mr. Childers related to Mrs. Knight.

22    There was a lot of discussion about whether or not the papers

23    said that Mrs. Knight had a bleed on warfarin in 2008, so I'm

24    going to get to that in a second.

25         But based on the INR readings alone that you saw and

Vanessa Shami - Redirect (Lewis)          1381

1    reviewed in this case, Mr. Childers asked you about that first

2    question I asked you, is warfarin safe and effective for Mrs.

3    Knight.

4    Q.  Just based on those INR readings alone, what is your

5    opinion on that?

6    A.  No, and that's what I was telling him.

7         You know, there was an implication that we misrepresented

8    it, but we were just calculating the number of times the INR

9    was above and then the number of times it was below.  It was

10   completely an accurate calculation.

11   Q.  And you were asked about, I believe, Exhibit 9005A-27.  It

12   may have been a different record that was referenced.

13        But I remember this specifically when Mr. Childers was

14   commenting that she appears to be on all three medications at

15   this time.

16   A.  I actually think that is incorrect.

17   Q.  Well, let's just look at what the assessment plan says.

18   A.  Yeah.

19   Q.  So regardless of whether she's on all three medications at

20   this time or not --

21   A.  Right.

22   Q.  -- let's look at 9005A, page 27 towards the bottom.

23   A.  Right.

24   Q.  He didn't show you this part, so I want to make sure the

25   jury gets a full view of the very record that Mr. Childers was

Vanessa Shami - Redirect (Lewis)                    1382

1    relying on here.

2         What does Dr. Gunnalaugsson said about whether or not Mrs.

3    Knight can be on all three medications?

4    A.   Unfortunately I don't think she can take coumadin, aspirin

5    and Plavix.  I think that she can stop the Plavix now.

6    Q.   That's what it says?

7    A.   Yeah.

8    Q.   You were also asked --

9         MR. LEWIS:  I'm finished with that exhibit.  Thank

10   you.

11        You were also asked a number of questions about the

12   switch from warfarin to Pradaxa in October of 2011 --

13        THE WITNESS:  That is correct.

14        MR. LEWIS:  -- and the discussion about whether or not

15   any record reflects that there was a reason for the switch

16   other than seeing a TV ad or request by the family.

17   Q.   Do you remember those questions?

18   A.   Yes, I do.

19   Q.   Have you seen records to suggest otherwise?

20   A.   Yes.

21   Q.   You referenced one of the records was the form that Dr.

22   MacFarland filled out?

23   A.   That is correct.

24   Q.   Okay.  But I also want to refer to 9009A-425.

25        Do you recognize this as a handwritten note from a visit

                    Vanessa Shami - Redirect (Lewis)                1383

1    around October 17th of 2011?

2    A.   Yes.  It says:  I want to replace coumadin with a new

3    medication.

4    Q.   And that looks like maybe that was a request since it is

5    under the chief complaint.  That is somebody saying something

6    to the doctor?

7    A.   That is correct.

8    Q.   But let's go down a little further to the bottom left-hand

9    corner where it says Diagnosis.

10   A.   Uh-huh.

11        Atrial fibrillation, supratherapeutic coumadin.

12   Q.   What does that mean to you as far as a diagnosis?

13   A.   I mean, again, it implies that her levels aren't within

14   that 2 to 3 INR range, and that it's -- you know, again, it's

15   more evidence that it's a difficult drug for her to keep

16   therapeutic.

17   Q.   Now, you were asked about the 2008 potential or suspected

18   bleed, and so I just want to get a couple things --

19   A.   Sure.

20   Q.   -- out of the way there.

21        Definitely no question about it, a colonoscopy was not

22   done in 2008, correct?

23   A.   That is correct.

24   Q.   Okay.  Is it fair to say you can't rule in that there was

25   a bleed without -- without that possibly?

Vanessa Shami - Redirect (Lewis)                1384

1    A.  That is correct.

2    Q.  Okay.  Is it also fair to say you can't rule it out

3    without a colonoscopy?

4    A.  She -- you mean in November 2008?

5    Q.  Yes.

6    A.  She had a bleed.  I mean, there is no question in my mind

7    she had a bleed.  She had a hemoglobin drop.  She had dark

8    stools.  Any gastroenterologist will tell you she's having a

9    bleed.

10       Dr. Rohrbach didn't just get consulted for another reason,

11   he got consulted for GI bleeding.  I mean, that is -- it may

12   not say it in the records, but that is the reason he got -- I

13   mean, he didn't just get consulted to get consulted.  He

14   didn't get consulted for anemia.  She's been anemic for a long

15   period of time.  So he got consulted to work up the blood

16   loss, and so he did work it up.

17   Q.  And were there references in the record after that date to

18   physicians who commented that she had a GI bleed?

19   A.  There were, and I think we had discussed several of them,

20   including her cardiologist.

21   Q.  Okay.  Final point.

22       You were asked a lot of questions about what Dr.

23   Abdelgaber said --

24   A.  Yes.

25   Q.  -- what he said in his deposition, what he said in his

Vanessa Shami - Redirect (Lewis)                    1385

1    records.

2         Do you still have the page that Mr. Childers showed you of

3    his deposition?  It was like one page.

4    A.  I'm sure I do.  I have it.

5    Q.  You have it in front of you?

6    A.  I do.

7    Q.  The question that he stopped on was:  Did you feel at any

8    time during her admission that her life was in danger from the

9    GI bleed?

10        And Dr. Abdelgaber said:  That's why I admitted her to the

11   hospital.

12        Do you see that is the page he gave you?

13   A.  Correct.

14   Q.  There's more to the question and answer after that, isn't

15   there?

16   A.  Yes, I'm sure there is.

17   Q.  On this very page --

18   A.  Did you expect that she would be able to be treated for

19   her GI bleed?  That was the plan.

20   Q.  And the question is:  And that's how it turned out.

21        And the answer was?

22   A.  Yes.

23   Q.  Did, in fact, Mrs. Knight -- regardless of the severity of

24   the bleed when she had it, was it treated correctly?

25   A.  She was treated correctly.

Vanessa Shami - Redirect (Lewis)                1386

1  Q.  You were also asked some questions about whether Dr.

2  Abdelgaber felt that she didn't bounce back after May of 2013.

3  And I can show you this if you want to refresh your

4  recollection.

5      But you recall he was asked a lot of questions even after

6  that particular question that was referred to you, including:

7  It's just as likely, isn't it, that her deterioration began

8  with the heart attack and the placement of the stents in April

9  of 2013?

10     And Dr. Abdelgaber said:  Possibly correct.

11     Do you recall that testimony?

12 A.  Yes.

13 Q.  But let's not go back and forth on depo testimony, medical

14 records.  Let's go to 9001 and here where I ended the direct

15 examination.

16     If we're going to talk about Dr. Abdelgaber's credibility,

17 should we talk about this document 9001?

18     Is that signed by Dr. Abdelgaber?

19 A.  Yes, it is.

20 Q.  And that is signed on 9/4/2013?

21 A.  That is correct.

22 Q.  Two days after Mrs. Knight passed.

23     Dr. Abdelgaber could have put anything in this document

24 that he felt was related to her passing; is that fair?

25 A.  Yes, that is fair.

Vanessa Shami - Redirect (Lewis)                    1387

1    Q.  In fact, he was obligated to do that under the law.

2        Do you understand that is a death certificate?

3    A.  I do.

4    Q.  Okay.  And this document that Mr. Childers has avoided

5    throughout this trial doesn't indicate anything about --

6            MR. CHILDERS:  Objection, Your Honor.

7            THE COURT:  Sustained.  That is an argumentative

8    statement about what counsel did.  Ignore the statement about

9    Mr. Childers' use of this document.

10           MR. LEWIS:  Fair enough.  Fair enough.

11   Q.  Does Exhibit 9001 in any place written by Dr. Abdelgaber

12   indicate that a GI bleed or Pradaxa was responsible for Mrs.

13   Knight's passing?

14   A.  No.

15           MR. LEWIS:  Okay.  That's all I have, Your Honor.

16           THE COURT:  All right.  Recross?

17           MR. CHILDERS:  Yes, Your Honor.

18                       RECROSS-EXAMINATION

19   BY MR. CHILDERS:

20   Q.  Doctor, you understand, we sat down and talked with Dr.

21   Abdelgaber --

22           THE COURT:  Turn your microphone on.

23           MR. CHILDERS:  Hello?

24           THE COURT:  There it is.

25           MR. CHILDERS:  Sorry.

Vanessa Shami - Recross (Childers)                    1388

1    Q.  You understand that, right?  That's what a deposition is.

2    A.  Correct.

3    Q.  You were deposed.  We asked you a lot of questions that

4    you didn't write down in your report, correct?

