IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
            Plaintiffs,
vs.                                      No. 3:15-CV-06424

BOEHRINGER INGELHEIM                     Volume 8
PHARMACEUTICALS, INC.,                   Pages 1440 through 1775

            Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

TUESDAY, OCTOBER 16, 2018, 9:00 A.M.

---o0o---


For the Plaintiffs:    CHILDERS, SCHLUETER & SMITH
                       1932 North Druid Hills Road, Ste 100
                       Atlanta, Georgia  30319
                       BY:  C. ANDREW CHILDERS
                       and  EMILY TWEED ACOSTA

                       URY & MOSKOW
                       883 Black Rock Turnpike
                       Fairfield, Connecticut 06825
                       BY:  NEAL L. MOSKOW


            (Appearances continued next page...)


Reported by:  KATHY L. SWINHART, CSR
              LISA A. COOK, RPR-RMR-CRR-FCRR
              Official Court Reporters
              (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                     APPEARANCES (Continued)

 2

 3    For the Plaintiffs:

 4                   FERRER, POIROT & WANSBROUGH
                     2100 RiverEdge Parkway, Suite 1025
 5                   Atlanta, Georgia  30328
                     BY:  RUSSELL ABNEY
 6                   and  HUNTER VANCE LINVILLE

 7    For the Defendant:

 8                   TUCKER ELLIS
                     925 Euclid Avenue, Suite 1150
 9                   Cleveland, Ohio  44115
                     BY:  JOHN Q. LEWIS
10

11                   COVINGTON & BURLING
                     One City Center
12                   850 Tenth Street NW
                     Washington, D.C.  20001
13                   BY:  PHYLLIS ALENE JONES
                     and  NICHOLAS HAILEY
14                   and  JESSICA PEREZ

15

16                   JACKSON KELLY
                     Post Office Box 553
                     Charleston, West Virginia  25322
17                   BY:  GRETCHEN M. CALLAS

18

19

20

21

22

23

24

25
```

1                                    INDEX

2

3    DEFENDANT'S WITNESSES:                                    PAGE:

4

     GEORGE CROSSLEY, M.D.
5
     DIRECT EXAMINATION BY MS. JONES                           1441
6    CROSS-EXAMINATION BY MR. CHILDERS                         1567
     REDIRECT EXAMINATION BY MS. JONES                         1652
7    RECROSS-EXAMINATION BY MR. CHILDERS                       1699

8

9    ARGUMENT ON MOTION FOR DIRECTED VERDICT                   1692
     ARGUMENT ON JURY INSTRUCTIONS                             1731
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                KATHY L. SWINHART, Official Court Reporter (304) 528-2244

1          HUNTINGTON, WEST VIRGINIA

2        TUESDAY, OCTOBER 16, 2018, 9:08 A.M.

3            THE COURT:  Good morning.

4      All right.  Are we ready to proceed with the next

5  defense witness?

6            MS. JONES:  We are, Your Honor.

7            MR. CHILDERS:  We still have one outstanding

8  objection to a document that we didn't believe was timely

9  disclosed.

10            THE COURT:  Okay.

11            MS. JONES:  I don't think it's going to be an

12  issue, Your Honor.

13            THE COURT:  Use the microphone.

14            MS. JONES:  It's an article.  The lead author is

15  named Dr. Chan.  I actually don't think it's going to be an

16  issue.  I don't currently intend to use it with him on

17  direct examination.  Depending on what they did on cross, we

18  might have a different conversation.  But for current

19  purposes, we're fine.

20            MR. CHILDERS:  Fair enough, Your Honor.

21            THE COURT:  Good enough.  Let's bring the jury in.

22      (Jury returned into the courtroom at 9:09 a.m.)

23            THE COURT:  All right.  You may be seated.

24      Good morning, ladies and gentlemen.

25      Plaintiff may call their -- or the defendant may call

1    its next witness.

2             MS. JONES:  Thank you, Your Honor.  The defense

3    calls Dr. Crossley.

4             THE COURT:  Doctor, if you'll step up here around

5    this side, my clerk will swear you in and you can take the

6    stand over here.

7             THE WITNESS:  Okay.

8             **GEORGE CROSSLEY, DEFENDANT'S WITNESS, SWORN**

9             MS. JONES:  Your Honor, while we're getting

10   situated, it is it okay for me to hand out the binders of

11   the exhibits?

12            THE COURT:  Absolutely.

13            MS. JONES:  May I approach the witness, Your

14   Honor?

15            THE COURT:  Yes.

16            MS. JONES:  May I proceed, Your Honor?

17            THE COURT:  Yes.

18                      DIRECT EXAMINATION

19   BY MS. JONES:

20   Q.   Good morning, Dr. Crossley.

21   A.   Good morning.

22   Q.   And good morning, members of the jury.

23        Dr. Crossley, could I ask you just to start by

24   introducing yourself to the jury, please?

25   A.   Yeah.  My name is George Crossley.  I am on the faculty

1    of Vanderbilt University.  I'm a heart doctor and I

2    specialize in taking care of people with heart rhythm

3    problems.

4    Q.    And when you say heart doctor, is that also known as

5    being a cardiologist?

6    A.    Correct.

7    Q.    And are you also what's known as an

8    electrophysiologist?

9    A.    That's correct.  That's the heart rhythm specialist.

10   Q.    Okay.  You're the -- you are our last witness in the

11   defense case but the first cardiologist that the jury has

12   heard from yet.  Can I just ask you to generally describe

13   what types of conditions you, you cover in your practice.

14   A.    I, I take care of patients with heart problems in

15   general but focus on patients with heart rhythm problems

16   like atrial fibrillation and other fast and slow heart

17   rhythm problems.

18   Q.    And over the course of your, your career as a

19   cardiologist and electrophysiologist, how many atrial

20   fibrillation patients would you estimate you've cared for?

21   A.    I couldn't possibly -- many thousands.

22   Q.    Okay.  And have you had experience treating atrial

23   fibrillation patients with anticoagulant medicines?

24   A.    Yes, ma'am.

25   Q.    Have, have you had an opportunity to review the medical

George Crossley - Direct (Jones)

1  records and the deposition testimony related to Mrs. Betty

2  Knight's treatment with anticoagulant therapy?

3  A.    Yes, I have.

4  Q.    Let me ask you another question.  As part of your

5  practive as a cardiologist do you also regularly treat

6  patients who have something known as coronary artery

7  disease?

8  A.    Yes.

9  Q.    And just in a very brief synopsis, tell the jury what

10 coronary artery disease is.

11 A.    So coronary disease is, is the kind of problem that

12 gives you heart attacks or angina or chest pain.  It's

13 caused by blockage in the blood vessels in the heart.  The

14 heart is fed by arteries just like any other organ is.  And

15 those blood vessels get stopped up by cholesterol and fatty

16 material that causes blockages there.

17 Q.    And have you also had experience in your practice

18 treating patients who have had heart attacks?

19 A.    Yes, certainly.

20 Q.    Okay.  How long have you been a cardiologist?

21 A.    Since -- I finished all of my training in 1991.  I did

22 my cardiology and electrophysiology training in one, in one

23 path.

24 Q.    And, so, are you coming up on 30 years as a

25 cardiologist?

1   A.    Yes.

2   Q.    Okay.  I want to ask you just some basic questions

3   about Mrs. Knight's case.  And then I want to come back to

4   talking a little bit more about your background.

5         As part of your review of the medical records and the

6   testimony related to Mrs. Knight's care and treatment, can

7   you tell the jury whether you formed an opinion about

8   whether she was an appropriate patient for anticoagulant

9   therapy?

10  A.    I certainly have.

11  Q.    Okay.  And what is your opinion on that just briefly?

12  A.    Yeah.  Just briefly, I think she's certainly a

13  candidate for anticoagulation therapy.

14  Q.    And, similarly, did you form an opinion on whether

15  Pradaxa was an appropriate treatment option for Mrs. Knight?

16  A.    Indeed it was.  Pradaxa and its -- the NOACs have

17  significant advantages over the other available blood

18  thinners for a patient like Ms. Knight who had tremendous

19  risk of stroke.

20  Q.    And when you -- you used a term that I think the jury's

21  heard a little bit about, this term "NOACs."  What are

22  NOACs?

23  A.    So NOACs are novel anticoagulants.  For 100 years all

24  we've had to treat, to treat blood clotting problems is

25  warfarin.  And warfarin is, is sort of an analog of the

1  material that's used in rat poison.  It's used in a very

2  titrated way because you have to be very careful with how

3  you dose it.  And I don't mean to suggest that it's poison

4  because it's not.

5      But it, it, it had -- it's very difficult to control

6  and we were, we were -- all of us that are in the world of

7  treating people with heart rhythm problems that need blood

8  thinners and, for that matter, the rest of cardiology with

9  heart valve problems that need blood thinners were very

10  excited to have these new drugs that give us better, even

11  control of their blood-thinning over time.

12      It's much easier to get patients therapeutically

13  controlled and keep them from going way too high and way too

14  low on these drugs than it is on warfarin.

15  Q.   And, Doctor, one final just kind of introductory

16  question and then we'll talk a little bit more about your

17  background.

18      Did you form an opinion based on your review of the

19  medical records and the testimony in the case of what led to

20  Mrs. Knight's passing in September of 2013?

21  A.   I, I think it's clear that her coronary artery disease

22  led to her death.

23  Q.   Okay.  Doctor, where are you from originally?

24  A.   I was born in Johnson City, Tennessee, and then raised

25  in Atlanta.

George Crossley - Direct (Jones)                    1446

1    Q.   And can you tell the jury a little bit about your

2    educational background starting with undergraduate school

3    and heading into becoming a cardiologist?

4    A.   I started college at the University of Tennessee as a

5    music major, and then changed to a more scientific approach

6    and moved to -- transferred back to the University of

7    Georgia.

8         I did my undergraduate degree and Master's Degree in

9    microbiology there where I met my wife.  It was the best

10   thing that came, came to me out of graduate school.

11        And then I went to medical college at the Medical

12   College of Georgia in Augusta, Georgia, and did all my

13   post-graduate training at the University of Alabama in

14   Birmingham.

15        I was an intern, resident, chief resident, fellow, and

16   an EP fellow there.  EP is electrophysiology, or the

17   arrhythmia world.

18   Q.   And I want to talk through each of those stages.  But

19   what led you to become a doctor in the first place?

20   A.   I think what led me to become a doctor is my mother's

21   illness.  My mother had a heritable problem called

22   Ehlers-Danlos Syndrome.  It's a genetic disorder that my

23   sister has too and probably her children do as well.  And it

24   causes aneurysms and can cause unexpected death.  It, it

25   happened to my mother at age 36.  My sister had her first

1   disaster at age 48.

2   Q.   And so you mentioned that you did your medical school

3   training in, in Georgia; is that right?

4   A.   Correct.

5   Q.   How, how long was the medical school curriculum that

6   you completed?

7   A.   Four years.

8   Q.   Okay.  And then after that, you completed an

9   internship; is that right?

10  A.   That's correct, in internal medicine.

11  Q.   And then you did a residency; is that right?

12  A.   Yes.

13  Q.   And tell the jury what a residency is as compared to

14  what you do in medical school.

15  A.   So when you're an intern and a resident, an intern is

16  really just a first-year resident.  And, and internal

17  medicine is the study of cardiology and nephrology, kidney

18  problems, liver problems, all the things that don't involve

19  surgery and things like that.

20       And, and you really spend three years at the, at the

21  elbow of the faculty learning how to take care of both

22  in-patients and out-patients with all internal medicine

23  problems.

24  Q.   And so after you completed your internal medicine

25  residency, you said you did what's known as a fellowship; is

George Crossley - Direct (Jones)

1   that correct?

2   A.   That's correct.

3   Q.   Tell the jury what a fellowship is once you've done all

4   that other training.

5   A.   So fellowship is the subspecialty training.  And so in

6   my case, it was a fellowship in cardiology and

7   electrophysiology.  At the time, we did them, did those two

8   together.  Now they're done sequentially.  That started in

9   the late '90s.

10       And, so, my fellowship was in cardiology or the study

11  of people with heart problems, and then electrophysiology,

12  which is the study of heart rhythm problems.  I was -- when

13  I started my electrophysiology training, I think there were

14  40 people in electrophysiology in the country.  And now

15  there are probably 8,000.

16  Q.   Where are you licensed to practice medicine?

17  A.   In Tennessee.

18  Q.   Do you hold any board certifications?

19  A.   I'm Board Certified in internal medicine, in

20  cardiology, and electrophysiology.  And I hold a special

21  certificate in care of patients with pacemakers and

22  defibrillators.

23  Q.   Can you tell the jury what it means when we say Board

24  Certified?

25  A.   So Board -- for any -- for every specialty in medicine

1    there is a certification board that determines what, what is

2    needed to be Board Certified.  That is sort of getting the

3    good housekeeping seal of approval on the doctor.  Not all

4    doctors are Board Certified.  About 75 percent are.  And in

5    some institutions board certification is required.  In some

6    it's not.

7    Q.   And what did you do after you completed your fellowship

8    in cardiology and electrophysiology?  Where did you go next?

9    A.   I joined the faculty at Wake Forest University in

10   Winston-Salem, North Carolina.

11   Q.   How long were you there?

12   A.   I was there from '91 to '99.

13   Q.   And what role did you have while you were at Wake

14   Forest?

15   A.   So I was on the faculty performing clinical care,

16   training students, training residents, training fellows, and

17   doing a lot of research.

18   Q.   And after that eight-year period at Wake Forest, where

19   did you go next?

20   A.   I was recruited to Nashville to help build and then run

21   a very large cardiology practice known as St. Thomas Heart.

22   When I got there, we, we merged three different practices

23   into a group that had 62 cardiologists and 14 heart

24   surgeons.  And I ran that for 10 years.

25   Q.   And during the time that you were at St. Thomas, did

George Crossley - Direct (Jones)

1    you participate in what the jury has heard described as the

2    RE-LY trial?

3    A.    I did.

4    Q.    Okay.  And what role did you have in that?

5    A.    I was the local principal investigator.  So the way

6    clinical trials work is there's a principal investigator and

7    a coordinating committee for the study that's over all of

8    the sites.  And then's a local principal investigator that's

9    over the study at that institution.  And that was my role.

10   Q.    Why, why was it that you decided to participate in the

11   RE-LY trial?

12   A.    We were very anxious to participate in the RE-LY trial

13   to, to have availability of Pradaxa so that our, our

14   patients could have an alternative to warfarin.

15   Q.    Doctor, where do you practice medicine currently?

16   A.    Vanderbilt University.

17   Q.    How long have you been there?

18   A.    Since 2014, four years.

19   Q.    And what role do you have at Vanderbilt?

20   A.    I'm an associate professor there which means I'm a

21   senior faculty member.  In addition to my clinical role,

22   taking care of patients with heart rhythm problems, I run

23   our clinical research, what's called a clinical research

24   enterprise which is the cardiology clinical trials unit.

25        And when we perform, we -- I don't -- I'm not -- that

George Crossley - Direct (Jones)

1   doesn't make me the principal investigator of those trials.

2   That makes me the herder of the cats in getting those trials

3   run.

4        And I also am the medical director of our

5   electrophysiology lab which is like the cardiac cath lab but

6   it's for heart rhythm problems for patients that need

7   pacemakers or defibrillators or ablations.  I run that.

8        Then for the next two weeks I still run the

9   electrophysiology training program.  Thankfully I don't need

10  three, three administrative tasks and I'll, I'll give one up

11  in a couple weeks to one of my younger colleagues.

12  Q.   Okay.  In terms of your clinical practice, can you just

13  give the jury a sense of, for example, what a week looks

14  like in terms of the number of patients you're seeing and

15  what types of conditions you're treating?

16  A.   So Mondays and Tuesdays are the days that I do studies

17  in the electrophysiology lab.  I put in pacemakers and

18  defibrillators.  I also take out pacemaker wires and

19  defibrillator wires which is the sort of crazy thing that I

20  do.  People come from all over the southeast for it.  It's

21  just something that I've done for a long time.

22       And on Wednesdays I, I split the time between being in

23  clinic and doing administrative tasks.

24       And on Thursdays and Fridays I see patients in clinic,

25  patients with heart rhythm problems.  And in all of these

1   things I'm teaching fellows or EP fellows with me, have

2   those people, and sometimes the medical students with me in

3   clinic.

4   Q.   And in the course of your practice on a weekly basis

5   are you regularly treating patients with atrial

6   fibrillation?

7   A.   All day, all day every day.

8   Q.   Are you regularly treating patients who have coronary

9   artery disease?

10  A.   Yes, ma'am, all day.

11  Q.   Okay.  As part of your practice over the 20-plus years

12  that you've been a cardiologist, have you had experience

13  prescribing the medicine warfarin?

14  A.   Yes.

15  Q.   Okay.  And have you had experience prescribing all of

16  what you described as the NOACs, Pradaxa, Xarelto and

17  Eliquis?

18  A.   I have.

19  Q.   Okay.  Do you prescribe all those medicines?

20  A.   Yes.

21  Q.   Do the patients that you see as part of your clinical

22  practice include patients who have severe renal impairment?

23  A.   They certainly do, uh-huh.

24  Q.   Okay.  And have you had patients for whom you have

25  prescribed the 75-milligram dose of Pradaxa because they

George Crossley - Direct (Jones)

1    have severe renal impairment?

2    A.    I have.

3    Q.    Do you currently have patients who are on the

4    75-milligram dose of Pradaxa?

5    A.    I do.

6    Q.    As part of your work as a clinician, have you become

7    familiar with the labeling for the medicines we've just

8    talked about, warfarin and Pradaxa, Xarelto and Eliquis?

9    A.    I have.  I, I've, I certainly -- when I was at St.

10   Thomas, I ran our pharmacy and therapeutics committee.  So

11   in that role I became very compulsive about reading labels.

12   Q.    You mentioned that you're in charge of the clinical

13   research enterprise at Vanderbilt.  As part of your career

14   in general have you been involved in research and

15   publication of, of articles in the peer-reviewed literature?

16   A.    I have been very involved in clinical research.  And I

17   started with efforts in, in research organization and

18   research trial execution as early as when I was a fellow.

19         I was part of a performance improvement trial, or

20   program there that led to some of the things -- some of the

21   tools and techniques I've used to help clinical research

22   move forward.

23   Q.    And as part of the work that you've done in terms of

24   clinical research, have you sometimes worked with companies

25   that make medicines and make medical devices?

George Crossley - Direct (Jones)                    1454

1    A.    I have.

2    Q.    Okay.  Is there a reason that you partner with

3    companies like that to do research?

4    A.    Sure.  I mean, we -- part of our mission is to do

5    first-line research.  And our goals in the clinical research

6    enterprise are to do research that, number one, benefits our

7    patients and brings something to them that they couldn't get

8    otherwise; and, number two, is first-line research that

9    allows our faculty to get involved in a position of

10   leadership and a position where they can publish if they

11   perform and bring the patients into the trial.

12   Q.    Has, has BI ever been one of the companies that you

13   partnered with in that capacity?

14   A.    In the RE-LY trial, yes.  And we have done other trials

15   since I've been at Vanderbilt with BI, but no huge trials.

16   Q.    Okay.  When the clinical research enterprise partners

17   with companies like the ones we've been describing, is that

18   a profit-making operation for the hospital?

19   A.    Not at all.  The clinical research enterprise is

20   intended to break even.  It is not -- it would be a problem

21   if it were profit-making.  Vanderbilt is not a profit-making

22   institution and we don't, we don't make profit and we -- but

23   we do intend to break even on them.

24         When I took over the clinical research enterprise, it

25   was not breaking even.  And I put in some of the contracting

1    strategies that I've used previously and helped with that.

2         One of the things that I have been a big proponent of

3    is partnering with companies that do a lot of research and

4    having a global overriding contract that helps us get the

5    study started.

6         For example, when I started at Vanderbilt, I think it

7    was about 10 months to start up -- it was something like

8    that -- from the time we got a trial until we could actually

9    start it.  And we've got that down to about 90 days now.  My

10   target is 60 days.  I don't know if I'll get there.

11        But that, that helps, helps us get started earlier and

12   be more of a meaningful participant in the study.  We always

13   want to be a high-end roller if it's appropriate.  We never

14   want to enroll a patient that wasn't appropriate.  That's

15   very tight -- that's, that's in our core mission is to only

16   do what's right.  The patient always comes first.  But we

17   want to do things that, that result in significant

18   participation.

19   Q.   And to the extent that you, you spend time involved in

20   some of these clinical research activities, are you

21   compensated for your time?

22   A.   Sure.  I'm, I'm paid -- it's part of my salary.  I'm

23   paid -- I am paid to be a faculty member and I'm paid very

24   little to do the administrative time.  Most of our

25   compensation actually comes from a formula that involves how

1  many patients we see and how many procedures we do.  I get a

2  small amount of my salary from that.  I, I do not get paid

3  directly from the companies for this outside my salary if

4  that's what you're asking.

5  Q.   To the extent that these -- you're working with

6  companies outside of Vanderbilt, are all of those agreements

7  and relationships reviewed by the institution?

8  A.   By a whole lot of lawyers, yes; the institution and a

9  compliance office, a contracting office, a legal office, and

10  an academic office.

11  Q.   And what's, what's the purpose of that review?

12  A.   Well, part of the review is to make sure -- the

13  compliance part of it is to make sure that there's no

14  conflict of interest.

15       The legal office is to make sure we're not promising

16  things we can't promise and to make sure we have

17  institutional liability and company liability balanced and

18  have that in the right way.  That's always a difficult thing

19  with a new drug, and, and just to make sure all the Is are

20  dotted and the Ts are crossed.  Others are responsible for

21  the nuts and bolts of the contracts.

22       My, my responsibility with the contracts isn't to

23  negotiate how much we pay for an -- how much we get paid to

24  do an echocardiogram but it's really to set the, set the

25  mission and, and try to drive us to be big participants in

1   big studies.

2   Q.   In addition to the work that you do at Vanderbilt, are

3   you also a member of professional organizations related to

4   the study of heart rhythm specifically and cardiovascular

5   disease more generally?

6   A.   I am.

7   Q.   Can you tell the jury about that?

8   A.   So the two, the two organizations I participate in the

9   most are the American College of Cardiology, which is the

10   organization of cardiologists.  And our mission really is to

11   push forward the quality of cardiac care.

12       We, we spend a lot of time in Washington trying to

13   lobby for things like improvements in the way healthcare is

14   administered so that we can get equitable, equitable care

15   for everybody and get things incentivized in ways that

16   promote quality, not promote quantity.  So that, that's

17   something that we've been very driven with.

18       The American College of Cardiology sets professional

19   standards for almost everything in cardiology.  And, and

20   I've been very involved with it.  I was the -- on their

21   Board of Governors.  I was the Tennessee chapter president.

22   And I continue to be involved in that.

23       I'm also a member of the Heart Rhythm Society which we,

24   we do a lot of advocation -- like we're -- you may have

25   heard ads in the last day or two for sudden cardiac death

1    awareness, having, having availability of external

2    defibrillators and having awareness of the need for internal

3    defibrillators.

4    Q.   Doctor, are you also a reviewer for medical journals

5    where peer-reviewed literature is published?

6    A.   Yes, ma'am.

7    Q.   Roughly how many journals do you serve in that role?

8    A.   I, I can't -- it's greater than 10, less than 20 I

9    think.

10   Q.   And what does that role involve?

11   A.   Whenever a paper is published -- whenever a paper is

12   submitted for publication, it's typically reviewed by an

13   editor for a, for a first review.

14       And then if it meets that review, it's sent out to two

15   or three reviewers.  And we review in a blinded way.  And we

16   look at the science.  We look at the ethics.  We look at

17   everything in it.  We give a review and the authors -- it's

18   a bit like a tennis match where you bat it back and forth

19   across the net a few times before you get it to a

20   publishable state.

21   Q.   And have you been an author on peer-reviewed literature

22   in medical journals?

23   A.   Many.

24   Q.   When you say many, how many are you estimating?

25   A.   It's -- I'd have to look at my CV.  I think it's around

1   60 primary papers, 10 or 12 editorials, several book

2   chapters and, and 150 or so abstracts which are -- abstracts

3   are the written report of when we present things about our

4   research at a meeting.

5   Q.   Last background topic and then I want to talk about

6   Mrs. Knight.  As part of your -- as a result of your

7   experience as a researcher and a clinician, are you

8   sometimes asked to serve as a consultant in litigation like

9   this?

10  A.   Yes.

11  Q.   How much of your time do you spend serving as an expert

12  witness in litigation?

13  A.   Not very much of my time other than this case.  This,

14  this case has been very long.  I think we're, we're over two

15  years into it.

16       I, I probably average a case or two a year that I, that

17  I look at.  And most all of them have been medical

18  malpractice cases.  There's only been one previous company

19  federal litigation case that I participated in.

20  Q.   Okay.  And are you being compensated for your time for

21  your work in this case?

22  A.   I am.

23  Q.   What is your hourly rate?

24  A.   $425 an hour for doing things that don't involve

25  sitting in the courtroom, and $650 an hour for, for court

1    time, deposition time.

2    Q.   And when you say things that don't involve sitting in a

3    courtroom, do you mean like reviewing the medical records?

4    A.   Reviewing the medical records, talking to the lawyers,

5    things like that.

6    Q.   Okay.  Roughly speaking, how much have you, have you

7    been compensated for your time in this case?

8    A.   How much what?

9    Q.   Have you been compensated for your time in this case.

10   A.   I don't know the total.  It's something --

11   Q.   Roughly around $60,000?

12   A.   Sixty?

13   Q.   Yes.

14   A.   If you say so.  I'll, I'll trust you.  It is -- this

15   has been a long, crazy thing over, over, over two years with

16   several sets of lawyers.

17   Q.   Okay.  I now want to turn to talking a little bit more

18   about Mrs. Knight.  Before Mrs. Knight ever took Pradaxa in

19   2011, did she also have something known as coronary artery

20   disease?

21   A.   She did.

22   Q.   Okay.  And you talked about that condition a little

23   bit.  And I'm actually going to ask for the Court's

24   permission to have you come down and just demonstrate on a

25   board what we're talking about when we say coronary artery

George Crossley - Direct (Jones)

 1  disease.

 2          MS. JONES:  Is that okay, Your Honor?

 3          THE COURT:  He may do so.

 4          MS. JONES:  Okay.

 5          THE COURT:  If he doesn't have a microphone, you

 6  just need to make sure you speak up so we can hear you,

 7  especially when your back is to the jury.

 8          THE WITNESS:  I will.

 9      So this, this drawing shows a cross section of

10  arteries.  That, that artery may be --

11      Can you hear me okay?

12          THE COURT:  Yes.

13          THE WITNESS:  So that may be an artery anywhere in

14  the body.  It's meant to display an artery in the heart or

15  coronary artery.

16      This is what the artery looks like when you're nice and

17  healthy, when you're 16 years old, 20 years old, haven't

18  smoked and haven't done a lot of other things and haven't

19  had the wrong parents.

20      And you can see that the muscle out here is nice and

21  smooth.  The lining is nice and smooth.  And that lumen or

22  the opening there is wide open.  And that's the -- that's

23  how the blood flows through.

24      At some juncture almost all of us get what we call

25  streaky plaques which are things like this here which is a

George Crossley - Direct (Jones)

1    little deposition of cholesterol and gruel that comes from

2    high cholesterol, family history, all those things.  And,

3    and that's the beginning of blockage in the heart where you

4    get -- where it lays that down.  And if you were to cross

5    section -- if you were to take a picture inside of the

6    artery, that's what you'd be able to see.

7         At that stage, it really doesn't do anything bad to

8    you.  It's just a marker that there's bad things coming.

9         As it progresses, that area there can grow and, and

10   start to close off that lumen.  And at this stage, what

11   happens is you can have chest pain or what's called angina

12   which is where you exert yourself and you have a squeezing

13   sensation in your heart.

14        Because what's happening here is nothing terrible has

15   happened, but you can't get nearly as much blood flow

16   through this little slit here as you can through that, that

17   big tube up there.  Make sense?

18        So then what happens is this -- let me get back over

19   here.  Right in the corners here where the plaques are, it

20   takes the form of crack there.  And this, this gruel down

21   here gets exposed to the blood and it starts forming a clot.

22        It forms platelets first which are the sort of -- what

23   are called blood platelets or the clotting cells that are in

24   your blood.  They stick first.  And then those platelets put

25   out a material that makes blood clot and, and form around

George Crossley - Direct (Jones)                    1463

1   it.  And then you get a blood clot that completely closes

2   off that, that blood vessel.

3       And at this point, you have a heart attack.  You have

4   what we call an, an ST elevation heart attack or a bad heart

5   attack where your, where your heart -- where the blood

6   vessel closes off completely and everything downstream from

7   that dies unless you get to the hospital and get one of my

8   plumber colleagues to open that up with a balloon or a

9   stent.

10  Q.   Okay.  Thank you.  You can go ahead and have a seat.

11  Thanks.

12      Doctor, you mentioned what you described as an ST

13  elevated myocardia infarction.  Is there also something

14  known as a non-ST elevated myocardia infarction?

15  A.   That's, that's correct.

16  Q.   Can you tell the jury what that is?

17  A.   Yeah.  In general, at the time of the heart attack,

18  that's a less bad heart attack.  Unfortunately, the

19  long-term impact of that is worse than the ST elevation MI

20  partly because ST elevation heart attacks now, we almost

21  always get to the emergency room and get open and get --

22  probably 80 percent of the time, we open those nowadays.

23      A non-ST segment elevation MI is largely caused by

24  having all three of those arteries in your heart blocked off

25  and having them -- having an area downstream from there

1    where you just don't get good blood flow.  And that can

2    cause angina.  And then if it gets bad enough, it can cause,

3    it can cause a heart attack.

4        Now, there are other reasons having non-ST segment

5    elevation in mind too, and that is like in the heart there

6    are three arteries.  And one goes down the front, one goes

7    down the right side, and one goes on the left side.

8        When the one on the left side gets plugged up, you're

9    less likely to see that on your EKG and see it as an ST

10   segment elevation MI.  So some really bad, big vessel

11   occlusion heart attacks look like non-ST segment elevation

12   MIs.

13   Q.  Dr. Crossley, what are the, the major risk factors for

14   coronary artery disease?

15   A.  Smoking, number one.  Are you going to write them or --

16   Q.  I'm going to write them, yes.  None of these markers

17   seem to work very well.  I apologize.  You mentioned

18   smoking?

19   A.  Smoking, high blood pressure, high cholesterol,

20   cholesterol, and a family history, especially of early

21   coronary disease.  Those are the severe risk factors.

22       There are other risk factors too like being overweight

23   and bad diet and things.  Some of those are related to those

24   four factors.

25   Q.  Can, can diabetes be a risk factor?

George Crossley - Direct (Jones)

1    A.    Oh, I'm so sorry.  Yeah.  I totally left that out.

2    Diabetes is certainly one of the major risk factors as well.

3    Q.    Based on your review of the medical records for Mrs.

4    Knight over time, did she have any of those risk factors for

5    coronary artery disease?

6    A.    She had all of them.

7    Q.    Okay.  And what would that mean in terms of her risk of

8    having a heart attack?

9    A.    That just means her risk was much higher than the

10   average person.  I mean, the average person has a very

11   considerable risk of having coronary disease, especially as

12   you get older.  But if you have multiple risk factors,

13   especially if you have all those risk factors, your risk is

14   dramatically high.

15   Q.    How do doctors go about actually evaluating in a

16   patient how much blockage exists in any particular artery of

17   the heart?

18   A.    With, with what's called an angiogram or a heart

19   catheterization.  We put a tube either in the wrist or in

20   the leg and pass it to the heart and inject a, a contrast

21   agent that lets us see the blood vessels under X-ray

22   cameras.

23   Q.    And did, did Mrs. Knight actually have a procedure like

24   that back in 2008 to evaluate the condition of her coronary

25   artery?

George Crossley - Direct (Jones)

1    A.   She did.

2    Q.   Okay.

3    A.   She had several of those over time.

4    Q.   Okay.  I'm going to ask you to turn to Exhibit 9007-B

5    in the binder that you have in front of you.  I want to

6    direct your attention to Pages 27 and 28.

7    A.   I am there.

8    Q.   And, just generally, Dr. Crossley, do you recognize

9    Exhibit 9007-B as a collection of medical records for Mrs.

10   Knight?

11   A.   I do.

12   Q.   Okay.

13           MS. JONES:  Your Honor, we'd move for the

14   admission of Exhibit 9007-B.

15           THE COURT:  Any objection?

16           MR. CHILDERS:  No objection.

17           THE COURT:  It's admitted and may be published.

18       (Exhibit Number 9007-B admitted into evidence.)

19   BY MS. JONES:

20   Q.   Doctor, can you just tell us what we're looking at here

21   on Page 27 of Exhibit 9007-B?

22   A.   What we're looking at is a report of that cardiac

23   catheterization of, of Mrs. Knight that was done on 11-17,

24   2008.

25   Q.   Okay.  And I'm going to ask you if you wouldn't mind,

George Crossley - Direct (Jones)

1    and with the Court's permission, to just come back down for

2    us once more and talk us through what the doctor saw.

3            MS. JONES:  Is that okay, Your Honor?

4            THE COURT:  Certainly.

5            THE WITNESS:  So this is the way the outside of

6    the heart looks.  This is the right ventricle.  That's the

7    left ventricle.  And these red tubes are the arteries that

8    feed the heart.

9        This is what's called the left main coronary artery.

10   This is the right coronary artery.  This is the circumflex

11   artery.

12       And, so, what they did is they put a tube -- and I

13   don't know if it was in her wrist or a leg -- and passed it

14   up to the heart and injected contrast dye in those.

15       And what they found first is that the pumping chamber

16   over here -- one of the things we do is to put the tube down

17   into the pumping chamber and put dye and take a picture.

18       And they found that her ejection fraction was

19   40 percent at that time.  And what ejection fraction means

20   is we compare the heart when it's full to when it's empty.

21   And that number, if you're normal, is around 65 percent.

22   And in hers at this time it was 40 percent.  At other times

23   it was a bit lower than that.

24       This artery, the main artery right there was normal.

25   And this left anterior descending coronary artery right here

1   had a really tight stenosis in it, really tight narrowing.

2   And it was 90 percent blocked off, much as that picture we

3   showed you before.

4       The circumflex artery out here had a minor little

5   stenosis, a minor little narrowed area there.  And then this

6   first branch here, this marginal branch had another tight

7   area in it.  It was about 70 or 80 percent.

8   Q.   And, Dr. Crossley, when you say tight, you mean that

9   the vessel was quite blocked up?

10  A.   It was blocked up, yeah.  It was blocked up to 70 or

11  80 percent.

12  Q.   Okay.

13  A.   And then the posterior descending artery, which is this

14  thing right here, had about a 50 percent narrowed area in it

15  right where that was.

16  Q.   Doctor, in the, the angiography results that we're

17  looking at, there's an item in number eight that says,

18  "Right coronary artery is the dominant vessel with mild

19  diffuse disease throughout.  There is proximal 30 percent

20  stenosis."  What does that mean?

21  A.   That just means there's a lot of gruel and sort of

22  minor narrowing all in this right coronary here.

23       Do you want me to talk about the angioplasty?

24  Q.   Yes, please.

25  A.   So then as part of this, they, they took a balloon with

George Crossley - Direct (Jones)

1  a stent on it and opened up this stent, this area right here

2  with a, with a device that is -- what they -- what we do is

3  to put a, put a wire across that narrowed area.  And then we

4  put a tube over that that has the balloon on it.

5      And on the outside of the balloon it looks like a wire

6  cage.  And we inflate the balloon to the, to an amount of

7  pressure that lets us know how big in diameter it is.  If we

8  over-inflate it, it gets bigger.  If we under-inflate it, it

9  gets smaller.

10     And that, number one, opens up that area.  And, number

11  two, that wire mesh helps form sort of a scaffolding and

12  hold that artery open.  And that was done in this area right

13  here.  I think that's all she had in this one.

14  Q.  All right.  Thank you.  You can sit back down, Doctor.

15     Dr. Crossley, you described multiple places where back

16  in 2008 Mrs. Knight had blockages that her doctors

17  identified.  Could any one of those blockages have led

18  eventually to a heart attack?  Do you have to have a

19  90 percent blockage to have a heart attack?

20  A.  You certainly don't.  That, that was proved by my old

21  boss at Wake Forest University in a famous study where,

22  where if you look at patients with narrowing in their

23  arteries who then go on to have a heart attack and try to

24  predict which one, which one of the narrowed areas caused

25  the heart attack, basically he showed that any narrowing

George Crossley - Direct (Jones)

1  greater than 30 percent can cause a heart attack.

2  Q.    Now, in terms of treating coronary artery disease with

3  medicines, are there medicines that doctors sometimes

4  prescribe to patients to try and help them lower the

5  progression of coronary artery disease?

6  A.    Yeah, there, there are lots of medicines that we use in

7  patients with coronary artery disease.  Some of them are

8  targeted at reducing the stress in the heart.  Some are

9  targeted at opening up the blood flow a little bit if areas

10 are squeezed down.

11       And the most important ones for the long-term health of

12 patients with coronary disease are the lipid-lowering agents

13 or the cholesterol medicines.

14 Q.    Are those also known as statins?

15 A.    Correct.

16 Q.    Okay.

17 A.    That's the mainstay.  There are other cholesterol drugs

18 that are, frankly, nowhere near as effective as statins.

19 Q.    Based on your review of the, the medical records, was

20 Mrs. Knight able to take statins?

21 A.    Unfortunately, she wasn't.  She had what's called

22 myopathy which is really a type of allergic reaction to the

23 statins where you get a terrible aching and it just makes

24 you miserable.

25       And patients, patients who cannot take statins are

Case 3:15-cv-06424 - Document 247-5 - Filed 12/21/18 - Page 35 of 340 PageID #: 20850

1   much, much, much worse off long-term than patients who can

2   that have coronary disease.

3   Q.   Now, you mentioned that in 2008 Mrs. Knight's doctors

4   placed one stent.  Did, did she actually go back at the

5   beginning of 2009 and have a second stent placed?

6   A.   She did.  They made a, a choice in her to do one stent

7   and then come -- to do it in a, quote, staged manner where

8   you do one stent the first time and bring her back the next

9   time to do the other stent.

10      And the rationale for that is that you have less chance

11  of what we call acute stent closure which is where during

12  the procedure one of the stents can just close down.  And if

13  you do -- the more stents you do, the more likely that is to

14  happen.

15      So certainly at that time, and even now, that's

16  commonly done.  It's less commonly done now than it was

17  then.  But that was a purposeful staged procedure.  And that

18  one off to the, to the side there where I said there's a

19  narrow area is the area where she had the second stent

20  placed.

21  Q.   Okay.  And just so the jury can see, this is where the

22  first stent was placed?

23  A.   That's correct.

24  Q.   Okay.  I'm just going to put a star there.  And then

25  there was a second stent placed --

George Crossley - Direct (Jones)                1472

1    A.    Right there, uh-huh.  That's correct.

2    Q.    All right.  I'm going to ask you to turn in Exhibit

3    9007-B to Page 53.

4    A.    I am there.

5    Q.    Do you recognize that medical record, Doctor?

6    A.    I do.

7    Q.    And tell the jury what we're looking at here on the

8    screen.

9    A.    This is the report of the catheterization procedure

10   done on January the 6th, 2009.

11   Q.    Okay.  And if we scroll down just a little bit, you can

12   see there's a section -- there's a reference to "Procedure"

13   up at the top of the screen?

14   A.    Yes.

15   Q.    And that says, "PCI of the first obtuse marginal

16   branch."  What does that mean?

17   A.    That means exactly what we showed.  That, that second

18   asterisk there is where that balloon with the stent on it

19   was put in there and opened up.  Percutaneous coronary

20   intervention is what PCI stands for.

21   Q.    Okay.  And a little further down it says

22   "History/Indications" right under "Procedure."

23   A.    Uh-huh.

24   Q.    It says, "Ischemic cardiomyopathy --" and before we go

25   any further, can you just explain to the jury what that

George Crossley - Direct (Jones)

1    means?

2    A.   That means that you've had enough coronary disease that

3    it beats your heart muscle up and your heart muscle doesn't

4    perform as well.  It doesn't squeeze as well as it should

5    have.

6    Q.   And it goes on to say, "Non-ST elevation myocardia

7    infarction."  Now, is that the term we were talking about

8    earlier?

9    A.   It is.

10    Q.   Okay.  And it goes on in that same section to say,

11    "Patient is staged multi-vessel PCI.  She underwent PCI of

12    the LAD six weeks ago."

13         Do you understand that to be a reference to the stent

14    placement in 2008?

15    A.   Correct.

16    Q.   And it says, "The complexity of her coronary anatomy

17    due to dextrocardia is one reason the procedure was done

18    staged."

19         Do you see that?

20    A.   I do.

21    Q.   And there's a reference there to dextrocardia.  I think

22    the jury has heard that term perhaps a couple of times

23    during the trial.  But could you just briefly explain what

24    that is and what it meant for Ms. Knight, if anything?

25    A.   So dextrocardia is just a birth abnormality.  I

1   wouldn't say it's a birth defect.  It's when you're born

2   with what should be on the left side on the right side.  And

3   when it comes -- dextrocardia means that it affects your

4   heart.

5        My understanding with Ms. Knight is she had what's

6   called situs inversus which means everything was on the

7   wrong side.  And, so, Ms. Knight's -- it does a couple of

8   things for you in coronary disease.

9        Number one, it makes it really hard to be able to feel

10  what you're doing and go where you want to go because you're

11  used to looking at everybody who has their heart on the left

12  side.

13       And when you push the wire, you expect it to go where

14  it's going to go on the left side.  And you have to sort of

15  retrain your brain and sort of look over your shoulder and

16  do funny things to make your hands work to, to make it -- to

17  be able to do an angioplasty or a complex intervention on a

18  patient with dextrocardia.

19  Q.   Okay.

20  A.   Number two, it changes your symptoms because symptoms

21  that you would have had on the left side of your body are

22  now on the right side of your body.

23  Q.   And we can take that record down.  Thank you, Mr.

24  Reynolds.

25       Doctor, I wanted to ask you about a series of events

George Crossley - Direct (Jones)

1    after Mrs. Knight's stent placement in November of 2008 just

2    to see if we can clear up some of the chronology for the

3    jury.

4         When Mrs. Knight had her stent placed in November of

5    2008, did her doctors stop her Coumadin treatment, the

6    anticoagulant that she was on at the time?

7    A.   That is my understanding that they did.

8    Q.   Okay.  And if you -- I'm going to ask you to turn in

9    your binder to 2000-D.

10   A.   To what?

11   Q.   2000 and the letter D.  It should be towards the front.

12   A.   Okay.

13   Q.   And I'm going to ask you to go to Page 4061 if you

14   would, please.  Are you there, Doctor?

15   A.   I'm not.

16   Q.   Okay.

17   A.   I am there.

18   Q.   Okay.  And, Dr. Crossley, do you recognize that as one

19   of the records relating to Mrs. Knight's medical care in the

20   2008-2009 time period?

21   A.   I do.

22   Q.   Okay.

23        MS. JONES:  Your Honor, we'd move for the

24   admission of Exhibit 2000-D which is just an excerpt of I

25   think the broader set of medical records.

George Crossley - Direct (Jones)                1476

1          THE COURT:  Any objection?

2          MR. CHILDERS:  No objection, Your Honor.

3          THE COURT:  It's admitted.

4      (Exhibit Number 2000-D admitted into evidence.)

5   BY MS. JONES:

6   Q.   Can you put that up, please, Mr. Reynolds, and go to

7   Page 4061?

8      (Pause)

9          MS. JONES:  I'll just use the ELMO if that's okay.

10         THE COURT:  All right.

11  BY MS. JONES:

12  Q.   Dr. Crossley, do you see that document?

13  A.   I can.

14  Q.   All right.  And you have a copy in your binder.

15  A.   I have a copy.

16  Q.   Okay.  So up at the top of the -- at the top of the

17  record do you see there's a reference to Mrs. Knight;

18  correct?

19  A.   Correct.

20  Q.   And then there's that date of February the 8th, 2009,

21  the date of a hospital admission she had at the beginning of

22  2009.  Do you see that?

23  A.   Correct.

24  Q.   If we move down in the record, there's a section that's

25  entitled "History of Present Illness."  Do you see that?

George Crossley - Direct (Jones)

1    A.    I do.

2    Q.    Okay.  And at the beginning of that section it says,

3    "This is an 80-year-old white female with a past medical

4    history significant for coronary artery disease, status post

5    bare metal stent to LAD and left circumflex artery in

6    November of 2008 and January of 2009 respectively."

7         And is that just a more complicated way of saying she

8    had two stents placed, one in November and one in January?

9    A.    Correct.

10   Q.    Okay.  It goes on in that same reference to History of

11   Present Illness about midway down, "Patient has been on

12   Coumadin in the past, however, it was held because of the

13   percutaneous coronary invention and it was not restarted."

14        Do you see that?

15   A.    I do see that.

16   Q.    And, so, is that consistent with your understanding

17   that when Mrs. Knight had her stent procedure in November of

18   2008 that they held her Coumadin treatment?

19   A.    That's correct.

20   Q.    Okay.  I want to ask you about another record that

21   talks a little bit more about that decision.  We're going to

22   go to 9009-B in your binder.

23   A.    I'm there.

24   Q.    Dr. Crossley, do you recognize 9009-B as a collection

25   of records for Mrs. Knight?

George Crossley - Direct (Jones)

1   A.   I do.

2   Q.   Okay.

3        MS. JONES:  Your Honor, we'd move for the

4   admission of 9009-B.

5        THE COURT:  Any objection?

6        MR. CHILDERS:  No objection, Your Honor.

7        THE COURT:  The record is admitted.

8   (Exhibit Number 9009-B admitted into evidence.)

9        MS. JONES:  Page 273, please.

10       THE WITNESS:  278?

11  BY MS. JONES:

12  Q.   273, please.  I apologize.

13  A.   I'm there.

14  Q.   Okay, all right.  So just up at the top of the page,

15  Doctor, do you see that this is a progress note by Dr. Skuli

16  Gunnalaugsson dated December 5th, 2008?

17  A.   I do.

18  Q.   Okay.  And do you have an understanding of who Dr.

19  Gunnalaugsson is?

20  A.   I do.

21  Q.   Who is he?

22  A.   He's the cardiologist that took care of Ms. Knight.

23  Q.   Okay.  And, so, December 5th, 2008, that would have

24  been after Mrs. Knight's first stent placement but before

25  her second one; is that correct?

1        MR. CHILDERS:  Your Honor, may we have a sidebar?

2        THE COURT:  Yes.

3        (Bench conference on the record)

4        MR. CHILDERS:  Your Honor, I want to object to

5   this as cumulative.  We went over the exact same record, the

6   exact same issues yesterday with their other expert witness

7   and I understood today they were not going to cover the same

8   ground.  This is the exact record and the exact same

9   questions that were asked about.

10       MS. JONES:  Well, I think we're certainly

11  permitted to cover with our cardiology expert the records

12  related to her cardiology treatment over time.  I will be as

13  efficient as I can be, but I don't think that there's any

14  prohibition on us to eliciting testimony from the expert on

15  the subject.

16       THE COURT:  Well, since he's a cardiologist, I'll

17  allow it.  But I would direct that you not spend a great

18  deal of time on this because then I think it would be

19  cumulative.

20       MS. JONES:  I understand.  And frankly, Your

21  Honor, part of the reason that we're doing this is because I

22  think there was an issue raised during cross-examination of

23  Dr. Shami regarding triple therapy and when Mrs. Knight was

24  on triple therapy, et cetera.  I think we're entitled to

25  address that.

George Crossley - Direct (Jones)                                    1480

1          THE COURT:  All right.

2          (Bench conference concluded)

3          THE COURT:  Okay.  Go ahead.

4          MS. JONES:  Thank you, Your Honor.

5    BY MS. JONES:

6    Q.   Again, Dr. Crossley, just to understand the chronology

7    here, there's a section entitled "History of Present

8    Illness."  Do you see that?

9    A.   I do.

10   Q.   And it says, "Ms. Knight is a 79-year-old woman with a

11   history of coronary disease.  She has dextrocardia.  I did a

12   stenting of her LAD with a bare metal stent two weeks ago.

13   She has had some bleeding and therefore a bare metal stent

14   was chosen."  Do you see that?

15   A.   I do.

16   Q.   What do you understand that statement to be referring

17   to in terms of bleeding and a bare metal stent being chosen?

18   A.   So there are two kinds of stents that are used.  There

19   are hundreds of models of stents, but there are basically

20   two kinds.  And they're either bare metal stents or

21   drug-eluting stents.

22        The bare metal stents require that you be on strong

23   blood thinners, strong platelet blood thinners for at least

24   a month and preferably longer.  The, the drug-eluting stents

25   require that you be on it for at least a year and preferably

1    for your life.

2        So I think what this has to do is Dr. Gunnalaugsson

3    trying hard to avoid any really strong blood-thinning for

4    Ms. Knight because she had so many things going on where we

5    have to use three different blood thinners all at once or

6    what we call triple therapy.

7    Q.   Okay.  And if you turn back to Page 275 of Exhibit

8    9009-B there's a section entitled "Assessment and Plan."  Do

9    you see that?

10   A.   I do.

11   Q.   Okay.  And it says, "79-year-old woman with

12   dextrocardia who has mild ischemic cardiomyopathy."  Do you

13   see that?

14   A.   Yes.

15   Q.   And then it refers to the successful stenting of Mrs.

16   Knight's LAD vessel.  That's what you described earlier?

17   A.   It is.

18   Q.   Okay.  And then it goes on to say, "The procedure was

19   scheduled for the next stenting of January 6th, 2009.  She

20   has been on Coumadin for atrial fibrillation but this was

21   stopped because of her chronic bleed.  She will remain on

22   the aspirin and Plavix."

23       Do you see that?

24   A.   I do.

25   Q.   And what do you understand that to be referring to in

George Crossley - Direct (Jones)

1  terms of her doctor's treatment of her during this time

2  period?

3  A.   So it was Dr. Gunnalaugsson's assessment that she was

4  bleeding and had significant blood loss while she had been

5  on Coumadin.  And he was concerned about the idea of using

6  triple therapy.

7       So what he chose to do is to stop the warfarin or the

8  Coumadin and just use the Plavix and aspirin.  Plavix and

9  aspirin is great therapy to keep the stent from being

10  plugged up, but it's not great therapy to keep you from

11  having a stroke from atrial fibrillation.  It was sort of a

12  rock-and-a-hard-place kind of decision.

13  Q.   Okay.  Then do you have an understanding that after

14  Mrs. Knight was taken off of her Coumadin that she actually

15  had a blood clot during that period?

16  A.   I do.

17  Q.   Okay.  And from your perspective as a doctor who treats

18  patients with atrial fibrillation and treats patients with

19  anticoagulation, what's the significance of that in terms of

20  what was going on with her?

21  A.   I think Ms. Knight is just incredibly lucky that that

22  blood clot landed in her arm in a place where it could be

23  taken care of rather than landing in her brain and causing a

24  stroke or landing in her heart and causing a big heart

25  attack.

George Crossley - Direct (Jones)                    1483

1    A clot like that is the same no matter where it lands.

2    It, it still comes out of the lining of the heart caused by

3    the atrial fibrillation, and it goes wherever it lands.

4    Unfortunately, many times that's the brain.  In her

5    fortunately this time it was the arm and she was able to

6    recover from it.

7    Q.   Doctor, I'm going to ask you to refer in your binder

8    again to -- do you have a 2000-D tab in your binder?

9    A.   I do.

10   Q.   And do you have an understanding based on your review

11   of the medical records that after Mrs. Knight had the blood

12   clot that went to her arm that her doctors decided that she

13   needed to be put back on Coumadin?

14   A.   That's my understanding.

15   Q.   Okay.  And, so, would that have been placing her on

16   triple therapy, what the jury has heard described as triple

17   therapy?

18   A.   That's right.  Triple therapy means you're on a

19   chemical blood thinner like warfarin and the NOACs plus

20   Plavix plus aspirin.

21   Q.   I want to ask you about a record related to her care by

22   Dr. Gunnalaugsson during this period when she had been put

23   on triple therapy with Plavix and aspirin and warfarin.  I'm

24   going to ask you to turn to 9005-B in your binder and go to

25   Page 26.

George Crossley - Direct (Jones)

1    A.    I am there.

2    Q.    And if we look at the History of Present -- actually,

3    first, just to orient ourselves, this is in March of 2009;

4    is that correct?

5    A.    That's correct.

6    Q.    You see up on the left-hand side, March the 12th of

7    2009.  And do you also see that this is a record from Dr.

8    Gunnalaugsson of his treatment of Mrs. Knight during this

9    period?

10   A.    Correct.

11   Q.    Okay.  And then in the History of Present Illness it

12   describes Mrs. Knight and says she has not been on Coumadin

13   because of GI bleed.  Do you see that?

14   A.    Correct.

15   Q.    And is that consistent with your review of the medical

16   records that her doctors had an understanding or a sense

17   that she had had a GI bleed at some point?

18   A.    That's correct.

19   Q.    Okay.  It goes on to say, "She had an embolus down her

20   right arm.  She was since put on Coumadin."  Do you see

21   that?

22   A.    I do.

23   Q.    Okay.  And if you look at the section entitled

24   "Medications" down at the bottom of the page --

25   A.    I see that.

George Crossley - Direct (Jones)

1   Q.   There's a little box in the middle of my screen.   Do

2   you see there's a reference to Plavix at the top?  Do you

3   see that?

4   A.   I do.

5   Q.   And there's a reference to aspirin.  Do you see that?

6   A.   I do.

7   Q.   And then if we go to the next page of that record, Page

8   27, there's also a reference to Coumadin.  Do you see that?

9   A.   I do.

10  Q.   And so at this point in time, Mrs. Knight was on triple

11  therapy?

12  A.   That's correct.

13  Q.   Okay.  Let's go to the Assessment and Plan section

14  which is towards the bottom of that same record.  It refers

15  to a 79-year-old woman with coronary artery disease

16  status-post multi-vessel intervention with bare metal

17  stents.  Do you see that?

18  A.   I do.

19  Q.   And it says, "The patient has a serious problem with

20  anemia requiring blood transfusions.  Unfortunately, I don't

21  think she can take Coumadin, aspirin and Plavix."

22       Do you see that?

23  A.   I do.

24  Q.   And do you have an understanding of what Dr.

25  Gunnalaugsson was, was referring to there?

George Crossley - Direct (Jones)

1    A.    I do.

2    Q.    And what's that?

3    A.    That, that there was -- she was -- she had obviously

4    had blood loss somewhere.  She had certainly had anemia.

5    And her course later shows us it was not renal failure or

6    other things.

7          And, and so his assessment was that that was from

8    bleeding somewhere.  And he was very concerned about the

9    concept of having her on triple therapy.

10   Q.    Okay.  And he goes on to say, "I think she can stop the

11   Plavix now.  I explained to them that there might be a

12   slight increase of stent thrombosis but I think the risk of

13   her having a bleed outweighs that risk."

14         Do you see that?

15   A.    I do.

16   Q.    And it says, "She will obviously remain on the Coumadin

17   and continue the aspirin."

18         Do you see that?

19   A.    I do.

20   Q.    And what is Dr. Gunnalaugsson explaining there based on

21   your review of Mrs. Knight's medical record?

22   A.    So what he's doing here is trying to navigate the

23   waters of this rock and a hard place I mentioned earlier

24   which is you've got a lady who's at tremendous risk for

25   bleeding, tremendous risk of stroke, and has brand new

1    stents in her heart, and trying to look at that and trying

2    to figure out what the least risky thing he can do is with

3    the most benefit.

4          And in her, she's shown us that she has such a

5    disastrous risk of stroke, he chose to push for stroke

6    prevention more than stent clogged up kind of prevention.

7          The stents don't clog up from a typical blood clot.

8    They clog up from platelets sticking to them, what we call a

9    platelet plug.  And, and so that's why with bare metal

10   stents they get pretty much covered up with tissue by the

11   end of the month.

12         And so he was sort of trying to navigate those waters

13   and do what the best thing was for this lady with a lot of

14   medical problems.

15   Q.   Now, let me ask you this question, Dr. Crossley.

16   During the time that Mrs. Knight was on triple therapy with

17   warfarin, as far as you know, did she have a bleed?

18   A.   His record indicates that, that she had a history of a

19   bleed.  I can't tell whether it happened while she was on

20   triple therapy or before that.  I certainly -- by his record

21   it occurred while she was on warfarin.

22         So I, I don't know -- I don't -- there's not a record

23   in here of a big GI bleed while she was on triple therapy

24   with warfarin.

25   Q.   Okay.  And that leads me to my next question that I

1  wanted to ask you.  Does the fact that Mrs. Knight didn't

2  have a bleed while she was on triple therapy with warfarin

3  back in 2009 mean that she couldn't have had a bleed if she

4  was on triple therapy with warfarin in 2013?

5  A.   No, it certainly doesn't.  It doesn't mean she wouldn't

6  have had a bleed the next day after he stopped it.  He was

7  referring to the risk of having her on triple therapy there

8  as being a pretty risky kind of venture, but something we

9  have to do sometimes.

10  Q.   We can take that down.  Thank you, Mr. Reynolds.

11       Doctor, you described how coronary artery disease can

12  lead to a heart attack.  Even if a patient doesn't have a

13  heart attack, can the patient nevertheless have symptoms

14  related to progressing coronary artery disease, that

15  blockage of the vessels?

16  A.   Certainly you can because that progressive blockage

17  diminishes blood flow to your heart.  You can have little

18  microscopic heart attacks that you don't know about.  And

19  then you can just have that narrowing causing an ailing

20  muscle like a -- it's like you've got a cramp in your heart.

21  Q.   In your review of the records for Mrs. Knight did you

22  see any indication that she had those types of symptoms

23  consistent with progressing coronary artery disease?

24  A.   Those are, those are throughout the record.  She's

25  continuously having complaints of feeling fatigued,

 1    shortness of breath, having this right-sided pain that went

 2    up to her neck and her right arm which might sound like it's

 3    not from your heart but, remember, her heart's in the other

 4    way.

 5         And so instead of having pain here that goes to your

 6    left arm, she had pain here that went to her right arm.

 7    And, so, those are very classic symptoms.  I mean, the fact

 8    is women can have lots of goofy symptoms from coronary

 9    disease.  But what she had is pretty classic symptoms.

10    Q.   And what we've just discussed in terms of her coronary

11    artery disease treatment, the stenting, the angiogram, was

12    that all before she ever started Pradaxa?

13    A.   Yes.

14    Q.   Now, the jury has heard that Mrs. Knight also had

15    atrial fibrillation.  And they have heard about what atrial

16    fibrillation is.  So I don't want to recover all that in

17    great detail.

18         But just from your perspective as a cardiologist, can

19    you explain to the jury what is atrial fibrillation?  How

20    does it work medically?

21    A.   So atrial fibrillation is an irregular heart rhythm

22    that comes from the heart's upper chambers.  And it makes

23    the heart try to beat electrically so fast and it just can't

24    contract.  It just sort of quivers like a bag of worms is

25    the, is the classic description that's relatively impolite,

1   but that's the classic description.

2       And there are two little pouches that come out the

3   front of the, of the atrium, one on the right side and one

4   on the left side.  And they're very rough on the inside.

5   And in those pouches are where we typically have clots form

6   that then break loose and go to the brain and can cause

7   heart attacks.

8       Atrial fib can cause -- excuse me -- go to the brain

9   and cause strokes.  It can go to the heart and cause heart

10  attacks.  It can go to the liver and cause problems there.

11  It can go to the kidney and cause problems there.

12      The -- in addition to causing strokes, atrial

13  fibrillation creates more atrial fibrillation because AFib

14  creates more AFib.  It certainly sets you up for heart

15  failure.

16      I think Ms. Knight had a lot of heart failure because

17  of her blockage in her heart, but she also probably had a

18  good bit of heart failure because of her atrial fibrillation

19  too.

20  Q.   And do you have a sense to what extent having AFib

21  increases a person's stroke risk?

22  A.   It's tremendous.  So we, we have -- I mean, when we

23  assess the stroke risk in a patient, we use a scoring system

24  that, that applies only to patients with AFib.  It doesn't

25  apply to patients that don't have AFib.  But it's called a

1   CHADS2-VASc score.

2   Q.   Okay.  And did we actually put something together just

3   to talk the jury through that?

4   A.   Yes.

5   Q.   Okay.  Could you call that up, Mr. Reynolds.

6        Okay.  You mentioned the CHADS2-VASc score.  What is

7   the CHADS2-VASc score?

8   A.   So it's, it is, as I said, a scoring system that helps

9   us when we look at a patient with AFib judge what their risk

10  of stroke is.  And it's pictured on the screen here.

11       And the C stands for congestive heart failure.  The H

12  stands for hypertension, age, diabetes, stroke, vascular

13  disease.  Age less than, than -- between 65 and 74 gets you

14  one point.  Age over 75 gets you two points.  And having

15  female gender gets you a point.

16  Q.   Okay.  And there's one thing I just wanted to clarify.

17  That reference to vascular disease, what does that mean?

18  A.   That means you've got atherosclerosis, or that

19  narrowing in your blood vessels somewhere in your body.  And

20  it certainly includes what she had with her coronary artery

21  disease.

22  Q.   Okay.  Well, that was going to be my next question.  To

23  what extent did Mrs. Knight have any of these stroke risk

24  factors?

25  A.   She had all of these which is an incredibly unusual

1   situation to have the highest risk score you can have on

2   this scale.

3   Q.   And what does that mean in terms of her risk of stroke?

4   A.   What that -- if we add all these up, it gives her a

5   score that translates into an annual risk of stroke of I

6   think it's 14.8 or 9 percent.  It's something just shy of

7   15 percent.

8        That means, you know, in three years you've got a

9   45 percent chance of having a stroke.  In six years you've

10  got a crazy high risk of stroke.

11       And it means -- you know, when we look at patients, we

12  strongly recommend blood thinners on anybody that has a risk

13  of two -- has a score of two.  Her risk was -- her score was

14  nine.

15  Q.   Have you had patients with atrial fibrillation who had

16  a stroke?

17  A.   Yes, I certainly have.

18  Q.   And can you just give the jury a sense of the range of

19  outcomes that, that a doctor can see with a patient who has

20  a stroke from atrial fibrillation?

21  A.   You, you can have any range of outcomes from relatively

22  minor strokes to major strokes.  But the sad thing is that

23  strokes -- strokes come principally from two different

24  things, either blockage in your neck vessels or atrial

25  fibrillation and clots that form in your heart that break

George Crossley - Direct (Jones)

1   loose.

2        And the ones that come from your heart tend to be

3   bigger strokes.  They tend to occlude half the blood flow to

4   the brain and leave you unable to move or sense one side of

5   your body or unable to speak, depending on which side of the

6   brain it affects.  They, they certainly can be bigger

7   strokes, disastrous.

8        I mean, the health outcome from a stroke in AFib is

9   just disastrous.  And that's the reason we spend so much

10  time and effort trying to prevent strokes.

11  Q.   And you mentioned disability and you mentioned they

12  both can have minor strokes.  Can strokes be fatal?

13  A.   Strokes can certainly be fatal in the short term and

14  they can be fatal in the long term too.

15  Q.   And what do you mean by that, they can be fatal in the

16  long term?

17  A.   Well, it leaves you with great debility.  And, I mean,

18  anything that puts you in bed and makes you inactive is

19  going to lead to a downhill course for you.  And, and

20  long-term that's how it does it long-term.  But even

21  short-term the risk of stroke can be very high.

22  Q.   Have you had patients express to you how seriously they

23  view the possible consequences of having a stroke?

24  A.   So when I sit down with a patient with AFib and

25  approach the, the concept of anticoagulation, I use what we

George Crossley - Direct (Jones)                    1494

1   now call shared decision-making which is a -- it wasn't

2   talked about when Ms. Knight was, was having this.  But, but

3   we -- I think all good doctors have long done that.

4        And that is you sit down with a patient and you say,

5   "Here are the bad things that can happen.  Here's the

6   therapy we can give you.  And here's the bad stuff that can

7   happen from the therapy and the good stuff that can happen

8   from the therapy and let's decide together what it is."

9        Frankly, in addition to the CHADS2-VASc score, we also

10  use another scoring system that gives you your risk of

11  bleeding.  And in Ms. Knight's case, her risk of bleeding

12  was about -- her risk of a major bleed from being on blood

13  thinners was close to 10 percent per year.  And, so, what we

14  typically do is sit down and have that discussion.

15       One of the things that's difficult for patients and

16  their families in thinking about this is weighing the stroke

17  risk versus the bleeding risk.  There's lots of things in

18  the medical literature that compare stroke risk versus

19  bleeding risk on a graph and try to draw equivalence between

20  the two.  And they're certainly not equivalent.

21       Having a big bleed is a bad thing and sometimes makes

22  you sick and sometimes takes a while to get over it.  But

23  having a big stroke you can rarely recover from.

24       And, so, those are not two things that are equivalent.

25  Bleeding is bad, but stroke is much, much worse.  And so

George Crossley - Direct (Jones)

1    guiding patients through that risk-benefit analysis is just

2    part of being a good doctor.  And it certainly sounds like

3    Dr. Gunnalaugsson and Dr. MacFarland did that by the record.

4    Their record reflects that they did.

5    Q.   One of the items that's listed in the CHADS2-VASc

6    system that you described is stroke.  That's the reference

7    to a prior stroke?

8    A.   It is.

9    Q.   Okay.  And did you see in the medical records evidence

10   that Mrs. Knight had had a stroke before?

11   A.   I did.

12   Q.   Okay.  And what would that mean in terms of increasing

13   her risk of having another stroke?

14   A.   So the stroke gives you two points.  And that's

15   probably -- if, if there's criticism of this scale, it's

16   that stroke isn't valued high enough and that gender is

17   valued too high.

18       If we were going to redo the scale today, stroke would

19   probably have three points and gender would probably have

20   half a point.  But that's, you know, that's a committee

21   decision and will probably happen in the next year or two.

22   Q.   Okay.  And just to follow up on that, this, this system

23   of scoring stroke risk, was that developed as a consequence

24   of scientific and medical discussions?

25   A.   It certainly was.  There was a prior system called the

1    CHADS score which was simpler.  And it was -- the

2    CHADS2-VASc score was developed in Europe and then rapidly

3    became used all over the world because it was better than

4    the CHADS score.

5    Q.   We can take that down.  Thank you, Mr. Reynolds.

6         Before Pradaxa was approved in, in atrial fibrillation

7    patients in the United States, what would the option have

8    been for Mrs. Knight's doctors if they wanted to give her an

9    oral anticoagulant therapy?

10   A.   Warfarin.

11   Q.   Okay.  And it sounds like you have experience treating

12   patients with warfarin; is that right?

13   A.   Oh, yes.

14   Q.   Okay.  And you have patients on warfarin today I take

15   it.

16   A.   I have lots of patients on warfarin.  In fact, our, our

17   Coumadin clinic at Vanderbilt has 41 nurses that man it.

18   Q.   Okay.  And why is it necessary to have 40 or so folks

19   who are devoted to a clinic for managing patients on

20   warfarin?

21   A.   Because it's very tedious.  It is -- there are many,

22   many things that affect your blood clotting level with, with

23   warfarin.  What you had for breakfast can affect it.

24   Antibiotics and other drugs affect it disastrously as we can

25   see in, in her record.

1    I remember one spot in the record, in Dr. MacFarland's

2    records where she went from an INR that wasn't thin to an

3    INR that was way too thin in just a couple of days after she

4    had been given an antibiotic called Levaquin for a

5    respiratory infection.  And that's very typical.  There's

6    nothing unusual about that in Ms. Knight.

7    When we, when we look at the results of big clinical

8    trials where we've got patients in a research trial, and

9    they're hovered over to a great degree to make sure that

10    they take their drugs and make sure that they understand

11    what to do with their diet and everything, they are still in

12    the therapeutic range only about 60 percent of the time

13    most, at the most.  Some of the trials are as low as

14    50 percent, but 60, 55, 60 percent of the time is typical.

15    So when you're, when you're on warfarin and your blood

16    is too thin, then you've got significantly increased risk of

17    bleeding.  And when you're on warfarin and your INR is less

18    than 2, that measure of how thin your blood is is less than

19    2, then your risk of stroke goes dramatically up.

20    Q.    Now, as a result of what you've just described in terms

21    of what's necessary to manage patients on warfarin, are

22    patients on warfarin required to have their blood monitored?

23    A.    Yes.  We, we typically monitor it weekly or more as

24    we're initiating the warfarin.  And then if, if it gets into

25    control and stays there at least monthly for the rest of

George Crossley - Direct (Jones)

1  their lives.

2  Q.    And basically --

3  A.    Probably only about a third of our warfarin patients in

4  our Coumadin clinic are on monthly follow-up though.

5  Q.    In your experience as a clinician, is it a common or a

6  typical thing that a medicine would require that type of

7  monitoring, blood monitoring?

8  A.    No, it's not.  There are very few -- there are very few

9  drugs where we, where we monitor drug levels.  I mean, there

10 are a few antibiotics that we do and there are a handful of

11 other drugs, some cancer drugs where we do.  But that is not

12 a common thing.

13      And it has to do with what we call therapeutic index of

14 the drug.  And that is if a drug has a broad therapeutic

15 index, if we give a little or a lot, the effect is

16 relatively constant over, over that area.

17      And if the drug has a narrow therapeutic index, if we

18 give a little, there's no effect.  If we give a lot, there's

19 way too much effect.  And the classic drug for that that's

20 always talked about in pharmacology is warfarin for that

21 purpose.

22 Q.    And, Dr. Crossley, I'm going to ask you to turn to

23 9009-S in your binder.

24 A.    I'm there.

25 Q.    And I'm going to actually ask you to just flip back to

1  Page 173, that first actual record with the handwriting on

2  it.

3  A.    Yes.

4  Q.    Okay.  And if, if you just flip through those records,

5  do you recognize that as a compilation of Mrs. Knight's INR

6  measurements --

7  A.    I do.

8  Q.    -- over time?  And the jury has heard about much of

9  this already so we're not going to go back through all of

10  that.  But can you just generally give the jury a sense

11  based on your experience as a cardiologist of how Mrs.

12  Knight did in terms of INR control over time?

13  A.    She, she did -- her response to her INR was not

14  atypical, but it was very poorly controlled.  I mean, if you

15  look through here, you see times where it's up around 4

16  where your risk of bleeding is dramatically high.

17       And where your -- and on the next page, for example, on

18  8-9 it was 4.3.  And on 8-16 it was 1.8.  And 1.8 probably

19  doubles your stroke risk.  As it comes down below 2, there's

20  a dramatic increase in stroke.  And we see it -- that's sort

21  of the pattern as you go through here.

22  Q.    And, Doctor, I was going to ask you, have you ever had

23  experience with patients who declined to take warfarin

24  because they found the blood monitoring to be challenging or

25  burdensome for some reason or another?

1    A.    Yes.  And I had patients before we had NOACs that

2    declined anticoagulation because of that.  We have lots of

3    patients now that strongly prefer to be on NOACs so that

4    they can avoid taking, you know, having their blood checked

5    every week or two or whatever it takes.

6    Q.    And when you say NOACs, you mean the newer agents like

7    Pradaxa and Xarelto and Eliquis?

8    A.    That's correct.

9    Q.    Okay.  Have you ever had a patient who started on

10   warfarin and then later said, "I don't think I can continue

11   to use this medicine because the monitoring is too

12   challenging"?

13   A.    Yes.

14   Q.    Did you actually see an instance in Mrs. Knight's

15   record where she communicated that to her doctor?

16   A.    I don't remember that.

17   Q.    Okay.  We'll find that record for you.

18             THE COURT:  We need to take a break at some point.

19             MS. JONES:  Yes, of course.  This is the perfect

20   time actually.

21             THE COURT:  All right.

22        Ladies and gentlemen, we're going to take a ten-minute

23   recess.  You can retire to the jury room.

24        Doctor, you can step down.  Don't discuss your

25   testimony.

George Crossley - Direct (Jones)

1    THE WITNESS:  Thank you.

2    (Recess taken at 10:34 a.m.)

George Crossley - Direct (Jones)          1502

1    (Back on the record at 10:44 a.m.)

2         THE COURT:  All right.  Are we ready?

3         Let's bring the jury out.

4         THE COURT SECURITY OFFICER:  Yes, Your Honor.

5    (Jury present.)

6         THE COURT:  All right.  Be seated.

7         You may resume your examination.

8         MS. JONES:  Thank you, Your Honor.

9         Your Honor, may I approach just to hand the witness a

10   document?

11        THE COURT:  Yes.

12   (Off the record.)

13        MS. JONES:  Folks, can you hear me okay?

14        Okay.  Dr. Crossley, just to wrap up what we were just

15   talking about, I've handed you what we've marked as Exhibit

16   9003.

17   Q.  Do you recognize that as medical records for Mrs. Knight

18   from 2008?

19   A.  I do.

20   Q.  Okay.  And I'm going to ask you to turn to page -- I think

21   you have page 10 in front of you; is that correct?

22   A.  I do.

23   Q.  Okay.

24        MS. JONES:  Your Honor, we move for the admission of

25   9003.

George Crossley - Direct (Jones)                    1503

1        THE COURT:  Any objection?

2        MR. CHILDERS:  No objection, Your Honor.

3        THE COURT:  It's admitted.

4    (DEFENDANT'S EXHIBIT 9003 ADMITTED INTO EVIDENCE.)

5    BY MS. JONES:

6    Q.  And just to situate ourselves, up at the top of the page,

7    you see this is a record from August of 2008 by Dr.

8    MacFarland, Mrs. Knight's primary care doctor?

9    A.  I do.

10   Q.  Okay.  And I actually just want to ask you about a

11   reference on page 12 of Exhibit 9003.

12   A.  Okay.

13   Q.  There is a section entitled Diet, and I'm actually going

14   to ask you to look at the second paragraph in that section.

15       It says:  She is currently off coumadin.  We will try the

16   Plavix and aspirin.  It was explained to her that coumadin is

17   the gold standard, but she does not want to come to the office

18   to get blood work checked as frequently as you need to with

19   coumadin and has declined to be on coumadin.

20       Do you see that?

21   A.  I do see that.

22   Q.  And is that consistent with your own clinical experience

23   that sometimes patients decline to be on warfarin or coumadin

24   because they find the monitoring of the medicine to be

25   challenging for some reason or another?

George Crossley - Direct (Jones)          1504

1    A.  That's correct.

2    Q.  Okay.  Dr. Crossley, do you have an understanding that in

3    2011, Mrs. Knight's anticoagulation therapy was switched from

4    warfarin to Pradaxa?

5    A.  I do.

6    Q.  Okay.  And the jury has heard a good bit about that, so I

7    actually just want to ask you a couple of questions.

8        In your opinion, based on what you reviewed in Mrs.

9    Knight's medical records, do you believe that was an

10   appropriate decision on the part of her doctors, a reasonable

11   decision?

12   A.  I certainly do.

13   Q.  Okay.

14   A.  Yes.

15   Q.  Tell the jury why you think that.

16   A.  I would have strongly encouraged Mrs. Knight to change to

17   one of the NOACs.  And the reason is because you could see in

18   the record her marked variability in her warfarin level.  And

19   coupled with the fact that in the clinical trials of all of

20   the NOACs, the drugs including Pradaxa did better in terms of

21   stroke prevention than warfarin did and had minor differences

22   in term of what the bleeding risk was.

23       So while -- while in Pradaxa I'll give you that there were

24   slightly more GI bleeds, there were less head bleeds and less

25   terrible bleeds than there were, and I certainly would have

George Crossley - Direct (Jones)                    1505

1    switched her.  I would have strongly encouraged her to find a

2    way to be on one of these drugs.

3    Q.  Okay.  Let me ask you another question on the same topic.

4        Would it have been unreasonable or below the standard of

5    care for Mrs. Knight's doctors if she had stayed on warfarin

6    and not moved her to Pradaxa?

7    A.  So I don't think it would have been a deviation from the

8    standard of care for sure.  It certainly would have been

9    within the standard of care.  I just think moving her to a

10   NOAC made her at much less risk for having a stroke, and

11   that's the reason to have done that.

12   Q.  Doctor, do you have an understanding that Pradaxa is a

13   medicine that is excreted by the kidneys?

14   A.  Certainly.

15   Q.  Okay.  And when Dr. MacFarland's office prescribed Pradaxa

16   to her, do you have an understanding that they actually

17   assessed her kidney function to determine which dose would be

18   appropriate for her under the label?

19   A.  I do understand that.

20   Q.  Okay.  And based on your review of the records, was she

21   properly dosed based on her renal function?

22   A.  She was given the dose that I would have chosen for her.

23   Q.  And what dose was that?

24   A.  75 milligrams twice per day.

25   Q.  And what is the reason that you would have given her that

George Crossley - Direct (Jones)                    1506

1    dose?

2    A.   So because her renal function was right at the edge of

3    the -- in the severe renal function range.  Those words don't

4    mean much.  But if the creatinine -- the recommendation is if

5    the creatinine clearance is between 15 and 30, which is a

6    measure of how your kidneys are working from a chemical

7    sense -- not how much urine you create, but how much they're

8    working from a chemical sense -- that the Food and Drug

9    Administration approved this 75-milligram dose for that

10   population.

11   Q.   And, Doctor, do you have an understanding based on your

12   review of the medical records that while Mrs. Knight was on

13   Pradaxa, that she had her kidney function monitored by her

14   doctors?

15   A.   This is certainly what appears to me.

16   Q.   Okay.

17   A.   There are a number of measurements of kidney function over

18   time.

19        MS. JONES:  Could I have just one moment, Your Honor?

20        THE COURT:  I'm sorry?

21        MS. JONES:  Could I just have one moment?

22        THE COURT:  Yes.

23   (Defense counsel conferring.)

24        MS. JONES:  Dr. Crossley, the jury has seen the

25   labeling for Pradaxa now over the course of the last two and a

George Crossley - Direct (Jones)                    1507

1   half weeks or so.  I'm not going to walk through all of that

2   with you.

3   Q.  But I did want to ask you, as a clinician, have you had

4   the opportunity to review the labeling for the medicine

5   Pradaxa?

6   A.  I have.

7   Q.  Okay.  And is that routine for you, that you review the

8   labels for medicines that you prescribe?

9   A.  It is.

10  Q.  And tell us why that is.

11  A.  Well, I think that is our sort of official documentation

12  that is codified by the U.S. Food and Drug Administration that

13  guides physicians on how to use drugs.

14      I must say that before my time chairing the pharmacy and

15  therapeutics committee, I was probably not rigorous enough

16  about reading that.  But I certainly have been since that

17  time, which is back in the mid 2000s.

18  Q.  And in your experience, is it common or routine that

19  labels for medicines might change, that the contents of a

20  label might change or be updated?

21  A.  Sure.

22  Q.  Is that an unusual thing in your experience?

23  A.  Not at all.

24  Q.  And how, as a doctor, do you keep up with those types of

25  changes?

George Crossley - Direct (Jones)                    1508

1    A.  Well, we -- you know, the way that we typically find out

2    about them is in our conferences in Vanderbilt.  I mean, we --

3    in most of the world, you probably get handed a new label by

4    the drug rep.  And we -- actually at Vanderbilt, we don't have

5    drug reps in our clinic or in our area, and so we typically go

6    over this in our -- in our cardiology conferences.

7    Q.  And is it your --

8    A.  And -- let me say and reading in journals, because the

9    journals are -- the things that create label changes are

10   typically in journals, you know, a year ahead of time.

11   Q.  Is it also the case that the label for Pradaxa and for

12   other medicines includes a section entitled Recent Major

13   Changes?  Are you familiar with that?

14   A.  That's correct.

15       When you open a label and look at a label in the PDR or in

16   an individual label, there is a section right at the top that

17   says Recent Major Changes that draws you right to anything

18   that is new.  And then as you go through the label, you can

19   see these bars drawn on the side to draw your attention to the

20   changes.

21       MS. JONES:  And just to give the jury a chance to see

22   what we're talking about, could we pull up Exhibit 5884,

23   please, Mr. Reynolds?

24   Q.  Dr. Crossley, do you recognize Exhibit 5884?

25   A.  I do.

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

George Crossley - Direct (Jones)          1509

1    Q.  Okay.  And just so we're clear about what we're looking

2    at, this is the first page of the Pradaxa label for January of

3    2012; is that right?

4    A.  That is, yes.

5    Q.  And do you see on the left-hand side, right under the

6    heading or highlights, there's a section entitled Recent Major

7    Changes?

8    A.  I do.

9    Q.  And what is your understanding of what that section

10   includes?

11   A.  It includes a description under dosing administrations and

12   warnings and precautions that are new.

13   Q.  And so what is -- what is that that appears in those

14   parentheses that we see in that same section?

15   A.  Those are the sections to draw your attention to in the

16   label.

17   Q.  Okay.  So --

18   A.  All of the sections are numbered.

19   Q.  So, for example, if we look at this recent major change

20   reference for dosage and administration, if we turn to page 2

21   of 5884, do you see that section entitled 2.2, Dosing

22   Adjustments?

23   A.  I do.

24   Q.  And do you see that line on the left-hand side?

25   A.  I do.

George Crossley - Direct (Jones)          1510

1   Q.  What do you understand that to be?

2   A.  That's the line I referred to that indicates that there is

3   change in that paragraph or those paragraphs.

4   Q.  And so that corresponds with that information on the very

5   first page of the label about changes in the label?

6   A.  It does.

7   Q.  Dr. Crossley, just to round out one issue, I'm going to

8   ask you to turn to Exhibit 2000C, please, in your binder.

9   A.  2000 what?

10  Q.  C like cat.

11  A.  I am there.

12  Q.  Okay.  And do you recognize this as a collection of lab

13  readings for Mrs. Knight including some of her kidney function

14  readings over time?

15  A.  I do.

16      MS. JONES:  Your Honor, we would move for the

17  admission of Exhibit 2000C.

18      THE COURT:  Any objection?

19      MR. CHILDERS:  No objection, Your Honor.

20      THE COURT:  It's admitted.

21  (DEFENDANT'S EXHIBIT 2000C ADMITTED INTO EVIDENCE.)

22      MS. JONES:  And just to give an example of what we're

23  looking at here, if we go to page 2043 of Exhibit 2000C --

24  sorry -- 2403, I apologize.

25      THE WITNESS:  Yes.

George Crossley - Direct (Jones)                1511

1    MS. JONES:  You see that there are various -- 2000C,

2  Mr. Reynolds.  2000 with a C at the end, 2403.  That's 2043.

3  2403, please.

4         And so just to look at this very quickly, you see that

5  there is a series of measurements taken for Mrs. Knight

6  including, for example, her creatinine levels.

7  Q.  Do you see that?

8  A.  I do.

9  Q.  And that's a measure that they sometimes will evaluate to

10  evaluate someone's kidney function?

11  A.  That's correct.

12  Q.  Okay.  And throughout the balance of this record, there

13  are various readings of laboratory values taken by Mrs.

14  Knight's doctors, correct?

15  A.  That's correct.

16  Q.  And if you turn, for example, to 2431 in that same

17  exhibit, you see down at the bottom of the page there is a

18  reference to the GFR estimate?

19  A.  I do.

20  Q.  And then there are references there to the numerical

21  values assigned if you're African American or non-African

22  American.

23     Do you see that?

24  A.  I do.

25  Q.  And do you understand that to be an example of Mrs.

George Crossley - Direct (Jones)                1512

1    Knight's doctors evaluating her kidney function at this point

2    in time in February of 2012?

3    A.   I do.

4    Q.   Okay.

5        MS. JONES:  We can take that down.  Thank you,

6    Mr. Reynolds.

7    Q.   Dr. Crossley, based on your -- and, again, I don't want to

8    march us through the label again.  But based on your

9    opportunity to review the contents of the Pradaxa label,

10   including the Medication Guide, do you have an opinion as a

11   clinician about whether or not the contents of that label are

12   adequate and reasonable?

13   A.   Certainly appears to be to me.

14   Q.   Okay.  And that's based on 30 or so years of reading drug

15   labels and treating patients?

16   A.   That's correct.

17   Q.   Okay.  Let me ask you this.

18       When you're treating a patient for any medication, do you

19   typically talk to them about the Medication Guide at all?

20   A.   I tell them that they're going to get the Medication

21   Guide.  They actually get it twice from us.  They get it once

22   from our computer system, which is not exactly the Medication

23   Guide.  It's a contracted service that gives you something

24   that is sort of a digest of the Medication Guide.  And then

25   when they pick it up at the pharmacy, they get the Medication

George Crossley - Direct (Jones)                1513

1   Guide.

2   Q.  Okay.  I want to ask you about one topic --

3   A.  But I do not -- I would never rely on that being the only

4   communication with a patient about a drug.

5   Q.  Okay.  And tell me what you mean by that.

6   A.  I mean, as I said before, I'll sit down and have a serious

7   shared decision-making discussion about any drug that has

8   significant risk.

9   Q.  Including oral anticoagulants?

10  A.  Absolutely.

11  Q.  And that would include warfarin or Pradaxa or Xarelto or

12  Eliquis?

13  A.  Yes.

14  Q.  Okay.  I wanted to ask you about one specific topic

15  related to the label, and again that is 5884 in your binder.

16      And on the first page -- can we call that up, please,

17  Mr. Reynolds -- there's a section entitled Drug Interactions.

18      Do you see that?

19  A.  I do.

20  Q.  And the third bullet in that section refers to P-gp

21  inhibitors in patients with severe renal impairment.

22      Do you see that?

23  A.  I do.

24  Q.  Do you understand that Mrs. Knight was a patient who fell

25  into the category of persons having severe renal impairment?

George Crossley - Direct (Jones)                1514

1    A.  I do.

2    Q.  Okay.  And it says Pradaxa use not recommended in that

3    section of Drug Interactions.

4        Just to take a step back very briefly, what is a P-gp

5    inhibitor?

6    A.  P-gp is a -- is called -- the name is permeability

7    glycoprotein.  And it's a -- it's a molecule that helps get

8    the drug across the membranes in your gut and into your

9    kidney.  It is -- when it's inhibited, then the drug -- a P-gp

10   inhibitor -- an inhibitor of that protein will make the drug

11   levels increase.  A facilitator of that molecule will make the

12   drug levels decrease.

13       And so that -- so Pradaxa is an example of a drug that is

14   affected by P-gp inhibitors.

15   Q.  And, in fact, the label specifically says that for

16   patients who have severe renal impairment, Pradaxa use is not

17   necessarily recommended; is that correct?

18   A.  Correct.

19   Q.  Okay.

20   A.  Yeah.

21   Q.  Now, based on your review of the records, was Mrs. Knight

22   on a P-gp inhibitor called Coreg?

23   A.  She was.

24   Q.  Okay.  And what is Coreg prescribed for?

25   A.  So Coreg is a beta blocker, and it's prescribed in Mrs.

George Crossley - Direct (Jones)          1515

1   Knight to help for three reasons really.  One is to help

2   control the heart rate and atrial fibrillation.  One is to

3   help control the ischemia or the effect of poor blood flow to

4   her heart on her heart.  And then it's also -- it also can be

5   helpful generally just in higher doses for high blood

6   pressure.

7   Q.  How many P-gp inhibitors are there?  Do you have a sense?

8   A.  So when you read about P-gp inhibitors, it's a big mess.

9   I mean, there's a whole lot.

10     I mean, if you just search for a list of P-gp inhibitors,

11  it includes things like citrus fruit and lots of dietary

12  supplements and foods and stuff, and it includes a good number

13  of drugs.  And some drugs are considered to be major P-gp

14  inhibitors, and some drugs are considered to be less

15  significant P-gp inhibitors.

16  Q.  Let me ask you this.

17     In your experience as a clinician and someone who is

18  active in the research community for cardiovascular medicines,

19  have you ever seen any data to suggest that Coreg increases

20  exposure levels in Pradaxa patients?

21  A.  I haven't seen direct data about that, just the data that

22  says it's a P-gp inhibitor.

23  Q.  Okay.  And do you have an understanding of what dose of

24  Coreg Mrs. Knight was on?

25  A.  So most of the record reflects that Mrs. Knight took 3.125

George Crossley - Direct (Jones)          1516

1    milligrams of Coreg twice per day.  Some places in the record

2    suggest that she was on 3.125 milligrams once a day.

3        Coreg is a drug that we try to dose -- it's a funny drug,

4    and you can't start at the target dose.  For most of the other

5    beta blockers, you start at whatever dose you think they're

6    going -- they're going to need.  For Coreg, we have to start

7    at this new low test dose, and that is what the 3.125

8    milligrams is.  It's -- 3.125 is not really intended to ever

9    be a long-term dose for an adult of Coreg.  That's a tiny

10   little dose.

11       And so typically what we would do is start at 3.125

12   milligrams and take that for about a week; double that to

13   6.25; double that to 12; and then double that to 25.  And then

14   if we're treating high blood pressure, double it again to 50

15   milligrams a day.

16       So the target dose for Coreg is 25 milligrams per day if

17   you are treating AFib or ischemia, and 50 milligrams -- I said

18   per day.  25 milligrams twice per day if you're treating the

19   usual things, AFib or coronary artery disease, and then 50

20   milligrams twice a day if you're treating high blood pressure.

21       And she was only on 3.125 milligrams.  That's a very, very

22   tiny dose.

23   Q.  So given what you've said about the dose of Coreg and in

24   light of what the label includes on the topic of using P-gp

25   inhibitors in patients with severe renal impairment, do you

George Crossley - Direct (Jones)                    1517

1   have an opinion or a perspective on the reasonableness of her

2   doctors' decisions to have her on both Pradaxa and Coreg?

3   A.   I think it's quite reasonable.  I think there -- the

4   record doesn't reflect why the dose of Coreg was limited so

5   much.  And I'd have to infer that she didn't tolerate

6   metoprolol or other drugs because she was on such a tiny dose

7   of a beta blocker.

8       And I think, you know, on such a low dose, I cannot

9   imagine having a big increase in the level.  And if you were

10  worried about that increase in the level, what you would do is

11  pick a lower dose of the drug, and that's exactly what they

12  did.  They picked the lowest dose of Pradaxa there is, the 75

13  milligrams twice per day.

14          MR. JONES:  Let me just ask you a general question --

15  we can take that down.  Thank you, Mr. Reynolds.

16          Let me just ask you a general question, again not

17  wanting to rehash all of the records the jury has seen

18  already.

19  Q.   Based on having reviewed the records and having had a

20  chance to review the testimony of Mrs. Knight's doctors, do

21  you have an opinion on how she did while she was on Pradaxa,

22  how she did on the medicine?

23  A.   She -- number one, she didn't have another stroke, which

24  is almost miraculous given her stroke risk.  And she also

25  didn't have a bleeding problem when she was on Pradaxa alone.

George Crossley - Direct (Jones)          1518

1    She was on Pradaxa from 2011, I guess, to 2013 if I

2    remember correctly.  And then she had -- she had a stenting

3    procedure and had to be on triple therapy for a while.  And

4    while she was on triple therapy, she had bleeding

5    complication -- she had bleeding.

6        And then after that bleeding event, when she recovered

7    from the bleeding event, she was on Pradaxa again and didn't

8    bleed -- didn't have any more GI bleeding again.

9    Q.  Let me ask you another question.

10       One of the things that the jury has heard some about is

11   this idea of whether or not Pradaxa also requires blood

12   monitoring.

13       Are you familiar with those discussions in the scientific

14   community?

15   A.  I am.

16   Q.  And is that a discussion that has happened with respect to

17   Pradaxa and the other NOACs, Xarelto and Eliquis?

18   A.  That's correct.

19   Q.  Do you have a view in your clinical practice, as a

20   clinician and a researcher, whether the existence of blood

21   monitoring for medicines like Pradaxa, Xarelto and Eliquis

22   would improve the care of your patients as you see them every

23   day?

24   A.  So Pradaxa -- all of those drugs were studied in

25   gargantuan trials.  I mean, 18,000 patients in the Pradaxa

George Crossley - Direct (Jones)          1519

1   study.  And it was studied using clinical factors to guide

2   therapy, and that is their -- how much -- what their renal

3   function is, how old they are, things like that to guide how

4   much Pradaxa to give them.

5       And in that trial, that strategy showed significant

6   benefit over warfarin.  It showed a little bit more bleeding,

7   but tremendous benefit in terms of stroke risk over -- over

8   warfarin.

9       And to go to a strategy where we have to measure the level

10  of the drug in the body is a very difficult thing.  I mean,

11  the technology to do that right now is mass spectroscopy,

12  which is something that can be done, but it takes a long time

13  to do, and it's very expensive.  And if you look at the

14  breadth of drugs that we give, nowhere near 1 percent of drug

15  are measured, drug levels are measured by any -- by any

16  method.

17      I think there are a couple of articles in the literature

18  where -- where the American College of Cardiology and others

19  got together a think tank to think about this and see if they

20  could create something that would help this and create a

21  monitoring that might be beneficial.  And the concept that

22  came out of it was it would be nice if we had a clot function

23  assay that would be helpful for these drugs the way the INR

24  test is for coumadin.

25      I mean, we don't measure the level of coumadin in the

George Crossley - Direct (Jones)          1520

1   body.  We can measure it.  It takes about three or four weeks

2   to get it back.  The only time I've ever seen that done is in

3   a coumadin overdose.  It was frankly done when my dog was

4   poisoned by a wayward soul, and that is the only experience I

5   have with measuring it honestly.

6       But what we do measure with coumadin is the effect of the

7   coumadin on the clotting.  And there is -- we don't have a

8   perfect test for that with Pradaxa or any of the other new

9   novel agents.

10      And that was really the outcome of this conference, was

11  sort of an arm waving, hey, it would be good if we had a way,

12  but we don't have a way, and sort of an agreement that we

13  can't measure the drug level.

14  Q.  In your clinical practice, do you have any reason to think

15  that measuring blood levels would improve the efficacy or the

16  safety of these medicines that you're using?

17  A.  I don't have any reason.

18  Q.  And what about with Mrs. Knight specifically?  Having had

19  a chance to review her medical records and the testimony of

20  her doctors, do you have any reason to think that had her

21  blood levels on Pradaxa been monitored, that something

22  different might have happened with her?

23  A.  I certainly don't.

24      I mean, I don't -- I don't think there's any evidence that

25  Mrs. Knight had too much Pradaxa in her system.  She was on a

George Crossley - Direct (Jones)                    1521

1    low dose of the drug.  She tolerated the drug well.  She did

2    not bleed when she was taking the Pradaxa alone.  She only

3    bled when she was given Pradaxa plus the two other blood

4    thinners.  And then when she recovered from that, when she was

5    put back on Pradaxa, she didn't bleed again.  So I don't think

6    there's any clinical evidence that that was part of what

7    happened in Ms. Knight.

8    Q.  Dr. Crossley, I want to just kind of wrap up by talking

9    about Mrs. Knight's condition in 2013 -- excuse me -- late

10   2012 and 2013, if we could.

11       Did you see evidence in the records that over time Mrs.

12   Knight's coronary artery disease became worse or progressed?

13   A.  Certainly.

14   Q.  I'm going to ask you to turn to 9004A in your binder.

15       Are you there, Doctor?

16   A.  I am.

17   Q.  Okay.

18           MS. JONES:  Your Honor, we would move --

19   Q.  And do you recognize that exhibit as medical records for

20   Mrs. Knight?

21   A.  I do.

22           MS. JONES:  Your Honor, we would move for the

23   admission of 9004A into evidence.

24           THE COURT:  Any objection?

25           MR. CHILDERS:  No, sir.

1          THE COURT:  It's admitted.

2      (DEFENDANT'S EXHIBIT 9004A ADMITTED INTO EVIDENCE.)

3          MS. JONES:  Okay.  Page 6.  Mr. Reynolds always has to

4  remind me to give him a page number.  That's my fault, not his

5  fault, just so everyone knows.

6          Okay.  Actually, I'm sorry, can we go to page -- yeah,

7  page 6.  Okay.

8  Q.  Up at the top of the page, do you see there's a reference

9  there to a visit with Dr. Skuli Gunnalaugsson in November of

10  2012?

11  A.  I do.

12  Q.  Okay.  And Dr. Gunnalaugsson, again, was Mrs. Knight's

13  cardiologist; is that right?

14  A.  That's correct.

15  Q.  Okay.  And in the section entitled History of Present

16  Illness, it says:  Betty Knight is an 83-year-old woman with a

17  history of mild ischemic cardiomyopathy, status post

18  multi-vessel stenting in the past as well as dextrocardia, who

19  has not been feeling well lately.

20      Did I read that correctly?

21  A.  That's correct.

22  Q.  And just very briefly, what is going on here with Mrs.

23  Knight in November of 2012?

24  A.  Well, he describes having struggled with her drugs and

25  just said that she was having generalized symptoms of feeling

George Crossley - Direct (Jones)                    1523

 1    poorly.

 2    Q.   Okay.  And it goes on here to say:  She has been

 3    complaining about fatigue and shortness of breath as well as

 4    orthopnea.

 5         Tell us what orthopnea is.

 6    A.   So what orthopnea is is when you lay down flat, you get

 7    short of breath, and it's usually caused by congestive heart

 8    failure where your heart is not pumping well enough.  And so

 9    you lay out flat, there is more pressure in your lungs, and so

10    people have to sit up to breathe.

11    Q.   Okay.  And if we scroll down, you can see there's a

12    listing here of Mrs. Knight's past medical history.

13         Do you see that?

14    A.   I do.

15    Q.   And so, for example, it mentions ischemic cardiomyopathy.

16         Do you see that?

17    A.   I do.

18    Q.   And is that consistent with her coronary artery disease?

19    A.   It is.

20    Q.   And then there's a reference to her atrial fibrillation.

21         Do you see that?

22    A.   I do.

23    Q.   And there is a reference to her chronicle -- excuse me --

24    her chronic renal insufficiency.

25         Do you see that?

George Crossley - Direct (Jones)                    1524

1   A.  Yes.

2   Q.  Then No. 10 on the list is statin intolerance.

3       Is that what you were mentioning earlier, that she had a

4   hard time taking statins?

5   A.  It is.

6   Q.  Okay.

7   A.  So the other drugs, like the Welchol that you mentioned,

8   are really weak sisters when it comes to statins.  Statins are

9   really effective at lowering cholesterol in most people, not

10  in everyone, but in most people.  And if you can tolerate

11  them, you will certainly live longer with coronary disease.

12      But she -- unfortunately she couldn't.

13  Q.  And if we scroll further down on that same page, there is

14  a section called Assessment Plan.

15  A.  Yes.

16  Q.  Do you see that?

17  A.  I do.

18  Q.  And the very first sentence says:  83-year-old woman with

19  a history of coronary artery disease with mild ischemic

20  cardiomyopathy with symptomatology suggestive for

21  decompensated congestive heart failure.

22      Tell us what that means, Dr. Crossley.

23  A.  It means the same thing that the introduction means, is

24  she was having shortness of breath, especially the shortness

25  of breath lying down, and the fatigue and the feeling badly

George Crossley - Direct (Jones)                1525

1    and all of that.

2    Q.  And would that be consistent with coronary artery disease?

3    A.  It is.

4    Q.  Okay.  Is there any reference in this record to problems

5    with Pradaxa or issues with Pradaxa?

6    A.  I don't see any.

7    Q.  Okay.  I'm going to ask you to turn now to Exhibit 9008A.

8    A.  I'm there.

9    Q.  And we're going to page 2 of that exhibit, if we could,

10   please.

11   A.  I am there.

12   Q.  Doctor, do you recognize that record at page 2 of 9008A?

13   A.  Yes.

14   Q.  Okay.  Do you recognize --

15   A.  I think this is a home visit record.

16   Q.  Okay.

17        MS. JONES:  Your Honor, we would move for the

18   admission of 9008A.

19        THE COURT:  Any objection?

20        MR. CHILDERS:  No objection.

21        THE COURT:  It's admitted.

22        MS. JONES:  Thank you, Your Honor.

23   (DEFENDANT'S EXHIBIT 9008A ADMITTED INTO EVIDENCE.)

24   BY MS. JONES:

25   Q.  Dr. Crossley, up at the top of the page, do you see

1   there's a reference to DOS or date of service of April 10,

2   2013?

3   A.  I do.

4   Q.  Okay.  And on the left-hand side we can see Mrs. Knight's

5   name up at the top?

6   A.  I see that.

7   Q.  Then there's a reference to a line that starts with CC and

8   a colon.

9       Do you see that?

10  A.  Yes.

11  Q.  And what's the -- that's chief complaint; is that right?

12  A.  That's correct.

13  Q.  And what was the chief complaint as of April 10, 2013?

14  A.  Chest discomfort.

15  Q.  Okay.  And then there is a section slightly further down

16  where it says:  Provider home visit is medically reasonable

17  and necessary in lieu of the office visit because.

18      Do you see that?

19  A.  Yes.

20  Q.  And is that a reference to the fact that you understood

21  this to be a visit of a health care professional to Mrs.

22  Knight's home?

23  A.  That's my understanding.

24  Q.  All right.  And then it references as the reason, that

25  circle there, tasking to get out.

George Crossley - Direct (Jones)                    1527

1    Do you see that?

2    A.  I do.

3    Q.  Okay.  And then in the handwritten notation, it says:

4    Generally, and then there's a zero with an X through it, feel

5    good times two weeks.

6        Do you have an understanding of what that means?

7    A.  I think it means she feels badly, and she has for a couple

8    of weeks.

9    Q.  Okay.  And it goes on to say:  Breathing is bad.  Feel bad

10   in my chest.  Having some CP, goes to armpit at times.

11       Do you see that?

12   A.  I do.

13   Q.  And would that be consistent with Mrs. Knight's coronary

14   artery disease?

15   A.  I certainly think it is.

16   Q.  Okay.  And then it goes on to say:  Sleeping more, naps

17   daily around noon.  And then it says:  Thinks abdomen is

18   swollen, says it's sore.

19   A.  Yes.

20   Q.  What do you understand that to be a reference to given

21   what you know about Mrs. Knight's medical --

22   A.  So Mrs. Knight had bad heart failure.  And, you know, if

23   we're standing up or sitting up all the time, then the heart

24   failure often makes your legs swell.  If you spend a good bit

25   of time in bed, or if your heart failure gets really bad, that

 1    swelling often happens in your liver rather than in your legs.

 2         I think there is lots of records on Mrs. Knight to show

 3    that her legs swelled from time to time, but this sounds like

 4    it's liver -- what we call passive congestion of the liver or

 5    swelling of the liver because of heart failure.  It's a very

 6    common thing in people like Mrs. Knight.

 7    Q.  And in this record, is there any mention at all of any

 8    issues with Pradaxa or concerns about how she was doing on

 9    Pradaxa?

10    A.  I don't see any.

11         MS. JONES:  We can take that down.  Thank you, Mr.

12    Reynolds.

13         Dr. Crossley, the jury has heard that in April of

14    2013, Mrs. Knight had a heart attack.

15    Q.  Are you familiar with that fact in her records?

16    A.  I am.

17    Q.  Okay.  I'm going to ask you to go back to 9003B, which I

18    believe is now admitted, and go to page 20, please.

19         And up at the top of that page, you see the reference to

20    Mrs. Knight's name, then the date of admission of April 2013?

21    A.  I --

22    Q.  April 17, 2013?

23    A.  I do.

24    Q.  Then do you also see the date of discharge of April 24,

25    2013?

George Crossley - Direct (Jones)                    1529

1    A.  I do.

2    Q.  Okay.  And if we scroll down under the listing of

3    Discharge Diagnoses, there's a reference to non-ST elevated

4    myocardial infarction, status post left heart catheterization

5    with two stents placed.

6    A.  Correct.

7    Q.  Tell us what that means.

8    A.  That means she had another procedure much as what I

9    described earlier.

10   Q.  Okay.  And that was after --

11   A.  And that means she came in with a heart attack, with that

12   non-ST elevation kind of heart attack.

13   Q.  Okay.  And let's look at the next page in this record if

14   we could, page 21.  And we're going to just call out the

15   hospital course, please.

16       It says:  The patient is an 83-year-old female who

17   presented to St. Mary's Medical Center emergency department on

18   April 17, 2013, with a complaint of chest pain.

19       It goes on to say:  The patient's troponin levels were

20   initially found to be elevated at 2.69.

21       Now the jury has heard a little bit about troponin.  In

22   your experience as a cardiologist and treating patients who

23   present with a heart attack, what does a troponin level of

24   2.69 mean?

25   A.  Well, in a patient who comes to the hospital with chest

George Crossley - Direct (Jones)        1530

1   discomfort, or symptoms sounding like heart disease like she

2   did, and has a troponin level of that magnitude and doesn't

3   have any EKG that glares that there's a heart attack, it means

4   that they have had what we call a non-Q wave myocardial

5   infarction.

6       That means an ST-segment elevation heart attack.  So she

7   did not have -- there's no mention of her having that, and

8   there was mention of all of the other diagnostic criteria for

9   a non-ST elevation MI.

10  Q.  Okay.  And that's the type of heart attack you described

11  where there is blockage throughout the vessels?

12  A.  Correct.

13  Q.  Okay.  About midway down that paragraph, it says:  While

14  in the emergency department, the patient was seen by Dr. Maru,

15  who discontinued Pradaxa.  A left heart catheterization was

16  then planned for 72 hours after the discontinuation of

17  Pradaxa.

18      Now, would that be a routine thing for a doctor to do, to

19  stop an anticoagulant before doing a catheter procedure?

20  A.  That's correct.  We no longer wait that long, but that was

21  common practice at the time.

22  Q.  Okay.  At the end of the page there, it says:  The patient

23  did remain stable over the next few days and underwent the

24  left heart catheterization on April 22nd, 2013, as scheduled.

25      Do you see that?

George Crossley - Direct (Jones)          1531

1   A.  I do.

2   Q.  And so is that a reference to the fact that Mrs. Knight

3   actually had another one of those procedures that you

4   described when we were looking at the board earlier?

5   A.  That's correct.

6   Q.  Okay.  Doctor, I'm going to ask you to turn in your binder

7   to Exhibit 9007B just to look at the report from that study.

8   We are going to go to page 94, and I believe this is already

9   in evidence.

10      Do you recognize that medical record at page 94, Doctor?

11  A.  I do.

12  Q.  Okay.  And just to reference the top part of the page, you

13  see there is Mrs. Knight's name in the upper left-hand corner?

14  A.  I do.

15  Q.  Okay.  And then a little further down, there's the date of

16  the examination, right under final report.

17      Do you see that?

18  A.  I do.

19  Q.  Okay.  And so tell the jury, again just generally is fine,

20  what her doctors did when she presented with a heart attack in

21  April of 2013.

22  A.  They did exactly the same thing I described before.  They

23  put a catheter in her wrist or her leg, passed it to her

24  heart, took pictures of the blockages, and then -- and then

25  put stents in where they were.

George Crossley - Direct (Jones)                    1532

1   Q.  Okay.  Let's --

2   A.  I believe there were two stents placed.

3   Q.  Let's go to page 95 --

4   A.  Yeah.

5   Q.  -- the Findings section.

6       Do you see that, Doctor?

7   A.  I do.

8   Q.  Okay.  And so what did they do based on this description

9   here?

10  A.  So they identified that her ejection fraction had fallen

11  from the 40 percent it was before to 30 or 40 percent now, and

12  it's very common to get a range in ejection fraction.

13      And then they identified scattered narrowing areas.  Her

14  left anterior descending, where that stent had been placed the

15  first time, was at 20 to 30 percent.  Her circumflex artery,

16  where it had previously had a relatively minor blockage, now

17  has a 90- to 95-percent stenosis.  And then the right coronary

18  had 30- to 40-percent stenosis in it.

19      And then they placed the stents.  The first one was in the

20  left circumflex artery.  They put a two-millimeter stent in

21  there.  And then they put a second stent in there that they

22  dilated up to 3.5 millimeters to open up that very tight area.

23  Q.  So she had two additional stents placed in 2013; is that

24  correct?

25  A.  That's correct.

George Crossley - Direct (Jones)          1533

1  Q.  Okay.  And I want to ask you to look at Exhibit 9005B also

2  in your binder.  We're going to go to page 8, please.

3      Dr. Crossley, do you recognize this as a further medical

4  record for Mrs. Knight from 2013?

5  A.  I do.

6  Q.  Okay.

7      MS. JONES:  Your Honor, we would move for the

8  admission of 9005B.

9      THE COURT:  Any objection?

10     MR. CHILDERS:  No objection.

11     THE COURT:  It's admitted.

12     (DEFENDANT'S EXHIBIT 9005B ADMITTED INTO EVIDENCE.)

13     MS. JONES:  Okay.

14 Q.  Dr. Crossley, very quickly up at the top, you see there's

15 a reference to May of 2013.

16     Do you see that?

17 A.  I do.

18 Q.  And this record actually documents a return visit with Dr.

19 Gunnalaugsson, Mrs. Knight's cardiologist, correct?

20 A.  That's correct.

21 Q.  And the part I wanted to ask you about is down at the

22 bottom of the page.  There is a section called Assessment and

23 Plan.

24     Do you see that?

25 A.  Yes.

George Crossley - Direct (Jones)                    1534

1   Q.  And it says:  This is an 83-year-old woman with a history

2   of multiple medical problems.  She had successful angioplasty

3   on two vessels two weeks ago by Dr. Maru.

4        Is that just a reference to the stent procedure that she

5   had?

6   A.  That's correct.

7   Q.  Okay.  And then it goes on to say these were new stenoses.

8        You see that?

9   A.  Yes.

10  Q.  What does that mean?

11  A.  That means these were not blockages.  These were different

12  from lesions that were seen in her previous heart cath.

13  Q.  So that was in addition to what you drew up on the board

14  earlier?

15  A.  That's correct.

16  Q.  Okay.

17       MS. JONES:  We can take that down.  Thank you,

18  Mr. Reynolds.

19  Q.  Doctor, as part of your clinical practice, have you had

20  occasion to have to place stents for patients who have

21  coronary artery disease?

22  A.  I don't place the stents, but I certainly have had many --

23  I have my colleagues, who are plumbers -- we divide

24  cardiologists into plumbers and electricians.  I'm an

25  electrician, so I get the plumbers to place stents on many of

George Crossley - Direct (Jones)                    1535

1    my patients.

2    Q.  Okay.  And are the plumbers the interventional

3    cardiologists?

4    A.  That's correct.

5    Q.  Okay.  Got it.

6        Given your experience with patients having that procedure,

7    do you have any concerns or questions about how Mrs. Knight's

8    doctors went about treating her in April of 2013 when she

9    presented with a heart attack?

10   A.  It looks perfect to me.

11   Q.  Okay.  Is it your understanding that after Mrs. Knight

12   presented with a heart attack in April of 2013, that she was

13   put on what the jury has now heard referred to a number of

14   times as triple therapy, aspirin, Plavix and Pradaxa?

15   A.  That is my understanding.

16   Q.  Okay.  And do you have experience with patients who are on

17   what is known as triple therapy?

18   A.  Yes, I do.

19   Q.  And is your experience something that includes patients

20   who are on warfarin as the anticoagulant or Pradaxa or Xarelto

21   or Eliquis?

22   A.  All of the above.

23   Q.  Okay.  Do you have a sense of, you know, how many patients

24   over the years you've treated who have required triple

25   therapy?

George Crossley - Direct (Jones)                    1536

1    A.  A lot.  Hundreds.

2    Q.  Okay.  And just so the jury understands from the

3    perspective of a cardiology clinician, why is it that patients

4    have to be on all three of those types of medicines at the

5    same time after they've had a stent placed?

6    A.  So the Plavix and aspirin are to inhibit the platelets.

7    Either drug alone is not enough.  Through big clinical trials

8    it was found that you needed to -- you needed to inhibit the

9    platelets sticking to the stent with both Plavix and aspirin.

10       On the flip side, the chemical anticoagulant, in this case

11   Pradaxa, or previously when she was on warfarin, is there to

12   prevent strokes in atrial fibrillation.  We know from big

13   clinical trials that Plavix and aspirin alone do a really bad

14   job of preventing strokes in atrial fibrillation.

15   Q.  And, again, just based on your clinical experience and

16   having had a chance to see Mrs. Knight's medical records, do

17   you have any concerns or issues with the way Mrs. Knight's

18   doctors proceeded in placing her on triple therapy in April of

19   2013?

20   A.  I don't.  We have to do this all the time, and it's always

21   a rock and a hard place issue, especially in somebody who has

22   a history of blood loss in the past.

23   Q.  And is that because the combination of those medicines can

24   increase the risk of bleeding?

25   A.  That's right.  The combination is a real mess for

George Crossley - Direct (Jones)                    1537

1   increasing bleed risk.

2   Q.  And is that something you discuss with your patients

3   before they're placed on triple therapy?

4   A.  Absolutely.  And I think her record suggests that that

5   discussion was held.

6   Q.  And do you have experience with patients who have been on

7   triple therapy where the anticoagulant medicine was warfarin,

8   and they had a bleed?

9   A.  Sure.

10  Q.  Have you seen that with patients who were on triple

11  therapy with Pradaxa?

12  A.  Yes.

13  Q.  What about with Xarelto and Eliquis?

14  A.  Absolutely.

15  Q.  Can a bleed happen no matter which of the oral

16  anticoagulants --

17  A.  Correct.

18  Q.  -- is a third part of that triple therapy?

19  A.  That is correct.

20  Q.  Doctor, I'm going to ask you to turn in your binder to

21  5431 if you would, please.

22      Are you there, Doctor?

23  A.  I am.

24  Q.  Do you recognize 5431?

25  A.  I do.

George Crossley - Direct (Jones)          1538

1    Q.  Just in general, what is 5431?

2    A.  It's a report of the patients in the RE-LY study who had

3    triple therapy.

4    Q.  Okay.  As part of forming your opinions in this case, is

5    this an article that you reviewed and relied upon?

6    A.  That's correct.

7         MS. JONES:  Your Honor, we would move for at least the

8    permission to publish 5431 subject to our earlier --

9         THE COURT:  As a learned treatise?

10        MS. JONES:  As a learned treatise.

11        THE COURT:  You may proceed.

12        MS. JONES:  Okay.

13   Q.  Doctor, up at the top of the page here, there is a title

14   of an article called Concomitant Use of Antiplatelet Therapy

15   with Dabigatran or Warfarin in the Randomized Evaluation of

16   Long-Term Anticoagulation Therapy Trial.

17   A.  Correct.

18   Q.  That's a long title.  What does that mean?

19   A.  Just what I said before.  In patients that were in the

20   RE-LY study who were on dabigatran or warfarin, who also had

21   to be put on triple therapy during the study, reporting the

22   results from that.

23   Q.  And if you look at the authors on the paper, do you see

24   that some of them are folks who work at Boehringer Ingelheim;

25   for example, Dr. Paul Reilly on the third line?

George Crossley - Direct (Jones)                1539

1    A.  Yes.

2    Q.  And do you recognize some of them as scientists and

3    doctors who are affiliated with institutions, outside

4    institutions?

5    A.  Correct.

6    Q.  Okay.  I'm going to ask you to flip, if you would, to page

7    2 of 5431.  And there is a paragraph that begins with a common

8    clinical dilemma.

9        Do you see that?

10   A.  I do.

11   Q.  It says:  A common clinical dilemma regarding treatment of

12   patients with AF is the need to use concomitant antiplatelets

13   for a variety of reasons.

14       And before we get into what the actual reasons are, what

15   is that statement saying?

16   A.  Just what we've talked about, the need to use antiplatelet

17   therapy along with systemic anticoagulation.

18   Q.  Okay.  Medicines like warfarin and Pradaxa?

19   A.  Right.

20   Q.  And then it describes some of the circumstances where that

21   might be necessary:  For primary prevention of coronary artery

22   disease; for secondary prevention after a diagnosis of

23   coronary disease; or for maintenance therapy after

24   percutaneous coronary intervention.

25       Did I read that correctly?

George Crossley - Direct (Jones)                    1540

1    A.  You did.

2    Q.  And into which of those three categories did Ms. Knight

3    fall?

4    A.  All of them actually.  But the compelling reason is the

5    prevention after a stent, and that's what the majority of

6    these were.

7    Q.  And that's that reference to maintenance therapy after

8    percutaneous coronary intervention?

9    A.  That's correct.

10   Q.  Okay.  It goes on to say:  In some of these situations,

11   dual antiplatelet therapy may be used.  For example, after an

12   acute myocardial infarction or after percutaneous coronary

13   intervention.

14       You see that, Doctor?

15   A.  I do.

16   Q.  And, again, that's the situation Mrs. Knight was in.  She

17   had had a heart attack, she had had a stent procedure, and

18   then they needed to figure out how to treat her most safely,

19   correct?

20   A.  That's correct.

21   Q.  All right.  And then it goes on to say:  Although the

22   combination of oral anticoagulants and antiplatelets carry the

23   potential of additive benefits, they also carry the danger of

24   increased risk of bleeding.

25       Is that just what you were describing for the jury earlier

1  in terms of that rock and a hard place situation?

2  A.  It was.

3  Q.  Okay.  If you look at page 3 in that same article, you see

4  there's a section called Results?

5  A.  I do.

6  Q.  And it actually describes the numbers of the patients who

7  were in different categories in the analysis that they did.

8      And you see there's a reference there to 812 patients on

9  both drugs?

10 A.  I do.

11 Q.  And do you see that -- do you understand that to be a

12 reference to patients who were on triple therapy, patients who

13 were on both aspirin and Plavix?

14 A.  I do.

15 Q.  Okay.  I want to ask you about what the authors found when

16 they actually looked at how people did on triple therapy with

17 warfarin versus triple therapy with Pradaxa.

18     If you turn to page 4 of that same article, there's -- are

19 you there?

20 A.  I'm there.

21 Q.  There's a paragraph that begins with:  We also attempted

22 to estimate the risk of bleeding according to the number of

23 antiplatelets used, single or dual, and median dose for

24 aspirin used.

25     Do you see that?

George Crossley - Direct (Jones)                    1542

1   A.  I do.

2   Q.  And that's just them trying to figure out do people have

3   worse bleeding if they're on one antiplatelet or two

4   antiplatelets; is that right?

5   A.  That's correct.

6   Q.  Okay.  And it goes on to say:  The risk of major

7   bleeding -- the next sentence down.  The risk of major

8   bleeding seemed higher among patients who received dual

9   antiplatelets than among patients who only received a single

10  antiplatelet in all treatment groups.

11      Do you see that?

12  A.  I do.

13  Q.  And so what are they telling us there?

14  A.  That dual antiplatelet therapy makes you bleed worse than

15  single antiplatelet therapy along with the systemic

16  anticoagulation.

17  Q.  And that --

18  A.  So if you're on warfarin plus Plavix, you're less likely

19  to bleed than if you're on warfarin plus Plavix and aspirin.

20  Q.  And did they say here that that was the case across all of

21  the treatment groups, so people who were on Pradaxa 150 or

22  people who were on warfarin?

23  A.  Correct.

24  Q.  Okay.  And then down at the bottom of that same paragraph,

25  it says:  Again, the relative increases were consistent

George Crossley - Direct (Jones)          1543

1   whether patients were on dabigatran 110, dabigatran 150 or

2   warfarin, but the absolute risks were lowest on dabigatran

3   110.  Similar trends were seen with minor bleeding,

4   extracranial bleeding, but not for intracranial bleeding

5   probably because of the low event rate.

6       So we know that the 110 isn't approved in the U.S., but

7   what is that telling us there about how dabigatran 150 on

8   triple therapy compared to warfarin on triple therapy?

9   A.  It was very similar.

10  Q.  Okay.  They didn't see a difference?

11  A.  Correct.

12      MS. JONES:  You can take that down.  Thank you,

13  Mr. Reynolds.

14      Dr. Crossley, there was one thing I just wanted to

15  make sure I understood based on our discussions today.

16  Q.  Is it your understanding that around the time that Mrs.

17  Knight was prescribed triple therapy in April of 2013, that

18  she actually had a different prescriber for her Pradaxa other

19  than Dr. MacFarland who started it?

20  A.  That's right.  Yes, that is my understanding.

21  Q.  Okay.  And I'm going to ask you to look at Exhibit 9002.

22  We're going to go to page 29.

23      Doctor, do you recognize Exhibit 9002 as a pharmacy record

24  for Mrs. Knight?

25  A.  I do.

George Crossley - Direct (Jones)                1544

1    Q.  Okay.

2         MS. JONES:  And, Your Honor, we would move for the

3    admission of 9002.

4         THE COURT:  Any objection?

5         MR. CHILDERS:  No objection.

6         THE COURT:  It's admitted.

7         (DEFENDANT'S EXHIBIT 9002 ADMITTED INTO EVIDENCE.)

8    BY MS. JONES:

9    Q.  So if we look at the bottom of the page here, you see

10   there's a reference there to a prescription of Pradaxa

11   75-milligram capsule.

12        Do you see that?

13   A.  I do.

14   Q.  And do you see the date of April 24th, 2013, right on the

15   end of the line?

16        It's also on the electronic screen if that is easier.

17   A.  Okay.  Yes, I do.

18   Q.  I know the type is teeny tiny.

19        And do you see --

20   A.  Have sympathy on my old eyes.

21   Q.  We do what we can.

22        Do you see that the prescriber's name is listed there?

23   A.  I do.

24   Q.  And do you see that the prescriber was someone named

25   Stephanie Graham?

George Crossley - Direct (Jones)          1545

1  A.  I do.

2  Q.  Okay.  And so that was a prescriber decision that was made

3  right around the time that Mrs. Knight had her myocardial

4  infarction and was placed on triple therapy?

5  A.  Correct.

6       MS. JONES:  We can take that down.  Thank you,

7  Mr. Reynolds.

8       Dr. Crossley, the jury has now heard about the GI

9  bleed that Mrs. Knight had in May of 2013, so we won't go

10  through all of those records again with you.

11  Q.  But do you have an understanding of what Mrs. Knight's

12  doctors identified as the source of her bleed when they

13  actually did a colonoscopy to check in May of 2013?

14  A.  It was an area where -- what is called angiodysplasia,

15  where you have a little network of little blood vessels that

16  one of them broke open and was bleeding.

17  Q.  Okay.

18  A.  And they were fortunately able to put a clip on there and

19  break it -- and stop the bleeding.

20  Q.  And let me ask you this.

21       In your experience, if you have a problem in your colon

22  that is prone to bleeding, and you're on Plavix and aspirin

23  and any other oral anticoagulant, is your risk of bleeding

24  from that source higher than it would normally be?

25  A.  Absolutely.

1    Q.  And would that risk exist whether you're on Pradaxa or

2    warfarin or Xarelto or Eliquis?

3    A.  Correct.

4    Q.  And so based on your review of the medical records for

5    Mrs. Knight, are you able to rule out the possibility that had

6    she been on warfarin with triple therapy in March -- in May of

7    2013, that she would have had the same bleed?  Are you able to

8    rule that out?

9    A.  No, of course not.

10   Q.  Okay.  And why do you say that?

11   A.  Because, I mean, triple therapy -- she had a bleed.  Those

12   drugs do not make you bleed.  Those drugs make you bleed more

13   when there is something that is bleeding.

14       So those drugs together don't create that angiodysplasia

15   or that area where that blood vessel was bleeding.  But that

16   angiodysplasia opening up and starting to ooze then is

17   converted into a worse bleed by being on all of those blood

18   thinners.  And whether you're on warfarin or whether you're on

19   Plavix or Xarelto or Eliquis, all of those can make you bleed.

20   Q.  Okay.  Do you have an understanding that after Mrs. Knight

21   had her bleed, and she was in the hospital, that her doctors

22   evaluated something known as the aPTT for her?

23   A.  Yes.

24   Q.  And can you just very briefly explain for the jury what

25   the aPTT is?

George Crossley - Direct (Jones)          1547

1  A.  The aPTT is a test, that the routine use of that is for

2  monitoring heparin, which is an IV blood thinner.  We use it

3  every day for that.

4      It can be used in Pradaxa in answering the question, is

5  there some Pradaxa effect left there?  It is not a great test

6  for saying how much Pradaxa effect do I have.  So, you know,

7  it's not a substitute for the INR that we use in warfarin.

8  Q.  And do you have an understanding based on looking at the

9  records, that when her doctors checked her aPTT in May of 2013

10 for Mrs. Knight, that it was elevated, that it was above the

11 normal range?

12 A.  It was.

13 Q.  Is that something you would expect to see in a patient who

14 is on an anticoagulant of any kind?

15 A.  It -- certainly on Pradaxa I would.  And for that matter,

16 if you're on warfarin it goes up, too, only if your PT goes

17 way out.  But as I said, the PTT, the aPTT is a good test for

18 answering the question, is there some Pradaxa effect left in

19 the body?

20 Q.  Doctor, I want to just finish up by talking about what

21 happened with Mrs. Knight after she was discharged from the

22 skilled nursing facility in June of 2013.

23     Okay?

24 A.  Okay.

25 Q.  All right.  I'm going to ask you to go to Exhibit 9003B,

George Crossley - Direct (Jones)                    1548

1   and we're going to go to page 277.  This is already in

2   evidence.

3   A.  I am there.

4   Q.  Okay.  Doctor, do you recognize this as a record of a

5   hospital visit by Mrs. Knight in September of 2013?

6   A.  Yes.

7   Q.  And this would have been after her bleed had stopped, and

8   she had been sent back home in June; is that right?

9   A.  I think so.

10  Q.  Okay.  If you look in the section entitled History of

11  Present Illness, it says chest pain.

12      You see that?

13  A.  I do.

14  Q.  And it goes on to say:  This started just prior to arrival

15  and is now gone.  It is described as dull and aching, and it

16  is described as located in the right chest area and radiating

17  to the right upper extremity.

18      Do you see that?

19  A.  I do.

20  Q.  What's going on there at this point with Mrs. Knight?

21  A.  Just another presentation of what would be typical angina

22  for Mrs. Knight or the absolutely classic findings of coronary

23  problems.

24  Q.  Okay.  And if you look a little further down, there is

25  actually a reference to similar symptoms previously.

George Crossley - Direct (Jones)                    1549

1      Do you see that?

2   A.  Yes.

3   Q.  And what do --

4   A.  And also the nitroglycerin relieving the pain has some

5   diagnostic significance, makes it much more likely that that

6   discomfort was from coronary disease.

7   Q.  Okay.  Do you see the section there where it says similar

8   symptoms previously?

9   A.  I do.

10  Q.  And what did they report in terms of whether she had had

11  similar symptoms to these before?

12  A.  There -- there are records throughout the record of

13  similar symptoms to this.

14  Q.  Okay.  That's consistent with what you saw in the records;

15  is that correct?

16  A.  That's correct.

17  Q.  Okay.  As far as you know and based on your review of this

18  record and others, is what Mrs. Knight is dealing with here,

19  is that related in any way to Pradaxa or her GI bleed in May

20  of 2013?

21  A.  No --

22  Q.  Okay.

23  A.  -- it's not.

24  Q.  And just to be clear for the record, by this time, Mrs.

25  Knight was back on Pradaxa; is that right?

George Crossley - Direct (Jones)              1550

1   A.  That's correct.

2   Q.  Okay.  And do you have any concerns or objections to her

3   doctors' decisions to put her back on Pradaxa after she had

4   her bleed?

5   A.  You know, some people might be critical of that because --

6   because of her recent bleed.  I'm certainly not.  That is

7   absolutely what I would have recommended for Mrs. Knight.

8   Q.  Okay.  I'm going to ask you to turn to page 255 in the

9   same record if you would, please.

10      And if you look up at the top, do you see that this is a

11  consultation record related to that same hospital admission on

12  July 12th?

13  A.  I do.

14  Q.  Okay.  And there is a section entitled History of Present

15  Illness.

16      Do you see that?

17  A.  I do.

18  Q.  At the top of that section, it says:  Ms. Knight is an

19  84-year-old chronically ill female who has been in and out of

20  the hospital this year for multiple reasons.  She does have a

21  history of dextrocardia, coronary artery disease and

22  pacemaker.

23      And then it refers to her GI bleed at the bottom of the

24  paragraph:  She was diagnosed with gastritis and AV

25  malformations.  She went to rehab and was discharged home on

George Crossley - Direct (Jones)                1551

1   June 8th.  She was at home and cared for by her family since

2   that time.

3        Do you see that?

4   A.  I do.

5   Q.  Then it goes on and says:  She has been weak since all of

6   her recent admissions.  She is just not bouncing back.

7        Do you see that?

8   A.  I do.

9   Q.  And do you have an understanding of what Mrs. Knight's

10  doctor was referring to here when he described that she seemed

11  not to be bouncing back?

12  A.  She -- yeah, that described a woman with just lots of

13  medical problems who is very ill for many reasons.

14  Q.  And the specific things that they mention in this record

15  after that reference to bouncing back is:  She's having

16  exertional shortness of breath.  Yesterday she had some mild

17  right-sided chest pain at rest.

18       Do you see that?

19  A.  I do.

20  Q.  And would those symptoms be consistent with issues that

21  Mrs. Knight had been having in terms of her heart disease?

22  A.  Correct.

23  Q.  And would those symptoms be related in your view at all to

24  the fact that she had had a GI bleed some month or so prior?

25  A.  I don't -- no.  I don't think there's a connection at all

George Crossley - Direct (Jones)          1552

1   there.  It's just this is a reflection of -- that her coronary

2   disease was getting worse and worse and worse.

3   Q.  In that same record, I'm going to ask you to turn 178 if

4   you would, please.

5       Are you there, Doctor?

6   A.  I am.

7   Q.  Do you see that that page and that record refers to a

8   hospital stay that started on July 26th and went until August

9   17th?

10  A.  I do.

11  Q.  Okay.  And if you scroll down in that same record, there

12  is a section at the top called Admitting Diagnoses.

13      Do you see that?

14  A.  I do.

15  Q.  What does admitting diagnoses mean?

16  A.  The conditions that the patient was admitted into the

17  hospital in order to treat.

18  Q.  It specifically says:  General debility stemming from

19  multiple medical problems including -- do you see that?

20  A.  I do.

21  Q.  And then there's a list of eight different items, correct?

22  A.  That's correct.

23  Q.  So, for example, they mention her congestive heart

24  failure, correct?

25  A.  Correct.

George Crossley - Direct (Jones)                    1553

1    Q.  They mention her chronic kidney disease, correct?

2    A.  Correct.

3    Q.  They mention her Type 2 diabetes, correct?

4    A.  That's correct.

5    Q.  They mention her atrial fibrillation, correct?

6    A.  That's correct.

7    Q.  Do they mention at all the fact that Mrs. Knight had had a

8    GI bleed roughly a month and a half prior to this?

9    A.  No.

10   Q.  Okay.  And if you look further down, there is a section

11   entitled Discharge Diagnoses.

12       Do you see that?

13   A.  I do.

14   Q.  Does that refer to the doctors documenting this is what we

15   determined was going on with her while she was in the

16   hospital?

17   A.  That's correct.

18   Q.  Okay.  And there's a similar type of listing there that

19   says:  General debility stemming from multiple medical

20   problems, and then there's that same list of eight things,

21   correct?

22   A.  That's correct.

23   Q.  And at any point in that listing, do her doctors say we

24   think something is going on related to a bleed that she had

25   earlier in the year?

George Crossley - Direct (Jones)                    1554

1    A.  They do not.

2    Q.  Okay.  Just to refresh our recollection, general debility

3    means what exactly?

4    A.  Just doing poorly.  Not -- it's a better term for the term

5    that was used just not bouncing back.

6    Q.  Okay.  When they describe the reasons for that, what they

7    describe are some of her heart issues and some of her other

8    chronic medical conditions?

9    A.  I think that's correct.

10   Q.  Okay.  I'm going to ask you to turn back to 9007B, which

11   is admitted.  We're going to go to page 146, please.

12   A.  I'm there.

13   Q.  Do you recognize that exhibit -- that record, Doctor?

14   A.  I do.

15   Q.  Okay.  So do you see up at the top that this is a

16   consultation in connection with an admission by Mrs. Knight to

17   the hospital on August the 22nd, 2013?

18   A.  That's correct.

19   Q.  Okay.  And if we go down to the section called Reason for

20   Consultation, we see a reference to elevated troponin.

21   A.  That's correct.

22   Q.  Do you see that?

23       What does that mean?

24   A.  Again, it's the test looking for damage to the heart from

25   a heart attack.

George Crossley - Direct (Jones)                1555

1   Q.  Okay.  And if we go down to the section called History of

2   Present Illness, it describes Mrs. Knight generally at the top

3   as a pleasant female with a history of heart disease, atrial

4   fibrillation, hypertension and dextrocardia.

5       And then in the third paragraph down, it says:  The

6   patient states she had been doing fairly well in her typical

7   state of health, but she did begin having some episodes of

8   chest discomfort this week.  She describes it as a discomfort

9   on the right side of her chest, which radiates down her right

10  arm to the elbow.

11      What's going on there at --

12  A.  Again, it's a description of having more symptoms related

13  to her coronary disease.

14  Q.  Okay.

15  A.  More of that typical angina that she had.

16  Q.  Okay.  And just to be complete on this, down at the bottom

17  of the page, there is a reference to past medical history.

18      Do you see that?

19  A.  I do.

20  Q.  And the second item that they identify is the fact she had

21  a gastrointestinal bleed, correct?

22  A.  Correct.

23  Q.  At any point in this record, do Mrs. Knight's doctors say

24  we think what is going on with her is related to the fact

25  she's on Pradaxa or the fact that she had a GI bleed?

George Crossley - Direct (Jones)                1556

1    A.  No, they don't.

2    Q.  And in fact, if you turn to page 148 of that same record,

3    you see there's a section there called Impression.

4        Do you see that?

5    A.  I do.

6    Q.  And the impression section of a medical record tells us

7    what exactly?

8    A.  What the doctors' diagnoses were that were creating the

9    symptoms that were treated during that admission.

10   Q.  Okay.  And in that listing of items there as things that

11   were possibly contributing to her situation, is there any

12   reference to Pradaxa or a prior GI bleed?

13   A.  No.

14   Q.  Okay.  And then at the bottom of the page, there is a

15   section called Plan.

16       Do you see that?

17   A.  I do.

18   Q.  All right.  And at the very bottom of that paragraph, it

19   says:  It should be noted that Dr. Gunnalaugsson did not want

20   her back on Plavix due to the history of gastrointestinal

21   bleeding.  We will simply keep her on low-dose aspirin along

22   with the Pradaxa as I do not think that Pradaxa could be held

23   in the long term given her multiple issues with blood clots.

24       Do you see that?

25   A.  I do.

George Crossley - Direct (Jones)          1557

1    Q.  And, again, just based on your clinical experience and
2    your opportunity to review the medical records, what does this
3    reflect in terms of what her doctors are doing?
4    A.  Just once again in this rock and a hard place business
5    between stroke risk and clot -- her history of throwing clots
6    and the coronary disease, they were trying to craft the safest
7    path for her.  In this case, they chose to discontinue the
8    Plavix, continue the aspirin and continue the Pradaxa.
9    Q.  Okay.  I'm going to ask you to turn back to 9003 if you
10   would, please.  It's 9003B, and we are going to go to page 62.
11        Are you there, Doctor?
12   A.  I am.
13   Q.  Okay.  And up at the top you can see this is a report from
14   the emergency room dated September the 1st, 2013.
15        Do you see that?
16   A.  I do.
17   Q.  And if you look a little further down, there is a section
18   entitled History of Present Illness.
19        Do you see that?
20   A.  I do.
21   Q.  And the first line says:  Chest pain, dyspnea.  This
22   started today and is still present.  It has been constant.
23        What is going on there, Doctor?
24   A.  Again, more of the classic coronary artery disease
25   symptoms, the shortness of breath and the chest discomfort

George Crossley - Direct (Jones)                    1558

1   that she complained of all through this period.

2   Q.  Okay.  Now one of the things I wanted to ask you about is

3   there's a reference in the next paragraph to her home health

4   support team saying that the patient had red-tinged urine the

5   day before.

6       Do you see that?

7   A.  I do.

8   Q.  And is it your understanding that there was actually a

9   urinalysis done to assess whether they could detect the

10  presence of blood in Mrs. Knight's --

11  A.  Yeah, I think the urinalysis -- I'm sorry.  I didn't mean

12  to interrupt you.

13  Q.  That's okay.

14  A.  I think the urinalysis was done the next day.

15  Q.  Okay.  Let's actually look at that document, which is on

16  page 95.  This is just a set of the records related to some of

17  the labs that were done.  I'm going to ask you to direct your

18  attention to page 97 if you would, please.

19      And just to situate ourselves, you see at the top of the

20  page there's a reference to her name, Mrs. Knight.  And you

21  see there's a reference to date and time ordered.

22      Do you see that?

23  A.  I do.

24  Q.  And it says on September the 1st, 2013, sometime in the

25  afternoon --

George Crossley - Direct (Jones)                    1559

1   A.  Yes.

2   Q.  -- correct?

3       And then if we scroll down, there is a listing of tests

4   that were done on Mrs. Knight's urine sample.

5       You see that?

6   A.  Yes.

7   Q.  And this was done in conjunction with the report by her

8   home health workers that they thought they saw blood in her

9   urine; is that right?

10  A.  That's correct.

11  Q.  Okay.  And if you look at the line that reads UA blood,

12  what does it -- what does it report there in terms of whether

13  that was positive or negative for blood in her urine?

14  A.  It reports that there was no blood detected in her urine.

15  Q.  Okay.  If you wanted to know whether someone had blood in

16  his or her urine, is the way you would figure it out to

17  actually do a urinalysis?

18  A.  Correct.

19  Q.  Doctor, just to finish up our discussion, I'm going to ask

20  you to turn back to 9003B, please.

21  A.  Okay.

22  Q.  And we're going to go to page 72, if you would.

23  A.  I'm there.

24  Q.  And, again, do you see this is a record relating to

25  Mrs. Knight's hospitalization in September of 2013?

George Crossley - Direct (Jones)                    1560

1    A.  I do.

2    Q.  And what they list in the assessment section is -- what is

3    that intended to capture in terms of what the doctors were

4    doing and thinking at the time?

5    A.  It shows that they -- that she was in acute respiratory

6    failure, and the doctors thought that what happened to her was

7    a cardiac arrest at home or a heart rhythm problem.  And --

8    and they had a long discussion with the family about whether

9    to proceed with aggressive therapy.  And after much

10   discussion, it was decided not to do that.

11   Q.  Okay.  And the second item listed there is new myocardial

12   infarction by enzyme criteria.

13        Do you see that?

14   A.  I do.  That --

15   Q.  And did -- go ahead.

16   A.  That means the troponin was elevated.

17   Q.  Okay.  At the end of that No. 2 items, it says:  I will

18   continue her on her Pradaxa and aspirin.

19        Do you see that?

20   A.  I do.

21   Q.  So they kept her on her Pradaxa during that

22   hospitalization?

23   A.  Correct.

24   Q.  Okay.  Is there any mention in this record to doctors

25   believing that what had happened with Mrs. Knight at the

George Crossley - Direct (Jones)                    1561

1    beginning of September had something to do with her having a

2    GI bleed or her Pradaxa treatment?

3    A.  No, there is not.

4    Q.  Dr. Crossley, do you have an understanding that Mrs.

5    Knight passed away on September the 2nd, 2013?

6    A.  I do.

7    Q.  Okay.  And I'm going to ask you to turn to 9006A in your

8    binder.  We're going to go to page 20.

9    A.  I'm there.

10   Q.  Do you recognize that record, Dr. Crossley?

11   A.  Yes.

12   Q.  Okay.

13        MS. JONES:  Your Honor, we would move for the

14   admission of 9006A.

15        THE COURT:  Any objection?

16        MR. CHILDERS:  No, sir.

17        THE COURT:  It's admitted.

18     (DEFENDANT'S EXHIBIT 9006A ADMITTED INTO EVIDENCE.)

19        MS. JONES:  Okay.  We're at 20.

20   Q.  Dr. Crossley, do you see at the top of the page this is a

21   death summary prepared by Mrs. Knight's doctors that's dated

22   September the 2nd, 2013?

23   A.  Yes.

24   Q.  And there is a reference there to diagnosis at time of

25   death.  Do you see that?

George Crossley - Direct (Jones)          1562

1  A.  I do.

2  Q.  And they refer to two things, acute respiratory failure

3  and out-of-hospital cardiac arrest; is that right?

4  A.  Correct.

5  Q.  And does that just mean that Mrs. Knight's heart and her

6  lungs stopped working?

7  A.  Yes.

8  Q.  Okay.  In the discussion section, it says:  This was an

9  84-year-old debilitated white female with a long list of

10 medical problems, and then it goes on to list some of those

11 issues.  And then later in that record, it says it is likely

12 that she had an out-of-hospital cardiac arrest a little

13 further down.

14     Is that consistent with your understanding of what had

15 happened with Mrs. Knight?

16 A.  It is.

17 Q.  Okay.  And at any point in this record, is there any

18 discussion of her doctors believing that her passing had

19 somehow been caused by her use of Pradaxa or the fact that she

20 had a GI bleed on Pradaxa?

21 A.  No, there is no reference to that.

22 Q.  Doctor, the last exhibit I want to look at with you is

23 Exhibit 9001, which is already in evidence.

24     Is this a document that you reviewed as part of your

25 evaluation of the medical records in this case?

George Crossley - Direct (Jones)            1563

1   A.  It is.

2   Q.  Do you recognize it as the death certificate or

3   certificate of death for Mrs. Knight dated September 2nd,

4   2013?

5   A.  I do.

6   Q.  Okay.  As part of your clinical practice, have you had to

7   complete death certificates for your patients?

8   A.  I have.

9   Q.  And is that a task that you take seriously?

10  A.  Definitely.

11  Q.  Is it something that you try your best to be as accurate

12  as you can when you are doing it?

13  A.  Correct.

14  Q.  Okay.  And do you have an understanding that this was a

15  death certificate that was completed by Dr. Abdelgaber, Mrs.

16  Knight's primary care doctor, in September of 2013?

17  A.  I do.

18      MS. JONES:  If we look down at the bottom of the page,

19  there is actually a signature from Dr. Abdelgaber.

20      Thank you, Mr. Reynolds.

21  Q.  Dr. Crossley, there's a question in this certificate that

22  refers to the immediate cause of Mrs. Knight's death.

23      Do you see that?

24  A.  I do.

25  Q.  It says cardiopulmonary arrest.  What does that mean?

George Crossley - Direct (Jones)                1564

1    A.   That means that she had a disastrous heart rhythm problem,

2    and her heart effectively quit pumping.

3    Q.   Okay.  Then it goes on to say -- it refers to acute

4    myocardial infarction, and then it lists atherosclerotic

5    coronary artery disease and hyperlipidemia.

6        Do you see that?

7    A.   I do.

8    Q.   Based on your review of the medical records, what is your

9    understanding of what that reflects in terms of what caused

10   Mrs. Knight's passing?

11   A.   I think it reflects what we've been talking about all

12   morning, which is that she had progressive coronary disease

13   that was caused by multiple risk factors.  Hyperlipidemia was

14   one of those.  That created the blockage in her arteries, the

15   atherosclerotic coronary artery disease.  That set her up for

16   the acute myocardial infarction.  And then acute myocardial

17   infarction caused the cardiac arrest.

18   Q.   Okay.  And then there is another section immediately below

19   that section that says:  Other significant conditions

20   contributing to death, but not resulting in the underlying

21   cause.

22       Do you see that?

23   A.   I do.

24   Q.   Based on your experience, is that an opportunity for

25   doctors to identify other things that they thought might have

George Crossley - Direct (Jones)          1565

1  somehow contributed to the death, but not an immediate cause

2  of the death?

3  A.  Correct.

4  Q.  Okay.  And what is listed there in that section?

5  A.  CHF is heart failure.  HTN is hypertension.  CKD is

6  chronic kidney disease.  And dementia is listed there as well.

7  Q.  Okay.  And are the conditions that are listed there

8  conditions -- conditions that are consistent with what you saw

9  in Mrs. Knight's medical records as things that she had going

10  on for a while?

11  A.  That's correct.

12  Q.  Okay.  Do you have a view to a reasonable degree of

13  medical certainty whether, based on your review of the

14  records, this death certificate accurately reflects what was

15  the cause of Mrs. Knight's passing?

16  A.  It certainly accurately reflects what I saw in the record.

17  Q.  Okay.  At any point in this certificate of death, did Dr.

18  Abdelgaber ever report that he believed that Pradaxa or Mrs.

19  Knight having a gastrointestinal bleed somehow contributed to

20  her passing?

21  A.  No, he does not.

22  Q.  Okay.  Dr. Crossley, I thank you for your time.

23      I want to ask you one last question, which is, are all of

24  the opinions that you have offered today offered to a

25  reasonable degree of medical certainty?

George Crossley - Direct (Jones)                    1566

1    A.   They are.

2              MS. JONES:   Thank you.

3              THE COURT:   All right.   Does that conclude your

4    examination?

5              MS. JONES:   It does, Your Honor.

6              THE COURT:   All right.   Ladies and Gentlemen, we'll

7    take a lunch break now before we start cross-examination.

8              Let's be back at 1:15.   Remember my instructions

9    before.   Don't discuss the case or allow anyone to discuss it

10   with you.   Don't start deliberating or try to ponder a

11   verdict.   Make sure that, as you return to the courthouse, you

12   come back to the jury room.   You can stay there as long on

13   this break as you like.   I will see you back here at 1:15.

14             Doctor, you can step down.   Don't discuss your

15   testimony with anyone.

16             I'd like to have a side bar with counsel off the

17   record for just a moment.

18        (Side bar conference, not reported.)

19        (Lunch recess taken at 12:07 p.m.)

20                          ---o0o---

21

22

23

24

25

George Crossley - Cross (Childers)

1     THE COURT:  All right.  Are we ready to resume the

2  cross-examination?

3     MR. CHILDERS:  Yes, Your Honor.

4     THE COURT:  Doctor, if you'll resume the stand.

5     **GEORGE CROSSLEY, DEFENDANT'S WITNESS, RESUMED THE**

6  **WITNESS STAND**

7     THE COURT:  All right.  Let's bring the jury out.

8     (Jury returned into the courtroom at 1:19 p.m.)

9     THE COURT:  All right, you may be seated.

10     Cross-examination?

11     MR. CHILDERS:  Yes, Your Honor.  My papers got a

12  little mixed up here.

13     THE COURT:  That's all right.  Take your time.

14     MR. CHILDERS:  Thank you, Your Honor.

15                    CROSS EXAMINATION

16  BY MR. CHILDERS:

17  Q.   Good afternoon, Dr. Crossley.

18  A.   Hello.

19  Q.   We met before; right?

20  A.   Correct.

21  Q.   And that was in Nashville?

22  A.   Correct.

23  Q.   Okay.  I want to ask you some follow-up questions to

24  the testimony you gave earlier today.  Okay?

25  A.   Okay.

George Crossley - Cross (Childers)

1  Q.   The jury heard yesterday from Dr. Shami.  Do you know

2  Dr. Shami?

3  A.   I met her briefly yesterday.  I never had a --

4  Q.   Were you here --

5  A.   -- conversation with her other than to say "hi" and

6  share pleasantries about the University of Virginia.

7  Q.   Were you here when she testified?

8  A.   Yes.

9  Q.   Okay.  So then I take it you don't know that yesterday

10  she testified that warfarin just did not work for Betty

11  Knight.  Did you know that?

12  A.   I didn't know that.

13  Q.   You don't agree with that, do you?

14  A.   As I said earlier, I don't think warfarin would be

15  outside the standard of care.  I do think that there's lots

16  of reasons to think that one of the NOACs would be far

17  superior for stroke prevention.

18  Q.   You agree with me that it would have been appropriate

19  for Betty Knight to stay on warfarin when she was switched;

20  right?

21  A.   Within the standard of care.

22  Q.   You agree with me it would have been an appropriate

23  choice; correct?

24  A.   I, I can't clarify it more than what I've said, that I

25  think it's within the standard of care and I do think the

George Crossley - Cross (Childers)

1 NOACs would have been a better -- were a better choice

2 because of superior stroke prevention. I think she -- that

3 is something that we always push to get on a NOAC when we

4 can. But if we can't, we settle for warfarin.

5 Q. Doctor, you recall in your deposition I asked you that

6 same question?

7 A. Uh-huh.

8 Q. And you gave me a different answer?

9 A. I gave you the same substance.

10 Q. Let me hand you your deposition.

11 MR. CHILDERS: May I approach, Your Honor?

12 THE COURT: You may.

13 BY MR. CHILDERS:

14 Q. Okay. If you would turn with me to Page 192 and line

15 12.

16 A. Yes, sir.

17 Q. Do you see that I asked you, "You don't disagree that

18 it would have been appropriate for Ms. Knight to stay on

19 warfarin, do you?"

20 And you answered, "I think either would have been

21 okay."

22 A. That is -- I think that's compatible with what I just

23 said, that, that it's within the standard of care to use it.

24 I would have rather had the NOAC.

25 Q. That's not what you said in your deposition, though;

George Crossley - Cross (Childers)

1   correct?

2   A.   That, that -- the meaning of the two is the same to me,

3   sir.

4   Q.   Okay.  Well, let's look then also on Page 216 when I

5   asked you that question in a different way, line 3.

6       Do you see I asked you, "She was an appropriate

7   candidate for warfarin; correct?"

8       And your answer was, "It would be appropriate for her

9   to stay on warfarin."

10       Right?  Isn't that right?

11   A.   That is correct.  And I think appropriate means it's

12   within -- to me means it's within the standard of care and

13   that's what I just said.  It's certainly within the standard

14   of care, but I would certainly have a preference for the

15   NOAC.

16   Q.   And you wouldn't agree that warfarin just did not work

17   for Ms. Knight; correct?

18   A.   No.

19   Q.   Okay.  I think you testified earlier that -- I'm sorry.

20   Let me take a step back.  You just said you would have

21   preferred Pradaxa; is that right?

22   A.   Yes.

23   Q.   And specifically for Ms. Knight if she had been your

24   patient?

25   A.   Correct.  And the reason is what I stated before is her

George Crossley - Cross (Childers)

1  CHADS-VASc score that defines the upper limits of the scale.

2  Q.   You know Ms. Knight, Betty, had reflux; right?

3  A.   Yes.

4  Q.   Or we call it GERD sometimes?

5  A.   Uh-huh.

6  Q.   You avoid Pradaxa in your own patients who have GERD,

7  don't you?

8  A.   If we can, but not in somebody who has a CHADS-VASc

9  score of 9.

10  Q.   So if you would -- do you recall I asked you that same

11  question at your deposition; right?

12  A.   I -- I'm sure you're going to show me that.

13  Q.   Yes, sir.  If you'd turn to Page 195, we were talking

14  about if you had preferences for one drug over the other for

15  anticoagulation.  Do you recall that discussion?

16  A.   Yeah.  I think that's perfectly compatible with what I

17  just said.

18  Q.   Okay.  And you said -- when I asked you if you had any

19  preference, you said the only preference -- at line 8

20  through 11.  You said, "The only preference I would say is

21  that patients who have nausea or GERD on Pradaxa is a bit

22  higher than the other drugs.  So if you have that, I would

23  go to another drug."

24       Right?

25            MS. JONES:  Excuse me, Mr. Childers.  I'm going to

George Crossley - Cross (Childers)                1572

1   object, Your Honor.  I don't think this is proper

2   impeachment.  It's not inconsistent with what he said.

3           THE COURT:  First, I could barely hear you.  I

4   don't know if that microphone is on.

5           MS. JONES:  I apologize.

6           THE COURT:  State your objection again.

7           MS. JONES:  My objection, Your Honor, is that this

8   is improper impeachment.  This is not inconsistent with what

9   he just said.

10          MR. CHILDERS:  I disagree, Your Honor.  I think it

11  is --

12          THE COURT:  Well, it's cross-examination.  I'll

13  allow it.

14          MR. CHILDERS:  Okay.

15  BY MR. CHILDERS:

16  Q.   So when I asked you that question about your preference

17  at your deposition, you said a patient with GERD, you'd go

18  with a different anticoagulant; right?

19  A.   This, this was asking me among the NOACs --

20  Q.   Okay.

21  A.   -- what's my preference.  And it is certainly true that

22  Pradaxa does have a certain instance of GERD and it can

23  aggravate the GERD and I might pick another NOAC rather than

24  Pradaxa.  But that's not a medically significant thing.

25  That just has to do with whether it's aggravating GERD or

George Crossley - Cross (Childers)

1   not.

2   Q.   Well, for your own patient that's the choice you would

3   make; correct?

4   A.   In the framework of what I just said, Mr. Childers.

5   Q.   Understood.  I want to ask you about -- actually, let

6   me just put something here.  If I could to start --

7        MS. JONES:  Your Honor, is it okay if I just

8   re-adjust so I can see the board?

9        THE COURT:  Yes, it is.

10       MR. CHILDERS:  I'm sorry.  This is your chart.

11   I'll switch out so I don't write on yours.

12       MS. JONES:  Okay.  That would be great also.

13       MR. CHILDERS:  I'm sorry, Your Honor.  This is

14   theirs, not mine.

15       THE COURT:  Well, all she wanted to do was

16   relocate over there.

17       MS. JONES:  I don't mind sharing a blank piece of

18   paper certainly.  I just wanted to be able to see what was

19   being written.  You're welcome to it.

20       MR. CHILDERS:  I didn't say she was complaining

21   about that.  I just realized I was writing on her board.

22       THE COURT:  Fair enough.

23   BY MR. CHILDERS:

24   Q.   Okay.  Is that accurate, that you would avoid Pradaxa

25   in a patient with GERD if possible?

George Crossley - Cross (Childers)

1   A.   Often I do, yeah.   The -- I mean, very frequently our

2   choice of NOACs is not ours, but it's that of the insurance

3   company.   And in a patient with GERD if that were -- if

4   Pradaxa were the preferred one, I would try it and see if it

5   worsens GERD.

6        It's not a medically important thing for the patient.

7   It's simply a symptom thing.   And if you, and if you give it

8   to a patient who has GERD and the GERD worsens, then I would

9   switch to another one.

10  Q.   Understood.   And that's why in your practice you try to

11  avoid Pradaxa in your GERD patients; right?

12  A.   On that very little limited issue, yes.

13  Q.   Okay.   You've had -- frequently have had patients come

14  to you and ask for a specific one of the NOAC drugs,

15  Xarelto, Pradaxa or Eliquis, to be given to them as a switch

16  from warfarin; correct?

17  A.   Correct.

18  Q.   And the reason you believe they've done that is because

19  they've seen a television ad; right?

20  A.   Correct.   Sometimes they ask for a specific one.

21  Sometimes they just ask for one of the new drugs.   Often the

22  latter is prompted by their primary care physician.   The

23  former is prompted by an ad on television.

24  Q.   So when you have a patient that comes and says, "I want

25  to be on Pradaxa," it's your assumption they saw a

George Crossley - Cross (Childers)

1  television ad; right?

2  A.    Usually.

3  Q.    Okay.  You read the depositions of Rick Knight and

4  Claudia Stevens; right?

5  A.    I did.

6  Q.    And you saw -- you recall from those depositions that

7  Claudia testified that she saw a Pradaxa ad and that she

8  called or told Rick about it.  And then he called Dr.

9  MacFarland's office to talk about switching Betty Knight

10  from warfarin; correct?

11  A.    That, that's my memory.

12  Q.    And you saw records that reflected that; correct?

13  A.    That's my memory.

14  Q.    And, in particular, you saw that they went into the, to

15  Dr. MacFarland's office and specifically asked for Pradaxa;

16  right?

17  A.    I, I wouldn't argue with that.  I think that is what

18  happened.

19  Q.    Okay.  And consistent with your experience, that would

20  indicate to you if that was your patient they probably saw a

21  television ad that brought them in; right?

22  A.    That's a humorous guess.  It's certainly not based on

23  any data.

24  Q.    That's based on your experience; correct?

25  A.    That's my guess when that happens, yes.  That's what

George Crossley - Cross (Childers)

1    I'm saying.

2    Q.   You didn't see any medical record in any of these

3    documents you reviewed that suggested one of Betty's doctors

4    actually suggested or initiated her switching from warfarin

5    to Pradaxa, did you?

6    A.   Sure.  Dr. MacFarland's -- Dr. MacFarland's note said

7    she switched it for good reason.  That, that -- I think

8    you're trivializing her medical concerns to say that it was

9    all based on some ad on television.

10   Q.   Before that day -- you're talking about the day they

11   came in and actually got Pradaxa.

12   A.   Right.

13   Q.   Before that day, you never saw any record that said

14   Betty Knight --

15   A.   Nothing --

16   Q.   -- should switch right?

17   A.   Yes.  Excuse me for interrupting.  No, nothing before

18   that.

19   Q.   Okay.  I thought on direct testimony you said that all

20   of the NOACs did better than warfarin in the clinical

21   trials.  Is that what you testified?

22   A.   Yes.

23   Q.   Okay.  And you said that Pradaxa -- I think you said it

24   was studied in what you called a gargantuan trial?

25   A.   18,000 patients.

George Crossley - Cross (Childers)

1   Q.   And that trial, I think you testified that the strategy

2   they used there was, "We're not going to monitor the

3   patient's blood for dosing.  We're going to compare no

4   monitoring to monitored warfarin."  Right?

5   A.   That's correct.

6   Q.   And in that test -- and in that clinical trial -- we're

7   talking about the RE-LY trial; right?

8   A.   That's correct.

9   Q.   In that RE-LY trial they never tested the 75-milligram

10  dose compared to warfarin; correct?

11  A.   That is correct.

12  Q.   They didn't test the 75-milligram dose against warfarin

13  to see if it was better at stroke prevention; right?

14  A.   The 75-milligram dose came from the FDA discussion at

15  the end of the trial.

16  Q.   Understood.  I'm asking you about the clinical trial

17  itself.

18  A.   Correct.  There was no 75-milligram dose available at

19  that time.

20  Q.   Not in any one of those 18,000 patients in that

21  gargantuan trial was the 75-milligram dose tested?

22  A.   That's correct.

23  Q.   And the 75-milligram dose was not tested in any one of

24  those 18,000 patients to see if the bleed risk was better on

25  that dose compared to warfarin; correct?

George Crossley - Cross (Childers)

1    A.   That's correct.  It was a pharmacokinetics analysis

2    that led to that.  So the, the FDA scientists looked at the

3    sub-analysis, the pharmacokinetics, and said, "We have this

4    high risk population," and expanded the indication to that

5    at the 75-milligram dose.

6    Q.   No, I understand.  My question, though, related to this

7    gargantuan trial that you described.  Nobody in that trial

8    took a 75-milligram dose; right?

9    A.   Correct.

10   Q.   Okay.  And when you say the NOACs did better than

11   warfarin in the clinical trials, what you're talking about

12   is the doses that were actually tested in the clinical

13   trials; right?

14   A.   That's correct.

15   Q.   Okay.  Would you agree with me that we don't have any

16   actual clinical data to show the 75-milligram dose is better

17   than warfarin for AFib patients?

18   A.   We don't have any randomized control data.  The data we

19   have is the pharmacokinetics data to say that those patients

20   with renal failure are expected to have a same -- a similar

21   blood level to the patients that were in the RE-LY study.

22   And that's why the FDA did what they did.

23   Q.   And that's not what we would call an outcome study;

24   correct?

25   A.   Correct.

George Crossley - Cross (Childers)

1  Q.   An outcome study would be:  Let's see what happens,

2  actually happens to the patients when we give them the drug.

3  Do we have less strokes?  Do we have less bleeds?  Right?

4  That's an outcome study; correct?

5  A.   That's correct.

6  Q.   And we don't have any of that kind of data for the

7  75-milligram dose; right?

8  A.   We have, we have real-world data from large studies

9  that show outcomes after the 75-milligram dose was relieved.

10  We do not have any randomized control outcome data.

11  Q.   And in those real-world studies you agree with me that

12  they say quite a number of the people that are on the

13  75-milligram dose, we couldn't even confirm that they had

14  severe renal impairment.

15  A.   They did say that.

16  Q.   So what they believed was there were people who didn't

17  have severe renal impairment who were taking the

18  75-milligram dose.

19  A.   That was a concern raised about those real-world

20  studies.

21  Q.   And that's why you really can't use that kind of a

22  study to get outcome data; correct?

23  A.   That -- those -- I wouldn't say you can't use

24  real-world studies.  They don't have the same level of

25  evidence as a randomized control study.

George Crossley - Cross (Childers)

1  Q.   It's not like one of those gargantuan trials that they

2  tested it.

3  A.   It was certainly gargantuan.  There's a lot of patients

4  in that.  But it's not like a randomized control trial.  Our

5  highest level of evidence when we, when we generate, when we

6  generate the, our recommendations like from the American

7  College of Cardiology, our highest level of evidence is a

8  randomized control trial.  Our next level of evidence down

9  is these large real-world trials.

10  Q.   Not one of those patients in those large real-world

11  trials even knew they were in a trial, did they?

12  A.   Correct.

13  Q.   So the next thing I'm going to write is there's no

14  clinical evidence that 75-milligram dose is better than

15  warfarin.  That's correct, isn't it?

16  A.   No.  I don't agree with that.  There is evidence that

17  it, that it -- there is evidence that the FDA used to

18  approve that that says that, that it's equivalent based on

19  the pharmacokinetics analysis.

20  Q.   Do you see the word "clinical" here?

21  A.   I see the word "clinical."  I know what clinical means,

22  sir.

23  Q.   All right.  And you --

24  A.   You're interrupting me.

25  Q.   I thought you were finished.

George Crossley - Cross (Childers)

1    A.    I was not.

2    Q.    Go ahead.

3    A.    So in the -- you're trying to mischaracterize what I'm

4    saying here and generate text up there for the jury.  And I

5    wouldn't buy at all that there's no clinical evidence that

6    the 75-milligram dose is, is equivalent to the 150-milligram

7    in patients that have normal renal function.

8        That data is what our scientists at the Food and Drug

9    Administration analyzed and created the 75-milligram dose

10   rather than approving the 110-milligram dose.

11   Q.    And that's why I wrote "clinical," sir.  They didn't

12   actually test the dose in patients; correct?

13   A.    It's not a randomized controlled study.  That's what I

14   would agree to.  Clinical means it has to do with the care

15   of patients.

16   Q.    Okay.  And which study are you talking about where they

17   actually compared the 75-milligram dose of warfarin to --

18   I'm sorry -- of Pradaxa to warfarin?

19   A.    I just said what you said, that there's no randomized

20   controlled study.  That doesn't mean there's no clinical

21   evidence.  Clinical means having to do with the care of

22   patients.  Clinical isn't defined as a randomized controlled

23   trial.  You're misdefining the word.

24   Q.    Okay.  No controlled trial evidence.  How about that?

25   A.    I'll agree to that.

George Crossley - Cross (Childers)

 1  Q.   Great.  I want to talk to you about how Pradaxa is

 2  dosed in patients in the United States.  Okay?

 3       If I understood your testimony correctly when we met

 4  last, you believe that Pradaxa dosing should be based on

 5  age, renal function, and something you referred to as

 6  fragility.  Is that right?

 7  A.   Frailty.

 8  Q.   Maybe the court reporter got it wrong.  Frailty?

 9  A.   Correct.

10  Q.   Okay.  Those are the three things you think Pradaxa

11  should be dosed on?

12  A.   Yeah.  And age and renal function are tightly linked.

13  Q.   Okay.  Do you have -- you looked at a Pradaxa label

14  earlier; right?

15  A.   I did.

16  Q.   I can't recall specifically what number that was.  Can

17  I look in your book there and -- actually, I have one of

18  those books here.  Pull out that Pradaxa label if you would

19  for us.

20  A.   The label from January of 2012 is on 5884.

21  Q.   Great.  Thank you for that.  Tell us, if you would,

22  where that label says you should consider age when you're

23  deciding the dose of Pradaxa you should give to a patient.

24  A.   I honestly don't know.

25  Q.   Take your time.

George Crossley - Cross (Childers)

1    A.    So I think where age comes into this is under eight

2    five under "Geriatric Use."

3    Q.    Okay.

4    A.    It says, "Of the total number of patients in the RE-LY

5    study, 82 percent were 65 and over while 40 percent were 75

6    and over.  The risk of bleeding increases with age but the

7    risk profile is favorable in all groups."

8    Q.    Okay.

9    A.    So I think that's where it brings up the point that age

10   may increase the bleeding risk.

11   Q.    Where does that section tell us that the dose should be

12   adjusted based on a patient's age?

13   A.    I think it's implied from that, but I don't think that

14   is specifically stated in the package insert.

15   Q.    Why don't we look, then, on the section that's actually

16   called "Dosing Adjustments" if we could.  It's Section 2.2.

17         Can you blow that up for us, Gina?

18   A.    I do see that.

19   Q.    That's where you would expect to find information about

20   how you dose a medication; right?

21   A.    Well, as I said, -- as I said in my deposition and I

22   said this morning, and I said in response to your question,

23   age and renal function are tightly linked there.  There is a

24   normal decline in renal function with age.  And that's

25   really where that whole thing comes into play.

George Crossley - Cross (Childers)

1   Q.   I understand.

2   A.   As your creatinine clearance falls, you should, you

3   should adjust the dose.  So as I, as I -- as you and I

4   argued considerably in my deposition, I think all of this

5   adjustment really hinges on renal, on renal function.

6   Q.   Well, I want to break that down a bit because you said

7   at your deposition very clearly there were three things that

8   you considered in dosing your patients; right?

9   A.   Correct.

10   Q.   And one of them was age.  One of them was renal

11   function.  And one of them is frailty.  Right?

12   A.   Right.

13   Q.   So with age, would you agree with me that in the

14   Pradaxa label it doesn't tell you to consider age when you

15   are choosing a dose?

16   A.   That's correct.

17   Q.   Okay.  It does say renal function; right?

18   A.   Yes.

19   Q.   Okay.  Tell us in the label where it tells you that you

20   should consider frailty.

21   A.   I don't think it tells you that in the, in the, in the

22   package insert.  That's just part of being a doctor.  When

23   you're giving medicine that has potential bleeding or other

24   side effects, you've got to take into account the patient's

25   frailty.

George Crossley - Cross (Childers)

1    And frailty means how sick you are, how generally ill

2    you are.  That's what frailty means.  It has a very thick

3    definition.  There's a whole body of science in gerontology

4    to look at frailty and come up with indices and things to

5    measure it.  Most of us take a

6    you-recognize-it-when-you-see-it kind of approach to

7    frailty.

8    Q.   You're not a gerontol -- I'm not sure how you pronounce

9    it.

10   A.   Gerontologist.  I'm definitely not a gerontologist and

11   I'm not about to get up here and talk about those frailty

12   indices.  I take an approach of recognizing it when you see

13   it.

14   Q.   Okay.  And then when you recognize that, what does the

15   label tell you about how to adjust the dose?

16   A.   The label doesn't say that.  That's what I said.

17   That's part of being a good doctor.

18   Q.   Okay.  And, so, when you see it, then, how do you

19   decide to change the dose for a Pradaxa patient?

20   A.   If they're frail, you're tempted to lower the dose.

21   Q.   Okay.  So that would be what we call off label; right?

22   A.   That -- not necessarily -- well, it is off label if

23   you're, if you're doing it without a decrease in renal

24   function, yes.

25   Q.   So what that means is we've heard over and over again

George Crossley - Cross (Childers)

1  from the defendant this is the label that the FDA approved;

2  right?

3  A.   Correct.

4  Q.   And what you're telling us is you don't even go by that

5  when you're dosing some of your patients; correct?

6  A.   No, I'm not -- I'm, I'm telling you that that's a guide

7  and that's just part of, one of the tools that you use in

8  practicing medicine.

9       You know, if medicine were as simple as we only had to

10  look at the label to know what to do, we wouldn't need

11  doctors.  We'd just need computers.  And what I'm telling

12  you is there are multiple factors you look at in prescribing

13  any therapy for a patient that involves risk.  And most of

14  my therapies do involve risk.

15  Q.   And there are multiple medications you can give a

16  patient for anticoagulation; correct?

17  A.   There are three NOACs and warfarin.

18  Q.   And Pradaxa is the only one that predominantly gets

19  cleared through the patient's kidneys; right?

20  A.   It's the most cleared through the kidneys, yes.

21  Q.   Okay.  And so with a kidney impaired patient, you've

22  got to be very careful with Pradaxa; correct?

23  A.   You've got to be careful and you've got to dose it.

24  And that's, that's why her doctors chose the 75-milligram

25  dose.

George Crossley - Cross (Childers)

1  Q.   And there are some patients that Pradaxa is just not

2  the right medication for; correct?

3  A.   Sure.

4  Q.   Okay.  I think -- and I'm sorry if I wrote this down

5  wrong.  I was trying to take notes while you talked.  Did

6  you testify on direct that we don't have a way to measure

7  Pradaxa blood levels?

8  A.   No.  I testified that we do have a way to measure

9  Pradaxa blood levels, but it's very time consuming and we

10 think it's very expensive.

11       And what I told you is that at Vanderbilt, same thing I

12 told you in my deposition, that at Vanderbilt we do not have

13 a way to do it because our lab tests go through a process

14 where a committee looks at them.  Anything that gets sent

15 out has to be approved by a committee for its utility so

16 that we're not wasting a lot of money doing things that

17 there's not science behind.

18 Q.   You --

19 A.   So at Vanderbilt if I ordered one, I would have to go

20 through an appeals process with a committee to get it sent

21 out.

22 Q.   Or you could send it over to LabCorp or Quest; right?

23 A.   No.  To send it out, I would have to go through that

24 appeals process.

25 Q.   Understood.

George Crossley - Cross (Childers)

1    A.    I mean, if I wanted to pay for it myself and write a

2    check for it, I could.  I could send it to LabCorp or Quest

3    and pay for it myself.

4    Q.    So the reason that you don't measure Pradaxa levels is

5    partly based on the fact that Vanderbilt won't let you do

6    that.  Is that accurate?

7    A.    The reason I don't measure Pradaxa levels is I haven't

8    seen any science that tells me I should measure Pradaxa

9    levels.

10   Q.    Has Boehringer ever told you how to measure Pradaxa

11   levels?

12   A.    No.

13   Q.    You, you believe they know how to do it; right?

14   A.    Sure.  They did in the clinical trial.

15   Q.    Okay.  Have you ever seen the European Pradaxa label?

16   A.    I don't practice in Europe.

17   Q.    That's not my question.  Have you ever seen --

18   A.    Only as part of preparation for this trial.  I think

19   you showed it to me.

20   Q.    Okay.  So you have seen it?

21   A.    Yeah.  I think you showed it to me the day of my

22   deposition.

23   Q.    I was the first person to show it to you?

24   A.    As far as I know, you were.

25   Q.    And that was after you'd been hired by Boehringer to be

George Crossley - Cross (Childers)

1    an expert in the case; right?

2    A.    That's correct.

3    Q.    And I think you told the jury earlier you've been

4    working on this case a long, long time; right?

5    A.    I have.

6    Q.    And it took until the time of your deposition for you

7    to even know what Boehringer told doctors in other countries

8    about how and when to measure blood levels; right?

9    A.    I -- about how and when to measure blood levels?  I, I

10   think that -- I -- well, my memory of the label may be off

11   but I don't -- I think that the label recommends alternative

12   clotting test, not blood levels.

13   Q.    Well, let's take a look at it.

14   A.    Okay.  Since I don't practice in Europe, I don't -- I

15   certainly don't have the European label memorized.

16   Q.    And I don't expect you to.  My question just dealt with

17   whether or not you've seen it and whether or not you know

18   what it says.  Sorry.

19           MR. CHILDERS:  May I approach, Your Honor?

20           THE COURT:  You may.

21   BY MR. CHILDERS:

22   Q.    This is Exhibit Number 80 which is already in evidence.

23   Do you recognize that's the European label that I first

24   showed you at your deposition?

25   A.    Correct.

George Crossley - Cross (Childers)

1    Q.   And if you would look with me on Page 6, do you see

2    there's a -- there are two charts and there's a couple

3    paragraphs in between them.

4    A.   Correct.

5    Q.   Do you see it says that the presence of lesions,

6    conditions, procedures and/or pharmacological treatment --

7    and it's got some treatments listed --

8    A.   I'm not, I'm not following you.  Hang on just a minute.

9    Q.   If you want to look on the screen, that may help you

10   orient yourself.

11   A.   Okay.

12   Q.   Then it says the presence of lesions, conditions,

13   procedures and/or pharmacological treatment such as NSAIDs,

14   anti-platelets, SSRIs and SNRIs which significantly increase

15   the risk of major bleeding requires a careful benefit-risk

16   assessment.  Pradaxa should only be given if the benefit

17   outweighs the bleeding risks.  Correct?

18   A.   Yes.

19   Q.   And you agree with that; right?

20   A.   Certainly.

21   Q.   You know those sentences are not in the U.S. label;

22   correct?

23   A.   I, I assume they're not.  I don't remember them.

24   Q.   Okay.  And then when we look on the next paragraph, it

25   says Pradaxa does not in general require routine

George Crossley - Cross (Childers)

1   anticoagulant monitoring.  Do you see that?

2   A.   Yes.

3   Q.   And that actually is in the U.S. label; correct?

4   A.   Correct.

5   Q.   And then it goes on to say, "However, the measurement

6   of dabigatran related anticoagulation may be helpful to

7   avoid excessive high exposure to dabigatran in the presence

8   of additional risk factors."

9        Do you see that?

10  A.   I do.

11  Q.   You agree with me that sentence is not in the U.S.

12  Pradaxa label; right?

13  A.   That's correct.

14  Q.   It's never been in the U.S. Pradaxa label; right?

15  A.   That's correct.

16  Q.   Okay.  And then when you look just below that paragraph

17  there's actually a Table II that tells us coagulation test

18  thresholds, meaning the readings at trough that may be

19  associated with an increased risk of bleeding; right?

20  A.   Correct.

21  Q.   And it's got three tests listed there that you can use.

22  And then it says the INR should not be used; right?

23  A.   That's correct.

24  Q.   Okay.

25  A.   But these -- none of these -- you said before measured

George Crossley - Cross (Childers)

1    dabigatran levels.  None of these are saying measure

2    dabigatran levels.  That's what I was trying to say.

3    Q.   Understood.  These are coagulation test thresholds;

4    correct?

5    A.   Correct.

6    Q.   Which tells you how well or how effective the

7    dabigatran is in the patient; right?

8    A.   It tells you a little bit about it.  None of these

9    tests are good tests for measuring the effect.  And that's

10   what I said in my testimony.

11        Even the compilation of the group of folks that got

12   together for the two think-tank meetings to, to think about

13   ways to manage these drugs agreed that we don't have the

14   right test to do this with.

15        These tests are relevant.  And, as I said, like the

16   aPTT is a good -- what the literature would say is it's a

17   good test for saying:  Is there some dabigatran around?

18   It's not a great test to say dabigatran is at the

19   therapeutic level.

20   Q.   The DTT test, that's the diluted thrombin time; right?

21   A.   Yes.

22   Q.   You understand that is a very good test that, that

23   tracks how active dabigatran is in the body; right?

24   A.   I think it's the best of these.  I don't think the

25   consensus of clotters is that it's ready for prime time to

George Crossley - Cross (Childers)

1   do this with.

2   Q.   Okay.  Well, have you ever seen -- did Boehringer share

3   with you the internal analysis document that they put

4   together explaining how they got to these numbers?

5   A.   I think I have seen that.  I don't remember the details

6   of it.

7   Q.   Okay.

8           MR. CHILDERS:  May I approach, Your Honor?

9           THE COURT:  You may.

10  BY MR. CHILDERS:

11  Q.   This is Exhibit Number 72 which is admitted into

12  evidence already.

13       Do you see, Dr. Crossley, that this is called a

14  Clinical Overview Statement, the first page?

15  A.   I do see that.

16  Q.   Very first page.  Let me put it on here.  I think for

17  some reason we're missing a page.  I just want to show the

18  jury so they can see real quick what it's called.

19       This is a Clinical Overview Statement; right?  And it's

20  about dabigatran; correct?

21  A.   Yes.

22  Q.   And it's talking about the 75-milligram, 110-milligram

23  and 150-milligram doses; right?

24  A.   Okay.

25  Q.   That's what it says?

George Crossley - Cross (Childers)

1    A.    Yes.

2    Q.    Okay.  And then it says it's for the Pradaxa prescriber

3    guide reference document.  And it says derivation of limits

4    in coagulation tests as given in Pradaxa prescriber guides

5    for SPAF and VTE.  SPAF is atrial fibrillation; right?

6    A.    Yes.

7    Q.    And look at the date on this report.  Do you see --

8    this is European, so that would be July 3rd, 2011, is the

9    way that that's written?

10   A.    Yes.

11   Q.    Okay.  If we could go into the document, go to Page

12   4 -- I'm sorry -- Page 5.  Do you see they talk about the

13   aPTT?

14   A.    I do.

15   Q.    If we turn to Page 6, the top paragraph, top two

16   paragraphs are talking about thresholds for the aPTT test;

17   right?

18   A.    Okay.

19   Q.    And it says, "It seems thus justified to consider 80

20   seconds as a boundary beyond which patients are exposed to

21   an increased risk of major bleeding exceeding the average

22   probability of bleeding under INR controlled warfarin."

23   Right?

24   A.    Okay, yes.

25   Q.    And you've not ever seen this before.  Am I right?

George Crossley - Cross (Childers)

1    A.   I, I -- you know, I've seen so much in the last two and

2    a half years, I can't tell you if I have seen or haven't

3    seen this.

4    Q.   Okay.  And then we go down to the next paragraph and it

5    talks about the fact that aPTT test results can vary

6    depending on the test you run; right?

7    A.   Correct.

8    Q.   And because of that, instead of talking about 80

9    seconds as the range, they're talking about using two to

10   three times the control; right?

11   A.   Yes.

12   Q.   Okay.  That's not --

13   A.   Two to three times the upper limit I think is what it

14   is.

15   Q.   Correct.  And what we saw in the label is that's

16   actually reflected; correct?  I'm sorry.  The European

17   label.

18   A.   I, I don't -- I still don't think the European label

19   recommends -- I don't think the science as a whole

20   recommends using this as a direct test for this.  I don't

21   know anybody that uses PTT on a regular weekly, monthly

22   basis to monitor this.

23        And, and I don't think it's thought of as a good line

24   like it is -- I mean, with, with, with the INR in warfarin,

25   there's a direct line.  As it goes up, the anticoagulation

George Crossley - Cross (Childers)                          1596

1   goes up.  And I don't think we have the data to say that

2   this gives us what we call a receiver operator curve that

3   would be favorable for this test.

4   Q.   This document says that this is the information that

5   the company believes would show a patient is exposed to an

6   increased risk of major bleeding exceeding the probability

7   if they were on warfarin.

8   A.   At 80 seconds, yes.

9   Q.   Correct.  And then they go on to say because that's

10  variable, we actually need to use a, a multiplier of the

11  upper limit of normal of the test; right?

12  A.   Yeah.  Again, I don't think they're trying to ascribe

13  therapeutic levels.  They're trying to describe super high

14  levels.

15  Q.   I understand that.  I didn't ask you about therapeutic

16  levels.

17  A.   Well, you asked if this was what we used to monitor

18  therapeutic levels and it's not.

19  Q.   I haven't said the word "therapeutic levels" today yet

20  until you just did.  I'm asking you if this is what the

21  company says is a measure to identify an increased or

22  excessive bleed risk.

23  A.   Yeah.

24  Q.   That's what I'm talking about.

25  A.   A really high aPTT, if there's no other reason for the

George Crossley - Cross (Childers)

1   aPTT to be high, like heart failure or being on Heparin or

2   being on warfarin, would indicate a lot of effect of

3   dabigatran.

4   Q.   And then if we turn back to Page 4, do you see that

5   it's talking there about the diluted thrombin time, the DTT?

6   A.   I do.

7   Q.   And I think you just told us that's not a test that's

8   really been shown to work.  Is that what you said?

9   A.   It's a test that I don't have access to.  So --

10   Q.   Okay.

11   A.   So I have no experience with this test.

12   Q.   And that's because Vanderbilt won't let you send your

13   blood samples out to LabCorp or Quest without pre-approval?

14   A.   That -- I assume that's what it is.  I think a DTT -- I

15   don't know if it can even be sent out.  Many clotting tests

16   cannot be sent out.  Like you could not send out -- an INR

17   expires in eight hours after you draw it.  And I don't know

18   what the requirements are for the DTT.

19   Q.   You just have no idea?

20   A.   I don't know, yeah.

21   Q.   Okay.  This in particular, if we look down into the

22   body of this test, it says that the diluted thrombin time

23   assay is a quantitative test which will provide dabigatran

24   plasma concentration.  Do you see that?

25   A.   I see that.

George Crossley - Cross (Childers)

1   Q.   You just told us we can't measure dabigatran plasma

2   concentration.

3   A.   Well, that doesn't measure dabigatran plasma

4   concentration.  That's the same thing -- that measures

5   clotting function.

6   Q.   Right.

7   A.   You asked me directly about measuring dabigatran plasma

8   concentration.  This doesn't measure that.  This measures

9   something that estimates, that's parallel to it.  It doesn't

10   measure what you asked.

11   Q.   Understood.  Let me, let me rephrase that.

12       This test, according to the company, will give a

13   quantitative assessment of what the patient's dabigatran

14   plasma concentration is; right?

15   A.   It will give a quantitative assessment of the clotting

16   factors, yes.

17   Q.   And that -- according to the company --

18   A.   That correlates -- that might correlate with the plasma

19   concentration.

20   Q.   What did the company say?  It says "will provide

21   dabigatran plasma concentration."  Correct?

22   A.   Yes.

23   Q.   Okay.  That's what I'm asking you.  And then if we go

24   down further, it says --

25       Starting here, Gina.

George Crossley - Cross (Childers)

1    "Based on the clotting times as determined by the

2    hemoclot assay," and you see up here that is the DTT,

3    "concentrations of 215 in the above-mentioned studies a

4    diluted thrombin clotting time of 65 seconds at trough is

5    considered to represent a conservatively assessed cutoff

6    value."  Right?

7    A.    Okay.

8    Q.    And then it goes on to say -- and you understand that

9    to mean -- a cutoff value is you don't want to go above it;

10   right?

11   A.    Correct.

12   Q.    And then it goes on to say, "As outlined above, an

13   assessment of the risk of bleed in a given patient should be

14   based --" and I want you to see this part, sir -- "on the

15   actual dabigatran concentration as determined by the

16   hemoclot assay rather than by determining thrombin time

17   only."

18        Do you see that?

19   A.    I do see that.

20   Q.    And what the company is saying is using this diluted

21   thrombin time, you can determine the actual dabigatran

22   concentration; right?

23   A.    You can measure something that correlates with it, yes.

24   Q.    According to the company?

25   A.    Yes.

George Crossley - Cross (Childers)

1   Q.   Okay.

2   A.   And this is the recommendation, as I understand, in

3   Europe.  And in this country, we generally follow what the

4   U.S. Food and Drug Administration describes for us.  And all

5   of this -- I certainly wasn't there when the label was

6   negotiated, but I'm sure there was an awful lot of data

7   pushed back and forth.  And the recommendation here was that

8   we follow clinical factors.

9   Q.   Sir, if you weren't there when any of this happened and

10  you haven't reviewed it, how do you know?

11  A.   I haven't reviewed what?

12  Q.   Back and forth between the FDA and Boehringer.  You

13  haven't reviewed that, have you?

14  A.   So there, there are probably a thousand drugs that I

15  use.  If your expectation that all practicing physicians be

16  at the FDA for negotiation of those labels, you've got a

17  really strange kind of assessment.

18       We have to rely, we have to rely on our experts that,

19  that spend their entire lives looking at drug safety and

20  drug monitoring to help us do what we do.  And that's what

21  our U.S. Food and Drug Administration said to do.

22  Q.   Maybe I misheard you.  I thought you said you were sure

23  that the FDA considered all that information.  But you

24  weren't there; is that right?

25  A.   I'm -- we don't stay -- we, we have to trust the Food

George Crossley - Cross (Childers)

1  and Drug Administration to do their job.  I do, I do trust

2  them to do their job.

3  Q.   Great.  My point, sir, is only you -- because you

4  weren't there, you can't tell us what in particular was

5  discussed.  I'm not faulting you for not being there.

6  A.   No, I can't tell you that.

7  Q.   Right.  You have no idea what was actually discussed

8  between the company and the FDA; right?

9  A.   No, I don't.

10  Q.   So if you say to us, "I'm sure the FDA did this or

11  that," you don't actually know that?

12  A.   I'm sure the FDA did their job.

13  Q.   Fair enough.

14  A.   Having been through a lot of FDA device discussions

15  with them, they're very thorough.

16  Q.   The device section of the FDA is different from the

17  drug section.

18  A.   It is different committees, different staff.

19  Q.   Different rules; right?

20  A.   A little bit different rules.

21  Q.   Okay.

22  A.   Similar level of scrutiny.

23  Q.   You understand, Dr. Crossley, that the information that

24  goes into the label, the warnings, the information about how

25  to use the drug, that's a responsibility of Boehringer, not

George Crossley - Cross (Childers)

1    the FDA; correct?

2    A.   It's the result of the drug companies proposing

3    something in a long and arduous negotiation with the FDA.

4    Q.   The responsibility for maintaining the drug label is

5    Boehringer's; correct?

6    A.   Correct.

7    Q.   That's not the FDA's responsibility; right?

8    A.   It is the -- I will repeat what I said.  The nature of

9    what's in there comes out of a long and arduous discussion

10   between the sponsor and the, and the agency.

11   Q.   You testified -- I'm sorry.  Just a minute ago, if I

12   heard you correctly, I think you said that you practice

13   medicine here and you follow the FDA's label.  You don't

14   look at --

15   A.   I do.

16   Q.   Except for those patients who are frail and you decide

17   you want to give them a dose that's different from what the

18   FDA label tells you.

19   A.   That -- you know, it's a favorite topic of lawyers to

20   criticize us for going off label.  And we have thousands of

21   patients in a big spectrum and the, the -- it is not a

22   terribly infrequent thing that we have to alter, alter what

23   we do because of specific patient factors.

24        I certainly, greater than 95 percent of the time,

25   prescribe drugs and devices straight down the middle of the

George Crossley - Cross (Childers)

1  road in the label.  Somewhat less than that, there are

2  reasons to do something different.

3  Q.  How many times have you been criticized by lawyers for

4  prescribing off label?

5  A.  I haven't been criticized by lawyers for prescribing

6  off label.  I've just heard it.

7  Q.  What are you talking about?

8  A.  Well, for one, your criticism of me in the deposition.

9  That, that was -- that, that's what comes to mind.  You were

10 pretty harsh on me for being off label in the deposition.

11 Q.  Sir, we didn't talk about any off label prescribing in

12 your deposition.

13 A.  I believe -- well, one of you did.  I don't remember

14 who it was.  We talked about this off label issue in great

15 detail.

16 Q.  Maybe your counsel can get up when I'm done and point

17 that out to us, but my recollection is that never came up.

18      All right.  Is it your -- I'm sorry.  I want to switch

19 gears just a bit.

20      You testified earlier that Betty's renal function, I

21 think you said, was at the edge of severe renal impairment.

22 And then you said those words don't mean much, though.  Do

23 you recall saying that?

24 A.  What I'm trying to say is the labels we put on things

25 like severe renal failure or end stage renal failure or

George Crossley - Cross (Childers)

1  moderate renal failure are just -- the words don't mean

2  much.  But, but we try to ascribe specific ranges where

3  things make sense.

4  Q.   And that's what I was going to get to.  What really

5  matters is what was the actual creatinine clearance for the

6  patient; right?

7  A.   Correct.

8  Q.   And in Ms. Knight's case, Betty's case, she was in the

9  15 to 30 milliliters per minute range; correct?

10 A.   Yes.  Most of the time she was just around 30.

11 Q.   And, in fact, --

12 A.   Just under 30.

13 Q.   And she fluctuated which you expect in a severe -- or

14 a -- we don't have to use the label, but a patient who has

15 kidney function that's around that range; right?

16 A.   Especially a patient who has heart failure and kidney

17 function around that range because that's what drives that,

18 that difference in that range.

19 Q.   And I want to make sure I, I'm clear and we're all

20 clear.  I thought I heard you say a couple things that I

21 wasn't sure of.  You're not blaming any of Betty's doctors

22 for the fact that she was on Pradaxa; right?

23 A.   No.

24 Q.   Okay.  And, and you told the jury you think Pradaxa --

25 you think it was an appropriate medicine for her?

George Crossley - Cross (Childers)

1    A.    I do.

2    Q.    I think you pointed out on direct examination that the

3    Pradaxa label had been changed in January of 2012 after

4    Betty Knight had already been started on Pradaxa.  Do you

5    recall that?

6    A.    I, I -- there, there were a number of changes to the

7    Pradaxa label over time.  But I think there was one very

8    soon after she was started.

9    Q.    I'm talking about the one that you and Ms. Jones talked

10   about during your exam.  Do you recall that?

11   A.    I think that -- my recollection is that was an edit

12   that happened right, very soon after she was put on the

13   Pradaxa.

14   Q.    I think that's Exhibit Number 5884 in that binder that

15   Ms. Jones gave you.

16   A.    Yeah.  That's the one I just pointed out to you from

17   1-2012.

18   Q.    Right.  And in that particular label, you pointed out

19   to us that the company added this information about P-gp

20   inhibitors in patients with severe renal impairment right

21   here.  Pradaxa use not recommended.  Right?

22   A.    Correct.

23   Q.    Do you agree with me that Boehringer never sent a "dear

24   doctor" letter or any other written communication alerting

25   Dr. MacFarland or any doctor in the United States that this

George Crossley - Cross (Childers)

1  particular change had been made to that label?

2  A.  I, I don't know their business practices as to how that

3  is promulgated.  But, I, I -- if you tell me that they

4  didn't do that, I'll accept that.

5  Q.  Well, --

6  A.  I, I certainly haven't reviewed their communications to

7  know that to be a fact.

8  Q.  You were hired by their counsel to testify in this

9  case; right?

10 A.  Correct.

11 Q.  One of the things you told us was you thought the label

12 was adequate; right?

13 A.  I do.

14 Q.  They haven't handed you any document to show you that

15 they ever communicated this label change through a "dear

16 doctor" letter or any other written communication sent out

17 to doctors; right?

18 A.  I, I have not seen that communication.  That's what I'm

19 telling you.  I agree with you.

20 Q.  They didn't give it to you?

21 A.  I agree with you.  I don't know why you're --

22 Q.  Okay.  So I want to make sure I'm clear.  When, when

23 this change happened and there was no written communication

24 sent out, you're not telling the jury that Betty's doctors

25 did something wrong if they didn't know about that label

1  change when it happened, are you?

2  A.  Well, we know about these label changes as much through

3  our IT system nowadays as we do through anything else.  I

4  mean, whenever we prescribe a drug, when it goes to a

5  pharmacy, it, it is, it goes through a pharmacy management

6  system that spits out warnings and tells us about these

7  contraindications.  And that's how we, by and large, find

8  out about these things.

9      We have a sort of geeky approach to that at Vanderbilt

10  where we have a lot of conferences and we talk about things.

11  But for most people, they find out about it that way or when

12  a rep hands them the new label.

13  Q.  Let me re-ask my question because I'm not sure you

14  understood it.  You're not telling the jury that Betty

15  Knight's doctors did something wrong if they weren't aware

16  of this label change when they didn't get a notification of

17  it, are you?

18  A.  I don't think they did anything wrong, period.  I

19  don't -- as I said before, I think they did a marvelous job

20  of trying to take care of her.

21  Q.  That includes every doctor who prescribed Pradaxa to

22  her; correct?

23  A.  That's correct.

24  Q.  Okay.  You testified earlier that Coreg is a P-gp

25  inhibitor; right?

George Crossley - Cross (Childers)

1    A.    Correct.

2    Q.    And I think you said -- again, I'm sorry if I, if I

3    don't get this exactly right.  But I think you said that you

4    have seen data that says Coreg is a P-gp inhibitor; right?

5    A.    I've seen -- yeah, lots of lists of P-gp inhibitors

6    list Coreg as a, as a risk, or as a P-gp inhibitor I should

7    say.

8    Q.    Did you see that data before or after you were hired to

9    be a witness for Boehringer?

10   A.    Before.  But Coreg is a very commonly used drug in

11   cardiology.

12   Q.    And especially -- you see it a lot with atrial

13   fibrillation patients who are also taking Coreg; right?

14   A.    Right, yeah.

15   Q.    And is part of that data the Coreg label, the label you

16   get sort of like the Pradaxa label that we're talking about

17   here?

18   A.    I, I don't remember.

19   Q.    You don't know if you looked at that or not?

20   A.    I don't remember -- I don't recall the details of the

21   Coreg label.  I know every time I prescribe Pradaxa and

22   Coreg, my computer system asks me if I know what I'm doing.

23   Q.    And that's at Vanderbilt?

24   A.    Yes.  And if it doesn't, then the pharmacy system does.

25   And sometimes we get both warnings.  But, again, her, her

George Crossley - Cross (Childers)

1  Coreg dose was really, really low.  And I think that's an

2  important consideration in this.

3          MR. CHILDERS:  Your Honor, I'm going to -- may I

4  approach the witness?

5          THE COURT:  You may.

6  BY MR. CHILDERS:

7  Q.  I'm going to hand you a document that's actually

8  Defendant's Exhibit 9027.  Do you see that's the Coreg

9  package label?

10  A.   Okay.

11  Q.  Do you see that?

12  A.   I do.

13  Q.  Can you take a look at that and tell us where it

14  says -- or it tells a doctor, "Be careful.  This is a P-gp

15  inhibitor."

16  A.   I don't see at least in the over sheet there where it

17  says that.

18  Q.  I've looked through it and I didn't see it anywhere.

19  But certainly I'm more than happy for you to look through

20  the whole thing.

21  A.   It talks about -- excuse me.  I'm sorry.  It talks

22  about CYP P450, but I don't see a discussion of P-gp.

23  Q.  But it is a P-gp inhibitor; right?

24  A.   It is.  It's accepted.

25  Q.  So if Betty's doctors looked at the label for Pradaxa

George Crossley - Cross (Childers)

1   and the label for Coreg, that wouldn't tell them that those

2   two medications shouldn't go together because the Coreg

3   label doesn't tell them that it's a P-gp inhibitor; right?

4   A.   At some juncture, it certainly was added to the MedX or

5   the, the, the, the systems that the pharmacies use to warn

6   us.  But you're right.  It was not in this package insert

7   and it's not in the other.

8        And, as I said, the, the two things is the Coreg dose

9   was very low and I don't think there's any evidence that she

10  was ever overly anticoagulated.

11  Q.   I haven't asked you that, sir.

12  A.   I know you didn't.

13  Q.   My question is if the doctor is prescribing Pradaxa and

14  Coreg at the same time and they look at the labels and it

15  says don't give Pradaxa to a severe renally impaired patient

16  who's taking a P-gp inhibitor, how do they know that Coreg

17  is a P-gp inhibitor?  It's not in a Pradaxa label or the

18  Coreg label; right?

19  A.   Not everything we know in medicine comes out of the

20  package insert.  I mean, we, we, we -- there's a lot to

21  learning how to be a good doctor that's not just in the

22  package insert.  And that's part of learning things.

23       I mean, I don't -- I, I would prefer it be in the

24  package insert.  But, you know, at -- and at, and at the

25  right time it was in the Pradaxa package insert once it

George Crossley - Cross (Childers)                    1611

1   became apparent.  But I don't think everything we do in

2   prescribing drugs comes out of the package insert.

3   Q.   You understand the package insert is the warnings that

4   the company provides?

5   A.   I do understand that.

6   Q.   And you understand we're here today for a failure to

7   warn issue that has to be decided by this jury; right?

8   A.   I do understand that.

9   Q.   Okay.  And, so, what we're talking about is the

10  information the company, Boehringer, provides patients and

11  doctors.  And that's what we have in the label, right, the

12  Pradaxa label?

13  A.   Yes.

14  Q.   Okay.  So in the Pradaxa label, any of them that you've

15  ever reviewed, did you see the word "Coreg"?

16  A.   In the Pradaxa -- Coreg?

17  Q.   Coreg.

18  A.   I saw the word "Carvedilol" I believe.

19  Q.   Great.  Show it to us.  Pick any label you want.  And

20  Carvedilol is the chemical name for Coreg; right?

21  A.   Yeah.

22  Q.   Okay.

23  A.   No, it's not in there.  It just says avoid P-gp

24  inhibitors, yes.

25  Q.   And so --

1612

1    A.    But, I mean, P-gp inhibitors -- if you listed all P-gp

2    inhibitors in the label, you'd need another page and a half.

3    I mean, we'd have to list oranges, grapes, St. John's Wart

4    and all this other manner of stuff that's listed as P-gp

5    inhibitors.

6    Q.    Pradaxa is a medication given to patients for a heart

7    condition called atrial fibrillation; right?

8    A.    It is, uh-huh.

9    Q.    And you just told us that Coreg is a very common

10   medication given to heart patients; correct?

11   A.    That's right.

12   Q.    So you ought to know that's the kind of drug that is

13   going to commonly be prescribed together; right?

14   A.    That's right.

15   Q.    But the label doesn't tell you that could be a problem

16   for a patient like Betty Knight; right?

17   A.    It could be a problem -- it could potentially be a

18   problem.  It needs monitoring.  And this lady was monitored

19   as well as anybody I've ever seen.

20   Q.    Do you agree with me that the Pradaxa label has never

21   said Coreg is a P-gp inhibitor; right?

22   A.    Correct.

23   Q.    It's never said Coreg is a drug that should be avoided

24   in patients who have severe renal impairment and are on

25   Pradaxa; correct?

George Crossley - Cross (Childers)

1   A.   That's correct.  I don't think I've ever seen a drug

2   label that, that involves P-gp inhibition that attempts to

3   list all P-gp inhibitors.

4   Q.   Well, the Pradaxa label does list some specifically;

5   right?

6   A.   It does some really strong ones.

7   Q.   Well, it actually lists quite a few.  And some of them

8   it says don't worry about them; right?

9   A.   I don't remember that part.  I trust you if it is.

10  Q.   Well, --

11  A.   I'm sure you've looked at that more than I have.

12  Q.   Coreg and Carvedilol, same thing, has never been in

13  Pradaxa?

14  A.   Correct.

15  Q.   You agree with me that Coreg is a P-gp inhibitor;

16  right?

17  A.   That's correct.

18  Q.   And you agree with me that the Pradaxa label does not

19  list Coreg at all; right?

20  A.   That is correct.  It doesn't list Coreg and it doesn't

21  list 150 or more other things that are there, as I said,

22  like commonly used stuff like oranges and grapes and things

23  that we all encounter every day.

24  Q.   You agree with me that Pradaxa contributed to Betty

25  Knight's bleed in May of 2013, don't you?

George Crossley - Cross (Childers)

1   A.   Pradaxa was one of the three drugs that she was taking

2   when she bled.

3   Q.   And you agree with me that it contributed to her GI

4   bleed; correct?

5   A.   It contributed as one of the three drugs.  What I have

6   to say in addition to that is she did well on Pradaxa

7   without triple therapy and did poorly on Pradaxa with triple

8   therapy.

9   Q.   Let me show you your deposition, Page 235.  Okay?  Go

10  to line 17.

11  A.   Yeah.  I, I agree with that.

12  Q.   And what you said on -- my question was the same here.

13  "You believe Pradaxa did contribute to her bleed; correct?"

14       And your answer was just, "Yes."

15       That's all you said; correct?

16  A.   That's right.

17  Q.   And you agree with that today; correct?

18  A.   I do agree with that, yes.  It is an anticoagulant.

19  It's a strong anticoagulant.

20  Q.   I wrote here "Pradaxa contributed to GI bleed."  Is

21  that fair?

22  A.   It's fair given the boundaries of what I told you

23  earlier.  I think, I think I'm -- just trying to twist

24  things that I'm saying a little bit is -- I'm trying to

25  clarify it.

1615

George Crossley - Cross (Childers)

1    Q.    Sir, that was a real straightforward question with a

2    straightforward answer when I took your deposition; right?

3    A.    The straightforward answer is she did well on Pradaxa

4    without triple therapy.  She bled on triple therapy.  She

5    did well on Pradaxa after she was off triple therapy.

6    Q.    Well, when I asked you --

7    A.    And, yes, it does contribute to it.  It is a blood

8    thinner.  It is an effective blood thinner.  And if you're

9    bleeding and you're on Pradaxa, it's going to make you bleed

10   worse.

11   Q.    Betty did not have a GI bleed when she took Plavix and

12   aspirin along with Coumadin in 2009; correct?

13   A.    I can't tell from the record.  The record reflects that

14   she had had lots of anemia and blood loss before that.  And

15   Dr. Gunnalaugsson wax poetic in the record about not wanting

16   her on triple therapy.  That's why he stopped it.

17        I don't -- I can't tell from the record whether that

18   occurred on triple therapy.  I don't think it did.  I think

19   it happened on, on the Coumadin alone or maybe Coumadin and

20   aspirin.

21        But I can't -- there's certainly lots of references

22   from both his record and the primary care doctor's record

23   about prior bleeding.  There's no clear -- there's no

24   colonoscopy and proven source and all that kind of stuff.

25   But that's why he took her off the triple therapy that

George Crossley - Cross (Childers)                    1616

1   included warfarin was his concern about bleeding.

2   Q.   Okay.  So when he took -- when Dr. Gunnalaugsson took

3   Betty off of triple therapy, as you call it, that was in

4   March of 2009; right?

5   A.   I think that's right.

6   Q.   She had been on triple therapy for some period of time

7   before March of 2009; right?

8   A.   For a few weeks is all.

9   Q.   Okay.  The jury yesterday was told that Dr. Shami

10  believes that Betty Knight had a bleed in November of 2008.

11  Okay?

12  A.   Yes.

13  Q.   She went on triple therapy after November of 2008;

14  correct?

15  A.   That's, that's what I just said.

16  Q.   Okay.

17  A.   I don't know when that bleed happened.  She had prior

18  bleeding and it's not clear from the record when it

19  happened.  And I don't think it did occur on the triple

20  therapy.  But she was only on the triple therapy for a few

21  weeks.

22  Q.   She was only on triple therapy in May of 2013 for a few

23  weeks too; correct?

24  A.   That's correct, yeah.

25  Q.   So --

George Crossley - Cross (Childers)

1    A.    That's, that's the way bleeding from, from that kind of

2    source happens is it doesn't -- it's not always there.  It's

3    not a static thing.  It's not like we can do an experiment

4    and say today we gave her prune juice and she didn't bleed

5    and tomorrow we're going to give her apple juice and she

6    does bleed, so it must be the apple juice.  It's not that

7    simple.

8    Q.    I just want to make sure that we're on the same page.

9    When she was on triple therapy with Coumadin, you didn't see

10   any evidence of a bleed; right?

11   A.    That's correct.

12   Q.    Okay.  And that's the only other time she was on triple

13   therapy until May of 2013; right?

14   A.    It was a long time.  I mean, your, your intestinal

15   veins can change a lot in that number of years.  What it

16   takes to bleed is not the drug.  The drug doesn't make you

17   bleed.  What makes you bleed is something in your colon

18   bleeds and the drug makes you bleed worse.

19        And, so, she wasn't bleeding when she was on triple

20   therapy before and she was bleeding when she was on triple

21   therapy the second time.

22   Q.    I understand.  And I understand you want to advocate

23   for your client.

24   A.    I'm not trying --

25   Q.    I'm asking you a question that has nothing to do with

1    that.

2              MS. JONES:  I'm sorry, Your Honor.  I'm going to

3    object.  I think this is becoming a little argumentative.

4              THE COURT:  Well, --

5              MR. CHILDERS:  It seemed very unresponsive.

6              THE COURT:  I would instruct each of you to ask a

7    proper question and give a direct answer and then move on.

8              THE WITNESS:  Okay.  I would take strong objection

9    to your characterizing as advocating for my client.  I'm

10   here to tell the truth and that's it.

11   BY MR. CHILDERS:

12   Q.   Okay.  Tell us the truth here.  This is a simple

13   question.  The only two times she was on triple therapy was

14   in March of 2009 and May of 2013.  That's my whole question.

15   A.   That's correct.

16   Q.   Okay.  When Betty was on triple therapy with Pradaxa,

17   she had a severe GI bleed; correct?

18   A.   Yes.  She had a GI bleed that was severe by whatever

19   those words mean.

20   Q.   According to her doctors, it was severe; right?

21   A.   Sure.  It required four units of blood transfusion.  It

22   was a big deal.  That's right.

23   Q.   And when Betty was on triple therapy with Coumadin, she

24   did not have any GI bleed; correct?

25   A.   That is correct.

George Crossley - Cross (Childers)

1  Q.   You reviewed records that went back beyond November of

2  2008, earlier than that, correct, for Betty Knight?

3  A.   Correct.

4  Q.   And when you reviewed those records, you didn't see

5  anything that showed you that Betty Knight had a GI bleed;

6  correct?

7  A.   I saw that she had -- there was lots of references to

8  her having anemia and having to -- I believe she was

9  transfused two units, if I'm not mistaken.  And I don't

10 think she ever had endoscopy proven GI bleeding.

11      When, when a lady -- when a patient like her has

12 missing blood, as we call it, and, and is anemic for reasons

13 that are not clear and you get transfused and it gets

14 better, the assumption is always that it's a GI bleed.

15 Q.   Sir, do you remember I asked you that same question at

16 your deposition?

17 A.   I don't remember.

18 Q.   Okay.

19 A.   That was a long deposition.

20 Q.   I was trying to be thorough to make sure I understood

21 all of your opinions.

22 A.   Yeah.

23 Q.   If you would look on Page 191 with me at line 11.

24 A.   Yes.

25 Q.   Do you see I asked you, "In the records you actually

George Crossley - Cross (Childers)

1   reviewed, Ms. Knight didn't have a GI bleed in that time

2   period while on warfarin; correct?"

3        And you answered, "That's correct."

4        Right?

5   A.   Yes.

6   Q.   And then I went on to say, "And that was a period of

7   multiple years; correct?"

8        And you answered, "That's correct."

9   A.   That's correct.

10  Q.   That's your testimony today; correct?

11  A.   That -- I, I -- perhaps I forgot about the episode in

12  the past where there were all the references to the anemia.

13  I don't know if she had a GI bleed.  She could have had a

14  retroperitoneal bleed or some other kind of bleed.  But she

15  certainly had somekind of bleed that got her blood count

16  down.

17  Q.   She had anemia; right?  You agree with that?

18  A.   Uh-huh.

19  Q.   You didn't see any evidence in the records you reviewed

20  of a GI bleed.  You just confirmed that to us; right?

21  A.    That's what I just said.  She had anemia that got

22  better without any therapy.  I mean, the, the -- if you were

23  to look at a differential diagnosis, which means the choices

24  we have in explaining something, --

25            MR. CHILDERS:  I would object as nonresponsive,

George Crossley - Cross (Childers)

1   Judge.

2           THE COURT:  Well, just answer his question

3   directly.

4           THE WITNESS:  Okay.

5           THE COURT:  You can be asked on redirect.

6           THE WITNESS:  Okay.

7   BY MR. CHILDERS:

8   Q.  Do you understand you and Dr. Shami reviewed the exact

9   same records?  Did you know that?

10  A.  I would assume we did.  I hope so.

11  Q.  Okay.  You pointed out on direct two records from Dr.

12  Gunnalaugsson that said he believes she, Betty had had a

13  bleed while on Coumadin; right?

14  A.  Correct.

15  Q.  Those were from December of 2008 and March of 2009;

16  right?

17  A.  I think that's right.

18  Q.  You understand that Dr. Gunnalaugsson never actually

19  himself saw those November, 2008, records that you and Dr.

20  Shami got to review; right?

21  A.  I didn't know that.  I don't know what record he

22  reviewed.

23  Q.  You read his deposition, didn't you?

24  A.  I did read his deposition.

25  Q.  And you recall he said, "I never actually read those

George Crossley - Cross (Childers)

1   records."  Do you recall that?

2   A.   I don't recall that.  I won't argue with it.

3   Q.   Okay.  I want to ask you about an article that you

4   listed in your report as something that you relied on.  It's

5   by Dr. Eikelboom.  Do you recall reading a couple of

6   articles by Dr. Eikelboom?

7   A.   Yes, sir.

8   Q.   And the one I want to ask --

9           MR. CHILDERS:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. CHILDERS:

12  Q.   The one I want to ask you about in particular is called

13  "Laboratory monitoring of non-Vitamin K antagonist oral

14  anticoagulant use in patients with atrial fibrillation."

15       Do you see that?

16  A.   Yes.

17  Q.   It's Exhibit 3122.  This is something you relied on for

18  your opinion; right?

19  A.   It's something I reviewed, certainly, and I did rely on

20  it, yes.

21          MR. CHILDERS:  May I publish this to the jury,

22  Your Honor?

23          THE COURT:  You may.

24          MR. CHILDERS:  You know what.  I apologize.  Gina

25  was right and I was wrong.  I gave you the wrong article.

George Crossley - Cross (Childers)

1   BY MR. CHILDERS:

2   Q.   You cited two articles by Dr. Eikelboom in your report

3   and I just gave you the wrong one.  I meant to show you

4   3124.  I apologize.

5          MR. CHILDERS:  May I approach?

6          THE COURT:  You may.

7   BY MR. CHILDERS:

8   Q.   This is the article I wanted to ask about.  Sorry.

9   A.   Okay.

10  Q.   And this is called "Risk of bleeding with two doses of

11  dabigatran compared with warfarin in older and younger

12  patients with atrial fibrillation."  Right?

13  A.   Correct.

14  Q.   Okay.  If we could turn -- and you see that there are

15  lots of authors listed here?

16  A.   Correct.

17  Q.   Some of them work for Boehringer, Dr. Reilly, Dr.

18  Yusuf.  All right.

19  A.   I don't know Dr. Yusuf.  Dr. Reilly does.

20  Q.   So if we turn to Page 4 -- and I'm sorry.  This is an

21  article you relied on for your opinions; right?

22  A.   Yes.

23  Q.   If we turn to Page 4 there is a section that's called

24  "Site of major gastrointestinal bleeding."  Do you recall

25  that?

George Crossley - Cross (Childers)

1   A.   I, I don't remember it directly.

2   Q.   Well, if you'll look at it with me, do you agree with

3   me that this says that patients on Pradaxa had GI bleeding

4   that was basically fifty-fifty in the upper and lower GI

5   tract?  Do you see that?

6   A.   I do.

7   Q.   And then it says -- and this is from the RE-LY trial;

8   right?

9   A.   Correct.

10  Q.   And it says patients on warfarin had 75 percent,

11  75 percent of the bleeding was in the upper GI tract and

12  only 25 percent was in the lower GI tract; right?

13  A.   Yes.  I remember this now.

14  Q.   And, so, what this says is in the RE-LY trial patients

15  who were on warfarin were more likely to have bleeds in the

16  upper GI tract than patients who were on Pradaxa; right?

17  A.   Yes.

18  Q.   Okay.  And then if we turn to Page 8 do you see there's

19  a section that starts with -- it says "higher blood

20  concentrations of dabigatran."  Do you see that?

21  A.   I do.

22  Q.   Do you recall reviewing this part of the article?

23  A.   I don't remember it directly.  I may recall it when I

24  read it again.

25  Q.   Okay.  And what they're trying to figure out is why

George Crossley - Cross (Childers)

1  these dabigatran bleeds seem to be happening in the lower GI

2  tract different than warfarin; right?

3  A.   Yes.

4  Q.   Okay.  And it goes on to say that Pradaxa has low

5  bioavailability after you take it; right?

6  A.   Correct.

7  Q.   And what that means is that a very small amount of the

8  medicine actually goes into your blood system and the rest

9  gets excreted through your intestines; right?

10  A.   Correct.

11  Q.   Okay.  And then it goes on to say it's possible that

12  the metabolism of the Pradaxa by esterases, if I'm saying

13  that right, -- is that right?

14  A.   Yes, esterases.

15  Q.   -- esterases leads to progressively higher

16  concentrations of the active drug during transit from the

17  gastrointestinal tract; right?

18  A.   Yes.

19  Q.   And what that means is as -- they're hypothesizing that

20  as the Pradaxa goes through the intestines, it's causing

21  local anticoagulant effect; right?

22  A.   Right.

23  Q.   And then if we look onto the next page, it says, "Thus,

24  local effects of dabigatran on diseased mucosa could account

25  for the relative increase in lower GI bleeding seen with

George Crossley - Cross (Childers)

 1  dabigatran compared with warfarin in elderly patients in the

 2  RE-LY trial."  Right?

 3  A.    Okay.

 4  Q.    Ms. Knight was an elderly patient; correct?

 5  A.    Sure.

 6  Q.    She had lower gastrointestinal bleeding; correct?

 7  A.    She -- that is what she had when she had her major GI

 8  bleed, yes.

 9  Q.    She was on dabigatran; correct?

10  A.    Correct.

11  Q.    Okay.  Do you agree with me that the risk of a GI bleed

12  is 50 percent higher if a patient is on Pradaxa than if

13  they're on warfarin?

14  A.    I don't know what the -- I'd have to look at the Reilly

15  paper to look at the percentage, but it's certainly higher.

16  The risk of GI bleeding is certainly higher.

17  Q.    And you know it's higher, but you'd have to look at the

18  Reilly article to confirm it's 50 percent?

19  A.    Yes.

20  Q.    Okay.  Fair enough.  I think the jury's already heard

21  that, so we'll move on.

22        So you agree with me that if you're on Pradaxa, you're

23  more likely to have a GI bleed than if you're on warfarin;

24  correct?

25  A.    That's correct.

George Crossley - Cross (Childers)

1  Q.   Okay.  I want to talk to you some now --

2           MR. CHILDERS:  Judge, I don't know if you wanted

3  to take an afternoon break or --

4           THE COURT:  Well, I planned to.  Is this a good

5  point?

6           MR. CHILDERS:  Sure.

7           THE COURT:  All right, ladies and gentlemen, we'll

8  take about a ten-minute recess.

9       You may step down.  Don't discuss your testimony.

10          THE WITNESS:  Okay.  Thank you.

11          THE COURT:  We'll start back in about 10 minutes.

12      (Recess taken at 2:33 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

George Crossley - Cross (Childers)          1628

1     (Back on the record at 2:41 p.m.)

2          THE COURT:  All right.  Let's bring the jury back.

3          THE COURT SECURITY OFFICER:  Yes, Your Honor.

4     (Jury present.)

5          THE COURT:  All right.  You may be seated.

6          You may resume your cross.

7          MR. CHILDERS:  Thank you, Your Honor.

8     Q.  I want to talk some now about the aPTT tests and, in

9     particular, Betty Knight.  Okay?

10    A.  Okay.

11    Q.  And you'll recall we talked about this before.

12         Betty had some periods where she had elevated aPTT test

13    results while she was on warfarin, correct?

14    A.  Correct.

15    Q.  In particular -- let me go ahead and just show you the

16    record so that we're on the same page.  Okay?

17         MR. CHILDERS:  May I approach, Your Honor?

18         THE COURT:  You may.

19         MR. CHILDERS:  This is Exhibit 2000-2641, which is

20    already in evidence.

21    Q.  Do you see this is a lab test result from April of 2009

22    for Betty Knight?

23    A.  Correct.

24    Q.  And in this particular day, you agree with me, Betty

25    Knight was over-anticoagulated on warfarin, right?

George Crossley - Cross (Childers)                1629

1    A.  That's correct.

2    Q.  And that day when she was over-anticoagulated, her aPTT

3    was 62, right?

4    A.  Correct.  But what tells us that she's over-anticoagulated

5    is the INR.

6    Q.  Oh, I understand that.

7        We confirm she is over-anticoagulated because her INR is

8    clearly higher than it should be, right?

9    A.  Correct.

10   Q.  And you agree with me that if a patient is

11   over-anticoagulated on warfarin, that could cause the aPTT to

12   be elevated, right?

13   A.  Particularly as the INR gets up above 3 and a half or 4,

14   the aPTT starts to go out.

15   Q.  The jury -- in fact, you told the jury that earlier.

16       I think in your direct you mentioned the aPTT can go up if

17   the INR is high, right?

18   A.  That's correct.

19   Q.  Yesterday the jury heard from Dr. Shami the exact

20   opposite.  She said that has nothing -- the aPTT can't be

21   elevated by the INR.

22       She's wrong about that, right?

23   A.  I would have -- that certainly is not what I was taught

24   and not been my experience.

25       I mean, we use the aPTT -- the reason she is saying that

George Crossley - Cross (Childers)            1630

1    is it's not a test that we ever use to assess the level of

2    anticoagulation on warfarin.  It's a test we use to assess

3    anticoagulation on heparin, and so it measures something

4    different.  And so what happens with the physiology of

5    warfarin is, as the INR gets really high, then the aPTT starts

6    to go out.

7    Q.  In this particular case with Betty Knight, it went up.

8        It went up to 62 when she was over-anticoagulated on

9    warfarin, right?

10   A.  And I don't know what else was going on here.  I mean,

11   there are other things that can make your aPTT go out, like

12   being in terrible heart failure or something.  I don't know

13   what was going on there.

14       But it is certainly my opinion that with an aP -- with an

15   INR in that range, it can make your aPTT go out modestly.

16   Q.  Okay.  And that's all I'm asking.

17   A.  Yep.

18   Q.  And then if you would turn one page to 2934.

19   A.  2934?

20   Q.  I'm sorry.  Yes.  Yes.

21       Do you see this is another -- blood test results with

22   coagulation labs that were taken in August of 2011?

23   A.  Yes.

24   Q.  Okay.  And on this day, you agree with me that Betty

25   Knight was over-anticoagulated on warfarin, right?  Her INR

George Crossley - Cross (Childers)          1631

1  was 3.7.

2  A.  Correct.

3  Q.  And I think you just told us with an INR over 3.5, that's

4  where you would see the aPTT start to go up, right?

5  A.  That's been my experience.

6  Q.  In this particular case, Betty Knight's aPTT was 47,

7  right?

8  A.  Yes.

9  Q.  And she was over-anticoagulated that day, there's no

10 question, right?

11 A.  Uh-huh.

12 Q.  When Betty had her bleed, they checked her aPTT, right?

13 A.  That's correct.

14     I think so.  I --

15 Q.  It was the day after she went into the hospital.

16 A.  The day after I think, yeah.

17 Q.  And if --

18 A.  One or two days later is when she had an aPTT of 47 or

19 something like that.

20 Q.  That's exactly what I was going to ask you.

21     If you turn two pages in what I handed --

22     MR. CHILDERS:  Gina, this is 4002.

23     THE WITNESS:  You guys like small font.

24     MR. CHILDERS:  I'm sorry.  This is the way it comes.

25 Q.  And if we look, this is a listing of blood tests that were

George Crossley - Cross (Childers)          1632

1    done on May 20th and May 21st of 2013, right?

2        If you look at the dates where they're collected, right

3    under hematology.

4    A.  Okay.  Yes, I see.

5    Q.  And on May 21st, her coagulation parameters were checked.

6        Do you see that?

7    A.  I'm looking for them.

8    Q.  It's --

9    A.  Yes, I see.

10   Q.  Okay.  And on that day, the day after she start -- she

11   came into the hospital with the GI bleed, her aPTT was 47 --

12   A.  Correct.

13   Q.  -- right?

14       Okay.  And it was --

15           MR. CHILDERS:  Sorry, Gina.  That's okay.

16           All right.  I want to shift gears just for a second.

17   Q.  I think you told us earlier when you prescribe

18   medications, you presume the FDA has done their job, and you

19   take them at their word, right?

20   A.  Sure.

21   Q.  It's been your experience as a cardiologist that some of

22   the medications that you prescribe to your patients that were

23   approved by the FDA have been later taken off the market

24   because of safety concerns, hasn't it?

25   A.  Absolutely.

George Crossley - Cross (Childers)                    1633

1    Q.  In particular a drug called Trasylol, did you ever use a

2    drug called Trasylol?

3    A.  I don't think so.

4    Q.  Do you know what that drug was for?

5    A.  I don't.

6    Q.  How about Baycol, a statin drug?

7    A.  Yes.

8    Q.  That drug had to be taken off the market because it was

9    causing people to have a terrible muscle condition that was

10   also causing kidney failure, right?

11   A.  Correct.

12   Q.  And how about Vioxx?  Did you ever prescribe Vioxx?

13   A.  I don't think I ever prescribed it but, yes, I'm familiar

14   with the issues.

15   Q.  It was causing people to have heart attacks, right?

16   A.  Right.

17   Q.  And the FDA originally approved the medicine, but then all

18   of those came off the market later, right?

19   A.  And that's because we try to rigorously monitor drug

20   safety as we go along.  Both the companies and organizations

21   like the organizations that I'm in try to do that.

22   Q.  My question to you, though, is you've seen instances on

23   more than one occasion where a drug was approved, and then

24   later it was determined it was unsafe, right?

25   A.  Sure.

George Crossley - Cross (Childers)          1634

1   Q.  Okay.  I want to ask you a little bit about the home

2   health care records that you reviewed.  I think they're in

3   that big binder that Ms. Jones gave you.  It's tab No. 9013A.

4       Do you see that?

5   A.  I'm looking.  I'll get there.

6   Q.  It's at the very back.  It's a big binder.

7   A.  Give me a second.

8   Q.  No problem.

9   A.  I just destroyed this.

10  Q.  No problem.

11  A.  What did you say, what tab?

12  Q.  The very last tab, 9013A I think it says.

13  A.  Okay.  The next to last one.

14  Q.  These are the home health records?

15  A.  Okay.

16  Q.  I'm sorry.  I don't mean to be a pain.

17      Is that a yes?

18  A.  Yes.

19  Q.  Okay.

20  A.  Yes.

21  Q.  And so you reviewed these, right?

22  A.  I did.

23  Q.  And you talked about some of them with Ms. Jones, right?

24  A.  I did.

25  Q.  Okay.  I want to ask you about one in particular.

George Crossley - Cross (Childers)          1635

1   A.   Okay.

2   Q.   If you would turn with me to page 1264.  You see that?

3          MS. JONES:  Mr. Childers, this is not an objection,

4   but I don't think we actually looked at this.  It might need

5   to be moved in if you are going to use it.  I don't think we

6   actually moved this exhibit just so you know.

7          MR. CHILDERS:  Fair enough.

8          Your Honor, I'm going to move Exhibit 9013 into

9   evidence.  These are a subset of the records that are already

10  in evidence.

11         THE COURT:  Okay.  Any objection?

12         MS. JONES:  No, Your Honor.

13         THE COURT:  9013A is admitted.

14         MR. CHILDERS:  Thank you, Your Honor.

15     (DEFENDANT'S EXHIBIT 9013A ADMITTED INTO EVIDENCE.)

16         MR. CHILDERS:  If we could look at page 1264.

17         THE WITNESS:  I'm there.

18         MR. CHILDERS:  Okay.

19  Q.   Do you see that the date on this home health record is

20  November 16th, 2011?

21  A.   I do.

22  Q.   That's a little less than a month after Betty Knight was

23  first prescribed Pradaxa, correct?

24  A.   I think that's correct.

25  Q.   And it notes in the record that her medication has changed

George Crossley - Cross (Childers)                    1636

1    since the last visit, right?

2    A.  Ah --

3    Q.  And if you want to look on the screen, it may help you

4    because it's such small print.

5    A.  Yes.

6    Q.  Okay.  And then if we look further down the page, there is

7    a section called Drug Regimen Review.

8        Do you see that?

9    A.  Yes.

10   Q.  I'm sorry.  Above that, Medications Review, do you see

11   that?

12       And it says the medication regimen review was completed,

13   right?

14   A.  Okay.

15   Q.  They checked off yes, right?

16   A.  That's correct.

17   Q.  Okay.  And then if we go further down in the section

18   called Drug Regimen Review, it says:  Does a complete drug

19   regimen review, indicate potentially clinically significant

20   medication issues, drug reaction and effective drug therapy,

21   side effects, drug interactions, duplicate therapy, omissions,

22   dosage errors or noncompliance.

23       You see that?

24   A.  That's correct.

25   Q.  And at this time, the label for Pradaxa that Ms. Knight

George Crossley - Cross (Childers)          1637

1   would have picked up with her first prescription didn't say

2   there was any interaction with P-gp inhibitors and Pradaxa in

3   a patient like her, right?

4   A.  That's correct.

5   Q.  Okay.  And it says no problems found during the review,

6   right?  And that's what you would expect based on that label,

7   correct?

8   A.  Correct.

9   Q.  All right.

10  A.  I certainly -- I mean, I wouldn't typically rely on home

11  health to guide drug-drug interactions.

12  Q.  Well, it says they reviewed the medication regimen, right?

13  A.  It does, yeah.  And so when my medical assistant reviews

14  it, it says she's reviewed it.  But I'm just saying I -- I

15  wouldn't rely on home health as a big authority in drug-drug

16  interactions.

17      We depend on home health to help with the things we

18  prescribe home health for, not --

19  Q.  In this particular case, this is something that this

20  particular record says they actually looked at, right?

21  A.  I -- and I have no idea what -- I've never seen this in a

22  home health record, having looked at thousands of home health

23  records, so I'm unfamiliar with home health doing that.  And I

24  have no idea what depth -- into what depth they looked for

25  that.

George Crossley - Cross (Childers)          1638

1   Q.  You reviewed --

2   A.  That's all I'm trying to convey.

3   Q.  You reviewed this record before?

4   A.  I did.

5   Q.  So you saw before that the home health provider said she

6   got a new medication right after the Pradaxa prescription, and

7   that they went over it to see if there were any drug-drug

8   interactions, right?

9   A.  Yes.

10  Q.  Okay.  And then if we turn to the following page, which is

11  2165, it says:  Patient caregiver high-risk drug education.

12      Do you see that?

13  A.  Yeah.

14  Q.  And in particular, this section says we need to go over it

15  again if it's a high-risk drug, and it specifically -- excuse

16  me -- lists anticoagulants, right?

17  A.  Correct.

18  Q.  And Pradaxa is an anticoagulant, right?

19  A.  Yes.

20  Q.  And then it checks off yes, we did that.

21  A.  And that is something we would typically expect home

22  health nurses to do.

23  Q.  Okay.  And that would be based on the risks that they're

24  aware of based on the materials they got from -- with the

25  medicine, right?

George Crossley - Cross (Childers)          1639

1   A.  Sure.

2   Q.  And then if we go -- one, two -- three pages farther, page

3   1268, there's a section called Interventions Instructions,

4   correct?

5   A.  Yes.

6   Q.  In the very last sentence it says:  Patient and caregiver

7   instructed on high-risk med Pradaxa for -- I'm not sure what

8   TX stands for -- with anticoagulation, right?

9        Is that what it says?

10  A.  Yes.

11  Q.  It specifically says we talked about Pradaxa, right?

12  A.  Yes.

13  Q.  And it says:  Patient and caregiver verbalized

14  understanding of education provided, E-D.

15       The last two letters --

16  A.  Provided.

17  Q.  Provided.  Excuse me.

18       And so they not only talked about it, they said we

19  understand it, right?

20  A.  Correct.

21  Q.  And then if we turn one more page, page 1269, do you see

22  there's a section at the very bottom that says Written

23  Instructions, Materials Provided?

24  A.  Yes.

25  Q.  And it says -- it has checked off every single one of the

George Crossley - Cross (Childers)          1640

1    items that are underneath there were -- written materials were

2    provided to her, correct?

3    A.  Correct.

4         MR. CHILDERS:  Okay.  Thank you, Gina.

5    Q.  Based on that, you were fully aware that Ms. Knight and

6    her caregiver reviewed the information not only themselves

7    that they were given with the first Pradaxa prescription, but

8    actually went over it with their home health care provider,

9    correct?

10   A.  Correct.

11   Q.  Thank you.

12        I want to shift gears again and talk about Betty's health

13   after she had the bleed.  Well, let's start with the time of

14   the bleed.

15        You agree that her bleed would have been considered to

16   be -- I'm sorry.  I'll let you finish that.

17   A.  I'm sorry.  I'm just trying to put it back together so it

18   doesn't explode on me again.

19   Q.  That's not a problem.

20   A.  I'm done.

21   Q.  You agree with me that the bleed that Betty had, if she

22   had been a patient in the RE-LY trial, would have been

23   considered or classified as life-threatening?

24   A.  That was the definition in the RE-LY trial.  That

25   is not -- as I -- you know, the word is sort of arbitrarily

George Crossley - Cross (Childers)                1641

1  defined there.

2  Q.  And you reviewed Dr. Abdelgaber's deposition, right?

3  A.  I did.

4  Q.  And you saw that when he was asked if he thought her life

5  was in danger, he said that's why I admitted her to the

6  hospital, right?

7  A.  Yes.

8  Q.  Okay.  And then you read the discharge summaries from both

9  the hospital and the skilled nursing facility, right?

10 A.  I did.

11 Q.  And both of those said Betty Knight had a severe

12 gastrointestinal bleed, right?

13 A.  Correct.  She -- it required four units of transfusion, as

14 I recall.

15 Q.  You don't disagree with anything that you read in the

16 deposition or in the medical records about the severity of the

17 bleed, do you?

18 A.  I don't know if you're implying something else other than

19 what I just said.  I'm not trying -- I don't know -- I'm

20 reluctant to give you a blanket endorsement that I agree with

21 all thousand words.  But --

22 Q.  Let me try to be more clear, and I apologize for that.

23 A.  Okay.

24 Q.  We were just talking about the fact that Dr. Abdelgaber

25 said he felt her life was in danger, so he put her in the

George Crossley - Cross (Childers)                1642

1    hospital.

2    A.   Correct.

3    Q.   And then the discharge summaries said it was a severe

4    bleed.  I am only confined to that.

5         You don't disagree with those things, do you?

6    A.   I don't disagree with that, no.

7    Q.   Okay.

8    A.   The --

9    Q.   You agree with me that having a GI bleed is a big blow to

10   anybody and especially a big blow to an elderly female

11   patient?

12   A.   Certainly.

13   Q.   You agree with me that Betty Knight's GI bleed was a big

14   blow to her?

15   A.   Correct.

16   Q.   You agree with me that Betty Knight was more debilitated

17   after that bleed than she was before the bleed?

18   A.   I'm not sure that I can say that from the record.  I mean,

19   she was pretty debilitated before.  She was in and out of

20   nursing homes and had lots of medical care.  It's hard to

21   discern that from the medical record.

22        She was certainly debilitated.  She had lots of things

23   going on.

24   Q.   My question is simply, you agree with me that she was more

25   debilitated after the bleed than she was before the bleed?

George Crossley - Cross (Childers)          1643

1  A.  I don't know the answer to that, that's what I'm saying.

2  Q.  Look with me, if you could, on page 211 of your

3  deposition.

4  A.  Okay.

5  Q.  Do you see, starting at line 10, the question I asked you

6  was:  The reason she was admitted to the skilled nursing

7  facility immediately following the bleed hospitalization was

8  debility as a result of the GI bleed, correct?

9      And then you answered:  It was debility.  I think much of

10 her debility was there long before the GI bleed.  I'm sure she

11 was more debilitated after the GI bleed than she was before,

12 but certainly she was not in good health before the GI bleed.

13 A.  I don't disagree with that at all.

14 Q.  And so my question to you is, she was worse --

15 A.  The day she went home, she was certainly worse.  I

16 don't -- what I can't -- what I'm trying to say is, if we look

17 at six months before and six months after, it's hard for me to

18 know what is -- how much the GI bleed contributes to that.

19 Certainly her course shows that her cardiovascular disease was

20 galloping and contributed greatly to what was going on with

21 her at the end of her life.

22 Q.  And when we're trying to determine if something affects a

23 person's death, sometimes we call that mortality, right?

24 A.  Yeah.

25 Q.  Okay.  And mortality means -- tell me what mortality means

George Crossley - Cross (Childers)                1644

1    to you in the medical context.

2    A.   It's just the rate at which people die.

3    Q.   Okay.

4    A.   In a clinical study, if that's what you're asking.

5    Q.   Yes, sir.

6    A.   Mortality is it applies to a specific patient, obviously

7    has a specific diagnosis, a specific issue.

8    Q.   As far as whether or not Betty's GI bleed affected her

9    mortality or her death, you don't have an opinion, do you?

10   A.   I'm not sure what you're asking there.

11        I'm sure that in the end, her death was related to her

12   coronary disease.  And all of the records toward the end of

13   her life showed that she had progressive angina and

14   progressive heart failure, and that contributed to it.

15        I don't think there's any evidence anywhere that the

16   bleeding contributed to things that ultimately caused her

17   death.  I think the cardiovascular disease is what ultimately

18   caused her death, if that's what you're asking me.

19   Q.   I'm asking about whether or not you have an opinion, which

20   I don't believe you do, as to whether or not Betty's GI bleed

21   had any impact on her mortality.

22   A.   I don't think it did.

23   Q.   Okay.  Let me look with you at your deposition, page 259.

24        If you look with me at line 15, do you see that I asked

25   you:  But it is not your opinion that the GI bleed that caused

George Crossley - Cross (Childers)          1645

1   her to be hospitalized, and then in a skilled nursing facility

2   for three weeks, significantly impacted her mortality?

3       And your answer was:  I think I would leave that up to an

4   official assessment of what her functional status was there.

5   The MI leaves you with a scar on your heart, and you have much

6   more risk of having sequelae than a GI bleed does.

7       Right?

8   A.  That's correct.

9   Q.  And then when we went on to talk about it, you told me

10  that you would defer that opinion to an expert --

11  A.  So --

12  Q.  -- because you're not an expert on functional assessment,

13  right?

14  A.  That -- that is correct.

15      What I'm trying to express here is that if I were to

16  measure her debility before the GI bleed and after, I'm not

17  the one to measure that.  I'm not trying to say that the GI --

18  that I don't have any idea whether the GI bleed killed her.

19  I'm talking about her level of debility before the GI bleed

20  and after.  That's what I'm referring to.

21  Q.  We were talking about mortality, right?

22  A.  No, I'm talking about debility.  That's what I'm saying

23  here.

24  Q.  Well, the question I asked you was mortality, right?

25      I didn't say debility.  I said did the GI bleed and

George Crossley - Cross (Childers)                1646

1    skilled nursing facility stay for three weeks impact her

2    mortality.

3        That was the question I asked you, right?

4    A.  I answered the wrong question, then.  Because what I was

5    answering is her debility before and after, and I went on to

6    describe the way a myocardial infarction kills you.

7    Q.  Okay.  Well, then you must have misunderstood me the next

8    three questions I asked.  Let's look at them.

9        I said on --

10   A.  Tell me what page first.

11   Q.  Page 260, line 11.

12       I asked:  When you say you would leave -- I asked you a

13   question about her mortality, I didn't say debility there.

14   You would leave how the GI bleed affected her mortality up to

15   a functional assessment.

16       And your answer was uh-huh, meaning affirmative, correct?

17   A.  Yes.

18   Q.  And then I asked you another question:  How would a

19   functional assessment impact what her mortality was.

20       Correct?

21       And you said:  In any 80-year-old, your functional

22   assessment of how you can take care of yourself, whether you

23   get dysthymic walking across the room, all that kind of stuff

24   is a much better predictor of your mortality than most other

25   things would measure.

George Crossley - Cross (Childers)                    1647

1      Right, that's what you said?

2    A.  Again, what I'm trying to express there is the effect --

3    you were -- it was my impression that you were trying to get

4    me to say that I thought her debility from the GI bleed is

5    what killed her.  And what I was saying is I would leave that

6    up to a functional assessment by a gerontologist or something.

7    Q.  Sure.

8    A.  What I do -- what I am confident in is that her coronary

9    disease was galloping.  She kept having unstable angina, she

10   had an acute myocardial infarction, and she died of a

11   ventricular arrhythmia or whatever it was that caused her

12   cardiac arrest.

13   Q.  And whether the bleed played any part in her mortality,

14   you said you'd leave that up to a functional assessment by

15   somebody else, right?

16   A.  Correct.

17   Q.  And you told me that you would leave that up to a person

18   named Dr. Gill, right?  Is that what you told me?

19   A.  Yes.

20   Q.  Dr. Gill is someone who was hired by Boehringer to be a

21   witness in this case, too, right?

22        MS. JONES:  Excuse me, Your Honor.  May we approach

23   for --

24        THE COURT:  Yes.

25      (Bench conference, reported.)

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

George Crossley - Cross (Childers)          1648

1       THE COURT:  Okay.  What's your objection?

2       MS. JONES:  Well, I don't think it's appropriate to be

3   asking Dr. Crossley about Dr. Gill and whether he's here and

4   what Dr. Gill may or may not have said.

5       I've allowed Mr. Childers to read directly from the

6   deposition, which I think is probably inappropriate.  I think

7   he has made his point.  I don't think we need to talk about

8   what some other expert did or didn't say.  What does that have

9   to do with anything?

10      MR. CHILDERS:  He's testified that he thought the

11  bleed didn't have anything to do with her death.  Clearly he

12  said that in his deposition.  He said, I think she died from a

13  heart attack.  Whether the bleed had anything to do with it or

14  contributed, I'll leave that up to someone else.

15      They have an expert, Dr. Gill.  I asked him who he

16  would leave that up to.  He said Dr. Gill.  He's not here to

17  testify, so I think it's important for the jury to know he's

18  not here saying anything about whether the bleed contributed

19  to it or not.  He left it up to somebody else.

20      THE COURT:  He's already testified that he didn't make

21  a decision, he didn't have an opinion.  I think that's as far

22  as you can go.

23      MR. CHILDERS:  Okay.  Yes, sir.

24    (Bench conference, concluded.)

25      MR. CHILDERS:  Doctor, I want to just make sure I'm

George Crossley - Cross (Childers)                    1649

1    clear.

2    Q.  As far as whether or not the bleed contributed to Betty

3    Knight's death, that's not an opinion that you formed one way

4    or the other.

5        You left that up to others, correct?

6    A.  Whether she was -- whether the -- it was my understanding

7    from your questioning with me that you were trying to get me

8    to say that I felt like she was much worse off after the GI

9    bleed, and she died of sort of debility as a result of being

10   hospitalized and the GI bleed itself.

11       And what I said is I would leave that up to a -- to a

12   gerontologist that I expected -- that I thought was going to

13   be a part of the case.

14   Q.  That's all I'm asking.  And I think we probably should

15   stop there.

16            THE COURT:  I agree.

17            THE WITNESS:  Okay.

18            MR. CHILDERS:  Thank you, Your Honor.

19   Q.  The jury did hear about Betty's condition after the May

20   2013 bleed from Dr. Abdelgaber, who actually treated her,

21   right?

22       You know that, right?

23   A.  Yes.

24   Q.  And you read that deposition, right?

25   A.  I did.

George Crossley - Cross (Childers)                1650

1    Q.  In fact, we played it for the jury last week.

2        You know that Dr. Abdelgaber testified that Betty did not

3    seem to ever get better or bounce back from the May 2000 GI

4    bleed -- I'm sorry -- from the May 2013 GI bleed, correct?

5    A.  I don't -- I don't recall his ascribing causation.  I

6    recall his saying she never bounced back.

7    Q.  You recall he testified that she did not seem to ever get

8    better or bounce back from the May 2013 GI bleed, right?

9    A.  It was my understanding, as I said, that he was saying

10   that she never got better after the bleed.  I don't -- I don't

11   recall his ascribing causation to the bleed.

12   Q.  That's not my question, sir.

13       My question is he said --

14   A.  Well -- okay.

15   Q.  Okay.  And I want you to -- I promise you, if you listen

16   to my question, it will go faster.

17       You know that he testified -- and I'm giving you a direct

18   quote from his testimony -- that Betty did not seem to ever

19   get better or bounce back from the May 2013 GI bleed.

20       That's what he testified, right?

21   A.  And I'm absolutely sure she did not bounce back.  There is

22   lots of data in the record, as I've said, to say that the not

23   bouncing back was because of her coronary disease, because of

24   her progressive heart failure, her progressive angina and

25   heart -- heart attacks.

George Crossley - Cross (Childers)          1651

1   Q.  Well, you don't disagree with Dr. Abdelgaber, do you?

2   A.  No, I don't think she bounced back.

3   Q.  Okay.

4   A.  I think there was a lot going on with Betty.

5   Q.  And in particular, the question that he -- or the

6   statement that he made was that she didn't seem to bounce back

7   after the May 2013 GI bleed.

8       That's all I'm asking.  That's what he said.

9   A.  She certainly didn't bounce back after that.

10  Q.  Okay.

11       MR. CHILDERS:  May I have just a moment, Your Honor?

12       THE COURT:  Yes.

13      (Plaintiffs' counsel conferring.)

14       MR. CHILDERS:  I don't think there is a lot of room

15  here on this paper, but I want to write one more thing.  Okay?

16       Six, defers opinion -- I spelled that wrong, sorry --

17  about GI bleed's effect on her mortality.

18  Q.  That's what you just told us, right?

19  A.  That is a bit of a twist in what I said.

20       What I said is that she definitely didn't bounce back

21  after the GI bleed.  But in that time period, she had all of

22  the signs and symptoms and clinical findings of galloping

23  coronary disease that I really feel was the cause of her

24  death.  That's what I'm saying.

25  Q.  And whether or not the bleed contributed to her death is

George Crossley - Cross (Childers)                1652

1  something that you're deferring, right?

2  A.  Right.

3  Q.  Okay.

4       MR. CHILDERS:  Your Honor, I think that's all I have.

5       THE COURT:  All right.  Redirect?

6       MS. JONES:  Yes, Your Honor.  Thank you.

7       Could I just have a couple of minutes to --

8       THE COURT:  Yes.  Go ahead.

9       You folks can stand up and stretch if you like, take a

10 minute.

11     (Pause in proceedings.)

12     THE COURT:  All right.  Ms. Jones, whenever you're

13 ready.

14     MS. JONES:  Thank you, Your Honor.

15     Dr. Crossley, I just had a handful of follow-up

16 questions on some of the topics that Mr. Childers covered with

17 you on cross-examination.  Okay?

18     THE WITNESS:  Great.

19     MS. JONES:  All right.

20                    REDIRECT EXAMINATION

21 BY MS. JONES:

22 Q.  I probably will go in about the order he went in, which

23 was to start with this exchange that you all had on whether or

24 not you testified about whether it would have been okay for

25 Mrs. Knight to stay on warfarin back in 2011.

George Crossley - Redirect (Jones)                1653

1      Do you remember that exchange?

2   A.  Oh, yes.

3   Q.  And do you remember him showing you testimony from your

4   deposition in November of 2017 related to that issue?

5   A.  Yes.

6   Q.  Okay.  I'm going to ask you to turn to page 216 of your

7   deposition.

8   A.  Two one six?

9   Q.  Two one six.

10      MR. CHILDERS:  Your Honor, I don't think it's proper

11   to impeach your own witness.

12      MS. JONES:  I'm not.

13      THE COURT:  Well, what are you asking him to refer to

14   the deposition for?

15      MS. JONES:  May we be heard at side bar, Your Honor?

16      THE COURT:  Yes.

17      (Bench conference, reported.)

18      MS. JONES:  First of all, I'm not impeaching my own

19   witness.  No one will be surprised to hear that.

20      He was purportedly impeached with 216, 3 through 7, on

21   whether or not it would have been appropriate for her to stay

22   on warfarin.  I'm permitted to go back and read the balance of

23   his testimony where he said -- he was asked:  So I'm asking

24   you, you could substitute Xarelto, Eliquis or warfarin for

25   that, correct?

KATHY L. SWINHART, Official Court Reporter (304) 528-2244

George Crossley - Redirect (Jones)          1654

1      And he answered:  You could, though I do think I would

2  have done the same thing her physicians did.  I think they

3  took good care of her.

4      I'm permitted to do that after he purportedly

5  impeached him.  That is permitted.

6      MR. CHILDERS:  I think that should be done at the time

7  if that was the issue.  This is redirect.

8      Also, Your Honor, I don't think that's -- those are

9  two different questions.

10      MS. JONES:  No, they're the same concept.

11      MR. CHILDERS:  If she wants to ask him the question,

12  she can.  It's improper to read the deposition.

13      THE COURT:  I think you can ask him the question and

14  ask if he remembers an answer to it.  You can refresh his

15  recollection by letting him look at it and see if he can

16  testify to it.

17      I think they're entitled to bring out statements that

18  are consistent with his testimony when you have cross-examined

19  him about inconsistencies or shown statements inconsistent.

20  So I understood at the beginning that's what you were talking

21  about.

22      MS. JONES:  Yes, Your Honor.

23      MR. CHILDERS:  Okay.

24      THE COURT:  Okay.

25      MS. JONES:  Thank you.

George Crossley - Redirect (Jones)                    1655

1    (Bench conference, concluded.)

2        MS. JONES:  Sorry for the brief interruption.

3    Q.  Are you still on page 216 of your deposition?

4    A.  I am.

5    Q.  Okay.  And do you recall the exchange that you had with

6    Mr. Childers about this Q and A on line 3 to line 7 regarding

7    whether it would have been appropriate for Mrs. Knight to stay

8    on warfarin in 2011?

9    A.  I do.

10   Q.  Okay.  If you look a little further down, do you also

11   recall being asked:  So I'm asking you, you could substitute

12   Xarelto, Eliquis or warfarin for that, correct?

13       And you answered:  You could, though I do think I would

14   have done the same thing her physicians did.  I think they

15   took good care of her.

16       Do you recall that testimony?

17   A.  I do.

18   Q.  And is that the point you were making earlier on

19   cross-examination?

20   A.  It is.

21   Q.  And could you just explain what you meant by that?

22   A.  What I meant is that while warfarin is not outside the

23   standard of care, any of the NOACs would provide superior

24   stroke prevention.  And Ms. Knight had tremendous risk of

25   stroke, and the most important thing we could do is keep her

George Crossley - Redirect (Jones)            1656

1   from having a big stroke.

2       And any of the NOACs would have been fine.  I would have

3   preferred, strongly preferred to use the NOACs.  And if forced

4   to use warfarin, that would have been within the standard of

5   care.

6   Q.  And was that your testimony when you were deposed in 2017?

7   A.  It was.

8   Q.  Okay.  You were asked some questions about something

9   called GERD; do you recall that?

10  A.  Yes.

11  Q.  And I'm not sure that the jury has even heard what GERD

12  is.

13      What is GERD just --

14  A.  Gastro -- excuse me.  I didn't mean to step on you there.

15  Q.  That's okay.  Go ahead.

16  A.  She'll shoot me.

17  Q.  That's not true.

18  A.  Gastroesophageal reflux disease.

19      We've all had indigestion, and so as it applies to this,

20  certainly -- there is two -- two is two important aspects of

21  that.  Number one, people with GERD probably have a little bit

22  more GI bleeding because they have stuff wrong in their

23  stomach.  That was not -- that did not apply to Mrs. Knight,

24  and she appeared to be bleeding from her colon.

25      And, number two, people with GERD that take Pradaxa

George Crossley - Redirect (Jones)          1657

1   sometimes get more GERD.  And I think the number was 15

2   percent of the people in the clinical trial, it may be a

3   little less than that, had GERD.

4        And so it's not that you're damaged if you take Pradaxa,

5   and you have more GERD.  It's that if we gave you Pradaxa, and

6   you got more indigestion, we would switch you to one of the

7   other drugs.  And even if your insurance said that's the only

8   one you could get, then we can get special dispensation in

9   that case because you have worse GERD.

10       That's what I was trying to say.

11  Q.  And, Dr. Crossley, just to talk specifically about Mrs.

12  Knight, would you see any indication in her medical records

13  that she had a problem with Pradaxa somehow worsening her

14  GERD?

15  A.  I did not see that.

16  Q.  Okay.  Did you have any reason to believe, based on your

17  review of her medical records, that the fact that she had GERD

18  and took Pradaxa somehow contributed to her having a

19  gastrointestinal bleed?

20  A.  Certainly not.  Again, the bleed was a colonic bleed,

21  proven by the fact that they clipped it, and the bleed

22  stopped.

23  Q.  Let me --

24  A.  They did -- they did see some gastritis at the time they

25  scoped her from above, but there was no evidence that that was

George Crossley - Redirect (Jones)          1658

1   contributing to the bleed.

2   Q.  You were asked some questions very early on in

3   cross-examination about television advertising for medicines.

4        Do you recall that?

5   A.  I do.

6   Q.  And you were asked some questions about patients coming to

7   you and asking for specific medicines based on having seen

8   things on television.

9        Do you recall that?

10  A.  I do.

11  Q.  Have you ever, when a patient suggested a medicine based

12  on something they saw on TV, just written a prescription

13  without forming your own medical judgment about whether that

14  was an appropriate medication for the patient?

15  A.  Heavens no.  Not -- not one time.

16  Q.  Okay.  And let me ask you about this topic of what

17  prompted Mrs. Knight's transition to Pradaxa in 2011.

18       In front of you, you still have your black binder --

19  A.  I do.

20  Q.  -- the one that was falling apart, for which I apologize.

21  A.  I did it.  So --

22  Q.  I'm going to ask you to go to 9009B at page 580.

23       MS. JONES:  And I apologize, Your Honor.  I don't

24  remember if this is something that was -- if this specific

25  excerpt has been admitted or not, but the record we're showing

1    is -- I'm told it has been admitted.

2              THE COURT:  All right.  You may proceed.

3              MS. JONES:  Thank you.

4    Q.  Dr. Crossley, have you seen what we have on the screen

5    here?

6    A.  Yes.

7    Q.  Do you recognize this as the prior authorization form that

8    had to be completed by Dr. MacFarland's office to actually

9    reflect what she thought was the reason that Mrs. Knight was

10   an appropriate candidate for moving from warfarin onto

11   Pradaxa?

12   A.  Yes, I do.

13   Q.  And do you have experience filling out paperwork like this

14   for your patients?

15   A.  Oh, yes.

16   Q.  Yeah.  Okay.

17        If we go to the second page of that record, which is on

18   page 581, you see up at the top of the page, it says:  Other

19   medications/therapies tried and reasons for failure and/or any

20   other information the physician feels is important to review.

21        Do you see that?

22   A.  Yes.

23   Q.  And what is that section supposed to include in a form

24   like this?

25   A.  Just the reason that you want to use a restricted drug or

George Crossley - Redirect (Jones)                    1660

1    a non-formulated drug.

2    Q.  Okay.  And what Dr. MacFarland's office reported was that

3    patient, Mrs. Knight, was sporadic and supratherapeutic on

4    coumadin since 2008 until the present.

5        Do you see that?

6    A.  I do.

7    Q.  And is that consistent with your understanding of the

8    medical records related to Mrs. Knight's care on warfarin

9    prior to her move to Pradaxa?

10   A.  It is.

11   Q.  You were asked some questions about the 75-milligram dose

12   of Pradaxa.

13       You said on direct examination you prescribe the

14   75-milligram dose of Pradaxa; is that correct?

15   A.  That's correct.

16   Q.  Do you prescribe it to patients who have severe renal

17   impairment?

18   A.  Yes.

19   Q.  And I take it just based on what you've told the jury

20   today, you take the care of your patients seriously; is that

21   right?

22   A.  That's correct.

23   Q.  Would you prescribe the 75-milligram dose of Pradaxa to

24   patients with severe renal impairment based on your experience

25   as a cardiologist over many decades, would you do that if you

George Crossley - Redirect (Jones)          1661

1    didn't believe it was an appropriate option for patients who

2    have anti -- excuse me -- atrial fibrillation?

3    A.  No, I certainly wouldn't.

4    Q.  Okay.  And have you had patients who were successfully

5    treated with the 75-milligram dose of Pradaxa?

6    A.  Yes.

7    Q.  You were asked some questions about this issue of blood

8    monitoring, and you were shown the European label by

9    Mr. Childers.

10        Have you had experience as a clinician treating patients

11   with the medicines Pradaxa and the other NOACs, Xarelto and

12   Eliquis, without blood monitoring?

13   A.  Yes.

14   Q.  Were those medicines approved by the FDA without blood

15   monitoring?

16   A.  Yes.

17   Q.  And have you been able to treat your patients safely and

18   effectively with those medicines without blood monitoring?

19   A.  I have.

20   Q.  Have you seen anything in the records to suggest that Mrs.

21   Knight's experience with Pradaxa would have been different if

22   she had had blood monitoring?

23   A.  I have not.

24   Q.  Okay.  And I want to ask you about a couple of things that

25   were raised on cross-examination in connection with the doctor

George Crossley - Redirect (Jones)                    1662

1    label for Pradaxa.

2         Do you have 5884 in front of you?

3    A.  Eight eight?

4    Q.  Yes.

5    A.  Okay.

6    Q.  Do you recognize that as the January 2012 --

7    A.  I do.

8    Q.  -- label?

9         One thing you were asked about was whether there is

10   information in Europe versus in the United States about

11   clotting tests like the aPTT or the ECT.

12        Do you remember that?

13   A.  I do.

14   Q.  Okay.  And if you turn in 5884 to page 5, do you see a

15   section there that is called Clinical Pharmacology.

16   A.  I do.

17   Q.  And does that section of the -- and just to be clear,

18   we're looking at the U.S. or American label for doctors; is

19   that right?

20   A.  That's right.

21   Q.  Okay.  And this section is called Pharmacodynamics.

22        Does this section actually discuss the use of clotting

23   tests like the aPTT and the ECT and the TT in patients who are

24   on Pradaxa?

25   A.  It does.

George Crossley - Redirect (Jones)          1663

1   Q.  Okay.  So, for example, the very first line of that

2   section on pharmacodynamics says:  At recommended therapeutic

3   doses, dabigatran etexilate prolongs the coagulation markers

4   such as aPTT, ECT and TT.

5       Do you see that?

6   A.  I do.

7   Q.  And just simplify that for us.  What does that mean

8   exactly?

9   A.  It just means that those tests become abnormal when you

10  are on dabigatran.

11  Q.  And does that mean that the time that you see reflected in

12  those tests will be higher if you're on --

13  A.  Will be longer.

14  Q.  -- Pradaxa?

15  A.  Yes.

16  Q.  Longer.  Okay.

17  A.  That's right.

18  Q.  And that's because Pradaxa and other oral anticoagulants

19  slow down the time it takes for your blood to clot?

20  A.  That's correct.

21  Q.  Okay.  And in that next sentence, there's a reference to

22  the aPTT -- I'm sorry, Mr. Reynolds, the next paragraph -- the

23  aPTT test provides an approximation of Pradaxa's anticoagulant

24  effect.

25      Do you see that?

George Crossley - Redirect (Jones)                1664

1    A.  Yes.

2    Q.  And then it goes on to discuss some information on that

3    issue, including information in that very last sentence about

4    the median trough aPTT in patients receiving the 150-milligram

5    dose of Pradaxa.

6        Do you see that?

7    A.  I do.

8    Q.  So the U.S. label for doctors communicates information

9    about the aPTT and the ECT and the TT; is that right?

10   A.  It does.  And it shows you the curve there for her

11   creatinine clearance is very similar to what we saw in that

12   PTT that was elevated on Ms. Knight.

13   Q.  Okay.

14       MS. JONES:  Actually, Mr. Reynolds, can we just show

15   that chart right below that.  Yeah, the aPTT time course.

16   Q.  Is this what you were referring to, Doctor?

17   A.  It is --

18   Q.  Okay.

19   A.  -- yeah.

20   Q.  And just explain what this is.

21   A.  What that shows is the top bar there is the bar that would

22   have applied to Mrs. Knight with a creatinine clearance less

23   than 30.  And it shows out at 24 hours, we would expect the

24   PTT to be in the 60 range.  And at 48 hours, we would expect

25   it to be in the 55 range as that PTT is -- as that test is

1    going away.

2        So that is actually a number that is higher than what we

3    saw in Ms. Knight.

4            MS. JONES:  We can take that down.  Thank you,

5    Mr. Reynolds.

6            I want to turn now to two other topics, one relating

7    to Mrs. Knight's GI bleed, and the other relating to Mrs.

8    Knight's passing in April -- excuse me -- in September of

9    2013.

10   Q.  You were asked some questions about whether or not Pradaxa

11   contributed to Mrs. Knight's bleed in May of 2013.

12       Do you recall that?

13   A.  I do.

14   Q.  Can you rule out the possibility that had Mrs. Knight been

15   on warfarin at that time, that it would have equally

16   contributed to her bleed?

17   A.  I don't -- I don't know of any reason to think it would

18   have been any different.  I mean --

19   Q.  And why is that?

20   A.  Because on triple therapy, you just have more bleeding.  I

21   mean, when we're faced with a patient like Ms. Knight, and we

22   have to use triple therapy, we just gird out loins, and we

23   know that we are going to have bleeding like this, and we just

24   do our best to get them through a month.

25       And trip -- at least in my experience, triple therapy with

George Crossley - Redirect (Jones)            1666

1  any of these drugs is a -- in a patient like Mrs. Knight who

2  has, you know, a history of blood loss, of GI bleeding is just

3  a -- just a problem waiting to happen, and there's not a good

4  answer for it.

5      You -- what you give up if you don't do that is you put

6  Mrs. Knight at a tremendous risk of having a stroke or a

7  tremendous risk of clotting off that stent.  And if you put a

8  stent in one of those big vessels, and it suddenly closes off,

9  that acute closure I talked about before, I think the chance

10 that she would have survived it would be very low.

11 Q.  And you were asked some questions about whether or not

12 Mrs. Knight had ever had a GI bleed while she was on warfarin.

13     And I actually want to ask you to go back to 9005B if you

14 would, please, in your binder.  I'm going to go to page 24.

15 A.  I'm there.

16 Q.  Do you recognize this as a record of a visit with Dr.

17 Gunnalaugsson, Mrs. Knight's cardiologist, in May of 2009?

18 A.  I do.

19 Q.  Okay.  And at the bottom of that first section called

20 History of Present Illness, you see where it says:  She has a

21 history of extensive carotid disease in the past, status post

22 left CVA.

23     Do you see that?

24 A.  I do.

25 Q.  And is that just a reference to blockage in some of her

1   vessels in her body?

2   A.   Correct, in her -- in the blood vessels that go to your

3   brain.

4   Q.   On the side of the neck?

5   A.   Uh-huh.

6   Q.   And that next sentence says:  She has had bad GI bleeds in

7   the past and has been a really tough case with regard to

8   anticoagulation.

9        Do you see that?

10  A.   I do see that.

11  Q.   Okay.  And is that one of the records that you were

12  referencing when you said there was some indication that her

13  doctors believed that she had had GI bleeds on warfarin in the

14  past?

15  A.   Correct.

16  Q.   Dr. Crossley, the last topic I wanted to cover with you is

17  the topic of what might have played a role in Mrs. Knight's

18  passing.  You were asked a series of questions about what

19  opinions you have or don't have on that topic.  Let me ask you

20  this.

21       Based on your review of the medical records, including

22  some of the records that we reviewed today, did you see any

23  indication that Mrs. Knight's doctors at the time believed

24  that her GI bleed had somehow contributed to her decline in

25  the summer of 2013?

George Crossley - Redirect (Jones)          1668

1  A.  I -- I don't.  I mean, there is no mention in the

2  discharge summaries of that.  There is no mention in the death

3  certificate.  There is no mention in the clinic visits that

4  they felt that -- I think all of the verbiage there and all of

5  the history there paints a picture, as I said, of progressive

6  disastrous coronary disease.

7  Q.  And is that what you meant when you said -- when you were

8  talking about Dr. Abdelgaber's testimony and that reference to

9  her not bouncing back, what did you mean when you said it did

10 seem like she wasn't bouncing back?  What were you referring

11 to?

12 A.  Well, in that time period she failed.  I mean, she did

13 very badly.  She just -- she kept coming back to the doctor

14 with chest pain and shortness of breath and orthopnea and lots

15 of heart failure findings and more chest pain and then a non-Q

16 wave myocardial infarction.  And she just had this progressive

17 downhill course that if you didn't look at the symptoms, you

18 might think was just because of the last big thing that

19 happened.

20     I think there were a lot of big things that happened in

21 that interval, which were a lot of things having to do with

22 her coronary disease and her heart failure.

23 Q.  Excuse me.  I didn't mean to interrupt you.  I apologize.

24     Was one of the things that happened to her actually that

25 same year that she had had a heart attack in April of 2013?

George Crossley - Redirect (Jones)          1669

1    A.   That's correct.

2    Q.   Okay.  And do you recall, having had a chance to review

3    Dr. Abdelgaber's deposition testimony, that he testified that

4    it was just as likely that her deterioration began with her

5    heart attack and the placement of her stents in April of 2013?

6    A.   Correct.

7    Q.   And in fact, did you have an opportunity to look at what

8    Dr. Abdelgaber actually wrote in the death certificate for

9    Mrs. Knight in September of 2013?

10        Did you see that?

11   A.   Yes, I did.

12   Q.   We talked about that on direct examination; is that right?

13   A.   That's correct.

14   Q.   Did you see anywhere in Dr. Abdelgaber's testimony where

15   he said, I think I got that wrong or that is somehow

16   incomplete or otherwise said that he believed her death

17   certificate was incorrect?

18   A.   I -- no, I haven't seen that.

19   Q.   Okay.

20        MS. JONES:  Nothing further, Your Honor.

21        THE COURT:  All right.  Recross?

22                    RECROSS-EXAMINATION

23   BY MR. CHILDERS:

24   Q.   Doctor, did you just testify that there was nothing in any

25   of the records after Ms. Knight's GI bleed and before her

George Crossley - Recross (Childers)          1670

1   death that mentioned the GI bleed?

2   A.  No.  I -- what I said is I don't -- I didn't see anything

3   that attributed her waning state to the GI bleed.

4   Q.  Let's look at a couple of records.  Okay?

5   A.  Okay.

6   Q.  And I'm just going to put these on the Elmo.

7       The first one is from July 12th, 2013, right?

8   A.  Right.

9   Q.  That's after the bleed?

10  A.  Yes.

11  Q.  About month and a half after the bleed, right?

12  A.  Correct.

13  Q.  And in particular, it says that she had -- she was in the

14  hospital, new onset bleeding.  Diagnosis of gastritis and AV

15  malformations.  Went to rehab, discharged home on June 8th.

16      Right?

17  A.  That's correct.

18  Q.  And then just below that, it says:  She's been weak since

19  all of her recent admissions.  She's just not bouncing back.

20      Right?

21  A.  That's correct.

22  Q.  Okay.  Then if we look -- this is another consult report

23  from August 23rd, 2013, right?

24  A.  Yes.

25  Q.  She was there for elevated troponin, right?

George Crossley - Recross (Childers)            1671

1    A.  Elevated troponin.

2    Q.  I'm sorry.

3    A.  Yes.

4    Q.  And that you talked about with us earlier is a cardiac

5    marker?

6    A.  That's correct.

7    Q.  Can kidney failure cause your troponin to be elevated?

8    A.  A little bit, not -- not -- in interpreting troponin, you

9    have to look at the pattern of it.  And so kidney failure can

10   create an elevated consistent troponin, but it doesn't -- it

11   doesn't cause a troponin that goes up and comes down.  So that

12   is how one has to evaluate that.

13   Q.  Kidney failure can elevate your troponin, right?  That's

14   my only question.  It can.

15   A.  You're asking for a yes no answer to something that

16   doesn't have a yes no answer.  I just gave you the answer.

17       Kidney failure can cause the troponin to go up and stay

18   flat and stay elevated for good.  It doesn't cause it to go up

19   and come down as it did in Ms. Knight.

20   Q.  Okay.  And this record was just over a week before Betty

21   Knight passed away, right?

22   A.  Correct.

23   Q.  And they specifically mention in the medical history that

24   she had a gastrointestinal bleed, correct?

25   A.  Well, they mention that under past medical history.

George Crossley - Recross (Childers)          1672

1   Q.  Right.

2   A.  Not as a current issue.

3   Q.  No, I understand that.

4       They put it in past medical history to let the doctor know

5   these are the problems this patient has been having, right?

6   A.  That doesn't mean that's the problem they're having today.

7   Q.  I'm not asking you that.

8   A.  Yeah.

9   Q.  These are problems --

10  A.  Yeah, they acknowledge that in the past she had a GI

11  bleed, yes.

12  Q.  Okay.  You were just shown another record from Dr.

13  Gunnalaugsson from May of 2009, right?

14  A.  Yes.

15  Q.  And I just want to be clear on this.

16      You know that Dr. Gunnalaugsson testified he never

17  confirmed in any medical record that Betty had a GI bleed,

18  right?

19  A.  I -- I hear that, yes.

20  Q.  Okay.  But you keep showing us records of his that say she

21  had a GI bleed even though he's told us he never confirmed it,

22  right?

23  A.  That -- yes, that is correct.

24  Q.  Okay.

25  A.  Now how one confirms it, there are different levels of

George Crossley - Recross (Childers)                    1673

1    evidence of a GI bleed.

2    Q.  Well, you're a cardiologist, right?

3    A.  I am a cardiologist.

4    Q.  He's a cardiologist, right?

5    A.  Yep.

6    Q.  He didn't confirm it in the records, right?

7    A.  He -- he kept saying it throughout her medical record that

8    she had, so it was his impression that she had a history of GI

9    bleeding.

10        And the data says that she was anemic, and she got better

11   with her anemia.  So that is not anemia that gets -- you

12   don't -- the principal other cause for anemia in her would be

13   renal failure, and renal failure anemia won't get better after

14   you transfuse her.

15   Q.  Patients who have severe kidney failure, you expect them

16   to be somewhat anemic, right?

17   A.  I just answered that question.

18        You expect them to be anemic and to stay that way after

19   you've transfused them.  The transfusion then -- you don't

20   come up and stay there.  You come up with a transfusion, and

21   you go right back down because you get lack of EPO, which is a

22   hormone that creates red blood cells.

23        Again, it must be interpreted not in a single test, but in

24   the pattern of tests over time.

25   Q.  You told the jury earlier that a patient like Betty

George Crossley - Recross (Childers)                1674

1    Knight's kidney function fluctuates.

2        You expect that, right?

3    A.  Yes.

4    Q.  And that kidney function as a direct effect on whether --

5    the severity of anemia, wouldn't it?

6    A.  Not -- not to the level of fluctuation that she had.

7        Once you get to -- you know, most people don't start

8    getting anemic until they get a little worse kidney function

9    than she had.  And once you get anemic, I've never seen

10   anybody have intermittent anemia from renal failure.

11   Q.  Well, she was diagnosed with chronic anemia, wasn't she?

12   A.  She was -- she had -- it wasn't chronic.  It was episodic.

13   She got transfused, it came up, and it stayed up.

14   Q.  Maybe I misread this.  We just looked at this record.

15   A.  Well --

16   Q.  What does that say right there, No. 5?

17   A.  Chronic anemia.

18       But that doesn't --

19   Q.  So she had chronic anemia.

20   A.  If you -- if you --

21   Q.  You're not really --

22   A.  It's difficult to answer your questions, but you diagnose

23   that by looking at the blood counts over time.  When you look

24   at her blood counts over time, you can see that when she got

25   transfused, her levels came up, and they stayed up after that.

George Crossley - Recross (Childers)          1675

1  They didn't come up and come back down the way you would

2  expect them to with chronic anemia from renal failure.

3  Q.  Did the diagnosis say a past medical history of chronic

4  anemia or not?

5  A.  It certainly said that.

6  Q.  Okay.  We talked about the Pradaxa label that you had in

7  front of you.  I think it's Exhibit 5884.

8  A.  Yes.

9  Q.  And you looked at this aPTT section; you recall that?

10  A.  Correct.

11  Q.  Tell us where in the aPTT section of the label it tells a

12  physician what the cutoff is.

13  A.  It doesn't say one.

14  Q.  Okay.  That's what it says in the document that we saw

15  that was an internal analysis from the company, though, right?

16  A.  Yes.

17  Q.  What does it say in the Pradaxa label, that you just

18  looked at, what level of aPTT tells a doctor that a patient is

19  at an increased risk of bleeding?

20  A.  It doesn't -- the U.S. label doesn't recommend that

21  approach.  That is not what the -- Boehringer and the FDA

22  negotiated for this label.

23  Q.  The question is, does -- let me back that up.

24      The label doesn't tell a physician what level of aPTT

25  means the patient might have an increased risk of bleed, does

George Crossley - Recross (Childers)                1676

1    it?

2    A.  That's correct.

3    Q.  That's --

4    A.  That's correct.  That is not what was put in this label.

5    Q.  Okay.  To this day.

6    A.  Correct.

7    Q.  Okay.  As far as Betty being on warfarin, you agree with

8    me that was an appropriate drug for her, right?

9    A.  Sure.

10   Q.  Okay.  She did not have a stroke while she was on

11   warfarin, did she?

12   A.  She -- she did not.  She had a disastrous embolic event

13   when she got taken off warfarin, but she did not have a stroke

14   while she was on warfarin.

15        And that certainly is not the standard that we use for --

16   I mean, if you see a patient on subtherapeutic warfarin, you

17   don't continue the subtherapeutic warfarin just because they

18   haven't had a stroke.  We try to use our medical judgment to

19   see how well we think they're anticoagulated.  And certainly,

20   as you can tell by the medical record, it was a struggle to

21   keep her within therapeutic range on warfarin.

22   Q.  My only question was, she didn't have a stroke while she

23   was on warfarin, correct?

24   A.  That's correct.

25   Q.  Okay.  And you didn't see any record that confirmed that

George Crossley - Recross (Childers)          1677

1   Betty Knight had a GI bleed while she was on warfarin,

2   correct?

3   A.  That's correct.

4   Q.  You said you prescribe the 75-milligram dose of Pradaxa to

5   some of your patients, right?

6   A.  That's correct.

7   Q.  Do you prescribe that dose to some patients who don't have

8   severe renal impairment?

9   A.  Maybe once or twice, almost never.  With -- I do recall

10  one elderly woman that had just an enormous risk of stroke,

11  had a prior stroke and was just head-to-toe bruising on -- on

12  150 that we put on 75.

13  Q.  That would be contrary to what the FDA-approved label

14  said?

15  A.  It is.  But it is part of being a doctor and having a

16  problem in front of you that you've got to solve.

17  Q.  I think you told us earlier that you actually participated

18  in the Pradaxa clinical trials, right?

19  A.  The RE-LY trial, yes, we did.

20  Q.  You were a -- what kind of site did you say you were?

21  A.  Site principal investigator.

22  Q.  Okay.

23  A.  That's our -- our site enrolled about 75 patients in it.

24  Q.  And when you enroll patients in a clinical trial like

25  that, your site gets paid by Boehringer Ingelheim, correct?

George Crossley - Recross (Childers)          1678

1  A.  The site gets reimbursed for the costs that it takes to do

2  the procedure.

3  Q.  They give a specific dollar amount for every patient that

4  goes into that trial, right?

5  A.  That is negotiated based on what our costs are, and that's

6  part of the ethical agreement of doing it.

7  Q.  You told us earlier you wanted Pradaxa to get approved,

8  right?

9  A.  I definitely wanted Pradaxa to get approved because it's a

10 big step forward for patients.

11 Q.  Did you participate in the Xarelto or Eliquis trials?

12 A.  We did not.  Vanderbilt, before I was there, I believe was

13 in the Eliquis trial.

14 Q.  You didn't participate in it?

15 A.  I did not.

16 Q.  You prescribe all of those drug to your patients, right?

17 A.  That's correct.

18 Q.  You don't prescribe all of your patients Pradaxa?

19 A.  No.  Huh-uh.

20 Q.  You prescribe even the drugs that you didn't participate

21 in the clinical trial?

22 A.  Sure.

23 Q.  Okay.  I think you testified -- maybe I wrote this down

24 wrong -- that you can't rule out that Betty would have had a

25 bleed or the same bleed or something along those lines in May

George Crossley - Recross (Childers)                 1679

1   of 2013 if she had been on warfarin, right?

2   A.  That's correct.

3   Q.  Can't rule out means it's possible that would have

4   happened, right?

5   A.  Sure.

6   Q.  Okay.  You agree with me that a patient on Pradaxa is more

7   likely, 50 percent more likely to have a bleed, a GI bleed

8   than a patient who is on warfarin?

9   A.  Yes, they are.  And they're much more likely not to have a

10  stroke.

11  Q.  So I understand you can't rule out the possibility that

12  she would have had a bleed in May of 2013 if she had been on

13  warfarin.

14      But you agree with me that any patient is more likely to

15  have a GI bleed if they're taking Pradaxa than if they're

16  taking warfarin?

17  A.  That's correct.  And they are much more likely to have a

18  stroke if they're on warfarin.

19  Q.  And Betty didn't have a stroke on warfarin, right?

20  A.  She did not have a stroke on warfarin.

21        MR. CHILDERS:  That's all the questions I have, Your

22  Honor.

23        THE COURT:  All right.  Redirect?

24        MS. JONES:  I'm all done, Your Honor.  Thank you.

25        THE COURT:  She said no.  All right.

1680

1     Doctor, you're excused.

2          THE WITNESS:  Thank you.

3          THE COURT:  All right.  For the defense?

4          MS. JONES:  Your Honor, could we just have a brief

5     moment with you at the bench?

6          THE COURT:  Certainly.

7          Well, why don't we go ahead and take about a

8     five-minute recess.  You may retire to the jury room.

9        (Jury not present.)

10         MR. LEWIS:  I want to move in that 9009 summary.

11    They've had that document for two days now.  I've done what

12    the rule said that I needed to do, which is provide them the

13    document.  So we want to move it in.

14         MR. CHILDERS:  Are we on the record, Your Honor?

15         THE COURT:  Yes.

16         MR. CHILDERS:  I will say this.  They didn't do what

17    the rule said they are supposed to do.  They didn't provide it

18    to us ahead of trial.

19         Beyond that, it had mistakes in it when we did get it.

20    The mistakes were told to them.  They have -- we told them

21    last Wednesday what the mistakes were, and then we didn't get

22    a response until Sunday night after 10:30 when we were about

23    to come in to trial to deal with two more witnesses.

24         I am sorry we haven't had a chance to go through it

25    entirely, but that's not our fault, Your Honor.  We tried to

1    be as efficient as we could in getting that done.  So we still

2    object to it.

3         MR. LEWIS:  They had -- let's just make sure the

4    record is clear on this.  They had the documents that support

5    the summary for over a year.

6         THE COURT:  And those are not -- there's no objection

7    to those --

8         MR. CHILDERS:  No, sir.

9         THE COURT:  -- underlying documents.

10        MR. CHILDERS:  No, sir.

11        MR. LEWIS:  No.

12        And we told them precisely what documents were going

13   to support the summary, called those out and provided those to

14   plaintiffs' counsel.  And they said we want additions to that,

15   we want additional INR readings on the summary.  We made those

16   corrections, supplied the summary on Sunday night.

17        If they have an objection to the summary, let's hear

18   what that is right now, and we'll make the correction.

19        THE COURT:  Well, so to be clear, first, the state of

20   the original exhibit is that the chart with the underlying

21   documents was found to be incomplete in some sense by

22   plaintiffs.  You have since amended the chart to reflect what

23   they have raised with you.

24        MR. LEWIS:  Yes.

25        THE COURT:  All right.  So now you have an amended

1682

1   chart with the records attached.

2        But, Mr. Childers, you're saying that you all found

3   more than just additions, actually found errors in the chart?

4        MR. CHILDERS:  In the original chart, we did, Your

5   Honor.  We found places where there were more -- that the same

6   test was listed twice on the chart.  We found places where the

7   INR -- it was listed as an INR when it was actually a PT

8   reading.  Things that are not just you forgot to include

9   something, it's an actual mistake that is in the chart itself.

10       In addition to being missing items -- and I understand

11  the statute to say you've got to be complete and accurate, not

12  just partial and accurate when you do something like this.

13       MS. JONES:  And, Your Honor, I don't think we would

14  say that didn't -- you know, that there weren't things that we

15  needed to fix.  We tried to fix them.  We provided an update.

16  It was Sunday night, we acknowledge that.

17       Now what we're hearing is not an actual substantive

18  objection, but just they have just not gotten around to

19  looking at, and so that means we can't get it into evidence,

20  which doesn't seem quite fair given where we are on this.

21  Particularly since we know the records are in, this isn't a

22  hotly disputed issue.  We just had to fix a chart.

23       THE COURT:  At what point did you first provide

24  plaintiffs a chart?

25       MR. LEWIS:  It would have been prior to Dr. Ashhab's

1683

1    cross-examination.

2            THE COURT:  During trial?

3            MR. LEWIS:  During trial.

4            THE COURT:  Well, then I'm afraid I'm going to have to

5    sustain the objection.

6            The purpose of the rule is to allow voluminous records

7    to be summarized in a chart to make it easy for the jury to

8    use and the parties to use.  It's contemplated that to comply

9    with that rule, the proponent of the evidence needs to be able

10   to assure the Court, the jury and the opposing parties that

11   the chart is complete and accurate.  Typically with something

12   like this where there are literally hundreds of pages of

13   documents, that should be done in advance of trial.

14           The documents themselves that underlie this chart are

15   admitted.  Frankly, I'm concerned now that if I sustain

16   admission, that I'm going to be giving the jury -- getting the

17   jury a chart that may still have errors, and I'm simply not, I

18   don't believe, entitled to take that risk.

19           Want to look at the rule?  Go ahead.

20           MR. CHILDERS:  Judge, if I could just point out, we

21   didn't object to the demonstrative they made.  It is this

22   chart that we're having a problem with.

23           MR. LEWIS:  So, Your Honor, Rule 1006 does not require

24   that the documents be provided before trial.  It says the

25   proponent must make the originals or duplicates available for

1684

1    examination or copying or both by the other parties at a

2    reasonable time and place.  It's been done a whole week ago.

3    And the Court may order the proponent to produce them in

4    court, which we've done.

5            So the rule is in place to do exactly what was done

6    here.  You show the records to the other side, they suggest

7    that it isn't complete and accurate, the corrections are made,

8    and then it's allowed go back.

9            THE COURT:  The problem here is the number of

10   documents and the lateness of providing the chart.

11           What do you intend to use this chart for if I admit

12   the record?

13           MR. LEWIS:  It's to support the -- the document

14   supports the INR readings that have been shown on the

15   demonstrative that is not going back with the jury.  They've

16   seen a demonstrative with fluctuating INR values, and it's

17   simply a summary so that the jury can find those INR readings

18   easily.

19           THE COURT:  Well, do you intend in your argument to

20   make reference to specific INR readings or reports and refer

21   to either the chart or the underlying documents during your

22   closing?

23           MR. LEWIS:  Ms. Jones is doing the closing, so I'll

24   defer to her.

25           MS. JONES:  Well, I certainly intend to talk about her

1685

1  INR variability.  I was not planning on waving the chart

2  around necessarily during closing.

3          THE COURT:  Well, here's my concern.

4          I appreciate that the lengths to which both sides have

5  gone to try to provide copies of everything, disclose all

6  exhibits in advance of trial, you folks have complied with the

7  spirit and letter of disclosure as best I can tell.

8          The problem here is that this is -- these are

9  voluminous records.  This chart wasn't provided in advance of

10 trial.  I appreciate that they've had it for several days, but

11 in that several days, they have found what they report were

12 omissions and/or errors.  You've said that those have been

13 corrected.  I certainly assume that is the case.  I don't

14 question you at all.

15         The problem now is that if I give -- if we admit this

16 chart, and the jury goes in and tries to use this chart, I

17 don't know what they're going to be referring to.  I don't

18 know which entry on the chart they're going to look at.

19 That's why I asked if you knew how you were going to use it.

20         MR. LEWIS:  Right.

21         THE COURT:  The problem is if they start going through

22 a chart, and the INR or aPTT readings at various points in

23 time become a material issue in their deliberation, I'm

24 concerned that they're going to have to try to figure out

25 where that chart -- where that record is underneath it and

1686

1    compare it.

2         MR. LEWIS:  That's correct.

3         So, Your Honor, what I did during the examination of

4    Dr. Shami is to admit, if you recall, the back-up documents.

5    Frankly the voluminous records are right there.

6         THE COURT:  Right.

7         MR. LEWIS:  So that's one exhibit, and we'll just cite

8    to that.

9         And if we have to cite something in the closing,

10   we'll --

11        THE COURT:  And I think you're fine to take any pages

12   from that exhibit and use them in your closing.

13        MR. LEWIS:  Okay.

14        THE COURT:  -- however you so desire.

15        MR. LEWIS:  Okay.

16        THE COURT:  I think that's what you're going to have

17   to do under the circumstances.

18        MR. LEWIS:  Okay.

19        THE COURT:  All right.  So does the plaintiff intend

20   to offer rebuttal evidence?

21        Well, first, I assume you're going to rest now subject

22   to maybe the exhibits?

23        MS. JONES:  Yes, Your Honor.  I've been informed by

24   Mr. Hailey, who is back here, that we still need to get in the

25   script records or whatever we're doing for purposes of the

1687

1    video deposition plays to make sure that they are in the

2    record.

3            And I'm not sure that we have to do that before we

4    officially rest in front of the jury, but that's another

5    outside --

6            THE COURT:  Well, subject then to completing the

7    request to introduce exhibits that were used in examination of

8    witnesses, the defendant is resting.

9            MS. JONES:  Subject to just making sure everything

10   gets in, yes.

11           THE COURT:  Right.

12           And then do the plaintiffs intend to offer rebuttal

13   evidence?

14           MR. CHILDERS:  We don't, Your Honor.

15           THE COURT:  All right.  I assume, then, the parties

16   agree that the next step is going to be dealing with the

17   pending motions, instructions, and then we'll be done.  So my

18   inclination is to bring the jury out here and send them home

19   until 9:30 tomorrow, and for us to stick around and work

20   through the remaining steps necessary to be able to give this

21   case to them with instructions and closings when they get back

22   here in the morning.

23           Okay?

24           MR. CHILDERS:  Thank you, Judge.

25           MR. MOSKOW:  Thank you, Your Honor.

1688

1       THE COURT:  All right.  So let's bring the jury back

2   in.

3       THE COURT SECURITY OFFICER:  Okay.

4       THE COURT:  I'm going to let each side declare the end

5   of their evidence on the record, understanding that the

6   defendant is reserving the right as to any exhibits that have

7   not yet been moved, and I would assume the same with regard to

8   the plaintiffs.

9       MR. MOSKOW:  Yes, Your Honor.

10       MS. JONES:  Yes, Your Honor.

11   (Jury present.)

12       THE COURT:  All right.  Ladies and Gentlemen, thank

13   you for your patience.

14       All right.  Ms. Jones?

15       MS. JONES:  Thank you, Your Honor.  The defense rests.

16       THE COURT:  All right.  Ladies and Gentlemen, the

17   defense rests its case.  That means they have finished

18   presenting their case in chief.

19       As I told you at the beginning, plaintiffs have the

20   right to offer rebuttal evidence.

21       Do the plaintiffs want to offer rebuttal evidence?

22       MR. CHILDERS:  No, Your Honor.

23       THE COURT:  All right.  So the plaintiffs rest as

24   well.

25       So you've heard all of the evidence you will hear in

1689

1  this case.  But given the hour, there is simply no way we're

2  going to get through instructions and closing arguments to be

3  able to hand this case to you to begin your deliberations

4  until tomorrow.  So we are going to recess until 9:30

5  tomorrow.

6       When you come back in the morning at 9:30, barring

7  some unforeseen circumstance, I'm prepared to read the final

8  instructions, which will probably take about half an hour, and

9  then we're going to do closing arguments.  And at that point,

10 you'll then be given the case to begin your deliberations.

11 And when that occurs, you will be in charge of the timing of

12 everything.  The rest of us will await your direction about

13 taking breaks, how long you stay, all of those things.

14      So we're going to recess until 9:00 a.m. tomorrow --

15 or sorry -- 9:30 a.m. tomorrow.  As I've indicated, I have

16 every reason to believe we're going to send this case to you,

17 and you will get it in time to be deliberating for a

18 substantial period tomorrow.  However, it is certainly

19 possible, especially with a case like this, that you may

20 choose to go into the evening a bit.  It will be up to you.

21      I say this now because I think all of you should

22 consider what, if anything, you have to do in order to be

23 prepared to stay longer if the jury together agrees to stay

24 past 5:00 or an hour like that.  So it will be your choice.  I

25 hope that you all will be agreeable to whether you want to end

1690

1    right at 5:00 or you want to go past that and, if so, for how

2    long.  So be prepared individually to do whatever as a group

3    you decide to do.

4         Also, remember, now that you've heard the evidence,

5    there is still an extremely important part of this trial that

6    you haven't heard.  You haven't heard this Court's

7    instructions about the law that you're to apply once you

8    decide what the fact are.  And you haven't heard the closing

9    arguments of these fine lawyers.  Obviously they have worked

10   hard on both sides to prepare this case.  I'm going to give

11   them an adequate amount of time tomorrow to make their closing

12   statements.  I want you to come back with the frame of mind to

13   be open to what the lawyers argue, and then and only then to

14   try to decide what you think the verdict should be.

15        Remember to leave any legal pads or anything like that

16   you have taken notes on here.  With that, we will see you back

17   here at 9:30 a.m. tomorrow.

18        I would direct everyone else to remain in the

19   courtroom until all of the jurors have departed.

20       (Jury not present.)

21        THE COURT:  You may be seated.

22        All right.  Here's what we're going to do next.  We're

23   going to take half an hour recess.  When we come back, I

24   intend to hear brief argument on the preemption motion.  I

25   intend to hear brief argument on the other directed verdict

1691

1    motion.  At this point, I think I'm inclined and prepared to

2    rule on each of them and then immediately get into the final

3    instructions and try to work through those and a verdict form

4    before we conclude for the day.

5            All right.  See you back here in about half an hour.

6            THE COURT SECURITY OFFICER:  All rise.  This court

7    stands in recess.

8        (Recess taken at 4:04 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  All right.  Are we ready to proceed?

 2              MR. MOSKOW:  Yes, Your Honor.

 3              MR. LEWIS:  Yes, Your Honor.

 4              THE COURT:  All right.  Let's start first with our

 5    favorite subject, pre-emption.  I'd like -- do you want to

 6    do the exhibits first?  That's fine with me if you want to

 7    do that.

 8              MS. JONES:  We just had one exhibit that I needed

 9    to make sure we moved in, Exhibit 9003-C which is just a

10    shorter version of a medical record.

11              MR. MOSKOW:  No objection, Your Honor.

12              THE COURT:  All right.  It's admitted.

13              MS. JONES:  9003-C.  Thank you, Your Honor.

14         (Exhibit Number 9003-C admitted into evidence.)

15              THE COURT:  Well, now my clerk's asking me -- so

16    what we had tendered we understood were 9003, which was a

17    voluminous exhibit.  And then what I understood to be

18    excerpts 9003-A and 9003-B.  B is what we just admitted.

19    So -- C is what we admitted.

20              MS. JONES:  Yes, Your Honor.

21              THE COURT:  So is 9003, the voluminous exhibit, is

22    it -- your folks are saying, yes, it was admitted.  Is

23    that --

24              THE CLERK:  That's true -- but I'm not sure that

25    they --
```

1    THE COURT:  Did you mean to?  I mean, is that what

2    you want in?

3    MS. JONES:  Hold on just a second.

4    (Pause)

5    MS. JONES:  I'm told we just need the excerpts, so

6    9003-A, B, and C, not 9003.

7    THE COURT:  Is that acceptable to the plaintiffs?

8    MR. MOSKOW:  That's fine, Your Honor.

9    THE COURT:  All right.  So 9003 will not be

10   admitted.  In its place we'll have 9003-A, B and C which are

11   excerpts of that larger exhibit.  Okay?

12   And then do you have something with respect to exhibits

13   or --

14   MR. MOSKOW:  I know that the parties are just

15   working through the final transmittal of the video

16   depositions.  I don't believe that's been finalized yet.  I

17   understand we're prepared to tender a thumb drive to the

18   Court that has all of that information.

19   THE COURT:  All right.  Then --

20   MR. MOSKOW:  Maybe it could be marked as a court

21   exhibit, Your Honor?  Is that appropriate?

22   THE COURT:  All right.  The courtroom deputy says

23   she would like the opportunity with the court reporter's

24   assistance and representatives from the parties to review

25   the video depositions, make sure that we're all satisfied

1    with what's in, what's out, and then make certain that

2    there's a thumb drive that reflects that which will then be

3    admitted.  So we're okay to do that.

4           MR. MOSKOW:  We'll work with Ms. Justice to make

5    sure that that happens, Your Honor.

6           THE COURT:  All right.  That's great.  Anything

7    else then in regard to exhibits or other matters?

8           MR. LEWIS:  Other matters perhaps, Your Honor.

9           THE COURT:  Yes.

10          MR. LEWIS:  I feel like we should make a formal

11   motion at the close now of all of the evidence --

12          THE COURT:  Okay.

13          MR. LEWIS:  -- before we get into maybe more

14   general arguments that I think Your Honor has contemplated.

15   Is that okay for me to do?

16          THE COURT:  Yes.

17          MR. LEWIS:  At this time, Your Honor, now that the

18   evidence has closed, defendant moves for judgment as a

19   matter of law on all of the claims that are in the case.

20      We renew the grounds for, for this motion that we made

21   at the motion for judgment as a matter of law at the close

22   of plaintiffs' case.  But I did want to add a couple of

23   additional grounds, Your Honor, if I may, or at least

24   clarify what our motion entails.  I'm not sure these are

25   additions.

1          THE COURT:  Okay.

2          MR. LEWIS:  Before moving for all of the claims

3     that either are in the complaint or have been made here at

4     trial through cross-examination of the witnesses or by any

5     kind of evidence as it came in at trial on federal

6     pre-emption.

7          So that includes the -- any direct warnings to patients

8     such as the Medication Guide, also any warnings to

9     physicians such as the physician label, but also on any

10    claims related to an absence of providing information to

11    patients or physicians.  All of those claims, in our view,

12    are pre-empted by federal law as they've been presented here

13    in this trial.  So that's one ground.

14         To the extent any claims survive pre-emption, Your

15    Honor, we would move for judgment as a matter of law on

16    those remaining claims because they fail for either lack of

17    duty under West Virginia law or lack of evidence, either

18    expert testimony suggesting that the manufacturer fell below

19    the standard of care or otherwise with an inadequate warning

20    or that there's evidence to support a deficiency that's

21    asserted by the plaintiffs.

22         And then the rest of the claims in the case, Your

23    Honor, are addressed by our original motion for judgment as

24    a matter of law at the close of the plaintiffs' case.

25              THE COURT:  All right.  Do you want to respond?

1          MR. MOSKOW:  Yes, Your Honor.  Thank you.

2      First, with regard to the claim that -- or the, the

3  motion that all claims based on federal pre-emption are

4  barred, as the Court is well aware, pre-emption is an

5  affirmative defense.  The defendant bears the burden.

6      They have put no evidence in the record at trial as to

7  their attempts to secure the warnings that plaintiff says

8  are required.  Their failure to meet that burden is fatal to

9  their defense at this point.

10      So the, the lack of evidence in and of itself bars the

11  claim.  And that's something that I will go into more detail

12  when we discuss later.

13          THE COURT:  All right.

14          MR. MOSKOW:  With regard to there being no duty

15  under West Virginia law, I think we very clearly established

16  that they had a duty to warn both Ms. Knight and her

17  physicians under, under West Virginia law.

18      The duty goes directly to Ms. Knight under, under

19  *Johnson*.  They have a duty to make sure that the label is

20  accurate at all times to the physician.  And the law is

21  clear that the defendants do not meet their burden on either

22  motion.

23          THE COURT:  All right.  Thank you.

24      I intend to rule on this as we get into the other

25  motions.

1    So let's go back, then, to the defendant's motion

2  challenging the sufficiency of the plaintiffs' evidence on

3  pre-emption at the close of plaintiffs' case.

4         MR. LEWIS:  Okay, Your Honor.  Well, we've -- do

5  you want me to open or do I --

6         THE COURT:  Yes.  Go ahead and then I'm going to

7  ask a couple of questions.

8         MR. LEWIS:  Sure.

9    Your Honor, the plaintiffs' claims here -- and I have

10  to be honest and I want to be fair -- have vacillated first

11  starting with a straight out attack on the Medication Guide

12  and then sort of morphing into a more general should have

13  supplied through some other vehicle additional information

14  to patients directly, and then still morphed into a

15  criticism of what was provided to physicians or perhaps even

16  that a "dear doctor" label or "dear doctor" letter should

17  have been sent around.  Maybe TV ads should have been taken

18  out.

19    So, I mean, we've really gotten a scattershot theory

20  here under a failure to warn and some of the other claims

21  that are tied to a failure to warn.

22         But at the end of the day, it all comes down to

23  whatever these claims are need to be run first through a

24  pre-emption analysis, and then secondly through an analysis

25  of whether there's a duty under West Virginia law and

1    whether the evidence supports it.

2         So focusing on pre-emption, we start with the

3    proposition that we have an FDA approved label that cannot

4    be changed at all, and we're talking about the Medication

5    Guide or the physician label or any communication from

6    manufacturer to anyone is, is labeling that needs to be

7    approved by the FDA.

8         And, so, let's start with labeling on the Medication

9    Guide.

10        The Medication Guide is the one patient labeling that

11   was permitted by the FDA.  And we cite to the 21, C.F.R.,

12   208 that outlines -- the FDA doesn't always require a

13   Medication Guide.  There are a lot of medicines that are

14   supplied without a Medication Guide.

15        But in that C.F.R. section there are circumstances

16   where the FDA says these circumstances are present and we're

17   going to regulate what you can say to patients and we're

18   going to do it through this thing called a Medication Guide.

19        And then there are rules surrounding what needs to be

20   in that Medication Guide and it needs to be approved by the

21   FDA.

22        So we get to the pre-emption analysis step one on the

23   Medication Guide.  We have an FDA approved communication and

24   that cannot be changed without FDA approval.  There are no

25   exceptions to that.  And we've cited the regulation to the

1    Court in our papers earlier.

2         And that includes any communication to patients.

3    There's no circumventing that rule.  That rule is,

4    "Manufacturer, this is how you're going to communicate to

5    patients."  And there would be no ability for the

6    manufacturer to go around that regulation and say something

7    different or additional or contradictory to what's in the

8    Medication Guide.

9         That's just what the regulation is and we just happen

10   to have a circumstance here where we've got a

11   direct-to-patient jurisdiction and we have a Medication

12   Guide that was approved by the FDA and can't be changed.

13   And because of that, any claims related to direct-to-patient

14   communications are pre-empted by federal law.

15        There are no exceptions, but when we get to physician

16   labels, there are some exceptions to an FDA approved label.

17   And that's when we get to step two in the pre-emption

18   process.

19        Step one is you have an FDA approved label that cannot

20   be changed absent something allowing you to change it.  And

21   there's the Changes Being Effected section of the

22   regulations that do allow manufacturers to change the

23   physician labels under certain circumstances.  But those

24   circumstances first have to be present in order to have the

25   ability to change the label.

1    And I've heard plaintiffs' counsel make this statement

2    and it's an incorrect statement of law to suggest that the

3    defendant has the burden to show that the FDA would have

4    rejected the change.  That's not what the law is.

5        The *Utts* case which we've cited in our papers is a case

6    against the other -- the Eliquis which is the other

7    anticoagulant medication, brand name anticoagulant

8    medication.  And that case lays out the analysis.

9        You start first with you've got a physician label that

10   cannot be changed absent the Changes Being Effected section.

11   And in order for the plaintiff to be able to pursue a theory

12   against the label, against the physician label, the

13   plaintiff has the burden to come forward with evidence that

14   there's newly acquired information or analysis to support a

15   change under that provision.  There has to be newly acquired

16   information.

17       If there's an absence of newly acquired information

18   that supports the change, not just any information, that

19   supports the change that the plaintiffs are saying needed to

20   be changed, then they can pursue a claim.

21       If there isn't newly acquired information, then there

22   is no ability for the manufacturer to change.

23            THE COURT:  We know in this case that the label

24   did change over the course of a number -- three or four

25   changes before Betty died, maybe even some after.

1    Under what authority were those changes allowed?

2         MR. LEWIS:  It depends on what change we're

3    talking about, Your Honor.

4         THE COURT:  Well, let's talk about the ones the

5    plaintiff has pointed out specifically.  And you're going to

6    be much more conversant with the date of the label.

7         But my recollection is as compared to the launch label,

8    the label was modified to provide that if a patient is on

9    P-gp inhibitors and has severe renal problems, Pradaxa is

10   not recommended.

11        So let's start with that.  That was a change made after

12   the launch before Betty's last prescription and before her

13   death.  How was that change effected?

14        MR. LEWIS:  Sure.  That was a CBE change that was

15   made in November of 2011, one month after Mrs. Knight's

16   first prescription.

17        THE COURT:  I note there was also the change from

18   the launch label in the -- I have down here the March, 2011,

19   change.  It was Exhibit 86, March, '11 label where language

20   was inserted specifically saying -- and I have it at 12.3 of

21   the label -- that patients with severe renal problems were

22   not studied as part of the RE-LY study and some modeling was

23   used instead to determine dosage.

24        How was that change effected?

25        MR. LEWIS:  That was the Changes Being Effected

1    section.  But that really wasn't, that wasn't what was put

2    in the label.

3        The label was changed to include an analysis that --

4    regarding severely renally impaired patients and the various

5    risk factors of bleeding associated.  And there's like an

6    asterisk or a footnote under there, under that table which

7    is Table 3 under I believe 12.2.

8            THE COURT:  Well, I mean, how is that somehow not

9    a change in the label?  This is all -- the label is this

10   whole document it seems to me.  It's not just one or two

11   pages.  It's -- the label has the full prescribing

12   information as part of it.

13       So what do you mean when you say it's not -- that

14   wasn't really a change in the label?

15           MR. LEWIS:  I didn't say it wasn't a change in the

16   label.  It wasn't designed to disclose what the complaining

17   fact is that the plaintiff -- the fact that the plaintiffs

18   are complaining about.

19       The, the plaintiffs have complained that the Medication

20   Guide didn't contain a warning that this wasn't tested on

21   folks who are severely renally impaired or the 75-milligram

22   dose wasn't, wasn't tested.

23           THE COURT:  Okay.  I think they've also made the

24   same complaint about the label.

25           MR. LEWIS:  Well, the original label describes

1   what was tested.  The original label describes that this was

2   tested on -- there was a clinical trial --

3               THE COURT:  Okay.

4               MR. LEWIS:  -- and it was on 150-milligram and

5   110-milligram doses.

6               THE COURT:  In any event --

7               MR. LEWIS:  There's no question that that's what

8   was there.

9               THE COURT:  Sure.  In any event, come 2011 there

10  was a change in what looks to me to be part of the label.

11              MR. LEWIS:  There is a change.

12              THE COURT:  Okay.

13              MR. LEWIS:  And it includes the pharmacokinetic

14  analysis that had been done previously on severely, severe

15  renal impairment patient population.

16              THE COURT:  Okay.

17              MR. LEWIS:  That analysis was put into the label

18  and I think it was the last section of that Table 3 I

19  believe.

20              THE COURT:  Right.

21              MR. LEWIS:  And then there was a footnote that was

22  put in to, to indicate that it wasn't tested on 75.  But

23  that's not the complaint that they're making.

24       The complaint that the plaintiffs are making is that we

25  didn't originally disclose that this wasn't tested on

1    severely renal impairment.

2          THE COURT:  It's not just that, though.

3          MR. LEWIS:  That's what they're, that's --

4          THE COURT:  That's when it starts, but that's not

5    when it ends.

6       What they're claiming is that the RE-LY study didn't

7    include severely impaired renal patients.  And although that

8    was in the study, there wasn't information in the Medication

9    Guide or the label to either a doctor or the patient to

10   point out that that was the case.

11      I mean, clearly between the launch label and the 2011

12   label, your company added language in the label to say that,

13   to say, yeah, -- not to say -- to say the study did not

14   include people with severe renal impairment.  We used

15   modeling instead.

16         MR. LEWIS:  But the, the modeling data was the

17   update.  It was already disclosed -- two things.

18         THE COURT:  Yeah.

19         MR. LEWIS:  One, it was already disclosed in the

20   physician label.  We can't change the Medication Guide

21   either way.

22         THE COURT:  Right.

23         MR. LEWIS:  But it was already disclosed in the

24   physician label, the patient population that was tested in

25   the clinical trial, 150 and 110.  There's no question that

1    any physician reading that knows that the clinical trial

2    included 150 and 110 and no one else.  That's in the label.

3    That's in the physician label.

4         Their complaint has always been -- their complaint and

5    the way they've tried this case, Your Honor, has always been

6    that it's not contained in the Medication Guide.

7         But even if their complaint is now that it's about the

8    physician label and that not being disclosed, we still have

9    to apply the pre-emption analysis.

10        And the pre-emption analysis starts with you can't

11   change it unless there's an exception.  And then the

12   plaintiff has to show newly acquired, newly acquired

13   information and analysis that was done to support the

14   change.

15        And just because we later changed it without FDA

16   objection under the Changes Being Effected section doesn't

17   mean we had newly acquired information that would have

18   supported a change and that we had to change it and that it

19   was deficient because of that.

20        Because, remember, we're also -- the step back is this

21   is a question about whether they're -- under West Virginia

22   law they're trying to make us do something that we can't do

23   because we'll violate federal regulations.  That's the

24   ultimate inquiry.

25        So if they win their tort claim, is that going to make

1    us do something that we really can't do to comply with FDA

2    regs?  That's the ultimate question here.

3        And, so, the only way that we could -- that their claim

4    could survive is to be able to show under the law that we

5    had newly acquired information --

6              THE COURT:  Or analysis.

7              MR. LEWIS:  -- or analysis that we should have

8    changed it earlier.  That's, that's the issue.

9        The fact that we ultimately made the change without FDA

10   objection doesn't prove that we had newly acquired

11   information, we should have changed it earlier.

12             THE COURT:  With respect to their arguments about

13   monitoring, the plaintiffs have adduced evidence that after

14   Pradaxa was on the market, there were, first, reports in the

15   literature but also exchanges between BI employees or agents

16   about the advisability of either doing some type of testing

17   at the beginning of a prescription or in having some type of

18   testing and monitoring thereafter, especially with patients

19   who have severe renal problems.

20       We know the label was never changed to implement that

21   suggestion.  But why wouldn't that be newly acquired

22   analysis that if believed by the jury would have permitted

23   Pradaxa, BI to change the label?

24             MR. LEWIS:  Sure.  So for that particular claim --

25   and I'm going to restate it probably better than the

1    plaintiffs have in this case just because they've jumped

2    around a bit.  But if the claim in the case is you should

3    have warned physicians to -- that there are levels of

4    monitoring that you could then adjust dosages and

5    modifications to see if they've had too much Pradaxa, it's a

6    closer call.  And I'm going to fully acknowledge that.  That

7    is a closer call.

8        And I've got to be honest with you, Your Honor.  That's

9    what we thought this case was going to be about because

10   that's how they've tried every other case.  And that's why

11   you didn't get a summary judgment motion on that point

12   because it's a closer call on pre-emption.

13       We definitely have an approved FDA label that didn't

14   require monitoring.  We have some new analysis that was

15   done.  There's no question about it.  And I think there's

16   probably a fact issue on whether there's newly acquired

17   information or newly acquired analysis that warranted a

18   change.

19       And we don't quite have the, the slam dunk clear

20   evidence that the FDA would have rejected the change.  We

21   don't have the, okay, we want to do this and a flat out

22   rejection of that.  But that's only for that failure to warn

23   claim, that piece of the failure to warn claim.  That

24   doesn't mean they get to make all of these other allegations

25   about deficiencies in the warning.

1       But on the failure to give monitoring information, I

2   think it's a closer call.  I could craft an argument that

3   that's pre-empted based on some of the data.  But some of

4   that data isn't into the trial evidence here.  And, so, I

5   think it's a close call for the Court --

6           THE COURT:  Okay.

7           MR. LEWIS:  -- on that particular issue.

8       That's why when I argued the DV before I was very

9   careful to carve that piece out and say, you know, that's a

10  close call.  I think arguments go -- but on these other

11  claims, Your Honor, they're clearly out.

12      The only claim that they could arguably pursue is the

13  monitoring claim.  But that's not what they've pursued

14  throughout this trial.  Frankly, the monitoring claim fails

15  for other reasons not about pre-emption.  I don't know if

16  you want to talk about that now or later.

17          THE COURT:  No.  Let's try to stick with this one

18  for now.

19          MR. LEWIS:  Yeah.  It's complicated enough.

20          THE COURT:  All right.

21          MR. LEWIS:  That's -- I mean, so when, when we're

22  looking at all of the challenges to the label, the, this

23  same analysis, and *Utts* does it, the *Dolin* case, the same

24  analysis has to be done for each of the challenges.

25      And I want to address -- because I know what's going to

1   be said.  I've heard it said before.  They can't end around

2   pre-emption by saying, "Well, I'm not really challenging the

3   Medication Guide.  I'm just going to say to the jury what's

4   in and not in that Medication Guide."

5       That's the same thing.  That's like if the Court were

6   to grant directed verdict on an express warranty claim that

7   involved a specific paper and the Court found, you know

8   what, that doesn't meet the test for an express warranty.

9   Okay.  That claim's out.

10      They can't get up in front of the jury and say, "Look

11  at this.  This was a warranty that they gave and look at

12  what's missing."  They can't do that.  Once that claim is

13  out, it's out.

14              THE COURT:  All right.

15              MR. LEWIS:  So that would be the other argument

16  that I'd like to make.

17              THE COURT:  Here's the last thing that I'll give

18  you a chance to respond to.

19      So you characterize this as plaintiffs' failure to show

20  that pre-emption doesn't bar these various claims.  Of

21  course, that's not the way the issue is framed in the

22  leading authorities.  It's not the way the Supreme Court

23  frames it in *Wyeth*.  It's not the way the appellate courts

24  have framed it.

25      They've always framed it, and plaintiff made this

 1   argument, articulated this, I guess it was last night, that

 2   the burden is on the defendant to establish what is

 3   characterized as a very difficult burden to establish

 4   conflict pre-emption, impossibility that the FDA -- that,

 5   that you could enact these changes to the label argued as

 6   created by state tort law without the FDA's approval.

 7        And, so, here what we do know is that you've

 8   acknowledged that there's one change that maybe is arguable

 9   that might have been based upon newly acquired analysis.

10   That's the monitoring that we just discussed.

11        I think you've heard me declare that by the regulation,

12   the CBE regulation, the Medication Guide is not subject to

13   the tort law claims, that the plaintiff cannot pursue a

14   claim here that's based upon an alleged defect or

15   insufficiency in the Medication Guide itself.

16        So we're somewhere in between with respect to these

17   others.  And now we know, as you've acknowledged, that some

18   of the changes to the label are changes that plaintiff has

19   argued were appropriate and necessary to fully inform

20   doctors and their patients about the limitations of the

21   RE-LY study and the, the risks that BI knew or should have

22   known was presented by the use of Pradaxa in these patients.

23        So it seems to me that the burden is on the defendant

24   to establish that the labeling changes that plaintiff

25   advocates would not have been approved by the FDA.

1    In *Dolin* they presented an extreme case that

2    demonstrates that principle by showing how many times the

3    FDA rejected something.  In the circuit they relied upon

4    that.

5    There's neither an expert nor other evidence here from

6    the defense that demonstrates to me that the FDA did or

7    would have disapproved of the labeling changes that

8    plaintiff is arguing for.

9    MR. LEWIS:  Your Honor, the case law is very clear

10   that it's plaintiffs' burden to come forward as part of

11   their end around pre-emption with evidence of newly acquired

12   information supporting a change.  That's got to be part of

13   their claim.

14   The *Utts* case -- and if I may just read from it.

15   THE COURT:  Go ahead.

16   MR. LEWIS:  This is a 2017 case regarding Eliquis.

17   Bristol-Myers is the defendant.

18   Post FDA approval pre-emption analysis proceeds in two

19   stages.  First, the plaintiff must show that there exists --

20   plaintiff must show that there existed newly acquired

21   information such that the defendants could unilaterally

22   change the label pursuant to the regulations without FDA

23   approval.

24   Because the starting point is I've got an FDA approved

25   label and I can't change it.  So that's the -- I've

1   established my burden.

2       Do I have an FDA approved label that I can't change?

3   As a defendant, I've established my burden on the

4   affirmative defense.

5       The law says, okay, you want to avoid that?  You have

6   to come forward with newly acquired evidence.  And if the

7   plaintiff can point to newly acquired evidence to support a

8   labeling change under the regulations, then the burden

9   shifts to the manufacturer to show by clear evidence that

10  the FDA would not have approved.

11      So it's, defendant, you've got to show that you've got

12  an FDA approved label and that you can't change it unless

13  there are certain exceptions.

14      Plaintiff then has to come forward and say, okay,

15  here's newly acquired information and they should have

16  changed it, and that's part of my tort claim.  I'm not

17  barred by federal pre-emption because it doesn't prevent me

18  from asserting under West Virginia law that you should have

19  changed your label with this newly acquired information.

20      Okay.  Then it's my burden back to say, wait a minute,

21  Your Honor.  That's not true.  We actually tried that and

22  the FDA said, no, you're not allowed to do it.  That's the

23  analysis.  And *Dolin* goes through the same analysis.

24      And I will note that in both cases there was a lot of

25  suggested newly acquired information.  And even the Court,

1    in particular the *Utts* case, is squarely our case because

2    they're making the very similar allegation.  You didn't

3    monitor.  You didn't test it, whatnot.

4        But I will say this.  There was a lot more, quote,

5    newly acquired information suggested in those cases that

6    wasn't sufficient.  There's no newly acquired information

7    directed at the specific claims except monitoring.  That's

8    the only one where they've submitted any newly acquired

9    information.

10       THE COURT:  Okay.  Thank you.

11       For the plaintiff.

12       MR. MOSKOW:  Thank you, Your Honor.  I prepared a

13   rather lengthy presentation, so I'm scaling it down --

14       THE COURT:  Wonderful.

15       MR. MOSKOW:  -- as we're talking.  And I won't

16   even use the AV system.  I think I can do it right from

17   here.

18       THE COURT:  Okay.

19       MR. MOSKOW:  Your Honor, first of all, I

20   appreciate the Court giving us the opportunity to have a

21   continuing argument on this matter.  It's of significant

22   importance to all of the parties, and I appreciate the

23   Court's willingness to hear us out on it.

24       And, and I have to say, you know, to the extent that

25   there's surprise on how this case was presented, I want to

1   make clear this is the first 75-milligram case that's been

2   tried in the country.  It's also the first case with a

3   direct-to-consumer requirement under state law.  So it's not

4   surprising that there are differences here than there were

5   in the prior trials.

6        And while it's unfortunate that, you know, this complex

7   issue is raised at this time, you know, we appreciate that,

8   you know, we can, we can deal with the issues.  But that

9   does not change the burden.

10       And as the Court identified and as *Wyeth* vs. *Levine*

11  makes clear, it's a demanding defense which requires the

12  defendant to prove by clear evidence that it was impossible

13  for it to comply with both federal and state requirements.

14       They can't do that here.  They can't do it here for a

15  number of reasons.  But at the heart of this, they have put

16  in no evidence, made no argument, and provided no case law

17  to identify how it would be a conflict between West Virginia

18  law and federal law for them to comply with their obligation

19  to fully warn West Virginia residents, including Mrs.

20  Knight.

21       And that's because, as *Wyeth* makes clear, federal

22  approval of a drug is the floor, not the ceiling.  And they

23  have an obligation to ensure that they craft an adequate

24  label at the time of launch and that it remains complete,

25  accurate, fair, and balanced at all times thereafter.

1    The defendants put in no, no argument whatsoever, no

2    evidence, no nothing to show how they're, they're put in a

3    position where they can't comply with both federal and state

4    law.

5    And I cite to a sister court here in West Virginia,

6    Your Honor.  It's Senior Judge Payne in the Eastern -- I'm

7    sorry.  I meant this circuit.  In the Eastern District of

8    Virginia.  And it's a slip opinion.  I'm not, I'm not

9    arguing otherwise.

10   But it makes clear that the, you know, *Wyeth* controls

11   the pre-emption issue -- and that was an allergen case --

12   and the CBE could be used to, you know, to increase or

13   strengthen the warnings and that wasn't done.

14   We also cite to the *Mullens* vs. *Ethicon* case in this,

15   in this district.  And in that case, Your Honor, -- and I

16   provided copies of both these cases to the Court and parties

17   just now.

18   And in this case, while it is a medical device case, so

19   the regulatory scheme is slightly different, the federal

20   pre-emption analysis is essentially identical.

21   And what that Court said is just by saying it's

22   difficult to comply or impossible comply is not enough; that

23   the defendant has a burden to show exactly how that

24   impossibility comes into play.  And there's, there's none of

25   that here.

1  As the Court mentioned just a few moments ago, to the

2  extent that the specific issues that we're talking about,

3  the fact that the 75-milligram dose wasn't tested in severe

4  renal AFib patients, that change was effected by a CBE.

5  So by definition, Boehringer Ingelheim represented to

6  the FDA that there was newly acquired information or new

7  analysis of existing information that required them to make

8  a label change, or at least permitted them to make a label

9  change and they made it.

10  So by definition the -- and, and by an admission of a

11  party opponent we have demonstrated to the Court that there

12  was newly acquired information.

13  To the extent that it strengthened the warning that was

14  already in the label at the time of launch, you know,

15  that's, that's a particularly important issue that's

16  reflected both in the majority opinion in *Wyeth*.  You know,

17  we cite to the statement at Page 573, the mere fact that the

18  FDA approved Phenergan's label does not establish that it

19  would have prohibited such a change.

20  And, interestingly, and I must admit in my career I

21  haven't cited to Justice Thomas a whole lot, but here I get

22  to cite to a concurring opinion of Justice Thomas where he

23  said at Page 582, 583 of the *Wyeth* decision federal law does

24  not give drug manufacturers an unconditional right to market

25  their federally approved drug at all times with the precise

1    label initially approved by the FDA.

2        If there were really an issue here as to whether or not

3    they had tried to make the label change and were refused to

4    do so, we would have heard about it either in

5    cross-examination of Dr. Plunkett or they would have brought

6    Dr. Mann, their FDA regulatory affairs person.

7        And, frankly, Your Honor, if this matter had been

8    raised at the summary judgment stage, I would have expected

9    an affidavit from Dr. Mann as to why or why not the

10   plaintiffs' claims must fail.  That would have been evidence

11   for the Court to consider.

12       In the big picture here, Judge, all this reliance on

13   *Utts*, while very entertaining, misses the point.  That was a

14   District Court in the Southern District of New York deciding

15   summary judgment.  And it did not follow the dictates of

16   *Wyeth*.  And, in fact, many courts have already distinguished

17   themselves from that decision.  That decision is pending on

18   appeal.  And it's not controlling on this Court.  What is

19   controlling on this Court is *Wyeth*.  So that's where we

20   start.

21       Where -- I want to make clear, based on what we just

22   heard, I thought we had articulated, and I appreciate the

23   Court repeating it back, that we had concerns about what was

24   in the launch label based on the RE-LY data that was

25   available before launch and was reflected in the CCDS, the

1    Core Company Data Sheet, Exhibit 351, which was dated

2    December of 2009 and reflected excessive dabigatran exposure

3    and talked about the close correlation between plasma

4    concentration and anticoagulant effect.

5         Neither of those statements appear in the label.  We've

6    seen no evidence that they were ever requested.  The

7    defendants have proffered nothing as part of their defense

8    that those, those issues were, were proffered and rejected

9    by the FDA.

10        So from the launch label up and to, up and through the

11   re-analysis of the RE-LY data that was part of the Reilly

12   paper and at various times in 2010, 2011, 2012, 2013 that

13   paper was revised to remove the therapeutic range, to remove

14   the idea of testing.  That's -- Exhibit 3247 is the final

15   publication of that.

16        We have Exhibit 5 which is the email between

17   Dr. Brueckmann and Dr. Reilly where they're talking about

18   the conclusions from the RE-LY data re-analysis where Dr.,

19   I'm sorry, Dr. Reilly says the results are not what

20   marketing has hoped for.

21        And Dr. Brueckmann responds, yeah, we were trying to

22   avoid a target range but, you know, maybe when we have a

23   competitor, this will be something that can differentiate

24   us.

25        And, most importantly, in her reply email she says

1    maybe we can distinguish ourselves from monitoring by saying

2    you just have to test the dose at initiation and

3    periodically thereafter.  That is exactly what Dr. Plunkett

4    said was missing from this label.

5        So I don't think there's a close argument on the

6    monitoring and, and the blood plasma concentration, and all

7    of those issues as counsel suggested.  I think the record is

8    clear that there was new analysis of existing information as

9    well as post-marketing information that supported that.

10       And as to the remaining claims, Your Honor, while I

11   appreciate that, you know, everybody is, is, is dealing with

12   the fact that trials are living, breathing things and things

13   happen during trial and we pivot and you adjust.

14       And the argument, well, while we think that there is a

15   good faith legal basis to conclude based on the changes to

16   the physician's label and the testimony from both

17   Ms. Kliewer and Dr. Plunkett that the label is one document,

18   it's not considered the physician's label in the Medication

19   Guide, but it's one document, we believe that there's

20   evidence in the record that would support the defendant

21   making a change.

22       And, in fact, when they added the information to the

23   physician's label part of the label, the package insert,

24   when they added that information, they never requested to

25   add information to the Medication Guide.  So we think that

1    raises a legitimate issue as to whether the statute applies

2    in this case.

3        We've heard the Court.  We've adjusted our presentation

4    of evidence.  And our presentation of evidence is to the

5    extent that this information is in the physician's label,

6    then you can use the Medication Guide as a tool to identify

7    whether or not it was communicated to the, to the plaintiff

8    in particular.

9        And, Judge, you had asked, you know, exactly how -- the

10   other day you had asked us exactly how there could be a

11   communication beyond the Medication Guide, or maybe Mr.

12   Lewis did.  I don't remember.

13       In the various approval letters that *Wyeth* received

14   after each one of, after each one of these label changes,

15   whether it was by CBE or whether it was by prior approval

16   supplement, they received a statement that was to the effect

17   of the following.

18       "You may request, you may request advisory comments on

19   proposed introductory advertising and promotional label.  To

20   do so, submit the following," and it gives a list.

21       And then it goes on.  "You must submit final

22   promotional materials and package inserts accompanied by."

23   So they don't have to wait for FDA approval to provide

24   promotional materials at any time if they believe that

25   there's an important issue that needs to be done.

1    And, in fact, as part of the CBE that we've been

2  talking about, Your Honor, -- I just want to make sure I

3  pulled the right document for you.

4    As part of the CBE that we've been talking about,

5  Exhibit 127, Your Honor, is not in evidence.  I'm using it

6  today for purposes of helping the Court see, you know, how

7  things developed here.

8    But the reason I think this is particularly important

9  is because this was part of the CBE process where Boehringer

10 was proposing to make changes.

11   And what happened here, if you look at the November

12 to -- it's the second page of the exhibit.

13       MR. LEWIS:  I'm sorry.  I'm lost with this.  Is

14 this admitted?  I didn't catch --

15       THE COURT:  No.  He represented it's not in

16 evidence.  He's using it as an example.

17       MR. MOSKOW:  For purposes of this argument.

18       MR. LEWIS:  Okay.

19       MR. MOSKOW:  So, Your Honor, you'll see there's a

20 pending CBE.  If we look at Page 2, there's an email from

21 Michelle Kliewer to Alison Blaus, so from Boehringer to the

22 FDA.

23   And she says, "Please find attached our proposal for a

24 proactive communication to be sent to healthcare

25 professionals advising them of the important update related

1    to the amended CBE."  And then attached to it is a proposed

2    physician letter, "dear healthcare provider" letter.  And

3    she asked for approval of it from the FDA.

4         And the response at the very top of the Page 2 from

5    Ms. Blaus to Ms. Kliewer is, "The review is going to take

6    longer.  We are definitely not implying that you need to

7    hold the communication for our comment because the law does

8    not require that they wait for FDA approval to communicate

9    with physicians and patients about critical safety issues

10   that are part of a CBE process."

11        In fact, I'm not aware of any regulation that prohibits

12   them from communicating without FDA approval on any issue of

13   safety as long as it's consistent with the approved

14   labeling.

15        And all of the issues in the Medication Guide are

16   consistent with the -- that the plaintiffs have raised with

17   regard to missing information in the Medication Guide are

18   clearly consistent with the labeling because we've

19   identified where they are in the package insert.

20        So, first, because they failed to meet their burden,

21   second, because we've established both through Dr. Plunkett

22   and Michelle Kliewer that the responsibility for the label

23   remains at all times with Boehringer and that they have

24   failed to provide any evidence that they requested and were

25   rejected from the matters in question, we believe we've met

1    our burden and the defendant has not.

2              THE COURT:  All right.  Thank you.

3         Do you want like two minutes?

4              MR. LEWIS:  Two minutes.  Can I just --

5              THE COURT:  Sure.

6              MR. LEWIS:  I just want to show the Court a couple

7    of decisions.  I know Your Honor has probably read more

8    pre-emption law during a product liability trial than you

9    ever want to.

10        This is from the *Dolin* case.  This is *Dolin* at -- this

11   is the Seventh Circuit.  So they had this trial.  The

12   defendant lost, took it up on appeal, and said based on the

13   trial evidence, we think the Court should have pre-empted

14   these claims or found that these claims were pre-empted.

15        And the Court is requiring the plaintiff to come

16   forward and say, okay, what's your newly acquired

17   information?  And, again, we've talked about this data

18   analysis.  It could be old data, new analysis.  That's fine.

19        Plaintiff proposes -- this is plaintiffs' burden.

20   Plaintiff proposes two ways that we could pursue our tort

21   claims and they had to present specific things to the Court

22   about, okay, how am I going to avoid pre-emption?  Here are

23   the ways that I'm going to avoid pre-emption.

24        GSK withheld data to the FDA or some of the data

25   showed -- it was about suicide risk in this particular

1    medicine.

2         They say the argument fails because the undisputed

3    evidence shows that the FDA was aware of the nature of the

4    data received from GSK.

5         When we look at the, many of the claims that are being

6    made by the plaintiffs here, 75-milligram dose, severe renal

7    impairment, these are things that the FDA indisputably knew

8    at the time that it approved the label.  And the Court isn't

9    saying, well, you could have done -- it isn't even getting

10   to the clear evidence step.

11        The first step is, hey, what new stuff did you have and

12   think you can now have a tort claim after the FDA has

13   already approved your label?

14        And the things that the plaintiff came toward with in

15   *Dolin* are things that the FDA indisputably knew about.

16   That's that point in *Dolin*.

17        That's why Your Honor was discussing some of the

18   specific claims as being things that the FDA knew.  I think

19   we have to do that analysis first.

20        And this is where, the only thing I wanted to cite is

21   this *In Re: Celexa* case.  This is the First Circuit.  And I

22   really just wanted to -- they talk about the back and forth

23   between the Court.

24        And, so, this is the inquiry that we have to do for

25   each of the claims.  I've got to be honest.  I've been doing

1   this a long time.  I've never seen so many different

2   sporadic attacks on a label and a physician label.  Usually

3   when we get to these failure to warn cases, there are one or

4   two very specific things that are being challenged.  And

5   then from there you go, okay, you challenge that.  Now did

6   that make a difference in this particular patient's case?

7        Yeah, the doctor said, "If I had known that, I would

8   have changed my behavior completely."  And then you have

9   your claim that gets around pre-emption.

10       Here we have to ask this question:  What specific

11  statements are you saying that we should have put in our

12  label or warning?  And each one requires a specific analysis

13  under the pre-emption framework.

14       Thank you, Your Honor.

15            THE COURT:  All right.  Thank you.

16       All right.  With respect to the defendant's motion both

17  at the close of plaintiffs' evidence and at the close of all

18  the evidence seeking to apply pre-emption to all the claims,

19  I grant it in part in that the Court finds that any claim by

20  the plaintiffs that the Medication Guide should be modified

21  to include the warnings or statements that plaintiff has

22  proffered is pre-empted.

23       The Court finds that with respect to the Medication

24  Guide, the regulations do not permit the manufacturer to

25  unilaterally or in advance make changes to the Medication

1    Guide.

2        So the Court finds that those things are pre-empted.

3        I deny the motion with respect to the remaining claims.

4    I find that the plaintiff -- the defendant has not

5    established that the other claims are pre-empted.  The Court

6    believes that the CBE process offers to BI the authority and

7    opportunity to make the changes that plaintiffs advocate in

8    their tort claims without advance FDA approval.  As such,

9    the Court does not believe that the claims are pre-empted.

10       So I grant in part and deny the balance.

11       Now let's go to the motion with respect to directed

12   verdict.  To be blunt, it's already getting late.  I'm

13   prepared to go ahead and rule.  I've heard from the parties

14   on both of these.

15       I'm going to deny the defendant's motions.

16       Let me find my copy of the defendant's motion.  Hold on

17   a minute.

18       (Pause)

19           THE COURT:  All right.  The first issue that the

20   defendant raised was that plaintiffs have not shown that

21   Pradaxa caused or contributed to Ms. Knight's injury.

22       I find taken in the light most favorable to the

23   plaintiffs there is sufficient evidence for the jury to

24   determine that.

25       Dr. Ashhab testified that the location and nature of

1    the GI bleed that she suffered is consistent with one being

2    caused or worsened by the Pradaxa that she was on.

3         He indicated that -- he testified that there was a

4    greater risk of a major life-threatening bleed as a result

5    of the Pradaxa than there had been on warfarin.

6         That and the other testimony I believe is sufficient to

7    take that issue to the jury.

8         Next, the defendant argues the plaintiffs have not

9    shown proximate cause.  This part of the motion is addressed

10   to whether or not there's evidence that Ms. Knight upon a

11   different set of warnings may have acted in a way to avoid

12   her injury.

13        Here the Court finds that taken in the light most

14   favorable to the plaintiffs, there is evidence that, first,

15   Ms. Knight's children saw -- at least one of them saw an ad

16   about the advantages of Pradaxa for patients who have AFib

17   and are on otherwise warfarin which requires a long-term

18   monitoring.

19        They approached Betty about it.  Together the three of

20   them went to see her treating physician.  They spoke with

21   the nurse practitioner.  The two children both testified

22   that in different ways they were aware of their mother's

23   decision-making with regard to her use of prescriptions and

24   treatment and that they also participated in helping her

25   decide these things.

1    They testified that they were not aware of a number of

2    factors about Pradaxa that if you believe the plaintiffs'

3    evidence may lead the jury to conclude that Pradaxa was not,

4    in fact, a good choice for her; that she was unaware of

5    these factors and that had she or they been aware either

6    through advertising or through the discussions with the

7    doctor or through reading the label, she would have decided

8    not to go, to take the risk of Pradaxa.

9    So I think there's enough evidence for the jury to

10   determine proximate cause.

11   Next, the defendant challenges the sufficiency of

12   plaintiffs' evidence on the express warranty claim.  Here

13   the Court notes that this is a claim based upon West

14   Virginia law that essentially codifies in West Virginia the

15   UCC.

16   An express warranty is any affirmation of fact or

17   promise that relates to the matters that the purchaser would

18   consider in determining to enter into the, the bargain, the

19   basis for the bargain.

20   Here plaintiffs have adduced evidence that the warning

21   and Medication Guide and other information provided to her

22   was either false or misleading, inadequate.

23   I believe that the West Virginia law does not require

24   that the plaintiff prove reliance in the same way that the

25   evidence must support the causation issue with respect to

1    product liability claim under the West Virginia statute.  If

2    the information that's at issue is part of the bargain, then

3    there's a presumption that if it turned out to be false or

4    misleading that the plaintiff is -- that that demonstrates

5    sufficient reliance for alleging a breach.

6         The next is the implied warranty claim.  The Court also

7    finds here the plaintiff has adduced evidence which if

8    believed would indicate that the drug -- there was an

9    implied warranty that the drug was safe, would be safe and

10   effective for Betty even given her patient characteristics;

11   that it was not, in fact, safe for her and that the

12   medicine, therefore, breached an implied warranty.

13        Last is the plaintiffs' fraud claim.  Here the

14   plaintiff has submitted evidence that at different points in

15   time prior to her death the company knew that there were, in

16   fact, greater risks about the use of Pradaxa for patients

17   like Betty given her patient characteristics, and that for

18   reasons related to the profitability of the drug rather than

19   the safety and efficacy of the drug decided not to add some

20   of the warnings or make other information generally

21   available.  I think it's not particularly strong, but I

22   think it's a matter for the jury to determine.

23        And, so, the Court intends to, in keeping with my prior

24   ruling, include in the verdict form the question of whether

25   the jury believes that the plaintiffs have proven

1730

1    sufficiently wrongful conduct that would meet the definition

2    for punitive damages.  And then if they return a verdict

3    favorable to the plaintiff as to that, then have the jury

4    return for deliberation as to any damages to be awarded.

5          So I'm trying to summarize as best I can my ruling.

6          The Court denies the defendant's motion for directed

7    verdict.

8          So that leaves us with the damage -- or the jury

9    instruction issues to resolve.  And the Court's prepared to

10   try to go through that with counsel now.

11         We're going to take just a break for a minute to switch

12   out court reporters.  So I don't know if same counsel are

13   staying for that part or not.  You can switch that out

14   however you want.

15              MR. MOSKOW:  Thank you, Your Honor.

16         (Recess taken at 5:30 p.m.)

17

18

19

20

21

22

23

24

25

1731

1    (Back on the record at 5:32 p.m.)

2        THE COURT:  Are you folks ready or do you need a

3    couple more minutes?

4        MR. LEWIS:  We're ready, Your Honor.

5        THE COURT:  All right.

6        MR. MOSKOW:  We're fine, Your Honor.

7        THE COURT:  All right.  So first the Court notes that

8    prior to the start of this part of the proceeding, my law

9    clerk has given to each side copies of the proposed jury

10   instructions.  These are instructions which include, first,

11   the base instructions that the parties informed the Court that

12   they had agreed upon, coupled with a number of instances

13   within that document that the parties had language that was in

14   dispute, but they expected the Court to resolve.

15       The Court went through a number of those matters with

16   the parties.  As a result, at the conference yesterday, the

17   Court essentially ruled on some of the matters that were

18   raised.  But not all matters were in fact raised because we

19   didn't have enough time.  But my clerk has now given to you,

20   just before this hearing, the draft of the final instructions

21   that he and I believe embody what the Court decided yesterday

22   evening and continues to show some of the instructions, which

23   I think are punitive damage instructions, where the Court has

24   yet to hear arguments of the parties.  And so those

25   instructions reflect the disputed language between the

1732

1    parties.

2            So at this point, my thought is to just simply go

3    through the instructions starting at the beginning and hear

4    counsel as to each one and if there is any objection and, if

5    so, the basis for it, and then any proposed language that a

6    party would advocate.

7            All right?

8            MR. MOSKOW:  Your Honor, can we respond sitting down

9    or do we need to stand up?

10           THE COURT:  No, you can respond sitting down.  That

11   would be fine.

12           MR. MOSKOW:  Thank you, Your Honor.

13           THE COURT:  So proposed instruction No. 1 is

14   introduction.

15           Proposed instruction No. 2 explains direct and

16   circumstantial evidence.

17           Proposed instruction No. 3 explains credibility.

18           No. 4 defines expert witnesses or expert testimony.

19           No. 5 explains deposition or, in this case, videotaped

20   testimony.

21           Instruction No. 6 explains the burden of proof.

22           Instruction No. 7 --

23           MS. JONES:  Excuse me, Your Honor.  Do you want us to

24   offer our objections to --

25           THE COURT:  Yes.  And I assumed to this point these

1    were all things that were agreed upon, so I was going to say

2    that when I got to -- I guess to No. 8 --

3         MS. JONES:  Well, the only objection that we just

4    wanted to note for the record would be to the instruction on

5    burden of proof, which we've discussed already.

6         That reference in the last three sentences that if the

7    plaintiffs prove, that the jury may find in favor of them, if

8    the plaintiffs don't prove, then they may find in favor of BI,

9    we object to that on the basis that we think that the law

10   requires that if they find in one way or another, that they

11   must return a verdict consistent with whichever side they

12   think prevailed on the burden -- excuse me -- on the

13   presentation of the evidence.

14        We also think that would be consistent with Your

15   Honor's pre-charge to the jury.  So we don't believe -- we

16   understand it's a model instruction, but we just don't think

17   it's consistent with the actual law on what the jury is

18   supposed to do.

19        THE COURT:  Certainly.  I reverted to the model.

20        What does plaintiff say?

21        MR. MOSKOW:  Plaintiffs request the Court revert to

22   the model.

23        THE COURT:  All right.  I'm going to leave it as is.

24   I deny the objection.  The Court is using the pattern

25   instruction developed by the West Virginia Supreme Court of

1734

1    Appeals and finds it's appropriate to do so because these are

2    pattern instructions that that court developed for these state

3    law claims.

4            No. 7, sympathy.

5            No. 8, parties equal under the law.

6            All right.  No. 9, do plaintiffs have any objection to

7    instruction 9?

8            MR. MOSKOW:  Your Honor, we are -- I am so used to

9    standing up.  I'm sorry.

10           We're still struggling with the idea of injuries

11   including her death as opposed to and/or her death, but I

12   don't think that this misstates the law in West Virginia.

13   It's just we're concerned about jury confusion where we keep

14   using the phrase injuries including her death.

15           But I think -- and this is what I mentioned to the

16   Court at side bar yesterday.  I think to a certain extent this

17   is resolved by the verdict form.  In the plaintiffs' proposed

18   verdict form, we have a separate line item for a finding of

19   injuries and a finding of death, and we would be -- I think

20   that resolves the issue that we would have with this

21   particular charge.

22           MS. JONES:  We haven't gotten to the verdict form.  We

23   have an objection to doing that in the verdict form.  We think

24   this reference here to injuries including her death is what

25   the Court used in the pre-charge.  It's throughout the current

1735

1    version of the instructions.  We think it's an appropriate

2    statement of the law as I understand Mr. Moskow to have agreed

3    with.

4            So I think it is --

5            THE COURT:  All right.  I'm going to leave the

6    instruction as I have provided it.  The parties are certainly

7    free in their closings to explain.

8            And here it is the case that plaintiffs have two types

9    of claims of injury.  One is that they have a claim for the

10   injuries suffered by Betty Knight from the time of her bleed

11   up to her death.  That is a surviving personal injury claim.

12   And then secondly there is the wrongful death claim, a claim

13   that is dependent upon the defendant's conduct causing or

14   contributing to her death, and that's a wrongful death claim.

15   And so counsel certainly can explain that these are each

16   separate types of damage that can be considered if the jury so

17   finds.

18           MR. MOSKOW:  Thank you, Your Honor.

19           THE COURT:  Next is the proximate cause instruction.

20           Any objection to it?

21           MS. JONES:  No, Your Honor.

22           THE COURT:  Next is the -- it's labeled proposed

23   instruction No. 6, necessity of expert testimony.

24           MR. MOSKOW:  Your Honor, the plaintiff just renews the

25   objection that we previously made.  We understand that this is

1   the Court's ruling over that objection.

2        THE COURT:  All right.  I would deny the plaintiffs'

3   objection.  I would find that in a pharmaceutical product

4   liability case, expert testimony is necessary for plaintiffs

5   to meet their burden.

6        Next is the limiting instruction.  It consists of

7   three parts, foreign labeling, failure to test, and relevance

8   of the physician warning.  So do the parties have objections

9   to any part of these three paragraphs?

10       (Defense counsel conferring.)

11       MS. JONES:  Your Honor, from -- I apologize.

12       From the BI side, no objection, but we do think this

13  is the appropriate place to include an instruction to the jury

14  on the Medication Guide.  We submitted a proposal to the Court

15  I believe earlier today.  I think plaintiffs also submitted

16  some red lines on that.

17       We may need to discuss that separately, but we do

18  think that needs to be incorporated into the instructions --

19       THE COURT:  All right.  We'll get to that in a few

20  minutes.  But as to the instruction as tendered by the Court,

21  you have no objection to what is stated on pages 15 and 16?

22       MS. JONES:  Your Honor, given what you ruled on the

23  directed verdict motion, I think what we had proposed with

24  respect to failure to test, it's encapsulated in that ruling.

25  And we articulated the reasons that we think the jury should

1737

1    be specifically advised that the company can't be held liable

2    for a failure to warn about whether certain testing was done

3    or not, but we certainly understand Your Honor's directed

4    verdict decision.

5            THE COURT:  All right.  How about from the plaintiffs?

6            MR. CHILDERS:  Thank you, Your Honor.

7            On the foreign labeling, no objection.

8            On the failure to test, the second sentence of the

9    proposed instruction reads:  Under the law, BI cannot be held

10   liable for failure to perform clinical testing on Pradaxa.

11   What we had proposed is plaintiffs in this case are not making

12   any claim against Boehringer for failure to perform clinical

13   testing on Pradaxa.  We think that rather than commenting on a

14   claim that is not being made, saying it can't be made, we can

15   just say it's not being made.

16           MS. JONES:  Frankly, Your Honor, given the way the

17   case has been tried, and there's been an awful lot of talking

18   about testing, I think they need to be directly instructed

19   that there is no -- there is no legal basis for a claim for

20   failure to test something with respect to Pradaxa.

21           We don't think it's sufficient just to say they are

22   not making the claim.  I think they need to get a pretty

23   strong instruction on that given the way the evidence has come

24   in.  So we're satisfied with the way it's written now.

25           THE COURT:  Well, how about I do this.  I'm going to

1738

1   add language that will say, under the law, BI is not -- well,

2   plaintiff is not making a claim, and BI not cannot be held

3   liable for a failure to perform clinical testing.

4           MR. MOSKOW:  Thank you, Your Honor.

5           THE COURT:  So that it's clear that it's not the

6   claim, and they can't be liable.

7           MS. JONES:  That's fine with us.

8           THE COURT:  All right.  I'm going to add that

9   language.

10          MR. MOSKOW:  Thank you, Your Honor.

11          And then page 16, the relevance of physician warnings.

12          THE COURT:  Yes.

13          MR. MOSKOW:  I just renew our objection, which I know

14  the Court has already ruled on, which is that this singles out

15  a particular type of testimony as opposed to all of the

16  evidence in the record, and we think it highlights as opposed

17  to instructing, and we object on that basis.

18          THE COURT:  All right.  I disagree.  I deny it.  The

19  parties are certainly free to argue about the other things

20  that may be considered as part of the sufficiency of the

21  warnings.

22          MR. MOSKOW:  Thank you, Your Honor.

23          THE COURT:  Next, it was labeled 21, compliance with

24  safety standards.

25          MR. MOSKOW:  No objection from plaintiffs, Your Honor.

1739

1    MS. JONES:  Your Honor, we still have an objection to

2    the last sentence of proposed instruction No. 21:

3    Noncompliance with appropriate regulations is competent

4    evidence that BI did not exercise due care in marketing

5    Pradaxa.  We don't think there is any evidence that the

6    company failed to comply with appropriate regulations, and so

7    we don't think that is an instruction that applies to the

8    evidence in this case.  So we don't think the instruction is

9    appropriate.

10   THE COURT:  Well, I have looked quickly at some of

11   Dr. Plunkett's testimony.  I'm not going to claim I've gone

12   through all of it, but I did find in more than one place where

13   she talks about the federal regulations that apply, which

14   essentially require the company to provide clinical data and

15   other supporting information.

16       As I understand it, it's plaintiffs' theory that BI

17   didn't do that, that you withheld information, for instance,

18   what we discussed moments ago about monitoring and whether

19   there was a need for a threshold monitoring or determination

20   of blood plasma and monitoring thereafter.  So I'm going to

21   include it.

22       But what I think I'm going to do is instead of saying

23   noncompliance, I'm going to say failure to comply with

24   appropriate regulations is competent evidence.

25       Any objection to that language given my ruling that

1740

1    some version of this is going to --

2              MS. JONES:  We would have the same objection, Your

3    Honor --

4              THE COURT:  Okay.

5              MS. JONES:  -- for the reasons that we have already

6    discussed in our earlier session.

7              THE COURT:  Well, I do think it's appropriate to call

8    this failure to comply with regulations rather than simply

9    noncompliance.

10             No. 27, learned treatises, any objection from the

11    parties there?

12             MR. MOSKOW:  No objection, Your Honor.

13             MS. JONES:  No objection, Your Honor.

14             THE COURT:  All right.  Now we get into the strict

15    liability, page 19.  Any objection there?

16             MR. MOSKOW:  I don't believe so, Your Honor, but give

17    me one second.

18             THE COURT:  Okay.

19             MS. JONES:  And same, Your Honor, I don't think we had

20    anything on that.

21             MR. MOSKOW:  No objection from plaintiffs, Your Honor.

22             THE COURT:  All right.  Page 20, effectiveness

23    defined?

24             MS. JONES:  No objection from BI, Your Honor.

25             MR. MOSKOW:  No objection from plaintiffs, Your Honor.

1741

1          THE COURT:  All right.  Next, No. 14, the so-called

2    strict liability failure to warn.

3          First, I'll note that the last two paragraphs that are

4    in the instruction I have put in there at the request of

5    plaintiffs over the objection of defendant.  The Court finds

6    that the first statement, which refers to the duty to warn

7    patients directly, is a proper and necessary statement as to

8    the element of West Virginia law given the law that applies to

9    this particular case.

10         And then I think similarly the last paragraph, which

11   consists of those two sentences, is also consistent with the

12   West Virginia law that applies here.  So I've denied

13   defendant's objection to that language.

14         Is there any other objection or matter that the

15   parties want to raise?

16         MR. MOSKOW:  No, Your Honor, on behalf of plaintiffs.

17         MS. JONES:  I think we've made our objection, Your

18   Honor.

19         THE COURT:  All right.  Good enough.

20         Next on page 22, proposed instruction 15, negligence.

21   The Court notes that at the bottom of this instruction, the

22   same two paragraphs just discussed were added at the request

23   of plaintiffs over the same objection of the defendant.

24         Other than that objection from the defendant, do the

25   parties have any other objections to this instruction?

1742

1       MR. MOSKOW:  No objection from plaintiffs, Your Honor.

2       MS. JONES:  Nothing for BI, Your Honor.

3       THE COURT:  All right.  No. 16 on page 24, the basic

4  standard of care, any objection to that instruction?

5       MR. MOSKOW:  None from plaintiffs, Your Honor.

6       MS. JONES:  Nothing from BI.

7       THE COURT:  All right.  No. 17, warning causation.

8       (Plaintiffs' counsel conferring.)

9       MR. MOSKOW:  Plaintiffs raise no further objection.

10  We previously discussed plaintiffs' concern about whether the

11  language should be to Mrs. Knight or Mrs. Knight and her

12  family in light of the evidence that came in.  Plaintiffs make

13  no further objection.

14       THE COURT:  All right.  Well, I've rejected the notion

15  that the instruction should consider warnings to the family

16  members because the duty is to warn the patient.  So I

17  rejected plaintiffs' request that we include a reference to

18  the family.

19       Any objection from the defendant?

20       MS. JONES:  No objection, Your Honor.

21       But Mr. Hailey, who has eagle eyes, mentions that on

22  line 4, in the sentence that begins, In other words, plaintiff

23  should be changed to plaintiffs plural.

24       THE COURT:  All right.  We'll fix that.

25       Next, express warranty, No. 26, essential elements.

1743

1    MR. MOSKOW:  No objection from plaintiffs, Your Honor.

2    MS. JONES:  Same, Your Honor, nothing from BI.

3    THE COURT:  No objections from --

4    MS. JONES:  No objection.  I apologize.

5    THE COURT:  I didn't hear you very well.

6    Implied warranty, No. 19.

7    MR. MOSKOW:  No objection from plaintiffs, Your Honor.

8    MS. JONES:  Nothing from BI, Your Honor.

9    MR. MOSKOW:  I should just renew for the record we had

10   requested that further information from the pattern

11   instruction be provided that referenced the statute 46-2-314.

12   And the Court considered that and entered the language that

13   you chose.

14   THE COURT:  All right.  Next, the -- was that implied

15   warranty?

16   MS. JONES:  It was.

17   THE COURT:  All right.  Then next on page 28, the

18   fraud instruction.

19   MR. MOSKOW:  Plaintiff has no objection, Your Honor.

20   MS. JONES:  No objection from BI.

21   THE COURT:  No. 22, general wrongful death?

22   MR. MOSKOW:  Your Honor, I believe that's been edited

23   to comply with the parties' agreement.  We have no objection.

24   MS. JONES:  Agreed.  No objection, Your Honor.

25   THE COURT:  All right.  Now we get to these punitive

1744

1    damages claims.  And so as I understand it, plaintiffs

2    tendered the West Virginia pattern instruction, and that is

3    reflected in what is before me.  But then the defendant

4    asserted some changes, either striking some things and adding

5    some things.

6         As I understand it, Ms. Jones, you would add what is

7    printed in bold type and strike what is deleted or stricken

8    through.

9         First, the strikethroughs on this instruction 23 are

10   consistent with this Court's ruling that, first, the jury

11   would have to determine that there is a basis to find conduct

12   that would result in punitive damages.  And if they do, then

13   after that return of a verdict, the Court would instruct them

14   on damages, and they would make a separate new determination

15   of damages.

16        So the Court agrees that -- does plaintiff have any

17   objection to that approach in striking that language from the

18   instruction?

19        MR. MOSKOW:  With the understanding that should the

20   jury find, as part of the bifurcated process, that language

21   would be then read to the jury, we have no objection.

22        THE COURT:  Okay.  Then I take it that the plaintiffs

23   object to the proposed language from the defendant that is

24   typed in bold.

25        So you want to explain your objection?

1745

1    MR. MOSKOW:  Yes, Your Honor.

2    We believe that that creates an obstacle to the jury's

3    finding of punitive damages that is not consistent with West

4    Virginia law or the pattern instruction.  In fact, it's

5    requiring that there be a specific effort to -- that we have

6    to prove that there was a specific effort to warn her.  To

7    disprove a negative is virtually impossible in a case like

8    this.

9    So the pattern instruction as written allows the jury

10   to reasonably consider all of the evidence to determine

11   whether or not the conduct was sufficiently egregious, in

12   reckless disregard for patient safety.

13   THE COURT:  Okay.  What says the defendant?

14   MS. JONES:  We're talking about instruction No. 24; is

15   that right?

16   MR. MOSKOW:  I'm on 23.

17   THE COURT:  No, 23.

18   And really the only thing that is at issue is the one

19   sentence in bold, the first one, that says:  If you find that

20   BI made an effort to warn about the dangers of Pradaxa that

21   plaintiffs claim caused Mrs. Knight's death, then you may not

22   find that BI acted with actual malice.

23   MS. JONES:  Well, the basis for that proposal, Your

24   Honor, is from the Ilosky case, which is cited on page 32.  We

25   think on these particular facts, and we know there was a

1746

1    warning that was provided -- whether or not there are

2    criticisms of the warning is a separate issue -- we think

3    that's an appropriate instruction given the evidence.

4         THE COURT:  Well, I disagree.  I think simply stating

5    that if BI made an effort to warn about the dangers, there

6    might not be a -- the jury is not allowed to find that BI

7    acted with malice, I think that's an incorrect statement.  I

8    don't think that's an accurate statement of the law.

9         It's much too vague, first of all, to say that an

10   effort to warn could defeat the balance of plaintiffs' proof,

11   if the jury would believe it, that there was actual malice.

12   So I'm not -- I'm going to reject that language.

13        I certainly agree and would perhaps entertain some

14   type of statement consistent with Ilosky that in determining

15   whether the defendant's conduct rises to the necessary level,

16   the jury may consider the extent to which the defendant

17   provided or attempted to provide warnings.  I think something

18   like that would be accurate, but I think this is too vague and

19   inaccurate.

20        MS. JONES:  Understood, Your Honor.  If it makes

21   sense, we're happy to type something up and share it with the

22   group.

23        THE COURT:  Well --

24        MR. MOSKOW:  Your Honor, I think at this late hour, it

25   really impacts the parties' ability to prepare for closing.  I

1747

1    think the pattern instruction takes into account circumstances

2    like this and, you know, it specifically says, you know, that

3    we have to prove by clear and convincing evidence and, as

4    written, shown by conduct that was intended to or was

5    substantially certain to injure Mrs. Knight.  So there is

6    already a specific component to this that takes into account

7    the circumstances of this case.

8           MS. JONES:  I think what Your Honor was suggesting was

9    probably a sentence, maybe two.  I don't know that it's a

10   terribly disruptive exercise to at least consider it.

11          THE COURT:  Well, here's what I'm willing to do.  If

12   you will draft something, provide it to the plaintiffs, if you

13   can keep it like one sentence, I will consider it, and we'll

14   take it up first thing in the morning.

15          MS. JONES:  Okay.  Thank you, Your Honor.

16          THE COURT:  Next, instruction 24.

17          MS. JONES:  Your Honor, I'm sorry.

18          On instruction No. 23, the additional bolded language

19   that I just made clear --

20          THE COURT:  Yeah, that stays in.

21          MS. JONES:  That stays in.  Okay.  Got it.

22          THE COURT:  That's consistent with the way we're

23   handling --

24          MS. JONES:  Okay.

25          MR. MOSKOW:  We have no objection to that, Your Honor.

1748

1    THE COURT:  So that stays in.

2    MS. JONES:  Got it.

3    THE COURT:  Defendant has proposed 24.  Plaintiff

4    objects.  Why?

5    MR. MOSKOW:  Plaintiffs object, Your Honor, for two

6    reasons.

7    One, because it's an inconsistent statement to the

8    prior statement about compliance with safety standards.  So to

9    the extent that it says punitive damages are not appropriate

10   when the defendant complied is probably going to lengthen it

11   to say punitive damages are appropriate when there is evidence

12   that the defendant did not comply.

13   I think we start creating a morass here.  The pattern

14   instruction was designed to capture both this and proposed

15   instruction 25 and 26, and I don't think there's a need to

16   provide this instruction.

17   THE COURT:  Do you want to respond?

18   MS. JONES:  Sure, Your Honor.  I don't know that I

19   have a much more detailed response than what I offered in

20   connection with instruction No. 23, which is we think this is

21   an appropriate addition to the pattern instruction in light of

22   the specific facts in this case, namely that we know that the

23   company made a warning available.

24   THE COURT:  Well, I'm going to refuse it.  The pattern

25   instructions do not include at least instructions similar to

1    this.  I think this is a matter best left for argument by

2    counsel as to what the evidence is.

3         No. 25.

4         MR. MOSKOW:  Plaintiff objects again on the same

5    basis.

6         And, in fact, for this one, the language in the

7    pattern instruction specifically talks about conduct addressed

8    to Mrs. Knight.  This is just a repetition of that.  We think

9    it's superfluous and unnecessary.

10        MS. JONES:  Your Honor, I may be able to save us some

11   time.

12        I think 25 and 26 are both instructions where we would

13   offer the same response, which is we think the facts of the

14   case justify including them.  We assume there's an objection

15   as to 26 as well.  But I don't know that we have distinct

16   responses on those two proposed additions.

17        THE COURT:  Well, I'm going to reject both of them.  I

18   think these are all matters that are for the parties to argue

19   and the jury to determine the facts.  And I think as to 25,

20   the pattern instruction adequately explains that the jury must

21   be making its determination about punitive -- a finding of

22   punitive -- a violation of a duty that creates punitive

23   damages and any damages to be awarded has to be based on harm

24   to Mrs. Knight.

25        As to No. 26 about scientific issues, I don't think

1750

1   that's a proper instruction and would actually serve to simply

2   confuse a jury.  So I'm going to deny it.

3          Next, No. 29 on page 36, damages.

4          MR. MOSKOW:  Plaintiff has no objection, Your Honor.

5          MS. JONES:  No objection from BI, Your Honor.

6          THE COURT:  All right.  Then on page 38, instruction

7   30, plaintiff's prior condition.

8          MR. MOSKOW:  Plaintiff has no objection, Your Honor.

9          MS. JONES:  We had no objection to that instruction,

10  Your Honor.  That's the pattern --

11         THE COURT:  No. 31, concurrent negligence?

12         MR. MOSKOW:  Plaintiff has no objection, Your Honor.

13         MS. JONES:  We do have an objection to instruction 31

14  on concurrent negligence.  As we've mentioned before to the

15  Court, we don't believe that there's been any suggestion or

16  evidence that there was concurrent negligence by any other

17  party.

18         To the extent that the claim is, well, perhaps they're

19  going to argue that her doctors made some kind of mistake, our

20  position has always been that her doctors made a perfectly

21  reasonable medical judgment with respect to Mrs. Knight's

22  care, so we don't think it's an appropriate instruction based

23  on the evidence.

24         MR. MOSKOW:  Both Dr. Shami and Dr. Crossley testified

25  as to the practice of reading labels each time a prescription

1751

1   is made and specifically identified the restart of Pradaxa

2   after the stent procedure in April of 2013 as a meaningful

3   issue for the jury to consider, suggesting that the label had

4   been updated as of that time and, you know, that that doctor

5   might have done something wrong if she continued on a P-gp

6   inhibitor and a -- and Pradaxa.

7        So based on the evidence already adduced at trial, we

8   believe this is an appropriate instruction.

9        (Defense counsel conferring.)

10       THE COURT:  Response?

11       MS. JONES:  Our introduction of that evidence was not

12  intended to suggest that any one of Mrs. Knight's doctors

13  engaged in any kind of negligence.  That has not been the

14  testimony.  That has not been the presentation that we have

15  offered.

16       THE COURT:  In fact, both of those doctors testified

17  that they did not fault any of the doctors who provided these

18  prescriptions, much less any of the other treatment that Betty

19  received during the course of her being on warfarin or later

20  Pradaxa.

21       MS. JONES:  I think Dr. Crossley literally said they

22  did a marvelous job with her.

23       MR. MOSKOW:  While that was testimony that was

24  offered, there was also testimony that each time that

25  prescription was renewed, it was an opportunity for the doctor

1752

1    to read the label.  And --

2         THE COURT:  A label that the same witnesses said was

3    sufficient.

4         MR. MOSKOW:  That's correct, Judge.

5         So we just want to make sure that the jury isn't

6    confused by on the one hand the doctor saying the care was

7    fine, and on the other hand saying they had an opportunity to

8    read the label.

9         THE COURT:  Well, perhaps we can resolve this more

10   simply by does the defense agree that it will not make any

11   argument at closing that any of the other doctors failed to

12   meet a standard of care or otherwise negligent in the

13   prescribing of Pradaxa or in her course of treatment?

14        MS. JONES:  We have no intention of making such a

15   claim or making such an argument.

16        To the extent that we've talked about different

17   labels, it's been to respond to the fact that they have

18   challenged various things about the labeling, and we've had to

19   be able to say, well, this information was in the label at

20   various points when she was treated.

21        We have absolutely no intention of pointing the finger

22   at any one of Mrs. Knight's doctors and saying somehow one of

23   them did something wrong.  In fact, our intention is to say

24   that they did a very good job caring for someone with

25   complicated medical issues.

1753

1    THE COURT:  Based on that representation, I'm inclined

2    to deny the instruction.  Certainly counsel can point out that

3    there is no claim here, certainly there is no evidence or

4    argument by the defendant that any of the doctors who

5    prescribed Pradaxa did so in violation of the standard of care

6    or in any other way negligent.  So I think that you can state

7    that explicitly and that the defendant cannot dispute that

8    given the position they've taken here.

9    I am concerned that by adding this instruction, in the

10   face of the defendant's stated intention not to argue

11   negligence on the part of anybody else, that it can only serve

12   to confuse the jury and add to the length of already lengthy

13   complicated instructions.

14   So I'm going to deny the objection --

15   MR. MOSKOW:  The requested instruction.

16   THE COURT:  The instruction and your objection.

17   MR. MOSKOW:  Thank you, Your Honor.

18   THE COURT:  So that takes us to the so-called --

19   MR. MOSKOW:  The new Medication Guide instruction?

20   THE COURT:  Yes, the Medication Guide instruction.  I

21   had a copy of it right here, and I have undoubtedly put it

22   with something else.

23   So I've seen the instruction as tendered by the

24   defense.  The plaintiffs have responded with a strike and

25   insert that alters much of the language.

1754

1      Does the defense object to the proposed changes that

2  the plaintiffs have sought?

3      MS. JONES:  We do, Your Honor.  And certainly in light

4  of your directed verdict motion with regard to the Medication

5  Guide, we think what we've proposed is entirely appropriate.

6      THE COURT:  All right.  Hold on a minute.  I had a

7  copy of that just minutes ago, I thought.  It's much easier to

8  work with the strikethrough.

9      Hold on.  Blake is getting me a new copy.

10     (Pause in proceedings.)

11     THE COURT:  Well, let's walk through the defendant's

12  objection to these changes so I have a clear understanding.

13     So it looks to me like the first three sentences or so

14  directly address the Court's ruling on the Medication Guide

15  and the preclusion of any claims based on it.

16     MS. JONES:  I'm sorry, Your Honor.  I'm just looking

17  at it on my computer screen.

18     THE COURT:  Sure.  Go ahead.

19     Do you have the plaintiffs' strikethrough version?

20     MS. JONES:  Yes, Your Honor.

21     THE COURT:  That helps a lot with that.

22     MS. JONES:  Well, I guess the concern we have with the

23  first sentence, Your Honor, is that the point of this

24  instruction is to be very clear with the jury about the fact

25  that they're not permitted to find a failure to warn with

1755

1    respect to the Medication Guide.  It's not supposed to be an

2    opportunity to remind the jury about the company's obligations

3    with respect to the Medication Guide.

4         The Court has already included in the failure to warn

5    instructions, over BI's objection, very similar language that

6    basically says the company always has responsibility for the

7    labeling, it has responsibility to keep the label adequate.

8    So the first sentence is duplicative of something that is

9    already -- at least the first clause is duplicative of

10   something that already appears in the instructions.

11        And then I guess the balance of these changes we're

12   not sure what the reason for them were, but it seems to us

13   that given where we are in this case, namely that it started

14   out hot and heavy as a Medication Guide case, the jury has now

15   seen this list of criticisms rolled in front of virtually

16   every witness in the case, we need something that is very

17   direct and makes very clear that the Court has made a

18   determination that they cannot reach a finding on that basis.

19        We have a very real concern, given the way that the

20   evidence has come in, and the way the case has been presented,

21   that there will be confusion on that front if there is any --

22   if we build in a bunch of nuance on this topic.  The purpose

23   of the instruction is to reflect the fact that the Court has

24   made a determination that they cannot find failure to warn

25   with respect to the Medication Guide in any regard, but

1    specifically with respect to those five criticisms that

2    they've now seen multiple times throughout the course of the

3    trial.

4         THE COURT:  You want to respond?

5         MR. MOSKOW:  Yes, Your Honor.

6         Again, labeling is the floor, not the ceiling.  If the

7    Court were to identify specific claims that have already been

8    ruled in under the state tort claim, but only cannot be

9    brought as it relates to the Medication Guide, the jury will

10   certainly be confused as to what they can consider and what

11   they cannot.  So what we tried to do was accomplish a clear

12   statement that the Medication Guide is not an issue here, but

13   that the evidence is.

14        You know, while there could be some wordsmithing here,

15   and I'm certainly, you know, glad to go through it now with

16   the Court and with the defendant to try to do that, we think

17   to give the proposal that the defense made is essentially

18   telling the jury they cannot consider the evidence, and that's

19   our concern.

20        THE COURT:  Okay.  Here's what I think I'm going to

21   do, if you'll just follow along.  So we'll work first from

22   plaintiffs' modified version.

23        MS. JONES:  Okay.

24        THE COURT:  The first line I'm going to strike all the

25   way into the second line to where it starts, BI is not

1757

1    permitted.  So the instruction will begin by reading:  BI is

2    not permitted to change the patient Medication Guide without

3    prior FDA approval.

4            I'm going to strike -- after the word and, I'm going

5    to strike the Court has ruled that.  So it will simply say,

6    after FDA approval, comma:  And the plaintiffs are not

7    bringing a claim based on any failure by BI to change the

8    patient Medication Guide.

9            I'm going to, consistent with what the plaintiffs

10   offered, continue it by saying:  Thus, when considering if the

11   warnings provided by BI were adequate, you cannot consider

12   BI's failure to change the patient Medication Guide as a basis

13   for your verdict.

14           I'm going to strike -- first, consistent with the

15   plaintiffs' objection, I'm going to strike that whole sentence

16   that starts, Specifically you may not find.  Then, coming down

17   to the next sentence that starts, However you may consider,

18   I'm going to strike that sentence.

19           And then after that sentence, I'm going to strike the

20   word additionally and have the last line as plaintiff

21   tendered, which would then read:  Because BI can change the

22   physician label without prior FDA approval, you may consider

23   if the physician label fails to properly warn about the true

24   nature of Pradaxa's bleeding risks and fails to properly

25   instruct doctors on how to identify or minimize bleeding risk.

1758

1    I think that encompasses the Court's ruling about the

2    Medication Guide not forming the basis of a claim.  The

3    language that's in the sentence starting specifically that the

4    defendant tendered I found confusing.  Because while it's

5    clear that the Medication Guide can't be faulted for not

6    explaining one, two, three, four, five, one, two, three, four,

7    five remains a part of plaintiffs' labeling deficiency claim.

8    And I think to state it this way here, after saying that there

9    is not a claim based on the Medication Guide, would confuse

10   the jury about the balance of the claims.

11       I have ruled that the claims based on an alleged

12   deficient label that involved one, two, three, four, five are

13   not preempted.

14       So you can state your objections to that now if that's

15   the case.

16       Do you follow along?

17   (Off-the-record discussion with law clerk.)

18   (Counsel conferring.)

19       THE COURT:  Do you want me to go through it again?

20       MS. JONES:  No, we're just conferring.

21       THE COURT:  That's fine.  Sure.  I just want to make

22   sure everybody knows what the words are.

23   (Counsel conferring.)

24       MS. JONES:  Your Honor, can I just respond to what

25   you've proposed?

1759

1       THE COURT:  Yeah, sure.

2       MS. JONES:  Okay.  So we would have an objection to

3  maintaining these references to failure by BI to change the

4  patient Medication Guide.  We understand Your Honor's ruling

5  on the Medication Guide to be that they are not permitted to

6  make a finding of liability with respect to defects in the

7  Medication Guide, so that is why we think the language that we

8  proposed is the appropriate language.

9       Because the challenge is not -- the preemptive claim

10  is not just that we failed to change something.  The

11  preemptive claim is that we failed in any way to warn about

12  something in the Medication Guide.  That's the scope of the

13  preemption ruling as we understand it.  We think this

14  reference here to whether or not the company changed something

15  or not is really not consistent with what the ruling is as we

16  understood it.

17       THE COURT:  Okay.  Let's stop there.

18       What do you say to that?  I think I understand your

19  position.

20       MR. MOSKOW:  Your Honor --

21       THE COURT:  So it's really, I guess, sort of twofold.

22  You can't claim that the Medication Guide should have been

23  changed to reflect new warnings, and you can't complain that

24  Medication Guide was deficient as at the time because it was

25  approved by the FDA.

1760

1           MR. MOSKOW:  So perhaps we can --

2           THE COURT:  Use the microphone so she can hear you.

3           MR. MOSKOW:  Perhaps we could say you cannot consider

4    the Medication Guide to be inadequate or BI's failure to

5    change the Medication Guide as a basis for your verdict.

6           THE COURT:  Why don't we just say not bringing --

7    plaintiffs cannot bring a claim based on any defect in the

8    patient Medication Guide.  Does that do it?

9           MS. JONES:  We think that is a much closer statement

10   in terms of what we think the implications of Your Honor's

11   ruling is.

12          THE COURT:  I see your point, and I agree with it,

13   that the Medication Guide has been attacked as being

14   insufficient from the beginning at the launch and then not

15   changed later.  I agree, so I'm going to change that to a

16   claim based on any defect in the patient Medication Guide.

17          MR. MOSKOW:  Then how does that language change in

18   the -- I believe it's the third sentence now, Thus when

19   considering?

20          THE COURT:  I think that that is probably right given

21   my ruling.  I think we have to make the change there, too.

22          MR. MOSKOW:  I'm just trying to figure out what it

23   would say.

24          So you may not consider any defect in the patient

25   Medication Guide or any -- that's why --

1      THE COURT:  Yes, I think that's what we should say.

2      MS. JONES:  Well, I guess on the subject of defect,

3  Your Honor, we would propose that before the word defect both

4  in the second sentence -- I guess it's the first sentence, it

5  should refer to alleged defect.

6      MR. MOSKOW:  Except that we're saying that we're not

7  making the claim, so that is --

8      THE COURT:  Yeah, I don't think we need to say alleged

9  there.  So I'm going to make it consistent with the first

10  sentence.  Thus, when you're considering if the warnings

11  provided by BI were adequate, you cannot consider any defect

12  in the patient Medication Guide as a basis for your verdict.

13      MR. MOSKOW:  With the understanding, Your Honor, that

14  plaintiff objects to this charge in its entirety --

15      THE COURT:  Right.

16      MR. MOSKOW:  -- the language proposed by the Court is

17  fine.

18      THE COURT:  Got it.

19      MS. JONES:  And we would maintain our objection, Your

20  Honor, to actually eliminating the specific criticisms that

21  the jury has seen so many times.

22      If this was a case where that had not been so

23  prominently featured with every single witness, we might not

24  even be proposing that.  But we are concerned, given how much

25  they've seen of that list, that they may not be entirely clear

1    about what they can and cannot do.

2         THE COURT:  Well, they are now being instructed, I

3    think clearly, that the Medication Guide -- any deficiency in

4    the Medication Guide is not a permitted claim.  It's not a

5    claim plaintiff is bringing, and it's not a claim that can

6    support a verdict.  But the Medication Guide is a source of

7    evidence about what is warned or not and, as such, it's

8    evidence in the case, and I don't think that it's appropriate

9    to tell the jury that they can't consider what is in the

10   Medication Guide.

11        Further, as I tried to say awhile ago, in your

12   sentence beginning specifically, you list five things that are

13   sort of summaries of the plaintiffs' claims of what is

14   inadequate in the defendant's warnings.  Of course, those

15   warnings aren't restricted to the Medication Guide, they're

16   criticisms of the labeling as a whole as well.  And so I think

17   it's confusing and perhaps misleading to the jury to tell them

18   that they can't find liability based upon those things.

19        I'm just not sure they will recognize what I think the

20   instruction otherwise does successfully, which is to tell them

21   it's not the Medication Guide that is alleged to be

22   insufficient, but these are insufficiencies that the jury may

23   consider in determining whether the label is in compliance.  I

24   don't know how else to explain it.

25        But if you feel like you've adequately stated your

1763

1  objections to my ruling, and I've tried to state my ruling,

2  I'm ready to move on.

3      MS. JONES:  Well, with respect to that sentence, Your

4  Honor, we understand.

5      On the last sentence, I'm just looking at it one more

6  time.  You may -- would it read you may consider if the

7  physician label fails to properly warn about the true nature

8  of Pradaxa's bleeding risk and fails to properly instruct

9  doctors on how to -- is that what it would say?

10      THE COURT:  Well, that's what is in there now.

11      MS. JONES:  Well, I guess we'd object to that.

12      One, I don't think that language tracks with what the

13  jury has already been instructed on what the duty to warn is.

14  Two is, I think the jury already has been given an instruction

15  on what they're supposed to consider with respect to the

16  company's duty to warn and, as I mentioned, is not consistent

17  with what is written here.

18      So this is supposed to be an instruction that gives

19  them clarity on what they're supposed to do about the

20  Medication Guide in light of the Court's ruling.  We think

21  that is gratuitous given that.

22      THE COURT:  In response, what I'm going to do subject

23  to comment from the plaintiffs, is if you look at the last two

24  lines, after the phrase, Fails to properly warn, put a period

25  and end it there.

1      That explains in essence the preemption decision I've

2  made, which is the Medication Guide can't be the basis of a

3  claim, but the label may be for failure to warn.

4      (Defense counsel conferring.)

5      MR. MOSKOW:  Your Honor, we would propose that the

6  word adequate -- well --

7      THE COURT:  It says properly warn.

8      MR. MOSKOW:  Again, subject to our objection to the

9  charge being given as a whole, that is acceptable to

10 plaintiffs, Your Honor.

11     MS. JONES:  Also, again subject to our objections that

12 we talked about already, I think this will be fine for us.

13     It would be helpful at some point, even if it is early

14 in the morning, just to see the final version of that

15 instruction.

16     THE COURT:  Well, law clerks love to work late.

17     MS. JONES:  Oh, I'm so sorry, Blake.

18     THE COURT:  And he's working on all this.  He'll have

19 all this, and I'll make a couple of comments about that a

20 little bit later.

21     MS. JONES:  Okay.  Great.

22     THE COURT:  So we'll probably have this in a draft

23 form in a minute, and I'll explain what I mean about that.

24     MS. JONES:  Okay.

25     THE COURT:  In any event, the next question is where

1765

1    do we put this instruction that we last crafted?

2              MS. JONES:  Well, we had contemplated putting it in

3    with the other limiting instructions.

4              MR. MOSKOW:  On page 15 and 16.

5              THE COURT:  I think where it would naturally go would

6    be in the section after relevance of physician warnings.

7              MR. MOSKOW:  Plaintiff has no objection to that, Your

8    Honor.

9              MS. JONES:  I'm sorry.  What page is that, Your Honor?

10             THE COURT:  It would be on page 16.

11             MS. JONES:  That's fine, Your Honor.

12             THE COURT:  It's the third paragraph in the limiting

13   instruction.  It looks like to me that it make sense to go

14   there.

15             MS. JONES:  Okay.  That's fine.

16             THE COURT:  Okay.  So that is where we'll put it.

17        (Off-the-record discussion with law clerk.)

18             THE COURT:  All right.  Are there any other objections

19   that the parties want to make to the proposed instructions?

20             MR. MOSKOW:  Your Honor, plaintiffs would just

21   reassert any objections that we made during the various

22   conferences we've had with the Court.  To the extent that

23   they've been overruled, they've been made on the record, and

24   we have no further objection.

25             THE COURT:  Okay.  And I assume you're satisfied -- I

1766

1    think we've only had one discussion about instructions before

2    this one.  Obviously we've heard considerable argument about

3    the motions that greatly affect the instructions.  But if

4    you're satisfied with that preserving your objections, that is

5    fine.

6              MR. MOSKOW:  We are, Your Honor.  Thank you.

7              THE COURT:  Okay.  What about the defendant, anything

8    else?

9              MS. JONES:  The same as to us, Your Honor.

10             THE COURT:  So the last thing that he's going to need

11   to do -- and maybe he'll get down there, it will take a few

12   minutes, and we'll e-mail these to you.

13             You know, we've been using essentially your titles and

14   numbers.  We did that to try to make it easier for all of us

15   to find the original proposed instructions and the iterations

16   of it after that.  Blake will go through and take all that

17   out, and it's going to read as pretty much a narrative.

18             MR. MOSKOW:  Right.

19             THE COURT:  I will say that my experience has been

20   that with complicated cases like these, jurors almost

21   inevitably ask for a copy of the instructions.  So in order to

22   do that, typically I give a standard instruction to the

23   jurors, at the time they make a request, that we're going to

24   provide those, and that they should not focus on just one

25   word, consider them as a whole and the instructions given

1767

1    throughout the trial.

2         But, in addition, because when we print these off we

3    use a format that is basically an outline where we have some

4    things in bold -- that is just how we outline it -- I usually

5    also either delete all of that from it or tell them to ignore

6    that, so that they understand any title of an instruction or

7    any number of an instruction is just my organizational

8    shortcut and not part of the instruction.

9         If Blake could do it tonight, I think I'm probably

10   going to ask him just to take all of those things out and run

11   this as a narrative instruction and be prepared if the jury

12   asks to consider giving that to them.

13        You can tell me now, if you know, do the parties

14   object to providing instructions to the jury?

15        MR. MOSKOW:  Plaintiff has no objection either to

16   providing it or in the manner the Court has identified.

17        MS. JONES:  Same, Your Honor.

18        THE COURT:  Do you have objection to me making the

19   instructions available to them immediately without their

20   request, after we have sent them back to deliberate?

21        MR. MOSKOW:  Plaintiff would request that, Your Honor.

22        MS. JONES:  No objection to that, Your Honor.

23        THE COURT:  All right.  Well, that's what I think I'll

24   do here.  I'd rather them not, in a complex case like this,

25   spin their wheels for half an hour or six hours, and then come

1768

 1    back and say we really need those instructions.  So I'm

 2    inclined to give them one set of the instructions at the time

 3    we send them in.

 4         So Terry told me that you all have finished all of the

 5    exhibit introduction and all that.

 6         Have you had discussion about -- typically everything

 7    admitted goes to the jury.

 8         MR. LEWIS:  Yeah, I believe we're going to meet at

 9    8:00 a.m., the parties.

10         THE COURT:  Okay.

11         MR. LEWIS:  We have a system in place to prepare the

12    binders for the jury.

13         THE COURT:  That would be great.

14         The other thing is that I think, because of the volume

15    of the exhibits, I'm inclined to make available to the jury,

16    along with the exhibits, the exhibit list that the clerk has

17    maintained showing by number and a short title what everything

18    is so that they can use that if they start sifting through

19    these things to find something in particular.

20         Is that agreeable?

21         MR. MOSKOW:  It's agreeable to the plaintiffs, Your

22    Honor.

23         MR. LEWIS:  Yes, Your Honor.

24         THE COURT:  All right.  Is there anything else that we

25    need to take up this evening?

1769

1    MR. MOSKOW:  The verdict form?

2    THE COURT:  Oh, okay.  Let's do that.

3    I've looked at the two proposed.  I don't see that

4    there is huge difference between them.

5    You both present the first section on liability under

6    A, plaintiffs' claims, the same.

7    Under B, legal causation, the plaintiffs assert that

8    there should be essentially a third question asked under legal

9    causation, that being whether plaintiffs have proven that

10   Pradaxa proximately caused Betty Knight's injuries.  You both

11   agree that there should be the next statement which deals with

12   proximate cause of death.

13   Does the defendant dispute that there is a surviving

14   personal injury claim here?

15   MS. JONES:  Well, I think the only question or concern

16   that we had was whether we in fact need two separate legal

17   causation questions for the jury to complete.

18   I mean, I think what we had proposed was a single --

19   THE COURT:  Well, you only said caused death, and they

20   want to say caused injury and caused death.  I don't mind

21   making it a single question.  If we did, I think we would have

22   to say something to the effect, did plaintiffs prove that

23   Pradaxa proximately caused either Betty Knight's injuries or

24   her death or both.

25   (Plaintiffs' counsel conferring.)

1770

1    MS. JONES:  I think one of those versions would

2    probably be fine with us, Your Honor.

3    MR. MOSKOW:  Our concern is jury confusion because of

4    the way the case has been tried in terms of the defense really

5    focusing on her health issues and whether or not this caused

6    her death as opposed to whether it caused her any additional

7    injury.

8    And so by separating it out this way, it allows the

9    jury to clearly indicate which question they're answering and

10   not get lost in is it and/or, is it because --

11   THE COURT:  Okay.

12   MS. JONES:  We still think that a single question is

13   appropriate perhaps with an adjustment that you described.

14   THE COURT:  Well, I think I agree with plaintiff.  In

15   this case, I think it might be useful and perhaps necessary

16   for the jury, to make sure that they all concur on a unanimous

17   verdict, that they all concur on these causation questions.

18   So I'm going to include their version of question 7.  They

19   left out a yes or no space for an answer, so that would be

20   inserted there.

21   MR. MOSKOW:  We have a cleaned-up version, Your Honor,

22   that we can provide.

23   THE COURT:  Okay.

24   MR. MOSKOW:  We'll e-mail it to Blake.

25   THE COURT:  I'm sorry?

1771

1     MR. MOSKOW:  We can e-mail it to Blake.

2     THE COURT:  Okay.  Copy them.

3     All right.  And then the next matter is on damages.

4  As I understand it, plaintiff wants to break them out between

5  economic, non-economic and wrongful death.  The defendant

6  asked for just a single amount.

7     I think when a party wants to break out elements of

8  damages, I think they're entitled to.  So if that's what

9  plaintiff wants to do, I'm inclined to include that.

10    MS. JONES:  And we object to that, but we understand

11  your position, Your Honor, just for the record.

12    THE COURT:  What's the objection for, then?

13    MS. JONES:  Well, ultimately they're being asked what

14  amount would fairly compensate for her injuries or her death.

15  I think they can include that amount -- I'm sorry -- can

16  include that amount based on whatever their decision is on

17  that topic.  But we understand Your Honor's ruling on that.

18    MR. MOSKOW:  On our proposed form, Your Honor, there

19  shouldn't have been a third line for wrongful death because

20  that is included under item 10.  So we'll delete that.

21    THE COURT:  Well, that raises another question, and

22  that is West Virginia law may well treat wrongful death

23  damages differently in terms of who gets to recover than

24  Betty's personal injury damages.

25    My recollection is personal injury damages are

1772

1    collected by the -- Gretchen will know this -- by the estate

2    representative?

3            MS. CALLAS:  I think that is correct, Your Honor.  I

4    think any damages would pass to the estate, and then the

5    distribution would probably be the question.  I think --

6            THE COURT:  Well, do you think that both personal

7    injury damages and wrongful death damages pass to the estate?

8    Or does the statute provide that when there is a personal

9    injury claim that survives someone's death, the beneficiary of

10   that claim is just the -- is decided -- it is the

11   representative of the estate who then can decide who gets the

12   money?

13           As opposed to wrongful death --

14           MS. CALLAS:  Right, which would pass to the -- yeah, I

15   think you're correct.

16           THE COURT:  It goes to the beneficiary.

17           MS. CALLAS:  I think you're correct as to where the

18   money goes.  I think the damages may also be somewhat

19   distinct.  That is, the wrongful death --

20           THE COURT:  I think they are, too.

21           MS. CALLAS:  Yeah, so maybe we need to look at that.

22           MR. MOSKOW:  The case is brought individually and as

23   representatives, so that does raise the issue.

24           THE COURT:  Right.  So I think you're going to have to

25   tender something that separates the damages into, first, any

1773

1   damages for her personal injury and the amount thereof;

2   second, any damages for wrongful death and the amount thereof

3   or whatever.

4        And if you want to separate that into -- well, there

5   aren't any -- the economic damages were just medical bills.

6        MR. MOSKOW:  Correct.  So I think we can do that with

7   section 10, Your Honor, by -- because question 10 is a

8   separate question on death, we can just separate it that way,

9   and that will address the issue.

10       THE COURT:  You're saying question 10, and --

11       MR. MOSKOW:  In our proposal, we have question 9, what

12  amount of money would fairly and reasonably compensate for

13  injuries.  And then we would separate the wrongful death into

14  a separate question 10.

15       THE COURT:  All right.  So I agree, I think you're

16  going to have to separate the damage amounts based upon the

17  two different types of claims here.

18       So you'll prepare the verdict form and share it --

19       MR. MOSKOW:  We will before we leave court, Your

20  Honor.

21       THE COURT:  And then the last one goes to the punitive

22  damages.  Defendant wants essentially a second question.

23       MS. JONES:  I think we're fine with just the one, Your

24  Honor.

25       THE COURT:  The way the plaintiff tendered it, then?

1774

1        MS. JONES:  Yes.

2        THE COURT:  All right.  We'll do it that way.  I think

3   that is what is proper, too, one question.

4        All right.  Does that resolve the verdict form?

5        MR. MOSKOW:  It does, Your Honor.

6        THE COURT:  Anything else the parties are aware of

7   that the Court needs to address tonight?

8        MS. JONES:  No.

9        THE COURT:  All right.  Blake is going to finish this

10  up in a matter of minutes and e-mail final instructions to

11  you.

12       MS. JONES:  Okay.

13       THE COURT:  If anything occurs -- I told the jury

14  9:30.  I want counsel here at 9:00.  And hopefully if you

15  think of anything that needs to be addressed, you'll tell the

16  other side and let me or Blake know as soon as you know that.

17       All right?

18       MR. LEWIS:  Will do.  Thank you, Your Honor.

19       THE COURT:  Thank you.

20       MR. MOSKOW:  Your Honor, just so the Court is aware,

21  and with the Court's indulgence, the parties would agree to an

22  hour and 15 minutes each side for closing.

23       Is that acceptable to the Court?

24       THE COURT:  Fine with me.  What I usually do is

25  require that you cannot save more than half.

1775

1        You know, I think I said this to you in your openings.

2   I don't like to put lawyers on a stopwatch.  So I'll hold you

3   more or less to your time, but I'll give you a prompt or two

4   well before I decide you have to be cut off.

5        MR. MOSKOW:  Appreciate that, Your Honor.

6        THE COURT:  Okay.

7        All right.  Thank you.  See you in the morning.

8        MR. MOSKOW:  Thank you.

9        MR. LEWIS:  Thank you, Your Honor.

10           (Proceedings were adjourned at 6:38 p.m.)

11                       ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1    CERTIFICATION:

2           We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3    RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter as reported on October 16, 2018.

6

7

8    October 17, 2018          _____
     DATE

9

10   /s/ Kathy L. Swinhart    _____
     KATHY L. SWINHART, CSR

11

12   /s/ Lisa A. Cook_____   _____
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```