IN THE UNITED STATES DISTRICT COURT FOR THE

SOUTHERN DISTRICT OF WEST VIRGINIA, HUNTINGTON DIVISION

BEFORE THE HONORABLE ROBERT C. CHAMBERS, JUDGE

---o0o---

CLAUDE R. KNIGHT and CLAUDIA
STEVENS, individually and as
personal representatives of the
Estate of BETTY ERLENE KNIGHT,
deceased,
          Plaintiffs,
vs.                                        No. 3:15-CV-06424

BOEHRINGER INGELHEIM                       Volume 9
PHARMACEUTICALS, INC.,                     Pages 1776 through 1969

          Defendant.
_____/

---o0o---

REPORTER'S TRANSCRIPT OF PROCEEDINGS

JURY TRIAL

WEDNESDAY, OCTOBER 17, 2018, 9:00 A.M.

---o0o---


For the Plaintiffs:     CHILDERS, SCHLUETER & SMITH
                        1932 North Druid Hills Road, Ste 100
                        Atlanta, Georgia  30319
                        BY:  C. ANDREW CHILDERS
                        and  EMILY TWEED ACOSTA

                        URY & MOSKOW
                        883 Black Rock Turnpike
                        Fairfield, Connecticut 06825
                        BY:  NEAL L. MOSKOW

            (Appearances continued next page...)

Reported by:   KATHY L. SWINHART, CSR
               LISA A. COOK, RPR-RMR-CRR-FCRR
               Official Court Reporters
               (304) 528-2244

Proceedings reported by mechanical stenography,
transcript produced by computer-aided transcription.

```
 1                      APPEARANCES (Continued)

 2

 3      For the Plaintiffs:

 4                      FERRER, POIROT & WANSBROUGH
                        2100 RiverEdge Parkway, Suite 1025
 5                      Atlanta, Georgia  30328
                        BY:  RUSSELL ABNEY
 6                      and  HUNTER VANCE LINVILLE

 7      For the Defendant:

 8                      TUCKER ELLIS
                        925 Euclid Avenue, Suite 1150
 9                      Cleveland, Ohio  44115
                        BY:  JOHN Q. LEWIS
10

11                      COVINGTON & BURLING
                        One City Center
12                      850 Tenth Street NW
                        Washington, D.C.  20001
13                      BY:  PHYLLIS ALENE JONES
                        and  NICHOLAS HAILEY
14                      and  JESSICA PEREZ

15

16                      JACKSON KELLY
                        Post Office Box 553
                        Charleston, West Virginia  25322
17                      BY:  GRETCHEN M. CALLAS

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

2

3                                                           <u>PAGE:</u>

4
      ARGUMENT ON ECONOMIC DAMAGES                        1776
5     DISCUSSION ABOUT JURY INSTRUCTIONS                  1780
      DISCUSSION ABOUT CLOSING PRESENTATIONS              1787
6
      FINAL JURY INSTRUCTIONS                             1792
7     CLOSING ARGUMENT BY MR. CHILDERS                    1813
      CLOSING ARGUMENT BY MS. JONES                       1856
8     REBUTTAL CLOSING ARGUMENT BY MR. CHILDERS           1911
      CLOSING FINAL JURY INSTRUCTIONS                     1920
9     SUPPLEMENTAL JURY INSTRUCTION                       1933

10    JURY NOTE                                           1939
      JURY VERDICT                                        1943
11
      DISCUSSION ABOUT PUNITIVE DAMAGE PHASE              1946
12    PUNITIVE DAMAGE JURY INSTRUCTION                    1960
      PUNITIVE DAMAGE ARGUMENT BY MR. CHILDERS            1962
13    PUNITIVE DAMAGE ARGUMENT BY MR. LEWIS               1964

14    PUNITIVE DAMAGE JURY VERDICT                        1967
15

16

17

18

19

20

21

22

23

24

25

1776

```
 1              HUNTINGTON, WEST VIRGINIA

 2          WEDNESDAY, OCTOBER 17, 2018, 9:04 A.M.

 3                    ---o0o---

 4      (Jury not present.)

 5          THE COURT:  Good morning.

 6          MR. CHILDERS:  Good morning, Your Honor.

 7          MR. LEWIS:  Good morning, Your Honor.

 8          THE COURT:  So I understand there's a matter we need

 9   to take up before we come back for closings?

10          MR. LEWIS:  Yes, Your Honor.  Thank you.

11          The issue relates to economic damages, in other

12   words, medical bills and funeral expenses, things of that

13   sort.

14          THE COURT:  Right.

15          MR. LEWIS:  There was no testimony where the claimed

16   medical bills or other expenses were identified.  There is

17   the stipulation that medical bills generally are -- we've

18   stipulated they are reasonable and necessary, no burden to

19   show that they weren't caused, but there has to be some

20   testimony in the record of the identification of what those

21   claimed expenses are.  And we went through the transcript,

22   and we didn't see that from any of the plaintiffs or

23   anybody.

24          THE COURT:  Okay.  What was the stipulation exactly?

25          MR. CHILDERS:  The stipulation is that the medical
```

1   bills, once redacted, are admissible.

2        So if you recall, Your Honor, I moved them into

3   evidence before the plaintiffs testified.  And if we didn't

4   have that stipulation, I would have had them go through the

5   medical bills and talk about them.  But the stipulation is

6   clear, it doesn't -- it says they're admissible, and that BI

7   has the opportunity, if they choose, to put up evidence that

8   says they don't believe they're related.  That evidence

9   never came in.

10       MR. LEWIS:  Well, the stipulation says that the

11  medical bills were reasonable and necessary by stipulation.

12  That means there's no expert testimony required to connect

13  those.  That doesn't mean that they don't have to identify

14  what they're claiming, including other expenses.

15       And --

16       THE COURT:  Isn't that included in the

17  documentation?  Isn't there documentation about the

18  expenses?

19       MR. CHILDERS:  Yes, sir.  It's actual bills.  And

20  then we have the records that match up to when the bills

21  were incurred.

22       MR. LEWIS:  But, again, there was no testimony that

23  these are the identified claimed expenses.  That's what is

24  troubling me.  The jury hasn't heard one sentence about any

25  of that.

1778

1       THE COURT:  If the bills have been the object of the

2    stipulation that finds them -- that declares that they're

3    reasonable and necessary, and that stipulation is entered as

4    a matter of the record, I don't see what else they would

5    need.  They don't need a witness to testify that the bills

6    were incurred.  By being admitted into evidence, it seems to

7    me they're agreed by the parties to be the bills that were

8    incurred.

9       MR. LEWIS:  I disagree, Your Honor.  So, please, I

10    think for the record, note our objection that we have an

11    objection to the plaintiffs being able to claim economic

12    expenses because we don't think they've established the

13    proper foundation, and I'll let the Court rule on that.

14       THE COURT:  Okay.  I haven't seen the stipulation.

15       MR. CHILDERS:  May I read it into the record, Your

16    Honor?

17       THE COURT:  Yes, please.

18       MR. CHILDERS:  Sorry.  I didn't realize this was an

19    issue this morning.

20       This is stipulation No. 2:  The parties stipulate

21    that the medical bills incurred by Betty Knight --

22       THE COURT:  Hold on.  Let's let the jurors pass.

23       MR. CHILDERS:  Sorry.  Yes, sir.

24       THE COURT:  Good morning.

25       (Brief pause in proceedings.)

1       MR. CHILDERS:  Sorry about that, Your Honor.

2       THE COURT:  Go ahead.

3       MR. CHILDERS:  I'll start over, if I can.

4       Stipulation No. 2:  The parties stipulate that the

5  medical bills incurred by Betty Knight were reasonable and

6  necessary for her care and treatment, and that each is

7  admissible, once redacted to remove personal identification

8  information and collateral source information; that

9  defendant reserves the right to contest whether any

10  particular medical bill is relevant and/or was related to

11  Ms. Knight's gastrointestinal bleed or the sequelae thereof.

12       And, Your Honor, we redacted them, we took out the

13  personal information, and then we admitted them into

14  evidence.

15       MR. LEWIS:  And let me just respond by saying the

16  reasonable and necessary obviates the need for expert

17  testimony.  The admissibility -- there is no question that

18  we did not object to the admissibility.  But in order for

19  the jury to find economic damages, they still have to have

20  some testimony that these were the bills incurred.  That's

21  our view.

22       THE COURT:  That stipulation says the bills were

23  incurred.

24       MR. CHILDERS:  That's exactly right.  It's the first

25  sentence.

1    THE COURT:  All right.  I think that is sufficient.

2    I deny your objection to it.

3    MR. LEWIS:  Thank you.

4    THE COURT:  While I've got you here, I've got

5    another proceeding I'm going to take up after we conclude,

6    but after I got my copy of the instructions last night, I

7    realized that some things needed to be moved around, and so

8    Blake is doing that.  I can tell you very quickly what they

9    are, and I think this will cover it.

10    I moved the discussion of a learned treatise and put

11    it right after expert witness.  So the expert is explained

12    and then the learned treatise.

13    I took the greater weight of the evidence section,

14    the burden of proof, I put that at the beginning of the

15    statement of plaintiffs' claims.  And I added a sentence

16    something to the effect that the plaintiff must establish

17    each element of their claims by a greater weight of the

18    evidence, and then that is defined.  And then I go to the

19    paragraph which says here are the five causes of action and

20    those things.

21    And then there was instructions on punitive damages,

22    and the punitive issue I moved after the fraud elements and

23    before the other general damage instructions.  So it will

24    read -- the order will be that we've got a paragraph saying

25    here are the four or five causes of action.  Then here are

1781

1    the elements of each.  And after fraud, then I have the law

2    on punitive damages, and then after that the general damage

3    instruction.

4              MR. CHILDERS:  Your Honor, there was one more

5    section.  I think we've e-mailed it to Blake and the

6    defendants.

7              In the damages section, the way it's written out

8    starts with wrongful death and then personal injury, and my

9    understanding is the jury would have to find personal injury

10   first before they would even get to the wrongful death.  So

11   it's a little -- the way it is written out, it almost sounds

12   like you have to find wrongful death before you can award

13   any damages.  And so all we would ask is you just switch

14   those in order.

15             THE COURT:  What do you think?

16             MR. LEWIS:  Did the Court just follow a pattern --

17   I'm not sure that's the law, but --

18             THE COURT:  I don't think it's a matter of the law.

19   I think what you're saying, and I think I probably agree, is

20   that if the jury finds that you've violated your conduct

21   duties, then in order to award any damages, they have to

22   find that there was injury proximately caused by your

23   conduct.  And there has to be personal injury to her before

24   there is wrongful death of her, because that is what the

25   evidence says.  If there was proximate cause, it's first

1782

1    that she was injured by having the bleed, et cetera, and

2    then the death.

3             MR. LEWIS:  I don't think it's a big deal, so no

4    objection to that switch.

5             THE COURT:  All right.  I think that probably at

6    least makes it less likely they're going to be confused if

7    they start sifting through this stuff, so I'll make that

8    change, too.

9             MR. CHILDERS:  Thank you, Your Honor.

10             MR. LEWIS:  And just for the record, no objection to

11    the movement of the instructions that the Court just

12    identified.

13             THE COURT:  All right.

14             MR. CHILDERS:  Thank you, Judge.

15             THE COURT:  Anything else?

16             If not, you're excused at this point.  My next

17    proceeding will take 15 or 20 minutes, and then we'll start.

18             MR. CHILDERS:  Thank you, Your Honor.

19             MR. MOSKOW:  Thank you, Your Honor.

20          (Recess taken at 9:15 a.m.)

21

22

23

24

25

```
 1        (9:50 a.m. in open court)
 2             THE COURT:  We have one matter to take up that I
 3   didn't realize.
 4             MS. JONES:  I think so, Your Honor.
 5             MR. LEWIS:  I guess there's some objections to our
 6   slides.
 7             THE COURT:  Well, that's another matter then.
 8        All right.  Are you folks ready?
 9             MS. JONES:  We're ready.
10             THE COURT:  So I didn't realize until I got
11   finished a few minutes ago that through the course of emails
12   last night defendant proposed some additional language and
13   plaintiff responded.  And then defendant responded to that.
14        And, so, I wanted to take that up and first make sure
15   that the Court understands and rules on anything if it's
16   still a matter at issue and then, secondly, to make sure
17   that the parties protected the record.  So --
18             MR. CHILDERS:  My understanding was that that
19   charge has been withdrawn.
20             THE COURT:  Well, so first I think that's -- I
21   understood that you all were proposing additional language.
22   Once proposed, plaintiff responded with a proposed addition.
23   And then in response to that, you said you'd rather not have
24   the original instruction.  So --
25             MR. LEWIS:  May I clarify?
```

1784

```
 1              THE COURT:  Yes, sure.

 2              MR. LEWIS:  We proposed an instruction consistent

 3    with our discussion yesterday on punitive damages related

 4    to -- and I was trying to look at that language but --

 5              THE COURT:  As I recall, the language was

 6    something to the effect that in determining whether to find

 7    punitive damages, the jury could consider, should consider,

 8    may consider the warnings which the defendant attempted to

 9    give or something to that effect.

10              MR. LEWIS:  Right out of the case law as we

11    discussed.

12       Our view, Your Honor, is to either give our instruction

13    as we crafted it or no instruction at all, but we're not

14    withdrawing it.  We just think that the plaintiffs' addition

15    doesn't have any basis in the law.  It's just a superfluous

16    add to twist the law in their favor there.

17              THE COURT:  Well, okay.

18              MR. MOSKOW:  If I may, Your Honor, the, the

19    addition of any language to the pattern instruction isn't

20    changed.  Our position is that if the jury's to properly

21    consider the evidence, it should be balanced.  They should

22    consider whether there was an effort or there was not.

23    That's it.

24              MR. LEWIS:  But the case, the case actually finds

25    that if we made an attempt to warn, there's no finding of
```

1   actual malice.  We dialed that back to -- at the Court's

2   suggestion to say they may consider that fact for purposes

3   of considering whether we acted with actual malice.  I don't

4   think there's any necessity to put the language proposed by

5   the plaintiffs because that's, they're already arguing that.

6        MR. CHILDERS:  I'm confused.  They sent an email

7   saying they didn't want it anymore.

8        THE COURT:  Well, I think what the email said was

9   they didn't want it if your language was going to be

10  included in it.

11       MR. CHILDERS:  Understood.

12       THE COURT:  You know, I'm going to give the

13  instruction as the defendant tendered it.  I do think it is

14  fair to say.

15     Clearly the evidence here is that the defendant made an

16  effort to include warnings.  Plaintiffs themselves have

17  cited the fact that this label was modified over the course

18  of time to add additional statements that could be

19  interpreted as warnings.

20     I think -- so I think the evidence is clear there was

21  an attempt to warn.  And I do not think it's improper to --

22  since that is the very conduct that might and should be an

23  issue in the jury's determination as to all of the elements

24  of the claim, including the punitive claim, I think it's

25  fair to say that.

1    So I'm going to add that sentence as tendered by the

2    defendant.  Of course, in argument plaintiffs are certainly

3    free to argue that the efforts were woefully inadequate or

4    however they want to argue it based on the evidence.  But I

5    think that is a matter for argument and not a defect in the

6    proposed instruction.

7         MR. MOSKOW:  Thank you, Your Honor.  Just for the

8    record, we'll note our objection to an alteration of the

9    pattern instruction.

10        THE COURT:  All right.  We'll add that language.

11   And I think Blake just passed out copies of the final

12   instructions.  You know, I want to give you a minute to see

13   if you're satisfied with the order in which things are now

14   and so forth.  We need to do this quickly.

15        MR. MOSKOW:  The plaintiff just is trying to

16   identify whether or not some language got left out when it

17   was redone.  We're dealing with that now.

18        THE COURT:  Okay.

19    (Pause)

20        THE COURT:  All right.  It will take him just a

21   couple minutes.  But in what we gave you I didn't realize in

22   the damage section we inadvertently split the wrongful death

23   language into two parts.  We're moving that.

24        MR. MOSKOW:  Thank you, Your Honor.

25        THE COURT:  Yeah.  He's going to fix that and then

1    he's going to add the sentence that I granted over

2    plaintiffs' objection.

3         MR. LEWIS:  We received notice of some objections

4    to our opening -- or to our closing slides.

5         THE COURT:  Okay.

6         MR. LEWIS:  I don't know if the Court wants to

7    take that up while this is being worked on.

8         THE COURT:  I do.

9         MR. CHILDERS:  Your Honor, we have objections to

10   several slides, but they're basically all the same thing.

11        There are multiple places in their presentation where

12   they are quoting language from the trial transcripts and

13   saying on the bottom of the slide where it came from the

14   trial transcript.

15        Our understanding was that was not something we were

16   supposed to do, that that would indicate to the jury that

17   there are transcripts that they may be able to see.

18        All we're asking is take out the quotation marks.  Take

19   out the references to trial transcripts so they don't get an

20   idea that they can come in here and ask to see those

21   transcripts.  We're not asking the language be changed.

22        MR. LEWIS:  Well, I guess we can take out the

23   reference, but putting quotation -- it's not an actual clip

24   from the transcript.  It's just quotation marks around

25   testimony.  We could do that whether there's a trial

```
 1   transcript or not.  The trial transcripts are the official

 2   record.

 3              THE COURT:  All right.  Why don't you just take

 4   out the, --

 5              MR. LEWIS:  The citations?

 6              THE COURT:  -- the citations to the transcript

 7   record.  Can you do that?

 8              MR. LEWIS:  Let me make sure we can do that.

 9   Okay.

10              MR. CHILDERS:  And then we had one other

11   objection.  Their very first slide they have a quote from me

12   in opening statement which is clearly not evidence.  So my

13   understanding is we're here to argue evidence.  And if

14   they're going to start with arguing statements of counsel,

15   that's inappropriate.

16              MR. LEWIS:  Well, what we have at the last --

17   first of all, that's done all the time.

18              THE COURT:  Yeah.  I mean, I'm going to let --

19   they can certainly tell the jury what they believe you said

20   in the outline of your case and then challenge whether or

21   not you've established that or proven that or whatever.