5    A.  Yeah.

6    Q.  And so we got to ask Dr. Abdelgaber himself to tell the

7    jury what he thought as far as her debility, Betty Knight's

8    debility after her May 2013 bleed --

9    A.  Correct.

10   Q.  -- whether or not she ever recovered, and how she did

11   after that, right?

12   A.  Yes.

13   Q.  So instead of just writing few words on a piece of paper,

14   he actually told the jury this is what I believe, right?

15   A.  Okay.

16   Q.  He said that, right?

17       When you say okay, it's not a yes or no, so I need you to

18   answer yes or no.

19   A.  If you're saying he said it, yes.

20   Q.  You read his deposition.

21       Do we need to go over it again?

22   A.  I -- I do not read every single -- I mean, I can't recall

23   every single word out of every deposition.  But I'm agreeing

24   with you.

25   Q.  Okay.  And when you read his deposition, you saw that he

Vanessa Shami - Recross (Childers)                    1389

1   said that she never recovered like he had hoped from the GI

2   bleed, correct?

3   A.  I saw that.

4   Q.  And you told the jury that you don't disagree with him,

5   correct?

6   A.  I can't -- I can't disagree with him.  I mean, that's what

7   he said, so --

8   Q.  What he said was Betty didn't seem to ever get better or

9   bounce back from the May 2013 GI bleed, right?

10  A.  I don't think Ms. Knight was -- she was chronically ill

11  since 2008.  But I'm not going to argue with him on that

12  statement, that is true.

13  Q.  In fact, you told me and you told the jury a little while

14  ago you defer to Dr. Abdelgaber's opinion on that, right?

15  A.  That's his opinion, that's correct.

16  Q.  He's the doctor who treated Mrs. Knight, right?

17  A.  Yeah.

18      One thing I want to point out is he's only known her since

19  April.  He's seen her once outside of the hospital.  So his

20  ability to say whether she bounced back or not is a little

21  bit, in my opinion, questionable because he has not followed

22  her entire course.  He was a new primary care physician.

23  Q.  You understand we took his deposition after she had died,

24  right?

25  A.  Yes.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

Vanessa Shami - Recross (Childers)                1390

1   Q.  And he had a chance to review medical records, correct?

2   A.  He did.

3   Q.  And then after he reviewed the medical records and treated

4   Mrs. Knight, he said she didn't ever seem to get better or

5   bounce back from the May 2013 bleed, right?

6   A.  So that statement is based on reviewing medical records, I

7   just want to make that clear.  That is different than saying

8   he saw her firsthand and determined that, correct?  It's two

9   different things.

10  Q.  He did see her in that interim period, didn't he?

11  A.  He saw her a few times, correct.

12  Q.  Okay.  So not only did he read the records, he saw Betty

13  Knight himself, right?

14  A.  Correct.

15  Q.  Okay.  And when he did that, when he thought about all of

16  that information, his testimony that the jury heard was she

17  didn't seem to get better or bounce back from the May 2013

18  bleed, right?

19  A.  That's what his testimony is, correct.

20  Q.  And your testimony is you defer to him for that opinion,

21  right?

22  A.  I mean, again, my testimony is that she is chronically

23  ill.  But I do defer to him on that point, that's fine.

24  Q.  All right.  Ma'am, I hate to do this again, but we're

25  going to have to look at your deposition.

Vanessa Shami - Recross (Childers)          1391

1       MR. LEWIS:  She answered the question, Your Honor.

2   This isn't impeachment.

3       THE WITNESS:  I'm answering it, yeah.

4       THE COURT:  Well, I do think it's been asked and

5   answered a number of times.  You've pointed out the deposition

6   testimony.  So --

7       MR. CHILDERS:  Fair enough, Judge.

8   Q.  I want to ask you about this progress note.

9       Remember this one?

10  A.  I do.

11  Q.  Okay.  And you just talked about it with Mr. Lewis, right?

12  A.  Yes.

13  Q.  And somehow you and Mr. Lewis took from this document that

14  Betty Knight was not on coumadin and Plavix and aspirin at the

15  same time?

16  A.  She was.  She was on triple therapy in March.

17  Q.  Okay.  Maybe I'm confused.

18      I thought he got up and said, isn't it true she never was

19  on all three of those drugs together, and that I got it

20  wrong --

21  A.  He did not say that.

22  Q.  Okay.  I just want to make sure the jury understands --

23  A.  He didn't -- I don't recall you saying that.

24      MR. LEWIS:  This is improper examination.  First of

25  all, I didn't say that, but this is improperly suggesting to

Vanessa Shami - Recross (Childers)                1392

1   the jury what I said and didn't say.

2          THE COURT:  Well, as I understand it, he's trying to

3   recount what he believed to be redirect.  But the witness has

4   clarified it, so --

5          MR. CHILDERS:  Thank you, Your Honor.

6          THE COURT:  -- move on.

7   BY MR. CHILDERS:

8   Q.  No question, Betty Knight was on coumadin, Plavix and

9   aspirin at the same time when this record was created in March

10  of 2009, right?

11  A.  Correct.

12  Q.  She didn't have a bleed in March of 2009, did she?

13  A.  No, she did not.

14  Q.  In fact, from the records you saw, she didn't have any

15  bleed during the time, the entire time she was on coumadin,

16  Plavix and aspirin together, right?

17  A.  That is correct.  But if you go further down the note,

18  which you don't point out, they say she should come off

19  sometime --

20  Q.  Well, let's --

21  A.  -- in March.

22  Q.  Right.

23          That was the back page where for some reason --

24  A.  I don't think she can take coumadin, aspirin and Plavix.

25  Q.  Based upon nothing in this actual record telling us why

Vanessa Shami - Recross (Childers)                    1393

1    that is, right?

2    A.  It states it.

3    Q.  Okay.  But at the time, she's on all three of them, right?

4    A.  Yes.

5    Q.  Not having a bleed, right?

6    A.  Not at this time, no.

7    Q.  Okay.  I'm not sure why you were asked about intracranial

8    hemorrhage, but I just have to follow up with you.

9        You relied on the paper that was written by Dr. Reilly

10   about outcomes that relate to how much Pradaxa is in a

11   patient's blood --

12   A.  Correct.

13   Q.  -- right?

14       And I think you told the jury, hey, with Pradaxa, we get a

15   lot less intracranial hemorrhage, right?

16   A.  Yeah.  Again, on the studies, it --

17   Q.  Okay.

18   A.  Based on RE-LY.

19   Q.  Based on RE-LY where no 75-milligram dose was ever tested,

20   right?

21   A.  No.

22   Q.  Where no severe renal patients were included, right?

23   A.  That's correct.  It was moderate renal insufficiency in

24   that one.

25   Q.  And so you don't know, and you can't tell the jury that a

Vanessa Shami - Recross (Childers)          1394

1   75-milligram dose of Pradaxa is any better when it comes to

2   intracranial hemorrhage than warfarin, can you?

3   A.  I can't tell you specifically with the 75, correct.

4   Q.  And that's what Ms. Knight took, right?

5   A.  She did.

6       But, again, I don't think you can use that 75 dose as not

7   being -- you're extrapolating to GI bleeding 75 being too much

8   for her, and she has an increased risk of GI bleeding.  Yet on

9   the other hand, Mr. Childers, you're saying that it's not

10  going to benefit her in terms of strokes and intracranial

11  bleeding.  So it's kind of, I don't know, an unusual

12  situation.

13  Q.  I'm not the one who decided to never test the 75-milligram

14  dose against warfarin, am I?

15          MR. LEWIS:  Your Honor, that's argumentative.

16          THE COURT:  I agree.

17          MR. CHILDERS:  Okay.

18  Q.  The choice as to whether or not to actually run a clinical

19  trial with the 75-milligram dose to see if it performed better

20  than warfarin, that choice has never been actually exercised

21  by the company, right?

22  A.  Nor has the FDA requested that information.

23  Q.  That's not my question.

24      You told us right now you don't know if the 75-milligram

25  dose is better than warfarin or not, right?  You don't have

Vanessa Shami - Recross (Childers)                1395

1   clinical data on that.

2   A.  For what specific thing?  I'm sorry.

3   Q.  For anything.

4   A.  Now we're -- I mean, again, it's a modeling study, and you

5   are extrapolating from it.

6   Q.  Okay.

7   A.  So if it was better for the 150 and the 110, you're saying

8   the plasma levels are increased in her, I mean, I don't -- I

9   don't see why you couldn't extrapolate that.

10  Q.  There's never been a clinical trial to prove that, has

11  there?