22   So --

23              MR. CHILDERS:  Thank you, Your Honor.

24              MR. LEWIS:  Thank you, Your Honor.

25              THE COURT:  Blake's emailing to each of you this
```

1   last version while he's also printing it off for me.  So I

2   would like you to look at that.  We'll take a couple minutes

3   to print it off maybe before we bring the jury in.

4        (Pause)

5            THE COURT:  Also have you all looked at the

6   verdict form?  Are we okay there?

7            MR. CHILDERS:  Plaintiffs are fine with it, Your

8   Honor.

9            MR. MOSKOW:  We provided it last night and I

10  haven't seen any objection.

11           MS. JONES:  Subject to our objections raised

12  yesterday, I think it's consistent with what we discussed

13  with the Court.

14           THE COURT:  All right.

15       (Pause)

16           THE COURT:  While we're doing this, let me also

17  just mention something so you're not taken by surprise.

18       I'll read the instructions.  But when I get to what is

19  essentially the last very brief section of my final

20  instructions, and I think it probably says "closing

21  instruction" or something at the end, at that point, I'll

22  stop.  We'll do closing statements.

23       And then after closing statements I'm going to read

24  that last brief portion, the instruction which is simply

25  instructions for the jury about selecting a foreperson,

1    return of a verdict, and so forth.

2        And I understand the parties agree an hour and 15

3    minutes.  Are you going to split it or anything or is this

4    one lawyer for all of them?

5            MR. CHILDERS:  One for us, Your Honor.

6            MS. JONES:  Same, Your Honor.

7            THE COURT:  All right.  Also a minor matter while

8    we're waiting.

9        Terry advises me that with respect to the exhibit lists

10   that you all have which we plan to give to the jury along

11   with the admitted exhibits, there's the cover sheet.  Each

12   of you have a different cover sheet, plaintiffs' exhibit

13   list, defendant's first amended exhibit list.  I assume each

14   side is okay with those going back.

15           MR. MOSKOW:  On behalf of plaintiff, Your Honor,

16   yes, we're fine with that.

17           THE COURT:  Do you know what I'm talking about?

18   Want to look at them real quick?

19           MR. LEWIS:  May I approach, Your Honor?

20           THE COURT:  Yes.

21           MR. MOSKOW:  Your Honor, subject to all of the

22   Court's rulings, the plaintiffs accept the final jury

23   instructions.

24           THE COURT:  All right.

25           MR. LEWIS:  Do we need a cover sheet?

1          THE COURT:  Well, you kind of do in the first

2   exhibit maybe.  I just -- we don't need it really with the

3   plaintiffs.  Terry can handwrite that in.

4          THE CLERK:  I can probably cursor down and fix it.

5          MR. LEWIS:  I mean, it's just a lot of confusing

6   verbiage.  I feel like little things like that can really

7   confuse folks.

8          THE COURT:  I don't disagree and it shouldn't

9   matter to the jury whose exhibit it is.

10          MR. LEWIS:  If we just have a list.

11          THE COURT:  But if we don't have that cover sheet,

12   is your first exhibit --

13          THE CLERK:  I can cursor down.  I can put a header

14   that just says --

15          THE COURT:  Don't even do that.

16          MR. LEWIS:  They just need a number.

17          THE COURT:  Yeah.  All right.  So I'm going to

18   remove these cover sheets and they'll be provided literally

19   just a list of exhibits by number, no header identifying

20   which party submitted it or any of the other language.

21          MR. MOSKOW:  That's fine, Your Honor.  Thank you.

22          THE COURT:  All right.  Are we ready to proceed?

23          MR. CHILDERS:  Yes, Your Honor.

24          MS. JONES:  Yes, Your Honor.

25          THE COURT:  Let's bring the jury in.

1          (Jury returned into the courtroom at 10:10 a.m.)

2              THE COURT:  All right.  You may be seated.

3       Good morning, ladies and gentlemen.  Sorry for the

4  delay.  I had a criminal matter I had to take up which took

5  a little bit longer than I thought.  And then I had a few

6  minor things to work out with the lawyers before we could

7  really start, but we're ready to go now.

8       So now I want to give you final instructions.  I will

9  now explain the law in this case and how to apply it in your

10  deliberations.  You must reach your verdict based only on

11  the evidence presented in this courtroom and the law as I

12  give it to you in these instructions and any instructions

13  during the trial.

14       You must follow the law as I explain it to you, even if

15  you do not agree with the law.  You must consider all of the

16  evidence, no matter which party produced the evidence.  You

17  must base your verdict solely upon the evidence presented.

18       The evidence is all the testimony received from the

19  witnesses, including the depositions, the exhibits

20  introduced into evidence, documents that were admitted as

21  part of the evidence, and the facts that the parties agreed

22  are true.

23       Evidence can sometimes, may be direct or indirect.  You

24  may hear the term "circumstantial evidence."

25       Direct evidence means a fact was proven by a document

1    or by testimony from a witness who saw or heard the fact

2    first-hand.  An example of direct evidence is testimony from

3    a witness who testified, "I was outside and it was raining."

4    The witness saw it raining.  This is direct evidence that it

5    was raining.

6        When direct evidence is proven, you may infer other

7    facts that naturally or logically follow according to your

8    common experience.  This is called indirect or

9    circumstantial evidence.

10       An example of indirect evidence is testimony from a

11   witness who did not see it raining but saw someone come

12   inside wearing a raincoat covered with drops of water.  The

13   witness did not personally see it raining, but inferred that

14   it was raining because of seeing the raincoat covered with

15   water.  This is indirect evidence of the fact that it is

16   raining.

17       So you may draw reasonable inferences from the evidence

18   but there must be a logical connection between the proven

19   facts and your conclusion.

20       You may use your experience and common sense in

21   reaching conclusions from facts that have been proven.  From

22   a legal standpoint, it makes no difference whether the

23   evidence is direct or indirect or circumstantial.

24       You may choose to believe or disbelieve either kind.

25   You should give every type of evidence whatever weight you

1    believe that particular evidence deserves.  You are the

2    judges of the evidence.  You can believe or not believe any

3    part of a witness's testimony.

4        In evaluating the believability of a witness's

5    testimony, you may consider:

6        First, how did the witness appear and act while

7    testifying?

8        Second, did the witness have the opportunity to see,

9    hear, or know the things about which he or she has

10   testified?

11       Next, was the witness's memory accurate or unclear?

12       Then does the witness have any bias or interest in the

13   case's outcome?

14       And, last, was the testimony reasonable or

15   unreasonable?

16       You may use any or all of these reasons to weigh a

17   witness's testimony in your deliberations.

18       Now, you've heard testimony from several expert

19   witnesses.  An expert witness is a witness who has more

20   specialized knowledge than an average person has about a

21   particular subject.

22       This specialized knowledge may be from education,

23   training, or experience.  In deciding the weight to give an

24   expert's testimony, you may consider the witness's skill,

25   knowledge, experience, background, and familiarity with the

1    facts in this case.

2        You may also consider the expert's truthfulness and

3    take into account whether the expert's testimony is sensible

4    or reliable and compare it to the other evidence.

5        After considering the facts and circumstances on which

6    an expert's opinion is based, you may give each expert's --

7    each expert's testimony the weight you believe it is

8    entitled to receive.  You can believe or not believe any

9    part of an expert's testimony.

10       Now, the parties have used what we call learned

11   treatises.  That's where they've had medical literature and

12   used parts of it.

13       Passages or statements contained in published

14   treatises, periodicals, or journals have been testified to

15   by experts or have been used by counsel in the examination

16   of expert witnesses.

17       You may consider the passages or statements testified

18   to or used from these published treatises, periodicals, or

19   journals along with all the other evidence material to the

20   issues in this case.

21       The rules of evidence allow these passages or

22   statements to be testified to, read into evidence, and

23   considered by the jury, but do not permit the publications

24   themselves to be submitted to the jury as exhibits for

25   review in the jury room.

1     Also during this trial depositions of several witnesses

2   were presented and received into evidence.  A deposition is

3   testimony given by a witness under oath before trial.

4     The lawyers question the witness who swears to tell the

5   truth and the questions and answers are recorded.  You

6   should use the same methods in evaluating the deposition

7   testimony that you use for a witness testifying in court.

8   You are the judges of the witness's testimony whether it is

9   in court or in a deposition.

10     Further, some of the witnesses played by video

11  testified in German and had their testimony translated into

12  English.  The fact that a witness testified in a foreign

13  language should not be considered in your evaluation of that

14  witness's testimony.

15     You should consider and decide this case as a dispute

16  between persons of equal standing in the community, of equal

17  worth, and holding the same or similar stations in life.  A

18  corporation is entitled to the same fair trial as a private

19  individual.  All persons, including corporations and other

20  organizations, stand equal before the law and are to be

21  treated as equals.

22     Now, some evidence or circumstances in this case may

23  make you sympathetic to one of the parties.  Sympathy, of

24  course, is a natural human emotion.  However, the law and

25  your oath as jurors require that you disregard sympathy and

1    not allow it to influence your verdict.  Your verdict must

2    be based only on the law and the evidence.

3        Now, plaintiffs must prove each element of each of

4    their claims by a greater weight of the evidence.  Sometimes

5    lawyers refer to that as the preponderance of the evidence.

6    It simply means greater weight.

7        The greater weight of the evidence means evidence that

8    you believe outweighs the evidence opposed to it.  It means

9    that the evidence is more persuasive or convincing.

10       If the plaintiffs prove their claims by a greater -- by

11   the greater weight of the evidence, then you may find in

12   favor of them.  If the plaintiffs did not prove their claims

13   by a greater weight of the evidence, then you may find for

14   BI.

15       If you believe that the evidence is equally balanced,

16   the plaintiffs have not established their claims by a

17   greater weight of the evidence, then you may find for the

18   defendants.

19       Now, here the plaintiffs claim that Pradaxa was a

20   proximate cause of Ms. Knight's injuries, including her

21   death.  Plaintiffs' case is based on five separate claims

22   against the defendant.  These claims are:

23       First, that the warnings provided with Pradaxa were

24   inadequate;

25       Second, that the defendant failed to exercise

1    reasonable care in formulating the warnings for Pradaxa;

2        Next, that the defendant breached an express warranty

3    covering Pradaxa;

4        Then that BI breached an implied warranty covering

5    Pradaxa;

6        And that BI committed fraud by misrepresenting facts

7    related to Pradaxa.

8        Of course the defendant, BI, denies any failure to

9    warn, negligence, breach of any warranty, or fraud claim and

10   denies that any wrongful conduct by it caused any injuries

11   to Ms. Knight or caused or contributed to her death.

12       The defendant BI further asserts that Ms. Knight's

13   death was due to other causes.

14       Now, I will instruct you and explain the law regarding

15   each of these claims separately.  You will consider them and

16   decide each claim separately.

17       First, the proximate cause of an injury is a cause that

18   produces the injury in the natural and probable sequence of

19   events and without which the injury would not have occurred.

20       You're to decide whether Boehringer's conduct was

21   negligent and whether it proximately caused Betty Knight's

22   harm.

23       The defendant's conduct proximately caused the injury

24   if the conduct, in the natural and probable sequence of

25   events, brought about the injury, and the injury; second,

1    the injury would not have happened without the conduct.

2        Of course, there can be more than one proximate cause

3    of an injury.  As such, plaintiffs are not required to prove

4    that the defendant's negligence was the sole proximate cause

5    or only cause of Betty Knight's injuries, including her

6    death.

7        Now, the only way that plaintiffs can prove some of the

8    elements of their claims is through expert testimony that is

9    grounded in reasonable medical or scientific certainty.  By

10   this I mean that if you do not accept the expert testimony

11   presented by plaintiff about a factual issue that must be

12   proved through expert testimony, then you should not find in

13   favor of the plaintiff on that issue.

14       For example, the only way plaintiffs can prove that

15   Pradaxa's warnings were inadequate is through expert

16   testimony.  In addition, the only way plaintiffs can prove

17   that Pradaxa was responsible for Ms. Knight's injuries or

18   death is through expert testimony.

19       You heard all of the evidence regarding Pradaxa's label

20   approved by regulatory agencies outside of the United

21   States.  Because the standards governing labeling vary by

22   country, the fact that the Pradaxa label available outside

23   the United States differs from the FDA approved label in

24   some respects does not establish that the Pradaxa label

25   available in the United States is inadequate.  But you may

1    consider the labeling for Pradaxa outside the United States

2    only to the extent that it provides evidence of the

3    defendant's knowledge regarding Pradaxa.

4        You heard testimony regarding the clinical testing of

5    the 75-milligram dose of Pradaxa.  Plaintiffs are not making

6    a claim, and BI cannot be held liable, for failure to

7    perform clinical testing on Pradaxa.

8        When deciding whether BI failed to warn, you must

9    consider only the information that BI provided or failed to

10   provide about the risks and dangers associated with the use

11   of Pradaxa.

12       BI has a duty to provide adequate warnings to Mrs.

13   Knight.  Because Pradaxa is a prescription medicine

14   available only with the approval of a healthcare

15   professional, when considering the adequacy of the warnings

16   provided you may consider the information that BI provided

17   to Ms. Knight's doctors through the physician label.

18       BI is not permitted to change the patient Medication

19   Guide without prior approval, FDA approval.  And plaintiffs

20   cannot bring a claim based on any defect in the patient

21   Medication Guide.

22       Thus, when considering if the warnings provided by BI

23   were adequate, you cannot consider any defect in the patient

24   Medication Guide as the basis for your verdict.

25       But because BI can change the physician's label without

1    prior FDA approval, you may consider if the physician's

2    label fails to probably warn.

3        In the course of this trial evidence has been

4    introduced that Pradaxa sold by BI complied with certain

5    federal or state laws or administrative regulations.

6        When you are determining the issue of failure to warn,

7    negligence, and breach of warranty, you may consider BI's

8    compliance with any federal or state law or administrative

9    regulation that prescribed standards for the manufacture of

10   Pradaxa existing at the time that Pradaxa was manufactured.

11       Compliance with appropriate regulations is competent

12   evidence that BI exercised due care in marketing Pradaxa.

13   Failure to comply with an appropriate regulation is

14   competent evidence that BI did not exercise due care in

15   marketing Pradaxa.

16       Plaintiffs claim that Ms. Knight was injured by a

17   defect in Pradaxa which was sold by BI.  To recover

18   plaintiffs must prove by a greater weight of the evidence

19   all of the following:

20       First, that BI sold the Pradaxa taken by Ms. Knight;

21       Second, that the Pradaxa was defective when it left

22   possession of BI;

23       And, third, the defect in Pradaxa was a proximate cause

24   of Ms. Knight's injury, including her death.

25       A product is defective if it is not reasonably safe for

1    its intended use.  A product defect may be established by

2    evidence proving the warnings, instructions, or labels

3    accompanying the product were inadequate to warn of the

4    dangers associated with the product.

5         Plaintiffs claim that Pradaxa's warnings of potential

6    risks were inadequate.  This is referred to as strict

7    liability failure to warn.

8         In considering this claim, you are instructed that not

9    all dangers require warnings.  You must decide what a

10   reasonably prudent manufacturer would have warned in regard

11   to the safety of Pradaxa at the time of its manufacture.

12        To establish this claim, plaintiffs must prove all of

13   the following elements:

14        First, that BI manufactured Pradaxa;

15        And, second, that use -- that a use of Pradaxa which

16   was reasonably foreseeable to the manufacturer involved a

17   substantial danger that would not be readily recognized by

18   the ordinary user of Pradaxa;

19        And, third, that BI failed to give adequate warnings of

20   such danger;

21        And, fourth, that the manufacturer's failure to provide

22   adequate warning was a proximate cause of Ms. Knight's

23   injuries, including death.

24        Now, Boehringer as the manufacturer of prescription

25   drugs has a duty to warn patients directly about the risks

1   of Pradaxa.  It is Boehringer's duty, and not the

2   responsibility of the FDA or anyone else, to provide

3   warnings, instructions, and directions for the use of

4   Pradaxa.

5         Therefore, BI is required by law to provide adequate

6   warnings for Pradaxa and to ensure that the warnings,

7   directions, and instructions regarding Pradaxa's use remain

8   adequate as long as Pradaxa is on the market.

9         Now, in addition to plaintiffs' claim that Pradaxa was

10  defective by virtue of inadequate warnings, plaintiffs also

11  claim that BI was negligent by not using reasonable care to

12  warn about Pradaxa's dangerous condition or about the facts

13  that make Pradaxa likely to be dangerous.

14        To establish this claim, the plaintiffs must prove by a

15  greater weight of the evidence all of these following

16  matters:

17        First, that BI sold Pradaxa;

18        Second, that BI knew or reasonably should have known

19  that Pradaxa was dangerous or was likely to be dangerous if

20  used in a reasonably foreseeable manner;

21        And, third, BI knew or reasonably should have known

22  that users would not realize the danger;

23        And, fourth, BI failed to warn adequately of the

24  danger;

25        And, fifth, that a reasonable seller under the same or

1    similar circumstances would have warned of the danger;

2        And, sixth, that Ms. Knight was injured;

3        And, last, that BI's failure to warn was a proximate

4    cause of Ms. Knight's injuries, including death.

5        Now, the defendant as a manufacturer of prescription

6    drugs has a duty to warn patients directly about the risks

7    of Pradaxa.  It is the defendant's duty, not the

8    responsibility of the FDA or anyone else, to provide

9    warnings, instructions, and directions for the use of

10   Pradaxa.

11       Therefore, BI is required by law to provide adequate

12   warnings for Pradaxa and to ensure that the warnings,

13   directions, and instructions regarding Pradaxa's use remain

14   adequate as long as Pradaxa is on the market.

15       Negligence is the failure to use reasonable care.

16       A seller is negligent if it fails to use the amount of

17   care in warning about the product that is -- that a

18   reasonably careful seller would use in similar circumstances

19   to avoid exposing others to a foreseeable risk of harm.

20       In determining whether BI used reasonable care, you

21   should balance what BI knew or should have known about the

22   likelihood and seriousness of potential harm from Pradaxa

23   against the burden of taking safety measures to reduce or

24   avoid that harm.

25       BI may be liable for failure to warn only if plaintiffs

1    prove that a failure to provide adequate warnings was the

2    legal cause of Ms. Knight's injury or death.

3         First, plaintiffs must establish that Pradaxa caused

4    Ms. Knight's injury, including death;

5         Second, plaintiffs must prove that a different warning

6    would have been -- made a difference.  In other words,

7    plaintiff must prove that the warning suggested by them

8    would have caused Ms. Knight to act differently or otherwise

9    change her behavior in a manner that would have avoided her

10   injuries, including death.

11        If plaintiffs did not prove it is more likely than not

12   that Ms. Knight read the warnings provided by BI, they

13   cannot prove that different warnings would have caused her

14   to change her behavior.

15        The third cause of action asserted by plaintiffs is for

16   what's called a breach of express warranty.  Here plaintiffs

17   claim that Ms. Knight was injured by Pradaxa because Pradaxa

18   was not as represented.  To establish this claim, the

19   plaintiffs must prove these elements:

20        First, that Ms. Knight purchased Pradaxa;

21        Second, that BI made a statement of fact to Ms. Knight

22   related to Pradaxa;

23        Third, that Pradaxa did not perform as stated;

24        Fourth, that Ms. Knight was injured;

25        And, last, that the failure of Pradaxa to be as

1   represented was a substantial factor in causing Ms. Knight's

2   injury, including death.

3       Formal words such as "warranty" or "guarantee" are not

4   required to create an express warranty.  It is not necessary

5   for BI specifically to have intended to create a warranty.

6   However, a warranty is not created if BI simply gave its

7   opinion of or recommendation regarding Pradaxa.

8       The fourth cause of action is for breach of implied

9   warranty.  Here plaintiffs claim what Ms. Knight was injured

10  by Pradaxa because the product did not have the quality that

11  a buyer would expect.  To establish this claim, the

12  plaintiff must prove these elements:

13      First, that Ms. Knight purchased the Pradaxa;

14      Second, that at the time of purchase, BI was in the

15  business of selling Pradaxa;

16      Third, that Pradaxa was not fit for the ordinary

17  purposes for which such goods are used;

18      And, fourth, Ms. Knight was injured;

19      And, last, that the failure of Pradaxa to have the

20  expected quality was a substantial factor in causing Ms.

21  Knight's injury, including death.

22      The fifth cause of action is for fraud.  To prevail on

23  a claim for fraud, the following must prove the following --

24  the plaintiffs must prove the following:

25      First, that BI committed an act that was material and

1 false;

2  Second, that Ms. Knight relied on that act;

3  Third, that Ms. Knight was justified under the

4 circumstances in relying upon it;

5  And, last, that Ms. Knight was damaged because she

6 relied on it.

7  For their fraud claim plaintiffs must prove each of

8 these elements by clear and convincing evidence which is a

9 higher standard of proof than preponderance or greater

10 weight of the evidence.

11  The last thing I want to explain the law concerning

12 what are called punitive damages.

13  Now, although I'm explaining the law of punitive

14 damages, it does not mean that I have any opinion on whether

15 punitive damages should be awarded.  That decision is yours

16 alone.  You are not required to award punitive damages.

17  If you award the plaintiffs compensatory damages to

18 compensate for Ms. Knight's injury or death, then you may

19 also award them punitive damages.  You may not award

20 punitive damages if you do not first find that plaintiffs

21 are entitled to compensatory damages.

22  As a general proposition, the purposes of punitive

23 damages are, first, to punish a wrongdoer for conduct that

24 has harmed another party; and, second, to discourage a

25 wrongdoer and others from acting in the same way in the

1    future.

2        Therefore, punitive damages are damages that are

3    awarded to punish and deter wrongdoers.  Punitive damages

4    are in addition to any damages you award to compensate a

5    party for injuries or loss.

6        Punitive damages may be awarded where you find by clear

7    and convincing evidence that BI acted with actual malice

8    toward Mrs. Knight or that BI acted with a conscious,

9    reckless, and outrageous indifference to the health, safety,

10   and welfare of others.

11       Clear and convincing evidence is proof that produces in

12   your mind a firm belief or conviction that actual malice, or

13   that conscious, reckless, and outrageous indifference to the

14   health, safety, and welfare of others has been established.

15       Actual malice may be found where you find that BI acted

16   with a state of mind shown by conduct that was intended to

17   or was substantially certain to injure Ms. Knight without

18   any just cause or excuse.

19       If you find that BI took steps to warn about the risks

20   associated with Pradaxa, you may consider these efforts when

21   deciding whether BI acted with any actual malice.

22       Therefore, if you find from the evidence that BI

23   committed a wrongful act with actual malice toward Ms.

24   Knight or acted with a conscious, reckless, or outrageous

25   indifference to the health, safety, and welfare of others,

1   then you may decide that punitive damages should be awarded.

2       Now, at this time in your deliberations you should only

3   decide if plaintiffs have met their burden to show that

4   punitive damages should be awarded.  You should not try to

5   choose or determine an amount of punitive damages at this

6   time.

7       But, remember, you are not required to award punitive

8   damages.  And any punitive damages that are awarded would be

9   in addition to any damages necessary to compensate

10  plaintiffs for Mrs. Knight's injury or death.

11      Now, if you decide that the plaintiffs, Claude Richard

12  Knight and Claudia Stevens individually and as personal

13  representatives of the estate of Betty Knight, deceased,

14  have proven that the defendant is legally responsible for

15  her injuries, you may reasonably compensate plaintiffs for

16  any harm that Betty Knight suffered.

17      The purpose of awarding damages like this is to

18  compensate a person who has been injured or harmed as fully

19  and completely as possible.  Damages that are speculative

20  cannot be recovered.

21      However, the mere fact that damages may be difficult to

22  determine should not cause you to refuse to award them where

23  the right to such damages has been proven.

24      You may award the following specific items of damage if

25  they have been proven by a greater weight of the evidence:

1     First, Betty Knight's past physical pain and suffering,

2  mental anguish, disfigurement, emotional distress, or loss

3  of enjoyment of life.

4     There is no rule or set method for deciding the amount

5  of these damages.  The amount of these damages is left to

6  the discretion of the jury to decide what is fair and just.

7  You must use your judgment to decide a reasonable amount

8  based on the evidence and your common sense.

9     Betty Knight's past reduction of capability to perform

10  as a whole person, to recover for this plaintiffs must prove

11  that the injury deprived or reduced Betty Knight's ability

12  to participate in her customary activities and resulted in

13  the loss of enjoyment of life.

14     Again, there's no set rule or method to decide this

15  type of damage.  The amount of this damage, if any, is left

16  to the discretion of the jury to decide what is fair and

17  just.  You must use your judgment to decide a reasonable

18  amount based on the evidence and your common sense.

19     Also, Betty Knight who -- her representatives have

20  alleged a claim for reimbursement or compensation for past

21  medical expenses.  To recover damages for past medical

22  expenses, plaintiffs must prove the reasonable cost of

23  reasonably necessary medical care that Betty Knight

24  received.

25     The medical bills introduced in this case are to be

1    considered reasonable and necessary unless you find that the

2    defendant has proven that these medical bills were not

3    reasonable in amount or necessary for medical care for Betty

4    Knight.

5        If Betty Knight had a physical or emotional condition

6    that was aggravated or made worse by the defendant's

7    wrongful conduct, you may award damages that will reasonably

8    and fairly compensate plaintiffs for the aggravation or

9    worsening of Betty Knight's pre-existing condition.

10       If you find that Betty Knight was more susceptible to

11   injury than a normal person, you may still award damages to

12   plaintiffs for the injuries caused by the defendant even if

13   a normal, healthy person would not have suffered similar

14   injury.

15       Now, if you decide the plaintiffs have proven that BI

16   is legally responsible for the death of Betty -- of Mrs.

17   Knight, then you may award these damages.  These are called

18   wrongful death damages.

19       You may award plaintiffs as the administrators of Betty

20   Knight's estate damages for expenses reasonably incurred as

21   a result of her death.

22       These expenses incurred may include damages such as

23   reasonable funeral expenses, reasonable hospital and medical

24   expenses related to the injuries suffered by Ms. Knight that

25   resulted in her death, and any other expenses reasonably

1    incurred as a result of the wrongful conduct that resulted

2    in Ms. Knight's death.

3         You may award damages to the administrators -- that's

4    the two individual plaintiffs -- that you find are fair and

5    just to reasonably compensate Claude Knight and Claudia

6    Stevens, Ms. Knight's children.  You will decide the amount

7    of any award to be distributed, if any, to each of these

8    persons.

9         In making any award of damages to be distributed to

10   each of these persons, you may consider the sorrow, mental

11   anguish, and solace suffered as a result of Ms. Knight's

12   death.  This loss may include loss of society,

13   companionship, comfort, guidance, kindly offices, and advice

14   of Ms. Knight.

15        Second, compensation for any conscious pain and

16   suffering that Ms. Knight suffered between the time she was

17   injured and the time of her death.

18        To award damages for pain and suffering, there must be

19   evidence that Ms. Knight was conscious of the pain and

20   suffering suffered -- suffering prior to her death.  Where

21   there is no evidence that Ms. Knight consciously perceived

22   pain and suffering, no damages for pain and suffering should

23   be awarded.

24        With the exception of some brief closing instructions,

25   those are the Court's instructions as to the law you're to

1    apply.  Now the parties will be providing their closing

2    statements.

3         Plaintiffs bear the burden of proof as to their claim,

4    so plaintiffs will do an opening portion of closing

5    argument.  The defendant may respond to that.  And then

6    plaintiffs will have a final brief reply or rebuttal period.

7         At that point I've got literally about one minute of

8    further instructions before you go back and begin your

9    deliberations.

10        With that, for the plaintiff.

11             MR. CHILDERS:  Thank you, Your Honor.

12        Good morning, ladies and gentlemen.

13        I want to start first by thanking you.  You've been

14   here for almost three weeks now and I know that's not easy

15   for anybody, especially when you're trying to work and take

16   care of your family.

17        And on behalf of myself, on behalf of Rick and Claudia

18   and Neal and the rest of the folks that have supported us in

19   bringing this trial to you, I thank you from the bottom of

20   my heart.

21        We heard just yesterday from Dr. Crossley.  You'll

22   remember Dr. Crossley.  And he told us Pradaxa is not the

23   right drug for all patients.  There are some patients it's

24   not right for.

25        And you'll remember just last week we heard from

1   Dr. Ashhab.  Pradaxa was not the right medicine, not the

2   right anticoagulant drug for Betty Knight.

3        You've heard a lot about the fact that Betty was

4   prescribed the 75-milligram dose of Pradaxa.  That's what

5   she took.

6        You've heard a lot about the fact that that dose was

7   never tested in humans.  You've heard that it was never

8   tested -- Pradaxa itself was never tested in severe kidney

9   impaired patients like Betty Knight.  We all agree on that.

10  That's no dispute.

11       Before they sold that drug to her, before they told her

12  doctors, "This drug is okay for Betty Knight," they never

13  tested it in any patient like Betty Knight.  And they never

14  tested the 75-milligram dose at all.

15       What we also agree on is that if you are a patient like

16  Betty Knight who has severe kidney impairment -- I should

17  say severe, I'm sorry -- and is also taking Coreg, a P-gp

18  inhibitor, you should avoid Pradaxa.  We know that now.

19  Unfortunately, the company didn't tell Betty or her doctors

20  that information when she was prescribed Pradaxa.

21       What we also agree on; there's no reversal agent for

22  Pradaxa.  You get a bleed, you've got to wait it out.  If

23  you're on warfarin, they can give you Vitamin K.  They can

24  give you fresh frozen plasma.  And they can stop the bleed

25  much quicker.

1    What we also agree on, the risk of a GI bleed.  A bleed

2  just like Ms. Knight had is 50 percent higher for any

3  patient on Pradaxa than it is on warfarin.

4    We also agree when you have a lower GI bleed, which is

5  what Betty had, you're three times more likely to have a

6  lower GI bleed on Pradaxa than on warfarin.  That

7  information was not provided to Betty Knight or to her

8  doctor.

9    What we also agree on, we went around and around on

10 this.  Betty Knight did not bleed when she was on triple

11 therapy, Plavix, aspirin and Coumadin.

12   You'll recall a couple days ago Dr. Shami got up on the

13 stand in direct and said, "Well, she never took those three

14 drugs together."  Remember that?

15   And then I got up on cross and said, "Well, let's look

16 at the record."  She did.  She took triple therapy on

17 Coumadin in 2009, didn't bleed.

18   We also agree Betty Knight had a severe GI bleed, a

19 life-threatening GI bleed on triple therapy when she was on

20 Pradaxa.  Why did that happen?  Triple therapy is dangerous.

21 I agree.  It's a dangerous combination of medicine.

22   But when you have a patient like Betty and you put them

23 on triple therapy with Pradaxa, they're three times more

24 likely to have a lower GI bleed like she did than if she

25 would have been on warfarin, three times more likely.

1    We also agree Betty Knight's family requested that she

2    be switched to Pradaxa from warfarin for convenience.  They

3    didn't know about the risks, about the dangers of Pradaxa to

4    a patient like Betty.

5    They knew that warfarin had worked for her.  She hadn't

6    had a stroke.  She hadn't had a bleed.  But it wasn't the

7    most convenient drug.  They saw the ad and they asked for

8    Pradaxa and it was prescribed to her.