12  A.  That is correct.

13  Q.  Okay.  So you can't tell the jury that in real patients,

14  not fake computer model patients, that the 75-milligram dose

15  is better, worse or the same as warfarin in preventing

16  strokes, correct?

17  A.  That is correct.

18  Q.  And you can't say whether the 75-milligram dose is better,

19  worse or the same as warfarin for anything, including

20  intracranial hemorrhage, right?

21  A.  Well, again, we are extrapolating.

22  Q.  Okay.  I just want to ask you again about the label when

23  Ms. Knight started Pradaxa.

24      You agree with me -- I think it was Exhibit 86 that's in

25  front of you.  It did not have that language about severe

Vanessa Shami - Recross (Childers)          1396

1   renal patients not being in a clinical trial in Table 3,

2   right?

3   A.  Yeah.  This is that old label?

4   Q.  This is the label when she started taking Pradaxa.

5   A.  Okay.  Yes, it doesn't have it on there.

6   Q.  And --

7   A.  And a few months later, it does.

8   Q.  Right.

9       And when that language was added --

10  A.  Uh-huh.

11  Q.  So let me back that up.

12      So when Mrs. Knight starting Pradaxa, that information not

13  only wasn't available to her, it wasn't available to her

14  doctor either, right?

15  A.  It's not there.

16  Q.  Okay.  So when she went and filled her first prescription,

17  that information never would have gotten to her whether it was

18  through the label, through her doctor or through the

19  Medication Guide, correct?

20  A.  That is correct.  With the first few prescriptions,

21  correct.

22  Q.  And when the label was actually changed to add that

23  information, Boehringer never sent a dear doctor letter or any

24  other written communication that you've ever seen to Dr.

25  MacFarland or any other doctor telling them about that change,

Vanessa Shami - Recross (Childers)                1397

1    right?

2    A.   That is correct.

3    Q.   And they never -- Boehringer never sent any information

4    directly to Betty Knight or any other patient about that

5    change in the label, correct?

6    A.   That is correct.  But the label is available for

7    physicians to review.  And like I said, it's standard of care

8    for us to re-review labels.

9         And additionally, Mr. Childers, there were more than

10   one -- there was more than one physician prescribing it.  So

11   would you -- I mean, if somebody is going to renew the drug,

12   especially right before a GI bleed, they probably would have

13   reviewed the label.

14   Q.   And you read that record that she stopped taking Pradaxa

15   because she had to have stents put in, just like the time back

16   in 2008 when she stopped taking coumadin, right?

17   A.   That's correct.

18   Q.   And then when you get done with whatever procedure, they

19   just -- and the words were restart, right, on Pradaxa?

20        That's what it says in the label?

21   A.   Correct.

22   Q.   I'm sorry.  In the medical record?

23   A.   In the medical record, yes.

24   Q.   All right.  So this wasn't some new doctor who said I

25   gotta figure out what this lady needs for atrial fibrillation.

1     It was the doctor at the hospital who said, she came in on

2   Pradaxa, let's put her back on Pradaxa because now the surgery

3   is over, right?

4   A.  Right.

5   Q.  Okay.  Do you read the drug label every single time that

6   you write a prescription?

7   A.  No.  But if I'm -- if I'm covering or if there is a new --

8   I will -- I will glance through, absolutely.

9   Q.  You don't do that every time you write a prescription,

10  right?

11  A.  Not every time I write a prescription, no.  I'm usually

12  familiar with the labels of the prescriptions I write.  But

13  yes.

14  Q.  When the labels change, oftentimes the drug company sends

15  you a letter to tell you we made a change to the label, right?

16  A.  Sometimes they do, and sometimes they don't, you're

17  correct.

18  Q.  And when they send you those letters, you are more likely

19  to see the change that got made, aren't you?

20     If you read the letter.

21  A.  I don't -- yeah, if you read the letter.  We get inundated

22  with mail.

23  Q.  There is so much information you have to know, you need

24  somebody to prompt you to know something like that, don't you?

25  A.  It's actually something, like I said, we do habitually.

1399

1    We re-review labels.  That's something we do.

2            MR. CHILDERS:  That's all the questions I have.

3            THE COURT:  All right.  Any other questions?

4            MR. LEWIS:  No, Your Honor.

5            THE COURT:  All right.  Thank you, Doctor.

6            THE WITNESS:  Thank you.  I appreciate it.

7            THE COURT:  You may be excused.

8            Was this your notebook, Mr. Lewis?

9            MR. LEWIS:  Yes.

10           THE COURT:  All right.

11           All right.  Ladies and Gentlemen, you've heard all of

12   the evidence you'll hear today.  In that last break, I talked

13   with the lawyers some about what remains to be done.

14           The plaintiffs -- or, rather, the defendant does have

15   one more expert.  He is here, he is ready to start testifying,

16   but we're not going to do that today for obvious reasons.  He

17   will be testifying first thing in the morning.  So we're going

18   to adjourn until 9:00 a.m. tomorrow.  The defense will call

19   that witness.

20           No one is quite sure in terms of counsel how long that

21   will take.  My guess is it will take most of the day.  Given

22   that, I'd say it's very likely that you'll have to come back

23   here on Wednesday.  It may be that we will finish the

24   testimony tomorrow, and it's certainly possible, maybe even

25   probable that we won't have time for much other than that.

1    Once we finish the testimony, of course, from the

2   defense, the plaintiff has a right to introduce rebuttal

3   evidence.  Usually that is pretty limited, if at all.

4    The instructions are being worked on.  We worked on it

5   on those days when you weren't here.  We've still got some

6   more work to do, so I'm going to make sure that our work on

7   the instructions doesn't interfere with or interrupt your

8   getting the evidence and being prepared to start deliberating.

9   But I can tell you that the instructions, as you can imagine,

10   will take awhile to read.

11    Then we will have closing statements.  In a

12   complicated trial lasting several days, I'm going to give the

13   lawyers sufficient agreeable time to make their arguments.  So

14   my guess is that we'll take up probably most or all of

15   tomorrow with the last evidence, and then come back on

16   Wednesday for instructions and closing arguments, and then you

17   will get the case.

18    So with that, I want to remind you of my previous

19   instructions from last week.  Don't deliberate.  Don't start

20   looking into anything about the case.  Don't discuss it with

21   anyone.  We appreciate you persevering today.  It was a long

22   day.  Remember to leave your notes here.

23    And with that, you're excused until tomorrow morning

24   at 9:00 a.m.

25    Could I see counsel just at side bar?

1                Doctor, you're excused.

2                THE WITNESS:  Okay.  Thank you.

3                THE COURT:  Everybody else should remain in the

4        courtroom until all of the jurors have departed.

5           (Side bar conference, not reported.)

6           (Jury not present.)

7                THE COURT:  All right.  Do you have the Court's

8        proposed instructions?

9                MR. MOSKOW:  Yes, Your Honor.

10               THE COURT:  So, first, I'm just going to walk through

11       it.

12               Unfortunately, in preparing this, we didn't realize

13       until Blake was doing it that the computer automatically

14       changed the instruction number.  I had tried to do it so that

15       your original numbers stuck with it, because I moved some

16       paragraphs around.  So they might be in places that are not

17       where you thought, and they would bear a different number, but

18       I think I can explain it to you.

19               So we can quickly go through the first instructions

20       all the way through -- I'll point out instruction No. 4 is

21       just the standard explanation of who an expert is and how the

22       jury is entitled to consider them.

23               Instruction 5 deals with people who testify by

24       deposition.

25               6 explains the burden of proof.  And I know that you

1    all were arguing about may or must.  I don't see much merit to

2    either one over the other, but the West Virginia pattern

3    instruction uses may, so I'm sticking with that since these

4    are state law claims.

5            7 and 8 were language that you all had apparently

6    already agreed upon.

7            Then paragraph 9 starts the plaintiffs' claims.  I

8    generally used what I understood the parties to have agreed to

9    when we -- let me find where I marked up from our discussion.

10           Maybe this is a good time to discuss what counsel

11   mentioned briefly to me, and that is where there is mention of

12   the causation issue.  There is causation and proximate cause,

13   and what I tried -- what I understood was, first, that

14   plaintiffs' injury claims consist of two types.  One is Betty

15   Knight's personal injury because she had a bleed in April and

16   suffered until her death.  And then, secondly, the wrongful

17   death damages, which include the general damages for the

18   survivors of her estate.

19           And so I tried to simply state that by saying that

20   plaintiffs claim that Pradaxa proximately caused her personal

21   injuries and may have caused or contributed to her death.  And

22   then the rest really seemed to me to be consistent with what

23   you all submitted.