9    We also agree there's no dispute Pradaxa contributed to

10   Betty's severe GI bleed.  Dr. Crossley told you that.  He's

11   their paid expert, their paid witness.  Yes, Pradaxa

12   contributed to the bleed.

13   Dr. Shami got up here the day before and said, "I don't

14   have any opinion of any drug she was taking caused,

15   contributed, had anything to do with the bleed."  Do you

16   recall that?

17   And she's a gastroenterologist.  They hired a

18   gastroenterologist to come in here and tell you this woman

19   had a gastrointestinal bleed and, "I don't have any opinion

20   if any of these blood-thinning medications she was on had

21   anything to do with it, not one way or the other.  I haven't

22   even decided."

23   We also agree Boehringer never sent a "dear doctor"

24   letter, one of these letters that says, "Hey, healthcare

25   professional, hey doctor, hey nurse, we have changed the

1   label.  There's really important information we put in

2   there.  We want to bring this to your attention."

3       No question, they never sent a letter like that to

4   Betty's doctors or any doctor in the country saying if a

5   patient like Betty comes to you with severe renal impairment

6   and they're taking Coreg or some other P-gp inhibitor,

7   Pradaxa is not the medicine for them.  They never did that.

8       We all agree that Boehringer never sent any warnings,

9   any warnings to Betty other than the Medication Guide.

10  We're going to talk about that in a little bit.  But that is

11  clearly the only information that was ever provided directly

12  to Betty by Boehringer.

13      And we all agree that Betty was more debilitated after

14  her bleed than she was before.  You saw I kind of went back

15  and forth with Dr. Crossley yesterday, but he had to admit

16  to me that he told me that when I took his deposition.

17      He said, "Yeah, she, she -- I think she was already

18  debilitated, but you're right.  She was more debilitated

19  after the bleed," no question.

20      We're to the point now in the trial where you have to

21  decide all of the issues.  And the thing that you're going

22  to do that with is the verdict form.  This is the verdict

23  form that you'll have to take back in the jury room and

24  decide all the questions.

25      And the very first part of it is plaintiffs' claims and

1    it's liability.  Liability means if they do something wrong

2    that harmed the plaintiff.

3        And what we have here are five different claims.  And I

4    want to go through each one of them with you so you can see

5    how we believe the evidence has proven each of those claims

6    in this case.

7        The first one is called strict liability failure to

8    warn.  The Judge just read you a jury charge.  We call that

9    jury charge, jury instructions.  I believe you'll have those

10   back with you in the jury room.  Look at them.

11       What it tells you very specifically, Boehringer -- in

12   two different places in the jury charge it tells you

13   Boehringer as a manufacturer of prescription drugs has a

14   duty to warn patients directly about the risks of Pradaxa.

15       I expect they will get up here and tell you, "We told

16   our doctors all kinds of stuff or at least they should have

17   known about all kinds of stuff."  That's not the law in West

18   Virginia.

19       Their duty is to tell Betty Knight all of this

20   information so she can make the choice.  "Yes, I want to

21   take that medication and take those risks," or, "No, it's

22   just not worth it to me."

23       You heard evidence from multiple witnesses on

24   deposition, as well as Dr. Plunkett came live.

25       Dr. Friedman you'll recall worked -- these four folks

1   on either side of Dr. Plunkett all work for Boehringer.

2       Dr. Friedman you'll recall told us, "Patients with

3   severe renal kidney impairment, yeah, we didn't include

4   those in our clinical trials."

5       And then he said something that is just mind-boggling.

6   He, the guy who works at Boehringer, the scientist who

7   helped develop this drug, said, "I don't know if Pradaxa is

8   safe and effective for a patient with severe kidney

9   impairment."  He said that.  Yet, they sold that drug to

10  Betty and didn't tell her that information.

11      And he also told you that when patients have certain

12  risk factors, we expect they're going to have a higher

13  Pradaxa level in their blood, and that, that can be

14  dangerous.

15      He also told you when you add all those risk factors

16  together, they compound each other.  They get bigger and

17  bigger.  He said, "We don't actually put that information in

18  the label.  We don't tell doctors how to figure out what the

19  bleed risk is going to be when you have multiple factors."

20      We heard from Michelle Kliewer.  Her job is to talk to

21  the FDA, tell them what Boehringer knows about this drug.

22  She said, "It's our duty, Boehringer's duty to ensure

23  Pradaxa warnings are complete and accurate."

24      The Judge told you the same thing.  That is

25  Boehringer's duty.  That's not the FDA's duty.  Boehringer,

1    as the manufacturer of the drug, has the legal duty to make

2    sure that the warnings that they provide are complete and

3    accurate the entire time that drug is sold.

4        Michelle Kliewer also told you that they haven't told

5    the FDA that they know how to identify patients who are at a

6    higher risk by using a particular blood test.  They didn't

7    share that information with them.

8        And she told you that Boehringer didn't tell the FDA

9    about the internal analysis they did of their own data in

10   the RE-LY trial that showed, hey, if we actually do this

11   blood testing, we'll probably make this drug safer for all

12   the patients who take it.  They never told them that.

13       You heard from Dr. Brueckmann who told us that the risk

14   of bleed is tied to the Pradaxa level in the body.  The more

15   you have, the more your risk of bleed.

16       She also told you that's not in the U.S. label.  We

17   don't specifically tell doctors here that the more Pradaxa

18   you have, the more likely you are to bleed.  We do tell

19   doctors in the rest of the world that.  We just don't tell

20   them here in the United States.

21       She also told you something very important.  She

22   said -- and my friend Neal asked her a question about

23   whether or not Boehringer has a duty to minimize certain

24   risks.  And she said in response Boehringer has a duty to

25   minimize any risk, any risk to patients.

1       You heard from Dr. Van Ryn.  She told you again you

2  increase the level of Pradaxa in a patient's blood, you

3  increase their bleed risk.

4       And she even said, "I'm, I'm a scientist and I think --

5  I work on this drug.  I think it's not a bad idea to check

6  that blood level every six months or every year."  But the

7  company's mantra, the company's position is you never have

8  to check it.

9       The scientist who works on the drug says it's a good

10  idea.  The company mantra is don't tell anybody that.  You

11  tell people that, they're not going to prescribe our drug.

12      And then you heard from Dr. Plunkett.  Dr. Plunkett was

13  the only person who came into this courtroom who is an FDA

14  expert.  Boehringer didn't bring you one of those.  And she

15  told you about the duties that any drug company has and that

16  Boehringer specifically has.

17      She told you how they failed to properly warn doctors

18  and patients about the true risk of bleed with Pradaxa.  And

19  she told you that none of this information was ever

20  communicated to Betty Knight or to Rick Knight or to Claudia

21  Stevens, none of it.

22      And she also told you that the first four items on here

23  weren't even communicated to Betty's doctor when she was

24  prescribed Pradaxa.  There's the chart.  They never warned

25  Betty of any of these things.  That's their duty.  It's not

1    a hard duty.

2        And I want to make sure you guys understand.  Just

3    because someone is injured, that doesn't make a case.  Drug

4    companies have a duty.  They have to tell patients what they

5    know about their drug, what the safety issues are, what the

6    benefits are so patients can make informed decisions.  Yes,

7    I want to take it.  No, I don't.

8        And when they don't do that, that is where liability

9    comes in.  You have to.  It's not hard.  They know this

10   information.  It's not hard to tell people things you know.

11   But they didn't do it.

12       Again, we just talked about this.  The Judge told

13   you -- sorry.  The responsibility for the label is

14   Boehringer's.  It's not the FDA's.  Don't, don't be

15   confused.  Don't be tricked by them coming up and saying FDA

16   has approved this label every time we've asked for it.

17   They've never asked for the approval of the things that

18   we've talked about in this courtroom.

19       It's not FDA's job to make sure that label is accurate.

20   It's Boehringer's.  That's the law.

21       The Judge also told you about the burden that we have

22   as plaintiffs on our claims.  And I'll read it to you again

23   and we accept that burden and I want to make sure you

24   understand that burden the way I do.

25       And it is:  Plaintiffs must prove each element of their

1   claim by the greater weight of the evidence.  The greater

2   weight of the evidence means evidence that you believe

3   outweighs the evidence opposed to it.  It means the evidence

4   that is more persuasive or convincing.

5       This is not a criminal case.  Our burden is not to

6   prove beyond a reasonable doubt.  We come in and we start

7   even.  We're on one side.  Boehringer is on the other.  I'm

8   going to call this side ours because I'm pointing at my

9   friend Neal.  If we go this much (indicating), we win.

10  That's the burden.

11      Now, I believe we've gone a lot farther than that, but

12  we don't have to tip the scales so that it falls over.  We

13  only have to have the greater weight of the evidence.  It's

14  very important that you remember that when you're deciding

15  the issues in this case.

16      And I believe based on the information we've provided

17  to you, we've met that burden on strict liability failure to

18  warn.

19      And, so, when you get back in the jury room and you're

20  looking at the verdict form, you should check "yes" on

21  direct liability failure to warn.

22      Our next claim is negligent failure to warn, the same

23  as.  It's just a different claim using different standards.

24      The Judge read to you specifically what those standards

25  are.  I'm not going to repeat them all to you.  Suffice it

1    to say it is the same evidence that we rely on for both of

2    those claims; failure to warn, failure to warn.

3        You saw yesterday that Betty Knight read the

4    information that was provided to her with her first Pradaxa

5    prescription.  That Pradaxa prescription came before any of

6    this information was in the physician label.  And it came,

7    obviously, because none of this has ever been in the

8    Medication Guide, without any of that information to her

9    directly.

10       You saw the record.  Dr. Crossley walked through it

11   with me.  Not only did she read it herself, the home health

12   person came in there and made sure she verbalized to them.

13   That means she told them, "I understand what you've told me

14   about this information you just read to me from the

15   information I got from the pharmacy."

16       And we know what information she got from the pharmacy

17   because we have the label and we have the Medication Guide.

18   It didn't tell her any of these things.

19       We also know that, again, Betty didn't warn -- excuse

20   me.  Boehringer didn't warn Betty's doctors about these

21   things.  Now, they'll tell you, "Well, we told them there

22   was a reversal agent."  Yeah.  It was buried in the

23   overdosage section on who knows what page in Section 10 of

24   the label.

25       And what happened after that?  They moved that

1  information right up to the risk of bleed part of the label,

2  the warning where it should have been so doctors actually

3  see it.  They don't just find out once a patient is

4  overdosed, "Oh, gosh, I don't have a reversal agent.  I

5  didn't know that."

6       They didn't have that information in the label when

7  Betty started taking Pradaxa when it was prescribed to her.

8       This is directly out of the defendant's own papers that

9  they published in 2014 after Betty passed away.  And they,

10  they own this.  They know this.

11       When you give Pradaxa to two different patients, one

12  could have a huge amount in their blood.  One could have a

13  low amount in their blood.

14       And how do we figure out how much it is?  Well, we just

15  kind of guess.  We look at how your kidneys are doing.  And

16  how do we look at how your kidneys are doing?  We use an

17  estimate for that.  It's not a direct measurement either.

18       And, so, we kind of guess how much Pradaxa you have in

19  your blood because we don't want to tell people how to find

20  out exactly how much Pradaxa you have in your blood by just

21  simply doing a blood test.

22       You heard from Dr. Plunkett.  She drew this -- I think

23  she called it Mr. Bill.  She drew this character to show you

24  how the Pradaxa gets in the body, how little of it actually

25  gets used by your body as an anticoagulant, and then how

1    it's sent through your GI tract, your intestines.

2        And as it's going through there, it's actually being

3    activated locally which means -- and this is just a bizarre

4    thing.  It's going through your GI tract causing places,

5    just random places, especially if there's a sore or a

6    lesion, to be over-anticoagulated.

7        She also explained to us this concept.  This isn't a

8    hard concept.  Any anticoagulant, there's a balance.  If you

9    have to too much, you're going to bleed.  If you don't have

10   enough, it doesn't help you.

11       I think you heard from the, the defense yesterday that,

12   well, we have all kinds of medicines we give people and they

13   don't all have to be measured and balanced.  No, that's

14   true, absolutely.  But those aren't anticoagulants.  When

15   you have a drug that is to thin a patient's blood, let her

16   know how much they have in their system.  If you don't, it's

17   dangerous.  How do we know that?  Their own paper again.  As

18   Pradaxa levels go up, bleed risk increases.

19       And here's the part that's just, again, hard to

20   believe, but it's what they know.  Stroke risk remains

21   essentially the same.  And what that means, if you get to a

22   certain point, a certain level of Pradaxa in your blood,

23   that's the maximum amount of stroke protection you're going

24   to get.

25       It doesn't matter if you double it, triple it,

 1    quadruple it.  You're not going to have better stroke

 2    protection.  Every increase you have in the level makes your

 3    risk of bleed higher and higher and higher and higher.  That

 4    is why doctors need to know how to measure Pradaxa levels in

 5    their patients.

 6        We saw Neal and Dr. Plunkett showed us that in this

 7    same paper.  This is right out of that paper, the Boehringer

 8    paper about how bleeds and stroke are tied or are not tied

 9    to plasma concentration or blood levels.

10        You heard from Dr. Friedman.  Yeah, you can measure the

11    blood level.  If you do that, you can identify people who

12    are going to absorb more of this drug.  They're going to

13    have more of it in their blood.  Yeah, we can do that.

14        You heard from Dr. Brueckmann.  She said, "I believe

15    it's important to have the opportunity to measure."

16        You heard from Dr. Friedman again.  He said, "I think

17    that would be helpful for physicians if they knew that."

18        And then you heard from Dr. Van Ryn who said, "Not a

19    bad idea to check it every six months or so."

20        So what does BI tell doctors here?  You don't need to

21    do that.  You don't need to assess Pradaxa levels.  It says

22    that in the label.

23        What do they tell doctors in other countries?  If you

24    do assess the label, you can identify patients who are at an

25    excessive bleed risk.

1    In the U.S. what do they tell them?  Well, tell you how

2    to measure the blood level.  You saw me go around and around

3    with Dr. Crossley yesterday.  He said this test, this aPTT,

4    that doesn't measure your Pradaxa level.  That's right.  It

5    doesn't.

6    So what do they tell -- but that's what they tell

7    doctors here in the U.S. to use.  What do they tell doctors

8    in the rest of the world?  Use a different test, the one

9    that measures the Pradaxa level.

10    You recall yesterday he and I went around and around on

11    that.  He said that's not measuring plasma concentration.

12    And I had to actually show him the words twice until he

13    finally agreed with me.  "Yeah, that's what it says."

14    That's what they tell doctors everywhere else, just not

15    here.  The U.S. label doesn't tell doctors how to -- I'm

16    sorry.  It doesn't even tell them that a patient can have an

17    excessive high exposure for Pradaxa.

18    And we know that that message is getting across.  You

19    know how we know that?  What did Dr. Abdelgaber say when I

20    asked him in his deposition, "You understand a patient can

21    have too much Pradaxa in their blood and be

22    over-anticoagulated."  He said, "I never heard that.  What

23    are you talking about?"

24    Because they don't tell the doctors that in the United

25    States.  They tell them exactly what the excessive level is

1   in these other countries and how to measure it.  In the U.S.

2   Boehringer doesn't tell doctors that female patients are

3   going to have a higher Pradaxa level in their blood just

4   because they're female.  They tell doctors everywhere else

5   in the world those females are going to have 30 percent more

6   Pradaxa in their blood.

7        Neither one of these doctors knew.  You heard from

8   them.  They testified, "I didn't know there was a Pradaxa

9   level that's too high.  If I had known, if they told me how

10  to measure blood levels, yeah, I'd do that.  Any doctor

11  would do that."

12       Dr. Brueckmann -- we already talked about this.  They

13  have an obligation to limit any risk they can.  And they can

14  limit that risk just by telling doctors and patients the

15  truth, but they don't.

16       So negligent failure to warn, I believe yet again we've

17  more than tipped the scales on that claim.  And when you get

18  to the jury room, you should check "yes" as well.

19       We have additional claims, breach of express warranty.

20  Now, what does that mean?  A lot of words.  It means they

21  told her it was safe for her and it wasn't.

22       And you'll see down here that they don't have to be

23  formal words like "warranty" or "guaranteeing this to create

24  an express warranty."  And they don't even have to intend

25  to.  If you tell a patient a drug is safe for them and it's

1    not, you have breached an express warranty.

2        So what did they do?  They gave her a Medication Guide.

3    And what did they say in that Medication Guide right up at

4    the top?  What is the most important information I need to

5    know about Pradaxa?

6        We're going to tell you, we're going to tell you right

7    here this is the most important information you need to know

8    about Pradaxa.  And you know what wasn't included?  Any of

9    this, not one bit of it.  Express warranty was made.

10       Claudia saw an ad that said this is a more convenient

11   medicine for a patient.  It didn't say not a patient like

12   Betty.  It said for any AFib patient.  They called the

13   doctor.  They made an appointment.  They got a prescription.

14   And when they filled that prescription, they got the

15   Medication Guide and she read it.  Not only did she read it,

16   she sat down with a home healthcare worker and made sure

17   they went through every bit of it and she understood it.

18       And when she was told by that Medication Guide what was

19   the most important thing to know, it wasn't any of these

20   things that both Rick and Claudia have told you would have

21   kept them from ever asking for this drug to be given to

22   their mother.

23       Breach of express warranty?  Yeah.  I believe we've met

24   our burden.

25       The next claim that we have is called breach of implied

1    warranty; again, sort of like the failure to warn claims.

2    It's, it's basically the same.  They sold a product to the

3    patient that was supposed to work a certain way and it

4    didn't.  It's not safe for her.  It's a good medicine for

5    some people.  It's not a safe medicine for a patient like

6    Betty Knight, but they didn't tell her that.  Again, the

7    same issues.

8         So when you get to breach of implied warranty, you

9    should check "yes."

10        We have another claim.  And that next claim we have is

11   called fraud.  That's what it sounds like.  You

12   misrepresented.  You said things that weren't true or you

13   omitted things that you should have told someone that were

14   vitally important to them, and it was material and false.

15        Ms. Knight relied on it.  She was justified in relying

16   on it.  That's important.  They told her it was a medication

17   that was safe for her.  They told her doctors it was a

18   medication that was safe for her.  She -- any patient would

19   be justified in relying on that, so she did and she was

20   damaged.  She had a severe life-threatening gastrointestinal

21   bleed that we've all talked about.

22        Here's the fraud.  They all know it's important to be

23   able to check Pradaxa blood levels.  Every one of them says,

24   yeah, you should do that.

25        Why don't they do it?  Because they had a plan from

1   before the drug was ever approved.  And that plan was no

2   monitoring.  Our mantra, our mantra is no monitoring.  If we

3   have monitoring, it's going to undermine our efforts to

4   compete with the other NOACs.

5        You heard Dr. Crossley yesterday.  There's two other

6   drugs in this class that he used.  If Pradaxa had monitoring

7   where they don't, nobody would be prescribing Pradaxa to

8   their patients.

9        What else did we hear from the defendant?  We know

10  there's this range that's safe and effective.  A little too

11  early.  This is after the drug is on the market.  This is,

12  this is just before Betty Knight starts taking it.  This is

13  August of 2011.

14       From a marketing point of view, we better not start

15  talking about a target plasma range.  We don't want to talk

16  about people checking Pradaxa blood levels.  Not from a

17  scientific point of view, not from a safety point of view,

18  not from a medical point of view, from a marketing point of

19  view that decision was made by Boehringer.

20       Why?  Because it would be a competitive disadvantage

21  versus -- that's Xarelto, Rivaroxaban, and that's Eliquis,

22  Apixaban.  And then what?  We've got to change part of our

23  story.

24       Well, that's a common theme with this company I think

25  you've seen in this trial.  They've changed their story a

1   few times.

2        She never took triple therapy with Coumadin.  Oh, wait.

3   Yes, she did.  She had all kinds of high aPTT values before.

4   Oh, I'm sorry.  Those weren't actually aPTT values.  The

5   story changes constantly.

6        What did Michelle Kliewer tell us?  She's the FDA

7   regulatory person who works for this company.  Marketing

8   should not influence the content of the Pradaxa label.

9   That's right.  We saw that it did and it does to this day

10  and that hurt Betty Knight.

11       So when we get to the -- when you get to the next

12  section, fraud, again, I believe we've met our burden.

13       Okay.  Now, this is important too.  It says right here

14  if you answered "yes" to any of questions five -- you may

15  disagree with me.  You may say, "I don't think they've

16  proved express warranty.  I don't even know what express

17  warranty means."

18       And I'll be honest with you.  It's not an easy thing to

19  understand for me.

20       But if you answer "yes" to any one of those five

21  questions or five of those five questions or two of those

22  five questions or three, then you move on to the next

23  section of the verdict form that's called causation, legal

24  causation.

25       And there's a very straightforward question:  Did

1    plaintiffs prove absent BI's wrongful conduct in any one of

2    those five, any one of those five Betty Knight would not

3    have taken Pradaxa?  That's the question you have to answer.

4        If they had warned her about it, if they hadn't told

5    her it was safe when it wasn't, if they hadn't

6    misrepresented to her and her doctors the fact that you

7    should monitor, then we've proven that.  That's legal

8    causation.  That's the first step of legal causation.

9        You know what happened.  Claudia saw a TV ad.  You

10   heard Dr. Crossley yesterday.  "When a patient comes to me

11   and asks for a particular NOAC drug, Pradaxa, Eliquis,

12   Xarelto, whichever one it is, I'm pretty sure they heard

13   that on a television commercial."

14       That's what happened here.  You saw the documents.

15   Betty had an appointment on the 17th of October.  Rick

16   called that morning, "Hey, we want to talk to the doctor

17   about changing this Coumadin."

18       And when they got to the doctor, what did they say?

19   "We want to replace Coumadin with the new medication

20   Pradaxa."  "Why?"  "Well, we saw an ad that said it's safe

21   and more convenient for Betty."  That sounds great.  But

22   they didn't know it's not safe for Betty.

23       And you heard from Dr. MacFarland.  She said Betty

24   didn't have a stroke or a bleed while she was on warfarin.

25   We switched her based on a request.  And she said patients

1  often request drugs after they see TV ads.  She knew about

2  Pradaxa.

3      She said if they had provided instructions for

4  measuring the Pradaxa level, she would have done it.  If she

5  had done that, Betty would have come right back off of

6  Pradaxa because it's not a drug for her.

7      I suspect you're going to hear from the defendant,

8  well, yeah, you know, she filled out this form for insurance

9  that says the reason for the switch was because Betty was

10 sub- and supratherapeutic.  And you'll recall Dr. Shami

11 liked that term a lot better than "over-anticoagulated" and

12 that's fine.

13     But think about that.  If Dr. MacFarland was told

14 Betty's insurance is not going to cover Pradaxa, sorry, and

15 she really wanted her to be on Pradaxa because the family

16 asked for it and she wrote on the insurance form the reason

17 for switch is patient saw a TV ad and wants to try it, do

18 you think the insurance company would have said "yes"?

19 Pradaxa costs hundreds of dollars a month.  She had to write

20 that on there or it wouldn't have been approved.

21     You saw the Medication Guide.  You know that the

22 information that they got didn't tell them any of these

23 things.  They didn't get any other information.  They didn't

24 know any of these things.  We know she read it.  Not only

25 did she read it, she went over it with her home healthcare

1    provider.

2         And how about this?  Their own paid witness.  You would

3    think they would have coordinated a little better.  They

4    bring in two paid witnesses, one from Virginia and one from

5    Tennessee.

6         And the first one who, by the way, doesn't prescribe

7    Pradaxa, doesn't prescribe any anticoagulants said warfarin

8    just didn't work for her.  She was absolute resolute in

9    that.

10        And then the cardiologist came yesterday and he said it

11   would have been appropriate for her to stay on warfarin.

12   That's right.  It would have been just fine for her to stay

13   on warfarin.  Is it less convenient?  Yes.  What's, what's

14   more important, convenience or safety?  Safety.

15        What else did Dr. Crossley tell you?  Coreg is

16   absolutely 100 percent a P-gp inhibitor drug.  And I have to

17   confess to you I'd never heard the term P-gp inhibitor until

18   I started working on this case.  I had no idea drugs worked

19   that way, but they do.

20        And what did he say?  Coreg is a commonly prescribed

21   drug, especially in AFib patients.

22        And then when I asked him how he knew that Coreg was a

23   P-gp inhibitor drug, he said he'd seen some lists and knew

24   about it.  And then I showed him the Coreg label, the drug

25   label.

1    So if a doctor has that label while they're prescribing

2    Pradaxa, are they going to know it's a P-gp inhibitor?  No.

3    You know why?  Coreg is an old drug.  They don't change

4    labels in old drugs very often.  You know why?  Because it

5    costs money, and generic drug companies don't like to spend

6    money.

7        But the more important part, the Pradaxa label doesn't

8    mention Coreg anywhere.  It tells the doctor, "Don't give

9    Pradaxa to a patient like Betty Knight if she's taking a

10   P-gp inhibitor," but it doesn't list for them one that is

11   commonly prescribed, especially in the patients who get

12   Pradaxa.

13       You've heard from Claudia.  She said, "If I had known

14   any of these things, I would not have asked for my mom to

15   switch.  I didn't know that.  I thought this was going to be

16   a good medicine for her.  Why would I put my mom on a drug

17   that's never been tested in patients like her?  Why would I

18   put her on a drug that the drug company knows is not safe

19   for her?  And, hey, if she's more likely to have a GI bleed

20   on this drug, I don't want her to be on that."

21       You heard the same from Rick.  They did this together

22   as a family.  And they weren't told the truth.

23       So when you get to the next phase, legal causation, you

24   should check "yes."  And if BI -- if any of those five

25   things hadn't -- let me rephrase that.  I believe all five

1  of those items in the first part are what led Betty Knight

2  to be on Pradaxa.  But any one of them is enough.

3      And certainly it was because of the information she was

4  and was not given about Pradaxa that she switched to

5  Pradaxa.  That's why she was taking it.  And if she had

6  known this, they never would have asked for it and she

7  wouldn't have been on it.

8      Next, there's another part, there's another part on the

9  verdict form for legal causation and that is did plaintiffs

10  prove that Pradaxa proximately caused Betty Knight's

11  injuries.

12      Proximately caused.  That's a word we only use in

13  court.  I don't know any other place where you use it.  And,

14  so, luckily for us, the Judge has jury instructions where he

15  defines it and he gives them to you so that you can

16  understand it.  Some day I hope I can understand it better,

17  but I've got to be honest with you.  I've been doing this

18  for 20 years and I still have a hard time understanding

19  proximate cause.

20      The most important part of that charge that I believe

21  you should look to is there can be more than one proximate

22  cause of an injury, more than one.  That's what we have

23  here.

24      She was on triple therapy.  And you heard from Dr.

25  Crossley himself.  Pradaxa was part of what caused her to

1   bleed.

2       You heard from Dr. Ashhab. It was part of what caused

3   her to bleed. And it was a substantial cause of it.

4       And not only that, when she had been on triple therapy

5   before with Coumadin, this didn't happen. So even if you

6   say, well, I don't think Plavix (verbatim) triggered the

7   bleed, that doesn't mean plaintiffs lose. There's more than

8   one proximate cause.

9       Pradaxa, according to both plaintiffs' experts and the

10  defense experts, was part of that cause.

11      You heard from Dr. Abdelgaber. "Did you feel at any

12  time during her admission her life was in danger, her life

13  was in danger from the GI bleed?" And he said

14  unequivocally, "That's why I admitted her to the hospital.

15  I thought her life was in danger."

16      She was on Pradaxa at the time of that life-threatening

17  bleed, not warfarin. Again, she had been on the combination

18  with warfarin before, Coumadin and warfarin, same drug. She

19  didn't have this problem.

20      And we know there's no diagnosis of her ever having a

21  GI bleed while she was on the warfarin. Dr. Ashhab went

22  through all the records. Dr. Shami went through all the

23  records. Dr. Crossley went through all the records, 4,000

24  plus pages which I hate to tell you guys you're going to

25  have back there with you, 4,000 pages. It's like a giant

1    box over here.  We may have already given that to the Court.

2    They looked at all those.

3        And you heard when I asked Dr. Shami, "Are you talking

4    about this particular hospitalization, November, 2008?"

5    "Yep."

6        We went through painstakingly every place in that

7    record and I said, "Where does it say she had a GI bleed?"

8    "Well, it doesn't but she had dark stools."  That's what she

9    said.

10       I said, "Well, let's look at where it says dark

11   stools."  "Well, actually it says she had some diarrhea that

12   was a little darker than usual."

13       That is the only thing that she relied on to say Betty

14   Knight had a GI bleed.  The diagnoses, huh-uh, they don't

15   say that.  She had anemia.  She's got kidney failure.  That

16   happens.  You have to get transfusions sometimes.

17       What did Dr. MacFarland say?  She treated Betty Knight

18   for years.  She never had a bleed or a stroke while she was

19   on warfarin that I'm aware of.

20       We're still on proximate cause here.  Okay.  So I want

21   you to keep this in mind.  Again, greater weight of the

22   evidence.  Nobody disagrees.  Betty is more likely to have a

23   GI bleed on Pradaxa than she would have been on warfarin.

24   How much more?  50 percent for any GI bleed.  We agree on

25   that.  For a lower GI bleed, three times more likely to have

1  on Pradaxa than on warfarin.

2      You recall that Neal and Dr. Plunkett went through the

3  information that was in this article written by Boehringer

4  to show you're three times more likely to have a lower GI

5  bleed on Pradaxa than you are on warfarin.

6      What did Dr. Crossley say about whether or not Pradaxa

7  was the proximate cause?  First of all, he said the GI bleed

8  was a big blow to Betty Knight.  I don't know if you recall

9  that.  It stuck out to me.  And he said unequivocally

10 Pradaxa contributed to her GI bleed, no doubt.

11      And then this was interesting because I thought I heard

12 him saying that he had an opinion on direct exam.  But when

13 I showed him that's not what he said in his deposition, he

14 had to agree with me.

15      And I -- hopefully I didn't annoy you all by having to

16 go back and forth with him on that deposition so many times,

17 but it's important to get the truth.

18      And what he said was, "I actually don't have an opinion

19 on whether the bleed contributed to her death.  I'm going to

20 defer that to some other doctors.  I'm not an expert in

21 that."

22      But we heard from other doctors.  Dr. Abdelgaber said

23 she never recovered.  She never recovered from that GI

24 bleed.  And who else?  Dr. Ashhab.  He said the same thing.

25 She didn't recover.  She had no reserve; the straw that

1    broke the camel's back.

2        And you'll recall he said, "It doesn't matter how heavy

3    that straw is.  It's just that last straw that makes it

4    happen."

5        And when you have a patient like Betty Knight, she's

6    had a heart attack before.  And she had this non-Q wave -- I

7    can't recall exactly how it's termed -- heart attack.

8    That's a lesser dangerous heart attack than the Q wave heart

9    attack.  That's what Dr. Crossley told us.

10       She would not have died from that heart attack if she

11   had a reserve, if she hadn't been so debilitated from the

12   bleed.

13       So when you get to, when you get to question 7, did

14   plaintiffs prove that Pradaxa proximately cause Betty

15   Knight's injuries -- and I want to make this clear too.

16       There's two issues here.  Did it cause the bleed

17   injuries?  That's one.  Did it cause the death?  That's two.

18       You may not agree with me on those two things.  You

19   don't have to.  Either one of those I think you should check

20   "yes."

21       Next is legal causation for the death.  Again, this

22   goes to proximate cause.  Again, proximate cause, a cause,

23   not the cause, a cause, caused or contributed to her death.