24           So what exactly are you concerned about there?

25           MR. MOSKOW:  Thank you, Your Honor.

1      I think maybe if we start down a little bit further in

2  the instruction where it says BI denies, and denies that any

3  wrongful conduct by BI caused any injuries to Mrs. Knight or

4  caused or contributed to her death, we believe that both there

5  and at the top it should be contributed or caused her injuries

6  and contributed or caused her death.

7      And it's particularly significant --

8      THE COURT:  Well, you don't need to argue it.

9      I agree under the West Virginia law something doesn't

10  have to be -- plaintiff doesn't have to prove that the

11  wrongful conduct was the sole cause of injury.  Whether it's

12  death or just personal injury, it's always either caused or

13  contributed to.  And so one is I could simply insert that

14  language.  I want to hear from the defendants.

15      MS. JONES:  Your Honor, thank you.

16      As I recall -- I'm just looking at my notes from our

17  last discussion on this.  I thought we had adjusted that first

18  sentence in a way that everyone was agreeable to, to say was a

19  proximate cause of her injuries, including her death.

20      The revised version seems to introduce a little bit of

21  asymmetry inasmuch as it refers to proximately causing her

22  injuries and proximately causing and contributing to her

23  death.  And I wasn't sure if there was a reason for that

24  distinction, and I wonder a little bit if the jury seeing that

25  will think there is something unique about the injury claim

1404

1  versus the death claim.

2          THE COURT:  Well, it was nothing nearly that

3  purposeful in the Court's decision.

4          MS. JONES:  Okay.

5          THE COURT:  So are you comfortable with just inserting

6  the phrase -- and I agree, and I even made note of this, but I

7  didn't want to repeat this phrase throughout.

8          One option would be to simply say that plaintiff

9  claims that Pradaxa injured Mrs. Knight and was a proximate

10 cause of her injuries, including death.

11         MR. MOSKOW:  As long as proximate cause is defined

12 someplace in --

13         THE COURT:  Well, the next instruction on the next

14 page does define proximate cause.

15         MR. MOSKOW:  So -- oh.  They're moved a little bit in

16 what we have.

17         THE COURT:  Yes.  So -- but on the draft I gave you

18 just this afternoon, the instruction on page 12, it's labeled

19 here instruction 28, so somehow this one managed to keep a

20 different number, but it's the definition of proximate cause.

21         MS. JONES:  As I understand it, Your Honor, what

22 appears on page 12 is verbatim what plaintiffs had proposed on

23 the definition of proximate cause.

24         THE COURT:  I think that's right out of the pattern

25 instruction.

1       MR. MOSKOW:  We're fine with that, Your Honor.  Our

2   concern was if there is the word cause without contributed, it

3   was a concern.

4       But just calling it proximate cause and having --

5       THE COURT:  A proximate cause.

6       MR. MOSKOW:  Okay.

7       THE COURT:  All right.  We'll make note of that and

8   change it throughout.  So that takes us through those.

9       Proposed instruction No. 6 entitled, by the defendant,

10  necessity of expert testimony, I looked at these cases, and I

11  agree with the defendant.  I don't think you could have a

12  failure to warn in a pharmaceutical product case without an

13  expert, and it's the expert that has to establish that the

14  warnings are inadequate.

15      MR. MOSKOW:  We understand, Your Honor.

16      THE COURT:  All right.  So that will be that.

17      Next was the defendant's failure to test.  There was

18  an original version of that that included the statement that

19  the plaintiff was not making any claim for failure to perform

20  clinical testing, and I took that statement out.

21      MR. MOSKOW:  That's fine with the plaintiffs, Your

22  Honor.

23      THE COURT:  All right.

24      Then I grouped --

25      MS. JONES:  Your Honor, before we move on to failure

1    to test, I think what we had proposed was language that said

2    more explicitly that when they were considering a failure to

3    warn, that they could not consider a failure to warn about

4    testing that was or was not done.  That is -- I think that's

5    just a variation that we had proposed.

6         And the reason that we had proposed that is because

7    there has been so much discussion, including this afternoon,

8    about testing and whether the company tested and whether BI

9    had hired Dr. Shami to run a test, that I think it has to be

10   quite explicit to the jury this isn't about whether or not the

11   company tested or whether they warned enough about how they

12   tested.

13        THE COURT:  Okay.  So I'm looking at page 6 of what

14   you guys gave me Friday.  And under failure to test -- this is

15   all included under BI's proposed instruction No. 4 -- you have

16   the first sentence, You have heard testimony.  That remains in

17   this latest draft.

18        The next sentence starts, Under law, BI cannot be held

19   liable.  That remains.

20        The third sentence that you had was:  Further, BI

21   cannot be held liable for failure to provide warnings on the

22   clinical testing of Pradaxa.  I struck that sentence.

23   Plaintiffs had objected to that sentence, as I recall, and we

24   talked about it.  We'll come back to that in a minute.

25        And then I struck the very last sentence in the

1407

1    defendant's original version that starts, The process of

2    clinical testing performed, because that sentence just didn't

3    make any sense to me.

4         MS. JONES:  And consistent with Your Honor's

5    direction, we had exchanged with plaintiffs' counsel over the

6    weekend a proposal on an alternative to failure -- alternative

7    instruction which we provided I think earlier this morning by

8    e-mail, which I'm happy to have printed off if we don't have

9    that printed already.

10        THE COURT:  Well, I think that's what I was just

11   reading from.  This is what you gave Blake, and this is what

12   he gave me, which --

13        MS. JONES:  I thought -- I think we gave something

14   that didn't have -- does that have a comment bubble on the

15   side?

16        THE COURT:  Yes, it does.  It lists on the column,

17   which is not on my draft -- lists in the right column and

18   shaded plaintiffs object.

19        MS. JONES:  So if I could, just for the record, Your

20   Honor.

21        What we had proposed -- and I apologize, I'm reading

22   this off of a device.  You have heard testimony -- thank you.

23        You have heard testimony regarding the clinical

24   testing of the 75-milligram dose of Pradaxa, which is

25   consistent with what is in the current draft.

1408

1      Under the law, BI cannot be held liable for a failure

2  to perform clinical testing on Pradaxa, which is also in the

3  draft.

4      Then we had proposed:  BI also does not have an

5  obligation to warn about the manner in which the 75-milligram

6  dose of Pradaxa was tested.  That is a sentence that varies.

7      And then the last sentence is, I think, basically

8  consistent.

9      THE COURT:  Okay.  Now I see that.

10     MR. CHILDERS:  I don't think that's an accurate

11  statement of law.  What they have an obligation to warn about

12  is the drug, and so to say there's some particular area they

13  don't have to warn about, there's no basis for that.

14     THE COURT:  Well, this is a good point to raise the

15  other facet of this discussion about the 75-milligram dose.

16     So, as I understand it, the facts are clear that when

17  BI submitted the RE-LY study and sought approval of the drug,

18  ultimately they obtained approval.  As part of that approval

19  process, the FDA considered, first, data that was submitted

20  through RE-LY that clearly indicated that patients with severe

21  renal impairments were not included in the study.  Secondly,

22  as I understand it, it was clear, and the FDA so stated, that

23  the 75-milligram dose was based upon modeling, not upon

24  patient testing.

25     So as I have continued to consider this federal

1   preemption argument, I fully intended to ask the parties to

2   further argue about this.  Because when I look at Wyeth and

3   the other cases, it suggests to me that where the FDA

4   explicitly approved the 75-milligram dose, with full knowledge

5   that this was a dose developed by modeling and not by

6   patients, and that in fact patients with severe renal problems

7   as defined were not included in the study, if that is the

8   case, I don't see how that is not a preempted decision as to

9   that label, as to the initial label.

10          MR. CHILDERS:  I would say because the facts of the

11  case are they added that language to the label when they did a

12  CBE change later.  So clearly they were able to add it at a

13  later point in time, and all we're saying is that should have

14  been done before Ms. Knight ever took the medication.

15          THE COURT:  Well, you know, I understand.  I

16  understood that as your argument all along.  But frankly when

17  I see the preemption argument laid out as they have and look

18  at the cases, the fact that the company could later change the

19  label doesn't mean that the first label is not preempted.

20          It seems to me that the first label is explicitly

21  approved by the FDA in the two respects that you're

22  criticizing it.  And if that's the case, even if they approved

23  it, improved or made stronger the warnings later, those two

24  things are not part of that subsequent analysis.

25          MR. CHILDERS:  I think I understand, Your Honor.

1410

1    THE COURT:  Okay.

2    MR. CHILDERS:  So she didn't get prescribed Pradaxa

3    for a whole year after the drug was approved.  Therefore,

4    there was a whole year period of time when the label could

5    have been changed to add this information and, in fact, they

6    changed it a month after she started taking it.