24       And what did we see in the records?  She didn't bounce

25   back.  July 12th, the day after her birthday, by the way,

1    and I think you recall what we heard about that.  She had a

2    heart attack in April and Rick had a birthday in May.  She

3    went to the birthday party.  She was doing well.

4         She had a GI bleed.  Then she had her own birthday,

5    July 11th, 2013.  She was so debilitated, they couldn't even

6    get together for dinner.  They'd never done that before.

7    That had never happened in this family before.  They always

8    celebrated her birthday together.

9         You saw another hospitalization June 22nd, weak and

10   debilitated, again referencing the bleed, same

11   hospitalization.  She's just not getting better.

12        Three days later, not getting better.

13        August 14th, debility.

14        August 23rd, debility.

15        The GI bleed.  We've talked enough about what happened

16   during that GI bleed, but we know that she had a

17   life-threatening GI bleed.  She had four units of blood.

18   Her hemoglobin dropped dangerously down to 6.

19        What did Dr. Shami tell us?  GI bleed?  Well, you

20   should be in the hospital two or three days and gone.  Very,

21   very unusual for her to send a GI bleed patient to skilled

22   nursing.

23        Not two or three days for Betty Knight.  It's three

24   weeks, three weeks.  That's not a normal hospitalization

25   even from the defense's own expert.

1    And she told us, "If that patient comes in on warfarin,

2  yeah, we can, we can give them reversal agents.  We can give

3  them fresh frozen plasma.  We can give them Vitamin K.  In

4  fact, I do that routinely.  That's what we do."

5    And then the part that -- again, I scratch my head at

6  several things in this trial, but she doesn't even prescribe

7  Pradaxa.  And she came in and tried to tell you all about

8  how safe it is and how good it is and how the label

9  adequately warns doctors about a drug she has never even

10  prescribed.

11    And then we see the discharge from skilled nursing.

12  Debility, general debility.  She did have various medical

13  problems and we're not trying to run away from that.  But

14  this was the straw that broke the camel's back, the severe

15  gastrointestinal blood loss, had her in the hospital and

16  skilled nursing for three weeks.

17    And here's the death certificate.  And I suspect

18  they're going to get up again and say, "Dr. Abdelgaber wrote

19  this and he didn't include GI bleed or Pradaxa."  You heard

20  that several times from them.  They're right.

21    And I have to be honest with you.  When I first saw

22  this death certificate, I had serious doubts about this case

23  too.  But I made a promise to Rick and to Claudia that I

24  would investigate thoroughly.

25    And, so, we went and talked to Dr. Abdelgaber.  We

1    didn't just look at the paper.  We went and took his

2    deposition and said, "Tell me about the bleed and how that

3    might have affected this."

4         And what did he say?  When he's asked himself, not just

5    on a piece of paper, he said declined after the GI bleed,

6    never really recovered, and that she came back in the

7    hospital multiple times after the May hospitalization each

8    time complaining she wasn't getting better.  And then she

9    passed away the last time she came in.  That's from his own

10   words.

11        And it -- you recall Dr. Shami yesterday said, well, he

12   only treated her for a couple months.  He didn't even see

13   all the records.  And I had to point out to her that by the

14   time we got to his deposition, not the time when he signed

15   the death certificate -- I agree.  He probably hadn't seen

16   most of the records.  By the time we got to his deposition

17   three years later, he had seen them all.  And he said she

18   never got better.  The bleed she never really recovered

19   from.

20        Okay.  So when you get to question 8, did plaintiffs

21   prove that Pradaxa proximately caused Betty Knight's death,

22   again, greater weight of the evidence; a cause, a cause, not

23   the cause, did it contribute to her death.  You should check

24   "yes."

25        And if you do that, then you move on to what's called

1  damages.  This is the hardest part for me to talk about.

2  It's the hardest part for me to comprehend.  What are the

3  damages that you award to a patient, to a person who's been

4  injured?

5      We don't have a perfect civil legal system, but this is

6  what we have.  When people are injured by somebody else's

7  conduct, the only thing we can do is award them money

8  damages.  We can't bring Betty back.  We can't give anymore

9  time to Rick and Claudia with their mother.  It's not

10  possible.  All we can do in our system is award money

11  damages.

12      And, so, what you'll see is two different kinds of

13  damages.  The first one is for the injuries.  This is the

14  injuries, not the death.  West Virginia law provides for

15  both of those.  There's economic damages and there's

16  non-economic damages.

17      Economic damages are the medical bills.  And you heard

18  from the Judge the medical bills introduced in this case are

19  to be considered reasonable and necessary.  That means what

20  she incurred, she had to incur.  And she's entitled -- the

21  estate is entitled to get those back.

22      And the only way you cannot find them reasonable and

23  necessary is if Boehringer has proven to you that those

24  bills weren't reasonable or necessary for her medical care.

25  They didn't put on one iota of evidence to try to refute

1     that.  I assume that means they agree those bills are

2     reasonable and necessary.

3          And you'll have the bills back there with you.  It's

4     Exhibits 2005, 2006 and 2007.  And you'll see that the total

5     of those medical bills from St. Mary's Medical Center, home

6     health, and the Huntington Internal Medicine group, which is

7     Dr. Abdelgaber, was $99,444.73.  That's the economic damages

8     that were suffered.  That's, that's the easy part.

9          Here's the hard part.  Pain and suffering.  What's pain

10    and suffering?  Betty Knight's pain and suffering during the

11    time between when she was injured and she died.  And it's

12    her reduction of her capability to function as a whole

13    person.

14         There's no formula for this.  There are suggestions we

15    can make and I can suggest to you.  Some juries look to the

16    medical bills as a starting point.  You base the pain and

17    suffering on some multiple of the medical bills.  That

18    happens.  I'm not telling you you have to do that.  I'm just

19    suggesting to you I've seen it done many times.

20         Whether her pain and suffering was two times what her

21    medical bills are, three times, five times, 10 times, that's

22    not up to me.  That is up to you.

23         But I will tell you the amount of money that she

24    incurred for medical expenses pales in comparison to the

25    pain and suffering she had during those last few months of

1  her life.  She couldn't even celebrate her own birthday with

2  her kids.

3      How do we know about this pain and suffering?  We heard

4  from Rick.  She had a toilet bowl full of blood when he got

5  to her house on May 20th.  He took her to the hospital.  She

6  was there for three weeks, didn't go home for three weeks

7  from a bleed that Dr. Shami said most people should get out

8  of the hospital in two or three days.

9      I don't know if you've ever spent time in a hospital,

10  but I can tell you one day in the hospital is excruciating.

11  She was there for three weeks.

12      That's her at skilled nursing.  That's where she had to

13  meet her great-grandson, not at her house, not Claudia's

14  house, at the skilled nursing facility.

15      So when it comes to damages -- excuse me, I'm sorry --

16  I would suggest to you that for economic damages it's the

17  medical bills.  Again, that's easy, $99,444.73.

18      Non-economic damages, that is up to you.  I've given

19  you some suggestions.  Use them.  Don't use them.  Use what

20  you think is fair.  That's all that the Knight family wants,

21  fair, reasonable, fair.

22      And then we move on to wrongful death damages.  And

23  you'll see here on that verdict form just below that if you

24  find that her death was caused by Pradaxa, or proximately

25  caused, excuse me, that it was a cause of her death, then

1    you can award wrongful death damages.

2        Again, there's no formula for that.  The Judge will

3    tell you what things -- he's already told you, excuse me,

4    things that you can consider when you're trying to come up

5    with what are wrongful death damages.  You'll have the, the

6    jury instructions back there with you.

7        But most importantly -- first of all, part of that is

8    medical bills.  That's already taken care of.  There's not

9    another set of medical bills and you shouldn't award medical

10   bills twice.  That, that wouldn't be reasonable.

11       But what I think is important is there are claims to be

12   awarded damages through here to Rick and Claudia.  That's

13   the way the law works in West Virginia.  And I'll read this

14   to you again.  The Judge has already read it to you.

15       That you can award -- when you are making your award of

16   damages to Rick and Claudia, because they're the

17   beneficiaries of the wrongful death claim, you can consider

18   the sorrow, mental anguish, and solace suffered as a result

19   of Ms. Knight's death.  This may include loss of society,

20   companionship, comfort, guidance, kindly offices, and advice

21   of Betty Knight.

22       You heard from Rick and Claudia both.  They saw Betty

23   multiple times a week.  They talked to her every day.  She

24   was with them at every holiday.  She was with them on

25   vacations.  She was part of their lives.  She was a mom.

1    She was a friend.

2        And, yes, she was 84 years old.  But wrongful death

3    damages are awarded whether you take away 50 years of

4    someone's life or 50 hours of someone's life.  You've taken

5    away from them something that shouldn't have been taken

6    away.  That's how you measure it.

7        Now, all I would suggest to you there is whatever you

8    awarded for the personal injury economic damages, I would

9    say that's a starting point.  Wrongful death damages are

10   significantly more than that.  And, again, that formula is

11   up to you to decide.  I just told you that part.  You'll see

12   that back there again.

13       You can also award conscious pain and suffering for the

14   time that Betty was injured to her death.  But, again, we've

15   already talked about that as part of her economic damages

16   for the injury, so that shouldn't be awarded twice.

17       And this -- for wrongful death this is what we're

18   talking about.  This is the family.  That's Betty with her

19   grandson.  That's Betty dancing with her grandson at his

20   wedding.  She won't get to do that with her other

21   grandchildren.

22       That's Betty with her great-grandchildren.  She won't

23   see them graduate from high school.  She won't see them get

24   married.

25       That's Betty at the *We Are Marshall* premier with Rick

1   and Claudia.

2       That's Betty's birthday, not in 2013 because they

3   couldn't celebrate that year, but that's Betty's birthday a

4   year or two before.

5       And that is what this case is really all about.  Betty,

6   Rick, Claudia, a family unit, a tight family unit.  That's

7   how you -- those are the things you need to consider when

8   trying to determine damages for wrongful death.

9       The last thing as far as damages is something called

10  punitive damages.  You don't have to -- if you decide that

11  Boehringer's conduct was reckless and outrageous with

12  indifference to the health, safety, and welfare of others,

13  then we've proven punitive damages.

14      Punitive damages are not to award the Knight family.

15  That's to punish Boehringer, to tell them, "Don't come to

16  West Virginia and lie to patients.  Tell patients the

17  truth."

18      And, so, this is about Boehringer's conduct.  It's

19  awarded to punish and deter.  Don't do it again.  Don't do

20  this again.  That's what it says to a defendant.

21      Boehringer, this is all about them.  Marketing should

22  not influence the content of the label.  They agree.  We saw

23  in the fraud part of this presentation marketing, marketing,

24  marketing.

25      Even though the world is crying -- this is an internal

1    document from their own scientist, "The world is crying for

2    this information."  Don't give it to them.

3         As far as what they told the FDA, we never recommended

4    to the FDA you should measure Pradaxa levels.  It would be

5    helpful to avoid excessive high exposure.  No.  We just tell

6    doctors everywhere else in the world that, not here.

7         We never told them there's a specific number of a blood

8    level that would be a cutoff value.  Don't go over that

9    amount.  No, we never told the FDA that.

10        We never told the FDA there's a number, don't, don't go

11   past it because it increases the risk of bleeding and it

12   makes that increase too much.  No, didn't tell the FDA that.

13        And why?  It's a goal.  Sell as much Pradaxa as

14   possible.

15        Why didn't they tell Betty Knight the truth?  You saw

16   this in my opening statement.  There's a huge potential

17   market here.  Millions of people have atrial fibrillation.

18   It requires life-long treatment.  This was to be a

19   blockbuster billion-dollar drug as long as there was no

20   requirement that you monitor the patient's blood levels.

21   That was an absolute necessity to make this drug a success.

22        This is what I showed you at the beginning of the case.

23   This is what we expect we'll hear from the defense.  And

24   that is what we did hear from the defense.

25        Betty Knight was sick, very sick.  Yeah, I agree.  But

1  you will see in the instructions and Judge, Judge Chambers

2  has already told you if Betty Knight had a physical or

3  emotional condition that was aggravated or made worse by

4  Boehringer's wrongful conduct, you may award damages that

5  will reasonably and fairly compensate plaintiffs for the

6  aggravation or worsening of the pre-existing condition.

7      If you find that Betty Knight was more susceptible to

8  injury than a normal person, she's sick, she's not a normal

9  person for these purposes, then you may still award damages

10  to plaintiffs for the injuries caused by Boehringer even if

11  a normal, healthy person would not have suffered similar

12  injuries.

13      You got to keep that in mind when they come in here and

14  say she was sick, sick, sick.  That is how they -- that's

15  the person they market this drug to, elderly atrial

16  fibrillation patients.

17      Don't sell a drug to a sick patient population and then

18  say it's not our fault when we hurt them because they were

19  already sick.  You can't do that.  And that's why the law

20  says if you make them worse, you're on the hook for it.

21      They'll say Betty Knight, Betty Knight had to be

22  anticoagulated.  Yeah.  What did Dr. Crossley tell you?

23  Warfarin was appropriate for her.

24      What did Dr. MacFarland tell you?  She didn't bleed or

25  have a stroke when she was on warfarin.  She could have

 1   stayed on warfarin.

 2        They'll tell you FDA approved Pradaxa.  And they did

 3   based on the information that Boehringer gave them, not on

 4   any test the FDA did itself.

 5        They'll tell you Pradaxa -- or they told you Pradaxa is

 6   better than warfarin.  We have no data to prove that for

 7   patients like Betty Knight or for this dose.  You've got a

 8   computer model that they ran.  That is not proof that

 9   Pradaxa is better.

10        And then they told you Plavix caused this bleed.  They

11   brought you Dr. Shami who after on direct she said all kinds

12   of stuff about the medicine and had to admit, "I actually

13   don't have any opinion on that."

14        They brought you Dr. Crossley who said, well, Pradaxa

15   was a cause of the bleed.  It contributed to the bleed.

16   Remember the proximate cause.  It could be more than one

17   thing.

18        And you'll recall that Betty had taken Plavix before

19   when she was on Coumadin.  She did not have a bleed.

20   Remember those things.

21        Before I sit down and defense counsel gets up, I want

22   to leave you with two questions.  Hopefully they'll answer

23   to you.

24        First one:  Why did they not tell Betty Knight any of

25   these five things?  If they have a good, reasonable

1    explanation, I have yet to hear it.

2        The second thing:  Why not tell doctors in this country

3    how to test Pradaxa blood levels and what level is too high

4    just like you tell doctors in the rest of the world?  Why

5    don't you do that?  Because I haven't heard an explanation

6    for that either.

7        I'm going to sit down now.  I'm going to have a few

8    minutes after Ms. Jones is done.  Hopefully she'll answer

9    those questions for you.

10       Thank you.

11           THE COURT:  All right.  We're going to take a

12   brief recess before we move to the defendant's closing

13   argument.  So we'll take about 10 minutes or whenever you're

14   ready.  My Court Security Officer will be there.  Just let

15   him know.

16       Please remember that you've only heard the plaintiffs'

17   closing argument, not the defendant's.  So don't discuss the

18   case or these closings.  Wait until you've heard everything.

19       Thank you.  We'll reconvene in about 10 minutes.  We'll

20   stand in brief recess.

21       (Recess taken at 11:47 a.m.)

22

23

24

25

1856

1     (Back on the record at 11:55 a.m.)

2          THE COURT:  All right.  Are we ready?

3          MS. JONES:  We are, Your Honor.

4          THE COURT:  Let's bring the jury in.

5          Mr. Childers, you have about 15 minutes left.

6          MR. CHILDERS:  Thank you, Your Honor.

7     (Jury present.)

8          THE COURT:  All right.  We're ready to proceed.  You

9     may be seated.

10          Closing statement.

11          MS. JONES:  Thank you, Your Honor.  And good afternoon

12     to all of you.

13          I'm very happy to have a chance to speak with you

14     again, and I want to start where Mr. Childers started.  I

15     thank you all for your time and your attention.  We've had a

16     couple of long weekends, and I will tell you sometimes jurors

17     don't come back after three- or four-day weekends.  So we are

18     very grateful for everything you've done to serve as jurors in

19     this case.

20          I told you at the very beginning of the case that

21     losing a loved one is a tough thing, it's a difficult thing.

22     And as we've gone through the evidence, it occurs to me that

23     it's also a universal thing.  It is one of those things where

24     we all share the experience of losing someone who is dear to

25     us.  And I suspect there's not a single person in this

1857

1  courtroom who hasn't heard the testimony of the plaintiffs and

2  related to some of what they had to say.

3      What stuck in my memory was when Mr. Knight was

4  testifying, and he said, you know, you're never ready.  No

5  matter what has happened with someone, you're never ready to

6  lose someone you love.  And so if you have felt sympathy or

7  related to what you heard, we don't ask you not to feel that

8  way.  Our case does not depend on you not having sympathy for

9  the Knight family.  Our case depends on you all doing exactly

10  what you committed to at the beginning of this case three

11  weeks ago and what the judge has instructed you to do, to make

12  a decision based on the evidence.  That's all we ask.

13      And that's really important.  It is the way our system

14  works.  It's the only way we know that our system works for

15  every single one of us, is that folks like you take time out

16  of your lives, and you take an oath, and you say I'm going to

17  make a decision based on the evidence.

18      Now we recognize you all did not pick us, we picked

19  each and every one of you.  And the reason that we did that is

20  because we were confident that you would each keep that

21  commitment to decide the case based on the evidence, in the

22  same way that we know that you keep your commitments in your

23  personal relationships, in your profession fields of endeavor,

24  as members of this community, as citizens of this country.

25  That's why we chose each and every one of you.

1858

1           Now one thing that Mr. Childers said at some point in

2       his closing was it can be tough -- it's important to get to

3       the truth.  It is important, we agree on that.  One question

4       that occurred to me when he said that was how on Earth do you

5       do that in a case like this when there's been so much

6       evidence, and the lawyers have gone back and forth so much

7       with the witnesses, have said things that seem to be different

8       on both sides of the case.

9           Let me suggest to you what the judge has already

10      instructed you on, that you rely on the evidence that is more

11      persuasive or more convincing.  In a case like this, where

12      it's all about Mrs. Knight, her experience on warfarin, her

13      experience on Pradaxa, what happened with her in 2013, the

14      most persuasive, the most convincing evidence is not bullet

15      points on a slide.  It's not summaries of what lawyers say

16      something meant from either of us.  You don't have to take our

17      word for anything.  The most persuasive, the most convincing

18      evidence is what did Ms. Knight's doctors say.  At the time,

19      in the real world, before there was a lawsuit, before any of

20      us lawyers got involved and started asking folks questions,

21      what did they say?  What decisions did they make?  What did

22      the medical records, many of which you have now seen, reflect

23      about what they thought was going on with Mrs. Knight?

24          And I told you at the beginning of the case, I invited

25      you, take everything we say and compare it to the evidence.

1859

1    Make sure that you're pressure-testing what you've been told

2    by counsel against the evidence.  And let me give you an

3    example of why that is really important in this case.

4         In opening statements, you were told this by counsel.

5    You'll hear from Dr. Abdelgaber.  That was Mrs. Knight's

6    primary care doctor.  He'll say she just didn't bounce back,

7    she didn't recover like I had hoped she would, and then she

8    passed away.  That's what you were told in opening, and then

9    you saw the evidence.

10        This is Exhibit 9001.  This is the death certificate

11   for Mrs. Knight from September of 2013.  What Dr. Abdelgaber

12   said in September of 2013 was not that he thought that she had

13   a GI bleed, and she just never recovered.  What he said was I

14   think she passed away because she had a heart attack, because

15   she had serious coronary disease, which you've now heard

16   described Dr. Crossley, and that's what led to her passing.

17        Now what struck me as we got to the end of the case

18   yesterday, and still sticks with me now, is if we hadn't shown

19   you this document, if we had not moved it into evidence, I'm

20   not sure you ever would have seen it.  Counsel for plaintiffs

21   did not show the death certificate for Mrs. Knight to a single

22   witness in the case.

23        Dr. Ashhab testified for an hour and a half, maybe two

24   hours on direct about what he thought about what had happened

25   with Mrs. Knight.  He was never asked about the death

1   certificate.  He was never asked how do you square what you

2   said to what her primary care doctor said at the time about

3   what led to her passing?  He was never asked that question.

4        Mr. Lewis, you might remember, got up on

5   cross-examination.  He was the one who first entered that

6   document into evidence and asked Dr. Ashhab, have you seen

7   this?  Have you ever considered this document?

8        Do you remember what Dr. Ashhab said?  He said, I

9   don't think so.  I'm not sure that I've ever seen it.  He had

10  testified to a reasonable degree of medical certainty about

11  what happened with Mrs. Knight, and he never considered what

12  is arguably the most important piece of what we describe as

13  contemporaneous, and that just means real time, evidence on

14  the subject of what led to her passing.

15       And Mr. Childers, he has some time left over.  They

16  have the burden of proof, and so he gets to stand back up and

17  talk some more.  And he may tell you, he may explain why it

18  was that they never showed that document to their only

19  causation medical expert.  He may tell you why they didn't

20  even show the document to Dr. Crossley or to Dr. Shami.

21       You never heard that they thought the document was

22  incorrect, that it was inaccurate.  Even Dr. Ashhab, he said,

23  yeah, that is what he says.  He never said it was incomplete.

24  He never said it was wrong.  Mr. Childers might explain that

25  for you for the first time on the last day of presentations by

1861

1   the parties.  But this is what I mean when I say take what we

2   say and compare it to the evidence.

3          Now I'm going to walk through some of that evidence in

4   a slightly different order.  You have seen the verdict form

5   already, and I'm actually going to start with the questions

6   that are in section B.7. and B.8., what we've generally

7   described as medical causation.  Those are the questions that

8   Mr. Childers walked through with you on whether or not

9   plaintiffs had proved that Pradaxa caused either Mrs. Knight's

10  bleed or caused her passing in September of 2013.

11         And I told you at the beginning of the case that that

12  was really a central issue.  That even though they have five

13  claims, they are really all failure to warn claims.  But even

14  though they only have five claims, for every single one of

15  those claims, they have to prove causation on both of those

16  points.  If you're not persuaded of that by a preponderance of

17  the evidence, you have to answer no as to each and every one

18  of those claims, and so I want to start by talking about those

19  issues first.

20         Mrs. Knight, I told you at the beginning of the case,

21  it's awfully hard to understand what happened with her in

22  September of 2013 without understanding what had been going on

23  with her for years.  And you've seen in those medical

24  records -- bless you, Your Honor.  And you've seen in those

25  medical records, Mrs. Knight had a number of chronic, very

1862

1    serious medical conditions that her doctors were helping her

2    with.

3         And at some point in the trial, I think Mr. Childers

4    said, well, she was more than just her medical records, she

5    was a person, and that's absolutely true.  You see that in the

6    pictures of her and her family, her grandkids and her great

7    grandkids.  She was a person, but this is a case about her

8    medical care and her medical treatment.  Their claims are

9    about her medical care and her medical experience.

10        And I'm going to tell you, there was more to her

11   medical history than the fact that she had a GI bleed in May

12   of 2013.  There was a fuller story there that wasn't shared

13   with you during the plaintiffs' case.

14        For example, you were told, I think over and over

15   again, that before Mrs. Knight ever had a GI bleed, she had

16   hospitalizations, but she always bounced back.  That became

17   almost like a catch phrase during the course of the trial.

18   Dr. Ashhab used that phrase.  He never showed you any of the

19   medical records relating to how Mrs. Knight actually did when

20   she was -- prior to when she was on Pradaxa, before she had a

21   GI bleed.  These are those records, hospitalization after

22   hospitalization from various things.  That is not bouncing

23   back.

24        And after some of those hospitalizations, just to give

25   you an example, back in 2008, she had a nine-day stay in the

1863

1    hospital for acute respiratory failure.  Then after that, she

2    had to spend eight days in a skilled nursing facility.  And

3    even after that, she still reported issues with her diabetes.

4         Here's another example.  In October of 2011, Mrs.

5    Knight had to go to the hospital because they thought she had

6    had a heart attack.  She had that elevated troponin that you

7    heard about from Dr. Crossley.  And after that, she had to

8    spend two weeks in a skilled nursing unit, all before she ever

9    had a GI bleed.  She didn't bounce back from these things.

10        And that doesn't mean that she was a bad person or

11   that her doctors were bad doctors.  I think looking at her

12   records you can tell that her doctors, folks right here in

13   Huntington, were doing the very best that they could to try to

14   take care of her.  It doesn't mean that her children,

15   Mr. Knight and Ms. Stevens, didn't care about her and didn't

16   try to do what they could to help her.  But she had a complex

17   medical history, which you heard very little about in the

18   course of the plaintiffs' case.

19        One of the things that you didn't really hear about

20   until just yesterday was the fact that Mrs. Knight had very

21   serious coronary artery disease.  And that's just a function

22   of the way the trial goes.  The plaintiff gets to put their

23   case on first, so we didn't have a chance to call our

24   cardiology expert until later in the case.  But you then got

25   to hear what was going on with Mrs. Knight well before she

1    ever took Pradaxa, well before she ever had a GI bleed.

2        Remember Dr. Crossley got up, and he showed you on

3    that big board of the heart.  He described what was going on

4    with Mrs. Knight, that she had blockages all over the left

5    side of her heart, she had blockages on the right side of her

6    heart.  It was so serious that her doctors had to place two

7    metal stents in her heart because they were trying so

8    desperately to try to protect her from having a heart attack.

9        That's the full picture of Mrs. Knight's medical

10   history.  And the reason that we talked about it, the reason

11   that we spent so much time about it with the only expert

12   cardiologist you heard from in the case is because this is

13   what Mrs. Knight's doctors said led to her passing in 2013.

14   That's why we spent time on it.  That's why we thought you

15   were entitled to see and know about that evidence.

16       And you heard from Dr. Crossley, even in patients who

17   have coronary artery disease and they don't have a heart

18   attack, they can still have incredibly serious symptoms.  And

19   you see that all throughout Mrs. Knight's medical records,

20   congestive heart failure, coronary disease.  You saw repeated

21   references of her having chest pain, cardiomyopathy, that

22   disease of the heart muscle that impairs its ability to

23   function.  All of this before she ever had issues with

24   Pradaxa, before she ever had a GI bleed, this was her state of

25   living.  This was her state of being for a long, long time.

1865

1    This is what her doctors were trying to help her with.

2         Now you've also heard that Mrs. Knight took Pradaxa,

3    and she took Pradaxa because she was a patient who had atrial

4    fibrillation and was at a very high risk of having a stroke.

5    I don't think there has been any question in the case that

6    Mrs. Knight had to be anticoagulated.  The reason Mr. Childers

7    knew I was going to say that is because that's the evidence.

8    Those are the facts in the case.

9         Mrs. Knight was on Pradaxa for two years, from October

10   of 2011 until September of 2013.  And one of the things I

11   think is really important that you know, just based on the

12   records -- and this isn't disputed either -- Pradaxa worked

13   for Mrs. Knight.

14        You've heard about warranty claims that have been made

15   in this case, warranty claims that require a showing that

16   somehow the product didn't work the way that it was promised.

17   The product worked.  Mrs. Knight was told this is a medicine

18   that is prescribed to keep you from having blood clots.

19   That's exactly what it did.  For two years, she was well

20   managed on the medicine.  That is the evidence relating to her

21   experience with Pradaxa.

22        Now even though Mrs. Knight's atrial fibrillation was

23   being dealt with, her stroke risk was being dealt with, her

24   heart disease was continuing to progress.  And in April of

25   2013, you've now seen this evidence, Mrs. Knight had a heart

1866

1   attack in April of 2013.

2          And I almost thought I heard Mr. Childers say, well,

3   that wasn't a serious thing.  That wasn't a serious event.

4   And you can test that claim against your own common sense,

5   against your own life experience, and you can test it against

6   the actual medical records in the case.

7          Her doctors went back into her vessels to look to see

8   what was going on, and they found additional 90-percent,

9   95-percent blockage in her vessels.  And when they actually

10  wrote in the medical records whether this was something that

11  had been there before or whether it was new, they said these

12  are new blockages.  This is something else that has occurred

13  since she had her stents in 2008 and 2009.

14         She had progressive disease, not because she did

15  anything wrong.  We know now, based on the evidence, that she

16  wasn't able to take statins.  She had an allergic reaction to

17  statins that caused her to have muscle pain, and so it was

18  hard for her doctors to be able to treat her as effectively

19  for that reason.  That wasn't her fault, but it meant that her

20  coronary artery disease was able to progress more than it

21  might have otherwise.

22         That was the thing that changed for Mrs. Knight in

23  April of 2013.  Not that she had been on Pradaxa, and she had

24  a problem.  It was the fact that she had a heart attack, and

25  her doctors had to place two additional stents in two more

1867

1  vessels of her heart because they trying to keep those vessels

2  open so that she wouldn't have a heart attack.  And that

3  created that challenge, what you heard described by I think a

4  couple of the doctors as a rock and a hard place, where you

5  have a patient who needs to be protected from stroke, and so

6  they're on an anticoagulant, and you also need to protect that

7  patient from developing a clot on that metal stent that's been

8  placed in the heart.

9        Dr. Crossley, again the only expert cardiologist you

10  heard from -- they didn't bring a cardiologist to talk to

11  you -- he's treated lots of these patients, and he has told

12  you that's a delicate, difficult situation.  Those patients

13  are at an increased risk of bleeding no matter what.

14        That's why the Medication Guide, the Medication Guide

15  for patients says specifically your risk of bleeding might be

16  higher if you're on Pradaxa and you're on Plavix and you're on

17  aspirin.  We warn about that.  That's why the labeling for

18  doctors said one of the risks of bleeding is if you're also on

19  antiplatelet agents.  That's our warning.

20        You heard claims about malice and fraud and lying to

21  people.  This is what the company told patients and told

22  doctors about the risks related to the situation that Mrs.

23  Knight found herself in in April of 2013.  And there's no

24  evidence in the case that her doctors didn't fully appreciate

25  that risk for Mrs. Knight at that time.

1    Now, there was a lot of back and forth with words like

2    trigger, what triggered the bleed, what caused the bleed, what

3    was the source of the bleed.  These are the facts.  Mrs.

4    Knight was on Pradaxa for 19 months.  She had no bleeds.  She

5    had no strokes.  Even Dr. Ashhab acknowledged she was on that

6    medicine for a long time, and she had no problems.  There is

7    not even a whisper in the medical records that she was having

8    an issue with Pradaxa.

9    But after she had a heart attack, she had her stents

10   placed, and they added Plavix to her existing medicine regimen

11   of Pradaxa and aspirin, she was on triple therapy.  And about

12   a month after that happened, she had a GI bleed.

13   Now, you've been told a lot about what Dr. Shami said

14   or didn't say or what Dr. Crossley said or didn't say, and you

15   can sort that out in your own judgment.  But look at what her

16   doctors said about what they believed had led to Mrs. Knight's