7    So we're not arguing the launch label should have had

8    that in there.  We're just showing it wasn't in there, and it

9    didn't make it in there until after she started taking it.

10   They could have made that CBE change at any point.

11   THE COURT:  I agree.

12   My problem is still that it strikes me that you are

13   claiming that that first label was inadequate.  It constituted

14   a failure to warn about the 75-milligram dose for the reason

15   that the study did not include severely impaired renal

16   patients, and the study did not include actual testing on

17   people but, rather, the company and FDA relied upon modeling.

18   So those two things, it seems to me, were clearly

19   known and part of the FDA approval.  And if that is the case,

20   then even if the company does later on change it, that doesn't

21   make that label -- excuse me -- that label is still subject to

22   the preemption analysis.

23   When I read these cases, what it seems to me is that

24   under the regulation, as new information or new analysis

25   reveals additional concerns, the company has a unilateral

1411

1    opportunity to change it.  And so if you can demonstrate

2    through your evidence that they had a new analysis of the

3    existing RE-LY data that should have supported them making the

4    change in the label, then you can hold them accountable for

5    failing to change the label until they did or in the way that

6    they did.

7              But it still seems to me that it starts with the label

8    that you've been attacking from the beginning as deficient

9    with regard to the 75-milligram dose for the two reasons that

10   I've said.  And those are two reasons that, it seems to me,

11   the FDA clearly contemplated when they granted approval.

12             MR. CHILDERS:  And, Your Honor, if I could.

13             THE COURT:  Yes.

14             MR. CHILDERS:  There was a label change between the

15   launch label and the time she started the drug.

16             THE COURT:  Okay.

17             MR. CHILDERS:  That's the label we are attacking

18   because that's the label that was in effect at the time.  It's

19   not the launch label.

20             The reason we're seeing the launch label is because

21   the one in effect at the time she started it, for whatever

22   reason, doesn't have a Medication Guide attached to it, so we

23   have to use the Medication Guide that came from the launch

24   label.  It's very strange, I know.

25             THE COURT:  Well, and, you know, we've got --

1    unfortunately for your side, I think that there was a good

2    argument from the defendant that the regulations preclude the

3    defendant's unilateral alteration of the Medication Guide.

4           MR. CHILDERS:  Understood.

5           THE COURT:  And because of that, under Wyeth and the

6    other cases, they can't be faulted for failure to change the

7    Medication Guide.

8           MR. CHILDERS:  And I'm not trying to argue that, Your

9    Honor.

10          THE COURT:  I know that.

11          MR. CHILDERS:  I'm just explaining to you the reason

12   why you keep seeing the launch label.  There's just not a

13   Medication Guide attached to the March 2011 label, so we can't

14   hand it to a witness and say turn to the medication label

15   because it's just not there.

16          THE COURT:  Okay.  And my response to that really is

17   so what?

18          If the label that was approved originally or the first

19   one that was -- the one that was still in effect when she got

20   her prescription proposed or allowed for the 75-milligram

21   dose, it was allowed based upon the FDA's decision that we are

22   allowing -- in fact, they directed it or suggested it.  I

23   realize in negotiation maybe they put them up to it.  But the

24   FDA approved that dose from the beginning knowing that the

25   study, the RE-LY study did not include severely impaired renal

1413

1    patients, and that's been one of your criticisms of the

2    75-milligram dose.  And the second criticism of it has been

3    that it was modeling based rather than clinical trial based.

4    The FDA knew that as well.

5            So I don't see how I can avoid finding that, to the

6    extent that any of the label from the first one through the

7    time she took it had the 75-milligram dose, it strikes me that

8    it was -- that any claim that that label is deficient for that

9    patient group, the 75-milligram dose for those two reasons is

10   preempted.

11           MR. MOSKOW:  Your Honor, may I?

12           THE COURT:  Yes.

13           MR. MOSKOW:  Thank you, Your Honor.

14           Let me start by saying that I realize that because of

15   the way this motion was raised, we're all kind of scrambling,

16   so I need to take a step back.

17           Which is that impossibility preemption, which is the

18   claim they've raised here, is not that the FDA didn't --

19   didn't know something and acted in a way that we believe is

20   improper.  Impossibility preemption reflects the sponsor, the

21   drug company's obligation to craft an adequate label and make

22   sure that it's accurate at all times.

23           And where impossibility comes in is if they identify

24   something in the label that is inaccurate or incomplete, or

25   because of either new analysis or new information determine

1414

1    that it needs to be changed, they have the ability under the

2    CBE process to do that.

3            What we're -- what we've identified as failings here

4    is that, as the product was being marketed -- actually on

5    cross-examination of Dr. Plunkett, they actually put into

6    evidence FDA notices of additional reports of adverse -- you

7    know, adverse events.

8            THE COURT:  Right.

9            MR. MOSKOW:  They put in information about the

10   75-milligram dose being used in the Graham study, for example.

11   So as this information is becoming available, they learned,

12   you know what, prescribers need to know additional

13   information.  And to meet their burden on impossibility, they

14   have to show that they actually proposed the labeling changes

15   that we're talking about, and they were rejected.  Or that,

16   based on FDA action, that the labeling change would not have

17   been -- would not -- it is a very high burden, by clear and

18   convincing evidence.

19           THE COURT:  So why can they not establish that by the

20   evidence that demonstrates that at the time the FDA approved

21   this, they knew, well knew two obvious facts about this study.

22   One, that patients who were severely impaired renally were not

23   part of the study.  The FDA knows that.  Maybe through further

24   analysis it becomes clearer and so forth, but that is not what

25   you're claiming.

1415

1    You're claiming that they should have been -- that

2    from the time the FDA approved a label, that label should have

3    said severely impaired renal patients weren't part of the

4    study, and we used modeling rather than clinical trials --

5            MR. MOSKOW:  Right.

6            THE COURT:  -- for that 75 dose.

7            MR. MOSKOW:  There are two reasons, Judge.

8            The first is because it's not FDA's knowledge that is

9    at issue in impossibility preemption.  It is whether the FDA

10   would have approved a label change had one been made under the

11   CBE process.  And in this case, there is no -- they have not

12   met their burden of showing that it would not have been

13   approved.  That's the first thing.

14           And the reason we know that is true is because the

15   same data from the RE-LY trial, upon which they approved the

16   drug, is the data that has been reanalyzed to reflect, ah,

17   this increase in bleed risk with no concomitant improvement in

18   stroke reduction.  And that is information that isn't in the

19   label.

20           So the data -- it's the same data set, but the

21   information that is drawn from it, what is being done in the

22   marketplace, how physicians are responding to it is that new

23   analysis.

24           THE COURT:  Well, I agree there was obviously new

25   analysis and, as a result, they exercised their authority,

1   that BI exercised its authority to unilaterally through the

2   CBE process change the label, strengthen warnings, restated

3   them, improved upon them greatly.  But, you know, I'm having

4   trouble saying that the two grounds that you've asserted as

5   the reasons the 75 dose was improper from the beginning were

6   somehow not before the FDA.  I mean, I think they were.

7              MR. MOSKOW:  So, Your Honor, maybe we're just

8   miscommunicating.  Let me try again.

9              THE COURT:  Yes.

10             MR. MOSKOW:  And I'm sure it is because there are two

11  of us here trying to figure out the best way to say it.

12             THE COURT:  It can't be my fault, we know that.

13             MR. MOSKOW:  We know that.

14             So we're not arguing that the dose should not have

15  been approved.  We're not arguing that the dose may not be

16  appropriate for a particular class of patients.

17             THE COURT:  Right.

18             MR. MOSKOW:  What we're saying is that there is

19  information about the lack of testing, both of the dose itself

20  and in severe renal -- in any of the people in the RE-LY

21  study --

22             THE COURT:  Right.

23             MR. MOSKOW:  -- that should have been communicated.

24             No doubt the FDA knew that.  But it's incumbent upon

25  the defendant to demonstrate that it sought to include that

1417

1    information in the label, and the FDA said no, or would have

2    said no based on the totality of the circumstances.  And there

3    is no evidence of that and, in fact, it's exactly the

4    contrary.

5           As Mr. Childers just demonstrated, they added that

6    information to the label in Exhibit 86.  It's not there in

7    Exhibit 87.  In 88, it is there.  So rather than being

8    impossible, when they sought to add that information, they

9    were able to do so.

10          I think we're confusing what the FDA knew at the time

11   of approval versus Boehringer's obligation to ensure that the

12   label was adequate at all times.