17   bleed.  This is a record from around that time where it

18   specifically says she was put on Plavix, which probably

19   triggered her bleed.

20   And you can also draw reasonable conclusions based on

21   how her doctor responded after she had that GI bleed.  It was

22   stopped within a day.  That's also not disputed.  We didn't

23   fuss about that.  They managed her bleed, they got it under

24   control, and then they put her back on Pradaxa.

25   This is another record where you can see her doctors

1869

1    said they didn't want her back on Plavix because they were

2    concerned about the GI bleed.  But they said, I don't think

3    that the Pradaxa could be held because she's got a risk of

4    clots.  She's at a very high stroke risk, and they put her

5    back on Pradaxa.  She continued on that medicine until

6    September of 2013.  She had no issues, no bleeding, no stroke.

7         Now you have to use your own common sense in

8    understanding the chronology here.  Even if you put to the

9    side what all of the witnesses you saw here said, look at what

10   her doctors did at the time.  If her doctors believed that

11   Pradaxa had caused her to have what they have described as a

12   severe life-threatening bleed, if they believed that, do you

13   think that they would have put her back on Pradaxa and let her

14   stay on that medicine?  No.  No, that's a reasonable

15   conclusion that you can draw from the evidence.

16        Now you've been shown a portion of the jury

17   instruction on this issue, and I want to say something very

18   clearly.  If you're on an anticoagulant, you have an increased

19   risk of bleeding.  That's the case whether you're on Pradaxa

20   or warfarin or Xarelto or Eliquis.  That is no -- no question,

21   that is the case.  And you've been told, well, if Plavix

22   triggered it, that's okay because Pradaxa can be another

23   proximate cause, and that's what the instruction says.

24        The part of the instruction that wasn't read to you

25   was this one:  Boehringer's conduct proximately caused the

1870

1    injury if the conduct, in the natural and probable sequence of

2    events, brought about the injury, and the injury would not

3    have happened without the conduct.

4         Now what does that mean on Mrs. Knight's facts, in her

5    situation?  What they have told you is if Mrs. Knight had just

6    been kept on warfarin, then she wouldn't have had that bleed.

7    That's what they've told you.  That's what they have tried to

8    persuade you.  That is the basis for their claim that Pradaxa

9    was a proximate cause.  And you will have the instruction in

10   the back where the judge has told you they have to demonstrate

11   that the injury would not have happened.  And in her

12   circumstance, that means if she hadn't been on Pradaxa, but

13   was on some other anticoagulant.  There's no evidence of that.

14        For one thing, every gastroenterologist told you that

15   that lesion in Mrs. Knight's colon, what you heard described

16   as an AVM or an arteriovenous malformation, that can bleed

17   whether you're on an anticoagulant or you're not on an

18   anticoagulant.  Every single GI doctor, including Dr. Ashhab,

19   told you that.  Those are common in older people.  Whether

20   you're on a blood thinner or not on a blood thinner, they're

21   prone to bleeding because those vessels are all twisted up,

22   and they are more fragile than they would normally be.  That's

23   the evidence.

24        The other thing is that by April of 2013, Mrs. Knight

25   would have been a very high risk warfarin patient.  Dr.

1   Ashhab, during his cross-examination, was shown the labeling

2   for warfarin.  You will have this back in the jury room with

3   you, and you see right there in the hemorrhage section, it

4   says coumadin or warfarin can cause major bleeding or fatal

5   bleeding, and it goes on to list 13 risk factors for bleeding.

6   Mrs. Knight, by April of 2013, had 10 of those.

7        Now some of those risk factors were risk factors that

8   would have applied with Pradaxa as well.  She was older.  She

9   had renal problems.  Those are things that increase your risk

10  whichever drug you are on.  But the label for warfarin also

11  tells you, if you had a high intensity of anticoagulation,

12  that means that your INR levels have been high, what you saw

13  in the evidence, that increases your risk.

14        If you have highly variable INRs, that factor No. 3 --

15  you saw that zigzag chart throughout the course of the case --

16  that can increase your risk.  They tell you at the very bottom

17  of the list, if you've had a long duration of warfarin

18  therapy, that can increase your risk of bleeding on the

19  medicine.  By April of 2013, Mrs. Knight would have been a

20  very high risk patient to have on a medicine like warfarin.

21        And even Dr. Ashhab, on cross-examination, he had to

22  agree these risk factors would have only gotten worse with

23  time.  She would have gotten older, and her bleed risk would

24  have gone up.  She would have been on the medicine longer, and

25  her risk of bleeding on warfarin would have gone up.  That is

1872

1     the evidence, including evidence that even their own expert

2     confirmed.

3         Now one thing that you've heard is, well, Mrs. Knight

4     was on Plavix and aspirin and warfarin back in 2009, and she

5     didn't bleed, so that means she wouldn't have bled in 2013.

6     And you heard Dr. Crossley's response to that.  That is

7     speculation at best.  And actually what we know is that Plavix

8     and aspirin present the same issues for warfarin as they do

9     for Pradaxa.

10        This, again, is the labeling for warfarin, the doctor

11    labeling.  And this specifically mentions both aspirin and

12    clopidogrel, which is also known as Plavix, as drugs that can

13    increase the bleeding risk for patients who are also on

14    warfarin.

15        You remember yesterday, Dr. Crossley and I went

16    through that paper, I think the lead author was called Ganz,

17    and it was a study that people had done to look at, from the

18    the RE-LY study, how did patients do when they were on triple

19    therapy with warfarin versus triple therapy with Pradaxa.  You

20    remember what Dr. Crossley told you?  They didn't see any

21    difference in the results.  People did the same, they had

22    equivalent numbers of bleeding, except for brain bleeding

23    where Pradaxa patients did better.  Otherwise, there was no

24    indication that the outcomes were different for patients on

25    warfarin versus patients who were on Pradaxa and had triple

1873

1    therapy.

2          Now they spent a lot of time in the course of the case

3    talking about this statement, that Mrs. Knight never had a GI

4    bleed while she was on warfarin.  We spent a lot of time on

5    that issue, and there's a reason for that.  And that's because

6    their medical records, record after record after record, that

7    report her doctors used at the time in the real world, before

8    lawyers were ever involved, saying things like she has been on

9    coumadin for atrial fibrillation, but this was stopped because

10   of her chronic bleed.  That is the evidence.  She had not been

11   on coumadin because of a GI bleed.

12         Another record from Dr. Gunnalaugsson in May of 2009,

13   she has had bad GI bleeds in the past.  Those were the

14   records.  And a lot of the time that we spent was spent with

15   counsel trying to explain away the plain language in the

16   document.

17         And there was almost a suggestion yesterday during Dr.

18   Crossley's cross-examination that maybe Dr. Gunnalaugsson had

19   said, oh, I got it wrong, that maybe at his deposition he said

20   something different.  Let me tell you, if Dr. Gunnalaugsson

21   had testified at his deposition those records were wrong, I

22   don't really think she had a GI bleed, you would have seen

23   that testimony.  They didn't play that testimony to you.

24   There was no evidence that Dr. Gunnalaugsson believed anything

25   other than what he wrote in his records, that he believed that

1874

1    she had had GI bleeds on warfarin.  And you saw him making

2    decisions about her care based on his concerns about her

3    having another bleed while she was on warfarin.

4         And even Dr. Ashhab, remember Mr. Lewis cross-examined

5    him on the topic of what he looked at to testify with such

6    certainty that Mrs. Knight had never had a bleed on warfarin.

7    You remember this?  He said, actually there were three years

8    of warfarin records that he had never considered, that he had

9    never evaluated.  I think Mr. Childers said, oh, well, Dr.

10   Ashhab looked at all the records.  His sworn testimony was for

11   2005, 2006, 2007, all the years when we know that Mrs. Knight

12   was on warfarin, he never looked at those records.  He never

13   confirmed that there wasn't evidence of a GI bleed in those

14   records.  And you're entitled, you're entitled to more than

15   speculation from a paid expert who didn't look at everything

16   that he would need to to give you reliable evidence and

17   opinion on that topic.

18        Now the other thing that you heard is that Mrs. Knight

19   was somehow at some special risk on Pradaxa because she was

20   over-anticoagulated.  And Mr. Childers told you, you'll have

21   all of those medical records back there with you, there is not

22   a single one where a doctor who cared for her said I think she

23   might be over-anticoagulated.  No doctor ever said that about

24   Mrs. Knight when she had her GI bleed in April of 2013.

25        And even the evidence that Dr. Ashhab points to

1875

1    doesn't support this theory of what you heard described by

2    counsel as over-anticoagulation.  He pointed to three separate

3    things, her patient factors, the fact that she was a woman,

4    that she had bad kidneys.  He pointed to the fact that she had

5    an elevated aPTT.  And he pointed to the fact that she had

6    lost a lot of blood during her GI bleed in the spring of 2013.

7         Let's talk about the first one.  During her entire use

8    of the medicine Pradaxa, Mrs. Knight had all of those patient

9    factors that Dr. Ashhab talked about.  She was on Coreg.  She

10   was on aspirin.  She was a woman.  She was older.  She was in

11   her -- moving towards her 80s, in her early 80s.  She had

12   impaired kidney function.  She had all of these factors.  She

13   never had an issue on the medicine except when she was placed

14   on Plavix.  She was otherwise fine.  There is no reason to

15   believe based on the evidence that Mrs. Knight was ever

16   over-anticoagulated because of her patient factors.  That is

17   not evidence of over-anticoagulation.

18        He also pointed to the fact that she had gotten this

19   aPTT reading.  An aPTT is just a measure of how quickly your

20   blood is clotting.  So if you are on a blood thinner, it will

21   take longer.  That is just the way it works medically.

22        And you saw here her range was 47.  Her number was 47.

23   She was within a reference range of 25 to 37.  As it turns

24   out, all of these doctors testified you would expect a patient

25   who was on an anticoagulant to have a higher aPTT level.  That

1876

1    is what you would expect because anticoagulants slow down the

2    rate at which your body actually creates a clot.  That is

3    the -- that's how they're supposed to work.

4         And then the last thing he cited is the amount of

5    blood.  And you heard from Dr. Shami, there is no evidence to

6    suggest that the amount of blood that Mrs. Knight might have

7    lost in April of 2013 -- excuse me -- May of 2013, that that

8    signaled over-anticoagulation.  And certainly you don't see

9    anywhere in her medical records, not a single doctor, not a

10   single nurse, not a single person who treated her, laid hand

11   on her in real time say I think this is a patient who is

12   over-anticoagulated.

13        And, again, just use your common sense, what you know

14   about medical care.  If her doctors believed that, that she

15   was over-anticoagulated on Pradaxa, would they have put her

16   back on the medicine and allowed her to continue on the

17   medicine until she passed away in September of 2013?  The

18   evidence doesn't support that theory.

19        And actually what you saw when Dr. Ashhab was actually

20   pushed on this testimony -- this was his direct testimony.

21   Did you form an opinion on whether or not she was

22   over-anticoagulated?  He said, I did, I think she was

23   over-anticoagulated.

24        And then Mr. Lewis got up, and he asked Dr. Ashhab:

25   Your conclusion that Mrs. Knight was over-anticoagulated at

1    the time of a bleed that had apparently started several days

2    before, the fact is you're guessing, right?  That was the

3    question.

4         Do you remember what his answer was?  Yes.  Full stop,

5    no explanation.  Yes, I'm guessing.  That is not evidence.

6    You can't reach a verdict based on a guess.  You're entitled

7    to more than just guesswork when you have to reach an

8    important decision in the case like this one.

9         Now after Mrs. Knight's bleed was treated, you heard

10   that she had a colonoscopy, and they went in and they

11   evaluated what was going on.  Her doctors treated her bleed

12   the same way that the Pradaxa label for doctors said that

13   that's what you need to do.

14        And you heard a lot about this was a life-threatening

15   bleed, this was a severe bleed.  And we don't quibble with the

16   idea that this was a serious event that required medical

17   attention.  That is not a dispute in the case.  But it was

18   treated.  Within a day of her coming to the hospital, they had

19   gotten that bleed under control, just like the label

20   recommends.

21        First of all, stop Pradaxa.  The label says

22   discontinue treatment with Pradaxa.

23        They transfused blood.  The label says initiate

24   appropriate clinical support, give blood.  That's how you

25   treat GI bleeds.

1    They performed a colonoscopy.  You saw the deposition

2  testimony of Dr. Huh, a doctor right here in Huntington, who

3  did her colonoscopy.  That is what the label says to do,

4  investigate the source of the bleeding.

5    And then they evaluated her aPTT to figure out what

6  might have been going on with respect to the medicine, and

7  that's what the label says, too.  When it's necessary, you can

8  use aPTT to assess her anticoagulant activity in patients on

9  Pradaxa.  Her bleed was managed in exactly the way that the

10 label recommends, and it was successfully managed.

11   Even Dr. Ashhab, this was his testimony.  He was

12 asked:  Within 24 of presenting to Dr. Huh, Mrs. Knight was

13 stabilized, and her AVM was treated, correct?  He said yes.

14 He said that I would view that as a successful treatment of an

15 AVM.  That bleed was stopped.  It was stopped fully in May of

16 2013.

17   Now at the same time Mrs. Knight had other medical

18 issues.  She had a heart attack, as you know, in April of

19 2013, and she continued to have heart issues as time went on.

20 Now there is a reason that, even after a long trial, I spent

21 time with Dr. Crossley to talk through each of those records

22 of her care in the summer of 2013.  That's because I think you

23 are entitled to know exactly what her doctor said about what

24 was going on with her at that time.

25   And you were shown this slide during counsel's

1879

1     argument earlier.  This is what you were shown.  You may

2     remember it.  They are all of these little clips from the

3     records, and I'm going to encourage each and every one of you

4     to go and back locate these records and look at them.

5          Not a single one of those records says we think that

6     her debility, her weakness, the fact she's not doing well was

7     caused by her GI bleed.  Not one of those records says that.

8     And there's a reason that they didn't put that on the slide

9     because it's not anywhere in those medical records.

10         Dr. Crossley told you, when he testified yesterday,

11    that the reason that she was continuing to have issues was not

12    because of her GI bleed, but because she had a long history of

13    having heart disease and symptoms from heart disease.  And

14    after her GI bleed, the symptoms that she had were entirely

15    consistent with the symptoms that she had had before.  They

16    were entirely consistent with progressive, worsening heart

17    disease.  That's what you heard from Dr. Crossley, the only

18    cardiologist who treats patients with this condition.  That is

19    what he told you, and that's what her medical records reflect.

20         What you have been told is that if only -- instead of

21    putting her on Pradaxa in October of 2013, if only they put

22    her on warfarin, just they just continued that prescription on

23    warfarin, then all of that stuff would have been different.

24    There's no evidence of that.  The medical records don't

25    support it.  Dr. Ashhab never really came out and said that.

1880

1    There is no evidence of that.

2        The evidence is that Mrs. Knight unfortunately had

3    very serious heart disease, and that continued right up until

4    she passed in September of 2013.  And you know that because

5    that's what Dr. Ashhab [verbatim] said.  That's what he said

6    when he had to fill out the death certificate.

7        And every doctor who testified in front of you

8    today -- throughout the course of the trial said when I have

9    to fill out a death certificate, it's a serious thing.  I try

10   to be accurate.  It's a legal document.  I try to be complete.

11   There was never any suggestion in the course of the trial that

12   Dr. Abdelgaber had done anything other than that.

13       And what I think I heard in plaintiffs' counsel's

14   closing argument was, well, we deposed him later, many years

15   later, and he thinks something different now.  That's not what

16   he testified to.  What he testified to was it's just as likely

17   that her heart attack was the reason that she had all of those

18   issues in the summer of 2013.

19       He never -- he was never shown the death certificate

20   at his deposition.  Counsel didn't show him the death

21   certificate and say do you still believe this is true?  And

22   you weren't shown any testimony from Dr. Abdelgaber suggesting

23   that he believed anything other than what he wrote in this

24   legal document in September of 2013, at the time, where he

25   said Mrs. Knight had a heart attack.

1881

1    She had an acute myocardial infarction, and that was

2    because she had coronary artery disease, atherosclerotic

3    coronory artery disease that had been so serious that she had

4    to have metal stents placed in the vessels of her heart.  And

5    that was caused by high cholesterol, high cholesterol that was

6    hard for her doctors to treat because they weren't able to use

7    statins.

8        And when Dr. Abdelgaber had an opportunity in this

9    document, 9001, to say here are the other things I think might

10   have been involved, he didn't mention Pradaxa.  He didn't

11   mention the GI bleed.  He said -- he mentioned the same

12   chronic issues we've already talked about, congestive heart

13   failure, kidney disease, dementia, hypertension.  He didn't

14   say a thing about Pradaxa.

15       That is entirely consistent, by the way, with all of

16   the medical records in that summer of 2013.  There was a death

17   summary that we talked about with Dr. Crossley.  They don't

18   even mention the fact that she had a GI bleed.  Her doctors

19   believed that what led to her passing was the fact that she

20   had a heart attack, and that's what you heard from both of our

21   experts, Dr. Shami and Dr. Crossley, the one cardiologist you

22   heard from in the case.

23       The one doctor who told you something different was

24   Dr. Ashhab.  And you learned -- during his cross-examination,

25   Dr. Ashhab was asked, have you seen the death certificate?

1882

1    Have you looked at what is arguably the most important piece

2    of evidence in the case on this issue?  I'm not sure.  He

3    couldn't even be certain that he reviewed that evidence.

4    You're entitled to more than that when you're being told that

5    Pradaxa was the reason that Mrs. Knight passed away, when they

6    have a burden to prove that to you.

7           Even the plaintiffs, when they were asked -- and you

8    may remember Mr. Lewis didn't ask a lot of questions on

9    cross-examination of Ms. Stevens and Mr. Knight.  He might

10   have asked five questions total.  But even when they were

11   asked about their discussions with the doctors who cared for

12   their mother, doctors they'd been interacting with -- you

13   heard that they were very involved in her medical care.

14          They were asked, with respect to the GI bleed, do you

15   recall any doctor ever coming to you and saying that was

16   caused by Pradaxa?  This was Mr. Knight's testimony.  He

17   answered very directly.

18          Did any doctor in the real world ever tell me that

19   Pradaxa caused it?  No, sir.  They didn't tell me that.

20          Ms. Stevens was asked a similar question:  To the best

21   of your recollection, did any of the doctors that treated your

22   mom tell you that Pradaxa caused her decline or her death, any

23   of them?  No.  They were candid about that.

24          In the real world, in real time, before lawyers got

25   involved in all of this, that's what her doctors said, that

1883

1  she had died from a heart attack caused by coronary artery

2  disease.  You've not been pointed to any evidence, any real

3  world evidence, real time evidence to suggest anything

4  contrary to that.  And so your answer on both of those

5  questions that you saw in the verdict form, question B.7. and

6  B.8., should both be no as to Mrs. Knight's injuries, her

7  bleed in the spring of 2013, and as to her death in the fall

8  of 2013.

9       I now want to turn to this issue of warnings.  And you

10  were told I think by Mr. Childers at the beginning of the case

11  that even though there are five claims, they're all basically

12  failure to warn claims.  And I'm going to address them kind of

13  collectively in that way and offer some responses to the

14  questions that he raised for what the company did and why the

15  company did it.

16       You have been told that in West Virginia, a company

17  like BI has an obligation to warn patients directly, and that

18  is absolutely true.  And the company does that in something

19  known as the Medication Guide.  You've now seen that in the

20  evidence.  And that is a document that is FDA-approved.  It's

21  regulated.  The structure, the content, the FDA has to approve

22  all of that.

23       The other thing that is important about the Medication

24  Guide is that it's written for patients.  It's a patient

25  friendly document, and it's written for all patients.  If you

1884

1    give Pradaxa to a hundred patients, a thousand patients, a

2    hundred thousand patients, the goal is that you create

3    something that is straightforward and direct and communicates

4    to patients the danger of the medicine.

5            And that's exactly what the company does.  It says in

6    the Medication Guide this is what -- the things you want to

7    know really about a medicine.  What is it, why am I taking it,

8    and what's the worst thing that could happen, right?  Those

9    are the things you want to know about a medicine.

10           And you were never actually shown what the Medication

11   Guide says.  You were only ever told about what it doesn't

12   say.  What the Medication Guide says that a patient wants to

13   know, what's the most important information I should know

14   about Pradaxa, Pradaxa can cause bleeding, which can be

15   serious and sometimes lead to death.

16           That's a warning that even their experts acknowledge.

17   It's strong, it's serious, it's truthful.  It is a truthful

18   warning.  That is a warning that would have been available to

19   Mrs. Knight, to Mrs. Knight's children.  There's no

20   allegation, you didn't even hear from Dr. Plunkett that

21   anything in that Medication Guide was untruthful in some way.

22           The Medication Guide does not say -- and I do want to

23   clarify this because you heard this suggested.  The Medication

24   Guide does not say this medicine will be safe for you.  In

25   fact, it almost says just the opposite.  It provides the most

1885

1    significant safety information about the medicine that

2    patients need to know.

3         Now one of the questions that Mr. Childers put to you

4    was why on Earth didn't the company put these other things in

5    the Medication Guide?  And I'll tell you why.  Because the

6    Medication Guide is intended to be a straightforward, direct

7    communication of the risk of the medicine.  So it doesn't have

8    technical information.  It doesn't have statistical

9    information.  It doesn't have information on every drug

10   interaction that might go along with taking Pradaxa.  It gives

11   straightforward risk information that, from a common sense

12   perspective, any patient would recognize is serious.

13        And it specifically says, you may have a higher risk

14   of bleeding if you have these features.  If you're over 75, as

15   Mrs. Knight was.  If you have kidney problems, as we know Mrs.

16   Knight did.  If you take certain medicines like Plavix or like

17   aspirin.  All of those things can increase your risk.

18        And you know, one way you can figure out whether or

19   not this is normal, whether this is kind of standard is you

20   have access to the Medication Guide for warfarin.  You've seen

21   that in the course of this trial.  And if you look at the

22   Medication Guide for warfarin, it's very similar.  It doesn't

23   talk about how warfarin was studied.  It doesn't say you

24   should know that this was a medicine that used to be used as

25   rat poison.  It doesn't tell people that.

1886

1       Warfarin has dozens and dozens and dozens of drug

2   interactions.  The warfarin Medication Guide doesn't list

3   every single drug interaction because that is not the way that

4   Medication Guides work.  They're intended to give patients, in

5   a brief summary, this is the most important information that

6   you should know.

7       It also encourages patients to talk with their

8   doctors, and that makes sense because you don't get Pradaxa

9   unless a doctor or another health care professional with the

10  ability to prescribe medicines says to you, this is the right

11  medicine for you.

12      Roughly 20 times the Medication Guide says to

13  patients, you need to talk to your doctor, starting with

14  saying the Medication Guide does not take the place of talking

15  with your doctor about your medical condition or your

16  treatment.  And over and over and over and over again in the

17  Medication Guide it encourages patients to talk with their

18  doctors.  Talk with them about what medicines you're using,

19  what your medical history might be.  Tell your doctors if

20  you're having symptoms, if you have dark stools, if you have

21  other things that might indicate bleeding.

22      Then at the very end, it says if you want a copy of

23  the doctor labeling for Pradaxa, talk to your pharmacist, talk

24  to your doctor.  They give the website for Pradaxa.  And

25  that's available to patients, too.

1887

1     And that is the other thing I want to talk to you

2     about is the doctor labeling.  You've been instructed by the

3     Court that in considering the adequacy of the warnings that BI

4     provided, that you may also consider what the company told

5     doctors, the folks who make decisions about the actual

6     prescription of the medicine.

7     The doctor labeling has more information in it, there

8     is no question.  It has tables and graphs and charts and

9     statistical information.  But just like the Med Guide, it's

10    FDA-approved, and it also includes that very same stark,

11    direct, strong warning on why it is you might need to be

12    mindful about prescribing this medicine.

13    And then throughout that label -- you'll have copies

14    of this in the jury room.  5883, 5884, 5889, those are all

15    versions of the label that you'll have access to.  It has all

16    of this information on dosing, on people who might be at

17    higher risk of bleeding, on clinical pharmacology, the

18    clinical trial's experience with the medicine.  It's a

19    detailed summary of information about the medicine.

20    There's the warning on the risk of bleeding with

21    patients who are older.

22    The other thing that the label does is it tells

23    doctors about changes that might have happened in the contents

24    of the label.  And there was a lot of discussion about when

25    people had access to certain labels, and whether they had

1888

1    certain information at certain times.  Based on the testimony

2    of all the experts you heard from, doctors read -- the general

3    practice is to read labels.  And in general, based on their

4    testimony, they would expect that it would be reasonable for

5    folks to read the label.

6         And there's a section in the label that specifically

7    refers to recent major changes, places where you can look in

8    the label where there might have been adjustments in some of

9    the language based on discussions with the FDA.

10        And one of the things that I want to be very clear

11   about is that, during most of the time that Mrs. Knight was on

12   Pradaxa, every single one of those warnings that you've heard

13   them complain about, those particular items that they

14   complained about on that rolling chart, those were in the

15   labeling for doctors.

16        This is the instruction that you've been given by the

17   judge, and I want to reiterate it just because of the way the

18   evidence has been presented and the way closing argument was

19   presented.  When considering if the warnings provided by BI

20   were adequate, you cannot consider any defect in the patient

21   Medication Guide as a basis for your verdict.  And you heard

22   the reason for that.  The company is not permitted to change

23   that Medication Guide without FDA's prior approval.  So you

24   can't reach a verdict based on determining that the Medication

25   Guide was somehow inadequate.

1889

1    Now you can consider the physician labeling, that

2    second document that we talked about, in terms of figuring out

3    whether or not the company specifically warned about the

4    issues that are relevant in this case.  And if you look at

5    that list, that chart that they rolled out and they rolled

6    back, and they rolled out and they rolled back, every single

7    one of those issues is identified in the doctor labeling for

8    Pradaxa.

9    The first two items relating to whether or not the

10   75-milligram dose was tested, patients with severe renal

11   impairment were not studied in RE-LY.  That is in section 12

12   of the label.

13   Don't take Pradaxa and Coreg.  That's that reference

14   to P-gp inhibitors.  P-gp inhibitors in patients with severe

15   renal impairment, Pradaxa use not recommended.  That is in the

16   label.  It's on the very first page, and then it's in the

17   section called Drug Interactions, section 7.

18   The fact that there was not a reversal agent for

19   Pradaxa, that is specifically called out in the labeling for

20   the product, first in section 10, and then it's repeated again

21   in section 5 at a later in time.

22   The last item that you've heard so much about, that

23   increased risk of GI bleeding that they saw in Pradaxa

24   patients in the RE-LY study, that is in the Pradaxa doctor

25   label.  Every single one of those items is listed.

1890

1          And importantly, Mrs. Knight was on Pradaxa for 23

2     months, slightly less than two years.  For 22 of those 23

3     months, every single one of those things was in the labeling

4     for Pradaxa.  And there's been no evidence in this case that

5     Dr. MacFarland didn't understand the risks of the medicine,

6     that she didn't read the labeling and understand the concerns.

7          And there were also prescribers later in time who

8     would have had access to later labeling for the medicine.

9     There is no indication that the folks who took care of Mrs.

10    Knight did anything other than treat her consistent with a

11    full understanding of the risks of taking the medicine

12    Pradaxa.

13         Now one of the things that they spent a lot of time

14    talking about was the 75-milligram dose.  And Dr. Plunkett, in

15    her direct examination testimony, basically suggested to

16    you -- she showed you this document, this company core data

17    sheet.  She almost suggested to you that patients with severe

18    renal impairment shouldn't take Pradaxa.  You see that

19    language there on the left-hand side.

20         What you also heard on cross-examination is that when

21    BI submitted an application for Pradaxa in the United States,

22    they told the FDA we didn't test these patients, we wouldn't

23    necessarily ask for a dose for these patients.  You know what

24    the FDA did?  The FDA struck that language out of the proposed

25    labeling because the FDA made a judgment that it was

1891

1    appropriate for patients with severe renal impairment to have

2    access to Pradaxa.

3         And you recall what I went through with Dr. Plunkett

4    in terms of explaining their reasoning on that, that patients

5    with very severe renal impairment are very hard to test in

6    clinical trials.  She agreed with that.  It's rare that you

7    have severe renally impaired patients in big trials for

8    cardiovascular medicines.

9         Now does that mean those folks don't get access to the

10   medicine?  Of course that's not what that means.  It means the

11   FDA comes up with other scientific and medicine based

12   approaches for identifying a dose.  And in the case of

13   Pradaxa, what they did was they took the data that they had,

14   and they had the folks at the FDA analyze it and determine --

15   compare it to folks who had done well in the RE-LY study and

16   tried to figure out what makes sense for a dose for people who

17   have severe renal impairment.  That's how they came up with

18   the 75-milligram dose of Pradaxa.

19        And I want to be very clear about something.  When we

20   talk about the FDA, that's not the company hiding behind the

21   FDA.  That is not us trying to push off our responsibility.

22   Pradaxa is BI's medicine.  We are responsible for it.  The

23   company is responsible for the label, every single word of it.

24   But this was the judgment of an outside regulatory agency, the

25   public health agency that we all trust to regulate the

1892

1    medicines, the prescription medicines that we take.

2          And it matters, it matters what doctors and

3    professionals and scientists outside of this courtroom have

4    said about that medicine, people who don't have a dog in the

5    hunt who have said we believe this is an appropriate dose for

6    patients who need to take Pradaxa.

7          And even Dr. Plunkett, after all she said on direct

8    examination, remember what she said?  She said I think

9    patients are being treated like guinea pigs.  I think this is

10   terrible.  I think this is a safety issue.

11         And I asked her on cross-examination, do you believe

12   that the FDA was wrong when it decided that a 75-milligram

13   dose of Pradaxa should be available for patients with severe

14   renal impairment?  You remember what she said?  No, I haven't

15   formed that opinion.  All of those opinions she offered from

16   the witness stand, she said, no, I don't think they made a

17   mistake.

18         And then when we talked about it more, I said, isn't

19   it the case when the FDA approves a dose of a medicine, they

20   believe it's safe and it's effective?  And she said, yeah,

21   that's what it means when the FDA reaches that conclusion.

22   That was the judgment of the agency.

23         Now one of the things that's been suggested is that

24   even though the FDA made that decision, the company didn't do

25   enough to test.  And you've been told by the Court that there

1893

1    is not a claim for failing to test the medicine, but I want to

2    show you the evidence on this issue.

3          The company continued to look at the use of Pradaxa in

4    patients with severe renal impairment.  And they were small

5    studies, there's no question about that, and that's because

6    it's hard to study patients with really bad kidneys.  The FDA

7    gets every adverse event report submitted to it and evaluates