13          THE COURT:  Okay.

14          MR. MOSKOW:  And I --

15          THE COURT:  Well, let me hear the defense side of

16   this, and then I want to get back to these instructions.

17   We'll finish this up, and I'll continue thinking about it.

18          MR. LEWIS:  Your Honor, you have the analysis correct,

19   so I'm going to start there.

20          The statement of law that Mr. Moskow made is

21   unfortunately incorrect.  The way this works, and this is the

22   conflict preemption analysis, it starts with the proposition

23   that you have an FDA-approved label.  And there are certain

24   things that permit a manufacturer to change the label, certain

25   things, and those certain things are contained in changes

1418

1    being effected.  And the things that allow someone to change

2    the label are newly acquired information on a particular topic

3    or a new analysis as the courts have kind of expounded upon.

4         But that has to be present in order to change the

5    label.  Manufacturers cannot just willy-nilly change the label

6    without a new analysis or new data to support the change.  It

7    just can't happen.  It is not permissible, and that is the

8    conflict here in this case.

9         Because the two things -- and each of these claims

10   does have to be run through a preemption analysis.  The two

11   things that are being complained about by the plaintiffs here

12   are, as Your Honor stated, the fact that it wasn't tested on

13   the 75-milligram dose.  That's a fact that was in existence at

14   the time the FDA label was approved, and there was never a new

15   analysis to suggest anything other than we didn't test the 75

16   milligrams.  And the same goes through with the renal -- renal

17   impairment.

18        The change that was made was about the level of the

19   increase in risk.  But the fact of whether we tested the

20   75-milligram dose or the fact of whether we tested on severely

21   renally impaired patients never changed, and there was no new

22   analyses on those two facts to change anything that the FDA

23   knew or the company knew at the time that the original label

24   was approved.

25        So on those two points, Your Honor, the Court is

1419

1    correct in its analysis.

2              THE COURT:  Okay.

3              MR. CHILDERS:  May I just say one thing, Your Honor?

4    I guess this is where I am really having confusion.

5              They actually made a CBE change to say exactly what we

6    asked -- are saying that they should change.  So I'm unclear

7    how that could possibly be impossible for them to do because

8    they did it through the CBE process.

9              THE COURT:  I don't know that -- you may be right.  I

10   don't know that I would say that it's impossible.  But

11   thinking in terms of conflict preemption, what I see is the

12   FDA explicitly approving the dose knowing the two facts from

13   the time of its approval that you claim now should have

14   resulted in some new or different warning.

15             And so I'll go back --

16             MR. CHILDERS:  Can we possibly put something together

17   and -- I think we're just having a hard time communicating.

18             THE COURT:  Could be.

19             MR. CHILDERS:  The issue is that, ah, my understanding

20   again of preemption is that you have to show that they are not

21   able to make this change on their own.  They have to have some

22   FDA assistance in order to do it.

23             THE COURT:  FDA approval.

24             MR. CHILDERS:  Correct.  They did it without FDA

25   approval is what I'm pointing out.

1420

1           THE COURT:  I understand.

2           MR. CHILDERS:  So if we could -- thank you, Your

3    Honor.

4           THE COURT:  All right.  Well, so at least for now,

5    then, I guess there's no need to try to resolve this

6    instruction.  It's going to be tied to the discussion we just

7    had.

8           Then going on, I'm now on page 15 of my proposed

9    instructions.  There is the foreign labeling limiting

10   instruction.  We've already said there is the failure to test

11   and the issue we just talked about.

12          On the next page, on page 16, I've included the

13   defendant's request for an instruction that BI has a duty to

14   provide warnings, but because it's a prescription, you can

15   consider the information BI provided to doctors.

16          Do plaintiffs object to that instruction?

17          MR. MOSKOW:  We did, Your Honor.  I believe it's some

18   evidence --

19          THE COURT:  Well --

20          MR. MOSKOW:  Maybe if we add --

21          THE COURT:  -- all it says here is you may consider

22   it.  So --

23          MR. MOSKOW:  We think it's superfluous, Your Honor, so

24   we would maintain our objection.  We understand the Court's

25   position.

1    THE COURT:  Well, what do you mean superfluous?

2    MR. MOSKOW:  Because they're being told that they

3    should, in an earlier instruction, consider all evidence,

4    direct and circumstantial.

5    And to the extent that there is evidence they can

6    infer that the information got from the physician to the --

7    THE COURT:  Okay.

8    MR. CHILDERS:  I think that was our issue, Judge.

9    This is calling out one specific piece of evidence as opposed

10   to just telling them they should consider all of the evidence,

11   and that was the objection I thought that we had made

12   previously.

13   THE COURT:  Well, I'm happy to add a phrase if you

14   think that would provide the balance, to make reference to the

15   other sources of information.

16   MS. JONES:  Your Honor, I don't want to run us into

17   another preemption buzz saw, but I think this may also raise a

18   question about just needing to get an understanding of the

19   rules of the road on the Medication Guide preemption issues.

20   Because as we've made clear, and Your Honor has

21   mentioned, we think that because the regulations don't permit

22   a change in that Medication Guide, they should not be able to

23   make arguments about whether the Medication Guide was adequate

24   or inadequate for any reason.

25   THE COURT:  Well, and I've tried to say that, and I

1422

1   said I'd entertain an instruction that more explicitly says

2   that plaintiff may not assert as a theory of failure to warn a

3   different Medication Guide.  Plaintiff has introduced evidence

4   about what is in the guide and what's not.  What's in the

5   guide is information that goes to patients, and clearly that

6   is admissible evidence.  What is not may also go to a

7   patient's knowledge, and it also goes to the defendant's

8   knowledge.  When you put things in the Medication Guide, you

9   know about them, BI does.

10        So I think either way it's still -- it's evidence of

11  what warnings or instructions were available, and yet we're

12  telling the jury, properly I think, that they can't have --

13  they can't find for plaintiffs on the basis that the

14  Medication Guide should have been rewritten so that it

15  disclosed those things.

16        MS. JONES:  Understood, Your Honor.  And we have put

17  together a draft of a proposed instruction, which we're happy

18  to submit.

19        THE COURT:  Okay.

20        MS. JONES:  I guess more broadly, we also want to be

21  sure that we're clear that counsel will not stand up in front

22  of the jury and point at the Medication Guide and say it

23  didn't have these five things that we've seen rolled out so

24  many times.  That would be concerning for us.

25        THE COURT:  Well, you know, I can't stop them from

1423

1    standing up and saying here's a piece -- here's a document

2    that is in evidence, here's what it says, here's what it

3    doesn't say.

4         I understand your concern.  I think they can't argue

5    that the failure of the Medication Guide to say these things

6    is enough for the jury to find a failure to warn has been

7    proven.

8         Compliance with safety standards, I think we added the

9    so-called mirror language that we talked about?

10        MR. MOSKOW:  Yes, Your Honor.

11        MS. JONES:  And we would maintain our objection to

12   that addition, Your Honor.  We don't think there has been any

13   evidence of the company not complying with appropriate

14   regulations, and so we think that instruction is

15   inappropriate.

16        THE COURT:  Well, I want to hear more about that when

17   we get to this point.

18        I've been trying to go back and reread some of

19   Plunkett's testimony, and I've gotten about halfway through

20   it.  And she's asked about regulations, but only as the

21   structure for her approach and analysis, not -- so far from

22   what I've read, not a claim by her that there was a regulation

23   that was violated.

24        I guess it's going to come down to, as I think maybe

25   you argued on the plaintiffs' side, that the regulation says

1424

1    you gotta be truthful and complete or something to that

2    effect, and I'm trying to figure out if that's what you're

3    talking about.

4            MR. MOSKOW:  It is, Your Honor.

5            THE COURT:  Okay.

6            MR. MOSKOW:  Under I believe it's 314.8.  I could be

7    off slightly.  But 21 CFR specifically requires the company to

8    be complete, balanced and accurate in its labeling.

9            And the testimony from Dr. Plunkett is that it was

10   incomplete, and that it lacked critical information, and we

11   believe that that is competent evidence of a failure to comply

12   with regulation.

13           MS. JONES:  And we agree that she said the labeling

14   didn't include certain things.  That's very different in our

15   minds from saying you violated a federal regulation.  That is

16   a very specific criticism, which frankly we think raises

17   another preemption issue.  But, in any event, she didn't say

18   that when she testified.

19           MR. MOSKOW:  And there's no evidence that they have

20   complied with any specific regulation either, Your Honor,

21   which is --

22           THE COURT:  Well, I'm going to continue reviewing her

23   testimony.

24           The next one was on page 18, the treatise instruction

25   that I thought nobody objected to.