8    to see if anything is going on.  They never raised a concern

9    about the use of the 75-milligram dose.  And in fact, they've

10   issued these drug safety communications saying that the FDA

11   continues to believe that Pradaxa provides an important health

12   benefit.

13         And finally, there are folks outside of the company

14   who have also studied patients in the real world who have used

15   Pradaxa, 75 milligrams, and concluded -- not identified any

16   issues.  No one, you've not heard any evidence to suggest that

17   eight years after the medicine was approved, including for

18   patients with severe renal impairment, that somehow there is

19   something going on with that patient population that is just

20   not right.  You've never heard that.  You've not seen a single

21   piece of evidence on that.

22         And you've not heard anything to suggest that if there

23   had been more testing, that something different might have

24   been the case for Mrs. Knight.  Because ultimately this is a

25   case about her, and every criticism they have, they have to

1894

1    demonstrate that it would have affected her directly.

2         One of the things that was interesting when Dr.

3    Plunkett was asked more questions on redirect examination by

4    Mr. Moskow was that he walked her through all of those studies

5    that we talked about on cross-examination.  And do you

6    remember what happened, what she did?  Every single one, she

7    said not good enough, not enough, not -- not good enough.  And

8    you almost got the sense that there was nothing that the

9    company could have done, that the FDA could have done that

10   would have satisfied her.

11        And what you heard on cross-examination is that that

12   is because this is part of what Dr. Plunkett does for her

13   work.  Half of her income is made doing what she did in this

14   courtroom, sitting in a witness box pointing to a company and

15   saying you did something bad.  Criticizing labeling approved

16   by the FDA for medicines she is not authorized to prescribe

17   and saying you did something wrong here.  Millions of dollars

18   she's made doing just that, traveling to different courtrooms

19   and doing what she did here.

20        But at the end of the day, I asked her a question

21   because I thought of my granddad who used to say to his

22   grandkids all the time, are you walking what you're talking?

23   That means is what you say consistent with what you're doing

24   in your day-to-day life, right?

25        And I asked her, now, you said that this is a serious

1       safety issue.  You said this is a really big problem that

2       patients are taking the 75-milligram dose.  And she said,

3       yeah, that is what I said.

4              And I said, Dr. Plunkett, have you ever communicated

5       to the FDA -- you're an FDA consultant.  Have you ever

6       communicated to the FDA that you think that's a serious safety

7       issue?  Remember what she said?  No.  Never done anything

8       outside of this courtroom consistent with what she told you

9       about that dose of the medicine.  That was a courtroom

10      opinion, not something reflecting what people think in the

11      real world.

12             The other topic that she addressed, and that counsel

13      addressed on closing, was this issue of blood monitoring,

14      whether patients who were on Pradaxa also need to have their

15      blood measured in some way to be able to use the medicine

16      safely.  And I told you at the very beginning the company has

17      looked at that, the FDA has looked at it.  It turns out the

18      European regulators have looked at it, too.  There's been no

19      recommendation consistent with what you heard in this

20      courtroom.

21             When the company was doing the RE-LY trial, it

22      collected data from 9,000 or so patients on blood plasma

23      concentration.  That wasn't a secret.  The FDA knew the

24      company was doing that.  All of that data was given to the

25      FDA, and they evaluated it.

1896

1     One of the things that you heard suggested, not even

2  suggested, it's been said frankly, is that the company had

3  identified a number, a magic number, a magic range, that there

4  is some special place where Pradaxa patients will be monitored

5  and managed safely, right?  There's a spot that the company

6  knows about that they haven't told anybody else about.  But

7  then when they showed you the documents, they're all different

8  numbers.  There's no magic number.  There is no magic range.

9  They didn't say to you, aha, we found the smoking gun with

10  this special number that no one has been told about.

11     Dr. Plunkett testified two days.  She came down from

12  the stand.  She wrote on a flip chart.  She never once, never

13  once wrote on that flip chart this is what the number is.  If

14  she knew that, if she had seen that in the company documents,

15  I guarantee you, you would have seen that up on that flip

16  chart, but you didn't.

17     The evidence is just what the company published.

18  There is no magic number.  There is no magic range.  There is

19  no single plasma concentration range that provides optimal

20  benefit-risk for patients.  That is what you heard.

21     And you've heard suggestions about marketing,

22  marketing having some role in decision-making.  But you know

23  who they played -- whose depositions they played?  Medical

24  professionals.  Dr. Friedman, who is a nephrologist, a kidney

25  doctor.  Ms. Kliewer, who is a nurse by training, who

1    interacted with the FDA.  Dr. Brueckmann, who is a medical

2    doctor.  They didn't play -- there was no evidence that they

3    played you or video deposition testimony that they showed you

4    that suggested that marketing folks somehow were the ones who

5    made the decision on this.  The folks involved were doctors

6    and scientists and regulatory professionals at the company.

7            And as the company looked at that issue, they

8    submitted data, they submitted analysis that they did on the

9    RE-LY data.  You saw the clinical overview statement where

10   they did that.  They submitted the European label that they

11   spent so much time talking about, the company core data sheet

12   that they spent so much time talking about.  That's all been

13   given to the FDA.  This isn't a hiding exercise by the

14   company.  That has all been given to the FDA, and the FDA has

15   made its own evaluation of that data.

16           This is an example of a chart -- excuse me -- a slide

17   that was shown at a big hearing when they were considering

18   whether Pradaxa should be approved, and they specifically

19   evaluated the relationship between blood levels and what

20   happens in terms of your outcomes.  If you have high blood

21   levels, you bleed more.  If you have high blood levels, you

22   might also have a reduced risk of stroke.  The FDA's

23   scientists and doctors analyzed that on their own.

24           And after they did that, after they decided to approve

25   the 75-milligram dose, they said we don't think monitoring of

1898

1    clotting effect is currently recommended.  We don't think you

2    need to monitor patients, monitor their blood levels on this

3    medicine.  And even Dr. Plunkett confirmed, yeah, that's what

4    FDA decided when it approved the 75-milligram dose of Pradaxa.

5    That was their judgment at the time.

6            Part of the reason that that's not necessary is

7    because Pradaxa already has a form of monitoring, kidney

8    monitoring.  And part of the reason that the company says that

9    in the doctor label is because exposure to Pradaxa increases

10   as your renal function gets worse.  That's laid out right

11   there in the labeling in the document.

12           And you heard exposure increases bleed risk.  That's

13   very clear to doctors.  There's a table in the label that

14   you'll have access to that shows how your exposure increases

15   if your kidneys are bad.

16           And what was interesting during Dr. Plunkett's

17   testimony -- because she made this big thing about how there

18   needed to be blood monitoring, right?

19           And I said, well, Dr. Plunkett, are you saying that

20   people need to be monitored the way that they are monitored on

21   warfarin?  And she said, oh, no, that's not what I have in

22   mind.  I'm just saying you test their blood levels initially

23   and then check it every once in a while, further assess when

24   necessary based on the patient's characteristics.  Turns out

25   that is already what the company tells doctors to do in the

1899

1    doctor labeling for Pradaxa with regard to kidney function.

2    Kidney function is the thing that determines your blood level

3    exposure.

4         In dosing adjustments -- it's on the first page of the

5    label, but it is also in section 2.2 -- assess renal function

6    prior to initiation of treatment, just like Dr. Plunkett

7    suggests.  Periodically assess renal function as clinically

8    indicated, more frequently in clinical situations that may be

9    associated with a decline in renal function, and adjust

10   therapy accordingly.

11        Patients on Pradaxa are monitored.  Their kidney

12   function, the thing that determines their blood levels and

13   their exposure, that is monitored, and that's what happened

14   with Mrs. Knight.  You will see in the records, which we

15   entered yesterday with Dr. Crossley, her kidney function was

16   being repeatedly measured by her doctors, consistently

17   measured.  There's not been any suggestion that her doctors

18   were not on close watch for Mrs. Knight when she was on this

19   medicine.

20        There has also not been any suggestion, any suggestion

21   at all, that that would have made a difference for Mrs.

22   Knight.  That if her blood had been monitored, in addition to

23   having her kidneys monitored, that that would have somehow

24   made a difference for her.  And that matters because

25   ultimately this is a case about Mrs. Knight and what might

1    have made a difference for her.

2         So the question I think I heard was why on Earth don't

3    they tell doctors in the physician labeling that you should

4    also measure blood levels?  It is because we already tell

5    doctors you can check renal function, and that's a way to

6    figure out whether people's exposure is going up.  That's the

7    answer to that question, because we already warn about the

8    need to monitor kidney function.

9         And even the doctors you heard from, including the one

10   cardiologist, the only cardiologist you heard from who

11   actually prescribes these medicines, has prescribed these

12   medicines for years and years and years over many decades, he

13   told you, I prescribe Pradaxa, I prescribe Xarelto, I

14   prescribe Eliquis, I prescribe all of these medicines without

15   blood monitoring, and I'm able to treat my patients safely

16   without the need for that.  And I don't believe it would have

17   made a difference for Mrs. Knight to have blood monitoring.

18        That's what Dr. Shami said.  Dr. Abdelgaber, he was

19   asked in his deposition, would you have treated her bleed any

20   differently if she had had blood monitoring?  And he said no.

21   And the reason for that is because her bleed was managed in

22   the way that bleeds are managed.  You stop the Pradaxa, you

23   investigate the source of the bleed, you deal with that once

24   you find the source, and then the patient is discharged.

25   That's what happened.

1    There is not a single shred of evidence in Mrs.

2  Knight's case that blood monitoring would have made a

3  difference for her, and that is why your answer to that

4  question A, it's the section where all of the claims are

5  listed, should also be no.  That should be your answer as to

6  every single one of those claims.  Because ultimately all of

7  those claims are about did the company warn enough?  Did the

8  company say enough?  Did the company make a misrepresentation?

9  And there has been no evidence of a misrepresentation, and

10  there's been ample, abundant evidence of all of the warnings

11  that the company gives to patients and to doctors on the risks

12  with the medicine.

13    The last topic I want to talk about is the other

14  question that appears on page 2 of the verdict form.  That's

15  this question:  Did plaintiffs prove that, absent BI's

16  wrongful conduct in any of 1-5 above, Betty Knight would not

17  have taken Pradaxa?  And that's really a question about

18  whether or not if that label had been different, if that would

19  have somehow affected whether or not she took Pradaxa.  Given

20  everything we know about her history, everything we know about

21  her need for an anticoagulant, everything we know about her

22  time on warfarin, the answer to that is also no.

23    There's been a lot of discussion in the case about INR

24  levels and Mrs. Knight's specific experience and her INR

25  levels while she was on warfarin.  The bottom line is, and I'm

1   not even sure this is contested, she had wildly variable INR

2   levels.

3          And even Dr. Ashhab, he told you, they can't keep

4   her -- he looked at this demonstrative, and he said --

5   Mr. Lewis asked him, they can't keep her within a safe range,

6   right?  And he agreed with that.  They're having a hard time

7   keeping her in that range of 2 to 3 that protects you slightly

8   more than -- from having a stroke or from having a bleed.

9   They couldn't do that.

10          Dr. MacFarland said it was dangerous, it was dangerous

11   for her to be too high or for her to be too low.  That is a

12   significant thing that has kind of been dismissed, not a big

13   deal, it's just a number on a piece of paper.  But for a

14   patient who needs to be protected, who needs to be protected

15   from a potentially catastrophic stroke on the one hand or the

16   possibility of a serious bleed, including a possible brain

17   bleed, those kinds of variations are serious.

18          And Dr. MacFarland, you know, she talked a lot about

19   how challenging warfarin was for Mrs. Knight, and she talked

20   about how that was part of what led to her decision to

21   transition her from warfarin to Pradaxa.  And what I think I

22   heard on closing argument was almost that Dr. MacFarland had

23   written something that wasn't truthful in an insurance form to

24   try to get Pradaxa prescribed.  I think that was the

25   suggestion.

1903

1       Because you saw that form where Dr. MacFarland said

2   the reason I am moving her from warfarin to Pradaxa is because

3   she has been supratherapeutic and sporadic on warfarin.   I

4   think Mr. Childers got up and said, well, if she had written

5   the truth, then maybe she wouldn't have been able to get her

6   switched, maybe it wouldn't have been covered.   That's a

7   serious claim.   That is a serious allegation to make about a

8   doctor who, by every indication, did her very best to try to

9   help Mrs. Knight.   That is a serious allegation to make in the

10  absence of any evidence at all and in the face of evidence

11  that Mrs. Knight was having a very hard time on the medicine

12  warfarin.

13      The other thing that you heard was that Mrs. Knight

14  struggled with warfarin's dietary restrictions.   And in some

15  way, this is something where you could say, well, no big deal,

16  just stop eating some things, it's okay.   But it can be a

17  burdensome thing.   It can be a challenging thing if there are

18  things you really love, and you're dealing with a bunch of

19  other medical issues, and suddenly you're told, well, all of

20  these things you really like you can't eat any more.

21      And even Mrs. Knight's children told you, she liked

22  greens, and she wasn't supposed to eat them, and we viewed

23  Pradaxa as a chance for her to be able to eat what she wanted

24  to eat.   Now that's easy to put down and dismiss, but you

25  heard even from the plaintiffs that that was a real quality of

1904

1    life issue for Mrs. Knight when she was on warfarin.

2        And then the last issue was this problem that she had

3    with blood monitoring.  This is the record from August of 2008

4    when she came to the doctor and reported she didn't want to be

5    on coumadin because she just didn't want to do the blood

6    monitoring.  And that was not a failing.  That was not Mrs.

7    Knight doing something wrong.  Lots of patients, you heard

8    this from Dr. Crossley, lots of patients have challenges with

9    that.  Mobility issues, transportation issues, some of those

10   were issues that Mrs. Knight had specifically.

11       And even Dr. MacFarland said it was difficult for her

12   to get her in the office as many times as we needed because of

13   the up and down of the coumadin.  Now, if you are well managed

14   on warfarin, maybe you don't have to go in and get checked as

15   much.  But when you are up and down and up and down all the

16   time, that means you have to be getting that done more

17   frequently.

18       Ms. Stevens, Mrs. Knight's daughter, testified she was

19   getting tired of having to go to the doctor a couple of times

20   a week to get the levels checked.  That was challenging for

21   her.  Those were the circumstances, that's what was going on

22   when there was a decision made to move Mrs. Knight from

23   warfarin to Pradaxa.

24       And if you look just at the week before that change,

25   she had the same issues that she had had for years and years.

1905

1    An INR of 8, a 5, a 6.3, a 4.6.  That INR on October 10th was

2    so high that when they called it into the doctor's office, the

3    doctor said you gotta get her to the emergency room.  This is

4    a serious thing.  Those were the circumstances leading to the

5    decision to ask for something that was different.

6         Now you've heard about a television advertisement.

7    You've not seen the advertisement, you've only had it

8    described to you.  But ask yourself -- one of the suggestions

9    that was left was, well, that advertisement was somehow false.

10   It told her she could eat what she wanted to, and she wouldn't

11   need blood monitoring.  That wasn't false.  She used Pradaxa

12   for two years.  It worked for her.  She was able to eat what

13   she wanted to, and she didn't need blood monitoring.

14        To the extent that that was in that advertisement --

15   and you didn't see it.  But if that's what the advertisement

16   said, that's not untruthful.  That is exactly what happened

17   with Mrs. Knight, two years of no issues on the medicine other

18   than when she was on triple therapy.

19        And the doctors you heard from in this case

20   overwhelmingly supported that decision to move her from

21   warfarin to Pradaxa.  Now you heard some wordsmithing over

22   whether Dr. Crossley said it would have been appropriate to

23   keep her on warfarin, would that have been okay?  And he said,

24   listen, that wouldn't have been below the standard of care if

25   her doctors had done that.  I wouldn't have thought it was

1906

1    unreasonable, but I also think it was a good idea for her to

2    get moved to a NOAC because of all of the things that she had

3    dealt with while she was on warfarin.

4         There were other folks who took care of her, including

5    Dr. Stephanie Graham, who made that decision at the time that

6    she was on triple therapy that it was appropriate for her to

7    be on Pradaxa, multiple doctors confirming the reasonableness

8    of that decision.

9         The one doctor who disagreed, the one doctor who told

10   you I don't think that was a good idea was their paid expert,

11   a gastroenterologist who doesn't prescribe Pradaxa, doesn't

12   prescribe it ever because that's not his practice.  They

13   didn't bring you a cardiologist who looked at Mrs. Knight's

14   records and said I think that was a bad idea.  The only

15   persuasive evidence was that that was a good choice for Mrs.

16   Knight.

17        Now you have been instructed on this question of

18   proximate cause in terms of the warning.  This is the

19   instruction, part of the instruction:  If plaintiffs did not

20   prove it is more likely than not that Mrs. Knight read the

21   warnings provided by BI, they cannot prove that different

22   warnings would have caused her to change her behavior.

23        And that probably makes sense to you.  If somebody

24   doesn't read something that has been given to them, then the

25   change in what that was couldn't have affected how that person

1    made decisions or proceeded.

2          Now, you may recall when Mr. Knight and Ms. Stevens

3    were testifying, Mr. Childers was asking them questions, at no

4    point during that examination did he ever say to them, did

5    your mom read the Medication Guide for Pradaxa?  He never

6    asked that question.  There was no evidence of that, he never

7    asked them.

8          Even as to the two of them, who he said, you know,

9    they were involved in the decision-making, he never asked

10   them, did you all read the Medication Guide?  And just to be

11   clear, that is not a criticism of the Knights.  I remember

12   during jury selection some people said I read every piece of

13   paper I get when I take a medicine.  And some people said, you

14   know, I talk to my doctor, I trust my doctor.  Both of those

15   are fine.  But for purposes of this claim, they have to

16   demonstrate that Mrs. Knight actually reviewed information.

17         What you were told during the testimony of Mrs.

18   Knight's children was, well, she kept stuff in a drawer, I

19   know she kept papers from the pharmacy in a drawer at her

20   house.  And Lord knows, we've all got papers in a drawer.

21   That's not evidence that that was ever read at any time.  That

22   is not evidence of that.

23         And then what you were told for the first time just

24   yesterday and during closing argument by counsel you were

25   shown this slide -- do you remember this?  They showed you

1908

1 this record from home health, and you were told that this says

2 that Mrs. Knight read her Medication Guide.  That's not what

3 that document says, and this is why I would encourage you to

4 actually consider the evidence.

5        It says patient and caregiver instructed on high risk

6 med Pradaxa for treatment of anticoagulation.  Then it says,

7 patient and caregiver verbalized understanding.  Now that

8 proved that Mrs. Knight's home health folks had a conversation

9 with her about anticoagulation therapy.  That doesn't say that

10 Mrs. Knight ever read a Medication Guide.  That doesn't say

11 that, and that's what I mean when I say test the claims

12 against what you actually see in the documents themselves.

13        Your answer on that last question should be no for a

14 couple of reasons.  One is that there's been no evidence that

15 Mrs. Knight ever read the Medication Guide.  The other is, if

16 you just consider the evidence as a whole and use your common

17 sense, there is no evidence that if she had read it and it

18 said something different, that would have changed her

19 decision.

20        This was a patient who had a really hard time on

21 warfarin, someone who had really struggled with that medicine,

22 who was looking -- even by the account of her daughter,

23 Ms. Stevens, who was looking for an alternative medicine.

24 There is no evidence to suggest, no reliable evidence that had

25 that said something different about testing or GI bleeding or

1909

1    Coreg, there is no evidence that there might have been a

2    different decision made.  Because this was a patient who had

3    had a very rocky course on the medicine warfarin, including

4    the variable INRs, GI bleeding that's reflected in her medical

5    records, having to go in and be monitored and finding that

6    challenging for her as she got older.  No evidence of that,

7    and so your answer on that question should also be no.  Your

8    answer on each one of those questions should be no.

9         Now I'm coming to the end of my time, and it's tough

10   for me because I don't get to stand up again and talk after

11   Mr. Childers talks one last time.  So -- but you all have

12   listened to me talk for a lot of this trial, and you have

13   heard the testimony of our witnesses, so you could probably

14   guess what I would say if he gets back up and says something.

15   And I'd ask you to think, what would she say about that?  Let

16   me give you a hint.

17        I would say, is what you're being told consistent with

18   the evidence?  Is it consistent with the actual medical

19   records that were prepared by Mrs. Knight's doctors and nurses

20   and health care professionals at the time, in the real world,

21   before a lawyer or us lawyers ever got involved?  Is it

22   consistent?  That would be one thing I would ask you, and I'd

23   invite you to ask that question of what you're being told.

24        The second thing would be is what you're being told

25   being connected to Mrs. Knight?  Are they telling you that

1910

1    what they're describing would have somehow changed her

2    experience on Pradaxa?  Which you now know was a two-year

3    course of the medicine where she was protected from strokes.

4    Successful management, she was protected.  She didn't have a

5    bleed other than when she was on triple therapy when the

6    medicine worked for her.  Are you being told something that

7    shows you that that would have made a difference for Mrs.

8    Knight?  Those would be my questions.

9         I'm going to conclude officially with the following.

10   I mentioned my granddad.  He was a plain spoken person, and he

11   was always giving us little nuggets.  One thing he used to

12   tell all of his grandkids was, there's no right that doesn't

13   have a responsibility that goes along with it.  Every right

14   has a responsibility.

15        And I've told you we don't quibble with the right of

16   the Knight family to have feelings about the passing of their

17   mother.  That is a serious thing.  We take that seriously.  We

18   tried to treat that with the seriousness that it deserves.

19        We don't even take issue with their right to bring a

20   claim.  That's something we all have the right to do in this

21   country.  It's one of the things that makes America a great

22   place to be.

23        But with that right comes a responsibility to present

24   you with evidence, with more than guesswork, with more than

25   speculation, with more than bullet points that don't match up

1911

1    with the actual documentary evidence.  And I'm going to say

2    this as respectfully but as directly as I can, that has not

3    happened here.  They have not discharged their obligation to

4    present you with evidence.  And for that reason, your answer

5    on all of those questions on the verdict form should be no,

6    and your verdict should be for BI.

7         Thank you all for your time, for your attention and

8    for your service as jurors.

9         THE COURT:  All right.  The plaintiffs have a few

10   minute for a reply.

11        MR. CHILDERS:  Your Honor, I'm ready whenever you are.

12        THE COURT:  Go ahead.

13        MR. CHILDERS:  Thank you, sir.

14        I think I honestly just heard that because Betty

15   wanted to eat greens, Ms. Jones thinks she was willing to take

16   a risk by taking a medicine that was too dangerous for her to

17   take.  That doesn't make sense.  Nobody would do that so they

18   could eat a salad.

19        She also told you there is no evidence that Betty read

20   the patient Medication Guide.  And you saw -- I'm sorry.  This

21   is a little hard to read.  You saw yesterday, home health care

22   came in, and they went over all of the materials that she had

23   with her.  Not only that, we know what materials she kept

24   because Claudia told you.  Short of bringing Betty here, which

25   is impossible, that is the evidence to prove that she read the

1   patient Medication Guide.

2          I want to go through some of the things that Ms. Jones

3   said to you.  I want to start with this slide, no evidence

4   that Mrs. Knight was over-anticoagulated.  That's what she

5   said.  First of all, Dr. Crossley, Dr. Shami and Dr. Ashhab

6   all told you, she's a patient you expect to have higher levels

7   of Pradaxa.  She's over 80, she has severe kidney problems,

8   and she's taking a P-gp inhibitor.  That in itself is evidence

9   that she was likely over-anticoagulated.  But there is more.

10          We showed you yesterday, actually we showed you

11  several times through the trial, this is the label in Europe

12  that BI gives to doctors to tell them how to figure out if a

13  patient on the 75-milligram dose might be at an increased risk

14  of bleeding.  And I want you to pay attention to this.

15          The aPTT, it says, times fold upper limit of normal.

16  That means how much more than the top number is it?  And it

17  says 1.3.  Right?  So if it's 1.3 times higher than the high

18  end of the normal range for that test, that patient is

19  probably at an increased bleeding risk.

20          Well, what did we see here?  She had an aPTT of 47.

21  The reference range is -- the high end of the reference range

22  is 37.  You multiply that by 1.3, it's 48.1.  This test was

23  taken 24 to 36 hours after she had her last dose.  It was

24  taken after she had been given two units of blood, which

25  should have brought that number down, and it was still right

1    at the edge of 1.3 times.

2           And what Dr. Ashhab told you was he thought she was

3    over-anticoagulated on the 20th.  Clearly as this medicine

4    cleared from her system, she had to be over-anticoagulated

5    when she came in with the bleed.

6           And then they said, well, you heard Dr. Ashhab, he's

7    just guessing.  He's not guessing.  You have to guesstimate

8    what the Pradaxa level is -- that's the question he was

9    asked -- because they don't tell you how to measure it.  They

10   don't tell doctors here how to measure it, so he did the best

11   he could.  He used the aPTT test.

12          And when he did that, along with the fact that he knew

13   she should have a higher level because of all of her issues

14   with renal impairment and her age and her medications, she was

15   likely over-anticoagulated.  That has been proven.

16          I'm going to try to go through these quickly, but

17   that's not it.  There is other reasons we've showed Betty had

18   too much Pradaxa in her blood when she bled.

19          You saw this yesterday and the day before.  Betty had

20   an aPTT of 47 when she was on warfarin, and every one of their

21   experts agreed with me, she was over-anticoagulated that day.

22   But when she had a 47 aPTT on Pradaxa, no, we can't say she's

23   over-anticoagulated.  That doesn't make sense.

24          You saw this slide, Pradaxa worked for Mrs. Knight.

25   You know what she didn't show you?  So did warfarin.  For six

1914

1    years it worked for her.

2         She also showed you -- she also showed you this slide,

3    that Mrs. Knight bled after Pradaxa.  She didn't show you this

4    slide that said she didn't bleed -- I'm sorry -- with Plavix.

5    She didn't bleed when Plavix was added to coumadin back in

6    2009.

7         And then she seemed to complain about the fact that

8    there was -- we disagree on whether there was a GI bleed.  And

9    what they rely on -- you saw it -- are three records from a

10   doctor who Dr. Shami told you from the stand, when she swore

11   under oath, yeah, I read his deposition, and he said he never

12   looked at those records.  Do you really believe if there was a

13   record that said Mrs. Knight had a GI bleed, they wouldn't

14   have brought it in here with the 4,000 other pages of her

15   medical records?  Do you really believe that?

16        Ms. Jones mentioned that we have to demonstrate to you

17   that Mrs. Knight's injuries would not have occurred other than

18   her being on Pradaxa.  Now, keep in mind, our burden is

19   greater weight of the evidence.  Is it more likely than not

20   that the injury would not have occurred but for Pradaxa.

21        We've shown you.  She had a 50-percent higher chance

22   of any GI bleed on Pradaxa than warfarin.  She had a three

23   times more likely chance to bleed in the lower GI on Pradaxa

24   than warfarin, and that's exactly what happened.

25        You also saw this, which I thought was interesting,

1915

1   the Medication Guide.  And they said, we gave her the

2   Medication Guide.  We told her everything she needs to know.

3   Didn't tell her any of these, not one.  I'm bringing the chart

4   back out.  They didn't tell her any one of those.

5        But that's not the only way they communicate with

6   patients.  There is something called direct-to-consumer

7   communicating, television ads, magazine ads, newspaper ads,

8   letters to patients.  You need to know this information.  In

9   this state, their duty is to tell a patient directly, and they

10  did not do that with Ms. Knight.

11       But let's think about the Medication Guide even

12  further.  She showed you, look, we tell patients if you're

13  taking Plavix or aspirin be careful.  Where does it say Coreg?

14  Coreg, a medication that is commonly given to AFib patients,

15  it doesn't mention it, not anywhere in the Medication Guide.

16       You also saw this slide from Ms. Jones where she said,

17  hey, we told the doctors all this information in the label.

18  Not when Betty Knight got the drug.  We've been over this.

19  That label when Betty got -- when Betty Knight got the drug,

20  it did not say anything about P-gp inhibitors and severe renal

21  impairment.  It didn't say any of that.  It didn't say

22  anything in the risk of bleed section about not having an

23  antidote, a reversal agent.  It didn't say that.

24       The label she's talking about is this one.  Look at

25  the date, January 2012, after Ms. Knight started Pradaxa.  And

1916

 1   there's clear evidence they never sent any communication to

 2   doctors to let them know they had made these changes, these

 3   changes that would have made a difference to Betty Knight.

 4          I think she showed you this slide about the

 5   75-milligram being studied in real world tests.  You know what

 6   real world test has never been done?  Not one head-to-head

 7   test between warfarin and the 75-milligram dose of Pradaxa,

 8   not one.  They can't tell you there's any proof that the

 9   75-milligram dose is safer, better, anything.  They can't tell

10   you how it compares to warfarin.

11          Then she complained about Dr. Plunkett.  She said Dr.

12   Plunkett, well, she just -- she's made millions of dollars

13   from plaintiffs lawyers.  Well, she didn't tell you the part

14   that that is over 20 years.  In 20 years, she's made over a

15   million dollars working on cases like this.

16          And then she said, well, she never -- here's the most

17   important one, and she even blew it up -- she's never shared

18   her opinions outside of this courtroom.  Okay.  You're going

19   to be in the jury room in a few minutes, and you're going to

20   have evidence to look at.  I want you to look at every one of

21   the documents that was produced by Boehringer Ingelheim, and

22   you will see at the bottom on every single one of them, it

23   says:  Confidential, subject to confidentiality order.

24          Dr. Plunkett had to sign that to be a witness in this

25   case.  She's not allowed to tell her opinions outside this

1917

1    courtroom.  That confidentiality order says the only place you

2    can share this information is in this courtroom, yet they come

3    here and complain that she hasn't somehow told people in

4    violation of the confidentiality order they insist on.

5         Then they told you her doctors all agree blood

6    monitoring is not necessary for Pradaxa or these doctors do.

7    Well, Dr. Shami, she doesn't even prescribe Pradaxa.

8         You heard Dr. Crossley.  He prescribes it off-label.

9    He's upset with me for -- he thinks I complain about that.

10   Well, here's what he told you.  I've got a patient who is on

11   the drug at the dose I'm supposed to give her.  She is so

12   over-anticoagulated, her whole body is bruised.  Are you

13   telling me it wouldn't be a good idea to monitor her blood

14   level so you know that before she got all bruised up?

15        And then finally they showed Dr. Abdelgaber, but you

16   heard his own testimony.  They never told him that it

17   mattered, that you could even be over-anticoagulated, you

18   could have too much Pradaxa in your blood.  He didn't know

19   that when I said that to him.  Why would he think he needs to

20   measure if he doesn't know that a patient could have too much

21   in their system?