1425

1    Then on 12, we get into strict liability.  I think

2    there was no objection on 12, what I believe was 12 on 13.

3    On 14, I know that the defendant objected to the final

4    paragraph which plaintiffs wanted inserted based on the Wyeth

5    case.  I've included the language.  You can more fully state

6    your reason for objecting to document the record.  Maybe I'll

7    change my mind, I don't know.  But at least you'll have your

8    chance when we go through these tomorrow to formally state

9    your objection.

10   Next on 15 starts the negligence under duty to warn.

11   I don't think there was any significant objection to that.

12   I'm trying to find --

13   MR. CHILDERS:  My notes said that that same language

14   was going to be added here from Wyeth and the Johnson case?

15   MS. JONES:  That is consistent with what I had

16   scribbled down, Your Honor, that that is a parallel addition.

17   I mean, we reserve our objection obviously, but I think that's

18   what we had talked about last week.

19   THE COURT:  Well, I missed that.  So what language?

20   MR. CHILDERS:  So that same language, Your Honor, that

21   was added to the last paragraph, the last two paragraphs you

22   just mentioned on 14, instruction 14, strict liability failure

23   to warn.

24   THE COURT:  Oh.  The it is --

25   MR. CHILDERS:  Starting with Boehringer as a

1426

1    manufacturer of prescription drugs --

2              THE COURT:  All right.

3              MR. CHILDERS:  -- and then all the way through to the

4    end.

5              THE COURT:  Okay.  So plaintiffs submit that should be

6    repeated in the negligence claim as well?

7              MR. CHILDERS:  Right.  And I believe in the conference

8    we had last week, everybody agreed that if it went into one,

9    it should go into the other.

10             THE COURT:  All right.  I'll add that.  I know the

11   defendant objects to it, and we'll hear you further tomorrow.

12             All right.  16, the standard of care.

13             17, a causation warning definition.  The defendant had

14   a sentence proposed in theirs at the end that said:  Further,

15   if plaintiffs did not prove that Pradaxa caused death, you

16   must find -- you may find in favor of BI.

17             To me, that was just inconsistent with the rest of and

18   the purpose of --

19             MS. JONES:  That's fine.

20             THE COURT:  -- that instruction.

21             MS. JONES:  That's fine, Your Honor.

22             THE COURT:  So I took it out.

23             MS. JONES:  Yes.

24             MR. CHILDERS:  Your Honor, the last sentence in this

25   particular instruction is:  If plaintiffs did not prove it is

1427

1    more likely than not that Ms. Knight read the warnings

2    provided by BI, they cannot prove that different warnings

3    would have caused her to change her behavior.

4         I'm not -- that seems to be a little different than

5    the evidence that has come in because what we've established

6    is there was a lot of information that was not provided to

7    Mrs. Knight in particular.

8         And I understand that the Medication Guide can't be

9    changed, but what we have is testimony today that there was no

10   other communication that Dr. Shami was aware of -- I don't

11   know if Dr. Crossley will have a different opinion -- in which

12   the information was provided.

13        So I --

14   THE COURT:  So what are your theories about how the

15   information -- where and how it should have been provided that

16   it could have made a difference in her decision to take

17   Pradaxa?

18   MR. CHILDERS:  So under the law, they can -- they can

19   direct-to-consumer communicate through television ads,

20   magazine ads, letters if they choose to do it.  They can send

21   out mailers with coupons in it to patients.  As long as the

22   information they include is in the label, they're allowed to

23   communicate that.

24        And so I think what we have here is -- I just don't

25   want to get in a situation where the jury says, well, she

1428

1   didn't -- maybe what they decide is she didn't read the

2   Medication Guide, which we are not relying on to say they

3   didn't warn.

4          THE COURT:  Right.

5          MR. CHILDERS:  But, rather, she just never got

6   anything else to read, and if she didn't get it to read, then

7   this says you can't find in the plaintiffs' favor.  And that's

8   how I read that last sentence, Your Honor.

9          MS. JONES:  A couple responses, Your Honor.

10         The first is, you know, this theory about, well, they

11  can advertise by television and magazine, and they can send

12  things to people's homes -- which I'm not entirely sure is

13  even accurate and is kind of a late-breaking theory of the

14  facts of the case.  But the other point, which is more

15  important I think, is that this statement at the conclusion of

16  this causation instruction is black letter warnings causation

17  law.  It's referenced at various points in the citations that

18  we provided.

19         And even if you embrace their theory that there were

20  other mechanisms by which the company could have provided

21  information to Mrs. Knight, the bottom line is she has to have

22  seen those warnings and looked at them and made a decision

23  based on them for that to matter for purposes of causation.  I

24  don't think there's any question about that basic legal

25  principle, whatever the mechanism of communicating the

1429

1    information.

2            THE COURT:  Yeah, this is a confusing one to me.

3            So perhaps you can explain where in the testimony you

4    have evidence that something other than what -- we've talked

5    about the Medication Guide.  We seem to be in agreement there.

6    Obviously the label is the other primary source that was

7    provided to her.

8            What is the evidence that you've adduced about the

9    duty for BI to convey warnings through some other means?

10           MR. CHILDERS:  Well, Your Honor, I think the law in

11   West Virginia is you have to provide warnings directly to the

12   patient, and what Dr. Plunkett testified about are the means

13   available to a company to provide information directly to

14   patients.

15           Advertising is one on television, again print

16   advertising, and drug companies do send out mail.  I myself

17   have received it before.  Here's a coupon for whatever, if you

18   want to go in and fill it, you got $5 off.

19           And I can't remember everything --

20           THE COURT:  A dear doctor letter she said?

21           MR. CHILDERS:  Yes, sir.

22           THE COURT:  Did she testify specifically about are

23   there regulations or --

24           MR. CHILDERS:  Sure.

25           THE COURT:  -- standards that apply to dear doctor

1430

1    letters?

2         MR. CHILDERS:  There are, Your Honor.  They have to --

3    they can't communicate anything that is not in the label.

4    That's basically what it comes down to, and that is also with

5    television ads.

6         And so with television ads, how that works, the

7    company puts it on the air, and they send a copy of it to the

8    FDA.  And the FDA later looks at it and either says nothing or

9    they say you shouldn't have aired that, so don't do it again.

10   So it's not one of those situations where they have to get

11   approval to do anything.

12        THE COURT:  So here the only evidence about anybody

13   seeing a TV ad was daughter Claudia saying she thought she saw

14   an ad for Pradaxa.

15        MR. CHILDERS:  Correct.

16        THE COURT:  Okay.  So you don't even have evidence

17   that Betty Knight saw any advertising for anything.  So if

18   Betty Knight -- if there isn't evidence that Betty Knight saw

19   advertising, then how is that any different from these cases

20   where the patient didn't see things, didn't read the label

21   and, therefore, was determined that, as a matter of law, the

22   warning wouldn't have mattered?

23        MR. CHILDERS:  Well, I think the case in particular,

24   the Zyprexa case that is cited here, first of all, was a

25   summary judgment issue.  And second of all, the testimony was

1431

1    they did not read the label.

2         We have --

3         THE COURT:  Right.

4         MR. CHILDERS:  We have testimony here that Betty

5    Knight received information, she saved it, she looked at it.

6    And so I don't think obviously summary judgment or directed

7    verdict would be appropriate, which is what this is talking

8    about.

9         THE COURT:  Right, I agree.

10         So that's why I thought that what the jury should be

11    asked to determine is whether they find Betty Knight read the

12    label, more likely than not read the label.  Because then, if

13    an adequate label had been included with the prescription any

14    of the times she got it, arguably she would have changed her

15    behavior and not stayed on -- not started taking Pradaxa or

16    stayed on it.

17         MR. CHILDERS:  Yes, sir.

18         THE COURT:  So --

19         MR. CHILDERS:  I'm sorry.

20         THE COURT:  Well, I'm --

21         MR. CHILDERS:  Understood.

22         The only other issue I guess we would have is the

23    testimony that has come in, is this was a decision made by the

24    three family members.  And so the two children were actually

25    the ones who suggested let's go do this.  And the testimony we

1    have, since Betty Knight is deceased, is this is what the

2    children knew when they made this request.

3          So at least we would ask that it say that Ms. Knight

4    or her family.  Or Rick or Claudia or however -- or

5    plaintiffs.  How about that, that plaintiffs read the warning,

6    because that would include Betty Knight as well.

7          But that's the testimony that has come through the

8    trial is that this was a decision the three of them made

9    together where they sort of pushed it instead of it being a

10   doctor recommendation that Betty Knight considered on her own.