22        I showed you this slide, and you've seen this a few

23   times.  And if you recall, we saw that slide with Dr. Shami.

24   And what Dr. Shami said was, well, when I looked at these, I

25   counted them all up, and 40 percent of the time it was too --

1918

1        it was right, excuse me, and 60 percent of the time it was too

2        high.  But when I asked her about the fact that she hadn't

3        actually calculated it right, what did she say?  Yeah, that's

4        true, I didn't.

5               And when I asked her if you calculate it, you'd agree

6        with me it's about 60 percent?  She said, yeah, I think that's

7        probably right.  I wouldn't be surprised.

8               And then she agreed with us 60 percent in range,

9        therapeutic time and range is higher than the warfarin

10       patients they tested Pradaxa against in the RE-LY trial.  But

11       they want to come in and say her time and therapeutic range

12       was just awful.  That is a misrepresentation.  But it's not

13       the only misrepresentation.

14              You remember this.  They wanted to come in here, and

15       they wanted to say her aPTTs were high all over the place.

16       Unfortunately, they were telling you something that wasn't

17       true.  Those tests weren't aPTT tests.  But for us calling

18       them on it, it probably would have been in their closing

19       argument slides.

20              And this one, I like this one a lot, Pradaxa was

21       appropriate for Mrs. Knight, and you see all these doctors

22       against Dr. Ashhab.  Well, you know what else doesn't agree

23       with this?  The January 2012 Pradaxa label says this drug was

24       not appropriate for Ms. Knight.  But they didn't share that

25       information with her, and they never told her doctors through

1919

1    a dear doctor letter or any other communication that they had

2    made that change.  So it's not just Dr. Ashhab who says it,

3    it's the company who says this was not the right medicine for

4    her.

5          Throughout this trial and throughout the closing

6    argument, it's been one thing, they will not accept any

7    responsibility.  It's clear they didn't warn patients about

8    these risks.  And when you do something wrong, you take

9    responsibility.  And if you don't take responsibility, we come

10   to a court of law, and a jury like you holds them responsible.

11         What have they done instead?  Blame game.  Betty

12   Knight, throwing fault, she wanted to eat salads.  She might

13   have been bleeding before she got to the doctor; she should

14   have come sooner.

15         Or no, no, no.  You know what, actually it's the

16   doctor's fault, even this mystery Dr. Graham, who they didn't

17   even have a picture of.  Did you notice that?  It was just

18   like a silhouette of somebody.  They should have known better.

19         And then it's the FDA made us sell this dose of the

20   drug.  Great.  If FDA wants you to sell it, no problem.  Just

21   tell patients what you know about it.  And what you know about

22   it is we don't know anything about it.  Tell them that.

23         It's time for you to make Boehringer accept

24   responsibility.  They didn't warn.  They told Betty and her

25   family things that were not true about the drug.  Pradaxa was

1920

1    a cause of her bleed, and that bleed debilitated her to such

2    an extent that she could not sustain the heart attack that she

3    suffered.

4         When you go back in the jury room, look at the

5    evidence.  I don't run away from any evidence.  Look at all of

6    it, look at any of it, and I think you'll come to the same

7    conclusion.  And all we ask is that you do what's right and

8    you do what's fair, and in my heart I believe that that is a

9    finding for the plaintiffs.

10        Thank you.

11        THE COURT:  All right.  Ladies and Gentlemen, when you

12   retire to the jury room, you should first select one of your

13   number to act as the foreperson of the jury.  The foreperson

14   will preside over your deliberations and be your spokesperson

15   here in court.

16        All jurors must agree on a verdict.  Your verdict must

17   be unanimous.

18        You must consult with one another and deliberate with

19   the intention of reaching a verdict if you can do so without

20   violence to your individual judgments.  During your

21   deliberations, do not hesitate to reexamine your own views or

22   to change your opinion.  But do not surrender your views or

23   opinions just to reach a verdict.

24        I have prepared a verdict form for you.  The lawyers

25   have shown it to you in their closings.  When you have reached

1921

1    a unanimous verdict, your foreperson should fill it in, date

2    it and sign it, and then let the court security officer know

3    that you have reached a unanimous verdict.

4         You will receive, as the lawyers have explained, a box

5    of exhibits that have been introduced.  Along with that, you

6    will receive the list of those exhibits that my deputy clerk

7    has maintained throughout the trial.  You can use that list to

8    identify and locate any of the exhibits that you want to look

9    at more carefully.

10        Second, I'm going to give you a copy of the

11   instructions that I read to you.  I want to emphasize that

12   when you're looking at these instructions, you should consider

13   them as a whole.  Apply your common sense, common

14   understanding to the terms in there and consider the

15   instructions as a whole as you deliberate on reaching a

16   verdict.

17        If at any point you want to take a break or recess for

18   the day, just send me a note through the court security

19   officer.

20        If you have any other matter, question or anything

21   else, also I would request that you reduce it to writing, a

22   simple note.  Give it to the court security officer, and he'll

23   bring it to me, and I'll deal with the parties if it's a

24   matter that involves them as well.

25        Obviously you've been here a long time already this

1922

1    morning.  One of the first things you probably should do when

2    you first go back to deliberate is decide whether you want to

3    go take a lunch break now or start deliberating.  At this

4    point, the schedule is in your control.

5         So I'm going to allow you to retire to the jury room

6    to begin your deliberations.  If you decide now or in a while

7    that you want to take a break for lunch or otherwise, just let

8    us know, and I do have to instruct you as I have in the past

9    about matters when you actually leave deliberation.  But it

10   will be up to you.

11        With that, you may retire to the jury room.  It will

12   take a couple of minutes for us to bring the box of exhibits,

13   the instructions and anything else to you.

14   (Jury not present.)

15        THE COURT:  I have one matter I want to take up with

16   counsel.

17        MR. LEWIS:  We have something, too, Your Honor,

18   when --

19        THE COURT:  Go ahead.

20        MR. LEWIS:  Based on the rebuttal that Mr. Childers

21   did, he raised an issue that the jury heard for the first

22   time, which is the designation on the bottom of some of the

23   documents that the documents are marked confidential pursuant

24   to a protective order.  And that is an order that was entered

25   by the Court to govern the exchange of documents in

1923

1   litigation.

2         He clearly misled the jury into thinking that

3   Boehringer alone came up with that and is preventing Dr.

4   Plunkett from revealing information, and that was terribly

5   misleading.  We didn't object to it because it was closing

6   argument, and you don't object in the middle of a five-minute

7   presentation, but I think the jury needs to be instructed

8   about that issue.

9         MR. CHILDERS:  Judge, the argument on closing by the

10  defense was their main criticism of Dr. Plunkett is she hasn't

11  shared her opinions --

12        THE COURT:  Hold on.

13        What did they want?

14     (Pause in proceedings.)

15        THE COURT SECURITY OFFICER:  They want to take a

16  lunch.

17        THE COURT:  Bring them out.  We'll let the jury go,

18  make this easy.  Tell them we're going to take a lunch break.

19     (Jury present.)

20        THE COURT:  All right.  The jurors want to take a

21  lunch break.

22        Apparently you said like 35 minutes; is that --

23        JUROR NO. 17:  30 to 45.

24        THE COURT:  All right.  How about we come back at

25  2:15.  Is that long enough?

1924

1        All right.  Remember my instructions.  Don't discuss

2    the case or allow anyone to discuss it with you.  You should

3    not have any discussions among yourselves or with each other

4    about the case or the evidence or what a verdict might be.

5        With that, we'll see you back here at 2:15.

6        When you all get back together, when all nine of you

7    are present, you may resume your deliberations.

8    (Jury not present.)

9        THE COURT:  You may be seated.

10       All right.  Mr. Lewis, what relief are you requesting?

11       MR. LEWIS:  I'm requesting an instruction be given to

12   the jury on the nature of the confidentiality order, the fact

13   that it was entered by the Court, that it's appropriate.

14       And also that documents that are put into the trial no

15   longer maintain their confidentiality.  She's testified in

16   three trials.  I mean, he completely misled the jury into

17   thinking that she's not permitted to tell anyone about what

18   her scientific views are based on the confidentiality

19   provisions at the bottom of some of those documents.  I think

20   it's completely misleading, and they need to be -- it needs to

21   be explained to them that that's not the case.

22       THE COURT:  All right.  Mr. Childers, you want to

23   respond to that?

24       MR. CHILDERS:  Yes, Your Honor.

25       The argument that was made was the main criticism of

1925

1    Dr. Plunkett was she hasn't shared her opinions about Pradaxa

2    that she bases largely on the documents that she read that

3    came from Boehringer, that bear a confidentiality stamp,

4    outside of the courtroom.  And I believe Ms. Jones even said

5    my grandfather taught me to walk the walk or something along

6    that line, and she hasn't walked the walk.  She made a huge

7    point of the fact that these opinions haven't been shared out

8    of the courtroom when the very reason for that is the

9    confidentiality that she had to sign.  I didn't insist on a

10   confidentiality order, that was their insistence.

11        THE COURT:  Well --

12        MR. LEWIS:  The problem is, Your Honor, the testimony

13   in the case was from Dr. Plunkett, and that's what she said in

14   response to the question.  If he wanted to have a redirect

15   with Dr. Plunkett and go through why she hasn't explained

16   something to the FDA, that should have been evidence in the

17   case, and it wasn't.  So what Mr. Childers did is to comment

18   on something that is not evidence, mislead the jury with

19   information that now they're going to consider in their

20   deliberations.  It needs to be corrected.

21        THE COURT:  Well, I agree with the defendant.  The

22   witness testified about her work.  She was asked on cross

23   about whether she did any work for or with the FDA or whether

24   she had made -- I don't recall what the phrasing was but, in

25   essence, whether or not she had been involved in any matter

1    where she publicly shared her opinions, and she said she had

2    not.

3         I believe you went beyond just referencing what was

4    restricted under the confidentiality order.  The defendant's

5    right about that.  While the use of the documents bear a

6    restriction, her testimony at trial does not, and you really

7    didn't limit your discussion of these restrictions to just

8    that she can't go out and offer opinions publicly about

9    confidential documents.

10        Having said -- go ahead.

11        MR. CHILDERS:  Your Honor, the order she has to sign

12   and that we have to sign says we can't use the documents or

13   the information we get from them outside of this litigation.

14   That's what it says.  And she signed it just like we did.  So

15   to somehow say, well, she should be able to go out and say

16   things because she'd testified in trial, she's not a lawyer.

17   She signed a confidentiality order.  For all she knows, if she

18   goes and does that, they're going to file a lawsuit against

19   her and say she breached the confidentiality.

20        Not one of those documents has had the confidentiality

21   stamp taken off.  It's still there.  She's doing her job,

22   which is follow the rules.

23        MR. LEWIS:  But, Your Honor, the problem is twofold.

24   One, the protective order has an exception for trial and

25   testimony.  Number two, that's not evidence in the case.

1927

1       If they wanted to have Dr. Plunkett explain why she

2   hasn't talked to anybody else, then that should have been

3   evidence.  He's commenting on things to the jury that never

4   came in in a misleading way.  That is inappropriate in

5   closing.

6       MS. JONES:  And, Your Honor, if I could just add one

7   other thing.

8       I specifically referenced the fact that Dr. Plunkett

9   had testified that she never conveyed to the FDA that she

10  believed that the 75-milligram dose presents some kind of

11  public health safety issue.  Her opinions on that issue are

12  based, I assume, on the FDA's publicly available memoranda and

13  documentation relating to its decision.  My comments in that

14  regard were related to that specifically -- that specific Q

15  and A, and she is not precluded by any confidentiality order

16  from saying to the FDA, based on what is publicly known about

17  what it did with the 75, that she thinks that was a bad idea

18  or a mistake by the FDA.

19      So the closing argument that I made was specifically

20  focused on her testimony on the 75.  All of that information

21  is based on FDA memos that she reviewed, which she can comment

22  on freely.  We're not able to bind the subject matter of the

23  FDA's deliberations.

24      MR. CHILDERS:  Judge, may I show you the slide?

25  Because I think it's very important.

1928

1    THE COURT:  Yes.

2    MR. CHILDERS:  The slide says, never shared her

3    opinions outside of the courtroom.  She signed a

4    confidentiality order saying I won't do that.  I won't share

5    these opinions -- I won't share this information, excuse me,

6    that I have gathered from any of these documents outside of

7    this litigation.

8         If this had said what Ms. Jones just said it says,

9    maybe we have a different issue.  But this clearly says they

10   are complaining that she hasn't gone out and talked about the

11   stuff that she had to sign a confidentiality order about not

12   talking about outside of the litigation.

13   MS. JONES:  This slide was right after a slide about

14   the 75-milligram.  This was all in the context of talking

15   about the 75-milligram and publicly available articles that

16   were on the study of the 75-milligram outside of the approval

17   process.  That is what I was talking about.  That's the

18   specific question and answer that I referenced.

19        What he said went well beyond what she would have been

20   limited to doing and did leave a misimpression about what she

21   was permitted to do or not to do.  If she wanted to, there is

22   no question that she could communicate with FDA about her view

23   that the 75-milligram dose presented some kind of public

24   health hazard.  There's no question about that.  And her basis

25   for that view is the FDA materials, which are not subject to a

1929

1    confidentiality order.  There's no question about that.

2         THE COURT:  Well, tell me succinctly what it is you

3    would ask the Court to instruct to the jury.

4         MR. LEWIS:  We probably need to craft some kind of an

5    instruction to the jury to explain what that reference was and

6    to undo the misleading and mischaracterization of a protective

7    order, among other things.

8         MS. JONES:  I would think the priority issue would be,

9    to the extent that there's a confidentiality order, that is an

10   order that the Court has entered.  That's not something, as he

11   suggested, that the company has somehow forced on them.

12   That's an order of the Court that he's criticizing when he

13   talks about that little stamp at the bottom.

14        And I do think there should be some clarification with

15   regard to what he said in connection with what I specifically

16   said in my closing argument, which was related to the

17   75-milligram dose.

18        MR. CHILDERS:  Your Honor, what I said was that they

19   insisted on the confidentiality order.  That is absolutely

20   true.  They wouldn't give us documents until there was one

21   entered by the Court.  That's not a mischaracterization.  To

22   say that a confidentiality order means you can't share

23   information outside of court, that's not a

24   mischaracterization, that's not a misrepresentation.  That is

25   what it is.

1930

1     So I understand you want to maybe say something to the

2  jury, but I don't believe anything was misrepresented as to

3  the nature of the confidentiality order or the fact that she

4  had to sign one in order to look at the documents that they

5  produced.  That is just the truth, and it was something that

6  was insisted upon by the defendant, and they didn't produce

7  any documents until it was entered.

8     THE COURT:  I will consider some succinct brief

9  statement.  You can prepare it, give it to me, provide it to

10  the plaintiffs before the jury comes back from lunch.

11     MR. LEWIS:  Okay.  Thank you, Your Honor.

12     THE COURT:  Anything else?

13     MR. CHILDERS:  No, Your Honor.  Thank you.

14     THE COURT:  All right.  We stand in recess until 2:15.

15     THE COURT SECURITY OFFICER:  All rise.  This honorable

16  court is in recess.

17     (Lunch recess taken at 1:45 p.m.)

18

19

20

21

22

23

24

25

1          (2:17 p.m. in open court, jury not present.)

2          THE COURT:  Briefly, do you want to just state it?

3     He's getting my copy.

4          MR. LEWIS:  We propose, Your Honor, the following

5     instruction be read to the jury:

6          You heard a reference by plaintiffs' counsel in his

7     rebuttal argument to the confidentiality order.  The

8     confidentiality order was entered by the Court, not by

9     either of the parties.

10         Plaintiffs' expert, Dr. Plunkett, relied on both

11    documents that were subject to the confidentiality order and

12    documents that were publicly available.  Nothing in the

13    confidentiality order precluded Dr. Plunkett from sharing

14    the opinions she has expressed for the FDA.

15         THE COURT:  All right.

16         MR. CHILDERS:  A few issues, Judge.

17         One, although the protective order was entered by the

18    Court, the parties signed it and a motion was filed to

19    approve it.  It wasn't the Court's own initiative.

20         Second, the last sentence of that, that nothing

21    precluded her from sharing that information with the Court,

22    is completely erroneous.  She's -- we're saying she relied

23    on internal documents and external documents to form an

24    opinion.  She's not allowed to then go tell the FDA

25    something that she gleaned from an internal document that's

1    confidential.  That's just not -- that's not true.

2              THE COURT:  All right.  I think there's a much

3    simpler way for the Court to handle it that would be both

4    proper and sufficient.

5         I intend to instruct the jury simply that in his

6    closing reply arguments Mr. Childers made reference to

7    Dr. Plunkett's testimony and he referred to the fact that

8    there are documents that are marked confidential.

9         The Court observes that Dr. Plunkett did not testify

10   that any confidentiality or other protective order

11   restricted her review.  So the counsel's statement should be

12   disregarded.

13        I do not intend to get into a deeper discussion of the

14   effect of the protective order.  That wasn't a matter of

15   evidence.  And the Court believes that to introduce the

16   subject the way the defendant has suggested would result in

17   considerable confusion and possibly misstate the effect of

18   the order.  So both sides can object to what my plan is.

19             MR. CHILDERS:  That's fine, Your Honor.  We just

20   want to get them going.

21             MR. LEWIS:  I think, I think what the Court

22   proposed is reasonable.  I would -- my only suggestion is

23   when talking about the restriction, I think it needs to be

24   focused on what he argued which is restricted her use, no

25   communication.

1       THE COURT:  Well, I --

2       MR. LEWIS:  That's the way it was used.  And, Your

3  Honor, I mean, I'm not trying to quibble here but this --

4  what, what was done in rebuttal was a serious violation.  It

5  was a comment on something that's not in evidence on an

6  issue about keeping the public from getting certain

7  information.

8       And this is a -- the claims in this case are

9  significant and they include punitive damages.  And, so,

10  this needs to be corrected because the jury could certainly

11  draw the conclusion based on no evidence whatsoever that

12  Boehringer is attempting to restrict an FDA consultant from

13  telling the world about a problem she knows about.  That's a

14  false and misleading statement.

15       THE COURT:  All right.  Thank you.  Let's bring

16  the jury in.

17       (Jury returned into the courtroom at 2:23 p.m.)

18       THE COURT:  This won't take long.  Come on in.

19       All right.  It came to my attention that in his

20  rebuttal reply argument for plaintiffs, Mr. Childers made a

21  reference to Dr. Plunkett, the plaintiffs' expert, and made

22  mention of the fact that some of the documents that are in

23  evidence and that she may have reviewed had a line at the

24  bottom that referred to confidentiality and how that might

25  have restricted her use of that document or similar

1    documents outside of this court.

2         Dr. Plunkett did not offer any testimony about any

3    restriction on her use of information based upon

4    confidentiality notes or protective orders or such things.

5         Since there's no evidence from Dr. Plunkett about that,

6    I instruct you to disregard Mr. Childers' brief statements

7    in reference to that that he made at the end of his rebuttal

8    argument.

9         With that, go deliberate.

10        Terry is going to come in and explain one sort of

11   technical matter about the exhibits just so you'll

12   understand how they're boxed.

13        I have yet another matter to take up with the parties.

14        (Jury retired to the jury room at 2:25 p.m.)

15             THE COURT:  Be seated.

16        Since we have no idea how long the jury will deliberate

17   or what the verdict will be, obviously, I wanted to, while

18   we're still fresh, relatively speaking, address the

19   possibility that the jury might come back with a plaintiffs'

20   verdict and an answer to the punitive damage question that

21   finds against the defendant.

22        It seems to me that there's a range of activities that

23   could follow.  And, so, I want to discuss it now because I

24   want to be able for us to quickly pivot to that if we need

25   to to keep this jury moving.

1    So at a minimum it seems to me the appropriate step to

2    take if the verdict comes back that way is to first instruct

3    the jury in accordance with the pattern instruction

4    concerning how they should evaluate, measure, and determine

5    punitive damages.

6    And, secondly, then to have counsel have a brief period

7    to make closing arguments on punitive damages and then

8    submit that case to the -- that issue to the jury for

9    determination.

10   Do the parties agree to that or do you think there's

11   some other procedure or process we should follow?

12   MR. CHILDERS:  I apologize, Your Honor.  I may

13   have missed it.  Did you say there would be a period of

14   putting in evidence about --

15   THE COURT:  Well, I guess -- I didn't say that and

16   that's sort of my question to you.

17   MR. CHILDERS:  So my understanding and how I've

18   done in the past is we actually have to present some

19   evidence of the defendant's net worth in order for the jury

20   to properly evaluate punitives.

21   And I know Your Honor had also reserved ruling on

22   whether or not we could show the launch video if we got to

23   that point.  And plaintiffs would again ask that we be

24   allowed to show the jury that video as part of punitive

25   damages.

1    THE COURT:  And do you have specific evidence that
2    you would offer as to the worth of the company?
3    MR. CHILDERS:  My hope would be that we could just
4    stipulate to that.  They're not a public company, so they
5    don't have a 10-K or a 10-Q or any of that.  In the past
6    that's how I've done it.  But it's a closely held company.
7    We have some testimony from Dr. Barner which we could
8    play along with during the launch video where he talks about
9    profit and the gross revenues of the company.
10    THE COURT:  Is that part of the launch video?
11    MR. CHILDERS:  It's not -- the deposition -- he
12    talks about the launch video and then he also talks about
13    the company's worth.
14    THE COURT:  Okay.
15    MR. CHILDERS:  So we could do that.
16    THE COURT:  All right.  About how long is the, is
17    the deposition video talking about the company's worth?
18    MR. CHILDERS:  Probably less than five minutes,
19    Judge.  It's in German.  It's translated.  I don't know if
20    it's synced is what Gina calls it.  And then the launch
21    video is about five minutes.
22    THE COURT:  Okay.  What's the defendant say?
23    MR. LEWIS:  We have an objection to the launch
24    video.  I think Your Honor is aware of that.
25    I'd like to consider the possibility of some sort of

1   stipulation.  I mean, I've never had a bifurcated proceeding

2   where it went that way, but I've heard that's how it

3   typically is done.  So maybe we can discuss that during this

4   time frame.

5           THE COURT:  Well, certainly.  I then will direct

6   that the parties confer about the possibility of a

7   stipulation as to relevant facts pertaining to the financial

8   status of the company.

9       If, if that's not reached, I would at least, I'm

10  certain, allow them to play the deposition.  And we'll have

11  a chance again to talk about the launch video before I

12  decide that.

13      But under those circumstances, what evidence, if any,

14  would you expect to adduce?

15          MR. LEWIS:  I think we would probably just rely on

16  argument about the evidence that's already been put in.

17          THE COURT:  All right.  So why don't you folks

18  talk about a stipulation and see if that can be reached.

19  I'll be thinking about this launch video.  But I'd like to

20  be ready to proceed pretty quickly.  You all know as well as

21  I do how hard this jury has worked.

22      And if they want to work through the afternoon and

23  evening to reach a verdict, which would not surprise me, you

24  never know, I'd like to be prepared to tell them as soon as

25  the initial verdict comes back of the necessity of

1    continuing.  And then it will be up to them to decide,

2    depending on the hour, whether we'll do this today or come

3    back tomorrow to finish that portion.  All right?

4                MR. CHILDERS:  Thank you, Judge.

5                THE COURT:  All right.  We'll stand in recess.

6         (Recess taken at 2:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1939

1      (Back on the record at 3:41 p.m.)

2      (Jury not present.)

3          THE COURT:  All right.  My law clerk just showed you

4      the note we got from the jury, but I'll put it on the record.

5          It reads:  On page 8 of the jury instructions, it says

6      that the "Plaintiffs must prove all of the following," then

7      goes on to list four items.  Must we agree on all four or

8      three of the four, et cetera?

9          So I've looked at the instructions.  I think with

10     respect to this claim and the other claims, there are a number

11     of elements with respect to each, and the instruction properly

12     tells the jury they have to find all four or whatever that

13     number is.  So I intend to bring them out and essentially

14     state with respect to their particular question, as well as

15     the other claims with similar numbered elements, they must

16     agree upon each and all of the elements.

17         Okay?  Anybody object or --

18         MR. CHILDERS:  Just not looking at them, I wasn't sure

19     if there were any that said "or," but I know this one does

20     not, Your Honor, that they asked about.

21         THE COURT:  I think they're all stated properly as

22     essential elements with "and."

23         MR. CHILDERS:  Yes, sir.  I meant if there's any other

24     instruction with numbers, if there might be one that's not an

25     "and."  And I don't know the answer to that.

1940

1      THE COURT:  And I think with respect to the claims,

2  they're all "and," and they are all listed that way.

3      MR. CHILDERS:  Understood, Your Honor.

4      MR. LEWIS:  Your Honor, may I?

5      So if the jury found unanimously that one of the

6  elements was not met, I believe it would be appropriate to

7  find that the claim was not met.

8      THE COURT:  Well, that is true, and they don't even

9  all have to agree to that.  If any juror does not believe that

10  any one of the four elements has been proven by a greater

11  weight of the evidence, they do not have a unanimous verdict

12  on that element.

13      MR. LEWIS:  Right.

14      I guess my -- the question from the jury is a little

15  bit confusing.  What I'm --

16      THE COURT:  I'll read it again:  Must we agree to all

17  four or three of the four, et cetera?

18      What I take that to mean is that they're asking

19  whether the jury must unanimously agree that plaintiffs have

20  proven each of the four elements.

21      MR. LEWIS:  Correct.

22      THE COURT:  And the answer to that is yes.

23      MR. LEWIS:  Right.  And I guess my point is, they

24  could also be asking what if we agree that the plaintiffs

25  haven't proven one of the four elements, but we can't agree on

1941

1     the others.

2          MR. CHILDERS:  Your Honor, they didn't ask that.  I

3     think the question asked has to be answered as they asked it.

4          MR. LEWIS:  Okay.

5          THE COURT:  Yeah, they only asked about what if they

6     agree.

7          All right.  Let's bring the jury out.

8       (Jury present.)

9          THE COURT:  All right.  You may be seated.

10         So let me read the note that you've given me.  It

11    reads:  On page 8 of the jury instructions, it says that the

12    "Plaintiffs must prove all of the following," then goes on to

13    list four items.  Must we agree to all four or three of the

14    four, et cetera?

15         So I refer you to the instructions.  First, you're

16    referring specifically to page 8, and you're referring to the

17    instruction on the claim that is characterized or summarized

18    as strict liability failure to warn.

19         And as the instruction states, to establish that

20    claim, the plaintiff must prove all of the following.  That

21    means the plaintiff must prove by a greater weight of the

22    evidence each and all of the four items listed there in order

23    for you to find for the plaintiff on that particular claim.

24         You'll see that, as you go through the balance of the

25    claims, the other claims similarly have a numbered listing.

1942

1   Those are considered elements of the claim which the plaintiff

2   must prove to your satisfaction with respect to each of those

3   other claims as well.

4         With that, you may retire to the jury room and resume

5   your deliberations.

6         We will file and make as part of the record the

7   question.

8      (Jury not present.)

9         THE COURT:  Anything else?

10        MR. CHILDERS:  No, Judge.

11        MR. MOSKOW:  Thank you, Your Honor.

12        MR. CHILDERS:  Thank you, Your Honor.

13     (Off the record at 3:47 p.m.)

14     (Back on the record at 5:20 p.m.)

15     (Jury not present.)

16        THE COURT:  All right.  We're advised that the jury

17   has reached a verdict.

18        Let's bring the jury out.

19        THE COURT SECURITY OFFICER:  Yes, Your Honor.

20        THE COURT:  As the jury is coming out, obviously I

21   don't know what their verdict is, but I commend counsel for

22   both sides.  This was an extremely challenging, difficult

23   case.  I can't imagine how both sides have been able to master

24   so much about this case from all these different angles, and I

25   respect the level of performance that I've seen in this trial.

1943

1          MR. CHILDERS:  Thank you, Judge.

2          MR. MOSKOW:  Thank you, Your Honor.

3          MR. LEWIS:  Thank you, Your Honor.

4     (Jury present.)

5          THE COURT:  All right.  I am advised the jury has

6    reached a verdict.  Who has the verdict form?

7          Would you please pass it to my court security officer,

8    and he will bring it up to me so I can inspect it.

9          Before I see your verdict, I want to thank all of you

10   publicly.  I know that the parties join me as well.  We know

11   this has been a difficult case, a very lengthy case, a huge

12   amount of material, many witnesses, many complicated matters.

13   We appreciate and respect your service.

14         I don't know if any of you had actually served on a

15   jury before.  I don't recall that any of you have.  As is

16   often the case, though, I think you'll find that now having

17   done it you will realize how important it is for our system of

18   civil justice to have citizens who are imposed upon, but as a

19   result of their civic duty serve as jurors in cases like this

20   to help us resolve these matters.  I think it makes it the

21   best system.  We know it's been a sacrifice for you folks.

22   Regardless of your decision, we all thank you for your work.

23         All right.  I'm now going to pass the verdict form up

24   to my clerk.  I'm going to ask that she read it aloud.  Make

25   sure each of you listen to it, and that it is your verdict,

1944

1       each of you, in all respects.

2              THE CLERK:  We, the jury in the above-captioned

3       matter, unanimously answer the following questions:

4              I. Liability.

5              A. Plaintiffs' claims:  As to each of plaintiffs'

6       claims, mark "YES" if plaintiffs have proven the elements of

7       the claim as the Court instructed or "NO" if you find the

8       elements of the claim have not been proven.

9              1. Strict liability failure to warn:  No.

10             2. Negligent failure to warn:  No.

11             3. Breach of express warranty:  No.

12             4. Breach of implied warranty:  No.

13             5. Fraud:  Yes.

14             B. Legal Causation:  Did plaintiffs prove that, absent

15      BI's wrongful conduct in any of 1-5 above, Betty Knight would

16      not have taken Pradaxa?  Yes.

17             7. Did plaintiffs prove that Pradaxa proximately

18      caused Betty Knight's injuries?  Yes.

19             8. Did plaintiffs prove that Pradaxa proximately

20      caused Betty Knight's death?  No.

21             II. Damages.

22             What amount of money would fairly and reasonably

23      compensate plaintiffs for Betty Knight's injuries?

24             Economic damages:  $50,000.

25             Non-economic damages:  $200,000.

1945

1       What amount of money would fairly and reasonably

2   compensate plaintiffs for Betty Knight's death?

3       Wrongful death:  N/A.

4       Did plaintiffs prove by clear and convincing evidence

5   that BI acted with actual malice toward Betty Knight, or that

6   BI acted with a conscious, reckless, and outrageous

7   indifference to the health, safety and welfare of others?

8   Yes.

9       THE COURT:  All right, Ladies and Gentlemen.

10       Do the parties want the jury polled?

11       MR. CHILDERS:  No, Judge.

12       MS. JONES:  Yes, Your Honor.  Thank you.

13       THE COURT:  All right.

14       THE CLERK:  Ladies and Gentlemen, if this is your

15   verdict, please answer Yes.  If it is not, please answer No.

16       Anita Kay.

17       JUROR NO. 2:  Yes.

18       THE CLERK:  Michael Cochran.

19       JUROR NO. 6:  Yes.

20       THE CLERK:  Paul Koza.

21       JUROR NO. 22:  Yes.

22       THE CLERK:  Tommy White.

23       JUROR NO. 23:  Yes.

24       THE CLERK:  Colby Sayre.

25       JUROR NO. 26:  Yes.

1946