11         MS. JONES:  Your Honor, if I could respond briefly.

12         First of all, the law is that our obligation, the

13   company's obligation was to Mrs. Knight.  There was not a

14   complimentary obligation to her children who might have been

15   involved with her medical care.  That's not what the legal

16   principle is, first of all.

17         Second of all, there was no testimony from either

18   Ms. Stevens or from Mr. Knight that either of them ever saw

19   the Medication Guide or read the Medication Guide.  So even if

20   you group them all into the same pot of people, the analysis

21   is still the same.  The instruction is still appropriate.

22         Thirdly, we have now heard more about this

23   advertisement.  The advertisement is not in evidence.  All we

24   have is what I think Ms. Stevens testified to in terms of what

25   she saw, but there has never been any criticism of a specific

1  advertisement.  Dr. Plunkett didn't say I've looked at the

2  advertisement for Pradaxa, and I deem it to be inadequate for

3  some reason.  That's been a peripheral issue at best.

4       So we think the instruction is black letter causation

5  law in these types of cases.  We don't think it's appropriate

6  to be grouping together the members of the family as though

7  there was an obligation that extended beyond Mrs. Knight.

8       MR. CHILDERS:  You probably don't want to hear me say

9  anything --

10       THE COURT:  What?

11       MR. CHILDERS:  You probably don't want to hear me say

12  anything else.

13       THE COURT:  Sure, go ahead.  Go ahead.

14       MR. CHILDERS:  I think I've said everything, Your

15  Honor.

16       THE COURT:  Well, I understand some of your points.

17  I'm struggling with it, though.  I agree with what Ms. Jones

18  said.

19       Part of the problem here is it sounds like we are

20  starting to instruct the jury that the duty is to inform the

21  family of the appropriate warnings about a medication.  You

22  know that ain't going to last long if it goes up on

23  something -- a favorable verdict.

24       I see what your point is about, that here there is

25  evidence that the family participated in the decision.  They

1    were the ones who started the process.  And obviously they

2    testified they at least implicitly talked to her about it,

3    they all agreed to talk to the doctor about it, and they all

4    talked to the doctor about it.

5         But I think that the obligation owed to Mrs. Knight,

6    and the corresponding duty that the cases talk about is that

7    the purchaser has to avail themselves of the manufacturer's

8    warnings or can't fault the warnings for being inadequate.

9    And so I think I'm probably likely to stick with the language,

10   and you can argue about whether the family would have

11   encouraged her to make a different decision.

12        MR. CHILDERS:  Understood, Your Honor.

13        THE COURT:  Okay.  The next instruction is 18, express

14   warranty.  Now, I know that in the preliminary instructions

15   the Court included, as proposed by the plaintiffs, the

16   statement that BI made a statement of fact to Mrs. Knight,

17   something to the effect that Pradaxa was safe and effective

18   for her.  I don't get that as being sufficient in an express

19   warranty case.  I think you've got -- for express warranty,

20   you've got to show an actual statement in the label that was

21   either misleading or false.

22        If you are arguing, and I'm sure you are, that a

23   manufacturer who puts the product into the -- gets FDA

24   approval and puts the product into the market is representing

25   that it is a safe and effective drug, well, clearly that is

1  the case, but that is an implied warranty, it seems to me.

2  And so I think you've got to be able to show, for violation of

3  an express warranty, that a specific statement was misleading

4  or inaccurate or perhaps even omitted.  But I don't think you

5  can just say there is an express warranty that this is safe

6  and effective for Betty.

7       So I leave the language there as a statement of fact

8  to Mrs. Knight related to Pradaxa.  I --

9       MR. CHILDERS:  That's what I understood from the

10  conference, Your Honor.  We don't have anything to add to

11  that.

12       MS. JONES:  The only -- I think just a corresponding

13  change, Your Honor, in light of that, is on the second line of

14  the instruction.  It says:  Mrs. Knight was injured by Pradaxa

15  because BI represented that Pradaxa was safe.  I think that

16  probably should be edited to say:  Plaintiffs claim that

17  Mrs. Knight was injured by Pradaxa because Pradaxa was not as

18  represented.

19       MR. CHILDERS:  That's fine, Your Honor.

20       THE COURT:  Well, say that language again so we can

21  get it.  Because I don't have that in my notes from --

22       MS. JONES:  We had -- I don't think we had discussed

23  this first section.  I think we had just talked about the

24  specific element in element 3.  But it occurred to me when I

25  was looking through the draft earlier today that we would need

1436

1    to make a corresponding change in the second line.

2         THE COURT:  Okay.  So tell me again what you want to

3    add and where.

4         MS. JONES:  It's not an add, it's a deletion.

5         So the second sentence starts with plaintiffs claim.

6    I think it should now say:  Plaintiffs claim Mrs. Knight was

7    injured by Pradaxa because, and then say Pradaxa was not as

8    represented.  So it's just cutting out those intervening

9    words.

10        THE COURT:  Oh, I see.  Okay.

11       (Off-the-record discussion with law clerk.)

12        THE COURT:  Okay.  We'll change that.

13        On the next page is the implied warranty.  I don't

14   recall there being -- well, I take that back.

15        There was some discussion about this, and --

16        MR. MOSKOW:  You made the change on line 3, Your

17   Honor, that we had discussed.

18        THE COURT:  Right.  That is essentially quoting the

19   statute.

20        MR. MOSKOW:  Right.

21        MS. JONES:  That's consistent with my recollection,

22   Your Honor.

23        THE COURT:  All right.  So -- all right.

24        And then the next is on page 27, the fraud claim.  I

25   thought the parties were in agreement on that.

1437

1    Then we get into the wrongful death instruction.  I

2  thought the parties were in agreement there.

3    MR. MOSKOW:  Yes, Your Honor.

4    MS. JONES:  Yes, Your Honor.

5    THE COURT:  All right.  So that brings us to the

6  punitive damages, which the parties had not had a chance to I

7  guess either discuss or at least didn't get a chance to convey

8  your positions to me.  So I'm going to set those aside again

9  for the moment.

10    Then if you keep going, at page 37 I've included the

11  plaintiffs' request to instruct on Betty's preexisting

12  condition.  And I've included plaintiffs' request on

13  concurrent negligence.

14    MS. JONES:  And we did have an objection to that one,

15  Your Honor, which we discussed last week.

16    THE COURT:  Right.  And we can discuss that, and you

17  can argue about it before.

18    So that pretty much covers everything that I had.

19    Do you know -- I asked Blake to just look at the West

20  Virginia pattern instructions on punitive damages, and he and

21  I have had barely a minute to talk about it, but it seemed

22  that these were pretty much out of those.

23    MR. CHILDERS:  That's what we proposed, Your Honor.

24  They had proposed some additional ones, and we objected to

25  anything beyond the pattern.

1438

1    MS. JONES:  That is the state of things, yes.

2    THE COURT:  All right.  Well, at least that gives me a

3    little more focus of what to look at.  So I'll look at the

4    additional instructions the defendant seeks.

5    So is there anything else, then, about these

6    instructions that you want to discuss now?

7    MR. CHILDERS:  So I can be clear, we're going to go

8    over them in another conference tomorrow?

9    THE COURT:  Yes, absolutely.

10   MR. CHILDERS:  Okay.  Thank you, Your Honor.

11   THE COURT:  And so to facilitate things, obviously

12   between now and as soon tomorrow as you can get to it, if you

13   would provide any new or proposed changes or additions in

14   writing, it would be great.  Exchange it and provide it to me.

15   What I would hope to do is, as I said, at the latest

16   tomorrow evening after we excuse the witness at whatever time,

17   stay and have a formal charge conference where we will go

18   through these again, letting each side identify anything that

19   they object to that's in my draft, and the defense can object

20   to anything, whether it's an omission or you want to delete

21   something.  We will do it on the record then and be finished

22   by tomorrow evening so we're ready to instruct this jury as

23   soon as we can on Wednesday.

24   Okay?

25   MR. CHILDERS:  Thank you, Judge.

1439

1      MR. MOSKOW:  Thank you, Judge.

2      THE COURT:  All right.  See you tomorrow.

3      THE COURT SECURITY OFFICER:  All rise.  This court is

4  now in recess.

5          (Proceedings were adjourned at 6:44 p.m.)

6                  ---o0o---

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CERTIFICATION:

2          We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3   RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4   transcript from the record of proceedings in the

5   above-entitled matter as reported on October 15, 2018.

6

7

8   October 16, 2018          _____
    DATE

9

10  /s/ Kathy L. Swinhart  _____
    KATHY L. SWINHART, CSR

11

12  /s/ Lisa A. Cook_____  _____
    LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25