```
 1          THE CLERK:  Eric Crum.

 2          JUROR NO. 8:  Yes.

 3          THE CLERK:  Sean Loring.

 4          JUROR NO. 11:  Yes.

 5          THE CLERK:  Michelle James.

 6          JUROR NO. 17:  Yes.

 7          THE CLERK:  Carlos Mann.

 8          JUROR NO. 15:  Yes.

 9          THE COURT:  All right.  Ladies and Gentlemen, I will

10  accept your verdict.  I will order that it be filed and made a

11  part of the record.

12          I'm now going to ask you to retire back to the jury

13  room.  There will be one other matter that the Court will need

14  to address with you.  With that, you'll retire to the jury

15  room.  We'll be back with you shortly.

16      (Jury not present.)

17          THE COURT:  All right.  As you just heard, the jury

18  has returned its verdict.  It has found the defendant liable

19  under the fraud count and awarded compensatory damages and has

20  also found that the defendant is subject to punitive damages.

21  We addressed this briefly earlier.

22          Have the parties prepared a stipulation or entered

23  into any stipulation?

24          MR. MOSKOW:  No, Your Honor.  Plaintiff provided a

25  brief play of Dr. Barner about an hour and a half ago or so
```

1947

1    and invited a stipulation, but we haven't received one.

2         MR. LEWIS:  I think we'll just stick with the play

3    that they're going to -- the video play.  And then on our

4    side, we have a few documents, as we have thought about the

5    issue, that we would like to move into admission and discuss

6    in a mini argument if we can.

7         THE COURT:  Have you identified the documents or --

8         MR. LEWIS:  We have not yet.  We were just going over

9    those during the break, so I need to confer.  The documents

10   are on our exhibit list, though.

11        MR. CHILDERS:  May we at least know what they are?

12        My understanding with the Phase II part of the trial

13   is just economic issues, that the behavior issues have already

14   been established.

15        MR. LEWIS:  Well, I'm not -- so when I read the

16   instruction, Your Honor, there were I think five elements that

17   the jury may take into account, and it's not just financial.

18   There's a reprehensibility aspect to it.  And so the evidence

19   that we are seeking to admit would be post conduct, conduct

20   after the events that took place to show that we've made

21   corrections and addressed some of the things that were at

22   issue in the case.

23        MR. MOSKOW:  Your Honor, without knowing what the

24   documents are, it's hard to argue in a vacuum.  But as the

25   Court is well aware, we weren't able to put in evidence

1948

 1  regarding the development of the reversal agent, which we

 2  believe, you know, would have demonstrated actual knowledge at

 3  the time that this drug had dangerous propensities and might

 4  have allowed the jury to find on other counts.  And so now to

 5  allow post conduct evidence to somehow show that they have

 6  mitigated their conduct seems to me unfair given the way the

 7  case was presented to the jury.

 8          MR. LEWIS:  Well, I think it's -- that would be --

 9  that was one of the topics that we would seek to address is

10  the fact that plaintiffs argued and there was no evidence in

11  this case that we had a reversal agent for this particular

12  medicine, and we have since gotten approval and have a

13  reversal agent, as an example, for this particular medicine.

14          I think when the jury is considering punishment,

15  punitive damages, it ought to consider what the company has

16  done to address the alleged deficiencies in the underlying

17  case.

18          THE COURT:  Well -- go ahead.  You can respond to

19  that.

20          MR. CHILDERS:  Your Honor, if you'll recall, the issue

21  of the reversal agent was kept out of the case based on

22  summary judgment filed by the defendant.  If now they want to

23  put in evidence that they now have a reversal agent, without

24  us being able to demonstrate what we wanted to show the jury,

25  which was they knew how to do it well before the drug came on

1949

1    the market, I don't believe that is fair, and I don't think

2    that is part of how the punitive side of this works.

3           Maybe I'm wrong.  It's not that often I have gotten to

4    a punitive phase.  But when I have, I haven't seen evidence

5    like that come in, Your Honor.  And I'm happy to do some

6    research, whatever it may be.

7           But my understanding, especially after what you told

8    us earlier, was get your stuff together.  And what we heard

9    from defendant was we're just going to argue, we're not going

10   to put on any evidence.

11   MR. LEWIS:  Well, we were making a decision in real

12   time and had just been proffered the question.  We've thought

13   about it during the break.

14          I was trying to pull the instruction, Your Honor, as

15   to things that the jury is to consider.

16   MR. CHILDERS:  Your Honor, in that case, if we play

17   the launch video, they can put in whatever they want.

18   MR. LEWIS:  Well, the launch video we've already

19   discussed, and the Court has ruled that that is not

20   admissible.  And we would argue that that is not admissible in

21   this phase of the case either because it's not directed at

22   relevant conduct that's at issue.

23          For instance, the concept of a reversal agent and the

24   fact that we've later developed a reversal agent is to show

25   the jury not that we have -- we shouldn't have been found

1950

1    liable, but that we're taking corrective measures.  That's

2    what punitive damages are for.  Punitive damages are for don't

3    do this again or teach them a lesson or have you learned your

4    lesson.  And we ought to be able to tell the jury about

5    conduct subsequent that suggests that we've taken an action

6    and invested in that.

7              THE COURT:  All right.  I'm going to take a brief

8    recess.  I will look into this a little more before I decide

9    the scope of evidence that could be presented in addition to

10   argument.

11             We stand in a brief recess.

12             MR. LEWIS:  Thank you.

13             MR. CHILDERS:  Thank you, Your Honor.

14             THE COURT SECURITY OFFICER:  All rise.  This honorable

15   court will be in recess.

16        (Recess taken from 5:30 to 5:38 p.m.)

17             THE COURT:  All right.  So as I'm working through

18   this, I wanted to bring your attention to West Virginia

19   statutory law, which I think applies.

20             MR. CHILDERS:  Yes, sir.

21             THE COURT:  55-7-29, have you all looked at this

22   section?

23             MR. CHILDERS:  Yes, sir.

24             THE COURT:  Have you?

25             MR. LEWIS:  Yes.

1951

1    THE COURT:  So for one thing, it limits the amount of

2    punitive damages.  I don't know that it provides any other

3    direction or guidance to the Court when we're in this

4    situation, although it does either require or suggest

5    bifurcation, which we've already undertaken.

6        So do counsel have any further suggestion based on the

7    statute?

8        MR. CHILDERS:  The only thing I would point out, Your

9    Honor, my understanding and how I've seen it done as well in

10   states that have caps on punitives, the jury may award

11   whatever number they want.  Obviously the Court would then

12   reduce it to the amount of the cap.  So we would just request

13   that we don't be restricted to only asking for the cap amount.

14       MR. LEWIS:  I guess our question on our end is kind of

15   are we just telling the jury what the financial information

16   is, and then they go back and deliberate?  Or are we making

17   arguments about the conduct?

18       THE COURT:  Well --

19       MR. LEWIS:  Because that's what I'm trying -- that's

20   what we're not sure of on our end.

21       THE COURT:  That's to me really the important

22   question, and the statute doesn't provide us any guidance

23   there as I read it.

24       The Court notes, as the parties have, that the pattern

25   instruction addresses the elements of a punitive damage award,

1  requiring that it bear a reasonable relationship to the harm

2  likely to occur from the conduct and that has actually

3  occurred; and then to take into account how long the defendant

4  continued its actions; whether it was aware that its actions

5  were causing or likely to cause harm; whether it attempted to

6  conceal or cover up its actions or harm; and how often it

7  engaged in similar conduct.

8          And then last, the extent to which the company

9  profited from wrongful conduct so the jury could consider an

10 award that would discourage future bad acts.

11         Based upon that, I think I have to make an opportunity

12 available to both parties, but in this instance it is really

13 to the defendant who has raised this, an opportunity to

14 present evidence about its post wrongful conduct actions here.

15         MR. LEWIS:  And I guess our question is, if the Court

16 was just inclined to provide the financial information to the

17 jury without getting into the argument about because of this

18 conduct you should really, you know, do this, that and the

19 other thing, if it was just financial information that the

20 jury got and then went back and deliberated that, then we

21 wouldn't put in all of this evidence.

22         But if there is going to be an argument continuing

23 about how they have to punish us based on kind of we haven't

24 learned our lesson yet, then I'm torn because then I feel like

25 they need to know more.  But I guess we just need to

1953

1  understand how the proceeding would go before we take a

2  position on what we want to do.

3       THE COURT:  Sure.

4       MR. CHILDERS:  And, Your Honor, I would envision an

5  argument being the statute says you have to award an amount to

6  punish and deter.  They've already decided they need to be

7  punished.  And then it goes into the amount of money that

8  would be required to do that, not they've done this or that.

9  We've already shown them what they did, and so I don't think

10  we need to go beyond this is how much money they have for us

11  to make those arguments.

12       THE COURT:  Well, so it sounds like the plaintiffs are

13  satisfied if they get to produce evidence, either through

14  stipulation or through the deposition testimony, by which

15  you've developed evidence about the company's financial worth

16  or something to that effect, you're willing to leave it at

17  that is what I'm hearing.

18       MR. CHILDERS:  That's correct, Your Honor.

19       The video we have goes through with the former CEO the

20  amount of money they made in year unfortunately 2016, because

21  that was the most recent year, how much that was, how much of

22  that was profit, and how many people are shareholders, that

23  kind of thing, so they can understand who they are punishing

24  and how they would have to do it.

25       THE COURT:  All right.  And if plaintiffs restrict

1954

1      their evidence to that, I take it then you would agree that,

2      for purposes of argument, you couldn't refer to anything other

3      than the evidence in the record already developed and now the

4      additional financial information?

5              MR. CHILDERS:  Correct.

6              MR. LEWIS:  But I would say that argument has already

7      been made then, Your Honor.  I mean, the argument about

8      whatever is already in the record, well, that's what the jury

9      has already found on.  So that is why I'm concerned, is that

10     they're going to argue the evidence that was already in the

11     first phase of the trial and then reargue that evidence for

12     different purposes here to talk about they haven't learned

13     their lesson.  And the jury is not getting the full story on

14     that piece of it, even though it wasn't relevant for

15     liability.  That's what I'm concerned about.

16             My suggestion would be put in the evidence of

17     financial worth, and then you just let the jury go back and

18     deliberate based on the arguments and conduct that they've

19     already heard without further argument by the lawyers, because

20     he's already made those arguments in closing argument and

21     throughout the trial.

22             THE COURT:  Well, I don't know that I can prevent or

23     prohibit the parties from making an additional closing

24     statement about the punitive damages.

25             Yes, they've already heard the evidence and, based

1955

1    upon that evidence, they have found the defendant liable for

2    punitive damages.  But by the terms of the instruction, the

3    measurement of it has to be based upon the evidence they've

4    already heard and apparently the financial standing evidence.

5            I don't think that I can stop the parties from arguing

6    about that.  And I don't think that that necessitates

7    reopening the evidence for some more elaborate presentation of

8    additional or new evidence by either side when it comes to the

9    defendant's conduct and the basis for punitive damages.

10           And I will add this.  I'm inclined to say that any

11   argument here is going to be very short.  I'm talking 10

12   minutes or 15 minutes, something like that, because I think

13   this jury has already been here a long time and worked through

14   and returned this verdict.  I have no reason to question their

15   ability to make this last determination fairly and promptly

16   and without a lot of additional argument.

17           MR. LEWIS:  May I just have, like, two minutes to

18   confer --

19           THE COURT:  Sure.

20           MR. LEWIS:  -- based on what we've discussed?

21           THE COURT:  Absolutely.

22      (Defense counsel conferring.)

23           THE COURT:  Go ahead.

24           MR. LEWIS:  So, Your Honor, we're prepared to go

25   forward with just the video play and then brief arguments by

1956

1    counsel.

2            Not the launch video.

3            MR. CHILDERS:  I just told her to take out the launch

4    video.

5            THE COURT:  You're not offering the launch video?

6            MR. CHILDERS:  No.  It sounds like Your Honor just

7    wants financial information.

8            THE COURT:  I think that's correct.  And --

9            MR. CHILDERS:  That's fine.

10           THE COURT:  So that's fine?

11           MR. CHILDERS:  Yes.

12           THE COURT:  All right.  So are you ready to play this

13   thing or --

14           MR. CHILDERS:  Have you guys approved the play --

15           MR. LEWIS:  With the launch video piece taken out?

16           MR. CHILDERS:  Correct.  It sounds like we're good to

17   go, Your Honor.

18           How long is it?  It's pretty short, Your Honor.

19           THE COURT:  All right.  I'm going to give I hope a

20   very neutral, brief explanation to the jury that, as a result

21   of their verdict, they found that there may be liability for

22   so-called punitive damages, and that they need to determine

23   what amount, if any, to award.  And that you're going to have

24   some brief evidence, some brief argument, I'm going to give

25   them an instruction pertaining to that, and then they can go

1957

1    back in and deliberate.

2         And in terms of the instruction, I don't know if you

3    all have readily available the version of the punitive damage

4    instruction that you submitted with the agreement as to what

5    went in and the strikethrough about the damage part that we

6    agreed to take out.

7         MR. CHILDERS:  I'm certain we have it.  I don't have

8    it with me.  Is it your intent that you would read it after

9    the evidence, and then we would argue like you did with the

10   other charge?

11        THE COURT:  Yes.

12        MR. CHILDERS:  I don't recall us having any issues.

13        Pattern charge, Your Honor?

14        THE COURT:  Yes.

15        MR. CHILDERS:  Okay.

16        THE COURT:  I literally have my copy of the West

17   Virginia pattern instruction, and for our purposes, I would

18   start it at the section where it says there is no fixed

19   formula to determine the amount, and then it lists 1, 2, 3, 4

20   and 5.

21        MR. MOSKOW:  Thank you.  I'm sorry.

22      (Counsel conferring.)

23        THE COURT:  So what I think I'm proposing is I would

24   just read the strikethrough that begins with there is no fixed

25   formula that you all had in your joint proposal.  We agreed

1958

1    that this should not be read unless and until a punitive award

2    was being actually considered by the jury.  And that language

3    looks to me like it tracks the pattern instruction and just

4    puts in BI's name.

5            MR. MOSKOW:  That's fine with the plaintiffs, Your

6    Honor.  Thank you.

7            MR. LEWIS:  I mean, if it's the pattern, we have no

8    objection.

9            THE COURT:  All right.  Let's bring the jury in.

10       (Jury present.)

11           THE COURT:  All right.  Ladies and Gentlemen, thank

12   you for your patience.  So, first, I want to explain to you

13   what we are doing now.

14           In your verdict form, you found that the defendant BI

15   is liable for fraud.  You then determined that, as a result of

16   that fraud, plaintiffs had proven that Betty Knight was

17   proximately injured, and you awarded damages for economic

18   damages of $50,000, non-economic damages of $200,000.  Of

19   course, you did not find in favor of the plaintiffs that the

20   fraud caused the death of Betty Knight, and you did not make

21   any award under wrongful death.

22           And then the very last question asked of you was

23   whether the plaintiffs proved by clear and convincing evidence

24   that BI acted with actual malice or with a conscious, reckless

25   or outrageous indifference to the health, safety or welfare of

1  others.  And, of course, you checked Yes to that.

2           As a result, plaintiffs are entitled to additional

3  punitive damages, if any, to be determined by you.  As a

4  result, we're going to conduct what I believe to be relatively

5  brief proceedings next where some limited evidence is going to

6  be entered that you'll hear.  Then the lawyers will then make

7  brief closing statements only about the amount, if any, of

8  punitive damages that you would award based on the evidence

9  that you've heard, the determination that you've made and this

10  additional evidence, and then ask for you to return a

11  supplemental verdict as to that question only.

12           Are the parties satisfied with my explanation of this

13  step?

14           MR. CHILDERS:  Yes, Your Honor.

15           MR. LEWIS:  Yes, Your Honor.

16           THE COURT:  All right.  Plaintiffs have indicated that

17  you have a short deposition to be played?

18           MR. CHILDERS:  Yes.

19           THE COURT:  You want to introduce it?

20           MR. CHILDERS:  This is a very brief deposition of

21  Andreas Barner, who was the CEO of Boehringer Ingelheim during

22  the time Betty Knight ingested Pradaxa.

23               ANDREAS BARNER, PLAINTIFFS' WITNESS,

24          October 2017 videotaped deposition played.)

25           MR. CHILDERS:  That's the end of the play, Your Honor.

1960

1        THE COURT:  All right.  That concludes the evidence

2   from the plaintiffs.

3        Is defendant offering anything else at this point?

4        MR. LEWIS:  No, Your Honor.

5        THE COURT:  All right.  I'm now going to instruct you

6   as to the law that you're to apply, and then we're going to

7   let the lawyers have a few minutes of argument about this.

8        Again, we're only focusing now on whether you as a

9   jury agree to award an amount of punitive damages.  It is

10  entirely up to you folks to make that determination.  Your

11  verdict must be unanimous.

12       There is no fixed formula to determine the amount of

13  punitive damages, but you cannot pull numbers out of the air.

14  If you decide to award punitive damages, you should consider

15  the following factors in determining the amount of punitive

16  damages:

17       First, punitive damages should bear a reasonable

18  relationship to the harm that is likely to occur from the

19  defendant's conduct, as well as the harm that actually

20  occurred.  If the defendant's actions caused or likely caused

21  in a similar situation only slight harm, the punitive damages

22  should be relatively small.  If the harm or potential harm was

23  severe, the punitive damages should be greater.

24       Second, you may consider whether the defendant's

25  conduct was reprehensible and, in doing so, you should take

1    into account how long the defendant continued in its actions;

2    whether the defendant was aware that its actions were causing

3    or likely to cause harm; whether the defendant attempted to

4    conceal or cover up actions or harm caused by such actions;

5    and, D, how often the defendant engaged in similar conduct in

6    the past.

7            Third, you may consider whether the defendant profited

8    from its wrongful conduct.  And if you find that the defendant

9    did profit from its conduct, you may remove the profit, and

10   your award may be in excess of the profit so that the award

11   discourages future bad acts by the defendant.

12           Fourth, as a matter of fundamental fairness, punitive

13   damages must bear a reasonable relationship to the

14   compensatory damages.

15           Last, in determining the amount of punitive damages,

16   the financial position of the defendant is relevant.

17           With that, each side will get about 10 minutes to

18   argue.  The argument is restricted to the evidence just heard

19   about the financial position of the defendant and to the

20   record already before this jury in the case in chief.

21           MR. MOSKOW:  Just a second, Your Honor.

22           THE COURT:  Certainly.

23           MR. CHILDERS:  Let me start by thanking you and

24   continue by saying I'm sorry you're still here.  I'm going to

25   be brief.

1962

1      What you just heard was the CEO of the company from

2   the time Pradaxa was launched up until about 2015.  What he

3   explained to you was that this company, unlike basically any

4   drug company in the world, is owned by one family, the

5   Boehringer family, and it's been in their family since 1885.

6   There are no public shares available.  You can't own a piece

7   of Boehringer Ingelheim.  It's only owned by he said 30 to 40

8   people.

9      And what he also told you was that those 30 to 40

10   people split each year two billion Euros in profit.  I don't

11   know how Euros and dollars convert currently, but I know a

12   Euro is worth more than a dollar.  That's more than two

13   billion dollars a year that these 30 to 40 people take home

14   from Boehringer Ingelheim.

15      The reason I'm telling you that is because the purpose

16   of punitive damages is to punish and deter.  The amount of the

17   award that you make has to be significant enough based on the

18   defendant's financial position, how much money they have, to

19   make them realize we can't do this any more.  We need to do

20   better.  We need to do what is required by law.

21      And so based on that, I did some quick math, and I

22   think my math is right.  If you take two billion dollars a

23   year, and you split that among those 30 to 40 people, every

24   year, every year the profit that they take home is between 50

25   million and 66 million dollars each simply because they were

1963

1    born in the Boehringer family.

2          It's been five years since Betty's bleed.  Each of

3    those people has taken home 250 million to 333 million

4    dollars, each of them.

5          You also heard from Dr. Barner that the profits of the

6    company increased by 200 million dollars a year just when they

7    started selling Pradaxa.  That's how big of an impact this

8    drug made on their company.

9          The judge told you your award has to have a reasonable

10   relationship to the harms that are likely to occur if this

11   conduct continues in the future.  What does that mean?

12   Pradaxa is still on the market.  Hundreds of thousands of

13   people still take it.  People still have severe bleeds and

14   will have severe bleeds.  People will die from those bleeds.

15   That is the kind of injury that your award should serve to

16   deter Boehringer from causing in the future.

17         And then the other thing that the judge told you is

18   your award may bear a reasonable relationship to the harm that

19   has already occurred, and you've already decided that.  You

20   decided the award to make for Betty's injuries.

21         I would encourage you to send a clear and decisive

22   verdict on punitive damages back to this company.  Let them

23   know this can't happen in West Virginia.  Make it so that they

24   feel the pain that Betty Knight felt, that they feel the pain

25   that they are inflicting currently on other people like Betty

1964

1    Knight who are taking Pradaxa and don't have any idea of the

2    damage it is doing to them.

3              Thank you.

4              THE COURT:  All right.  For the defense, Mr. Lewis.

5              MR. LEWIS:  Thank you, Your Honor.

6              May it please the Court, members of the jury, counsel.

7              Ladies and Gentlemen, let me first start by saying how

8    appreciative we are for your time and your service as jurors.

9    You've put in a lot of time and effort, and we sit over at

10   that table, and we peek over at you sometimes.  And I can tell

11   you from my perspective, all of you were paying attention

12   throughout the entire trial, listening to the evidence,

13   listening to the witnesses and taking this very, very

14   seriously.

15             The men and women at Boehringer take this very

16   seriously, too.  And I want you to know that your message

17   today has been heard.  And the things that have been brought

18   out at this trial about 2010, 2011, have been heard.  And I

19   wanted to just remind you of a couple things before you go

20   back and deliberate this next phase.

21             We heard folks when they said you need to update your

22   label to include new information, and you saw that in the

23   trial Boehringer continued to update the physician label over

24   time.  In November of 2011 and even as late as 2013, April of

25   2013, we had new information that was becoming available.  And

1965

1      that's important, that's what we want folks to do, continue to

2      take information and put it out there.

3           We know that Boehringer continued to study, with the

4      rest of the scientists in the world, the issue of whether

5      monitoring of blood plasma levels should take place and

6      published an article that you saw in the trial that talked

7      about whether or not that should be done and have continued to

8      do that through today.

9           And you also saw that the United States Food and Drug

10     Administration was looking at the adverse events that came in

11     when Pradaxa first came onto the market and, through the drug

12     safety communications, consistently reaffirmed that Pradaxa

13     was helpful to many, many people who had a very, very high

14     stroke risk.  I want you to consider that evidence, but I also

15     want you to know that we've heard you.

16          There are hundreds and thousands of folks out there

17     who need medication to prevent them from having a stroke.  And

18     warfarin was a good option for many, many years, and

19     physicians were looking for something that they could also

20     consider.  And we know that the label through updates and

21     through information, those options are still available today.

22     Pradaxa is available as an option with many others to help

23     people get better, to protect people from getting a stroke.

24          And we know from the evidence that Pradaxa is also

25     very good at preventing other types of bleeds.  But there's no

1966

1    question about it, there is a higher risk of gastrointestinal

2    bleed.  We are studying that issue.

3         So I want you to consider both what you've heard at

4    the underlying trial, but also the impact that any award would

5    have on the continued science and development and research for

6    medications like Pradaxa to help people fight and protect from

7    stroke risk.  I want you to consider that.

8         But at the end of the day, the most important thing

9    that I want you to understand is that you've been heard.  Your

10   voice has been heard.  This is a message, and Boehringer is

11   going to continue, as you've seen throughout the trial, to

12   update the label when appropriate, when new information

13   becomes available, and it's going to continue to do that, and

14   your message is going to be heard already, already.

15        Thank you for your time and service as jurors.

16        THE COURT:  All right.  I have prepared an additional

17   supplemental verdict form.  It's very simple.  It asks what

18   amount, if any, do you award as punitive damages.

19        So, with that, you may retire to the jury room to

20   begin your deliberations.  We'll bring this jury verdict form

21   to you in just a few minutes.

22      (Off the record at 6:11 p.m.)

23      (Back on the record at 6:46 p.m.)

24        THE COURT:  All right.  We're advised the jury has a

25   verdict on their last question.

1967

1      Let's bring them out.

2           THE COURT SECURITY OFFICER:  Yes, Your Honor.

3      (Jury present.)

4           THE COURT:  All right.  Mr. Sayre, you're the

5      foreperson.  Has the jury reached a verdict on the last

6      question?

7           JURY NO. 26:  Yeah, we have.

8           THE COURT:  All right.  Would you pass it to my court

9      security officer?  He'll bring it to me.

10          All right.  I'll read your verdict aloud.

11          The form reads:  We, the jury in the above-captioned

12     matter, unanimously answer the following questions:

13          I. Punitive damages.

14          1. What amount, if any, do you award for punitive

15     damages?  One million dollars.

16          Then it is signed by Mr. Sayre and dated today.

17          So the Court will order that this verdict also be

18     recorded and made a part of the record.

19          Do the parties want to poll the jury as to the

20     verdict?

21          MS. JONES:  No, Your Honor.  Thank you.

22          THE COURT:  If not, Ladies and Gentlemen, that

23     concludes your work.

24          On behalf of all of us, we want to thank you for your

25     hard work over these last three weeks.  We know this has been

1968

1    a lot to -- a huge interruption in your lives.  I hope that

2    you walk away from this with a feeling of satisfaction,

3    because you should.  You've contributed a very valuable public

4    service.

5              With that, you're excused.  You're free to go.

6              I would ask everyone else to remain in the courtroom

7    until the jury has departed.

8         (Jury excused at 6:49 p.m.)

9         (Off the record.)

10             THE COURT:  All right.  You may be seated.

11             I'm going to enter judgment on the jury's verdict.  I

12   direct the parties to file any post-trial motions in writing

13   within the next 28 days.

14             I've been advised by my courtroom deputy that one or

15   more of the parties have expressed a desire to talk to jurors.

16   Our general rule is, first, it can only be done upon notice

17   and proper motion to the Court.

18             Secondly, it's always been our practice in this

19   district that we will not allow lawyers to talk to jurors

20   until those jurors have finished their jury service.  These

21   folks are on the October through December panel and so, in

22   theory, they could be called to try additional cases between

23   now and the end of the calendar year.  So it's unlikely that I

24   would be willing to permit counsel to talk to them before

25   then, if at all.  Okay?

1969

1       MS. JONES:  Understood, Your Honor.

2       THE COURT:  All right.  Is there anything else that we

3   need to address here today?

4       MS. JONES:  Your Honor, I think on behalf of all of

5   the parties, I just want to say thank you to yourself and to

6   your staff, who have been tremendous and very kind to us.  So

7   thank you very much.

8       THE COURT:  Well, I said it while ago, and I meant it

9   sincerely.  I haven't seen finer lawyers in my courtroom for

10  anything.  And regardless of the outcome, you should each be

11  proud of the work that you've done in this case.

12      MR. MOSKOW:  Thank you very much, Your Honor.

13      MR. CHILDERS:  Thank you, Your Honor.

14      MR. LEWIS:  Thank you, Your Honor.

15      MS. JONES:  Thank you, Judge.

16      THE COURT:  We stand adjourned.

17      THE COURT SECURITY OFFICER:  All rise.  This honorable

18  court will be adjourned.

19          (Proceedings were adjourned at 6:51 p.m.)

20                  ---o0o---

21

22

23

24

25

1    CERTIFICATION:

2         We, Kathy L. Swinhart, CSR, and Lisa A. Cook,

3    RPR-RMR-CRR-FCRR, certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter as reported on October 17, 2018.

6

7

8    October 19, 2018           _____
     DATE

9

10   /s/ Kathy L. Swinhart  _____
     KATHY L. SWINHART, CSR

11

12   /s/ Lisa A. Cook_____  _____
     LISA A. COOK, RPR-RMR-CRR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25